FILED

2021 Mar-12  PM 05:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| LAKEISHA EZELL, as representative of the ESTATE OF TERRENCE ANDREWS, ) ) ) | Honorable Judge Annemarie Carney Axon |
| Plaintiff, ) ) | |
| v. ) ) | Case No.: 4:20-cv-02058-ACA |
| JEFFERSON DUNN; GRANTT CULLIVER; CHARLES DANIELS; JEFFERY WILLIAMS; EDWARD ELLINGTON; KARLA JONES; GWENDOLYN GIVENS; ANTHONY BROOKS; CARL SANDERS; GARY MALONE; KEVIN WHITE; CARLA GRAHAM; NEKETRIS ESTELLE; LARRY BAKER, TANYA ARY, CYNTHIA CAVER, and ERIC GARRETT, ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. ) ) ) ) ) | JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff LaKeisha Ezell, as representative of the Estate of Terrence Andrews, by her attorneys with the law firms of Loevy & Loevy and the Dagney Johnson Law Group, files this Complaint against Defendants Jefferson Dunn, Grantt Culliver, Charles Daniels, Jeffery Williams, Edward Ellington, Karla Jones, Gwendolyn Givens, Anthony Brooks, Carl Sanders, Gary Malone, Kevin White, Carla Graham, Neketris Estelle, Larry Baker, Tanya Ary, Cynthia Caver, and Eric Garrett, stating as follows:

## INTRODUCTION

1.      Plaintiff LaKeisha Ezell brings this action to redress the horrific death of her son, Terrence Andrews, at St. Clair Correctional Facility ("St. Clair") on or about December 29, 2018. As a result of Defendants' failure to protect Mr. Andrews from harm, he was stabbed repeatedly by his cellmate in the P block at St. Clair, and, ultimately, killed.

2.      Correctional officers failed to intervene as Mr. Andrews's cellmate repeatedly stabbed him.

3.      When correctional officers further failed to facilitate the provision of emergency medical care to Mr. Andrews, a group of prisoners was forced to wheel the gravely-injured Mr. Andrews to the infirmary on a garbage cart.

4.      Defendants had long been on notice of a complete breakdown of security in the P/Q blocks at St. Clair. Indeed, Defendants had turned the P/Q blocks into a "hot bay" by grouping together a large number of prisoners with histories of violence and disciplinary issues; failing to provide any meaningful monitoring or surveillance; and allowing prisoners to carry contraband weapons and perpetrate violence with impunity.

5.      The levels of violence in the P/Q blocks at St. Clair were staggering. For example, in the months leading up to Mr. Andrews's death, three other prisoners—Terry Pettiway, Travis Wilson, and Rogarius Bray—were stabbed to death in separate incidents there. Two of those fatal stabbings occurred within the four months preceding Mr. Andrews's death.  Dozens more prisoners were assaulted and stabbed in the P/Q blocks over that same period. A letter from the Equal Justice Initiative ("EJI") to Defendant Dunn in September 2018 warned about the substantial risk of serious harm confronting prisoners in the "hot bay" P/Q blocks and urged immediate action.

2

6.     Defendants had also long been on notice that prisoners in the P/Q blocks lacked access to timely, emergency medical care following assaults, exacerbating the consequences of the violence. For example, Mr. Pettiway, too, had had to be rushed to the infirmary by prisoners on a garbage cart when officers failed to timely intervene or assist after his stabbing.

7.     Tragically, Defendants responded with deliberate indifference to the violence in the P/Q blocks at St. Clair and the assault of Mr. Andrews, causing his death.

## JURISDICTION AND VENUE

8.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the Defendants' deprivation of Plaintiff's rights secured by the U.S. Constitution.

9.     This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state law claim pursuant to 28 U.S.C. § 1367.

10.     Venue is proper under 28 U.S.C. § 1391(b), as the majority of the Defendants reside in this judicial district and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

## PARTIES

### Plaintiff

11.     LaKeisha Ezell is the mother of Terrence Andrew and the representative of his Estate.

12.     Mr. Andrews was a prisoner at St. Clair who was just twenty-four years old when he was brutally stabbed and killed by his cellmate. Mr. Andrews had been incarcerated at St. Clair for approximately six months prior to his death. Mr. Andrews would have been eligible for parole in 2020.

3

**Defendants**

13.     Plaintiff sues each of the Defendants listed below in his or her individual capacity.

14.     Each of the Defendants listed below acted under color of law and within the scope of his or her employment when engaging in the misconduct described herein.

15.     Each of the Defendants listed below is above the age of majority.

*Defendant Administrative Supervisors*

16.     Defendant Jefferson Dunn is the Commissioner of the Alabama Department of Corrections ("ADOC"). The Commissioner is the highest-ranking official in the ADOC and is responsible for the direction, supervision, and control of the Department of Corrections. Defendant Dunn undertook the role in January 2015.

17.     Defendant Grantt Culliver is a former Associate Commissioners for Operations and Institutional Security for the ADOC. Defendant Culliver first undertook that role in August 2014 and returned to the position in mid-2015 after a demotion in early 2015. He was placed on administrative leave in September 2018 and permitted to retire in December 2018. As Associate Commissioner for Operations and Institutional Security, Defendant Culliver was responsible for ensuring the effective and safe daily operations of prison facilities, including directing and managing institutional security, staffing, the Classification Review Board, the Training Division, and the Transfer Division.

18.     Defendant Charles Daniels is a former Associate Commissioner for Operations and Institutional Security for the ADOC. Defendant Daniels took over the role after Culliver's retirement. As Associate Commissioner for Operations and Institutional Security, Defendant Daniels was responsible for ensuring the effective and safe daily operations of prison facilities,

including directing and managing institutional security, staffing, the Classification Review Board, the Training Division, and the Transfer Division.

19.     Defendant Jeffery Williams is the current Deputy Commissioner of Governmental Relations for the ADOC. During the period between when Culliver went on administrative leave and Daniels took over as Associate Commissioner for Operations and Institutional Security, Williams took over some or all of the responsibilities of Associate Commissioner for Operations and Institutional Security.

20.     Defendant Edward Ellington is the Institutional Coordinator for the Northern Region of the ADOC, a role which he assumed in June 2017. In that role, Defendant Ellington was responsible for planning, monitoring, and reviewing the day-to-day operations of correctional institutions in his assigned area, which included St. Clair. His duties included supervising the wardens of St. Clair, ensuring safe conditions at St. Clair, and leading the external security audit team.

21.     Collectively, Defendants Dunn, Culliver, Daniels, Williams, and Ellington are referred to as the "Defendant Administrative Supervisors."

22.     Each of the Defendant Administrative Supervisors acted in a supervisory capacity over other St. Clair employees, at all times relevant to this Complaint. Further, the constitutional violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct at St. Clair, which occurred with the consent of the Defendant Administrative Supervisors, who personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation of rights by their actions or by their deliberate indifference and failure to act.

*Defendant Facility Supervisors*

23.    Defendant Karla Jones was the Warden at St. Clair leading up to and during the events described in Plaintiff's Complaint. As Warden of St. Clair, Defendant Jones was responsible for the day-to-day operations of the prison, the safety and security of all prisoners at St. Clair, and the supervision of all subordinate employees. Defendant Jones's responsibilities as Warden included ensuring adequate supervision and monitoring of prisoners, adequate classification of prisoners, appropriate housing assignments for prisoners, adequate staffing levels, appropriate discipline and deterrence of prisoner and staff misconduct, adherence by staff to the requirements of PREA, adherence by staff to search protocols, adequate implementation of internal security audits, and proper installation, repair, and maintenance of locks, cameras, and other security devices necessary for safety and security.

24.    Defendant Gwendolyn Givens was an Assistant Warden at St. Clair leading up to and during the events described in Plaintiff's Complaint.  As Assistant Warden, Defendant Givens was responsible for the day-to-day operations of the prison, as well as the safety of all prisoners at St. Clair and the supervision of all subordinate employees.

25.    Defendant Anthony Brooks was an Assistant Warden at St. Clair Correctional Facility leading up to and during the events described in Plaintiff's Complaint. As Assistant Warden, Defendant Books was responsible for the day-to-day operations of the prison, as well as the safety of all prisoners at St. Clair and the supervision of all subordinate employees.

26.    Defendant Carl Sanders was a Captain at St. Clair at the time of the events in Plaintiff's Complaint. As Captain, Defendant Sanders was responsible for the safety of all prisoners at St. Clair and the supervision of all security activities and subordinate employees.

27.     Defendant Gary Malone was a Captain at St. Clair leading up to and during the events described in Plaintiff's Complaint. As Captain, Defendant Malone was responsible for the safety of all prisoners at St. Clair and the supervision of all security activities and subordinate employees.

28.     Defendant Kevin White was a Captain at St. Clair leading up to and during the events described in Plaintiff's Complaint. As Captain, Defendant White was responsible for the safety of all prisoners at St. Clair and the supervision of all security activities and subordinate employees.

29.     Defendant Carla Graham was a Captain at St. Clair leading up to and during the events described in Plaintiff's Complaint. As Captain, Defendant Graham was responsible for the safety of all prisoners at St. Clair and the supervision of all security activities and subordinate employees.

