FILED

2025 Jan-28 PM 05:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| **LAKEISHA EZELL,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Case No. 4:20-CV-2058-ACA** |
| **v.** ) | |
| ) | **[OPPOSED]** |
| **JEFFERSON DUNN,** *et al.*, ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OF LAW IN
## <u>SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION .............................................................................................. 1

NARRATIVE STATEMENT OF UNDISPUTED FACTS ........................................ 2

   I.   Procedural History ............................................................................ 2

   II.  The ADOC Officials ........................................................................ 2

   III. Factual Background ......................................................................... 3

       A.   ADOC's Facilities and Custody Levels ................................... 3

       B.   Andrews's Institutional History ............................................. 4

       C.   Davis's Institutional History .................................................. 6

       D.   The December 29, 2018, Incident ......................................... 7

       E.   The Investigation ................................................................... 9

   IV. St. Clair ............................................................................................ 11

       A.   St. Clair Standard Operating Procedures ............................. 11

       B.   The ADOC Officials' Efforts Regarding Correctional Staffing ........... 13

       C.   The ADOC Officials' Efforts Regarding Inmate Violence and Contraband at St. Clair ............................................................ 15

       D.   Security Features of St. Clair ................................................. 16

       E.   The ADOC Officials' Efforts to Control Inmate Movement ............... 17

       F.   St. Clair's Classification Procedures ..................................... 18

   V.   Training ............................................................................................. 19

EXPERT TESTIMONY ...................................................................................... 20

LEGAL STANDARDS ....................................................................................... 24

   I.   Summary Judgment. ....................................................................... 24

   II.  Deliberate Indifference. ................................................................. 25

       A.   Wade v. McDade. ................................................................. 25

       B.   Supervisory Liability. ............................................................ 29

   III. Qualified Immunity. ...................................................................... 29

   IV. Wrongful Death. ............................................................................. 30

ARGUMENT .................................................................................................... 30

I.   Dunn's Actions Entitle Him to Summary Judgment. ..................................30

   A.   Plaintiff's Failure-to-Protect Claim. ......................................................30

   B.   Plaintiff's Wrongful-Death Claim. ........................................................40

II.  Ellington's Actions Entitle Him to Summary Judgment. ............................41

   A.   Plaintiff's Failure-to-Protect Claim. ......................................................41

   B.   Plaintiff's Wrongful-Death Claim. ........................................................43

III. Jones's Actions Entitle Her to Summary Judgment. ...................................43

   A.   Plaintiff's Failure-to-Protect Claim. ......................................................43

   B.   Plaintiff's Wrongful-Death Claim. ........................................................45

CONCLUSION ...........................................................................................................45

CERTIFICATE OF SERVICE ........................................................................................47

## TABLE OF AUTHORITIES

**Cases**                                                      **Page(s)**

Anderson v. Liberty Lobby, Inc.,
   477 U.S. 242 ....................................................................................25

Boykins v. Dunn,
   696 F. Supp. 3d 1061 (N.D. Ala. 2023) ............................................45

Brown v. Dunn,
   C.A. No. 2:21-cv440-MHT,  2024 WL 5168637 (M.D. Ala. Dec. 19, 2024) .....40

Celotex Corp. v. Catrett,
   477 U.S. 317 (1986) ..........................................................................25

Cottone v. Jenne,
   326 F.3d 1352 (11th Cir. 2003)..........................................................29

Ex parte Ala. Dept. of Corrs.,
   201 So.3d 1170 (Ala. 2016)...................................................... 41, 43, 45

Ex parte Cranman,
   792 So. 2d 392 (Ala. 2000) ......................................................... 31, 41

Ex parte Est. of Reynolds,
   946 So. 2d 450 (Ala. 2006) ................................................................41

Farmer v. Brennan,
   511 U.S. 825, 114 S.Ct. 1970 (1994) ......................................... passim

Gaines v. Wardynski,
   871 F.3d 1203 (11th Cir. 2017)..........................................................37

George v. Wexford Health Sources, Inc.,
   Case No. 2:22-cv-434-ECM, 2024 WL 1120110 (M.D. Ala. Mar. 10, 2024).....34

Gilmore v. Dept. of Corr.,
   111 F.4th 1118 (11th Cir. 2024)..........................................................37

Hale v. Tallapoosa County,
   50 F.3d 1579 (11th Cir. 1995)................................................... passim

Hunter v. Leeds,
   941 F.3d 1265 (11th Cir. 2019)..........................................................37

Jones v. Fransen,
   857 F.3d 843 (11th Cir. 2017)............................................................37

Lee v. Ferraro,
    284 F.3d 1188 (11th Cir. 2002)...........................................................................30

Marbury v. Warden,
    936 F.3d 1227 (11th Cir. 2019)...........................................................................31

Marsh v. Butler County, Alabama,
    268 F.3d 1014 (11th Cir. 2001)................................................................... passim

Rasho v. Jeffreys,
    22 F.4th 703 (7th Cir. 2022)................................................................................36

Stalley v. Cumbie,
    -- F.4th --, 2024 WL 5244627 (11th Cir. Dec. 30, 2024) .............................. 29, 38

Swain v. Junior,
    961 F.3d 1276 (11th Cir. 2020)..................................................................... 28, 36

Wade v. McDade,
    106 F.4th 1251 (11th Cir. 2024)................................................................... passim

Wade v. McDade,
    83 F.4th 1332 (11th Cir. 2023)...........................................................................27

Williams v. Bennett,
    689 F.2d 1370 (11th Cir. 1982)..................................................................... 33, 34

Willingham v. Loughnan,
    261 F.3d 1178 (11th Cir. 2001)...........................................................................30

**Statutes**

18 U.S.C.§ 3636(a)(1)(A) ..................................................................................32

18 U.S.C.§ 3636(c)(2)........................................................................................32

42 U.S.C. § 1983 ................................................................................................2

Ala. Code § 6-5-410.......................................................................... 30, 40, 43, 45

**Rules**

Fed. R. Civ. P. 56(a)...........................................................................................25

Fed. R. Civ. P. 56(e)...........................................................................................25

Rule 56(c).........................................................................................................25

Jefferson Dunn ("Dunn"), Edward Ellington ("Ellington"), and Karla Jones ("Jones," and, together with Dunn and Ellington, the "ADOC Officials") submit this memorandum in support of their Motion for Summary Judgment (Doc. 183).

## INTRODUCTION

Plaintiff seeks to hold the ADOC Officials personally liable for the criminal actions of one inmate (Cedric Davis ("Davis")) that resulted in the death of another inmate (Terrence Andrews ("Andrews")).  After the Court ruled on the ADOC Officials' Motion to Dismiss (Doc. 105), the Parties engaged in extensive discovery, and the Eleventh Circuit issued its landmark opinion in Wade v. McDade, 106 F.4th 1251 (11th Cir. 2024) (en banc).  Wade changed the landscape for deliberate-indifference claims in this Circuit, clearly demarcating the level of deliberation required for a state official to violate an individual's Eighth Amendment rights.  At the same time, discovery confirmed the absence of evidence supporting Plaintiff's claims.  Discovery disproved Plaintiff's allegation that the ADOC Officials "did nothing" to protect inmates at St. Clair from violence, establishing the extensive actions each ADOC Official took, within his or her authority, to address inmate violence at St. Clair.

As set forth separately below with respect to each individual ADOC Official, the Court should grant summary judgment to each ADOC Official for at least the following three (3) reasons:

(1)    Plaintiff cannot establish that any ADOC Official violated the Constitution;

(2)    Plaintiff cannot establish that any ADOC Official violated clearly established law; and

(3)    Plaintiff cannot establish a state-law wrongful-death claim against any ADOC Official.

The ADOC Officials therefore respectfully request that the Court grant summary judgment in their favor on Plaintiff's remaining claims against them.

## NARRATIVE STATEMENT OF UNDISPUTED FACTS

### I.    PROCEDURAL HISTORY

1.    Plaintiff, as the representative of the Estate of Andrews, filed this action attempting to hold the ADOC Officials and other current and former ADOC employees personally liable for Andrews's death at St. Clair on December 29, 2018. (Docs. 1, 34).

2.    After the Court decided the ADOC Officials' Motion to Dismiss, the following claims remained against the ADOC Officials: Count One, failure-to-protect Andrews from inmate violence pursuant to 42 U.S.C. § 1983 ("section 1983"); and Count Nine, wrongful death pursuant to Alabama state law.

### II.    THE ADOC OFFICIALS

3.    Dunn served as ADOC's Commissioner from April 1, 2015, until December 31, 2021.  (Doc. 185-11 (Ex. C) at 6 (14:8-10), 14 (48:16-17)).

