FILED

2025 Mar-03  PM 07:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

**In The Matter Of:**

**Lakeisha Ezell v. Jefferson Dunn, et al.**

_____

Kevin Myers

*February 4, 2025*

_____

Bain & Associates Court Reporting Services, Inc.

505 20th Street North

Suite 1250

Birmingham, AL 35203

Toll Free 1.888.326.0594

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

| | |
|---|---|
| 1      IN THE UNITED STATES DISTRICT COURT | 1           A P P E A R A N C E S |
| 2      FOR THE NORTHERN DISTRICT OF ALABAMA | 2 FOR THE PLAINTIFF: (Via Zoom) |
| 3             MIDDLE DIVISION | 3           RUTH BROWN |
| 4            **CONFIDENTIAL** | 4           Attorney at Law |
| 5 | 5           Loevy & Loevy |
| 6 LAKEISHA EZELL, as        ) | 6           311 N. Aberdeen, 3rd Floor |
| 7 representative of the     )   Honorable Judge | 7           Chicago, Illinois 60607 |
| 8 ESTATE OF TERRENCE ANDREWS,)  Annemarie Carney Axon | 8           ruth@loevy.com |
| 9      Plaintiff,           ) | 9 |
| 10 VS.                       )        Case No. | 10 FOR THE DEFENDANT: (Via Zoom) |
| 11 JEFFERSON DUNN, et al.,    )    4:20-cv-02058-ACA | 11           ALLEN SHEEHAN |
| 12      Defendant.           ) | 12           Attorney at Law |
| 13                        DEPOSITION OF: | 13           Capell & Howard |
| 14 LORI GUY, as representative)    KEVIN MYERS | 14           150 South Perry Street |
| 15 of the ESTATE OF STEVEN    ) | 15           Montgomery, Alabama  36104 |
| 16 MULLINS,                   )        Case No. | 16           allen.sheehan@chlaw.com |
| 17      Plaintiff,           )    4:21-cv-00264-SGC | 17 |
| 18 VS.                       ) | 18 FOR THE DEFENDANT: |
| 19 JEFFERSON DUNN, et al.,    ) | 19           WILL CRANFORD |
| 20 | 20           DANIEL CHISM (Via Zoom) |
| 21      S T I P U L A T I O N S | 21           Attorneys at Law |
| 22      IT IS STIPULATED AND AGREED, by and between | 22           Butler Snow |
| 23 the parties through their respective counsel, that | 23           200 West Side Square, Suite 100 |
| 24 the deposition via Zoom of: | 24           Huntsville, Alabama  35801 |
| 25           KEVIN MYERS, | 25           will.cranford@butlersnow.com |
| Page 1 | Page 3 |
| 1 may be taken before LeAnn Maroney, Notary Public, | 1          I N D E X |
| 2 State at Large, at the law offices of Butler Snow, | 2      MS. BROWN:    6-231 |
| 3 200 West Side Square, Huntsville, Alabama, 35801, on | 3      MR. CRANFORD:  232-257 |
| 4 February 4, 2025, commencing at 10:08 a.m. | 4 |
| 5 | 5 |
| 6      IT IS FURTHER STIPULATED AND AGREED that the | 6 |
| 7 signature to and reading of the deposition by the | 7          E X H I B I T S |
| 8 witness is not waived, the deposition to have the | 8 PLAINTIFF'S EXHIBIT:                    PAGE |
| 9 same force and effect as if full compliance had been | 9 A - Ezell report                        70 |
| 10 had with all laws and rules of Court relating to the | 10 B - Guy report                         70 |
| 11 taking of depositions. | 11 C - 10-22-18 incident report           194 |
| 12 | 12 |
| 13      IT IS FURTHER STIPULATED AND AGREED that it | 13 |
| 14 shall not be necessary for any objections to be made | 14 |
| 15 by counsel to any questions, except as to form or | 15 |
| 16 leading questions, and that counsel for the parties | 16 |
| 17 may make objections and assign grounds at the time | 17 |
| 18 of the trial, or at the time said deposition is | 18 |
| 19 offered in evidence, or prior thereto. | 19 |
| 20 | 20 |
| 21 | 21 |
| 22            *** | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 |
| Page 2 | Page 4 |

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 1 (1 - 4)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

Page 5

```
1            I, LeAnn Maroney, a Court Reporter of
2  Birmingham, Alabama, and a Notary Public for the
3  State of Alabama at Large, acting as commissioner,
4  certify that on this date, pursuant to the Federal
5  Rules of Civil Procedure and the foregoing
6  stipulation of counsel, there came before me on
7  February 4, 2025, KEVIN MYERS, witness in the above
8  cause, for oral examination, whereupon the following
9  proceedings were had:
10                     * * * * *
11           THE VIDEOGRAPHER:  This marks the
12  beginning of the deposition of Kevin Myers in the
13  matter of Lakeisha Ezell, as representative of the
14  estate of Terrence Andrews, versus Jefferson Dunn
15  and also in the matter of Lori Guy, as
16  representative of the estate of Steven Mullins,
17  versus Jefferson Dunn, et al., Case Number
18  4:20-CV-02058-ACA, also Case Number
19  4:21-CV-00264-ACA, both filed in the United States
20  District Court for the Northern District of Alabama,
21  Middle Division.  The date is February 4th 2025.
22  The time is 10:08 a.m.
23           All attorneys present, will you please
24  state your names and whom you represent.
25           MR. CRANFORD:  This is William Cranford
```

Page 6

```
1  for Mr. Myers and the ADOC officials.
2            MR. SHEEHAN:  This is Allen Sheehan.  In
3  the Ezell matter, I'm representing Larry Baker.  And
4  in the Guy matter, we're representing Givens,
5  Ragsdale, Price, Brooks, Malone, Graham, and Gordy.
6            MS. BROWN:  Okay.  And good morning,
7  sir.  My name is Ruth Brown, and I'm an attorney for
8  Lakeisha Ezell, who is the administrator of the
9  estate of Terrence Andrews, and also for Lori Guy,
10  who is the administrator of the estate of Steven
11  Mullins.
12           KEVIN MYERS,
13  being duly sworn, was examined and testified as
14           follows:
15           THE REPORTER:  Usual stipulations?
16           MR. CRANFORD:  For us, yes, ma'am,
17  except we would like to read and sign.
18           MR. SHEEHAN:  Yes.
19           MS. BROWN:  Yes, that's fine with us.
20  EXAMINATION BY MS. BROWN:
21  Q.       Okay.  Mr. Myers, good morning.
22  A.       Good morning.
23  Q.       Could you please -- could you please
24  state and spell your name for the record?
25  A.       Kevin Myers, K-E-V-I-N, M-Y-E-R-S.
```

Page 7

```
1  Q.       Okay.  And have you ever sat for a
2  deposition before?
3  A.       Yes, ma'am.
4  Q.       How many times?
5  A.       Probably less than five.  I don't know
6  the exact number.
7  Q.       Okay.  What was the most recent
8  deposition that you sat for?
9  A.       One on the Abrams case for Alabama.
10  Q.       Okay.  And when was that deposition?
11  A.       To the best of my memory, the fall of
12  2024.
13  Q.       Okay.  Have you sat for any other
14  depositions in Alabama?
15  A.       No, ma'am.
16  Q.       Okay.  So I know you've done this a few
17  times before.  But just to make sure we're on the
18  same page, I'm going to start by going over the
19  ground rules for the deposition.  Okay?
20  A.       Yes.
21  Q.       Okay.  You understand that you're giving
22  sworn testimony under oath today, right?
23  A.       Yes.
24  Q.       Okay.  And there's a court reporter
25  present who's going to be taking down all of the
```

Page 8

```
1  questions and answers.  Okay?
2  A.       Yes.
3  Q.       The court reporter can't take down
4  uh-huhs and huh-uhs or head nods.  So I would ask
5  you to do your best to give verbal responses to my
6  questions like yes and no.  Okay?
7  A.       Yes.
8  Q.       If you and I were having a conversation,
9  we might naturally anticipate where the other one
10  was going and talk over one another a little bit.
11  But that makes life very difficult for the court
12  reporter because she can't down take two people
13  speaking at the same time.  Does that make sense?
14  A.       Yes.
15  Q.       Okay.  So to make the court reporter's
16  life easier and a clear record, I'm going to ask
17  that you do your best to let me finish asking my
18  question before you begin your answer.  Okay?
19  A.       Yes.
20  Q.       And I will also do my best to wait until
21  you've finished your answer before I begin my next
22  question.  Okay?
23  A.       Yes.
24  Q.       And if either one of us forgets, you
25  know, we will -- the attorneys will remind us not to
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 2 (5 - 8)

Lakeisha Ezell v. Jefferson Dunn, et al.

**Kevin Myers**
**2/4/2025**

1 talk over one another. Okay?

2 A.          Yes.

3 Q.          Okay. If you need to take a break at

4 any time, please just let me know, and we can take a

5 break. Okay?

6 A.          Yes.

7 Q.          The only thing I ask is that you finish

8 answering any pending question before you take the

9 break. Fair?

10 A.          Yes.

11 Q.          If at any time you don't understand one

12 of my questions or you didn't hear it or you need me

13 to repeat it or rephrase it, please just let me

14 know, and I'm happy to do that. Okay?

15 A.          Yes.

16 Q.          If, on the flip side, you answer one of

17 my questions, I will assume that you understood it

18 as posed. Fair?

19 A.          Yes.

20 Q.          Okay. Are you on any medications that

21 would impact your ability to testify today?

22 A.          No.

23 Q.          Do you have any medical conditions that

24 would impact your ability to testify today?

25 A.          No.

Page 9

1 Q.          Okay. If at any time you remember

2 information that's responsive to one of my earlier

3 questions and you would like to supplement your

4 answers, please let me know, and I'll give you a

5 chance to do that. Okay?

6 A.          Yes.

7 Q.          Okay. If you don't supplement answers,

8 I will understand that the answers that you've

9 previously given were complete to the best of your

10 ability. Fair?

11 A.          Yes.

12 Q.          Okay. So you are here in this case as

13 an expert retained by defendants, correct?

14 A.          Yes.

15 Q.          And which defendants have retained you

16 for your opinions in this case?

17 A.          **Commissioner Dunn and the Alabama**

18 **Department of Corrections in both cases.**

19 Q.          Okay. So the Alabama Department of

20 Corrections as an entity?

21          MR. CRANFORD: Object to the form.

22 Q.          I'm sorry. So were you retained by the

23 Alabama Department of Corrections as an entity?

24          MR. CRANFORD: Object to the form.

25 A.          **I was retained by Butler & Snow to**

Page 10

1 **represent the Alabama Department of Corrections for**

2 **those defendants that were identified.**

3 Q.          Okay. So you mentioned Defendant Dunn,

4 correct?

5 A.          **Correct.**

6 Q.          Okay. Are you retained to represent any

7 defendants other than Defendant Dunn?

8 A.          **I believe so.**

9 Q.          Okay. Do you know which defendants?

10 A.          **Not without the information in front of**

11 **me.**

12 Q.          Okay. So you don't remember the name of

13 any defendants that you're representing other than

14 Defendant Dunn as you sit here today?

15 A.          **Correct.**

16 Q.          Okay. And are you representing the

17 Alabama Department of Corrections as an entity in

18 this litigation?

19          MR. CRANFORD: Object to the form.

20 Q.          I'm sorry. Let me rephrase.

21          Are you -- are you serving as an expert

22 on behalf of the Alabama Department of Corrections

23 in this litigation?

24          MR. CRANFORD: Object to the form.

25 A.          **I was retained by Butler & Snow as an**

Page 11

1 **expert in these two cases to provide my expert**

2 **opinion on the complaints filed by the plaintiffs.**

3 Q.          Okay. And you have been an expert in --

4 you've provided -- you've been retained as an expert

5 in other litigation, correct?

6 A.          **Yes, ma'am.**

7 Q.          Okay. About how many active cases do

8 you work on in a year in any capacity as a retained

9 expert?

10          MR. CRANFORD: Object to the form.

11 A.          **No more than two or three.**

12 Q.          Okay. How many cases are you working on

13 at this particular moment as a retained expert?

14 A.          **Currently Guy and Ezell are the only**

15 **open cases that I'm working with.**

16 Q.          Okay. What percentage of your work in

17 serving as a retained expert has focused on

18 litigation about violence in correctional

19 institutions as opposed to other issues relating to

20 correctional institutions?

21          MR. CRANFORD: Object to the form.

22 A.          **I cannot provide a percentage. I can**

23 **say all but one have related to conditions of**

24 **confinement complaints.**

25 Q.          Okay. Which other cases have you worked

Page 12

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 3 (9 - 12)

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

1 on as a retained expert that related to conditions
2 of confinement specifically regarding inmate-on-
3 inmate violence?
4            MR. CRANFORD:  Object to the form.
5 A.        The allegations that I provided an
6 expert opinion on other than these two would be
7 Abrams.
8 Q.        Okay.  So the Abrams case also addressed
9 conditions of confinement relating to violence?
10            MR. CRANFORD:  Object to the form.
11 A.        I would not agree that it's necessarily
12 violence.
13 Q.        Okay.  So are you saying that your work
14 in the Abrams case was somehow related to the kind
15 of work that you did in Ezell and Guy?
16            MR. CRANFORD:  Object to the form.
17 A.        I would stipulate that the work in the
18 Abrams case was similar in that it occurred within
19 an Alabama Department of Corrections facility and
20 had some similar complaints.  But I do not recall
21 violence, as you state it, to be one of those
22 complaints.
23 Q.        Understood.
24            What were the similar complaints that
25 you recall that are common between the Abrams case
                                              Page 13

1 A.        I did not recall.
2 Q.        Okay.  Do you -- which -- which ADOC
3 facilities were at issue in the Abrams case?
4            MR. CRANFORD:  Object to the form.
5 A.        That was a situation that occurred at
6 St. Clair.
7 Q.        Okay.  And in the Abrams case, the
8 situation that occurred at St. Clair that was the
9 basis for that litigation, what was the time frame
10 of when it had occurred?
11 A.        I do not recall the time frame.
12 Q.        Okay.  But you gave the deposition, you
13 believe, earlier -- or late last year?
14 A.        In the fall, yes, ma'am, the fall of
15 2024.
16 Q.        Okay.  Can you just generally summarize
17 the opinions that you gave in the Abrams case
18 regarding St. Clair?
19            MR. CRANFORD:  Object to the form.
20 A.        Without having that document in front of
21 me and without having the ability to refresh my
22 memory on that, I really cannot provide what those
23 opinions were.
24 Q.        Okay.  You can't give any high level
25 general summary at all of your opinions in that
                                              Page 15

1 on one hand and either Ezell or Guy on the other?
2            MR. CRANFORD:  Object to the form.
3 A.        The staffing of the facility, the age of
4 the facility primarily.
5 Q.        Okay.  And who retained you to provide
6 expert testimony in the Abrams case?
7 A.        Butler & Snow.
8 Q.        And who were you representing -- I'm
9 sorry.  Scratch that.
10            Who -- on what behalf -- were you
11 retained as an expert in Abrams on behalf of
12 defendants?
13 A.        Can you restate that question, please?
14 Q.        Sure.
15            In the Abrams case, were you retained to
16 provide an expert opinion on behalf of certain
17 defendants in the Abrams case?
18 A.        Yes.
19 Q.        Which defendants?
20 A.        I do not recall specifically which ones.
21 Q.        Okay.  Do you recall whether Defendant
22 Dunn was one of those defendants?
23 A.        I believe he was.
24 Q.        Okay.  Do you recall whether Edward
25 Ellington was one of those defendants?
                                              Page 14

1 case?
2            MR. CRANFORD:  Object to the form.
3 A.        I believe if I did that, they would not
4 necessarily be factual, nor would they necessarily
5 follow what I wrote in my expert opinion.
6 Q.        Okay.  What -- do you recall what the
7 incident -- what kind of incident gave rise to the
8 litigation in Abrams?
9            MR. CRANFORD:  Object to the form.
10 A.        It was a suicide.
11 Q.        Okay.  What housing unit did the suicide
12 at St. Clair that was the basis of litigation in
13 Abrams take place in?
14            MR. CRANFORD:  Object to the form.
15 A.        I don't recall.
16 Q.        Okay.  Okay.  Other than your expert
17 opinion that you gave in the Abrams case, have you
18 ever given an expert opinion before regarding
19 staffing levels at a correctional facility?
20            MR. CRANFORD:  Object to the form.
21 A.        Can you restate the question to make
22 sure I answer it accurately?
23 Q.        Sure.
24            Other than the Guy and Ezell cases and
25 the Abrams case, have you given any other expert
                                              Page 16

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 4 (13 - 16)

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

1 opinions before regarding staffing levels at
2 correctional facilities?
3          MR. CRANFORD:  Object to the form.
4 **A.        No, ma'am.**
5 Q.        Okay.  Okay.  In the last five years,
6 approximately how many expert reports have you
7 disclosed as a retained expert in litigation?
8          MR. CRANFORD:  Object to the form.
9 **A.        Four.**
10 Q.        Okay.  And so those -- does that include
11 the Ezell case, the Guy case, and the Abrams case?
12 **A.        Yes, ma'am.**
13 Q.        Okay.  What was the fourth case?
14 **A.        Trivette, T-R-I-V-E-T-T-E, in the state**
15 **of Tennessee.**
16 Q.        Okay.  And in that case, were you
17 retained by plaintiff or defendants?
18 **A.        The defendant.**
19 Q.        Okay.  And what was the incident that
20 gave rise to that litigation?
21 **A.        It was not an incident.**
22 Q.        Okay.  Can you generally describe, you
23 know, at a high level the subject matter of the
24 litigation?
25          MR. CRANFORD:  Object to the form.  And
                                                        Page 17

1 I just also object to the extent that you would be
2 violating any protective order in that case by
3 discussing -- if it's ongoing by discussing any of
4 the facts of that case.  If you can answer it
5 without doing the so, then go ahead.
6          THE WITNESS:  Okay.  Thank you for that
7 clarification.
8 **A.        The case has been settled.  And I can**
9 **tell you that it was access to accommodations for a**
10 **deaf and/or hard of hearing inmate.**
11 Q.        Okay.  So have you -- let's go ten years
12 back.  So in the past ten years, how many expert
13 reports have you disclosed relating to conditions of
14 confinement at correctional facilities?
15          MR. CRANFORD:  Object to the form.
16 **A.        I only began doing this work in the last**
17 **three to five years.  So the answer would be the**
18 **same as I have already provided.**
19 Q.        Understood.
20          So you began working as a retained
21 expert around three or four or five years ago; is
22 that correct?
23          MR. CRANFORD:  Object to the form.
24 **A.        Yes.**
25 Q.        Okay.  And since that -- I'm sorry.  Is
                                                        Page 18

1 there more?
2 **A.        No.**
3 Q.        Okay.  I didn't want to cut you off.
4          Since that time that you began working
5 as a consultant, have you disclosed four expert
6 reports as a retained expert, correct?
7          MR. CRANFORD:  Object to the form.
8 **A.        Yes.**
9 Q.        Okay.  And in all four cases, you were
10 retained by the defendants in the case, correct?
11 **A.        Yes.**
12 Q.        Okay.  Have you ever disclosed a legal
13 opinion on behalf of a plaintiff in a -- in a case?
14          MR. CRANFORD:  Object to the form.
15 **A.        No.**
16 Q.        Have you ever disclosed a report on
17 behalf of a prisoner in a legal case?
18          MR. CRANFORD:  Object to the form.
19 **A.        No.**
20 Q.        Okay.  Your consulting firm is called
21 Four Square Corrections, LLC, correct?
22 **A.        Yes.**
23 Q.        Okay.  And in addition to serving as a
24 retained expert, what other kinds of work do you do
25 as part of -- on behalf of Four Square Corrections,
                                                        Page 19

1 LLC?
2 **A.        That is all at this time.**
3 Q.        Okay.  Okay.  So is it fair to say that
4 you've never done any consulting work through Four
5 Square Corrections, LLC, that was done on behalf of
6 inmates or prisoners?
7          MR. CRANFORD:  Object to the form.
8 **A.        That is fair.**
9 Q.        Okay.  The only work that you've done as
10 a consultant through Four Square Corrections, LLC,
11 has been on behalf of defendants in litigation that
12 were corrections -- current and former corrections
13 employees, correct?
14          MR. CRANFORD:  Object to the form.
15 **A.        No, ma'am.**
16 Q.        Okay.  What's incorrect about that?
17 **A.        I am -- I have done audits for the**
18 **American Correctional Association, and I have in the**
19 **past assisted the Commonwealth of Kentucky with**
20 **doing audits and inspections of their facilities.**
21 Q.        Okay.  And when you did audits for the
22 American Correctional Association, were those audits
23 that were requested by correctional facilities?
24 **A.        Indirectly.  Those facilities were**
25 **accredited through the American Correctional**
                                                        Page 20

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 5 (17 - 20)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 Association.  As part of that accreditation process,
2 they're required to be audited every three years.
3 And so when that three years comes up, the American
4 Correctional Association can reach out and ask for
5 auditors that are trained, are they available to
6 perform a reaccreditation audit at a facility.  And
7 then you're assigned actually by the American
8 Correctional Association, not by the facility or its
9 governing parent.
10 Q.        Understood.
11           So when you have worked as an auditor
12 for the American Correctional Association, you have
13 been carrying out audits in order to determine
14 whether facilities would receive accreditation by
15 the ACA, correct?
16 A.        No.
17 Q.        Okay.  What's incorrect about that?
18 A.        The auditors -- normally it's a team of
19 three -- go out to the facility and inspect based
20 upon the standards of the American Correctional
21 Association.  Then that report is written by all
22 three auditors, submitted to the commission on
23 accreditation.  And that commission, a panel of four
24 or five individuals, review the report, meet with
25 the representatives of the facility, and they
Page 21

1 determine accreditation.
2 Q.        Understood.
3           So your work doing audits for the ACA
4 has involved audits of facilities that were seeking
5 accreditation or seeking to continue their existing
6 accreditation, correct?
7 A.        Yes.
8 Q.        You said you did audits in Kentucky; is
9 that correct?
10 A.        For the Commonwealth of Kentucky, yes.
11 Q.        Okay.  What were the circumstances in
12 which a facility would be audited by the
13 Commonwealth of Kentucky?
14           MR. CRANFORD:  Object to the form.
15 A.        The Commonwealth of Kentucky is
16 proactive -- excuse me.  The Commonwealth of
17 Kentucky is proactive in that they do annual
18 inspections of every facility.  Most of that
19 inspection is checking to make sure that they are
20 remaining in compliance with the standards
21 established by the American Correctional
22 Association.
23 Q.        Okay.  Okay.  So three of the four cases
24 in which you've been retained as a legal expert
25 since you started your consulting business have been
Page 22

1 cases in which you were retained by Butler Snow,
2 correct?
3 A.        Yes.
4 Q.        Have you ever testified in court in any
5 case as a retained expert?
6           MR. CRANFORD:  Object to the form.
7 A.        Yes.
8 Q.        In which case did you give testimony in
9 court?
10 A.        I do not remember the title of the case.
11 All I can say was it was a federal case in Idaho
12 around or about the year of 2016, I believe.
13 Q.        Okay.  And who were you retained by in
14 that case to provide expert testimony?
15 A.        At that time, it was Corrections
16 Corporation of America.  That company is now known
17 as Core Civic.
18 Q.        Okay.  Were you working for Corrections
19 Corporation of America at the time?
20 A.        I was not.  I had recently retired from
21 CCA.
22 Q.        Okay.  And what was the -- what kind of
23 case was it in which you gave testimony on behalf of
24 CCA in Idaho?
25 A.        Analysis of staffing patterns.
Page 23

1 Q.        Okay.  And was there -- in the
2 litigation, was there an incident, like a suicide or
3 an incident of violence or some other incident, that
4 gave rise to the litigation?
5           MR. CRANFORD:  Object to the form.
6 A.        Not to my knowledge.
7 Q.        Okay.  Who was suing who in that case
8 and why, to the best of your recollection?
9           MR. CRANFORD:  Object to the form.
10 A.        I really don't recall who the plaintiff
11 was.
12 Q.        Okay.  Do you -- do you recall what kind
13 of incident the plaintiff was suing about?
14           MR. CRANFORD:  Object to the form.
15 A.        It was not a specific incident.  It was
16 a question over the integrity of documentation
17 related to the staffing of the facility.
18 Q.        Okay.  And do you recall whether the
19 plaintiff was an inmate or an employee?
20 A.        I do recall.
21 Q.        Okay.  And what were they?
22 A.        It was not an inmate or an employee.
23 Q.        Okay.  What was -- who was the plaintiff
24 in that case?
25 A.        As I said, I'm not completely certain
Page 24

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 6 (21 - 24)

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

1 who the plaintiff was.  I do know it was not an
2 inmate and it was not an employee.
3 Q.        Okay.  What do you recall about the
4 relationship of the plaintiff to the correctional
5 facility at issue?
6          MR. CRANFORD:  Object to the form.
7 A.        Without recalling who the plaintiff was,
8 I can't tell you what the relationship was.
9 Q.        Well, then, sir, how do you remember
10 that it wasn't an employee and it wasn't a prisoner?
11 A.        Because I don't recall whether it was
12 the State of Idaho, whether it was the federal
13 government, or who initiated the legal process.
14 Q.        I see.
15          So it might have been litigation brought
16 by a government entity?
17          MR. CRANFORD:  Object to the form.
18 A.        It might have been.  I -- like I said, I
19 don't recall.  And I'm not willing to testify on
20 something that I did not come prepared to discuss.
21 Q.        Okay.  Have you ever testified in court
22 on any -- in any case as a retained expert other
23 than this federal case in Idaho that you just
24 mentioned?
25          MR. CRANFORD:  Object to the form.
Page 25

1 A.        I have not.
2 Q.        Did you bring any materials with you to
3 the deposition today?
4 A.        I brought one small piece of paper.
5 Q.        Okay.
6 A.        That basically has names on it so I will
7 remember to get them correct.  So I've got written
8 down Andrews, Mullins, Davis, Jackson, and then a
9 couple of other notes.
10 Q.        Okay.  Can you read your other notes?
11 A.        Sure.
12          The other notes are St. Clair, 1,000
13 bed.  Prison transformation.  Quality improvement
14 team.  2017.  Savage.  And prison management team.
15 Sergeant academy.  Executive leadership, ORAS,
16 O-R-A-S.  PREA, P-R-E-A.  BMU (48.)  SSU, (48.)  And
17 then the bottom part is B, as in boy, CO and CCO,
18 2016.  20 percent pay merit, 500 COs.  New
19 facilities.  2019.
20 Q.        Okay.  Can you read the note again that
21 -- the part that said 2006 towards the end of the
22 note?
23 A.        2016, 2016.  And it's BCO and CCO.
24 Q.        Okay.  What does BCO and CCO stand for?
25 A.        Those were two positions created by
Page 26

1 Commissioner Dunn to help deal with staffing.  Basic
2 correctional officer and cubical correctional
3 officer, if I recall.
4 Q.        Okay.  And what -- and your note also
5 refers to BMU and SSU.  What do those refer to?
6 A.        BMU is a behavioral management unit.
7 The number 48 was the size that unit was to be.  SSU
8 is special safety unit, also designed to be 48 beds.
9 Q.        Okay.  How do you know the attorneys in
10 this case at Butler Snow?
11          MR. CRANFORD:  Object to the form.
12 A.        Primarily through assisting with
13 reviewing the information related to the three cases
14 that we've talked about, and providing an expert
15 opinion on those three cases.
16 Q.        Okay.  Prior to being retained in
17 Abrams, did you know any of the attorneys at Butler
18 Snow?
19          MR. CRANFORD:  Object to the form.
20 A.        Not to my knowledge.
21 Q.        Okay.  And who are the attorneys that
22 you worked with on the Abrams case at Butler Snow?
23 A.        Oh, my goodness.  I don't recall.  It
24 was one attorney.  I'm sorry.  His name escapes me.
25 Q.        Okay.  What was your understanding of
Page 27

1 what your role is -- scratch that.
2          When you received -- when you were
3 retained by Butler & Snow to provide opinions in the
4 Guy case, what was your understanding of what your
5 task was?
6 A.        My understanding is that I reviewed the
7 complaint that's been filed, reviewed the documents
8 that have been filed by either the plaintiffs or the
9 defendants, and come to my own conclusion, my own
10 opinion as to the complaints and the veracity of
11 those complaints.
12 Q.        Okay.  And that was your understanding
13 of your role in both the Ezell case and the Guy
14 case, correct?
15 A.        Yes.
16 Q.        Okay.  And your understanding of your
17 role is that you were to reach an opinion about the
18 veracity of the allegations, correct?
19          MR. CRANFORD:  Object to the form.
20 A.        That is what I said.  "Veracity" is
21 probably not the proper word.  My role is to provide
22 my expert opinion related to each one of the
23 complaints that were made, as to whether I find them
24 to be valid, whether they have merit, don't have
25 merit, mitigating, aggravating, what's my expert
Page 28

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 7 (25 - 28)

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

1 opinion about those complaints.

2 Q.        Okay.  And when you were conducting your
3 review of the evidence in the Ezell and Guy cases,
4 were you -- were you reviewing that evidence in an
5 objective manner?  Or were you looking for arguments
6 to make to support the defense position?

7         MR. CRANFORD:  Object to the form.

8 A.        I believe, as a professional of 50
9 years, that it's my responsibility to always be
10 objective, look at the information before me, and
11 make a determination based upon my experience and my
12 knowledge and the information provided.

13 Q.        Okay.  So you were trying to be fair to
14 the plaintiffs in Ezell and Guy as well as to the
15 defendants in formulating your opinions in the Ezell
16 and Guy cases, correct?

17         MR. CRANFORD:  Object to the form.

18 A.        I was providing my expert opinion of
19 what I surmised from the review, which would be fair
20 to all concerned.

21 Q.        Okay.  You created one expert report in
22 Guy and a separate expert report in Ezell, correct?

23 A.        Yes.

24 Q.        Okay.  All of your opinions relating to
25 the Guy case are documented in your Guy report,

Page 29

1 have taken longer.  So as I discussed the Guy and
2 the Ezell case, I may have increased my hourly
3 amount a small amount.

4 Q.        Okay.  What was your hourly rate in the
5 -- I believe it was the Trivette case.

6         MR. CRANFORD:  Object to the form.

7 A.        It was the Trivette case.  I don't
8 recall.

9 Q.        Do you recall whether it was more or
10 less than $250 an hour?

11         MR. CRANFORD:  Object to the form.

12 A.        My recollection is it was more.

13 Q.        Okay.  Any reason you charged a higher
14 hourly rate in the Trivette case?

15         MR. CRANFORD:  Object to the form.

16 A.        I'm not sure what the reasoning was.

17 Q.        Okay.  If you -- if there's a trial in
18 this case, what will be your hourly rate for trial
19 testimony?

20 A.        I would have to look at the agreement.
21 I don't recall whether it's 200 or 250 an hour.  But
22 it's stipulated in the agreement.

23         And which agreement is that?

24 A.        The one with Butler & Snow where my
25 services were retained.

Page 31

1 correct?

2 A.        Yes.

3 Q.        And all of your opinions relating to the
4 Ezell case are documented in your Ezell report,
5 correct?

6 A.        Yes.

7 Q.        Okay.  How much are you getting paid for
8 your work in the Ezell and Guy cases?

9 A.        It's $250 an hour.

10 Q.        How did you arrive at that rate for your
11 work in the Ezell and Guy cases?

12 A.        That was the agreed amount that I had
13 with Butler Snow, which is what my research says is
14 a fair compensable matter.

15 Q.        Was that the same rate that you received
16 in the Abrams case?

17 A.        I don't recall the compensation in the
18 Abrams case.

19 Q.        Okay.  Is it possible that you received
20 a different hourly rate in the Abrams case than you
21 did in the Ezell and Guy cases?

22 A.        It is possible.

23 Q.        Okay.  Is there any reason for that?

24 A.        Abrams was the first case that I had
25 done.  There was a learning curve for me.  So it may

Page 30

1 document with them?

2 document with them?

3         MR. CRANFORD:  Object to the form.

4 A.        Yes.

5 Q.        Okay.  And what do you charge for travel
6 in this case, the Ezell and the Guy cases?

7         MR. CRANFORD:  Object to the form.

8 A.        I don't recall.  It's in the agreement.

9 Q.        Okay.  Do you have any arrangements to
10 receive any bonuses in the Ezell or the Guy cases?

11 A.        No.

12 Q.        How many invoices have you submitted so
13 far in the Guy and Ezell cases to obtain
14 compensation for your work?

15         MR. CRANFORD:  Object to the form.

16 A.        I don't recall.

17 Q.        Have you submitted any invoices so far
18 to obtain compensation for your work in the Ezell
19 and Guy cases?

20 A.        Yes.

21 Q.        Okay.  Have you submitted invoices on a
22 monthly basis in the Guy and Ezell cases?

23 A.        Can you clarify "on a monthly basis"?

24 Q.        Well, let me ask you about how much time
25 has passed between each invoice that you've

Page 32

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 8 (29 - 32)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 submitted in the Ezell and Guy cases in order to
2 receive compensation?
3          MR. CRANFORD: Object to the form.
4 **A.          For the most part, my memory says that I**
5 **have submitted monthly invoices when I have done**
6 **work on either the Guy or the Ezell case since the**
7 **date that I was retained.**
8 Q.     Okay.  And you were retained in April of
9 2024, correct?
10 **A.     I don't recall.**
11 Q.     I'm sorry.  Okay.  All right.
12     Approximately how many hours have you
13 billed for your work in the Guy case?
14 **A.     I don't know.**
15 Q.     Do you have any ball park figure as to
16 how many hours you've spent preparing your opinions
17 in the Guy case?
18 **A.          Not without reviewing my records.**
19 Q.     Okay.  Well, you were subpoenaed for
20 your invoices, correct?
21          MR. CRANFORD: Object to the form.  I'm
22 just going to object to the extent that we've lodged
23 an objection to the timing specified in plaintiff's
24 subpoena.  It's not a reasonable time under the
25 Federal Rules of Civil Procedure.  And we will
Page 33

1 address and comply with any document production
2 within the reasonable time as outlined in our
3 responses.
4 Q.          Okay.  Did you invoice your hours in the
5 Guy and Ezell cases separately or together, for both
6 cases combined?
7 **A.          Separately.**
8 Q.     Okay.  So you kept track of how many
9 hours you were working on preparing your opinions in
10 the Ezell case versus separately how much time you
11 were spending preparing your opinions in the Guy
12 case?
13 **A.     Yes.**
14 Q.     Okay.  As you sit here today, have you
15 submitted invoices for all of the -- all of your
16 work up to the point in which you submitted your
17 reports in Ezell and Guy?
18          MR. CRANFORD: Object to the form.
19 **A.     Can you ask that question again, please?**
20 Q.     Sure.
21     Have you -- have you invoiced Butler &
22 Snow already for all the hours that you expended in
23 creating your reports in Ezell and Guy?
24 **A.          All invoices have been submitted through**
25 **the time that the final documents in Ezell and in**
Page 34

1 Guy were provided.
2 Q.          Okay.  Okay.  And just as a ball park
3 figure, do you have any sense of how much your total
4 billing was in Ezell and Guy that you've invoiced
5 Butler Snow for to date?
6          MR. CRANFORD: Object to the form.
7 **A.          I'm not willing to ball park or**
8 **guesstimate.**
9 Q.     Because you're incapable of it?  Or
10 because you refuse to do so?
11          MR. CRANFORD: Object to the form.
12 **A.     Because I did not come prepared to**
13 **answer that question.  And I'm testifying under**
14 **oath.  I don't want to provide you or anyone else in**
15 **this conference with incorrect information.**
16 Q.     Okay.  So fair to say that you don't --
17 as you sit here today, you don't have any estimate
18 of approximately how much money you're going to be
19 -- you've billed Butler Snow for your reports in the
20 Ezell and Guy case?
21          MR. CRANFORD: Object to the form.
22 **A.     I do not have that information with me.**
23 Q.     Okay.  It could be $2,000?  It could be
24 $20,000?  You don't really know.  Fair to say?
25          MR. CRANFORD: Object to the form.
Page 35

1 **A.     That's not fair.  You're asking me again**
2 **to estimate.  And I'm testifying under oath.**
3 Q.     Sure.  And I'm asking you to provide an
4 estimate.  Okay?  And since you're here to answer my
5 questions today, unless your attorney instructs you
6 not to, my question is do you know whether the
7 billings that you have -- the invoices that you have
8 submitted for your work in the Ezell and the Guy
9 cases in total are greater than or less than
10 $10,000?
11          MR. CRANFORD: Object to the form.
12 **A.     I believe they're more than 10,000.**
13 Q.     Okay.  Do you believe they're more than
14 $20,000?
15          MR. CRANFORD: Object to the form.
16 **A.     Without having the information in front**
17 **of me, I don't want to play a guessing game.  I**
18 **don't know.**
19 Q.     Okay.  So it could be that you've billed
20 more than $20,000 in total for the Ezell and Guy
21 case work to date, correct?
22          MR. CRANFORD: Object to the form.
23 **A.     I don't know.**
24 Q.     Are the hours that are reflected in your
25 invoices in the Guy and Ezell cases an accurate
Page 36

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 9 (33 - 36)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 record of the time that you have spent preparing
2 your opinions in those cases?
3          MR. CRANFORD:  Object to the form.
4 A.          They are accurate.
5 Q.          Okay.  And -- okay.  Have you ever been
6 sued before in any capacity, any professional
7 capacity?
8          MR. CRANFORD:  Object to the form.
9 A.          Yes.
10 Q.          Okay.  In what circumstances have you
11 been sued before?
12 A.          Primarily as a warden of facilities in
13 the state of Tennessee when I worked for Corrections
14 Corporation of America.
15 Q.          Okay.  Besides lawsuits against you as a
16 warden in facilities in Tennessee for CCA, what
17 other lawsuits have been filed against you in your
18 professional capacity?
19          MR. CRANFORD:  Object to the form.
20 A.          None that I recall.
21 Q.          Okay.  Have you ever been found liable
22 in any of those lawsuits that you just mentioned?
23          MR. CRANFORD:  Object to the form.
24 A.          No, ma'am.
25 Q.          Okay.  Have you sat through any jury

Page 37

1 trials in which you were a defendant?
2 A.          Yes, ma'am.
3 Q.          Okay.  Have you sat through any jury
4 trials in which you were a defendant in which -- in
5 cases in which the jury found against you?
6          MR. CRANFORD:  Object to the form.
7 A.          Not to my recollection.
8 Q.          Okay.  Have you ever faced any -- have
9 you received any discipline in your career?
10          MR. CRANFORD:  Object to the form.
11 A.          No, ma'am.
12 Q.          Have you ever been suspended or
13 terminated from any professional position?
14 A.          That would be a redundant question.  No,
15 ma'am.
16 Q.          Okay.  You received a BA from Phillips
17 University in Oklahoma in 1977, correct?
18 A.          Yes.
19 Q.          Okay.  Did you complete any coursework
20 on corrections at Phillips University?
21          MR. CRANFORD:  Object to the form.
22 A.          Yes.  There were several.
23 Q.          What courses did you complete?
24 A.          Oh, my goodness.  Let's see.  1977 was
25 50 years ago, thereabouts.  To the best of my

Page 38

1 memory, there was a criminal justice course, some
2 corrections, courses in sociology.  But that's a
3 long time.  I don't recall.
4 Q.          Okay.  Fair to say you don't remember
5 the content of any of this coursework that you took
6 around 50 years ago at Phillips University that was
7 related to constructions?
8          MR. CRANFORD:  Object to the form.
9 A.          That's fair.
10 Q.          Okay.  After you received your
11 bachelor's degree, did you go straight into a
12 master's program?
13 A.          No, ma'am.
14 Q.          What did you do in between getting your
15 BA and going into a master's program?
16 A.          I was actually a correctional officer
17 while I was finishing my undergraduate work.  I kept
18 doing that while my wife completed her undergraduate
19 work.  Then we moved from Enid to Oklahoma City.  At
20 that time, she and I both began working on our
21 master's while we continued full-time employment.
22 Q.          Okay.  And did you obtain a master's
23 degree?
24 A.          I did not.  I completed 33 hours of
25 graduate coursework, completed a thesis, but did not

Page 39

1 do my oral presentation.
2 Q.          Okay.  What was your thesis on?
3 A.          Social climate in correctional prisons.
4 Q.          Okay.  What was the methodology of your
5 thesis?
6          MR. CRANFORD:  Object to the form.
7 A.          The methodology was at the time I was
8 the executive assistant to the commissioner.  And as
9 part of that job and part of working in graduate
10 school, I was able to go to every prison in the
11 state of Oklahoma and administer the correctional
12 environment institution scale to both staff and
13 inmates.  Then I evaluated that information and
14 provided a written report to the commissioner and to
15 the Oklahoma University school on the correctional
16 environments in the Oklahoma prisons.
17 Q.          Okay.  Do you still have a copy of that
18 thesis?
19 A.          I wish I did.  I do not.
20 Q.          Okay.  According to your research, what
21 kind of factors affected the social climate of a
22 prison as you determined in your work?
23          MR. CRANFORD:  Object to the form.
24 A.          The instrument I used divided the
25 dimensions of a prison's social climate into nine

Page 40

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 10 (37 - 40)

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

1 different dimensions. I do not remember all nine.
2 But it was autonomy, order and organization. Like I
3 said, I can't remember them all. But basically you
4 can assess the social climate of the prison by using
5 those scales.
6 Q.        Okay. And would you agree with me that
7 the way a prison is run by prison supervisors is a
8 factor that impacts the social climate of a prison?
9            MR. CRANFORD: Object to the form.
10 A.        There are many variables that impact the
11 social climate of any institution, whether it's
12 prison, mental health, or otherwise. The
13 administration of that prison or the oversight of
14 that prison is only one of many variables.
15 Q.        Okay. But you agree with me that it is
16 one of the variables that impacts the social climate
17 of a prison, correct?
18            MR. CRANFORD: Object to the form.
19 A.        One of many.
20 Q.        Okay. So in other words, would you
21 agree with me that an effective administrator can
22 have a positive impact on prison culture and an
23 ineffective administrator could have a negative
24 impact on prison culture?
25            MR. CRANFORD: Object to the form.
Page 41

1 A.        Not necessarily.
2 Q.        Okay. What do you disagree about with
3 regard that that statement?
4 A.        I disagree because I think that's an
5 overgeneralization of the impact that any
6 administrator has on a prison and the environment in
7 that prison.
8 Q.        Okay. So -- okay. Why did you not
9 complete the oral presentation of your thesis?
10 A.        Because I was stubborn. The Oklahoma --
11 I had -- through the three years when I did the 33
12 hours of coursework, Oklahoma University never
13 provided me a counselor. And when I got all of my
14 work done, to include the thesis I did, when I tried
15 to get my oral scheduled, I couldn't get it done.
16 So I finally said -- stubborn me, a bad mistake at
17 that time -- "I don't need your damn piece of paper
18 anyway." So I quit trying.
19 Q.        Okay. What do you mean you couldn't get
20 it scheduled?
21 A.        Exactly what I said. I tried several
22 times, working through school administrators, to get
23 my oral scheduled. And they would say, "Get with
24 your counselor."
25            And I would say, "You never assigned me
Page 42

1 a counselor." So we went around the rabbit hole for
2 a long time until I was stubborn and quit trying.
3 Q.        Okay. And were there any other
4 requirements that you were missing to obtain your
5 master's degree other than the oral presentation?
6 A.        No.
7 Q.        Okay. I believe you wrote in your CV
8 that your focus at Oklahoma -- Oklahoma University
9 in this master's program was on program planning and
10 evaluation of coursework. Is that correct?
11 A.        Yes, ma'am.
12 Q.        Okay. What do you mean by "program
13 planning and evaluation of coursework"?
14 A.        My master's was a master's of public
15 administration. It had a heavy focus on urban
16 management. It had a heavy focus on statistical
17 analysis and evaluating the impact of programs on
18 urban areas. And as I've already testified this
19 morning, my thesis was on the social climate in
20 prisons.
21 Q.        Okay. So in studying in this master's
22 program at Oklahoma University, you learned
23 methodologies and how to evaluate the effectiveness
24 of programs; is that fair?
25            MR. CRANFORD: Object to the form.
Page 43

1 A.        Yes.
2 Q.        Okay. Through statistical and other
3 methods?
4 A.        Correct.
5 Q.        Okay. Have you ever possessed any
6 responsibility for compliance with court mandates in
7 your professional career?
8 A.        Yes.
9            MR. CRANFORD: Object to the form.
10 A.        Yes.
11 Q.        Okay. In what legal cases?
12 A.        In the state of Oklahoma, the entire
13 time I worked for the State of Oklahoma, we were
14 under the court order from Battles v. Anderson. It
15 was a condition of confinement court order.
16            When I moved to Tennessee in 1992 as an
17 assistant warden until '94 when I became the warden,
18 state of Tennessee was under two federal oversights.
19 Oh, shoot. Grubbs, G-R-U-B-B-S. And I don't recall
20 the other one. But there were two federal cases
21 that -- oversight cases in Tennessee while I was the
22 warden.
23 Q.        Okay. And with regard to the Battles
24 case in Oklahoma, what procedures did you implement
25 to ensure compliance with court mandates?
Page 44

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

1 A.          I did not implement procedures.  I
2 followed the procedures that were developed in
3 response to the complaint.
4 Q.          Okay.  And what was your role at the
5 time?
6 A.          Anywhere from a correctional officer, up
7 to assistant superintendent, to assistant warden.
8 Q.          Okay.  And so you didn't have any
9 responsibility for assessing whether the Oklahoma
10 DOC was complying with the court mandates in the
11 Battles case, correct?
12        MR. CRANFORD:  Object to the form.
13 A.          As an assistant warden, assistant
14 superintendent, even as a correctional officer, it
15 was my responsibility to follow the policies and
16 procedures that were established by the
17 commissioner.  Actually, in Oklahoma it's called the
18 director of corrections.  And those policies were
19 developed in part from or an outgrowth of the court
20 case.
21 Q.          Understood.
22          So your role -- you were following --
23 your role was to follow the policies that were an
24 outgrowth of this court case, correct?
25 A.          Yes.
                                        Page 45

1 Q.          Okay.  You didn't have any role in terms
2 of assessing whether other people within the
3 institutions were complying with the court mandates
4 in the Battles case, correct?
5        MR. CRANFORD:  Object to the form.
6 A.          No.
7 Q.          Okay.  That's correct, right?
8 A.          No.
9 Q.          It's incorrect?
10 A.          It is incorrect.
11 Q.          Okay.  How is it incorrect?
12 A.          As an assistant superintendent or an
13 assistant warden, I would make tours of the
14 facility, work with the staff to monitor compliance
15 with policies and procedures.
16 Q.          Okay.  Did you produce any reporting
17 about monitoring -- the monitoring that you just
18 described?
19        MR. CRANFORD:  Object to the form.
20 A.          Not to my recollection.
21 Q.          Okay.  With respect to the court
22 mandates in Tennessee that you described, can you
23 describe your role as it related to compliance with
24 court -- with the court mandates?
25 A.          It would be the same as in Oklahoma.  In
                                        Page 46

1 Tennessee, I was initially the assistant warden and
2 then the warden.  So my responsibilities would be to
3 make sure that the staff knew the policies,
4 procedures, and then to monitor compliance.
5 Q.          Okay.  And what procedures did you
6 implement in Tennessee to monitor compliance with
7 the court mandates?
8        MR. CRANFORD:  Object to the form.
9 A.          I did not have written procedures.
10 Q.          Okay.  What about unwritten procedures?
11        MR. CRANFORD:  Object to the form.
12 A.          My style was to get to the prison early,
13 get my paperwork done, and then to go out and walk
14 the facility, talk to the staff, talk to the
15 inmates, and observe compliance.
16 Q.          Okay.  And did you create any
17 documentation yourself reporting on whether the
18 staff were complying with court mandates?
19        MR. CRANFORD:  Object to the form.
20 A.          Not to my recollection.
21 Q.          Have you ever overseen implementation of
22 policies and procedures within correctional
23 facilities during your career?
24        MR. CRANFORD:  Object to the form.
25 A.          Yes.
                                        Page 47

1 Q.          Please describe some situations in which
2 you've had that role.
3 A.          Any time the department or the
4 company -- any time a new policy was promulgated, it
5 would be my responsibility to read the policy, know
6 the policy, and then ensure that -- whether it was
7 through training formally or training informally
8 through meetings, make sure that all of the staff
9 understood the new policy.
10          If a policy impacted the inmates in the
11 facility, then that would be posted in the inmate
12 law library -- or in the library, not necessarily
13 law library.  And often times I would have meetings
14 with inmates to make sure they understood the new
15 policy and procedure.
16 Q.          Okay.  Did you ever look at any data on
17 outcomes to determine whether compliance with
18 policies and procedures was at the level that you
19 expected?
20        MR. CRANFORD:  Object to the form.
21 A.          Most facilities that I was involved with
22 were accredited by the American Correctional
23 Association.  Also, after 2003, facilities started
24 being accredited by PREA.  So as a warden or an
25 overseer of prisons, those were two reports that
                                        Page 48

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 12 (45 - 48)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 would be a good measuring -- measurement of
2 compliance.
3 Q.         Okay.  Did you use any other reports,
4 other than what you've just described, to determine
5 whether compliance was at the level that you
6 expected when you were implementing policies and
7 procedures within correctional facilities during
8 your career?
9              MR. CRANFORD: Object to the form.
10 A.         When I was working for the private
11 company Corrections Corporation of America as a
12 warden or a managing director, often times the
13 facility would be monitored by the public entity.
14 And they might provide a report.  And I would review
15 that report and, if necessary, take corrective
16 action if we were out of line or out of compliance.
17 Q.         Okay.  While you were overseeing
18 implementation of policies and procedures within
19 correctional facilities during your career, was
20 there ever a time that you personally requested some
21 sort of audit or review to determine whether
22 compliance was at the level that you expected?
23              MR. CRANFORD: Object to the form.
24 A.         I may have.
25              I think we froze.  No, we didn't.
Page 49

1 A.         No.
2 Q.         What does it mean to be a correctional
3 treatment officer?
4 A.         That was the position I held while I was
5 in undergraduate school.  And at that time, the
6 Oklahoma Department of Corrections wanted to
7 increase the professionalism of some of their
8 correctional officers.  And they were hiring people
9 who had at least, I want to say, 64 hours of college
10 as correctional officers.  And in order to make it
11 interesting to applicants, they renamed it
12 correctional treatment officer and increased the
13 salary a little bit.
14 Q.         I see.  But it was just a basic
15 correctional officer position?
16 A.         It was the same correctional officer
17 position responsible for supervising the population.
18 Q.         Got it.  Okay.
19              And then you -- you then became a
20 correctional case manager I, II, and III; is that
21 correct?
22 A.         Yes.
23 Q.         Can you -- can you generally describe
24 what your responsibilities were as a correctional
25 case manager I, II, and III?
Page 51

1 Q.         Okay.  Do you remember any instances, as
2 you sit here today, of any times in which you
3 requested an audit or other analysis to determine
4 whether compliance with policies and procedures was
5 at the level that you expected?
6              MR. CRANFORD: Object to the form.
7 A.         Other than requesting the routine
8 required American Correctional Association audit,
9 the only other one that I can recall would be when I
10 asked for assistance from our HR department to come
11 down and do their outside assessment on staff
12 morale.  That's really not policy and procedure
13 related.  But it was me asking for an outside
14 assessment of the morale of the facility.
15 Q.         Okay.  Okay.  You spent 14 years working
16 for the Oklahoma Department of Corrections, right?
17 A.         Yes.
18 Q.         That was from 1976 to 1990?
19 A.         Yes.
20 Q.         Okay.  Your first position was as a
21 correctional treatment officer, correct?
22 A.         Correct.
23 Q.         Okay.  Does that mean that you were
24 counseling prisoners and creating rehabilitation
25 plans for them to follow outside of the prison?
Page 50

1 A.         Management of case loads.  The inmates
2 that were assigned to a prerelease center, who many
3 had jobs out in the community, I was helping coach
4 them, if you will, mentor them.  I'm not going to
5 say I was counseling them because I wasn't a
6 counselor.  But I was coaching, mentoring, and
7 trying to help them get their feet back on the
8 ground.
9 Q.         Okay.  Were you -- did you supervise any
10 employees as a correctional case manager?
11 A.         It's been a long time.  But I think when
12 I became a case manager III that I did have people
13 underneath my supervision.  Also, part of that time
14 when I was a case manager III, I was actually
15 assigned to the planning and research department of
16 the -- planning and research portion of the
17 department of corrections.
18 Q.         What did you do for the planning and
19 research department -- planning and research unit of
20 the department of corrections?
21 A.         Pretty much whatever the director asked
22 me to.  Maybe population trends.  I did the graduate
23 work while I was working in planning and research.
24 Just a lot of different information that the
25 director might ask for.
Page 52

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 13 (49 - 52)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 Q.          Okay.  So fair to say that in your work
2 in the planning and research unit, you were looking
3 at data, including surveys and other forms of data,
4 to answer research questions for your supervisor?
5 A.          Yeah.  The best we could 45 years ago.
6 We didn't have the technology then that you do now.
7 Q.          Okay.  And what kind of data were you
8 looking at?
9 A.          Like I just said, it was 45 years ago.
10 So a lot of it was picking up the phone, calling,
11 trying to assess and gather data by hand, and then
12 analyzing it on a calculator.  It wasn't high tech.
13 Q.          Got it.  Okay.
14             And you then became an assistant
15 superintendent at Clearwater CTC; is that correct?
16 A.          Yes.
17 Q.          Okay.  What does CTC stand for?
18 A.          Correctional treatment center.
19 Q.          Okay.  And what kind of -- can you
20 describe the population of inmates that were housed
21 at Clearwater CTC?
22             MR. CRANFORD:  Object to the form.
23 A.          I don't remember the actual number.  I
24 want to say around 70 female offenders who were in
25 the process of transitioning back into the
Page 53

1 community.
2 Q.          Okay.  You then became an executive
3 assistant to the director of the Oklahoma Department
4 of Corrections, correct?
5 A.          Yes.
6 Q.          Okay.  And was that the director of the
7 entire Oklahoma Department of Corrections?
8 A.          Yes.
9 Q.          Okay.  Did you supervise any employees
10 in that role?
11 A.          Not formally.
12 Q.          Okay.  Did you also do research and look
13 at data in that role?
14             MR. CRANFORD:  Object to the form.
15 A.          I would look at data and trends in that
16 role.
17 Q.          What kind of data and trends would you
18 look at in that role as -- in the role of being the
19 executive assistant to the director of the Oklahoma
20 Department of Corrections?
21 A.          The best of my recall -- and once again,
22 we're going back 40 years -- it was primarily
23 population management, maybe some disciplinary
24 trends.  But once again, the data collection ability
25 in 1978 to 1980 is not what it was today.
Page 54

1 Q.          Okay.  So you didn't have access back in
2 the '80s to the kinds of data that are available to
3 prisons, you know, 20, 30 years later regarding
4 disciplinary trends; is that correct?
5             MR. CRANFORD:  Object to the form.
6 A.          It was very difficult.  If we collected
7 data, we would have to put it on what was called an
8 IBM card and go to a huge reader where it may or may
9 not eat your card.  So no, it was not -- not a
10 pleasant process, nor was it very productive.
11 Q.          You then served as administrator of
12 house arrests?
13 A.          Yes, ma'am.
14 Q.          Okay.  And in that role -- well, can you
15 describe what your general responsibilities were?
16 A.          As we discussed a while ago, the
17 department was underneath a court order.  Part of
18 that court order was to keep the population at a
19 certain capacity.  The probation and parole -- I'm
20 sorry.  The patrol board, which was a separate
21 entity from the department of corrections, had
22 yielded to public pressure and had quit paroling
23 individuals for the most part from the institutions.
24             So in order to relieve the population
25 pressure, we created what was called a house arrest
Page 55

1 program, which was actually a new security level
2 where inmates were screened and released to live in
3 their house in the community under our supervision
4 by probation officers.
5 Q.          Got it.
6             So the inmates that were eligible for
7 house -- for house arrest in this position, they
8 were -- they differed from the population of
9 prisoners at St. Clair in the 2018, 2019 time frame,
10 fair to say?
11             MR. CRANFORD:  Object to the form.
12 A.          No, that's not fair.
13 Q.          Okay.  So were there any differences, in
14 your mind, as you sit here today, between the
15 population that you were -- population of inmates
16 that you were dealing with as the administrator of
17 house arrests as compared with the population of
18 prisoners at St. Clair?
19             MR. CRANFORD:  Object to the form.
20 A.          So, the philosophy in the program -- and
21 I'm not saying it was a good one.  It was what year?
22 '78, '80, '82.  So 40 years ago, the philosophy was
23 that every inmate would be getting out of prison at
24 some point.  So regardless of the crime they were
25 incarcerated for, regardless of their disciplinary
Page 56

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 14 (53 - 56)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

---

1 history, while in the prison, they were going to be
2 getting out. And in order to protect the community,
3 we would release them onto house arrest under strict
4 supervision.
5          So to answer your question, some of
6 those released on house arrest were similar to, if
7 I understand the population of St. Clair, those
8 inmates assigned at St. Clair.
9 Q.         Got it. Okay.
10          You then became deputy warden at Joseph
11 Harp Correctional Center, correct?
12 A.    Yes.
13 Q.         Okay.
14          MR. CRANFORD: Ruth, I'm not meaning to
15 interrupt. Whenever you get to a point, can we just
16 take a quick break?
17          MS. BROWN: Yeah. Let's take a -- let's
18 take a five-minute break. Is five minutes enough?
19 Or do you want ten?
20          MR. CRANFORD: Five is good, I think.
21 A.    Five is good.
22          MS. BROWN: All right. Let's take a
23 break.
24          THE VIDEOGRAPHER: We are off the
25 record. The time a 11:23 a.m.
                                        Page 57

1          (Recess was taken.)
2          THE VIDEOGRAPHER: We are back on the
3 record. The time is 11:32 a.m.
4 Q.         Okay. You were a correctional
5 administrator from September of 2018 to May of 2023
6 for the Tennessee Department of Corrections,
7 correct?
8 A.    Yes.
9 Q.         Okay. How many -- scratch that.
10          Can you generally describe your
11 responsibilities in that role?
12 A.    Roughly the -- 2018 is when I became a
13 correctional administrator for the adult prisons in
14 Tennessee. Initially I had three facilities in
15 Nashville and one in Turney Center and one in Wayne
16 County. The nature of those facilities were a
17 female medium max death row and male medium max
18 death row, a male mental health medical facility,
19 and then one general population medium facility, and
20 then an annex.
21          After about two years of doing that, the
22 commissioner asked me to supervise the facilities in
23 west Tennessee, and I agreed to that. He needed
24 some help in the west. So at that point, I had four
25 facilities in west Tennessee basically along the
                                        Page 58

1 Mississippi River that ranged from maximum custody
2 down to minimum.
3 Q.         Okay. So approximately what year did
4 you take over the west Tennessee facilities?
5 A.         I think -- does it say on my vitae? I
6 want to say it was 2021, around that time. During
7 COVID, I still had the middle. Because for about a
8 year and a half, I served as acting warden and the
9 correctional administrator. So it was after COVID.
10 So probably 2021.
11 Q.         Okay. And what was the greatest number
12 of facilities that you supervised at one time while
13 working as a correctional administrator for the
14 Tennessee Department of Corrections?
15 A.    Five.
16 Q.         Okay. What was your chain of command as
17 a correctional administrator?
18 A.    I reported to the assistant director of
19 operations, and the wardens all reported to me.
20 Q.         Okay. What reporting did you have your
21 wardens provide to you while you were working as a
22 correctional administrator so that you knew that
23 they were executing policies and procedures as you
24 expected them to?
25          MR. CRANFORD: Object to the form.
                                        Page 59

1 A.    In Tennessee, there was a Tennessee
2 offender management information system that
3 collected information from each one of the
4 facilities. There was also a process -- I don't
5 recall exactly what it looked like. But there was a
6 process where the wardens would fill out a monthly
7 report about serious incidents, disciplinaries,
8 population, drug test results, that kind of thing.
9 Q.         Okay. So the wardens would submit to
10 you a monthly report as you just described; is that
11 correct?
12 A.    Yes.
13 Q.         Okay. And what kind of data was
14 available on the information system relating to
15 safety and security at the facilities that you were
16 overseeing?
17          MR. CRANFORD: Object to the form.
18 A.    The TOMIS, Tennessee Offender Management
19 Information System, came about around 1984, '85. So
20 the platform was old school, to use my term. So the
21 ability to pull reports out of that was very
22 limited.
23          I could pull out a report that might
24 show the number of inmates working in the kitchen,
25 working in maintenance. I might be able to pull out
                                        Page 60

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 15 (57 - 60)

1  reports, if I hand pulled them, on the number of
2  grievances filed.  But it was a very antiquated --
3  still is a very antiquated system.
4  Q.         When you were working as a correctional
5  administrator in the Tennessee Department of
6  Corrections, do you recall any facilities that you
7  -- that were assigned to you in which there was more
8  than one murder in a year?
9  A.         I don't recall.
10 Q.         How did you evaluate whether violence
11 was trending up or down at the facilities that you
12 oversaw as a correctional administrator?
13             MR. CRANFORD:  Object to the form.
14 A.         When you use the term "violence," most,
15 if not every -- well, one exception -- of the
16 facilities that I managed had fights, they had
17 assaults, they had thefts.  And when I made my tours
18 of the facilities, I would walk around, talk to the
19 inmates.  I would talk to the staff.  I would talk
20 to the warden to gauge for myself, if you will, the
21 social climate of the facility and see if there were
22 things that we might be able to do to curb the
23 fights, curb the assaults.
24             But at the end of the day, what many
25 don't realize is we have taken these men and women
Page 61

1  out of our communities, the legal system has,
2  because they are predatory on people in the
3  community.  And to think that putting them behind a
4  fence in a prison is going to change that behavior
5  is not solid thinking.
6             When we take people out of the community
7  because they're predatory toward the people in that
8  community, then we put a whole lot on those people
9  in the same environment.  But that alone is not
10 going to change the behavior of those people.
11             So it's my experience that fights and
12 assaults and theft is going to occur in a prison.
13 The best that a warden or an assistant warden or a
14 shift supervisor can do is try to manage those
15 threats.
16 Q.         Okay.  And what factors, in your mind,
17 in your experience, that are within the control of a
18 facility supervisor impact the level of fights and
19 assaults within a correctional facility?
20 A.         I'm sorry.  Can you ask that one more
21 time?
22 Q.         Sure.
23             Based on your experience, what kind of
24 factors that are within the control of a warden to
25 impact affect the level of fights and assaults
Page 62

1  within a correctional facility?
2  A.         The best -- in my opinion, the best a
3  warden can do is walk their facility, interact with
4  their staff, interact with the inmates, try to
5  identify where it might be happening.  And with the
6  resources available to him or her, manage those
7  resources and minimize the threat of the -- the
8  threat to the safe, secure operation.
9  Q.         Okay.  While you were working as a
10 correctional administrator, did you ever implement
11 any corrective action plans that were directed at
12 reducing inmate-on-inmate fights or assaults at one
13 of the correctional facilities that you oversaw?
14             MR. CRANFORD:  Object to the form.
15 A.         As a correctional administrator, I was
16 constantly communicating with the wardens about
17 opportunities to bring staff in from other
18 facilities, bring cert teams in, move, swap inmates
19 from one facility to another, make sure they were
20 properly classified.  All of those are activities
21 that a correctional administrator, a warden, can
22 take to try to minimize the threat to the safe
23 operation of the facility.
24 Q.         When you were a correctional
25 administrator for the Tennessee Department of
Page 63

1  Corrections, how did you evaluate whether your
2  wardens were ensuring that sufficient contraband
3  weapon searches were happening at their facilities?
4  A.         Primarily by walking around, checking
5  documentation, watching the staff to see what my
6  eyes were telling me about their searches of inmates
7  and the inmate housing areas.
8  Q.         What kind of documentation would you
9  check to evaluate whether your wardens were
10 executing sufficient contraband weapon searches at
11 the facilities that you oversaw as a correctional
12 administrator?
13             MR. CRANFORD:  Object to the form.
14 A.         So there are several ways.  If the staff
15 documented it into the TOMIS system, then I could
16 see contraband finds in the TOMIS system.  If there
17 was an area where we were searching and finding a
18 lot of weapons, then that would be an indication
19 that maybe we need to do additional searches or find
20 out best of all where are the items coming from and
21 how can we minimize access to some of those items.
22 Q.         Okay.  During your career, have you ever
23 conducted any sort of a formal analysis of whether
24 levels of fights and assaults were unacceptably high
25 at a facility that you oversaw?
Page 64

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 16 (61 - 64)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1     MR. CRANFORD: Object to the form.
2 A.        A formal analysis, I would say not to my
3 recollection.
4 Q.        Okay. During your career, have you ever
5 conducted any sort of a formal analysis of whether
6 contraband searches were being carried out in
7 sufficient numbers at a correctional facility?
8     MR. CRANFORD: Object to the form.
9 A.        I guess the confusion I have is the
10 definition of "formal analysis." There were times
11 when I would take reports, do my own assessment of
12 them, have a discussion with the warden about how
13 can I help, how can I assist, what are we doing,
14 what are the challenges. I'm not sure what you mean
15 by "formal analysis."
16 Q.        I'm wondering if you -- well, let me --
17 let me ask a new question.
18        During your career, did you ever -- did
19 you ever, you know, look methodically at
20 quantitative data on whether contraband searches
21 were being carried out in a sufficient number at a
22 particular prison that you oversaw?
23     MR. CRANFORD: Object to the form.
24 A.        I believe I answered that in that I was
25 constantly, with my eyes and my ears, watching and
Page 65

1 listening and doing an informal analysis of whether
2 or not I thought searches were being done at the
3 level I expected. I believe that is something that
4 most, if not all, wardens do, all correctional
5 administrators do as part of our role as a leader in
6 that facility.
7 Q.        Okay. And during your career, did you
8 ever implement any sort of a corrective action plan
9 with a subordinate warden in which you instructed
10 the warden the level of contraband searches that are
11 being done is inadequate, and I want you to make
12 these changes as a result?
13     MR. CRANFORD: Object to the form.
14 A.        Can you ask that one more time? I'm
15 sorry.
16 Q.        Sure.
17        During your career, did you ever reach
18 the conclusion that the number of contraband
19 searches carried out in a correctional facility that
20 you oversaw was insufficient and, as a result,
21 designed some sort of corrective action plan
22 directed at fixing that problem?
23     MR. CRANFORD: Same objection.
24 A.        I would say there were times when I met
25 with the warden and his or her team to identify
Page 66

1 whether there were special areas or certain areas
2 that needed focus. And then part of that meeting
3 might be deciding that we're going to bring a team
4 of staff in from multiple facilities, cert teams in
5 to do a concentrated search, if that's responsive to
6 your question.
7 Q.        Okay. Got it.
8        And so as a correctional administrator,
9 you know, you knew that you would want to target
10 areas of a facility that had particularly high
11 levels of contraband, correct?
12     MR. CRANFORD: Object to the form.
13 A.        Within the resources available to me.
14 Q.        You produced a report in the Guy matter,
15 correct?
16 A.        Yes.
17 Q.        And you produced a report in the Ezell
18 matter, correct?
19 A.        Yes.
20 Q.        Okay. In each of those reports, you
21 have a section of your report titled Opinions in
22 which you list your various opinions in the case,
23 correct?
24 A.        Yes.
25 Q.        Your opinions in the Guy matter are
Page 67

1 limited to those opinions that are listed in the
2 Opinions section of your report in Guy, correct?
3     MR. CRANFORD: Object to the form.
4 A.        I believe that's correct.
5 Q.        Okay. And your opinions in the Ezell
6 matter are limited to those that are discussed in
7 the Opinions section of your report in Ezell,
8 correct?
9     MR. CRANFORD: Object to the form.
10 A.        I believe that's correct. And the
11 reason I say "I believe" is throughout the reports,
12 there may be a sentence or a statement here or there
13 that says, "in my opinion." So I would not
14 necessarily say that my opinions are only in that
15 section of that report. That's a summary of my
16 opinions.
17 Q.        Got it.
18        So your opinions in the Guy matter are
19 limited to the opinions that are identified in your
20 report, correct?
21     MR. CRANFORD: Object to the form.
22 A.        If I have opinions in the Guy case, they
23 would be included in that report, yes.
24 Q.        Okay. And your opinions in the Ezell
25 matter are limited to those that are -- that are
Page 68

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 17 (65 - 68)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 discussed in your report in Ezell, correct?

2 **A.      Yes.**

3 Q.        Okay.  You're not intending to offer any

4 opinions today that were not disclosed in your

5 reports in Guy or Ezell, correct?

6         MR. CRANFORD:  Object to the form.

7 **A.      That's correct.**

8 Q.        Okay.  And you're relying in this case

9 solely on your expertise regarding corrections,

10 correct?

11         MR. CRANFORD:  Object to the form.

12 **A.      I'm relying on what is written in the**

13 **report, which is a result of nearly 50 years in the**

14 **correctional industry and involvement in those**

15 **national organizations that are cited within that**

16 **report.**

17 Q.        Okay.  Do you have any expertise that

18 bears on your reports in Guy or Ezell other than

19 corrections expertise?

20         MR. CRANFORD:  Object to the form.

21 **A.      I don't believe so.**

22 Q.        Okay.  Let's take a look at your report

23 in Ezell.  We're going to call this Exhibit A.

24         MR. CRANFORD:  And, Ruth, I don't know

25 if you mind.  I have a paper copy for him to look

Page 69

---

1 at, if that would be helpful.

2         MS. BROWN:  Yeah, that would be great.

3 Thank you.

4         MR. CRANFORD:  Sure.

5 Q.        Okay.  So let's mark that as Exhibit A.

6

7         (Plaintiff's Exhibit A was

8         marked for identification.)

9

10 Q.        And I'd like you to direct your

11 attention to Exhibit B at the end of that report,

12 which is the list of materials reviewed.

13 **A.      Okay.**

14 Q.        Okay.  And before we go any farther,

15 let's take a look at a second exhibit alongside this

16 one.  So let's mark as Exhibit B the Ezell report.

17         MR. CRANFORD:  Do you mean the Guy

18 report, Ruth?

19         MS. BROWN:  Was A Ezell?

20         MR. CRANFORD:  A was Ezell, I believe.

21         MS. BROWN:  Okay.  Thank you.

22 Q.        So B will be the Guy report.

23

24         (Plaintiff's Exhibit B was

25         marked for identification.)

Page 70

---

1

2         MR. CRANFORD:  And I'm just handing him

3 a paper copy of that for his review, as well.

4         MS. BROWN:  Thank you.  That does make

5 things easier.  I appreciate that, Will.

6         MR. CRANFORD:  No problem.

7 Q.        Okay.  So I'd like you to direct your

8 attention in Exhibit B to the list of materials

9 reviewed in the Guy report, which is at the end of

10 that report.  So do you have both of the material

11 reviewed lists in front of you?

12 **A.      Yes, ma'am.**

13 Q.        Okay.  So you have the materials

14 reviewed exhibit in the Ezell report and in the Guy

15 report, correct?

16 **A.      Correct.**

17 Q.        Okay.  So beginning with Exhibit A, the

18 Ezell report, you created this exhibit, this list of

19 materials reviewed that you called in your report

20 Exhibit B, correct?

21 **A.      Yes.**

22 Q.        Okay.  And I just want to confirm that

23 there are no other materials that you reviewed in

24 preparation for your Ezell report other than those

25 that are listed in the list of material -- materials

Page 71

---

1 reviewed at the end of your Ezell report.  Is that

2 correct?

3         MR. CRANFORD:  Object to the form.

4 **A.      To the best of my knowledge, that's**

5 **correct.**

6 Q.        Okay.  So when you created your list of

7 materials reviewed in the Ezell report, that was

8 comprehensive in terms of the documents that you

9 reviewed to reach your opinions, correct?

10         MR. CRANFORD:  Object to the form.

11 **A.      To the best of my ability.**

12 Q.        Okay.  You're not claiming to have

13 reviewed any documents to reach your opinions in

14 Ezell that are not listed in your list of materials

15 reviewed in Ezell, are you?

16         MR. CRANFORD:  Object to the form.

17 **A.      To my knowledge, this is an exhaustive**

18 **list of items reviewed for the report.**

19 Q.        Okay.  And turning to the Guy report and

20 the list of materials reviewed in that case, to your

21 knowledge, the list of materials reviewed at the end

22 of your Guy report is an exhaustive list of the

23 documents that you reviewed to reach your opinions

24 in the Guy case, correct?

25         MR. CRANFORD:  Object to the form.

Page 72

---

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 18 (69 - 72)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 A.          Yes.  The same as I said a while ago, to
2 the best of my ability.
3 Q.          Okay.  You're not aware of having
4 reviewed any other documents to prepare your
5 opinions in Guy other than those that you listed in
6 your list of materials reviewed at the end of that
7 report, correct?
8          MR. CRANFORD: Object to the form.
9 A.          I believe this is an exhaustive list of
10 items reviewed.
11 Q.          Okay.  Were there any materials that you
12 wanted to review when forming your opinions in Guy
13 or Ezell but were not able to review?
14 A.          Not to my recollection.
15 Q.          Okay.  Did you ask Butler Snow to supply
16 you with any materials in particular in order to
17 reach your opinions in Guy and Ezell?
18          MR. CRANFORD: Object to the form.
19 A.          The documents that were reviewed were
20 those that, to my knowledge, for the most part were
21 submitted for the case.  There were a couple that I
22 pulled off of the internet, which is public
23 knowledge.
24 Q.          Got it.
25          Setting aside the ones -- the documents

Page 73

1          So you reviewed the documents that you
2 received from Butler & Snow to reach your opinions
3 in the Guy and Ezell cases, correct?
4 A.          Yes.
5 Q.          Okay.  You did not request any
6 additional documents from Butler & Snow regarding
7 the Ezell and Guy cases, correct?
8          MR. CRANFORD: Object to the form.
9 A.          Not to my knowledge.
10 Q.          Okay.  The methodologies that you used
11 to reach your opinions in the Guy case are described
12 in your report in that case, right?
13 A.          Repeat that, please.  I'm sorry.
14 Q.          The methodologies that you used to reach
15 your opinions in the Guy case are described in your
16 report in that case, correct?
17 A.          I believe that's true, yes.
18 Q.          And the methodologies that you used to
19 reach your opinions in the Ezell case are described
20 in your report in the Ezell case, correct?
21 A.          I believe that's true.
22 Q.          Okay.  You didn't do any sort of
23 analyses that are not described in your reports,
24 correct?
25 A.          I believe that is true for both the Guy

Page 75

1 that you pulled from the internet, the documents --
2 the remaining documents that you received to review
3 in Guy and Ezell, were those documents that you
4 specifically requested from Butler & Snow?  Or were
5 those documents that Butler & Snow sent to you on
6 their own initiative?
7          MR. CRANFORD: Object to the form.
8 A.          They are the documents that were
9 submitted with the case and already had the Bates
10 number attached to them.
11 Q.          Okay.  So the documents that you
12 reviewed from the Guy and Ezell cases were provided
13 to you by Butler & Snow, correct?
14          MR. CRANFORD: Object to the form.
15 A.          Yes.
16 Q.          Okay.  And you didn't specifically
17 request any of those documents by name, correct?
18          MR. CRANFORD: Object to the form.
19 A.          I do not recall requesting any document
20 other than those that had been entered and assigned
21 a Bates number.
22 Q.          Okay.  Which documents did you
23 specifically request from Butler & Snow?
24 A.          I don't recall requesting any.
25 Q.          Oh, understood.  Okay.

Page 74

1 and the Ezell case.
2 Q.          Okay.  So you didn't do any analysis of
3 data on assaults at St. Clair that are not described
4 in your reports in Guy and Ezell, correct?
5          MR. CRANFORD: Object to the form.
6 A.          I did not see a need to do any
7 additional data analysis, that's correct.
8 Q.          Okay.  And so my question was just a
9 little bit different.
10          I just want to make sure you didn't do
11 any analyses of data on assaults at St. Clair other
12 than what you described in your reports, correct?
13          MR. CRANFORD: Object to the form.
14 A.          Correct.
15 Q.          Okay.  And you didn't do any analysis of
16 contraband searches at St. Clair other than what's
17 described in your reports in Guy and Ezell, correct?
18          MR. CRANFORD: Object to the form.
19 A.          Correct.
20 Q.          You didn't do any analysis of line staff
21 compliance with St. Clair's written policies other
22 than what's described in your reports in Guy and
23 Ezell, correct?
24          MR. CRANFORD: Object to the form.
25 A.          Correct.

Page 76

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 19 (73 - 76)

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

1 Q.        You didn't do any analysis of staffing
2 levels at St. Clair other than what is described in
3 your reports in Guy and Ezell, correct?
4        MR. CRANFORD: Object to the form.
5 A.    Correct.
6 Q.        Okay. In the Guy matter, aside from
7 looking at incident reports pertaining to Steven
8 Mullins and his assailant, Clarence Jackson, you
9 didn't look at any other incident reports
10 documenting fights or assaults at St. Clair,
11 correct?
12        MR. CRANFORD: Object to the form.
13 A.    I believe that's true.
14 Q.        Okay. If you had looked at incident
15 reports other than those pertaining to Steven
16 Mullins and his assailant, Clarence Jackson, those
17 would have been documented in the list of materials
18 reviewed at the end of your report, correct?
19        MR. CRANFORD: Object to the form.
20 A.    If I can clarify. I looked at incident
21 reports with Mullins and/or Jackson as they related
22 to incidents that either Mullins and/or Jackson had
23 with other inmates. So some of the incidents were
24 not Mullins on Jackson or Jackson on Mullins. I
25 looked at the history of both of those inmates.
Page 77

1 Q.        Thank you for that clarification.
2        Other -- other than incident reports
3 that pertained to Steven Mullins or Clarence
4 Jackson, regardless of whether they pertained to
5 other inmates, as well, you didn't look at any other
6 incident reports documenting assaults at St. Clair?
7 A.    I believe that --
8        MR. CRANFORD: Object to the form.
9 A.    I believe that's true.
10 Q.        Okay. So if you had looked at incident
11 reports at St. Clair other than those that
12 referenced Steven Mullins and Clarence Jackson, that
13 would have been documented in your report in the Guy
14 matter, correct?
15        MR. CRANFORD: Object to the form.
16 A.    If it was used as part of the
17 development of my opinion, yes, they would have been
18 listed.
19 Q.        Okay. And all the documents that you
20 reviewed that you received from Butler & Snow were
21 used in the development of your opinions, correct?
22        MR. CRANFORD: Object to the form.
23 A.    Restate the question, please.
24 Q.        Okay. Are there any documents in the
25 Guy matter that you received from Butler & Snow in
Page 78

1 the Guy matter but then did not list in your list of
2 materials reviewed in the Guy report?
3        MR. CRANFORD: Object to the form.
4 A.    I don't recall whether I included every
5 report received into this opinion.
6 Q.        Okay. But every -- every document that
7 you reviewed that contributed to your opinions in
8 the Guy case is documented in the list of materials
9 reviewed at the end of the Guy report, correct?
10 A.    Correct.
11 Q.        Okay. And in the Ezell matter, you
12 looked at incident reports pertaining to Terrence
13 Andrews and his assailant, Cedrick Davis, correct?
14 A.    Yes.
15 Q.        Okay. In the Ezell matter, you did not
16 look at any incident reports documenting fights or
17 assaults at St. Clair other than those pertaining to
18 Terrence Andrews and Cedrick Davis, correct?
19        MR. CRANFORD: Object to the form.
20 A.    No.
21 Q.        That's incorrect?
22 A.    Yes.
23 Q.        Okay. How so?
24 A.    I looked at incidents involving Terrence
25 Andrews and I looked at incidents involving Cedrick
Page 79

1 Davis, not necessarily just those involving Davis
2 and Andrews.
3 Q.        Okay. In the Ezell matter, you did not
4 look at any incident reports documenting fights or
5 assaults at St. Clair that did not refer to either
6 Terrence Andrews or Cedrick Davis, correct?
7        MR. CRANFORD: Object to the form.
8 A.    Correct.
9 Q.        Okay. To develop your opinions in the
10 Guy and Ezell matter, you didn't do any sort of
11 analysis of quantitative data on fights or assaults
12 at St. Clair, correct?
13        MR. CRANFORD: Object to the form.
14 A.    Correct.
15 Q.        Okay. If you had, that would have been
16 documented in your reports in Guy and Ezell,
17 correct?
18        MR. CRANFORD: Object to the form.
19 A.    Yes.
20 Q.        Okay. And as part of the development of
21 your opinions in Guy and Ezell, you didn't conduct
22 any analysis into whether it was common or not at
23 St. Clair in the 2018 and early 2019 time frame for
24 inmates to sleep in cells other than those they were
25 assigned to, correct?
Page 80

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 20 (77 - 80)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

| | |
|---|---|
| 1    MR. CRANFORD: Object to the form. | 1 Q.        Okay.  So the written policies and |
| 2 **A.        I believe that's correct.** | 2 procedures that you considered in developing your |
| 3 Q.        Okay.  If you had conducted that sort of | 3 report in Ezell are those written policies and |
| 4 analysis, it would have been documented in your | 4 procedures that are specifically listed in Exhibit B |
| 5 reports in Guy and Ezell, correct? | 5 at the end of your Ezell report, correct? |
| 6    MR. CRANFORD: Object to the form. | 6 **A.        That is true for Ezell and Guy both.** |
| 7 **A.        Yes.** | 7 Q.        Okay.  Did you look at any audits in |
| 8 Q.        Okay.  You didn't look at any training | 8 either Ezell or Guy in order to reach your opinions |
| 9 materials from ADOC's sergeant academy or lieutenant | 9 in either case? |
| 10 or captain academy when preparing your reports in | 10    MR. CRANFORD: Object to the form. |
| 11 the Guy and Ezell case, correct? | 11 **A.        Can you define what you are calling an** |
| 12    MR. CRANFORD: Object to the form. | 12 **audit?** |
| 13 **A.        I did not look at the specific** | 13 Q.        Well, what is your understanding of what |
| 14 **curriculum for those two opportunities.  I am** | 14 an audit is? |
| 15 **familiar nationwide with sergeants' academies and** | 15    MR. CRANFORD: Object to the form. |
| 16 **executive leadership organizations similar to what** | 16 **A.        Well, an audit to me is a formal** |
| 17 **was referenced.  And there was some reporting on** | 17 **evaluation by an outside organization similar to the** |
| 18 **those two events that gave me some idea of what the** | 18 **American Correctional Association or PREA.** |
| 19 **commissioner's expectations were.  And those** | 19 Q.        Okay.  I'm going to broaden that to |
| 20 **expectations are very consistent with what I have** | 20 include either a formal external audit or a formal |
| 21 **witnessed in other jurisdictions.** | 21 internal audit of the kind that you described. |
| 22 Q.        But it's correct that you didn't | 22 Okay? |
| 23 look at the specific training curricula from the | 23 **A.        Okay.** |
| 24 ADOC sergeant academy or lieutenant or captains' | 24 Q.        Okay.  Using that definition, did you |
| 25 academies that are referenced in your reports in Guy | 25 review any audits in order to prepare your opinions |
| Page 81 | Page 83 |

| | |
|---|---|
| 1 and Ezell, correct? | 1 in the Guy case? |
| 2 **A.        That's correct.  I do not believe the** | 2    MR. CRANFORD: Object to the form. |
| 3 **curriculum was provided.** | 3 **A.        I reviewed statements related to the** |
| 4 Q.        Okay.  And you didn't look at any of the | 4 **audits, whether they were done by PREA, done by** |
| 5 curriculum from the executive leadership conference | 5 **ASCA, done by people that the commissioner asked to** |
| 6 that's referenced in your reports in Guy and Ezell, | 6 **come in, on staffing reports.  I did not have nor** |
| 7 correct? | 7 **review the complete audit itself.** |
| 8 **A.        That's correct.  I didn't feel a need to** | 8 Q.        Okay.  So you didn't review the PREA |
| 9 **ask for that curriculum.  Because as I said, that is** | 9 audit that you described in your report.  But |
| 10 **very commonplace among especially state** | 10 rather, you reviewed statements regarding that PREA |
| 11 **jurisdictions to have executive leadership** | 11 audit? |
| 12 **conferences and sergeant academies.  And because of** | 12    MR. CRANFORD: Object to the form. |
| 13 **ASCA and other organizations, that content is very** | 13 Q.        Is that correct? |
| 14 **similar, with the objectives being very similar.** | 14 **A.        I reviewed what I believed were the** |
| 15 Q.        Okay.  I understand that you reviewed a | 15 **pertinent parts of the PREA audit assessment.** |
| 16 number of written policies in your report in Guy. | 16 Q.        Okay.  And other than the PREA audit, do |
| 17 Is that correct? | 17 you recall any other audits that you reviewed and |
| 18 **A.        There were administrative regulations** | 18 received in order to reach your opinions in the Guy |
| 19 **and standard operating procedures reviewed.** | 19 or Ezell cases? |
| 20 Q.        Okay.  And the list of written policies | 20    MR. CRANFORD: Object to the form. |
| 21 and procedures that you considered in developing | 21 **A.        There was a staffing analysis done.** |
| 22 your opinions in Guy are those that were identified | 22 **There was a report done by Richard Stodler --** |
| 23 in Exhibit B of your report in Guy, correct? | 23 **Stalder, excuse me.  Stalder, S-T-A-L-D-E-R,** |
| 24 **A.        That is true for Guy, and that is true** | 24 **Stalder.  Once again, the overall summary of the** |
| 25 **for Ezell.** | 25 **report, not necessarily the report itself.** |
| Page 82 | Page 84 |

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 21 (81 - 84)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 Q.        Okay.  So with regard to the staffing
2 analysis that you just referenced, are you talking
3 about the one that was committed by -- the one that
4 was prepared by -- I think their names are the
5 Savages?
6 A.        Correct.  The Savages did one.  Also,
7 Mr. Stalder, when he came -- Stalder.  When he came
8 in, he did an assessment.
9 Q.        Okay.  And when you were preparing your
10 opinions in the Guy and Ezell matter, did you review
11 the Savages' staffing analysis, or just a summary of
12 what the Savages determined?
13        MR. CRANFORD:  Object to the form.
14 A.        A summary.
15 Q.        Okay.  And when you -- when you prepared
16 your opinions in the Ezell and Guy case, did you
17 review the Richard Stalder report, or just a summary
18 of that report?
19        MR. CRANFORD:  Object to the form.
20 A.        Summary.
21 Q.        Okay.  What was the -- where did you
22 receive the summary that you reviewed of the
23 Savages' report from?
24        MR. CRANFORD:  Object to the form.
25 A.        When I say "the summary," there were
Page 85

1 references to the Savage report.  There were
2 references to the Stalder report in some of the
3 exhibits.  So it wasn't a formal summary, no.  It
4 was references that either ETI made or some other
5 entity made about the findings of those efforts.
6 Q.        Understood.  Okay.
7        And so when you reviewed the staffing
8 analysis in the Savages' report and the Stalder
9 report, what you were reviewing was any reference to
10 those analyses that were provided in materials that
11 you listed in Exhibit B of your Guy and Ezell
12 reports, correct?
13        MR. CRANFORD:  Object to the form.
14 A.        I did not follow that question.  I'm
15 sorry.
16 Q.        Okay.  Let me ask it more clearly.
17        So when you were -- when you reviewed
18 summaries or references to the Savages' report and
19 the Richard Stalder report, what you were reviewing
20 was references to those reports that were in
21 documents that you received to prepare your opinions
22 in the case, correct?
23        MR. CRANFORD:  Object to the form.
24 A.        Correct.
25 Q.        Okay.  And the documents -- the list of
Page 86

1 documents referring to the Savages and the Stalder
2 reports that you reviewed in preparation of your
3 opinions in Guy and Ezell are the ones that are
4 listed in Exhibit B of your report in Guy and
5 Exhibit B of your report in Ezell, correct?
6        MR. CRANFORD:  Object to the form.
7 A.        Yes.
8 Q.        Okay.  Okay.  You reviewed the -- did
9 you review the classification manual applicable to
10 St. Clair in 2018 and early 2019 in order to reach
11 your opinions in the Guy and Ezell matters?
12        MR. CRANFORD:  Object to the form.
13 A.        I did not review the complete
14 classification manual.  I did review some of the
15 classification actions that were taken using the
16 Ohio Risk Assessment Scale.  And I'm very familiar
17 with the ORAS as that is adopted by many states.
18 I've actually used that tool myself and know the
19 work that Mr. Austin does.  So I didn't review the
20 whole manual.  I did review the portions that I felt
21 were applicable.
22 Q.        Okay.  And which portions of the
23 classification manual did you -- did you review in
24 order to reach your opinions in the Guy case?
25 A.        Well, once again, my knowledge of the
Page 87

1 ORAS and looking at the expected time periods when
2 an inmate should be classified, reclassified, the
3 weights of disciplinaries, that kind of thing.
4 Q.        Okay.  And did you review -- was your
5 review of the classification manual for purposes of
6 the development of your opinions in Ezell the same
7 as what you just described for Guy?
8 A.        Yes.
9 Q.        Okay.  You looked at certain
10 classification records in the Guy case that were
11 pertaining to Steven Mullins and Clarence Jackson,
12 correct?
13 A.        Yes.
14 Q.        Okay.  You did not review classification
15 records for any other inmates in order to prepare
16 your opinions in the Guy case, correct?
17        MR. CRANFORD:  Object to the form.
18 A.        The exhibits that I reviewed, that I've
19 testified those are what I relied on, contain the
20 classification actions for those two inmates.
21 Q.        Okay.  And so in other words, you didn't
22 rely -- review or rely on classification records for
23 any inmates other than Mullins and Jackson when
24 preparing your opinions in the Guy case, correct?
25        MR. CRANFORD:  Object to the form.
Page 88

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 22 (85 - 88)

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

1 A.          That's correct.  I didn't feel like it
2 was pertinent.
3 Q.          Okay.  And in the Ezell case, you looked
4 at certain classification records for Terrence
5 Andrews and Cedrick Davis, correct?
6 A.          Yes.
7 Q.          You did not review classification
8 records for any inmate other than Terrence Andrews
9 and Cedrick Davis in order to reach your opinions in
10 the Ezell case, correct?
11          MR. CRANFORD:  Object to the form.
12 A.          Correct.
13 Q.          Okay.  You didn't do any analysis of
14 classification records to assess whether the
15 classification manual was being followed as it
16 relates to St. Clair outside of the classification
17 records pertaining to Steven Mullins and Clarence
18 Jackson in the Guy case, correct?
19          MR. CRANFORD:  Object to the form.
20 A.          Only Mullins and Jackson were pertinent
21 to this case.  So that's correct.
22 Q.          Okay.  And in the Ezell case, you didn't
23 do any analysis of classification records to assess
24 whether the classification manual was being
25 followed, other than looking at the classification

Page 89

1 records of Terrence Andrews and Cedrick Davis,
2 correct?
3          MR. CRANFORD:  Object to the form.
4 A.          That's correct.  Only Andrews and Davis
5 were involved.
6 Q.          Okay.  Okay.  You reviewed meeting
7 minutes from St. Clair in which correctional
8 supervisors generally instructed staff to carry out
9 their assigned duties, correct?
10          MR. CRANFORD:  Object to the form.
11 A.          Yes.
12 Q.          And that was in both -- you reviewed
13 those meeting minutes in both Ezell and in Guy,
14 correct?
15          MR. CRANFORD:  Object to the form.
16 A.          Yes.  Often times they were the same set
17 of minutes.  But yes.
18 Q.          Okay.  The scope of your work in this
19 case did not involve any analysis to determine
20 whether any instructions provided at staff meetings
21 were actually implemented by staff following those
22 meetings, correct?
23          MR. CRANFORD:  Object to the form.
24 A.          Correct.
25 Q.          Okay.  If you had done that analysis,

Page 90

1 you would have documented that in your reports in
2 Guy and Ezell, correct?
3          MR. CRANFORD:  Object to the form.
4 A.          Correct.
5 Q.          Okay.  Okay.  You didn't review the
6 settlement agreement in the Duke v. Dunn case in
7 order to reach your opinions in Guy or Ezell,
8 correct?
9 A.          I'm not sure that is correct.  There
10 were portions of the settlement that were included
11 in the exhibits.  There was also -- and I may be
12 misstating this -- a stipulation that EJI submitted.
13 And I believe that was in relationship to the Duke
14 case about their actual work in the correction
15 industry.
16 Q.          Okay.  And when you included information
17 about the stipulation, for example, did you have --
18 did you receive the entire settlement agreement
19 containing the stipulation?  Or did you receive
20 only -- only the excerpt with the stipulation?
21          MR. CRANFORD:  Object to the form.
22 A.          I believe the entire -- yes.  It's item
23 Number 46, Duke, EJI stipulation.  That's in the Guy
24 case.  So yes, I had the whole stipulation.
25 Q.          Okay.  And when you say "the whole

Page 91

1 stipulation," are you referring to the settlement
2 agreement between the plaintiffs and the defendants
3 in the Duke v. Dunn case setting forth the various
4 agreements about changes that would take place at
5 St. Clair?
6          MR. CRANFORD:  Object to the form.
7 A.          No.  The stipulation I'm talking about
8 is where EJI stipulated to their direct knowledge or
9 awareness of things related to the correctional
10 industry and their limitations.
11 Q.          Okay.  So fair to say that you did not
12 look at the settlement agreement in the Duke v. Dunn
13 case in which the defendants in the Duke v. Dunn
14 case agreed to make particular changes at St. Clair;
15 is that correct?
16          MR. CRANFORD:  Object to the form.
17 A.          I reviewed only those that are inclusive
18 in the exhibits attached.
19 Q.          Okay.  And so you reviewed the
20 stipulation.  And what else did you review that
21 pertains to the settlement in Duke v. Dunn?
22          MR. CRANFORD:  Object to the form.
23 A.          Well, there were references in several
24 of the EJI documents and maybe others and references
25 in the complaint itself about the Duke settlement

Page 92

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 23 (89 - 92)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 that would have excerpts from the Duke settlement,
2 if my recollection is correct.
3 Q.        I see.  So you didn't review the
4 underlying document itself.  You reviewed summaries
5 or quotations from the document from other sources?
6 A.        Correct.
7 Q.        Okay.  Okay.  You didn't do any sort of
8 quantitative analysis of the sufficiency of staffing
9 levels at St. Clair in order to reach your opinions
10 in the Guy and Ezell cases, correct?
11        MR. CRANFORD:  Object to the form.
12 A.        That's correct.
13 Q.        You didn't do any sort of analysis of
14 levels of unauthorized movement at St. Clair in
15 order to reach your opinions in the Guy and Ezell
16 cases, correct?
17        MR. CRANFORD:  Object to the form.
18 A.        Correct.
19 Q.        If you had done that sort of analysis,
20 you would have documented that in your reports in
21 Guy and Ezell, correct?
22        MR. CRANFORD:  Object to the form.
23 A.        Correct.
24 Q.        Okay.  In order to prepare your opinions
25 in the -- scratch that.

1 Guy or Ezell cases, correct?
2        MR. CRANFORD:  Object to the form.
3 A.        Correct.
4 Q.        You didn't review any documents relating
5 to discipline of any ADOC employees in order to
6 reach your opinions in the Guy and Ezell cases,
7 correct?
8        MR. CRANFORD:  Object to the form.
9 A.        Correct.
10 Q.        You didn't review any incident reports
11 or summaries of incident reports that documented
12 discipline of ADOC employees at St. Clair in the
13 2018 and early 2019 time frame in order to reach
14 your opinions in the Guy and Ezell cases, correct?
15        MR. CRANFORD:  Object to the form.
16 A.        Correct.
17 Q.        You didn't conduct any sort of analysis
18 of the documentation of contraband weapon searches
19 at St. Clair in order to reach your opinions in the
20 Guy and Ezell cases, correct?
21        MR. CRANFORD:  Object to the form.
22 A.        Correct.
23 Q.        In other words, you didn't do any sort
24 of independent review from records to determine
25 whether the level of contraband weapon searches at

1 You didn't do any analysis of levels of
2 fights and assaults by prisoners in the P-Q blocks
3 as compared with other housing units at St. Clair in
4 order to reach your opinions in the Guy and Ezell
5 cases, correct?
6        MR. CRANFORD:  Object to the form.
7 A.        Correct.
8 Q.        If you had done such an analysis, you
9 would have documented that in your reports in Guy
10 and Ezell, correct?
11        MR. CRANFORD:  Object to the form.
12 A.        Correct.
13 Q.        Okay.  You didn't review any documents
14 relating to discipline of any defendants in order to
15 reach your opinions in the Guy case, correct?
16        MR. CRANFORD:  Object to the form.
17 A.        It did not affect my opinion.  But I do
18 believe that one of the exhibits was a disciplinary
19 action taken on the warden.  But I'm not even sure
20 that I relied on it, nor is it in my list of
21 exhibits.  So I would say the answer is no.  It's
22 correct.  I did not.
23 Q.        Okay.  Just to be clear, you didn't
24 review any documents relating to discipline of any
25 defendants in order to reach your opinions in the

1 St. Clair was adequate or inadequate as part of your
2 expert review in the Guy and Ezell cases, correct?
3        MR. CRANFORD:  Object to the form.
4 A.        I felt like the documentation provided
5 in the reports was sufficient to give me that
6 information.
7 Q.        When you say "the documentation provided
8 in the reports," what are you referring to?
9 A.        There were statements from the assistant
10 commissioner, warden -- other people, I don't
11 recall off the top of my head -- that talked about
12 the searches that were done and documentation of
13 searches being done.
14 Q.        Okay.  So when you were reaching your
15 opinion about the level of contraband weapon
16 searches that were carried out at St. Clair, you
17 relied on statements from depositions of ADOC
18 employees, correct?
19 A.        Correct.
20 Q.        Okay.  And you didn't do any sort of
21 independent analysis to corroborate or evaluate the
22 level of contraband weapon searches that were
23 happening at St. Clair, correct?
24        MR. CRANFORD:  Object to the form.
25 A.        Correct.

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 Q.          Okay.  Your report -- your reports in
2 Guy and Ezell do not include any sort of comparison
3 of levels of assaults and fights at St. Clair as
4 compared with other prison systems, correct?
5          MR. CRANFORD:  Object to the form.
6 A.          Correct.
7 Q.          Okay.  And if you had done that sort of
8 a comparative analysis, you would have documented it
9 in your reports in Guy and Ezell, correct?
10 A.          Correct.
11 Q.          Okay.  Based on your analysis in the Guy
12 case, what were the options that correctional
13 supervisors had available to them at St. Clair in
14 order to house an inmate that was vulnerable and at
15 risk of violence?
16          MR. CRANFORD:  Object to the form.
17 A.          And which case was that?
18 Q.          The Guy case.
19 A.          The Guy case.  And when you say
20 "correctional supervisor," who are you actually
21 talking about?  What level?
22 Q.          I don't think it matters.  Because I'm
23 actually just asking what are the -- what are the
24 different housing unit options in which a
25 correctional employee could place an inmate at

Page 97

1 St. Clair that was vulnerable and at risk of harm in
2 the time frame of 2018 and early 2019?
3          MR. CRANFORD:  Object to form.
4 A.          So I think it does matter because not
5 any correctional employee has the authority to move
6 an inmate from one spot to another spot.
7          But the shift supervisor, with the
8 resources available to him or her, would assess
9 where the beds are available, how those beds are
10 being used, and if an inmate made a complaint,
11 investigate it.
12          And with the basis of the resources
13 available to him or her, they could move an inmate
14 or multiple inmates in order to potentially mitigate
15 any potential threat or allegation of a threat.  But
16 not anyone can move an inmate.  And even the shift
17 supervisor is limited by the resources within that
18 facility.
19          And I'm going to say again that it has
20 to be -- it doesn't have to be.  It has to be
21 understood that the people within the St. Clair
22 facility are there because they were a threat to the
23 safe operation of the community.  And just because
24 they went to St. Clair doesn't mean that they
25 decided all at once to follow the rules and not

Page 98

1 fight and not get into assaults.  So many of the
2 inmates at St. Clair are a threat to the safe
3 operation of the facility.
4 Q.          One of the options that a correctional
5 warden at St. Clair had available in which to place
6 a vulnerable inmate at St. Clair in the 2018 time
7 frame, 2018 and early 2019 time frame, was the
8 restrictive housing unit, correct?
9          MR. CRANFORD:  Object to the form.
10 A.          Well, first, that authority is outlined
11 in the administrative regulation and the SOP.  And
12 the warden, if I recall right, delegates that
13 authority to the sift supervisor.  The restrictive
14 housing unit is an option.  But that is a limited
15 number of beds when you're looking at a thousand-bed
16 prison.
17 Q.          Okay.  So you would agree with me that
18 the restrictive housing unit is one option that was
19 available at St. Clair at least on occasion in the
20 2018 and early 2019 time frame in which to place a
21 vulnerable -- a vulnerable inmate that faced a risk
22 to their safety, correct?
23          MR. CRANFORD:  Object to the form.
24 A.          That is an option for an inmate who
25 states he has a risk or has a documented actual

Page 99

1 risk, yes.
2 Q.          Okay.  Other than the restrictive
3 housing unit, are there any other housing units at
4 St. Clair that you're aware of in late -- in late
5 2018 and early 2019 in which the correctional
6 official could place an inmate that was vulnerable
7 and in need -- vulnerable and at risk of harm to
8 their safety?
9          MR. CRANFORD:  Object to the form.
10 A.          Yes.
11 Q.          Okay.  What other housing units were
12 available at that time?
13 A.          My experience in St. Clair, from what I
14 have read, is very similar to the experiences that
15 I've had over my career.
16          The first option a shift supervisor or
17 even a shift sergeant looks at is how can I best
18 place this offender while I investigate whether
19 there is a true threat to his safety.
20          The trend in America, the expectation in
21 American prisons is that restrictive housing is the
22 last option considered.  The studies and the
23 research clearly indicate that placing a person in a
24 restrictive housing unit can have long-term negative
25 impacts on that person because of the isolation that

Page 100

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 25 (97 - 100)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1  happens.

2          So the first option is not restrictive
3  housing.  The first option is can I move Jimmy from
4  this unit to another unit, can I change cells with
5  him, what are the opportunities while I assess
6  whether there is a risk to his safety or not.

7  Q.        When preparing your opinions in the Guy
8  case, did you reach any opinions about whether or
9  not there was a special safety unit at St. Clair
10 that was operational in early 2019?

11 A.        Yes.

12 Q.        Okay.  And if you reached those
13 opinions, they would be identified in your report in
14 Guy, correct?

15 A.        I believe so.

16 Q.        Okay.  And what's your understanding of
17 what was available in terms of special safety unit
18 housing at St. Clair in early 2019 for purposes of
19 the Guy case?

20          MR. CRANFORD:  Object to the form.

21 A.        My understanding is the special safety
22 unit, as well as the behavior modification unit were
23 each 48 beds out of a thousand-bed prison.  And it's
24 my experience and what I read out of the St. Clair
25 documentation, it was very difficult to be able to

Page 101

1  get those two units up and operational.

2          And it's the same challenge that I've
3  had in my career, is how do you -- first off, how do
4  you identify which 48 inmates you're going to put in
5  those slots, are they the right 48, and how do you
6  constantly manage that so the outcome is your
7  desired outcome.

8          It's a great concept.  It's a great
9  philosophy.  But it's very, very difficult to
10 actually actualize.

11 Q.        Which housing units at St. Clair in late
12 2018 and early 2019 were single cell and which were
13 double cell, to your knowledge?

14          MR. CRANFORD:  Object to the form.

15 A.        I don't believe I'm familiar with that
16 answer.

17 Q.        Do you know whether the P-Q blocks were
18 single cell or double cell?

19          MR. CRANFORD:  Object to the form.

20 A.        I believe P-Q was double celled.  But I
21 may be incorrect.

22 Q.        Okay.  And do you know whether the L and
23 M blocks were single cell or double cell in early
24 2019 at St. Clair?

25          MR. CRANFORD:  Object to the form.

Page 102

1  A.        I believe they were double celled.

2          MS. BROWN:  It is 12:40.  We've been
3  going for a while.  Can we take a lunch break?

4          MR. CRANFORD:  Sure.  How long do you
5  think you need?

6          MS. BROWN:  Let's -- let's go off the
7  record.

8          THE VIDEOGRAPHER:  We're off the record.
9  The time is 12:39 p.m.

10         (Lunch break was taken.)

11         THE VIDEOGRAPHER:  We are back on the
12 record.  The time is 1:43 p.m.

13 Q.        Okay.  Mr. Myers, when preparing your
14 opinions in the Guy and Ezell matters, you reviewed
15 certain deposition transcripts, correct?

16 A.        Correct.

17 Q.        When you reviewed those transcripts, did
18 you review the entire deposition transcripts or just
19 excerpts?

20 A.        I believe it was the full deposition
21 that's listed in Exhibit B in my report.

22 Q.        Okay.  How many deposition transcripts
23 did you review to prepare your opinions in the Guy
24 case?

25 A.        According to the -- well, you asked Guy.

Page 103

1  Ezell, there was one, two, three, four, five, six,
2  it appears.

3  Q.        Okay.  And are you looking at Ezell or
4  Guy?

5  A.        Guy.

6          Guy.  Okay.

7  A.        Number 38 through 43.

8  Q.        Okay.  And when you reviewed those
9  deposition transcripts in Guy, did you review the
10 entire transcripts or just excerpts from them?

11 A.        The entire transcript.

12         MR. CRANFORD:  Object to the form.

13 Q.        Okay.  And the same question for Ezell.
14 When you reviewed deposition transcripts to prepare
15 your opinions in this case, you reviewed the entire
16 transcripts, correct?

17 A.        I reviewed four entire transcripts and
18 two condensed transcripts according to Exhibit B.

19 Q.        Okay.  What do you mean by "condensed
20 transcripts".

21 A.        That was the way it was labeled in the
22 exhibit.  It was Cynthia Caver and Eric Garrett.

23 Q.        Okay.  And this is your report, correct?

24 A.        Yes, ma'am.

25 Q.        Okay.  So when you wrote "condensed

Page 104

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 26 (101 - 104)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

Page 105

1 transcripts," what did you mean by that?
2          MR. CRANFORD: Object to the form.
3 A.          That was the way the exhibit was sent
4 and that was the title of the exhibit. So I used
5 the title of the exhibit.
6 Q.          Okay. So --
7 A.          Let me clarify, if I might. I notice
8 there's actually five depositions complete and two
9 condensed.
10 Q.          So regardless of how the document was
11 titled when it was sent to you, do you know whether
12 the condensed transcripts that you reviewed in
13 preparation of your opinions in Ezell were complete
14 transcripts of those depositions or were only
15 partial -- partial transcripts?
16 A.          Without having that document in front of
17 me, I can't answer that question.
18 Q.          Did you -- how did you determine
19 which ADOC employees' depositions to review in order
20 to reach your opinions in the Guy case?
21          MR. CRANFORD: Object to the form.
22 A.          I reviewed all of the depositions and
23 all of the exhibits that were sent. And I did not
24 screen them out. I reviewed them all and then
25 determined whether or not I felt like they should be

Page 106

1 included in my report or not.
2 Q.          Okay. And all the ones that you
3 received and reviewed were documented in your report
4 in Guy, correct?
5          MR. CRANFORD: Object to the form.
6 A.          All that I received, reviewed, and
7 relied my expert opinion on are listed in the
8 report.
9 Q.          Okay. So did you receive other
10 deposition transcripts to review in Guy that you did
11 not rely upon and list in your report?
12 A.          Without having all of the information in
13 front of me, I'm not certain whether I included them
14 all or excluded some.
15 Q.          Okay. So the Exhibit B at the end of
16 your report is titled list of materials reviewed,
17 correct?
18 A.          Documents Reviewed.
19 Q.          Documents Reviewed. And are you telling
20 me that that refers not -- not to documents
21 reviewed, but rather to documents that you reviewed
22 and relied upon?
23 A.          I believe I testified this morning
24 before the break that those are the documents that I
25 reviewed and are included in formalizing my opinion.

Page 107

1 Q.          Okay. So I'm still unclear on whether
2 you reviewed -- you received from Butler Snow other
3 documents that you reviewed, but you then did not
4 list in Exhibit B at the end of your Guy report.
5          MR. CRANFORD: Object to --
6 Q.          Can you clarify?
7          MR. CRANFORD: Object to the form.
8 A.          And I don't know the answer to that. I
9 can tell you that Exhibit B contains all those
10 documents that I reviewed and then based some of my
11 opinion on in the report. Whether there was others
12 or not, I don't recall.
13 Q.          Okay. Do you recall reviewing any other
14 deposition transcripts to reach your opinions in Guy
15 other than the ones that are listed at the end of
16 your report?
17          MR. CRANFORD: Object to the form.
18 A.          Not that I recall.
19 Q.          Okay. And the deposition transcripts
20 that you reviewed in the Guy matter are ones that
21 Butler & Snow selected and sent to you, correct?
22          MR. CRANFORD: Object to the form.
23 A.          Yes.
24 Q.          They're not ones that you specifically
25 requested, correct?

Page 108

1          MR. CRANFORD: Object to the form.
2 A.          As I stated before, the documents in
3 here were those that were sent to me by Butler &
4 Snow, other than those that I researched myself off
5 of the internet and included in the list.
6 Q.          Okay. So likewise in the Ezell case,
7 you don't recall reviewing any deposition
8 transcripts other than the depositions that are
9 listed in your Documents Reviewed section of the
10 report, correct?
11          MR. CRANFORD: Object to the form.
12 A.          My answer for the Ezell case is the same
13 as the Guy case.
14 Q.          And what is that answer?
15 A.          That the list of the documents are those
16 that I reviewed and used to formulate the opinions
17 cited in the report.
18 Q.          Okay. And so as you sit here today, you
19 don't recall reviewing any deposition transcripts in
20 order to reach your opinions in Ezell other than the
21 deposition transcripts that are identified in your
22 materials -- Documents Reviewed section, correct?
23          MR. CRANFORD: Object to the form.
24 A.          That is correct. I do not recall.
25 Q.          Okay. And in Ezell, the deposition

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 27 (105 - 108)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 transcripts that you reviewed were selected for you
2 by Butler Snow, correct?
3              MR. CRANFORD:  Object to the form.
4 A.          Ask the question again, please.
5 Q.    Sure.
6              In the Ezell case, the deposition
7 transcripts that you reviewed are ones that were
8 selected for you by Butler Snow, correct?
9              MR. CRANFORD:  Object to the form.
10 A.         Those are the ones that were forwarded
11 to me by Butler Snow, yes.
12 Q.    Okay.  You did not specifically request
13 any particular deposition transcripts to review in
14 order to reach your opinions in the case, correct?
15 A.         That is correct.
16 Q.        Okay.  Let's take a look at Exhibit B,
17 which is your report in the Guy case.  And if I
18 could direct your attention to Page 7 of your report
19 in Guy.
20              Okay.  The first sentence of the first
21 full paragraph, can you read that out loud to us?
22 A.         "On July 7th 2018, St. Clair
23 correctional staff placed Mullins in the RHU special
24 security unit, a segregated area referred to as
25 protective custody."
                                              Page 109

1 determined in need of protection, could be there as
2 a result of a disciplinary, could be there as an
3 investigative situation.  But I believe in this
4 report, the information sent to me was that the two
5 terms were being used interchangeably.
6 Q.         Okay.  So the restrictive housing unit
7 could -- scratch that.
8              A prisoner in the restrictive housing
9 unit could be -- could have various different
10 statuses, correct?
11 A.         That is my experience.
12 Q.         Okay.  And so a prisoner in the
13 restrictive housing unit could either be there in
14 disciplinary status or investigatory status or
15 administrative status, correct?
16              MR. CRANFORD:  Object to the form.
17 A.         That is my experience nationwide.
18 Q.         Okay.  And you're not sure what the
19 difference statuses were in the restrictive housing
20 unit at St. Clair in 2018, is that fair to say?
21 A.         That's fair.
22 Q.         Okay.  But in your experience, those are
23 the different statuses?
24 A.         Plus protective custody.  I don't think
25 you named it.
                                              Page 111

1 Q.        Okay.  And so is it your testimony that
2 the restrictive housing unit and the special
3 security unit at St. Clair were one and the same in
4 July of 2018?
5              MR. CRANFORD:  Object to the form.
6 A.         That statement is taken directly from
7 Bates number ADOC 008964 and does indicate that the
8 special security unit is also called the protective
9 custody unit.
10 Q.         Okay.  And does it -- is it your
11 understanding that the special security unit is also
12 called the restrictive housing unit?
13              MR. CRANFORD:  Object to the form.
14 A.         Those are actually two different
15 purposes.  And it's actually special safety unit.  I
16 quoted that wrong.  That is a place where a person
17 might go to be investigated to determine whether or
18 not there is a threat for his or her safety.
19 Q.         Okay.  So can you explain your
20 understanding of the difference between the
21 restrictive housing unit and the special safety
22 unit?
23              MR. CRANFORD:  Object to the form.
24 A.         A person in the restrictive housing unit
25 typically is there -- could be subsequent to being
                                              Page 110

1 Q.         Okay.  How -- how do you see protective
2 custody as different from administrative status in
3 restrictive housing?
4              MR. CRANFORD:  Object to the form.
5 A.         Typically administrative status could
6 include someone that is placed in restrictive
7 housing for an extended period of time as a maximum
8 custody.  They may have already served their
9 disciplinary time, but the classification board has
10 determined that they are not ready to be released
11 into the general population.  So administrative
12 segregation can refer to multiple different levels
13 of segregation.
14 Q.         Okay.  And is it your understanding that
15 the special safety unit at St. Clair was the
16 segregated area referred to as protective custody?
17              MR. CRANFORD:  Object to the form.
18 A.         It's my understanding that the intent
19 was to create a special safety unit.  However, I
20 would believe from reviewing the materials that
21 there were probably inmates in protective custody
22 that were housed in areas other than what you're
23 calling the special safety unit.
24 Q.         Okay.  And what areas would an inmate
25 that was in protective housing be housed at in
                                              Page 112

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 28 (109 - 112)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 St. Clair in 2018 other than the special safety

2 unit?

3            MR. CRANFORD:  Object to the form.

4 A.          I don't have the answer to that without

5 seeing the population sheet.

6 Q.          Okay.  Okay.  Do you recall that Steven

7 Mullins reported that he was assaulted by his

8 cellmate on February 25th of 2019, and that on the

9 following day that cellmate subsequently fatally

10 assaulted Mr. Mullins?

11 A.          Not exactly the way you said it.

12 Q.          Okay.  How would you characterize it?

13 A.          I would characterize it that Mullins

14 went to the shift supervisor or sergeant or

15 whomever, maybe the lieutenant, and claimed he was

16 in fear of his safety.  He did not indicate exactly

17 who he was in fear of.

18            My recollection is upon further

19 questioning, that Mullins then identified a person

20 by the nickname of C.J., which could have been

21 multiple people.

22 Q.          Okay.  And so it's your understanding

23 that Steven Mullins did not confirm that the person

24 that he was referring to was Clarence Jackson until

25 after he was fatally assaulted?

Page 113

1            MR. CRANFORD:  Object to the form.

2 A.          That's correct.  He did not identify

3 Jackson until after the assault had already

4 occurred.

5 Q.          Okay.  And that was a fact that you

6 discussed numerous times in your report in the Guy

7 case, correct?

8            MR. CRANFORD:  Object to the form.

9 A.          I'm not sure what you consider numerous.

10 I did point it out a couple of times.

11 Q.          Okay.  Because it was significant to

12 you, correct?

13            MR. CRANFORD:  Object to the form.

14 A.          Correct.

15 Q.          Okay.  And why was it significant to you

16 that Steven Mullins did not -- did not confirm that

17 the cellmate that he was in fear of was Clarence

18 Jackson until after he was fatally assaulted?

19 A.          Okay.  You said "cellmate."  To my

20 knowledge, Mullins never said "cellmate."  He said

21 he was in fear of his life from C.J.  And the reason

22 I believe that is material to my opinion is when you

23 have a population and someone is saying, "I'm in

24 fear of C.J.," I'm going to start looking around

25 trying to identify C.J.

Page 114

1            And in this case, there was actually

2 another inmate with the nickname of C.J., Chris

3 Johnson, I believe.  I think it's in the report

4 somewhere.  That they initially thought that was who

5 C.J. was.  So in order to find the alleged person

6 that Mullins was afraid of, you've got to have some

7 idea of who to look for.

8 Q.          Got it.

9            So based on your review, Steven Mullins

10 did not disclose that it was his cellmate that was

11 bothering him at any time on February 25th of 2019,

12 correct?

13            MR. CRANFORD:  Object to the form.

14 A.          That is my finding of reviewing the

15 report, yes.

16 Q.          Okay.  And based on your review -- I'm

17 sorry.  If I could ask you to just shut the report

18 for a second and set it aside.  Thank you.

19            Based on your review, Steven Mullins

20 didn't report that he was having an issue with his

21 cellmate at any time in the morning of February 26,

22 2019, correct?

23            MR. CRANFORD:  Ruth, I'm just going to

24 object to the form and also to the fact that if he

25 needs to review a document in order to refresh his

Page 115

1 recollection, he can look at his report or he can

2 ask to see the document.  So I don't think it's

3 appropriate for you to tell him to not review his

4 report if he needs to.

5            MS. BROWN:  Sure.

6 Q.          You know, I just want it to be clear

7 what you're looking at when.  So if there's a point

8 in time in which you need to review your report,

9 please ask me.  Okay?  And we can discuss it at that

10 time.

11            MS. BROWN:  So back to my question.  Can

12 the court reporter please read the question back?

13            (Record read.)

14            MR. CRANFORD:  Object to the form.

15 A.          So initially your question was about

16 February the 25th.  And now you're talking about

17 February the 26th.  In order to refresh my memory, I

18 need to be able to look at the report and see what

19 happened between the 25th and the 26th since now

20 we're talking about a different day.

21 Q.          Okay.  Very well.  Go ahead, sir.  And

22 let me know when you're done.

23 A.          Okay.

24 Q.          Okay.  So what is your response to my

25 question?

Page 116

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 29 (113 - 116)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

Kevin Myers
2/4/2025

Page 117

1  A.        You're asking me about the morning of
2  the 26th?
3  Q.        Yes, sir.
4  A.        I found nothing in my report reflecting
5  anything about Monday -- or the morning of February
6  26th on Page 7.
7  Q.        Okay.  So in your report at any place --
8  well, scratch that.
9           Based on your review of the incidents in
10 this case, in the Guy case, did you find any
11 evidence that Steven Mullins indicated that the
12 inmate with whom he was having an issue on February
13 25th was his cellmate?
14           MR. CRANFORD:  Object to the form.
15 A.        My recollection is that the report from
16 Mullins was that someone named C.J. punched him and
17 assaulted him.  And then as a result of that,
18 Lieutenant Gordy investigated it, trying to find out
19 who C.J. was so they can try to identify who the
20 alleged assailant was.
21 Q.        Okay.  Okay.  Now, you would agree with
22 me that there was -- that Mr. Mullins reported an
23 incident with another inmate on February 25th, and
24 then on February 26th Mullins was fatally stabbed,
25 correct?

Page 118

1           MR. CRANFORD:  Object to the form.
2  A.        As I said, yes, he reported on February
3  25th he had a problem with someone indicated as C.J.
4  The next day, he was stabbed.
5  Q.        Okay.  So with respect to the February
6  25th incident, did you examine when any ADOC
7  employee first received sufficient information to
8  identify Clarence Jackson as the person with whom
9  Mr. Mullins was having an issue on February 25th?
10           MR. CRANFORD:  I'm going to object to
11 the form.  And, Ruth, I'm also just going to ask are
12 we going to -- are you asking about a specific
13 report, a specific employee, at what point in time?
14 It's not clear to me what the question is.
15           MS. BROWN:  Will, just a reminder that
16 -- Will, just a reminder that we're not going to
17 have speaking objections during this deposition.
18 Q.        Did you understand my question, sir?
19 A.        Not completely.
20           But I'll answer it this way:  From the
21 initial report where he indicated C.J., there were
22 multiple staff that interviewed and talked to
23 Mr. Mullins to try to identify who the alleged
24 assailant was.  At one point, the staff were led to
25 believe that it was a C.J.  I would have to look at

Page 119

1  my report.  But I think that was a Chris Johnson.
2  And then it was not until after the stabbing and
3  Mullins was en route to medical that he said,
4  "Jackson did it."
5  Q.        Okay.  So it's your testimony that it
6  was not until after Mr. Mullins was fatally
7  assaulted that he -- that he first confirmed that
8  the inmate with which he was having these issues was
9  Clarence Jackson.  Do I have that right?
10 A.        Partially.  I'm going to say that it was
11 not until after he was stabbed en route to medical
12 that he told staff it was Jackson.  And the
13 difference is he wasn't fatally stabbed right at
14 that point.  He was stabbed and later on died as a
15 result of the stabbing.
16 Q.        Okay.  So it's your -- based on your
17 review, you believe that the first time that
18 Mr. Mullins identified Clarence Jackson as the
19 inmate with which he was having an issue was after
20 Mr. Mullins had been stabbed on February 26th,
21 correct?
22           MR. CRANFORD:  Object to the form.
23 A.        Yes.
24 Q.        Okay.  And so it's your opinion in this
25 case that the ADOC employee -- employees who

Page 120

1  interacted with Mr. Mullins did not have sufficient
2  information to identify Clarence Jackson as the
3  inmate that Mr. Mullins had been reporting to them
4  until after Mr. Mullins was stabbed on February
5  26th --
6           MR. CRANFORD:  Object to --
7  Q.        -- right?
8           MR. CRANFORD:  Object to the form.
9  A.        That is my opinion, yes.
10 Q.        Okay.  Did you -- as part of your work
11 in this case, did you conduct an examination to
12 determine when ADOC employees first received
13 sufficient information to identify the inmate that
14 Mr. Mullins was reporting to them as Clarence
15 Jackson?
16           MR. CRANFORD:  Object to the form.
17 A.        Based on my review of the information
18 and as I've already stated, I believe that the
19 sufficient information, as you put it, occurred
20 after the stabbing and when Mullins was en route to
21 medical.
22 Q.        Okay.  So if it turned out that ADOC
23 employees had sufficient information to identify
24 Clarence Jackson earlier, before the stabbing, that
25 would change your opinions in the case, right?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 30 (117 - 120)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1  MR. CRANFORD: Object to the form.
2  A.        No, I don't think it would.  And this is
3  why.  It's easy on Monday to tell what should have
4  happened on Sunday.  So anything of saying, well,
5  they should have known, could have known, would have
6  known, they had sufficient information is Monday
7  morning quarterbacking.
8        I believe, from looking at the
9  information, as real time occurred, that the staff
10  at St. Clair did a very thorough job of trying to
11  identify who Mullins was claiming to be a threat to
12  him.  And understand that Mullins had a history of
13  claiming people had different threats to him,
14  wanting locked up and then wanting out.  So he went
15  back and forth.
16        But even with that continual back and
17  forth, it's my belief that on February the 25th,
18  that the staff did a very thorough job of trying to
19  identify whether there was a threat to Mullins'
20  safety, and if so, who that was and identifying it
21  with the information that they had at that point in
22  time.
23  Q.        Okay.  If it turned out that Mullins did
24  identify Clarence Jackson as his -- as the inmate
25  that he was fearful of prior to being stabbed, that

Page 121

1  would -- would that change your opinion?
2        MR. CRANFORD: Object to the form.
3  A.        Not necessarily.  We're talking about a
4  thousand-bed prison with many moving parts.  And
5  communication even in a perfect world is a
6  challenge.  So if Mullins had told employee A
7  something and that did not get communicated -- that
8  can happen.  I'm not saying it did.  But I'm not
9  going to say that there was information found out
10  later on that could have changed it.  Because the
11  staff can only deal with what they know at the point
12  in time when they make the decisions they make.
13  Q.        Okay.  Was Steven Mullins' report that
14  he was -- that he had been assaulted by another
15  inmate on February 25th of 2019, was that report
16  corroborated by any medical evidence?
17        MR. CRANFORD: Object to the form.
18  A.        I'm not sure what your question is.
19  Which assault and corroborated how?
20  Q.        Sure.  Was there any medical evidence
21  that you reviewed that corroborated that Steven
22  Mullins had been assaulted by another inmate on
23  February 25th of 2019?
24        MR. CRANFORD: Object to the form.
25  A.        If I recall correctly -- without

Page 122

1  reviewing the report, if I recall correctly, the
2  staff took him to medical on the 25th to have him
3  examined.  And also that was a time when Mullins
4  could have further given information about who the
5  alleged assailant was.  And it's my information that
6  he did not do that.  I do not recall the results of
7  the medical exam on the afternoon, evening of the
8  25th.
9  Q.        Okay.  So you don't recall whether there
10  was any bruising or injuries documented during that
11  medical examination?
12  A.        Not without reviewing my report.
13  Q.        Okay.  Go ahead and review your report,
14  sir.
15  A.        Okay.  I find on Page 18 where it says,
16  "After reviewing the incident, Lieutenant Gordy
17  escorted Mullins to St. Clair's infirmary for a
18  brief medical assessment and noted that Captain
19  White would investigate Mullins' claim of sexual
20  assault, sexual harassment against C.J.  Mullins
21  then received another transfer from P36 to L28."
22        That was either the second or the third
23  investigation done on the afternoon of the 25th by
24  staff at St. Clair.  I do not have the actual
25  findings of the medical report.

Page 123

1  Q.        Okay.  So as you sit here today, you
2  don't know whether or not there was medical
3  corroboration that Steven Mullins had been
4  physically assaulted on February 25th 2019, correct?
5        MR. CRANFORD: Object to the form.
6  A.        That is true.  But I also will add that
7  the charge appears to be sexual harassment, not
8  sexual assault.  Two different issues.
9  Q.        Okay.  And what's your understanding of
10  the nature of the allegations that Steven Mullins
11  made about the conduct of this inmate on February
12  25th of 2019?
13  A.        I'll have to look at my report again.
14  Q.        Okay.
15  A.        Actually, it vacillates back and forth
16  from assault to harassment.  Let me see if I can
17  find the original.  ADOC OO8964 states that at
18  approximately 6:01 a.m., Mullins reported that
19  another inmate assaulted him.  And that's when the
20  investigation began with Lieutenant Ragsdale, and
21  then later on in the day with Lieutenant Gordy.
22  Q.        Okay.  And on February 25th of 2019,
23  Mr. Mullins made several reports about the assault
24  by this inmate, correct?
25        MR. CRANFORD: Object to the form.

Page 124

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 31 (121 - 124)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 A.          Not by this inmate.  He made several
2 allegations of either assault or harassment by an
3 inmate known as C.J.
4 Q.          Okay.  And what were the allegations
5 that he made in terms of the conduct of the inmate?
6 A.          I don't find that specifically other
7 than the PREA hotline, which was later on in the
8 day.  So not the first report.  But the PREA hotline
9 says that C.J. punched him in the head and demanded
10 Mullins perform oral sex at knifepoint.
11 Q.          So you don't know whether there was any
12 corroboration, medical corroboration of Mr. Mullins'
13 report that an inmate named C.J. had punched him in
14 the head, do you?
15          MR. CRANFORD: Object to the form.
16 A.          I find no medical corroboration.  And I
17 can also say it's my experience that I can punch you
18 in the head numerous times, and there will be no
19 evidence that I punched you in the head.  That
20 doesn't mean it didn't happen.  But also, as I
21 testified earlier, they did take him to medical.
22 Q.      Okay.  Okay.  So during at least one of
23 the reports that Mr. Mullins made about an inmate on
24 February 25th of 2019, he reported that this inmate
25 demanded that he perform oral sex at knifepoint,

1 correct?
2 A.          That's what the -- that was the call
3 made to the PREA hotline.
4 Q.          Okay.  And you're not aware of any
5 search for a knife having taken place at any time on
6 February 25th or February 26th prior to Mr. Mullins
7 been stabbed, correct?
8          MR. CRANFORD: Object to the form.
9 A.          If I don't know who the assailant --
10 alleged assailant is, where am I going to start
11 searching?  Allegedly, there's a knife.  But we
12 don't even know who has a knife, wouldn't even know
13 where the start searching.  It's a large place.
14 Q.          Okay.  So, you know, you -- let's go
15 back to what my question was.
16          So you're not aware of any evidence that
17 there was a search carried out for the knife that
18 Mr. Mullins reported at any time on February 25th or
19 February 26th prior to when Mr. Mullins was stabbed,
20 correct?
21          MR. CRANFORD: Object to the form.
22 A.      I am not aware that there was sufficient
23 information provided that would allow staff to know
24 where to start searching for an alleged weapon.
25 Q.          Okay.  So I understand the why.  But are

1 we on the same page about the fact that there's no
2 documented evidence of any -- well, scratch that.
3          I understand what you're saying about
4 why you believe there was no search.  But can we
5 agree that there's no documented evidence that there
6 was a search for a knife that took place on February
7 25th or February 26th prior to when Mr. Mullins was
8 stabbed?
9 A.          Not really.  Because I cannot -- with
10 the information that I reviewed, I can't stand here
11 today and say that searches for contraband did not
12 happen on the 25th or 26th.
13          What I can say is that there was
14 insufficient information provided to cause anyone to
15 go start searching for an alleged weapon, real or
16 otherwise.
17 Q.          Okay.  Okay.  When you were preparing
18 your report in the Guy case, you did not consider
19 any documentation regarding whether Mr. Mullins
20 required placement in the special safety unit at
21 St. Clair, correct?
22          MR. CRANFORD: Object to the form.
23 A.          That's not correct.  You covered a
24 large, wide area.  What date are you talking about
25 now?

1 Q.          I -- when I looked at the list of
2 materials reviewed in your Guy report, I did not see
3 any documentation that would cover Mr. Mullins
4 requiring placement -- any consideration of
5 Mr. Mullins requiring placement in the special
6 safety unit at St. Clair.
7          Do you agree with me or disagree with
8 me?
9          MR. CRANFORD: Object to the form.
10 A.          I disagree with you.  Are you talking
11 about at any time he was at St. Clair?
12 Q.          Yes.
13 A.          He had been just released out of
14 protective custody on February -- excuse me while I
15 look through this report.  On February the 12th,
16 Mullins was released out of RHU, protective custody.
17 And he signed a statement, "I do hereby state that I
18 can live in the St. Clair population without any
19 problems, and I have no known enemies at this
20 institution.  I hereby relieve any and all ADOC
21 officials of any liability and damages."
22          So he was in protective custody up until
23 February the 12th.  And if I recall right, he had
24 been in there for a long period of time, maybe since
25 July.  Yes.  On July 17th, Mullins wrote a

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 32 (125 - 128)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 statement, "I was jumped and a knife pulled on me.
2 I was told I owed some guy ten tops."
3          So he got locked up.  And through the
4 time, he alleged that he couldn't out in population.
5 Then he would change his mind.  No, I do want to go
6 out in population.  I don't want to live in
7 restrictive housing.  So they finally released him
8 into population before this incident happened on the
9 25th.
10 Q.          Okay.  So if I'm understanding you
11 correctly, you know, it's your belief that
12 Mr. Mullins was in restrictive housing for a long
13 period of time up through February 12th of 2019 at
14 St. Clair, correct?
15          MR. CRANFORD:  Object to the form.
16 A.          That's my recollection.
17 Q.          I'm wondering not about the restrictive
18 housing unit, but about the separate special safety
19 unit.
20          Did you review any documentation
21 regarding whether Mr. Mullins required placement in
22 the special safety unit at any time during which --
23 while he was at St. Clair?
24          MR. CRANFORD:  Object to the form.
25 A.          I think there's a misunderstanding of

Page 129

1 the special safety unit.  That was at best going to
2 be 24 beds.  And as I testified earlier, there's
3 often times that inmates were in the restrictive
4 housing unit while on protective custody.
5          A population of a thousand inmates at
6 St. Clair with a protective custody population will
7 not -- my experience says will not fit in 24 beds.
8 It's my belief that Mullins was in restrictive
9 housing for his protection.
10 Q.          Okay.  You would agree with me that the
11 restrictive housing unit and the special safety unit
12 at St. Clair were two -- were in two different areas
13 in the prison, correct?
14          MR. CRANFORD:  Object to the form.
15 A.          I'm not sure exactly where the special
16 safety unit is.  My focus was on the status that
17 Mullins was placed in, not necessarily what housing
18 unit he was placed in to keep him safe while he was
19 alleging that his safety was in jeopardy.
20 Q.          Okay.  So you don't know whether or not
21 the special safety unit at St. Clair was a different
22 housing unit than the restrictive housing unit at
23 St. Clair in February of 2019.  Is that fair to say?
24          MR. CRANFORD:  Object to the form.
25 A.          That's fair to say.

Page 130

1 Q.          Okay.  And so you also don't know about
2 any differences in privileges that were available to
3 inmates in the special safety unit versus in the
4 restrictive housing unit at St. Clair as of February
5 2019, right?
6          MR. CRANFORD:  Object to the form.
7 A.          I'll go back to saying that I don't know
8 that the special safety unit ever got fully
9 activated.  Even if it had, it's not possible to get
10 everyone into a 24-bed facility or unit that need
11 protective custody.  The staff have to manage the
12 resources they have in the best method they can to
13 try to provide a safe and orderly facility.
14 Q.          Okay.  But my question was entirely
15 different.
16          My question was are you aware of any
17 differences in privileges that were available to
18 inmates in the special safety unit at St. Clair
19 versus in restrictive housing at St. Clair?
20          MR. CRANFORD:  Object to the form.
21 A.          I am not.
22 Q.          Okay.  You didn't review any
23 documentation regarding the capacity in the special
24 safety unit at St. Clair in February 2019, correct?
25          MR. CRANFORD:  Object to the form.

Page 131

1 A.          Correct.
2 Q.          Okay.  And you don't know how many
3 special safety unit beds were available at St. Clair
4 in February of 2019, correct?
5          MR. CRANFORD:  Object to the form.
6 A.          Correct.
7 Q.          Okay.  You don't know the number of
8 total beds in the special safety unit at St. Clair
9 in February of 2019, correct?
10          MR. CRANFORD:  Object to the form.
11 A.          That's correct.  I think I answered that
12 twice at least.
13 Q.          Got it.
14          And you don't know -- you didn't look at
15 any documentation to tell you whether or not there
16 were beds available in the special safety unit at
17 St. Clair at any time in late 2018 or early 2019,
18 correct?
19          MR. CRANFORD:  Object to the form.
20 A.          I did not find that necessary to look at
21 because, to refresh your memory, he got locked up
22 initially in July of 2018 and had asked to come out
23 several times.
24 Q.          Okay.  Now, you did not review any
25 emails about Mr. Mullins by ADOC employees in

Page 132

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 33 (129 - 132)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 preparation of your report in the Guy case, correct?
2          MR. CRANFORD: Object to form.
3 A.          Only if they were a part of a
4 classification decision.  And moving an inmate from
5 restrictive housing into general pop, general
6 population to restrictive housing would be a
7 classification action.  So it is possible that some
8 of that information would be contained in those
9 classification actions.
10 Q.          Okay.  If you reviewed any emails
11 regarding Mr. Mullins by ADOC employees in
12 consideration of your opinions in the Guy case, you
13 would have -- you would have identified them by
14 Bates number in your report, correct?
15          MR. CRANFORD: Object to the form.
16 A.          That is correct.
17 Q.          Okay.  Are you aware of whether or not
18 EJI asked that Mr. Mullins be placed in the special
19 safety unit at any time in the fall of 2018 or
20 winter 2018 or early 2019?
21          MR. CRANFORD: Object to the form.
22 A.          I'm not aware of that.  And I will add
23 that I would think that request would be
24 inappropriate.
25 Q.          Okay.  And you are not aware of any

Page 133

1 emails by ADOC employees regarding whether
2 Mr. Mullins should be moved to the special safety
3 unit, correct?
4          MR. CRANFORD: Object to the form.
5 A.          I testified that I haven't reviewed any
6 emails.
7 Q.          Okay.  Okay.  Based on your correctional
8 experience, how would you expect correctional
9 supervisors at a prison like St. Clair to handle a
10 situation in which they received a report that a
11 specific identified inmate in a general population
12 housing block had punched another prisoner in the
13 head, had exposed his genitalia to that prisoner,
14 and brandished a knife in the process?
15          MR. CRANFORD: Object to the form.
16 A.          That appears to be a hypothetical
17 question.  And I'd rather not answer a hypothetical
18 question.
19 Q.          Okay.  So you don't have -- you don't --
20 you don't have an opinion on how you would expect a
21 correctional supervisor to handle that situation
22 that I just described.  Is that fair to say?
23          MR. CRANFORD: Object to the form.
24 A.          That's hypothetical and wit a lack of
25 factual foundation.  In order for a supervisor or

Page 134

1 for me to second-guess a supervisor, I've got to
2 know more about the specific actual facts
3 surrounding the case, not a hypothetical.  Is that
4 the first time it's ever happened?  Has it happened
5 multiple times in the past?  What is the history?
6 Hypothetical questions are just that.  They're
7 hypothetical.
8 Q.          Sure.  Let's say that it's the first
9 time.  So there's a -- there's a report that a shift
10 supervisor receives that one inmate in general
11 population is reporting that another inmate who has
12 been identified by name had physically assaulted
13 him, had exposed his genitalia to him, and had
14 brandished a knife at him.  And this was the first
15 incident involving this alleged perpetrator that the
16 shift supervisor is aware of.  How would you expect
17 the shift supervisor to handle that situation?
18 A.          I still find that to be highly
19 hypothetical, without enough information for me to
20 answer.  I will tell you this:  It's my opinion, as
21 I put in the report, that when Mullins made the
22 allegation that he made, that the staff at St. Clair
23 took all deliberate action to investigate, to
24 separate, and do the best they could to properly
25 house Mullins.

Page 135

1 Q.          Okay.  What -- you know, if you were
2 training a shift supervisor in your capacity as a
3 correctional expert on how to handle a situation in
4 which they receive a report from an inmate that a
5 specific other inmate has physically assaulted a
6 prisoner, exposed his genitalia to the prisoner, and
7 brandished a knife at the prisoner, is there any
8 advice or guidance that you would give the shift
9 supervisor as to how that handle in a situation?
10          MR. CRANFORD: Object to the form.
11 A.          Yeah.  Look for the facts, see what you
12 can isolate, see what you can find out.  And I'm
13 going to state it again.  I believe that in this
14 case, the St. Clair staff did the best they could to
15 find out who C.J. is, find out whether the incident
16 happened.  And they gave Mr. Mullins more than one
17 opportunity to share more information about the
18 situation.
19 Q.          Okay.  All right.  During the course of
20 your -- your work in the Guy matter, you did not
21 find evidence of any rule violations by any ADOC
22 employees with regard to their treatment of
23 Mr. Mullins on February 25th or 26th of 2019,
24 correct?
25          MR. CRANFORD: Object to the form.

Page 136

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 34 (133 - 136)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 A.          It is my opinion -- I'll state it again.
2 It is my opinion that the staff acted on the
3 information they had on the 25th.  They took action.
4 They could have just said, oh, never mind, he makes
5 those allegations all the time.  They did not do
6 that.  They took deliberate action and, in my
7 opinion, followed the standard operating procedures
8 outlined for them.
9 Q.          Okay.  So my question was about the
10 procedures.
11          Did you find any violation of any
12 procedures when you were preparing your report in
13 the Guy matter?
14          MR. CRANFORD:  Object to the form.
15 A.          I did not.
16 Q.          Okay.  And did you find any evidence of
17 any violation of any policy or procedure by any ADOC
18 employee with regard to Clarence Jackson?
19          MR. CRANFORD:  Object to the form.
20 A.          You've identified Clarence Jackson
21 again.  Which his identity wasn't known until the
22 26th.  Once they knew it was Clarence Jackson, they
23 took appropriate action.
24 Q.          Okay.  You didn't find any evidence of
25 any -- of a single rule violation by ADOC employees
Page 137

1 with regard to Clarence Jackson prior to February
2 26th of 2019, correct?
3 A.          I did not find that Clarence Jackson was
4 identified as a suspect until after the 25th.  So
5 no, there's no way that I believe that the staff
6 violated a rule related to Jackson on the 25th.
7 Q.          Okay.  My question is a little
8 different.
9          So you're aware that Clarence Jackson
10 was an inmate at St. Clair in 2018 and 2019,
11 correct?
12 A.          Yes.
13 Q.          And to prepare your opinions in the Guy
14 case, you looked at Clarence Jackson's inmate file,
15 correct?
16 A.          I looked at the records that were
17 provided out of his file.
18 Q.          Which records were those?
19 A.          Those that are listed in the exhibit.
20 Q.          Okay.  So after having reviewed those
21 records, is there -- did you find any evidence of a
22 single rule violation by any ADOC employee that
23 relates to Clarence Jackson?
24          MR. CRANFORD:  Object to the form.
25 A.          For 2018, 2019, two years?
Page 138

1 Q.          Yes.
2 A.          I didn't find anything out of the
3 ordinary.  But you're asking me to talk about one
4 inmate over a two-year period when I was focused on
5 the incident at hand.
6 Q.          Okay.  With regard to the incidents at
7 hand on February 25th and 26th of 2019, you did not
8 find evidence of a single rule violation by any ADOC
9 employee that related to the inmate that later
10 became known as Clarence Jackson, correct?
11          MR. CRANFORD:  Object to the form.
12 A.          I did not find that the staff failed to
13 take action on Jackson until they knew that he was
14 an alleged perpetrator.  You're asking me to say
15 they should have done something on the 25th.  Which
16 that's like saying, well, I knew it was going to
17 snow three days ago when I didn't know it was going
18 to snow three days ago.
19          One of the challenges that correctional
20 staff have is people second-guessing everything they
21 do every minute of the day.  They're dealing with a
22 population who has chosen not to follow the rules of
23 society.  And just because they go to prison doesn't
24 mean that the light switch is going to go on and
25 they're going to follow the rules of society.
Page 139

1          I find that staff acted appropriately in
2 regards to Jackson on the 25th and the 26th with the
3 information they had at that point in time.
4 Q.          Okay.  Do you have any opinion as to
5 whether ADOC employees followed St. Clair's policies
6 and procedures or did not follow St. Clair's
7 policies and procedures in their treatment of
8 Mr. Jackson on February 25th and 26th of 2019?
9          MR. CRANFORD:  Object to the form.
10 A.          You continually go back to the 25th.
11 And I'm going to tell you I am not going to address
12 anything that Jackson did on the 25th when he wasn't
13 even identified as a potential assailant.  I will
14 say again I believe the staff, once they knew
15 Jackson was the potential assailant, took deliberate
16 and proper action.
17 Q.          Okay.  So if you're not going to address
18 what staff did with regard to Clarence Jackson on
19 February 25th of 2019, it's fair to say you have no
20 opinions on what staff did with respect to Clarence
21 Jackson on February 25th of 2019, correct?
22          MR. CRANFORD:  Object to the form.
23 A.          I will say that I do not believe there
24 was any reason to single out Jackson on February the
25 25th.
Page 140

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 35 (137 - 140)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 Q.        Sir, that's not my question.

2          I'm asking whether you have an opinion

3 about whether there was a rule violation by ADOC

4 staff with respect to Clarence Jackson on February

5 25th of 2019.  And if at trial you're going to say

6 that there was, then I would like to know that now

7 in the deposition.

8          MR. CRANFORD:  And I'm going to object

9 to the form.

10 Q.        And if you don't have any opinions on

11 that matter, then that's fine, too.  Please let me

12 know.

13          So here is my question again.  Do you

14 have --

15          MR. CRANFORD:  And I'm objecting to the

16 form, asked and answered.

17 Q.        -- any opinion as to whether on February

18 25th of 2019 any ADOC staff members violated ADOC

19 policy regarding in their treatment -- within their

20 interactions or treatment with respect to Clarence

21 Jackson?

22          MR. CRANFORD:  Object to the form.  He's

23 answered the question multiple times now.

24          MS. BROWN:  He's not answering the

25 question.

Page 141

1 A.        I'll answer it one more time.  It is my

2 opinion, after reviewing all the information, that

3 the staff at St. Clair on the 25th and 26th acted

4 with deliberate and determined efforts to identify

5 potential allegation -- or the allegations that were

6 made by Mullins and take the proper action.  I did

7 not find that any staff at St. Clair on the 25th or

8 the 26th violated standard protocol related to the

9 allegations that Mullins made.

10 Q.        Okay.  Do you recall seeing evidence

11 that Mr. Mullins reported to ADOC employees on

12 February 25th of 2019 that when he had arrived

13 earlier at his assigned cell, at Q32, two inmates

14 occupied that cell and so he relocated to cell Q27?

15 A.        That did not happen on the 25th.  That

16 -- if my memory is right, that happened the day he

17 was released from restrictive housing.  He did not

18 go to his assigned cell, which was part of the

19 reason -- when people want to Monday morning

20 quarterback and say, well, he was living with C.J.,

21 he was not living in the cell he was assigned to

22 when he came out of restrictive housing.

23 Q.        Okay.  And do you recall that

24 Mr. Mullins first reported on February 25th to ADOC

25 staff that he had been -- that according to

Page 142

1 Mr. Mullins, when he had earlier arrived at his

2 assigned cell in Q32, two inmates had occupied that

3 cell?

4 A.        That was on February the 12th, not the

5 25th.

6 Q.        Okay.  When is your understanding of

7 when Mr. Mullins reported that occurrence to ADOC

8 employees?

9 A.        I don't know that Mullins ever reported

10 that.  It is my --

11 Q.        You're not -- I'm sorry.  Go ahead.

12 A.        It's my memory that Mullins talked to

13 another inmate because -- he said, "There's two

14 inmates in the cell I'm supposed to go to."  And he

15 talked to another inmate.  And he and this other

16 inmate, whoever it was, went to Jackson.  And they

17 all agreed, "Yeah, we can live together."  And that

18 was when he chose to live with Jackson.  And that

19 was on February the 12th, not on February the 25th.

20 Q.        Okay.  And to your knowledge,

21 Mr. Mullins did not report on February 25th 2019 to

22 any ADOC employees the account that when he had

23 arrived at his cell in Q32 earlier in February, two

24 inmates had occupied that cell and so he relocated

25 to cell Q27?

Page 143

1          MR. CRANFORD:  Object to the form.

2 A.        I do not recall that.

3 Q.        Okay.  Okay.  You're not aware of any

4 investigation having taken place by any ADOC

5 employees into whether two inmates were occupying

6 cell Q32 in February of 2019 without authorization,

7 correct?

8 A.        I am aware --

9          MR. CRANFORD:  Object to the form.  Go

10 ahead.

11 A.        I am aware of that.

12 Q.        Okay.  What are you aware of?

13 A.        I'm aware that Agent Casey did that

14 after the fact.  Once again, everyone wants to go

15 back and determine what they should have known way

16 back when.  Agent Casey found that out after the

17 stabbing, after Jackson had been identified, not

18 before.  And that was not told to him by Mullins.

19 Q.        Okay.  And so you're not aware of any

20 efforts being made by any ADOC staff prior to when

21 Mr. Mullins was stabbed on February 26th to

22 investigate whether two inmates were occupying Q32

23 without authorization, correct?

24          MR. CRANFORD:  Object to the form.

25 A.        Once again, you're wanting to Monday

Page 144

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 36 (141 - 144)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 morning quarterback and say, "Well, they should have
2 known." Well, why in the world would you do that?
3 The allegation is that someone punched him in the
4 head. You're trying to find out who punched him in
5 the head, not all these other hypothetical
6 situations.
7 Q.        Sure.
8           And so it's your understanding that --
9 your belief is that ADOC employees did not receive
10 information that Mullins had indicated that two
11 inmates were occupying cell Q32 until after Mullins
12 was stabbed on February 26th, correct?
13 A.        That is my opinion.
14 Q.        Okay. And so if ADOC officials had no
15 reason to believe that two inmates were occupying
16 cell Q32 without authorization, they, therefore,
17 would not have had any reason to go investigate that
18 issue, correct?
19           MR. CRANFORD: Object to the form.
20 A.        Ask that again, please.
21 Q.        If ADOC employees had no information
22 prior to Mr. Mullins being stabbed that two inmates
23 had been occupying cell Q32 without authorization,
24 they would not have had any reason to go investigate
25 that prior to Mr. Mullins being stabbed, correct?
Page 145

1           MR. CRANFORD: Object to the form.
2 A.        If I understand your question, yes,
3 that's correct.
4 Q.        Okay. And so you are not aware of any
5 evidence that -- well, scratch that.
6           Did you -- are you aware of any evidence
7 disproving Mr. Mullins' report that when he arrived
8 to cell Q32, two inmates already occupied that cell?
9           MR. CRANFORD: Object to the form.
10 A.        Ask that again, please.
11 Q.        Well, scratch that.
12           Let's assume that Mr. Mullins had
13 reported that when he arrived to cell Q32, two
14 inmates had already occupied that cell. So I know
15 you disagree with me. But let's just assume that to
16 be the case. Okay? Do you understand that
17 instruction?
18           MR. CRANFORD: Object to the form.
19 A.        Yes.
20 Q.        Okay. Are you aware of any evidence
21 that would dispute an account by Mr. Mullins that
22 when he arrived to cell Q32 in February of 2019, two
23 inmates already occupied that cell?
24           MR. CRANFORD: Object to the form.
25 A.        I would say I read no evidence, no
Page 146

1 information that indicates Mullins reported that to
2 any staff. So I'm not sure how we're assuming or
3 getting from point A to point B.
4           My information is that Mullins saw there
5 were two inmates there. Mullins went to another
6 inmate, and that was when they said, "Let's go talk
7 to Jackson." And Jackson and Mullins agreed that
8 they would be good cell mates. So I don't see any
9 staff involved and why we're jumping to that
10 conclusion.
11 Q.        Okay. Okay. The P block at St. Clair
12 in February 2019 was a double-celled block in
13 general population, correct?
14 A.        As far as I know.
15 Q.        Okay. And the L block at St. Clair in
16 February 2019 was a double-celled block in
17 general population, correct?
18 A.        As far as I know. And let me clarify.
19 That means that all of those cells in that housing
20 unit were capable of being double celled. I'm not
21 saying that there was an inmate in every bed in that
22 unit.
23 Q.        Okay. Okay. I believe that in that
24 report, you indicated that Mr. Mullins failed to
25 divulge the identity of assailants in incidents
Page 147

1 prior to February of 2019. Is that correct?
2 A.        Yes.
3 Q.        Okay. You're not aware of any evidence,
4 documented evidence, that Mr. Mullins was lying when
5 he indicated he couldn't identify earlier
6 assailants, are you?
7           MR. CRANFORD: Object to the form.
8 A.        No, I would not say Mullins was lying.
9 I will say that it's very difficult to expect staff
10 to investigate and keep a person safe when they
11 don't have sufficient information to investigate.
12 Q.        Okay. Are you aware of any false
13 information given by Steven Mullins at any time
14 relating to his interactions with the inmate that
15 later became known as Clarence Jackson on February
16 25th and 26th of 2019?
17 A.        Repeat that, please.
18 Q.        Are you aware of any false information
19 given by Steven Mullins to any ADOC employees
20 relating to his interactions with the inmate that
21 became known as Clarence Jackson on February 25th or
22 26th of 2019?
23           MR. CRANFORD: Object to the form.
24 A.        I wouldn't say that it's false
25 information. I would say that Mullins failed to
Page 148

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 37 (145 - 148)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 give thorough information that would allow ADOC
2 staff to act maybe differently than they did.
3 Q.        Okay.  So --
4 **A.        Just giving a nickname of C.J. is not**
5 **false.  But it's not complete enough to allow staff**
6 **to take appropriate action.**
7 Q.        Okay.  So the answer to my question is
8 no, you're not aware of any false information that
9 was given by Steven Mullins on February 25th or 26th
10 of 2019, correct?
11        MR. CRANFORD: Object to the form.
12 **A.        He did not give any false.  He gave**
13 **incomplete.**
14 Q.        Okay.  Are you aware of any unjustified
15 commotion made by Steven Mullins on February 25th or
16 26th of 2019?
17        MR. CRANFORD: Object to the form.
18 **A.        What do you mean by "unjustified**
19 **commotion"?**
20        **Hello?**
21 Q.        Yes.  I'm sorry.  Just a second.
22        Okay.  You wrote at the top of your
23 report in Guy on Page 20 that "Inmates routinely
24 provide false information and create commotion to
25 avoid responsibility for inmates."  And I'm
Page 149

1 wondering if you found any evidence in your review
2 in Guy of Mr. Mullins making a commotion that was --
3 I guess we'll say creating a commotion to avoid
4 responsibility in some way?
5 **A.        I am not aware of Mullins doing that,**
6 **no.**
7 Q.        Okay.  Okay.  Sometimes with PREA
8 incidents, inmates can make false reports, correct?
9 **A.        Yes.**
10 Q.        Okay.  So is it your testimony that an
11 accepted practice for correctional staff is to wait
12 until they can corroborate a report of a PREA
13 incident before they take action to separate the
14 reporting inmate from the alleged victim?
15        MR. CRANFORD: Object to the form.
16 **A.        Ask that again, please.**
17 Q.        Sure.
18        Is it your testimony that it's an
19 accepted correctional practice for staff to wait
20 until they can corroborate a report of a PREA
21 incident before taking action to separate the
22 reporting inmate from the alleged victim in case the
23 reporting inmate is lying?
24        MR. CRANFORD: Object to the form.
25 **A.        No.  Staff are to take some type of**
Page 150

1 action.  I'm not going to say they don't do anything
2 at all.
3 Q.        Okay.  What type of action are they
4 supposed to take?
5 **A.        There's options available.  Once again,**
6 **the staff have to look at their resources.  But if**
7 **I'm alleging that inmate A is harassing me,**
8 **assaulting me, or whatever, while I investigate it,**
9 **I may separate them to a different part of the unit,**
10 **I may separate them to another unit, or I may place**
11 **them in restrictive housing.  And that is a judgment**
12 **call that the supervisor or the sergeant or the**
13 **lieutenant has to make, given the information they**
14 **have.  But they don't do nothing.  They do go ahead**
15 **and separate while they can get more facts and**
16 **information.**
17 Q.        In your opinion in both the Guy and
18 Ezell matters, St. Clair had an adequate staffing
19 plan in 2018 and early 2019, correct?
20        MR. CRANFORD: Object to the form.
21 **A.        Did they have an adequate staffing plan?**
22 Q.        Yes.
23        MR. CRANFORD: Object to the form.
24 **A.        I believe that they had the pieces in**
25 **place to follow the policy and the administrative**
Page 151

1 regulations to staff their facilities to the best of
2 their ability.
3 Q.        Okay.  So it's your opinion that
4 St. Clair had adequate staff in 2018 and early 2019
5 to comply with the written policies regarding safety
6 and security at the facility, correct?
7        MR. CRANFORD: Object to the form.
8 **A.        They had the resources available to do**
9 **what they needed to do to comply, yes.**
10 Q.        Okay.  And St. Clair's staffing
11 resources including -- included both staff assigned
12 to St. Clair as well as augmented staff from the
13 cert team and from other facilities, correct?
14 **A.        And to include the commissioner's work**
15 **of hiring basic correctional officers, cubical**
16 **correctional officers, and augmenting staff in many,**
17 **many ways.  It's my opinion that the department and**
18 **the facility at St. Clair went to extra strides to**
19 **try to provide the staff necessary for that**
20 **facility.**
21 Q.        Okay.  So in your opinion, St. Clair --
22 in your opinion in both Guy and Ezell, St. Clair had
23 sufficient staff to conduct adequate contraband
24 searches as required by policy, right?
25        MR. CRANFORD: Object to the form.
Page 152

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 38 (149 - 152)

**Lakeisha Ezell v. Jefferson Dunn, et al.**                    **Kevin Myers**
**2/4/2025**

1 A.          It's my opinion that, reviewing the
2 documentation, that there were searches going on and
3 that there were staff available to do it.  It's also
4 my information that cert teams came in and assisted
5 with contraband searches.
6 Q.          Okay.  So you're not aware of any
7 evidence that St. Clair lacked sufficient staff to
8 carry out adequate contraband searches as required
9 by policy, right?
10          MR. CRANFORD:  Object to the form.
11 A.          I am aware that St. Clair, as most every
12 prison in America, to my knowledge, is challenged
13 with staffing issues.  I am also aware that on any
14 given day, a prison may start out with the right
15 number of staff to post every post.  But if there's
16 hospital runs, transportation runs, that best laid
17 plan will have to be modified and changed throughout
18 the day.  It is not a static situation at any point
19 in time 24/7.  That is a very dynamic operation.
20 Q.          Do you have any opinion in the Guy or
21 Ezell matter as to whether St. Clair had sufficient
22 staff or insufficient staff to conduct contraband
23 searches as required by policy?
24          MR. CRANFORD:  Object to the form.
25 A.          I believe that they conducted the
Page 153

1 searches that were necessary in accordance with
2 policy.
3 Q.          So they had sufficient staff to do so,
4 correct?
5 A.          My answer was they had conducted the
6 required amount of searches.
7 Q.          Okay.  Do you have any opinion as to
8 whether St. Clair had sufficient staff or
9 insufficient staff to adequately control inmate
10 movement?
11          MR. CRANFORD:  Object to the form.
12 A.          I believe that inmate movement within
13 St. Clair was being controlled.
14 Q.          Okay.  That's your opinion in both Guy
15 and Ezell, correct?
16 A.          That is correct.
17 Q.          Okay.  And in your opinion in both Guy
18 and Ezell, St. Clair had sufficient staff to execute
19 its written policies regarding safety and security,
20 right?
21 A.          I believe that the policies underneath
22 the shift supervisor were being executed to the best
23 of his ability.
24 Q.          Okay.  Setting aside what's to the best
25 of the shift supervisor's ability, in your opinion,
Page 154

1 St. Clair had sufficient staff to adequately execute
2 its policies regarding safety and security back in
3 2018 and early 2019, right?
4          MR. CRANFORD:  Object to the form.
5 A.          I would say, because it's evidenced by
6 the work of the commissioner, that he did not
7 believe we had the staffing levels in Alabama that
8 were necessary.  That's why the commissioner,
9 starting in 2016, were looking at alternatives, can
10 we increase pay, can we give merit bonuses, can we
11 create a basic correctional officer, can we create a
12 correctional cubical officer, can we bring in cert
13 teams from other areas.
14          Were there enough staff that we wish we
15 had?  No, there were not.  Was the commissioner and
16 his staff taking every possible effort possible to
17 enhance the staffing?  Yes, he was.
18 Q.          Okay.  It's not your opinion in either
19 Guy or Ezell that St. Clair lacked sufficient staff
20 to maintain safe conditions for inmates, right?
21          MR. CRANFORD:  Object to the form.
22 A.          I'll say it again.  It would have been
23 nice for them to have more staff.  I do believe that
24 the evidence indicates on those two dates, the staff
25 were available, the staff did respond appropriately
Page 155

1 in accordance with policy.
2 Q.          Okay.  And generally in 2018 and early
3 2019, you're not claiming that St. Clair had
4 insufficient staff such that they could not maintain
5 safe conditions for inmates, right?
6          MR. CRANFORD:  Object to the form.
7 A.          I'm not saying they didn't have
8 insufficient staff.  Otherwise, the commissioner
9 would not have been doing what he was doing.  There
10 was a need for additional staff.
11          What I am saying is that the
12 commissioner, his assistants, the warden were
13 looking at every possible avenue to enhance and
14 increase the staffing levels not just at St. Clair,
15 but at all facilities in Alabama.
16 Q.          Okay.  So the staff that they had, in
17 your opinion, was not -- you know, not ideal.  But
18 in your opinion, they were able to maintain safe
19 conditions at St. Clair given the staffing that they
20 had.  Is that fair?
21 A.          Yes.
22 Q.          Okay.  In your experience as a
23 correctional administrator, there is sometimes the
24 circumstance at a particular facility that the
25 facility has adequate policies but poor staff
Page 156

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 39 (153 - 156)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 compliance with those policies and, therefore, the
2 prison as a whole falls below generally accepted
3 correctional practices and standards, right?
4         MR. CRANFORD:  Object to the form.
5 **A.        I'm sorry.  I'm going to have to ask you**
6 **to -- I've got an idea.  But ask it again, please.**
7 Q.        Sure.
8         In your experience as a correctional
9 administrator, it's not sufficient to just have
10 correct policies on paper.  A correctional facility
11 also needs to ensure an adequate level of
12 enforcement with written policies, correct?
13 **A.        Yes.**
14 Q.        Okay.  And in your experience as a
15 correctional administrator, sometimes prisons can
16 have adequate policies but poor staff compliance
17 with those policies, such that the prison falls
18 below generally accepted correctional practices and
19 standards, right?
20         MR. CRANFORD:  Object to the form.
21 **A.        I'll answer that by saying there are**
22 **times when the administrative regulations, standard**
23 **operating procedures are in place.  But there are**
24 **times when staff fail to follow those policies.**
25 Q.        Okay.  And in this case, you didn't --
Page 157

1 in Guy and Ezell, you didn't undertake any sort of
2 systemic review to assess facility compliance with
3 safety and security policies, right?
4         MR. CRANFORD:  Object to the form.
5 **A.        I was focused on the events in and**
6 **around the date of -- well, now I've forgotten.**
7 **Davis and Jackson.  Andrews and Davis.  The two**
8 **cases.  I was focused on those cases around that**
9 **time in identifying where, in my opinion, was**
10 **failure to follow the administrative regulations set**
11 **forth by the commissioner, failure to follow the**
12 **standard operating procedures established by the**
13 **warden were causal factors in those two events.  I**
14 **didn't look at a six-month or a one-year assessment**
15 **of compliance.**
16 Q.        Okay.  So there's no information in your
17 reports in either Guy or Ezell documenting any
18 opinions regarding whether there was overall
19 compliance with St. Clair's written policies as a
20 systemic matter.  Your opinions on compliance are
21 limited to those -- compliance during the incidents
22 in the two lawsuits, correct?
23         MR. CRANFORD:  Object to the form.
24 **A.        Correct.**
25         MR. CRANFORD:  Ruth we've been going
Page 158

1 almost an hour and a half here.  Can we get to a
2 break in a minute?
3         MS. BROWN:  Yeah.  Now is the great
4 time.  Let's take a break.  Ten minutes?
5         MR. CRANFORD:  That works for me.  Is
6 that good for you?
7         THE WITNESS:  Sure.
8         THE VIDEOGRAPHER:  We're off the record.
9 The time is 3:08 p.m.
10         (Recess was taken.)
11         THE VIDEOGRAPHER:  We are back on the
12 record.  The time is 3:28 p.m.
13 Q.        Okay.  Can you please take a look at
14 Page 29 of your report in the Guy case?
15 **A.        Yes, ma'am.**
16 Q.        Okay.  Looking at the second paragraph
17 from the bottom of Page 29, do you see a paragraph
18 that begins with, "As previously noted in this
19 report"?
20 **A.        Yes, ma'am.**
21 Q.        Okay.  Can you read the first sentence
22 of that paragraph out loud?
23 **A.        "As previously noted in this report, the**
24 **commissioner and the leadership of the ADOC actively**
25 **addressed the physical plant and staffing needs of**
Page 159

1 **the ADOC in fiscal years 2016, 2017, and 2019 and**
2 **throughout Dunn's tenure as commissioner."**
3 Q.        Okay.  And that statement in your report
4 is based on your review of ADOC reports from fiscal
5 years 2016, 2017, and 2019, correct?
6 **A.        Yes, along with several other documents**
7 **that I don't recall off the top of my head.  But**
8 **there were reports to the legislature, the annual**
9 **report, and other documents that are cited in**
10 **Appendix B.**
11 Q.        Okay.  All the reports on which you
12 relied for this statement are listed in Appendix B
13 of your report, correct?
14 **A.        Correct.**
15 Q.        Okay.  And you looked at annual reports
16 from fiscal years 2016, 2017, and 2019, correct?
17 **A.        Correct.**
18 Q.        Why did you not look at the ADOC annual
19 report from fiscal year 2018?
20 **A.        I don't believe I had access to that**
21 **one.**
22 Q.        Did you request it?
23 **A.        Not that I recall.**
24 Q.        Okay.  Your report in Guy describes some
25 challenges in the physical plant of St. Clair,
Page 160

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 40 (157 - 160)

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

1  correct?

2  A.          Correct.

3  Q.          And it's your opinion that construction
4  of new facilities was required as a long-term
5  solution to address those physical plant
6  deficiencies, correct?

7  A.          Correct.

8  Q.          Okay.  In the short term, prior to the
9  construction of new facilities to replace St. Clair,
10  which positions in the chain of command of ADOC had
11  responsibility to ensure safety in the interim prior
12  to when new facilities would be constructed?

13          MR. CRANFORD:  Object to the form.

14  A.          Are you asking in relationship to the
15  physical plant of St. Clair?

16  Q.          Yes.  Let's begin there.

17  A.          Okay.  Then I would stipulate that when
18  you're talking about a facility that was built in
19  the '80s, 40 years ago, that technology in the '80s
20  is different than it is today.  Wear and tear on a
21  40-year prison is, as you might imagine, very heavy.
22  So who's got the responsibility for the day-to-day
23  maintenance of that facility?  Over 40 years, a lot
24  of people did.

25          In my opinion, as I put in the report,

Page 161

1  prisons built in the '80s had lower ceilings.  We
2  weren't worried about inmates hitting cameras in
3  1980 because cameras didn't exist.  When I put a
4  camera in an antiquated facility nowadays, that
5  camera is low enough that they can be manipulated,
6  managed, messed with by the inmate population.

7          But regardless, the commissioner went
8  ahead and forged forward with cameras, locks,
9  fencing systems, and other things to try to make
10  that facility as safe as he possibly could.

11  Q.          Okay.  You know, given that there was --
12  there was not an ability to construct new facilities
13  that were -- well, scratch that.

14          Given that there were no new facilities
15  replacing St. Clair in late 2018 and early 2019 when
16  the incidents at issue in Ezell and Guy took place,
17  who was responsible in the chain of command for
18  coming up with short-term solutions to ensure that
19  safety was maintained at St. Clair for inmates
20  despite the deficiencies in the physical plant?

21  A.          From the physical plant standpoint, I'm
22  not sure --

23  Q.          From other standpoints, any other
24  standpoints.

25          MR. CRANFORD:  Object to the form.

Page 163

1  beginning in 2016, Commissioner Dunn, as well as the
2  governor, brought this challenge in front of the
3  legislature and began pointing out the challenges
4  that facilities, St. Clair and others, had, and the
5  problem of trying to modernize a 40-year-old
6  facility is not reasonable.

7          So in the interim, a lot of money was
8  allocated to try to replace locks.  Which I can tell
9  you from experience, putting a new lock in an old
10  door doesn't work well.  There's a lot of electrical
11  linkages that go to it.  The door has worn over the
12  years.  Regardless, if you put a brand new lock on
13  an old door, it may or may not function.  So there's
14  challenges there.  But the commissioner and the
15  legislature went ahead and appropriated the money to
16  do a large lock project at St. Clair.

17          They also -- because back in the '80s
18  when we built prisons, we didn't have cameras like
19  we do in 2020 or 2015.  That was not technology that
20  was readily available back then.  So recognizing
21  that the commissioner, the governor, and other
22  political advocates went ahead and approved money to
23  go ahead and put some cameras in, realizing that the
24  physical plant design made that problematic.

25          And here is what I mean by that.  The

Page 162

1  A.          Well, it's up to the warden and the
2  warden's staff to follow the administrative
3  regulations established by the commissioner and to
4  follow the standard operating procedures.  The
5  physical plant just makes that more of a challenge.

6  Q.          Okay.  So a warden that has a deficient
7  facility, is it fair to say that the warden is
8  responsible -- is the primary person that's
9  responsible in the short term for running her
10  facility in a way that, you know, best minimizes the
11  impact of the deficient facility?

12          MR. CRANFORD:  Object to the form.

13  A.          At the end of the day, it's my opinion
14  that the warden is responsible for those things that
15  occur within that facility.

16  Q.          Okay.  Let's take a look at page -- Page
17  30 of your report in the Guy case.

18  A.          Yes.  I'm there.

19  Q.          Okay.  Do you see in opinion A, towards
20  the second half of the first paragraph in that
21  section, there's a sentence that begins with, "In my
22  review"?

23  A.          Yes.

24  Q.          Can you read beginning with that
25  sentence through the end of the paragraph, please?

Page 164

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 41 (161 - 164)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1  A.        "In my review, I found one prior
2  disciplinary issue on March 18th 2018 to Jackson
3  regarding allegations of sexual harassment.
4  However, St. Clair investigated this incident and
5  determined they could not substantiate the
6  allegation.  ADOC cannot punish Jackson for an
7  unsubstantiated PREA allegation."
8  Q.        Okay.  When you say, "ADOC cannot punish
9  Jackson for an unsubstantiated PREA allegation," you
10 mean that Jackson can't be disciplined for an
11 allegation that's unsubstantiated, correct?
12 A.        That's correct.
13 Q.        Okay.  Do you have any understanding as
14 to whether ADOC policy required a disciplinary
15 allegation to be substantiated in order to alter an
16 inmate's classification level or housing assignment
17 based on that allegation?
18         MR. CRANFORD:  Object to the form.
19 A.        Okay.  I'm going to back up and talk
20 about PREA for a minute.
21         When a PREA allegation is made, it's
22 investigated.  This is by PREA policy.  And upon
23 investigation, the investigator can find one of
24 three options.  Either it's founded, it did happen,
25 they have the evidence it happened, at which point
Page 165

1  the perpetrator would be held accountable through
2  disciplinary action.
3         Secondly, it could be unsubstantiated.
4  Unsubstantiated means it may have happened, but I
5  don't have enough information to prove that it did.
6  I don't have enough information to prove that it did
7  not.  It's unsubstantiated.
8         The third option is unfounded.  I can
9  prove that didn't happen.  You made an allegation
10 that Johnny did so and so.  But the camera shows or
11 the information shows that Johnny wasn't even in the
12 area at that point in time.  It could not have
13 happened.  Therefore, it's unfounded.
14         So in this case, the finding was
15 unsubstantiated.  You can't prove it did, can't
16 prove it did not.  So you're not going to charge
17 someone with a disciplinary when you can't prove it
18 did or did not happen.
19 Q.        Okay.  So my question is a little
20 different.
21         So I understand that a facility is not
22 going to discipline or charge someone for an
23 allegation that they can't substantiate.  But is it
24 your understanding that ADOC requires substantiation
25 of a PREA allegation in order to take that
Page 166

1  allegation into consideration when making
2  classification decisions?
3         MR. CRANFORD:  Object to the form.
4  A.        I'm not understanding your question or
5  the direction.
6  Q.        Sure.  Okay.
7         So in your -- you know, in your mind,
8  ADOC cannot punish Jackson with discipline for an
9  unsubstantiated PREA allegation, correct?
10 A.        Correct.
11 Q.        Okay.  Do you have any understanding as
12 to whether ADOC can modify Jackson's classification
13 level based on an unsubstantiated PREA allegation or
14 not?
15         MR. CRANFORD:  Object to the form.
16 A.        In my opinion, they should not modify
17 his classification based upon an unsubstantiated
18 allegation.
19 Q.        Okay.  Do you know, as a matter of ADOC
20 policy, whether or not ADOC policy allows for
21 classification -- a classification level to be
22 modified based on an allegation that has not been
23 substantiated?
24         MR. CRANFORD:  Object to the form.
25 A.        I don't believe that it would be
Page 167

1  modified unless it was substantiated and if the
2  inmate was found guilty of that substantiation.
3  Even if it was substantiated, if due process was not
4  followed and the inmate, therefore, had the
5  disciplinary thrown out, you would not reclassify
6  that inmate and charge him with that.  Because once
7  it's thrown out, it's as if it never happened.
8  Q.        Okay.  Do you have any understanding
9  whether ADOC policy applicable to St. Clair in 2018
10 and early 2019 allowed ADOC employees to take into
11 account unsubstantiated allegations when making
12 housing assignment decisions?
13         MR. CRANFORD:  Object to the form.
14 A.        Do you have a document that I can look
15 at that indicates that's true?
16 Q.        No, I don't have a document.  I'm just
17 -- I'm just trying to figure out what you know about
18 ADOC policy.
19 A.        To the best of my recollection from what
20 I reviewed, unless an inmate is found substantiated,
21 guilty, then that would not be considered in a
22 housing situation or a disciplinary.
23         Now, I will add a caveat to that.  Any
24 supervisor who has a belief that that may have
25 happened and there may be some evidence and some
Page 168

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 42 (165 - 168)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 unsubstantiated, I can choose to say I'm not going
2 to put you in that cell because there may be a risk.
3 I don't have to have anything documented to say that
4 I'm not going to put you in that cell because my gut
5 says you don't need to be in that cell.
6 Q.        Okay.
7 A.        As I've said before, you have to manage
8 the resources you have with the information you have
9 to the best of your ability and with the information
10 that you have at that point in time.
11 Q.      Okay.  So it's not your opinion that
12 ADOC is required to ignore allegations when making
13 classification and housing decisions when those
14 allegations are found to be unsubstantiated,
15 correct?
16            MR. CRANFORD: Object to the form.
17 A.        Ask that question in a different way.
18 Ask that, please.
19 Q.      Sure.
20            It's not your opinion that ADOC
21 employees are required to ignore allegations of PREA
22 violations or other -- or assaults that are
23 unsubstantiated when making classification and
24 housing decisions, right?
25            MR. CRANFORD: Object to the form.

Page 169

1 would include cells Q32 and Q27, correct?
2 A.        Without having a schematic of the pod, I
3 don't know.
4 Q.        Okay.  Well, you indicated here that
5 St. Clair placed Jackson in the two side of the
6 population dorm because he was a predator, correct?
7 A.        Yes.
8 Q.        Okay.  So the cells -- the cell in which
9 Clarence Jackson was housed was on the two side of
10 the Q dorm, correct?
11 A.        I assume that to be true.
12 Q.        Okay.  Well, you concluded that it was
13 true.  What did you conclude that based on?
14 A.        Well, I don't have the cell assignment
15 in front of me.  I don't know that that's his cell.
16 I do know that Jackson was classified as a predator
17 not because of what he did inside the prison.  He
18 was classified as a predator because while he was
19 out on the streets, he got a young lady pregnant and
20 she was underage.  That made him classified by PREA
21 as a predator.
22 Q.        Turning back to this issue here, you
23 wrote in this paragraph that "At the time of
24 Mullins' death, St. Clair appropriately housed
25 Jackson in Q dorm side two," correct?

Page 171

1 Q.      They can take those -- they can take
2 those incidents into account?
3            MR. CRANFORD: Object to the form.
4 A.        I would say the policy doesn't say to
5 ignore it.  I would say that the policy says it can
6 only actually be weighed if it is substantiated.
7 And as I said earlier, the common practice would be,
8 if I have a sense, if I have a gut feeling, if
9 there's unsubstantiated information out there, I
10 might use that when I'm making a housing decision.
11 It's not black and white.  We're dealing with
12 humans.
13 Q.        Okay.  All right.  Let's look at a
14 different page here.  Okay.  At the bottom of Page
15 31, do you see there's a reference at the very
16 bottom of the page to SOP 83?
17 A.        Yes.
18 Q.        Okay.  Can you read that sentence out
19 loud?
20 A.        "Pursuant to SOP 083, inmates designated
21 as predators must be housed on the two side of the
22 population dorms, with inmates designated as
23 potential victims housed on one side of population
24 dorms."
25 Q.        Okay.  So side two in the cube block

Page 170

1 Q.        Correct.
2 Q.        Okay.  And you continued by saying,
3 "Pursuant to SOP 83, inmates assigned as predators
4 must be housed on the two side of the population
5 dorms," correct?
6 A.        Correct.
7 Q.        Okay.  And so what documents did you
8 review to determine that Q dorm side two -- that
9 Jackson was housed in Q dorm, side two?
10 A.        It would have to be that document with
11 the Bates label of ADOC 024205.
12 Q.        Okay.  All right.  What evidence did you
13 review in the -- in the Guy case regarding what
14 request Steven Mullins made for himself -- made for
15 his housing on February 25th and February 26th of
16 2019?
17            MR. CRANFORD: Object to the form.
18 A.        What was the question again, please?
19 Q.        Sure.
20            What -- what information do you have
21 about what Mr. Mullins requested on February 25th
22 and 26th of 2019 with regard to where he wanted to
23 be housed?
24 A.        I don't --
25            MR. CRANFORD: Object to the form.

Page 172

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 43 (169 - 172)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 A.        I don't recall that he requested
2 anything specifically.  I do remember that he made
3 multiple requests through that day, with each one
4 being followed up on by different supervisory staff.
5 And his allegations were not very thorough, which
6 created a challenge.
7        But after each allegation was followed
8 up on by the supervisor, Mullins was moved initially
9 to a different side of the pod.  And then the second
10 time, to a different pod altogether.  I don't know
11 if that answers your question or not.
12 Q.        Well, I guess I'm wondering if you -- if
13 you reviewed any evidence that Mullins requested
14 placement in a cell by himself or in the restricted
15 housing unit or to be out of general population or
16 to be placed in the special safety unit, anything of
17 that nature.  Do you recall any evidence on that?
18 A.        I don't recall that.  But I will tell
19 you that my review of what happened on that day and
20 my review with the expectations in the correctional
21 industry is that you take the inmate and place him
22 in the least restrictive area possible to protect
23 him while the incident is being investigated.  So
24 putting him in restrictive housing is the most
25 restrictive area possible.
Page 173

1        In my opinion, the staff did right, as I
2 testified previously, by looking at the least
3 restrictive area possible with the information that
4 they had available at hand.
5 Q.        Okay.  You wrote on Page 32 of your
6 report that Mr. Mullins requested placement in a
7 cell by himself.  Do you recall that?  Or do you see
8 that, I should say?
9 A.        Which paragraph?
10 Q.        The middle of Page 32.  It's in the
11 third paragraph.
12 A.        Okay.  I see that.
13 Q.        Okay.  So you wrote in here that
14 "Mullins requested placement in a cell by himself."
15 Do you see that?
16 A.        I see that.
17 Q.        Okay.  Why did you choose to include
18 that?
19 A.        I don't know the answer to that.
20 Q.        Okay.  Does it matter, in your opinion,
21 what Mullins was requesting of himself in terms of
22 where he -- where he thought he should be placed?
23 A.        I believe that the reason I included
24 that is that somewhere in the complaint filed by the
25 plaintiff, it states that Mullins requested
Page 174

1 placement in RHU.  My research of the evidence
2 indicates that he did not request placement in RHU.
3 Which to refresh everyone's memory, he had just
4 gotten out of RHU on February the 12th, said he
5 didn't want to live there.
6        If he had requested living in a cell by
7 myself, well, most inmates at St. Clair would like
8 to live in a cell by themselves.  That's not
9 reality.
10 Q.        Okay.  Did you see any evidence that
11 Mr. Mullins requested to be out of general
12 population in any of the materials that you
13 reviewed?
14        MR. CRANFORD:  Object to the form.
15 A.        What I recall, as I've stated, is that
16 Mullins made a vague accusation that he was in fear
17 for his safety, someone is rubbing his foot and
18 different things all day long.  And then he finally
19 said, "C.J."  Not a whole lot to follow on.  But the
20 staff did not discount it.  The staff followed up
21 and took decisive action each time.
22 Q.        Okay.  My question was as little bit
23 different.
24        My question is whether you are aware of
25 any evidence, yes or no, that Mullins requested to
Page 175

1 be out of general population when he made reports on
2 February 25th and 26th of 2019?
3        MR. CRANFORD:  I'm going to object to
4 the form and the instruction that he answer yes or
5 no.  He can answer the question however he believes
6 is adequate.
7 A.        I don't recall him -- in the review of
8 the information, I don't recall him requesting to be
9 out of population, in RHU.
10 Q.        Okay.  You don't recall him requesting
11 to be out of general population; is that correct?
12 A.        I don't recall him requesting -- out of
13 population would mean restrictive housing unit.  So
14 it's either A or B.  I don't recall him requesting
15 the restrictive housing unit.
16 Q.        Were there only two options at
17 St. Clair, general population or restricted housing
18 --
19        MR. CRANFORD:  Object to the form.
20 Q.        -- back in February of 2019?
21        MR. CRANFORD:  Object to the form.
22 A.        I believe those are the two options for
23 him.
24 Q.        Okay.  All right.  Okay.  Let's look at
25 the bottom of Page 34 of your report in Guy.
Page 176

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 44 (173 - 176)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 Actually, scratch that.  Let's keep going.
2           You offered some opinions in your report
3 in Ezell and Guy about the expertise of Equal
4 Justice Initiative counsel, correct?
5 A.        Correct.
6 Q.        Okay.  And in the Duke v. Dunn case,
7 you're aware that the parties jointly selected
8 correctional experts as part of their settlement
9 agreement, correct?
10          MR. CRANFORD:  Object to the form.
11 A.        Yes.
12 Q.        Are you aware of the names of some of
13 those correctional experts that were jointly
14 selected by the parties in the Duke v. Dunn case?
15          MR. CRANFORD:  Object to the form.
16 A.        I believe Richard Stalder was one of
17 those.  I can't remember who else.
18 Q.        Okay.  So your opinions about the
19 expertise of EJI counsel are limited to EJI counsel.
20 You're not claiming that the jointly selected
21 correctional experts from Duke lacked the expertise
22 to provide opinions in that case, right?
23          MR. CRANFORD:  Object to the form.
24 A.        Correct.
25 Q.        Okay.  Let's take a look at Page 37 of

Page 177

1 was that staff acted upon his allegations with
2 determined speed and took the action necessary to
3 investigate.  At no time did they write up or
4 discipline Mullins in any form or fashion.
5 Q.        Okay.  So this opinion is based on the
6 specifics of Steven Mullins, correct?
7          MR. CRANFORD:  Object to the form.
8 A.        Correct.
9 Q.        Okay.  You didn't do any sort of
10 analysis or review of how St. Clair or ADOC staff
11 treated reporting victims in any other incident
12 reports or any other incidents, correct?
13          MR. CRANFORD:  Object to the form.
14 A.        My knowledge or my recollection is that
15 the complaint said that retaliation could -- would
16 occur.  So my logic said check on Mullins and
17 Jackson and see if there's any evidence of
18 retaliation.
19          My research with those two inmates and
20 the multiple times that Mullins went to protective
21 custody did not ever produce evidence that
22 retaliation occurred.
23 Q.        Okay.  So your opinion is based on the
24 histories of Steven Mullins and Clarence Jackson; is
25 that correct?

Page 179

1 your report in Guy.  Do you see in the second
2 paragraph a sentence beginning with, "I find
3 nowhere"?
4 A.        Correct.
5 Q.        Can you read that sentence out loud?
6 A.        "I find nowhere in the exhaustive
7 documentation produced in this case that St. Clair
8 or ADOC staff retaliated against victims for
9 reporting violence or disciplined inmates for
10 refusing to name the individuals who they feared."
11 Q.        Okay.  So my question about this
12 sentence is when you say -- is what documentation
13 you reviewed to determine whether -- scratch that.
14          My question is what documentation did
15 you review in the Guy case that related to whether
16 St. Clair or ADOC staff retaliated against victims
17 for reporting violence or disciplined inmates for
18 refusing to name the individuals who they feared?
19 A.        I -- excuse me.  I relied on the fact
20 that Mullins three times tried to name an aggressor,
21 tried to get out of population.  And at no time
22 during that time was Mullins threatened, was he
23 disciplined, was adverse action taken against him
24 for failing to identify who the perpetrator was.
25          What I found in the -- in the contrary

Page 178

1 A.        Yes.
2 Q.        Okay.  And it's not based on review of
3 any documentation regarding any other inmates or any
4 other incidents that didn't involve Steven Mullins
5 and Clarence Jackson, correct?
6 A.        Correct.
7          MR. CRANFORD:  Object to the form.
8 Q.        Continuing on to the next paragraph on
9 the same page, you wrote, "From my review, I found
10 levels of inmate-on-inmate violence at St. Clair
11 consistent with my experience and expectation in any
12 similar maximum security male facility."  Do you see
13 that?
14 A.        Yes.
15 Q.        Okay.  And any -- well, scratch that.
16          What document specifically is this
17 opinion based on?
18 A.        Based on a review of everything that you
19 see that I listed in Exhibit B.
20 Q.        Okay.  So it's not based on anything
21 that's not listed in Exhibit B, correct?
22          MR. CRANFORD:  Object to the form.
23 A.        Correct.
24 Q.        Okay.  Okay.  And just generally
25 speaking, what kinds of documents were you -- did

Page 180

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 45 (177 - 180)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

---

1 you -- were you relying upon that were listed in
2 Exhibit B when reaching this -- when reaching this
3 opinion that levels of inmate-on-inmate violence at
4 St. Clair were consistent with your experience and
5 expectation at any similar maximum security male
6 facility?
7 **A.        I'm really not sure which ones it would**
8 **be.  But it would be one of the ones in Exhibit B**
9 **listed out.**
10 Q.        Okay.  So as you sit here today, you
11 don't recall what documentation you specifically
12 were relying on when you wrote that sentence of the
13 report?
14 **A.        Correct.**
15 Q.        Okay.  All right.  Let's continue on to
16 Page 38 of your report in Guy.
17          Actually, one more sentence.  So did you
18 also find in Ezell that levels of inmate-on-inmate
19 violence at St. Clair were consistent with your
20 experience and expectation at any similar maximum
21 security male facility?
22 **A.        Yes.**
23 Q.        Okay.  And you don't recall the basis
24 for -- the specific documents that you relied on for
25 that opinion in Ezell today, correct?
Page 181

1 **A.        Correct.**
2 Q.        Whatever you relied upon to reach that
3 opinion in Ezell would have been documented in
4 Exhibit B to your report in Ezell, correct?
5 **A.        Correct.**
6 Q.        Okay.  On Page 38 of your report in Guy,
7 do you see at the bottom of the first full paragraph
8 there's a sentence that begins with, "Because
9 neither Dunn nor Ellington"?
10 **A.        Yes.**
11 Q.        Can you read that sentence out loud?
12 **A.        "Because neither Dunn nor Ellington can**
13 **be at all places at all times, they delegate the**
14 **day-to-day operations of ADOC facilities, including**
15 **St. Clair, to facility, level leadership, and**
16 **staff."**
17 Q.        Okay.  And who is the primary supervisor
18 that Dunn and Ellington delegated the day-to-day
19 operations of St. Clair to in the 2018 and early
20 2019 time frame?
21 **A.        As I testified earlier, it is my opinion**
22 **that the warden is the ultimate responsible person**
23 **for the day-to-day operations of a prison.**
24 Q.        Okay.  Did Ellington have any
25 responsibility to take action if St. Clair developed
Page 182

1 a serious, systemic problem with assaults?
2          MR. CRANFORD:  Object to the form.
3 **A.        Ellington had a responsibility for the**
4 **general oversight of all of those facilities**
5 **underneath him.  And if he identified or perceived**
6 **of a trend that was in a negative direction, then it**
7 **would be his responsibility to discuss and/or**
8 **address it with the warden.**
9 Q.        Okay.  Ellington's role included
10 supervision of the warden III of St. Clair, correct?
11 **A.        I believe that's true.**
12 Q.        Okay.  Let's continue on to Page 40 of
13 your report in Guy.
14 **A.        Okay.**
15 Q.        Do you see a sentence in the middle of
16 the page that begins with, "Based on my experience"?
17 **A.        Yes.**
18 Q.        Okay.  Can you read that sentence out
19 loud?
20 **A.        "Based on my experience, I am confident**
21 **that St. Clair underreported contraband searches in**
22 **the documents I reviewed."**
23 Q.        Okay.  This observation from your report
24 in Guy is based solely on your correctional
25 experience as opposed to documentary evidence in
Page 183

1 this case, correct?
2 **A.        Correct.**
3 Q.        Okay.  And if you offered the same
4 opinion in the Ezell report, that opinion also would
5 be based solely on your experience as a -- your
6 experience in corrections and not based on the
7 documentary evidence in Ezell, correct?
8          MR. CRANFORD:  Object to the form.
9 **A.        Correct.**
10 Q.        Okay.  So you're not aware of any
11 documents that you reviewed that either support or
12 contradict your observation about underreporting of
13 contraband searches at St. Clair, correct?
14 **A.        It's my experience that staff are**
15 **constantly searching and looking -- whether it's at**
16 **St. Clair, another Alabama facility, one in**
17 **Tennessee, they're constantly searching and looking.**
18 **They don't document every time they search an area.**
19 **They do, should document every time they search an**
20 **area and find contraband.**
21 Q.        Okay.  And, again, that's -- that's your
22 opinion based on your correctional experience alone
23 and not documentary evidence in the Guy or Ezell
24 cases, correct?
25          MR. CRANFORD:  Object to the form.
Page 184

---

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 46 (181 - 184)

Lakeisha Ezell v. Jefferson Dunn, et al.                                    Kevin Myers
                                                                            2/4/2025

1  A.          That's correct.  It's hard to document
2  something that didn't happen.  Or it's hard to state
3  that something happened if it's not documented.
4  Q.          Did you -- do you know whether St. Clair
5  policy requires documentation of contraband searches
6  regardless of whether contraband is located?
7           MR. CRANFORD:  Object to the form.
8  A.          SOP 110 does outline those expectations.
9  Q.          Okay.  So if the correctional officers
10 were failing to document contraband searches, as you
11 are confident they were, that would be in violation
12 of St. Clair's written policies and procedures,
13 right?
14          MR. CRANFORD:  Object to the form.
15 A.          Correct.
16 Q.          Okay.  All right.  Continuing on to Page
17 41, do you see the paragraph that begins with, "It
18 remains clear to me"?
19 A.          Yes.
20 Q.          Can you read that paragraph out loud?
21 A.          "It remains clear to me from my
22 experience as a correctional professional and from
23 my review of the documents, including testimony in
24 this case, St. Clair staff conducted contraband
25 searches and shakedowns.  And although not perfect,
                                                     Page 185

1  they substantially complied with St. Clair SOP 110;
2  that is, the practice associated with contraband
3  searches and shakedowns fundamentally complied with
4  the policies implemented by the ADOC officials."
5  Q.          Okay.  And this is an opinion you had in
6  both Ezell and Guy, correct?
7  A.          I believe that's true.
8  Q.          And this opinion was based on your
9  review of St. Clair SOP 110 and deposition testimony
10 in the case, correct?
11 A.          Correct.
12 Q.          Okay.  Was your opinion based on any
13 other evidence besides SOP 110 and deposition
14 testimony?
15 A.          No.
16 Q.          Okay.  Okay.  Continuing to the bottom
17 of Page 47 in the Guy report, do you see that there
18 is a sentence that begins with, "I found no
19 indication"?
20 A.          Yes.
21 Q.          Can you read that sentence out loud?
22 A.          "I found no indication during my review
23 of evidence produced that indicated St. Clair or
24 ADOC leadership failed to discipline staff."
25 Q.          Okay.  What documents is that opinion
                                                     Page 186

1  based on in the Guy case?
2  A.          I guess that's based on the fact that I
3  didn't see any evidence.  There were discussions in
4  the minutes where the warden was talking to his
5  staff about her expectations.  There were
6  discussions throughout the minutes about
7  expectations.
8  Q.          Okay.  You didn't review any documents
9  relating to discipline of ADOC employees to prepare
10 your opinions in the Ezell and Guy cases, correct?
11          MR. CRANFORD:  Object to the form.
12 A.          Correct.
13 Q.          Okay.  And you didn't review any
14 incident reports documenting potential rule
15 violations by ADOC employees aside from any incident
16 reports that you read relating to the victim and the
17 assailant in the Ezell and Guy cases, correct?
18          MR. CRANFORD:  Object to the form.
19 A.          Correct.
20 Q.          Did you request any disciplinary records
21 from St. Clair in order to prepare your opinions in
22 this case, in Ezell?
23          MR. CRANFORD:  Object to the form.
24 A.          I did not.
25 Q.          Did you review any evidence of any kind
                                                     Page 187

1  in either Ezell or Guy indicating that the P and Q
2  blocks at St. Clair were -- scratch that.
3           Did you review any evidence in either
4  Guy or Ezell indicating that inmates in the P and Q
5  blocks at St. Clair were the source of a
6  disproportionately large level of assaults as
7  compared with inmates from other housing blocks at
8  St. Clair in the 2018 and early 2019 time frame?
9           MR. CRANFORD:  Object to the form.
10 A.          What I believe I found, which would be
11 normal in management of prisons, is that those
12 inmates who are prone to disciplinary issues, not
13 following the rules, theft, fights, et cetera,
14 typically would be housed in an area away from other
15 inmates.  Not in restrictive housing, but in a unit
16 where they could be monitored and watched.
17          That's done for a lot of reasons.  You
18 take your problematic inmates, put them in an area
19 so that they're not preying on your nonproblematic
20 inmates.  It allows you to manage them closer than
21 your nonproblematic inmates.
22          At St. Clair, I know they had an honor
23 dorm or honor dorms.  It's basically a tiered
24 structure that the warden would use to help manage
25 the population within that facility and create
                                                     Page 188

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

---

1  incentives or disincentives.
2  Q.          Okay.  So do you have any opinion as to
3  whether in 2018 and early 2019 the P-Q blocks at
4  St. Clair were housed like many inmates with
5  disciplinary issues that were consolidated together
6  for the reason that you just described?
7               MR. CRANFORD:  Object to the form.
8  A.          It appears that that was the case.
9  Q.          Okay.  Okay.  Turning to the Terrence
10 Andrews death at St. Clair, do you recall the name
11 of the assailant of Terrence Andrews?
12 A.          Cedrick Davis.
13 Q.          Okay.  Are you aware of any incidents in
14 2018 in which Cedrick Davis was reported by others
15 as having had an inmate weapon?
16 A.          I don't recall.  If it's in the report,
17 if you could direct me to that page, I would be glad
18 to look at it.
19 Q.          Why don't you take a look at your
20 report.  You can review it and let me know.
21               MR. CRANFORD:  Do you want him to look
22 at the entire report?
23 A.          Can you not just direct me to the page
24 you're looking at?
25 Q.          I'm not looking at a particular page.

Page 189

---

1  A.          All I see in 2018 is Davis was in an
2  unauthorized area.  In April 2018, Davis refused to
3  give a urine test.  I don't see anything about
4  weapons.
5  Q.          Okay.  So you're not aware of any
6  incidents in 2018 in which Cedrick Davis was
7  reported by others as having an inmate weapon,
8  correct?
9  A.          Not from what I'm seeing in this report.
10 Q.          Okay.  Do you recall that -- did you
11 review Cedrick Davis' master file to prepare your
12 opinions in this case?
13 A.          I read the portions that were in the
14 exhibits, Exhibit B.  I'm not going to say I read
15 every page.  But I did look at a large portion of
16 both Davis and Andrews' files.
17 Q.          Okay.  So turning to Exhibit B of your
18 report on Ezell, it looks like you looked at Cedrick
19 Davis' inmates files.  You looked at pages ADOC
20 Ezell 987 to 1900, correct?
21 A.          Yes.
22 Q.          Okay.  And then you also looked at
23 Cedrick Davis' classification summary from 2022 --
24 from November 3rd of 2022, correct?
25               MR. CRANFORD:  Object to the form.

Page 191

---

1  I'm wondering if you are aware of any incidents in
2  2018 in which Cedrick Davis was reported by others
3  as having an inmate weapon.
4  A.          Let me flip over to Cedrick Davis.  On
5  November 2, 2012 -- no.  I'm sorry.  July 31st 2011,
6  Davis stabbed another inmate 11 times.  That's on
7  Page 10.
8  Q.          Are you aware of any incidents in 2018
9  in which Davis was reported by others as having an
10 inmate weapon?  Aside from the Terrence Andrews
11 case, of course.
12 A.          Okay.  And I apologize.  But this is a
13 whole lot of material for me to try to remember.  So
14 it will take me a while.  And it does help if you
15 can specifically say when and where you're looking
16 at.
17               So 2018?
18 Q.          So, you know, you have a section of the
19 behavioral history of Cedrick Davis --
20 A.          Right.
21 Q.          -- that you cover on Pages 10, 11, and
22 12.
23 A.          And you said April of 2018?
24 Q.          I just said 2018 prior to the stabbing
25 of Terrence Andrews.

Page 190

---

1  A.          Correct.
2  Q.          Okay.  And you also reviewed some
3  incident and duty officer reports relating to
4  Cedrick Davis' murder of Terrence Andrews, correct?
5  A.          Correct.
6  Q.          Okay.  You're not aware of reviewing any
7  incident reports involving an incident in 2018 in
8  which Davis was reported by others as having an
9  inmate weapon, correct?
10               MR. CRANFORD:  Object to the form.
11 A.          I can say I don't recall that.  That
12 doesn't mean I didn't review it.
13 Q.          Okay.  If the document was not in
14 Cedrick Davis' master file and is not listed on
15 Exhibit B, then you wouldn't have reviewed it,
16 correct?
17               MR. CRANFORD:  Object to the form.
18 A.          If it wasn't there.  But my testimony is
19 it may have been there and I have not included it.
20 Q.          Okay.  If there was a report of an
21 incident in 2018 in which Davis was reported by
22 others as having an inmate weapon, that's -- is
23 there a reason you would have omitted that from your
24 report?
25               MR. CRANFORD:  Object to the form.

Page 192

---

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 48 (189 - 192)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1  A.          There is no reason.

2  Q.          Okay.  Because that would be a

3  significant consideration when considering how ADOC

4  dealt with Cedrick Davis in the time frame leading

5  up to his murder of Terrence Andrews, correct?

6          MR. CRANFORD:  Object to the form.

7  A.          Not necessarily.  Number one, we're

8  assuming, based upon what you're saying, that there

9  was one and I didn't include it.  I don't know that

10 that's true.  I also don't know that whatever this

11 incident is would have modified his classification

12 status.

13 Q.          Okay.  Do you know -- are you aware that

14 there was an October 22nd of 2018 incident in which

15 a prisoner by the name of Carlton Nero reported to

16 staff that several prisoners, including Mr. Davis,

17 had assaulted him and that Mr. Davis had pulled a

18 knife on him?

19          MR. CRANFORD:  Object to the form.

20 A.          I do not recall that.

21 Q.          Okay.  And you don't -- you don't know

22 whether the incident report from that October 22nd

23 2018 incident is included in the Andrews' -- I'm

24 sorry.  The Cedrick Davis inmate file materials that

25 you reviewed, correct?

Page 193

1          MR. CRANFORD:  Object to the form.

2  A.          That's correct.

3  Q.          Okay.  And so you don't have any

4  knowledge as to whether there's documentation that

5  -- scratch that.

6          You're not aware of any evidence that

7  Cedrick Davis was searched for a knife that was --

8  that was reported to be on his person in October of

9  2018, correct?

10         MR. CRANFORD:  Object to the form.

11 A.          If you have that information, I will be

12 glad to look at it on the screen so I can clarify my

13 memory.

14 Q.          All right.  Let's take a look.  Okay.

15 I'm going to show you an exhibit.  We're going to

16 mark this as Exhibit 3.

17         MS. BROWN:  And just for the record, it

18 is Bates stamped ADOC 45005 through ADOC 45008.  I'm

19 going to drop it in the chat for the attorneys, and

20 then I'll put it on the screen for you.

21 Q.          Okay.  So this is what we're going to

22 mark as Exhibit C.  I'm sorry, not three.  Exhibit

23 C.

24         (Plaintiff's Exhibit C was

25         marked for identification.)

Page 194

1          

2  Q.          And I'm going to take you to the last

3  page of the exhibit.  Do you see that there's an

4  incident report here dated October 22nd of 2018?

5  A.          There's no way I can see that.

6          MR. CRANFORD:  Can you make it any

7  bigger, Ruth?

8  A.          There you go.  That's big enough.

9  Q.          How is that?  Is that better?

10 A.          And was this in his inmate file?

11 Q.          I don't believe it was.  But your

12 counsel can let you know.

13 A.          Okay.  Go ahead.  I'm watching it.

14 "Intentionally creating a security" -- well, wait a

15 minute.  May I read the incident report, please?

16 Q.          Yes.  Tell me when you would like me to

17 scroll down.

18 A.          Go ahead and scroll.  Okay.  Right

19 there.  Okay.  Is that it?

20 Q.          I'm sorry.  I had my sound turned off

21 for a second.  Go ahead, sir.  Did you say

22 something?

23 A.          I was going to -- I do recall reading

24 that incident report.  But to my recollection -- and

25 I can stand to be corrected -- I do not believe that

Page 195

1  Cedrick Davis was found guilty of that allegation.

2  And if he was not found -- if he wasn't charged and

3  found guilty, then he would not be classified

4  differently.

5  Q.          Okay.  So it's your belief that unless

6  he was charged and found guilty, the Carlton Nero

7  incident would not factor into his classification or

8  housing decisions?

9          MR. CRANFORD:  Object to the form.

10 A.          That's true, if he is not found guilty.

11 You cannot hold an inmate accountable in

12 classification or any other due process hearing if

13 he's not found guilty.  It never happened.

14 Q.          Okay.  So both for classification

15 purposes and also for housing purposes, your -- your

16 understanding is that staff could not take into

17 account this October 22nd of 2018 incident involving

18 Carlton Nero because there was no disciplinary

19 finding against Cedrick Davis?

20 A.          That's not actually what I said.

21 Q.          Okay.  What was incorrect about that?

22 A.          You said housing could not be

23 considered.  As I testified earlier, the people

24 making housing assignments, with the information

25 that they know formally or informally, may choose to

Page 196

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 49 (193 - 196)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 assign a person to a certain cell, a certain unit,
2 or a certain bed.  You don't necessarily have to go
3 off of formal disciplinaries.
4           What I did say was that if he was not
5 convicted of a charge, then it does not calculate
6 into a classification hearing.
7 Q.         Okay.  And this report does not indicate
8 that Cedrick Davis was ever searched for the knife
9 that Carlton Nero reported to be on Mr. Davis'
10 person, correct?
11 A.        I don't think there's anything in this
12 report that would say he was or was not.  Also, it
13 would not necessarily follow that it would be in
14 that report.
15 Q.        Okay.  If there was -- if there was a
16 contraband search -- well, scratch that.
17           If there was a contraband search carried
18 out in connection with this report from Carlton
19 Nero, where would you expect it to be documented?
20 A.        I'm not certain exactly how ADOC SOP
21 would have you document that.
22           I will add that it is common place --
23 I'm not saying it happened here.  But if I owed
24 Johnny some money and I can't pay up, one of the
25 things I can do is make a false accusation so that

Page 197

1 he's moved out of my area.  And I deal with it that
2 way instead of paying my debt.  I'm not saying that
3 happened.  I'm just saying that's another thing that
4 our staff in the facilities have to try to manage
5 through.
6 Q.         Okay.  So you're not aware of any other
7 kind of document in which the ADOC staff would
8 document a contraband search arising from the
9 investigation of this report by Carlton Nero other
10 than this incident report, correct?
11 A.        Correct.
12 Q.        Okay.  Okay.  And the reports -- the
13 body chart documentation associated Carlton Nero's
14 report does reflect evidence of a knot?
15 A.        Okay.  If you can scroll back up, I
16 would like to make a point.  There is no evidence
17 that anyone had a knot.  Scroll the other way to the
18 top part of that form.  There.
19           "A couple of guys jumped me, hit me with
20 fists, and pushed me against the wall.  They would
21 have pulled a knife on me if I hit back."
22 Q.        That's the inmate's written
23 statement out of this handwritten form, correct?
24 A.        Correct.
25 Q.        Okay.  And in the bottom of this form

Page 198

1 where it says Description of Markings, there is a
2 note here that Carlton Nero had a small knot to the
3 left side of his lips, correct?
4 A.         Yeah.  He says, "I got hit with a
5 first."
6 Q.         And C fist, does that mean a closed
7 first in your experience?
8 A.         No.  That means with.
9 Q.         The C with the line above it?
10 A.        Uh-huh.  It means with.
11 Q.        So I got hit with --
12 A.        And it could have been his own fist.  I
13 mean, excuse me.  But I'm cynical after 50 years.
14 Q.         Okay.  All right.  And so you don't have
15 any information, as you sit here today, whether this
16 was a false report or a true report by Carlton Nero,
17 correct?
18           MR. CRANFORD:  Object to the form.
19 A.        I have information that indicates or
20 suggests that in this event, Davis was not charged,
21 nor was he found guilty of these accusations.
22 Q.         Okay.  All right.  And you don't have --
23 you didn't put any opinions regarding this incident
24 in your report in the Ezell case, correct?
25 A.        That's correct.

Page 199

1 Q.         Okay.
2 A.         Once again, he wasn't charged, he wasn't
3 found guilty.  It would be erroneous of me to opine
4 one way or the other in the report.  It never
5 happened.
6 Q.         What do you mean by "it never happened"?
7 A.         He was never charged.  He was never
8 found guilty.  Just like if you went to traffic
9 court and they find you not guilty, it never
10 happened.
11 Q.         So you mean it never -- from the
12 perspective of correctional officials, it's like it
13 never happened if it's not -- it doesn't result in
14 discipline?
15 A.         Formally if they're not charged and
16 convicted, it does not weigh into the classification
17 hearings.
18 Q.         Okay.  Okay.  In your report in Ezell,
19 you found that ADOC's classification manual and
20 standard operating procedure 126 on the internal
21 classification board were adequate policies,
22 correct?
23 A.         Yes.  And as I testified earlier, I'm
24 familiar with ORAS.  Looking at both of these cases,
25 it is my opinion that the staff at St. Clair and the

Page 200

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 50 (197 - 200)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 other facilities did an admirable job of applying
2 the classification tool.
3 Q.          Okay.  And can you describe how ORAS
4 works?
5 A.          Without having the tool in front of me,
6 I can do it in generic terms.  But it accounts for
7 the crime that the offender is doing time for.  It
8 accounts for sometimes their age.  It will account
9 for disciplinary history, job history within the
10 facility.  There's a whole list of variables that
11 all add up where you can get points or lose points.
12 And when you get down to the bottom, there's a total
13 point tally that will make you minimum, medium, or
14 closed custody.
15 Q.          Okay.  In your opinion in the Ezell and
16 the Guy case, the scorings -- the ADOC employees
17 properly followed the classification manual as it
18 relates to the classification decision and the
19 scoring system that you just described, correct?
20 A.          Correct.
21 Q.          Okay.  You didn't indicate in your
22 report in Ezell that you conducted any analysis of
23 how standard operating procedure 126 was being
24 implemented at St. Clair outside of the -- looking
25 at the classification records for Terrence Andrews
Page 201

1 and Cedrick Davis; is that right?
2 A.          Correct.
3 Q.          Okay.  So you didn't look at -- you
4 didn't conduct any analysis of how standard
5 operating procedure 126 was being implemented aside
6 from looking at Cedrick Davis' and Terrence Andrews'
7 classification decisions, correct?
8          MR. CRANFORD: Object to the form.
9 A.          Correct.  I felt like it was only
10 material to look at those two's classification
11 action since they were the alleged perpetrator and
12 the alleged victim.
13 Q.          Okay.  Based on your review in the Ezell
14 and the Guy cases, did you determine whether the
15 internal classification board was charged with
16 considering placement of inmates in the special
17 safety unit in 2018?
18 A.          I do not recall that off the top of my
19 head.
20 Q.          Do you recall who was in charge of
21 making determinations about whether inmates should
22 be housed in the special safety unit at St. Clair in
23 late 2018 and early 2019?
24          MR. CRANFORD: Object to the form.
25 A.          Normally that would be the
Page 202

1 classification board.  But that's only speculation.
2 I do not recall.
3 Q.          Okay.  Based on your correctional
4 expertise, what documentation would you expect there
5 to be created by the facility when considering
6 placement of inmates in the special safety unit?
7          MR. CRANFORD: Object to the form.
8 A.          Without having a policy in front of me
9 and how they expect to do it in Alabama, I can only
10 tell you how I would see it in other jurisdictions.
11 And that's primarily through the classification
12 tool.  There's always a section for comment.  And
13 you'll see that on many of the classification
14 actions.
15          And I would anticipate that if
16 consideration was given for one of those two units,
17 it would be documented on there that we considered
18 it, and this is why we recommend or don't recommend.
19 At the end of the day, that type of classification
20 action is normally signed off on by the warden.
21 Q.          Okay.  So that's your experience from
22 other jurisdictions.  And you're not sure how the
23 process worked at St. Clair in 2018 and early 2019,
24 fair?
25 A.          Not without having that tool in front of
Page 203

1 me.
2 Q.          Which tool are you referring to?
3 A.          The classification tool, manual.
4 Q.          Oh, okay.
5          So do you know whether ADOC's
6 classification manual addressed placement in the
7 special safety unit at St. Clair?
8          MR. CRANFORD: Object to the form.
9 A.          I think I just said no, I do not
10 remember.
11 Q.          Okay.  Okay.  So you're not sure of the
12 form of the documentation.  But you would expect
13 that whoever was charged with making determinations
14 about placement of individual inmates in the special
15 safety unit at St. Clair in late 2018 and early 2019
16 would create some sort of documentation regarding
17 the decision, correct?
18 A.          Some type of documentation.
19 Q.          Okay.  And in the -- in the Guy case,
20 you didn't review any documentation regarding
21 approval or denial of placements in the special
22 safety unit at St. Clair in late 2018 and early
23 2019, correct?
24          MR. CRANFORD: Object to the form.
25 A.          That would be true in both cases.
Page 204

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 51 (201 - 204)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

Kevin Myers
2/4/2025

1 Q.          Okay.  That's true in Ezell, as well?

2 A.          Yes.  I don't know how many times you

3 want me to answer that.

4 Q.          Okay.  All right.

5           MS. BROWN:  Can we take a five-minute

6 break?

7           MR. CRANFORD:  Sure.

8           THE VIDEOGRAPHER:  We're off the record.

9 The time is 4:42 p.m.

10           (Recess was taken.)

11           THE VIDEOGRAPHER:  We are back on the

12 record.  The time is 4:56 p.m.

13 Q.          Okay.  Let's take a look at your report

14 in the Ezell case at the -- in exhibit -- sorry.  At

15 the end of the report where you list your materials,

16 your documents reviewed.  Can you take a look at

17 that?

18 A.          Sure.  I'm there.

19 Q.          Okay.  So looking at the list of

20 documents reviewed at Pages 47 and 48 of your expert

21 report in Ezell, can you identify any documents that

22 you reviewed that were created by persons outside of

23 the ADOC such as outside auditors or outside

24 experts?

25           MR. CRANFORD:  Object to the form.

Page 205

---

1 A.          The only ones I see are on the bottom of

2 Page 47, the Ohio Risk Assessment System and the

3 link for the NIC gov Ohio Risk Assessment System.

4 And then there's documentation on Page 48 from the

5 prelegislative session budget hearing.

6 Q.          Okay.  So you -- you relied on ADOC

7 incident reports and movement histories and

8 classification records, correct?

9 A.          Yes.

10 Q.          Okay.  And you relied on investigation

11 reports by ADOC, correct?  Scratch that.

12           You relied on four pages from Terrence

13 Andrew's law enforcement services division's

14 investigative report, correct?

15 A.          That is correct.

16 Q.          Okay.  And you relied on annual reports

17 created by ADOC for fiscal years 2015, 2016, 2017,

18 and 2019, correct?

19 A.          Correct.

20 Q.          Okay.  And you relied on a 2017 Prison

21 Transformation Initiation booklet that was also

22 prepared by ADOC employees, correct?

23           MR. CRANFORD:  Object to the form.

24 A.          Correct.

25 Q.          Okay.  And the ADOC new compensation

Page 206

---

1 plan from July 2019, that was also a document that

2 was created by ADOC employees, correct?

3           MR. CRANFORD:  Object to the form.

4 A.          Correct.

5 Q.          Okay.  The meeting from February 14th of

6 2019 updated agenda, do you recall what that

7 document was?

8 A.          I believe that was a meeting of one of

9 the outside entities with the staff there where they

10 were reviewing some plans.  I believe that's what

11 that is.

12 Q.          Okay.  Was that perhaps a list of -- a

13 presentation and associated materials from an Equal

14 Justice Works Initiative presentation to ADOC

15 administrators about St. Clair?

16           MR. CRANFORD:  Object to the form.

17 A.          It may be.  But I'm only speculating.

18 Q.          Okay.  And if it was an EJI

19 presentation, then you would have discounted it

20 because, in your opinion, EJI counsel lack expertise

21 to provide information about St. Clair, correct?

22           MR. CRANFORD:  Object to the form.

23 A.          Not necessarily.

24 Q.          Okay.  What was incorrect about my

25 statement?

Page 207

---

1 A.          As you pointed out, EJI did have some

2 entities working for them that did have correctional

3 expertise.  What I would discount from EJI are those

4 items that were stipulated in the agreement that

5 they do not have the background, history, knowledge

6 to stipulate to.

7 Q.          Okay.  The wristband audit at St. Clair

8 that's listed in your Documents Reviewed section,

9 that was created by ADOC employees, correct?

10           MR. CRANFORD:  Object to the form.

11 A.          Correct.

12 Q.          Okay.  Okay.  And then the deposition

13 transcripts that you considered, those were all

14 depositions of ADOC employees, both current and

15 former, correct?

16           MR. CRANFORD:  Object to the form.

17 A.          No, that's not correct.

18 Q.          Okay.  Why is that incorrect?

19 A.          There's a deposition from Lakeisha

20 Ezell.

21 Q.          Oh, okay.  Yes, I see that.  Thank you.

22           Any other deposition transcripts that

23 you reviewed that were -- that were of people

24 outside of ADOC?

25           MR. CRANFORD:  Object to the form.

Page 208

---

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 52 (205 - 208)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 A.        I don't believe so.

2 Q.        Okay.  And so you didn't look at any

3 external audits of St. Clair in order to prepare

4 your opinions in the Ezell matter, correct?

5         MR. CRANFORD:  Object to the form.

6 A.        Correct.

7 Q.        Okay.  And you didn't look at any

8 reports of any outside experts about St. Clair in

9 order to reach your opinions in the Ezell case,

10 correct?

11         MR. CRANFORD:  Object to the form.

12 A.        Ask the question again, please.

13 Q.        You didn't review any reports by outside

14 experts in order to reach your opinions in the Ezell

15 case, correct?

16         MR. CRANFORD:  Object to the form.

17 A.        Not necessarily.  There were -- there

18 was information, as I already testified to, by

19 staffing groups, by Richard Stalder and others, by a

20 construction group -- I don't recall their name --

21 that talked about things -- and it may have been in

22 the annual reports.  But there were information from

23 outside entities.

24 Q.        Okay.  And if there was information from

25 outside entities, it would have been in the

Page 209

1 documents that are listed in Exhibit B to your Ezell

2 report, correct?

3         MR. CRANFORD:  Object to the form.

4 A.        Correct.

5 Q.        Okay.  And so you don't see listed here

6 any documents that are -- that are expert -- are

7 reports from experts outside of ADOC regarding

8 St. Clair, correct?

9         MR. CRANFORD:  Object to the form.

10 A.        Other than the deposition that I

11 previously noted.

12 Q.        Okay.  And that was the deposition of

13 Lakeisha Ezell, correct?

14 A.        Correct.

15 Q.        And who is Lakeisha Ezell?

16 A.        I believe that is the plaintiff.

17 Q.        Okay.  And that is Mr. Andrews' mother,

18 correct?

19         MR. CRANFORD:  Object to the form.

20 A.        That's the plaintiff in this case.

21 Q.        Okay.  Do you know Lakeisha Ezell as the

22 mother of Terrence Andrews?

23 A.        I believe that's accurate.

24 Q.        Okay.  So Lakeisha Ezell was not

25 providing expert testimony, outside expert testimony

Page 210

1 about St. Clair, correct?

2 A.        That's correct.

3 Q.        Okay.  Let's look at the Guy report

4 again.

5 A.        What page, please?

6 A.        Exhibit B.

7 A.        Yes, ma'am.  I'm there.

8 Q.        Just a second.  My computer has frozen.

9         Okay.  You reviewed 50 different

10 documents to prepare your opinions in the Guy case,

11 correct?

12 A.        As previously testified to, yes.

13 Q.        Okay.  And which, if any, of the

14 documents that you reviewed to prepare your opinions

15 in the Guy case were authored by either auditors or

16 correctional experts that are outside of ADOC?

17         MR. CRANFORD:  Object to the form.

18 A.        I think they're self-evident by the

19 title.  There are some reports that are information

20 about the crime Mr. Mullins provided.  There's some

21 movement history, classification history, annual

22 reports, standard operating procedures,

23 classification manuals, a certain section of it.

24 I'm not sure what you're looking for.

25 Q.        Okay.  All the documents that you just

Page 211

1 described, those are all authored by ADOC or its

2 employees, correct?

3         MR. CRANFORD:  Object to the form.

4 A.        No.

5 Q.        Which ones were not?

6 A.        Items 7, 8, 9, 10 are not authored by

7 ADOC employees.  Number 1, ADOC Guy amended

8 complaint is not authored -- authored by an ADOC

9 employee.

10 Q.        Okay.  Which one here -- which of the

11 documents listed in your Documents Reviewed section

12 in the Guy report are either audits for analyses of

13 conditions at St. Clair that were prepared by

14 persons outside of ADOC?

15         MR. CRANFORD:  Object to the form.

16 A.        I think 36 is an EJI stipulation.  37 is

17 a report from PREA on keeping vulnerable populations

18 safe.  I'm just not -- Number 48 is Dan Pacholke's

19 expert report.  I'm not sure what you're asking me

20 to produce.

21 Q.        That's what I'm asking.

22         So there's an EJI stipulation.  There's

23 items 36, 37, 48, and 49.  Those are all documents

24 that were authored regarding conditions at -- well,

25 scratch that.

Page 212

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 53 (209 - 212)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1      So the PREA audit of May 1st through 3rd
2  of 2018, do you know whether the auditor team that
3  prepared that was external to ADOC or internal to
4  ADOC?
5  **A.      A PREA audit would be external.**
6  Q.      Okay.  So 49 is an external audit of
7  PREA compliance regarding conditions at St. Clair,
8  correct?
9  **A.      Correct.**
10  Q.      Okay.  And 48 is Dan Pacholke's report,
11  which is an expert report in this case by someone
12  outside of ADOC, correct?
13  **A.      Correct.**
14  Q.      Okay.  Are there -- other than those two
15  documents, are there any other documents that you
16  reviewed and relied on that were critiquing ADOC
17  from the outside?
18      MR. CRANFORD:  Object to the form.
19  **A.      At a cursory glance, I don't think so.**
20  Q.      Okay.  And let me exclude from that the
21  complaint in this case, as well.
22  Q.      So other than the PREA audit and
23  the Dan Pacholke report, you're not aware of having
24  reviewed any documents critiquing ADOC, you know, by
25  a correctional expert or auditor that was outside of
Page 213

1  ADOC, correct?
2      MR. CRANFORD:  Object to the form.
3  **A.      Other than that I stated earlier I saw**
4  **some documentation -- I don't recall in which**
5  **report -- information about staffing from the**
6  **staffing experts, information from Richard Stalder**
7  **and his group from ASCA.  And that was incorporated**
8  **into something.  I don't recall which one.**
9  Q.      Okay.  Anything else that you're aware
10  of other than the Savages' and Stalder reports?
11      MR. CRANFORD:  Object to the form.
12  **A.      No, ma'am.**
13  Q.      Okay.  Turning to the Andrews report.
14      MR. CRANFORD:  You mean the report in
15  Ezell?
16  Q.      I'm sorry.  Turning to the Ezell report.
17  **A.      Okay.**
18  Q.      Okay.  If you look at Page 19 of the
19  report, do you see that you indicate -- that you
20  provide an analysis of whether Terrence Andrews
21  qualified for special safety unit placement?
22  **A.      Yes.**
23      MR. CRANFORD:  Object to the form.
24  Q.      Okay.  And that analysis that you
25  provide is on pages -- it begins at the bottom of
Page 214

1  Page 17 of your report.  It continues through Page
2  18 of your report.
3  **A.      Slow down, please.  You just backed up**
4  **from 19.  Where are we?**
5  Q.      Yeah.  So your discussion of the special
6  safety unit and whether Andrews qualified for
7  placement there is on Pages 17 through 19 of your
8  report in Ezell, correct?
9  **A.      I'm not sure what Page 17 and 18 have to**
10  **do with the SSU and the VMU.**
11      THE REPORTER:  The what?
12  **A.      SSU and VMU.**
13  Q.      Well, at the bottom of Page 17, you
14  discuss the special safety unit.  Do you see that,
15  and how 24 beds have been allotted to the -- for the
16  SSU?
17  **A.      Yes.**
18  Q.      Okay.  And on Page 18 of your report,
19  you discuss how ADOC and St. Clair leadership placed
20  physical plant obstacles relating to establishing a
21  48 SSU.  Do you see that?
22  **A.      Yes.**
23  Q.      Okay.  And then on Page 19, you provide
24  your opinion that "Nothing from my review indicates
25  that Andrews qualified for SSU placement."  Do you
Page 215

1  see that?
2  **A.      Yes.**
3  Q.      Okay.  Nowhere in your report in the Guy
4  case do you discuss whether Steven Mullins qualified
5  for special safety unit placement, right?
6      MR. CRANFORD:  Object to the form.
7  **A.      Okay.**
8  Q.      Is there anywhere that you can point me
9  to in your Guy report in which you address whether
10  or not Steven Mullins qualified for special safety
11  unit placement?
12      MR. CRANFORD:  Object to the form.
13  She's asking you about the Guy report.
14  **A.      Oh, we're on the wrong -- are we back on**
15  **the Guy report?**
16  Q.      So we were looking at the Andrews' -- we
17  were looking at the Ezell report.  And I'm -- and I
18  believe we agreed that in the Andrews report, you
19  offer an opinion that Andrews did not qualify for
20  special safety unit placement, correct?
21  **A.      That is correct.**
22  Q.      Okay.  My next question is about the Guy
23  case.
24      In the Guy report, there's nowhere in
25  which you discuss whether or not Steven Mullins
Page 216

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 54 (213 - 216)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 qualified for placement in the special safety unit,
2 correct?
3 **A.        Correct.**
4 Q.        Okay.  Do you have any explanation for
5 why you discussed the lack of a special safety unit
6 placement for Andrews but not for Mr. Mullins?
7 **A.        It was probably a response to the**
8 **complaint made by the plaintiff that was made in the**
9 **Ezell report that was not in the Guy report.  I was**
10 **trying to be responsive to the complaints made.**
11 Q.        Okay.  So in your view, because you
12 believe the complaint in the Guy case did not raise
13 an issue about the special safety unit placement of
14 Mr. Mullins, you didn't -- for that reason, you did
15 not discuss it in your report?
16 **A.        Correct.**
17 Q.        Okay.  Okay.  In both the Ezell and Guy
18 report, you discuss -- scratch that.
19          Okay.  Your report in Ezell discusses
20 whether unauthorized movement contributed to
21 Terrence Andrews' death, correct?
22 **A.        Correct.**
23          Okay.  And in the Terrence Andrews case,
24 your report indicates an opinion that unauthorized
25 movement did not cause or contribute to Mr. Andrews'

Page 217

1 death, correct?
2 **A.        And that is on what page, please?**
3 Q.        Let me find it for you.  Okay.  Can you
4 turn to Page 22 of your Ezell report?
5 **A.        Yes, ma'am.**
6 Q.        Okay.  And do you see that under bullet
7 point number three in the second paragraph, you
8 provide an opinion that Davis and Andrews were in
9 their assigned housing unit at the time of the
10 incident between them, and unauthorized inmate
11 movement did not cause or contribute to Andrews'
12 death?  Do you see that?
13 **A.        Yes, ma'am.**
14 Q.        Okay.  So in Andrews, your report
15 indicates an opinion that unauthorized movement did
16 not cause or contribute to Andrews' death, right?
17 **A.        Correct.**
18 Q.        Okay.  Now turning to the Guy case,
19 there's nowhere in your report in the Guy case in
20 which you state an opinion as to whether
21 unauthorized movement caused or contributed to
22 Mr. Mullins' death, correct?
23 **A.        Correct.**
24          MR. CRANFORD:  Object to the form.
25 **A.        Correct.**

Page 218

1 Q.        Do you have any explanation for why you
2 considered -- you offered that opinion in the Ezell
3 case and not in the Guy case?
4 **A.        I do not.**
5 Q.        Okay.  Did you find any evidence in the
6 chronology of events relating to the death of
7 Terrence Andrews and discipline against Cedrick
8 Davis for that murder that included evidence that
9 there had been unauthorized movement by either of
10 those individuals?
11          MR. CRANFORD:  Object to the form.
12 **A.        Ask me that again, please.**
13 Q.        Sure.
14          Did you find any evidence in your work
15 on the Ezell case that either Cedrick Davis or
16 Terrence Andrews had engaged in unauthorized
17 movement in connection with the incident that led to
18 Mr. Andrews' death?
19 **A.        I do not believe that unauthorized**
20 **movement played a part in that death.**
21 Q.        Okay.  Did you find any evidence that
22 there was any unauthorized movement by Cedrick Davis
23 on the date of the murder of Terrence Andrews?
24          MR. CRANFORD:  Object to the form.
25 **A.        Only that after the event, he left and**

Page 219

1 **went to another cell inside the same dorm.**
2 Q.        Okay.  And do you have any knowledge as
3 to how Cedrick Davis was able to go to another --
4 another area of the prison after stabbing Terrence
5 Andrews?
6          MR. CRANFORD:  Object to the form.
7 **A.        I don't recall, no.**
8 Q.        Excuse me for just a second.
9          Okay.  I apologize.  Sorry about that.
10 **A.        If I can clairfy --**
11 Q.        Are you aware of any evidence of any
12 unauthorized movement that was implicated -- scratch
13 that.
14          Are you aware of any evidence of any
15 unauthorized movement by either Steven Mullins or
16 Clarence Jackson?
17 **A.        Wait a minute.  Time out, please.  You**
18 **jump from one case to another.  And I'm starting to**
19 **think that you're doing that intentionally to try to**
20 **confuse me after these many hours.**
21          **I would like to follow up on Davis and**
22 **Andrews.  They both lived in P dorm.  The event**
23 **happened in P dorm.  I'm not sure why there's a**
24 **question about unauthorized movement on Davis and**
25 **Andrews.**

Page 220

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 55 (217 - 220)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 Q.        Well, there was unauthorized movement by
2 Cedrick Davis after stabbing Terrence Andrews,
3 correct?
4            MR. CRANFORD:  Object to the form.
5 A.        He went to a different cell, which is
6 not abnormal.  If I stab someone in an altercation
7 in the hallway, I'm not going to stand there and
8 wait for someone to come get me.
9 Q.        Okay.  Well, he went from the P1 housing
10 unit to the P2 housing unit, correct?
11            MR. CRANFORD:  Object to the form.
12 A.        Okay.  And I will tell you that we've
13 had a stabbing.  The cubical officer called for
14 assistance.  In order for officers to be able to
15 respond to an incident where potential death is
16 involved, you're going to have to open the doors.
17 And that allows movement.
18            Now, if you want to call that
19 unauthorized movement, go for it.  But I think
20 that's stretching.  And going back to what I was
21 saying earlier, we like to Monday morning
22 quarterback what these men and women have to do on a
23 daily basis with hindsight and expectations.
24 Q.        Is it your testimony that Cedrick Davis
25 was authorized to go from the P1 block to the P2
Page 221

1 block on the date that he stabbed Terrence Andrews?
2            MR. CRANFORD:  Object to the form.
3 A.        No.  What I'm saying is after the
4 incident, you have to open the doors for staff to be
5 able to respond.  When you open the doors, you lose
6 some level of control.  Your focus is not on where
7 inmates are going.  Your focus is on responding to
8 that incident with the information that you have at
9 that point in time, not 24 hours later.
10 Q.        Okay.  Turning to the Guy case, you did
11 not provide any opinion as to whether unauthorized
12 movement caused or contributed to Mr. Mullins'
13 death, correct?
14            MR. CRANFORD:  Object to the form.
15 A.        I believe I answered that.  Yes.  That's
16 correct.
17 Q.        Okay.  That's not -- that's not in your
18 report, correct?
19            MR. CRANFORD:  Object to the form.
20 A.        I believe I answered that.  Yes.
21 Q.        Okay.  And as you reviewed the Mullins'
22 incident with the inmate that came to be identified
23 as Clarence Jackson on February 25th and 26th of
24 2019, did you find any evidence of any unauthorized
25 inmate movement?
Page 222

1            MR. CRANFORD:  Object to the form.
2 A.        What I found was an opportunity during a
3 high-movement period, which was a lunch period, when
4 staff have to, number one, move and supervise the
5 chow hall, which means you're deploying resources to
6 a different area.  Plus you're moving a lot of
7 inmates out of one area into the chow hall, which
8 means you have to open the door, so they're moving
9 multiple inmates at one time.  That is, as all
10 correctional professionals know, an opportunity --
11 and the inmates know an opportunity for unauthorized
12 movement.
13 Q.        Okay.  Did you -- have you offered at
14 any time during your consulting work with your
15 consulting business that any correctional
16 employee violated any facility rules?
17            MR. CRANFORD:  Object to the form.
18 A.        I'm not sure of the question.
19 Q.        Sure.
20            Have you ever provided an expert opinion
21 through your consulting business that a correctional
22 employee violated any policy or procedure applicable
23 to that employee?
24            MR. CRANFORD:  Object to the form.
25 A.        I don't believe so.
Page 223

1 Q.        Have you ever offered an opinion through
2 your consulting business that any correctional
3 employee was deliberately indifferent?
4            MR. CRANFORD:  Object to the form.
5 A.        I have not.
6 Q.        Okay.  You didn't find any supervisory
7 failure by any ADOC employee in the Guy case,
8 correct?
9            MR. CRANFORD:  Object to the form.
10 A.        That's correct.
11 Q.        And you didn't find any supervisory
12 failure by any ADOC employee in the Mullins case,
13 correct?
14            MR. CRANFORD:  Object to the form.
15 A.        That's correct.
16 Q.        You didn't find any supervisory failure
17 by any ADOC employee in the Abrams' case, correct?
18            MR. CRANFORD:  Object to the form.
19 A.        Correct.
20 Q.        Okay.  You've never offered an opinion
21 that any correctional employee in any case in which
22 you've been a retained expert through your
23 consulting business engaged in inadequate
24 supervision, correct?
25            MR. CRANFORD:  Object to the form.
Page 224

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 56 (221 - 224)

**Lakeisha Ezell v. Jefferson Dunn, et al.**                                    **Kevin Myers**
**2/4/2025**

| | |
|---|---|
| 1  A.          Correct. | 1  A.          I don't believe it is.  I don't recall. |
| 2  Q.          Okay.  So you haven't offered an opinion | 2  Q.          Okay.  You don't believe there was an |
| 3  that there was any supervisory failure by any | 3  override, but you don't recall; is that correct? |
| 4  correctional employee in the history of your | 4              MR. CRANFORD:  Object to the form. |
| 5  consulting business, correct? | 5  A.          Correct. |
| 6              MR. CRANFORD:  Object to the form. | 6  Q.          Okay.  And the same question for |
| 7  A.          Correct. | 7  Clarence Jackson.  Do you know whether the point |
| 8  Q.          Okay.  You didn't identify in your Guy | 8  system in the classification manual was overridden |
| 9  report any ways in which any ADOC employee could | 9  for Clarence Jackson or was adhered to for Clarence |
| 10 have prevented the murder of Steven Mullins, | 10 Jackson with regard to the housing decisions in |
| 11 correct? | 11 February of 2019? |
| 12 A.          That's -- | 12             MR. CRANFORD:  Object to the form. |
| 13             MR. CRANFORD:  Object to the form. | 13 A.          Classification and housing are two |
| 14 A.          That is correct. | 14 separate processes.  And you continue to combine |
| 15 Q.          Okay.  You didn't identify in your Ezell | 15 them together.  They are not the same.  I do not |
| 16 report any ways in which any ADOC employee could | 16 recall any override on Jackson in the classification |
| 17 have prevented the murder of Terrence Andrews, | 17 process. |
| 18 correct? | 18 Q.          Okay.  Warden Jones is responsible for |
| 19             MR. CRANFORD:  Object to the form. | 19 ensuring compliance with standard operating |
| 20 A.          That is correct. | 20 procedures by captains at St. Clair in the time |
| 21 Q.          Okay.  In the Guy case, you didn't do | 21 frame relevant to the Ezell and Guy cases, correct? |
| 22 any analysis of overall levels of contraband weapons | 22             MR. CRANFORD:  Object to the form. |
| 23 at St. Clair in the pertinent time frame, correct? | 23 A.          Warden -- Warden Jones is responsible |
| 24 A.          I believe I've answered that.  That is | 24 for the operation of the facility. |
| 25 correct. | 25 Q.          Okay.  And that would include ensuring |
|                                Page 225 |                                Page 227 |
| 1  Q.          Okay.  And in Ezell, you didn't do any | 1  compliance with standard operating procedures, |
| 2  analysis of overall levels of contraband weapons at | 2  correct? |
| 3  St. Clair in the pertinent time frame, correct? | 3              MR. CRANFORD:  Object to the form. |
| 4              MR. CRANFORD:  Object to the form. | 4  A.          Yes. |
| 5  A.          As previously answered, correct. | 5  Q.          Okay.  And Defendant Ellington was |
| 6  Q.          Okay.  There's a point system in the | 6  responsible for managing Warden Jones to ensure that |
| 7  classification manual that determines whether an | 7  she was securing compliance with St. Clair's |
| 8  inmate should be in closed custody or medium custody | 8  policies at her facility, correct? |
| 9  that we've discussed during this deposition, | 9              MR. CRANFORD:  Object to the form. |
| 10 correct? | 10 A.          I wouldn't say Ellington was responsible |
| 11             MR. CRANFORD:  Object to the form. | 11 for the oversight and supervision of Warden Jones. |
| 12 A.          The point system makes a recommendation | 12 Q.          Okay.  All right.  In the Ezell report, |
| 13 that can be overridden. | 13 let's take a look at Page 32. |
| 14 Q.          Okay.  And do you have any information | 14 A.          Yes, ma'am. |
| 15 regarding whether the point system was overridden or | 15 Q.          Okay.  Do you see in the first paragraph |
| 16 adhered to with respect to Cedrick Davis? | 16 under Section C, at the end of the paragraph there's |
| 17             MR. CRANFORD:  Object to the form. | 17 a sentence that begins with, "Additionally, the |
| 18 A.          As I put in my report, I felt like the | 18 documents I reviewed"? |
| 19 classification was appropriate, timely, and | 19 A.          Yes. |
| 20 implemented properly. | 20 Q.          Can you read that sentence out loud? |
| 21 Q.          Okay.  And do you have any opinion | 21 A.          "Additionally, the documents I reviewed |
| 22 whether -- do you have any knowledge as to whether | 22 demonstrate that ADOC identifies and confiscates |
| 23 the point system was overridden or adhered to in the | 23 contraband such as drugs, knives, and cell phones at |
| 24 classification decisions regarding Cedrick Davis? | 24 St. Clair and other facilities, and ADOC attempts to |
| 25             MR. CRANFORD:  Object to the form. | 25 deter rule violations with disciplinary sanctions, |
|                                Page 226 |                                Page 228 |

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 57 (225 - 228)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 including restrictive housing."

2 Q.        Okay.  What documents did you review

3 that demonstrated to you that ADOC identifies and

4 confiscates contraband such as drugs, knives, and

5 cell phones at St. Clair?

6 A.        Both Davis and Jackson had a long

7 history of disciplinaries where they were held

8 accountable for weapons, drugs, cell phones, MP3

9 players.  Their two cases alone indicate that staff

10 were searching, were finding contraband, and were

11 holding the inmates accountable.

12 Q.        Okay.  Other than what you've just

13 testified to, are there any other documents that you

14 reviewed in preparing your opinions in the Ezell

15 case that demonstrate that ADOC identifies and

16 confiscates contraband such as drugs, knives, and

17 cell phones at St. Clair?

18        MR. CRANFORD: Object to the form.

19 A.        Only that -- these two, Davis and

20 Jackson, in some of the disciplinaries that I

21 reviewed, the incidents that I reviewed with them,

22 often times would have other inmates involved.  So

23 it wasn't just two inmates.  There were multiple

24 inmates.

25 Q.        Got it.

Page 229

1        So the documents that are the basis for

2 your opinion that the documents that you reviewed

3 demonstrate that ADOC identifies and confiscates

4 contraband, the documents were those relating to the

5 incidents involving Terrence Andrews and/or Cedrick

6 Davis, as well as possibly other inmates in those

7 same incidents?

8 A.        And my apologies.  I was confusing the

9 two cases together.  Yes, Andrews and Davis.

10        MR. CRANFORD: And I just would object

11 to the form of the last question.

12 Q.        Okay.  And your opinions about

13 underreporting of contraband searches, based on your

14 experience, those are the same in Ezell as they are

15 in Guy, correct?

16        MR. CRANFORD: Object to the form.

17 A.        Correct.

18 Q.        Okay.  In other words, you are relying

19 for those opinions only on your correctional

20 experience and not on documentary evidence, correct?

21        MR. CRANFORD: Object to the form.

22 A.        Correct.

23        MS. BROWN: Okay.  Let's take a final

24 five-minute break.  I think I'm done, but I want to

25 check and confirm.

Page 230

1        THE VIDEOGRAPHER:  We are off the

2 record.  The time is 5:34 p.m.

3        (Recess was taken.)

4        THE VIDEOGRAPHER:  We are back on the

5 record.  The time is 5:36 p.m.

6        MS. BROWN: Okay.  I have no further

7 questions.  Thank you for your time.

8 A.        Thank you.

9        MR. CRANFORD: Allen, do you have

10 anything?  I'm going to have just a little bit.

11        THE WITNESS: Allen?  Allen may still be

12 gone.  I think he is.  Allen is not back yet.

13        MS. BROWN: Let's give him a minute.

14        THE VIDEOGRAPHER:  We are off the

15 record, 5:37 p.m.

16        (Recess was taken.)

17        THE VIDEOGRAPHER:  We are back on the

18 record.  The time is 5:37 p.m.

19        MS. BROWN: Okay.  Allen, did you have

20 any questions?

21        MR. SHEEHAN: I do not have any

22 questions.

23        MR. CRANFORD: I've just got a few.  I

24 just want to run through a couple of things.

25

Page 231

1 EXAMINATION BY MR. CRANFORD:

2 Q.        Mr. Myers, earlier Ms. Brown was asking

3 you some questions about the Mullins and the Jackson

4 incident.  Do you recall that?

5 A.        Yes.  I recall the incident.

6 Q.        I'm sorry.  Do you recall the questions

7 that Ms. Brown was asking you about the days of

8 February 25th and February 26th?

9 A.        Yes.

10        MS. BROWN: Objection.  I'm sorry.

11 Objection to form.

12        MR. CRANFORD: What's the basis?

13        MS. BROWN: Well, we've been -- we've

14 had a deposition for seven hours that included lots

15 of different sets of questions about those

16 incidents.  I'm wasn't sure which ones you were

17 asking him if he recalls.

18 Q.        Okay.  Do you recall Ms. Brown asking

19 you about the reports that Mr. Mullins made

20 throughout the day on the 25th and the 26th of

21 February 2019?

22 A.        I do.

23 Q.        And when she was asking you those

24 questions, you were doing the best to answer those

25 questions based on your memory, correct?

Page 232

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 58 (229 - 232)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1  A.          Correct.

2              MS. BROWN:  Objection to form.

3  Q.          During your work in these cases, you
4  reviewed a number of different documents and pages
5  of documents, correct?

6  A.          Correct.

7              MR. CRANFORD:  Objection to form.

8  Q.          Do you recall every single piece of
9  information in every single one of those documents?

10 A.          No.

11 Q.          And so I'm going to show you -- I'm
12 going to share my screen and show you a document
13 here, if I can.

14              MR. CRANFORD:  That is, for the record
15 -- give me one second.  For the record, this is
16 documents Bates labeled ADOC 000472 to 000473.

17 Q.          Do you see that this is -- the first
18 page is a duty officer report from St. Clair
19 Correctional Facility on February 25th of 2019?

20 A.          Yes.

21 Q.          Do you see that the time of the incident
22 is identified as 6:00 o'clock a.m.?

23 A.          Yes.

24 Q.          And if you will, look down in the brief
25 narrative section.  Do you see that section?

Page 233

1 report from February the 25th of 2019 at St. Clair
2 Correctional Facility?

3  A.          Yes.

4  Q.          And the time on this duty officer report
5  of the incident is identified as 3:30 p.m.?

6  A.          Yes.

7  Q.          Okay.  And if you'll look down in the
8  brief narrative portion, do you see that on February
9  25th 2019 at approximately 3:30 p.m., Correctional
10 Attendant Angelia Gordy, PREA compliance manager,
11 received an email from Correctional Lieutenant
12 Taboris Surrells concerning a PREA hotline call made
13 by Inmate Steven Mullins?  Do you see that at
14 10:52 a.m.?

15 A.          Yes.

16 Q.          So according to this incident report,
17 Ms. Gordy received notification of Mr. Mullins' PREA
18 hotline call at 3:30 p.m. on February the 25th of
19 2019; is that right?

20 A.          That's correct.

21 Q.          Do you see that Inmate Mullins alleged
22 he was moved from segregation two weeks ago, was
23 assigned to cell Q32, stated that two inmates were
24 already in cell Q32 so he moved to an empty bed in
25 cell Q27?  Do you see that?

Page 235

1  A.          Yes.

2  Q.          It indicates that on February 25th 2019
3  at approximately 6:01 a.m., officer Dylan Tucker
4  escorted Inmate Steven Mullins to the breezeway?  Do
5  you see that?

6  A.          Yes.

7  Q.          "Officer Tucker reported to Lieutenant
8  William Ragsdale that Inmate Mullins alleged he had
9  been assaulted.  Inmate Mullins was escorted to the
10 infirmary for a body chart.  Nurse Jeremy Marcano
11 completed the examination.  Inmate Mullins had an
12 abrasion on the left side of his head.  Inmate
13 Mullins could not identify who assaulted him."  Do
14 you see that?

15 A.          Yes.

16 Q.          Did I read that correctly?

17 A.          Yes.

18 Q.          And then the next sentence says, "Inmate
19 Mullins was moved to P dorm, bed P36 1A; is that
20 right?

21 A.          Yes.

22 Q.          I want to show you another document.
23 This is Bates labeled ADOC 000467.  And let me make
24 it a little bigger for you so you can see it.

25              Do you see that this is a duty officer

Page 234

1  A.          I see that.

2  Q.          And a little further down, Inmate
3  Mullins further stated that this morning, 2-25-19,
4  he was awakening by his cell partner punching him on
5  the side of the head and twice in the eye.  Do you
6  see that?

7  A.          Yes, sir.

8  Q.          And do you see where it says, "Inmate
9  Mullins stated that his cell partner pulled a knife
10 on him and tried to force him to perform oral sex"?
11 Do you see that?

12 A.          Yes, sir.

13 Q.          It indicates here that Mr. Mullins
14 stated that he pushed his cell partner out of the
15 way and exited the cell.  "Inmate Mullins stated he
16 went to the shift office and reported the incident."
17 Do you see that?

18 A.          Yes, sir.

19 Q.          And then down here at the bottom, the
20 last -- I think it's the last line or second to last
21 line.  Do you see that it says, "Inmate Mullins
22 identified his cell partner as Inmate Clarence
23 Jackson"?

24 A.          Yes.

25 Q.          And it says, "Inmate Mullins was moved

Page 236

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 59 (233 - 236)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 from cell P36 to cell L28." And that entry -- this
2 entry here indicates that it was made on February
3 25th 2019 at 5:43 p.m. by Angelia Gordy; is that
4 correct?
5 **A.      Correct.**
6 Q.      So according to this incident report,
7 the first time Ms. Gordy reported that Mr. Mullins
8 identified his cell partner as Inmate Clarence
9 Jackson was at 5:43 p.m. on February 25th of 2019,
10 correct, according to this incident report?
11      MS. BROWN: Objection to form.
12 **A.      That's correct.**
13 Q.      I want to look at another document.
14 This is ADOC 000468. I'm sorry. Give me one
15 second.
16 **A.      I can see now.**
17 Q.      I'm trying to find the correct document.
18 Okay. I'm sorry. This is ADOC 000469.
19      Do you see that this is a duty officer
20 report from February 26th of 2019 at 5:45 p.m.?
21 **A.      Yes, sir.**
22 Q.      And do you see that on February 26,
23 2019, at approximately 5:45 p.m., Operator Brandy
24 Smith heard a loud noise and observed Inmate Mullins
25 bleeding on the floor outside the cubical door?
                                          Page 237

1 **A.      Yes.**
2 Q.      And do you see that -- let's see.
3 "While en route to the healthcare unit, Inmate
4 Mullins identified Inmate Clarence Jackson as the
5 inmate that assaulted him to Correctional Captain
6 Kevin White and Correctional Lieutenant Antoine
7 Price." Is that right?
8 **A.      Correct.**
9 Q.      And then we have that two other
10 suspects, Christopher Jones and Venderick Thomas,
11 were also taken into custody pending an
12 investigation, correct?
13 **A.      Correct.**
14 Q.      And so I'm going to show you one
15 additional document. This is ADOC 009156. Can you
16 see that?
17 **A.      Yes.**
18 Q.      And this indicates that it is a phone
19 call, Inmate Steven Mullins to Agent Brian Casey.
20 I'm sorry. A phone call Inmate Steven Mullins to
21 Agent Brian Casey. Do you see that?
22 **A.      Yes.**
23 Q.      And the date is indicated as February
24 25th 2019; is that right?
25 **A.      Correct.**
                                          Page 238

1 Q.      And the time is 10:52 a.m.?
2 **A.      Correct.**
3 Q.      And this is -- it indicates that it's a
4 recording indicating to report sexual abuse or
5 sexual harassment to an agency outside of Alabama
6 DOT, leave detailed information so the report can be
7 investigated. Press number 66 after this message.
8 Do you see that?
9 **A.      Yes.**
10 Q.      If you look -- I want you to read the
11 section that is indicated SM and starts with, "My
12 name is Steven Mullins."
13 **A.      "My name is Steve Mullins."**
14 Q.      Sorry. I should have been more
15 specific. Just read it to yourself.
16 **A.      Oh. I'm used to reading out loud today.**
17 Q.      No problem. And just let me know when
18 you're done.
19 **A.      Okay.**
20 Q.      Is there anywhere in this statement that
21 Mr. Mullins provided to the PREA hotline where he
22 identifies Clarence Jackson as the individual
23 responsible for this alleged assault?
24 **A.      Not that I see.**
25 Q.      Is there anywhere in this recording or
                                          Page 239

1 transcript of Mr. Mullins' call to the PREA hotline
2 where he identifies a C.J. as the person responsible
3 for his assault?
4 **A.      No, sir.**
5 Q.      I want to show you now a document that's
6 identified as ADOC -- or Bates labeled as ADOC
7 000546. Can you see that?
8 **A.      Yes.**
9 Q.      And earlier Ms. Brown was asking you
10 questions about Cedrick Davis' institutional
11 history; is that right?
12 **A.      Correct.**
13 Q.      And Cedrick Davis was the assailant in
14 the alleged incident with Terrence Andrews; is that
15 right?
16 **A.      Correct.**
17 Q.      Do you recall -- I'm sorry. Strike
18 that.
19      Do you see that this is an incident
20 report from March 16th of 2018?
21 **A.      Yes.**
22 Q.      And it's from Ventress Correctional
23 Center. Do you see that?
24 **A.      Yes.**
25 Q.      And this is a report involving Terrence
                                          Page 240

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 Andrews; is that right?  Can you see it?

2 A.            No, I'm good.  Yes.

3 Q.            And do you see in the narrative summary

4 section it says that "On March 16, 2018,

5 Correctional Officer Nico Patterson was assigned as

6 dormitory F rover.  At approximately 12:28 a.m.,

7 Officer Patterson observed Inmate Michael Stone

8 walking to the front of the dormitory with blood on

9 his facial area"?  Do you see that?

10 A.            Yes.

11 Q.            And then if you drop down a couple of

12 lines, do you see where it starts, "It was

13 discovered"?

14 A.            Yes.

15 Q.            "It was discovered that Inmate Stone was

16 assaulted by Terrence Andrews over a previous verbal

17 altercation."  Do you see that?

18 A.            Yes.

19 Q.            It says a little further down, "At

20 approximately 1:45 p.m., Nurse Patricia Galvin

21 conducted a medical assessment on Andrews.  No

22 injuries were noted.  Inmate Andrews was reassigned

23 to the restrictive privilege dorm, B1, pending

24 disciplinary action."  Do you see that?

25 A.            Yes.

Page 241

1 you see that?

2 A.            Yes.

3 Q.            And under Suspects, Terrence Andrews is

4 listed as the suspect?

5 A.            Yes.

6 Q.            Okay.  And do you see that on April 12,

7 2018, at approximately 7:24 p.m., Cube Operator CCO

8 Joshua Merit observed several inmates gathered in

9 the back of the dormitory?  Do you see that?

10 A.            Yes.

11            MS. BROWN:  Objection.

12 Q.            "Officer Hill approached Inmate Terrence

13 Andrews and observed Inmate Andrews bleeding."  Do

14 you see that?

15            MR. CRANFORD:  Objection to form.

16 A.            Yes.

17 Q.            And then if we go down towards the

18 bottom, do you see -- I'm sorry.  In the very middle

19 of the page, there's a line that starts "Inmate

20 Nevitt."  Do you see that?

21 A.            Yes.

22 Q.            Do you see that it records, "Inmate

23 Nevitt stated, 'I was sleeping, and Andrews stabbed

24 my face.  So I got up and stabbed him'"?  Did I read

25 that correctly?

Page 243

1 Q.            I show you another incident report Bates

2 labeled ADOC 000548.  Do you see that this is an

3 incident report from Ventress Correctional Center on

4 April 2nd of 2018?

5 A.            Yes.

6 Q.            And do you see under Suspects the

7 suspect listed is Terrence Andrews?

8 A.            Yes.

9 Q.            And if you go to the narrative, do you

10 see that it indicates on April 4th 2018 at

11 approximately 9:40 a.m., inmate Michael Martin

12 reported to Correctional Office Jimmy Rumph that he

13 had been forced at knifepoint by Inmate Terrence

14 Andrews to perform oral sex on him approximately

15 three days prior?

16 A.            Yes.

17 Q.            And one more incident report that I want

18 to ask you about.  This is Bates labeled ADOC

19 000551.  And do you see that this is --

20            MS. BROWN:  Will, I'm sorry to

21 interrupt.  But I'm having a hard time hearing you.

22 Can you speak up a little?

23            MR. CRANFORD:  Sure.

24 Q.            This is a duty officer report from

25 Ventress Correctional Center, April 12, 2018.  Do

Page 242

1 A.            Yes.

2 Q.            If you go down a little bit further, it

3 indicates that Officer Tyquan Wiggam recovered a

4 hatchet-like weapon with blood on it inside

5 dormitory F1?

6 A.            Yes.

7 Q.            So let me ask you this:  In your report,

8 you detailed Mr. Andrews' institutional history.

9 Based on these incidents alone in 2018, is it your

10 opinion that Terrence Andrews was properly

11 classified in a -- at a class 5 security facility?

12 A.            Yes.

13 Q.            Let me stop sharing my screen.

14            Earlier Ms. Brown was asking you some

15 questions about staffing.  Do you recall that?

16 A.            Yes.

17            MS. BROWN:  Objection to form.

18 Q.            And she asked you about what she

19 referred to as sufficient or adequate staffing.  In

20 correctional practice, there are allotted positions

21 for facilities, correct?

22            MS. BROWN:  Objection to form.

23 A.            Yes.

24 Q.            And what are those?  What do those

25 reflect?  What is an allotted position?

Page 244

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 61 (241 - 244)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 A.          Typically every facility that I've ever
2 been around, the leadership considers the size,
3 mission of the facility.  And based upon that, there
4 will be positions allotted to that facility.  And
5 normally we'll actually go down to the level of so
6 many for this shift, so many for that shift.
7 Normally we want the mandatory posts filled,
8 critical posts.  And then anything above that would
9 be an optional post to be filled.
10 Q.          And so the number of allotted posts or
11 allotted positions at St. Clair would represent the
12 number of officers that the department would like to
13 have under ideal conditions, correct?
14           MS. BROWN:  Objection to form.
15 A.          Yes.  And normally it's called FTE,
16 full-time equivalent, that is authorized for that
17 facility.  You are authorized to hire up to that
18 amount.
19 Q.          And those positions would include things
20 like programming, vocational posts, visitation
21 posts, those types of things, as well, correct?
22           MS. BROWN:  Objection to form.
23 A.          Yes.
24 Q.          Now, you mentioned something called
25 mandatory and critical posts.  What are mandatory

Page 245

1 and critical posts?
2 A.          The warden and the warden's staff
3 identify for normal operation, normal times, these
4 are the posts that I mandate that have to be filled.
5 Whatever you have to do, you fill these posts.
6 Critical posts are important.  But if you have to
7 pull to do a medical transport or somewhere else,
8 you would pull a critical post.
9           And like I was saying while ago, in
10 times of chow, in times of education programming, in
11 times of recreation, I will move staff from one area
12 to another area in order to supervise that program
13 or that function.
14           So even though I may have 20 at any
15 given time -- like I said earlier, it's very
16 dynamic.  It's not static where you go and stay at
17 one point.  You go and fulfill the functions based
18 upon what's going on in that facility at that point
19 in time.
20 Q.          So is it -- is it true that your
21 mandatory and critical posts could change from shift
22 to shift or day to day?
23 A.          It is true --
24           MS. BROWN:  Objection to form,
25 incomplete hypothetical.

Page 246

1           MR. CRANFORD:  I'm sorry.  That's not a
2 form objection.  But okay.
3 Q.          So is it true that the mandatory or
4 critical posts at a facility could change from shift
5 to shift, day to day based on what's happening at
6 the facility?
7           MS. BROWN:  Objection to form.
8 A.          The actual post designation probably
9 would not change.  But where I deploy my staff to
10 those posts might change.
11           And it's not as simple as one plus one
12 equals two.  Because if I'm looking at staff that I
13 want to assign to -- as we discussed earlier, P and
14 Q typically has those inmates that don't want to
15 follow the rules.  I will pick what staff I assign
16 to those mandatory critical posts versus, say, an
17 honor dorm.  If you're a new staff member, I may put
18 you in an honor dorm instead of putting you in P and
19 Q.  So, again, it's very dynamic.
20 Q.          I also want to ask you -- Ms. Brown was
21 asking you about things -- or efforts that ADOC took
22 as far as to increase staffing on the lines of
23 hiring.  Are you aware of influences outside of the
24 Alabama Department of Corrections' control that
25 influence their ability to staff correctional

Page 247

1 facilities?
2           MS. BROWN:  Objection to form.
3 A.          Yeah.  And it's not just Alabama.  It's
4 nationwide, the challenges of staffing correctional
5 institutions, actually staffing any operation in
6 America nowadays.  If you go to any fast food
7 restaurant, the first thing you see is "Now hiring."
8 Corrections is no different.  Corrections is always
9 hiring.
10           Corrections is challenged with outsiders
11 looking at that industry as less than professional.
12 Back in the '70s and '80s, we were referred to as
13 knuckle draggers.  No one wants to go to work and be
14 considered to be a knuckle dragger.
15           Then in '19 and '20, I got to experience
16 it firsthand as I was the acting warden and the
17 correctional administrator when COVID hit.  The
18 ability to attract anyone to want to come work in a
19 confined prison when you have that kind of an
20 outbreak, it's challenging.  And the industry is
21 still challenged with overcoming the impact to
22 COVID.
23           As I said earlier, I believe the
24 commissioner, starting in '16, 2016 and forward, by
25 creating new positions, doing merit raises,

Page 248

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 62 (245 - 248)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 increasing salary has done incredible work in trying
2 to overcome the odds.  Unfortunately, we're still
3 struggling nationwide.
4 Q.        And is one factor that would contribute
5 to a department's ability to hire additional staff a
6 willing and qualified applicant pool?
7        MS. BROWN:  Objection to form.
8 A.        Absolutely.
9 Q.        What about -- would a state's personnel
10 hiring process be one factor that could contribute
11 to a department's difficulty in hiring correctional
12 officers?
13        MS. BROWN:  Objection to form.
14 A.        It definitely does.  Even though
15 correctional officers are often times seen less in
16 the law enforcement world -- no one grows up in the
17 third and fourth grade saying I want to be a
18 correctional officer when I grow up.
19        But once you apply to be a correctional
20 officer, there are tests, merit tests, to take,
21 there's physicals to past, there's drug tests to
22 pass.  You have to have a clean history as far as
23 arrests.  There's a high standard to be met, and the
24 ability to meet that high standard and generational
25 differences are now impacting.

Page 249

1 We are still doing corrections in
2 America like we did when I started in 1976.  And
3 most kids nowadays, they want a cell phone.  They
4 want to be able to do everything automatic -- or
5 automated.  And we're still doing everything
6 handwriting.  And that's something that the industry
7 is looking at.
8        So there are a lot of challenges.  And
9 the time from when a vacancy occurs until I'm able
10 to select, hire, screen, and get the training done,
11 we're talking five, six months.
12 Q.        Are you aware -- in your 50 plus -- 50
13 years of experience in corrections, are you aware of
14 any correctional department that was able to
15 completely eliminate violence within their
16 facilities?
17 A.        No, sir.  As I said earlier, what a lot
18 of the public doesn't stop to think about is people
19 put in prison are normally there because the legal
20 system, the judges, the police have dealt with them
21 numerous times, and they're through.  They won't
22 follow the rules.  They won't comply with the laws
23 of the land.  Therefore, we place them in prison.
24        So the people that are incarcerated in
25 our prisons -- not just in Alabama, but

Page 250

1 nationwide -- are those who typically -- not all,
2 but typically think about their wants.  Not their
3 needs, but what they want.  They don't think about
4 what their impact on other people are when they go
5 out to satisfy their wants.
6        And they will do often times -- not
7 everyone.  I don't mean to make this everyone is
8 this way.  But there is a large portion of the
9 population that will do whatever they need to do to
10 get what they want, whether it's drugs, whether it's
11 cigarettes, whether it's your commissary that you
12 have and I don't have because I don't have any
13 family at home.  And that becomes a violent
14 facility.
15        And as in these cases, the people
16 involved committed crimes in the community that were
17 violent.  They're not going to stop just because
18 they go to prison.
19        MS. BROWN:  I'm sorry to interrupt.  I
20 don't want to interrupt you.  But I want to insert
21 and interpose a form objection to the previous
22 question.  Go ahead.
23 Q.        Along the same lines, have you ever
24 encountered a correctional department, in your
25 experience, that was able to completely eliminate

Page 251

1 contraband within their facilities?
2        MS. BROWN:  Objection to form.
3        MR. CRANFORD:  What's the basis?
4        MS. BROWN:  You know, some of the terms
5 that you're using are ambiguous like "completely
6 eliminate contraband."
7 Q.        Do you understand what the word
8 "eliminate" means?
9 A.        I understand "eliminate."  And even if
10 it's reduced, the challenges of the last 10, 15
11 years, we're seeing it on the streets with fentanyl,
12 with the drugs that are easily concealed, easily
13 moved from point A to point B.  It's actually
14 increased nationwide.
15        And now we're faced with, in the
16 correctional industry, the operation of drones that
17 can easily fly over a prison and drop drugs, cell
18 phones, whatever.
19        We're also in the industry faced with
20 we're not allowed to block cell phone transmissions
21 within the facility.  So now -- whereas 20 years
22 ago, cell phones weren't an issue.  Either they
23 didn't exist or you didn't have radio transmission
24 to allow the cell phone to get out.  Nowadays no
25 matter where you are in America, you have cell phone

Page 252

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 63 (249 - 252)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

1 service. Well, that's also true in a prison, with a
2 cell phone inside a prison. And we see it in these
3 cases.
4         They don't use the landline anymore.
5 They use cell phones to call home. They text
6 message. Well, those messages are not just about
7 hey, Mom, I love you, how are you doing. It's about
8 how can I get contraband into the facility. So not
9 only has it not reduced cell phones, MP3 players,
10 drugs, weapons, it's actually increased.
11 Q.        And in your review of the documents that
12 you reviewed in these cases, did you find evidence
13 that ADOC implemented efforts to interdict
14 contraband coming into St. Clair?
15 A.        Yes. I saw and experienced in the
16 Abrams case where they had the metal detectors set
17 up. They're processing staff and visitors in and
18 out. They're bringing search teams in to search
19 facilities in a holistic approach, which is not
20 abnormal. Most states do it. You bring in a large
21 group, bring in narcotics dogs to do the best you
22 can to deter.
23 Q.        And I think just one last thing. Do you
24 recall Ms. Brown asking you about deposition
25 transcripts that you reviewed in this case, in these

Page 253

1 cases?
2 A.        Yes.
3 Q.        Okay. And you received or reviewed
4 multiple depositions in this case, correct?
5 A.        Yes.
6 Q.        And did you choose of your own decision
7 and discernment which deposition transcripts to rely
8 on in forming your opinions in this -- in these
9 cases?
10 A.        I did. There was a lot of documentation
11 that was provided. I went through, reviewed it. I
12 did not necessarily include everything I read in the
13 opinion. What I put in the opinion and what I cited
14 is that information that I relied on for that
15 report. So there was some information that I had
16 that I did not include because I did not rely on it.
17         MR. CRANFORD: That's all I've got.
18         MR. SHEEHAN: I don't have anything.
19         MS. BROWN: Okay. This is not a
20 follow-up question. I just want to put on the
21 record that we object to the answers that were
22 provided by this witness to the extent that, in
23 response to Mr. Cranford's questions, he is
24 disclosing new opinions that are not disclosed in
25 his Guy and Ezell reports, and improperly expanding

Page 254

1 opinions.
2         MR. CRANFORD: What opinions? What
3 opinions? What opinions?
4         MS. BROWN: There were many. I don't
5 have -- I don't have a complete list. We're going
6 to have to go back and look at the transcript.
7         MR. CRANFORD: Well, I would just
8 dispute the fact that he offered any new opinions
9 based on any of my questions.
10         MS. BROWN: That's fine. We can hash
11 it out later. I just wanted to put that on the
12 record.
13         And one other thing, Will, is that you
14 weren't sharing those exhibits as you went through
15 them. So can you please email them?
16         MR. CRANFORD: I did share them. I
17 shared my screen. They were shared.
18         MS. BROWN: Yes, the underlying
19 documents. So I don't have them.
20         MR. CRANFORD: You have them. They're
21 all Bates labeled and identified with Bates labels.
22         MS. BROWN: I'm just asking for the
23 court reporter, if you can send them to the court
24 reporter.
25         MR. CRANFORD: I didn't make them

Page 255

1 exhibits. I just asked him questions.
2         MS. BROWN: Okay. So the documents
3 that you showed to the witness you're refusing to
4 email to the court reporter?
5         MR. CRANFORD: I can email them to the
6 court reporter, sure. I identified them by Bates
7 label based on the document production in this case
8 by ADOC.
9         MS. BROWN: Okay. All I'm asking is
10 that you email them to the court reporter and to
11 myself after the deposition. That's all I'm
12 asking. It doesn't sound like we have a dispute
13 about it. Do we?
14         MR. CRANFORD: No. I can email you
15 the documents that we looked at. They are incident
16 reports from Terrence Andrews' and Steven Mullins'
17 inmate files that were produced in this case by
18 ADOC.
19         MS. BROWN: Okay. Thank you.
20         All right. I believe we're done,
21 unless the court reporter needs anything else from
22 us.
23         THE REPORTER: Do you want it
24 transcribed, Ms. Brown?
25         MS. BROWN: Yes, we do.

Page 256

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 64 (253 - 256)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

| | |
|---|---|
| 1        THE VIDEOGRAPHER:  This ends the | 1            SIGNATURE OF WITNESS |
| 2  deposition of Kevin Myers.  The time is now | 2 |
| 3  6:11 p.m. | 3       I, _____, do hereby |
| 4 | 4  certify that on this _____ day of _____, 2025, I |
| 5       (DEPOSITION ENDED AT 6:11 P.M.) | 5  have read the foregoing transcript, and to the best |
| 6 | 6  of my knowledge it constitutes a true and accurate |
| 7 | 7  transcript of my testimony taken by oral deposition |
| 8 | 8  on February 4, 2025. |
| 9 | 9 |
| 10 | 10 |
| 11 | 11 |
| 12 | 12  _____ |
| 13 | 13   KEVIN MYERS |
| 14 | 14 |
| 15 | 15 |
| 16 | 16 |
| 17 | 17  Subscribed and sworn to |
| 18 | 18  before me this ____ day |
| 19 | 19  of _____, 2025. |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24  _____ |
| 25               Page 257 | 25   NOTARY PUBLIC            Page 259 |

| | |
|---|---|
| 1  STATE OF ALABAMA ) | 1             ERRATA SHEET |
| 2  JEFFERSON COUNTY ) | 2 |
| 3 | 3  PAGE   LINE       CORRECTION       REASON |
| 4      I hereby certify that the above | 4 |
| 5  proceedings were taken down by me and transcribed | 5 |
| 6  by me using computer-aided transcription and that | 6 |
| 7  the above is a true and correct transcript of said | 7 |
| 8  proceedings taken down by me and transcribed by me. | 8 |
| 9      I further certify that I am neither of | 9 |
| 10  kin nor of counsel to any of the parties nor in | 10 |
| 11  anywise financially interested in the result of | 11 |
| 12  this case. | 12 |
| 13      I further certify that I am duly | 13 |
| 14  licensed by the Alabama Board of Court Reporting as | 14 |
| 15  a Certified Court Reporter as evidenced by the ACCR | 15 |
| 16  number following my name found below. | 16 |
| 17      So certified on February 4, 2025. | 17 |
| 18 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21    /s/LeAnn Maroney | 21 |
| 22    LeAnn Maroney, Commissioner<br>    ACCR# 134, Expires 9/30/25 | 22 |
| 23    505 North 20th Street, Suite 1250<br>    Birmingham, AL  35203 | 23 |
| 24 | 24 |
| 25               Page 258 | 25               Page 260 |

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 65 (257 - 260)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

## WORD INDEX

**< $ >**
**$10,000**   36:10
**$2,000**   35:23
**$20,000**   35:24
36:14, 20
**$250**   30:9
31:10

**< 0 >**
**000467**   234:23
**000468**   237:14
**000469**   237:18
**000472**   233:16
**000473**   233:16
**000546**   240:7
**000548**   242:2
**000551**   242:19
**008964**   110:7
**009156**   238:15
**024205**   172:11
**083**   170:20

**< 1 >**
**1**   212:7
**1,000**   26:12
**1:43**   103:12
**1:45**   241:20
**10**   190:7, 21
212:6   252:10
**10,000**   36:12
**10:08**   2:4   5:22
**10:52**   235:14
239:1
**100**   3:23
**10-22-18**   4:11
**11**   190:6, 21
**11:23**   57:25
**11:32**   58:3
**110**   185:8
186:1, 9, 13
**12**   190:22
242:25   243:6
**12:28**   241:6
**12:39**   103:9
**12:40**   103:2
**1250**   258:22
**126**   200:20
201:23   202:5

**12th**   128:15, 23
129:13   143:4,
19   175:4
**134**   258:22
**14**   50:15
**14th**   207:5
**15**   252:10
**150**   3:14
**16**   241:4
248:24
**16th**   240:20
**17**   215:1, 7, 9,
13
**17th**   128:25
**18**   123:15
215:2, 9, 18
**18th**   165:2
**19**   214:18
215:4, 7, 23
248:15
**1900**   191:20
**194**   4:11
**1976**   50:18
250:2
**1977**   38:17, 24
**1978**   54:25
**1980**   54:25
163:3
**1984**   60:19
**1990**   50:18
**1992**   44:16
**1A**   234:19
**1st**   213:1

**< 2 >**
**2**   190:5
**20**   26:18   55:3
149:23   246:14
248:15   252:21
**200**   2:3   3:23
31:21
**2003**   48:23
**2006**   26:21
**2011**   190:5
**2012**   190:5
**2015**   162:19
206:17
**2016**   23:12
26:18, 23
155:9   160:1, 5,
16   162:1
206:17   248:24

**2017**   26:14
160:1, 5, 16
206:17, 20
**2018**   56:9
58:5, 12   80:23
87:10   95:13
98:2   99:6, 7,
20   100:5
102:12   109:22
110:4   111:20
113:1   132:17,
22   133:19, 20
138:10, 25
151:19   152:4
155:3   156:2
160:19   163:15
165:2   168:9
182:19   188:8
189:3, 14
190:2, 8, 17, 23,
24   191:1, 2, 6
192:7, 21
193:14, 23
194:9   195:4
196:17   202:17,
23   203:23
204:15, 22
213:2   240:20
241:4   242:4,
10, 25   243:7
244:9
**2019**   26:19
56:9   80:23
87:10   95:13
98:2   99:7, 20
100:5   101:10,
18   102:12, 24
113:8   115:11,
22   122:15, 23
124:4, 12, 22
125:24   129:13
130:23   131:5,
24   132:4, 9, 17
133:20   136:23
138:2, 10, 25
139:7   140:8,
19, 21   141:5,
18   142:12
143:21   144:6
146:22   147:12,
16   148:1, 16,
22   149:10, 16

**151:19**   152:4
155:3   156:3
160:1, 5, 16
163:15   168:10
172:16, 22
176:2, 20
182:20   188:8
189:3   202:23
203:23   204:15,
23   206:18
207:1, 6
222:24   227:11
232:21   233:19
234:2   235:1, 9,
19   237:3, 9, 20,
23   238:24
**2020**   162:19
**2021**   59:6, 10
**2022**   191:23, 24
**2023**   58:5
**2024**   7:12
15:15   33:9
**2025**   2:4   5:7,
21   258:17
259:4, 8, 19
**20th**   258:22
**22**   218:4
**2-25-19**   236:3
**22nd**   193:14, 22
195:4   196:17
**232-257**   4:3
**24**   130:2, 7
215:15   222:9
**24/7**   153:19
**24-bed**   131:10
**250**   31:21
**25th**   113:8
115:11   116:16,
19   117:13, 23
118:3, 6, 9
121:17   122:15,
23   123:2, 8, 23
124:4, 12, 22
125:24   126:6,
18   127:7, 12
129:9   136:23
137:3   138:4, 6
139:7, 15
140:2, 8, 10, 12,
19, 21, 25
141:5, 18
142:3, 7, 12, 15,

1-888-326-0504  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 1

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

24    143:5, 19,
21    148:16, 21
149:9, 15
172:15, 21
176:2    222:23
232:8, 20
233:19    234:2
235:1, 9, 18
237:3, 9    238:24
26    115:21
237:22
26th    116:17, 19
117:2, 6, 24
119:20    120:5
126:6, 19
127:7, 12
136:23    137:22
138:2    139:7
140:2, 8    142:3,
8    144:21
145:12    148:16,
22    149:9, 16
172:15, 22
176:2    222:23
232:8, 20
237:20
29    159:14, 17
2nd    242:4

< 3 >
3    194:16
3:08    159:9
3:28    159:12
3:30    235:5, 9,
18
30    55:3    164:17
31    170:15
311    3:6
31st    190:5
32    174:5, 10
228:13
33    39:24    42:11
34    176:25
35203    258:23
35801    2:3    3:24
36    212:16, 23
36104    3:15
37    177:25
212:16, 23
38    104:7
181:16    182:6

3rd    3:6
191:24    213:1

< 4 >
4    2:4    5:7
258:17    259:8
4:20-cv-02058-ACA
1:11    5:18
4:21-CV-00264-ACA
5:19
4:21-cv-00264-SGC
1:17
4:42    205:9
4:56    205:12
40    54:22
56:22    161:19,
23    183:12
40-year    161:21
40-year-old
162:5
41    185:17
43    104:7
45    53:5, 9
45005    194:18
45008    194:18
46    91:23
47    186:17
205:20    206:2
48    26:16    27:7,
8    101:23
102:4, 5
205:20    206:4
212:18, 23
213:10    215:21
49    212:23
213:6
4th    5:21
242:10

< 5 >
5    244:11
5:34    231:2
5:36    231:5
5:37    231:15, 18
5:43    237:3, 9
5:45    237:20, 23
50    29:8    38:25
39:6    69:13
199:13    211:9
250:12
500    26:18

505    258:22

< 6 >
6:00    233:22
6:01    124:18
234:3
6:11    257:3, 5
60607    3:7
6-231    4:2
64    51:9
66    239:7

< 7 >
7    109:18
117:6    212:6
7:24    243:7
70    4:9, 10
53:24
70s    248:12
78    56:22
7th    109:22

< 8 >
8    212:6
80    56:22
80s    55:2
161:19    162:17
163:1    248:12
82    56:22
83    170:16
172:3
85    60:19

< 9 >
9    212:6
9/30/25    258:22
9:40    242:11
94    44:17
987    191:20

< A >
a.m    2:4    5:22
57:25    58:3
124:18    233:22
234:3    235:14
239:1    241:6
242:11
Aberdeen    3:6
ability    9:21,
24    10:10
15:21    54:24
60:21    72:11

73:2    152:2
154:23, 25
163:12    169:9
247:25    248:18
249:5, 24
able    40:10
60:25    61:22
73:13    101:25
116:18    156:18
220:3    221:14
222:5    250:4, 9,
14    251:25
abnormal    221:6
253:20
Abrams    7:9
13:7, 8, 14, 18,
25    14:6, 11, 15,
17    15:3, 7, 17
16:8, 13, 17, 25
17:11    27:17,
22    30:16, 18,
20, 24    224:17
253:16
abrasion    234:12
Absolutely    249:8
abuse    239:4
ACA    21:15    22:3
academies    81:15,
25    82:12
academy    26:15
81:9, 10, 24
accepted    150:11,
19    157:2, 18
access    18:9
55:1    64:21
160:20
accommodations
18:9
accordance
154:1    156:1
According    40:20
103:25    104:18
142:25    235:16
237:6, 10
account    143:22
146:21    168:11
170:2    196:17
201:8
accountable
166:1    196:11
229:8, 11

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 2

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

accounts 201:6, 8

ACCR 258:15, 22

accreditation 21:1, 14, 23 22:1, 5, 6

accredited 20:25 48:22, 24 37:4 210:23 259:6

accurate 36:25

accurately 16:22

accusation 175:16 197:25

accusations 199:21

act 149:2

acted 137:2 140:1 142:3 179:1

acting 5:3 59:8 248:16

action 49:16 63:11 66:8, 21 94:19 133:7 135:23 137:3, 6, 23 139:13 140:16 142:6 149:6 150:13, 21 151:1, 3 166:2 175:21 178:23 179:2 182:25 202:11 203:20 241:24

actions 87:15 88:20 133:9 203:14

activated 131:9

active 12:7

actively 159:24

activities 63:20

actual 53:23 91:14 99:25 123:24 135:2 247:8

actualize 102:10

add 124:6 133:22 168:23 197:22 201:11

addition 19:23

additional 64:19 75:6

76:7 156:10 238:15 249:5

Additionally 228:17, 21

address 34:1 140:11, 17 161:5 183:8 216:9

addressed 13:8 159:25 204:6

adequate 96:1 151:18, 21 152:4, 23 153:8 156:25 157:11, 16 176:6 200:21 244:19

adequately 154:9 155:1

adhered 226:16, 23 227:9

administer 40:11

administration 41:13 43:15

administrative 82:18 99:11 111:15 112:2, 5, 11 151:25 157:22 158:10 164:2

administrator 6:8, 10 41:21, 23 42:6 55:11 56:16 58:5, 13 59:9, 13, 17, 22 61:5, 12 63:10, 15, 21, 25 64:12 67:8 156:23 157:9, 15 248:17

administrators 42:22 66:5 207:15

admirable 201:1

ADOC 6:1 15:2 81:24 95:5, 12 96:17 105:19 110:7 118:6 119:25 120:12, 22 124:17 128:20 132:25 133:11 134:1

136:21 137:17, 25 138:22

139:8 140:5 141:3, 18 142:11, 24 143:7, 22 144:4, 20 145:9, 14, 21 148:19 149:1 159:24 160:1, 4, 18 161:10 165:6, 8, 14 166:24 167:8, 12, 19, 20 168:9, 10, 18 169:12, 20 172:11 178:8, 16 179:10 182:14 186:4, 24 187:9, 15 191:19 193:3 194:18 197:20 198:7 201:16 205:23 206:6, 11, 17, 22, 25 207:2, 14 208:9, 14, 24 210:7 211:16 212:1, 7, 8, 14 213:3, 4, 12, 16, 24 214:1 215:19 224:7, 12, 17 225:9, 16 228:22, 24 229:3, 15 230:3 233:16 234:23 237:14, 18 238:15 240:6 242:2, 18 247:21 253:13 256:8, 18

ADOC's 81:9 200:19 204:5

adopted 87:17

adult 58:13

adverse 178:23

advice 136:8

advocates 162:22

affect 62:25 94:17

afraid 115:6

afternoon 123:7, 23

age 14:3 201:8

agency 239:5

agenda 207:6

Agent 144:13, 16 238:19, 21

aggravating 28:25

aggressor 178:20

ago 18:21 38:25 39:6 53:5, 9 55:16 56:22 73:1 139:17, 18 161:19 235:22 246:9 252:22

agree 13:11 41:6, 15, 21 99:17 117:21 127:5 128:7 130:10

AGREED 1:22 2:6, 13 30:12 58:23 92:14 143:17 147:7 216:18

agreement 31:20, 22, 23 32:8 91:6, 18 92:2, 12 177:9 208:4

agreements 92:4

ahead 18:5 116:21 123:13 143:11 144:10 151:14 162:15, 22, 23 163:8 195:13, 18, 21 251:22

al 1:11, 19 5:17 258:23

ALABAMA 1:2 2:3 3:15, 24 5:2, 3, 20 7:9, 14 10:17, 19, 23 11:1, 17, 22 13:19 155:7 156:15 184:16 203:9 239:5 247:24 248:3 250:25 258:1, 14

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 3

allegation
  98:15    135:22
  142:5    145:3
  165:6, 7, 9, 11,
  15, 17, 21
  166:9, 23, 25
  167:1, 9, 13, 18,
  22   173:7   196:1
allegations
  13:5    28:18
  124:10   125:2,
  4   137:5   142:5,
  9   165:3
  168:11   169:12,
  14, 21   173:5
  179:1
alleged   115:5
  117:20   118:23
  123:5   126:10,
  24   127:15
  129:4   135:15
  139:14   150:14,
  22   202:11, 12
  234:8   235:21
  239:23   240:14
Allegedly   126:11
alleging   130:19
  151:7
ALLEN   3:11
  6:2   231:9, 11,
  12, 19
  allen.sheehan@chla
  w.com   3:16
allocated   162:8
allotted   215:15
  244:20, 25
  245:4, 10, 11
allow   126:23
  149:1, 5   252:24
allowed   168:10
  252:20
allows   167:20
  188:20   221:17
alongside   70:15
alter   165:15
altercation
  221:6   241:17
alternatives
  155:9
altogether
  173:10

ambiguous   252:5
amended   212:7
America   23:16,
  19   37:14
  49:11   100:20
  153:12   248:6
  250:2   252:25
American   20:18,
  22, 25   21:3, 7,
  12, 20   22:21
  48:22   50:8
  83:18   100:21
amount   30:12
  31:3   154:6
  245:18
analyses   75:23
  76:11   86:10
  212:12
Analysis   23:25
  43:17   50:3
  64:23   65:2, 5,
  10, 15   66:1
  76:2, 7, 15, 20
  77:1   80:11, 22
  81:4   84:21
  85:2, 11   86:8
  89:13, 23
  90:19, 25   93:8,
  13, 19   94:1, 8
  95:17   96:21
  97:8, 11
  179:10   201:22
  202:4   214:20,
  24   225:22
  226:2
analyzing   53:12
and/or   18:10
  77:21, 22
  183:7   230:5
Anderson   44:14
ANDREWS   1:8
  5:14   6:9
  26:8   79:13, 18,
  25   80:2, 6
  89:5, 8   90:1,
  4   158:7
  189:10, 11
  190:10, 25
  191:16   192:4
  193:5, 23
  201:25   202:6
  210:17, 22

214:13, 20
  215:6, 25
  216:16, 18, 19
  217:6, 21, 23,
  25   218:8, 11,
  14, 16   219:7,
  16, 18, 23
  220:5, 22, 25
  221:2   222:1
  225:17   230:5,
  9   240:14
  241:1, 16, 21,
  22   242:7, 14
  243:3, 13, 23
  244:8, 10
  256:16
Andrew's   206:13
Angelia   235:10
  237:3
Annemarie   1:8
annex   58:20
annual   22:17
  160:8, 15, 18
  206:16   209:22
  211:21
answer   8:18, 21
  9:16   16:22
  18:4, 17   35:13
  36:4   53:4
  57:5   94:21
  102:16   105:17
  107:8   108:12,
  14   113:4
  118:20   134:17
  135:20   142:1
  149:7   154:5
  157:21   174:19
  176:4, 5   205:3
  232:24
answered   65:24
  132:11   141:16,
  23   222:15, 20
  225:24   226:5
answering   9:8
  141:24
answers   8:1
  10:4, 7, 8
  173:11   254:21
anticipate   8:9
  203:15
antiquated   61:2,

3   163:4
Antoine   238:6
anymore   253:4
anyway   42:18
anywise   258:11
apologies   230:8
apologize
  190:12   220:9
appears   104:2
  124:7   134:16
  189:8
Appendix   160:10,
  12
applicable   87:9,
  21   168:9
  223:22
applicant   249:6
applicants   51:11
apply   249:19
applying   201:1
appreciate   71:5
approach   253:19
approached
  243:12
appropriate
  116:3   137:23
  149:6   226:19
appropriated
  162:15
appropriately
  140:1   155:25
  171:24
approval   204:21
approved   162:22
approximately
  17:6   33:12
  35:18   59:3
  124:18   234:3
  235:9   237:23
  241:6, 20
  242:11, 14
  243:7
April   33:8
  190:23   191:2
  242:4, 10, 25
  243:6
area   64:17
  109:24   112:16
  127:24   166:12
  173:22, 25
  174:3   184:18,
  20   188:14, 18

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 4

**Lakeisha Ezell v. Jefferson Dunn, et al.**

Kevin Myers
2/4/2025

191:2   198:1
220:4   223:6, 7
241:9   246:11,
12
**areas**   43:18
64:7   67:1, 10
112:22, 24
130:12   155:13
**arguments**   29:5
**arising**   198:8
**arrangements**
32:9
**arrest**   55:25
56:7   57:3, 6
**arrests**   55:12
56:17   249:23
**arrive**   30:10
**arrived**   142:12
143:1, 23
146:7, 13, 22
**ASCA**   82:13
84:5   214:7
**aside**   73:25
77:6   115:18
154:24   187:15
190:10   202:5
**asked**   50:10
52:21   58:22
84:5   103:25
132:22   133:18
141:16   244:18
256:1
**asking**   8:17
36:1, 3   50:13
97:23   117:1
118:12   139:3,
14   141:2
161:14   212:19,
21   216:13
232:2, 7, 17, 18,
23   240:9
244:14   247:21
253:24   255:22
256:9, 12
**assailant**   77:8,
16   79:13
117:20   118:24
123:5   126:9,
10   140:13, 15
187:17   189:11
240:13

**assailants**
147:25   148:6
**assault**   114:3
122:19   123:20
124:8, 16, 23
125:2   239:23
240:3
**assaulted**   113:7,
10, 25   114:18
117:17   119:7
122:14, 22
124:4, 19
135:12   136:5
193:17   234:9,
13   238:5
241:16
**assaulting**   151:8
**assaults**   61:17,
23   62:12, 19,
25   63:12
64:24   76:3, 11
77:10   78:6
79:17   80:5, 11
94:2   97:3
99:1   169:22
183:1   188:6
**assess**   41:4
53:11   89:14,
23   98:8   101:5
158:2
**assessing**   45:9
46:2
**assessment**
50:11, 14
65:11   84:15
85:8   87:16
123:18   158:14
206:2, 3   241:21
**assign**   2:17
197:1   247:13,
15
**assigned**   21:7
42:25   52:2, 15
57:8   61:7
74:20   80:25
90:9   142:13,
18, 21   143:2
152:11   172:3
218:9   235:23
241:5

**assignment**
165:16   168:12
171:14
**assignments**
196:24
**assist**   65:13
**assistance**
50:10   221:14
**assistant**   40:8
44:17   45:7, 13
46:12, 13   47:1
53:14   54:3, 19
59:18   62:13
96:9
**assistants**
156:12
**assisted**   20:19
153:4
**assisting**   27:12
**associated**
186:2   198:13
207:13
**Association**
20:18, 22   21:1,
4, 8, 12, 21
22:22   48:23
50:8   83:18
**assume**   9:17
146:12, 15
171:11
**assuming**   147:2
193:8
**attached**   74:10
92:18
**attempts**   228:24
**Attendant**   235:10
**attention**   70:11
71:8   109:18
**Attorney**   3:4,
12   6:7   27:24
36:5
**Attorneys**   3:21
5:23   8:25
27:9, 17, 21
194:19
**attract**   248:18
**audit**   21:6
49:21   50:3, 8
83:12, 14, 16,
20, 21   84:7, 9,
11, 15, 16

208:7   213:1, 5,
6, 22
**audited**   21:2
22:12
**auditor**   21:11
213:2, 25
**auditors**   21:5,
18, 22   205:23
211:15
**audits**   20:17,
20, 21, 22
21:13   22:3, 4,
8   83:7, 25
84:4, 17   209:3
212:12
**augmented**   152:12
**augmenting**
152:16
**Austin**   87:19
**authored**   211:15
212:1, 6, 8, 24
**authority**   98:5
99:10, 13
**authorization**
144:6, 23
145:16, 23
**authorized**
221:25   245:16,
17
**automated**   250:5
**automatic**   250:4
**autonomy**   41:2
**available**   21:5
55:2   60:14
63:6   67:13
97:13   98:8, 9,
13   99:5, 19
100:12   101:17
131:2, 17
132:3, 16
151:5   152:8
153:3   155:25
162:20   174:4
**avenue**   156:13
**avoid**   149:25
150:3
**awakening**   236:4
**aware**   73:3
100:4   126:4,
16, 22   131:16
133:17, 22, 25
135:16   138:9

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 5

144:3, 8, 11, 12,
13, 19    146:4, 6,
20    148:3, 12,
18    149:8, 14
150:5    153:6,
11, 13    175:24
177:7, 12
184:10    189:13
190:1, 8    191:5
192:6    193:13
194:6    198:6
213:23    214:9
220:11, 14
247:23    250:12,
13
**awareness**    92:9
**Axon**    1:8

**< B >**
**B1**    241:23
**BA**    38:16    39:15
**bachelor's**    39:11
**back**    18:12
52:7    53:25
54:22    55:1
58:2    103:11
116:11, 12
121:15, 16
124:15    126:15
131:7    140:10
144:15, 16
155:2    159:11
162:17, 20
165:19    171:22
176:20    198:15,
21    205:11
216:14    221:20
231:4, 12, 17
243:9    248:12
255:6
**backed**    215:3
**background**    208:5
**bad**    42:16
**Baker**    6:3
**ball**    33:15
35:2, 7
**based**    21:19
29:11    62:23
97:11    107:10
115:9, 16, 19
117:9    119:16
120:17    134:7

160:4    165:17
167:13, 17, 22
171:13    179:5,
23    180:2, 17,
18, 20    183:16,
20, 24    184:5, 6,
22    186:8, 12
187:1, 2    193:8
202:13    203:3
230:13    232:25
244:9    245:3
246:17    247:5
255:9    256:7
**Basic**    27:1
51:14    152:15
155:11
**basically**    26:6
41:3    58:25
188:23
**basis**    15:9
16:12    32:22,
23    98:12
181:23    221:23
230:1    232:12
252:3
**Bates**    74:9, 21
110:7    133:14
172:11    194:18
233:16    234:23
240:6    242:1,
18    255:21
256:6
**Battles**    44:14,
23    45:11    46:4
**BCO**    26:23, 24
**bears**    69:18
**bed**    26:13
147:21    197:2
234:19    235:24
**beds**    27:8
98:9    99:15
101:23    130:2,
7    132:3, 8, 16
215:15
**began**    18:16, 20
19:4    39:20
124:20    162:3
**beginning**    5:12
71:17    162:1
164:24    178:2
**begins**    159:18
164:21    182:8

183:16    185:17
186:18    214:25
228:17
**behalf**    11:22
14:10, 11, 16
19:13, 17, 25
20:5, 11    23:23
**behavior**    62:4,
10    101:22
**behavioral**    27:6
190:19
**belief**    121:17
129:11    130:8
145:9    168:24
196:5
**believe**    11:8
14:23    15:13
16:3    23:12
29:8    31:5
36:12, 13    43:7
65:24    66:3
68:4, 10, 11
69:21    70:20
73:9    75:17, 21,
25    77:13    78:7,
9    81:2    82:2
91:13, 22
94:18    101:15
102:15, 20
103:1, 20
106:23    111:3
112:20    114:22
115:3    118:25
119:17    120:18
121:8    127:4
136:13    138:5
140:14, 23
145:15    147:23
151:24    153:25
154:12, 21
155:7, 23
160:20    167:25
174:23    176:22
177:16    183:11
186:7    188:10
195:11, 25
207:8, 10
209:1    210:16,
23    216:18
217:12    219:19
222:15, 20
223:25    225:24

227:1, 2
248:23    256:20
**believed**    84:14
**believes**    176:5
**best**    7:11    8:5,
17, 20    10:9
24:8    38:25
53:5    54:21
62:13    63:2
64:20    72:4, 11
73:2    100:17
130:1    131:12
135:24    136:14
152:1    153:16
154:22, 24
164:10    168:19
169:9    232:24
253:21    259:5
**better**    195:9
**big**    195:8
**bigger**    195:7
234:24
**billed**    33:13
35:19    36:19
**billing**    35:4
**billings**    36:7
**Birmingham**    5:2
258:23
**bit**    8:10
51:13    76:9
175:22    231:10
244:2
**black**    170:11
**bleeding**    237:25
243:13
**block**    134:12
147:11, 12, 15,
16    170:25
221:25    222:1
252:20
**blocks**    94:2
102:17, 23
188:2, 5, 7
189:3
**blood**    241:8
244:4
**BMU**    26:16
27:5, 6
**board**    55:20
112:9    200:21
202:15    203:1
258:14

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 6

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

body   198:13
 234:10
bonuses   32:10
 155:10
booklet   206:21
bothering   115:11
bottom   26:17
 159:17   170:14,
 16   176:25
 182:7   186:16
 198:25   201:12
 206:1   214:25
 215:13   236:19
 243:18
boy   26:17
brand   162:12
brandished
 134:14   135:14
 136:7
Brandy   237:23
break   9:3, 5, 9
 57:16, 18, 23
 103:3, 10
 106:24   159:2,
 4   205:6   230:24
breezeway   234:4
Brian   238:19, 21
brief   123:18
 233:24   235:8
bring   26:2
 63:17, 18   67:3
 155:12   253:20,
 21
bringing   253:18
broaden   83:19
Brooks   6:5
brought   25:15
 26:4   162:2
BROWN   3:3   4:2
 6:6, 7, 19, 20
 57:17, 22   70:2,
 19, 21   71:4
 103:2, 6   116:5,
 11   118:15
 141:24   159:3
 194:17   205:5
 230:23   231:6,
 13, 19   232:2, 7,
 10, 13, 18
 233:2   237:11
 240:9   242:20
 243:11   244:14,

17, 22   245:14,
22   246:24
247:7, 20
248:2   249:7,
13   251:19
252:2, 4
253:24   254:19
255:4, 10, 18,
22   256:2, 9, 19,
24, 25
bruising   123:10
budget   206:5
built   161:18
 162:18   163:1
bullet   218:6
business   22:25
 223:15, 21
 224:2, 23   225:5
Butler   2:2
3:22   10:25
11:25   14:7
23:1   27:10, 17,
22   28:3   30:13
31:24   34:21
35:5, 19   73:15
74:4, 5, 13, 23
75:2, 6   78:20,
25   107:2, 21
108:3   109:2, 8,
11

< C >
C.J   113:20
114:21, 24, 25
115:2, 5
117:16, 19
118:3, 21, 25
123:20   125:3,
9, 13   136:15
142:20   149:4
175:19   240:2
calculate   197:5
calculator   53:12
call   69:23
126:2   151:12
221:18   235:12,
18   238:19, 20
240:1   253:5
called   19:20
45:17   55:7, 25
71:19   110:8,

12   221:13
245:15, 24
calling   53:10
83:11   112:23
camera   163:4, 5
166:10
cameras   162:18,
23   163:2, 3, 8
capable   147:20
capacity   12:8
37:6, 7, 18
55:19   131:23
136:2
Capell   3:13
captain   81:10
123:18   238:5
captains   81:24
227:20
card   55:8, 9
career   38:9
44:7   47:23
49:8, 19   64:22
65:4, 18   66:7,
17   100:15
102:3
Carlton   193:15
196:6, 18
197:9, 18
198:9, 13
199:2, 16
Carney   1:8
carried   65:6,
21   66:19
96:16   126:17
197:17
carry   90:8
153:8
carrying   21:13
Case   1:10, 16
5:17, 18   7:9
10:12, 16   13:8,
14, 18, 25   14:6,
15, 17   15:3, 7,
17   16:1, 17, 25
17:11, 13, 16
18:2, 4, 8
19:10, 13, 17
23:5, 8, 10, 11,
14, 23   24:7, 24
25:22, 23
27:10, 22   28:4,
13, 14   29:25

30:4, 16, 18, 20,
24   31:2, 5, 7,
14, 18   32:6
33:6, 13, 17
34:10, 12
35:20   36:21
44:24   45:11,
20, 24   46:4
51:20, 25   52:1,
10, 12, 14
67:22   68:22
69:8   72:20, 24
73:21   74:9
75:11, 12, 15,
16, 19, 20   76:1
79:8   81:11
83:9   84:1
85:16   86:22
87:24   88:10,
16, 24   89:3, 10,
18, 21, 22
90:19   91:6, 14,
24   92:3, 13, 14
94:15   97:12,
17, 18, 19
101:8, 19
103:24   104:15
105:20   108:6,
12, 13   109:6,
14, 17   114:7
115:1   117:10
119:25   120:11,
25   127:18
133:1, 12
135:3   136:14
138:14   146:16
150:22   157:25
159:14   164:17
166:14   172:13
177:6, 14, 22
178:7, 15
184:1   185:24
186:10   187:1,
22   189:8
190:11   191:12
199:24   201:16
204:19   205:14
209:9, 15
210:20   211:10,
15   213:11, 21
216:4, 23
217:12, 23

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 7

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

218:*18, 19*
219:*3, 15*
220:*18*  222:*10*
224:*7, 12, 17,*
*21*  225:*21*
229:*15*  253:*16,*
*25*  254:*4*
256:*7, 17*
258:*12*
**cases**  10:*18*
12:*1, 7, 12, 15,*
*25*  16:*24*  19:*9*
22:*23*  23:*1*
27:*13, 15*  29:*3,*
*16*  30:*8, 11, 21*
32:*6, 10, 13, 19,*
*22*  33:*1*  34:*5,*
*6*  36:*9, 25*
37:*2*  38:*5*
44:*11, 20, 21*
74:*12*  75:*3, 7*
84:*19*  93:*10,*
*16*  94:*5*  95:*1,*
*6, 14, 20*  96:*2*
158:*8*  184:*24*
187:*10, 17*
200:*24*  202:*14*
204:*25*  227:*21*
229:*9*  230:*9*
233:*3*  251:*15*
253:*3, 12*
254:*1, 9*
**Casey**  144:*13,*
*16*  238:*19, 21*
**causal**  158:*13*
**cause**  5:*8*
127:*14*  217:*25*
218:*11, 16*
**caused**  218:*21*
222:*12*
**caveat**  168:*23*
**Caver**  104:*22*
**CCA**  23:*21, 24*
37:*16*
**CCO**  26:*17, 23,*
*24*  243:*7*
**Cedrick**  79:*13,*
*18, 25*  80:*6*
89:*5, 9*  90:*1*
189:*12, 14*
190:*2, 4, 19*
191:*6, 11, 18,*

*23*  192:*4, 14*
193:*4, 24*
194:*7*  196:*1,*
*19*  197:*8*
202:*1, 6*  219:*7,*
*15, 22*  220:*3*
221:*2, 24*
226:*16, 24*
230:*5*  240:*10,*
*13*
**ceilings**  163:*1*
**cell**  102:*12, 13,*
*18, 23*  142:*13,*
*14, 18, 21*
143:*2, 3, 14, 23,*
*24, 25*  144:*6*
145:*11, 16, 23*
146:*8, 13, 14,*
*22, 23*  147:*8*
169:*2, 4, 5*
171:*8, 14, 15*
173:*14*  174:*7,*
*14*  175:*6, 8*
197:*1*  220:*1*
221:*5*  228:*23*
229:*5, 8, 17*
235:*23, 24, 25*
236:*4, 9, 14, 15,*
*22*  237:*1, 8*
250:*3*  252:*17,*
*20, 22, 24, 25*
253:*2, 5, 9*
**celled**  102:*20*
103:*1*  147:*20*
**cellmate**  113:*8,*
*9*  114:*17, 19,*
*20*  115:*10, 21*
117:*13*
**cells**  80:*24*
101:*4*  147:*19*
171:*1, 8*
**center**  52:*2*
53:*18*  57:*11*
58:*15*  240:*23*
242:*3, 25*
**cert**  63:*18*
67:*4*  152:*13*
153:*4*  155:*12*
**certain**  14:*16*
24:*25*  55:*19*
67:*1*  88:*9*
89:*4*  103:*15*

106:*13*  197:*1,*
*2, 20*  211:*23*
**Certified**
258:*15, 17*
**certify**  5:*4*
258:*4, 9, 13*
259:*4*
**cetera**  188:*13*
**chain**  59:*16*
161:*10*  163:*17*
**challenge**  102:*2*
122:*6*  162:*2*
164:*5*  173:*6*
**challenged**
153:*12*  248:*10,*
*21*
**challenges**
65:*14*  139:*19*
160:*25*  162:*3,*
*14*  248:*4*
250:*8*  252:*10*
**challenging**
248:*20*
**chance**  10:*5*
**change**  62:*4, 10*
101:*4*  120:*25*
122:*1*  129:*5*
246:*21*  247:*4,*
*9, 10*
**changed**  122:*10*
153:*17*
**changes**  66:*12*
92:*4, 14*
**characterize**
113:*12, 13*
**charge**  32:*5*
124:*7*  166:*16,*
*22*  168:*6*
197:*5*  202:*20*
**charged**  31:*13*
196:*2, 6*
199:*20*  200:*2,*
*7, 15*  202:*15*
204:*13*
**chart**  198:*13*
234:*10*
**chat**  194:*19*
**check**  64:*9*
179:*16*  230:*25*
**checking**  22:*19*
64:*4*

**Chicago**  3:*7*
**CHISM**  3:*20*
**choose**  169:*1*
174:*17*  196:*25*
254:*6*
**chose**  143:*18*
**chosen**  139:*22*
**chow**  223:*5, 7*
246:*10*
**Chris**  115:*2*
119:*1*
**Christopher**
238:*10*
**chronology**  219:*6*
**cigarettes**
251:*11*
**circumstance**
156:*24*
**circumstances**
22:*11*  37:*10*
**cited**  69:*15*
108:*17*  160:*9*
254:*13*
**City**  39:*19*
**Civic**  23:*17*
**Civil**  5:*5*
33:*25*
**claim**  123:*19*
**claimed**  113:*15*
**claiming**  72:*12*
121:*11, 13*
156:*3*  177:*20*
**Clair**  15:*6, 8,*
*18*  16:*12*
26:*12*  56:*9, 18*
57:*7, 8*  76:*3,*
*11, 16*  77:*2, 10*
78:*6, 11*  79:*17*
80:*5, 12, 23*
87:*10*  89:*16*
90:*7*  92:*5, 14*
93:*9, 14*  94:*3*
95:*12, 19*  96:*1,*
*16, 23*  97:*3, 13*
98:*1, 21, 24*
99:*2, 5, 6, 19*
100:*4, 13*
101:*9, 18, 24*
102:*11, 24*
109:*22*  110:*3*
111:*20*  112:*15*
113:*1*  121:*10*

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 8

123:24   127:21
128:6, 11, 18
129:14, 23
130:6, 12, 21,
23   131:4, 18,
19, 24   132:3, 8,
17   134:9
135:22   136:14
138:10   142:3,
7   147:11, 15
151:18   152:4,
12, 18, 21, 22
153:7, 11, 21
154:8, 13, 18
155:1, 19
156:3, 14, 19
160:25   161:9,
15   162:4, 16
163:15, 19
165:4   168:9
171:5, 24
175:7   176:17
178:7, 16
179:10   180:10
181:4, 19
182:15, 19, 25
183:10, 21
184:13, 16
185:4, 24
186:1, 9, 23
187:21   188:2,
5, 8, 22   189:4,
10   200:25
201:24   202:22
203:23   204:7,
15, 22   207:15,
21   208:7
209:3, 8   210:8
211:1   212:13
213:7   215:19
225:23   226:3
227:20   228:24
229:5, 17
233:18   235:1
245:11   253:14
**clairfy**   220:10
**Clair's**   76:21
123:17   140:5,
6   152:10
158:19   185:12
228:7

**Clarence**   77:8,
16   78:3, 12
88:11   89:17
113:24   114:17
118:8   119:9,
18   120:2, 14,
24   121:24
137:18, 20, 22
138:1, 3, 9, 14,
23   139:10
140:18, 20
141:4, 20
148:15, 21
171:9   179:24
180:5   220:16
222:23   227:7,
9   236:22
237:8   238:4
239:22
**clarification**
18:7   78:1
**clarify**   32:23
77:20   105:7
107:6   147:18
194:12
**class**   244:11
**classification**
87:9, 14, 15, 23
88:5, 10, 14, 20,
22   89:4, 7, 14,
15, 16, 23, 24,
25   112:9
133:4, 7, 9
165:16   167:2,
12, 17, 21
169:13, 23
191:23   193:11
196:7, 12, 14
197:6   200:16,
19, 21   201:2,
17, 18, 25
202:7, 10, 15
203:1, 11, 13,
19   204:3, 6
206:8   211:21,
23   226:7, 19,
24   227:8, 13, 16
**classified**
63:20   88:2
171:16, 18, 20
196:3   244:11
**clean**   249:22

**clear**   8:16
94:23   116:6
118:14   185:18,
21
**clearly**   86:16
100:23
**Clearwater**
53:15, 21
**climate**   40:3,
21, 25   41:4, 8,
11, 16   43:19
61:21
**closed**   199:6
201:14   226:8
**closer**   188:20
**coach**   52:3
**coaching**   52:6
**collected**   55:6
60:3
**collection**   54:24
**college**   51:9
**combine**   227:14
**combined**   34:6
**come**   25:20
28:9   35:12
50:10   84:6
132:22   221:8
248:18
**comes**   21:3
**coming**   64:20
163:18   253:14
**command**   59:16
161:10   163:17
**commencing**   2:4
**comment**   203:12
**commissary**
251:11
**commission**
21:22, 23
**commissioner**
5:3   10:17
27:1   40:8, 14
45:17   58:22
84:5   96:10
155:6, 8, 15
156:8, 12
158:11   159:24
160:2   162:1,
14, 21   163:7
164:3   248:24
258:21

**commissioner's**
81:19   152:14
**committed**   85:3
251:16
**common**   13:25
80:22   170:7
197:22
**commonplace**
82:10
**Commonwealth**
20:19   22:10,
13, 15, 16
**commotion**
149:15, 19, 24
150:2, 3
**communicated**
122:7
**communicating**
63:16
**communication**
122:5
**communities**   62:1
**community**   52:3
54:1   56:3
57:2   62:3, 6,
8   98:23   251:16
**company**   23:16
48:4   49:11
**comparative**   97:8
**compared**   56:17
94:3   97:4
188:7
**comparison**   97:2
**compensable**
30:14
**compensation**
30:17   32:1, 14,
18   33:2   206:25
**complaint**   28:7
45:3   92:25
98:10   174:24
179:15   212:8
213:21   217:8,
12
**complaints**   12:2,
24   13:20, 22,
24   28:10, 11,
23   29:1   217:10
**complete**   10:9
38:19, 23   42:9
84:7   87:13

1-888-326-0409  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 9

completed    105:8, 13
149:5    255:5
completed    39:18,
24, 25    234:11
completely
24:25    118:19
250:15    251:25
252:5
compliance    2:9
22:20    44:6, 25
46:14, 23    47:4,
6, 15    48:17
49:2, 5, 16, 22
50:4    76:21
157:1, 16
158:2, 15, 19,
20, 21    213:7
227:19    228:1,
7    235:10
complied    186:1,
3
comply    34:1
152:5, 9    250:22
complying    45:10
46:3    47:18
comprehensive
72:8
computer    211:8
computer-aided
258:6
concealed    252:12
concentrated
67:5
concept    102:8
concerned    29:20
concerning
235:12
conclude    171:13
concluded    171:12
conclusion    28:9
66:18    147:10
condensed
104:18, 19, 25
105:9, 12
condition    44:15
conditions    9:23
12:23    13:1, 9
18:13    155:20
156:5, 19
212:13, 24
213:7    245:13

conduct    80:21
95:17    120:11
124:11    125:5
152:23    153:22
202:4
conducted    64:23
65:5    81:3
153:25    154:5
185:24    201:22
241:21
conducting    29:2
conference
35:15    82:5
conferences
82:12
confident
183:20    185:11
CONFIDENTIAL    1:4
confined    248:19
confinement
12:24    13:2, 9
18:14    44:15
confirm    71:22
113:23    114:16
230:25
confirmed    119:7
confiscates
228:22    229:4,
16    230:3
confuse    220:20
confusing    230:8
confusion    65:9
connection
197:18    219:17
consider    114:9
127:18
consideration
128:4    133:12
167:1    193:3
203:16
considered
82:21    83:2
100:22    168:21
196:23    203:17
208:13    219:2
248:14
considering
193:3    202:16
203:5
considers    245:2

consistent
81:20    180:11
181:4, 19
consolidated
189:5
constantly
63:16    65:25
102:6    184:15,
17
constitutes
259:6
construct    163:12
constructed
161:12
construction
161:3, 9    209:20
constructions
39:7
consultant    19:5
20:10
consulting
19:20    20:4
22:25    223:14,
15, 21    224:2,
23    225:5
contain    88:19
contained    133:8
containing    91:19
contains    107:9
content    39:5
82:13
continual    121:16
continually
140:10
continue    22:5
181:15    183:12
227:14
continued    39:21
172:2
continues    215:1
Continuing
180:8    185:16
186:16
contraband    64:2,
10, 16    65:6, 20
66:10, 18
67:11    76:16
95:18, 25
96:15, 22
127:11    152:23
153:5, 8, 22
183:21    184:13,

20    185:5, 6, 10,
24    186:2
197:16, 17
198:8    225:22
226:2    228:23
229:4, 10, 16
230:4, 13
252:1, 6    253:8,
14
contradict
184:12
contrary    178:25
contribute
217:25    218:11,
16    249:4, 10
contributed
79:7    217:20
218:21    222:12
control    62:17,
24    154:3
222:6    247:24
controlled
154:13
conversation    8:8
convicted    197:5
copy    40:17
69:25    71:3
Core    23:17
Corporation
23:16, 19
37:14    49:11
correct    10:13
11:4, 5, 15
12:5    18:22
19:6, 10, 21
20:13    21:15
22:6, 9    23:2
26:7    28:14, 18
29:16, 22    30:1,
5    33:9, 20
36:21    38:17
41:17    43:10
44:4    45:11, 24
46:4, 7    50:21,
22    51:21
53:15    54:4
55:4    57:11
58:7    60:11
67:11, 15, 18,
23    68:2, 4, 8,
10, 20    69:1, 5,

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 10

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

7, 10    71:15, 16,
20    72:2, 5, 9,
24    73:7    74:13,
17    75:3, 7, 16,
20, 24    76:4, 7,
12, 14, 17, 19,
23, 25    77:3, 5,
11, 18    78:14,
21    79:9, 10, 13,
18    80:6, 8, 12,
14, 17, 25    81:2,
5, 11, 22    82:1,
2, 7, 8, 17, 23
83:5    84:13
85:6    86:12, 22,
24    87:5    88:12,
16, 24    89:1, 5,
10, 12, 18, 21
90:2, 4, 9, 14,
22, 24    91:2, 4,
8, 9    92:15
93:2, 6, 10, 12,
16, 18, 21, 23
94:5, 7, 10, 12,
15, 22    95:1, 3,
7, 9, 14, 16, 20,
22    96:2, 18, 19,
23, 25    97:4, 6,
9, 10    99:8, 22
101:14    103:15,
16    104:16, 23
106:4, 17
107:21, 25
108:10, 22, 24
109:2, 8, 14, 15
111:10, 15
114:2, 7, 12, 14
115:12, 22
117:25    119:21
124:4, 24
126:1, 7, 20
127:21, 23
129:14    130:13
131:24    132:1,
4, 6, 9, 11, 18
133:1, 14, 16
134:3    136:24
138:2, 11, 15
139:10    140:21
144:7, 23
145:12, 18, 25
146:3    147:13,

17    148:1
149:10    150:8
151:19    152:6,
13    154:4, 15,
16    157:10, 12
158:22, 24
160:5, 13, 14,
16, 17    161:1, 2,
6, 7    165:11, 12
167:9, 10
169:15    171:1,
6, 10, 25    172:1,
5, 6    176:11
177:4, 5, 9, 24
178:4    179:6, 8,
12, 25    180:5, 6,
21, 23    181:14,
25    182:1, 4, 5
183:10    184:1,
2, 7, 9, 13, 24
185:1, 15
186:6, 10, 11
187:10, 12, 17,
19    191:8, 20,
24    192:1, 4, 5,
9, 16    193:5, 25
194:2, 9
197:10    198:10,
11, 23, 24
199:3, 17, 24,
25    200:22
201:19, 20
202:2, 7, 9
204:17, 23
206:8, 11, 14,
15, 18, 19, 22,
24    207:2, 4, 21
208:9, 11, 15,
17    209:4, 6, 10,
15    210:2, 4, 8,
13, 14, 18
211:1, 2, 11
212:2    213:8, 9,
12, 13    214:1
215:8    216:20,
21    217:2, 3, 16,
21, 22    218:1,
17, 22, 23, 25
221:3, 10
222:13, 16, 18
224:8, 10, 13,
15, 17, 19, 24

225:1, 5, 7, 11,
14, 18, 20, 23,
25    226:3, 5, 10
227:3, 5, 21
228:2, 8
230:15, 17, 20,
22    232:25
233:1, 5, 6
235:20    237:4,
5, 10, 12, 17
238:8, 12, 13,
25    239:2
240:12, 16
244:21    245:13,
21    254:4    258:7
**corrected**    195:25
**correction**
91:14    260:3
**correctional**
12:18, 20
16:19    17:2
18:14    20:18,
22, 23, 25    21:4,
8, 12, 20    22:21
25:4    27:2
39:16    40:3, 11,
15    45:6, 14
47:22    48:22
49:7, 19    50:8,
21    51:2, 8, 10,
12, 15, 16, 20,
24    52:10
53:18    57:11
58:4, 13    59:9,
13, 17, 22    61:4,
12    62:19    63:1,
10, 13, 15, 21,
24    64:11    65:7
66:4, 19    67:8
69:14    83:18
90:7    92:9
97:12, 20, 25
98:5    99:4
100:5    109:23
134:7, 8, 21
136:3    139:19
150:11, 19
152:15, 16
155:11, 12
156:23    157:3,
8, 10, 15, 18
173:20    177:8,

13, 21    183:24
184:22    185:9,
22    200:12
203:3    208:2
211:16    213:25
223:10, 15, 21
224:2, 21
225:4    230:19
233:19    235:2,
9, 11    238:5, 6
240:22    241:5
242:3, 12, 25
244:20    247:25
248:4, 17
249:11, 15, 18,
19    250:14
251:24    252:16
**Corrections**
10:18, 20, 23
11:1, 17, 22
13:19    19:21,
25    20:5, 10, 12
23:15, 18
37:13    38:20
39:2    45:18
49:11    50:16
51:6    52:17, 20
54:4, 7, 20
55:21    58:6
59:14    61:6
64:1    69:9, 19
184:6    247:24
248:8, 10
250:1, 13
**corrective**
49:15    63:11
66:8, 21
**correctly**
122:25    123:1
129:11    234:16
243:25
**corroborate**
96:21    150:12,
20
**corroborated**
122:16, 19, 21
**corroboration**
124:3    125:12,
16
**COs**    26:18
**counsel**    1:23
2:15, 16    5:6

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 11

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

177:4, 19
195:12    207:20
258:10
**counseling**
50:24    52:5
**counselor**    42:13,
24    43:1    52:6
**County**    58:16
258:2
**couple**    26:9
73:21    114:10
198:19    231:24
241:11
**course**    39:1
136:19    190:11
**courses**    38:23
39:2
**coursework**
38:19    39:5, 25
42:12    43:10, 13
**COURT**    1:1
2:10    5:1, 20
7:24    8:3, 11,
15    23:4, 9
25:21    44:6, 14,
15, 25    45:10,
19, 24    46:3, 21,
24    47:7, 18
55:17, 18
116:12    200:9
255:23    256:4,
6, 10, 21
258:14, 15
**cover**    128:3
190:21
**covered**    127:23
**COVID**    59:7, 9
248:17, 22
**CRANFORD**    3:19
4:3    5:25
6:16    10:21, 24
11:19, 24
12:10, 21    13:4,
10, 16    14:2
15:4, 19    16:2,
9, 14, 20    17:3,
8, 25    18:15, 23
19:7, 14, 18
20:7, 14    22:14
23:6    24:5, 9,
14    25:6, 17, 25
27:11, 19

28:19    29:7, 17
31:6, 11, 15
32:3, 7, 15
33:3, 21    34:18
35:6, 11, 21, 25
36:11, 15, 22
37:3, 8, 19, 23
38:6, 10, 21
39:8    40:6, 23
41:9, 18, 25
43:25    44:9
45:12    46:5, 19
47:8, 11, 19, 24
48:20    49:9, 23
50:6    53:22
54:14    55:5
56:11, 19
57:14, 20
59:25    60:17
61:13    63:14
64:13    65:1, 8,
23    66:13, 23
67:12    68:3, 9,
21    69:6, 11, 20,
24    70:4, 17, 20
71:2, 6    72:3,
10, 16, 25    73:8,
18    74:7, 14, 18
75:8    76:5, 13,
18, 24    77:4, 12,
19    78:8, 15, 22
79:3, 19    80:7,
13, 18    81:1, 6,
12    83:10, 15
84:2, 12, 20
85:13, 19, 24
86:13, 23    87:6,
12    88:17, 25
89:11, 19    90:3,
10, 15, 23    91:3,
21    92:6, 16, 22
93:11, 17, 22
94:6, 11, 16
95:2, 8, 15, 21
96:3, 24    97:5,
16    98:3    99:9,
23    100:9
101:20    102:14,
19, 25    103:4
104:12    105:2,
21    106:5
107:5, 7, 17, 22

108:1, 11, 23
109:3, 9    110:5,
13, 23    111:16
112:4, 17
113:3    114:1, 8,
13    115:13, 23
116:14    117:14
118:1, 10
119:22    120:6,
8, 16    121:1
122:2, 17, 24
124:5, 25
125:15    126:8,
21    127:22
128:9    129:15,
24    130:14, 24
131:6, 20, 25
132:5, 10, 19
133:2, 15, 21
134:4, 15, 23
136:10, 25
137:14, 19
138:24    139:11
140:9, 22
141:8, 15, 22
144:1, 9, 24
145:19    146:1,
9, 18, 24    148:7,
23    149:11, 17
150:15, 24
151:20, 23
152:7, 25
153:10, 24
154:11    155:4,
21    156:6
157:4, 20
158:4, 23, 25
159:5    161:13
163:25    164:12
165:18    167:3,
15, 24    168:13
169:16, 25
170:3    172:17,
25    175:14
176:3, 19, 21
177:10, 15, 23
179:7, 13
180:7, 22
183:2    184:8,
25    185:7, 14
187:11, 18, 23
188:9    189:7,

21    191:25
192:10, 17, 25
193:6, 19
194:1, 10
195:6    196:9
199:18    202:8,
24    203:7
204:8, 24
205:7, 25
206:23    207:3,
16, 22    208:10,
16, 25    209:5,
11, 16    210:3, 9,
19    211:17
212:3, 15
213:18    214:2,
11, 14, 23
216:6, 12
218:24    219:11,
24    220:6
221:4, 11
222:2, 14, 19
223:1, 17, 24
224:4, 9, 14, 18,
25    225:6, 13,
19    226:4, 11,
17, 25    227:4,
12, 22    228:3, 9
229:18    230:10,
16, 21    231:9,
23    232:1, 12
233:7, 14
242:23    243:15
247:1    252:3
254:17    255:2,
7, 16, 20, 25
256:5, 14
**Cranford's**
254:23
**create**    47:16
112:19    149:24
155:11    188:25
204:16
**created**    26:25
29:21    55:25
71:18    72:6
173:6    203:5
205:22    206:17
207:2    208:9
**creating**    34:23
50:24    150:3
195:14    248:25

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 12

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

crime    56:24
 201:7    211:20
crimes    251:16
criminal    39:1
critical    245:8,
 25    246:1, 6, 8,
 21    247:4, 16
critiquing
 213:16, 24
CTC    53:15, 17,
 21
cube    170:25
 243:7
cubical    27:2
 152:15    155:12
 221:13    237:25
culture    41:22,
 24
curb    61:22, 23
current    20:12
 208:14
Currently    12:14
curricula    81:23
curriculum
 81:14    82:3, 5,
 9
cursory    213:19
curve    30:25
custody    59:1
 109:25    110:9
 111:24    112:2,
 8, 16, 21
 128:14, 16, 22
 130:4, 6
 131:11    179:21
 201:14    226:8
 238:11
cut    19:3
CV    43:7
cynical    199:13
Cynthia    104:22

< D >
daily    221:23
damages    128:21
damn    42:17
Dan    212:18
 213:10, 23
DANIEL    3:20
data    48:16
 53:3, 7, 11
 54:13, 15, 17,

24    55:2, 7
 60:13    65:20
 76:3, 7, 11
 80:11
date    5:4, 21
 33:7    35:5
 36:21    127:24
 158:6    219:23
 222:1    238:23
dated    195:4
dates    155:24
Davis    26:8
 79:13, 18    80:1,
 6    89:5, 9
 90:1, 4    158:7
 189:12, 14
 190:2, 4, 6, 9,
 19    191:1, 2, 6,
 11, 16, 19, 23
 192:4, 8, 14, 21
 193:4, 16, 17,
 24    194:7
 196:1, 19
 197:8, 9
 199:20    202:1,
 6    218:8    219:8,
 15, 22    220:3,
 21, 24    221:2,
 24    226:16, 24
 229:6, 19
 230:6, 9
 240:10, 13
day    61:24
 113:9    116:20
 118:4    124:21
 125:8    139:21
 142:16    153:14,
 18    164:13
 173:3, 19
 175:18    203:19
 232:20    246:22
 247:5    259:4, 18
days    139:17, 18
 232:7    242:15
day-to-day
 161:22    182:14,
 18, 23
deaf    18:10
deal    27:1
 122:11    198:1
dealing    56:16
 139:21    170:11

dealt    193:4
 250:20
death    58:17, 18
 171:24    189:10
 217:21    218:1,
 12, 16, 22
 219:6, 18, 20
 221:15    222:13
debt    198:2
decided    98:25
deciding    67:3
decision    133:4
 170:10    201:18
 204:17    254:6
decisions
 122:12    167:2
 168:12    169:13,
 24    196:8
 202:7    226:24
 227:10
decisive    175:21
Defendant    1:12
 3:10, 18    11:3,
 7, 14    14:21
 17:18    38:1, 4
 228:5
defendants
 10:13, 15    11:2,
 7, 9, 13    14:12,
 17, 19, 22, 25
 17:17    19:10
 20:11    28:9
 29:15    92:2, 13
 94:14, 25
defense    29:6
deficiencies
 161:6    163:20
deficient    164:6,
 11
define    83:11
definitely
 249:14
definition
 65:10    83:24
degree    39:11,
 23    43:5
delegate    182:13
delegated    182:18
delegates    99:12
deliberate
 135:23    137:6
 140:15    142:4

deliberately
 224:3
demanded    125:9,
 25
demonstrate
 228:22    229:15
 230:3
demonstrated
 229:3
denial    204:21
Department
 10:18, 19, 23
 11:1, 17, 22
 13:19    48:3
 50:10, 16    51:6
 52:15, 17, 19,
 20    54:3, 7, 20
 55:17, 21    58:6
 59:14    61:5
 63:25    152:17
 245:12    247:24
 250:14    251:24
department's
 249:5, 11
deploy    247:9
deploying    223:5
DEPOSITION    1:13,
 24    2:7, 8, 18
 5:12    7:2, 8,
 10, 19    15:12
 26:3    103:15,
 18, 20, 22
 104:9, 14
 106:10    107:14,
 19    108:7, 19,
 21, 25    109:6,
 13    118:17
 141:7    186:9,
 13    208:12, 19,
 22    210:10, 12
 226:9    232:14
 253:24    254:7
 256:11    257:2,
 5    259:7
depositions
 2:11    7:14
 96:17    105:8,
 14, 19, 22
 108:8    208:14
 254:4
deputy    57:10

1-888-326-0504  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 13

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

describe   17:22
46:23   48:1
51:23   53:20
55:15   58:10
201:3
described   46:18,
22   49:4   60:10
75:11, 15, 19,
23   76:3, 12, 17,
22   77:2   83:21
84:9   88:7
134:22   189:6
201:19   212:1
describes   160:24
Description
199:1
design   162:24
designated
170:20, 22
designation
247:8
designed   27:8
66:21
desired   102:7
despite   163:20
detailed   239:6
244:8
detectors   253:16
deter   228:25
253:22
determination
29:11
determinations
202:21   204:13
determine   21:13
22:1   48:17
49:4, 21   50:3
90:19   95:24
105:18   110:17
120:12   144:15
172:8   178:13
202:14
determined
40:22   85:12
105:25   111:1
112:10   142:4
165:5   179:2
determines   226:7
develop   80:9
developed   45:2,
19   182:25

developing
82:21   83:2
development
78:17, 21
80:20   88:6
died   119:14
differed   56:8
difference
110:20   111:19
119:13
differences
56:13   131:2,
17   249:25
different   30:20
41:1   52:24
76:9   97:24
110:14   111:9,
23   112:2, 12
116:20   121:13
124:8   130:12,
21   131:15
138:8   151:9
161:20   166:20
169:17   170:14
173:4, 9, 10
175:18, 23
211:9   221:5
223:6   232:15
233:4   248:8
differently
149:2   196:4
difficult   8:11
55:6   101:25
102:9   148:9
difficulty
249:11
dimensions
40:25   41:1
direct   70:10
71:7   92:8
109:18   189:17,
23
directed   63:11
66:22
direction   167:5
183:6
directly   110:6
director   45:18
49:12   52:21,
25   54:3, 6, 19
59:18

disagree   42:2,
4   128:7, 10
146:15
discernment
254:7
disciplinaries
60:7   88:3
197:3   229:7, 20
disciplinary
54:23   55:4
56:25   94:18
111:2, 14
112:9   165:2,
14   166:2, 17
168:5, 22
187:20   188:12
189:5   196:18
201:9   228:25
241:24
discipline   38:9
94:14, 24   95:5,
12   166:22
167:8   179:4
186:24   187:9
200:14   219:7
disciplined
165:10   178:9,
17, 23
disclose   115:10
disclosed   17:7
18:13   19:5, 12,
16   69:4   254:24
disclosing
254:24
discount   175:20
208:3
discounted
207:19
discovered
241:13, 15
discuss   25:20
116:9   183:7
215:14, 19
216:4, 25
217:15, 18
discussed   31:1
55:16   68:6
69:1   114:6
217:5   226:9
247:13
discusses   217:19
discussing   18:3

discussion
65:12   215:5
discussions
187:3, 6
disincentives
189:1
disproportionately
188:6
disproving   146:7
dispute   146:21
255:8   256:12
DISTRICT   1:1, 2
5:20
divided   40:24
DIVISION   1:3
5:21
division's
206:13
divulge   147:25
DOC   45:10
document   15:20
32:2   34:1
74:19   79:6
93:4, 5   105:10,
16   115:25
116:2   168:14,
16   172:10
180:16   184:18,
19   185:1, 10
192:13   197:21
198:7, 8   207:1,
7   233:12
234:22   237:13,
17   238:15
240:5   256:7
documentary
183:25   184:7,
23   230:20
documentation
24:16   47:17
64:5, 8   95:18
96:4, 7, 12
101:25   127:19
128:3   129:20
131:23   132:15
153:2   178:7,
12, 14   180:3
181:11   185:5
194:4   198:13
203:4   204:12,
16, 18, 20

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 14

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

206:4    214:4
254:10
documented
   29:25    30:4
   64:15    77:17
   78:13    79:8
   80:16    81:4
   91:1    93:20
   94:9    95:11
   97:8    99:25
   106:3    123:10
   127:2, 5    148:4
   169:3    182:3
   185:3    197:19
   203:17
documenting
   77:10    78:6
   79:16    80:4
   158:17    187:14
documents    28:7
   34:25    72:8, 13,
   23    73:4, 19, 25
   74:1, 2, 3, 5, 8,
   11, 17, 22    75:1,
   6    78:19, 24
   86:21, 25    87:1
   92:24    94:13,
   24    95:4
   106:18, 19, 20,
   21, 24    107:3,
   10    108:2, 9, 15,
   22    160:6, 9
   172:7    180:25
   181:24    183:22
   184:11    185:23
   186:25    187:8
   205:16, 20, 21
   208:8    210:1, 6
   211:10, 14, 25
   212:11, 23
   213:15, 24
   228:18, 21
   229:2, 13
   230:1, 2, 4
   233:4, 5, 9, 16
   253:11    255:19
   256:2, 15
dogs    253:21
doing    18:5, 16
   20:20    22:3
   39:18    58:21
   65:13    66:1

150:5    156:9
201:7    220:19
232:24    248:25
250:1, 5    253:7
door    162:10, 11,
13    223:8
237:25
doors    221:16
222:4, 5
dorm    171:6, 10,
25    172:8, 9
188:23    220:1,
22, 23    234:19
241:23    247:17,
18
dormitory    241:6,
8    243:9    244:5
dorms    170:22,
24    172:5
188:23
DOT    239:6
double    102:13,
18, 20, 23
103:1    147:20
double-celled
147:12, 16
dragger    248:14
draggers    248:13
drones    252:16
drop    194:19
241:11    252:17
drug    60:8
249:21
drugs    228:23
229:4, 8, 16
251:10    252:12,
17    253:10
due    168:3
196:12
Duke    91:6, 13,
23    92:3, 12, 13,
21, 25    93:1
177:6, 14, 21
duly    6:13
258:13
DUNN    1:11, 19
5:14, 17    10:17
11:3, 7, 14
14:22    27:1
91:6    92:3, 12,
13, 21    162:1

177:6, 14
182:9, 12, 18
Dunn's    160:2
duties    90:9
duty    192:3
233:18    234:25
235:4    237:19
242:24
Dylan    234:3
dynamic    153:19
246:16    247:19

< E >
earlier    10:2
15:13    120:24
125:21    130:2
142:13    143:1,
23    148:5
170:7    182:21
196:23    200:23
214:3    221:21
232:2    240:9
244:14    246:15
247:13    248:23
250:17
early    47:12
80:23    87:10
95:13    98:2
99:7, 20    100:5
101:10, 18
102:12, 23
132:17    133:20
151:19    152:4
155:3    156:2
163:15    168:10
182:19    188:8
189:3    202:23
203:23    204:15,
22
ears    65:25
easier    8:16
71:5
easily    252:12,
17
easy    121:3
eat    55:9
education    246:10
Edward    14:24
effect    2:9
effective    41:21
effectiveness

43:23
effort    155:16
efforts    86:5
142:4    144:20
247:21    253:13
either    8:24
14:1    28:8
33:6    77:22
80:5    83:8, 9,
20    86:4
111:13    123:22
125:2    155:18
158:17    165:24
176:14    184:11
188:1, 3
211:15    212:12
219:9, 15
220:15    252:22
EJI    91:12, 23
92:8, 24
133:18    177:19
207:18, 20
208:1, 3
212:16, 22
electrical
162:10
eligible    56:6
eliminate
250:15    251:25
252:6, 8, 9
Ellington    14:25
182:9, 12, 18,
24    183:3
228:5, 10
Ellington's
183:9
email    235:11
255:15    256:4,
5, 10, 14
emails    132:25
133:10    134:1, 6
employee    24:19,
22    25:2, 10
97:25    98:5
118:7, 13
119:25    122:6
137:18    138:22
139:9    212:9
223:16, 22, 23
224:3, 7, 12, 17,
21    225:4, 9, 16

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 15

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

employees    20:13
  52:10    54:9
  95:5, 12    96:18
  105:19    119:25
  120:12, 23
  132:25    133:11
  134:1    136:22
  137:25    140:5
  142:11    143:8,
  22    144:5
  145:9, 21
  148:19    168:10
  169:21    187:9,
  15    201:16
  206:22    207:2
  208:9, 14
  212:2, 7
employment    39:21
empty    235:24
en    119:3, 11
  120:20    238:3
encountered
  251:24
ENDED    257:5
ends    257:1
enemies    128:19
enforcement
  157:12    206:13
  249:16
engaged    219:16
  224:23
enhance    155:17
  156:13
Enid    39:19
ensure    44:25
  48:6    157:11
  161:11    163:18
  228:6
ensuring    64:2
  227:19, 25
entered    74:20
entire    44:12
  54:7    91:18, 22
  103:18    104:10,
  11, 15, 17
  189:22
entirely    131:14
entities    207:9
  208:2    209:23,
  25
entity    10:20,
  23    11:17

25:16    49:13
  55:21    86:5
entry    237:1, 2
environment
  40:12    42:6
  62:9
environments
  40:16
Equal    177:3
  207:13
equals    247:12
equivalent
  245:16
Eric    104:22
ERRATA    260:1
erroneous    200:3
escapes    27:24
escorted    123:17
  234:4, 9
especially    82:10
established
  22:21    45:16
  158:12    164:3
establishing
  215:20
ESTATE    1:8, 15
  5:14, 16    6:9,
  10
estimate    35:17
  36:2, 4
et    1:11, 19
  5:17    188:13
ETI    86:4
evaluate    43:23
  61:10    64:1, 9
  96:21
evaluated    40:13
evaluating    43:17
evaluation
  43:10, 13    83:17
evening    123:7
event    199:20
  219:25    220:22
events    81:18
  158:5, 13    219:6
everyone's    175:3
evidence    2:19
  29:3, 4    117:11
  122:16, 20
  125:19    126:16
  127:2, 5
  136:21    137:16,

24    138:21
  139:8    142:10
  146:5, 6, 20, 25
  148:3, 4    150:1
  153:7    155:24
  165:25    168:25
  172:12    173:13,
  17    175:1, 10,
  25    179:17, 21
  183:25    184:7,
  23    186:13, 23
  187:3, 25
  188:3    194:6
  198:14, 16
  219:5, 8, 14, 21
  220:11, 14
  222:24    230:20
  253:12
evidenced    155:5
  258:15
exact    7:6
Exactly    42:21
  60:5    113:11,
  16    130:15
  197:20
exam    123:7
examination    5:8
  6:20    120:11
  123:11    232:1
  234:11
examine    118:6
examined    6:13
  123:3
example    91:17
exception    61:15
excerpt    91:20
excerpts    93:1
  103:19    104:10
exclude    213:20
excluded    106:14
excuse    22:16
  84:23    128:14
  178:19    199:13
  220:8
execute    154:18
  155:1
executed    154:22
executing    59:23
  64:10
Executive    26:15
  40:8    54:2, 19
  81:16    82:5, 11

exhaustive
  72:17, 22    73:9
  178:6
EXHIBIT    4:8
  69:23    70:5, 7,
  11, 15, 16, 24
  71:8, 14, 17, 18,
  20    82:23    83:4
  86:11    87:4, 5
  103:21    104:18,
  22    105:3, 4, 5
  106:15    107:4,
  9    109:16
  138:19    180:19,
  21    181:2, 8
  182:4    191:14,
  17    192:15
  194:15, 16, 22,
  24    195:3
  205:14    210:1
  211:6
exhibits    86:3
  88:18    91:11
  92:18    94:18,
  21    105:23
  191:14    255:14
  256:1
exist    163:3
  252:23
existing    22:5
exited    236:15
expanding    254:25
expect    134:8,
  20    135:16
  148:9    197:19
  203:4, 9    204:12
expectation
  100:20    180:11
  181:5, 20
expectations
  81:19, 20
  173:20    185:8
  187:5, 7    221:23
expected    48:19
  49:6, 22    50:5
  59:24    66:3
  88:1
expended    34:22
experience
  29:11    62:11,
  17, 23    100:13
  101:24    111:11,

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 16

**Lakeisha Ezell v. Jefferson Dunn, et al.**

Kevin Myers
2/4/2025

17, 22    125:17
130:7    134:8
156:22    157:8,
14    162:9
180:11    181:4,
20    183:16, 20,
25    184:5, 6, 14,
22    185:22
199:7    203:21
230:14, 20
248:15    250:13
251:25
**experienced**
253:15
**experiences**
100:14
**expert**    10:13
11:21    12:1, 3,
4, 9, 13, 17
13:1, 6    14:6,
11, 16    16:5, 16,
18, 25    17:6, 7
18:12, 21    19:5,
6, 24    22:24
23:5, 14    25:22
27:14    28:22,
25    29:18, 21,
22    96:2    106:7
136:3    205:20
210:6, 25
212:19    213:11,
25    223:20
224:22
**expertise**    69:9,
17, 19    177:3,
19, 21    203:4
207:20    208:3
**experts**    177:8,
13, 21    205:24
209:8, 14
210:7    211:16
214:6
**Expires**    258:22
**explain**    110:19
**explanation**
217:4    219:1
**exposed**    134:13
135:13    136:6
**extended**    112:7
**extent**    18:1
33:22    254:22

**external**    83:20
209:3    213:3, 5,
6
**extra**    152:18
**eye**    236:5
**eyes**    64:6
65:25
**EZELL**    1:6    4:9
5:13    6:3, 8
12:14    13:15
14:1    16:24
17:11    28:13
29:13, 14, 15, 22
30:4, 8, 11, 21
31:2    32:6, 10,
13, 18, 22    33:1,
6    34:5, 10, 17,
23, 25    35:4, 20
36:8, 20, 25
67:17    68:5, 7,
24    69:1, 5, 18,
23    70:16, 19,
20    71:14, 18,
24    72:1, 7, 14,
15    73:13, 17
74:3, 12    75:3,
7, 19, 20    76:1,
4, 17, 23    77:3
79:11, 15    80:3,
10, 16, 21    81:5,
11    82:1, 6, 25
83:3, 5, 6, 8
84:19    85:10,
16    86:11    87:3,
5, 11    88:6
89:3, 10, 22
90:13    91:2, 7
93:10, 15, 21
94:4, 10    95:1,
6, 14, 20    96:2
97:2, 9    103:14
104:1, 3, 13
105:13    108:6,
12, 20, 25
109:6    151:18
152:22    153:21
154:15, 18
155:19    158:1,
17    163:16
177:3    181:18,
25    182:3, 4
184:4, 7, 23

186:6    187:10,
17, 22    188:1, 4
191:18, 20
199:24    200:18
201:15, 22
202:13    205:1,
14, 21    208:20
209:4, 9, 14
210:1, 13, 15,
21, 24    214:15,
16    215:8
216:17    217:9,
17, 19    218:4
219:2, 15
225:15    226:1
227:21    228:12
229:14    230:14
254:25

< F >
**F1**    244:5
**face**    243:24
**faced**    38:8
99:21    252:15,
19
**facial**    241:9
**facilities**    15:3
17:2    18:14
20:20, 23, 24
21:14    22:4
26:19    37:12,
16    47:23
48:21, 23    49:7,
19    58:14, 16,
22, 25    59:4, 12
60:4, 15    61:6,
11, 16, 18
63:13, 18    64:3,
11    67:4    152:1,
13    156:15
161:4, 9, 12
162:4    163:12,
14    182:14
183:4    198:4
201:1    228:24
244:21    248:1
250:16    252:1
253:19
**facility**    13:19
14:3, 4    16:19
21:6, 8, 19, 25
22:12, 18

24:17    25:5
46:14    47:14
48:11    49:13
50:14    58:18,
19    61:21
62:18, 19    63:1,
3, 19, 23    64:25
65:7    66:6, 19
67:10    98:18,
22    99:3
131:10, 13
152:6, 18, 20
156:24, 25
157:10    158:2
161:18, 23
162:6    163:4,
10    164:7, 10,
11, 15    166:21
180:12    181:6,
21    182:15
184:16    188:25
201:10    203:5
223:16    227:24
228:8    233:19
235:2    244:11
245:1, 3, 4, 17
246:18    247:4,
6    251:14
252:21    253:8
**fact**    114:5
115:24    127:1
144:14    178:19
187:2    255:8
**factor**    41:8
196:7    249:4, 10
**factors**    40:21
62:16, 24
158:13
**facts**    18:4
135:2    136:11
151:15
**factual**    16:4
134:25
**fail**    157:24
**failed**    139:12
147:24    148:25
186:24
**failing**    178:24
185:10
**failure**    158:10,
11    224:7, 12,
16    225:3

**Fair** 9:9, 18
10:10   20:3, 8
29:13, 19
30:14   35:16,
24   36:1   39:4,
9   43:24   53:1
56:10, 12
92:11   111:20,
21   130:23, 25
134:22   140:19
156:20   164:7
203:24
**fall** 7:11
15:14   133:19
**falls** 157:2, 17
**false** 148:12,
18, 24   149:5, 8,
12, 24   150:8
197:25   199:16
**familiar** 81:15
87:16   102:15
200:24
**family** 251:13
**far** 32:13, 17
147:14, 18
247:22   249:22
**farther** 70:14
**fashion** 179:4
**fast** 248:6
**fatally** 113:9,
25   114:18
117:24   119:6,
13
**fear** 113:16, 17
114:17, 21, 24
175:16
**feared** 178:10,
18
**fearful** 121:25
**February** 2:4
5:7, 21   13:8
115:11, 21
116:16, 17
117:5, 12, 23,
24   118:2, 5, 9
119:20   120:4
121:17   122:15,
23   124:4, 11,
22   125:24
126:6, 18, 19
127:6, 7
128:14, 15, 23

129:13   130:23
131:4, 24
132:4, 9
136:23   138:1
139:7   140:8,
19, 21, 24
141:4, 17
142:12, 24
143:4, 19, 21,
23   144:6, 21
145:12   146:22
147:12, 16
148:1, 15, 21
149:9, 15
172:15, 21
175:4   176:2,
20   207:5
222:23   227:11
232:8, 21
233:19   234:2
235:1, 8, 18
237:2, 9, 20, 22
238:23   258:17
259:8
**Federal** 5:4
23:11   25:12,
23   33:25
44:18, 20
**feel** 82:8   89:1
**feeling** 170:8
**feet** 52:7
**felt** 87:20
96:4   105:25
202:9   226:18
**female** 53:24
58:17
**fence** 62:4
**fencing** 163:9
**fentanyl** 252:11
**fight** 99:1
**fights** 61:16,
23   62:11, 18,
25   63:12
64:24   77:10
79:16   80:4, 11
94:2   97:3
188:13
**figure** 33:15
35:3   168:17
**file** 138:14, 17
191:11   192:14
193:24   195:10

**filed** 5:19
12:2   28:7, 8
37:17   61:2
174:24
**files** 191:16,
19   256:17
**fill** 60:6
246:5
**filled** 245:7, 9
246:4
**final** 34:25
230:23
**finally** 42:16
129:7   175:18
**financially**
258:11
**find** 28:23
64:19   115:5
117:10, 18
123:15   124:17
125:6, 16
132:20   135:18
136:12, 15, 21
137:11, 16, 24
138:3, 21
139:2, 8, 12
140:1   142:7
145:4   165:23
178:2, 6
181:18   184:20
200:9   218:3
219:5, 14, 21
222:24   224:6,
11, 16   237:17
253:12
**finding** 64:17
115:14   166:14
196:19   229:10
**findings** 86:5
123:25
**finds** 64:16
**fine** 6:19
141:11   255:10
**finish** 8:17
9:7
**finished** 8:21
**finishing** 39:17
**firm** 19:20
**first** 30:24
50:20   99:10
100:16   101:2,
3   102:3

109:20   118:7
119:7, 17
120:12   125:8
135:4, 8, 14
142:24   159:21
164:20   182:7
199:5, 7
228:15   233:17
237:7   248:7
**firsthand** 248:16
**fiscal** 160:1, 4,
16, 19   206:17
**fist** 199:6, 12
**fists** 198:20
**fit** 130:7
**five** 7:5   17:5
18:17, 21
21:24   57:18,
20, 21   59:15
104:1   105:8
250:11
**five-minute**
57:18   205:5
230:24
**fixing** 66:22
**flip** 9:16
190:4
**Floor** 3:6
237:25
**fly** 252:17
**focus** 43:8, 15,
16   67:2
130:16   222:6, 7
**focused** 12:17
139:4   158:5, 8
**follow** 16:5
45:15, 23
50:25   86:14
98:25   139:22,
25   140:6
151:25   157:24
158:10, 11
164:2, 4
175:19   197:13
220:21   247:15
250:22
**followed** 45:2
89:15, 25
137:7   140:5
168:4   173:4, 7
175:20   201:17

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 18

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

following    5:8
45:22    90:21
113:9    188:13
258:16
follows    6:14
follow-up    254:20
food    248:6
foot    175:17
force    2:9
236:10
forced    242:13
foregoing    5:5
259:5
forged    163:8
forgets    8:24
forgotten    158:6
form    2:15
10:21, 24
11:19, 24
12:10, 21    13:4,
10, 16    14:2
15:4, 19    16:2,
9, 14, 20    17:3,
8, 25    18:15, 23
19:7, 14, 18
20:7, 14    22:14
23:6    24:5, 9,
14    25:6, 17, 25
27:11, 19
28:19    29:7, 17
31:6, 11, 15
32:3, 7, 15
33:3, 21    34:18
35:6, 11, 21, 25
36:11, 15, 22
37:3, 8, 19, 23
38:6, 10, 21
39:8    40:6, 23
41:9, 18, 25
43:25    44:9
45:12    46:5, 19
47:8, 11, 19, 24
48:20    49:9, 23
50:6    53:22
54:14    55:5
56:11, 19
59:25    60:17
61:13    63:14
64:13    65:1, 8,
23    66:13
67:12    68:3, 9,
21    69:6, 11, 20

72:3, 10, 16, 25
73:8, 18    74:7,
14, 18    75:8
76:5, 13, 18, 24
77:4, 12, 19
78:8, 15, 22
79:3, 19    80:7,
13, 18    81:1, 6,
12    83:10, 15
84:2, 12, 20
85:13, 19, 24
86:13, 23    87:6,
12    88:17, 25
89:11, 19    90:3,
10, 15, 23    91:3,
21    92:6, 16, 22
93:11, 17, 22
94:6, 11, 16
95:2, 8, 15, 21
96:3, 24    97:5,
16    98:3    99:9,
23    100:9
101:20    102:14,
19, 25    104:12
105:2, 21
106:5    107:7,
17, 22    108:1,
11, 23    109:3, 9
110:5, 13, 23
111:16    112:4,
17    113:3
114:1, 8, 13
115:13, 24
116:14    117:14
118:1, 11
119:22    120:8,
16    121:1
122:2, 17, 24
124:5, 25
125:15    126:8,
21    127:22
128:9    129:15,
24    130:14, 24
131:6, 20, 25
132:5, 10, 19
133:2, 15, 21
134:4, 15, 23
136:10, 25
137:14, 19
138:24    139:11
140:9, 22
141:9, 16, 22

144:1, 9, 24
145:19    146:1,
9, 18, 24    148:7,
23    149:11, 17
150:15, 24
151:20, 23
152:7, 25
153:10, 24
154:11    155:4,
21    156:6
157:4, 20
158:4, 23
161:13    163:25
164:12    165:18
167:3, 15, 24
168:13    169:16,
25    170:3
172:17, 25
175:14    176:4,
19, 21    177:10,
15, 23    179:4, 7,
13    180:7, 22
183:2    184:8,
25    185:7, 14
187:11, 18, 23
188:9    189:7
191:25    192:10,
17, 25    193:6,
19    194:1, 10
196:9    198:18,
23, 25    199:18
202:8, 24
203:7    204:8,
12, 24    205:25
206:23    207:3,
16, 22    208:10,
16, 25    209:5,
11, 16    210:3, 9,
19    211:17
212:3, 15
213:18    214:2,
11, 23    216:6,
12    218:24
219:11, 24
220:6    221:4,
11    222:2, 14,
19    223:1, 17,
24    224:4, 9, 14,
18, 25    225:6,
13, 19    226:4,
11, 17, 25
227:4, 12, 22

228:3, 9
229:18    230:11,
16, 21    232:11
233:2, 7
237:11    243:15
244:17, 22
245:14, 22
246:24    247:2,
7    248:2    249:7,
13    251:21
252:2
formal    64:23
65:2, 5, 10, 15
83:16, 20    86:3
197:3
formalizing
106:25
formally    48:7
54:11    196:25
200:15
former    20:12
208:15
forming    73:12
254:8
forms    53:3
formulate    108:16
formulating
29:15
forth    92:3
121:15, 17
124:15    158:11
forward    163:8
248:24
forwarded    109:10
found    37:21
38:5    117:4
122:9    144:16
150:1    165:1
168:2, 20
169:14    178:25
180:9    186:18,
22    188:10
196:1, 2, 3, 6,
10, 13    199:21
200:3, 8, 19
223:2    258:16
foundation
134:25
founded    165:24
Four    17:9
18:21    19:5, 9,
21, 25    20:4, 10

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 19

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

21:23    22:23
58:24    104:1,
17    206:12
**fourth**    17:13
249:17
**frame**    15:9, 11
56:9    80:23
95:13    98:2
99:7, 20
182:20    188:8
193:4    225:23
226:3    227:21
**front**    11:10
15:20    36:16
71:11    105:16
106:13    162:2
171:15    201:5
203:8, 25    241:8
**froze**    49:25
**frozen**    211:8
**FTE**    245:15
**fulfill**    246:17
**full**    2:9
103:20    109:21
182:7
**full-time**    39:21
245:16
**fully**    131:8
**function**    162:13
246:13
**functions**    246:17
**fundamentally**
186:3
**FURTHER**    2:6, 13
113:18    123:4
231:6    236:2, 3
241:19    244:2
258:9, 13

< G >
**Galvin**    241:20
**game**    36:17
**Garrett**    104:22
**gather**    53:11
**gathered**    243:8
**gauge**    61:20
**general**    15:25
55:15    58:19
112:11    133:5
134:11    135:10
147:13, 17
173:15    175:11

176:1, 11, 17
183:4
**generally**    15:16
17:22    51:23
58:10    90:8
156:2    157:2,
18    180:24
**generational**
249:24
**generic**    201:6
**genitalia**
134:13    135:13
136:6
**getting**    30:7
39:14    56:23
57:2    147:3
**give**    8:5    10:4
15:24    23:8
96:5    136:8
149:1, 12
155:10    191:3
231:13    233:15
237:14
**given**    10:9
16:18, 25
123:4    148:13,
19    149:9
151:13    153:14
156:19    163:11,
14    203:16
246:15
**Givens**    6:4
**giving**    7:21
149:4
**glad**    189:17
194:12
**glance**    213:19
**go**    18:5, 11
21:19    39:11
40:10    47:13
55:8    70:14
103:6    110:17
116:21    123:13
126:14    127:15
129:5    131:7
139:23, 24
140:10    142:18
143:11, 14
144:9, 14
145:17, 24
147:6    151:14
162:11, 23

195:8, 13, 18,
21    197:2
220:3    221:19,
25    242:9
243:17    244:2
245:5    246:16,
17    248:6, 13
251:4, 18, 22
255:6
**going**    7:18, 25
8:10, 16    33:22
35:18    39:15
52:4    54:22
57:1    62:4, 10,
12    67:3    69:23
83:19    98:19
102:4    103:3
114:24    115:23
118:10, 11, 12,
16    119:10
122:9    126:10
130:1    136:13
139:16, 17, 24,
25    140:11, 17
141:5, 8    151:1
153:2    157:5
158:25    165:19
166:16, 22
169:1, 4    176:3
177:1    191:14
194:15, 19, 21
195:2, 23
221:7, 16, 20
222:7    231:10
233:11, 12
238:14    246:18
251:17    255:5
**good**    6:6, 21,
22    49:1    56:21
57:20, 21
147:8    159:6
241:2
**goodness**    27:23
38:24
**Gordy**    6:5
117:18    123:16
124:21    235:10,
17    237:3, 7
**gotten**    175:4
**gov**    206:3
**governing**    21:9

**government**
25:13, 16
**governor**    162:2,
21
**grade**    249:17
**graduate**    39:25
40:9    52:22
**Graham**    6:5
**great**    70:2
102:8    159:3
**greater**    36:9
**greatest**    59:11
**grievances**    61:2
**ground**    7:19
52:8
**grounds**    2:17
**group**    209:20
214:7    253:21
**groups**    209:19
**grow**    249:18
**grows**    249:16
**Grubbs**    44:19
**G-R-U-B-B-S**
44:19
**guess**    65:9
150:3    173:12
187:2
**guessing**    36:17
**guesstimate**    35:8
**guidance**    136:8
**guilty**    168:2,
21    196:1, 3, 6,
10, 13    199:21
200:3, 8, 9
**gut**    169:4
170:8
**GUY**    1:14    4:10
5:15    6:4, 9
12:14    13:15
14:1    16:24
17:11    28:4, 13
29:3, 14, 16, 22,
25    30:8, 11, 21
31:1    32:6, 10,
13, 19, 22    33:1,
6, 13, 17    34:5,
11, 17, 23    35:1,
4, 20    36:8, 20,
25    67:14, 25
68:2, 18, 22
69:5, 18    70:17,
22    71:9, 14

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 20

72:19, 22, 24
73:5, 12, 17
74:3, 12    75:3,
7, 11, 15, 25
76:4, 17, 22
77:3, 6    78:13,
25    79:1, 2, 8,
9    80:10, 16, 21
81:5, 11, 25
82:6, 16, 22, 23,
24    83:6, 8
84:1, 18    85:10,
16    86:11    87:3,
4, 11, 24    88:7,
10, 16, 24
89:18    90:13
91:2, 7, 23
93:10, 15, 21
94:4, 9, 15
95:1, 6, 14, 20
96:2    97:2, 9,
11, 18, 19
101:7, 14, 19
103:14, 23, 25
104:4, 5, 6, 9
105:20    106:4,
10    107:4, 14,
20    108:13
109:17, 19
114:6    117:10
127:18    128:2
129:2    133:1,
12    136:20
137:13    138:13
149:23    150:2
151:17    152:22
153:20    154:14,
17    155:19
158:1, 17
159:14    160:24
163:16    164:17
172:13    176:25
177:3    178:1,
15    181:16
182:6    183:13,
24    184:23
186:6, 17
187:1, 10, 17
188:1, 4
201:16    202:14
204:19    211:3,
10, 15    212:7,

12    216:3, 9, 13,
15, 22, 24
217:9, 12, 17
218:18, 19
219:3    222:10
224:7    225:8,
21    227:21
230:15    254:25
**guys**    198:19

**< H >**
**half**    59:8
159:1    164:20
**hall**    223:5, 7
**hallway**    221:7
**hand**    14:1
53:11    61:1
139:5, 7    174:4
**handing**    71:2
**handle**    134:9,
21    135:17
136:3, 9
**handwriting**
250:6
**handwritten**
198:23
**happen**    122:8
125:20    127:12
142:15    165:24
166:9, 18    185:2
**happened**    116:19
121:4    129:8
135:4    136:16
142:16    165:25
166:4, 13
168:7, 25
173:19    185:3
196:13    197:23
198:3    200:5, 6,
10, 13    220:23
**happening**    63:5
64:3    96:23
247:5
**happens**    101:1
**happy**    9:14
**harassing**    151:7
**harassment**
123:20    124:7,
16    125:2
165:3    239:5
**hard**    18:10
185:1, 2    242:21

**harm**    98:1
100:7
**Harp**    57:11
**hash**    255:10
**hatchet-like**
244:4
**head**    8:4
96:11    125:9,
14, 18, 19
134:13    145:4,
5    160:7
202:19    234:12
236:5
**health**    41:12
58:18
**healthcare**    238:3
**hear**    9:12
**heard**    237:24
**hearing**    18:10
196:12    197:6
206:5    242:21
**hearings**    200:17
**heavy**    43:15, 16
161:21
**held**    51:4
166:1    229:7
**Hello**    149:20
**help**    27:1
52:7    58:24
65:13    188:24
190:14
**helpful**    70:1
**helping**    52:3
**hey**    253:7
**high**    15:24
17:23    53:12
64:24    67:10
249:23, 24
**higher**    31:13
**highly**    135:18
**high-movement**
223:3
**Hill**    243:12
**hindsight**    221:23
**hire**    245:17
249:5    250:10
**hiring**    51:8
152:15    247:23
248:7, 9
249:10, 11
**histories**
179:24    206:7

**history**    57:1
77:25    121:12
135:5    190:19
201:9    208:5
211:21    225:4
229:7    240:11
244:8    249:22
**hit**    198:19, 21
199:4, 11
248:17
**hitting**    163:2
**hold**    196:11
**holding**    229:12
**hole**    43:1
**holistic**    253:19
**home**    251:13
253:5
**honor**    188:22,
23    247:17, 18
**Honorable**    1:7
**hospital**    153:16
**hotline**    125:7,
8    126:3
235:12, 18
239:21    240:1
**hour**    30:9
31:10, 21    159:1
**hourly**    30:20
31:2, 4, 14, 18
**hours**    33:12, 16
34:4, 9, 22
36:24    39:24
42:12    51:9
220:20    222:9
232:14
**house**    55:12, 25
56:3, 7, 17
57:3, 6    97:14
135:25
**housed**    53:20
112:22, 25
170:21, 23
171:9, 24
172:4, 9, 23
188:14    189:4
202:22
**housing**    16:11
64:7    94:3
97:24    99:8, 14,
18    100:3, 11,
21, 24    101:3,
18    102:11

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 21

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

110:2, 12, 21,
24  111:6, 8, 13,
19  112:3, 7, 25
129:7, 12, 18
130:4, 9, 11, 17,
22  131:4, 19
133:5, 6
134:12  142:17,
22  147:19
151:11  165:16
168:12, 22
169:13, 24
170:10  172:15
173:15, 24
176:13, 15, 17
188:7, 15
196:8, 15, 22,
24  218:9
221:9, 10
227:10, 13
229:1
Howard  3:13
HR  50:10
huge  55:8
huh-uhs  8:4
humans  170:12
Huntsville  2:3
3:24
hypothetical
134:16, 17, 24
135:3, 6, 7, 19
145:5  246:25

< I >
IBM  55:8
Idaho  23:11, 24
25:12, 23
idea  81:18
115:7  157:6
ideal  156:17
245:13
identification
70:8, 25  194:25
identified  11:2
68:19  82:22
101:13  108:21
113:19  119:18
133:13  134:11
135:12  137:20
138:4  140:13
144:17  183:5
222:22  233:22

235:5  236:22
237:8  238:4
240:6  255:21
256:6
identifies
228:22  229:3,
15  230:3
239:22  240:2
identify  63:5
66:25  102:4
114:2, 25
117:19  118:8,
23  120:2, 13,
23  121:11, 19,
24  142:4
148:5  178:24
205:21  225:8,
15  234:13
246:3
identifying
121:20  158:9
identity  137:21
147:25
ignore  169:12,
21  170:5
II  51:20, 25
III  51:20, 25
52:12, 14
183:10
Illinois  3:7
imagine  161:21
impact  9:21, 21
41:10, 22, 24
42:5  43:17
62:18, 25
164:11  248:21
251:4
impacted  48:10
impacting  249:25
impacts  41:8,
16  100:25
implement  44:24
45:1  47:6
63:10  66:8
implementation
47:21  49:18
implemented
90:21  186:4
201:24  202:5
226:20  253:13
implementing
49:6

implicated
220:12
important  246:6
improperly
254:25
improvement
26:13
inadequate
66:11  96:1
224:23
inappropriate
133:24
incapable  35:9
incarcerated
56:25  250:24
incentives  189:1
incident  4:11
16:7  17:19, 21
24:2, 3, 13, 15
77:7, 9, 14, 20
78:2, 6, 10
79:12, 16  80:4
95:10, 11
117:23  118:6
123:16  129:8
135:15  136:15
139:5  150:13,
21  165:4
173:23  179:11
187:14, 15
192:3, 7, 21
193:11, 14, 22,
23  195:4, 15,
24  196:7, 17
198:10  199:23
206:7  218:10
219:17  221:15
222:4, 8, 22
232:4, 5
233:21  235:5,
16  236:16
237:6, 10
240:14, 19
242:1, 3, 17
256:15
incidents  60:7
77:22, 23
79:24, 25
117:9  139:6
147:25  150:8
158:21  163:16
170:2  179:12

180:4  189:13
190:1, 8  191:6
229:21  230:5,
7  232:16  244:9
include  17:10
42:14  83:20
97:2  112:6
152:14  171:1
174:17  193:9
227:25  245:19
254:12, 16
included  68:23
79:4  91:10, 16
106:1, 13, 25
108:5  152:11
174:23  183:9
192:19  193:23
219:8  232:14
including  53:3
152:11  182:14
185:23  193:16
229:1
inclusive  92:17
incomplete
149:13  246:25
incorporated
214:7
incorrect  20:16
21:17  35:15
46:9, 10, 11
79:21  102:21
196:21  207:24
208:18
increase  51:7
155:10  156:14
247:22
increased  31:2
51:12  252:14
253:10
increasing  249:1
incredible  249:1
independent
95:24  96:21
indicate  100:23
110:7  113:16
197:7  201:21
214:19  229:9
indicated
117:11  118:3,
21  145:10
147:24  148:5

**Lakeisha Ezell v. Jefferson Dunn, et al.**

Kevin Myers
2/4/2025

indicates 171:4 186:23
238:23 239:11
**indicates** 147:1
155:24 168:15
175:2 199:19
215:24 217:24
218:15 234:2
236:13 237:2
238:18 239:3
242:10 244:3
**indicating**
188:1, 4 239:4
**indication**
64:18 186:19,
22
**indifferent**
224:3
**Indirectly** 20:24
**individual**
204:14 239:22
**individuals**
21:24 55:23
178:10, 18
219:10
**industry** 69:14
91:15 92:10
173:21 248:11,
20 250:6
252:16, 19
**ineffective**
41:23
**infirmary**
123:17 234:10
**influence** 247:25
**influences**
247:23
**informal** 66:1
**informally** 48:7
196:25
**information**
10:2 11:10
27:13 29:10,
12 35:15, 22
36:16 40:13
52:24 60:2, 3,
14, 19 91:16
96:6 106:12
111:4 118:7
120:2, 13, 17,
19, 23 121:6, 9,
21 122:9
123:4, 5

126:23 127:10,
14 133:8
135:19 136:17
137:3 140:3
142:2 145:10,
21 147:1, 4
148:11, 13, 18,
25 149:1, 8, 24
151:13, 16
153:4 158:16
166:5, 6, 11
169:8, 9 170:9
172:20 174:3
176:8 194:11
196:24 199:15,
19 207:21
209:18, 22, 24
211:19 214:5,
6 222:8
226:14 233:9
239:6 254:14,
15
**initial** 118:21
**initially** 47:1
58:14 115:4
116:15 132:22
173:8
**initiated** 25:13
**Initiation**
206:21
**initiative** 74:6
177:4 207:14
**injuries** 123:10
241:22
**inmate** 13:3
18:10 24:19,
22 25:2 48:11
56:23 64:7
88:2 89:8
97:14, 25 98:6,
10, 13, 16 99:6,
21, 24 100:6
112:24 115:2
117:12, 23
119:8, 19
120:3, 13
121:24 122:15,
22 124:11, 19,
24 125:1, 3, 5,
13, 23, 24
133:4 134:11
135:10, 11

136:4, 5
138:10, 14
139:4, 9
143:13, 15, 16
147:6, 21
148:14, 20
150:14, 22, 23
151:7 154:9,
12 163:6
168:2, 4, 6, 20
173:21 189:15
190:3, 6, 10
191:7 192:9,
22 193:24
195:10 196:11
218:10 222:22,
25 226:8
234:4, 8, 9, 11,
12, 18 235:13,
21 236:2, 8, 15,
21, 22, 25
237:8, 24
238:3, 4, 5, 19,
20 241:7, 15,
22 242:11, 13
243:12, 13, 19,
22 256:17
**inmate-on** 13:2
**inmate-on-inmate**
63:12 180:10
181:3, 18
**inmates** 20:6
40:13 47:15
48:10, 14 52:1
53:20 56:2, 6,
15 57:8 60:24
61:19 63:4, 18
64:6 77:23, 25
78:5 80:24
88:15, 20, 23
98:14 99:2
102:4 112:21
130:3, 5 131:3,
18 142:13
143:2, 14, 24
144:5, 22
145:11, 15, 22
146:8, 14, 23
147:5 149:23,
25 150:8
155:20 156:5
163:2, 19

170:20, 22
172:3 175:7
178:9, 17
179:19 180:3
188:4, 7, 12, 15,
18, 20, 21
189:4 191:19
202:16, 21
203:6 204:14
222:7 223:7, 9,
11 229:11, 22,
23, 24 230:6
235:23 243:8
247:14
**inmate's** 165:16
198:22
**insert** 251:20
**inside** 171:17
220:1 244:4
253:2
**inspect** 21:19
**inspection** 22:19
**inspections**
20:20 22:18
**instances** 50:1
**institution**
40:12 41:11
128:20
**institutional**
240:10 244:8
**institutions**
12:19, 20 46:3
55:23 248:5
**instructed** 66:9
90:8
**instruction**
146:17 176:4
**instructions**
90:20
**instructs** 36:5
**instrument** 40:24
**insufficient**
66:20 127:14
153:22 154:9
156:4, 8
**integrity** 24:16
**intending** 69:3
**intent** 112:18
**Intentionally**
195:14 220:19
**interact** 63:3, 4
**interacted** 120:1

interactions
 141:20   148:14,
20
interchangeably
 111:5
interdict   253:13
interested
 258:11
interesting
 51:11
interim   161:11
 162:7
internal   83:21
 200:20   202:15
 213:3
internet   73:22
 74:1   108:5
interpose   251:21
interrupt   57:15
 242:21   251:19,
20
interviewed
 118:22
investigate
 98:11   100:18
 123:19   135:23
 144:22   145:17,
24   148:10, 11
 151:8   179:3
investigated
 110:17   117:18
 165:4, 22
 173:23   239:7
investigation
 123:23   124:20
 144:4   165:23
 198:9   206:10
 238:12
investigative
 111:3   206:14
investigator
 165:23
investigatory
 111:14
invoice   32:25
 34:4
invoiced   34:21
 35:4
invoices   32:12,
17, 21   33:5, 20
 34:15, 24   36:7,
25

involve   90:19
 180:4
involved   22:4
 48:21   90:5
 147:9   221:16
 229:22   251:16
involvement
 69:14
involving   79:24,
25   80:1
 135:15   192:7
 196:17   230:5
 240:25
isolate   136:12
isolation   100:25
issue   15:3
 25:5   115:20
 117:12   118:9
 119:19   145:18
 163:16   165:2
 171:22   217:13
 252:22
issues   12:19
 119:8   124:8
 153:13   188:12
 189:5
item   91:22
items   64:20, 21
 72:18   73:10
 208:4   212:6, 23
its   21:8
 154:19   155:2
 212:1

< J >
Jackson   26:8
 77:8, 16, 21, 22,
24   78:4, 12
 88:11, 23
 89:18, 20
 113:24   114:3,
18   118:8
 119:4, 9, 12, 18
 120:2, 15, 24
 121:24   137:18,
20, 22   138:1, 3,
6, 9, 23   139:10,
13   140:2, 8, 12,
15, 18, 21, 24
 141:4, 21
 143:16, 18
 144:17   147:7

 148:15, 21
 158:7   165:2, 6,
9, 10   167:8
 171:5, 9, 16, 25
 172:9   179:17,
24   180:5
 220:16   222:23
 227:7, 9, 10, 16
 229:6, 20
 232:3   236:23
 237:9   238:4
 239:22
Jackson's
 138:14   167:12
JEFFERSON   1:11,
19   5:14, 17
 258:2
jeopardy   130:19
Jeremy   234:10
Jimmy   101:3
 242:12
job   40:9
 121:10, 18
 201:1, 9
jobs   52:3
Johnny   166:10,
11   197:24
Johnson   115:3
 119:1
jointly   177:7,
13, 20
Jones   227:18,
23   228:6, 11
 238:10
Joseph   57:10
Joshua   243:8
Judge   1:7
judges   250:20
judgment   151:11
July   109:22
 110:4   128:25
 132:22   190:5
 207:1
jump   220:18
jumped   129:1
 198:19
jumping   147:9
jurisdictions
 81:21   82:11
 203:10, 22
jury   37:25
 38:3, 5

justice   39:1
 177:4   207:14

< K >
keep   55:18
 130:18   148:10
 177:1
keeping   212:17
Kentucky   20:19
 22:8, 10, 13, 15,
17
kept   34:8
 39:17
KEVIN   1:14, 25
 5:7, 12   6:12,
25   238:6
 257:2   259:13
K-E-V-I-N   6:25
kids   250:3
kin   258:10
kind   13:14
 16:7   23:22
 24:12   40:21
 53:7, 19   54:17
 60:8, 13   62:23
 64:8   83:21
 88:3   187:25
 198:7   248:19
kinds   19:24
 55:2   180:25
kitchen   60:24
knew   47:3
 59:22   67:9
 137:22   139:13,
16   140:14
knife   126:5, 11,
12, 17   127:6
 129:1   134:14
 135:14   136:7
 193:18   194:7
 197:8   198:21
 236:9
knifepoint
 125:10, 25
 242:13
knives   228:23
 229:4, 16
knot   198:14, 17
 199:2
know   7:5, 16
 8:25   9:4, 14
 10:4   11:9

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 24

17:23    25:1
27:9, 17    33:14
35:24    36:6, 18,
23    48:5    55:3
65:19    67:9
69:24    87:18
102:17, 22
105:11    107:8
116:6, 22
122:11    124:2
125:11    126:9,
12, 14, 23
129:11    130:20
131:1, 7    132:2,
7, 14    135:2
136:1    139:17
141:6, 12
143:9    146:14
147:14, 18
156:17    163:11
164:10    167:7,
19    168:17
171:3, 15, 16
173:10    174:19
185:4    188:22
189:20    190:18
193:9, 10, 13,
21    195:12
196:25    204:5
205:2    210:21
213:2, 24
223:10, 11
227:7    239:17
252:4
**knowledge**    24:6
27:20    29:12
72:4, 17, 21
73:20, 23    75:9
87:25    92:8
102:13    114:20
143:20    153:12
179:14    194:4
208:5    220:2
226:22    259:6
**known**    23:16
121:5, 6    125:3
128:19    137:21
139:10    144:15
145:2    148:15,
21
**knuckle**    248:13,

14

**< L >**
**L28**    123:21
237:1
**label**    172:11
256:7
**labeled**    104:21
233:16    234:23
240:6    242:2,
18    255:21
**labels**    255:21
**lack**    134:24
207:20    217:5
**lacked**    153:7
155:19    177:21
**lady**    171:19
**laid**    153:16
**LAKEISHA**    1:6
5:13    6:8
208:19    210:13,
15, 21, 24
**land**    250:23
**landline**    253:4
**Large**    2:2    5:3
126:13    127:24
162:16    188:6
191:15    251:8
253:20
**Larry**    6:3
**late**    15:13
100:4    102:11
132:17    163:15
202:23    204:15,
22
**law**    2:2    3:4,
12, 21    48:12,
13    206:13
249:16
**laws**    2:10
250:22
**lawsuits**    37:15,
17, 22    158:22
**leader**    66:5
**leadership**
26:15    81:16
82:5, 11
159:24    182:15
186:24    215:19
245:2
**leading**    2:16
193:4

**LeAnn**    2:1    5:1
258:21
**learned**    43:22
**learning**    30:25
**leave**    239:6
**led**    118:24
219:17
**left**    199:3
219:25    234:12
**legal**    19:12, 17
22:24    25:13
44:11    62:1
250:19
**legislature**
160:8    162:3, 15
**level**    15:24
17:23    48:18
49:5, 22    50:5
56:1    62:18, 25
66:3, 10    95:25
96:15, 22
97:21    157:11
165:16    167:13,
21    182:15
188:6    222:6
245:5
**levels**    16:19
17:1    64:24
67:11    77:2
93:9, 14    94:1
97:3    112:12
155:7    156:14
180:10    181:3,
18    225:22
226:2
**liability**    128:21
**liable**    37:21
**library**    48:12,
13
**licensed**    258:14
**lieutenant**    81:9,
24    113:15
117:18    123:16
124:20, 21
151:13    234:7
235:11    238:6
**life**    8:11, 16
114:21
**light**    139:24
**likewise**    108:6
**limitations**
92:10

**limited**    60:22
68:1, 6, 19, 25
98:17    99:14
158:21    177:19
**line**    49:16
76:20    199:9
236:20, 21
243:19    260:3
**lines**    241:12
247:22    251:23
**link**    206:3
**linkages**    162:11
**lips**    199:3
**list**    67:22
70:12    71:8, 18,
25    72:6, 14, 18,
20, 21, 22    73:6,
9    77:17    79:1,
8    82:20    86:25
94:20    106:11,
16    107:4
108:5, 15
128:1    201:10
205:15, 19
207:12    255:5
**listed**    68:1
71:25    72:14
73:5    78:18
83:4    86:11
87:4    103:21
106:7    107:15
108:9    138:19
160:12    180:19,
21    181:1, 9
192:14    208:8
210:1, 5
212:11    242:7
243:4
**listening**    66:1
**lists**    71:11
**litigation**
11:18, 23    12:5,
18    15:9    16:8,
12    17:7, 20, 24
20:11    24:2, 4
25:15
**little**    8:10
51:13    76:9
138:7    166:19
175:22    231:10
234:24    236:2

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 25

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

241:19    242:22
244:2
live    56:2
  128:18    129:6
  143:17, 18
  175:5, 8
lived    220:22
living    142:20,
  21    175:6
LLC    19:21
  20:1, 5, 10
loads    52:1
located    185:6
lock    162:9, 12,
  16
locked    121:14
  129:3    132:21
locks    162:8
  163:8
lodged    33:22
Loevy    3:5
logic    179:16
long    39:3
  43:2    52:11
  103:4    128:24
  129:12    175:18
  229:6
longer    31:1
long-term
  100:24    161:4
look    29:10
  31:20    48:16
  54:12, 15, 18
  65:19    69:22,
  25    70:15    77:9
  78:5    79:16
  80:4    81:8, 13,
  23    82:4    83:7
  92:12    109:16
  115:7    116:1,
  18    118:25
  124:13    128:15
  132:14, 20
  136:11    151:6
  158:14    159:13
  160:18    164:16
  168:14    170:13
  176:24    177:25
  189:18, 19, 21
  191:15    194:12,
  14    202:3, 10
  205:13, 16

209:2, 7    211:3
  214:18    228:13
  233:24    235:7
  237:13    239:10
  255:6
looked    60:5
  77:14, 20, 25
  78:10    79:12,
  24, 25    88:9
  89:3    128:1
  138:14, 16
  160:15    191:18,
  19, 22    256:15
looking    29:5
  53:2, 8    77:7
  88:1    89:25
  99:15    104:3
  114:24    116:7
  121:8    155:9
  156:13    159:16
  174:2    184:15,
  17    189:24, 25
  190:15    200:24
  201:24    202:6
  205:19    211:24
  216:16, 17
  247:12    248:11
  250:7
looks    100:17
  191:18
LORI    1:14
  5:15    6:9
lose    201:11
  222:5
lot    52:24
  53:10    62:8
  64:18    161:23
  162:7, 10
  175:19    188:17
  190:13    223:6
  250:8, 17
  254:10
lots    232:14
loud    109:21
  159:22    170:19
  178:5    182:11
  183:19    185:20
  186:21    228:20
  237:24    239:16
love    253:7
low    163:5
lower    163:1

lunch    103:3, 10
  223:3
lying    148:4, 8
  150:23

< M >
ma'am    6:16
  7:3, 15    12:6
  15:14    17:4, 12
  20:15    37:24
  38:2, 11, 15
  39:13    43:11
  55:13    71:12
  104:24    159:15,
  20    211:7
  214:12    218:5,
  13    228:14
maintain    155:20
  156:4, 18
maintained
  163:19
maintenance
  60:25    161:23
making    150:2
  167:1    168:11
  169:12, 23
  170:10    196:24
  202:21    204:13
male    58:17, 18
  180:12    181:5,
  21
Malone    6:5
manage    62:14
  63:6    102:6
  131:11    169:7
  188:20, 24
  198:4
managed    61:16
  163:6
management
  26:14    27:6
  43:16    52:1
  54:23    60:2, 18
  188:11
manager    51:20,
  25    52:10, 12,
  14    235:10
managing    49:12
  228:6
mandate    246:4

mandates    44:6,
  25    45:10    46:3,
  22, 24    47:7, 18
mandatory    245:7,
  25    246:21
  247:3, 16
manipulated
  163:5
manner    29:5
manual    87:9, 14,
  20, 23    88:5
  89:15, 24
  200:19    201:17
  204:3, 6    226:7
  227:8
manuals    211:23
Marcano    234:10
March    165:2
  240:20    241:4
mark    70:5, 16
  194:16, 22
marked    70:8, 25
  194:25
Markings    199:1
marks    5:11
Maroney    2:1
  5:1    258:21
Martin    242:11
master    191:11
  192:14
master's    39:12,
  15, 21, 22    43:5,
  9, 14, 21
material    71:10,
  25    114:22
  190:13    202:10
materials    26:2
  70:12    71:8, 13,
  19, 23, 25    72:7,
  14, 20, 21    73:6,
  11, 16    77:17
  79:2, 8    81:9
  86:10    106:16
  108:22    112:20
  128:2    175:12
  193:24    205:15
  207:13
mates    147:8
matter    5:13, 15
  6:3, 4    17:23
  30:14    67:14,
  18, 25    68:6, 18,

1-888-326-0504  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 26

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

*25*   *77:6*   *78:14,*
*25*   *79:1, 11, 15*
*80:3, 10*   *85:10*
*98:4*   *107:20*
*136:20*   *137:13*
*141:11*   *153:21*
*158:20*   *167:19*
*174:20*   *209:4*
*252:25*
**matters**   *87:11*
*97:22*   *103:14*
*151:18*
**max**   *58:17*
**maximum**   *59:1*
*112:7*   *180:12*
*181:5, 20*
**mean**   *42:19*
*43:12*   *50:23*
*51:2*   *65:14*
*70:17*   *98:24*
*104:19*   *105:1*
*125:20*   *139:24*
*149:18*   *162:25*
*165:10*   *176:13*
*192:12*   *199:6,*
*13*   *200:6, 11*
*214:14*   *251:7*
**meaning**   *57:14*
**means**   *147:19*
*166:4*   *199:8,*
*10*   *223:5, 8*
*252:8*
**measurement**   *49:1*
**measuring**   *49:1*
**medical**   *9:23*
*58:18*   *119:3,*
*11*   *120:21*
*122:16, 20*
*123:2, 7, 11, 18,*
*25*   *124:2*
*125:12, 16, 21*
*241:21*   *246:7*
**medications**   *9:20*
**medium**   *58:17,*
*19*   *201:13*
*226:8*
**meet**   *21:24*
*249:24*
**meeting**   *67:2*
*90:6, 13*   *207:5,*
*8*

**meetings**   *48:8,*
*13*   *90:20, 22*
**member**   *247:17*
**members**   *141:18*
**memory**   *7:11*
*15:22*   *33:4*
*39:1*   *116:17*
*132:21*   *142:16*
*143:12*   *175:3*
*194:13*   *232:25*
**men**   *61:25*
*221:22*
**mental**   *41:12*
*58:18*
**mentioned**   *11:3*
*25:24*   *37:22*
*245:24*
**mentor**   *52:4*
**mentoring**   *52:6*
**merit**   *26:18*
*28:24, 25*
*155:10*   *243:8*
*248:25*   *249:20*
**message**   *239:7*
*253:6*
**messages**   *253:6*
**messed**   *163:6*
**met**   *66:24*
*249:23*
**metal**   *253:16*
**method**   *131:12*
**methodically**
*65:19*
**methodologies**
*43:23*   *75:10,*
*14, 18*
**methodology**
*40:4, 7*
**methods**   *44:3*
**Michael**   *241:7*
*242:11*
**MIDDLE**   *1:3*
*5:21*   *59:7*
*174:10*   *183:15*
*243:18*
**mind**   *56:14*
*62:16*   *69:25*
*129:5*   *137:4*
*167:7*
**minimize**   *63:7,*
*22*   *64:21*
**minimizes**   *164:10*

**minimum**   *59:2*
*201:13*
**minute**   *139:21*
*159:2*   *165:20*
*195:15*   *220:17*
*231:13*
**minutes**   *57:18*
*90:7, 13, 17*
*159:4*   *187:4, 6*
**missing**   *43:4*
**mission**   *245:3*
**Mississippi**   *59:1*
**misstating**   *91:12*
**mistake**   *42:16*
**misunderstanding**
*129:25*
**mitigate**   *98:14*
**mitigating**   *28:25*
**modernize**   *162:5*
**modification**
*101:22*
**modified**   *153:17*
*167:22*   *168:1*
*193:11*
**modify**   *167:12,*
*16*
**Mom**   *253:7*
**moment**   *12:13*
**Monday**   *117:5*
*121:3, 6*
*142:19*   *144:25*
*221:21*
**money**   *35:18*
*162:7, 15, 22*
*197:24*
**monitor**   *46:14*
*47:4, 6*
**monitored**   *49:13*
*188:16*
**monitoring**   *46:17*
**Montgomery**   *3:15*
**monthly**   *32:22,*
*23*   *33:5*   *60:6,*
*10*
**months**   *250:11*
**morale**   *50:12, 14*
**morning**   *6:6, 21,*
*22*   *43:19*
*106:23*   *115:21*
*117:1, 5*   *121:7*
*142:19*   *145:1*
*221:21*   *236:3*

**mother**   *210:17,*
*22*
**move**   *63:18*
*98:5, 13, 16*
*101:3*   *223:4*
*246:11*
**moved**   *39:19*
*44:16*   *134:2*
*173:8*   *198:1*
*234:19*   *235:22,*
*24*   *236:25*
*252:13*
**movement**   *93:14*
*154:10, 12*
*206:7*   *211:21*
*217:20, 25*
*218:11, 15, 21*
*219:9, 17, 20,*
*22*   *220:12, 15,*
*24*   *221:1, 17,*
*19*   *222:12, 25*
*223:12*
**moving**   *122:4*
*133:4*   *223:6, 8*
**MP3**   *229:8*
*253:9*
**MULLINS**   *1:16*
*5:16*   *6:11*
*26:8*   *77:8, 16,*
*21, 22, 24*   *78:3,*
*12*   *88:11, 23*
*89:17, 20*
*109:23*   *113:7,*
*10, 13, 19, 23*
*114:16, 20*
*115:6, 9, 19*
*117:11, 16, 22,*
*24*   *118:9, 23*
*119:3, 6, 18, 20*
*120:1, 3, 4, 14,*
*20*   *121:11, 12,*
*19, 23*   *122:6,*
*13, 22*   *123:3,*
*17, 19, 20*
*124:3, 10, 18,*
*23*   *125:10, 12,*
*23*   *126:6, 18,*
*19*   *127:7, 19*
*128:3, 5, 16, 25*
*129:12, 21*
*130:8, 17*
*132:25*   *133:11,*

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 27

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

18    134:2
135:21, 25
136:16, 23
142:6, 9, 11, 24
143:1, 7, 9, 12,
21    144:18, 21
145:10, 11, 22,
25    146:7, 12,
21    147:1, 4, 5,
7, 24    148:4, 8,
13, 19, 25
149:9, 15
150:2, 5
171:24    172:14,
21    173:8, 13
174:6, 14, 21,
25    175:11, 16,
25    178:20, 22
179:4, 6, 16, 20,
24    180:4
211:20    216:4,
10, 25    217:6,
14    218:22
220:15    222:12,
21    224:12
225:10    232:3,
19    234:4, 8, 9,
11, 13, 19
235:13, 17, 21
236:3, 9, 13, 15,
21, 25    237:7,
24    238:4, 19,
20    239:12, 13,
21    240:1
256:16
multiple    67:4
98:14    112:12
113:21    118:22
135:5    141:23
173:3    179:20
223:9    229:23
254:4
murder    61:8
192:4    193:5
219:8, 23
225:10, 17
MYERS    1:14, 25
5:7, 12    6:1,
12, 21, 25
103:13    232:2
257:2    259:13

< N >
name    6:7, 24
11:12    27:24
74:17    135:12
178:10, 18, 20
189:10    193:15
209:20    239:12,
13    258:16
named    111:25
117:16    125:13
names    5:24
26:6    85:4
177:12
narcotics    253:21
narrative
233:25    235:8
241:3    242:9
Nashville    58:15
national    69:15
nationwide
81:15    111:17
248:4    249:3
251:1    252:14
naturally    8:9
nature    58:16
124:10    173:17
nearly    69:13
necessarily
13:11    16:4
42:1    48:12
68:14    80:1
84:25    122:3
130:17    193:7
197:2, 13
207:23    209:17
254:12
necessary    2:14
49:15    132:20
152:19    154:1
155:8    179:2
need    9:3, 12
42:17    64:19
76:6    82:8
100:7    103:5
111:1    116:8,
18    131:10
156:10    169:5
251:9
needed    58:23
67:2    152:9

needs    115:25
116:4    157:11
159:25    251:3
256:21
negative    41:23
100:24    183:6
neither    182:9,
12    258:9
Nero    193:15
196:6, 18
197:9, 19
198:9    199:2, 16
Nero's    198:13
never    20:4
42:12, 25
114:20    137:4
168:7    196:13
200:4, 6, 7, 9,
11, 13    224:20
Nevitt    243:20,
23
New    26:18
48:4, 9, 14
56:1    65:17
161:4, 9, 12
162:9, 12
163:12, 14
206:25    247:17
248:25    254:24
255:8
NIC    206:3
nice    155:23
nickname    113:20
115:2    149:4
Nico    241:5
nine    40:25
41:1
nods    8:4
noise    237:24
nonproblematic
188:19, 21
normal    188:11
246:3
normally    21:18
202:25    203:20
245:5, 7, 15
250:19
North    258:22
NORTHERN    1:2
5:20
Notary    2:1
5:2    259:25

note    26:20, 22
27:4    199:2
noted    123:18
159:18, 23
210:11    241:22
notes    26:9, 10,
12
notice    105:7
notification
235:17
November    190:5
191:24
nowadays    163:4
248:6    250:3
252:24
Number    5:17, 18
7:6    27:7
53:23    59:11
60:24    61:1
65:21    66:18
74:10, 21
82:16    91:23
99:15    104:7
110:7    132:7
133:14    153:15
193:7    212:7,
18    218:7
223:4    233:4
239:7    245:10,
12    258:16
numbers    65:7
numerous    114:6,
9    125:18
250:21
Nurse    234:10
241:20

< O >
oath    7:22
35:14    36:2
Object    10:21,
24    11:19, 24
12:10, 21    13:4,
10, 16    14:2
15:4, 19    16:2,
9, 14, 20    17:3,
8, 25    18:1, 15,
23    19:7, 14, 18
20:7, 14    22:14
23:6    24:5, 9,
14    25:6, 17, 25
27:11, 19

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 28

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

28:19    29:7, 17
31:6, 11, 15
32:3, 7, 15
33:3, 21, 22
34:18    35:6, 11,
21, 25    36:11,
15, 22    37:3, 8,
19, 23    38:6, 10,
21    39:8    40:6,
23    41:9, 18, 25
43:25    44:9
45:12    46:5, 19
47:8, 11, 19, 24
48:20    49:9, 23
50:6    53:22
54:14    55:5
56:11, 19
59:25    60:17
61:13    63:14
64:13    65:1, 8,
23    66:13
67:12    68:3, 9,
21    69:6, 11, 20
72:3, 10, 16, 25
73:8, 18    74:7,
14, 18    75:8
76:5, 13, 18, 24
77:4, 12, 19
78:8, 15, 22
79:3, 19    80:7,
13, 18    81:1, 6,
12    83:10, 15
84:2, 12, 20
85:13, 19, 24
86:13, 23    87:6,
12    88:17, 25
89:11, 19    90:3,
10, 15, 23    91:3,
21    92:6, 16, 22
93:11, 17, 22
94:6, 11, 16
95:2, 8, 15, 21
96:3, 24    97:5,
16    98:3    99:9,
23    100:9
101:20    102:14,
19, 25    104:12
105:2, 21
106:5    107:5, 7,
17, 22    108:1,
11, 23    109:3, 9,
110:5, 13, 23

111:16    112:4,
17    113:3
114:1, 8, 13
115:13, 24
116:14    117:14
118:1, 10
119:22    120:6,
8, 16    121:1
122:2, 17, 24
124:5, 25
125:15    126:8,
21    127:22
128:9    129:15,
24    130:14, 24
131:6, 20, 25
132:5, 10, 19
133:2, 15, 21
134:4, 15, 23
136:10, 25
137:14, 19
138:24    139:11
140:9, 22
141:8, 22
144:1, 9, 24
145:19    146:1,
9, 18, 24    148:7,
23    149:11, 17
150:15, 24
151:20, 23
152:7, 25
153:10, 24
154:11    155:4,
21    156:6
157:4, 20
158:4, 23
161:13    163:25
164:12    165:18
167:3, 15, 24
168:13    169:16,
25    170:3
172:17, 25
175:14    176:3,
19, 21    177:10,
15, 23    179:7,
13    180:7, 22
183:2    184:8,
25    185:7, 14
187:11, 18, 23
188:9    189:7
191:25    192:10,
17, 25    193:6,
19    194:1, 10

196:9    199:18
202:8, 24
203:7    204:8,
24    205:25
206:23    207:3,
16, 22    208:10,
16, 25    209:5,
11, 16    210:3, 9,
19    211:17
212:3, 15
213:18    214:2,
11, 23    216:6,
12    218:24
219:11, 24
220:6    221:4,
11    222:2, 14,
19    223:1, 17,
24    224:4, 9, 14,
18, 25    225:6,
13, 19    226:4,
11, 17, 25
227:4, 12, 22
228:3, 9
229:18    230:10,
16, 21    254:21
**objecting**    141:15
**objection**    33:23
66:23    232:10,
11    233:2, 7
237:11    243:11,
15    244:17, 22
245:14, 22
246:24    247:2,
7    248:2    249:7,
13    251:21
252:2
**objections**    2:14,
17    118:17
**objective**    29:5,
10
**objectives**    82:14
**observation**
183:23    184:12
**observe**    47:15
**observed**    237:24
241:7    243:8, 13
**obstacles**    215:20
**obtain**    32:13,
18    39:22    43:4
**occasion**    99:19

**occupied**    142:14
143:2, 24
146:8, 14, 23
**occupying**    144:5,
22    145:11, 15,
23
**occur**    62:12
164:15    179:16
**occurred**    13:18
15:5, 8, 10
114:4    120:19
121:9    179:22
**occurrence**    143:7
**occurs**    250:9
**o'clock**    233:22
**October**    193:14,
22    194:8
195:4    196:17
**odds**    249:2
**offender**    60:2,
18    100:18
201:7
**offenders**    53:24
**offer**    69:3
216:19
**offered**    2:19
177:2    184:3
219:2    223:13
224:1, 20
225:2    255:8
**office**    236:16
242:12
**officer**    27:2, 3
39:16    45:6, 14
50:21    51:3, 12,
15, 16    155:11,
12    192:3
221:13    233:18
234:3, 7, 25
235:4    237:19
241:5, 7
242:24    243:12
244:3    249:18,
20
**officers**    51:8,
10    56:4
152:15, 16
185:9    221:14
245:12    249:12,
15
**offices**    2:2
**official**    100:6

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 29

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

officials   6:1
  128:21   145:14
  186:4   200:12
Oh   27:23
  38:24   44:19
  74:25   137:4
  204:4   208:21
  216:14   239:16
Ohio   87:16
  206:2, 3
Okay   6:6, 21
  7:1, 7, 10, 13,
  16, 19, 21, 24
  8:1, 6, 15, 18,
  22   9:1, 3, 5,
  14, 20   10:1, 5,
  7, 12, 19   11:3,
  6, 9, 12, 16
  12:3, 7, 12, 16,
  25   13:8, 13
  14:5, 21, 24
  15:2, 7, 12, 16,
  24   16:6, 11, 16
  17:5, 10, 13, 16,
  19, 22   18:6, 11,
  25   19:3, 9, 12,
  20, 23   20:3, 9,
  16, 21   21:17
  22:11, 23
  23:13, 18, 22
  24:1, 7, 12, 18,
  21, 23   25:3, 21
  26:5, 10, 20, 24
  27:4, 9, 16, 21,
  25   28:12, 16
  29:2, 13, 21, 24
  30:7, 19, 23
  31:4, 13, 17
  32:1, 5, 9, 21
  33:8, 11, 19
  34:4, 8, 14
  35:2, 16, 23
  36:4, 13, 19
  37:5, 10, 15, 21,
  25   38:3, 8, 16,
  19   39:4, 10, 22
  40:2, 4, 17, 20
  41:6, 15, 20
  42:2, 8, 19
  43:3, 7, 12, 21
  44:2, 5, 11, 23
  45:4, 8   46:1,

7, 11, 16, 21
  47:5, 10, 16
  48:16   49:3, 17
  50:1, 15, 20, 23
  51:18   52:9
  53:1, 7, 13, 17,
  19   54:2, 6, 9,
  12   55:1, 14
  56:13   57:9, 13
  58:4, 9   59:3,
  11, 16, 20   60:9,
  13   62:16   63:9
  64:22   65:4
  66:7   67:7, 20
  68:5, 24   69:3,
  8, 17, 22   70:5,
  13, 14, 21   71:7,
  13, 17, 22   72:6,
  12, 19   73:3, 11,
  15   74:11, 16,
  22, 25   75:5, 10,
  22   76:2, 8, 15
  77:6, 14   78:10,
  19, 24   79:6, 11,
  15, 23   80:3, 9,
  15, 20   81:3, 8,
  22   82:4, 15, 20
  83:1, 7, 19, 22,
  23, 24   84:8, 16
  85:1, 9, 15, 21
  86:6, 16, 25
  87:8, 22   88:4,
  9, 14, 21   89:3,
  13, 22   90:6, 18,
  25   91:5, 16, 25
  92:11, 19   93:7,
  24   94:13, 23
  96:14, 20   97:1,
  7, 11   99:17
  100:2, 11
  101:12, 16
  102:22   103:13,
  22   104:3, 6, 8,
  13, 19, 23, 25
  105:6, 18
  106:2, 9, 15
  107:1, 13, 19
  108:6, 18, 25
  109:12, 16, 20
  110:1, 10, 19
  111:6, 12, 18,
  22   112:1, 14,

24   113:6, 12,
  22   114:5, 11,
  15, 19   115:16
  116:9, 21, 23,
  24   117:7, 21
  118:5   119:5,
  16, 24   120:10,
  22   121:23
  122:13   123:9,
  13, 15   124:1, 9,
  14, 22   125:4,
  22   126:4, 14,
  25   127:17
  129:10   130:10,
  20   131:1, 14,
  22   132:2, 7, 24
  133:10, 17, 25
  134:7, 19
  136:1, 19
  137:9, 16, 24
  138:7, 20
  139:6   140:4,
  17   142:10, 23
  143:6, 20
  144:3, 12, 19
  145:14   146:4,
  16, 20   147:11,
  15, 23   148:3,
  12   149:3, 7, 14,
  22   150:7, 10
  151:3   152:3,
  10, 21   153:6
  154:7, 14, 17,
  24   155:18
  156:2, 16, 22
  157:14, 25
  158:16   159:13,
  16, 21   160:3,
  11, 15, 24
  161:8, 17
  163:11   164:6,
  16, 19   165:8,
  13, 19   166:19
  167:6, 11, 19
  168:8   169:6,
  11   170:13, 14,
  18, 25   171:4, 8,
  12   172:2, 7, 12
  174:5, 12, 13,
  17, 20   175:10,
  22   176:10, 24
  177:6, 18, 25

178:11   179:5,
  9, 23   180:2, 15,
  20, 24   181:10,
  15, 23   182:6,
  17, 24   183:9,
  12, 14, 18, 23
  184:3, 10, 21
  185:9, 16
  186:5, 12, 16,
  25   187:8, 13
  189:2, 9, 13
  190:12   191:5,
  10, 17, 22
  192:2, 6, 13, 20
  193:2, 13, 21
  194:3, 14, 21
  195:13, 18, 19
  196:5, 14, 21
  197:7, 15
  198:6, 12, 15,
  22, 25   199:14,
  22   200:1, 18
  201:3, 15, 21
  202:3, 13
  203:3, 21
  204:4, 11, 19
  205:1, 4, 13, 19
  206:6, 10, 16,
  20, 25   207:5,
  12, 18, 24
  208:7, 12, 18,
  21   209:2, 7, 24
  210:5, 12, 17,
  21, 24   211:3, 9,
  13, 25   212:10
  213:6, 10, 14,
  20, 22   214:9,
  13, 17, 18, 24
  215:18, 23
  216:3, 7, 22
  217:4, 11, 17,
  19, 23   218:3, 6,
  14, 18   219:5,
  21   220:2, 9
  221:9, 12
  222:10, 17, 21
  223:13   224:6,
  20   225:2, 8, 15,
  21   226:1, 6, 14,
  21   227:2, 6, 18,
  25   228:5, 12,
  15   229:2, 12

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 30

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

230:*12, 18, 23*
231:6, *19*
232:*18*    235:7
237:*18*    239:*19*
243:6    247:2
254:*3, 19*
256:*2, 9, 19*
**Oklahoma**    38:*17*
39:*19*    40:*11,
15, 16*    42:*10,
12*    43:*8, 22*
44:*12, 13, 24*
45:*9, 17*    46:*25*
50:*16*    51:6
54:*3, 7, 19*
**old**    60:*20*
162:*9, 13*
**omitted**    192:*23*
**once**    54:*21, 24*
84:*24*    87:*25*
98:*25*    137:*22*
140:*14*    144:*14,
25*    151:5
168:6    200:2
249:*19*
**ones**    14:*20*
73:*25*    87:3
106:2    107:*15,
20, 24*    109:*7,
10*    181:*7, 8*
206:1    212:5
232:*16*
**one-year**    158:*14*
**ongoing**    18:3
**OO8964**    124:*17*
**open**    12:*15*
221:*16*    222:*4,
5*    223:8
**operating**    82:*19*
137:7    157:*23*
158:*12*    164:4
200:*20*    201:*23*
202:5    211:*22*
227:*19*    228:1
**operation**    63:*8,
23*    98:*23*    99:3
153:*19*    227:*24*
246:3    248:5
252:*16*
**operational**
101:*10*    102:1

**operations**
59:*19*    182:*14,
19, 23*
**Operator**    237:*23*
243:7
**opine**    200:3
**opinion**    12:2
13:6    14:*16*
16:5, *17, 18*
19:*13*    27:*15*
28:*10, 17, 22*
29:1, *18*    63:2
68:*13*    78:*17*
79:5    94:*17*
96:*15*    106:*7,
25*    107:*11*
114:*22*    119:*24*
120:*9*    122:1
134:*20*    135:*20*
137:*1, 2, 7*
140:4    141:*2,
17*    142:2
145:*13*    151:*17*
152:*3, 17, 21,
22*    153:*1, 20*
154:*7, 14, 17,
25*    155:*18*
156:*17, 18*
158:*9*    161:*3,
25*    164:*13, 19*
167:*16*    169:*11,
20*    174:*1, 20*
179:*5, 23*
180:*17*    181:*3,
25*    182:*3, 21*
184:*4, 22*
186:*5, 8, 12, 25*
189:2    200:*25*
201:*15*    207:*20*
215:*24*    216:*19*
217:*24*    218:*8,
15, 20*    219:2
222:*11*    223:*15,
20*    224:*1, 20*
225:2    226:*21*
230:2    244:*10*
254:*13*
**opinions**    10:*16*
15:*17, 23, 25*
17:1    28:3
29:*15, 24*    30:3
33:*16*    34:*9, 11*

37:2    67:*21, 22,
25*    68:*1, 2, 5,
7, 14, 16, 18, 19,
22, 24*    69:4
72:*9, 13, 23*
73:5, *12, 17*
75:*2, 11, 15, 19*
78:*21*    79:7
80:*9, 21*    82:*22*
83:*8, 25*    84:*18*
85:*10, 16*
86:*21*    87:*3, 11,
24*    88:*6, 16, 24*
89:*9*    91:7
93:*9, 15, 24*
94:*4, 15, 25*
95:*6, 14, 19*
101:*7, 8, 13*
103:*14, 23*
104:*15*    105:*13,
20*    107:*14*
108:*16, 20*
109:*14*    120:*25*
133:*12*    138:*13*
140:*20*    141:*10*
158:*18, 20*
177:*2, 18, 22*
187:*10, 21*
191:*12*    199:*23*
209:*4, 9, 14*
211:*10, 14*
229:*14*    230:*12,
19*    254:*8, 24*
255:*1, 2, 3, 8*
**opportunities**
63:*17*    81:*14*
101:5
**opportunity**
136:*17*    223:*2,
10, 11*
**opposed**    12:*19*
183:*25*
**option**    99:*14,
18, 24*    100:*16,
22*    101:*2, 3*
166:8
**optional**    245:*9*
**options**    97:*12,
24*    99:4    151:5
165:*24*    176:*16,
22*

**oral**    5:8    40:1
42:*9, 15, 23*
43:5    125:*10,
25*    236:*10*
242:*14*    259:7
**ORAS**    26:*15*
87:*17*    88:1
200:*24*    201:3
**O-R-A-S**    26:*16*
**order**    18:2
21:*13*    33:1
41:2    44:*14, 15*
51:*10*    55:*17,
18, 24*    57:2
73:*16*    83:*8, 25*
84:*18*    87:*10,
24*    88:*15*    89:9
91:7    93:*9, 15,
24*    94:*4, 14, 25*
95:*5, 13, 19*
97:*14*    98:*14*
105:*19*    108:*20*
109:*14*    115:*5,
25*    116:*17*
134:*25*    165:*15*
166:*25*    187:*21*
209:*3, 9, 14*
221:*14*    246:*12*
**orderly**    131:*13*
**ordinary**    139:3
**organization**
41:2    83:*17*
**organizations**
69:*15*    81:*16*
82:*13*
**original**    124:*17*
**outbreak**    248:*20*
**outcome**    102:*6, 7*
**outcomes**    48:*17*
**outgrowth**    45:*19,
24*
**outline**    185:8
**outlined**    34:2
99:*10*    137:8
**outside**    50:*11,
13, 25*    83:*17*
89:*16*    201:*24*
205:*22, 23*
207:*9*    208:*24*
209:*8, 13, 23,
25*    210:*7, 25*
211:*16*    212:*14*

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 31

Case 4:20-cv-02058-ACA    Document 348    Filed 03/03/25    Page 98 of 113

Lakeisha Ezell v. Jefferson Dunn, et al.                                          Kevin Myers
2/4/2025

213:*12, 17, 25*
237:*25*    239:*5*
247:*23*
**outsiders**    248:*10*
**overall**    84:*24*
158:*18*    225:*22*
226:*2*
**overcome**    249:*2*
**overcoming**
248:*21*

**overgeneralization**
42:*5*
**overridden**
226:*13, 15, 23*
227:*8*
**override**    227:*3,*
*16*
**oversaw**    61:*12*
63:*13*    64:*11,*
*25*    65:*22*    66:*20*
**overseeing**
49:*17*    60:*16*
**overseen**    47:*21*
**overseer**    48:*25*
**oversight**    41:*13*
44:*21*    183:*4*
228:*11*
**oversights**    44:*18*
**owed**    129:*2*
197:*23*

< P >
**p.m**    103:*9, 12*
159:*9, 12*
205:*9, 12*
231:*2, 5, 15, 18*
235:*5, 9, 18*
237:*3, 9, 20, 23*
241:*20*    243:*7*
257:*3, 5*
**P1**    221:*9, 25*
**P2**    221:*10, 25*
**P36**    123:*21*
234:*19*    237:*1*
**Pacholke**    213:*23*
**Pacholke's**
212:*18*    213:*10*
**PAGE**    4:*8*    7:*18*
109:*18*    117:*6*
123:*15*    127:*1*
149:*23*    159:*14,*

*17*    164:*16*
170:*14, 16*
174:*5, 10*
176:*25*    177:*25*
180:*9*    181:*16*
182:*6*    183:*12,*
*16*    185:*16*
186:*17*    189:*17,*
*23, 25*    190:*7*
191:*15*    195:*3*
206:*2, 4*    211:*5*
214:*18*    215:*1,*
*9, 13, 18, 23*
218:*2, 4*
228:*13*    233:*18*
243:*19*    260:*3*
**Pages**    190:*21*
191:*19*    205:*20*
206:*12*    214:*25*
215:*7*    233:*4*
**paid**    30:*7*
**panel**    21:*23*
**paper**    26:*4*
42:*17*    69:*25*
71:*3*    157:*10*
**paperwork**    47:*13*
**paragraph**
109:*21*    159:*16,*
*17, 22*    164:*20,*
*25*    171:*23*
174:*9, 11*
178:*2*    180:*8*
182:*7*    185:*17,*
*20*    218:*7*
228:*15, 16*
**parent**    21:*9*
**park**    33:*15*
35:*2, 7*
**parole**    55:*19*
**paroling**    55:*22*
**part**    19:*25*
21:*1*    26:*17, 21*
33:*4*    40:*9*
45:*19*    52:*13*
55:*17, 23*    66:*5*
67:*2*    73:*20*
78:*16*    80:*20*
96:*1*    120:*10*
133:*3*    142:*18*
151:*9*    177:*8*
198:*18*    219:*20*

**partial**    105:*15*
**Partially**    119:*10*
**particular**
12:*13*    65:*22*
73:*16*    92:*14*
109:*13*    156:*24*
189:*25*
**particularly**
67:*10*
**parties**    1:*23*
2:*16*    177:*7, 14*
258:*10*
**partner**    236:*4,*
*9, 14, 22*    237:*8*
**parts**    84:*15*
122:*4*
**pass**    249:*22*
**passed**    32:*25*
**Patricia**    241:*20*
**patrol**    55:*20*
**patterns**    23:*25*
**Patterson**    241:*5,*
*7*
**pay**    26:*18*
155:*10*    197:*24*
**paying**    198:*2*
**pending**    9:*8*
238:*11*    241:*23*
**people**    8:*12*
46:*2*    51:*8*
52:*12*    62:*2, 6,*
*7, 8, 10*    84:*5*
96:*10*    98:*21*
113:*21*    121:*13*
139:*20*    142:*19*
161:*24*    196:*23*
208:*23*    250:*18,*
*24*    251:*4, 15*
**perceived**    183:*5*
**percent**    26:*18*
**percentage**
12:*16, 22*
**perfect**    122:*5*
185:*25*
**perform**    21:*6*
125:*10, 25*
236:*10*    242:*14*
**period**    112:*7*
128:*24*    129:*13*
139:*4*    223:*3*
**periods**    88:*1*

**perpetrator**
135:*15*    139:*14*
166:*1*    178:*24*
202:*11*
**Perry**    3:*14*
**person**    100:*23,*
*25*    110:*16, 24*
113:*19, 23*
115:*5*    118:*8*
148:*10*    164:*8*
182:*22*    194:*8*
197:*1, 10*    240:*2*
**personally**    49:*20*
**personnel**    249:*9*
**persons**    205:*22*
212:*14*
**perspective**
200:*12*
**pertained**    78:*3,*
*4*
**pertaining**    77:*7,*
*15*    79:*12, 17*
88:*11*    89:*17*
**pertains**    92:*21*
**pertinent**    84:*15*
89:*2, 20*
225:*23*    226:*3*
**Phillips**    38:*16,*
*20*    39:*6*
**philosophy**
56:*20, 22*    102:*9*
**phone**    53:*10*
238:*18, 20*
250:*3*    252:*20,*
*24, 25*    253:*2*
**phones**    228:*23*
229:*5, 8, 17*
252:*18, 22*
253:*5, 9*
**physical**    159:*25*
160:*25*    161:*5,*
*15*    162:*24*
163:*20, 21*
164:*5*    215:*20*
**physically**
124:*4*    135:*12*
136:*5*
**physicals**    249:*21*
**pick**    247:*15*
**picking**    53:*10*
**piece**    26:*4*

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 32

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

42:17    233:8
pieces    151:24
place    16:13
92:4    97:25
99:5, 20    100:6,
18    110:16
117:7    126:5,
13    127:6
144:4    151:10,
25    157:23
163:16    173:21
197:22    250:23
placed    109:23
112:6    130:17,
18    133:18
171:5    173:16
174:22    215:19
placement
127:20    128:4,
5    129:21
173:14    174:6,
14    175:1, 2
202:16    203:6
204:6, 14
214:21    215:7,
25    216:5, 11,
20    217:1, 6, 13
placements
204:21
places    182:13
placing    100:23
Plaintiff    1:9,
17    3:2    17:17
19:13    24:10,
13, 19, 23    25:1,
4, 7    174:25
210:16, 20
217:8
plaintiffs    12:2
28:8    29:14
92:2
PLAINTIFF'S    4:8
33:23    70:7, 24
194:24
plan    66:8, 21
151:19, 21
153:17    207:1
planning    43:9,
13    52:15, 16,
18, 19, 23    53:2
plans    50:25
63:11    207:10

plant    159:25
160:25    161:5,
15    162:24
163:20, 21
164:5    215:20
platform    60:20
play    36:17
played    219:20
players    229:9
253:9
pleasant    55:10
please    55:23
6:23    9:4, 13
10:4    14:13
34:19    48:1
75:13    78:23
109:4    116:9,
12    141:11
145:20    146:10
148:17    150:16
157:6    159:13
164:25    169:18
172:18    195:15
209:12    211:5
215:3    218:2
219:12    220:17
255:15
Plus    111:24
223:6    247:11
250:12
pod    171:2
173:9, 10
point    34:16
56:24    57:15
58:24    114:10
116:7    118:13,
24    119:14
121:21    122:11
140:3    147:3
153:18    165:25
166:12    169:10
198:16    201:13
216:8    218:7
222:9    226:6,
12, 15, 23
227:7    246:17,
18    252:13
pointed    208:1
pointing    162:3
points    201:11
police    250:20

policies    45:15,
18, 23    46:15
47:3, 22    48:18
49:6, 18    50:4
59:23    76:21
82:16, 20    83:1,
3    140:5, 7
152:5    154:19,
21    155:2
156:25    157:1,
10, 12, 16, 17,
24    158:3, 19
185:12    186:4
200:21    228:8
policy    48:4, 5,
6, 9, 10, 15
50:12    137:17
141:19    151:25
152:24    153:9,
23    154:2
156:1    165:14,
22    167:20
168:9, 18
170:4, 5    185:5
203:8    223:22
political    162:22
pool    249:6
poor    156:25
157:16
pop    133:5
population
51:17    52:22
53:20    54:23
55:18, 24    56:8,
15, 17    57:7
58:19    60:8
112:11    113:5
114:23    128:18
129:4, 6, 8
130:5, 6    133:6
134:11    135:11
139:22    147:13,
17    163:6
170:22, 23
171:6    172:4
173:15    175:12
176:1, 9, 11, 13,
17    178:21
188:25    251:9
populations
212:17

portion    52:16
191:15    235:8
251:8
portions    87:20,
22    91:10
191:13
posed    9:18
position    29:6
38:13    50:20
51:4, 15, 17
56:7    244:25
positions    26:25
161:10    244:20
245:4, 11, 19
248:25
positive    41:22
possessed    44:5
possible    30:19,
22    131:9
133:7    155:16
156:13    173:22,
25    174:3
possibly    163:10
230:6
post    153:15
245:9    246:8
247:8
posted    48:11
posts    245:7, 8,
10, 20, 21, 25
246:1, 4, 5, 6,
21    247:4, 10, 16
potential    98:15
140:13, 15
142:5    170:23
187:14    221:15
potentially
98:14
P-Q    94:2
102:17, 20
189:3
practice    150:11,
19    170:7
186:2    244:20
practices    157:3,
18
PREA    26:16
48:24    83:18
84:4, 8, 10, 15,
16    125:7, 8
126:3    150:7,
12, 20    165:7, 9,

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 33

**Lakeisha Ezell v. Jefferson Dunn, et al.**

Kevin Myers
2/4/2025

20, 21, 22
166:25  167:9,
13  169:21
171:20  212:17
213:1, 5, 7, 22
235:10, 12, 17
239:21  240:1
P-R-E-A  26:16
predator  171:6,
16, 18, 21
predators
170:21  172:3
predatory  62:2,
7
pregnant  171:19
prelegislative
206:5
preparation
71:24  87:2
105:13  133:1
prepare  73:4
83:25  86:21
88:15  93:24
103:23  104:14
138:13  187:9,
21  191:11
209:3  211:10,
14
prepared  25:20
35:12  85:4, 15
206:22  212:13
213:3
preparing  33:16
34:9, 11  37:1
81:10  85:9
88:24  101:7
103:13  127:17
137:12  229:14
prerelease  52:2
present  5:23
7:25
presentation
40:1  42:9
43:5  207:13,
14, 19
Press  239:7
pressure  55:22,
25
Pretty  52:21
prevented
225:10, 17

previous  241:16
251:21
previously  10:9
159:18, 23
174:2  210:11
211:12  226:5
preying  188:19
Price  6:5
238:7
primarily  14:4
27:12  37:12
54:22  64:4
203:11
primary  164:8
182:17
prior  2:19
27:16  121:25
126:6, 19
127:7  138:1
144:20  145:22,
25  148:1
161:8, 11
165:1  190:24
242:15
Prison  26:13,
14  40:10, 22
41:4, 7, 8, 12,
13, 14, 17, 22,
24  42:6, 7
47:12  50:25
56:23  57:1
62:4, 12  65:22
97:4  99:16
101:23  122:4
130:13  134:9
139:23  153:12,
14  157:2, 17
161:21  171:17
182:23  206:20
220:4  248:19
250:19, 23
251:18  252:17
253:1, 2
prisoner  19:17
25:10  111:8,
12  134:12, 13
136:6, 7  193:15
prisoners  20:6
50:24  56:9, 18
94:2  193:16
prisons  40:3,
16  43:20

48:25  55:3
58:13  100:21
157:15  162:18
163:1  188:11
250:25
prison's  40:25
private  49:10
privilege  241:23
privileges
131:2, 17
proactive  22:16,
17
Probably  7:5
28:21  59:10
112:21  217:7
247:8
probation  55:19
56:4
problem  66:22
71:6  118:3
162:5  183:1
239:17
problematic
162:24  188:18
problems  128:19
Procedure  5:5
33:25  48:15
50:12  137:17
200:20  201:23
202:5  223:22
procedures
44:24  45:1, 2,
16  46:15  47:4,
5, 9, 10, 22
48:18  49:7, 18
50:4  59:23
82:19, 21  83:2,
4  137:7, 10, 12
140:6, 7
157:23  158:12
164:4  185:12
211:22  227:20
228:1
proceedings  5:9
258:5, 8
process  21:1
25:13  53:25
55:10  60:4, 6
134:14  168:3
196:12  203:23
227:17  249:10
processes  227:14

processing
253:17
produce  46:16
179:21  212:20
produced  67:14,
17  178:7
186:23  256:17
production  34:1
256:7
productive  55:10
professional
29:8  37:6, 18
38:13  44:7
185:22  248:11
professionalism
51:7
professionals
223:10
program  39:12,
15  43:9, 12, 22
56:1, 20  246:12
programming
245:20  246:10
programs  43:17,
24
project  162:16
promulgated  48:4
prone  188:12
proper  28:21
140:16  142:6
properly  63:20
135:24  201:17
226:20  244:10
protect  57:2
173:22
protection
111:1  130:9
protective  18:2
109:25  110:8
111:24  112:1,
16, 21, 25
128:14, 16, 22
130:4, 6
131:11  179:20
protocol  142:8
prove  166:5, 6,
9, 15, 16, 17
provide  12:1,
22  14:5, 16
15:22  23:14
28:3, 21  35:14
36:3  49:14

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 34

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

59:21    131:13
149:24    152:19
177:22    207:21
214:20, 25
215:23    218:8
222:11
provided    12:4
13:5    18:18
29:12    35:1
40:14    42:13
74:12    82:3
86:10    90:20
96:4, 7    126:23
127:14    138:17
211:20    223:20
239:21    254:11,
22
providing    27:14
29:18    210:25
Public    2:1
5:2    43:14
49:13    55:22
73:22    250:18
259:25
pull    60:21, 23,
25    246:7, 8
pulled    61:1
73:22    74:1
129:1    193:17
198:21    236:9
punch    125:17
punched    117:16
125:9, 13, 19
134:12    145:3, 4
punching    236:4
punish    165:6, 8
167:8
purposes    88:5
101:18    110:15
196:15
pursuant    5:4
170:20    172:3
pushed    198:20
236:14
put    55:7    62:8
102:4    120:19
135:21    161:25
162:12, 23
163:3    169:2, 4
188:18    194:20
199:23    226:18
247:17    250:19

254:13, 20
255:11
putting    62:3
162:9    173:24
247:18

< Q >
Q27    142:14
143:25    171:1
235:25
Q32    142:13
143:2, 23
144:6, 22
145:11, 16, 23
146:8, 13, 22
171:1    235:23,
24
qualified
214:21    215:6,
25    216:4, 10
217:1    249:6
qualify    216:19
Quality    26:13
quantitative
65:20    80:11
93:8
quarterback
142:20    145:1
221:22
quarterbacking
121:7
question    8:18,
22    9:8    14:13
16:21    24:16
34:19    35:13
36:6    38:14
57:5    65:17
67:6    76:8
78:23    86:14
104:13    105:17
109:4    116:11,
12, 15, 25
118:14, 18
122:18    126:15
131:14, 16
134:17, 18
137:9    138:7
141:1, 13, 23,
25    146:2
149:7    166:19
167:4    169:17
172:18    173:11

175:22, 24
176:5    178:11,
14    209:12
216:22    220:24
223:18    227:6
230:11    251:22
254:20
questioning
113:19
questions    2:15,
16    8:1, 6
9:12, 17    10:3
36:5    53:4
135:6    231:7,
20, 22    232:3, 6,
15, 24, 25
240:10    244:15
254:23    255:9
256:1
quick    57:16
quit    42:18
43:2    55:22
quotations    93:5
quoted    110:16

< R >
rabbit    43:1
radio    252:23
Ragsdale    6:5
124:20    234:8
raise    217:12
raises    248:25
ranged    59:1
rate    30:10, 15,
20    31:4, 14, 18
reaccreditation
21:6
reach    21:4
28:17    66:17
72:9, 13, 23
73:17    75:2, 11,
14, 19    83:8
84:18    87:10,
24    89:9    91:7
93:9, 15    94:4,
15, 25    95:6, 13,
19    101:8
105:20    107:14
108:20    109:14
182:2    209:9, 14
reached    101:12

reaching    96:14
181:2
read    6:17
26:10, 20    48:5
100:14    101:24
109:21    116:12,
13    146:25
159:21    164:24
170:18    178:5
182:11    183:18
185:20    186:21
187:16    191:13,
14    195:15
228:20    234:16
239:10, 15
243:24    254:12
259:5
reader    55:8
readily    162:20
reading    2:7
195:23    239:16
ready    112:10
real    121:9
127:15
reality    175:9
realize    61:25
realizing    162:23
really    15:22
24:10    35:24
50:12    127:9
181:7
reason    30:23
31:13    68:11
114:21    140:24
142:19    145:15,
17, 24    174:23
189:6    192:23
193:1    217:14
260:3
reasonable
33:24    34:2
162:6
reasoning    31:16
reasons    188:17
reassigned
241:22
recall    13:20,
25    14:20, 21,
24    15:1, 11
16:6, 15    24:10,
12, 18, 20    25:3,
11, 19    27:3, 23

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 35

**Lakeisha Ezell v. Jefferson Dunn, et al.**

Kevin Myers
2/4/2025

30:17    31:8, 9,
21    32:8, 16
33:10    37:20
39:3    44:19
50:9    54:21
60:5    61:6, 9
74:19, 24    79:4
84:17    96:11
99:12    107:12,
13, 18    108:7,
19, 24    113:6
122:25    123:1,
6, 9    128:23
142:10, 23
144:2    160:7,
23    173:1, 17,
18    174:7
175:15    176:7,
8, 10, 12, 14
181:11, 23
189:10, 16
191:10    192:11
193:20    195:23
202:18, 20
203:2    207:6
209:20    214:4,
8    220:7    227:1,
3, 16    232:4, 5,
6, 18    233:8
240:17    244:15
253:24
**recalling**    25:7
**recalls**    232:17
**receive**    21:14
32:10    33:2
85:22    91:18,
19    106:9
136:4    145:9
**received**    28:2
30:15, 19    38:9,
16    39:10    74:2
75:2    78:20, 25
79:5    84:18
86:21    106:3, 6
107:2    118:7
120:12    123:21
134:10    235:11,
17    254:3
**receives**    135:10
**Recess**    58:1
159:10    205:10
231:3, 16

**reclassified**
88:2
**reclassify**    168:5
**recognizing**
162:20
**recollection**
24:8    31:12
38:7    46:20
47:20    65:3
73:14    93:2
113:18    116:1
117:15    129:16
168:19    179:14
195:24
**recommend**    203:18
**recommendation**
226:12
**record**    6:24
8:16    37:1
57:25    58:3
103:7, 8, 12
116:13    159:8,
12    194:17
205:8, 12
231:2, 5, 15, 18
233:14, 15
254:21    255:12
**recording**    239:4,
25
**records**    33:18
88:10, 15, 22
89:4, 8, 14, 17,
23    90:1    95:24
138:16, 18, 21
187:20    201:25
206:8    243:22
**recovered**    244:3
**recreation**
246:11
**reduced**    252:10
253:9
**reducing**    63:12
**redundant**    38:14
**refer**    27:5
80:5    112:12
**reference**    86:9
170:15
**referenced**
78:12    81:17,
25    82:6    85:2

**references**    86:1,
2, 4, 18, 20
92:23, 24
**referred**    109:24
112:16    244:19
248:12
**referring**    87:1
92:1    96:8
113:24    204:2
**refers**    27:5
106:20
**reflect**    198:14
244:25
**reflected**    36:24
**reflecting**    117:4
**refresh**    15:21
115:25    116:17
132:21    175:3
**refuse**    35:10
**refused**    191:2
**refusing**    178:10,
18    256:3
**regard**    42:3
44:23    85:1
136:22    137:18
138:1    139:6
140:18    172:22
227:10
**regarding**    13:2
15:18    16:18
17:1    55:3
69:9    75:6
84:10    127:19
129:21    131:23
133:11    134:1
141:19    152:5
154:19    155:2
158:18    165:3
172:13    180:3
199:23    204:16,
20    210:7
212:24    213:7
226:15, 24
**regardless**
56:24, 25    78:4
105:10    162:12
163:7    185:6
**regards**    140:2
**regulation**    99:11
**regulations**
82:18    152:1

157:22    158:10
164:3
**rehabilitation**
50:24
**related**    12:23
13:1, 14    24:17
27:13    28:22
39:7    46:23
50:13    77:21
84:3    92:9
138:6    139:9
142:8    178:15
**relates**    89:16
138:23    201:18
**relating**    2:10
12:19    13:9
18:13    29:24
30:3    60:14
94:14, 24    95:4
148:14, 20
187:9, 16
192:3    215:20
219:6    230:4
**relationship**
25:4, 8    91:13
161:14
**release**    57:3
**released**    56:2
57:6    112:10
128:13, 16
129:7    142:17
**relevant**    227:21
**relied**    88:19
94:20    96:17
106:7, 22
160:12    178:19
181:24    182:2
206:6, 10, 12,
16, 20    213:16
254:14
**relieve**    55:24
128:20
**relocated**
142:14    143:24
**rely**    88:22
106:11    254:7,
16
**relying**    69:8,
12    181:1, 12
230:18
**remaining**    22:20
74:2

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 36

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

remains   185:18, 21
remember   10:1
  11:12   23:10
  25:9   26:7
  39:4   41:1, 3
  50:1   53:23
  173:2   177:17
  190:13   204:10
remind   8:25
reminder   118:15, 16
renamed   51:11
repeat   9:13
  75:13   148:17
rephrase   9:13
  11:20
replace   161:9
  162:8
replacing   163:15
report   4:9, 10,
  11   19:16
  21:21, 24
  29:21, 22, 25
  30:4   40:14
  49:14, 15   60:7,
  10, 23   67:14,
  17, 21   68:2, 7,
  15, 20, 23   69:1,
  13, 16, 22
  70:11, 16, 18,
  22   71:9, 10, 14,
  15, 18, 19, 24
  72:1, 7, 18, 19,
  22   73:7   75:12,
  16, 20   77:18
  78:13   79:2, 5,
  9   82:16, 23
  83:3, 5   84:9,
  22, 25   85:17,
  18, 23   86:1, 2,
  8, 9, 18, 19
  87:4, 5   97:1
  101:13   103:21
  104:23   106:1,
  3, 8, 11, 16
  107:4, 11, 16
  108:10, 17
  109:17, 18
  111:4   114:6
  115:3, 15, 17,
  20   116:1, 4, 8,

18   117:4, 7, 15
  118:13, 21
  119:1   122:13,
  15   123:1, 12,
  13, 25   124:13
  125:8, 13
  127:18   128:2,
  15   133:1, 14
  134:10   135:9,
  21   136:4
  137:12   143:21
  146:7   147:24
  149:23   150:12,
  20   159:14, 19,
  23   160:3, 9, 13,
  19, 24   161:25
  164:17   174:6
  176:25   177:2
  178:1   181:13,
  16   182:4, 6
  183:13, 23
  184:4   186:17
  189:16, 20, 22
  191:9, 18
  192:20, 24
  193:22   195:4,
  15, 24   197:7,
  12, 14, 18
  198:9, 10, 14
  199:16, 24
  200:4, 18
  201:22   205:13,
  15, 21   206:14
  210:2   211:3
  212:12, 17, 19
  213:10, 11, 23
  214:5, 13, 14,
  16, 19   215:1, 2,
  8, 18   216:3, 9,
  13, 15, 17, 18,
  24   217:9, 15,
  18, 19, 24
  218:4, 14, 19
  222:18   225:9,
  16   226:18
  228:12   233:18
  235:1, 4, 16
  237:6, 10, 20
  239:4, 6
  240:20, 25
  242:1, 3, 17, 24
  244:7   254:15

reported   59:18,
  19   113:7
  117:22   118:2
  124:18   125:24
  126:18   142:11,
  24   143:7, 9
  146:13   147:1
  189:14   190:2,
  9   191:7   192:8,
  21   193:15
  194:8   197:9
  234:7   236:16
  237:7   242:12
Reporter   5:1
  6:15   7:24
  8:3, 12   116:12
  215:11   255:23,
  24   256:4, 6, 10,
  21, 23   258:15
reporter's   8:15
reporting   46:16
  47:17   59:20
  81:17   120:3,
  14   135:11
  150:14, 22, 23
  178:9, 17
  179:11   258:14
reports   17:6
  18:13   19:6
  34:17, 23
  35:19   48:25
  49:3   60:21
  61:1   65:11
  67:20   68:11
  69:5, 18   75:23
  76:4, 12, 17, 22
  77:3, 7, 9, 15,
  21   78:2, 6, 11
  79:12, 16   80:4,
  16   81:5, 10, 25
  82:6   84:6
  86:12, 20   87:2
  91:1   93:20
  94:9   95:10, 11
  96:5, 8   97:1,
  9   124:23
  125:23   150:8
  158:17   160:4,
  8, 11, 15   176:1
  179:12   187:14,
  16   192:3, 7
  198:12   206:7,

11, 16   209:8,
  13, 22   210:7
  211:19, 22
  214:10   232:19
  254:25   256:16
represent   5:24
  11:1, 6   245:11
representative
  1:7, 14   5:13,
  16
representatives
  21:25
representing
  6:3, 4   11:13,
  16   14:8
request   74:17,
  23   75:5
  109:12   133:23
  160:22   172:14
  175:2   187:20
requested   20:23
  49:20   50:3
  74:4   107:25
  172:21   173:1,
  13   174:6, 14,
  25   175:6, 11, 25
requesting   50:7
  74:19, 24
  174:21   176:8,
  10, 12, 14
requests   173:3
required   21:2
  50:8   127:20
  129:21   152:24
  153:8, 23
  154:6   161:4
  165:14   169:12,
  21
requirements
  43:4
requires   166:24
  185:5
requiring   128:4,
  5
research   30:13
  40:20   52:15,
  16, 19, 23   53:2,
  4   54:12
  100:23   175:1
  179:19
researched   108:4

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 37

resources    63:6,
7    67:13    98:8,
12, 17    131:12
151:6    152:8,
11    169:8    223:5
respect    46:21
118:5    140:20
141:4, 20
226:16
respective    1:23
respond    155:25
221:15    222:5
responding    222:7
response    45:3
116:24    217:7
254:23
responses    8:5
34:3
responsibilities
47:2    51:24
55:15    58:11
responsibility
29:9    44:6
45:9, 15    48:5
149:25    150:4
161:11, 22
182:25    183:3, 7
responsible
51:17    163:17
164:8, 9, 14
182:22    227:18,
23    228:6, 10
239:23    240:2
responsive    10:2
67:5    217:10
restate    14:13
16:21    78:23
restaurant    248:7
restricted
173:14    176:17
restrictive
99:8, 13, 18
100:2, 21, 24
101:2    110:2,
12, 21, 24
111:6, 8, 13, 19
112:3, 6    129:7,
12, 17    130:3, 8,
11, 22    131:4,
19    133:5, 6
142:17, 22
151:11    173:22,

24, 25    174:3
176:13, 15
188:15    229:1
241:23
result    66:12,
20    69:13
111:2    117:17
119:15    200:13
258:11
results    60:8
123:6
retained    10:13,
15, 22, 25    11:6,
25    12:4, 8, 13,
17    13:1    14:5,
11, 15    17:7, 17
18:20    19:6, 10,
24    22:24    23:1,
5, 13    25:22
27:16    28:3
31:25    33:7, 8
224:22
retaliated
178:8, 16
retaliation
179:15, 18, 22
retired    23:20
review    21:24
29:3, 19    49:14,
21    71:3    73:12,
13    74:2    83:25
84:7, 8    85:10,
17    87:9, 13, 14,
19, 20, 23    88:4,
5, 14, 22    89:7
91:5    92:20
93:3    94:13, 24
95:4, 10, 24
96:2    103:18,
23    104:9
105:19    106:10
109:13    115:9,
16, 19, 25
116:3, 8    117:9
119:17    120:17
123:13    129:20
131:22    132:24
150:1    158:2
160:4    164:22
165:1    172:8,
13    173:19, 20
176:7    178:15

179:10    180:2,
9, 18    185:23
186:9, 22
187:8, 13, 25
188:3    189:20
191:11    192:12
202:13    204:20
209:13    215:24
229:2    253:11
reviewed    28:6,
7    70:12    71:9,
11, 14, 19, 23
72:1, 7, 9, 13,
15, 18, 20, 21,
23    73:4, 6, 10,
19    74:12    75:1
77:18    78:20
79:2, 7, 9
82:15, 19    84:3,
10, 14, 17
85:22    86:7, 17
87:2, 8    88:18
90:6, 12    92:17,
19    93:4
103:14, 17
104:8, 14, 15,
17    105:12, 22,
24    106:3, 6, 16,
18, 19, 21, 25
107:2, 3, 10, 20
108:9, 16, 22
109:1, 7
122:21    127:10
128:2    133:10
134:5    138:20
168:20    173:13
175:13    178:13
183:22    184:11
192:2, 15
193:25    205:16,
20, 22    208:8,
23    211:9, 14
212:11    213:16,
24    222:21
228:18, 21
229:14, 21
230:2    233:4
253:12, 25
254:3, 11
reviewing    27:13
29:4    33:18
86:9, 19

107:13    108:7,
19    112:20
115:14    123:1,
12, 16    142:2
153:1    192:6
207:10
RHU    109:23
128:16    175:1,
2, 4    176:9
Richard    84:22
85:17    86:19
177:16    209:19
214:6
right    7:22
33:11    46:7
50:16    57:22
75:12    99:12
102:5    119:9,
13    120:7, 25
128:23    131:5
136:19    142:16
152:24    153:9,
14    154:20
155:3, 20
156:5    157:3,
19    158:3
169:24    170:13
172:12    174:1
176:24    177:22
181:15    185:13,
16    190:20
194:14    195:18
199:14, 22
202:1    205:4
216:5    218:16
228:12    234:20
235:19    238:7,
24    240:11, 15
241:1    256:20
rise    16:7
17:20    24:4
Risk    87:16
97:15    98:1
99:21, 25
100:1, 7    101:6
169:2    206:2, 3
River    59:1
role    28:1, 13,
17, 21    45:4, 22,
23    46:1, 23
48:2    54:10, 13,
16, 18    55:14

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 38

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

58:11    66:5
183:9
Roughly    58:12
route    119:3, 11
120:20    238:3
routine    50:7
routinely    149:23
rover    241:6
row    58:17, 18
rubbing    175:17
rule    136:21
137:25    138:6,
22    139:8
141:3    187:14
228:25
rules    2:10
5:5    7:19
33:25    98:25
139:22, 25
188:13    223:16
247:15    250:22
Rumph    242:12
run    41:7
231:24
running    164:9
runs    153:16
RUTH    3:3    6:7
57:14    69:24
70:18    115:23
118:11    158:25
195:7
ruth@loevy.com
3:8

< S >
s/LeAnn    258:21
safe    63:8, 22
98:23    99:2
130:18    131:13
148:10    155:20
156:5, 18
163:10    212:18
safety    27:8
60:15    99:22
100:8, 19
101:6, 9, 17, 21
110:15, 18, 21
112:15, 19, 23
113:1, 16
121:20    127:20
128:6    129:18,
22    130:1, 11,

16, 19, 21
131:3, 8, 18, 24
132:3, 8, 16
133:19    134:2
152:5    154:19
155:2    158:3
161:11    163:19
173:16    175:17
202:17, 22
203:6    204:7,
15, 22    214:21
215:6, 14
216:5, 10, 20
217:1, 5, 13
salary    51:13
249:1
sanctions    228:25
sat    7:1, 8, 13
37:25    38:3
satisfy    251:5
Savage    26:14
86:1
Savages    85:5, 6,
11, 12, 23    86:8,
18    87:1    214:10
saw    147:4
214:3    253:15
saying    13:13
56:21    114:23
121:4    122:8
127:3    131:7
139:16    147:21
156:7, 11
157:21    172:2
193:8    197:23
198:2, 3
221:21    222:3
246:9    249:17
says    30:13
33:4    68:13
123:15    125:9
130:7    169:5
170:5    199:1, 4
234:18    236:8,
21, 25    241:4, 19
scale    40:12
87:16
scales    41:5
scheduled    42:15,
20, 23
schematic    171:2

school    40:10,
15    42:22    51:5
60:20
scope    90:18
scoring    201:19
scorings    201:16
Scratch    14:9
28:1    58:9
93:25    111:7
117:8    127:2
146:5, 11
163:13    177:1
178:13    180:15
188:2    194:5
197:16    206:11
212:25    217:18
220:12
screen    105:24
194:12, 20
233:12    244:13
250:10    255:17
screened    56:2
scroll    195:17,
18    198:15, 17
search    67:5
126:5, 17
127:4, 6
184:18, 19
197:16, 17
198:8    253:18
searched    194:7
197:8
searches    64:3,
6, 10, 19    65:6,
20    66:2, 10, 19
76:16    95:18,
25    96:12, 13,
16, 22    127:11
152:24    153:2,
5, 8, 23    154:1,
6    183:21
184:13    185:5,
10, 25    186:3
230:13
searching    64:17
126:11, 13, 24
127:15    184:15,
17    229:10
second    70:15
115:18    123:22
149:21    159:16
164:20    173:9

178:1    195:21
211:8    218:7
220:8    233:15
236:20    237:15
second-guess
135:1
second-guessing
139:20
Secondly    166:3
section    67:21
68:2, 7, 15
108:9, 22
164:21    190:18
203:12    208:8
211:23    212:11
228:16    233:25
239:11    241:4
secure    63:8
securing    228:7
security    56:1
60:15    109:24
110:3, 8, 11
152:6    154:19
155:2    158:3
180:12    181:5,
21    195:14
244:11
see    25:14
38:24    51:14
61:21    64:5, 16
76:6    93:3
112:1    116:2,
18    124:16
128:2    136:11,
12    147:8
159:17    164:19
170:15    174:7,
12, 15, 16
175:10    178:1
179:17    180:12,
19    182:7
183:15    185:17
186:17    187:3
191:1, 3    195:3,
5    203:10, 13
206:1    208:21
210:5    214:19
215:14, 21
216:1    218:6,
12    228:15
233:17, 21, 25
234:5, 14, 24,

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 39

**Lakeisha Ezell v. Jefferson Dunn, et al.**

Kevin Myers
2/4/2025

25  235:8, 13,
21, 25  236:1, 6,
8, 11, 17, 21
237:16, 19, 22
238:2, 16, 21
239:8, 24
240:7, 19, 23
241:1, 3, 9, 12,
17, 24  242:2, 6,
10, 19  243:1, 6,
9, 14, 18, 20, 22
248:7  253:2
**seeing**  113:5
142:10  191:9
252:11
**seeking**  22:4, 5
**seen**  249:15
**segregated**
109:24  112:16
**segregation**
112:12, 13
235:22
**select**  250:10
**selected**  107:21
109:1, 8  177:7,
14, 20
**self-evident**
211:18
**send**  255:23
**sense**  8:13
35:3  170:8
**sent**  74:5
105:3, 11, 23
107:21  108:3
111:4
**sentence**  68:12
109:20  159:21
164:21, 25
170:18  178:2,
5, 12  181:12,
17  182:8, 11
183:15, 18
186:18, 21
228:17, 20
234:18
**separate**  29:22
55:20  129:18
135:24  150:13,
21  151:9, 10,
15  227:14
**separately**  34:5,

7, 10
**September**  58:5
**Sergeant**  26:15
81:9, 24  82:12
100:17  113:14
151:12
**sergeants**  81:15
**serious**  60:7
183:1
**served**  55:11
59:8  112:8
**service**  253:1
**services**  31:25
206:13
**serving**  11:21
12:17  19:23
**session**  206:5
**set**  90:16
115:18  158:10
253:16
**sets**  232:15
**Setting**  73:25
92:3  154:24
**settled**  18:8
**settlement**  91:6,
10, 18  92:1, 12,
21, 25  93:1
177:8
**seven**  232:14
**sex**  125:10, 25
236:10  242:14
**sexual**  123:19,
20  124:7, 8
165:3  239:4, 5
**shakedowns**
185:25  186:3
**share**  136:17
233:12  255:16
**shared**  255:17
**sharing**  244:13
255:14
**SHEEHAN**  3:11
6:2, 18  231:21
254:18
**sheet**  113:5
260:1
**shift**  62:14
98:7, 16
100:16, 17
113:14  135:9,
16, 17  136:2, 8
154:22, 25

236:16  245:6
246:21, 22
247:4, 5
**shoot**  44:19
**short**  161:8
164:9
**short-term**
163:18
**show**  60:24
194:15  233:11,
12  234:22
238:14  240:5
242:1
**showed**  256:3
**shows**  166:10, 11
**shut**  115:17
**Side**  2:3  3:23
9:16  170:21,
23, 25  171:5, 9,
25  172:4, 8, 9
173:9  199:3
234:12  236:5
**sift**  99:13
**sign**  6:17
**signature**  2:7
259:1
**signed**  128:17
203:20
**significant**
114:11, 15
193:3
**similar**  13:18,
20, 24  57:6
81:16  82:14
83:17  100:14
180:12  181:5,
20
**simple**  247:11
**single**  102:12,
18, 23  137:25
138:22  139:8
140:24  233:8, 9
**sir**  6:7  25:9
116:21  117:3
118:18  123:14
141:1  195:21
236:7, 12, 18
237:21  240:4
250:17
**sit**  11:14
34:14  35:17
50:2  56:14

108:18  124:1
181:10  199:15
**situation**  15:5,
8  111:3
134:10, 21
135:17  136:3,
9, 18  153:18
168:22
**situations**  48:1
145:6
**six**  104:1
250:11
**six-month**  158:14
**size**  27:7
245:2
**sleep**  80:24
**sleeping**  243:23
**slots**  102:5
**Slow**  215:3
**SM**  239:11
**small**  26:4
31:3  199:2
**Smith**  237:24
**Snow**  2:2  3:22
10:25  11:25
14:7  23:1
27:10, 18, 22
28:3  30:13
31:24  34:22
35:5, 19  73:15
74:4, 5, 13, 23
75:2, 6  78:20,
25  107:2, 21
108:4  109:2, 8,
11  139:17, 18
**Social**  40:3, 21,
25  41:4, 8, 11,
16  43:19  61:21
**society**  139:23,
25
**sociology**  39:2
**solely**  69:9
183:24  184:5
**solid**  62:5
**solution**  161:5
**solutions**  163:18
**SOP**  99:11
170:16, 20
172:3  185:8
186:1, 9, 13
197:20

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 40

Lakeisha Ezell v. Jefferson Dunn, et al.

Kevin Myers
2/4/2025

sorry   10:22
11:20     14:9
18:25     27:24
33:11     55:20
62:20     66:15
75:13     86:15
115:17    143:11
149:21    157:5
190:5     193:24
194:22    195:20
205:14    214:16
220:9     232:6,
10    237:14, 18
238:20    239:14
240:17    242:20
243:18    247:1
251:19
sort   49:21
64:23     65:5
66:8, 21    75:22
80:10     81:3
93:7, 13, 19
95:17, 23
96:20     97:2, 7
158:1     179:9
204:16
sound   195:20
256:12
source   188:5
sources   93:5
South   3:14
speak   242:22
speaking   8:13
118:17    180:25
special   27:8
67:1     101:9, 17,
21    109:23
110:2, 8, 11, 15,
21    112:15, 19,
23    113:1
127:20    128:5
129:18, 22
130:1, 11, 15,
21    131:3, 8, 18,
23    132:3, 8, 16
133:18    134:2
173:16    202:16,
22    203:6
204:7, 14, 21
214:21    215:5,
14    216:5, 10,
20    217:1, 5, 13

specific   24:15
81:13, 23
118:12, 13
134:11    135:2
136:5    181:24
239:15
specifically
13:2    14:20
74:4, 16, 23
83:4    107:24
109:12    125:6
173:2    180:16
181:11    190:15
specifics   179:6
specified   33:23
speculating
207:17
speculation
203:1
speed   179:2
spell   6:24
spending   34:11
spent   33:16
37:1    50:15
spot   98:6
Square   2:3
3:23    19:21, 25
20:5, 10
SSU   26:16
27:5, 7    215:10,
12, 16, 21, 25
St   15:6, 8, 18
16:12    26:12
56:9, 18    57:7,
8    76:3, 11, 16,
21    77:2, 10
78:6, 11    79:17
80:5, 12, 23
87:10    89:16
90:7    92:5, 14
93:9, 14    94:3
95:12, 19    96:1,
16, 23    97:3, 13
98:1, 21, 24
99:2, 5, 6, 19
100:4, 13
101:9, 18, 24
102:11, 24
109:22    110:3
111:20    112:15
113:1    121:10
123:17, 24

127:21    128:6,
11, 18    129:14,
23    130:6, 12,
21, 23    131:4,
18, 19, 24
132:3, 8, 17
134:9    135:22
136:14    138:10
140:5, 6    142:3,
7    147:11, 15
151:18    152:4,
10, 12, 18, 21,
22    153:7, 11,
21    154:8, 13,
18    155:1, 19
156:3, 14, 19
158:19    160:25
161:9, 15
162:4, 16
163:15, 19
165:4    168:9
171:5, 24
175:7    176:17
178:7, 16
179:10    180:10
181:4, 19
182:15, 19, 25
183:10, 21
184:13, 16
185:4, 12, 24
186:1, 9, 23
187:21    188:2,
5, 8, 22    189:4,
10    200:25
201:24    202:22
203:23    204:7,
15, 22    207:15,
21    208:7
209:3, 8    210:8
211:1    212:13
213:7    215:19
225:23    226:3
227:20    228:7,
24    229:5, 17
233:18    235:1
245:11    253:14
stab   221:6
stabbed   117:24
118:4    119:11,
13, 14, 20
120:4    121:25
126:7, 19

127:8    144:21
145:12, 22, 25
190:6    222:1
243:23, 24
stabbing   119:2,
15    120:20, 24
144:17    190:24
220:4    221:2, 13
staff   40:12
46:14    47:3, 14,
18    48:8    50:11
61:19    63:4, 17
64:5, 14    67:4
76:20    90:8, 20,
21    109:23
118:22, 24
119:12    121:9,
18    122:11
123:2, 24
126:23    131:11
135:22    136:14
137:2    138:5
139:12, 20
140:1, 14, 18,
20    141:4, 18
142:3, 7, 25
144:20    147:2,
9    148:9    149:2,
5    150:11, 19,
25    151:6
152:1, 4, 11, 12,
16, 19, 23
153:3, 7, 15, 22
154:3, 8, 9, 18
155:1, 14, 16,
19, 23, 24, 25
156:4, 8, 10, 16,
25    157:16, 24
164:2    173:4
174:1    175:20
178:8, 16
179:1, 10
182:16    184:14
185:24    186:24
187:5    193:16
196:16    198:4,
7    200:25
207:9    222:4
223:4    229:9
246:2, 11
247:9, 12, 15,

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 41

17, 25    249:5
253:17
**staffing**    14:3
16:19    17:1
23:25    24:17
27:1    77:1
84:6, 21    85:1,
11    86:7    93:8
151:18, 21
152:10    153:13
155:7, 17
156:14, 19
159:25    209:19
214:5, 6
244:15, 19
247:22    248:4, 5
**Stalder**    84:23,
24    85:7, 17
86:2, 8, 19
87:1    177:16
209:19    214:6,
10
**S-T-A-L-D-E-R**
84:23
**stamped**    194:18
**stand**    26:24
53:17    127:10
195:25    221:7
**standard**    82:19
137:7    142:8
157:22    158:12
164:4    200:20
201:23    202:4
211:22    227:19
228:1    249:23,
24
**standards**    21:20
22:20    157:3, 19
**standpoint**
163:21
**standpoints**
163:23, 24
**start**    7:18
114:24    126:10,
13, 24    127:15
153:14
**started**    22:25
48:23    250:2
**starting**    155:9
220:18    248:24
**starts**    239:11
241:12    243:19

**State**    2:2    5:3,
24    6:24    13:21
17:14    25:12
37:13    40:11
44:12, 13, 18
82:10    128:17
136:13    137:1
185:2    218:20
258:1
**stated**    108:2
120:18    175:15
214:3    235:23
236:3, 9, 14, 15
243:23
**statement**    42:3
68:12    110:6
128:17    129:1
160:3, 12
198:23    207:25
239:20
**statements**    84:3,
10    96:9, 17
**STATES**    1:1
5:19    87:17
99:25    124:17
174:25    253:20
**state's**    249:9
**static**    153:18
246:16
**statistical**
43:16    44:2
**status**    111:14,
15    112:2, 5
130:16    193:12
**statuses**    111:10,
19, 23
**stay**    246:16
**Steve**    239:13
**STEVEN**    1:15
5:16    6:10
77:7, 15    78:3,
12    88:11
89:17    113:6,
23    114:16
115:9, 19
117:11    122:13,
21    124:3, 10
148:13, 19
149:9, 15
172:14    179:6,
24    180:4
216:4, 10, 25

220:15    225:10
234:4    235:13
238:19, 20
239:12    256:16
**stipulate**    13:17
161:17    208:6
**STIPULATED**    1:22
2:6, 13    31:22
92:8    208:4
**stipulation**    5:6
91:12, 17, 19,
20, 23, 24    92:1,
7, 20    212:16, 22
**stipulations**
6:15
**Stodler**    84:22
**Stone**    241:7, 15
**stop**    244:13
250:18    251:17
**straight**    39:11
**Street**    3:14
258:22
**streets**    171:19
252:11
**stretching**
221:20
**strict**    57:3
**strides**    152:18
**Strike**    240:17
**structure**    188:24
**struggling**    249:3
**stubborn**    42:10,
16    43:2
**studies**    100:22
**studying**    43:21
**style**    47:12
**subject**    17:23
**submit**    60:9
**submitted**    21:22
32:12, 17, 21
33:1, 5    34:15,
16, 24    36:8
73:21    74:9
91:12
**subordinate**    66:9
**subpoena**    33:24
**subpoenaed**    33:19
**Subscribed**
259:17
**subsequent**
110:25

**subsequently**
113:9
**substantially**
186:1
**substantiate**
165:5    166:23
**substantiated**
165:15    167:23
168:1, 3, 20
170:6
**substantiation**
166:24    168:2
**sued**    37:6, 11
**sufficiency**    93:8
**sufficient**    64:2,
10    65:7, 21
96:5    118:7
120:1, 13, 19,
23    121:6
126:22    148:11
152:23    153:7,
21    154:3, 8, 18
155:1, 19
157:9    244:19
**suggests**    199:20
**suicide**    16:10,
11    24:2
**suing**    24:7, 13
**Suite**    3:23
258:22
**summaries**    86:18
93:4    95:11
**summarize**    15:16
**summary**    15:25
68:15    84:24
85:11, 14, 17,
20, 22, 25    86:3
191:23    241:3
**Sunday**    121:4
**superintendent**
45:7, 14    46:12
53:15
**supervise**    52:9
54:9    58:22
223:4    246:12
**supervised**    59:12
**supervising**
51:17
**supervision**
52:13    56:3
57:4    183:10
224:24    228:11

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 42

**Lakeisha Ezell v. Jefferson Dunn, et al.**

Kevin Myers
2/4/2025

supervisor    53:4
62:14, 18
97:20    98:7, 17
99:13    100:16
113:14    134:21,
25    135:1, 10,
16, 17    136:2, 9
151:12    154:22
168:24    173:8
182:17
supervisors
41:7    90:8
97:13    134:9
supervisor's
154:25
supervisory
173:4    224:6,
11, 16    225:3
supplement    10:3,
7
supply    73:15
support    29:6
184:11
supposed    143:14
151:4
sure    7:17
14:14    16:22,
23    22:19
26:11    31:16
34:20    36:3
47:3    48:8, 14
62:22    63:19
65:14    66:16
70:4    76:10
91:9    94:19
103:4    109:5
111:18    114:9
116:5    122:18,
20    130:15
135:8    145:7
147:2    150:17
157:7    159:7
163:22    167:6
169:19    172:19
181:7    203:22
204:11    205:7,
18    211:24
212:19    215:9
219:13    220:23
223:18, 19
232:16    242:23

256:6
surmised    29:19
Surrells    235:12
surrounding
135:3
surveys    53:3
suspect    138:4
242:7    243:4
suspects    238:10
242:6    243:3
suspended    38:12
swap    63:18
switch    139:24
sworn    6:13
7:22    259:17
system    60:2, 14,
19    61:3    62:1
64:15, 16
201:19    206:2,
3    226:6, 12, 15,
23    227:8
250:20
systemic    158:2,
20    183:1
systems    97:4
163:9

< T >
Taboris    235:12
take    8:3, 12
9:3, 4, 8
16:13    49:15
57:16, 17, 18,
22    59:4    62:6
63:22    65:11
69:22    70:15
92:4    103:3
109:16    125:21
139:13    142:6
149:6    150:13,
25    151:4
159:4, 13
164:16    166:25
168:10    170:1
173:21    177:25
182:25    188:18
189:19    190:14
194:14    195:2
196:16    205:5,
13, 16    228:13
230:23    249:20

taken    2:1
31:1    58:1
61:25    87:15
94:19    103:10
110:6    126:5
144:4    159:10
178:23    205:10
231:3, 16
238:11    258:5,
8    259:7
talk    8:10    9:1
47:14    61:18,
19    139:3
147:6    165:19
talked    27:14
96:11    118:22
143:12, 15
209:21
talking    85:2
92:7    97:21
116:16, 20
122:3    127:24
128:10    161:18
187:4    250:11
tally    201:13
target    67:9
task    28:5
team    21:18
26:14    66:25
67:3    152:13
213:2
teams    63:18
67:4    153:4
155:13    253:18
tear    161:20
tech    53:12
technology    53:6
161:19    162:19
tell    18:9
25:8    107:9
116:3    121:3
132:15    135:20
140:11    162:8
173:18    195:16
203:10    221:12
telling    64:6
106:19
ten    18:11, 12
57:19    129:2
159:4
Tennessee    17:15
37:13, 16

44:16, 18, 21
46:22    47:1, 6
58:6, 14, 23, 25
59:4, 14    60:1,
18    61:5    63:25
184:17
tenure    160:2
term    60:20
61:14    161:8
164:9
terminated    38:13
terms    46:1
72:8    101:17
111:5    125:5
174:21    201:6
252:4
TERRENCE    1:8
5:14    6:9
79:12, 18, 24
80:6    89:4, 8
90:1    189:9, 11
190:10, 25
192:4    193:5
201:25    202:6
206:12    210:22
214:20    217:21,
23    219:7, 16,
23    220:4
221:2    222:1
225:17    230:5
240:14, 25
241:16    242:7,
13    243:3, 12
244:10    256:16
test    60:8
191:3
testified    6:13
23:4    25:21
43:18    88:19
106:23    125:21
130:2    134:5
174:2    182:21
196:23    200:23
209:18    211:12
229:13
testify    9:21,
24    25:19
testifying
35:13    36:2
testimony    7:22
14:6    23:8, 14,
23    31:19

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 43

**Lakeisha Ezell v. Jefferson Dunn, et al.**

Kevin Myers
2/4/2025

110:1    119:5
150:10, 18
185:23    186:9,
14    192:18
210:25    221:24
259:7
tests    249:20, 21
text    253:5
Thank    18:6
70:3, 21    71:4
78:1    115:18
208:21    231:7,
8    256:19
theft    62:12
188:13
thefts    61:17
thereabouts
38:25
thereto    2:19
thesis    39:25
40:2, 5, 18
42:9, 14    43:19
thing    9:7
60:8    88:3
198:3    248:7
253:23    255:13
things    61:22
71:5    92:9
163:9    164:14
175:18    197:25
209:21    231:24
245:19, 21
247:21
think    42:4
49:25    52:11
57:20    59:5
62:3    85:4
97:22    98:4
103:5    111:24
115:3    116:2
119:1    121:2
129:25    132:11
133:23    197:11
204:9    211:18
212:16    213:19
220:19    221:19
230:24    231:12
236:20    250:18
251:2, 3    253:23
thinking    62:5

third    123:22
166:8    174:11
249:17
Thomas    238:10
thorough    121:10,
18    149:1    173:5
thought    66:2
115:4    174:22
thousand    130:5
thousand-bed
99:15    101:23
122:4
threat    63:7, 8,
22    98:15, 22
99:2    100:19
110:18    121:11,
19
threatened
178:22
threats    62:15
121:13
three    12:11
18:17, 21    21:2,
3, 19, 22    22:23
27:13, 15
42:11    58:14
104:1    139:17,
18    165:24
178:20    194:22
218:7    242:15
thrown    168:5, 7
tiered    188:23
time    2:17, 18
5:22    8:13
9:4, 11    10:1
15:9, 11    19:4
20:2    23:15, 19
32:24    33:24
34:2, 10, 25
37:1    39:3, 20
40:7    42:17
43:2    44:13
45:5    48:3, 4
49:20    51:5
52:11, 13    56:9
57:25    58:3
59:6, 12    62:21
66:14    80:23
88:1    95:13
98:2    99:6, 7,
20    100:12
103:9, 12

112:7, 9
115:11, 21
116:8, 10
118:13    119:17
121:9, 22
122:12    123:3
126:5, 18
128:11, 24
129:4, 13, 22
132:17    133:19
135:4, 9    137:5
140:3    142:1
148:13    153:19
158:9    159:4, 9,
12    166:12
169:10    171:23
173:10    175:21
178:21, 22
179:3    182:20
184:18, 19
188:8    193:4
201:7    205:9,
12    218:9
220:17    222:9
223:9, 14
225:23    226:3
227:20    231:2,
5, 7, 18    233:21
235:4    237:7
239:1    242:21
246:15, 19
250:9    257:2
timely    226:19
times    7:4, 17
42:22    48:13
49:12    50:2
65:10    66:24
90:16    114:6,
10    125:18
130:3    132:23
135:5    141:23
157:22, 24
178:20    179:20
182:13    190:6
205:2    229:22
246:3, 10, 11
249:15    250:21
251:6
timing    33:23
title    23:10
105:4, 5    211:19

titled    67:21
105:11    106:16
today    7:22
9:21, 24    11:14
26:3    34:14
35:17    36:5
50:2    54:25
56:14    69:4
108:18    124:1
127:11    161:20
181:10, 25
199:15    239:16
told    119:12
122:6    129:2
144:18
TOMIS    60:18
64:15, 16
tool    87:18
201:2, 5
203:12, 25
204:2, 3
top    96:11
149:22    160:7
198:18    202:18
tops    129:2
total    35:3
36:9, 20    132:8
201:12
tours    46:13
61:17
track    34:8
traffic    200:8
trained    21:5
training    48:7
81:8, 23    136:2
250:10
transcribed
256:24    258:5, 8
transcript
104:11    240:1
255:6    258:7
259:5, 7
transcription
258:6
transcripts
103:15, 17, 18,
22    104:9, 10,
14, 16, 17, 18,
20    105:1, 12,
14, 15    106:10
107:14, 19
108:8, 19, 21

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 44

109:1, 7, 13
208:13, 22
253:25   254:7
transfer   123:21
transformation
26:13   206:21
transitioning
53:25
transmission
252:23
transmissions
252:20
transport   246:7
transportation
153:16
travel   32:5
treated   179:11
treatment   50:21
51:3, 12   53:18
136:22   140:7
141:19, 20
trend   100:20
183:6
trending   61:11
trends   52:22
54:15, 17, 24
55:4
trial   2:18
31:17, 18   141:5
trials   38:1, 4
tried   42:14, 21
178:20, 21
236:10
Trivette   17:14
31:5, 7, 14
T-R-I-V-E-T-T-E
17:14
true   75:17, 21,
25   77:13   78:9
82:24   83:6
100:19   124:6
168:15   171:11,
13   183:11
186:7   193:10
196:10   199:16
204:25   205:1
246:20, 23
247:3   253:1
258:7   259:6
try   62:14
63:4, 22
117:19   118:23

131:13   152:19
162:8   163:9
190:13   198:4
220:19
trying   29:13
42:18   43:2
52:7   53:11
114:25   117:18
121:10, 18
145:4   162:5
168:17   217:10
237:17   249:1
Tucker   234:3, 7
turn   218:4
turned   120:22
121:23   195:20
Turney   58:15
turning   72:19
171:22   189:9
191:17   214:13,
16   218:18
222:10
twice   132:12
236:5
two   8:12   12:1,
11   13:6   26:25
44:18, 20
48:25   58:21
81:14, 18
88:20   102:1
104:1, 18
105:8   110:14
111:4   124:8
130:12   138:25
142:13   143:2,
13, 23   144:5,
22   145:10, 15,
22   146:8, 13,
22   147:5
155:24   158:7,
13, 22   170:21,
25   171:5, 9, 25
172:4, 8, 9
176:16, 22
179:19   203:16
213:14   227:13
229:9, 19, 23
230:9   235:22,
23   238:9
247:12
two's   202:10
two-year   139:4

type   150:25
151:3   203:19
204:18
types   245:21
typically
110:25   112:5
188:14   245:1
247:14   251:1, 2
Tyquan   244:3

< U >
Uh-huh   199:10
uh-huhs   8:4
ultimate   182:22
unacceptably
64:24
unauthorized
93:14   191:2
217:20, 24
218:10, 15, 21
219:9, 16, 19,
22   220:12, 15,
24   221:1, 19
222:11, 24
223:11
unclear   107:1
underage   171:20
undergraduate
39:17, 18   51:5
underlying   93:4
255:18
underneath
52:13   55:17
154:21   183:5
underreported
183:21
underreporting
184:12   230:13
understand   7:21
9:11   10:8
57:7   82:15
118:18   121:12
126:25   127:3
146:2, 16
166:21   252:7, 9
understanding
27:25   28:4, 6,
12, 16   83:13
101:16, 21
110:11, 20
112:14, 18
113:22   124:9

129:10   143:6
145:8   165:13
166:24   167:4,
11   168:8
196:16
understood   9:17
13:23   18:19
21:10   22:2
45:21   48:9, 14
74:25   86:6
98:21
undertake   158:1
Unfortunately
249:2
unfounded   166:8,
13
unit   16:11
27:6, 7, 8
52:19   53:2
97:24   99:8, 14,
18   100:3, 24
101:4, 9, 17, 22
109:24   110:2,
3, 8, 9, 11, 12,
15, 21, 22, 24
111:6, 9, 13, 20
112:15, 19, 23
113:2   127:20
128:6   129:18,
19, 22   130:1, 4,
11, 16, 18, 21,
22   131:3, 4, 8,
10, 18, 24
132:3, 8, 16
133:19   134:3
147:20, 22
151:9, 10
173:15, 16
176:13, 15
188:15   197:1
202:17, 22
203:6   204:7,
15, 22   214:21
215:6, 14
216:5, 11, 20
217:1, 5, 13
218:9   221:10
238:3
UNITED   1:1
5:19
units   94:3
100:3, 11

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 45

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

102:1, 11
203:16
University
38:17, 20    39:6
40:15    42:12
43:8, 22
unjustified
149:14, 18
unsubstantiated
165:7, 9, 11
166:3, 4, 7, 15
167:9, 13, 17
168:11    169:1,
14, 23    170:9
unwritten    47:10
updated    207:6
urban    43:15, 18
urine    191:3
use    49:3
60:20    61:14
170:10    188:24
253:4, 5
Usual    6:15

< V >
vacancy    250:9
vacillates
124:15
vague    175:16
valid    28:24
variables    41:10,
14, 16    201:10
various    67:22
92:3    111:9
Venderick    238:10
Ventress    240:22
242:3, 25
veracity    28:10,
18, 20
verbal    8:5
241:16
versus    5:14, 17
34:10    131:3,
19    247:16
victim    150:14,
22    187:16
202:12
victims    170:23
178:8, 16
179:11
VIDEOGRAPHER
5:11    57:24

58:2    103:8, 11
159:8, 11
205:8, 11
231:1, 4, 14, 17
257:1
view    217:11
violated    138:6
141:18    142:8
223:16, 22
violating    18:2
violation
137:11, 17, 25
138:22    139:8
141:3    185:11
violations
136:21    169:22
187:15    228:25
violence    12:18
13:3, 9, 12, 21
24:3    61:10, 14
97:15    178:9,
17    180:10
181:3, 19
250:15
violent    251:13,
17
visitation
245:20
visitors    253:17
vitae    59:5
VMU    215:10, 12
vocational
245:20
VS    1:10, 18
vulnerable
97:14    98:1
99:6, 21    100:6,
7    212:17

< W >
wait    8:20
150:11, 19
195:14    220:17
221:8
waived    2:8
walk    47:13
61:18    63:3
walking    64:4
241:8
wall    198:20
want    19:3
35:14    36:17

51:9    53:24
57:19    59:6
66:11    67:9
71:22    76:10
116:6    129:5, 6
142:19    175:5
189:21    205:3
221:18    230:24
231:24    234:22
237:13    239:10
240:5    242:17
245:7    247:13,
14, 20    248:18
249:17    250:3,
4    251:3, 10, 20
254:20    256:23
wanted    51:6
73:12    172:22
255:11
wanting    121:14
144:25
wants    144:14
248:13    251:2, 5
warden    37:12,
16    44:17, 22
45:7, 13    46:13
47:1, 2    48:24
49:12    57:10
59:8    61:20
62:13, 24    63:3,
21    65:12    66:9,
10, 25    94:19
96:10    99:5, 12
156:12    158:13
164:1, 6, 7, 14
182:22    183:8,
10    187:4
188:24    203:20
227:18, 23
228:6, 11
246:2    248:16
wardens    59:19,
21    60:6, 9
63:16    64:2, 9
66:4
warden's    164:2
246:2
watched    188:16
watching    64:5
65:25    195:13
way    41:7
104:21    105:3

113:11    118:20
138:5    144:15
150:4    164:10
169:17    195:5
198:2, 17
200:4    236:15
251:8
Wayne    58:15
ways    64:14
152:17    225:9,
16
weapon    64:3, 10
95:18, 25
96:15, 22
126:24    127:15
189:15    190:3,
10    191:7
192:9, 22    244:4
weapons    64:18
191:4    225:22
226:2    229:8
253:10
Wear    161:20
weeks    235:22
weigh    200:16
weighed    170:6
weights    88:3
Well    25:9
29:14    32:24
33:19    55:14
61:15    65:16
71:3    78:5
83:13, 16
87:25    92:23
99:10    101:22
103:25    116:21
117:8    121:4
127:2    139:16
142:20    145:1,
2    146:5, 11
152:12    158:6
162:1, 10
163:13    164:1
171:4, 12, 14
173:12    175:7
180:15    195:14
197:16    205:1
212:24    213:21
215:13    221:1,
9    230:6
232:13    245:21
253:1, 6    255:7

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 46

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Kevin Myers**
**2/4/2025**

went    43:1
98:24    113:14
121:14    143:16
147:5    152:18
162:15, 22
163:7    179:20
200:8    220:1
221:5, 9
236:16    254:11
255:14
we're    6:4
7:17    54:22
67:3    69:23
103:8    116:20
118:16    122:3
147:2, 9    159:8
170:11    193:7
194:15, 21
205:8    216:14
249:2    250:5,
11    252:11, 15,
19, 20    255:5
256:20
West    2:3    3:23
58:23, 24, 25
59:4
we've    27:14
33:22    103:2
158:25    221:12
226:9    232:13
White    123:19
170:11    238:6
wide    127:24
wife    39:18
Wiggam    244:3
will.cranford@butl
ersnow.com    3:25
William    5:25
234:8
willing    25:19
35:7    249:6
winter    133:20
wish    40:19
155:14
wit    134:24
witness    2:8
5:7    18:6
159:7    231:11
254:22    256:3
259:1
witnessed    81:21

women    61:25
221:22
wondering    65:16
129:17    150:1
173:12    190:1
word    28:21
252:7
words    41:20
88:21    95:23
230:18
work    12:8, 16
13:13, 15, 17
18:16    19:24
20:4, 9    22:3
30:8, 11    32:14,
18    33:6, 13
34:16    36:8, 21
39:17, 19
40:22    42:14
46:14    52:23
53:1    87:19
90:18    91:14
120:10    136:20
152:14    155:6
162:10    219:14
223:14    233:3
248:13, 18
249:1
worked    12:25
21:11    27:22
37:13    44:13
203:23
working    12:12,
15    18:20    19:4
23:18    34:9
39:20    40:9
42:22    49:10
50:15    52:23
59:13, 21
60:24, 25    61:4
63:9    208:2
works    159:5
201:4    207:14
world    122:5
145:2    249:16
worn    162:11
worried    163:2
wristband    208:7
write    179:3
written    21:21
26:7    32:1
40:14    47:9

69:12    76:21
82:16, 20    83:1,
3    152:5
154:19    157:12
158:19    185:12
198:22
wrong    110:16
216:14
wrote    16:5
43:7    104:25
128:25    149:22
171:23    174:5,
13    180:9
181:12

< Y >
Yeah    53:5
57:17    70:2
136:11    143:17
159:3    199:4
215:5    248:3
year    12:8
15:13    23:12
56:21    59:3, 8
61:8    160:19
years    17:5
18:11, 12, 17,
21    21:2, 3
29:9    38:25
39:6    42:11
50:15    53:5, 9
54:22    55:3
56:22    58:21
69:13    138:25
160:1, 5, 16
161:19, 23
162:12    199:13
206:17    250:13
252:11, 21
yielded    55:22
young    171:19

< Z >
Zoom    1:24    3:2,
10, 20

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 47