**FILED**

2025 Mar-03 PM 07:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

Myers 1

# IN THE UNITED STATES DISTRICT COURT OF
# THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE DIVISION

| | |
|---|---|
| **LAKEISHA EZELL,** | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Case No. 4:20-CV-2058-ACA** |
| | ) |
| **JEFFERSON DUNN,** *et. al.,* | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

## EXPERT REPORT OF KEVIN BRADLEY MYERS

## I.    INTRODUCTION

I am the sole member of 4Square Corrections, LLC. As such, I engage in subject matter expert work, auditing, and monitoring correctional facilities, providing leadership courses, and assisting in the use of various tools related to correctional management.

## II.    QUALIFICATIONS

Prior to my work with 4Square Corrections, LLC, I held a variety of positions in the field of adult corrections between August 1976 and June 2023. I began full-time employment with Wayne Halfway House in February 2024 and currently serve as the Training Director. In this position, I oversee and provide staff development, leadership, and training for staff assigned to provide residential services for juveniles in the states of Tennessee and Florida.

I previously served in correctional facilities as a line staff member, Assistant Warden, and Warden for individual facilities. I also worked in direct management and/or supervision of multiple adult correction facilities in multiple states. My correction management activities included facilities housing males and females in state, county, United States Marshall Service, and U.S. Immigration and Customs Enforcement facilities.

Associated responsibilities in these positions included, but are not limited to, the direct provision of services as well as supervision of staff providing services to inmates. I possessed responsibility for compliance with court mandates (see e.g.,

**CONFIDENTIAL**



PLAINTIFF'S
EXHIBIT
A

PENGAD 800-631-6989

Myers 2

Battles v Anderson, 457 F.Supp. 719 (E.D. Okla. Sept. 11, 1978; and Grubbs v. Bradley, 821 F.Supp. 496 (M.D. Tenn. May 14, 1993)), federal and state laws, and regulations providing both direct provision of services as well as supervising staff who directly provided services to inmates under my custody. In addition, I participated in drafting policies and procedures in accordance with federal and state laws as well as standards established by the American Correctional Association ("ACA") and National Commission on Correctional Health Care ("NCCHC"). I also oversaw implementation of those policies and procedures within correctional facilities.

I am an active member of the ACA and served for eight years as a commissioner of ACA accreditation. I currently serve as a trained auditor for ACA and serve on an ad hoc Committee on Adult Corrections for ACA. I attached a complete copy of my professional curriculum vitae as **Exhibit A**.

A.    Chronological examples of my professional work include:

1)    Oklahoma Department of Corrections (1976-1990) Correction Treatment Officer, Case Manager, Associate Superintendent, Executive Associate to Director, Administrator of House Arrest (Developed and Implemented program) and Deputy Warden of 880 bed Medium Security Facility.

2)    Corrections Corporation of America - Associate Warden Operations (1990-1992) Venus Pre-Release Center Texas.

3)    Corrections Corporation of America - Warden South Central Correctional Center (1994-2005) Tennessee.

4)    Corrections Corporation of America - Managing Director (2005-2014). Provide supervision of Wardens and facility operations. At various times, these operations included facilities that serviced state operations, county operations, U.S. Immigration and Customs Enforcement as well as U.S. Marshall Services. Facilities located in Tennessee, Kentucky, Minnesota, and Idaho.

5)    Corrections Corporation of America -Director of Activations and Transitions (2014- 2016). In this position, served as project manager for the activation of South Texas Family Residential

**CONFIDENTIAL**

Center and an adult male immigration facility in Otay Mesa Detention Center.

6) Tennessee Department of Correction - Probation and Parole Administrator for the State of Tennessee (2016 to 2018). In this position, responsible for the supervision of Probation and Parole in the Middle and West Regions of Tennessee. This included the implementation of a risk and needs assessment tool required by the Public Safety Act of 2016 and monitoring standards related to the community supervision of justice involved individuals.

7) Tennessee Department of Correction - Correctional Administrator (2018 to 2022). Supervised the Wardens in the Middle Region of Tennessee which included Lois M DeBerry Special Needs Facility (854), Riverbend Maximum Security Institution (810), Debra K. Johnson Rehabilitation Center (817) and Turney Center Industrial Complex (1616). Supervision included monitoring facility operations through the COVID pandemic situation.

8) Tennessee Department of Correction -Correctional Administrator (2022-2023). Supervised the Wardens in the West Region of Tennessee which included facilities of Northwest Correctional Complex (1801), West Tennessee State Penitentiary (1010), Women's Therapeutic Residential Center (1068) and Mark Luttrell Transition Center (294).

9) Wayne Halfway House - Training Director (2024 to present). Oversee and provide staff development, leadership and preservice/in-service training for staff assigned to daily operations of residential juvenile facilities in Tennessee and Florida.

B.   Associated Correctional Memberships and Committee Assignments:

1) Member American Correctional Association.

2) Member Southern States Correctional Association.

**CONFIDENTIAL**

Myers 4

3)      Member North American Association of Wardens and Superintendents.

4)      Commissioner on Commission on Accreditation for Corrections- 2000-2008.

5)      American Correctional Association Ad Hoc Committee on Behavioral Intervention Strategies- 2021 to 2023.

6)      American Correctional Association Ad Hoc Committee on Adult Corrections- 2021 to present.

7)      Tennessee Department of Corrections Risk Needs Assessment Steering Committee – 2016 -2020.

8)      Tennessee Department of Corrections Restrictive Housing Step Down Program Committee– 2019 -2023.

9)      Tennessee Department of Corrections Withdrawal Management Team – 2022 -2023.

10)     Auditor American Correctional Association June 2022 to present.

## III.    RETENTION

Butler Snow LLP retained me on April 27, 2024, as a consulting expert to assist with analyzing issues raised in the litigation entitled **Lakeisha Ezell v. Jefferson Dunn** *et al.*, Case No 4:20-CV-02058-ACA. I did not reach any conclusion until completing my evaluation of the information and documents identified in this report. Neither the content of my report nor the outcome of this case affects my compensation.

This report, including the exhibits and attachments, summarize my opinions currently. I reserve the right to supplement this report by adding, subtracting, or modifying my conclusions based on any additional evidence or information provided after the date of this report.

I receive compensation for my services at a rate of two hundred and fifty dollars ($250.00) per hour for time spent on document review, drafting, on-site work,

**CONFIDENTIAL**

and communication with counsel. I receive compensation of one hundred dollars ($100.00) per hour for travel.

## IV.    METHODOLOGY

I considered the information contained in the documents identified in **Exhibit B**, supplemented with my professional education, training, and experience, as previously established in this report, to independently evaluate the claims asserted in the case.

I base my opinions on my forty-eight (48) years of experience and analysis of materials identified in **Exhibit B**, including court filings, documents reflecting actions taken by the former Commissioner and his team, and documentation about St. Clair and the incident itself.

This report responds to the unsupported allegations brought against former Commissioner Jefferson Dunn ("Dunn"), Institutional Coordinator for the Northern Region Edward Ellington ("Ellington"), and former St. Clair Warden Karla Jones ("Jones" and together with Dunn and Ellington, the "ADOC Officials") related to Terrence Andrews' ("Andrews") health and safety and alleged violations of his rights under the Eighth Amendment and state-law death claims.

Specifically, I address and assess the following allegations and theories brought by Plaintiff against the ADOC Officials under 42 U.S.C § 1983 Eight Amendment - Failure to Protect Counts I; Count III Eight Amendment State-Created Danger; Count IV Denial of Adequate Medical Care; Count VI Civil Conspiracy; Count VIII Failure to Intervene and Count IX Wrongful Act or Omission Resulting in Death. Plaintiff's specific allegations as identified in the Complaint remain as follows:

1. The ADOC Officials' failure to protect Andrews from a known and substantial risk of serious harm. (Doc. 34 at 9).

2. The ADOC Officials' failure to provide adequate monitoring and timely emergency medical care in the P/Q Dorms at St. Clair. (Id. at 26).

3. The ADOC Officials' failure to address the widespread proliferation of contraband weapons at St. Clair. (Id. at 30).

4. The ADOC Officials' failure to adequately respond to reports of safety concerns and segregate dangerous inmates. (Id. at 32).

**CONFIDENTIAL**

5.   The ADOC Officials' failure to adequately respond to and discipline instances of inmate misconduct. (Id. at 33).

6.   ADOC staff's failure to properly investigate, discipline acts of violence and possession of contraband, and discourage victims from reporting incidents of violence. (Id.).

7.   The ADOC Officials' creation or encouragement of a culture of abuse at St. Clair. (Id. at 34).

## V.    FACTUAL BACKGROUND

### A.    The Incident Report:

On December 29, 2018, at approximately 3:35 p.m., Correctional Cubicle Operator Cynthia Caver ("Caver") assigned to P-cubicle observed Andrews B/289406 (P22-1a) and inmate Cedric Davis ("Davis") B/228379 (P22-2a) involved in an altercation on P-1 side. (ADOC_Ezell_000002). Caver radioed 10-17 code on P-1 side. (ADOC_Ezell_000002). Correctional Officer Eric Garrett ("CO Garrett") responded from Q-dorm and Correctional Officer Rickey Johnson ("CO Johnson") responded from the G-yard to the incident. (ADOC_Ezell_000002). St. Clair staff escorted Andrews to the infirmary by cart with multiple stab wounds. (ADOC_Ezell_000002). Lieutenant Larry Baker ("Baker") and Sergeant Jacob Weaver ("Weaver") responded to P-Dorm, and Caver advised Baker and Weaver that Davis ran from P-1 side to P-2 side. (ADOC_Ezell_000002).

Baker and Weaver searched for inmate Davis and any potential evidence. (ADOC_Ezell_000002). Weaver observed Davis exiting P-28 cell. Baker placed Davis in handcuffs to the rear with no incident. (ADOC Ezell-Experts_003262). Weaver searched P-28 cell discovering a black bed box with bloody clothing inside. (ADOC_Ezell_000002). Weaver picked up a pair of bloody pants, with a bloody inmate-made knife wrapped up in the pants. (ADOC_Ezell_000002). Weaver located the name "CED" on the inside waistband of the bloody pants. (ADOC_Ezell_000002). Further search of the box by Weaver revealed two (2) additional inmate-made knives. (ADOC_Ezell_000002). Weaver took possession of the evidence. (ADOC_Ezell_000002). Baker and Sergeant Derrick Dent ("Sgt. Dent") escorted inmate Davis to the Shift Commander's office. (ADOC_Ezell_000002). Officer Steven Thompkins ("Thompkins") remained present holding the crime scene secure on P-1 side. (ADOC_Ezell_000002).

**CONFIDENTIAL**

Regional Paramedic Service ("RPS") Emergency Medical Technician ("EMT") Paul McClain treated Andrews in the St. Clair infirmary. (ADOC_Ezell_000002). At approximately 4:10 p.m., EMT McClain advised assigned infirmary rover, Sergeant Dennis Stefaniak ("Stefaniak"), that Andrews showed no signs of life and lacked vital signs. (ADOC_Ezell_000002). At approximately 4:12 p.m., Doctor Williams from Grandview Medical Center pronounced Andrews deceased. (ADOC_Ezell_000002).

### B.    Behavioral History of Terrance Andrews:

Andrews possessed a history of rule violations and assaultive behaviors that created challenges for his own protection and presented a safety risk to other inmates and staff. As with all male inmates entering the ADOC system, Andrews entered ADOC custody through Kilby Correctional Facility ("Kilby") on June 20, 2013, upon reception from the Mobile County Jail. (ADOC_Ezell_000023). Andrews received a sentence of twenty-five (25) years for Robbery I and Burglary III after robbing the victims at gunpoint for their car. (ADOC_Ezell_000112). Andrews also possessed a juvenile record for Robbery. (ADOC_Ezell_000113).

### Staton:

On August 23, 2013, Andrews transferred to Staton Correctional Facility ("Staton") where he stayed until July 3, 2014. (ADOC_Ezell_000023). Within five months of his transfer to Staton, on January 14, 2014, Andrews accused another inmate of stealing from him, and assaulted the inmate with a broom stick. (ADOC_Ezell_000116). Less than a month later, on February 7, 2014, Andrews threatened an inmate over stolen drugs. (ADOC_Ezell_000506-507). Again, only a few weeks later, on April 18, 2014, Andrews and two other inmates stole tobacco and assaulted an inmate; Andrews entered an unauthorized area during the April 18th incident and received disciplinary action. (ADOC_Ezell_000509-510).

