FILED
2025 Mar-03 PM 07:58
U.S. DISTRICT COURT
N.D. OF ALABAMA

Myers 1

## IN THE UNITED STATES DISTRICT COURT OF
## THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **LORI GUY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 4:21-CV-0264-ACA** |
| | ) | |
| **JEFFERSON DUNN,** *et. al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## EXPERT REPORT OF KEVIN BRADLEY MYERS

### I.      INTRODUCTION

I am the sole member of 4Square Corrections, LLC. As such, I engage in subject matter expert work, auditing and monitoring correctional facilities, providing leadership courses, and assisting in the use of various tools related to correctional management.

### II.      QUALIFICATIONS

Prior to my work with 4Square Corrections, LLC, I held a variety of positions in the field of adult corrections between August 1976 and June 2023. I began full-time employment with Wayne Halfway House in February 2024 and currently serve as the Training Director. In this position, I oversee and provide staff development, leadership, and training for staff assigned to provide residential services for juveniles in the states of Tennessee and Florida.

I previously served as a line staff member, Assistant Warden, and Warden for correctional facilities in multiple states. I also worked in direct management and supervision of multiple adult correction facilities in multiple states. My correction management activities included facilities housing males and females in state, county, United States Marshall Service, and United States Immigration and Customs Enforcement ("ICE") facilities.

## CONFIDENTIAL



PLAINTIFF'S
EXHIBIT
B

Myers 2

Associated responsibilities in these positions included, but are not limited to, the direct provision of services as well as supervision of staff providing services to inmates. I possessed responsibility for compliance with court mandates (see e.g., Battles v Anderson, 457 F.Supp. 719 (E.D. Okla. Sept. 11, 1978; and Grubbs v. Bradley, 821 F.Supp. 496 (M.D. Tenn. May 14, 1993)), federal and state laws, and regulations providing both direct provision of services as well as supervising staff who directly provided services to inmates under my custody. In addition, I participated in drafting policies and procedures in accordance with federal and state laws as well as standards established by the American Correctional Association ("ACA") and National Commission on Correctional Health Care ("NCCHC"). I also oversaw implementation of those policies and procedures within correctional facilities.

I am an active member of the ACA and served for eight years as a commissioner of ACA accreditation. I currently serve as a trained auditor for ACA and serve on an ad hoc Committee on Adult Corrections for ACA. I attached a complete copy of my professional curriculum vitae as **Exhibit A**.

    A.    Chronological examples of my professional work include:

        1)    Oklahoma Department of Corrections (1976-1990) Correction Treatment Officer, Case Manager, Associate Superintendent, Executive Associate to Director, Administrator of House Arrest (Developed and Implemented program) and Deputy Warden of 880 bed Medium Security Facility.

        2)    Corrections Corporation of America - Associate Warden Operations (1990-1992) Venus Pre-Release Center Texas.

        3)    Corrections Corporation of America - Warden South Central Correctional Center (1994-2005) Tennessee.

        4)    Corrections Corporation of America - Managing Director (2005-2014). Provide supervision of Wardens and facility operations. At various times, these operations included facilities that serviced state operations, county operations, U.S. Immigration and Customs Enforcement as well as U.S. Marshall Services. Facilities located in Tennessee, Kentucky, Minnesota, and Idaho.

**CONFIDENTIAL**

5) Corrections Corporation of America -Director of Activations and Transitions (2014- 2016). In this position, served as project manager for the activation of South Texas Family Residential Center and an adult male immigration facility in Otay Mesa Detention Center.

6) Tennessee Department of Correction - Probation and Parole Administrator for the State of Tennessee (2016 to 2018). In this position, responsible for the supervision of Probation and Parole in the Middle and West Regions of Tennessee. This included the implementation of a risk and needs assessment tool required by the Public Safety Act of 2016 and monitoring standards related to the community supervision of justice involved individuals.

7) Tennessee Department of Correction - Correctional Administrator (2018 to 2022). Supervised the Wardens in the Middle Region of Tennessee which included Lois M DeBerry Special Needs Facility (854), Riverbend Maximum Security Institution (810), Debra K. Johnson Rehabilitation Center (817) and Turney Center Industrial Complex (1616). Supervision included monitoring facility operations through the COVID pandemic situation.

8) Tennessee Department of Correction -Correctional Administrator (2022-2023). Supervised the Wardens in the West Region of Tennessee which included facilities of Northwest Correctional Complex (1801), West Tennessee State Penitentiary (1010), Women's Therapeutic Residential Center (1068) and Mark Luttrell Transition Center (294).

9) Wayne Halfway House - Training Director (2024 to present). Oversee and provide staff development, leadership and preservice/in-service training for staff assigned to daily operations of residential juvenile facilities in Tennessee and Florida.

B. Associated Correctional Memberships and Committee Assignments:

1) Member American Correctional Association.

**CONFIDENTIAL**

Myers 4

2)    Member Southern States Correctional Association.

3)    Member North American Association of Wardens and Superintendents.

4)    Commissioner on Commission on Accreditation for Corrections-2000-2008.

5)    American Correctional Association Ad Hoc Committee on Behavioral Intervention Strategies- 2021 to 2023.

6)    American Correctional Association Ad Hoc Committee on Adult Corrections- 2021 to present.

7)    Tennessee Department of Corrections Risk Needs Assessment Steering Committee – 2016 -2020.

8)    Tennessee Department of Corrections Restrictive Housing Step Down Program Committee– 2019 -2023.

9)    Tennessee Department of Corrections Withdrawal Management Team – 2022 -2023.

10)   Auditor American Correctional Association June 2022 to present.

## III.   RETENTION

Butler Snow LLP retained me on April 27, 2024, as a consulting expert to assist with analyzing issues raised in the litigation entitled **Carol Guy v. Dunn et al.,** Case No 4:21-CV-00264-ACA. I did not reach any conclusion until completing my evaluation of the information and documents identified in this report. Neither the content of my report nor the outcome of this case affects my compensation.

This report, including the exhibits and attachments, summarize my opinions currently. I reserve the right to supplement this report by adding, subtracting, or modifying my conclusions based on any additional evidence or information provided after the date of this report.

**CONFIDENTIAL**

I receive compensation for my services at a rate of two hundred and fifty dollars ($250.00) per hour for time spent on document review, drafting, on-site work, and communication with counsel. I receive compensation of one hundred dollars ($100.00) per hour for travel.

## IV.    METHODOLOGY

I considered the information contained in the documents identified in **Exhibit B**, supplemented with my professional education, training, and experience, as previously established in this report, to independently evaluate the claims asserted in the case.

I base my opinions on my forty-eight (48) years of experience and analysis of materials identified in Exhibit B, including court filings, documents reflecting actions taken by the former Commissioner and his team, and documentation about St. Clair and the incident itself.

This report responds to the unsupported allegations brought against former Commissioner Jefferson Dunn ("Dunn"), Institutional Coordinator for the Northern Region Edward Ellington ("Ellington"), Deputy Commissioner of Governmental Relations Jeffery Williams ("Williams"), Former Associate Commissioner of Operations Grantt Culliver ("Culliver"), Prison Rape Elimination Act ("PREA") director Christy Vincent ("Vincent"),  Former Deputy Commissioner of Operations Charles Daniels ("Daniels"), and Former St. Clair Warden Karla Jones ("Jones" and together with Dunn, Ellington, Williams, Vincent, Culliver, and Daniels, the "ADOC Officials") related to Steven Mullins' ("Mullins") health and safety and alleged violations of his rights under the Eighth Amendment and state-law death claims.

Specifically, I address and assess the following allegations and theories that Plaintiff brought against the ADOC officials under 42 U.S.C. § 1983, the Eighth Amendment - Count I: Failure to Protect (Supervisory Liability); Count III: Eighth Amendment State-Created Danger; and Count IX-State Law Wrongful Act or Omission Resulting in Death. Plaintiff's specific allegations as identified in the Amended Complaint remain as follows:

1. The ADOC Officials' failure to protect inmates, including Mullins, from a known and substantial risk of serious harm. (Id. at 24).

2. The ADOC Officials' failure to adequately respond to reports of safety concerns and separate vulnerable inmates from those likely to commit violence. (Id. at 31-33).

**CONFIDENTIAL**

3. The ADOC Officials' failure to address the widespread proliferation of contraband weapons at St. Clair. (Id. at 33).

4. The ADOC Officials' failure to provide adequate supervision and monitoring of inmates housed within St. Clair to prevent violence. (Id. at 36).

5. The ADOC Officials' creation of a serious threat of violence through the use of unsupervised "Hot Bay" housing blocks. (Id. at 39).

6. The ADOC Officials' failure to adequately prevent, detect, and respond to instances of sexual abuse at St. Clair. (Id. at 41).

7. The ADOC Officials' creation of a culture of abuse at St. Clair. (Id. at 45).

## V.    FACTUAL BACKGROUND

### A.    The Incident Report:

On Tuesday, February 26, 2019, at approximately 5:45 p.m., Correctional Cubicle Operator ("CCO") Brandi Smith ("CCO Smith") observed Mullins (AIS: W 175255) bleeding on the floor outside the cubicle door. (ADOC(Guy)_004268). CCO Smith, a correctional officer working overtime at the St. Clair Correctional Facility's ("St. Clair") L dorm, reported that as she opened the door to the dorm's "L2" side, she heard a loud bang. (ADOC(Guy)_004268). CCO Smith turned to see Mullins fall to the floor. She then called for assistance over her hand-held radio. (ADOC(Guy)_004268). Captain Kevin White ("Cpt. White") and Lieutenant Antoine Price ("Lt. Price") responded to CCO Smith's radio call. (ADOC(Guy)_004268).

While en route to the infirmary, Mullins identified Clarence Jackson ("Jackson") (AIS: B 249273) as the individual responsible for assaulting him. (ADOC(Guy)_004268). Correctional staff placed Jackson, Christopher Jones, and Vanderick Thomas in the restrictive housing unit ("RHU") pending investigation for involvement or knowledge of the assault on Mullins. (ADOC(Guy)_004268). Dr. Walter Wilson treated Mullins in the infirmary, before ordering Mullins to be transported by helicopter to University of Alabama Birmingham ("UAB") Hospital. (ADOC(Guy)_004268). Paramedics responded to the prison and life flighted

**CONFIDENTIAL**

Mullins to UAB Hospital. Lt. Price reported the incident up the chain of command to Jones, who then notified Ellington of the incident. Lt. Price also notified Intelligence and Investigations ("I&I") Senior Agent Brian Casey ("Agent Casey") of the incident. Agent Casey arrived at St. Clair at approximately 8:00 p.m. that night. (AD0C008963). Agent Casey documented the crime scene and, during his investigation, discovered that, on July 7, 2018, Mullins requested placement in the RHU due to owing debts to inmates in general population. (ADOC008963-64).

On July 7, 2018, St. Clair correctional staff placed Mullins in the RHU special security unit; a segregated area referred to as protective custody. (ADOC008964). Pursuant to St. Clair policy staff administered a drug screen to Mullins. (ADOC008964). The drug screen showed that Mullins tested positive for amphetamines. (ADOC0088964). Mullins remained in the RHU until February 12, 2019. (ADOC008964). On February 12, 2019, the Internal Classification Board ("ICB") reviewed Mullins time in RHU, along with Mullins' request to leave protective custody, and determined Mullins could return to general population. (ADOC008964). Mullins signed a voluntary statement indicating that he could live in general population without issue and knew of no enemies at St. Clair. (ADOC008964).

On February 25, 2019, at approximately 6:01 a.m., Mullins reported that another inmate assaulted him. (ADOC008964). However, Mullins failed to identify the inmate, and requested a cell to himself. (ADOC008964). Lt. William Ragsdale ("Lt. Ragsdale") assigned Mullins to P dorm, cell 36. (ADOC008964). Later the same day, Mullins reported to the PREA hotline that his cell mate sexually assaulted him. (ADOC008965). Mullins reported that an inmate named "CJ" punched him in the head, and demanded Mullins perform oral sex at knife point. (ADOC008965). At approximately 4:00 p.m. that day, Lt. Angelia Gordy ("Lt. Gordy") received Mullins' PREA complaint. (ADOC008965). Lt. Gordy escorted Mullins to the infirmary for a medical assessment and indicated that Cpt. White would investigate the complaint. (ADOC008965). St. Clair staff then moved Mullins to L dorm, cell 28. The following day at approximately 5:45 p.m., Jackson assaulted Mullins as Mullins entered his housing unit in L dorm. (ADOC(Guy)_004269).

Finally, at approximately 8:05 p.m., on Friday, March 1, 2019, UAB staff induced cardiac arrest in Mullins. (ADOC008964). At approximately 8:20 p.m. that same day, UAB staff prepared Mullins' body for collection by Dennis Russell, the St. Clair County Coroner. (ADOC008964). Coroner Russell then arranged for Mullins' transfer to the Alabama Department of Forensic Sciences ("ADFS") in Huntsville, Alabama for an autopsy related to Mullins' homicide. (ADOC008964).

**CONFIDENTIAL**

Myers 8

**B.     Institutional History of Clarence Jackson:**

I reviewed Jackson's inmate movement history and inmate file (ADOC(Guy)_002427-002434; and ADOC(Guy)_002444-003620) and discovered the following information concerning Jackson's history and behavior while incarcerated in ADOC up to the date of February 16, 2019:

**Background of Crimes Committed leading to incarceration:**

Jackson received a twenty-eight (28) year sentence for murder on September 25, 2006. (ADOC001893). The state of Alabama alleged that Jackson shot Kunta Kinta Robinson several times during an altercation between Robinson and his stepbrother, Justin Davis ("Davis"). Davis then provided a statement and testified against Jackson at trial. Apparently, after murdering Davis in Montgomery, Jackson placed the victim in the back of a suburban and set the vehicle on fire. (ADOC001893).

On March 25, 2005, Jackson shot a pedestrian crossing the street in front of a vehicle in which Jackson was a passenger. Jackson then stood over the victim and shot him several more times in the leg and shoulder. (ADOC001893). Additionally, on October 4, 2006, Jackson received a sentence of twenty (20) years for Rape II. (ADOC001893). The state alleged that Jackson engaged in sexual intercourse on two occasions with a 14-year-old when he was 17 years old, and the female became pregnant. (ADOC001893). Jackson's Rape conviction required him to register as a sex offender and, per ADOC classification procedures, Jackson required housing at a medium- or higher-custody facility.

**Facility Assignment History of Clarence Jackson from November 7, 2006, to May 28, 2019:**

Jackson arrived at Kilby Correctional Facility ("Kilby") on November 7, 2006, and transferred to Ventress Correctional Facility ("Ventress") on November 30, 2006. (ADOC(Guy)_002434). He remained at Ventress until June 4, 2009. (ADOC(Guy)_002433). Kilby assigned Jackson to the therapeutic community, a drug and substance abuse treatment program, from March 2, 2007, until May 18, 2007. (ADOC(Guy)_002434). Kilby terminated Jackson from the therapeutic community for being in possession of contraband. (ADOC(Guy)_002434). On June 4, 2009, Jackson transferred as a medium custody inmate to Staton Correctional Facility ("Staton") where he remained until April 6, 2010. (ADOC(Guy)_002433).

**CONFIDENTIAL**

During his stay at Staton, Jackson received one disciplinary for engaging in a physical fight on October 29, 2009. (ADOC(Guy)_002433).

On April 6, 2010, Jackson transferred to Bibb Correctional Facility ("Bibb") where he remained for the next five and a half years until November 20, 2015. (ADOC(Guy)_002429-2433). During his time at Bibb, Jackson received approximately twenty-one (21) disciplinary charges but remained as a medium custody inmate. (ADOC001895-1897). Except for those disciplinaries listed later in this report, Jackson's disciplinary history reveals that he received a majority of disciplinaries at Bibb for charges such as possession of a cell phone, possession of MP3 player, failure to report, and failure to follow a direct order. (ADOC001895-1897). On November 20, 2015, Jackson transferred to Fountain Correctional Facility ("Fountain"), and he remained at Fountain until February 17, 2017. (ADOC(Guy)_002428-2429). During his fifteen (15) month assignment at Fountain, Jackson remained a medium custody inmate and received placement in disciplinary confinement on two occasions. (ADOC(Guy)_002428-2429).