30.     Defendant Neketris Estelle was the Head of Classification at St. Clair at the time of the events at issue in Plaintiff's Complaint and first began working in classification at St. Clair in 2009. As the Head of Classification, Defendant Estelle's responsibilities included conducting initial screenings; conducting semi-annual progress reviews for prisoners, attended by the warden or his designee, to review their disciplinary histories and other developments; serving on the Institutional Segregation Review Board along with the Warden and Segregation Captain; serving on the Sexual Incident Review Team; reclassifying prisoners for segregation if their disciplinary history warranted a segregation placement; reclassifying prisoners for general population if they no longer required a segregation placement; notifying security staff of housing assignment requests; making recommendations that prisoners be transferred to protective custody; and ensuring safe housing assignments for prisoners.

31.     Collectively, Defendants Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Estelle are referred to as the "Defendant Facility Supervisors."

32.     Each of the Defendant Facility Supervisors acted in a supervisory capacity over other St. Clair employees at all times relevant to this Complaint. Further, the constitutional violations and other injuries complained of herein were proximately caused by a pattern and practice of misconduct at St. Clair, which occurred with the consent of the Defendant Facility Supervisors, who personally knew about, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation of rights by their actions or by their deliberate indifference and failure to act.

33.     Collectively, the Defendant Administrative Supervisors and the Defendant Facility Supervisors are referred to as the "Defendant Supervisors."

*Additional Defendants*

34.     Defendant Larry Baker was a lieutenant at St. Clair leading up to and during the events described in Plaintiff's Complaint. He was responsible for the safety and security of the prisoners at St. Clair, and for monitoring and supervising the prisoners, as well as for supervising subordinate staff. During the fatal stabbing of Mr. Andrews, Defendant Baker was the shift supervisor on duty at St. Clair. As shift supervisor, he was responsible for assigning staff to posts, ensuring that staff were where they were supposed to be and carrying out their duties and responsibilities, and ensuring that contraband searches were done, among other things.

35.     Defendant Tanya Ary was a classification officer at St. Clair leading up to and during the events described in Plaintiff's Complaint. Her responsibilities included identifying vulnerable prisoners, prisoners with a history of violence, and enemies within the prisoner

population and ensuring that all prisoners were assigned to housing units in which they were safe from violence.

36.     Defendant Cynthia Caver was the cube officer on duty in the P block during the murder of Mr. Andrews by Cedric Davis, and she was the sole officer stationed in the cube in the P block at the time of the fatal assault on Mr. Andrews by Cedric Davis.

37.     Defendant Eric Garrett was the sole officer on duty at the gates for the L/M and P/Q blocks and responsible for monitoring the gates leading to the L/M and P/Q blocks at the time of the fatal assault of Mr. Andrews by Cedric Davis.

### DEFENDANTS' FAILURE TO PROTECT MR. ANDREWS FROM A KNOWN AND SUBSTANTIAL RISK OF SERIOUS HARM

#### The Fatal Stabbing of Mr. Andrews

38.     On or about December 29, 2018, Mr. Andrews was stabbed numerous times by his cellmate, Cedric Davis, while he was incarcerated at St. Clair.

39.     Cedric Davis had a known history of violence.

40.     Cedric Davis had a known history of possessing contraband weapons at St. Clair.

41.     On the morning before he attacked Mr. Andrews, Mr. Davis was seen by other prisoners in possession of a hatchet and knife.

42.     Mr. Andrews requested a cell change prior to his death because of problems he was experiencing with Mr. Davis and because he was afraid of Mr. Davis.

43.     Mr. Andrews made this request for a cell change to, among others, Defendant Brooks.

44.     Defendant Brooks took no steps to protect Mr. Andrews from the danger presented by Mr. Davis and to ensure that Mr. Andrews was safely housed at St. Clair.

45.     Instead, Defendant Brooks left Mr. Andrews in P block, where he shared a cell with the dangerous Mr. Davis and the two men remained effectively unsupervised.

46.     The assault on Mr. Andrews began on or about December 29, 2018, in the L/M blocks.

47.     The altercation lasted for more than an hour.

48.     No officers intervened.

49.     Instead, other prisoners forced the two men out of the L/M blocks.

50.     The two men ran into P block.

51.     Again, no officers—including Defendants Caver, Baker, and Garrett—intervened in any way.

52.     The sole correctional officer monitoring the entire P block at the time was Defendant Caver.

53.     Defendant Caver was the cube officer on duty during the murder of Mr. Andrews, and she was stationed in the cube in the P block at the time of the fatal assault on Mr. Andrews by Cedric Davis.

54.     While Mr. Andrews was stabbed to death, Defendant Caver was sitting in the cube.

55.     Mr. Davis stabbed Mr. Andrews repeatedly in the P block.

56.     Mr. Andrews and other prisoners in the P block yelled continuously for help.

57.     The gate outside P block was locked, preventing Mr. Andrews and other prisoners from getting desperately needed assistance.

58.     Defendants Caver and Garrett and other correctional officers could hear Mr. Andrews and other prisoners yelling for help during Mr. Davis's assault of Mr. Andrews, but did not intervene.

10

59.     Defendants Caver and Garrett and other correctional officers failed to respond as Mr. Andrews was gravely injured in P block and required emergency care.

60.     Defendant Garrett failed to unlock the gate to P block for at least several minutes after Mr. Andrews was stabbed, impeding Mr. Andrews from reaching the infirmary.

61.     When the gate was finally unlocked, Defendants Caver and Garrett and other correctional officers failed to take steps to facilitate the provision of desperately needed medical assistance to Mr. Andrews.

62.     Because officers failed to provide access to timely emergency medical care to Mr. Andrews, a group of prisoners was forced to carry Mr. Andrews to a garbage cart and wheeled him to the infirmary on the garbage cart.

63.     Due to Defendants' inaction, Mr. Andrews ultimately succumbed to his injuries and was eventually pronounced dead.

64.     Defendant Baker was the shift supervisor on duty at the time and was responsible for ensuring the safety of Mr. Andrews and other prisoners, and making sure that timely assistance was provided in an emergency.

65.     Defendant Baker did not take meaningful steps to ensure that the prisoners in P/Q blocks were safe and secure, or that the blocks were being adequately monitored, despite knowledge of the substantial risk of serious harm in the P/Q blocks and posed by the dangerous Mr. Davis.

66.     Specifically, Defendant Baker failed to ensure that security rounds and checks were carried out in the L/M and P/Q blocks on the day that Mr. Andrews was fatally stabbed.

67.     Defendant Baker also failed to ensure that the L/M and P/Q blocks had adequate supervision on the day that Mr. Andrews was fatally stabbed.

68.     Defendant Baker further failed to ensure that contraband weapons searches were carried out, including of Mr. Davis and his cell.

69.     As a result of these failures, officers did not prevent, intervene in or otherwise respond to the assault of Mr. Andrews, or facilitate the provision of emergency medical care.

### The Security Crisis at St. Clair

70.     Well before the fatal stabbing of Mr. Andrews at St. Clair on or about December 29, 2018, all Defendants were all on notice of a security crisis at St. Clair in which prison beatings, stabbings, and rapes were endemic; violence and terror reigned; and the threat of assault was constant—in the prison as a whole and most acutely, in the "hot bay" P/Q blocks.

71.     In 2018, Alabama's prisons for men had the highest homicide rate in the nation for a state prison system.

72.     In 2018, St. Clair had the highest per capita homicide rate of all of the men's prisons in Alabama.

73.     In the months leading up to Mr. Andrews's murder, at least three men were killed as a result of assaults that took place in whole or in part in the P/Q blocks at St. Clair: Travis Wilson, Terry Pettiway, and Rogarius Bray.

74.     But long before St. Clair became the deadliest prison in the country, all Defendants were on notice of the risks posed by high levels of violence at the facility.

75.     The violence at St. Clair increased sharply beginning in 2010.

76.     In fiscal year 2010, the number of reported assaults at St. Clair was just 23.

77.     The number of reported assaults has grown at an astonishing rate: to 59 in fiscal year 2011; 78 in fiscal year 2012; 101 in fiscal year 2013; 127 in fiscal year 2014; 157 in fiscal year 2015; 249 in fiscal year 2016; 132 in fiscal year 2017; and 163 in fiscal year 2018.

78. The rate of assaults at St. Clair far exceeded typical levels of violence at comparable facilities across the nation.

79. Listed below are but some of the assaults at St. Clair in general, and in the P/Q blocks in particular, in the two years preceding Mr. Andrews's brutal murder:

80. In January 2017, a prisoner was assaulted by two men in a day room in Q-block within sight of the Warden. The prisoner was stabbed in the left temple.

81. In February 2017, a prisoner was stabbed 9 times by three men who came into his cell and attacked him.

82. In March 2017, a prisoner was raped and later found by officers having been beaten and tied to a chair.

83. That same month, at least four other prisoners were stabbed.

84. In April 2017, two men were hospitalized with stab wounds after a knife fight.

85. That same month, another stabbing occurred that left a prisoner in a coma.

86. In May 2017, a large violent incident occurred in which 15 prisoners were stabbed.

87. That same month, a prisoner suffered a broken jaw when he was assaulted by another prisoner who used a lock placed in a sock as a weapon.

88. In July 2017, a prisoner at St. Clair was found dead by staff with his hands tied to a bedpost, with clear strangulation marks on his neck.

89. That same month:

    a. Another prisoner was killed, a second was stabbed in the neck, and a third was stabbed in his sleep;

    b.   A prisoner told officers that he was unsafe in Q block and was being extorted, prompting staff to order him to return to Q block, where he was held hostage, raped, and stabbed;

    c.   A violent incident in Q-block resulted in the stabbing of 4 prisoners;

    d.   A knife fight occurred in P-block and officers witnessed the fight but did nothing to intervene; and,

    e.   The same prisoner stabbed at least 5 people, in 3 separate incidents.