2

4.      As ADOC's Commissioner, Dunn represented the highest-ranking official in ADOC and exercised general oversight over ADOC's statewide operations.  (Doc. 89, ¶ 17).

5.      Ellington began working for ADOC on June 26, 1989, as a correctional officer and received several promotions throughout his career, including his promotion to Institutional Coordinator for ADOC's Northern Region in June 2017, a position he occupied at the time of the Incident at issue in this action.  (Doc. 185-5 (Ex. B) at 8 (21:14-20), 9 (28:5-29:5)).

6.      As Institutional Coordinator, Ellington provided general oversight over the security operations of ADOC male facilities within the northern region of Alabama, including St. Clair.  (Id. at 11 (35:24-36:8)).

7.      Jones served as the Warden III at St. Clair at the time of the Incident; in that position, she exercised general oversight over certain day-to-day operations at St. Clair.  (Doc. 185-12 (Ex. D) at 6 (14:21-15:13); Doc. 89, ¶ 23).

III.    **FACTUAL BACKGROUND**

A.      **ADOC'S FACILITIES AND CUSTODY LEVELS.**

8.      ADOC designates its facilities as Security Level I, Security Level II, Security Level IV, or Security Level V, with Security Level V constituting the most secure and restrictive environment in the ADOC system and housing the most

violent and highest classified offenders in ADOC custody.  (ADOC Male Inmate Handbook, https://doc.alabama.gov/docs/PublicMaleInmateHandbook.pdf, at 7-8).

9.      St. Clair maintains the designation of a Security Level V facility (https://doc.alabama.gov/facility.aspx?loc=21).

10.    ADOC also assigns each inmate a custody level.  (Doc. 185-18 (Ex. D-N) at 6-8).

11.    "Close" custody level represents ADOC's most restrictive custody level and includes inmates with prior escape attempts, inmates exhibiting violent behavior, and inmates who demonstrate an inability to follow institutional regulations; ADOC houses "Close" custody inmates in restrictive housing units at Security Level V facilities, including St. Clair.    (Id. at 29-30).

12.    ADOC's "Medium" custody level applies to inmates considered suitable for institutional programming and able to adapt to dormitory living or double occupancy cells; ADOC houses "Medium" custody inmates at Security Level IV and V facilities, including St. Clair.  (Id. at 31-32).

B.    ANDREWS'S INSTITUTIONAL HISTORY.

13.    Andrews received a twenty-five-year sentence for Robbery I and Burglary III and entered ADOC custody on June 20, 2013.  (Doc. 185-32 at (Ex. H) at 8).

14.    However, Andrews repeatedly engaged in assaultive and violent behavior, which resulted in multiple placements in the Restrictive Housing Unit ("RHU") and increased his custody level.  (See, Id. at 8-10).

15.    On June 21, 2014, Andrews stabbed another inmate with a pencil so severely that the victim required helicopter transport to an outside hospital and treatment in an intensive care unit.  (Id. at 8).

16.    Based on Andrews's assault with a weapon causing serious injury, ADOC Classification standards required Andrews to be reclassified from Security Level IV, medium custody, to close custody at a Security Level V institution, and ADOC assigned Andrews to Holman, a Security-Level V facility, from July 3, 2014, until June 28, 2017.  (Id.).

17.    On April 24, 2016, Andrews assaulted an inmate with a broom handle, resulting in his placement in Holman's RHU until August 30, 2016. (Id. at 9).

18.    Within two months of his release from RHU, on October 17, 2016, Andrews, along with six other inmates, stabbed another inmate at Holman. (Id.).

19.    Within two months of his transfer to Ventress, Andrews and four other inmates assaulted another inmate over a debt. (Id.).

20.    On August 31, 2017, Andrews sexually assaulted an inmate at Ventress (Id.).

21.    Andrews assaulted inmates on at least five occasions between December 2017 and April 2018, and, in April 2018, he received disciplinary action for assault on an inmate and a recommendation to increase his custody level based on repeated infractions.   (Id.).

22.    On May 16, 2018, after a re-classification hearing, ADOC increased Andrews to medium custody at a Security Level V facility due to his repeated violent behavior, and, on June 12, 2018, ADOC transferred Andrews to St. Clair.  (Id.).

23.    At the time of the Incident, ADOC classified Andrews as Security Level V and medium custody level.  (Doc. 185-32 (Ex. H) at 28).

### C.    DAVIS'S INSTITUTIONAL HISTORY

24.    Davis received a life sentence for murder and entered ADOC custody on December 18, 2006.  (Id. at 11; Doc. 185-17 (Ex. D-M) at 17).

25.    Davis committed several disciplinary infractions at various ADOC facilities.  (Doc. 185-17 (Ex. D-M) at 30-35 (twelve disciplinaries December 2008-August 2009; stabbed another inmate at Donaldson; stabbed another inmate at Staton; fighting with a weapon at Fountain).

26.    ADOC transferred Davis to St Clair on August 14, 2017, where he remained until April 23, 2019. (Doc. 185-32 (Ex. H) at 12-13).

27.     At the time of the Incident, ADOC classified Davis as Security Level V and medium custody level.  (Doc. 185-17 (Ex. D-M) at 37; Doc. 185-32 (Ex. H) at 28-29).

### D.     THE DECEMBER 29, 2018, INCIDENT

28.     On December 29, 2018, at approximately 3:35 p.m., while manning the P dorm cubicle, Correctional Cubicle Operator Cynthia Caver ("Caver") observed Andrews and Davis involved in an altercation on the one side of P dorm.  (Doc. 185-8 (Ex. B-9) at 2).

29.     Caver called for assistance over her radio, and Correctional Officer Eric Garrett ("Garrett") responded from Q dorm, located in the same housing unit, where he was performing a security round at the time of the altercation.  (Id.).

30.     Simultaneously, Correctional Officer Rickey Johnson ("Johnson"), assigned to the population yard, also responded to the altercation in P dorm.  (Id.).

31.     Garrett and Johnson observed Andrews bleeding with multiple stab wounds, and immediately escorted Andrews to the St. Clair infirmary for medical treatment.  (Id.).

32.     Lieutenant Larry Baker ("Baker") and Sergeant Jacob Weaver ("Weaver") also responded to P dorm immediately following Caver's call for assistance.  (Id.).

33.    Weaver located Davis exiting cell P-28, detained Davis, and searched the cell for evidence.  (Id.).

34.    Weaver located a pair of bloody pants with the name "CED" written on the inside waistband, and a bloody inmate-made knife wrapped inside the bloody pants inside cell P-28.  (Id.).

35.    Baker and Sergeant Derrick Dent escorted Davis to the shift office, and Officer Steven Thompkins secured the crime scene while awaiting the arrival of investigators from ADOC's Investigations and Intelligence Division ("I&I").  (Id.).

36.    St. Clair medical staff conducted life-saving measures on Andrews until Regional Paramedic Service ("RPS") Emergency Medical Technician Paul McClain ("EMT McClain") arrived at the St. Clair infirmary.  (Id.).

37.    EMT McClain continued life-saving measures until approximately 4:10 p.m., when EMT McClain determined Andrews possessed no signs of life and lacked vital signs.  (Id.).

38.    At approximately 4:12 p.m. on December 29, 2018, Dr. Williams from Grandview Medical Center pronounced Andrews deceased.  (Id.).

39.    At the time of the Incident, ADOC assigned Andrews to P dorm cell P22 bed 1A and assigned Davis to P dorm cell P22 bed 2A.  (Id.).

### E.    THE INVESTIGATION

40.    I&I investigating agent Matthew Dawkins ("Agent Dawkins") responded to St. Clair the evening of the Incident.  (Doc. 185-55 (Ex. P-14) at 2).

41.    Agent Dawkins inspected and took pictures of Andrews's body, noting two wounds to Andrews's upper left arm, and one wound to Andrews's upper chest which appeared consistent with stab wounds.  (Id.).

42.    I&I investigating agents Hedrick ("Agent Hedrick") and Hopper ("Agent Hopper") also responded to St. Clair and inspected the crime scene in P dorm.  (Id. at 3).

43.    Agents Hedrick and Hopper photographed the crime scene, as well as Andrews's and Davis's assigned cell P-22.  (Id.).

44.    Agent Dawkins interviewed Davis regarding the Incident, but Davis largely refused to answer questions.  (Id.).

45.    Agent Dawkins photographed the inmate-made knife and the bloody pants recovered from cell P-28, noting possible blood on the clothing and knife.  (Id.).

46.    Sergeant Rafael Santa-Maria provided a statement to Agent Dawkins indicating that, while in the infirmary, Davis stated "he and his cell partner had words about Inmate Davis's cell partner using drugs and involved in sexual activity in the cell with another inmate."  (Id.).