On June 21, 2014, while in medium custody at Staton, Andrews stabbed another inmate with a pencil multiple times, and the victim required transport by LifeFlight to an outside medical facility. (ADOC_Ezell_000513). ADOC reclassified Andrews to closed-custody, requiring a transfer to a security-level 5 facility, because of the stabbing. (ADOC_Ezell_000025). On July 3, 2014, due to Andrews' reclassification, ADOC transferred Andrews to Holman Correctional Facility ("Holman"). (ADOC_Ezell_000022).

**CONFIDENTIAL**

Myers 8

**Holman**:

ADOC assigned Andrews to Holman, a security-level 5 facility, from July 3, 2014, until June 28, 2017. (ADOC_Ezell_000020-22). From April 13, 2015, to October 10, 2015, Andrews consistently caused incidents. On April 14, 2015, Andrews failed to follow a direct order, (ADOC_Ezell_000517); on April 26, 2015, Andrews failed to follow a direct order, which resulted in use of a chemical agent to obtain compliance (ADOC_Ezell_000520); on May 16, 2015, Andrews received disciplinary action for indecent exposure toward a nurse (ADOC_Ezell_000521); and on October 10, 2015, Andrews forced his cell door open and created a security issue (ADOC_Ezell_000522).

Andrews' disciplinary problems continued into 2016 when, on April 24, 2016, Andrews assaulted an inmate with a broom handle again (ADOC_Ezell_000523), resulting in his placement in the restrictive housing unit ("RHU") under preventative status until August 30, 2016. (ADOC_Ezell_000020). Within two months of his release from RHU, on October 17, 2016, Andrews along with six other inmates stabbed another inmate. (ADOC_Ezell_000536-537). Holman correctional staff placed Andrews in RHU under preventative status until June 28, 2017, at which time he transferred to Ventress Correctional Facility ("Ventress"). (ADOC_Ezell_000020).

**Ventress**:

Within two months of his transfer to Ventress, Andrews and four other inmates assaulted another inmate over a debt—a couple of packs of tops tobacco. (ADOC_Ezell_000560). On August 31, 2017, Andrews sexually assaulted an inmate. (ADOC_Ezell_000562). On October 19, 2017, Andrews received disciplinary action for possession of cell phone and being in an unauthorized area. (ADOC_Ezell_000564). On December 2, 2017, Andrews assaulted another inmate over debts the inmate allegedly owed. (ADOC_Ezell_000566).

At Ventress, an investigation concluded on April 12, 2018, revealed that approximately one month earlier, on February 18, 2018, Andrews assaulted another inmate in retaliation for a previous confrontation. (ADOC_Ezell_000569). On April 2, 2018, Andrews forced an inmate at knifepoint to perform oral sex. (ADOC_Ezell_000571). Additionally, on April 12, 2018, Andrews assaulted another inmate while the inmate slept. (ADOC_Ezell_000575-576). A few weeks after the April 12, 2018, incident, and investigation, on May 25, 2018, ADOC

**CONFIDENTIAL**

security staff located "brown clown" (a synthetic cannabis) under Andrews' bed. (ADOC_Ezell_000577). On June 12, 2018, ADOC transferred Andrews to St. Clair. (ADOC_Ezell_000018).

**St Clair**:

Upon arrival at St. Clair, staff assigned Andrews to the RHU, originally under disciplinary status. (ADOC_Ezell_000018). On July 8, 2018, ADOC changed Andrews' status to preventative, and on November 1, 2018, ADOC placed Andrews under investigative status. (ADOC_Ezell_000018). Andrews also received disciplinary action on November 4, 2018, for jamming the tray door on his cell. (ADOC_Ezell_000578). St. Clair staff placed Andrews in bed P22-1a upon his release from RHU on November 26, 2018; Andrews remained assigned to P22-1a until his death on December 29, 2018. (ADOC_Ezell_000018).

Agent Matthew Dawkins ("Agent Dawkins") spoke to thirty-five (35) potential inmate-witnesses about the death of Andrews; however, only one inmate, Timothy Brown, possessed knowledge of the incident between Andrews and Davis. (ADOC(Ezell)_000208). Agent Dawkins received information that Nathaniel Gros ("Gros") also potentially possessed information regarding the incident between Andrews and Davis; however, when questioned, Gros disclaimed any knowledge of the incident. (ADOC(Ezell)_000208). Gros commented during his interview, "I don't care…well you live by the gun; you die by the gun. That's what it is bro." (ADOC(Ezell)_000160).

LaKeisha Ezell's ("Ezell") testimony at her deposition revealed that Andrews communicated with her through Messenger (a Facebook application) from an electronic device with an allocated telephone number—likely a contraband cell phone. (Ezell Depo. at 31:3-18). Ezell also revealed that Andrews communicated at least once or twice per week with her, his two uncles, and his aunt using FaceTime or Messenger—again, likely from a contraband cell phone. (Ezell Depo. at 29:8-30:10). Ezell indicated that she spoke to Andrews the day of his death. (Ezell Depo at. 166:2-6). However, Andrews never mentioned any problem with other inmates at St. Clair, and never knew that Andrews engaged in homosexual relationships while incarcerated. (Ezell Depo. at 166:10-167:9; 116:23-117:22).

**C.    Behavioral History of Cedric Davis:**

**CONFIDENTIAL**

Davis received a life sentence for a murder conviction from Baldwin County. During a robbery, the victim threw a bundle of money at Davis, and Davis fired two shots into the victim's chest. (ADOC_Ezell_000005).

Davis arrived at the Mobile County Jail on April 5, 2004, and then transferred to Baldwin County Jail on May 5, 2004. (ADOC_Ezell_000985). On December 18, 2006, Davis transferred to Kilby where Davis stayed until ADOC transferred him to Bullock Correctional Facility ("Bullock"), a medium-custody facility, on January 17, 2007, and assigned him to the substance abuse program. (ADOC_Ezell_000985). Davis received a security-level 4 classification on February 29, 2008. (ADOC_Ezell_000985).

Bullock staff assigned Davis to the Mental Health Unit from June 8, 2010, to June 10, 2010. (ADOC_Ezell_000984). Davis received twelve (12) disciplinary actions while housed at Bullock. (ADOC_Ezell_000007-8). Davis' disciplinaries ranged from assault on another inmate on December 16, 2008, to fighting without a weapon on February 21, 2007, June 11, 2009, August 26, 2009, and June 9, 2010, to contraband, to being in an unauthorized area, to indecent exposure. (ADOC_Ezell_000007-8). Following these disciplinary actions, St. Clair staff placed Davis in the RHU. On June 9, 2010, classification staff reclassified Davis to closed-custody due to fighting other inmates during a "black and white fight" in Dorm E-1. (ADOC_Ezell_001019). Consistent with ADOC's classification manual, Davis demonstrated an inability to live within the regulations of Bullock. That, along with closing Davis' custody, resulted in ADOC staff transferring Davis to a security-level 5, enemy-free facility, St. Clair. (ADOC_Ezell_001021). Bullock staff placed Davis in mental health unit on preventative status on June 8, 2010, pending his transfer to St. Clair on June 10, 2010. (ADOC_Ezell_000984).

Davis remained at St. Clair from June 10, 2010, to November 2, 2012. (ADOC_Ezell_000982-984). Davis remained in RHU under preventative status when he transferred to St. Clair. On July 31, 2011, Davis stabbed another inmate eleven times in the torso area. (ADOC_Ezell_001022). A few days later, on August 9, 2011, St. Clair correctional staff found Davis guilty of stabbing the inmate, and Davis received forty-five (45) days in the RHU. (ADOC_Ezell_001022). As a result of this incident, classification reclassified Davis' to close custody on August 24, 2011. (ADOC_Ezell_001022). Approximately one year later, on August 22, 2012, consistent with the classification protocol, ADOC reclassified Davis to medium-custody because Davis remained discipline-free while housed in the RHU. (ADOC_Ezell_001023).

**CONFIDENTIAL**

ADOC housed Davis at Donaldson Correctional Facility ("Donaldson") from November 2, 2012, until August 8, 2014, (ADOC_Ezell_000982). Davis spent his time at Donaldson in the infirmary. Davis received no disciplinary action while assigned to Donaldson, and he received classification assessments twice annually, as required by ADOC's classification protocol. (ADOC_Ezell_000982).

Beginning on August 8, 2014, and continuing until to December 23, 2016, ADOC housed Davis to Fountain Correctional Facility ("Fountain"), a security-level 4 facility. (ADOC_Ezell_000981-982). ADOC's classification staff classified Davis as medium-custody and placed him into aftercare. (ADOC_Ezell_000982). While at Fountain, Davis received a disciplinary for fighting with a weapon on February 9, 2016, due to a disagreement with another inmate over money. (ADOC_Ezell_001612). Davis also received disciplinary action for being under the influence of alcohol, narcotics, or another intoxicant on October 11, 2016. (ADOC_Ezell_001526).

Davis transferred to Staton on December 23, 2016, and remained at Staton until August 14, 2017. (ADOC_Ezell_000980-981). Davis admitted to stabbing an inmate on July 25, 2017. (ADOC_Ezell_001561). In the days preceding the stabbing, Davis on July 12, 2017, Davis fought another inmate in the kitchen over a debt the inmate owed to Davis on July 12, 2017, and received a citation for a rule violation for fighting without a weapon on July 23, 2017. (ADOC_Ezell_001558). Due to these incidents, on August 11, 2017, Staton classification staff conducted a hearing to evaluate the propriety of increasing Davis' custody level. At the conclusion of the hearing, the classification staff decided to keep Davis at medium-custody due to the non-serious nature of injuries in the three incidents. (ADOC_Ezell_001416).

ADOC transferred Davis from Staton to St Clair on August 14, 2017, and he remained there until April 23, 2019. (ADOC_Ezell_000979-980). On April 7, 2018, during an institutional bed roster count, St. Clair correctional staff located Davis in an unauthorized area, and on April 11, 2018, Davis refused to submit a urine sample for testing, even after another inmate identified Davis as his assailant. (ADOC_Ezell_001004-1006; 001536-1540). St. Clair classification staff classified Davis as medium custody, security level 5 following these disciplinaries. (ADOC001378). Classification reviewed Davis' custody level again on October 14, 2018, and made no changes to Davis' security level. (ADOC_Ezell_001443).

**CONFIDENTIAL**

ADOC found Davis guilty of a rule 901 violation (Homicide) on January 11, 2019, because of the altercation between Davis and Andrews on December 29, 2018, in P-Dorm. (ADOC_Ezell_001008). On February 1, 2019, St. Clair classification staff increased Davis close custody in accordance with the ADOC classification manual. (ADOC_Ezell_001008).

**D.     Summary of Events and Statements related to the December 29, 2018 Incident:**

**Statement of Sgt. Rafael Santa-Maria ("Sgt. Santa-Maria") (ADOC(Ezell)_000170-172)**

Following the incident on December 29, 2018, Sgt. Santa-Maria spoke with Davis in the infirmary. Sgt. Santa-Maria asked Davis: "Ced is it that serious?" Sgt. Santa-Maria understood Davis to indicate the issue was, in fact, that serious. Davis told Sgt. Santa-Maria that Davis and his cellmate had a disagreement about Davis' cell partner using drugs and engaging in sexual activity in the cell with another inmate. Davis told Sgt. Santa-Maria that he tried to go to the cell to fall asleep and saw the cellmate with another inmate inside of the cell. Davis left the cell for an unspecified period and returned to the cell to see his cellmate still engaged in sexual activity with another inmate. Sgt. Santa-Maria told Agt. Dawkins that Davis spoke about the altercation with Andrews.

**Statement of Registered Nurse Margaret Goubeaux ("RN Goubeaux") (ADOC(Ezell)_000161-163)**

RN Goubeaux performed a body chart on Davis following the December 29, 2018, incident. RN Goubeux stated that she:

> "was taking [Davis'] blood pressure, and he was talking about how he was trying to go into, and I can't remember if he called it his house. But he was trying to get into his, where he lives. And [Davis] said that he couldn't because there's an f'in nigger in there. And so, he said that he left, and he said that he warned [Andrews] that you know, that he lived there too. And um [Davis] said he went someplace else and laid down and then he went back. And when he went back, he said that there was another f'in white guy in there. And um that's pretty much all I heard other than um

**CONFIDENTIAL**

> he was saying that he'd warned him. He said I warned him
> three (3) times.