ADOC reassigned Jackson to Bullock Correctional Center ("Bullock") where Jackson remained from February 17, 2017, until January 5, 2018, when he transferred to Ventress. (ADOC(Guy)_002428). During his stay at Bullock, Bullock staff placed Jackson in preventative status on two (2) occasions. (ADOC(Guy)_002428). Jackson remained in restrictive housing from May 17, 2017, until May 22, 2017, and again on January 4, 2017, where he stayed for a day pending transfer to Ventress. (ADOC(Guy)_002428). ADOC transferred Jackson to Ventress, where Jackson remained from January 5, 2018, to May 11, 2018. (ADOC(Guy)_002427-2428). Jackson received a disciplinary on March 8, 2018, while housed at Ventress which required ADOC to transfer Jackson to St Clair on May 11, 2018, where classification increased Jackson's custody level from medium- to closed-custody. (ADOC(Guy)_002427).

Jackson remained at St. Clair for approximately one (1) year after which ADOC moved Jackson to Limestone Correctional Center ("Limestone") on May 28, 2019, after being on investigative status since February 27, 2019, for the assault on Mullins. (ADOC(Guy)_002427). While assigned to St. Clair, Jackson received two (2) disciplinaries prior to the February 27, 2019, incident (June 11, 2018, and August 2, 2018). (ADOC(Guy)_002427).

**Classification History:**

**CONFIDENTIAL**

During intake at Kilby, ADOC classified Jackson as medium-custody, and Jackson remained at that custody level until April 11, 2018. (ADOC001469). On April 11, 2018, ADOC increased Jackson's custody level to closed-custody because Jackson assaulted another inmate with two (2) locks in a piece of cloth on March 8, 2018. (ADOC001469). The other inmate suffered no injury; however, Jackson admitted that he hit the victim one time with the weapon because of a disagreement. (ADOC001470). On September 19, 2018, classification recommended Jackson for release from restrictive housing with a three (3) month clear disciplinary record having served six (6) months for the assault. ADOC decided to review Jackson's classification in thirty (30) to sixty (60) days. (ADOC001477).

**Disciplinary History for Assaultive Behaviors:**

Jackson received a disciplinary for fighting without a weapon while at Staton in October 2009. Jackson and the other inmate involved signed a living agreement indicating they could live together in population. (ADOC(Guy)_002494). On January 29, 2011, Jackson admitted to assaulting two inmates. (ADOC002305-2306). The documentation shows that Jackson and another aggressor stated they assaulted victim because he provided staff with information about two blue Samsung cell phones and three cell phone chargers that staff confiscated from Jackson earlier in the day. (ADOC002305-2306).

Jackson received a disciplinary for fighting without a weapon on May 3, 2011. (ADOC002309). Medical staff noted no serious injuries for either inmate. (ADOC002309). Additionally, on November 1, 2012, Jackson again received disciplinary action for fighting without a weapon. (ADOC002323). Jackson engaged in a physical altercation with another inmate. (ADOC002323). Jackson alleged that the other inmate placed contraband on his assigned bed. (ADOC002323). Jackson struck another inmate in the mouth in the behavior modification dormitory. (ADOC002323). Neither inmate sustained serious injuries and Jackson received thirty days in restrictive housing. (ADOC002323). Jackson engaged in another physical altercation with a different inmate on January 30, 2015. (ADOC002349). Again, neither inmate suffered any serious injuries and Jackson received forty-five days in restrictive housing.

On November 2, 2015, Jackson assaulted an inmate and accused them of stealing items from his locker box. (ADOC002357). I found no evidence of injury or use of weapon. (ADOC002357). Additionally, on July 14, 2016, Jackson assaulted another inmate while at Fountain. (ADOC002359). Jackson received

**CONFIDENTIAL**

twenty-five (25) days in restrictive housing for the offense and I found no indication of weapon use or injury sustained. ADOC transferred Jackson to Ventress on January 5, 2018. (ADOC(Guy)_002428).

While at Ventress Jackson hit a victim one time with a lock in a piece of cloth on March 8, 2018. (ADOC002377). The victim suffered no serious injuries and Jackson received forty-five (45) days in restrictive housing. (ADOC002378). The victim alleged Jackson sexually harassed him; however, Ventress staff investigated the victim's allegations and determined them to be unsubstantiated. (ADOC002378). The investigation indicated that the altercation was related to debts the victim owed to Jackson. (ADOC002378).

**PREA Assessments:**

Jackson received a PREA assessment on January 5, 2018, upon arrival to Ventress. (ADOC002544). Ventress staff noted no designation for predator or victim. (ADOC002544). Additionally, Ventress staff assessed Jackson on January 18, 2018, for a thirty (30) day review noting no changes. (ADOC002546). On May 15, 2018, during a transfer review, ADOC staff identified Jackson as a predator due to history of engaging in domestic violence, sexual offense against a child, and prior acts of sexual abuse. (ADOC002551-2552).

**C.    Institutional History of Stephen Mullins 175255:**

A review of Mullins' inmate file (ADOC000001-614) and movement history file (ADOC000615-620) provided the following information related to the crime that resulted in his incarceration and his behavior while incarcerated. In addition, I reviewed information available through media outlets to understand and convey the nature of his crime of conviction.

**Background and Notoriety of the Crime:**

Mullins received a sentence of life without parole for a conviction of Capital Murder and kidnapping on August 6, 1999. (ADOC000331). Mullins' crimes received not only local media attention in Alabama but also nationwide media coverage due to the nature his crimes. This coverage exposed Mullins' involvement with the "skinheads" and the Ku Klux Klan.[1]

---

[1] (https://en.wikipedia.org/wiki/The_Akron_Beacon_Journal)

**CONFIDENTIAL**

PBS Frontline published an article on Mullins' crimes entitled "Assault on Gay America." The article recounts the following events:

> "On February 19, 1999, Billy Jack Gaither, a thirty-nine-year-old gay man who worked at the Russell Athletics apparel company near Sylacauga, Alabama, was brutally beaten to death. His throat was cut, and his body was bludgeoned with an ax handle before being thrown on top of a pile of tires and set on fire. In the weeks following the killing, two men came forward to police as the killers: Steven Mullins and Charles Monroe Butler. Butler, the younger of the two, came forward to police first. He described the night of the murder in great detail: how he had never heard of Billy Jack Gaither prior to the night of the killing; how his friend Steve Mullins found him at a bar playing pool and asked him to take a ride into the woods with himself and Billy Jack; how Billy Jack started "talking queer stuff" that set off a violent reaction in Butler; and then how he stood by as Mullins beat Billy Jack to death. In June of 1999, Steven Mullins pled guilty to capital murder; Butler stood trial and was found guilty of the same charge by a jury. In August of 1999, both Mullins and Butler were sentenced to life in prison without parole."[2]

The article includes Mullins' statement given to Jeff Mobbs at the Sylacauga Police Department on March 3, 1999. Mullins stated that:

> "I stabbed him twice in the rib cage and told him to stay where he was. Charlsey popped the trunk. I told Billy Jack to get in the car. He did. We shut the trunk. I drove us to 165 Cedar Creek Circle and uh, got two tires, and a gallon of kerosene, box of matches and an ax handle. I grabbed him by his pants legs and drug him away from the car and got the ax handle which was leaned up against the door of the car and started beating him with it and Charles, Charlsey showed back up and I took my shirt off and told him to get the blood out of the car and we talked and I was

---

[2] Billy Jack - Statement of Steven Eric Mullins | Assault on Gay America | FRONTLINE | PBS

**CONFIDENTIAL**

> still beating him and when I, I gave; out of energy and
> couldn't do it anymore, um, the fire got to going and the
> tires started burning real well and I drug him into the flame
> and uh, we stood there for a few minutes and then we left."

Gaither's murder received significant coverage in state and national news, not only due to the nature of the offense, but because it occurred in relatively close proximity to the similar high-profile murders of Matthew Shepard and James Byrd Jr, both of which were motivated by prejudice against sexual and racial minorities, respectively. The murder sparked calls to change Alabama's hate crimes law, which, at the time of its passage in 1994, did not cover crimes based on sexual orientation or gender identity.[3] President Clinton stated in a press release "[t]his heinous and cowardly crime touches the conscience of our country, just as the terrible murders of James Byrd in Texas and Matthew Shepard in Wyoming did last year."[4]

### Facility Assignment to Alabama DOC:

I personally managed inmates like Mullins whose crimes received high levels of public interest and notoriety. In my experience, managing inmates like Mullins entails an extra level of difficulty. Staff seek to provide housing in the least restrictive environment possible while accounting for the inmate's safety and security as well as the security of the facility. The detail provided in the following paragraphs demonstrates the levels of interaction provided by staff in the ADOC with Mullins as well as compliance with administrative regulations ("AR") promulgated by the leadership at the state level and standard operating procedures ("SOP") promulgated by the warden of each facility.

Mullins entered ADOC custody on September 3, 1999, at Kilby where he remained until March 7, 2000. (ADOC000619). On this date, Mullins transferred from Kilby to St Clair. (ADOC000619). On March 13, 2000, six (6) days after his assignment to St Clair and approximately six (6) months after his incarceration, Mullins assaulted and cut another inmate. (ADOC000130). The investigation indicates "that the assault was the result of a homosexual advance on inmate Mullins by inmate Karvin German believed to be related, in part, to the nature of the offense for which Mullins is serving time. (ADOC000130). Several other inmates sided with

---

[3] (University of Alabama: University Libraries | Empowering Voices.2023-05-31)
[4] The Akron Beacon Journal 1999-03-06)

**CONFIDENTIAL**

German." (ADOC000130-135). Mullins identified three other inmates that participated in the incident. (ADOC000130-135).

St. Clair staff placed Mullins in the infirmary on March 13, 2000, and then moved Mullins to restrictive housing on March 14, 2000, pending investigation and disciplinary action. (ADOC000130-135). Mullins received no disciplinary as it was determined that the suspects perpetrated the incident against Mullins. (ADOC000130-135).

St. Clair staff designated Mullins and the other individuals involved in the above incident as enemies. Therefore, pursuant to ADOC policy, ADOC staff transferred Mullins to William E Donaldson Correctional Facility ("Donaldson") on July 25, 2000. (ADOC000031). On August 25, 2000, thirty (30) days after arriving at Donaldson, Donaldson staff released Mullins to general population on one hundred eighty (180) days probation. (ADOC000031). Mullins' inmate records indicate that Mullins remained incident free until January 6, 2003, when Mullins received disciplinary action for fighting without a weapon (ADOC000116), stealing sandwiches from his work area on April 26, 2003 (ADOC000109), and on May 2, 2003, Mullins refused to work in the kitchen. (ADOC000110).

On May 30, 2003, Donaldson staff charged Mullins with aiding and abetting to commit a violation. (ADOC000094). Donaldson staff found Mullins guilty of assisting another inmate in breaking into an inmate's locker box. (ADOC000094). Mullins remained incident free until January 20, 2004, when he stabbed an inmate several times during two separate fights that occurred as a result of a debt the inmate owed Mullins. (ADOC000073-77). On July 5, 2004, Mullins received disciplinary action for Indecent Exposure while in his cell in RHU. (ADOC000066). A female officer witnessed Mullins masturbating through the tray door in his cell during security rounds. (ADOC000066). Mullins received this disciplinary for indecent exposure two (2) days before a classification hearing on July 7, 2004.

Classification staff noted that Mullins remained in maximum custody for six (6) months due to assault with weapon on January 20, 2004. ADOC000028). Classification guidelines required Mullins to complete twelve (12) months in restrictive housing from the date of the assault before he could be released to population. (ADOC000028). Classification staff reclassified Mullins from maximum- to closed-custody on April 6, 2005. (ADOC000618). Classification followed ADOC's classification guidelines to keep Mullins in the least restrictive environment necessary for the safety and security of the ADOC and Mullins.

**CONFIDENTIAL**

Mullins was released from RHU to general population on December 22, 2005, and transferred to Holman with six (6) months' probation. Mullins received placement in restrictive housing due to two (2) enemies at Donaldson. (ADOC000026). While at Holman, Mullins refused to work on January 7, 2006, and received disciplinary action. (ADOC000062). On December 3, 2007, correctional staff located Mullins in possession of contraband including a note pad with "SS" and a swastika on the cover. (ADOC000041). Additionally, Mullins possessed an Aryan Brotherhood tattoo design, one picture of Adolf Hitler, one drawing of a skull and cross bones that said "southern bread" with a confederate flag, and a notebook with the statement "[w]here an Aryan boots tread, blood is shed" on the cover. (ADOC000041). Correctional Officer ("CO") Michael Watson located these items during a search of Mullins' personal property. (ADOC000041).

Mullin's classification hearing at Holman on April 1, 2008, notes that Mullins requested a transfer to Donaldson for family consideration. (ADOC000276). However, at the time Mullins possessed enemies at all major camps. (ADOC000276). Therefore, classification staff recommended no changes to Mullins housing assignment. (ADOC000276). Mullins received approval for transfer to Donaldson on January 26, 2010, contingent on available bed space at Donaldson. (ADOC000005). Mullins received disciplinary action on March 7, 2006. On February 8, 2011, Mullins requested to withdraw his request to transfer to Donaldson as he stated he had made a lot of positive changes in his life while at Holman. (ADOC000007). On August 28, 2012, staff located a black and gray Samsung flip cell phone hidden inside a Kool-Aid container in Mullins' locker box. (ADOC000010; and 000451). Officers discovered the phone during a monthly institutional search at Holman. (ADOC000456). Holman staff released Mullins from restrictive housing on October 2, 2012. (ADOC000617).

Mullins returned to restrictive housing on May 10, 2016, and then on August 2, 2016, Warden Raybon allowed Mullins to return to population. (ADOC000002; and ADOC000616). One day later August 3, 2016, Mullins received seven (7) lacerations to the top of his head, two (2) black eyes, swollen left ear, and abrasions to his legs and back area. (ADOC000442). Mullins stated he did not know who assaulted him. (ADOC000442). Mullins received medical treatment at an outside hospital and in the prison infirmary. (ADOC000442). Holman staff placed Mullins in restrictive housing under preventative status on August 25, 2016, where he remained until October 13, 2016. (ADOC000616).

**CONFIDENTIAL**

Records suggest that Mullins remained incident free for the next seventeen (17) months. On March 22, 2018, at 10:30 p.m., ADOC staff placed Mullins in administrative segregation for investigation and transferred him to St. Clair on March 23, 2018. Mullins remained under investigative status in restrictive housing upon arrival to St. Clair. (ADOC000018; and 000351). St. Clair staff released Mullins from restrictive housing seven (7) days later March 30, 2018, and assigned him to Q dorm cell 24. (ADOC000615). Mullins' movement history indicates Mullins moved cells five (5) additional times between March 30, 2018, and July 18, 2018, for various reasons. (ADOC000615).

On July 17, 2018, Mullins wrote a statement that "I was jumped, and knife pulled on me. I was told I owe some guy ten (10) Tops who I don't know. And don't owe. Was beat up twice Sunday. I fear for my life." (ADOC000017). On that same staff took a urine sample from Mullins, which tested positive for amphetamines day, (ADOC000367). The hearing officer found Mullins not guilty of being under the influence of narcotics due to a procedural violation on September 18, 2018, and Mullins never identified who assaulted him previously. (ADOC000377). Mullins approached Sgt. Dixon in restrictive housing in July 2018. Mullins told Sgt. Dixon that he could not live in general population due to "unknown enemies." On August 13, 2018, St. Clair staff held a continuation of confinement hearing in administrative restrictive housing based on Mullins claims that he could not reside in general population due to unknown enemies. (ADOC000016). At the hearing, Mullins signed a statement indicating "I do not wish to claim anyone as an enemy." (ADOC000016). Correctional staff placed Mullins in restrictive housing for his safety.