90.    In August 2017, a prisoner was stabbed in his own cell after confronting another prisoner about stealing his property.

91.    That same month:

    a.   A prisoner was stabbed near the cubicle in block P-2 by a prisoner who was intoxicated on crystal methamphetamine;

    b.   A prisoner was stabbed 13 times in block P-1 shortly after being released from segregation; and,

    c.   Another prisoner was stabbed in block P-1.

92.    In September 2017, a prisoner was found under his bed in block Q-2 with multiple stab wounds.

93.    That same month:

    a.   A prisoner at St. Clair was raped;

    b.   A prisoner was stabbed by a known enemy, in a fight that lasted for over 20 minutes before anyone intervened;

    c.   Four prisoners were involved in a fight with box cutters and knives; and,

    d.   A knife fight in G-Yard involved at least 6 prisoners.

94. In October 2017, a prisoner was sexually assaulted in the P/Q barbershop after he had passed out, and another prisoner was sexually assaulted in the Q block at knifepoint.

95. That same month:

a. A prisoner took another prisoner hostage in his cell and assaulted him over a period of two days;

b. A prisoner was sexually assaulted in the H dorm;

c. Officers observed a prisoner walk onto the yard wearing only a blanket and socks, after he had been severely beaten and burned on his face;

d. A prisoner was stabbed in his sleep in segregation when the cube officer left the cubicle with the door open;

e. Three additional prisoners were stabbed in two separate incidents; and,

f. Another prisoner slit a prisoner's throat in the O block after improperly gaining access to the housing unit.

96. In November 2017, a prisoner was held hostage and sexually assaulted over three days by four prisoners in Q block. The prisoner had recently been released from segregation.

97. That same month:

a. Another prisoner was raped at knifepoint;

b. A prisoner stabbed another prisoner who was being escorted by two correctional officers, and then was allowed to escape without recovery of the knife;

c. A prisoner stabbed another prisoner who was trying to sexually assault him; and,

d. Two prisoners fought with large machete-type knives in the chow hall and then out onto the G-yard, while three officers watched but did not intervene.

98. In December 2017, two prisoners were sexually assaulted, one at knifepoint.

99. That same month:

    a. A prisoner was stabbed 16 times in front of the P/Q blocks.

    b. A prisoner was stabbed in his back, knees, and legs while helping another prisoner move his belongings into Q block.

    c. A prisoner was stabbed 12 times in the arm, side, and back in H-dorm, in view of an officer who was nearby but did not intervene;

    d. Another prisoner was robbed and assaulted in the N/O blocks;

    e. Another prisoner was stabbed four times; and,

    f. A transgender prisoner was assaulted by a prisoner wielding a metal pole.

100. In January 2018, a prisoner was sexually assaulted at knifepoint in O block. The assailant had previously been reported as the assailant in a number of sexual assaults at St. Clair.

101. That same month, a prisoner was stabbed repeatedly in his cell in O block by prisoners carrying out a robbery.

102. Starting in January 2018 and lasting through June 2018, a prisoner was repeatedly raped by a group of individuals who said he owed them a debt. The rapes occurred on a near daily basis, and officers were aware of the situation but did nothing to intervene.

103. In February 2018, a prisoner was stabbed repeatedly in Q block.

104. That same month:

    a. Another prisoner was killed in a knife fight at St. Clair by a prisoner with an extensive history of being disciplined for possession of knives;

    b. A prisoner was stabbed in the back of the head near the P/Q blocks right after being released from segregation;

    c. Another prisoner was stabbed in the P/Q blocks;

     d.   A prisoner at St. Clair was repeatedly physically and sexually assaulted over the course of several days by his cell mate, who was also extorting him;

     e.   A handcuffed prisoner was stabbed in segregation when another prisoner escaped from his own handcuffs; and,

     f.   Another prisoner was stabbed in the G dorm.

105.    In March 2018, a prisoner was stabbed in the P/Q blocks while the prison was on lockdown, and the knife was still embedded in his body when he emerged from the blocks.

106.    That same month:

     a.   A prisoner was sexually assaulted multiple times during his first month at St. Clair;

     b.   A prisoner was stabbed in the chest at the doorway to Q block;

     c.   A prisoner was stabbed in the leg during an attempted robbery in the gym; and.

     d.   At least five other stabbing incidents occurred.

107.    In April 2018, a prisoner was kidnapped and raped in Q block.

108.    That same month:

     a.   A knife fight in P block resulted in a prisoner being stabbed 13 times, including in the chest and head;

     b.   A prisoner was threatened with rape by two men armed with knives, and was able to escape from them only by cutting his wrists with a razor blade so that he could report what happened to a mental health officer; and,

     c.   A prisoner was stabbed in front of the gym by a prisoner who had recently been released from segregation.

109.    In May 2018, a prisoner was held hostage by four other prisoners and sexually assaulted him. During the two days, officers did not enter the cell and simply asked how many

men were inside when they conducted counts. The victim did not press charges after an investigator told him reporting would put his life in danger and promised that he would be transferred if he did not report.

110.     That same month:

a.   A prisoner was stabbed in his sleep in his cell in Q block;

b.   A prisoner was sexually assaulted at knifepoint by another prisoner;

c.   A prisoner was stabbed and beaten outside the doorway to the L/M blocks;

d.   Another prisoner was stabbed 7 times in the G yard;

e.   Another prisoner was stabbed in front of officers on his way to a GED class; and,

f.   Another prisoner was held in a cell and beaten with a wooden paddle.

111.     Also in May 2018, a prisoner was stabbed by a group of prisoners outside the entry to Q block. The apparent motive for the attack was that the assailants had seen a document suggesting that the prisoner had provided staff with information related to a prior stabbing.

112.     In June 2018, a prisoner was sexually assaulted in P block. When he reported the rape to Defendant Jones, she told him that she did not care.

113.     In July 2018, three prisoners physically assaulted and attempted to sexually assault another prisoner who returned to P block following a prior sexual assault. The group of prisoners locked him in a cell and beat him with a belt buckle.

114.     That same month:

a.   A prisoner was stabbed by his cellmate and several other prisoners because he refused to move out of his cell in P block;

b.   A prisoner was stabbed in his sleep in his cell in Q block;

c.   Another prisoner was stabbed in Q block;

    d.  Yet another prisoner was stabbed in his cell in Q block after confronting other prisoners about taking his belongings;

    e.  A prisoner taped knives to both his hands and repeatedly stabbed yet another prisoner in Q block;

    f.  Another prisoner was stabbed in the P/Q hallway;

    g.  Another prisoner was stabbed on the porch of the P/Q blocks;

    h.  A robbery resulted in the stabbing of another prisoner, who passed out from blood loss; and,

    i.  A prisoner slit the throat of another prisoner with a razor in the common area of A block in an attack that was witnessed by a correctional officer who did not intervene.

115.    In August 2018, a prisoner was sexually assaulted within a week of his arrival at St. Clair.

116.    That same month:

    a.  A prisoner was stabbed over 20 times by a group of prisoners in the P/Q hallway in August 2018, in front of a cubicle officer who observed the incident but did not intervene;

    b.  A prisoner was stabbed over 10 times in the Q block in relation to a debt;

    c.  A prisoner was given a drink laced with a substance that caused him to lose consciousness; stabbed by several prisoners in the P-2 dayroom while he was unconscious; and left there for about 30 minutes while other prisoners tried to get help from officers who refused to intervene;

      d.   A prisoner was stabbed through the tray hole in his cell in B Block by a prisoner who was working as a segregation runner; and,

      e.   At least six other separate incidents occurred in which prisoners were stabbed.

117.    In September 2018, a prisoner was stabbed to death at St. Clair. The prisoner had previously been stabbed at St. Clair in July 2017.

118.    That same month:

      a.   A prisoner was stabbed in his bed in H dorm by an intoxicated prisoner, who was then attacked and stabbed by another group of prisoners; and,

      b.   A prisoner was stabbed in the stomach and the leg, and forced to attempt to sew up the lacerations himself, which eventually became infected.

119.    In October 2018, a prisoner was stabbed by several men in a cell in Q block.

120.    That same month:

      a.   A prisoner was sexually assaulted in P block at knifepoint; and,

      b.   A prisoner was stabbed in the throat while in segregation.

121.    In November 2018, a prisoner was stabbed in the P/Q blocks by an intoxicated prisoner who was acting erratically before the assault.

122.    That same month, another prisoner was stabbed in the H dorm.

123.    In December 2018, a prisoner was stabbed and killed by another prisoner in an altercation that took place in part in the P/Q blocks.

124.    That same month, a robbery resulted in a prisoner being stabbed in Q block.

125.    Also in December 2018, a group of prisoners assaulted and threatened to stab a prisoner who had just been released from restricted housing. Because the prisoner would not identify his attackers, he was written up by staff for creating a safety and security hazard.

**Notice of the Substantial Risk of Serious Harm to Mr. Andrews**

126.    All Defendants had knowledge of the substantial risk of serious harm facing prisoners such as Mr. Andrews at St. Clair—particularly, in the "hot bay" P/Q blocks—based on incident reports for the above-identified assaults, as well reports by the ADOC Investigations & Intelligence division, duty officer reports, disciplinary records, medical records, annual and monthly ADOC data reports, prisoner progress reports, prisoner lawsuits, and their own experience/observations at St. Clair and ADOC.