47.    Agent Dawkins also interviewed Caver, who stated that she observed Andrews and Davis in an altercation, she radioed for help, and she observed Davis enter the P-2 side of P dorm.  (Id. at 4).

48.    Caver identified the inmate who assaulted Andrews as "Little Ced" or "Ced," and explained that she did not witness the actual assault as it occurred within cell P-22.  (Id.).

49.    A nurse overheard Davis, while in the infirmary, saying the altercation between Davis and Andrews stemmed from Andrews engaging in sexual relations with multiple inmates inside their assigned cell.  (Id.).

50.    Agent Dawkins also interviewed Garrett, Johnson, and Weaver, who provided statements consistent with information documented in the Incident Report. (Id.).

51.    The coroner, with the Alabama Department of Forensic Sciences, concluded that the manner of Andrews's death was homicide.  (Id. at 6).

52.    Agent Dawkins sent the investigation to the St. Clair County District Attorney's Office and recommended charging Davis with Capital Murder.  (Id.).

53.    On October 2, 2020, a St. Clair County Grand Jury returned an indictment against Davis for Capital Murder.  (Doc. 185-38 (Ex. N) at 2-4).

## IV.  ST. CLAIR

### A.    ST. CLAIR STANDARD OPERATING PROCEDURES

54.    In 2018 and 2019, ADOC maintained a comprehensive set of Administrative Regulations ("AR") which established the policies and procedures that applied to all ADOC facilities.  (Doc. 185-57 (Ex. P-16) at 1-7).

55.    In addition to ADOC's ARs, St. Clair maintained Standard Operating Procedures ("SOP"), which established the specific policies and procedures governing operations at St. Clair.  (See e.g., Docs. 185-59—185-66 (Exs. P-18-P-25)).

56.    St. Clair SOP 031, titled "Staffing," defines "Critical Manning" as "[t]he minimum number of security personnel needed to man all posts without altering the routine operations of the institution."  (Doc. 185-60 (Ex. P-19) at 2).

57.    Pursuant to SOP 031, "Essential Posts" are those posts "that will be manned twenty-four hours a day, seven days a week."  (Id. at 3).

58.    In addition to the staffing plan set forth in SOP 031, SOP 032 establishes the "posts that should be shut down" in times of minimal staff availability, and the order in which shift supervisors should close those posts.  (Doc. 185-61 (Ex. P-20) at 6).

59.    SOP 083, which establishes the responsibilities for St. Clair's Inmate Control Systems Officer, requires staff to house inmates identified as potential

11

PREA victims on the one side of the population housing units and inmates identified as potential PREA predators on the two side.  (Doc. 185-62 (Ex. P-21) at 8-9).

60.    Additionally, SOP 083 assigns the ICS Officer responsibility for issuing colored wristbands according to inmates' housing assignments.  (Id. at 7).

61.    St. Clair's Internal Classification Board ("ICB"), which consists of a Captain or above, a classification specialist, and psychological associate or mental health professional, meets weekly and on an as needed basis to review housing assignments and determines the "needs and requirements of an inmate," including custody level, programming, and housing unit placement for inmates housed at St. Clair.  (Doc. 185-32 (Ex. H) at 17).

62.    St. Clair SOP 137, titled "Inmate Movement Control," guides correctional officers in controlling inmate movement to provide for "orderly movement as well as provide increased security."  (Doc. 185-29 (Ex. F-9) at 2).

63.    Under SOP 137, inmates may not visit unassigned living areas, job sites, or program areas unless they obtain approval from the shift commander or a higher-ranking security staff member.  (Id. at 4).

64.    Under SOP 110, titled "Search and Shakedowns," cell block rovers must conduct cell searches each shift in their assigned housing unit and perform pat searches randomly or as the situation dictates to prevent the introduction of

contraband into the facility, detect the manufacture of prohibited items, discourage theft, and discover health or safety hazards.  (Doc. 185-62 (Ex. P-23) at 4).

### B.    THE ADOC OFFICIALS' EFFORTS REGARDING CORRECTIONAL STAFFING

65.    ADOC and St. Clair faced staffing challenges, much like most corrections agencies throughout the nation.  (Doc. 185-35 (Ex. K) at 37-38; Doc. 185-31 (Ex. G) at 35).

66.    Prior to the COVID-19 pandemic, ADOC, under Dunn's leadership, reversed the decline in hiring of new correctional staff and achieved an increase in correctional officers in 2019, which continued until the outbreak of COVID-19 in early 2020.  (Doc. 185-11 (Ex. C) at 49 (186:6-17)).

67.    In 2016, Dunn introduced a new classification of security staff – Correctional Cubicle Operators ("CCO"), who work in enclosed booths and do not come into direct contact with inmates; the introduction of CCOs increased the availability of fully-trained correctional officers for other tasks.  (Id. at 43 (161:17-20); Doc. 185-73 (Ex. P-32) at 14).

68.    In fiscal year 2019, the Alabama Legislature approved a thirty-million-dollar supplement to ADOC's budget, and ADOC dedicated a portion of these funds to correctional officer pay raises.  (Doc. 185-73 (Ex. P-32) at 14).

69.    In 2017, ADOC retained Warren Averett to advise it on its staffing challenges; among other things, Warren Averett recommended an increase in base

pay for Correctional Officer Trainees from $29,371 to approximately $37,500-$38,500. (Id. at 72).

70.    In July 2018, after receiving legislative approval, ADOC implemented a four-step ten percent (10%) increase for correctional officers working in close security prisons, such as St. Clair, and a two-step five percent (5%) increase for correctional officers working in medium security prisons. (Id. at 14).

71.    When Dunn began his tenure as Commissioner, ADOC received an annual budget of approximately $320 million; however, in 2021, when Dunn left his role as ADOC Commissioner, ADOC's budget increased to approximately $620 million dollars. (Doc. 185-31 (Ex. G) at 21).

72.    ADOC retained Savage Corrections Consulting, LLC ("Savage") to conduct a staffing analysis regarding the number of posts required at each facility for optimal staffing levels, which ADOC and Savage completed in May 2018. Doc. 185-69 (Ex. P-28)).

73.    In addition to retaining Warren Averett and Savage, ADOC retained Stephen Condrey at Troy University, who also conducted an analysis of the compensation offered to correctional staff. (Doc. 185-73 (Ex. P-32) at 14).

74.    ADOC supplemented St. Clair's staff regularly in 2018 and 2019 with Correctional Emergency Response Team ("CERT") members, officers from

Hamilton Aged and Infirm, retired officers, and volunteers from other facilities in order to address staffing levels at St. Clair.  (Doc. 180-5 (Ex. B) at 36 (136:7-13)).

75.    In the thirty days preceding the Incident, CERT team members and volunteer officers manned posts at St. Clair on at least thirteen shifts.  (Doc. 185-52 (Ex. P-12) at 3-12).

### C.    THE ADOC OFFICIALS' EFFORTS REGARDING INMATE VIOLENCE AND CONTRABAND AT ST. CLAIR

76.    ADOC maintained a zero-tolerance policy for contraband at all ADOC facilities, including St. Clair.  (Doc. 185-11 (Ex. C) at 17 (59:23-60:6)).

77.    Correctional facilities throughout the country face challenges with individuals attempting to introduce contraband.  (Doc. 185-31 (Ex. G) at 49).

78.    ADOC conducted facility searches by I&I or the Law Enforcement Services Division ("LESD") and K-9 units, K-9 searches of vehicles, searches of individuals going in the front gate, and monitoring of perimeter fences.  (Doc. 185-12 (Ex. D) at 49 (187:14-188:13).

79.    Ellington testified that in 2017, ADOC deployed five CERT teams consisting of 80-85 correctional officers and K-9 officers to conduct searches at ADOC's male facilities, including St. Clair, on a rotating basis.  Doc. 185-5 (Ex. B) at 35-36 (132:7-25), 133:9-134:1).

80.    ADOC also assigned CERT team members and staff from Hamilton Aged and Infirm to assist St. Clair staff with searches and shakedowns in 2018 and 2019.  (Id. at 35-36 (129:21-130:24, 136:4-137:7, 138:3-8)).

81.    Jones testified that during her tenure as Warden III at St. Clair, staff conducted daily searches, conducted larger shakedowns throughout the facility three to four times per week, and conducted facility-wide searches approximately twice per month.  (Doc. 185-12 (Ex. D) at 49 (185:5-19; 186:7)).

### D.    SECURITY FEATURES OF ST. CLAIR

82.    During Dunn's first visit to St. Clair, he recognized structural deficiencies of the institution and their resulting security challenges, including line-of-sight issues from housing cubicles into the dayrooms, low ceilings that allowed inmates access to tamper with or damage surveillance equipment, and generally aging infrastructure not originally designed for modern correctional practices.  (Doc. 185-11 (Ex. C) at 9-10 (25:17-27:5, 28:4-29:18).