RN Goubeaux supplemented her statement on December 31, 2018, via email. In the email, RN Goubeaux states that Davis said that he had given Andrews three warnings. Davis stated that he could not get into his "house" or cell because Andrews had a "fucking nigger in there doing him." Davis stated that he went somewhere else to lay down and, when he came back again, Andrews had a "fucking white guy in there." Davis also stated something to the effect to RN Goubeaux that he told Andrews that it was not just Andrew's number on the house, but Davis' number also, saying "228379 lives there too and I can't even get in there." Davis told RN Goubeaux that, "I knew he was already dead by the way they were carrying him." From RN Goubeaux's perspective dealing with Davis, he showed no remorse in his tone or affect when making these statements about Andrews or the incident.

### E.    Provision of Medical Care

Plaintiff alleges correctional officers failed to facilitate the provision of emergency medical care to Andrews and forced a group of inmates to carry Andrews to a garbage cart and wheel him to the infirmary. Plaintiff further alleges the "defendants" possessed notice that inmates in P/Q Dorms lacked access to timely, emergency medical care following assaults, exacerbating the consequences of the violence.

Correctional Cubicle Officer ("CCO") Caver testified that, consistent with her non-contact security position as a CCO, she could not leave the cubicle and that correctional officers certified by the Alabama Peace Officer Standards and Training Commission ("APOSTC") and authorized to work contact posts escorted CCO Caver to and from her post in the cubicle. (Caver Depo. at 12:17-22). Notably, to ensure eyes on inmates within a dormitory and the ability to communicate problems to correctional staff quickly as opposed to leave cubicles unoccupied, Dunn created the CCO position in 2017 to supplement staffing. (Dunn Depo. at 161:17-23). CCO Caver further testified that, if she observed an altercation or emergency while working a cubicle, CCO Caver's training required her to call for assistance. (Caver Depo. at 13:18-14:1).

CCO Caver testified that she requested security assistance in P-Dorm on the radio when she observed two inmates "horse-playing," and then CCO Caver called a medical alert when she realized the seriousness of the situation between Davis and

**CONFIDENTIAL**

Andrews. (Caver Depo. at 42:21-23). Specifically, Caver testified that, "I called it, and that's instant. They're coming." (Caver Depo. at 44:25-45:2). From the Duty Post Log kept by CCO Caver during her shift, CCO Caver called a code at 3:37 p.m. when Davis and Andrews were arguing. CCO Carver then observed one of the two inmates fall and other inmates picked up the fallen inmate. (ADOC_Ezell_001905).

CO Garrett indicated in his statement that he was performing a security check in Q-Dorm when Caver called the code. (ADOC(Ezell)_000130). CO Garrett stated that he immediately responded to P-Dorm. Similarly, Baker stated that, when Caver called the code, he responded from the chow hall at approximately 3:35 p.m. (ADOC(Ezell)_000130). CO Rickey Johnson responded to the G-gate during chow and assisted CO Garett in escorting Andrews to the infirmary. (ADOC(Ezell)_000134). CO Garret explained that inmates assisted in placing Andrews on the cart, and assisted staff in escorting Andrews to the infirmary. (ADOC(Ezell)_000130-131).

### F.    Allegation of P/Q Dorms serving as a "hot bay."

Plaintiff alleges that:

> "Defendants had long been on notice of a complete breakdown of security in the P/Q blocks at St. Clair. Indeed, Defendants had turned the P/Q blocks into a "hot bay" by grouping together a large number of inmates with histories of violence and disciplinary issues; failing to provide any meaningful monitoring or surveillance; and allowing inmates to carry contraband weapons and perpetrate violence with impunity."

(Doc. 34 at 2). From my review of documents and investigation, the term "hot bay" appears nowhere in any of the evidentiary documentation other than a reference in the Equal Justice Initiative ("EJI") Update and Agenda. I found that both Andrews and Davis received appropriate placement in P/Q-Dorms due to their security classifications.  Note sections V.B. and C. of this report above outline the classification and housing assignments made for Davis and Andrews to respond to safety and security of the facilities and inmates. I did determine that, St. Clair had dorms known as "hot bays;" however, at the time of the incident between Davis and Andrews, St. Clair did not use P Dorm (where Davis and Andrews were housed) as a "hot bay."

**CONFIDENTIAL**

### G.    EJI's Allegations

Plaintiffs allege that the ADOC Officials failed to take meaningful corrective actions to reduce the substantial risk of serious harm facing inmates at St. Clair. (Doc. 34 at 23). Plaintiff references alleged failures to implement a classification system or incident management system, to replace faulty locks, to install surveillance cameras, and to create a transitional unit for inmates released from restrictive housing. (Doc. 34 at 22-23).

ADOC addressed, and continues to address, physical plant needs within its facilities, including St. Clair. Dunn outlined these actions in the Alabama Prison Transformation Initiative ("APTI") Information Paper on February 2, 2016. (ADOC_Ezell_002286-002293). Then-Governor Robert Bentley called for the consolidation of fourteen high- and medium-custody prisons into four regional, state of the art prisons. (ADOC(Ezell)_002288). In 2017, Dunn provided additional details in the APTI Information Paper, including information from independent studies and analyses. (ADOC(Ezell)_002286-2293). The APTI acknowledged that forty-year-old correctional facilities required labor-intensive security management to oversee offenders. Dunn adopted a long-term approach to replace existing facilities with efficient, modern regional prisons to achieve long-term sustainable infrastructure improvements as opposed to short-term quick fixes that fail to adequately address infrastructure concerns.

In his annual report for fiscal year 2016 (i.e., October 1, 2015 to September 30, 2016), Dunn reported that "facility improvements included a $4 million lock replacement project and security system upgrades at [St. Clair]." (ADOC_Ezell _001997). In fiscal year 2019 ADOC implemented infrastructure projects at St. Clair, including $142,755 for surveillance cameras in P/Q Dorms, a $615,049 interior fencing project to divide the camp internally to prevent unauthorized movement within St. Clair, and $66,825 for cell dorm repairs in P/Q Dorms. (ADOC_Ezel_002119).

### 1.    Classification:

ADOC implemented a classification manual to govern the procedures and practices applicable to classification within its male facilities. ADOC's classification system complies with nationally accepted standards and considers an inmate's security risk, disciplinary history, and mental health, medical, programming, educational, and vocational needs to place the inmate into the least restrictive setting

**CONFIDENTIAL**

available considering the safety and security of the facility, staff, other inmates, and the public generally. (ADOC021920). Additionally, St. Clair implemented Standard Operating Procedure ("SOP") 126, which established St. Clair's Internal Classification Board ("ICB"). (ADOC047756-047764). The ICB at St. Clair serves to provide all inmates assigned to St. Clair review and assessment for internal classification specific to St. Clair, including housing assignment, job assignment, and programming needs. (ADOC047756). SOP 126 provides that, certain inmates who pose an imminent threat to the safety and security of the facility or others receive placement in the RHU. (ADOC047756).

The ICB at St. Clair consists of a Captain or person of higher rank, a classification specialist, and a psychological associate or mental health professional. (ADOC47757). Pursuant to SOP 126, the ICB meets weekly and as needed to assess all St. Clair inmates and any bed changes made by correctional staff. (ADOC047757). The ICB reviews all inmates as they enter St. Clair population or program housing. (ADOC047757). Additionally, the ICB reviews all inmate requests for programming or work assignments. (ADOC047757). SOP 126 requires the ICB to review inmates assigned to the RHU monthly to determine their continued placement in RHU and makes recommendations to retain or release inmates from RHU. (ADOC047757).

A memorandum from Charlotte Morrison ("Morrison"), counsel for EJI, communicated the various contentions on February 12, 2019. (ADOC042636-42638). I note that EJI sent this memorandum after the date of the incident involving Davis and Andrews. The ADOC Officials dispute that EJI ever served as independent monitor, possessed, or currently possesses any expertise or experience serving as independent monitor, and instead, the ADOC Officials asserted that, at all times, EJI remained counsel for an adverse party to them during Duke et. al. v. Dunn et. al., No. 4:14-CV-01952-RDP, in the United States District Court for the Northern District of Alabama (the "Duke Action").

In my review, I found no evidence indicating the court in the Duke Action appointed EJI to monitor St. Clair or any evidence to suggest that EJI in any way possessed the expertise or experience necessary to provide analysis of security operations at St. Clair. In fact, EJI counsel, including Morrison, stipulated in the Duke Action that they prepared the "Monitoring Reports," while continuously serving as counsel for the Duke plaintiffs, and "never served or acted as an independent or neutral 'monitor' of St. Clair … or any correctional facility in any jurisdiction…." (ADOC_Ezell_002328). Additionally, EJI stipulated that "EJI Counsel has not been employed or retained in any capacity … in any prison or with

**CONFIDENTIAL**

any correctional agency," and "EJI Counsel never received any training or education from, or ever obtained any certification issued by, any organization or entity which promulgates any standards for the operation of or activities within correctional facilities...." (ADOC_Ezell_002329).

In contrast to EJI counsel, including Morrison, I worked my entire career in corrections. I am a member of ACA and NIC; I have participated in the development of national standards for correctional practice through ACA and audited or reviewed correctional facilities' compliance with applicable standards. From my review, I found no evidence supporting the proposition that EJI counsel, including Morrison, possessed the background, education, training, or experience necessary to evaluate, analyze, or offer reasoned, reliable, and unbiased opinions about the operations of St. Clair or any other ADOC facility.

Because EJI's opinions expressed by Morrison in the February 12, 2019, correspondence lacked any reliability and originated from an unqualified, biased source, I afford them little to no weight whatsoever in my evaluation and analysis. I did, however, take note of the factual information and/or contentions by Dr. Austin and Mr. Stalder in reviewing EJI's correspondence:

> During mediation, it was recommended that:
>
> (1) establishment of an Internal Classification Board (ICB) to control housing assignments at St. Clair. Implementation of the ICB has required retraining of classification officers on the close custody AR. ADOC policy in the classification manual that has been interpreted to require 6 to 12 months of close custody for an inmate based on certain disciplinary infractions. Dr. Austin and Mr. Stalder recommended that this policy is a major impediment to the RHU's functioning and that the ICB needs to have the authority to move men with close custody designations.
>
> (2) to free up bed space occupied by men in need of increased protection, ADOC agreed to establish a forty-eight bed Special Safety Unit (SSU). To date, twenty-four beds have been allotted for the SSU, and there remains a backlog of inmates in need of increased protection who are occupying beds in the [RHU].

**CONFIDENTIAL**

> (3) ADOC agreed to establish a forty-eight bed Behavior Modification Unit (BMU)—a step up-step down unit with programming and increased supervision—in general population. To date, ADOC has not been able to implement the BMU. The experts continue to work with the Department to establish a pared down version located in the lockdown units. Even this approach has not yet reached full implementation, and the segregation and lockdown units continue to consistently operate at 98 to 100 percent capacity.

(ADOC042636-42650).

Morrison's contentions on behalf of EJI remain unfounded, as no record exists of the mediation (as appropriate from my understanding of confidentiality of mediation discussions) or of Dr. Austin's and Mr. Stalder's alleged recommendations and work in the <u>Duke</u> Action. Regardless, as to EJI's contentions, they are simply wrong. St. Clair maintained an ICB and, pursuant to SOP 126 (as noted above), the ICB retained decision-making authority to determine release or placement of inmates in RHU. Moreover, ADOC and St. Clair leadership faced physical plant obstacles related to establishing a forty-eight (48) SSU. Under Dunn's leadership, ADOC implemented a plan to construct four (4) new facilities designed to address the impediments of the existing infrastructure and, in the intervening period, made reasonable, concerted efforts to provide accommodations within the limitations of St. Clair's physical plant to establish space for the SSU and BMU. This plan represents an appropriate and reasonable attempt to provide long-term sustainable improvements to ADOC's infrastructure as well as alleviate short-term needs in its facilities.

During 2017, ADOC implemented the Ohio Risk Assessment System ("ORAS"), a risk and needs assessment designed to measure criminal risk factors and needs of the inmate population. ORAS targets areas of weakness specific to the inmate and identifies evidence-based programming to address those weaknesses. Corrections experts believe this tool can help predict institutional conduct and guide proper assignment within the prison system. ADOC's adoption of ORAS represents Dunn's and ADOC's commitment to improve the services and security of ADOC facilities.