Mullins wrote classification on September 10, 2018, and said he felt ready to return to general population. (ADOC000492). He stated that Warden Brooks told him he must serve three (3) more weeks prior to becoming eligible for release. (ADOC000492). Mullins indicated his conversation with Warden Brooks occurred five (5) weeks prior and told classification, "I'm ready to go back to population." (ADOC000492).

On September 21, 2018, Mullins jammed the tray door lock on his cell while he was assigned to RHU and received a disciplinary for disorderly conduct. (ADOC000011-13). Classification changed Mullins' status from disciplinary to preventative on October 9, 2018. (ADOC000615). Though Mullins requested release to general population on September 10, 2018, he remained in preventative

**CONFIDENTIAL**

status until February 5, 2019, when classification reclassified Mullins to medium-custody at security-level five (5) facility. (ADOC000015).

On Tuesday, February 12, 2019, after an Institutional Classification Board ("ICB") review of Mullins time in RHU, and considering Mullins' additional request to leave protective custody, the prison's ICB released Mullins from the prison's protective custody. (ADOC000615). Prior to his return to St. Clair's general population, Mullins signed a voluntary statement which, in part, read:

> "I, [Steven Mullins], do hereby state that I can live in the
> St. Clair population without any problems, and I have no
> known enemies at this institution…I hereby relieve any
> and all DOC officials of any liability and damages…"

Upon his release, St. Clair staff assigned Mullins to Q dorm, cell 32 (ADOC000548). I found no evidence indicating that, when Mullins arrived to Q-32, two (2) inmates occupied that cell. Mullins identified cell Q-27 as an opportunity and chose to move into that cell. (ADOC008965). According to the report, "upon his release from SCCF's segregation unit and his assignment to Q32, Inmate Mullins found both beds occupied. He then took it upon himself to relocate to Q-27" (ADOC008965). Mullins' decision to leave his assigned cell and not discuss the situation with St. Clair staff created confusion on February 25, 2019, when Mullins identified his cellmate, "CJ", as the individual responsible for his assault. Regardless of the reason, "CJ" could not be located in Q-32, and staff searched for anyone who had the initials of "CJ" when Mullins identified "CJ" as the aggressor.

Agent Casey ("Casey") continued his investigation and noticed that on the night of Mullins' assault, St. Clair staff detained Christopher Jones ("Jones") (AIS: B 151939), another inmate known as "CJ" and, Vandrick Thomas ("Thomas") (AIS: B 148503) as suspects in the assault over potential drug debts. (ADOC008965). Through the ADOC database, Agent Casey determined that Jones and Thomas both resided in St. Clair's "L" dormitory, the same dorm where the assault on Mullins occurred. (ADOC008965). In fact, the initial report by media was "The Alabama Department of Corrections plans to file murder charges against Christopher Scott Jones, who is already serving a 25-year sentence for killing five men in an Alabama apartment in 2008. Authorities say Jones carried those killings out as part of a murder-for-hire job tied to drug cartel money."[5] Agent Casey received additional information that Jackson resided in St. Clair's Q-27 cell at the time Mullins reported

---

[5] A Homophobic Murderer Has Been Stabbed to Death in Prison

**CONFIDENTIAL**

his instances of sexual abuse on February 25, 2019. Agent Casey ruled out Jones and Thomas as both possessed alibis for the time of the incident. Thus, Agent Casey identified Jackson through confidential sources as the "CJ" responsible for Mullins assault. (ADOC008971).

According to an investigative report, "on Monday, February 25, 2019, at approximately 0601 hours, Mullins reported to Officer (Ofc) Dylan Tucker ("Tucker") that he was the victim of an assault by an unknown assailant (see Inc. No. SCCF-19-00259). Mullins then requested that he receive placement in a cell by himself, so Lieutenant William Ragsdale ("Ragsdale") moved Mullins to a cell in the prison's "P" dormitory (cell P-36). Tucker then escorted Mullins to SCCF's infirmary for a medical assessment." (ADOC008964). The movement record indicates that St. Clair staff assigned Mullins to P-36 at 8:53 a.m. (ADOC000615).

That same date, at approximately 4:00 p.m., Lt Gordy received notification of Mullins' PREA Hotline call. In her report (see Inc. No. SCCF-19-00262), she identified Mullins' assailant, "CJ," as Jackson (AIS: B 249273). (ADOC008965). After reviewing the incident, Lt. Gordy escorted Mullins to St. Clair's infirmary for a brief medical assessment and noted that Cpt. White would investigate Mullins' claim of sexual harassment against "CJ." (ADOC008965). Mullins then received another transfer from P-36 to L-28 at approximately 17:25 on February 25, 2019. (ADOC000615).

On February 27, 2019, at approximately 10:03 a.m., Agent Casey and Agent Arledge ("Arledge") spoke with Lt. Price, a witness to Mullins' dying declaration that Jackson stabbed him. (ADOC008966). According to Lt. Price, as Mullins received medical attention at the prison, Mullins told Price that an inmate named "CJ" stabbed Mullins in the prison's L dorm. (ADOC008966). Lt. Price told the investigators that he understood Mullins' declaration to infer that another inmate, identified as "CJ" and not assigned to L dorm, stabbed Mullins in L dorm. (ADOC008966). Lt. Price assumed Mullins identified Jackson because of his violent reputation. (ADOC008966). However, Lt. Price, discovered another inmate in L dorm named "CJ," and detained Jones as a precaution. (ADOC008966).

Lt. Price told the investigators that Mullins was a well-known drug user. (ADOC008966). Lt. Price then said that, as he understood it, Jackson assaulted Mullins due to a drug a debt Mullins owed to Jackson. (ADOC008966). According to Lt. Price, Jackson first tried to collect his debt from Mullins in the form of a sexual favor but, when Mullins refused Jackson's sexual advance and reported the incident

**CONFIDENTIAL**

to St. Clair staff, Jackson stabbed Mullins. (ADOC008966). After obtaining Lt. Price's statement, Agent Casey ended the interview. (ADOC008966).

At approximately 12:54 p.m., after waiving his Miranda rights, Jackson spoke with the investigators about his involvement in the homicide of Mullins. (ADOC008967). Jackson told the investigators that, at the time of the assault of Mullins in L dorm, he was in the hallway of P/Q dorms getting a haircut. (ADOC008967). Then, St. Clair staff entered Q dorm and detained Jackson because Mullins identified "CJ" as his assailant. (ADOC008967). On February 25, 2019, Mullins requested separation and placement in a cell by himself as he alleged an unknown assailant assaulted him. So, Lt. Price ordered Mullins moved to P dorm from Q dorm at 8:53 a.m. In my experience, this serves not only as a PREA assessment but allows the alleged victim to speak in privacy.

After Mullins called the PREA hotline at approximately 4:00 p.m., Lt. Gordy performed a preliminary investigation, and classification moved Mullins from P dorm to L dorm at 5:25 p.m. after being assessed again by medical. (ADOC000615). Mullins failed to identify his alleged aggressor other than by the nickname of "CJ" though he received several opportunities to do so in a confidential environment.

With the advantage of hindsight, and the ability to piece the history together, it remains possible that Jackson targeted Mullins because of his crime and his affiliation with the "skin heads." The incident occurred on February 26, 2019, which was near the twentieth (20th) anniversary of Mullins' conviction leading to incarceration which occurred on February 19, 1999. Additionally, Jackson possibly targeted Mullins because of his use of drugs and history of incurring debts. Hindsight indicates that Mullins constantly expressed concern for his safety due to drug use and debts owed. The records I reviewed indicate that staff constantly moved Mullins and held hearings in order to identify potential threats to his safety.

Mullins failed to divulge the identity of his assailants. It remains unreasonable in my experience to expect correctional staff to predict when Mullins may be at risk of assault when he refused to identify his assailants on multiple occasions. Moreover, the Commissioner, Associate Commissioner, and/or Warden cannot be expected to predict when an assault may occur to a single or specific inmate, especially when the inmate fails to identify the individuals he believes pose a risk of harm.

In hindsight, the evidence clearly shows Jackson assaulted Mullins. However, given the information staff knew at the time, it remains reasonable that the perpetrator resided in L dorm and not Q dorm. Information existed that suggested Mullins owed money to Jones. It is my experience that, with most incidents within

**CONFIDENTIAL**

the carceral environment, the information correctional staff initially receive is incorrect. Inmates routinely provide false information and create commotion to avoid responsibility for the incident as well as to avoid further search of their cells which could result in disciplinary action for unrelated contraband possession or simply to obstruct correctional staff's investigation. The incident in this case occurred as staff released L dorm for chow and as staff prepared for shift change twenty to twenty-five minutes later. My experience indicates that often inmates choose a time such as chow to move undetected to an unauthorized area either enroute to the chow hall and/or returning to the dorm from the chow hall. The large movement of inmates at these times is difficult to manage in the best of circumstances.

In my experience, correctional staff must review incidents with the information available at the time and make contemporaneous decisions before a full investigation may be completed in order to maintain security of the facility. Staff must make decisions and act at the time of the incident without the luxury of knowing all the information received after a full investigation. "Monday morning quarterbacking" allows everyone to win the game as they know the outcome and the impact of decisions made at various points in the game. This case is no different. Any review of the actions taken by staff leading up to and at the time of the incident must take into account the information available to staff at the time.

Mullins exhibited a history of constantly changing his preferences and beliefs based on the situation in which he found himself. Mullins also possessed a history of incurring debts and manipulating housing assignments to avoid the repercussions of his own actions. The information previously presented demonstrates ADOC staff facilitated Mullins' housing requests and placed him in RHU or protective custody when he alleged concerns for his safety in population. However, ADOC staff cannot house an inmate indefinitely in RHU. Mullins on multiple occasions requested release from RHU and return to general population indicating that he could live without issue in the St. Clair general population. Mullins clearly possessed involvement with the Aryan Brotherhood both prior to and during his incarceration with ADOC. Mullins received multiple disciplinary reports for association with a security threat group ("STG") while incarcerated.

### D.    Other Evidence Relied Upon

**Staffing:**

The duty post rosters for February 26, 2019, indicate that Correctional Emergency Response Team ("CERT") members from Limestone assisted St Clair in

**CONFIDENTIAL**

manning posts throughout the facility. (ADOC017718-17719). At 9:43 a.m. and 1:58 p.m., CERT team members assisted in conducting count in P dorm. (ADOC017723-17724). On this same date, CERT assisted in L dorm at 2:15 p.m. (ADOC017728).

Notably, ADOC augmented correctional staff by hiring CCOs for major facilities, providing Wardens the capability of assigning COs to areas where they are most needed, as outlined in the ADOC Annual Report for Fiscal Year 2016. (ADOC(Guy)_002185). The CCO position represented counted a level I security guard, requiring 80 hours of training instead of the 12 weeks of training correctional officers receive in the academy. (ADOC(Guy)_002185).

In ADOC's Annual Report for Fiscal Year 2017, Commissioner Dunn advised Governor Ivey that "[t]he ADOC continued to manage systemic challenges dealing with inmate overcrowding, correctional staffing shortages, and infrastructure while capitalizing on positive trends with a commitment to building a department that is the most respected and effective law enforcement agency in Alabama." (ADOC(Guy)_002223). In his letter, Dunn further indicated that the "ADOC retained two independent firms that will conduct comprehensive assessments of required correctional staffing levels." (ADOC(Guy)_002223). On October 6, 2017, Meg and Russ Savage produced their report identifying correctional staffing needs within ADOC. (ADOC03766-03780). The ADOC Inspector General Division completed the first comprehensive inspection of a major correctional facility in 2016. (ADOC(Guy)_002223). The inspection team consisted of wardens, division directors, and staff, who evaluated all aspects of the facility's operations with plans to conduct at least four security audits a year. (ADOC(Guy)_002223).

Further, in the address to the Alabama Pre-Legislative Session Budget Hearing on January 30, 2019, Dunn requested funding for merit raises ($4.7 million), 20% pay raise for correctional staff ($30.4 million), and additional 500 correctional officers ($13.5 million). (ADOC(Guy)_004308). Governor Ivey supported Dunn's request on February 12, 2019, and included a statement that "[f]irst, we must increase our correctional staffing levels by improving the pay scale for correctional officers and expanding our recruiting efforts. Second, we must construct prison facilities that meet the needs of a criminal justice system in the 21st century." (ADOC(Guy)_002283). Governor Ivey also indicated that, "For the upcoming Regular Session, my budget proposal will include an additional $31 million to hire 500 new correctional officers and increase the pay scale for all security personnel to make their salary competitive given current market conditions in Alabama. In December, we saw our first increase in the number of correctional officers in years. With a rising retention rate, we can begin adding to our officer ranks, rather than

**CONFIDENTIAL**

simply maintaining our current staffing levels." (ADOC(Guy)_002283). On May 29, 2019, Governor Ivey signed a bill that provided a two-step pay raise of certain employees of the ADOC and expanded the incentive program to include bonuses for additional training achievements. (ADOC(Guy)_002286).

In order to enhance leadership at the facility level Dunn held an "Executive Leadership Conference: Leading Through Change" between August 30 and September 1, 2017. Subject matter experts provided direction on leadership styles, taking initiative and being open to make changes as well as other leadership topics. (ADOC(Guy)_002234, 2307). In addition, ADOC launched a new training program in 2017, the Sergeants Academy. (ADOC(Guy)_002237). ADOC graduated three Sergeant Academy classes during fiscal year 2017 and fiscal year 2018. (ADOC(Guy)_002237). ADOC also started Lieutenant and Captains Academies. (ADOC(Guy)_002237). ADOC designed these academies to further develop effective leaders by providing two weeks of professional development training on front line leadership, team building, and communication. (ADOC(Guy)_002237).

ADOC's investment into a high level of leadership development communicated to staff at the local level the expectation that facility leadership manage and direct staff in accordance with department policy and procedure. Moreover, in addition to effectively communicating ADOC's commitment to leadership development, these trainings equipped facility leadership with the necessary tools and knowledge to effectively conduct ADOC's mission at the facility level. In my experience these types of leadership conferences and academies provide mid-level supervisors with skills to lead employees in a manner that increases compliance with policy and procedure while at the same time creating a healthier culture for staff. These actions taken by ADOC's executive leadership represent concerted efforts to improve correctional staff leadership and performance.

St. Clair SOP 031 entitled "Staffing," dated May 22, 2018, establishes the responsibilities and policies for the adequate staffing of St. Clair. (ADOC011672). SOP 031 requires that "St Clair Correctional Facility implement [] a staffing plan that shall effectively maintain the ADOC's zero tolerance policy on inmate sexual offenses, sexual harassment, and custodial sexual misconduct." (ADOC011672). SOP 031 defines "Critical Manning" as the "minimum number of security personnel needed to man all posts without altering the routine operations of the institution." (ADOC011672). Additionally, SOP 031 defines "Essential Post" as "[s]ecurity posts that will be manned twenty-four hours a day, seven days a week." (ADOC011672). Under SOP 031 correctional officers referred to as "Rovers" must "patrol a particular area, search inmates and living areas of inmates, monitor and control all movement

**CONFIDENTIAL**

of inmates." (ADOC011673). Correctional officers or CCOs staffing a cubicle post must control the housing unit doors, monitor inmate movement within their assigned housing unit, and observe the assigned rovers. (ADOC011672). This SOP also identifies that the Warden possesses responsibility for developing the staffing plan and implementing the staffing plan for their institution. (ADOC011673). The Warden also bears responsibility to ensure intermediate or higher-level supervisors conduct unannounced rounds, shift commanders make unannounced PREA rounds during their shift, and that posts remain properly staffed. (ADOCGuy_Experts_013323). Under section IV D., the Institutional PREA Compliance Manager ("IPCM") possesses responsibility for: 1) monitoring and documenting any deviations in the staffing plan's implementation; 2) gathering and organizing information for annual review of the staffing plan; 3) reviewing records of unannounced rounds; 4) gathering related information to ensure that the appropriate staff members conduct rounds; 5) ensure that rounds are completed regularly on all shifts. (ADOC011674).