127.    ADOC's publicly available reports in the timeframe leading up to the murder of Mr. Andrews at St. Clair also reflected that injuries, deaths, and fighting were a systemic problem at St. Clair.

128.    Despite having ample notice of the substantial risk of serious harm facing prisoners at St. Clair in the time leading up to Mr. Andrews's murder at St. Clair, Defendant Supervisors, Defendant Baker, and Defendant Ary failed to take reasonable steps to address and reduce the risk of violence to prisoners at St. Clair, including Mr. Andrews.

129.    In 2014, a security audit of St. Clair was conducted. Defendant Culliver later admitted that, to his knowledge, no corrective action plan of any kind was developed in response to the audit.

130.    In October 2014, following an alarming number of violent attacks and murders at St. Clair, the Equal Justice Initiative ("EJI") filed a class action lawsuit on behalf of St. Clair prisoners seeking injunctive relief to reduce the violence at St. Clair. *See* Exh. A, *Cheatham* Complaint.

131.    The *Cheatham* Complaint also described the policies and practices fueling the outbreak of violence at St. Clair, including inadequate supervision and monitoring of the facility,

failure to address the widespread proliferation of contraband weapons at the facility, creation of a dangerous culture of violence and abuse, and failure to respond appropriately to violence and rape.

132.    All Defendants were put on notice of the *Cheatham* litigation and deficiencies identified therein long before the fatal stabbing of Mr. Andrews.  For example, Defendants Sanders and Malone were each named as Defendants in the *Cheatham* Complaint at the time it was filed and served with the *Cheatham* Complaint. Defendant Dunn received notice of the allegations in the *Cheatham* Complaint and became a defendant in the action when he took over as ADOC Commissioner in January 2015.

133.    In the aftermath of the *Cheatham* lawsuit, the Defendant Supervisors, Defendant Baker, and Defendant Ary failed to take reasonable, necessary, and appropriate steps to remedy the dangerous conditions at St. Clair.

134.    The violence at St. Clair continued to escalate.

135.    In October 2016, the United States Department of Justice ("DOJ") opened an investigation into whether the conditions in Alabama's prisons for men violated the Eighth Amendment of the U.S. Constitution.  The DOJ investigation included inquiries into whether ADOC adequately protects prisoners from physical harm and sexual abuse at the hands of other prisoners and provides prisoners with safe living conditions.

136.    All Defendants received notice of the DOJ investigation.

137.    Nonetheless, the Defendant Supervisors, Defendant Baker, and Defendant Ary again failed to take meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners at St. Clair.

138.    The *Cheatham* case settled in November 2017, with the ADOC agreeing to implement an internal classification system to protect prisoners and staff by identifying risks and

needs, rather than randomly assigning people to beds; create an incident management system that would allow the prison to prevent, track, and respond to violent incidents; replace faulty locks and install surveillance cameras; and create a transitional unit for prisoners released from segregation, among other things. *See* Equal Justice Initiative, *Alabama Department of Corrections Agrees to Reforms at St. Clair Prison in Response to EJI Lawsuit* (Nov. 8, 2017), available at https://eji.org/news/alabama-settles-eji-lawsuit-on-st-clair-prison/.

139.   All Defendants were on notice of the settlement agreement in *Cheatham*.

140.   However, the Defendant Supervisors, Defendant Baker, and Defendant Ary again failed to take meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners at St. Clair in response.

141.   In June 2018, EJI notified Defendant Administrative Supervisors including Defendant Dunn that ADOC had failed to implement the necessary reforms and comply with the settlement agreement.

142.   At the time of Mr. Andrews's fatal stabbing at St. Clair, the unconstitutional policies and practices identified in the *Cheatham* litigation continued at St. Clair despite the *Cheatham* litigation and settlement.

143.   In a letter dated September 6, 2018, just three-and-a-half months before the December 2018 murder of Mr. Andrews at St. Clair, EJI notified Defendant Dunn of a "concerning increase in serious incidents of violence" at St. Clair.

144.   EJI warned in its letter specifically about the dangers of St. Clair's "'hot bay' dorm management policy that houses individuals with behavior problems together in a single housing unit in general population where they lack programming opportunities and any regular security

staff presence" and that "the last two homicides [of Travis Wilson and Terry Pettiway] are a manifestation of the safety problems this kind of management technique creates."

145.   EJI also warned Defendant Dunn in its letter that "weapons contraband continues to saturate the prison and continues to contribute to serious incidents of violence at St. Clair," and that "contraband searches continue to be sporadic and ineffectual."

146.   EJI further noted in its letter: "Nationally recognized experts who have reviewed operations at St. Clair have recommended specific, detailed steps that are necessary to the detection and elimination of contraband at the facility," including "to completely lock-down the facility 'for several days' and 'conduct a thorough unannounced shake down of all areas including living areas and administrative or program areas before releasing inmates,'" as the "first step in creating a 'sterile' environment," to be followed by a "'regular, routine and effective practice of searching the prison.'"

147.   The contents of the EJI letter were shared and/or communicated to the rest of the Defendant Supervisors. However, Defendant Supervisors failed to take meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners at St. Clair following receipt of EJI's letter.

148.   The violence at St. Clair continued unabated.

149.   Prisoners filed individual complaints alleging assaults at knifepoint at St. Clair and detailing the dangerous conditions at St. Clair, the prevalence of stabbings and violence, and the failures such as inadequate supervision, monitoring, and contraband searches at the prison, including: Complaint, Dkt. 1, *McGregor v. Thomas, et al.*, Case 4:17-cv-00593 (N.D. Ala. Apr. 12, 2017); Amended Complaint, Dkt. 11, *Miller v. Dunn, et al.*, Case 4:17-cv-00180 (N.D. Ala. Mar. 28, 2017); and Complaint, Dkt. 1, *Townsel v. Thomas, et al.*, Case 4:17-cv-00516 (N.D. Ala.

Mar. 31, 2017). Defendants including Defendants Dunn, Culliver, Sanders, Malone, Estelle, and Ary were named as Defendants in these lawsuits, served with the lawsuits, and provided with notice of the allegations therein, in which they were accused of having failed to protect prisoners from assaults at knifepoint at St. Clair in 2014 and 2015. Defendants Dunn, Sanders, Malone, Ary, and Estelle were deposed in the lawsuits, and confronted with evidence of systematic failures at St. Clair to protect prisoners from prisoner-on-prisoner beatings and stabbings. Defendant Dunn's deposition occurred in November 2018, just one month before Mr. Andrews's fatal stabbing.

150.    Nonetheless, the Defendant Supervisors, Defendant Baker and Defendant Ary continued in their failure to take meaningful corrective action to reduce the substantial risk of serious harm facing prisoners such as Mr. Andrews at St. Clair.

151.    Following its investigation beginning in 2016, the DOJ issued extensive Notice Letters to the ADOC in April 2019 and July 2020 outlining the ADOC's failures with regard to protection of prisoners.

152.    The April 2019 Notice Letter, for example, put the Defendant Supervisors, Defendant Ary, and Defendant Baker on notice that ADOC was violating the Eighth Amendment rights of prisoners by failing to prevent prisoner-on-prisoner violence and sexual abuse and failing to provide safe conditions.

153.    The April 2019 Notice Letter went on to conclude that the constitutional "violations are severe, systematic, and exacerbated by serious deficiencies" including those in "ineffective housing and classification protocols"; "inadequate incident reporting"; "inability to control the flow of contraband into and within the prisons, including illegal drugs and weapons"; "ineffective prison management and training"; "the use of segregation and solitary confinement to both punish

and protect victims of violence and/or sexual abuse"; and "a high level of violence that is too common, cruel, of an unusual nature, and pervasive." And further, the DOJ found that "an excessive amount of violence, sexual abuse, and prisoner deaths occur within Alabama's prisons on a regular basis."

154.   The violence at St. Clair has continued unabated, and the DOJ filed a lawsuit on December 9, 2020.

155.   Despite having ample notice of the substantial risk of serious harm facing prisoners at St. Clair in the time leading up to Mr. Andrews's murder at St. Clair, including the notice discussed above, the Defendant Supervisors, Defendant Baker, and Defendant Ary failed to take reasonable steps to address and reduce the risk of violence to prisoners such as Mr. Andrews at St. Clair.

**Defendants' Failure to Provide Adequate Monitoring
and Timely Emergency Medical Care
in the P/Q Blocks at St. Clair**

156.   Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Baker, through their acts and omissions, failed to provide adequate supervision and monitoring of prisoners housed within St. Clair—particularly in the P/Q blocks—to prevent violence.

157.   As set forth above, at the time of Mr. Andrews's fatal stabbing at St. Clair in December 2018, the P/Q blocks at St. Clair had long been subject to staggering levels of prisoner-on-prisoner violence.

158.   Defendant Supervisors and Defendant Baker were aware of this problem.

159.   A large proportion of the prisoners housed in the P/Q blocks had disciplinary problems and histories of violence while in ADOC custody.

160. Contraband, including knives and prisoner-made weapons, was common in the P/Q blocks.

161. Despite this, the supervision in this area was virtually non-existent.

162. Most of the time, as was the case during the assault by Cedric Davis on Terrence Andrews, a single cube officer was the only officer monitoring the entire area of the P block.