83.    Dunn developed a plan to modernize ADOC's infrastructure, including St. Clair, early in his tenure, and drafted the Alabama Prison Transformation Initiative ("APTI") in late 2015.  (Id. at 10 (30:10-17)).

84.    Dunn developed the APTI to consolidate fourteen high and medium custody level prisons into four large scale, state-of-the-art regional correctional facilities.  (Doc. 185-42 (Ex. P-2) at 15).

85.    Dunn and Ellington explained how the low ceilings at St. Clair presented particular challenges in terms of ADOC maintaining working cameras inside the facility, as the ceiling height provided inmates easy access to tamper with or damage the cameras in their housing units.  (Doc. 185-11 (Ex. C) at 10 (29:2-30:3); Doc. 185-5 (Ex. B) at 21 (73:22-74:10)).

86.    Despite the physical challenges of St. Clair's design, ADOC expended a vast number of resources to repair, replace, and maintain the camera system, repair and replace locks, and replace cell doors at St. Clair in the face of damage by inmates.  (Doc. 185-11 (Ex. C) at 19 66:2-7); Doc. 185-42 (Ex. P-2) at 6).

### E.    THE ADOC OFFICIALS' EFFORTS TO CONTROL INMATE MOVEMENT

87.    St. Clair maintains SOP 137 (Inmate Movement Control) "to ensure orderly movement as well as provide increased security."  (Doc. 185-64 (Ex. P-23) at 2).

88.    Ellington testified that ADOC completed several fencing projects at St. Clair to assist with inmate movement control, including installation of interior fences in the population yard designed to provide separation of the population housing units.  (Doc. 185-5 (Ex. B) at 46 (173:22-175:22)).

89.    St. Clair implemented a color-coded wristband system to assist security staff in identifying inmate housing assignments and improve inmate movement

control; however, St. Clair faced difficulties as inmates removed or damaged their wristbands.  (Id. at 44 (166:3-167:25)).

90.    During a September 2018 audit of wristband compliance at St. Clair, only 19 of the 888 inmates housed at St. Clair lacked wristbands; moreover, the auditors noted that correctional staff secured and controlled all doors, and in total only 2.3% of the inmate population failed to comply with the wristband policy, and those inmates received disciplinary action.  (Doc. 185-32 (Ex. H) at 23).

91.    Correctional officers received corrective action for failing to secure doors and locks and received reminders from facility leadership to keep housing unit doors secure to control inmate movement.  ((Doc. 185-15 (Ex. D-K) at 6-25; Doc. 185-32 (Ex. H) at 24).

92.    Moreover, as noted above, ADOC expended vast resources installing interior fencing in the population yard to control and restrict inmate movement between population housing units.  (Doc. 185-62 (Ex. P-23) at 8).

    F.    ST. CLAIR'S CLASSIFICATION PROCEDURES

93.    ADOC utilizes the Ohio Risk Assessment System ("ORAS") in its facilities, including St. Clair.  The ORAS considers an inmate's security risk, disciplinary history, mental health and medical needs, programming, educational, and vocational needs to place inmates into the least restrictive setting available while

taking into account the safety and security of the facility, staff, other inmates, and the general public.  (Doc. 185-18 (Ex. D-N) at 6-7).

94.    All inmates received initial classification assessments upon intake to ADOC, and, twice a year or as needed, classification reviewed of each inmate's classification designation for any necessary changes.  (Id. at 12-14, 17-18).

95.    ADOC and St. Clair's classification system complies with nationally accepted standards.  (Doc. 185-32 (Ex. H) at 16).

96.    ADOC employs classification specialists at each facility, including St. Clair.   (Doc. 185-18 (Ex. D-N) at 10-11, 17).

## V.    TRAINING

97.    Dunn appointed Elliot Sanders as ADOC's training director in February 2017.  (Doc. 185-71 (Ex. P-30) at 2).

98.    The ADOC Correctional Training Academy (the "Academy") consists of ten (10) weeks of instruction for Correctional Officers Trainees, who must meet all required standards set forth by APOSTC and ADOC to obtain certification.  (Id. at 3, ¶ 9).

99.    Correctional officer trainees receive 400 training hours at the Academy on topics including, but not limited to, searches of bodies, cells, and areas, classification procedures, illicit drugs, evidence collection, disciplinary procedures, security, custody and control, count procedures, use of force, de-escalation tactics,

contraband, security threat groups known colloquially as gangs, strategic self-defense and grappling tactics, mental health, and PREA. (<u>Id.</u>, 4 (¶ 12)).

100.    APOSTC mandates continuing education for correctional officers each year, and ADOC requires 40 hours of annual training, which it documents in employee training files. (<u>Id.</u> at 5, ¶ 16).

### EXPERT TESTIMONY

The ADOC Officials submitted expert reports from two experts: Kevin Myers ("<u>Myers</u>") and Mark Inch ("<u>Inch</u>"). In addition, other current and former ADOC employees named as defendants in this action submitted an expert report from Brian Zawilinski ("<u>Zawilinski</u>").

Myers possesses almost fifty years of experience in corrections, from a line staff member to warden and management positions. (Doc. 185-32 (Ex. H) at 2). Myers provided the following opinions regarding the allegations against Dunn, Ellington, and Jones:

- "The ADOC Officials took reasonable and appropriate steps to protect inmates from the risk of inmate-on-inmate violence at St. Clair." (<u>Id.</u> at 26).

- "St. Clair correctional staff adequately monitored the P/Q dorms and responded appropriately to the incident." (<u>Id.</u> at 30).

- "The ADOC Officials established appropriate policies and procedures for identification and removal of contraband, and St. Clair staff conducted appropriate searches for contraband and disciplined inmates in possession of contraband items." (<u>Id.</u> at 33).

- "The ADOC Officials maintained a comprehensive classification system; ADOC staff appropriately classified Andrews and Davis; and the ADOC Officials implemented an appropriate system to address safety concerns, including separating dangerous inmates from the general population." (Id. at 37).

- "ADOC appropriately responded to and disciplined instances of inmate misconduct." (Id. at 39).

- "[T]he ADOC Officials demonstrated continued commitment to addressing safe and secure operations across ADOC and did not fail to protect Andrews from harm." (Id. at 40).

- "The ADOC Officials acted in [a] thoughtful and creative way to address challenges in ADOC facilities (including St. Clair) with staffing, contraband, inmate-on-inmate violence, inmate misconduct, physical plant, and operation of the ADOC system with limited resources." (Id. at 41).

Inch's "forty-year public service career" includes leadership positions "in the military and civilian sectors at both the Federal and State levels." (Doc. 185-31 (Ex. G) at 3). From 2017 to 2018, Inch served as the Director of the Federal Bureau of Prisons, and, from 2019 to 2021, Inch served as the Secretary of the Florida Department of Corrections. (Id. at 4). Inch provided opinions regarding the claims "against the executive leadership of" ADOC, including the ADOC Officials. (Id. at 3). Inch also reviewed the report of Plaintiffs' purported expert, Dan Pacholke ("Pacholke"). Inch concluded that "Pacholke failed to identify any concrete policy, procedure, or practice that Dunn, Culliver, Daniels, or Ellington failed to adhere to that caused the assaults of Andrews and Mullins, or anything those officials could have done in their individual capacities to prevent either assault." (Id. at 32-34).

Inch offered the following opinions:

- "Dunn identified challenges facing the ADOC and responded reasonably, by developing a comprehensive strategic plan and taking concerted actions to implement his plan to realize long-term positive change for ADOC." (Id. at 37).

- "The ADOC Officials responded reasonably to the risk of violence at St. Clair by repairing or replacing damaged and aging infrastructure, establishing controlled movement measures, and taking various steps to address staffing challenges." (Id. at 41).

- "St. Clair staff responded quickly and appropriately to the discovery of the inmate-on-inmate assaults at issue in these cases." (Id. at 43).

- "ADOC operates under a robust set of policies and procedures guiding the practice of every individual from Commissioner to correctional officer within the ADOC." (Id.).

- Staffing levels, inmate population levels, inmate supervision, unauthorized movement, classification and housing policies, and contraband search protocols did not cause Andrews's assault. (Id. at 46-49).

Unlike Myers and Inch, Zawilinksi primarily focused on lower-level ADOC personnel. Zawilinksi offered the following opinions relevant to the ADOC Officials:

- St. Clair faced "a serious staffing shortage," and "ADOC has taken several additional measures to recruit new staff." (Doc. 185-35 (Ex. K) at 29-31).