ADOC maintained a robust classification system and comprehensive classification manual. (ADOC021916-021998). ADOC's classification system and

**CONFIDENTIAL**

manual comply with national standards and represent accepted classification practices in correctional departments across the country. From my review, ADOC appropriately classified inmates within its custody, especially at St. Clair where ADOC deployed the ICB (as noted above), including as it relates to Davis' and Andrews' classification, and appropriately assessed each inmate's classification at routine intervals.

ADOC's ability to fully establish the SSU and BMU depended largely on the existing design of the physical plant at St. Clair. St. Clair allotted twenty-four (24) beds for the SSU at the time of Andrews' death. However, nothing from my review indicates that Andrews qualified for SSU placement. In fact, due to Andrews disciplinary history, including engaging in violent acts against other inmates, Andrews (as an aggressor) did not qualify for SSU placement and, therefore, the lack of SSU placement did not cause or contribute Andrews' death.

In any event, Dunn engaged an outside agency, Goodwin/Mills/Cawood, in 2016 to perform an architectural and engineering study to identify costs associated with needed improvements to ADOC facilities, including St. Clair. (ADOC_Ezell_002153). A step necessary to assess the viability of short-term and long-term improvements to existing facilities versus replacement of existing facilities to seek requisite funding from the Alabama legislature that funds ADOC. Following a comprehensive assessment and analysis, ADOC (under Dunn's leadership) also engaged Meg and Russ Savage, industry recognized prison staffing consultants, who work closely with NIC. Based on the review and recommendations from ADOC's outside consultants, Dunn and other stakeholders determined the APTI presented the best path forward and pursued authority to construct new, modern facilities to replace aging infrastructure. In my expert opinion and under the circumstances with the annual maintenance and cost of repairing existing facilities greatly exceeding the cost of constructing new facilities offset by the savings realized from these new facilities, pursuit of the APTI represented an appropriate and reasonable response to the obstacles ADOC faced in terms of the ADOC's physical plant and infrastructure.

2. **Staffing**:

In Morrison's correspondence from February 2019, she states:

> The Commissioner agreed that staffing remains a crucial challenge for the department. Mr. Stalder's review indicated that the facility needs a minimum of twenty-six

**CONFIDENTIAL**

officers assigned to the housing units (general pop and
lockdown units) per shift. He found that St. Clair averages
only 16 to 17 officers for the housing units per shift. At
times, the facility has had as few as 11 officers working
the entire prison and there have been times when there
were 0 officers assigned to work in the general population
housing units.

During our conversation, the Commissioner discussed the
following issues that he hoped would address the staffing
problem at St. Clair: (a) local recruiting and regional
training of officers; (b) CO specific APOST training
curriculum; (c) development of a new correctional staff
position; (d) increased hours for retiree and part-time
employees; and (e) assignment of 7 or more officers from
current class to St. Clair.

(ADOC042636-42650).

Under Dunn's leadership, ADOC developed two new correctional staff
positions: (1) the Basic Correctional Officer ("BCO"), and (2) the CCO.
(ADOC_Ezell_002299). BCOs represent correctional officers pending completion
of the ADOC training academy. CCO's represent cubicle operators who require less
training than correctional officers and work only in non-contact posts. (Dunn Depo.
at 161:7-23). ADOC augmented correctional staff by hiring CCOs for its major
facilities, providing wardens the ability to assign APOSTC-certified correctional
officers to fill security posts with direct inmate contact (where most staff were
needed at the time). (ADOC_Ezell_001997). For every non-contact post filled by a
CCO, it allowed a BCO or CO to work outside the non-contact posts like cubicles
and put them on the floor with direct inmate contact. BCOs required 80 hours of
training as first-level security, instead of the 12-week APOSTC training
correctional staff receive in the academy. (ADOC_Ezell_002013). Moreover, the
addition of BCOs and CCOs allowed ADOC to increase the number of correctional
staff more quickly at facilities, such as St. Clair, while maintaining correctional staff
in contact security posts. Additionally, ADOC used members of the Correctional
Emergency Response Team ("CERT") to work posts on shifts over extended
periods of time to increase staffing at St. Clair. (Ellington Depo. at 98:19-99:1).

ADOC by and through the ADOC Officials, among others, engaged in
recruitment and retention efforts to increase ADOC staff. For example, ADOC

**CONFIDENTIAL**

retained Warren Averett in 2017, to complete a comprehensive recruiting and retention report. (ADOC_Ezell_002216). As a result of ADOC's efforts in conjunction with outside experts, ADOC hired forty-seven (47) new corrections officers in March 2019. (ADOC_Ezell_002216). Additionally, ADOC realized compensation increases for its employees, achieving 5% salary increases for correctional staff. (ADOC_Ezell_002198). ADOC also offered recruiting and retention bonuses tied to successful completion of the training academy, resulting in bonuses between $4,500 and $7,500 for employees who met qualifications. (ADOC_Ezell_002199).

In ADOC's Annual Report for Fiscal Year 2017, Dunn advised Governor Ivey that, "ADOC continued to manage systemic challenges dealing with inmate overcrowding, correctional staffing shortages, and infrastructure while capitalizing on positive trends with a commitment to building a department that is the most respected and effective law enforcement agency in Alabama." (ADOC_Ezell_002051). In Dunn's letter, he further indicated that, "ADOC retained two independent firms that will conduct comprehensive assessments of required correctional staffing levels." (ADOC_Ezell_002051). ADOC's Office of Inspector General, developed under Dunn's leadership, completed the first comprehensive inspection of a major correctional facility in 2016. (ADOC_Ezell_002051). The inspection team, comprised of wardens, division directors, and staff, evaluated all aspects of the facility's operations and developed plans to conduct at least four security audits each year. (ADOC_Ezell)002051).

Further, in the address to the Alabama Pre-Legislative Session Budget Hearing, on January 30, 2019, Dunn asked for funding for merit raises ($4.7 million), 20% pay raise for correctional staff ($430.4 million), and additional five hundred correctional officers ($13.5 million). (ADOC_Ezell_002283). Appropriations from the Alabama legislature determine ADOC's annual budget and ability to implement reforms or improvements. Governor Ivey publicly supported Dunn's request on February 12, 2019, and stated that, "First, we must increase our correctional staffing levels by improving the pay scale for correctional officers and expanding our recruiting efforts. Second, we must construct prison facilities that meet the needs of a criminal justice system in the 21st century." (ADOC_Ezell_002111). Governor Ivey also indicated that, "[f]or the upcoming Regular Session, my budget proposal will include an additional $31 million to hire 500 new correctional officers and increase the pay scale for all security personnel to make their salary competitive given current market conditions in Alabama." (ADOC_Ezell_002111). Additionally, Governor Ivey noted that, "[i]n December, we saw our first increase in the number of correctional officers in years. With a rising retention rate, we can

**CONFIDENTIAL**

begin adding to our officer ranks, rather than simply maintaining our current staffing levels." (ADOC_Ezell_002111). On May 29, 2019, Governor Ivey signed a bill that provided a two-step pay raise of certain ADOC employees, expanded the incentive program to include bonuses for additional training achievements, and increased pay for officers working in maximum or level five (5) institutions. (ADOC_Ezell_002113).

### 3.    Unauthorized Movement/Bed Checks:

St. Clair operated under SOP 137 entitled "Inmate Movement Control." (ADOC010492-ADOC010496). SOP 137 provides "guidance to officers of [St. Clair] in controlling the flow of inmate movement and to ensure orderly movement as well as provide increased security." (ADOC010492). Additionally, SOP 137 provides that "[i]nmates will not be allowed to loiter in or visit, unassigned living areas, job sites, program areas, etc...[a]ll violaters will be subject to disciplinary action" (ADOC010494). SOP 137 represents an appropriate and reasonable SOP for controlling inmate movement and establishes the specific procedures for inmate movement within the facility.

In its February 2019 correspondence, EJI contended that, "[St. Clair] has a continued pattern of a significant level of unauthorized movement throughout the prison. As a result, men accessing unauthorized areas have been involved in the most serious incidents of violence, sexual assault, and extortion at the facility." (ADOC042636-42638). However, at the time of the incident involving Davis and Andrews, ADOC housed both inmates in P-Dorm. (ADOC_Ezell_000018; ADOC_Ezell_000979). Therefore, Davis and Andrews were in their assigned housing unit at the time of the incident between them, and unauthorized inmate movement did not cause or contribute to Andrews' death.

ADOC implemented a wristband policy to assist in identify inmates and their assigned housing unit. Warden Carter, along with Institutional PREA Compliance Managers ("IPCM") Wood and Johnson, conducted an audit of wristband compliance at St. Clair on September 13, 2018. (ADOC025051-25053). At that time, St. Clair housed 888 inmates, below St. Clair's original design capacity of 984 inmates, and the auditors located only two inmates out of place. (ADOC025051-25053). Both inmates were wearing their assigned wristband. (ADOC025051-25053). Nineteen (19) inmates possessed no wristbands in accordance with their dorm. (ADOC025051-25053). Correctional staff secured and controlled all doors. In total, 2.3% of the population failed to comply with the wristband policy, and staff held those inmates accountable. (ADOC025051-25053).

**CONFIDENTIAL**

CCO Caver highlighted the difficulty experienced achieving compliance with the wristband policy among the inmate population in her deposition, indicating that: "one minute they'll have a wrist brand; the next minute they can take it off. And by the time somebody comes, they'll have it back on. Q: So you would just log it if somebody had their wristband off? A: Yes. Q: Would you instruct them to put their wristband back on? A: I would." (Caver Depo. at 65:1-13). CCO Caver further testified, "[m]ost of them don't come out of the pods. Most of them go to their assigned dorms. Or they might be walking around or attempt to [go] somewhere, but most of them always go to their right living areas." (Caver Depo. at 67:6-15). CCO Caver also testified that she holds inmates accountable for the wrist band policy and documents issues in her logbook. (Caver Depo. at 66:6-22). Caver testified that she controlled movement in and out of the dorm. Additionally, CCO Caver testified that staff received corrective action as to securing doors and locks, and they received constant reminders to keep doors secured. (Caver Depo. at 99:8-100:24). Nevertheless, ADOC appropriately housed Davis and Andrews in P-Dorm; therefore, any problem at St. Clair with unauthorized movement of inmates and the existence or non-existence of locked dorm doors did not cause or contribute to Andrews' death.

### H.    ADOC Policies and Procedures

ADOC's mission reads: "Dedicated professionals providing public safety through the safe and secure confinement, rehabilitation, and successful re-entry of offenders." (See Alabama Dep't of Corr's, About ADOC, Mission, Vision, Values, available at https://doc.alabama.gov/Mission.aspx). ADOC maintained a robust set of Administrative Regulations ("AR(s)") to aid in achieving its mission. (ADOC006271-6280). From my general review, ADOC's ARs appear complete and comply with national standards for correctional systems. ADOC's ARs reflect appropriate and reasonable policies, procedures, and practices intended to provide for the safe and secure operations of ADOC facilities.

In addition to ARs, each ADOC facility maintains SOPs and post orders that provide direction on the day-to-day management of the specific facility. St. Clair possesses its own SOP like other ADOC facilities. St. Clair SOP 001 at (II)(2) establishes that "[e]ach employee knows the guidelines of this SOP and is responsible for insuring that they review current SOPs at least quarterly, that they understand and comply with the provisions of published SOPs, changes and/or recissions, and that they sign a statement as directed to this effort." (ADOC_Ezell_023875).

**CONFIDENTIAL**

SOP 110 provides the policies and procedures for conducting searches and shakedowns within St. Clair. (ADOC010483-ADOC010491). SOP 110 provides that "[s]hift [c]ommanders will ensure that [c]ell [b]lock rovers conduct a minimum of (2) two cell searches each shift in their assigned [c]ell [b]locks." (ADOC010485). Additionally, SOP 110 requires correctional officers to conduct random pat searches, along with pat searches as needed based on suspicion of possession of contraband. (ADOC010485). SOP 110 requires St. Clair Captains to implement an "on-going Institutional Shakedown Procedure" to search all areas at St. Clair occur monthly. (ADOC010486). Moreover, SOP 110 establishes that correctional staff search all inmate housing units every thirty (30) days, and all other areas within the facility every sixty (60) days. (ADOC010486). SOP 110 explains in specific detail how officers should conduct and record searches. (ADOC010488-ADOC010491).