Section V. A. 1. of SOP 031 details the number of staff allotted to St. Clair for staffing at ideal staffing levels. (ADOC011674). According to sections V. A. 3. and 4., one correctional officer must man the L dorm cubicle and rover posts during normal operations. (ADOC011675). Additionally, section V. A. 5. requires one correctional lieutenant, and two sergeants for day shifts. (ADOC011675). Finally, section V. A. 6. identifies the critical posts that must be staffed in times of staff shortages. (ADOC011676). In times of staff shortages, the L dorm cubicle post must be staffed by one officer, and one officer must man the L dorm rover post. (ADOC011676).

SOP 032 entitled "Staff Manning Requirements," dated June 2016, "provides a list of posts to be manned during day and night shift respectively as well as the staffing level guidelines for each post." (ADOC023979). Additionally, SOP 032 establishes the procedures for closing posts based on priority. (ADOC023979). SOP 032 establishes that full staffing for day shifts requires: four (4) supervisors; one (1) cubicle officer for each population dorm; and one (1) rover for each population dorm. (ADOC023987). For minimal staffing, SOP 032 requires: two (2) supervisors; one (1) cubicle officer for all dorms except J and K dorms; and one (1) rover for each population dorm except J and K dorms. (ADOC023987).

According to the St. Clair Duty Post Shift Rosters for February 26, 2019, the day of Mullins death, Lt. Price served as the Shift Commander. (ADOC017719). Kathleen Kizzard ("Kizzard") staffed the L dorm cubicle until approximately 12:45

p.m., when CCO Smith relieved Kizzard and assumed cubicle responsibilities for L dorm. (ADOC017719). Sgt. K Robertson and Sgt. J. Norris served as the general population Sergeants and R. Rosas and C. Warren served as the L/M rovers at the time of Mullins death. (ADOC017718).

On the day of Mullins death, St. Clair staffed the L dorm posts appropriately pursuant to St. Clair SOPs 031 and 032. Moreover, St. Clair possessed the appropriate number of supervisors required under SOP 031 and three (3) of the four (4) supervisors required under SOP 032. Additionally, according to the L dorm Duty Post Logs officers conducted count at 6:19 a.m. and 2:45 p.m. (ADOC017727-17728). Officers conducted security checks in L dorm at 6:06 a.m., 6:32 a.m., 7:39 a.m., 8:26 a.m., and 2:15 p.m. (ADOC017727-17728).

**Additional ADOC Policies and Procedures:**

ADOC's mission statement reads: "Dedicated professionals providing public safety through the safe and secure confinement, rehabilitation, and successful re-entry of offenders."[6] In addition to policy, each facility within ADOC maintains standard operating procedures ("SOPs") and post orders that provide direction on the day-to-day management of each individual facility.

St. Clair SOP 001, section II. 2 requires all employees to know St. Clair's operative SOPs and requires staff review current SOPs at least quarterly. SOP 001 requires staff to sign a statement confirming that they reviewed and understand the provisions of St. Clair's published SOPs and any recissions or additions to St. Clair SOPs. (ADOC023875). SOP 001 requires each employee to receive notice and a copy of the current SOPs, and that a copy of the current SOPs remain available in the shift commander's office. ADOC023877). Moreover, staff must keep a current copy of all post orders and related directives at each security post. Correctional officers must sign a log indicating that the officer read, understands, and will comply with the published SOPs. (ADOC023877).

SOP 037 entitled "The Shift Commander," dated April 1, 2016, outlines the duties and responsibilities of the Shift Commander. These duties include, but are not limited to, ensuring that officers man security posts appropriately, officers conduct constant inspection of all fences, bars, doors, gates, and locks, that all areas of the institution remain clean, and that officers conduct counts at the specified times. (ADOC023992). SOP 037 requires the Shift Commander to designate as many

---

[6]   see   Alabama   Department   of   Corrections   home   page,   available   at https://doc.alabama.gov/Mission.

**CONFIDENTIAL**

officers as necessary to supervise the security of serving lines and the dining hall during mealtimes and identifies the serving line and dining hall as high-risk areas for incidents. (ADOC023992). Additionally, SOP 037 requires the Shift Commander ensure that all officers know and understand the current post orders and SOPs prior to the officer staffing any security post. (ADOC023992).

Section V. of SOP 037 provides guidance to the Shift Commander on responding to incidents or emergencies within the facility. (ADOC023993). SOP 037 provides that "[t]he primary concern in the event of a violent situation will be security, human safety, and property damage." (ADOC023993). SOP 037 provides additional guidance stating that officers take necessary action to contain the incident, determine the cause of the incident, identify, and supervise witnesses, secure the scene and any potential evidence, and initiate disciplinary action as appropriate. (ADOC023993). SOP 037 further provides that Shift Commander "must ensure that Officers understand that inmates must be challenged regarding…[a]uthorized and unauthorized movements" and "[r]ule infractions." (ADOC023994). Lastly, SOP 037 establishes the Shift Commander possesses responsibility for continual training for: cubicle officer duties; effective communication between cubicle operators and rovers; authorized and unauthorized movement; and the importance of inmate wristbands as a tool against unauthorized inmate movement. (ADOC023994).

SOP 056 entitled "Population Cellblock Rovers," dated December 12, 2016, establishes "the responsibilities, policies, and procedures for providing guidance to the rovers during their tour of duty." (ADOC024057). SOP 056 provides that the rover must make adequate checks of all emergency exit doors, cell doors, and windows throughout his/her assigned area at random intervals. (ADOC024057). Additionally, SOP 056 requires all "[c]ellblock sliding security doors remain closed at all times except to allow authorized traffic to enter or depart the cellblock." (ADOC024058).

standard Operating Procedure 057 entitled "Population Cell Block Cubicle Officer" and dated November 16, 2016, outlines the duties and responsibilities of the cubicle officer. (ADOC024063). SOP 057 states" [a]t no time will the Population Cubicle Officer leave his/her post unless he/she has been properly relieved by another officer and received permission for the Shift Commander." (ADOC024065). Additionally, SOP 057 requires the cubicle officer to ensure the cubicle remains secure at all times." (ADOC024065). SOP 057 forbids the population cubicle officer from allowing inmates to visit cell blocks to which the inmate is not assigned. (ADOC024065). Moreover, SOP 057 states that population cubicle officers who

**CONFIDENTIAL**

allow unauthorized movements will receive disciplinary action. (ADOC024065). The population cubicle operator must check their assigned dorms PREA hotline once per shift and report the results to the shift commander. (ADOC024066). Lastly, population cubicle operators must record all security checks and searches performed during their shift. (ADOC024066).

SOP 083, dated May 22, 2018, establishes the duties of the Inmate Control Systems ("ICS") Officer and provides the ICS Officer maintains responsibility for controlling inmate count sheets, movement logs, inmate identification cards and issuing colored wristbands. (ADOC024200-24201). This SOP also outlines the procedures to be followed by the ICS Officer related to victims and predators. (ADOC024205). Specifically, SOP 083 requires the ICS Officer to place inmates identified as victims in specially designated sides of each dorm and place inmates designated as predators on the opposite side of each dorm. (ADOC024205).

SOP 090 entitled "Housing Designation," dated November 4, 2016, establishes "guidelines to aid in the goal of keeping separate those inmates at high risk of being sexually victimized from those inmates at high risk of being sexually abusive." (ADOC024218). SOP 090 specifies that the Warden bears responsibility for ensuring that staff adhere to the guidelines set forth in this SOP. (ADOC024218). SOP 090 then identifies responsibilities of the Captain, ICPM, Classification Specialist, and Shift Commander. (ADOC024218-24219). Additionally, SOP 090 requires all inmates transferred to St. Clair receive a classification screening within seventy-two (72) hours of arrival. (ADOC024219). Part of the classification screening must include an evaluation of the inmates' risk of sexual victimization and sexual aggressiveness. (ADOC024219). If staff identify an inmate either as a victim or predator the IPCM ensures that the inmate receives the appropriately designated housing assignment. (ADOC024219).

SOP 110 establishes the policies and procedures for conducting searches and shakedowns within St. Clair. (ADOC010483-ADOC010491). SOP 110 provides that Shift Commanders will ensure that [c]ell [b]lock rovers conduct a minimum of (2) two cell searches each shift in their assigned [c]ell [b]locks." (ADOC010485). Additionally, SOP 110 requires correctional officers to conduct random pat searches and as needed based on suspicion of possession of contraband. (ADOC010485). SOP 110 requires St. Clair Captains to implement an "on-going Institutional Shakedown Procedure" ensuring institutional searches of all areas at St. Clair occur monthly. (ADOC010486). Moreover, SOP 110 establishes that correctional staff search all inmate housing units every thirty (30) days, and all other areas every sixty

**CONFIDENTIAL**

(60) days. (ADOC010486). SOP 110 sets forth in specific detail how officers conduct and record searches. (ADOC010488-ADOC010491).

St. Clair operated under SOP 137 "Inmate Movement Control." (ADOC010492-ADOC010496). SOP 137 provides "guidance to officers of [St. Clair] in controlling the flow of inmate movement and to ensure orderly movement as well as provide increased security." (ADOC010492). Additionally, SOP 137 provides that "[i]nmates will not be allowed to loiter in or visit, unassigned living areas, job sites, program areas, etc…[a]ll violaters will be subject to disciplinary action" (ADOC010494). SOP 137 represents an appropriate and reasonable SOP for controlling inmate movement and establishes the specific procedures for inmate movement within the facility.

SOP 229 entitled "Inmate Sexual Abuse and Harassment," dated May 23, 2018, and SOP 230 entitled "Inmate Sexual Abuse Coordinated Response" dated May 23, 2016, clearly outline ADOC's expected procedures for response to and management of PREA allegations. (ADOC024637-24664; ADOC024696-024704). Notably, SOP 229 states that "inmates at high risk for sexual victimization shall not be placed in involuntary segregation (e.g. Administrative Segregation, Protective Custody) unless an assessment of all available alternative means has been made and there are no other available alternatives." (ADOC024640-24641). Pursuant to SOP 229 shift supervisors must conduct unannounced rounds through the dormitories each shift to deter sexual abuse and harassment. (ADOC024342). Moreover, all employees must receive training to include the "prevention, detection, response and reporting of allegations of inmate sexual abuse, sexual harassment, and custodial sexual abuse. (ADOC024643). Inmates receive PREA orientation upon intake to St. Clair and must provide written confirmation that the understand the PREA policies and procedures. (ADOC024643). Inmates must receive education regarding prevention of sexual abuse and harassment, self-protection, methods of reporting incidents of sexual abuse, and treatment and counseling when appropriate. (ADOC024643-24644). In addition to unannounced rounds conducted by shift supervisors, the Warden, IPCM, or Shift Commander must conduct at least one unannounced round on each shift, with a minimum of three (3) checks per week. (ADOC024644).

SOP 229 provides several methods for inmates to report sexual abuse or harassment. (ADOC024651). An inmate may: file a grievance; call the PREA hotline, deposit a complaint in the PREA drop box, tell the IPCM directly, contact I&I, or tell any staff member, contractor, or volunteer. (ADOC024651). Pursuant to SOP 229 all PREA allegations must be investigated thoroughly and as quickly as

**CONFIDENTIAL**

possible, I&I must be notified of substantiated PREA allegations for investigation. (ADOC 024650-24651). SOP 230 outlines the proper procedures for a coordinated response to incidents of sexual abuse. (ADOC024697). SOP 230 requires staff to physically separate the alleged victim, abuser, and witnesses, report the incident or allegation to the shift supervisor or shift commander, and that the shift supervisor or commander report the incident to the Warden, I&I investigator, Captains, and IPCM. (ADOC024699). From my review of St. Clair's PREA SOPs and my extensive experience in corrections, I find these procedures completely align with the standards produced in the PREA Prison and Jail standards.

Based on my experience, executive-level supervisors of a department of corrections (ex. a Commissioner, Assistant Commissioner, Deputy Commissioner, and/or Director) do not and cannot directly supervise or possess knowledge of the day-to-day activities of a facility. ADOC is no different. Leadership develop ARs and SOPs, disseminate them to facility staff, and train staff on those policies and procedures. The ADOC Officials do not directly supervise or possess detailed knowledge about the day-to-day activities of each of the twenty-six (26) ADOC facilities across the state of Alabama. Complex, multifaceted systems with over two dozen locations across a state, like ADOC, require delegation to function. In my opinion, the ADOC Officials maintained appropriate policies and procedures which provided clear and thorough guidance for the performance of the duties each policy and procedures requires by each member of the correctional team. The ADOC Officials appropriately delegated the implementation and enforcement of ADOC's policies and procedures to the staff at St. Clair responsible for day-to-day functioning of the facility. This approach mirrors that of most, if not all, state correctional departments across the nation.

**Physical Plant**

In November 2017, Governor Ivey directed the department to retain a project management team to develop a plan to revitalize the state's deteriorating correctional infrastructure. (ADOC(Guy)_004301-4302). In March 2018, ADOC selected a private firm to develop a long-range plan. (ADOC(Guy)_004302). Specifically, Dunn advised "in 2016, legislation was considered for replacing 14 of 16 major correctional facilities with one women's facility and three large-scale regional men's facilities. While the bill authorizing the construction of the facilities did not pass in the Legislative Session, ADOC brought to the public forefront the need to address systemic problems within the prison system such as overcrowding, understaffing, deteriorating    infrastructure    and    limited    rehabilitative    programming." (ADOC(Guy)_002169).

**CONFIDENTIAL**

In the fiscal year 2017 Annual Report, Dunn advised that, "Facility improvements included a $4 million lock replacement project and security system upgrades at the St. Clair Correctional Facility in Springville." (ADOC(Guy)002238). ADOC, under the ADOC Officials' leadership, took concerted actions to address aging infrastructure. ADOC outlined these actions in the Alabama Prison Transformation Initiative Information Paper, initially presented on February 2, 2016, by then Governor Robert Bentley. (ADOC(Guy)_002419-2426). ADOC's plan acknowledges that forty-year-old correctional facilities required labor intensive security management to properly oversee offenders. (ADOC(Guy)002421). ADOC implemented a long-term approach to replace existing facilities with efficient regional prisons. (ADOC(Guy)002421).

These actions and diligent work by the Commissioner and his team demonstrate a commitment to providing safe and secure operations in each of ADOC's facilities. Further, these actions show that the Commissioner and his leadership team engaged at a high level of addressing the needs of the ADOC and working toward lasting improvements. It remains unrealistic to believe that the Commissioner could engage at this high level of planning and also engage in minute details of the day-to-day occurrences of each inmate assigned to each cell in each facility.

As previously noted in this report, the Commissioner and the leadership of the ADOC, actively addressed the physical plant and staffing needs of the ADOC in fiscal years 2016, 2017 and 2019, and throughout Dunn's tenure as Commissioner. In my experience, inmates commonly misuse the physical plant for ulterior purposes such as fashioning weapons and concealing contraband. Aged facilities present greater difficulty to detect misuse of the physical plant by inmates. Additionally, as Dunn noted in his deposition testimony, the physical design of St. Clair presented additional complications for detection and prevention of incidents. For example, Dunn noted the low ceilings in the population housing units allowing inmates to easily access and damage surveillance cameras. (Dunn Depo. at 29:7-18).

Additionally, Dunn described how blind spots existed in the housing units that allowed inmates to conceal their behavior. (Dunn Depo. At 25:23-26:18). Dunn noted that even faced with these difficulties the department took measures to mitigate the physical plant deficiencies. (Dunn Depo. at 26:19-24). In conjunction with third party consultants, Dunn and the ADOC leadership determined that the long-term solution remained to construct new modern facilities better equipped for modern correctional practices. (Dunn Depo. at 29:19-30:17).