163. The cube officers generally did not leave their cubicles.

164. Oftentimes, the cube officers had not even undergone basic correctional officer training.

165. The officers in the cube were, at times, absent, asleep, on the telephone, or otherwise not paying attention to the prisoners they were charged with monitoring.

166. Random patrols of the P/Q blocks by additional officers occurred extremely infrequently.

167. The P/Q blocks also lacked adequate surveillance cameras to monitor the housing units.

168. Blind spots on the units, in concert with inadequate staff presence, officer inattentiveness, and the lack of surveillance equipment, created a further substantial risk of serious harm to prisoners such as Mr. Andrews and had contributed to numerous violent incidents in the years leading up to the murder of Mr. Andrews.

169. Exacerbating these problems was the absence of emergency call buttons in the cells to summon assistance from staff.

170. Due to lax supervision, security staff at St. Clair sometimes watched violent or troubling incidents unfold without intervening.

171.     Due to lax supervision, security staff at St. Clair often failed to observe violent incidents and only discovered the victim after the violence and/or injuries had occurred.

172.     Further, due to lax supervision, security staff at St. Clair often failed to timely respond to prisoners who had been seriously injured in violent incidents, causing critical delays in the treatment of serious injuries.

173.     On numerous occasions prior to the fatal stabbing of Mr. Andrews in December 2018, prisoners themselves had to carry or otherwise bring to the infirmary prisoners who had been injured at St. Clair, particularly in the P/Q blocks, in violent incidents.

174.     The Defendant Supervisors and Defendant Baker were aware of the particular dangerousness of the P/Q blocks, the high proportion of prisoners housed there with disciplinary problems and histories of violence while in ADOC custody, the lack of adequate monitoring of prisoners in the P/Q blocks, the acute inattentiveness of officers and their failures to intervene in assaults, the proliferation of contraband weapons, the lack of cameras, the existence of blind spots, and the lack of timely access for prisoners to emergency medical care, including through the incidents described above.

175.     The Defendant Supervisors and Defendant Baker were also aware that when prisoners were in a cell, they had no way of contacting a security officer other than banging on their cell doors or shouting—wholly ineffective means for getting help because security officers were frequently asleep, inattentive, absent, or otherwise out of earshot.

176.     The Defendant Supervisors and Defendant Baker were likewise aware that the resulting inadequate supervision and monitoring of prisoners created a substantial risk of serious harm that facilitated and encouraged homicides and assaults such as the fatal stabbing of Mr. Andrews.

177.    In addition, the Defendant Supervisors and Defendant Baker knew that a lack of programming opportunities in the P/Q blocks left prisoners there idle and that idleness, along with inadequate supervision and monitoring, increased the likelihood of violence in those blocks.

178.    The Defendant Supervisors and Defendant Baker were also aware that a lack of supervision and monitoring in the P/Q blocks created a substantial risk in the event of an emergency, caused significant delays in the provision of emergency medical care to prisoners, and otherwise prevented prisoners from accessing necessary medical care in the event of an emergency or other urgent need.

179.    Despite this, Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Baker failed to improve supervision and monitoring in the P/Q blocks.

180.    Further, Defendant Baker failed to ensure that there was adequate monitoring and supervision in the P/Q blocks on the day that Mr. Andrews was attacked by Mr. Davis.

181.    Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Baker did not provide any additional staffing to the P/Q blocks or improve supervision and monitoring of existing staff in the P/Q blocks.

182.    Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Baker took no meaningful steps to address the substantial risk of serious harm to prisoners in the P/Q blocks such as Mr. Andrews.

183.    Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Baker acted with deliberate indifference and their misconduct placed prisoners such as Mr. Andrews at substantial risk of serious harm and caused his injuries.

**Defendants' Failure to Address the Widespread**
**Proliferation of Contraband Weapons at St. Clair**

184.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks,

Sanders, White, Malone, Graham, and Baker, through their acts and omissions, permitted

contraband weapons to proliferate at St. Clair and failed to effectively control the introduction,

manufacture, and use of contraband weapons by prisoners at St. Clair, exhibiting deliberate

indifference to the substantial risk of serious harm that such weapons created to prisoners such as

Mr. Andrews.

185.     As set forth above, both the widespread availability of weapons at St. Clair and the

resulting stabbings and other violent incidents at St. Clair were brought to the attention of these

Defendants through, for example, incident reports, the *Cheatham* lawsuit, EJI's letter from

September 6, 2018, and individual prisoner lawsuits.

186.     The widespread proliferation of contraband weapons within St. Clair contributed to

the high rate of violence and death and created a substantial risk of serious harm to prisoners such

as Mr. Andrews.

187.     By the time of Mr. Andrews's brutal death, it was a matter of common knowledge

among St. Clair staff that the prisoner population at St. Clair was heavily armed.

188.     Prisoners believed they needed to arm themselves at St. Clair for protection because

of the endemic violence at the facility.

189.     Stab wounds were seen on a weekly, if not daily, basis.

190.     Large machete-type knives have been reported at St. Clair.

191.     At least one knife found at St. Clair was over 2 feet long.

192.     In the words of St. Clair Correctional Officer Jonathan Truitt, a single 24-person

cell block at St. Clair could contain "30 to 40" contraband knives; contraband was "out of control";

and prisoners were being "being assaulted in every way imaginable." Cam Ward, Alabama Correctional Officer Numbers Down 20%, Montgomery Advertiser (Jan. 8, 2017), available at http://www.camward.com/alabama_correctional_officer_numbers_down_20.

193.    Staff at St. Clair frequently responded with deliberate indifference when prisoners were observed with contraband weapons and failed to discipline prisoners found with contraband weapons.

194.    The failure to discipline prisoners in possession of contraband weapons created a dangerous culture whereby prisoners knew they could possess such weapons with impunity and felt emboldened to use such weapons without fear of incurring any disciplinary action.

195.    As set forth above, knives, box cutters, and other contraband weapons were commonly used in assaults at St. Clair.

196.    Despite this, Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Baker permitted contraband weapons to proliferate at St. Clair and took no meaningful action to curtail the widespread availability of contraband weapons at St. Clair, exhibiting deliberate indifference to prisoners such as Mr. Andrews who were likely to be victimized by such weapons.

197.    In the months leading up to the fatal stabbing of Mr. Andrews, contraband searches continued to be ineffective and sporadic.

198.    Defendant Culliver has admitted that the contraband search protocols at St. Clair were inadequate.

199.    As of December 2018, Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Baker had made no meaningful changes to increase and improve contraband searches at St. Clair.

200.    Further, Defendant Baker took no action to ensure that contraband searches were carried out and that contraband was identified and confiscated on December 29, 2018.

201.    As of December 2018, Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Baker had made no effort to provide meaningful discipline for prisoners found with contraband weapons at St. Clair.

202.    Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Baker acted with deliberate indifference and their misconduct placed prisoners such as Mr. Andrews at substantial risk of serious harm and caused his injuries.

### Defendants' Failure to Adequately Respond to Reports of Safety Concerns and Segregate Dangerous Prisoners

203.    Defendant Supervisors and Defendant Ary had an unreasonable and longstanding policy and practice of failing to protect prisoners who reported safety concerns relating to their housing assignments and failing to identify and safely segregate prisoners with a history of violence and possession of contraband weapons from potential victims.

204.    These Defendants maintained these policies and practices even though they knew that the failure to adequately respond to reports of safety concerns from prisoners and to identify and safely segregate predatory prisoners had contributed to violent incidents in the past, including those identified above.

205.    These Defendants, through their acts and omissions, failed to implement effective classification and housing policies, thereby resulting in violence caused by commingling prisoners who should have been kept separate.

206.    For example, Mr. Andrews requested a transfer because of dangers related to his sharing of a cell with Mr. Davis, but he was not transferred.

207.    Defendant Supervisors and Defendant Ary failed to ensure that Mr. Andrews was safely housed so as to prevent violent incidents like the stabbing that resulted in his death.

208.    Defendant Supervisors and Defendant Ary failed to safely house Mr. Davis, who had a known history of violence and possession of contraband, to prevent him from harming other prisoners at St. Clair like Mr. Andrews.

209.    Defendant Supervisors and Defendant Ary acted with deliberate indifference and their misconduct placed prisoners such as Mr. Andrews at substantial risk of serious harm and caused his injuries.

**Defendants' Failure to Adequately Respond to and
Discipline Instances of Prisoner Misconduct**

210.    Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, and Graham, through their acts and omissions, failed to properly respond to and discipline prior instances of prisoner misconduct in the time period leading up to Mr. Andrews's murder at St. Clair, creating a culture of violence.

211.    ADOC staff failed to properly investigate and discipline acts of violence and possession of contraband weapons by prisoners at St. Clair, emboldening violent prisoners such as Mr. Davis.

212.    ADOC staff routinely discouraged victims from reporting incidents of violence or threats of violence at St. Clair.

213.    ADOC staff routinely retaliated against prisoners who reported violence and threats of violence by subjecting such prisoners to discipline in conjunction with the prisoners' reports of violence and threats of violence. This retaliation had the effect of deterring prisoners from reporting violence and threats of violence.

214.    In many cases, prisoners were subjected to discipline for refusing to name the individuals who they feared might harm them.

215.    St. Clair did not have an established grievance system, limiting prisoners' ability to report threats of violence.

216.    ADOC staff responded with deliberate indifference when prisoners were extorted by other prisoners at St. Clair, resulting in serious physical injuries.

217.    These failures created a dangerous culture of violence at St. Clair, which, in turn, posed a substantial risk of serious harm to prisoners such as Mr. Andrews.