- "All maximum-security prisons are dangerous, volatile, and stressful environments because they house convicted criminals, plain and simple. . . . [Inmates serving sentences of life without parole] could not care less about getting written up or receiving additional criminal charges, which negates almost all leverage staff have to curtail their behavior." (Id. at 34).

22

Plaintiff submitted a report from her advocate Pacholke. Pacholke's report focused on "the conditions at St. Clair," and it failed to identify any conduct by any ADOC Official that placed Andrews at a substantial risk of serious harm. (Doc. 185-36 (Ex. L) at 5) ("In my opinion, the conditions at St. Clair posed a substantial risk of serious harm to prisoners such as Mr. Andrews. . . ."). Pacholke "visited St. Clair for the first time in April 2022" – more than three years after Andrews's death. (Id.). Accordingly, Pacholke's alleged observations regarding "conditions" at St. Clair fail to represent the conditions at the time of Andrews's death.

Pacholke criticized "understaffing" at St. Clair, but he failed to acknowledge the extensive efforts the ADOC Officials took to increase staffing (see supra at ¶¶ 65-75), and he failed to suggest that any ADOC Official failed to take any action within his or her authority to improve St. Clair's staffing levels. (Id. at 43-44). Pacholke's criticisms of contraband at St. Clair relied on the number of contraband items St. Clair staff recovered in searches – thus indicating that St. Clair staff in fact attempt to control contraband within the facility. (Id. at 44-46). Pacholke's criticisms of inmate movement focused largely on allegedly insufficient staffing. (Id. at 45-49).

The ADOC Officials deposed Pacholke on January 20, 2025.[1]  Pacholke made a number of concessions during his testimony, including: levels of contraband exist in all correctional facilities; St. Clair put in place systems to identify and remove contraband from the facility; Pacholke found no evidence that the ADOC Officials took any action or failed to take any action with the objective of harming the inmate population at St. Clair; the ADOC Officials attempted to increase staffing at St. Clair through use of CERT team members; Pacholke identified no evidence that the ADOC Officials possessed any notice or knowledge of Andrews's particular security or safety concerns; Pacholke failed to identify any deficiencies in ADOC's methods for reducing contraband; and Pacholke conceded that departments of corrections cannot prevent all inmate on inmate assaults or eliminate contraband from their facilities, including ADOC and St. Clair.  Ultimately, Pacholke failed to identify any measures the ADOC Officials failed to take within their authority to reduce inmate violence at St. Clair.

## LEGAL STANDARDS

### I.   SUMMARY JUDGMENT.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[1] The ADOC Officials have not received the transcript of Pacholke's deposition at this time; however, they will supplement their evidentiary submission with Pacholke's deposition testimony upon receipt of the transcript.

matter of law."  Fed. R. Civ. P. 56(a); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-24 (1986).  To defeat a motion for summary judgment, a plaintiff must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  <u>Celotex</u>, 477 U.S. at 324 (quoting former Fed. R. Civ. P. 56(e)).  Because Plaintiff cannot produce any, much less substantial, evidence supporting her claims, the ADOC Officials are entitled to summary judgment.

## II.    DELIBERATE INDIFFERENCE.

### A.    <u>WADE V. MCDADE</u>.

On July 10, 2024, the Eleventh Circuit issued its unanimous opinion in <u>Wade v. McDade</u>, 106 F.4th 1251 (11th Cir. 2024) (en banc).  The Court granted rehearing *en banc* in <u>Wade</u> "to resolve a question that, while simply stated, has bedeviled panels of this Court for the better part of the last three decades: 'What is the standard for establishing liability on an Eighth Amendment deliberate-indifference claim?'" <u>Id.</u> at 1253.  The Court provided the following answer to that question:

1.    *First*, of course, the plaintiff must demonstrate, as a threshold
      matter, that he suffered a deprivation that was, "objectively,

'sufficiently serious.'" [Farmer v. Brennan, 511 U.S. 825,] 834, 114 S.Ct. 1970 [1994] (citation omitted).

2.  *Second*, the plaintiff must demonstrate that the defendant acted with "subjective recklessness as used in the criminal law," *id.* at 839, 114 S.Ct. 1970, and to do so **he must show that the defendant was actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff**—with the caveat, again, that even if the defendant "actually knew of a substantial risk to inmate health or safety," he "cannot be found liable under the Cruel and Unusual Punishments Clause" if he "responded reasonably to the risk." *Id.* at 844-45, 114 S.Ct. 1970.

Id. at 1262 (emphasis added).

The Wade Court observed that Eleventh Circuit "precedent has been marred by internal inconsistency regarding the" legal standard for deliberate-indifference claims. 106 F.4th at 1255. Previous precedents required an inmate-plaintiff to "prove that the [defendant] official was subjectively aware that the inmate was at risk of serious harm" and "that the official disregarded that risk." Id. Additionally, the precedents required the plaintiff to "demonstrate that the official acted with more than some requisite level of negligence," but, "[w]ith respect to this third sub-requirement, our precedent reflects a persistent split between cases holding that the inmate must prove that the official's conduct reflected 'more than *mere* negligence' and those holding that the inmate must demonstrate that the official acted with more than *gross* negligence.'" Id. (citing Wade v. McDade, 83 F.4th 1332 (11th Cir. 2023)). The Court observed that these "negligence-based formulations" "stray[ed]

26

from" the Supreme Court's pronouncement "that the Eighth Amendment requires proof of 'subjective recklessness as used in the criminal law.'" Id. at 1255, 1256 (quoting Farmer v. Brennan, 511 U.S. 825, 837, 839 (1994)). The Court therefore "repudiate[d] [its] dueling 'more than' formulations." Id. at 1255.

In place of the negligence-based standards, the Wade Court returned to Farmer's standard of "'subjective recklessness as used in the criminal law.'" Id. (quoting Farmer, 511 U.S. at 839). Critically, to meet Farmer's criminal recklessness standard, the Court held that a "plaintiff must show that *the defendant was subjectively aware that his own conduct put the plaintiff at substantial risk of serious harm*." Id. (emphasis added). The Court distinguished a risk of harm caused by the official's own conduct from "some preexisting risk that the inmate plaintiff faced, without regard to its origin or cause." Id. at 1260. The Court noted that, in Farmer itself, "the inmate's allegations—and thus the Court's decision concerning those allegations—were trained not just on the risks of violence and assault that *exist* in a prison's general population, but rather on the risks that the prison officials *created* by placing the inmate in a particular prison's general population." Id. at 1258. Moreover, the Court noted the Supreme Court's observation in Farmer that "'[t]he Eighth Amendment does not outlaw cruel and unusual *conditions*; it outlaws cruel and unusual *punishments*.'" Id. at 1257 (quoting Farmer, 511 U.S. at 837) (internal quotation marks omitted) (emphasis added). Therefore, "'[a] subjective

approach,' the [Farmer] Court stressed, 'isolates those who inflict punishment,' and thus 'ensure[s] that only inflictions of punishment carry liability.'" Id. (quoting Farmer, 511 U.S. at 839, 841).

The Wade Court retained Farmer's "caveat" that "a defendant who 'respond[s] reasonably' to a risk, even a known risk, 'cannot be found liable' under the Eighth Amendment." Id. at 1255 (quoting Farmer, 511 U.S. at 837, 844). Thus, it remains true after Wade, as it was before, that "[e]ven a 'prison official[] who actually knew of a substantial risk to inmate health or safety may be found free of liability if [he] responded reasonably to the risk, even if the harm was not averted.'" Id. at 1257 (quoting Farmer, 511 U.S. at 844); see also Swain v. Junior, 961 F.3d 1276, 1286 (11th Cir. 2020)). Wade represents a substantial development in Eleventh Circuit jurisprudence, and many previous Eleventh Circuit precedents will not survive scrutiny under its revised deliberate-indifference standard. See id. at 1265 (Jordan, J. concurring) ("[C]ourts and attorneys [should] look carefully at prior Eleventh Circuit cases to see if they are consistent with the subjective component of deliberate indifference set out in Farmer. . . . If they are not, then they probably have been abrogated to at least some degree by today's decision."); 1269 (Newsom, J., concurring) (describing majority opinion as "the Court wisely repudiat[ing] its long-confused deliberate-indifference caselaw"); Stalley v. Cumbie, -- F.4th --, 2024 WL 5244627, at *15 (11th Cir. Dec. 30, 2024) (Ed Carnes, J., concurring) ("[A]ll of the

28

pre-*Wade* decisions . . . are obsolete, extinct, gone, insofar as establishing that deliberate indifference does exist in a post-*Wade* conduct case.").

###### B.  SUPERVISORY LIABILITY.

Under Eleventh Circuit precedent, "supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation." <u>Cottone v. Jenne</u>, 326 F.3d 1352, 1360 (11th Cir. 2003).  Plaintiff makes no allegation that any ADOC Official personally participated in the events that led to Andrews's death.  Accordingly, Plaintiff must establish a causal connection between the ADOC Officials' actions and a violation of Andrews's constitutional rights.  She cannot do so.