St. Clair SOP 083 establishes the duties of the Inmate Control Systems ("ICS") Officer. (ADOC010440-10447). SOP 083 also outlines the procedures for housing of victims and predators. (ADOC010446). For example, an ICS Officer verifies count sheets, transfer orders, and daily movement sheets. (ADOC010441). Additionally, an ICS Officer at St. Clair must "[e]nter all pertinent information concerning inmates' reception, movements, transfers, etc. into the institutional computer terminal." (ADOC010444). Of course, pursuant to SOP 083, a Captain or above at St. Clair must approve any bed movements, and the Captain over general population must inspect the bed movement sheets and sign off on them each day. (ADOC010446). Notably, St. Clair separates inmates designated as victims from those designated as predators, and predators "will not be assigned to the same dorm as victims." (ADOC010446-ADOC010447). In my expert opinion, SOP 083 represent appropriate policies providing guidance to ICS Officers on St. Clair procedures and practices for tracking inmate housing assignments.

SOP 031 entitled "Staffing" establishes the responsibilities, policies, and procedures for staffing of security posts within St. Clair. (ADOC010417-010425). SOP 031 requires one cubicle officer for each general population dorm, two unit rovers for each general population dorm, and an additional correctional officer assigned to the general population entrance and exit gate under normal operations. (ADOC010420). Pursuant to SOP 031, a dorm at St. Clair required at least one CCO or CO assigned to the P-Dorm cubicle and another CO assigned as the P-Dorm rover. (ADOC010421). On December 29, 2018, the Shift Commander assigned CO Garrett as the general population gate officer, assigned CCO Caver as the P-Dorm cubicle officer, and assigned CO R. Taylor as the P-Dorm rover. Additionally, Sgt. Weaver and Sgt. McGilberry worked as the general population Sergeants roving those areas on December 29, 2018. Accordingly, although not fully staffed on December 29,

**CONFIDENTIAL**

2018, St. Clair staffed P-Dorm adequately and greater than the minimum staffing contained in SOP 031.

St. Clair's SOPs establish detailed schedules, movement processes, access to activities, programs, and services, and actions necessary to operate the facility safely and securely. Responsibility for the day-to-day management of the facility and compliance with policies, procedures, and practices rests with the Warden and staff assigned to the facility. ADOC ARs and St. Clair SOPs provide processes and procedures to fulfill ADOC's mission and compliance sound correctional practices, as well as applicable court orders. In my experience, ADOC's ARs and St. Clair's SOPs represent a comprehensive set of policies and procedures and provide appropriate guidance to staff in the performance of their duties.

## VI.   EXPERT OPINIONS

### A.   The ADOC Officials took reasonable and appropriate steps to protect inmates from the risk of inmate-on-inmate violence at St. Clair.

The ADOC Officials recognized the need to manage inmates such as Davis and Andrews; they made concerted efforts to minimize the risk that these two inmates posed to themselves and others. From the information I reviewed and considering my experience, ADOC staff appropriately classified and housed Davis and Andrews. Additionally, ADOC staff, including St. Clair staff, appropriately disciplined inmates such as Davis and Andrews when they violated institutional rules and created an unsafe environment for themselves and others.

Plaintiff's assertion that the ADOC Officials failed to protect Andrews from a known and serious risk of harm lacks merit considering my experience and the information I received in this case. I found nothing to indicate any ADOC Official knew of any conflict between Davis and Andrews, or any specific risk posed to Andrews at St. Clair by Davis or anyone else. Similarly, I found nothing to indicate that Andrews told an ADOC Official or any other person within ADOC that Andrews feared Davis or that Andrews believed Davis intended him harm. It remains clear from my review of Andrews' and Davis' inmate files, as well as the additional documented incident evidence, that the ADOC Officials and St. Clair staff properly responded to incidents of violence within St. Clair, appropriately disciplined inmates involved in incidents of violence after an investigation, and reasonably acted to prevent or reduce the level of violence in ADOC facilities, including St. Clair.

**CONFIDENTIAL**

With respect to Commissioner Dunn, Institution Coordinator Ellington, and Warden Jones, I identified nothing in the record indicating that they individually or collectively knew about, facilitated, approved, and/or condoned any isolated incident or series of incidents of misconduct at St. Clair or any other ADOC facility. Instead, from my review the ADOC Officials took the safety and security of inmates within their custody seriously and took concrete steps to improve security and conditions at St. Clair. ADOC staff in each facility, including at St. Clair, make institutional assignments, classification decisions, and initiate disciplinary actions in accordance with ADOC's ARs and applicable SOPs.

Dunn and Ellington cannot know each inmate in every ADOC facility, along with the particular needs and circumstance of every ADOC inmate on a particular day. That is also true of Jones as to each of the hundreds of inmates at St. Clair. None of the ADOC Officials could have known about or reasonably anticipated the spontaneous reaction of Davis to the activities occurring in his cell or to the anger it uniquely provoked in Davis on December 29, 2018. Indeed, to suggest Dunn (as the Commissioner) or Ellington (as an Institutional Coordinator) possessed the ability to actively engage in the day-to-day operations within a specific facility or, more specifically, a dorm in a specific facility demonstrates a lack of knowledge and understanding as to the role of executive- or administrative-level personnel in a correctional system, especially a system like Alabama operating twenty-six (26) facilities across the state.

Dunn focused his efforts on system-wide actions intended to achieve long-term positive changes for ADOC, such as gaining funding from the Alabama legislature to address the physical plant and the staffing needs of the department. Dunn consistently worked to obtain resources necessary to address ADOC's needs and to develop ADOC's strategic plans and initiatives to move the department forward. Ellington possessed a similar regional, multi-facility approach focused on deployment of resources, addressing general correctional practices and operations of multiple facilities, and conveying ADOC-wide information to facility leadership within his region. Ellington worked tirelessly to respond to his regional facilities in times of emergency, review and provide guidance on SOPs, and address specific issues within the facilities under his supervision. (Ellington Depo. at 39:22-43:10). Like most correctional systems, during Dunn's tenure as Commissioner, ADOC employed and continues to employ a military-like command structure. Because neither Dunn nor Ellington can be in all places at all times, they delegated the day-to-day operations of ADOC's facilities, including St. Clair, to facility-level leadership and staff.

**CONFIDENTIAL**

Even at the facility level, the same command structure applies for the practical same reasons. That is, Jones (like Dunn and Ellington) cannot be in all places at all times within St. Clair—a camp with hundreds of inmates, multiple buildings, programs, services, and a multitude of events occurring simultaneously each and every day of the year. Jones (like Dunn and Ellington) must rely on the command structure for supervision and oversight of all St. Clair operations, starting with the Wardens under Jones to the Captains, then to the Sergeants, then to the Lieutenants, then to the Senior COs, then to the COs, then to the BCOs, then to the CCO, etc. with the number of staff growing larger at each level moving down the chain of command. This type of top-down leadership approach, in my opinion, represents an appropriate and effective exercise of the ADOC Officials' leadership, as well as appropriate and effective supervision and oversight in a correctional environment, especially in a system as large as ADOC. Notwithstanding a top-down management approach, Jones testified that she reviewed incidents occurring at St. Clair, provided guidance and oversight to correctional staff, held correctional staff meetings to address any issues, approved discipline of inmates and staff, and walked the facility regularly to track compliance with St. Clair and ADOC policies and procedures. (Jones Depo. at 30:25-31:3; 92:20-93:24; 162:25-164:2; and 59:9-14).

During fiscal year 2017, ADOC implemented the ORAS risk and needs assessment tool. (ADOC_Ezell_002052). The ORAS tool assists ADOC in targeting areas of weakness specific to the inmate and maps those needs to evidence-based programs for the inmate. Correctional professionals believe ORAS effectively predicts institutional conduct to guide housing assignments and programming within a prison system. (ADOC_Ezell_002068). Again, in my opinion, ADOC properly classified Davis and Andrews consistent with ADOC's male classification system and, during their incarceration, ADOC routine reviewed their classification and reclassified Davis and Andrews, especially engaging in a violent altercation. ADOC went so far as to move Davis and Andrews to higher security-level facilities to deal with their bad behavior.

At the time of the incident between Davis and Andrews, ADOC appropriately classified each of them according to the male classification procedures. Classification classified Andrews as medium custody security level 5. (ADOC_Ezell_001443). Andrews committed three assaults between February and April 2018. (ADOC_Ezell_000024). As a result, classification reclassified Andrews from medium to close custody on May 7, 2018. (ADOC_Ezell_000024). However, after serving his disciplinary time in the RHU, classification downgraded Andrews's custody to medium custody security level 5 on June 12, 2018. (ADOC_Ezell_000018). Therefore, at the time of the incident ADOC appropriately

**CONFIDENTIAL**

assigned Andrews and Davis to a security level 5 facility considering Davis' and Andrews' criminal and institutional history, including recent disciplinary action (as detailed above). Neither Davis nor Andrews required specialized housing like protective custody, and neither Davis nor Andrews qualified for housing in St. Clair's honor dorm. Instead, St. Clair appropriately assigned them to general population housing.

St. Clair staff held inmates accountable for rule violations, initiating discipline action and enforcing disciplinary sanctions such as confinement to the RHU. Further, as it relates to Davis and Andrews, St. Clair staff acted in accordance with ADOC applicable policy and procedures established by the ADOC Officials, including, for example, as it relates to the classification and housing of Davis and Andrews and as it relates to the actions before and after the December 29, 2018, incident between Davis and Andrews. Regardless of interventions by ADOC staff, Davis and Andrews appear to have lacked any concern for openly violating ADOC rules. Andrews had no apparent concern for engaging in sexual activities in his cell or for the warning Davis gave him about continuing to engage in those activities. Davis had no apparent concern for unexpectedly hurting or killing Andrews in front of an entire dormitory of inmates over what some might perceive as a minor annoyance to get peace and quiet in his cell.

Nothing in the record before me indicated that an actual, imminent conflict existed between Davis and Andrews, or that the ADOC Officials or St. Clair staff knew or should have known of an actual risk of harm existed to Andrews from Davis. By all accounts from inmates and St. Clair staff, Davis and Andrews were not enemies. Andrews never reported any altercations or issues with Davis or any other inmate in his dorm or at St. Clair generally. No ADOC Official could reasonably foresee or anticipate the risk posed to Andrews by Davis on or around the date of the incident or any other specific risk to Andrews at St. Clair.

Based on my experience coupled with the information in the record before me, I firmly believe the ADOC Officials acted appropriately and consistent with their respective duties and roles within ADOC. I found no evidence indicating that the ADOC Officials or any St. Clair staff knew Davis intended to or might assault Andrews on December 29, 2018. Again, from my reviewed, this unfortunate incident between Davis and Andrews appears to have been an unanticipated, spontaneous reaction by Davis. Indeed, I am confident in says nothing in the record before me even suggests the ADOC Officials intended harm to Andrews or any other St. Clair inmate or acted in a manner demonstrating a lack of concern or apathy toward Andrews or any other St. Clair inmate. To the contrary, the ADOC Officials worked

**CONFIDENTIAL**

daily in an effort to improve the conditions of confinement (including safety and security) for Davis, Andrews, and the other ADOC and St. Clair inmates.

**B.    St. Clair correctional staff adequately monitored the P/Q Dorms and responded appropriately to the incident.**

Plaintiff contends that St. Clair lacked adequate staff to fill the dorm cubicles with cube officers, that cube officers slept during their shift, that correctional officers failed to regularly conduct random patrols, and that St. Clair possessed no surveillance cameras or emergency call buttons. Plaintiff further alleges that a lack of supervision in P/Q Dorms created delays in the provision of emergency medical care. Plaintiff's contentions lack merit as it relates to the incident in this case.