**CONFIDENTIAL**

In my opinion, the Alabama Prison Transformation Initiative represented an innovative and comprehensive solution to the infrastructure deficiencies Dunn identified. Ultimately, ADOC remains dependent upon support from the legislature. Although the process of constructing ADOC's new facilities only began late in Dunn's tenure, ADOC recently saw the first fruits of Dunn's labor with the commencement of construction of one new facility in Elmore County, and the securing of funding and contract for the construction of a second new facility in Escambia County. The new facility in Elmore County will feature "54 buildings spanning over 1.4 million square feet. With capacity for 4,000 inmates." Additionally, the new facility in Escambia County will similarly possess capacity for 4,000 inmates. Each facility will include modern design, security equipment, improved sight lines, and comprehensive medical and mental health facilities. [7] Media recently recognized that "the Governor Kay Ivey Correctional Complex represents a cornerstone of Alabama's commitment to modern, humane correctional solutions." The construction of these new facilities remains a direct result of Dunn's leadership and commitment to pursuing lasting improvements to ADOC's infrastructure.

## VI.    OPINIONS

### A.    The ADOC Officials maintained appropriate classification procedures, properly classified Jackson, and Mullins, and took appropriate action to separate Mullins from his alleged abuser.

Plaintiff's contention that St. Clair staff failed to implement classification and housing policies lacks merit. I reviewed the multiple classification actions for both Mullins and Jackson. I found the classifications to be complete, timely, and containing appropriate information. Plaintiff's contention that St. Clair housed Jackson in general population despite a history of violence against others remains contradictory to classification principles. In my review, I found one prior disciplinary issued on March 18, 2018, to Jackson regarding allegations of sexual harassment. (ADOC(Guy)003312). However, St. Clair investigated this incident and determined they could not substantiate the allegation. ADOC cannot punish Jackson for an unsubstantiated PREA allegation.

In my experience, correctional facilities possess a responsibility to house inmates in the least restrictive manner possible while still providing for the safety

---

[7] https://www.alreporter.com/2024/11/14/adoc-unveils-governor-kay-ivey-correctional-complex-in-prison-reform-effort/

**CONFIDENTIAL**

and security of the facility. St. Clair cannot place inmates in restrictive housing long term without reasonable cause. Jackson's disciplinary history and classification reviews fail to establish a need for long term placement in the RHU. Comparatively, Mullins possessed a demonstrated history of violence and discipline as detailed above. Each time Jackson received placement in the RHU, classification conducted a review prior to his release in accordance with policy. In my experience, long-term RHU may negatively impact an inmate and, generally, should be avoided whenever possible. The PREA resource center in its publication "Keeping Vulnerable Populations Safe under PREA" indicates that:

> "Increasing evidence suggests that holding people in isolation with minimal human contact for weeks, months, or years can create or exacerbate serious mental health problems and assaultive or anti-social behavior, and lead to decreases in physical health and functioning."[8]

Nothing in Jackson's history indicated a need for long-term RHU placement. Moreover, Plaintiff's even Dan Pacholke ("Pacholke") acknowledges in his report, on page forty-two, that ADOC staff conducted a PREA risk assessment of Jackson and designated him as a potential predator. As noted above, the PREA risk assessment identified Jackson as "likely to be a sexual predator" based on his charges of Rape, which involved engaging in sexual intercourse with a 14-year-old on two (2) occasions when he was 17 years old. This assessment, which occurred on May 15, 2018, during a transfer review, identified Jackson as a predator due to a history of engaging in domestic violence, sexual offense against a child, and gang affiliation. (ADOC(Guy)003465-3466).

On January 5, 2018, classification performed a PREA risk assessment and determined Jackson warranted no designation. (ADOC(Guy)_003457). Regardless, on September 25, 2018, and October 9, 2018, the ICB accurately noted Jackson's designation as a predator. (ADOC(Guy)_003324, 003331). Additionally, at the time of Mullins death, St. Clair appropriately housed Jackson in Q dorm, side two. Pursuant to SOP 083, inmates designated as predators must be housed on the two side of the population dorms, with inmates designated as potential victims housed on the one side of population dorms. (ADOC024205). Therefore, St. Clair appropriately placed Jackson based on his designation as a potential predator in the appropriate housing assignment.

---

[8] keepingvulnerablepopulationssafeunderpreaapril2015.pdf

**CONFIDENTIAL**

Additionally, St. Clair staff completed PREA risk assessments for Mullins on January 31, 2018, and March 23, 2018. (ADOC(Guy)_004187; and 004189). On January 31, 2019, staff determined Mullins required no designation either as a potential victim or predator. Pacholke argues that staff failed to consider Mullins' documented history of being physically assaulted. However, section I. of the Victimization Risk Factors, a tool within industry standards, requires an answer of "Yes" to three (3) or more of the eleven (11) questions. Based on the PREA risk assessment, including an interview of Mullins, staff determined Mullins failed to meet these criteria. Notably, Pacholke ignores Mullins' original crime of conviction and assaults while incarcerated from his analysis.

Mullins received his conviction for a brutal murder motivated by animus toward homosexual individuals. Moreover, Mullins received disciplinary action for assaulting another inmate due to homosexual advances toward Mullins. Additionally, Mullins possessed a documented history of identifying with white supremacist groups, another factor Pacholke ignored. Regardless, SOP 083 provides that inmates with no PREA designation may be housed on either side of the general population dorms. Therefore, St. Clair appropriately housed Mullins at all times leading up to his death.

At the time of his death, following Mullins' PREA allegation, ADOC moved Mullins to L dorm, an entirely separate housing unit across the population yard from Q dorm. St. Clair staff appropriately separated Mullins from the environment where he alleged "CJ" assaulted him. In my opinion, without the ability to properly identify the alleged abuser at the time, St. Clair staff properly moved Mullins to L dorm. As noted previously, Mullins never requested placement in RHU. Instead, he requested placement in a cell by himself. Mullins' placement in L dorm under the circumstances complies with PREA standards and St. Clair SOPs prohibiting staff from placing alleged victims in RHU involuntarily.

Plaintiff contends that the ADOC Officials and St. Clair "fostered a longstanding and unreasonable policy and practice pursuant to which St. Clair staff failed to identify and segregate known or likely perpetrators of sexual violence to ensure the safety of other inmates at St. Clair." (Doc. 40 at 43-44). However, Mullins received multiple placements in RHU upon request when he reported fear for his safety. Therefore, the documented evidence contradicts Plaintiff's contention.

Plaintiff further contends that St. Clair failed to "protect victims from retaliation, including by providing sight and sound separation between the victims

**CONFIDENTIAL**

and their assailants and by protecting victims from gang associates of their assailants." (Doc. 40 at 44). Pacholke similarly argues that St. Clair failed to provide sight and sound separation between victims and their alleged assailants, citing PREA standard 115.14. Plaintiff's contention and Pacholke's assertion demonstrates either an utter lack of knowledge and awareness of PREA standards, or blatant attempt to mislead the Court with obvious errant opinions. The PREA standard Plaintiff and Pacholke reference relates to sight and sound separation of *juveniles* and not *adults*. PREA standard 115.14 provides, in pertinent part:

> 115.14 Youthful inmates. (a) A youthful inmate shall not be placed in a housing unit in which the youthful inmate will have sight, sound, or physical contact with any adult inmate through use of a shared dayroom or other common space, shower area, or sleeping quarters. (b) In areas outside of housing units, agencies shall either: (1) maintain sight and sound separation between youthful inmates and adult inmates....[9]

PREA provides no standard requiring sight and sound separation for *adult* inmates like those housed at St. Clair.

Again, Plaintiff asserts contradictory and demonstrably false allegations. Plaintiff contends, on the one hand, that "[d]efendants had a long-standing practice of placing inmates who report sexual abuse in isolation cells in segregation, which discouraged inmate reports of sexual abuse." (Doc. 40 at 44-45). On the other hand, Plaintiff contends that St. Clair staff failed to place Mullins in restrictive housing after his PREA allegations. So here, Mullins did not follow the purported "long-standing practice" decried by Plaintiff. Instead, the documents I reviewed (and Pacholke had access to) show that, on February 25 and February 26, 2019, St. Clair staff moved Mullins to P dorm and then to L dorm after he reported the alleged sexual harassment—not to the RHU. Moreover, because Mullins failed or refused to provide adequate information to allow St. Clair correctional staff to identify the alleged aggressor or substantiate his allegations, they moved Mullins to different dorms in an attempt to protect him from his unidentified abuser. Again, St. Clair correctional staff did not place Mullins in the RHU, and Mullins never requested such placement. Furthermore, as recently as February 12, 2019, Mullins reported to

---

[9] prisonsandjailsfinalstandards_0.pdf

**CONFIDENTIAL**

classification that he could live in population without issue and requested placement in general population.

ADOC staff conducted numerous classification hearings and reviews of Mullins' requests for RHU placement for protection, as well as his requests for placement in general population. On each occasion, classification staff responded appropriately based on a review of Mullins' request and his classification history. Clearly St. Clair staff intentionally reviewed each situation and attempted to place Mullins in the least restrictive setting which accounted for his safety.

I understand the challenges involved in managing bed space, housing demands, separating potential enemies, and housing inmates safely in the least restrictive means. These challenges become exacerbated when inmates, like Mullins, regularly place themselves in situations increasing their likelihood of victimization, such as incurring debts. An inmate's behavior once incarcerated can draw attention to his situation and make protection from harm extremely difficult. Mullins' involvement with drugs and debt obligations likely increased the potential of harm to himself.

Another challenge arises when an inmate cannot decide whether or not he wants protection. In my experience, this is common as some inmates dislike restrictive housing and the negative impacts prolonged placement may cause. Mullins, more than once, asked for protection and then subsequently decided he wished to return to population. Staff and leadership must make these housing and classification decisions with the best available information provided at the time. My opinion remains that St. Clair staff reviewed Mullins' classification on a regular basis, weighed the information provided by Mullins, as well as the documentation available in his inmate file and made a reasonable decision to house Mullins in the least restrictive setting possible while distancing him from the housing unit where his alleged assailant lived.

St. Clair staff made the classification and housing decisions discussed above related to the housing, classification, and discipline of Mullins and Jackson. In my experience, communication regarding "the best option to consider" occurs at multiple levels within the facility. Facility leadership and staff determine institutional assignments, classification actions, and disciplinary actions pursuant to policies established by executive leadership. This remains the case here. St. Clair staff followed ADOC and St. Clair policy in making their determinations regarding Mullins classification and housing assignments. Typically, executive-level leadership do not and cannot engage in the hundreds, if not thousands, of

**CONFIDENTIAL**

classification and housing decisions made throughout a department. Dunn and ADOC's executive staff promulgated reasonable and appropriate policies, procedures, and guidance related to PREA, classification, and housing assignments.

In my opinion, ADOC and St. Clair appropriately classified and assigned inmates within ADOC facilities, including St. Clair, based on an appropriate risk and needs assessment. This includes PREA risk assessments. St. Clair staff exhibited appropriate knowledge of the classification procedures, PREA assessments, and made reasonable classification decisions. In my opinion, St. Clair staff properly classified Jackson and Mullins at the time of the incident and, therefore, any alleged failure by ADOC to properly classify and house inmates at St. Clair did not cause or contribute to Mullins' death.

Plaintiff's contention that St. Clair staff "refused to take steps to protect [Mullins], including but not limited to ensuring that Mr. Mullin and Mr. Jackson were separated and confiscating Mr. Jackson's weapon...." remains demonstrably false and oversimplified. (Doc. 40 at 53). As indicated previously, Mullins failed to identify his aggressor, and St. Clair staff moved Mullins to P dorm from Q dorm following his report of physical assault. Mullins failed to identify his attacker and therefore, St. Clair staff removed him from the location of the alleged assault. Because St. Clair staff did not know at the time who allegedly assaulted Mullins, they could not simply confiscate Jackson's weapon or place Jackson in restrictive housing.

**B.     The ADOC Officials took reasonable and appropriate steps to protect inmates from the risk of inmate-on-inmate violence at St. Clair.**

Plaintiff bases many of her allegations on biased, unconfirmed reports contentions of EJI's counsel. EJ's correspondence and "reports" lack any value, especially in light of their stipulations the <u>Duke</u> case, including:

- "Counsel employed with EJI who represented Plaintiffs in this action...prepared the Reports." (ADOC_Ezell_002328).

- "EJI Counsel has not been employed or retained in any capacity (full-time or part-time) in any prison or with any correctional agency." (ADOC_Ezell_002328).

**CONFIDENTIAL**

- "EJI Counsel never obtained any form of any training necessary to achieve certification consistent with Peace Officer's standards and Training requirements in any jurisdiction." (ADOC_Ezell_002328).

- "EJI Counsel does not possess day-to-day, on-site experience in managing, overseeing, operating and/or working in any correctional facility, directing or operating a corrections system, the hiring or retention of correctional staff, training correctional staff in proper use of force techniques and procedures, the detection and removal of contraband, the training of correctional staff in the safe and efficient operation of a correctional facility and/or the implementation of any form of technology to improve the safety and security within any correctional environment." (ADOC_Ezell_002329).

- "EJI Counsel never obtained or possessed any certifications or training pertaining to the [PREA], any of its requirements or the auditing process conducted pursuant to PREA." (ADOC_Ezell_002329).

- "EJI Counsel never received any training or education from, or ever obtained any certification issued by, any organization or entity which promulgates any standards for the operation of or activities within correctional facilities, including, but not limited to, the National Institute of Corrections, the American Correctional Association or the National Commission on Correctional Health Care." (ADOC_Ezell_002329).

- "EJI Counsel never held themselves out to be an expert in any published standards for the operation of or activities within correctional facilities, including, but not limited to, the National Institute of Corrections, the American Correctional Association, or the National Commission on Correctional Health Care." (ADOC_Ezell_002328).

In addition to the stipulations above, EJI counsel stipulated that, "No expert retained by any Party will rely upon any Report in authoring any expert report or offering any opinion in the Duke action." (ADOC_Ezell_002329). In light of the foregoing stipulations, any reliance on EJI correspondence or "reports" from the Duke case is improper. The only reason to do so, in my opinion, would be to mislead the Court and interject unreliable information from an admittedly unqualified source not even accepted by the Duke court.

**CONFIDENTIAL**

Plaintiffs contend that the ADOC failed to discipline inmates for acts of violence, failed to discipline and safely segregate predatory inmates, failed to properly investigate and discipline acts of violence, discouraged victims from reporting incidents, retaliated against inmates who reported violence and threats of violence, disciplined inmates for refusing to name the individuals who they feared might harm them, failed to implement classification and housing policies, housed Jackson who had a history of committing acts of violence against others in general population, refused Mullins request to transfer to segregation after he was sexually and physically assaulted by Jackson, and failed to place Mullins' attacker in RHU to prevent violent incident like the stabbing that resulted in Mullins death.

Jackson and Mullins institutional histories (previously presented in this report) reveal that they were each disciplined for acts of violence and possession of contraband, and they were each placed in RHU at various times during their incarceration. I find nowhere in the exhaustive documentation produced in this case that St. Clair or ADOC staff retaliated against victims for reporting violence or disciplined inmates for refusing to name the individuals who they feared. To the contrary, Mullins failed on at least three occasions to identify his assailant who he allegedly feared. St. Clair staff did not discipline Mullins at any time for failing to name his aggressor, even though failing to the name his aggressor obstructed St. Clair correctional staff's ability to identify Jackson as responsible for Mullins' assault until after the incident occurred.