218.    The Defendant Supervisors were on notice of these failures, as well as the substantial risk of serious harm that resulted for prisoners such as Mr. Andrews.

219.    The Defendant Supervisors were put on notice of the culture of violence at St. Clair through their roles at St. Clair and ADOC, internal ADOC reports, communications with staff and prisoners, lawsuits, and media coverage.

220.    The Defendant Supervisors were also put on notice of the culture of violence at St. Clair through EJI's *Cheatham* Complaint, which described in detail the ways in which Defendants fostered and encouraged a culture of violence at St. Clair and the resulting risks to prisoners such as Mr. Andrews.

221.    Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, and Graham fostered the culture of violence at St. Clair through their acts and omissions.

222.    For example, the Defendant Administrative Supervisors and Defendant Jones failed to act to provide an established grievance system at St. Clair.

223.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, and Graham, through their acts and omissions, discouraged victims from reporting incidents of violence or threats of violence at St. Clair.

224.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, and Graham failed to ensure proper investigation and discipline of violence and possession of contraband weapons by prisoners, emboldening violent prisoners such as Mr. Davis.

225.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, and Graham, through their acts and omissions, also failed to prevent prisoners from extorting other prisoners, resulting in serious physical injuries and presenting a substantial risk of serious harm to prisoners at St. Clair.

226.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, and Graham acted with deliberate indifference and their misconduct placed prisoners such as Mr. Andrews at substantial risk of serious harm and caused his injuries.

**Defendants' Creation of a Culture of Abuse at St. Clair**

227.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, and Baker also fueled a culture of abuse at St. Clair by tolerating and condoning excessive uses of force by staff members, and in the case of Defendant Malone, engaging in excessive force and abusive tactics himself.

228.     These Defendants' acts and omissions created a culture of abuse at St. Clair in which staff perpetrated excessive force against prisoners with impunity.

229.     The failure to discipline officers for excessive force and other misconduct signaled to the correctional officers at St. Clair that they could abuse, or fail to protect, prisoners without fear of any adverse consequences.

230.    The conduct of Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, and Baker created a dangerous culture of violence and abuse at St. Clair, which, in turn, heightened the risk of prisoner-on-prisoner assaults.

231.    Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, and Baker were on notice of the culture of abuse through internal sources including use-of-force reports, incident reports, duty officer reports, and medical reports.

232.    For example:

   a.   In March 2017, Officer Howard and other officers assaulted a prisoner with severe mental health issues after he told them he thought his skin was falling off. The officers sprayed the prisoner with mace, beat him with handcuffs, and left him in his cell for three days rather than taking him to the infirmary. He was subsequently rushed to the hospital because his esophagus closed. Defendant Malone was present during the assault.

   b.   In June 2017, a prisoner was sprayed with a large volume of mace in his cell at the direction of Defendant Malone after officers discovered a broken window in his cell. He was left alone in the cell with mace for approximately one hour despite having asthma.

   c.   In August 2017, guards assaulted an 84-year-old prisoner who was confined to a wheelchair. He had to be taken to an outside hospital due to the severity of his injuries.

   d.   In November 2017, an officer slapped a prisoner without provocation in front of a large group of officers and incarcerated men before a meeting of the segregation

board. The officer had previously been encouraged by other officers to "slap [prisoners] upside the head" whenever they "talk crazy."

e. In November 2017, a handcuffed prisoner was beaten by officers in the segregation yard.

f. In December 2017, Officers McMillian and McLemore assaulted a handcuffed prisoner in D block. The prisoner had requested to be taken to a suicide cell, and the officers punched him in the face, head, and body for multiple minutes.

g. In January 2018, Sergeant Weaver and other officers assaulted a prisoner after he reported fearing for his life and requesting to be placed in segregation. Sgt. Weaver and the officers dragged the prisoner by his feet from the shift office, struck him in the head, and sprayed him with mace. Officer Walker witnessed the event and did nothing to intervene.

h. In March 2018, Sgt. McLemore and others handcuffed a prisoner in the infirmary, sprayed him with a large volume of Sabre Red chemical agent so that he could not see clearly, and then proceeded to punch and kick his entire body for over 10 minutes, using particular violence against his head, face, and testicles. The prisoner has experienced ongoing injuries, including difficulty with his vision.

i. Also in March 2018, a prisoner was assaulted by Officer Chapman at a meeting of the segregation board. The prisoner reportedly made a statement about an officer during his segregation board hearing, and Officer Chapman interjected that he was lying and slammed him forcefully into the doorframe while other officers watched. The prisoner's nose was broken in the incident, and he was then disciplined for

failure to obey a direct order for leaving the place prisoners are forced to stand during their segregation board hearings.

j.   In May 2018, a prisoner was assaulted by officers after he cut his wrists in segregation, where he had been placed after suffering a sexual assault several days earlier. He was struck in the face while handcuffed by Sgt. Dent and then had his head slammed into a brick wall by Officer Jones.

k.   Also in May 2018, Sgt. Dent assaulted a prisoner in B block, breaking his jaw.

l.   In August 2018, Sgt. Dent, Officer Kendrick, and Officer McMillian assaulted a prisoner in B block after he asked to be moved from the top tier to the lower tier.

m.   In September 2018, a prisoner made a comment that an officer interpreted as disrespectful, so the officer tried to have his cell assignment changed so he would be next to a prisoner who had previously stabbed him. When the prisoner refused to go, Defendant Malone sprayed him with Sabre Red chemical agent and wrote a false report that the prisoner had threatened to kill an officer and charged at him.

n.   In October 2018, Sgt. Dent, Officer Burns, and Officer Kendrick attacked a prisoner who had been beating on his cell door trying to get help after smoking a cigarette that had been laced with methamphetamine without his knowledge. The officer sprayed him with mace, picked him up by the handcuffs and ankle cuffs, scraped him on the concrete, and beat on him while he was on the ground. He was taken to an outside hospital for treatment.

o.   In December 2018, Sgt. Dent sprayed a prisoner in the face with mace and then forced the prisoner to go outside with his hands and feet shackled, while it was sleeting and the prisoner was wearing only boxer shorts.

p.  In early January 2019, Sgt. McLemore sprayed a prisoner in B block, left him for more than 30 minutes without decontaminating him, then told him to cuff up forcing him to remove the splint he wore for carpal tunnel syndrome. As the prisoner walked out of the cell in cuffs, Sgt. McLemore jumped him from behind, busting his head open and injuring his arm. Defendant Malone had Sgt. McLemore take photos of the prisoner after the assault. The prisoner was then written up for disorderly conduct and disobeying a direct order.

233.  Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, and Baker were also on notice of the culture of abuse at St. Clair through their roles at St. Clair and ADOC, internal ADOC reports, communications with staff and prisoners, prisoner lawsuits, and media coverage.

234.  In addition, Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, and Baker were on notice of this culture of abuse through EJI's *Cheatham* Complaint, which described in detail the ways in which Defendants fostered and encouraged a culture of abuse at St. Clair and the resulting risks to prisoners.

235.  Because this culture of abuse was tolerated, if not condoned, and staff could cause harm to prisoners seemingly with impunity, staff often failed to prevent harm to prisoners like Mr. Andrews.

236.  Nonetheless, Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, and Baker took no meaningful action to disrupt the culture of abuse and impunity at St. Clair. Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, Malone, White, Graham, and Baker acted with

deliberate indifference and their misconduct placed prisoners like Mr. Andrews at substantial risk of serious harm and caused his injuries.

## PLAINTIFF'S DAMAGES

237.    As a result of the Defendants' wrongful actions, Mr. Andrews—a young man— was brutally murdered and had his future taken from him. In the moments before his death, he suffered immense physical and emotional pain and terror.

## CLAIMS

### Count I - 42 U.S.C § 1983
### Eighth Amendment Failure to Protect
### Against Defendant Supervisors, Defendant Baker, and Defendant Ary

238.    Plaintiff incorporates by reference and as if fully restated here paragraphs 1-7, 11- 35, and 38-237 of this Complaint.

239.    Pursuant to the Eighth Amendment of the United States Constitution, Mr. Andrews was entitled to be free from a substantial risk of serious harm while in the custody of the State.

240.    Defendant Supervisors, Defendant Baker, and Defendant Ary knew of and consciously disregarded the substantial risk that Mr. Andrews would be seriously harmed while in custody, failing to protect him from harm.

241.    Defendant Supervisors, Defendant Baker, and Defendant Ary, acting individually and in conspiracy with other Defendants, failed to protect Mr. Andrews.

242.    More specifically, and as set out in paragraphs 70-155, Defendant Supervisors, Defendant Baker, and Defendant Ary were aware of an acute security crisis at St. Clair and in the P/Q blocks in particular.

243.    Despite this, Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Baker failed to take steps to ensure that prisoners at St.

Clair (and particularly in the P/Q blocks) were adequately supervised and monitored, as set out in paragraphs 156-183.

244.    Defendant Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Baker failed to ensure that prisoners and staff were disciplined for acts of violence or possession of contraband, as set out in paragraphs 184-202 and 210-236;

245.    Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Baker failed to ensure that adequate contraband searches were carried out and that contraband weapons were confiscated, as set out in paragraphs 184-202.

246.    Defendant Supervisors and Defendant Ary failed to ensure that prisoners were safely housed at St. Clair and that prisoners who were likely to perpetrate violence were safely segregated from their likely victims, as set out in paragraphs 203-209.