#### III.  QUALIFIED IMMUNITY.

"Qualified immunity offers complete protection for government officials sued in their individual capacities so long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (internal quotation marks and citations omitted).  Qualified immunity protects "'all but the plainly incompetent or one who is knowingly violating the federal law.'"  <u>Id.</u> at 1194 (quoting <u>Willingham v. Loughnan</u>, 261 F.3d 1178, 1187 (11th Cir. 2001)).  Plaintiff concedes that the ADOC Officials acted within their discretionary authority.  (Doc. 105 at 25).

Accordingly, to defeat qualified immunity, Plaintiff must demonstrate both that the ADOC Officials violated a constitutional right of Andrews and that the right was clearly established at the time of the violation. Lee, 284 F.3d at 1194.

## IV. WRONGFUL DEATH.

Under Alabama's wrongful-death statute, a personal representative may pursue a claim "for the wrongful act, omission, or negligence of any person . . . whereby the death of the testator or intestate was caused, provided the testator or intestate could have commenced an action for the wrongful act, omission, or negligence if it had not caused death." Ala. Code § 6-5-410. However, under Alabama law, state-agent immunity protects state employees against individual-capacity liability arising from the official "formulating plans, policies, or designs" and/or "exercising his or her judgment in the administration of a department or agency of government," unless the official acted "willfully, maliciously, fraudulently in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." Ex parte Cranman, 792 So. 2d 392, 405 (Ala. 2000).

## ARGUMENT

## I. DUNN'S ACTIONS ENTITLE HIM TO SUMMARY JUDGMENT.

### A. PLAINTIFF'S FAILURE-TO-PROTECT CLAIM.

As noted above, the Court decided the ADOC Officials' Motion to Dismiss without the benefit of the Eleventh Circuit's decision in Wade. The Court therefore relied on pre-Wade caselaw to conclude that "[t]he first element of a failure to

30

protect claim is an objective analysis which requires a plaintiff to plead facts showing that 'conditions were extreme and posed an unreasonable risk of serious injury to his future health or safety.'" (Doc. 105 at 27 (quoting Marbury v. Warden, 936 F.3d 1227, 1233 (11th Cir. 2019)). However, Wade made clear that, instead of "some preexisting risk that the inmate plaintiff faced, without regard to its origin or cause," courts should "focus[] on the official's subjective awareness of the risk created by his own conduct." 106 F.4th at 1260, 1261. Accordingly, Plaintiff must establish more than that Dunn "knew that the conditions at St. Clair created a risk of harm to Mr. Andrews." (Doc. 105 at 13). She must establish that Dunn knew ***his own conduct*** placed Andrews at a substantial risk of serious harm. Wade, 106 F.4th at 1260. Plaintiff failed to identify any conduct by Dunn that placed Andrews at a substantial risk of serious harm, much less demonstrate that Dunn knew his own conduct placed Andrews at a substantial risk of serious harm.

Plaintiff's Complaint relies heavily on a putative class action filed by the Equal Justice Initiative (the "Duke Action"). (Doc. 34, ¶¶ 130-133; 138-147).[2] According to Plaintiff, Dunn "failed to take meaningful corrective actions to reduce the substantial risk of serious harm facing prisoners at St. Clair," and "ADOC . . . failed to implement the necessary reforms and comply with the settlement

---

[2] The Duke Plaintiffs reinstated the Duke Action, and their motion for class certification remains pending. Duke v. Hamm, Civil Action No. 4:14-cv-01952-RDP (N.D. Ala.) (Doc. 417).

agreement." (Id., ¶ 141).  As a preliminary matter, Plaintiff failed to establish that the actions included in the Duke settlement agreement represented constitutional requirements, rather than aspirational goals. The Duke settlement agreement constituted a private settlement agreement under 18 U.S.C.§ 3636(c)(2), which permits parties to enter into private settlement agreements that "do[] not comply with the limitations of relief set forth in subsection (a)." (Doc. 185-13 (Ex. D-A) at 3). Accordingly, the private settlement agreement lacked any finding or stipulation that the relief was necessary to correct any violation of federal law.    18 U.S.C.§ 3636(a)(1)(A) (providing that courts "shall not grant or approve any prospective relief [in actions regarding prison conditions] unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right"). Indeed, the Duke settlement agreement explicitly stated that it did not constitute "an admission by any Defendant that any policy, practice, or procedure addressed in this Agreement violated or failed to comply with any applicable Constitutional provision, law, rule, or regulation." (Doc. 185-13 (Ex. D-A) at 3). Thus, Plaintiff possesses no evidence that non-compliance with the Duke settlement agreement violated the Constitution.

Moreover, the Duke Plaintiffs instituted an official-capacity action, not an individual-capacity action like this one.  Even assuming the truth of Plaintiff's

allegations here that ADOC failed to meet some of the <u>Duke</u> settlement agreement's provisions, those allegations do not lead to individual-capacity liability for Dunn. The Eleventh Circuit addressed a similar situation over forty years ago. <u>Williams v. Bennett</u>, 689 F.2d 1370 (11th Cir. 1982). <u>Williams</u> involved individual-capacity damages claims arising from an inmate-on-inmate assault. <u>Id.</u> at 1384. In a previous class action, "the district court entered injunctive relief . . . direct[ing] that only minimum custody inmates be assigned to dormitories and that at least one guard be stationed inside and one guard outside the dormitories." <u>Id.</u> at 1375. Despite the injunction, the plaintiff's "dormitory housed medium security prisoners, and no prison guards were stationed either inside or outside the dormitory." <u>Id.</u> at 1374. The plaintiff sought to hold various prison officials individually liable for failing to protect him from violence by failing to implement the injunction. <u>Id.</u> at 1380.

The Eleventh Circuit held that the plaintiff could not simply rest on "wrongdoing by the prison system, in its corporate form," but instead "must prove that one or more of the individual defendants acted with such callous indifference to [plaintiff's] safety as to amount to constitutional wrongdoing." <u>Id.</u> Therefore, "to prove actionable conduct or callous indifference, [plaintiff] must demonstrate that a particular defendant had the capability (authority and means) to provide adequate security and did not do so." <u>Id.</u> at 1388-89 ("[W]e refuse to adopt the position that an employee who attempts to accommodate the constitutional rights of prisoners in

his charge, within the financial limitations imposed, should, instead, resign from his position because of the realization that full compliance is impossible in the absence of adequate funding.  Indeed, the corrections official who walks away could be said to act with greater indifference than those who remain and attempt to work within the system."); George v. Wexford Health Sources, Inc., Case No. 2:22-cv-434-ECM, 2024 WL 1120110 (M.D. Ala. Mar. 10, 2024) (rejecting a plaintiff's "attempts to cobble together factual findings from [a previous official-capacity class action] and Eleventh Circuit case law on deliberate indifference to overcome qualified immunity," because it "asks this Court to leapfrog the requisite analysis of culpability for individual defendants for alleged violations of the Eighth Amendment").  Plaintiff cannot establish that Dunn possessed the "authority and means" to eliminate any risk of harm to Andrews but failed to do so.

Indeed, the record confirms the affirmative steps taken by Dunn within his authority to reduce the risk of inmate violence at St. Clair.  For example, Dunn's administration instituted an extensive "lock project, the fencing project, the QIT, Operation Restore Order, the pay increase to increase staff, the classification of a new cubicle officer classification, the use of retirees, the augmentation of our CERT teams from other facilities, augmentation from other correctional officers from facilities."  (Doc. 185-11 (Ex. C) at 43 (161:17-23)).  Dunn also faced limitations at St. Clair.  For example, "the physical design of the prison presented security

34

problems," including visibility challenges and low ceilings that permitted inmates to damage security cameras.  (Id. at 9 (26:21-27:5), 10 (29:7-16)).  Dunn and his administration sought new facilities as a "long-term" solution "while using the resources that we had to manage the short-term issues."  (Id. at 10 (29:19-30:17), 43 (161:7-11)).  Dunn testified that, "with the resources that we had, I believed that we were working to stem the issues and address them as best as we could as we were working towards more long-term solutions."  (Id. at 49 (186:23-187:1)).  Thus, discovery demonstrated the falsity of Plaintiff's allegation that Dunn failed to take actions to reduce the risk of inmate violence at St. Clair.