On December 29, 2018, St. Clair's P/Q Dorms possessed more than adequate correctional staff, including CCO Carver working the cubicle. No evidence exits remotely suggesting CCO Carver slept through the incident between Davis and Andrews; to the contrary, CCO Carver's testimony and records contemporaneous to the incident reveal CCO Carver identified concerning activity and quickly called for assistance to P-Dorm in light of her knowledge of the inmates in the P/Q Dorms. (Carver Depo. at 41:3-10; 44:25-45:2). Similarly, the presence and supervision of CCO Carver (even if confined by policy to the cubicle), COs Garrett and Taylor, and Sgts. Weaver and McGillberry were appropriate for P/Q Dorms at the time of the incident. (Carver Depo. at 12:17-22). Because of CCO Carver's keen observation of the dorm, quick identification of a problem, and prompt radio call for assistance, she alerted correctional staff of a problem and sought an emergency response faster, in my opinion, than a response initiated by a person working in a control room watching a surveillance video feed or than a response initiated by an alert from an emergency call button. On December 29, 2018, CCO Carver was not asleep or distracted causing or contributing to Davis' assault of Andrews or a delay in medical care for Andrews.

Nothing supports Plaintiff's contention of an undue delay of medical care for Andrews by St. Clair staff, or their more preposterous assertions about St. Clair staff potentially being asleep or distracted, delaying a response. After CCO Carver called the code, CO Garrett—at the time performing a security check in Q-Dorm—immediately responded to P-Dorm. (ADOC(Ezell)_000130, 000181). CO Johnson, serving as the G-yard gate officer at the time, also immediately responded to CCO Carver's call for assistance. (ADOC(Ezell)_000002, 000182). In addition to COs Garrett and Johnson, Lt. Baker and Sgt. Weaver responded to P-Dorm when they received CCO Caver's radio code. (ADOC_Ezell_000002). Because of the presence of adequate correctional staff in and around P/Q Dorms, CCO Carver received a

**CONFIDENTIAL**

timely and robust response from correctional staff. I do not find it problematic, but instead commendable, that inmates assisted a correctional staff member to remove Andrews from P-Dorm. (Caver Depo. at 78:6-8).

From my review, the only delay in a response would be an expected delay in a prison setting associated with correctional staff unlocking gates and unit doors to keep all the other inmates safe and secure as responders moved toward and into P-Dorm. I found nothing supporting Plaintiff's assertion that unit doors at St. Clair were open as a matter of practice. If so, then the open unit doors would have allowed responders quicker access to P-Dorm than slower access, defeating Plaintiff's assertion of a delay. Again, in my experience and based on my review of the record in this case, I found nothing to support any delay in the provision of medical care to Andrews by St. Clair staff, and it goes without saying, that the ADOC Officials, who were not present at St. Clair on December 29, 2018, did not delay or cause a delay in rendering medical care to Andrews. Instead, the training provided by ADOC concerning responding to an emergent situation within an ADOC facility worked, as reflected in the actions of St. Clair staff that day.

St. Clair maintained SOP 031, updated May 22, 2018, which outlined the procedure for developing and implementing a staffing plan for St. Clair. (ADOC010417-10425). SOP 031 makes the "captain ... responsible for insuring all Standard Operating Procedures are adhered to at all times." (ADOC010418). The ADOC Officials therefore lack any responsibility for the staffing allocation or post designation at St. Clair on any shift, including the shift at the time of the incident. Based on their knowledge and experience at St. Clair, including recent events in the facility, a St. Clair Captain sets posts correctional staffing for each shift and in each area of the institution. Moreover, SOP 031 establishes the ideal number of staff allotted to St. Clair. (ADOC010419-10422). However, in my experience, the number of correctional staff allotted to an institution does not reflect the number of correctional staff necessary to operate the institution safely and securely on a given shift. SOP 031 also designates security posts and the minimum number of correctional staff for those posts at St. Clair. (ADOC010420-10421).

From my review of the St. Clair B-Day Shift Duty Post Log on December 29 2018, St. Clair staffed the general population gate, the L, M, P, and Q cubicles, the P/Q rover, and L/M rover posts in accordance with SOP 031. (ADOC_Ezell_001901). At the time of the incident, two officers filled temporary posts outside St. Clair, providing hospital transports. (ADOC_Ezell_001901). In addition to the general population posts, St. Clair staffed had a Shift Commander and two Sergeants on duty. (ADOC_Ezell_001901). Additionally, Sgt. Stefaniak

**CONFIDENTIAL**

staffed the infirmary. (ADOC_Ezell_001901). Two correctional officers remained on holiday leave, with three correctional officers on sick leave. (ADOC_Ezell_001901). St. Clair therefore appropriately prioritized staff to the population dorms and yard, including P/Q Dorms, consistent with SOP 031. Even after the incident, Sgt Weaver acted quickly to identify and locate the alleged perpetrator of the assault. (ADOC_Ezell_000002). His swift action resulted in securing the alleged perpetrator and potential evidence related to the incident. In sum, St. Clair staff timely and appropriately responded on December 29, 2018, to the incident between Davis and Andrews, reflecting favorably on their training and understanding of how to respond to an emergency within the facility.

In their role with ADOC, the ADOC Officials worked to increase staffing within ADOC facilities. For example, Dunn achieved compensation increases for correctional staff, incentive pay for correctional officers assigned to level five (5) facilities, created the BCO and CCO positions to free up correctional officers to serve in contact posts, increased recruiting initiatives, and retained outside consultants to review ADOC's staffing and recruitment plans. Similarly, ADOC under Dunn's leadership stemmed the attrition rate of correctional staff and achieved an increase in correctional officers in 2019 before the COVID-19 pandemic that impacted all employers. As other examples, ADOC enlisted the help of retired correctional officers, increased overtime, assigned CERT officers to St. Clair, and reassigned officers from other facilities to St. Clair. Instead of ignoring staffing challenges, the ADOC Officials' actions demonstrated a commitment to providing safe and secure operations in each ADOC facilities and, specifically, St. Clair.

The ADOC Officials' extraordinary efforts must be viewed in the proper light. ADOC does not set its own budget or fund itself. Instead, ADOC relies on the Alabama legislature for funding. Moreover, candidates for correctional staffing positions face heightened qualifications and background checks based on their job duties and responsibilities, and correctional officers must pass physical and educational requirements to become certified through APOSTC. All of these employment requirements and limitations constrain the number of qualified applicants willing to seek employment with ADOC through no fault of ADOC or the ADOC Officials. Accordingly, I believe the ADOC Officials took all reasonable actions within their control to increase staffing within ADOC, including St. Clair before and after December 29, 2018. Plaintiff's contentions about a failure to monitor and staff security posts lacks any support in my opinion.

The choices made by Davis and, to some degree by Andrews, caused the incident. Davis assaulted Andrews, without warning, inside his cell. The

**CONFIDENTIAL**

spontaneous altercation even surprised inmate Timothy Brown (a resident of P-Dorm) who stated, "they did just about everything together" speaking of Davis and Andrew. (ADOC(Ezell)_000174). Inmate Brown understood Davis and Andrews to be friends, not enemies, further demonstrating the unforeseeable and unanticipated nature of this altercation. (ADOC(Ezell)_000177). For the foregoing reasons, I believe St. Clair staff appropriately monitored P/Q Dorm and responded to the incident between Davis and Andrews. Moreover, no act or omission that I found in the records by the ADOC Officials caused or contributed to Andrews' death.

**C.    The ADOC Officials established appropriate policies and procedures for identification and removal of contraband, and St. Clair staff conducted appropriate searches for contraband and disciplined inmates in possession of contraband items.**

Plaintiff contends St. Clair failed to control the proliferation of contraband (specifically, weapons), failed to hold inmates accountable for possession of contraband, and St. Clair staff failed to take meaningful action to curtail the availability of weapons. Plaintiff further alleges that searches remained ineffective and sporadic. From my review of Davis' and Andrews' disciplinary histories alone, Plaintiff's contentions lack merit. Davis and Andrews each had contraband confiscated and received discipline for possession of contraband, including weapons. Additionally, the documents I reviewed demonstrate that ADOC identifies and confiscates contraband such as drugs, knives, and cell phones at St. Clair and other facilities, and ADOC attempts to deter rule violations with disciplinary sanctions, including RHU placement.

CCO Caver testified that, if she observed an inmate with a weapon—regardless of the purpose or intent by the inmate to use it—she let an "officer know to come over and check the guy." (Caver Depo. at 52:7-11). CCO Caver further testified that "staff would [then] do a search, pat a few of them down," and "[t]hey would come do a shakedown." (Caver Depo. at 54:3-13). CCO Caver explained, "Sometimes if it seemed like something might be going on, they would search a couple of cells." (Caver Depo. at 55:25-56:3). Additionally, "if a weapon was observed, movement would result in two officers in the hallway that would pat you down, make sure you don't have weapons on you…." (Caver Depo. at 58:18-59:1). During the deposition, Plaintiff specifically asked CCO Carver about concerns with staff failing to conduct searches; CCO Caver responded: "No. Because they did a good job in searching and coming through doing security checks." (Caver Depo. at 84:5-11).

**CONFIDENTIAL**

My observations from the materials reviewed in this support my opinion that St. Clair staff routinely searched inmates and the facility for contraband through random pat down searches, planned housing unit and general facility searches, and facility-wide sweeps with the K-9 unit. Based on my experience, I am confident that St. Clair underreported contraband searches in the documents I reviewed. In my experience, correctional staff do a good job of completing routine searches but fail to document those searches when that search produces no contraband and staff become busy with an important or urgent need requiring their attention immediately after completing the search, resulting in an unintended failure to document a search. Nevertheless, and importantly in this case, Sgt. Weaver located Davis exiting cell P-28 after the incident, detained Davis for placement in the RHU pending investigation, and searched cell P-28, locating an inmate-made knife with blood on it and a pair of bloody pants with the name "CED" written inside the waistband. (ADOC_Ezell_000002).

SOP 110 entitled "Search and Shakedowns" provides guidance to staff in the proper procedures for conducting searches and shakedowns at St. Clair. (ADOC010483-10491). Consistent with a chain of command system, section IV.A. of SOP 110 provides that a "captain of this institution [must] ensure subordinate staff members" know and comply SOP 110, and section IV B. passes this obligation down the chain of command, making each supervisor on shift responsible for correctional officers under his or her supervision. (ADOC010484). Ultimately, section IV.C. of SOP 110 makes each correctional officer responsible "to read, understand and follow the guidelines of this SOP." (ADOC010484).

SOP 110 provides detailed instructions for St. Clair staff on performing searches and shakedowns. For example, SOP 110 provides for two cell searches each shift in dorms and monthly institutional searches for all areas of St. Clair. (ADOC010485-10486). From a policy and procedure perspective, SOP 110 represents an adequate policy for searching inmates and a correctional facility for contraband. Additionally, SOP 110 provides comprehensive and appropriate guidance to St. Clair staff on completing searches and shakedowns at St. Clair. From the face of SOP 110, nothing allocates any responsibility for searches and shakedowns at St. Clair on the ADOC Officials. Instead, the ADOC Officials complied with their responsibility by providing clear procedures and guidance through policies like SOP 110, by training through APOSTC and annual or other in-service training session on contraband detection and interdiction (see AR 219), and by providing general oversight on facility security searches for contraband through audits (see AR 322 at 6). In fact, in February 2019, ADOC conducted a facility-wide

**CONFIDENTIAL**

institutional search at St. Clair, which involved participation from approximately three hundred state and local law enforcement officers. (ADOC039856-39881).

Ellington testified that Jones possessed several resources to conduct searches. Jones could request CERT team or K-9 unit assistance to conduct searches at St. Clair, hold-over correctional staff from a prior shift to conduct searches, and order correctional staff to conduct targeted or additional searches by on a shift. (Ellington Depo. at 127:2-128:10). Ellington specifically recalled Jones requesting the CERT team to assist in facility searches, and used the other available methods identified above to conduct searches at St. Clair. (Ellington Depo. at 129:5-21). In fact, Ellington testified that, in 2017, ADOC deployed five CERT teams consisting of approximately 80-85 correctional officers and K-9 officers to conduct searches on a rotating basis. (Ellington Depo. at 132:7-25). During 2018 and 2019, Ellington testified that ADOC assigned a CERT team to St. Clair to assist in daily operations, including searches. (Ellington Depo. at 129:21-130:9). In addition to the CERT team, ADOC reassigned correctional staff from Hamilton Aged and Infirmed to St. Clair to provide additional staffing and assist in searches and shakedowns. Finally, Ellington recalled occasions when ADOC mobilized additional CERT teams from other regions to conduct facility-wide searches at St. Clair. (Ellington Depo. at 130:16-24).