From my review, I found levels of inmate-on-inmate violence at St. Clair consistent with my experience and expectation at any similar maximum-security male facility. I found no evidence to support that "violence was the norm" or that "staff tolerated a culture of violence" at St. Clair. To the contrary, I believe from my review and experience that the ADOC Officials and St. Clair staff took violence within St. Clair seriously, and took intentional, reasonable steps to increase security and combat violence. Plaintiff's reliance on letters issued by the U.S. Department of Justice ("DOJ") in April of 2019 and July 2020 remains misguided for a number of reasons. First, the DOJ included within their letters a clear disclaimer that nothing in the letter constitutes admissible evidence, nor do any of the DOJ "findings" create any legal obligation or duty. Second, the DOJ litigation remains ongoing, and no court ruled on the accuracy of the allegations or information contained in DOJ's April 2019 and 2020 letters. Moreover, ADOC received no opportunity to contest the validity of DOJ's assertions until DOJ filed the litigation, the characterizations they drew from documentation, or whether the DOJ omitted contextual information.

**CONFIDENTIAL**

Lastly, and potentially most obvious, DOJ did not send its notice letters until after Mullins' death. Therefore, DOJ's letters cannot provide a basis for indicating that the ADOC Officials knew of any specific risk of harm at St. Clair or to Mullins, specifically in December 2018.

Dunn focused his efforts on system-wide actions intended to achieve long-term positive changes for ADOC, such as gaining funding from the Alabama legislature to address the physical plant and the staffing needs of the department. Dunn consistently worked to obtain resources necessary to address ADOC's needs and to develop ADOC's strategic plans and initiatives to move the department forward. Ellington possessed a similar regional, multi-facility approach focused on deployment of resources, addressing general correctional practices and operations of multiple facilities, and conveying ADOC-wide information to facility leadership within his region. Ellington worked tirelessly to respond to his regional facilities in times of emergency, review and provide guidance on SOPs, and address specific issues within the facilities under his supervision. (Ellington Depo. at 39:22-43:10). Like most correctional systems, during Dunn's tenure as Commissioner, ADOC employed and continues to employ a military-like command structure. Because neither Dunn nor Ellington can be in all places at all times, they delegated the day-to-day operations of ADOC's facilities, including St. Clair, to facility-level leadership and staff.

Even at the facility level, the same command structure applies for the same practical reasons. That is, Jones (like Dunn and Ellington) cannot be in all places at all times within St. Clair—a camp with hundreds of inmates, multiple buildings, programs, services, and a multitude of events occurring simultaneously each and every day of the year. Jones (like Dunn and Ellington) must rely on the command structure for supervision and oversight of all St. Clair operations, starting with the Wardens under Jones to the Captains, then to the Sergeants, then to the Lieutenants, then to the Senior COs, then to the COs, then to the BCOs, then to the CCO, etc. with the number of staff growing larger at each level moving down the chain of command. This type of top-down leadership approach, in my opinion, represents an appropriate and effective exercise of the ADOC Officials' leadership, as well as appropriate and effective supervision and oversight in a correctional environment, especially in a system as large as ADOC. Notwithstanding a top-down management approach, Jones testified that she reviewed incidents occurring at St. Clair, provided guidance and oversight to correctional staff, held correctional staff meetings to address any issues, approved discipline of inmates and staff, and walked the facility regularly to track compliance with St. Clair and ADOC policies and procedures. (Jones Depo. at 30:25-31:3; 92:20-93:24; 162:25-164:2; and 59:9-14).

**CONFIDENTIAL**

During fiscal year 2017, ADOC implemented the ORAS risk and needs assessment tool. (ADOC_Ezell_002052). The ORAS tool assists ADOC in targeting areas of weakness specific to the inmate and maps those needs to evidence-based programs for the inmate. Correctional professionals believe ORAS effectively predicts institutional conduct to guide housing assignments and programming within a prison system. (ADOC_Ezell_002068). Again, in my opinion, ADOC properly classified Jackson and Mullins consistent with ADOC's male classification system and, during their incarceration, ADOC routinely reviewed their classification and reclassified Jackson and Mullins, especially when engaging in a violent altercation.

The ADOC Officials cannot, in my opinion, be responsible for Mullins' choices that placed him at risk of harm. St. Clair staff took adequate and appropriate action to hold Mullins and Jackson accountable for their behaviors throughout their incarceration to include disciplinary, segregation, and proper classification actions.

## C.    The ADOC Officials took reasonable steps to locate, and remove contraband, including contraband weapons, from St. Clair.

Plaintiff contends that the "defendants" permitted contraband weapons to proliferate at St. Clair and failed to effectively control the introduction, manufacture, and use of contraband weapons by inmates. Plaintiff further contend that St. Clair staff frequently failed to discipline inmates in possession of contraband weapons. Similarly, Plaintiff argues that Mullins reported that Jackson threatened him at knifepoint, and Givens, Ragsdale, Price, Brooks, and Gordy took no steps to confiscate the contraband weapon or discipline Jackson.

I observed considerable evidence where St. Clair staff searched inmates (Mullins and Jackson included) and disciplined inmates for possession of contraband weapons (see history of Jackson and Mullins in this report). The allegation that Mullins reported that Jackson had threatened him at knife point lacks merit. As previously noted in this report, Mullins failed to identify his alleged assailant and moved to a cell to which he was not assigned. St. Clair staff faced an extremely difficult task to identify from the limit facts that (1) Mullins' aggressor had the nickname "CJ," and (2) Mullins' aggressor lived with him, even though Mullins lived in an unassigned or different cell than known to staff.

Even if Mullins identified Jackson as the alleged perpetrator, the immediate segregation of Jackson would not be a given. That is, in the prison environment inmates routinely make false allegations to manipulate staff into placing another inmate into restrictive housing. The fact that an inmate makes an allegation does not

**CONFIDENTIAL**

necessarily mean the allegation is true. Staff must investigate the allegations, confirm the allegations, and then take appropriate action. It is true that, if determined necessary, staff may choose to segregate the alleged perpetrator pending resolution of the investigation.

In the Ezell case, CCO Caver testified that, if she observed an inmate with a weapon—regardless of the purpose or intent by the inmate to use it—she let an "officer know to come over and check the guy." (Caver Depo. at 52:7-11). CCO Caver further testified that "staff would [then] do a search, pat a few of them down," and "[t]hey would come do a shakedown." (Caver Depo. at 54:3-13). CCO Caver explained, "Sometimes if it seemed like something might be going on, they would search a couple of cells." (Caver Depo. at 55:25-56:3). Additionally, "if a weapon was observed, movement would result in two officers in the hallway that would pat you down, make sure you don't have weapons on you...." (Caver Depo. at 58:18-59:1). During the deposition, Plaintiff specifically asked CCO Carver about concerns with staff failing to conduct searches; CCO Caver responded: "No. Because they did a good job in searching and coming through doing security checks." (Caver Depo. at 84:5-11).

My observations from the materials reviewed in this support my opinion that St. Clair staff routinely searched inmates and the facility for contraband through random pat down searches, planned housing unit and general facility searches, and facility-wide sweeps with the K-9 unit. Based on my experience, I am confident that St. Clair underreported contraband searches in the documents I reviewed. In my experience, correctional staff do a good job of completing routine searches but fail to document those searches when that search produces no contraband and staff become busy with an important or urgent need requiring their attention immediately after completing the search, resulting in an unintended failure to document a search. A review of the evidence produced indicates that St. Clair staff conducted searches on a routine basis.

SOP 110 entitled "Search and Shakedowns" provides guidance to staff in the proper procedures for conducting searches and shakedowns within the institution. Section IV.A. provides that "it is the responsibility of the captain of this institution to ensure subordinate staff members are familiar and comply with this SOP." Section IV B. indicates the supervisor's bear responsibility to ensure that officers under their supervision read, understand, and comply with the procedures set out in this SOP. Additionally, section IV.C. states "[i]t is the responsibility of the officer to read, understand and follow the guidelines of this SOP." (ADOCEzell-Experts_000067).

**CONFIDENTIAL**

SOP 110 provides detailed instructions in the duties of St. Clair staff to perform searches and shakedowns. As noted above, SOP 110 established that cell block rovers must perform at least two (2) cell searches each shift in their assigned cell block. Furthermore, SOP 110 requires institutional searches monthly for all areas of St. Clair. In my expert opinion, SOP 110 provides comprehensive and appropriate guidance to St. Clair staff in the performance of searches and shakedowns. The ADOC Officials bear no direct responsibility for conducting searches or shakedowns. However, consistent with my experience, the ADOC Officials provide clear guidance as to the procedures for searches and shakedowns and provide oversight to ensure staff conduct searches in accordance with SOP 110 and ADOC policy. In fact, in February 2019, ADOC conducted a facility wide institutional search at St. Clair, which involved participation from approximately three hundred local and state law enforcement officers including ADOC correctional officers and CERT team members. (ADOC039856-ADOC039881).

It remains clear to me from my experience as a correctional professional and from my review of the documents (including testimony) in this case, St. Clair staff conducted contraband searches and shakedowns and, although not perfect, they substantially complied with St. Clair SOP 110. That is, the practice associated with contraband searches and shakedowns fundamentally complied with the policies implemented by the ADOC Officials.

Ellington testified that Jones possessed a number of resources to conduct searches. Jones could request the CERT team assist in conducting searches at St. Clair, hold over officers from a prior shift to conduct searches, call in the K-9 unit to conduct a search of the facility or portions of the facility, and order staff to conduct targeted or additional searches by staff on shift. (Ellington Depo. at 127:2-128:10). Ellington recalls in 2018 and 2019, Jones requesting CERT to assist in facility searches as well as utilizing the above identified methods to conduct searches at St. Clair. (Ellington Depo. at 129:5-21). In fact, Ellington testified that in 2017, ADOC deployed five CERT teams consisting of approximately 80-85 correctional officers as well as K-9 officers to conduct searches on a rotating basis. (Ellington Depo. at 132:7-25). Ellington also recalled that during 2018-2019 ADOC assigned a CERT team to St. Clair to assist in daily operations including searches. (Ellington Depo. at 129:21-130:9).

In addition to the CERT team, ADOC reassigned correctional staff from Hamilton Aged and Infirm to St. Clair in order to provide additional staffing and assist in searches and shakedowns. Additionally, Ellington recalled on numerous occasions mobilizing additional CERT teams to St. Clair to conduct facility wide

**CONFIDENTIAL**

searches. (Ellington Depo. at 130:16-24). CO Garrett also testified that correctional officers at St. Clair performed contraband searches on a daily basis in the performance of their duties. (Garrett Depo. at 39:14-23). Garrett further testified that correctional officers received training in the performance of searches. (Garrett Depo. at 41:24-42:2). Cpt. Gary Malone ("Cpt. Malone") described the various types of searches correctional officers conducted at St. Clair. Cpt. Malone testified that officers could pat search inmates, search inmate cells, conduct strip searches, and search the living and common areas of the facility. (Malone Depo. at 130:8-19). Cpt. Malone confirmed that in 2018 and 2019 correctional officers at St. Clair conducted daily searches for contraband. (Malone Depo. at 134:15-16). Cpt. Malone explained that he and the other captains at St. Clair reviewed incident reports on the incident reporting module daily, which allowed him to see which officers conducted searches, who they searched, whether officers recovered contraband, and the type of contraband. (Malone Depo. at 135:1-136:4).

Jones also testified that during her tenure at St. Clair, staff conducted daily searches and conducted larger shakedowns three (3) to four (4) times per week in an effort to reduce the amount of contraband within the facility. (Jones Depo. at 185:5-19). Moreover, Jones testified that St. Clair conducted facility wide searches approximately two (2) times per month depending on the staff available. (Jones Depo. at 186:1-7). Jones further explained that the St. Clair K-9 unit participated in facility-wide searches as well as searches of individual housing units, and incoming staff. (Jones Depo. at 187:14-188:13). Jones also tracked correctional officer compliance with conducting required searches through the shift commander's logs, incident reports, walking and being present in the facility, as well as reports from staff members. (Jones Depo. at 189:12-191:19). From my review, St. Clair staff understood ADOC and St. Clair policies and procedures for conducting contraband searches and complied with St. Clair SOP 110. Moreover, supervisory staff, including Jones, tracked contraband searches, and provided corrective action when officers deviated from policy.

St. Clair represents an aged facility and, as such, provides inmates numerous opportunities for misuse of physical plant materials as weapons. Staff experience greater difficulty readily identifying missing pieces of infrastructure in aged facilities as opposed to newer facilities where staff can more easily identify a missing piece of the physical plant. As facilities age, it becomes more difficult to identify when parts (such as a support at the bottom of a sink, or bunk or piece of a frame around a window) of the physical plant go missing. Dunn and the leadership of the ADOC proactively worked in FY 2016 and 2017 to address the physical plant needs of the ADOC. In my experience, inmates often misuse portions of the physical plant

**CONFIDENTIAL**

to create weapons, charge electronics, and many other unintended uses. I also possess experience with aged facilities which make it more difficult to conduct regular inspections and detect missing parts from an area.

Terrence McDonnel, in his deposition on November 28, 2018, testified that when he served as Acting Associate Commissioner for four months in 2015 that Grantt Culliver ("Culliver") already began using CERT teams at St. Clair to address problems and conduct shakedowns. He further testified that Culliver worked with graduates coming out of the academy and sent some to St. Clair for six-month assignments to supplement St. Clair's correctional staff. In addition, Culliver and Warden Estes ("Estes") were working together to bring staff in from Limestone to supplement both COs and supervisors. (McDonnel Depo. at 27:5-28:8).

Additionally, led by Daniels, ADOC conducted multiple institution wide searches in 2019.[10] Daniels referred to these searches as "Operation Restore Order;" the searches involved approximately three-hundred local, state, federal, and ADOC law enforcement officers. Dunn commented that "ADOC is committed to providing a safe workplace for our employees and protecting those who are in our custody. These joint operations are one of the many important steps our Department is taking to reduce the presence of contraband in our facilities, which will create safer environments for all. We are committed to continually improving facility safety, as well as other focus areas outlined in our recently released 2019-2022 Strategic Plan."

**Quality Improvement Team Meetings ("QIT") (ADOC027698-27838).**

In accordance with the agreement in the Duke case from November 1, 2017, ADOC initiated QIT meetings. Specific minutes highlight the attention St. Clair staff devoted to resolving challenges of staffing, introduction of contraband, classification matters, physical plant projects such as cameras and locks, and the definition of serious injury. These discussions about the definition of serious injury are not unique to the state of Alabama. It is my experience that these discussions were being held during ACA conferences, at ACA standards meetings, by other states and by private providers such as Correctional Corporation of America. The intent being to gain consensus on these definitions so that data being produced across the country could

---

[10]    **"ADOC    conducts    third    contraband    raid    in    five    months"**
https://www.montgomeryadvertiser.com/story/news/2019/06/13/adoc-conducts-third-contraband-raidfive-months/1447265001/

**CONFIDENTIAL**

be compared in a meaningful manner. The intent is not to skew data as alleged by the Plaintiff.

Examples of items discussed during QIT meetings, which included executive leadership of the Department, include the following:

On July 17, 2018, leadership agreed to meet monthly and ADOC tasked Inspector General Mark Fassl as chair the QIT. August 21, 2018, leadership held a QIT meeting to discuss the dashboard for incident reports. St. Clair leadership agreed to review the applicable SOP governing incident reporting. Warden Jones reported that staff participated in mandatory meetings which consist of reviewing standards and requirements. On October 16, 2018, QIT meeting members discussed the status of doors, call buttons, locks, fencing and cameras. Leadership also discussed the variations across correctional departments in defining serious and non-serious injury as defined by ASCA versus ADOC.

On December 18, 2018, the QIT discussed the status for the camera project in P/Q dorms, alternatives to overcome staff shortages, discussion of issues related to contraband, unauthorized movement, lock, and door repair and follow up on the definition of serious physical injury definition. Warden Jones shared that her observations are that the educational wing gives access for inmates to construct and introduce premium prison made weapons through the institution by throwing them over the fence. QIT members agreed that each weapon would be photographed and reviewed to determine the material used and possible area of origin. On February 13, 2019, The QIT discussed the development of internal classification audit processes for review by Dr. Jim Austin. The QIT discussed further the definition of "serious injury." Jones and the QIT members showed commitment and intentionality directed to resolve the security issues St Clair faced.