247.    The misconduct described in this cause of action was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners such as Mr. Andrews, and was objectively unreasonable.

248.    These Defendants' misconduct directly and proximately caused Mr. Andrews to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries and death.

### Count II - 42 U.S.C § 1983
### Eighth Amendment Failure to Protect
### Against Defendants Brooks, Baker, Caver, Ary, and Garrett

249.    Plaintiff incorporates by reference and as if fully restated here paragraphs 1-7, 11-15, 25, 34-209, and 237 of this Complaint.

250.     Pursuant to the Eighth Amendment of the United States Constitution, Mr. Andrews was entitled to be free from a substantial risk of serious harm while in the custody of the State.

251.     Defendants Brooks, Baker, Caver, Ary, and Garrett knew of and consciously disregarded the substantial risk that Mr. Andrews would be seriously harmed by Mr. Davis, failing to protect him from harm.

252.     Defendants Brooks, Baker, Caver, Ary, and Garrett, acting individually and in conspiracy with other Defendants, failed to protect Mr. Andrews.

253.     More specifically, Defendants Brooks, Baker, Caver, Ary, and Garrett knew or should have known that Mr. Davis had a history of violence and possession of contraband, as set out in paragraphs 39-41.

254.     Despite this, Defendant Ary took no steps to ensure that Mr. Davis was safely housed in order to prevent him from harming other prisoners, including Mr. Andrews, as set out in paragraphs 203-209.

255.     Defendant Brooks knew that Mr. Andrews was afraid of Mr. Davis and wanted a housing change for his safety, as set out in paragraph 44.

256.     Despite this Defendant Brooks took no steps to safely segregate Mr. Andrews and Mr. Davis, or to otherwise ensure Mr. Andrews's safety, as set out in paragraphs 44-45 and 206-208.

257.     Defendant Baker knew of the high levels of violence and proliferation of contraband weapons in the P/Q blocks and the substantial risk of serious harm to prisoners in those blocks like Mr. Andrews, as set out in paragraphs 70-139, 149-178, and 185-195.

258.     Despite this, Defendant Baker failed to take any measures to ensure that the P/Q blocks were adequately supervised and monitored on the day that Mr. Davis attacked Mr. Andrews,

or to ensure that contraband searches were carried out and contraband weapons confiscated on that date, as set out in paragraphs 64-69, 180-184, and 196-202.

259.    Defendants Caver and Garrett were present when Mr. Davis attacked and stabbed Mr. Andrews, but did not take steps to intervene or otherwise protect Mr. Andrews, as set out in paragraphs 38 and 46-60.

260.    The misconduct described in this cause of action was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners such as Mr. Andrews, and was objectively unreasonable.

261.    These Defendants' misconduct directly and proximately caused Mr. Andrews to be subjected to a substantial risk of serious harm and to suffer horrific physical and emotional injuries and death.

### Count III - 42 U.S.C § 1983
### Eighth Amendment State-Created Danger
### Against Defendant Supervisors, Defendant Baker, and Defendant Ary

262.    Plaintiff incorporates by reference and as if fully restated here paragraphs 1-7, 11-35, and 38-237 of this Complaint.

263.    Pursuant to the Eighth Amendment of the United States Constitution, Mr. Andrews was entitled to be free from a known and substantial risk of serious harm while in the custody of the State, including from a State-created danger.

264.    Defendants limited Mr. Andrews's ability to care for himself in prison.

265.    Defendant Supervisors, Defendant Baker, and Defendant Ary affirmatively placed Mr. Andrews in a position of danger he would not have otherwise faced.

266.    In violation of Mr. Andrews's Eighth Amendment rights, Defendant Supervisors, Defendant Baker, and Defendant Ary knew of and consciously disregarded the substantial risk that Mr. Andrews would be seriously harmed while in custody, including from a State-created danger.

267.    Defendant Supervisors, Defendant Baker, and Defendant Ary, acting individually and in conspiracy with other Defendants, then failed to take reasonable steps to address the known and substantial risk of serious harm to Mr. Andrews, including from a State-created danger, as set out in paragraphs 70-155.

268.    Specifically, Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Baker permitted and encouraged the proliferation of weapons at St. Clair, putting Mr. Andrews and other prisoners at a substantial risk of serious harm, as set out in paragraphs 184-202.

269.    Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Baker permitted and encouraged a culture of violence at St. Clair (especially in the P/Q blocks) by failing to discipline acts of violence by prisoners and/or staff, as set out in paragraphs 210-236.

270.    Defendant Supervisors and Defendant Ary permitted prisoners to be housed with prisoners who were likely to commit violence against them. For example, Defendants Estelle, Ary, and Brooks housed Mr. Davis, a prisoner with a known history of violence and possession of contraband weapons, in the P/Q blocks with Mr. Andrews and other prisoners, posing a danger to Mr. Andrews and other prisoners, as set out in paragraphs 39-45 and 203-209.

271.    Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Baker permitted the St. Clair housing units, especially the P/Q blocks, to exist largely unmonitored and unsupervised, creating a substantial risk that prisoners like Mr. Andrews would be harmed by prisoners with a history of violence like Mr. Davis, as set out in paragraphs 156-183.

272.    The misconduct described in this cause of action was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners such as Mr. Andrews, and was objectively unreasonable.

273.    These Defendants' misconduct directly and proximately caused Mr. Andrews to be subjected to a substantial risk of serious harm, and caused him to suffer horrific physical and emotional injuries and death.

### Count IV - 42 U.S.C § 1983
### Eighth Amendment Denial of Adequate Medical Care
### Against Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Baker

274.    Plaintiff incorporates by reference and as if fully restated here paragraphs 1-7, 11-29, 31-34, 38-183, and 237 of this Complaint.

275.    Pursuant to the Eighth Amendment of the United States Constitution, Mr. Andrews was entitled to adequate medical care while in the custody of the state.

276.    Mr. Andrews had a serious medical need as a result of his assault by Cedric Davis that posed a substantial risk of serious harm, including death, to Mr. Andrews.

277.    Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Baker knew that violent attacks, including stabbings, like the one suffered by Mr. Andrews were commonplace at St. Clair, and especially in the P/Q blocks, as set out in paragraphs 70-183.

278.    The medical need resulting from these attacks and the substantial risk posed by a failure to provide timely medical care were obvious.

279.    Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Baker were further aware that a lack of supervision and monitoring at St. Clair, especially in the P/Q blocks, prevented the timely provision of medical care for serious

medical needs, including related to stabbings like that suffered by Mr. Andrews, as set out in paragraphs 161-175, and 178.

280.     Despite this, Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Baker failed to take steps to ensure that prisoners in the P/Q blocks, like Mr. Andrews, had access to timely emergency medical care as set out in paragraphs 56-64, 179-183.

281.     The misconduct described in this cause of action was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners such as Mr. Andrews, and was objectively unreasonable.

282.     Defendants' misconduct directly and proximately caused Mr. Andrews to be subjected to a substantial risk of serious harm, and caused him to suffer horrific physical and emotional injuries and death.

### Count V - 42 U.S.C § 1983
### Eighth Amendment Denial of Adequate Medical Care
### Against Defendants Baker, Caver, and Garrett

283.     Plaintiff incorporates by reference and as if fully restated here paragraphs 1-7, 11-15, 34-69, and 237 of this Complaint.

284.     Pursuant to the Eighth Amendment of the United States Constitution, Mr. Andrews was entitled to adequate medical care while in the custody of the state.

285.     Mr. Andrews had a serious medical need as a result of his assault by Cedric Davis that posed a substantial risk of serious harm, including death, to Mr. Andrews, as set out in paragraphs 38, 55, 59, 61, 63, and 237.

286.     This medical need and the substantial risk of serious harm posed by a failure to provide timely medical care were obvious.

287.    Defendants Baker, Caver, and Garrett, acting individually and in conspiracy with other Defendants, failed to provide Mr. Andrews with access to timely and necessary medical care in response to his serious medical need, as set out in paragraphs 38-69.

288.    The misconduct described in this cause of action was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of prisoners such as Mr. Andrews, and was objectively unreasonable.

289.    Defendants' misconduct directly and proximately caused Mr. Andrews to be subjected to a substantial risk of serious harm, and caused him to suffer horrific physical and emotional injuries and death.

## Count VI - 42 U.S.C § 1983
## Civil Conspiracy
## Against All Defendants

290.    Plaintiff incorporates by reference and as if fully restated here paragraphs 1-7 and 11-237 of this Complaint.

291.    As described more fully in the preceding paragraphs, the Defendants and other co-conspirators not yet known to Plaintiff acted in concert with one another to accomplish an unlawful purpose by unlawful means.

292.    The Defendants and other co-conspirators not yet known to Plaintiff reached an agreement among themselves to deprive Mr. Andrews of his right to be free from unreasonable harm and to receive adequate medical care, and to fail to intervene to prevent harm from occurring to Mr. Andrews, in violation of his constitutional rights, in the manner described above.

293.    In furtherance of this conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity, including creating and promoting a culture of abuse and violence.

294.     Specifically, the Defendants were aware of the substantial risk of serious harm presented by the conditions at St. Clair and by Mr. Davis in particular, and agreed to act to maintain and perpetuate those conditions and expose Mr. Andrews and other prisoners to a substantial risk of serious harm.

295.     Defendants Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Baker left the housing units at St. Clair, especially the P/Q blocks, largely unmonitored and unsupervised; permitted and encouraged the proliferation of weapons among the prisoners; and created and encouraged a culture of violence and abuse at St. Clair, as set out in paragraphs 156-202 and 210-236.