Ultimately, Plaintiff complains that Dunn's and ADOC's actions failed to eradicate inmate violence at St. Clair.  However, even before Wade, Supreme Court and Eleventh Circuit precedent provided that "'officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, *even if the harm ultimately was not averted*.'" Swain v. Junior, 961 F.3d 1276, 1287 (11th Cir. 2020) (quoting Farmer, 511 U.S. at 844).  The Court emphasized that "the fundamental question in any deliberate-indifference case is whether the defendants exhibited 'a sufficiently culpable state of mind.'"  Id. (quoting Farmer, 511 U.S. at 834).  "In evaluating that question, we must focus not on isolated failures—or impossibilities, as the case may be—but rather on the defendants' entire course of conduct."  Id. at 1287-88; see also Rasho

35

v. Jeffreys, 22 F.4th 703, 710 (7th Cir. 2022) (reversing deliberate-indifference finding where officials "made reasonable efforts to cure the deficiencies," which "demonstrate[d] a commitment to addressing the problem—the antithesis of the callous disregard required to make out an Eighth Amendment claim").  Moreover, while "[i]t is always possible to do more or move faster . . . , the existence of policies that may have been more effective does not mean an official recklessly disregarded the risk of harm."  Rasho, 22 F.4th at 711.  Thus, the mere fact that the Dunn administration's measures failed to eliminate all violence at St. Clair, or even that they failed to prevent Andrews's death, does not automatically mean Dunn acted with deliberate indifference.

Even if Plaintiff could establish that Dunn violated the Constitution, she cannot establish a violation of clearly established law.  This Court previously recognized that, to qualify as "clearly established law," a case must "put officials on 'fair warning that their acts are unconstitutional.'"  (Doc. 105 at 40-41 (quoting Hunter v. Leeds, 941 F.3d 1265, 1281 (11th Cir. 2019))).  A plaintiff seeking to identify clearly established law must "point to prior case law (from the Supreme Court of the United States, the Eleventh Circuit, or the highest court in the relevant state) that is 'materially similar.'"  Gaines v. Wardynski, 871 F.3d 1203, 1208 (11th

Cir. 2017) (quoting <u>Jones v. Fransen</u>, 857 F.3d 843, 851-52 (11th Cir. 2017)).[3]
Plaintiff cannot identify any caselaw putting Dunn on notice that his conduct
violated the Constitution.

At the motion to dismiss stage, the Court concluded that <u>Marsh v. Butler
County, Alabama</u>, 268 F.3d 1014 (11th Cir. 2001) (en banc), <u>abrogated on other
grounds by</u> <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544 (2007), and <u>Hale v. Tallapoosa
County</u>, 50 F.3d 1579 (11th Cir. 1995), provided clearly established law.  (Doc. 105
at 40-43).  As a preliminary matter, <u>Wade</u> abrogated <u>Marsh</u> and <u>Hale</u>, because they
improperly relied on a "risk" posed to inmates by "conditions," rather than a risk
created by the prison officials' own conduct.  <u>Marsh</u>, 268 F.3d at 1028 (referring to
risk posed by "conditions" at jail); <u>Hale</u>, 50 F.3d at 1583 (holding that plaintiff
needed to demonstrate "only that [the defendant prison official] had subjective
knowledge of a generalized, substantial risk of serious harm from inmate violence").
According to Judge Ed Carnes, "all of the pre-*Wade* decisions . . . are obsolete,
extinct, gone, insofar as establishing that deliberate indifference does exist in a post-
*Wade* conduct case."  <u>Stalley</u>, 2024 WL 5244627, at *15.  Judge Carnes reasoned:

> The entire purpose of going en banc in *Wade* was to throw into the
> judicial dumpster the unsatisfactory negligence-based measures of
> deliberate indifference and the decisions applying those measures, and

---

[3] The en banc Eleventh Circuit is currently considering whether a "robust consensus" of out-of-
circuit authority may clearly establish the law for purposes of qualified immunity.  <u>Gilmore v.
Dept. of Corr.</u>, 111 F.4th 1118, 1135, <u>reh'g en banc granted and vacated by</u> 119 F.4th 839 (11th
Cir. 2024).  The outcome of that rehearing remains irrelevant to this action because no authority,
binding or otherwise, supports individual liability in the circumstances present here.

replace them with the criminal recklessness standard and decisions applying it. *See Wade*, 106 F.4th at 1255. And that is exactly what *Wade* did. The post-*Wade* criminal recklessness standard, drawn from criminal law, is undeniably a more difficult one for a plaintiff to meet than either of the negligence-measurement standards that had been used in pre-*Wade* decisions.

*     *     *

It necessarily follows that pre-*Wade* negligence measurement cases cannot serve as binding precedent to establish deliberate indifference in the post-*Wade* era. They can't because when a deliberate indifference claim was up for decision before *Wade* existed, that panel did not apply or purport to apply the criminal recklessness deliberate indifference standard adopted in *Wade*. That earlier panel had no occasion to determine whether the facts of the case amounted to criminal recklessness because that was not the deliberate indifference standard that applied then.

Id., at *16 (Ed Carnes, J., concurring).

Even if Wade did not abrogate Marsh and Hale, both cases remain distinguishable from the facts here. Marsh involved a motion to dismiss (under the pre-Twombly standard). 268 F.3d at 1021. The plaintiffs alleged that "jailers were afraid to conduct visual inspections of inmate cells;" "[n]o visual or audio surveillance system was in place;" "[j]ailers never conducted prisoner headcounts;" the jail employed "[n]o system of classification;" "[n]ever were prisoners disciplined or segregated for assaulting other inmates, destroying jail property, or threatening jailers;" and the sheriff "did absolutely nothing to alleviate the conditions." Id. at 1024-25, 1029. The Court concluded "that it is an unreasonable response for an official to do nothing when confronted with prison conditions—like the conditions alleged in this case—that pose a risk of serious physical harm to inmates." Id. at

38

1034.  Here, unlike in <u>Marsh</u>, where the sheriff allegedly did "nothing," ADOC and St. Clair staff maintain surveillance cameras, employ a classification system, discipline inmates for violent acts, and conduct regular inmate headcounts.  Further, as set forth above, the record reflects numerous actions Dunn and his administration took to reduce inmate violence at St. Clair.  (See <u>supra</u>, ¶¶ 65-100).  Accordingly, even if <u>Marsh</u> remains good law, its holding that an officer responds unreasonably when he "do[es] nothing" could not put Dunn on notice that his multiple actions to reduce inmate violence at St. Clair amounted to a constitutionally insufficient response.

The <u>Hale</u> plaintiff offered evidence similar to that in <u>Marsh</u>: "that the jail had no policy for classifying and segregating the inmates," "had no written training policy and that [the jailer] had received no professional training at all."  50 F.3d at 1583-84.  The sheriff argued "that he was not deliberately indifferent primarily because he worked toward construction of a new jail which, he contends, was the only was to reduce the risk of violence."  <u>Id.</u>  The <u>Hale</u> Court held that "[a] jury could find that despite any efforts he made toward construction of the new jail, [the sheriff] was deliberately indifferent by disregarding 'alternative means' or interim measures for reducing the risk of violence," such as providing training or instituting a classification procedure.  <u>Id.</u>  Again, the undisputed evidence establishes that St. Clair employed classification procedures and provided training to security staff.

(<u>Supra</u>, ¶¶ 93-100).  Accordingly, even if <u>Hale</u> survived <u>Wade</u>, it could not put Dunn on notice that his actions with respect to inmate violence at St. Clair violated the Constitution.

### B.    PLAINTIFF'S WRONGFUL-DEATH CLAIM.

As a preliminary matter, Plaintiff's wrongful-death claim duplicates her section 1983 claim, and the Court should therefore dismiss it.  See <u>Brown v. Dunn</u>, 2024 WL 5168637, at \*10 (M.D. Ala. Dec. 19, 2024) (dismissing wrongful-death claim "as redundant" because "plaintiff's § 1983 claim is based on a violation of the wrongful-death statute").  In any event, Plaintiff cannot establish a wrongful-death claim against Dunn because, as set forth at length above, she possesses no evidence suggesting Dunn performed a "wrongful act, omission, or negligence . . . whereby the death of [Andrews] was caused."  Ala. Code § 6-5-410.  Instead, Plaintiff seeks to hold Dunn personally liable because of allegedly generally violent conditions in St. Clair.  Under this theory, ADOC's commissioner would bear personal liability for any inmate death due to violence in any ADOC facility deemed "too violent," despite the efforts of the commissioner and his or her administration to mitigate the violence.  Plaintiff possesses no authority supporting such broad liability, and such a rule would deter qualified individuals from serving as commissioner of ADOC.