CO Garrett testified that correctional officers at St. Clair performed contraband searches daily in the performance of their duties. (Garrett Depo. at 39:14-23). CO Garrett further testified that correctional staff received training on performing searches at St. Clair. (Garrett Depo. at 41:24-42:2). Similarly, Cpt. Gary Malone ("Cpt. Malone") described several types of searches correctional staff conducted at St. Clair, including pat down searches of inmates, cell searches, strip searches, and living and common area searches of the facility. (Malone Depo. at 130:8-19). Cpt. Malone, a Captain responsible for searches and shakedowns at St. Clair at the time, confirmed that, in 2018 and 2019, correctional staff at St. Clair conducted daily searches for contraband. (Malone Depo. at 134:15-16). Cpt. Malone explained that he and the other Captains at St. Clair reviewed incident reports on the incident reporting module daily, allowed him to see who conducted searches, who correctional staff searched, whether correctional staff recovered contraband, and the type of contraband. (Malone Depo. at 135:1-136:4).

Consistent CO Garrett's and Cpt. Malone's testimony, Jones testified that, during her tenure at St. Clair, staff conducted daily searches, and conducted larger shakedowns three (3) to four (4) times per week to reduce the amount of contraband within the facility. (Jones Depo. at 185:5-19). Moreover, Jones testified that St. Clair

**CONFIDENTIAL**

conducted facility-wide searches approximately twice per month, depending on the staff available. (Jones Depo. at 186:1-7). Jones explained that the St. Clair K-9 unit participated in facility-wide searches as well as searches of individual housing units and incoming staff to interdict contraband. (Jones Depo. at 187:14-188:13). To ensure St. Clair staff searched for contraband, Jones tracked correctional staff compliance with the searches required by SOP 110 by reviewing Shift Commander logs and incident reports and walking through and keeping a presence in the facility to get feedback and information from inmates and staff members. (Jones Depo. at 189:12-191:19).

It is clear to me from my experience as a correctional professional and from my review of the documents (including testimony) in this case, St. Clair staff conducted contraband searches and shakedowns and, although not perfect, they substantially complied with St. Clair SOP 110. That is, the practice associated with contraband searches and shakedowns fundamentally complied with the policies implemented by the ADOC Officials. Indeed, Jones' tracking system and corrective action (when necessary) confirmed, from a supervisory perspective, an acceptable level of compliance, and neither Jones nor any other ADOC Official should have been concerned about any inadequacy in the policies, procedures, or practices regarding contraband searches.

St. Clair represents an aged facility and, as such, provides inmates numerous opportunities for misuse of physical plant materials as weapons. From experience, as facilities age, it becomes increasingly difficult to identify when parts of a facility (such as a support at the bottom of a sink or bunk or a piece of a frame around a window) go missing. However, ADOC under Dunn's leadership made reasonable efforts to address limitations presented by the aged physical plant of St. Clair and other ADOC facilities, acknowledging the labor-intensive and difficult security management of older facilities and developing a plan to address those issues in the short-term and in the long-term with the APTI. (ADOC_Ezell_002286-2293). Specifically, as to St. Clair, Dunn petitioned the Alabama legislature in 2017 (and later received approval) for a $4 million lock replacement project and additional security upgrades at St. Clair. (ADOC_Ezell_002066).

Consistent with their managerial duties and responsibilities, the ADOC Officials implemented adequate and appropriate policies and procedures for the identification and removal of contraband. They ensured an appropriate amount of oversight over contraband searches to confirm reasonable compliance with ADOC policies and procedures, with Jones developing an oversight system to keep

**CONFIDENTIAL**

informed about the frequency and results of contraband searches and seizures and to allow for corrective action if and when necessary. Similarly, St. Clair correctional staff conducted adequate and appropriate searches for contraband with oversight from Captains and other supervisors, disciplining inmates in possession of contraband items (as reflected by the institutional files for Davis and Andrews). In my opinion, Plaintiff's contentions concerning contraband (including weapons) lack merit.

> **D.     The ADOC Officials maintained a comprehensive classification system; ADOC staff appropriately classified Andrews and Davis; and the ADOC Officials implemented an appropriate system to address safety concerns, including separating dangerous inmates from the general population.**

Plaintiff contends that the ADOC Officials failed to respond to safety concerns and failed to identify and safely separate inmates with a history of violence from the general population. Plaintiff further contends the ADOC Officials failed to implement classification and housing policies resulting in violence caused by commingling violent and non-violent inmates. Based on my experience and the documents I reviewed, Plaintiff's contentions lack any support.

As I explained in detail above, ADOC implemented a classification system consistent with national standards that adequately classifies ADOC based on several factors, including historical criminal conduct and institutional history. It even relies on evidence-based risk assessment tools like the ORAS. Unique to St. Clair (and most other correctional systems familiar to me), St. Clair possesses an internal classification system as reflected in SOP 126. SOP 126 employs an ICB to further assist, at the facility level, the placement of maximum-security inmates in appropriate housing units at St. Clair, relying on a variety of factors such as violent history, access to programs, and know enemies with the institution.

Davis and Andrews histories demonstrated a propensity for violence, justifying medium custody security level 5 classification and necessitating placement in a security-level 5 facility like St. Clair. Upon review by the ICB, they appropriately placed Davis and Andrews in P-Dorm, because the record before me does not justify placement of Davis or Andrews in specialized housing such as a honor dorm, SSU, or BMU due to their history of disciplinary action and violence. Additionally, neither Davis nor Andrews qualified for or sought placement in the RHU or protective custody prior to their altercation. And, nothing in the record available to me indicates Davis and Andrews were enemies (although both inmates'

**CONFIDENTIAL**

files possessed a unique enemy list); instead as inmate Brown testified, Davis and Andrews were friendly and spent time together in P-Dorm. Accordingly, ADOC and St. Clair's ICB properly placed Davis and Andrews at St. Clair in a general population dorm together consistent with the classification manual and SOP 126. In fact, Andrews' placement took into consideration his enemies within St. Clair, as reflected in Andrews' institutional file. Under the circumstances, the spontaneous and unexpected nature of the altercation did not afford St. Clair staff, including the ICB, warning of a problem or a need to separate Davis and Andrews before the altercation.

I reviewed documents related to the RHU, disciplinaries, and classification actions. These documents indicate that St. Clair staff held inmates accountable for their behavior, including rule violations. St. Clair correctional staff used the RHU for disciplinary sanctions consistent with AR 403 and to separate violent and disruptive inmates from the general population. Through the classification and reclassification process (including after violent incidents), ADOC classification staff and the ICB properly classified and housed Davis and Andrews at St. Clair, demonstrating an understanding of the classification policy, procedure, and practices and an ability to appropriately apply that understanding.

After reviewing the frequency and scope of inmate-on-inmate violence at St. Clair, I did not find inmate-on-inmate violence to drastically exceed that of any other comparable maximum-security facility. I found no evidence to support the suggestion that "violence was the norm" or that "staff tolerated a culture of violence" at St. Clair. To the contrary, in my opinion, the ADOC Officials and St. Clair staff took violence within St. Clair seriously, and took intentional, reasonable steps to increase security and combat violence.

Plaintiff's reliance on letters issued by the U.S. Department of Justice ("DOJ") in April of 2019 and July 2020 remains misguided for at least two reasons. First, DOJ included within their letters a clear disclaimer, indicating that nothing in the letters constituted admissible evidence, or created any legally binding conclusion or obligation. Second, the case filed by DOJ against Alabama remains pending and undecided, meaning no court had rendered a decision about the accuracy or validity of the information or allegations contained in DOJ's lawsuit against Alabama or its letters to Alabama from August 2019 and July 2020. As such, DOJ's allegations in the lawsuit and their earlier letters to Alabama lack any application to this case and certainly do not support an assertion by Plaintiff that the ADOC Officials possessed any knowledge of risk of harm to Andrews by Davis or any other inmate at St. Clair in December 2018. Instead, Andrews' institutional behavior resulting four facility

**CONFIDENTIAL**

transfers in approximately five years and sexual behavior after warning from his cellmate jeopardized Andrews' safety.

In sum, no evidence exists to complain about ADOC's or St. Clair's classification system or decisions as to Davis and Andrews classification and housing placement. Neither the classification nor housing placement decisions concerning Davis or Andrews caused or contributed to Andrews' death. St. Clair possessed appropriate mechanisms to separate disruptive and violent inmates through RHU and other housing placement, but neither Davis nor Andrews qualified for such placement prior to their altercation, and they did not qualify for any specialized housing in St. Clair. Again, Plaintiff's contentions lack merit.

### E.    ADOC appropriately responded to and disciplined instances of inmate misconduct.

Plaintiff contends ADOC staff failed to properly investigate acts of violence. Plaintiff contends ADOC staff discouraged victims from reporting incidents of violence. Plaintiff's contention run contrary to the documents I reviewed in this case. From a Davis' and Andrews' file (aside from the other disciplinary and classification information available) ADOC possesses an adequate policy for the investigation and discipline of inmate misconduct. From my review of the record, when ADOC inmates engaged in misconduct and rule violations (see AR 403 at Rule Violations Table), including Davis and Andrews, facility-level staff reported the incident in an incident report which ADOC investigated and, when appropriate, disciplined inmates consistent with AR 403. (See Davis' and Andrews' disciplinary histories above). For example, Davis and Andrews experienced investigations, disciplinary sanctions (including RHU placement), reclassification, and facility transfers as a result of their misconduct. (Id.).

Davis and Andrews experienced disciplinary sanctions for conduct at St. Clair before the December 29, 2018, incident. Further, on December 29, 2018, St. Clair staff exercised vigilance in immediately securing the area where the incident occurred, locating the alleged perpetrator (Davis), securing potential evidence, and interviewing relevant persons. Multiple Investigations and Intelligence Division ("I&I") agents promptly responded to St. Clair, processed the scene, tagged evidence, took witness statements, and conducted a thorough investigation. I&I's investigation led to the prosecution of Davis by the local district attorney and an indictment of Davis for homicide. The response by St. Clair staff and I&I to this particular incident demonstrated a thorough understanding of their investigative role

**CONFIDENTIAL**

and practice of promptly taking immediate action to detain suspects and investigate crimes after a violent incident.

From my review of the record, the St. Clair staff and I&I properly responded to the altercation between Davis and Andrews. They properly secured the scene of the crime, located and detained, investigated the incident by securing evidence and statements, reclassified and disciplined Davis timely for the incident, and referred the incident for prosecution. Similarly, I found no evidence of a systemic problem with the timely and appropriate investigation and discipline of St. Clair inmates for misconduct. Finally, I found no evidence of a systemic problem with St. Clair staff discouraging the reporting incidents of violence.

## VII.  CONCLUSION

It is my expert opinion that the ADOC Officials demonstrated continued commitment to addressing safe and secure operations across ADOC and did not fail to protect Andrews from harm. The December 29, 2018, incident resulted from the intentional and unforeseen actions of Davis. No ADOC staff member, much less the ADOC Officials, possessed any awareness that Davis intended to stab Andrews in the P-Dorm at St. Clair.

My conclusion remains supported by the evidence described in the information previously identified. With my forty-seven (47) years of experience as a correctional officer, Associate Warden, Warden, Correctional Administrator in private and state operations responsible for multiple facilities, and an ACA auditor coupled with the documents and information reviewed and identified in this report, it is my firm opinion that the ADOC Officials and St. Clair staff did not cause or contribute and lack any responsibility for Andrews' death.

The ADOC Officials implemented adequate and appropriate policies and procedures through ARs and SOP. St. Clair staff, as it relates to Andrews' death, complied in practice with the ARs and SOPs. My experience provides me with the knowledge that choices inmates make can expose them to potential of harm. Staff face a challenge of keeping inmates safe from each other and themselves on a daily basis, often intervening at a risk to their own safety. Drug interdiction, cell phone interdictions, contraband interdictions, gang violence, sexual violence, and efforts to breach the secure perimeter reflect only a few constant challenges present for facilities like St. Clair. Executive leadership and local staff must manage these threats while working to improve the physical plant, maintain suitable operating levels, and provide basic services such as medical, mental health, programming, and food services.

**CONFIDENTIAL**

I found no documents or information demonstrating the ADOC Officials were indifferent to the safety and security of Andrews on December 29, 2018 or generally as asserted in Plaintiff's Complaint, including Plaintiff's contentions that:

- The ADOC Officials failed to protect Andrews from a known and substantial risk of serious harm.

- The ADOC Officials failed to provide adequate monitoring and timely emergency medical care in the P/Q Dorms at St. Clair.