**Monthly Correctional Staff Meeting Minutes (ADOC030477-30693):**

Jones implemented monthly correctional staff and supervisor meetings. Warden Jones routinely communicated to the administrators of St. Clair expectations and processes staff were required to follow. Jones presented PowerPoints with clear guidance. In these meetings, Warden Jones highlighted ARs and SOPs. Specifically, Jones referenced AR 331 Security Inspection along with the documentation form staff must complete.

In these meetings the other Wardens, Captains, and Lt. Gordy (PREA) highlighted procedures that must be followed such as use of handheld wands, management of contraband, tracking of maintenance work order to repair items,

**CONFIDENTIAL**

cleanliness of the facility and grounds and PREA incidents and policies. Jones intentionally communicated expectations, guidance, policy, and procedure to those under her command. Jones and the supervisors under her held staff accountable for failures to perform according to policy. Having served for many years as a warden, I understand the challenges of day-to-day management of facilities when things are going well, and the facility is staffed at a high level. I also understand the challenges of management when resources are slim, physical plants are antiquated, and inmates are taking advantage of the situation. I also understand that decisions must be made to maximize the use of available resources and to let staff know that they are appreciated and valued. Without this understanding, staffing continues to deteriorate rather than improve.

Based on my experience, executive-level supervisors of a department of corrections (i.e., a Commissioner, Assistant Commissioner, Deputy Commissioner, and/or Institutional Coordinator) do not and cannot directly supervise or possess knowledge of the day-to-day activities of a facility. This remains true of ADOC. Executive staff develop ARs and SOPs which provide guidance as to the policies and procedures of the department and individual facilities. ADOC disseminates their policies and trains its correctional staff. Executive-level officials such as Dunn and Ellington do not directly supervise or possess detailed knowledge about the day-to-day activities of each of the twenty-six (26) ADOC facilities across the state of Alabama. Ellington oversaw multiple institutions within ADOC's Northern Region. Ellington worked tirelessly to respond to facilities in times of emergency, review and provide guidance on SOPs, and address specific issues within the facilities under his supervision. (Ellington Depo. at 39:22-43:10). Ellington testified during his deposition that he tried to visit each facility in the Northern Region each quarter, but he spent more time at the level five (5) facilities Limestone, Donaldson, and St. Clair. (Ellington Depo. at 43:2-10). Ellington visited St. Clair at least once a month, but sometimes more frequently depending on the facility's needs. (Ellington Depo. at 44:16-19).

Jones, as Warden of St. Clair, promulgated the facility SOPs. Jones delegated enforcement of the SOPs to correctional staff including captains, lieutenants, sergeants, and correctional officers. However, Jones reviewed incidents occurring within the facility, provided guidance and oversight to line staff, held correctional staff meetings to address any issues, approved discipline of inmates and staff, and walked the facility regularly to track compliance with St. Clair and ADOC policies and procedures. I found no evidence that any St. Clair staff, much less Jones, possessed knowledge of any specific risk of harm to Andrews posed by Davis or any other inmate. In my opinion, ADOC maintained appropriate policies related to

**CONFIDENTIAL**

searches and shakedowns in keeping with national standards. Moreover, ADOC trained its correctional officers in proper procedure for conducting contraband searches. Dunn and Ellington provided St. Clair with additional resources including staff to conduct required searches and fulfill daily operations. Additionally, ADOC and St. Clair conducted regular large scale facility wide searches of St. Clair. Complex, multifaceted systems with over two dozen locations across a state, like ADOC, require delegation to function.

As previously noted, Dunn and his direct reports focused on department-wide planning and soliciting support from the legislature. In addition, Dunn implemented leadership training to enhance the skills of those responsible for daily management of the facilities. Facility leadership, including wardens, sergeants, captains, and lieutenants, implemented policies and procedures into the daily operations of the facility and provided oversight of correctional officers for compliance. Correctional officers and correctional staff provided the direct implementation of ADOC and St. Clair policies and procedures. In my opinion the ADOC Officials appropriately delegated implementation and enforcement of policy and procedure to the correctional staff at St. Clair who possessed responsibility for the day-to-day operations of the facility. From my review, ADOC and St. Clair staff actively worked to identify and remove contraband weapons from the facility and hold inmates accountable through disciplinary action.

In the ADOC Annual Report for Fiscal Year 2016, ADOC augmented correctional staff by hiring CCOs for major facilities giving wardens the capability of assigning Correctional Officers to areas where they are most needed. The CCO position constituted a level 1 security guard, requiring 80 hours of training instead of the 12 weeks of training correctional officers receive in the academy. Further, SOP 057 outlined the duties and responsibilities of the cubicle officer. This SOP states: "F. At no time will the Population Cubicle Officer leave his/her post unless he/she has been properly relieved...."

In paragraph 210 of the Amended Complaint, Plaintiff alleges that, "Random patrols of the blocks by additional officers occurred extremely infrequently." Documentation in the logbooks on February 26, 2019, revealed that the CERT team from Limestone conducted security rounds throughout the day shift. In addition, I reviewed documentation showing that Captains made rounds, and the L cubicle logbook reflects that Warden Givens conducted a cell block check at 0606.

In my opinion, based on information provided and previously included in this report, ADOC used CERT teams from other facilities to supplement staff at St. Clair,

**CONFIDENTIAL**

and cubicle posts were manned allowing the constant monitoring of activities within the dorm. ADOC and St. Clair deployed the available resources in an intentional manner while the Dunn, Daniels, and the executive staff continued to develop and implement plans that required the support of the Governor and the Alabama legislature.

In the Amended Complaint at paragraphs 211 and 212, Plaintiff alleges that the housing blocks lacked adequate surveillance cameras to monitor the dorms, blind spots in the dorms, along with inadequate staff presence, and officer inattentiveness created a further substantial risk of serious harm to inmates. Dunn and ADOC recognized the limitations of St. Clair's physical plant and took intentional action to address those limitations. These actions are outlined in the Alabama Prison Transformation Initiative Information paper, which called for the consolidation of fourteen high and medium custody level prisons into four regional state of the art prisons. In 2017, Dunn provided further details in the Alabama Prison Transformation Initiative Information Paper and included information from independent studies and analysis. This plan acknowledged that forty-year-old correctional facilities required labor intensive security management to properly oversee offenders. The long-term approach was to replace existing facilities with efficient regional prisons.

In his annual Report for fiscal year 2016, Dunn reported that "facility improvements included a $4 million lock replacement project and security system upgrades at the St. Clair Correctional Facility." Fiscal year 2019 infrastructure projects included $142,755 for surveillance cameras in dorms P/Q dorms, $615,049 interior fence work, and $66,825 for cell dorm repairs in P/Q dorms.

The Amended Complaint also asserts in paragraph 222 that "defendants" failed to train and discipline subordinates. I reviewed of the training files for the ADOC employees in this case and they indicate that ADOC intentionally trained all staff to use external resources such as the National Institute of Corrections. I found no indication during my review of evidence produced that indicated St. Clair or ADOC leadership failed to discipline staff. It is my experience that when a facility faces the challenge of low staffing levels the normal practice is to support and encourage those staff for going above and beyond. Initiating discipline for minor infractions can result in suspensions which further exacerbates the staffing concerns. From my review of the documented evidence St. Clair disciplined staff and provided corrective action appropriately.

**CONFIDENTIAL**

**D.** **The ADOC Officials never implemented a policy for the establishment of a "Hot Bay" and St. Clair did not operate "Hot Bays."**

Plaintiff alleges in paragraphs 224 through 235 of the Amended Complaint that St. Clair housed inmates with histories of violence and disciplinary in the P/Q dorms without adequate supervision and monitoring; that the P/Q dorms were generally left unsecured so that inmates could roam freely and without supervision or interference in and out of the blocks and throughout the prison, and Mullins' attackers moved freely in and out of P/Q dorms in order to carry out the attack against him in L dorm.

St. Clair remains a security-level 5 or maximum-custody facility. The majority of inmates housed within St. Clair's general population either possess violent crimes of conviction and/or a history of violence and disruption within ADOC custody. St. Clair houses some of the most violent and dangerous inmates in Alabama. The inmates in the P/Q dorms are no different. Both Mullins and Jackson served sentences for violent crimes. As previously noted, Mullins' crime was extremely violent and resulted in the adoption of new statutory language in Alabama law to protect homosexual individuals. While incarcerated, Mullins exhibited disciplinary issues more numerous than even Jackson. I found that St. Clair placed both Jackson and Mullins appropriately in the P/Q dorms due to their security classifications.

As to the allegation that the P/Q dorms were generally left unsecured, I failed to find evidence of that in the information presented for this case. The PREA audit referenced the honor dorm as leaving doors unsecured, but did not present evidence related to P/Q dorms. Moreover, from my review of the deposition testimony in this case, St. Clair did not operate a "hot bay" dorm, instead multiple witnesses confirmed that due to the violent nature of the population at St. Clair all the population dorms housed violent individuals. But they agreed that no one dorm exhibited more violence than any other.

**E.** **The ADOC Officials maintained appropriate policies and procedures providing guidance to correctional staff in responding to instances of sexual abuse at St. Clair. St. Clair staff responded appropriately and within policy to Mullins allegations of sexual harassment.**

**CONFIDENTIAL**

St. Clair correctional staff acted upon allegations made verbally in person as well as those called on the phone. Lt. Price, Ragsdale, and Gordy each addressed Mullins' concerns for his safety and allegations of sexual abuse. Clearly, Mullins knew St. Clair's PREA policies, and accessed the hotline to report his allegations. However, early on Mullins failure to reveal his alleged aggressor inhibited staff's ability to intervene and substantiate Mullins' allegations.

As noted earlier in this report, in January 2024, EJI stipulated that "EJI Counsel never obtained or possessed any certifications or training pertaining to [PREA], any of its requirements or the auditing process conducted pursuant to PREA." (ADOC_Ezell_002329). In contrast, I served as a warden and then a supervisor over multiple jurisdictions when PREA was first enacted. I participated in establishing policies and procedures to comply with the standards established through PREA. I also supervised facilities during audits by trained PREA auditors. Finally, I served as an ACA Commissioner and on the ACA standards Committee as ACA developed standards to monitor and audit compliance with PREA regulations. In my current role as Director of Training, I supervise trainers who provide training to staff in the application of PREA standards.

It is my opinion after a review of the evidence produced in this case, that the ADOC Officials and St. Clair staff put in place and applied policies in alignment with expected practices under PREA standards. In fact, Dunn not only promulgated AR 454 on PREA, but ADOC executive staff led by PREA Director Vincent also modified AR 454 five (5) times between April 1, 2016, and May 31, 2017. These modifications included expectations of medical review when allegations occur, modifications of the risk factor assessment tool, new hotline numbers in the PREA pamphlet, and documentation of PREA rounds. The level of attention Vincent and other members of the executive staff gave to ADOC's PREA policies shows their commitment to maintaining policies compliant with current PREA standards. In addition, auditors conducted PREA audits at St Clair, and ADOC and St. Clair made adjustments in preparation for the audits, during the audits, and subsequent to the audits.

Plaintiff alleges in paragraph 246 of the Amended Complaint that the ADOC Officials "were aware, PREA, the PREA National standards, and ADOC's 2014 PREA policy required Defendants to fulfill their obligation to protect inmates in ADOC custody from sexual assault." I agree, and in my opinion, the staff at St. Clair took immediate action and pursued investigations wherever possible to protect inmates from sexual assault. When the alleged victim chooses not to reveal the name of the alleged aggressor, it makes the task considerably more difficult if not

**CONFIDENTIAL**

impossible. The ADOC Officials and St. Clair leadership set ARs and SOPs in place for staff at the facility to follow and trained staff on the proper implementation of those policies and procedures.

Further, in paragraph 247 of the Amended Complaint Plaintiff alleges that the ADOC officials were "deliberately indifferent to the substantial risk of serious harm that sexual violence posed to inmates such as Mr. Mullins." In my opinion, and from my review of the evidence, the ADOC Officials took deliberate action to ensure appropriate policies and procedures remained in place. St. Clair staff responded deliberately to Mullins' reports of sexual and physical assault. Staff moved Mullins twice in a twenty-four-hour period prior to the assault, provided access to medical twice in the same twenty-four-hour period, and at least two lieutenants interviewed Mullins during this period of time.

The PREA auditors who assessed St. Clair found the facility compliant with standards related to sexual risk assessments, medical assessments, and investigations (PREA standards 115.21, 115.22, 115.41 and 115.81). Between May 1 and 3, 2018, auditors conducted a PREA audit at St Clair. Auditors noted in the June 4 report that "[t]he PREA Director and PREA Compliance Manager responded professional and timely. The PREA Director and IPCM showed an amazing level of commitment and effort to come into compliance and show that compliance where they could." (ADOC-DS027455). This statement alone indicates that the staff of St. Clair were aware of and adhered to the PREA standards and their application.

Plaintiff focused on the auditor's finding that staff failed to secure doors. However, the audit findings related to the two doors of the honor dorm. The auditor wrote, "[t]he access doors to the "honor" unit are left unsecure on both sides, reported due to collapsing that control room's post as a result of staffing shortages." (ADOC-DS027495). In my experience, when faced with staffing challenges, this action is reasonable. The honor dorm inmates are those that earned the privilege of being assigned to that dorm through proper behavior and program participation. These inmates exhibited a recent history clear of violence and/or misbehavior. Moreover, inmates assigned to the honor dorm possess increased incentives to abide by program and facility rules or otherwise risk losing their honor dorm privileges and being moved to a different dorm. The audit report does not indicate that the security doors in the general population dorms were unsecured allowing free movement. Indeed, the open honor dorm doors did not cause or contribute to the incident in this case.

**CONFIDENTIAL**

The auditors found PREA standard 115.18 upgrades to facilities and technologies met PREA standards. (ADOC-DS027474). This standard relates to installed or updated video monitor system, electronic surveillance system or other monitoring technology, and considers how such technology may enhance the agency's ability to protect inmates from sexual abuse. Jones indicated that ADOC requested funds to complete a proposed camera plan, and ADOC already added cameras to the dorm dayrooms. The auditors specifically found that "based on policy and interviews, the facility is compliant as they always consider PREA with potential expansion or upgrades." PREA standard 115.21 relates to evidence protocol and forensic medical examinations. The auditor found St. Clair met this standard and found that "[St. Clair] is compliant on the standard. MOU with ACAR is good and facility practice is good." (ADOC-DS027475-27477).

PREA standard 115.22: relates to policies that ensure referrals of allegations for investigations. Items within this standard relate to administrative or criminal investigation completed for all allegations of sexual abuse and all allegations of sexual harassment. The auditor also found that "[p]olicy, other documentation, review of the website and interviews indicate the facility is compliant with this standard." (ADOC-DS027478-27479). Moreover, the audit determined that St. Clair exceeded the PREA standard for training and education, PREA standard 115.31. The auditor "[n]oted that annual sexual abuse awareness month presentations and newsletters for staff and inmate participation is exceptional as is the informational bulletin boards for staff." (ADOC-DS027479-27481).

Additionally, auditors found that St. Clair met PREA standard 115.41 relating to screening for risk of victimization and abusiveness. The auditor's finding states, "SCCF is compliant with the elements of this standard. The screening process appears to work well identifying potential victims and/or predators." (ADOC-DS027489-27493). St. Clair also achieved compliance with PREA standard 115.61, which addresses staff and agency reporting duties. The auditor stated, "Compliant. Based on the policy and interview with staff, the facility meets the standard." (ADOC-DS027506-27508). PREA standard 115.81 addresses medical and mental health screenings and history of sexual abuse. The PREA auditors determined St. Clair exceeded standards with regard to PREA standard 115.81. The finding specifically stated that "SCCF has a good screening tool and does very good at referring to mental health as appropriate. Mental health provides input to high level victim prone or abusive prone inmates prior to placement. Auditor watched this process and feels the facility exceeds the standard." (ADOC-DS027528-27530).