296.     Defendant Supervisors and Defendant Ary housed vulnerable prisoners alongside prisoners with a history of violence, as set out in paragraphs 203-209.

297.     Defendant Brooks and Defendant Ary permitted Mr. Davis, who had a known history of violence and possession of weapons, to be housed alongside Mr. Andrews, who had expressed a fear of Mr. Davis to Defendant Brooks, as set out in paragraphs 39-41, 44-45, and 203-209.

298.     Defendants Caver, Baker, and Garrett permitted Mr. Davis to fatally stab Mr. Andrews without interference, and impeded the provision of timely medical care to Mr. Andrews, as set out in paragraphs 38, 46-69, and 180.

299.     As a direct and proximate result of the illicit agreement referenced above, Mr. Andrews's rights were violated and he suffered physical and emotional injuries and death.

**Count VII - 42 U.S.C § 1983**
**Failure to Intervene**
**Against Defendant Supervisors, Defendant Baker, and Defendant Ary**

300.     Plaintiff incorporates by reference and as if fully restated here paragraphs 1-7, 11-35 and 38-237 of this Complaint.

301.    Defendants knew that Mr. Andrews's rights were being violated, and had the realistic opportunity to intervene to prevent or stop the constitutional misconduct alleged above, but failed to do so.

302.    Specifically, Defendant Supervisors, Defendants Baker, and Defendant Ary had the opportunity to take action to address the known security crisis at St. Clair and the substantial risk of serious harm it posed to Mr. Andrews, but failed to do so.

303.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Andrews's constitutional rights.

304.    As a result of the Defendants' failure to intervene, Mr. Andrews's constitutional rights were violated and he suffered damages.

**Count VIII - 42 U.S.C § 1983**
**Failure to Intervene**
**Against Defendants Brooks, Baker, Caver, Ary and Garrett**

305.    Plaintiff incorporates by reference and as if fully restated here paragraphs 1-7, 11-15, 25, 34-209, 237 of this Complaint.

306.    Defendants knew that Mr. Andrews's rights were being violated, and had the realistic opportunity to intervene to prevent or stop the constitutional misconduct alleged above, but failed to do so.

307.    Specifically, Defendants Brooks, Baker, and Ary knew that Mr. Andrews was exposed to a substantial risk of serious harm from Mr. Davis and the security crisis at St. Clair (particularly in the P/Q blocks).

308.    Despite this Defendants Brooks, Baker, and Ary failed to take any action to address this risk and prevent the violation of Mr. Andrews's constitutional rights, despite having the opportunity to do so.

309.     Defendants Caver and Garrett were present when Mr. Andrews's was being attacked and stabbed while other ADOC staff stood by without providing assistance.

310.     Despite knowing of the serious risk posed to Mr. Andrews's by the inaction of ADOC staff and the opportunity to intervene, Defendants Caver and Garrett failed to take any action to prevent or stop the violation of Mr. Andrews's constitutional rights.

311.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally and with willful indifference to Mr. Andrews's constitutional rights.

312.     As a result of the Defendants' failure to intervene, Mr. Andrews's constitutional rights were violated and he suffered damages.

**Count IX – State Law**
**Wrongful Act or Omission Resulting in Death**
**Against Defendant Supervisors, Defendant Baker, and Defendant Ary**
**Ala. Code § 6-5-410**

313.     Plaintiff incorporates by reference and as if fully restated here paragraphs 1-7, 11-35, 38-237 of this Complaint.

314.     Plaintiff was in the custody and care of Defendants.

315.     Defendants had a duty of care to Mr. Andrews, including to safely house Mr. Andrews, to protect him from violence by other prisoners, and to ensure the provision of adequate medical care.

316.     Defendant Supervisors, Defendant Baker, and Defendant Ary breached that duty of care.

317.     More specifically, and as set out in paragraphs 70-155, Defendant Supervisors, Defendant Baker, and Defendant Ary were aware of an acute security crisis at St. Clair and in the P/Q blocks in particular.

318.     Despite this, Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Baker failed to take steps to ensure that prisoners at St. Clair (and particularly in the P/Q blocks) were adequately supervised and monitored, as set out in paragraphs 156-183.

319.     Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Baker failed to ensure that prisoners were disciplined for acts of violence or possession of contraband, as set out in paragraphs 184-202 and 210-226;

320.     Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Baker failed to ensure that adequate contraband searches were carried out and that contraband weapons were confiscated, as set out in paragraphs 184-202.

321.     Defendant Supervisors and Defendant Ary failed to ensure that prisoners were safely housed at St. Clair and that prisoners who were likely to perpetrate violence were safely segregated from their likely victims, as set out in paragraphs 203-209.

322.     Dunn, Culliver, Daniels, Williams, Ellington, Jones, Givens, Brooks, Sanders, White, Malone, Graham, and Baker created a culture of violence at St. Clair by, among other things, failing to discipline staff for acts of violence and/or committing acts of violence themselves, as set out in paragraphs 227-236.

323.     In doing so, Defendant Supervisors, Defendant Ary, and Defendant Baker acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law.

324.     These Defendants' breach of their duty of care to Mr. Andrews directly and proximately caused Mr. Andrews to suffer damages, including physical and emotional pain and suffering and death.

325.     Mr. Andrews would have been able to bring a claim for Defendants' misconduct had that misconduct not resulted in his death.

### Count X – State Law
### Wrongful Act or Omission Resulting in Death
### Against Defendants Brooks Baker, Caver, Ary and Garrett
### Ala. Code § 6-5-410

326.     Plaintiff incorporates by reference and as if fully restated here paragraphs 1-7, 11-15, 25, 34-209, 237 of this Complaint.

327.     Plaintiff was in the custody and care of Defendants.

328.     Defendants had a duty of care to Mr. Andrews, including to safely house Mr. Andrews, to protect him from violence by other prisoners, and to ensure the provision of adequate medical care.

329.     Defendants Brooks, Baker, Caver, Ary, and Garrett breached that duty of care.

330.     Defendants Brooks, Baker, Caver, Ary, and Garrett knew of and consciously disregarded the substantial risk that Mr. Andrews would be seriously harmed by Mr. Davis, failing to protect him from harm.

331.     Defendants Brooks, Baker, Caver, Ary, and Garrett, acting individually and in conspiracy with other Defendants, failed to protect Mr. Andrews.

332.     More specifically, Defendants Brooks, Baker, Caver, Ary, and Garrett knew or should have known that Mr. Davis had a history of violence and possession of contraband, as set out in paragraphs 39-41.

333.     Despite this, Defendant Ary took no steps to ensure that Mr. Davis was safely housed in order to prevent him from harming other prisoners, including Mr. Andrews, as set out in paragraphs 203-209.

334.   Defendant Brooks knew that Mr. Andrews was afraid of Mr. Davis and wanted a housing change for his safety, as set out in paragraph 44.

335.   Despite this Defendant Brooks took no steps to safely segregate Mr. Andrews and Mr. Davis, or to otherwise ensure Mr. Andrews's safety, as set out in paragraphs 44-45 and 206-208.

336.   Defendant Baker knew of the high levels of violence and proliferation of contraband weapons in the P/Q blocks and the substantial risk of serious harm to prisoners in those blocks like Mr. Andrews, as set out in paragraphs 70-139, 149-178, and 185-195.

337.   Despite this, Defendant Baker failed to take any measures to ensure that the P/Q blocks were adequately supervised and monitored on the day that Mr. Davis attacked Mr. Andrews, or to ensure that contraband searches were carried out and contraband weapons confiscated on that date, as set out in paragraphs 64-69, 180-184, and 196-202.

338.   Defendants Caver and Garrett were present at the time that Mr. Davis attacked and stabbed Mr. Andrews, but did not take steps to intervene or otherwise protect Mr. Andrews, as set out in paragraphs 38 and 46-60.

339.   In doing so, Defendants Brooks, Baker, Caver, Ary and Garrett acted willfully, maliciously, fraudulently, in bad faith, beyond their authority, or under a mistaken interpretation of the law.

340.   These Defendants' breach of their duty of care to Mr. Andrews directly and proximately caused Mr. Andrews to suffer damages, including physical and emotional pain and suffering and death.

341.   Mr. Andrews would have been able to bring a claim for Defendants' misconduct had that misconduct not resulted in his death.

WHEREFORE, Plaintiff LaKeisha Ezell, as representative of the Estate of Terrence Andrews, respectfully requests that this Court enter a judgment in Plaintiff's favor and against all Defendants, awarding compensatory damages, punitive damages, and attorneys' fees and costs against each Defendant, jointly and severally, and any other relief this Court deems just and appropriate.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**LAKEISHA EZELL as representative of the ESTATE OF TERRENCE ANDREWS**

BY: /s/ Megan Pierce
  *One of Plaintiff's Attorneys*

BY: /s/ Anil Mujumdar
  *Local Counsel*

*Ruth Z. Brown (pro hac vice application forthcoming)
Megan Pierce (pro hac vice application forthcoming)
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
T: 312-243-5900
F: 312-243-5902
E: ruth@loevy.com, megan@loevy.com
*Counsel of Record

Anil A. Mujumdar (ASB-2004-L65M)
Dagney Johnson Law Group
2170 Highland Avenue, Suite 250
Birmingham, AL 35205
T: 205.590.6986

F: 205.809.7899
E: anil@dagneylaw.com