Even if Plaintiff possessed evidence supporting her claim that Dunn caused Andrews's death, she cannot overcome state-agent immunity.  Plaintiff does not

dispute that her claims "'arise from a function that would entitle the State agent to immunity.'" (Doc. 105 at 67 (quoting <u>Ex parte Est. of Reynolds</u>, 946 So. 2d 450, 452 (Ala. 2006))). Accordingly, Plaintiff must demonstrate that Dunn "acted 'willfully, maliciously, fraudulently, in bad faith, beyond [his] authority, or under a mistaken interpretation of the law.'" (<u>Id.</u> (quoting <u>Cranman</u>, 792 So. 2d at 405)). As set forth above with respect to Plaintiff's section 1983 claim, Plaintiff failed to do so. <u>See Ex parte Ala. Dept. of Corrs.</u>, 201 So.3d 1170, 1181 (Ala. 2016) (holding state-agent immunity applied to claim against on-site prison officials where plaintiff alleged they "fail[ed] to conduct a more thorough investigation" of an incident between two inmates where one inmate later stabbed the other to death). Instead, the evidence establishes that Dunn took reasonable actions within his authority to address inmate violence at St. Clair. Accordingly, state-agent immunity protects him from Plaintiff's wrongful-death claim.

## II.    ELLINGTON'S ACTIONS ENTITLE HIM TO SUMMARY JUDGMENT.

### A.    PLAINTIFF'S FAILURE-TO-PROTECT CLAIM.

Plaintiff cannot meet the <u>Wade</u> standard with respect to Ellington. Specifically, Plaintiff cannot identify any conduct by Ellington that placed Andrews at a substantial risk of serious harm, and she certainly cannot establish that Ellington knew his own conduct placed Andrews at a substantial risk of serious harm. <u>Wade</u>, 106 F.4th at 1255. To the contrary, the record establishes that Ellington worked

within his authority to address inmate violence at St. Clair.  For example, Ellington, the other institutional coordinator, and the wardens from Level IV and V facilities held monthly "violence indicator meeting[s]" in which each warden "would actually report out on some of the incidents that transpired at his or her facility."  (Doc. 185-5 (Ex. B) at 17 (60:25-61:13), 18 (64:23)).   Those meetings presented "an opportunity for the wardens and [Ellington] and the other region institutional coordinator to actually sit down and have discussions to mitigate crime, violence, drugs, contraband."  (Id. at 18 (61:14-25)).  Ellington also testified about efforts to replace cameras and fix cell door locks when inmates damaged them.  (Id. at 21 (73:5-74:1), 23 (81:10-12, 84:20-25)).  St. Clair utilized staff members from other facilities and CERT members to augment staffing, and Ellington worked with Daniels and others to transfer 100 particularly violent inmates from St. Clair to other facilities.   (Id. at 27 (98:19-99:10), 37 (137:8-138:24)).   Thus, the record demonstrates Ellington's reasonable response to inmate violence at St. Clair, and Plaintiff cannot establish that he violated Andrews's constitutional rights.

Plaintiff certainly cannot establish that Ellington violated clearly established law. As set forth above with respect to Dunn, the facts here remain distinguishable from those in Marsh and Hale.  The record shows that, rather than doing "nothing," Ellington took reasonable actions within his authority to reduce inmate violence at St. Clair.  (Supra, ¶¶ 76-100; supra p. 41).  No caselaw exists putting Ellington on

notice that any instance of inmate violence at a facility over which he bore supervisory responsibility would expose him to individual liability. Accordingly, qualified immunity protects Ellington from Plaintiff's failure-to-protect claim.

### B.    PLAINTIFF'S WRONGFUL-DEATH CLAIM.

Plaintiff cannot establish a wrongful-death claim against Ellington because, as set forth above, she possesses no evidence suggesting Ellington "caused" Andrews's death. Ala. Code § 6-5-410. This evidentiary failure disposes of Plaintiff's claim. Even if Plaintiff possessed evidence supporting her claim, she cannot overcome state-agent immunity. See Ex parte Ala. Dept. of Corrs., 201 So.3d at 1181 (Ala. 2016). As set forth above with respect to Plaintiff's section 1983 claim, the evidence establishes that Ellington took reasonable actions within his authority to address inmate violence at St. Clair. Accordingly, state-agent immunity protects him from Plaintiff's wrongful-death claim.

### III.    JONES'S ACTIONS ENTITLE HER TO SUMMARY JUDGMENT.

### A.    PLAINTIFF'S FAILURE-TO-PROTECT CLAIM.

As with the other ADOC Officials, Plaintiff cannot identify any conduct by Jones that placed Andrews at a substantial risk of serious harm. Wade, 106 F.4th at 1255. The record demonstrates that Jones acted within her authority to prevent inmate violence at St. Clair. For example, in response to a 2018 PREA audit, Jones issued a memorandum reminding St. Clair staff to "enforce the wristband policy" and "ensure that security doors are secured always" and requiring that "only

Lieutenants and above are to conduct PREA unannounced round[s]." (Doc. 185-15 (Ex. D-K) at 2). She instituted additional bed roster checks after discovering that inmates "were out of place." (Doc. 185-12 (Ex. D) at 45 (169:14-170:4)). Thus, the record demonstrates that Jones took reasonable actions within her authority to reduce inmate violence at St. Clair, and Plaintiff cannot demonstrate that she violated Andrews's constitutional rights.

Even if Plaintiff could establish a constitutional violation, she cannot establish that Jones violated clearly established law. As set forth above with respect to Dunn, the facts here remain distinguishable from those in <u>Marsh</u> and <u>Hale</u>. The record shows that, rather than doing "nothing," Jones took reasonable actions within her authority to address inmate violence at St. Clair. (<u>Supra</u>, ¶¶ 76-100; <u>supra</u> p. 43). No caselaw exists putting Jones on notice that any instance of inmate violence at St. Clair would expose her to individual liability. Indeed, this Court recently held that a warden of St. Clair was entitled to qualified immunity in a similar case. <u>Boykins v. Dunn</u>, 696 F. Supp. 3d 1061, 1085 (N.D. Ala. 2023) (although plaintiff alleged that former St. Clair warden "was aware of the conditions at St. Clair," plaintiff "failed to demonstrate how it shows that he violated clearly established law"). Accordingly, the Court should grant summary judgment to Jones on the basis of qualified immunity.

### B.    PLAINTIFF'S WRONGFUL-DEATH CLAIM.

Plaintiff's failure to provide evidence that Jones caused Andrews's death disposes of her wrongful-death claim.  Ala. Code § 6-5-410.  Moreover, Jones's reasonable actions to address violence at St. Clair entitle her to state-agent immunity. See Ex parte Ala. Dept. of Corrs., 201 So.3d at 1181 (Ala. 2016).  Accordingly, the Court should grant summary judgment to Jones on Plaintiff's wrongful-death claim.

### CONCLUSION

For the reasons set forth herein and in the ADOC Officials' Motion for Summary Judgment and Evidentiary Submission, the ADOC Officials respectfully request that the Court grant them summary judgment on Plaintiff's remaining claims against them.

Respectfully submitted this 28th day of January, 2025.

/s/ William J. Cranford, III

One of the Attorneys for the ADOC Officials

William R. Lunsford
Matthew B. Reeves
Daniel J. Chism
William J. Cranford, III
**BUTLER SNOW LLP**
200 West Side Square
Suite 100
Huntsville, Alabama 35801
Telephone: (256) 936-5650
Facsimile: (256) 936-5651

bill.lunsford@butlersnow.com
matt.reeves@butlersnow.com
daniel.chism@butlersnow.com
will.cranford@butlersnow.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been served upon all parties in this matter, including without limitation the following, by the Court's CM/ECF system or by U.S. Mail on this 28th day of January, 2025:

Ruth Z. Brown *(pro hac vice)*
Megan Pierce *(pro hac vice)*
Quinn Rallins *(pro hac vice)*
**LOEVY & LOEVY**
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
Telephone: (312) 243-5900
Facsimile: (312) 243-5902
ruth@loevy.com
megan@loevy.com
rallins@loevy.com

Anil A. Mujumdar
**DAGNEY JOHNSON LAW GROUP**
2170 Highland Avenue, Suite 250
Birmingham, AL 35205
Telephone: (205) 590-6986
Facsimile: (205) 809-7899
anil@dagneylaw.com

*Attorneys for Plaintiff*

James N. Walter, Jr.
C. Richard Hill, Jr.
W. Allen Sheehan
Caitlin E. Cobb
W. Jackson Britton
**CAPELL & HOWARD P.C.**
150 South Perry Street (36104)
P.O. Box 2069
Montgomery, AL 36102-2069
Telephone: (334)241-8043
Facsimile: (334)-241-8243
jimmy.walter@chlaw.com
rick.hill@chlaw.com
allen.sheehan@chlaw.com
caitlin.cobb@chlaw.com
jackson.britton@chlaw.com

*Attorneys for Larry Baker*

/s/ William J. Cranford, III
_____
*Of Counsel*