- The ADOC Officials failed to address the widespread proliferation of contraband weapons at St. Clair.

- The ADOC Officials failed to adequately respond to reports of safety concerns and separate dangerous inmates from general population.

- The ADOC Officials failed to adequately respond to and discipline instances of inmate misconduct, failed to properly investigate and discipline acts of violence and possession of contraband, and staff routinely discouraged victims from reporting incidents of violence.

- The ADOC Officials' created a culture of abuse at St. Clair.

Contrary to Plaintiff's contentions, the ADOC Officials implemented, trained, and supervised the application of policies and procedures at ADOC facilities, including St. Clair. They worked to protect all inmates in ADOC custody at St. Clair and elsewhere. The ADOC Officials acted in thoughtful and creative way to address challenges in ADOC facilities (including St. Clair) with staffing, contraband, inmate-on-inmate violence, inmate misconduct, physical plant, and operation of the ADOC system with limited resources. For example, engaged Alabama's executive and legislative branches of government to address ADOC's needs, engaged subject matter experts to find more effective methods to address ADOC's challenges, and provided training to provide staff with tools and direction to deal with the challenges of working in corrections and to encourage practices consistent with applicable policies and procedures. Notably, I find ADOC's challenges generally consistent with the challenges faced by other correctional systems across the country, including systems I operated or audited with ACA, such as staffing, contraband, inmate-on-inmate violence, inmate misconduct, physical plant, and administration and operation of a correctional system with limited resources.

**CONFIDENTIAL**

I very much appreciate the opportunity to work with the employees of the State of Alabama who assisted in providing the documents necessary for the preparation of this report. I appreciate their dedication to serving the State of Alabama and her constituents.

I was not instructed, required, or paid any additional compensation to reach any conclusions or directed to make any specific findings, as the above represents my own conclusions. The opinions identified above are based upon my independent professional review of the particular facts in this case along with my experience. My compensation is not dependent upon the results obtained in this action. Nevertheless, I am prepared to testify before the applicable court regarding these opinions.

I reserve the right to supplement or revise my report and my opinions if new or revised information becomes available.

Dated:  December 20, 2024.

/s/ Kevin Bradley Myers
Kevin Bradley Myers

**CONFIDENTIAL**

### Exhibit A- Professional Curriculum Vitae Kevin Myers

### Kevin Myers
### 4Square Corrections, LLC

**Objective:** Continue to share experience and add value to the correctional industry through:

- Support of new technologies,
- Linkage of classification, risk needs assessments and program work assignments,
- Security, program, ACA inspections and audits
- Expert witness

## Education:

- **Ralston High School** – 1972

- **Phillips University-** Enid, Oklahoma- 1977 Bachelor of Arts

  - Political Science and minors in German and Sociology

- **Oklahoma University** MPA-1978-1980

  - Completed 36 hours with focus on program planning and evaluation coursework culminating in thesis on "Social Climate in Oklahoma Prison". Did not complete oral presentation.

## Work and Related Experience:

I possess forty-seven (47) years of varied correctional experiences with increasing supervision and management responsibilities. I previously testified in various federal courts on numerous occasions and presented at numerous conferences.

## Oklahoma Department of Corrections *(1976-1990)*
- **Correctional Treatment Officer** (August 1976– August 1978).

  - Responsible for first ACA accreditation in 1978.

**CONFIDENTIAL**

- **Correctional Case Manager I, II, and III** Planning and Research (August 1978– February 1981).

- **Assistant Superintendent Clara Waters** CTC (February 1981– November 1983).

- **Executive Assistant to Director** (November 1983-June 1984).

  - Served as legislative liaison, responded to grievances, investigated issues, and served as a communication link with Deputy Directors.

- **Administrator House Arrest** (June 1984-March 1986).

  - Served as the first administrator and established policy and procedure for the House Arrest security level.
  - Achieved static population in excess of 1200 inmates.
  - Significant responsibilities included constant communication with legislators, media, and other law enforcement agencies.

- **Deputy Warden Joseph Harp Correctional Center** (March 1986– June 1990)

  - Responsible for daily operations of an 880-bed medium security facility.
  - Significant accomplishments include:
    - implementation of unit management, master roster for correctional officers, and Specialized Mental Health Unit.

**Corrections Corporation of America (1990-2016)**
- **Assistant Warden Venus Prerelease Center** (June 1990– October 1992)

  - 500 bed Prerelease Operated for Texas Department of Criminal Justice

- **Assistant Warden South Central Correctional Center** (October 1992– May 1994)

**CONFIDENTIAL**

- 1506 bed Medium/Close Facility operated for Tennessee Department Correction.
- Instrumental in development and rolling out Incident Command Systems throughout the company.

- **Warden South Central Correctional Center** (May 1994– May 2005).

  - 1506 bed Medium/Close Facility operated for Tennessee Department Correction which included Step Up and Step-Down units for Mental Health.
  - While in this position worked with Gary Mohr to develop Unit management CCA Way and was a certified Seven Habits Trainer.

- **Managing Director Division V** (May 2005-October 2014)

  - Supervised nine Wardens and Operations in Tennessee, Kentucky, Minnesota, and Idaho.

- **Director of Activations and Transitions** (October 2014– October 2016)
  - Start-up activities for institutions, immigration detention facilities, and family immigration facilities.
  - Collaborated with construction teams and contractors to manage project deployment and tracking.

**Tennessee Department of Correction** (2016– May 2023)

- **Probation and Parole Administrator** (November 2016– September 2018)

  - Responsible for the oversight and leadership of Nine Probation and Parole Districts in Middle and West Tennessee consisting of over 23,000 active offenders and over 8,000 administrative offenders.
  - During this period Tennessee enacted the Public Safety Act of 2016 and I served on the work group to implement a risk needs assessment process throughout the department.
  - I achieved significant increases on behalf of the Tennessee

**CONFIDENTIAL**

Department of Corrections in performance as measured by Office of Internal compliance.

- **Correctional Administrator** (September 2018–May 2023)

  o Responsible for the oversight and leadership of the four ACA accredited institutions in Middle Tennessee until July 2022 then asked to assist and supervise operations in West Tennessee.
  o Facilities where I served possessed a wide range of missions, and included the Tennessee Prison for Women, Riverbend Maximum Security Institution, Lois DeBerry Special Needs Institution, and the Turney Center Industrial Complex.
  o In addition to Correctional Administrator, I served as the acting Warden at Turney Center through the pandemic.
  o I also served at the following west Tennessee facilities: Northwest Correctional Complex; West Tennessee State Penitentiary; West Tennessee Rehabilitation Center; and Mark Luttrell Transition Center.

## Professional Certification and Training:

- **Signature Executive Program**-Scarlett Leadership Institute Belmont University- May 2009.
- **Art of M&A– M&A Leadership Council**– June 2016.
- **Probation and Parole Chief Executives**– NIC Academy Colorado– March 2018.
- **Advanced Incident Command System for Corrections**– NIC Academy Online-January 2020.
- **Talk, Listen, Connect (TLC) Workforce Suicide Prevention Training**– Tennessee Mental Health and Substance Abuse Services– January 2020.
- **2020 LEAD Tennessee Leadership Development**– Tennessee State University— December 2020.
- **Correctional Behavioral Health Certification with Honors**– American Correctional Association-April 2021.

## Professional and Community Involvement:

- **Member American Correctional Association** since 1978.

**CONFIDENTIAL**

- **Member of North American Association of Wardens and Superintendents**– Board member.
- **Member of Southern States Correctional Association and Tennessee Correctional Association.**
- **Executive Board member of Make-A-Smile** (Currently Project Manager for upcoming project in Breathitt County Kentucky) Make-A-Smile.Org.
- **Cumberland Presbyterian Church**
- **Elder and Pianist at Waynesboro Cumberland Presbyterian Church.**
- **Tennessee Department of Correction Risk Needs Assessment Steering Committee**-2016-2020.
- **Tennessee Department of Correction Restrictive Housing Step Down Committee**– 2019-2023.
- **Tennessee Department of Correction Withdrawal Management Team**– 2022-2023.
- **Behavioral Intervention Ad Hoc Committee**– American Correctional Association– 2021.
- **Adult Corrections Committee**– American Correctional Association– 2021 and 2023.

## Publications:

- Corrections Today January/February 2023- "Thoughts on Workforce culture, morale, recruitment and retention."

**CONFIDENTIAL**

## Exhibit B- Documents Reviewed

- ADOC-Ezell. Doc. 34 - Amended Complaint
- Andrews, Terrence Inmate Movement History (ADOC_Ezell_18-23).
- Andrews, Terrence Inmate File (ADOC_Ezell_24-97).
- Davis, Cedric Leshawn Inmate File (ADOC_Ezell_000987-1900).
- Davis, Cedric Leshawn Inmate Movement History (ADOC_Ezell_978-986).
- Davis, Cedric Leshawn 2022-11-03 Classification Summary (ADOC_Ezell_4-15).
- SCCF Duty Post Log B-Day Shift 2018 12 29 (ADOC_Ezell_1901-1938).
- Andrews, Terrance Duty Officer Report SCCF-18-01654 (ADOC_Ezell_1).
- Andrews, Terrance Incident Report SCCF-18-01654 (ADOC_Ezell_2-3).
- Andrews, Terrance Law Enforcement Services Division Investigative Report (ADOC(Ezell)_000205-209).
- ADOC Duty Post Log 2018.01.07-2019.03.30 (ADOC009807-10413).
- Alabama Prison Transformation Initiative Information Paper (ADOC_Ezell_2286-2293).
- 2017 Prison Transformation Initiative Booklet (ADOC_Ezell_2149-2190).
- Annual Report Fiscal Year 2015 (ADOC_Ezell_1939-1992).
- Annual Report Fiscal Year 2016 (ADOC_Ezell_1993-2047).
- Annual Report Fiscal Year 2017 (ADOC_Ezell_2048-2101).
- Annual Report Fiscal Year 2019 (ADOC_Ezell_2102-2148).
- ADOC New Compensation Plan July 2019 (ADOC_Ezell_2197-2215).
- St. Clair Meeting 2.14.19 - Update and Agenda (ADOC042636-42638).
- Wristband Audit at St. Clair 09.13.2018 (ADOC25051-ADOC25053).
- ADOC DUKE EJI Stipulation (ADOC_Ezell_002327).
- Ohio Risk Assessment System | National Institute of Corrections
- https://nicic.gov/weblink/ohio-risk-assessment-system

**CONFIDENTIAL**

- Alabama Pre-Legislative Session Budget Hearing January 30, 2019 (ADOC_Ezell_2274-2285).
- ADOC - SOP 137_Inmate Movement Control (ADOC10492-10496).
- ADOC – SOP 126_Internal Classification Board (ADOC47743-47751).
- ADOC SCCF SOP-001_Standard Operating Procedure
- ADOC - SOP 110_Search and Shakedowns (ADOC10483-10491).
- ADOC - SOP 083_Inmate Control Systems (ICS) (ADOC10440-10447).
- ADOC – SOP 094 Required Voluntary Overtime ADOC10472-10478).
- ADOC - SOP 031 Staffing (ADOC 10417-10425).
- ADOC – SOP 032 Staff Manning Requirements (ADOC10426-10431).
- ADOC – AR 403 Procedures for Inmate Rule Violations (Ezell 002602-002639).
- ADOC Statement of Inmate Nathanuel Gros (Cell P-43) (ADOC(Ezell)_157-160).
- ADOC Statement of Inmate Timothy Brown (Cell P-7) (ADOC(Ezell)_173-178).
- ADOC Statement of Cynthia Caver (ADOC(Ezell)_116-129).
- ADOC Statement of Eric Garrett (ADOC(Ezell)_130-132).
- ADOC Statement of Sgt. Rafael Santa-Maria (ADOC(Ezell)_170-172).
- ADOC Statement of RN Margaret Goubeaux (ADOC(Ezell)_161-163).
- LaKeisha Ezell Deposition Exhibit 1
- Deposition Transcript of Jefferson Dunn
- Deposition Transcript of Edward Ellington
- Deposition Transcript of Gary Malone
- Deposition Transcript of Karla Jones
- Cynthia Caver-Condensed Transcript
- Eric Garrett-Condensed Transcript
- Alabama Department of Corrections https://doc.alabama.gov/Mission

**CONFIDENTIAL**