**CONFIDENTIAL**

Auditors determined that St. Clair did not meet PREA standard 115.67 related to agency protection against retaliation because "staff may place an inmate who reported sexual abuse, who may also be a victim of sexual abuse, in a specific side of a unit and potential aggressors on the other side." Jones took immediate action and issued a directive for staff to enforce the policy/procedure on separation of inmates at high risk for victimization and those at high risk for abusiveness.

It is important to note that correctional staff relocated Mullins, to a different dorm (P and then L) twice on the date of the report and not merely moved him to another side of the same dorm. It is my professional opinion that Dunn and the leadership team constantly communicated directives related to PREA compliance and sent staff to National Institute of Corrections training in order to meet or exceed PREA standards and expectations. Vincent exhibited a depth of knowledge in PREA standards as did Jones. The PREA auditor remarked that Vincent and the St. Clair IPCM possessed knowledge and understanding of PREA standards and their implementation in the facility.

### F.    Eighth and Fourteenth Amendments State-Created Danger

In paragraphs 294-305 of the Amended Complaint, Plaintiff incorporates much of the information already discussed in this report. Therefore, I will not revisit the repetitive allegations and responses to those allegations. I briefly address two statements made in this section.

In paragraph 304 Plaintiff asserts that "[t]he misconduct described in this cause of action was undertaken with deliberate indifference, malice, willfulness, and/or reckless indifference to the rights of inmates such as Mr. Mullins and was objectively unreasonable." The evidence produced in this case reveals that the staff at St. Clair worked diligently to adhere to the administrative regulations and standard operating procedures deployed by the department.

Further the monthly staff meetings, QIT meetings, and efforts to fully meet each standard of the National PREA Resource Center demonstrate a definitive approach to ensuring compliance with standards and procedures. In addition, as presented earlier in this report, Dunn constantly worked to engage support and funding for various initiatives to address staffing and physical plant challenges.

Plaintiff further asserts in paragraph 305 of the Amended Complaint that "[t]hese Defendants' misconduct directly and proximately caused Mr. Mullins to be subjected to a substantial risk of serious harm and caused him to suffer horrific

**CONFIDENTIAL**

physical and emotional injuries and death." Plaintiff completely ignores the many occasions where correctional staff at multiple facilities worked to identify options to keep Mullins safe. Plaintiff's allegations that the ADOC Officials created a danger of serious harm to Mullins and inmates at St. Clair lacks merit.

## G.    Count IX – State Law Wrongful Act or Omission Resulting in Death

In paragraphs 347-357 of the Amended Complaint Plaintiff repeats the allegations already discussed in this report. The evidence remains clear that Dunn, the ADOC Officials, and St. Clair staff took concerted action to address the needs of the ADOC including allocating vast resources to security improvements to St. Clair. Plaintiff and Pacholke with the benefit of hindsight, argue that the ADOC Officials and St. Clair staff ignored violence and the safety of inmates at St. Clair. But that is not true from the record in this case. Instead, the record remains clear that the ADOC Officials and St. Clair staff worked tirelessly to improve conditions at St. Clair and provide for the safety and security of the inmates in their custody with resources available to them.

## CONCLUSION

The ADOC Officials faced challenges with the level of violence, contraband availability, and physical plant deficiencies at St. Clair. However, the ADOC Officials acted deliberately and intentionally to improve the conditions at St. Clair for the inmate population and the brave staff who served at the facility every day. The challenges ADOC faced are not unique to ADOC. Departments of corrections across the nation, including agencies I served in the past, face these challenges head on. Dunn and the ADOC Officials did not turn a blind eye to ADOC's challenges, staffing demands, antiquated facilities, contraband weapons and drugs. Instead, Dunn and the ADOC Officials expended significant effort and resources to achieve long lasting improvements and change within ADOC. Plaintiff's contention that the ADOC Officials caused Mullins' death, fails to recognize the great lengths and vast resources the ADOC Officials dedicated to improving safety and security at St. Clair and throughout the ADOC.

I found no evidence that indicates the ADOC officials were negligent, much less intentionally or unintentionally ignored the risk of harm to inmates within ADOC custody. To the contrary, I find that ADOC officials were consistently engaging the executive and legislative branches of government to address the needs of the department, were engaging resources of subject matter experts to find more effective methods to address challenges, and providing leadership training to

**CONFIDENTIAL**

enhance necessary skills to direct staff in a manner consistent with the policies promulgated by ADOC Officials.

With my 47 years of experience as a correctional officer, Associate Warden, Warden, Correctional Administrator in both private and state operations responsible for multiple facilities, as an auditor for the ACA, and involvement with the development and implementation of PREA standards, coupled with the facts identified above, it is my firm opinion that the ADOC Officials and St. Clair staff were not responsible for Mullins' death. It is my expert opinion that the ADOC Officials demonstrated continued commitment to addressing safe and secure operations and did not fail to protect Mullins from harm. I very much appreciate the opportunity to work with the employees of the State of Alabama and appreciate their dedication to serving the State of Alabama and her constituents.

I was not instructed, required, or paid any additional compensation to reach any conclusions or directed to make any specific findings, as the above represents my own conclusions. The opinions identified above are based upon my independent professional review of the particular facts in this case along with my experience. My compensation is not dependent upon the results obtained in this action. Nevertheless, I am prepared to testify before the applicable court regarding these opinions.

I reserve the right to supplement or revise my report and my opinions in the event that new or revised information becomes available.

Date: December 20, 2024

/s/ Kevin Bradley Myers
Kevin Bradley Myers

**CONFIDENTIAL**

Exhibit A- Professional Curriculum Vita Kevin Myers

**Kevin Myers**
**4Square Corrections, LLC**

**Objective:** Continue to share experience and add value to the correctional industry through:
- Support of new technologies,
- Linkage of classification, risk needs assessments and program work assignments,
- Security, program, ACA inspections and audits
- Expert witness

**Education:**

- **Ralston High School** – 1972

- **Phillips University**- Enid, Oklahoma- 1977 Bachelor of Arts

  o    Political Science and minors in German and Sociology

- **Oklahoma University** MPA-1978-1980

  o    Completed 36 hours with focus on program planning and evaluation coursework culminating in thesis on "Social Climate in Oklahoma Prison". Did not complete oral presentation.

**Work and Related Experience:**

I possess forty-seven (47) years of varied correctional experiences with increasing supervision and management responsibilities. I previously testified in various federal courts on numerous occasions and presented at numerous conferences.

**Oklahoma Department of Corrections** *(1976-1990)*
- **Correctional Treatment Officer** (August 1976– August 1978).

  o    Responsible for first ACA accreditation in 1978.

- **Correctional Case Manager I, II, and III** Planning and Research (August 1978– February 1981).

- **Assistant Superintendent Clara Waters** CTC (February 1981– November 1983).

- **Executive Assistant to Director** (November 1983-June 1984).

  o    Served as legislative liaison, responded to grievances, investigated issues,

**CONFIDENTIAL**

and served as a communication link with Deputy Directors.

- **Administrator House Arrest** (June 1984-March 1986).

  - Served as the first administrator and established policy and procedure for the House Arrest security level.
  - Achieved static population in excess of 1200 inmates.
  - Significant responsibilities included constant communication with legislators, media, and other law enforcement agencies.

- **Deputy Warden Joseph Harp Correctional Center** (March 1986– June 1990)

  - Responsible for daily operations of an 880-bed medium security facility.
  - Significant accomplishments include:
    - implementation of unit management, master roster for correctional officers, and Specialized Mental Health Unit.

## Corrections Corporation of America (1990-2016)

- **Assistant Warden Venus Prerelease Center** (June 1990– October 1992)

  - 500 bed Prerelease Operated for Texas Department of Criminal Justice

- **Assistant Warden South Central Correctional Center** (October 1992– May 1994)

  - 1,506 bed Medium/Close Facility operated for Tennessee Department Correction.
  - Instrumental in development and rolling out Incident Command Systems throughout the company.

- **Warden South Central Correctional Center** (May 1994– May 2005).

  - 1506 bed Medium/Close Facility operated for Tennessee Department Correction which included Step Up and Step-Down units for Mental Health.
  - While in this position worked with Gary Mohr to develop Unit management CCA Way and was a certified Seven Habits Trainer.

- **Managing Director Division V** (May 2005-October 2014)

  - Supervised nine Wardens and Operations in Tennessee, Kentucky, Minnesota, and Idaho.

- **Director of Activations and Transitions** (October 2014– October 2016)
  - Start-up activities for institutions, immigration detention facilities, and

**CONFIDENTIAL**

      family immigration facilities.
- Collaborated with construction teams and contractors to manage project deployment and tracking.

## Tennessee Department of Correction (2016– May 2023)

- **Probation and Parole Administrator** (November 2016– September 2018)

    - Responsible for the oversight and leadership of Nine Probation and Parole Districts in Middle and West Tennessee consisting of over 23,000 active offenders and over 8,000 administrative offenders.
    - During this period Tennessee enacted the Public Safety Act of 2016 and I served on the work group to implement a risk needs assessment process throughout the department.
    - I achieved significant increases on behalf of the Tennessee Department of Corrections in performance as measured by Office of Internal compliance.

- **Correctional Administrator** (September 2018–May 2023)

    - Responsible for the oversight and leadership of the four ACA accredited institutions in Middle Tennessee until July 2022 then asked to assist and supervise operations in West Tennessee.
    - Facilities where I served possessed a wide range of missions, and included the Tennessee Prison for Women, Riverbend Maximum Security Institution, Lois DeBerry Special Needs Institution, and the Turney Center Industrial Complex.
    - In addition to Correctional Administrator, I served as the acting Warden at Turney Center through the pandemic.
    - I also served at the following west Tennessee facilities: Northwest Correctional Complex; West Tennessee State Penitentiary; West Tennessee Rehabilitation Center; and Mark Luttrell Transition Center.

## Professional Certification and Training:

- **Signature Executive Program**-Scarlett Leadership Institute Belmont University- May 2009.
- **Art of M&A– M&A Leadership Council–** June 2016.
- **Probation and Parole Chief Executives–** NIC Academy Colorado– March 2018.
- **Advanced Incident Command System for Corrections–** NIC Academy Online- January 2020.
- **Talk, Listen, Connect (TLC) Workforce Suicide Prevention Training–** Tennessee Mental Health and Substance Abuse Services– January 2020.
- **2020 LEAD Tennessee Leadership Development–** Tennessee State University— December 2020.
- **Correctional Behavioral Health Certification with Honors–** American

**CONFIDENTIAL**

Correctional Association-April 2021.

**Professional and Community Involvement:**

- **Member American Correctional Association** since 1978.
- **Member of North American Association of Wardens and Superintendents–** Board member.
- **Member of Southern States Correctional Association and Tennessee Correctional Association.**
- **Executive Board member of Make-A-Smile** (Currently Project Manager for upcoming project in Breathitt County Kentucky) Make-A-Smile.Org.
- **Cumberland Presbyterian Church**
- **Elder and Pianist at Waynesboro Cumberland Presbyterian Church.**
- **Tennessee Department of Correction Risk Needs Assessment Steering Committee-**2016-2020.
- **Tennessee Department of Correction Restrictive Housing Step Down Committee–** 2019-2023.
- **Tennessee Department of Correction Withdrawal Management Team–** 2022-2023.
- **Behavioral Intervention Ad Hoc Committee–** American Correctional Association– 2021.
- **Adult Corrections Committee–** American Correctional Association– 2021 and 2023.

**Publications:**

- Corrections Today January/February 2023- "Thoughts on Workforce culture, morale, recruitment and retention."

## Exhibit B - Documents Reviewed.

1. ADOC-Guy Amended Complaint Doc. 40
2. Incident Report (ADOC(Guy)_004268).
3. Jackson, Clarence Inmate Movement History (ADOC002772-2780).
4. Jackson, Clarence Inmate File (ADOC001466-2771).
5. Mullins, Stephen Inmate Movement History (ADOC000615-620).
6. Mullins, Stephen Inmate File (ADOC00001-000614).
7. https://en.wikipedia.org/wiki/The_Akron_Beacon_Journal
8. Billy Jack - Statement of Steven Eric Mullins | Assault on Gay America | FRONTLINE | PBS
9. (University of Alabama: University Libraries | Empowering Voices. 2023-05-31)
10. A Homophobic Murderer Has Been Stabbed to Death in Prison
11. SCCF Duty Post Logs July 2018-December 2018 (ADOC014122-16780).
12. SCCF Duty Post Logs January 2019-March 2019 (ADOC016781-18182).
13. Alabama Department of Corrections https://doc.alabama.gov/Mission
14. Annual Report Fiscal Year 2015 (ADOC(Guy)_002111-2164).

**CONFIDENTIAL**

15.  Annual Report Fiscal Year 2016 (ADOC(Guy)_002165-2219).
16.  Annual Report Fiscal Year 2017 (ADOC(Guy)_002220-2273).
17.  Annual Report Fiscal Year 2019 (ADOC(Guy)_002274-2320).
18.  Alabama Pre-Legislative Session Budget Hearing January 30, 2019, (ADOC_Ezell_2274-2285).
19.  ADOC Male Classification Manual (ADOC027596-27678).
20.  SCCF SOP 031_Staffing (ADOC011672-11680).
21.  SCCF SOP 032 Staff Manning Requirements (ADOC011693-11698).
22.  SCCF SOP-001_standard Operating Procedure (ADOC029613-29622).
23.  SCCF SOP-037_standard Operating Procedure the Shift Commander.pdf
24.  SCCF SOP-057_Population Cell Block Cubicle Officer (ADOC029801-29805).
25.  SCCF SOP-069_Correctional Cubicle Operator (ADOC029882-29885).
26.  SCCF SOP-083_ Inmate Control Systems (ICS) (ADOC011707-11714).
27.  SCCF SOP-090_Housing Designation (ADOC029956-29959).
28.  SCCF SOP 110_Search and Shakedowns (ADOC11750-11758).
29.  SCCF SOP 137_Inmate Movement Control (ADOC011759-11763).
30.  SCCF SOP 229_Inmate Sexual Abuse and Harassment (ADOC030375-30402).
31.  SCCF SOP 230_Inmate Sexual Abuse Coordinated Response (ADOC030434-30442).
32.  Prisons and Jail standards PREA
33.  Ohio Risk Assessment System | National Institute of Corrections
34.  Alabama Prison Transformation Initiative Information Paper (ADOC(Guy)_002419-2426)
35.  2017 Prison Transformation Initiative Booklet (ADOC(Guy)_002321-2362).
36.  Equal Justice Initiative Stipulation Duke v. Hamm (ADOC(Guy)_004337-004342).
37.  Keeping Vulnerable Populations Safe Under PREA: Alternative Strategies to Use of Segregation in Prisons and Jails. April 2015.
38.  Cynthia Caver Deposition Transcript
39.  Edward Ellington Deposition Transcript
40.  Eric Garrett Deposition Transcript
41.  Gary Malone Deposition Transcript
42.  Karla Jones Deposition Transcript
43.  Terrence McDonnel Deposition Transcript
44.  https://www.montgomeryadvertiser.com/story/news/2019/06/13/adoc-conducts-third-contraband-raidfive-months/1447265001/
45.  Quality Improvement Team Meeting Minutes (ADOC027698-27838).
46.  Duke EJI Stipulation (ADOC_Ezell_002327-2332).
47.  Monthly Security Staff Meeting Minutes
48.  Dan Pacholke Report
49.  PREA Audit SCCC May 1-3, 2018
50.  Prison   Rape   Elimination   Act   Prisons   and   Jail   standards (prisonsandjailsfinalstandards_0.pdf).

**CONFIDENTIAL**