FILED

2025 Mar-03  PM 08:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

# In The Matter Of:

# Lakeisha Ezell v. Jefferson Dunn, et al.

---

Anthony Brooks

*August 7, 2024*

---

Bain & Associates Court Reporting Services, Inc.

505 20th Street North

Suite 1250

Birmingham, AL 35203

Toll Free 1.888.326.0594

Lakeisha Ezell v. Jefferson Dunn, et al.

Anthony Brooks
8/7/2024

```
 1        IN THE UNITED STATES DISTRICT COURT
 2     FOR THE NORTHERN DISTRICT OF ALABAMA
 3              MIDDLE DIVISION
 4             **CONFIDENTIAL**
 5
 6 LAKEISHA EZELL, as        )
 7 representative of the     )    Honorable Judge
 8 ESTATE OF TERRENCE ANDREWS,) Annemarie Carney Axon
 9      Plaintiff,           )
10 VS.                       )        Case No.
11 JEFFERSON DUNN, et al.,   )    4:20-cv-02058-ACA
12      Defendant.           )
13                               DEPOSITION OF:
14 LORI GUY, as representative)    ANTHONY BROOKS
15 of the ESTATE OF STEVEN   )
16 MULLINS,                  )        Case No.
17      Plaintiff,           )    4:21-cv-00264-SGC
18 VS.                       )
19 JEFFERSON DUNN, et al.,   )
20         S T I P U L A T I O N S
21
22        IT IS STIPULATED AND AGREED, by and between
23 the parties through their respective counsel, that
24 the deposition via Zoom of:
25         ANTHONY BROOKS,
                                            Page 1
```

```
 1 may be taken before LeAnn Maroney, Notary Public,
 2 State at Large, at Bain & Associates, 1250 Financial
 3 Center, Birmingham, Alabama, 35203, on August 7,
 4 2024, commencing at 9:01 a.m.
 5
 6        IT IS FURTHER STIPULATED AND AGREED that the
 7 signature to and reading of the deposition by the
 8 witness is waived, the deposition to have the same
 9 force and effect as if full compliance had been had
10 with all laws and rules of Court relating to the
11 taking of depositions.
12
13        IT IS FURTHER STIPULATED AND AGREED that it
14 shall not be necessary for any objections to be made
15 by counsel to any questions, except as to form or
16 leading questions, and that counsel for the parties
17 may make objections and assign grounds at the time
18 of the trial, or at the time said deposition is
19 offered in evidence, or prior thereto.
20
21
22             ***
23
24
25
                                            Page 2
```

```
 1            A P P E A R A N C E S
 2
 3 FOR THE PLAINTIFF: (Via Zoom)
 4        MEGAN PIERCE
 5        Attorney at Law
 6        Loevy & Loevy
 7        311 N. Aberdeen, 3rd Floor
 8        Chicago, Illinois 60607
 9        megan@loevy.com
10
11 FOR THE DEFENDANT: (Via Zoom)
12        CAITLIN COBB
13        Attorney at Law
14        Capell & Howard
15        150 South Perry Street
16        Montgomery, Alabama  36104
17        caitlin.cobb@chlaw.com
18
19 FOR THE DEFENDANT: (Via Zoom)
20        DANIEL CHISM
21        Attorney at Law
22        Butler Snow
23        200 West Side Square, Suite 100
24        Huntsville, Alabama  35801
25        daniel.chism@butlersnow.com
                                            Page 3
```

```
 1              I N D E X
 2       MS. PIERCE:    7-151
 3       MR. CHISM:    151-164
 4
 5
 6
 7          E X H I B I T S
 8 PLAINTIFF'S EXHIBIT NO:               PAGE
 9 1  - 12-29-18 duty officer report       29
10 2  - 12-29-18 duty post log             31
11 3  - Inmate movement history           35
12 4  - Inmate movement history           43
13 5  - Classification summary            45
14 6  - 10-22-18 incident report          51
15 7  - 7-17-18 incident report           60
16 8  - Emails                            69
17 9  - Emails                            75
18 10 - Email                             77
19 11 - Email                             82
20 12 - 2-26-19 duty officer report       84
21 13 - Email                             87
22 14 - Emails                            93
23 15 - Email                             98
24 16 - Vulnerability analysis           116
25 17 - 3-23-18 incident report          128
                                            Page 4
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 1 (1 - 4)

Lakeisha Ezell v. Jefferson Dunn, et al.

Anthony Brooks
8/7/2024

1  18 - Email                                    133
2  19 - Email                                    136
3  20 - Email                                    138
4  21 - Security staff meeting notes             145
5  22 - Email                                    148
6  23 - PREA audit report                        149

```
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                       Page 5
```

```
 1 pay.
 2              We are agreeing with defense counsel not
 3 to ask those questions at these depositions, but
 4 that we will not be waiving our right to seek that
 5 information while we wait for the Court to resolve
 6 the issue.
 7 EXAMINATION BY MS. PIERCE:
 8 Q.           Mr. Brooks, my name is Megan Pierce, and
 9 I'm an attorney for the plaintiffs, Lakeisha Ezell
10 and Lori Guy, in this matter.
11              Where are you currently while you're
12 sitting for this deposition?
13 A.           I'm at home.
14 Q.           Is there anyone in the room with you?
15 A.           No.
16 Q.           Mr. Brooks, have you ever been deposed
17 before?
18 A.           Yes.
19 Q.           About how many times?
20 A.           I'm not sure.  Probably four, five, six.
21 I don't know.  I can't remember.
22 Q.           Were these all in relation to your job
23 with ADOC?
24 A.           Yes.
25              I'm going to just go over the rules of
                                       Page 7
```

```
 1              I, LeAnn Maroney, a Court Reporter of
 2 Birmingham, Alabama, and a Notary Public for the
 3 State of Alabama at Large, acting as commissioner,
 4 certify that on this date, pursuant to the Federal
 5 Rules of Civil Procedure and the foregoing
 6 stipulation of counsel, there came before me on
 7 August 7, 2024, ANTHONY BROOKS, witness in the above
 8 cause, for oral examination, whereupon the following
 9 proceedings were had:
10              ANTHONY BROOKS,
11 being first duly sworn, was examined and testified
12 as follows:
13        THE REPORTER:  Usual stipulations?
14        MS. COBB:  Yes.
15        MS. PIERCE:  Yes.
16        MR. CHISM:  Yes.
17        MS. PIERCE:  I'll just put one
18 additional stipulation on the record that we
19 discussed before we went on the record today.
20        The parties are still waiting for the Court
21 to resolve their dispute regarding the
22 appropriateness of discovery into punitive damages.
23 Plaintiffs aren't going to ask questions at this
24 deposition and the subsequent depositions about the
25 defendants' punitive damages and their ability to
                                       Page 6
```

```
 1 the deposition.  I know you've been deposed before.
 2 But I just want to make sure that we're all on the
 3 same page.
 4              So I'm going to ask you questions, and
 5 you're going to give answers under oath just as if
 6 you were in a courtroom.  Okay?
 7              If you don't understand a question,
 8 please ask for clarification.  If you don't ask for
 9 clarification, I'll assume you understood the
10 question.  Is that fair?
11 A.           Yes.
12 Q.           And then let's try to -- we'll both try
13 to make sure that we don't talk over each other for
14 the court reporter's sake.  So I'll try to make sure
15 that I wait until you're done with your answer
16 before I ask another question.  And if you could
17 wait until I finish my question before you start
18 answering, I think that will help the court
19 reporter.  Okay?
20 A.           Okay.
21 Q.           And please make sure to give audible,
22 verbal answers.  Instead of shaking or nodding your
23 head, make sure to say yes or no.  And make sure to
24 speak loudly and clearly so the court reporter can
25 hear you.  Okay?
                                       Page 8
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 2 (5 - 8)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

| | |
|---|---|
| 1 **A.**        Okay. | 1 reports or other documentation relating to Steven |
| 2 Q.        And if your lawyer objects, you must | 2 Mullins or Terrence Andrews? |
| 3 still answer the question unless she instructs you | 3 **A.**        No. |
| 4 not to. | 4 Q.        Mr. Brooks, when did you join ADOC? |
| 5        And then finally, we can take a break at | 5 **A.**        July of 1994. |
| 6 any point.  I just ask if a question is pending, | 6 Q.        And when did you become warden I? |
| 7 that you answer that question.  And then we can go | 7 **A.**        August 2016. |
| 8 ahead and take a break.  Okay? | 8 Q.        And have you been working continuously |
| 9 **A.**        Okay. | 9 for ADOC since -- I think you said 1994, correct? |
| 10 Q.        Mr. Brooks, do you have any medical | 10 **A.**        Yes. |
| 11 conditions or are you taking any medication that | 11 Q.        And you've been working continuously for |
| 12 would affect your ability to testify truthfully and | 12 ADOC during that time? |
| 13 fully here today? | 13 **A.**        Yes. |
| 14 **A.**        No. | 14 Q.        When was the first time that you worked |
| 15 Q.        Do you have any conditions or are you | 15 at St. Clair? |
| 16 taking any medication that would affect your memory? | 16 **A.**        August 1, 2019.  2016. |
| 17 **A.**        No. | 17 Q.        Okay.  So the first time you worked at |
| 18 Q.        And I'm going to ask you a few questions | 18 St. Clair was when you were promoted to warden I; is |
| 19 about your preparation for this deposition.  But I | 19 that correct? |
| 20 want to start by saying I'm not asking for any | 20 **A.**        Yes. |
| 21 substantive information about what you discussed | 21 Q.        And what were your responsibilities as |
| 22 with your attorneys.  Okay? | 22 warden I at St. Clair? |
| 23 **A.**        Okay. | 23 **A.**        I was responsible for the TC program, |
| 24 Q.        Did you do anything to prepare for your | 24 most of the programs that the inmates was involved |
| 25 deposition today? | 25 in, classification, the chaplain services.  I think |
| Page 9 | Page 11 |

| | |
|---|---|
| 1 **A.**        Did I do anything like -- what you mean | 1 that's mostly -- education. |
| 2 by "do anything"? | 2 Q.        Anything else that you can remember? |
| 3 Q.        Did you speak with your attorneys to | 3 **A.**        That's most of all -- I think that's |
| 4 prepare for your deposition today? | 4 most of it. |
| 5        MS. COBB:  And, Mr. Brooks, I'll | 5 Q.        When you say you were responsible for |
| 6 instruct you not to disclose any of the things that | 6 those areas, does that mean you were supervising and |
| 7 we discussed in our meeting. | 7 running those areas?  What do you mean by that? |
| 8 **A.**        Yes. | 8 **A.**        Well, they were -- okay.  So the -- I |
| 9 Q.        How many times did you speak with your | 9 sort of -- each area had their own supervisor.  But |
| 10 attorneys? | 10 I was sort of -- I sort of managed the manager of |
| 11 **A.**        Once. | 11 those areas, classification manager.  You know, I |
| 12 Q.        Did you speak with anyone else about | 12 worked hand in hand with the Gadsden State director |
| 13 your deposition today? | 13 that was there, the chaplain.  You know, I managed |
| 14 **A.**        No. | 14 those guys.  I wrote their annual evaluations. |
| 15 Q.        Have you spoken with any of the other | 15 Q.        So it would be fair to say, for example, |
| 16 defendants outside the presence of your attorneys? | 16 with regard to classification, Nekitris Estelle, the |
| 17 **A.**        No. | 17 head of classification, was reporting directly to |
| 18 Q.        Did you review any documents in | 18 you? |
| 19 preparation for your deposition? | 19 **A.**        Yes.  At that particular time, yes. |
| 20 **A.**        No. | 20 When I started there, yeah. |
| 21 Q.        Did you review the complaints in this | 21 Q.        Did that change at any point? |
| 22 matter? | 22 **A.**        Yes.  It changed when Warden Jones got |
| 23 **A.**        I got them.  I get so many, I just -- | 23 there.  She took over classification.  She started |
| 24 you know, I didn't -- I didn't read over them. | 24 managing classification. |
| 25 Q.        Did you review any of the incident | 25 Q.        Do you know why that change was made? |
| Page 10 | Page 12 |

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 3 (9 - 12)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
**8/7/2024**

1 A.          I'm not sure.  I guess she just wanted
2 to manage it, that department.
3 Q.          I'm sorry?
4 A.          I said I guess she just wanted to manage
5 that department.  I'm not sure why.
6 Q.          Did you have any conversation with her
7 about it?
8 A.          No.
9 Q.          When Warden Jones -- strike that.
10             Can you tell me what your
11 responsibilities were once Warden Jones took over?
12 A.          Mainly the TC program and education.
13 Q.          Anything else?
14 A.          I can't remember what other
15 responsibilities she had given me.
16 Q.          Were you responsible, together with the
17 other wardens, for overseeing the captains?
18 A.          You know, of course I was the warden and
19 they were captains.  But I didn't have -- I could
20 authorize or ask them to do things.  But as far as
21 having them -- being responsible for them, no.
22 Q.          Who would you say was responsible for
23 the captains?
24 A.          Most of the time, the warden II who was
25 in charge of security.

*Page 13*

1 Q.          And who was in charge with overseeing
2 the shift commander?
3 A.          That would be the captain's
4 responsibility, the captain over population, over
5 general population.
6 Q.          And the captain over population, was
7 that always the same person?  Or did that change
8 depending on the day or shift?
9 A.          No.  It was always the same person.  You
10 had a captain that was administrative and you had a
11 captain that was over the restrictive housing.  You
12 had one over the general population.
13 Q.          Who was the captain over population in
14 the 2018 time frame?
15 A.          I think Captain White.
16 Q.          And as warden I, did you have any
17 responsibility for assigning the staff to posts on
18 their shift?
19 A.          No.  I didn't -- I didn't take on that
20 responsibility.
21 Q.          And who would have been -- I'm sorry.
22 Go ahead.
23 A.          You said for the posts of the staff?
24 Q.          Yes, security.
25 A.          The security staff, mainly the shift

*Page 14*

1 commander, the captain, and the warden II who was
2 directly over security.
3 Q.          And did you have any responsibility
4 relating to contraband searches while you were
5 warden I?
6 A.          Well, contraband searches was
7 everybody's responsibility.
8 Q.          And what do you mean by that?
9 A.          I'm saying, you know, we search for
10 contraband.  That was -- that was one of the things
11 that -- you know, it was daily.  It was done daily.
12 Q.          The policy required searches to be done
13 at certain times, some searches to be done daily,
14 some to be done --
15 A.          Well, most --
16             MS. COBB:  Object to form.  I was
17 objecting.  You can answer, Warden Brooks.
18 Q.          Let me reask the question.
19             Did policy have requirements with regard
20 to when contraband searches had to be done?
21             MS. COBB:  Object to form.  You can
22 answer.
23 A.          Yes.  Normal policy should have been --
24 every shift should search for contraband.
25 Q.          Okay.  So fair to say every officer on

*Page 15*

1 their shift should be doing some searches for
2 contraband?
3 A.          Yes, it's fair to say that.
4 Q.          And who would have been responsible for
5 making sure that those daily contraband searches
6 were done?
7 A.          I think those reports was sent directly
8 to the captain that was over general population and
9 the warden II.
10 Q.          And did you have any responsibilities
11 for making sure that staff at St. Clair were
12 carrying out their obligations with regard to PREA?
13 A.          Again, PREA was everybody's
14 responsibility that worked there.
15 Q.          I understand that everyone had
16 responsibilities under PREA.  Who would have been
17 responsible for making sure that staff or
18 subordinates were carrying out their obligations
19 with regard to PREA and that PREA was being complied
20 with at St. Clair?
21 A.          Well, we had --
22             MR. CHISM:  Object to the form.
23 A.          We had a PREA officer that PREA
24 incidents were reported to.  And that was Lieutenant
25 Gordy.  And the head warden.

*Page 16*

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 4 (13 - 16)

Lakeisha Ezell v. Jefferson Dunn, et al.

Anthony Brooks
8/7/2024

1 Q.        So I want to make sure I understand your
2 testimony correctly.  Your testimony is that the
3 PREA manager, Lieutenant Gordy, and the head warden,
4 Ms. Jones, would have been responsible for making
5 sure that PREA was complied with at St. Clair?
6          MR. CHISM:  Object to the form.
7 A.        I can answer that?
8 Q.        Yes.
9 A.        Yeah.  Yeah.  So if there was a PREA
10 incident, then some type of PREA notice, it would
11 always go to Lieutenant Gordy.  And she would report
12 it to the head warden, whoever was in charge at the
13 time.
14 Q.        You mean whoever was the head warden at
15 the time?
16 A.        Yes.
17 Q.        Fair to say that the head warden at the
18 time, Warden Jones, in late 2018 and early 2019 and
19 the PREA manager, Lieutenant Gordy, would have been
20 responsible for making sure that the PREA
21 requirements were followed with regard to each PREA
22 incident that was reported?
23          MR. CHISM:  Object to the form.
24 A.        Yes.  Lieutenant Gordy, she received the
25 PREA incidents.  She reported it to the head warden.
Page 17

1 That's who she -- that's who managed her.
2          MS. COBB:  Let's go off the record for
3 just a second.
4          (Discussion held off the record.)
5 Q.        Mr. Brooks, in the 2018, early 2019 time
6 frame, did you participate in any regular meetings
7 as warden I?
8 A.        Yes.  We had -- we had administrative
9 meetings.
10 Q.        And how often -- I'm sorry.  Go ahead.
11 A.        Daily.
12 Q.        And who was involved in those daily
13 meetings?
14 A.        The three captains and three wardens.
15 And once a week, we would have the department heads.
16 The department heads, we participated in meetings
17 daily.
18 Q.        And who are the department heads?
19 A.        Estelle, the head of -- the health
20 services administrator, the chaplain, the
21 administrator over education, the chief steward.
22 Those are department heads.
23 Q.        Did you participate in any other regular
24 meetings while you were a warden I?
25 A.        Yes.  We participated -- like I say,
Page 18

1 daily we had the administrative staff, which was the
2 three wardens and three captains.  We had meetings
3 daily.
4 Q.        And what types of things would you
5 discuss at the daily administrative meetings?
6 A.        Just events that happened the day before
7 or what we was planning on going forward through the
8 week or whatever.
9 Q.        Did you ever discuss problems or issues
10 that you were trying to address at St. Clair?
11 A.        Sometimes, yes.  Most -- yes.
12 Q.        And when would you discuss -- strike
13 that.
14          Did you ever discuss problems relating
15 to staff not carrying out contraband searches?
16 A.        It could have been a topic.
17 Q.        But you don't recall?
18 A.        I don't recall.
19 Q.        Did you ever discuss particular problems
20 with violence in the P-Q blocks?
21          MS. COBB:  Object to form.
22 A.        Yeah, that was a topic.  That was a
23 topic we discussed.
24 Q.        What types of things would you talk
25 about with regard to the P-Q blocks?
Page 19

1 A.        Well, just the -- if there was an
2 incident that happened in the P and Q block
3 throughout that day or the day prior, we talked
4 about it.
5 Q.        And in 2018, early 2019, would you, in
6 these administrative meetings, try to discuss
7 corrective action that you could take to address
8 levels of violence at St. Clair?
9          MS. COBB:  Object to form.
10 A.        Yeah, sometimes.  Yes.
11 Q.        What type of corrective action did you
12 discuss?
13 A.        I can't remember.
14 Q.        Any other meetings, weekly, monthly,
15 quarterly meetings, that you attend as warden I?
16 A.        We would always have a -- once a month,
17 we would have a supervisors' meeting.  That's with
18 all the supervisors from each shift, with all the
19 department heads and administrative staff.
20 Q.        What would you discuss at these monthly
21 meetings?
22 A.        A variety of things.
23 Q.        Would you discuss problems or issues
24 that were going on at St. Clair?
25 A.        I'm sure we did.  You know, it's been a
Page 20

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 5 (17 - 20)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
**8/7/2024**

1 while and I've been away from it since '19.  So we
2 discussed, like I said, a variety of issues that was
3 going on.
4 Q.          When you were a warden I in 2018 and
5 early 2019, who did you -- who was your direct
6 supervisor?
7 A.          The warden III, the head warden.
8 Q.          And so would you report directly to the
9 warden III?
10 A.          Yes.
11 Q.          Did you ever raise concerns about safety
12 at St. Clair to the warden III?
13          MR. CHISM:  Object to the form.
14 A.          The warden III was -- I would have to --
15 she was clearly aware of it.
16 Q.          What do you mean by that?
17 A.          I'm saying everybody was -- repeat the
18 question again.  I want to make sure --
19 Q.          Sure.
20          I asked if you were -- if you ever
21 raised concerns about safety issues at St. Clair to
22 the warden III.
23          MR. CHISM:  Object to the form.
24 A.          Again, the warden III was clearly aware
25 of the safety at St. Clair.  So I didn't have to --
                                                    Page 21

1 I didn't have to raise that.  You know, I didn't
2 have to initiate that with her or him.
3 Q.          Did you ever raise concerns about
4 contraband searches not being done to Warden Jones
5 while she was warden III?
6          MS. COBB:  Object to form.
7 A.          No, I never did raise that.  Because if
8 you remember, I told you that all the contraband
9 information went to the warden too.  The reports and
10 all that stuff went to him or her.
11 Q.          Did you ever raise concerns to Warden
12 Jones that staff weren't properly controlling inmate
13 movement during their shifts?
14          MS. COBB:  Object to form.
15 A.          I can't remember if I spoke with her
16 about that at all.
17 Q.          Did you have concerns, while you were a
18 warden I at St. Clair, that staff weren't properly
19 controlling inmate movement during their shifts?
20 A.          When you say "movement, controlling
21 movement," what do you mean by that?
22 Q.          I mean were they making sure that
23 inmates weren't going into areas they weren't
24 authorized to be.
25 A.          I didn't -- you know, that might have
                                                    Page 22

1 been a concern.  But I never raised that.  She was
2 clearly aware of any movement of inmates.  She got
3 those reports too.  You know, I didn't get them.  If
4 an inmate was out of pocket or somewhere he wasn't
5 supposed to be, the report was done, and she usually
6 would get them.  And the captains and the warden II.
7 Q.          When you say "she," who are you
8 referring to?
9 A.          You're saying warden -- Warden Jones or
10 either Ms. Givens.  Ms. Givens at the time was our
11 warden II.  You know, during the time I was there,
12 we had two different warden IIIs and two warden IIs.
13 So the first span was Mr. Estes and Warden Specks.
14 And the second span was Givens and Warden Jones.  So
15 most of that information went to those -- the warden
16 II, the captains, and the warden III.
17 Q.          I'm going to ask you about your
18 independent recollection.  And what I mean by that
19 is just your recollection as you sit here today
20 without relying on any documents or incident
21 reports.
22 A.          Okay.
23 Q.          So as you sit here today, do you have an
24 independent recollection of Terrence Andrews?
25 A.          Terrence Andrews?
                                                    Page 23

1 Q.          Yes.
2 A.          Terrence Andrews.  I'm trying to think.
3 No, I don't have any.
4 Q.          Do you have an independent recollection
5 of Cedrick Davis?
6 A.          You know what?  Ced, Little Ced.  Yeah,
7 I remember Cedrick Davis.
8 Q.          What do you remember about Cedrick Davis
9 or Little Ced?
10 A.          So Terrence Andrews, his friend
11 Terrence, I think he -- I think he was involved in
12 his murder, Ced, Little Ced.
13 Q.          You think Little Ced was involved in
14 Terrence Andrews' murder?
15 A.          If I can recollect, yeah.
16 Q.          I'll represent to you that Cedrick Davis
17 did kill Terrence Andrews in December of 2018.  Do
18 you have any recollection of that incident or
19 learning about that incident?
20 A.          I do remember that incident.  Cedrick
21 and Terrence was really close friends in prison.
22 And I remember Cedrick -- they used to do -- they
23 used to do mischievous stuff in prison together,
24 them two.  And Cedrick had a friend that transferred
25 up there from another prison that they were
                                                    Page 24

Lakeisha Ezell v. Jefferson Dunn, et al.

Anthony Brooks
8/7/2024

1 homosexually involved with.
2          And this particular -- this particular
3 incident with them, Cedrick had left the cell.  The
4 three of them was in the same cell together.  And
5 Cedrick had left that cell.  When he came back,
6 Terrence Andrews allegedly had raped his friend.
7 And I think that's what caused Cedrick to kill him.
8 Q.          How did you learn about that?
9 A.          Just information from CIs.
10 Q.          What are CIs?
11 A.          Informants.
12 Q.          So an informant told you about the
13 relationship and then Terrence Andrews' death; is
14 that correct?
15 A.          Yes.
16 Q.          And prior to Terrence Andrews' death,
17 were you aware of and familiar with Cedrick Davis
18 and Terrence Andrews?
19 A.          Yeah.  Like I said, they used to run
20 around the prison together all the time.  They were
21 really close.
22 Q.          Why were you aware of them before the
23 incident?
24 A.          Because, again, information used to get
25 to the staff.  And, you know, they just -- they name
Page 25

1 Q.          When you say, "We were all at the
2 facility," who do you mean?
3 A.          So whenever -- whenever an inmate --
4 most of time whenever an inmate get killed at the
5 facility, most of the time all the wardens and the
6 captains show up for that, you know, to see if we
7 can gain information to help the investigators out.
8 Q.          And --
9 A.          And try to -- I'm sorry.
10 Q.          No, no.
11 A.          We try to speak to the suspects, if they
12 would talk with us.  But most of the time, they
13 wouldn't talk.  If an incident of that nature
14 happened, they never talked.
15 Q.          Did Cedrick Davis tell you anything when
16 you talked to him after he killed Terrence Andrews?
17 A.          I can't remember.  I don't think he -- I
18 can't remember, you know, if he -- if he said
19 anything to us or not.
20          You know, a lot of times -- like I told
21 you, whenever an incident of that nature happens,
22 the suspect never talks to the staff.  Most of the
23 time, he never talks.  Sometimes they would try to
24 explain why they did what they did.  But most of the
25 time, no.
Page 27

1 was always highlighted in some shape, form, or
2 fashion where they either took something from
3 somebody or got high together and was acting out,
4 that kind of stuff.
5 Q.          Did Cedrick Davis have a reputation as
6 violent prior to the incident where Terrence Andrews
7 was killed?
8          MS. COBB:  Object to form.
9 A.          I don't remember violence, him being
10 violent.
11 Q.          Did you ever speak with Cedrick Davis or
12 Terrence Andrews prior to Cedrick Davis killing
13 Terrence Andrews?
14 A.          I probably have talked with them, you
15 know, told them, hey, man -- stuff like, "Your name
16 is really coming across a lot of desks around here."
17 But other than -- speaking to them about them being
18 violent, no, nothing of that nature.
19 Q.          Do you recall, as you sit here today,
20 any conversations you had with Cedrick Davis?
21 A.          Not other than when I found out that he
22 had killed Terrence.  You know, we all came -- we
23 were all at the facility and just spoke to him, you
24 know, briefly about -- asked him why.  And he didn't
25 have anything to say about it.
Page 26

1 Q.          Besides speaking with Cedrick Davis
2 after he killed Terrence Andrews, what other steps
3 did you take in response to that incident?
4 A.          Well, we don't take any -- we turn it
5 over to the investigators, the department of
6 investigators.  We pretty much leave it alone.
7 Q.          Did you have any discussions with any of
8 the other wardens or any other employees at
9 St. Clair about what steps could be taken to reduce
10 the risk of similar violence in the future?
11          MR. CHISM:  Object to the form.
12 A.          Of course.  We needed staffing, you
13 know.  We needed people, boots on the ground.  That
14 was the main conversation about that.
15 Q.          Did you discuss anything else besides
16 getting more staff that could be done to reduce the
17 risk of violence in the future?
18 A.          I can't remember what we discussed.
19 Q.          Prior to Terrence Andrews' death, do you
20 recall any conversations or interactions that you
21 had with him?
22 A.          I probably talked to Terrence before.  I
23 can't recall the conversations.
24 Q.          Is there anything else you recall about
25 Terrence Andrews or Cedrick Davis or the incident in
Page 28

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 7 (25 - 28)

Lakeisha Ezell v. Jefferson Dunn, et al.                                    **Anthony Brooks**
**8/7/2024**

1 which Terrence Andrews was killed other than what
2 we've just discussed?
3 **A.        No.**
4 Q.        As you sit here today, do you have an
independent recollection of Steven Mullins?
6 **A.        I can't remember Steven Mullins.**
7 Q.        As you sit here today, do you have any
8 independent recollection of Clarence Jackson?
9 **A.        Clarence Jackson either.  I don't**
10 **remember.**
11 Q.        Do you have any independent recollection
12 of an incident in which Clarence Jackson sexually
13 assaulted Kevin Mullins in the Q block in February
14 2019?
15 **A.        No.**
16               MR. CHISM:  Object to the form.
17 Q.        Do you have any independent recollection
18 of an incident in which Clarence Jackson stabbed
19 Steven Mullins in the L dorm in February 2019?
20 **A.        No.**
21 Q.        I'm going to share a document with you
22 which I'll mark as Exhibit 1.
23 **A.        Okay.**
24               (Exhibit 1 was marked
25               for identification.)
                                                      Page 29

1               It says, "At approximately 5:25 p.m.,"
2 starting on Line 3, "Warden Brooks notified" --
3 sorry.  Let me start that again.
4               "At approximately 5:25 p.m., Warden
5 Brooks notified Inmate Andrews' next of the kin,
6 Lakeisha Scott."
7               Do you recall notifying Mr. Andrews'
8 next of kin about his death?
9 **A.        I normally -- normally -- I don't recall**
10 **that.  But I could have.  Because normally the**
11 **chaplain would notify them.  Just in case the**
12 **chaplain wasn't able to notify them, I probably**
13 **attempted to call her, yes.  I see I did, if it's in**
14 **the report.**
15 Q.        Do you recall that?  Do you have an
16 independent recollection of speaking with her as you
17 sit here today?
18 **A.        I don't remember the conversation.**
19 Q.        I'm going to stop sharing that document.
20 And I will show you what I'll mark as Exhibit 2.
21
22               (Exhibit 2 was marked
23               for identification.)
24
25               MS. PIERCE:  For the record, this is --
                                                      Page 31

1 give me one second.  This is ADOC Andrews LESD
2 000193.
3 Q.        Can you see the document, Mr. Brooks?
4 **A.        Yes.**
5 Q.        And do you know what this is?  It's a
6 little hard to read.  But at the top here --
7 **A.        It looks like it's a duty post log.**
8 Q.        So this is a duty post log?
9 **A.        Yes.**
10 Q.        And these were completed by officers on
11 each shift; is that correct?
12 **A.        Yes.**
13 Q.        And this one was completed by CCO Caver;
14 is that correct?
15 **A.        Yes.**
16 Q.        On 12-29-18 in P cubicle?
17 **A.        Uh-huh.**
18 Q.        And I will represent to you that this is
19 the duty post log relating to the incident in which
20 Cedrick Davis killed Terrence Andrews.  Okay?
21 **A.        Okay.**
22 Q.        CCO Caver writes down here, "At 4:02,
23 Officer Garrett, Officer Thompson, Warden Brooks,
24 Officer Taylor, Sergeant Weaver arrived, lockdown.
25 4:09, inmates in cell.  Enter P1 for cell 22.
                                                      Page 32

1               MS. PIERCE:  For the record, this is
2 ADOC000556 to ADOC000558.
3 Q.        Mr. Brooks, I'm going to start on the
4 first page.  Do you know what this document is?
5 **A.        Yeah.  It's a duty officer report.**
6 Q.        And the date on the report is 12-29-18;
7 is that right?
8 **A.        Yes.**
9 Q.        Take a minute just to read the report.
10 And let me know when you've had a moment.
11 **A.        Yes.  I'm finished.**
12 Q.        Does this refresh -- strike that.
13               After reviewing this report, do you
14 remember anything else about the incident in which
15 Terrence Andrews was killed?
16 **A.        No.  That's probably -- I just gave you**
17 **my recollection of that incident.  I remember it**
18 **happening.  I remember it.**
19               **Do you want me to read this, this**
20 **incident report?**
21 Q.        Let me just go down -- so this is an
22 incident report relating to the same event.  That
23 starts on ADOC000557.  And I'm just going to go down
24 to the second page of this incident report.
                                                      Page 30

Lakeisha Ezell v. Jefferson Dunn, et al.

Anthony Brooks
8/7/2024

1 Property suspect found on P2 side. Warden Brooks,
2 Lieutenant Baker escorted out from P2."
3           Did I read that correctly?
4 **A.      Yes.**
5 Q.        Do you recall, after looking at this,
6 responding to the scene after Cedrick Davis killed
7 Terrence Andrews?
8 **A.      Do I recall going there?**
9 Q.        Yes.
10 **A.      Yes, I guess.  Yes.**
11 Q.       When you say, "Yes, I guess," do you
12 have an independent recollection of responding to
13 the scene?
14 **A.      Well, if she wrote it -- I don't**
15 **remember going.  But if she said I was there, I was**
16 **there.  If she wrote it in the duty post log, yes.**
17 Q.       So based on this, it doesn't -- strike
18 that.
19           This document doesn't refresh your
20 recollection at all about responding to the scene
21 after Cedrick Davis killed Terrence Andrews; is that
22 correct?
23 **A.      Before we go any further, is that**
24 **4:20 a.m. or 4:20 p.m.?  I'm not --**
25 Q.       I think, based on the time of the

Page 33

1 incident, it should be 4:20 p.m.
2 **A.      If it was 4:20 p.m., I probably was**
3 **still at the institution.  And I probably did go**
4 **down to the scene.**
5 Q.       But as you sit here today, you don't
6 have any independent recollection of responding to
7 the scene; is that correct?
8 **A.      I don't.  It's been five or six years.**
9 **I don't -- I don't recall going to it.  But if she**
10 **wrote it in there, I probably was there.**
11 Q.      As warden I at St. Clair, did you
12 respond to a lot of incidents of violence?
13 **A.      Well, if I was on duty, if I was at the**
14 **facility, I would go to a lot of incidents if it was**
15 **-- especially if it was a violent incident, I would**
16 **go to the scene, yes.**
17 Q.      And how often were you responding to
18 incidents of violence at St. Clair while you were a
19 warden I?
20           MS. COBB:  Object to form.
21           MR. CHISM:  Object to the form.
22 **A.      I can't recall.  I'm saying if I was at**
23 **the institution -- I'm just going to let you know if**
24 **I was there, I probably would go to the scene.  So I**
25 **don't know how -- you know, it was fairly often.**

Page 34

1 Q.       When you say, "fairly often," would you
2 say weekly?  Daily?  Several times a week?
3           MR. CHISM:  Object to the form.
4 **A.      Whenever there was a violent incident or**
5 **an incident that I thought I should -- you know,**
6 **somebody should be there, yes.**
7 Q.       Were incidents of violence occurring on
8 a daily basis at St. Clair?
9           MS. COBB:  Object to form.
10           MR. CHISM:  Object to the form.
11 **A.      We had -- you know, it was known that**
12 **St. Clair was a violent prison.  So yes, violence**
13 **was there.**
14 Q.       Fair to say incidents of violence were
15 happening daily or almost daily?
16           MS. COBB:  Object to form.
17           MR. CHISM:  Object to the form.
18 **A.      Almost daily.**
19 Q.       I'm going to share what I'll mark as
20 Exhibit 3.
21
22           (Exhibit 3 was marked
23           for identification.)
24
25           MS. PIERCE:  And this is ADOC000925 to

Page 35

1 ADOC000930.
2 Q.       Mr. Brooks, do you know what this
3 document is?
4 **A.      It says an Inmate Movement History.**
5 Q.       Were you familiar with these types of
6 documents while you were a warden I at St. Clair?
7 **A.      Yes, I'm familiar with them.**
8 Q.       So this reflects every time an
9 assigned -- a cell assignment was changed for an
10 inmate; is that correct?
11 **A.      Yes.**
12 Q.      I'm going to direct your attention to
13 the third line on -- strike that.
14           So this Inmate Movement History is for
15 Terrence Andrews; is that correct?
16 **A.      Yes.**
17 Q.      And I'm going to direct your attention
18 to the third line, 11-26-2018.  Do you see where I'm
19 pointing out?
20 **A.      Yes.**
21 Q.      This was a little over a month prior to
22 Mr. Andrews' death.  It says, "Move to bed, bed
23 P22-1A at 1323 until 12-29-2018."
24 **A.      Uh-huh.**
25 Q.      And the user name is Jeffrey Smith.  Do

Page 36

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 9 (33 - 36)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
**8/7/2024**

1 you know who that is?

2 **A.       Yes.**

3 Q.       Who is Jeffrey Smith?

4 **A.       He was the ICS officer.**

5 Q.       What's an ICS officer?

6 **A.       He did movements, all the bed**

7 **assignments throughout the institution.**

8 Q.       Does that stand for internal

9 classification officer?

10 **A.       No.  It was -- I think it's inmate**

11 **control movement system or something like that.  I**

12 **can't recall.**

13 Q.       And at the -- I'm sorry.  Were you still

14 --

15 **A.       Go ahead.**

16 Q.       In the comments, it says, "SL5 medium,

17 comments per Warden Brooks."

18       Did I read that correctly?

19 **A.       Yes.**

20 Q.       Why does it say, "Per Warden Brooks"

21 here?

22 **A.       I'm not sure.**

23 Q.       Did you, as warden I, direct cell

24 changes?

25 **A.       No.  So if I'm on call -- it could have**

Page 37

1 been this situation.  If I was on call at the time

2 -- and this is 11-26-2018.  I don't know the day or

3 whatever.  But a supervisor might have called me and

4 said, hey, this inmate is doing this.  And I might

5 have instructed them to just put him in segregation.

6       Just say, for instance, he could have

7 been high on heroin or some type of drug and he was

8 acting erratic or whatever.  And they called me and

9 said, hey, we have inmate such and such.  Then I

10 might say, put him in restrictive housing.  After he

11 calmed down or after medical looked at him, I might

12 give the instruction to put him in restrictive

13 housing until he calmed down or whatever the case

14 may be.

15       So I don't recall why I put him over

16 there or why per me, but that could have been the

17 case.  I'm not sure.

18       Here's the thing.  And this is for

19 Caitlin.

20       THE WITNESS:  Caitlin, is this Guy

21 versus Dunn?  Or is this something else?  I'm saying

22 the case that I'm being drilled on.

23       MS. COBB:  I think Megan can probably

24 answer that question.  I just don't want to testify

25 for you.

Page 38

1 **A.       Megan, is this -- because the**

2 **information I got, I was going to be doing Guy**

3 **versus Dunn.  Is he part of Guy versus Dunn?**

4 Q.       Let me just explain to you -- if that's

5 all right, Caitlin -- what's going on.  So I

6 represent Lori Guy, which is Steven Mullins' sister.

7 Steven Mullins is deceased.

8 **A.       Okay.**

9 Q.       So she has brought a lawsuit relating to

10 the death of her brother, Steven Mullins.

11       And then Lakeisha Ezell is the mother of

12 Terrence Andrews.  She has also brought a lawsuit

13 relating to the death of her son, Terrence Andrews.

14 So these lawsuits that we're here to discuss today

15 relate to the death of Steven Mullins, Lori Guy's

16 sister, and then Terrence Andrews, Ms. Ezell's son.

17       MS. COBB:  Megan, if I may add, Warden

18 Brooks, you're a named defendant in the Guy versus

19 Dunn case.  However, your knowledge -- you may serve

20 as a fact witness for the Ezell case.

21 **A.       Okay.  Because I know the email that I**

22 **got had Guy versus Dunn.  And you're talking about**

23 **Ezell and Terrence Andrews.  I was sort of, you**

24 **know, confused.  But that's fine.**

25 Q.       Do you have any other questions before

Page 39

1 we --

2 **A.       No.**

3 Q.       So I understand your testimony that you

4 might temporarily authorize a shift commander or a

5 supervisor to move someone to restrictive housing.

6       Are there any situations where, as

7 warden I, you would be directing someone to

8 permanently reassign an individual to another cell

9 in population?

10 **A.       Well, if -- the case for that would be**

11 **if I was on call and the shift commander asked me --**

12 **that they needed to reassign somebody, yes, I would**

13 **authorize it if they asked me for authorization to**

14 **reassign someone.**

15 Q.       And would you direct staff who reached

16 out to you about where to assign an individual to?

17 **A.       No.  I didn't -- I didn't give any**

18 **directions on that.  If they asked, hey, we need to**

19 **place so and so inmate in a certain block or**

20 **whatever, you know, I would just authorize it.**

21 Q.       And a decision to reassign an inmate

22 like this one on November 26, 2018, should that be

23 documented anywhere other than the inmate movement

24 history that we're looking at?

25 **A.       I can't remember where else it would be**

Page 40

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 10 (37 - 40)

Lakeisha Ezell v. Jefferson Dunn, et al.

Anthony Brooks
8/7/2024

1 documented at.
2 Q.          Would you document a conversation -- if
3 a shift supervisor or captain reached out to you
4 with a question or a request, would you document
5 that?
6 A.          I never documented it.
7 Q.          Would you expect the shift supervisor or
8 the captain to document it?
9 A.          Well, if it was part of an ongoing
10 incident, they should have documented it saying,
11 hey, the inmate was placed in whatever block or
12 cell, you know, if it was an ongoing incident.  So
13 it would be documented in the 302, the incident
14 report.
15 Q.          And would a bed reassignment like this
16 qualify as an incident that needed to be documented?
17 A.          I'm not sure.  I'm not sure of the
18 reasoning he was moved.  I'm not sure about that.  I
19 can't recall.
20 Q.          I want to direct your attention down to
21 the sixth line, 11-11-18.  It says, "Status changed
22 to disciplinary."
23          Do you see that?
24 A.          Yes.
25 Q.          And it looked like his status was
Page 41

1 changed to disciplinary for two days.  Did I read
2 that correctly?
3 A.          Yes.
4 Q.          And then afterward, he was placed in P
5 block, which is a general population block, correct?
6 A.          Yes.
7 Q.          Do you know why an inmate would be
8 placed on disciplinary status for two days and then
9 put into general population?
10 A.          Well, one thing I could probably relate
11 this to is the bed space.  So he probably went over
12 there for something simple, and they had an incident
13 where we needed the bed space.  And the case that he
14 was on might not have, you know, been so significant
15 that we kept him over there for a period of time and
16 then released him.
17          I just can't -- I can't see -- you know,
18 it's several reasons they probably moved him after
19 two days.  So I don't recall.  I just don't recall
20 what the reasoning would be for them to move him.
21 But it could have been several things.  And bed
22 space could have been one of them.
23 Q.          So fair to say that at times inmates
24 were moved out of disciplinary segregation because
25 there wasn't enough space for them to be in
Page 42

1 segregation?
2          MS. COBB:  Object to form.
3          MR. CHISM:  Object to the form.
4 A.          Again, depending on the severity of the
5 incidents.  You know, if he was just over there for
6 taking something from somebody or whatever, you
7 know, and you had an incident where somebody had
8 maybe got stabbed and we needed the bed space, yeah,
9 we might have moved him out.
10          I don't know -- I don't know the
11 reasoning he was over there.  And it don't show what
12 the disciplinary was.
13 Q.          I'm going to stop sharing Exhibit 3.
14 And I will share what's marked as Exhibit 4.
15
16          (Exhibit 4 was marked
17           for identification.)
18
19          MS. PIERCE:  And this is ADOC002047 to
20 ADOC002055
21 Q.          This is the same type of document we
22 just looked at.  It's called Inmate Movement
23 History.  But this one is for Cedrick Leshawn Davis;
24 is that correct?
25 A.          Yes.
Page 43

1 Q.          And seeing Mr. Davis' picture there, do
2 you recognize him?
3 A.          Yes.
4 Q.          I'm going to take you down to the 2018
5 time period, the first one on Page 3, the top line
6 here.  "11-26-2018.  Type, moved to bed.  Bed P22-2A
7 at 1323 until 12-29-2018," again by Jeffrey Smith.
8          Did I read that correctly?
9 A.          Yes.
10 Q.          And in the comments, it says, "SL:5,
11 Cust: medium.  Comments per Warden Brooks."
12          Did I read that correctly?
13 A.          Yes.
14 Q.          As you sit here today, do you have an
15 independent recollection of instructing Mr. Davis to
16 be moved to bed P22-2A?
17 A.          I don't have any recollection of it.
18 Q.          Do you know why you would have
19 instructed Cedrick Davis to be moved from Q block to
20 P?
21 A.          I'm not sure.
22 Q.          And to the best of your knowledge, is
23 there anywhere that the reasoning or any other
24 information about that decision would have been
25 documented?
Page 44

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 11 (41 - 44)

Lakeisha Ezell v. Jefferson Dunn, et al.

Anthony Brooks
8/7/2024

1  A.          I'm not sure.

2  Q.          I'm going to stop sharing Exhibit 4.

3  And I'm going to show you Exhibit 5.

4

5              (Exhibit 5 was marked

6              for identification.)

7

8  Q.          If you do need a break, just let me

9  know.

10  A.          Just continue to go.  I'm good.  I'm at

11  home.  Maybe the clerk need a break.

12              MS. PIERCE:  If anyone needs a break,

13  please let me know.

14  Q.          So this that I'll share with you is

15  Exhibit 5.  I am having trouble seeing the Bates

16  numbers because they are stamped over page numbers

17  that are already here.  Let me see if I can -- this

18  is a 14-page document.  Let me see if I can find any

19  of the Bates numbers.

20              I will just describe it for the record.

21  So at the top, this says Alabama Department of

22  Corrections Classification Summary.

23              Did I read that correctly?

24  A.          Yes.

25  Q.          And the inmate name on here is Cedrick

Page 45

1  Leshawn Davis.

2              Did I read that correctly?

3  A.          Yes.

4  Q.          Are you familiar with these types of

5  documents?

6  A.          Yes.  Classification summary, yes.

7  Q.          And for some period while you were

8  warden I, you were responsible for classification,

9  correct?

10  A.          Yes.

11  Q.          So would you review these summaries?

12  A.          Yes.

13  Q.          Just to further identify this for the

14  record, it says, "Run date, 10-4-2018.  1:01:36 a.m.

15  It's Page 1 of 14.  I want to direct you -- strike

16  that.

17              As warden I, what responsibility did you

18  have for reviewing classification summaries?

19  A.          Well, whenever an inmate had an annual

20  review or a semiannual review, I would sit in on the

21  reviews and look at the document -- look at the

22  documentation in the files.

23  Q.          Any other responsibilities that you had?

24  A.          I would seldomly look at them if there

25  were -- their classification documents if they were

Page 46

1  just -- we had issues with inmates.  I would, you

2  know, sort of randomly look at some of them.

3  Q.          And would the purpose of that be to

4  determine if their classification needed to be

5  changed?

6  A.          Not necessarily.  Just to see what type

7  of inmate -- you know, the history of the inmate

8  pretty much.

9  Q.          So fair to say if you became notified of

10  an incident, a serious incident relating to an

11  inmate, you would look at their classification file

12  to determine their history?

13  A.          Yes.

14  Q.          And that was your normal practice?

15  A.          Normally, yes.

16  Q.          And you said that you would sit in on

17  the semiannual and annual classification reviews.

18  When you say, "sit in" on it, were you involved at

19  all in the decision about how to classify someone?

20  A.          Not really.  When I sit in, I would

21  listen to -- basically I would be there for any

22  advice from the classification specialist or

23  Ms. Estelle, the supervisor.  But normally whatever

24  recommendation they made, I usually would go with

25  it.

Page 47

1  Q.          So fair to say you were responsible for

2  signing off on the decision made by the

3  classification review team?  Is that fair?

4  A.          Well, I would -- here's the thing.  I

5  would sign off on the documents at the review board.

6  But the head warden would normally be the overall --

7  you know, he would make the overall decision and

8  sign off on it.

9  Q.          So when Warden Jones was warden III,

10  fair to say that she was responsible for signing off

11  on classification decisions for each inmate?

12  A.          Exactly.  When she got there, yeah.  All

13  my responsibilities -- as a matter of fact, I didn't

14  even sit in on the boards when she was there.  So if

15  she was here at the time, at this particular time, I

16  might have -- if she was gone away from the

17  facility, I would sit in.  Other than that, she was

18  there.

19  Q.          Again, is it fair to say that she would

20  be responsible for signing off on all classification

21  decisions for each inmate?

22  A.          Yes.

23              MR. CHISM:  Object to the form.

24  Q.          I want to direct your attention to Page

25  4.  We have a section called Disciplinaries.  Do you

Page 48

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 12 (45 - 48)

Lakeisha Ezell v. Jefferson Dunn, et al.

Anthony Brooks
8/7/2024

1 see that?

2 A.        Yes.

3 Q.        This section on the classification

4 summary, should this include all disciplinaries that

5 were found to be substantiated against a given

6 inmate?

7 A.        Yes.

8 Q.        I'm going to scroll down to Page 11 of

9 this document.  The title of this page, Page 11, is

10 Inmate Classification Security Level.

11          Did I read that correctly?

12 A.       Yes.

13 Q.        And then Institutional Recommendation.

14 There's a paragraph there about Cedrick Davis; is

15 that right?

16 A.       Yes.

17 Q.        So this institutional recommendation,

18 who would have written that?

19 A.       **That would have been written by his**

20 **classification specialist.**

21 Q.        And then I want to go down here to

22 Warden Review.  It says, "Agree with specialist's

23 recommendation," is that right?

24 A.       Yes.

25 Q.        And so if Warden Jones was already at

Page 49

1 the facility, would this warden review be referring

2 to Warden Jones?

3          MR. CHISM:  Object to the form.

4 A.       **Like I said, if she was there, yes.  If**

5 **she was out of the facility, maybe me or Givens.**

6 Q.        Is there anywhere it would have been

7 noted which warden was signing off on the

8 recommendation?

9 A.       **Well, if she was sitting -- if she was**

10 **sitting in on the review board, there would have**

11 **been somewhere documented who was all present at the**

12 **board at the time.**

13 Q.        And would the board have reviewed all

14 documents -- strike that.

15          Would the board have reviewed all

16 documents and all incident reports relating to the

17 inmate who was the subject of the classification

18 review during the assessment?

19          MS. COBB:  Object to form.

20 A.       **Not all the board.  Just classification**

21 **and maybe whatever warden was sitting in on it.  The**

22 **board consists of the chaplain and a psychologist or**

23 **a psychiatrist and the warden and the classification**

24 **specialist.**

25 Q.        But fair to say that the warden and the

Page 50

1 classification specialist would have looked at all

2 recent incident reports relating to that individual?

3          MS. COBB:  Object to form.

4          MR. CHISM:  Object to the form.

5 A.       **Yeah.**

6 Q.        I'm going to share what I'll mark as

7 Exhibit 6.

8

9          (Exhibit 6 was marked

10          for identification.)

11

12          MS. PIERCE:  This is, for the record,

13 ADOC001634.

14 Q.        Mr. Brooks, can you see the document

15 I've shared with you?

16 A.       Yes.

17 Q.        And this is an incident report, correct?

18 A.       Yes.

19 Q.        And the date on here is 10-22-2018?

20 A.       Yes.

21 Q.        And the individual who received the

22 report here in Section 9 is Gwendolyn Givens; is

23 that right?

24 A.       Yes.

25 Q.        What does it mean that someone received

Page 51

1 the report?

2 A.       **That just means whoever was on call at**

3 **the time, the incident was reported to them from the**

4 **-- from whoever was writing the report.**

5 Q.        Can you explain to me about the on-call

6 procedure?

7 A.       **Well, the on-call procedures were we all**

8 **was on call one week out of -- one week.  And the**

9 **rotation was probably six because you had the**

10 **captains in that rotation, also.**

11          **So the rotation would be the head**

12 **warden, Warden Givens, myself, then the three**

13 **captains.  And we would all be on call one week at a**

14 **time until it rotated back to them.  So at this**

15 **particular time, it looks like Ms. Givens was the**

16 **on-call official.**

17 Q.        What were your responsibilities when you

18 were on call?

19 A.       **All reports of incidents was reported to**

20 **you after hours.  And you would have to -- that**

21 **official would have to -- if an incident warranted**

22 **it, you would have to go over to the facility.**

23          **Say it was an incident of Cedrick and**

24 **Terrence's nature and it was -- we were off duty at**

25 **the time, after 5:00 or after 6:00 o'clock, and it**

Page 52

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 13 (49 - 52)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
**8/7/2024**

1 happened after that time. Then whoever was the
2 warden I -- the warden on call would have to go over
3 there, make sure -- look into the incident, then
4 notify the proper officials down in Montgomery,
5 whatever the incident -- if it warranted that.
6 Q.        As on-call warden, would you have
7 additional responsibilities during business hours?
8 Or just after hours?
9 A.        Even during business hours, you would
10 get notified. But you had the warden III there.
11 And she always wanted -- if she was there, she
12 wanted you to notify her even though you were on
13 call. And the lieutenant, she would always want
14 them to notify her, too, at the same time.
15 Q.        I want to take a minute to go over this
16 incident with you.
17        But before I do, are you familiar with
18 an inmate named Carlton Nero?
19 A.        I can't recall.
20 Q.        And then in Section 13, it says here,
21 "Suspects Carlton Nero, Larry White, and Cedrick
22 Davis."
23        Did I read that correctly?
24 A.        Yes.
25 Q.        I'm going to read this narrative

Page 53

1 summary. "On October 22, 2018, at approximately
2 7:30 a.m., Inmate Carlton Nero, BM, 134912, Q35-1A,
3 stated to Lieutenant Russell Jones at the breezeway
4 that he, Inmate Nero, was not able to you live in Q
5 dorm.
6        At approximately 7:35 a.m., Lieutenant
7 Jones notified Gwendolyn Givens, warden II, that
8 Inmate Nero could not live in population. Officer
9 Joel Christian and Dominique Vales checked Inmate
10 Nero's assigned cell for his property. Inmate Nero
11 did not have any property in his cell.
12        Inmate Nero started, 'My life was in
13 danger, and I'm not affiliated with any gangs.'
14 Inmate Nero stated to Warden Givens and Lieutenant
15 Jones that he, Inmate Nero, was unable to live in
16 population, that his stuff was stolen.
17        He claims he was jumped by several
18 inmates whom he identified in a statement. See
19 attached statement. Inmate Larry White, BM, 202282,
20 and Cedrick Davis, BM, 228379. Inmate Nero is in
21 debt for drugs and is in need of a bath. Inmate
22 Nero has very poor hygiene practice.
23        At approximately 9:00 a.m., Officer
24 Christian escorted Inmate Nero was escorted to the
25 infirmary for a restrictive housing unit body chart.

Page 54

1 Nurse Sheila Wood completed the medical examination.
2 See attached body chart.
3        Inmate Nero had no property to inventory
4 and placed in the property. Inmate Nero was
5 reassigned to cell B12-1A pending disciplinary
6 action for intentionally creating a security,
7 safety, or a health hazard. 10-22-2018, 1:00 p.m.,
8 by Russell Jones."
9        Did I read that correctly?
10 A.        Yes.
11 Q.        Do you recall this incident?
12 A.        I don't recall it.
13 Q.        Fair to say that based on this incident
14 report, Inmate Nero has reported to Lieutenant Jones
15 and Warden Givens that he had his stuff stolen and
16 was jumped by Larry White and Cedrick Davis?
17        MR. CHISM: Object to the form.
18 A.        According to the -- according to the
19 report, yes. That's what it says.
20 Q.        Based on your experience and knowledge
21 as warden I, what action should have been taken in
22 response to these allegations by Mr. Nero?
23 A.        Well, what I would have done is
24 investigated it a little more in depth. You know,
25 if Nero was a drug addict and he owed for drugs and

Page 55

1 he couldn't pay, he could have just -- I don't know
2 if -- I don't know the circumstances from the body
3 chart, if he was injured or not.
4        And if he was in danger, if he felt like
5 his life was in danger because he had went into debt
6 for drugs, I probably would have put him in
7 restrictive housing other than population just to --
8 it just depends on the outcome of further
9 investigation.
10        Because a lot of times, an inmate would
11 go in debt and he would make allegations of inmates
12 attempting to either jump on him or cause him harm
13 when the whole time he done got drugs and can't pay
14 them.
15        So I just would have -- me personally, I
16 would have looked into it further or had the
17 captains look into it, make sure this is what
18 happened.
19 Q.        So fair to say you would have
20 investigated to see whether or not Larry White and
21 Cedrick Davis had actually jumped or attacked
22 Mr. Nero?
23 A.        Exactly. Exactly.
24 Q.        And where would that have been
25 documented if that investigation took place?

Page 56

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 14 (53 - 56)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
**8/7/2024**

1 A.          Well, it would have been -- this is the
2 duty officer report.  Is this -- go back to the top.
3 So this is the actual incident report.  It would
4 have been documented into this report.
5 Q.          So if an investigation was done, it
6 should have been documented in this incident report?
7          MR. CHISM: Object to the form.
8 Q.    Can you repeat your answer?
9 A.    Yes.
10 Q.          If an investigation showed that Cedrick
11 Davis and Larry White had jumped or attacked
12 Mr. Nero, what action should have been taken with
13 regard to them?
14 A.          A disciplinary should have been held
15 against them for assault.
16 Q.          While any investigation into whether or
17 not they had attacked Mr. Nero was ongoing, should
18 they have been left in general population or placed
19 in restrictive housing?
20          MR. CHISM: Object to the form.
21 A.          Most likely if the investigation showed
22 that they had attacked the individual, yeah, placed
23 in restrictive housing.
24 Q.          And would it be appropriate to leave
25 them in general population after an allegation like

Page 57

1 this was made while the investigation was ongoing?
2          MR. CHISM: Object to the form.
3 A.          I'm not sure.  It just depends on the
4 circumstances.
5 Q.          What do you mean by that?
6 A.          I'm saying if there's an -- of course,
7 you want to put the inmate, Nero, in safety.  You
8 want to make sure he's safe.
9          But during the investigation, if you're
10 still investigating, I guess if you don't have the
11 housing or the space for those inmates to be locked
12 up, then you could leave them out until the
13 investigation is over.  And then if there was some
14 merit where they had jumped on him and assaulted him
15 and did whatever he alleged, then you could lock
16 them up.
17 Q.          If there is space in segregation, should
18 those individuals have been placed in segregation
19 while the investigation was pending?
20 A.          Of course, yes.  If they had the space,
21 yes.
22 Q.          Did policy at St. Clair require an
23 investigation to be conducted into Mr. Nero's
24 allegations?
25          MR. CHISM: Object to the form.

Page 58

1 A.          All incidents should be thoroughly
2 investigated.
3 Q.          You mentioned that you may have placed
4 Mr. Nero in segregation in response to this
5 incident.  I want to clarify.
6          Would you have placed him in
7 segregation -- disciplinary segregation or
8 segregation for protective reasons?
9 A.          Protective reasons.
10 Q.          Would it be appropriate to discipline
11 Mr. Nero based on what's written in this incident
12 report?
13 A.          It just depends.  Like I said, if he
14 came up there with allegations and there was nothing
15 found that this actually happened, then yes.
16 Q.          And if the allegations in here were
17 true, were found to be true, would it be appropriate
18 to discipline Mr. Nero based on those allegations?
19 A.          No.
20 Q.          Why not?
21 A.          Well, I'm looking here, and it says he
22 went in debt -- it just depends on the writer.  If
23 he felt like Mr. Nero put himself in that position
24 where he got drugs and went into debt with other
25 inmates, and then he decided he wanted to -- you

Page 59

1 know, he didn't have the appropriate funds to pay
2 them, then he put himself in that position and
3 intentionally created a safety and health hazard for
4 himself.  So yeah, it just depends on who wrote it.
5 Q.          Inmates who attack another inmate should
6 be disciplined whether or not the victim of their
7 attack is in debt for drugs, correct?
8 A.          Of course.
9 Q.          I will stop sharing Exhibit 6.  I'm
10 going to share what I will mark as Exhibit 7.
11
12          (Exhibit 7 was marked
13           for identification.)
14
15          MS. PIERCE:  This is ADOC000462 to
16 ADOC00464.
17 Q.          Can you see the document?
18 A.          Yes.
19 Q.          And this is an incident report from
20 7-17-2018; is that correct?
21 A.          Yes.
22 Q.          And it says in box 9 that you received
23 the report; is that correct?
24 A.          Yes.
25 Q.          So does that mean that you were most

Page 60

Lakeisha Ezell v. Jefferson Dunn, et al.                    **Anthony Brooks**
**8/7/2024**

1 likely the on-call warden on that day?

2 A.        Yes.

3 Q.        I'm going to read the narrative summary.

4 "On July 17, 2018, at approximately 5:30 p.m.,

5 Inmate Steven Mullins, W, 175255, approached

6 Sergeant Phillip Dixon at the breezeway and stated,

7 'That he could not live in population because he

8 feared for his life by unknown inmates.'  Sergeant

9 Phillip Dixon noticed bruises to his face.

10 Apparently Inmate Mullins was involved in a physical

11 altercation.

12        At approximately 5:45 p.m., Sergeant

13 Dixon notified Warden Anthony Brooks of this

14 incident.  Inmate Mullins will be placed in

15 restrictive housing unit for the inability to adapt

16 to population.  No further action was taken at this

17 time until further investigation is made into this

18 incident."

19        Did I read that correctly?

20 A.        Yes.

21 Q.        Do you recall this incident with

22 Mr. Mullins?

23 A.        No, I don't recall.

24 Q.        I want to direct your attention up to

25 the fourth box here.  It says this is a class code C

Page 61

1 incident.

2        Did I read that correctly?

3 A.        Yes.

4 Q.        Should this have been marked as a class

5 code C?

6 A.        I'm not sure.

7 Q.        Do you remember the different incident

8 levels?

9 A.        I don't remember.

10 Q.        I'm going to go down to the next

11 Incident Report Amendment.  Did I read that

12 correctly?

13 A.        It says it's an amendment?

14 Q.        Yes.  The title of the document is

15 Incident Report Amendment.

16 A.        Oh, yes.  I see it, yes.

17 Q.        What is an incident report amendment?

18 A.        It's where the facts might have changed

19 with the original incident.  Somewhere some of the

20 facts might have got changed or something happened

21 during an investigation or whatever.  They found

22 something different, and they just wanted to amend

23 it.

24 Q.        So I'm going to scroll down to the next

25 page of this document, which is ADOC000464.

Page 62

1 A.        Okay.

2 Q.        This is another incident report with the

3 same date.  So I want to point out again the one we

4 just discussed was 7-17-2018 at 5:30 p.m, and this

5 one is 7-17-2018 at 9:40 p.m.

6        Did I read that correctly?

7 A.        Yes.

8 Q.        And I'm going to read the summary.  "On

9 July 17, 2018, at approximately 9:40 p.m., a urine

10 sample collection began.  Inmate Steven Mullins, WM,

11 175255, assigned to C42 provided a urine sample to

12 Correctional Sergeant T. Miller to be tested for the

13 use of drugs.

14        On July 18, 2018, at approximately

15 3:08 a.m., the sample was tested by Correctional

16 Officer Perry Wilson, drug testing officer."

17 A.        I see that.

18 Q.        Did I read that correctly?

19 A.        Yes.

20 Q.        Would it be appropriate to subject an

21 inmate to a drug test simply because they reported

22 that they could not live in general population?

23 A.        Yes.

24 Q.        And in what circumstances would that be

25 appropriate?

Page 63

1 A.        Maybe they gained information that he

2 was on drugs or he was high, you know, and they

3 wanted to see if that was true.

4 Q.        And if they got information that he was

5 on drugs or was high, that should have been

6 documented in the incident report, right?

7 A.        Yes.

8 Q.        If there was no indication that somebody

9 was on drugs or was high, would it be appropriate to

10 subject them to a drug test simply because they had

11 reported to staff that they were in fear of their

12 safety in general population?

13        MR. CHISM:  Object to the form.

14        MS. COBB:  Object to form.

15 A.        Repeat the question again.

16 Q.        Is it appropriate to subject someone to

17 drug testing simply because they reported to staff

18 that they were in fear for their safety in general

19 population?

20        MS. COBB:  Object to form.

21        MR. CHISM:  Object to the form.

22 A.        Well, if the -- if the lieutenant or

23 whoever is on the shift and it was reported to them,

24 this inmate came to them and said he couldn't live

25 in general population, yes, it's appropriate.

Page 64

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 16 (61 - 64)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
**8/7/2024**

---

1  Because a lot of times at St. Clair,
2 that was the reason, you know, get high and couldn't
3 pay. So let's see if he's running for some reason
4 other than just saying he feared for his life. You
5 know, let's see if he's on drugs.
6  And they might have asked him, have you
7 been getting high down there? Do you owe anybody?
8 And he might have told them no. So they probably
9 figured, hey, let's just test him and see.
10 Q.  Would you have any concerns as warden I
11 that if an inmate was subjected to a drug test
12 within hours of reporting concerns for their safety,
13 that they might be reluctant to come forward again
14 when they were afraid?
15  MS. COBB: Object to form.
16  MR. CHISM: Object to the form.
17 A.  Repeat that again.
18 Q.  Would you have concerns as warden I that
19 if an inmate was subjected to a drug test hours
20 after reporting that they were afraid for their
21 safety, that they would be reluctant to come forward
22 again when they were afraid?
23  MS. COBB: Same objection.
24  MR. CHISM: Object to the form.
25 A.  No, I wouldn't have any concerns.

Page 65

1 Q.  Do you have any concerns that subjecting
2 an inmate to drug testing after he reports concerns
3 for his safety is retaliatory?
4  MS. COBB: Object to form.
5 A.  No. I don't think it's retaliatory.
6 Q.  Why not?
7 A.  Because a lot of times, like I said, the
8 inmate put himself in a position. And then he can't
9 -- and all he -- if he put himself in that position
10 and then all of a sudden he wants to make
11 allegations that his life is in danger -- and that
12 could have been true. But, you know, what is the
13 reasoning? We need to get to the bottom line of it.
14  We had so much of this going on. You
15 know, they had to figure out why, is he on drugs or
16 what is the case. Everybody keep coming up here
17 saying that they can't stay in general population
18 because somebody is out to harm them. So it was --
19 I think it was appropriate for them to test him.
20  And the inmates, they would definitely
21 come back. Even if he went back into general
22 population, he probably would have -- if he felt
23 like his life was in danger, he would come back and
24 do the same thing. He would notify the staff that
25 he was in danger.

Page 66

1  I don't think they would -- I don't
2 think they would be reluctant not to -- not to come
3 back and tell the staff that they -- that they
4 wasn't in danger or they was in danger. I think
5 they would do it.
6 Q.  Isn't it important at St. Clair for
7 staff -- strike that.
8  Is it important at St. Clair for staff
9 to create an environment where inmates feel
10 comfortable and encouraged to come forward when they
11 fear for their safety?
12 A.  Yes.
13  MR. CHISM: Object to the form.
14 Q.  I'm sorry. Could you repeat your
15 answer?
16 A.  Yes.
17 Q.  As warden I, did you take any steps to
18 make sure that inmates felt comfortable coming
19 forward when they had concerns with their safety?
20 A.  You know, I followed the policies. So
21 if an inmate came to us and had concerns about his
22 safety, I would do whatever I could do to keep him
23 safe. And I believe everybody at St. Clair would do
24 the same thing that worked there. There was no
25 specific policy. But, you know, we had -- that's

Page 67

1 just the nature of the job. We had to keep the guys
2 safe.
3 Q.  Based on the three pages that we just
4 reviewed, are you able to identify who requested the
5 drug testing of Mr. Mullins?
6 A.  I'm not -- I can't -- unless Lieutenant
7 Price. I'm not sure who requested it.
8 Q.  Is it possible that you requested the
9 drug testing?
10 A.  They could have called me and asked to
11 drug test him, and I probably -- I could have gave
12 them the go-ahead. I don't remember. If they
13 called me and said, hey, Warden Brooks, this guy
14 seems to be on some drugs, we want to drug test
15 them, of course I'm going to tell them to drug test
16 him.
17 Q.  Would it be your practice to request
18 drug testing of an inmate solely because they
19 reported concerns for their safety?
20 A.  No. That ain't a practice that I would
21 -- that I would normally do. But if I got
22 information from the security staff that, hey, this
23 guy appears to be on drugs, then I'm going to
24 probably tell them to drug test him.
25 Q.  To be clear, if the security staff said

Page 68

---

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 17 (65 - 68)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
**8/7/2024**

1 that someone appeared to be on drugs, that should be
2 recorded in the incident report, correct?
3 **A.        It should be, yes.**
4 Q.        I will stop sharing Exhibit 7.
5        MS. PIERCE:  Let's go ahead and take a
6 quick ten-minute break.  And we'll come back at
7 10:50.
8            (Recess was taken.)
9 Q.        I'm going to mark as Exhibit 8 what I'll
10 share with you now.
11
12            (Exhibit 8 was marked
13            for identification.)
14
15        MS. PIERCE:  This is ADOC018644 to
16 018648.
17 Q.        Mr. Brooks, can you see the document I
18 shared?
19 **A.        Yes, I see it.**
20 Q.        And the first part is Ms. Estelle has
21 forwarded your message to four individuals.  But I
22 want to look down -- strike that.
23        Ms. Estelle has forwarded the message
24 from Mr. Malone to four individuals.  But I want to
25 look down at the email from Gary Malone.

Page 69

1 and whether or not they are a candidate for the SSU?
2 **A.        I'm not sure.**
3 Q.        Do you know what information you
4 requested from Gary Malone?
5 **A.        I can't recall the reason I requested**
6 **it.  I think it -- I'm not sure why I requested it.**
7 **I got some requests, several requests from**
8 **Montgomery that needed -- they needed information**
9 **on, I guess, moving inmates.  They were going to**
10 **move a bunch of inmates from St. Clair.  And this**
11 **might have been one of the reasons.  I'm not sure.**
12 Q.        When you got a request from Montgomery,
13 who would those requests come from specifically?
14 **A.        Ms. Price.**
15 Q.        Did you ever get requests from Edward
16 Ellington?
17 **A.        It could have been from him, too.  I**
18 **have gotten requests from him.**
19 Q.        I'm looking at Page 4 of this document.
20 In the middle here eight lines down, it says,
21 "Inmate Steve Mullins is a candidate for SSU,
22 problems with gang members."
23        Did I read that correctly?
24 **A.        Yes.**
25 Q.        Do you recall being informed that Steven

Page 71

1        Do you know who Gary Malone is?
2 **A.        Yes.  He was one of the captains at**
3 **St. Clair at the time.**
4 Q.        And this email is dated November 28,
5 2018; is that correct?
6 **A.        Yes.**
7 Q.        And the email is to you, Edward
8 Ellington, Karla Jones, Gwendolyn Givens, and cc'g
9 Nekitris Estelle; is that correct?
10 **A.        Yes.**
11 Q.        And the body of the email says, "Warden
12 Brooks, here is the data that you requested."
13 **A.        Yes.**
14 Q.        I'm going to scroll down to the
15 attachment.  And just take a look -- it's several
16 pages long.  You don't need to read every word.  But
17 just take a moment to review what's here.  And let
18 me know when I can continue to --
19 **A.        Okay.  Go ahead.**
20 Q.        And this is the last page.  Were you
21 able to more or less review that attachment,
22 Mr. Brooks?
23 **A.        Yes.**
24 Q.        And that appears to be -- is it fair to
25 say that this appears to be a list of inmate names

Page 70

1 Mullins was a candidate for the SSU?
2 **A.        I will be honest with you.  I don't**
3 **recall Steven Mullins period.  We had so many**
4 **incidents going on at St. Clair, I just don't**
5 **remember Steven Mullins.**
6 Q.        When you say you had so many incidents,
7 what do you mean by that?
8 **A.        I'm saying there is so much going on.**
9 **And you're aware of it already, that St. Clair was a**
10 **violent prison.  And we had -- we was severely**
11 **understaffed.  I just don't remember Steven Mullins.**
12 **I don't -- I can't remember what he looked like.  I**
13 **don't remember incidents that occurred with him.**
14 Q.        While you were a warden I, would you be
15 surprised when you learned that an inmate had been
16 severely injured by another inmate?
17        MS. COBB:  Object to form.
18 **A.        No, that didn't surprise me.**
19 Q.        While you were a Warden I, would you be
20 surprised when you learned that an inmate had been
21 killed by another inmate?
22        MS. COBB:  Object to form.
23 **A.        No.**
24 Q.        This email refers repeatedly to the SSU;
25 is that correct?

Page 72

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 18 (69 - 72)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
**8/7/2024**

| | |
|---|---|
| 1 A. Yes. | 1 in the SSU even without a request from the reporting |
| 2 Q. Do you know what the SSU is? | 2 officer? |
| 3 A. It was a safety unit. | 3 A. Yes, I could make that request. I could |
| 4 Q. Were you involved -- strike that. | 4 -- I could direct or instruct someone to do that. |
| 5 When was the safety unit created? | 5 But since the SSU wasn't part of my |
| 6 A. I can't remember. | 6 direct supervision, I would probably place the |
| 7 Q. Was it created sometime while you were | 7 inmate in restrictive housing, in a holding cell, |
| 8 already a warden I at the facility? | 8 and then talk to the captain that was responsible |
| 9 A. Yes. | 9 for SSU and tell him, hey, whenever we can place |
| 10 Q. Were you involved in the decision or the | 10 this man, this inmate, into the SSU unit, do that. |
| 11 creation of the SSU? | 11 Q. I'm going to share what I will mark as |
| 12 A. No. | 12 Exhibit 9. |
| 13 Q. Do you recall who was in charge of | 13 |
| 14 implementing the SSU? | 14 (Exhibit 9 was marked |
| 15 A. If I can recall, it might have been | 15 for identification.) |
| 16 Captain Malone and the ICB. | 16 |
| 17 Q. What was the purpose of the SSU? | 17 MS. PIERCE: This is ADOC018719 to |
| 18 A. Protect inmates that had safety issues | 18 ADOC018720. |
| 19 in general population. | 19 And this is an email -- two emails from |
| 20 Q. Were you involved in decisions of | 20 Nekitris Estelle to Gary Malone, Ronald Douglas, and |
| 21 whether or not to place an inmate in SSU? | 21 you, Anthony Brooks; is that correct? |
| 22 A. Not directly. But if a lieutenant -- if | 22 A. Yes. |
| 23 I was on call and a lieutenant requested that the | 23 And then the first email was also |
| 24 inmate possibly go into SSU, needed to go in, then I | 24 including someone named Deborah Gardner; is that |
| 25 would approve it. But I didn't have -- I didn't | 25 correct? |
| Page 73 | Page 75 |

| | |
|---|---|
| 1 have a direct decision on the SSU unit, | 1 A. Yes. |
| 2 decision-making on the SSU unit. | 2 Q. The subject is, "Inmates for 90 day |
| 3 Like I said, Captain Malone, maybe the | 3 review by ICB." |
| 4 warden II who was over security, or the ICB board, | 4 Did I read that correctly? |
| 5 the ICB, or either classification. At this time -- | 5 A. Yes. |
| 6 you said it was 2018. And Warden Jones was the | 6 Q. What's the 90-day review by ICB? |
| 7 warden at the time, right? | 7 A. Could you go back up the document? |
| 8 Q. I'll represent to you that Warden Jones | 8 Okay. |
| 9 was the warden III in November of 2018. | 9 The 90-day review is a review that they |
| 10 A. So yeah. I didn't have -- I didn't have | 10 -- the ICB board for releasing inmates out of |
| 11 direct responsibility for the SSU. | 11 restrictive housing, as far as I can recollect. |
| 12 Q. Where was the SSU housed at St. Clair? | 12 Q. Do you know why you were cc'd on this |
| 13 A. It was in the restrictive housing area. | 13 email? |
| 14 I can't remember the dorm number or name. | 14 A. At this particular time, I might have -- |
| 15 Q. Do you recall any efforts to expand the | 15 I could have still been in charge of classification |
| 16 number of inmates who could be housed in SSU? | 16 before Ms. Jones -- because her name is not up |
| 17 A. Again, I don't recall. I don't recall | 17 there. Givens' name is not up there on the cc list. |
| 18 trying to expand it. | 18 So I could have still been the classification |
| 19 Q. Do you recall anyone else taking efforts | 19 supervisor. That could have been part of my |
| 20 to expand the SSU? | 20 responsibilities. |
| 21 A. No, I don't. | 21 Q. So would it have been part of your |
| 22 Q. If you were the on-call warden and | 22 responsibilities to make sure that the 90-day |
| 23 someone reported an incident to you that suggested | 23 reviews were done? |
| 24 an inmate had a real risk to their safety in general | 24 A. She cc'd me to let me know that it was |
| 25 population, could you make the decision to put them | 25 time for it, I guess. So the ICB board -- yes. |
| Page 74 | Page 76 |

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 19 (73 - 76)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
**8/7/2024**

1 Yes, it could have been my responsibility to say
2 it's time for a 90-day review by ICB.  So yes.
3 Q.         What other involvement would you have
4 had in the 90-day review?
5 A.         Not much at all.  Because Malone, Ronald
6 Douglas, and Deborah Gardner, those were the people
7 that were assigned to the ICB board.  And I was just
8 cc'd on it because maybe I was still the
9 classification -- it was still under my
10 responsibility.
11 Q.         Scrolling down to the second page of the
12 attachment, in the last paragraph, the sixth person
13 down is Steven Mullins.
14 A.         Uh-huh.
15 Q.         Do you recall anything about
16 Mr. Mullins' placement in restrictive housing or his
17 90-day review?
18 A.         I have no recollection of Steven
19 Mullins.
20 Q.         I'm going to share what I'll mark as
21 Exhibit 10.
22
23                (Exhibit 10 was marked
24                    for identification.)
25
Page 77

1         MS. PIERCE:  This is ADOC018959 to
2 ADOC018960.
3 Q.         This is an email from Becky Steele to
4 Karla Jones, Gwendolyn Givens, you, Gary Malone,
5 Kevin White, and Carla Graham; is that correct?
6 A.         Yes.
7 Q.         And the subject is, "Steven Mullins,
8 office of record contact"?
9 A.         Yes.
10 Q.         And Becky Steele -- who is Becky Steele?
11 A.         She's the warden III secretary.  She was
12 the lady that came on earlier.  So she's the warden
13 III secretary.
14 Q.         I want to scroll down to the attachment.
15 It says, "Alabama Department of Corrections record
16 of office contact."  Have you ever seen this type of
17 document before?
18 A.         Yes.
19 Q.         What is it?
20 A.         It's just a record of contact when an
21 inmate's family members or somebody is concerned
22 about that inmate calls.  And they just record what
23 the concerns are about the inmate, whatever the
24 nature of the call is.  And they pass it along to
25 whoever.
Page 78

1 Q.         And the date on this contact is February
2 26, 2019, at 3:57 p.m.; is that correct?
3 A.         Yes.
4 Q.         And so that would have been the date and
5 time that this individual called; is that right?
6 A.         Yes.
7 Q.         And the name here is redacted.  But the
8 individual who called, here it says the mother of
9 the inmate, Steven Mullins; is that correct?
10 A.         It says mother, yes.
11 Q.         And then the summary of the discussion
12 is, "He fears for his life and does not need to be
13 in population."
14         Did I read that correctly?
15 A.         Yes.
16 Q.         And then down near the bottom, it says,
17 "Latonya Burton, signature of staff member."
18         Did I read that correctly?
19 A.         Yes.
20 Q.         So why would Latonya Burton have signed
21 this?
22 A.         Because Latonya Burton works for the
23 commissioner.  And Steven Mullins' mother must have
24 called Montgomery, and Latonya forwarded that
25 message to Ms. Becky Steele.
Page 79

1 Q.         So when this message was received, what
2 steps should have been taken to address Steven
3 Mullins' mother's concerns?
4         MR. CHISM:  Object to the form.
5 A.         Well, it should have been investigated
6 by someone.
7 Q.         So the wardens and the captains were
8 notified of this call, correct?
9 A.         Yes.
10 Q.         So who would have been responsible for
11 making sure that an investigation was undertaken in
12 regard to this call?
13 A.         Well, Karla Jones, she could have
14 directed it to one of the captains or one of the
15 lieutenants and had them call Steven Mullins up and
16 talk to him.  And if he gave them the same
17 information that he gave his mother, that his life
18 was in danger, then they should have put him in some
19 -- they should have put him in a safety environment.
20 Q.         What do you mean by "a safety
21 environment"?
22 A.         Restrictive housing or if they had room
23 in the SSU unit, one of the two.  Get him out of
24 general population.
25 Q.         I want to make sure I understand your
Page 80

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 20 (77 - 80)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
**8/7/2024**

1 testimony.  Is it fair to say that Karla Jones would
2 have been responsible for making sure that that
3 investigation was undertaken?
4           MR. CHISM:  Object to the form.
5 A.        Here's the deal.  The information was
6 forwarded to Becky Steele.  I guess she sent it to
7 Karla Jones.  But the information came from
8 Montgomery, the commissioner's secretary.
9           So when it was passed along, she was the
10 top of the -- you know, she was in charge of the
11 facility and she got it first.  She could have --
12 like I said, she could have instructed one of the
13 captains or called the lieutenant that was on shift
14 and had them talk with the inmate.  I don't recall.
15 I don't recall this at all.
16 Q.        What would have been your responsibility
17 when you received an email like this?
18 A.        Most likely if I received it and
19 Ms. Jones received it and Ms. Givens received it --
20 again, I told you I didn't -- I wasn't in charge of
21 the security group.  That was Givens and Jones.
22           So I would have looked at the email and
23 maybe -- I might have called either Captain White or
24 Malone and said, hey, did y'all see this email?  Has
25 Ms. Jones talked to y'all about it yet?

Page 81

1           Most likely, I probably wouldn't have --
2 wouldn't have initiated anything because you had two
3 wardens that was higher than me on the food chain
4 that got it, too.  But if they wasn't there, I would
5 have called one of the captains and had them bring
6 Mullins up to the office.
7 Q.        So fair to say as long as Karla Jones or
8 Gwendolyn Givens were at the facility, you would
9 have expected them to handle this?
10 A.        Yes.
11 Q.        And would this be a message that would
12 be treated with urgency?
13 A.        Yes.  If an inmate feared for his life,
14 yes, that's urgency.
15 Q.        So immediate or urgent action would
16 needed to be taken in response to a message like
17 this, correct?
18 A.        If they got it, yes.
19 Q.        I will share with you what I'll now mark
20 as Exhibit 11.
21
22           (Exhibit 11 was marked
23            for identification.)
24
25           MS. PIERCE:  This is ADOC018942 to

Page 82

1 ADOC018943.
2 Q.        It's an email on 2-25-19 from Carla
3 Graham to Jeffrey Smith, Antoine Price, John Mason,
4 Kenneth Robertson, Raphael SantaMaria, Jason Norris,
5 Nekitris Estelle, and Latonya Scott.  And it's cc'g
6 Karla Jones, Gwendolyn Givens, Anthony Brooks, Gary
7 Malone, and Kevin White; is that correct?
8 A.        Yes.
9 Q.        And the subject -- strike that.
10           I'm going to scroll down to the
11 attachment.  This is a document that says, "Inmate
12 bed movement;" is that correct?
13 A.        Yes.
14 Q.        And the bottom line of this chart
15 identifies Steven Mullins moved from P36-1A to
16 L28-1A; is that correct?
17 A.        Yes.
18 Q.        Do you know why you received this
19 message?
20 A.        It seems like she just cc'd everybody
21 that was -- all the administrative staff, the
22 captains and wardens.  That's the reason why, I
23 guess.
24 Q.        Was it typical for you to receive
25 messages like this updating you of inmate bed

Page 83

1 movement?
2 A.        Yeah, I think we got the bed movements.
3 Daily bed movements were cc'd to all the wardens and
4 captains and shift commanders.
5 Q.        Were you required to take any action
6 when you received a message like this one?
7 A.        No.
8 Q.        No?
9 A.        No, I wasn't required to take any
10 actions.
11 Q.        Was anyone else required to take any
12 action with regard to messages like this?
13 A.        Unless they knew something that -- they
14 deemed that some action needed taken, they would
15 take it.
16 Q.        I'm going to stop sharing Exhibit 11.
17 And I'm going to share what I'll mark as Exhibit 12.
18
19           (Exhibit 12 was marked
20            for identification.)
21
22           MS. PIERCE:  This is ADOC000469 to
23 ADOC000471.
24 Q.        This is a Duty Officer Report from
25 2-26-2019 at 5:45 p.m.; correct?

Page 84

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 21 (81 - 84)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
**8/7/2024**

1 A.         Yes.

2 Q.         And then the next page is an Incident

3 Report on 2-26-19 at 5:45 p.m., as well, correct?

4 A.         Yes.

5 Q.         And then the next is an Incident Report

6 Amendment from 2-26-2019 at 5:45 p.m.

7            Did I read that correctly?

8 A.         Yes.

9 Q.         Why don't you go ahead and review for

10 yourself the narrative summary on this Incident

11 Report Amendment.  And let me know when you've

12 finished.

13 A.         Okay.

14 Q.         I can scroll down.  If you need me to

15 scroll down so you can see the whole thing, let me

16 know.

17 A.         Okay.  Scroll down some.  The top of the

18 page is cut off.  Right there.  Can you scroll up

19 some for me?

20 Q.         Sure.

21 A.         Right there.  Okay.

22 Q.         You've had a chance to review this

23 amended incident report?

24 A.         Yes.

25 Q.         After reading this report, does this

Page 85

1 report -- strike that.

2            Does reading this report refresh your

3 recollection at all about who Steven Mullins was or

4 Steven Mullins' death?

5 A.         No.  I still don't remember it.

6 Q.         And this incident report describes an

7 event in which Steven Mullins was stabbed in the L

8 dorm of St. Clair; is that correct?

9 A.         Yes.

10 Q.         And he later died at the hospital; is

11 that correct?

12 A.         Yes.

13 Q.         Do you recall -- it says here that you

14 were notified of Mr. Mullins' death; is that

15 correct?

16 A.         Yes, that's what it says.

17 Q.         But fair to say you don't recall that?

18 A.         I don't recall it.

19 Q.         Do you recall notifying the warden or

20 Mr. Ellington about Mr. Mullins' death?

21 A.         I don't recall notifying them about his

22 death.  It's just -- it's just an incident.  I'm

23 saying the incident doesn't -- I just don't remember

24 the incident at all other than him dying.  I might

25 have been the next person on call.  I see where he

Page 86

1 had went to the hospital, and then I was notified

2 about his death.

3            But prior to that, the whole incident

4 WAS ms. Jones, one of the other -- somebody else was

5 on call at the time.  So when he died, the week must

6 have changed, and I got the information that he had

7 passed away.  But I don't -- I don't recall it at

8 all.

9 Q.         You don't recall anything about this

10 incident at all?

11 A.         I really don't.  I don't recall this

12 incident.

13 Q.         I will share with you what I will mark

14 as Exhibit 13.

15

16            (Exhibit 13 was marked

17             for identification.)

18

19            MS. PIERCE:  This is ADOC019026.

20 Q.         This is an email on March 1, 2019, from

21 you to mate11@bellsouth.net.  Who is

22 mate11@bellsouth.net?

23 A.         That's my personal email address.

24 Q.         Why were you forwarding work emails to

25 your personal email address?

Page 87

1 A.         I'm not sure, ma'am.

2 Q.         Did you generally engage in any -- I'm

3 sorry.

4 A.         Here's the deal.  So I could have done

5 it -- I was going home maybe and I wanted to read

6 this.  I'm not sure why I sent it from my -- it

7 looks like an Outlook phone or an Android.  I'm not

8 sure why I sent it to my personal email.

9            I might have been -- I'm from

10 Huntsville.  I lived in -- I lived on the grounds

11 down there at St. Clair during the week, but I came

12 home on the weekends to Huntsville.

13            So it could have been, hey, let me just

14 send that to my house.  And then when I get there, I

15 can look over it maybe.  I was in the process of

16 driving home.  I'm not sure what the case may be.

17 Q.         Did you regularly engage in work

18 correspondence on your personal email?

19 A.         No.  It wasn't -- it wasn't a normal

20 thing to do.  But sometimes I would if I was at home

21 and needed to open up a document or something.

22 Q.         Would you generally send emails about

23 work from your work email address?

24 A.         No, not generally.

25 Q.         But there were times that you did?

Page 88

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 22 (85 - 88)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

1  A.        Of course, it was.

2  Q.        The email that you forwarded is one from

3  Carla Graham to you, and then cc'g Karla Jones,

4  Gwendolyn Givens, Gary Malone, and Kevin White; is

5  that correct?

6  A.        Yes.

7  Q.        And the email says, "Dr. John Sydney

8  pronounced Inmate Steven Mullins, W, 175255,

9  deceased at 8:20 p.m. per Sergeant Mason.  He said

10  I&I has area been down there to get pictures and

11  order for the remains to be sent for autopsy."

12        Did I read that correctly?

13  A.        Yes.

14  Q.        Again, your testimony is that you most

15  likely received notification of this because you

16  were the on-call warden; is that correct?

17  A.        Maybe so, yes.

18  Q.        Is there any other reason why you would

19  have been notified in particular of the death of

20  Steven Mullins?

21  A.        Well, Karla Jones -- not Karla Jones.

22  But Carla Graham.  So whenever the captains was on

23  call, they had to have a backup.  One of the wardens

24  had to be the backup.  So I was Graham's backup.

25        Either she was at the facility at the

1  time, at 8:57 p.m., and I was on call, or the

2  information was sent to her and she sent it to me by

3  me being her backup.  That's the only thing I can

4  think of, the reason it was sent to me and cc'd to

5  Jones and Givens.

6  Q.        And seeing this email and reviewing it,

7  does this refresh your recollection at all about

8  Steven Mullins or his death?

9  A.        No, it doesn't.  It just doesn't ring a

10  bell.

11  Q.        I've stopped sharing Exhibit 13.

12        In 2018 and early 2019, were there

13  issues with staffing shortages at St. Clair?

14  A.        Yes.

15  Q.        Describe those issues for me.

16  A.        Staffing shortages.  Nobody wanted to

17  work.  We couldn't hire anybody.  Didn't nobody --

18  wasn't nobody on the register to be hired.  People

19  were quitting.  It was short throughout the

20  department.  It wasn't just at St. Clair.

21  Q.        During 2018 and early 2019, in your

22  opinion and experience as warden I, did you have

23  sufficient staff to adequately monitor the housing

24  units at St. Clair?

25        MR. CHISM:  Object to the form.

1  A.        No.

2  Q.        Why do you say, "No"?

3  A.        Because we was short-staffed.  We had

4  sometimes six and seven people on a shift.  It was

5  just short.  It was short-staffed.  I'm pretty sure

6  you're familiar -- you know that.

7  Q.        In 2018, did you ever have a single cube

8  officer manning an entire housing unit?

9        MR. CHISM:  Object to the form.

10        MS. COBB:  Same objection.

11  A.        I'm not sure.

12  Q.        In 2018 and early 2019, did staffing

13  shortages interfere with the ability to complete

14  required contraband searches?

15        MR. CHISM:  Object to the form.

16        MS. COBB:  Same objection.

17  A.        I'm not sure.

18  Q.        In 2018 and early 2019, did staffing

19  shortages interfere with the ability to control

20  inmate movement at St. Clair?

21        MR. CHISM:  Object to the form.

22        MS. COBB:  Same objection.

23  A.        It could have.

24  Q.        When you say, "It could have," what do

25  you mean?

1  A.        If we didn't -- if we were moving

2  inmates and we didn't have the staff to move them,

3  they might not have got moved.

4  Q.        Did the staffing shortage in 2018 and

5  early 2019 present risks to inmate and staff safety

6  at St. Clair?

7        MR. CHISM:  Object to the form.

8        MS. COBB:  Same objection.

9  A.        I'm not sure.

10  Q.        Did you ever consider whether staffing

11  shortages presented a risk to inmate and staff

12  safety at St. Clair?

13  A.        Repeat the question.

14  Q.        Did you ever consider, while you were a

15  warden I, whether staff shortages presented a risk

16  to inmate and staff safety at St. Clair?

17        MS. COBB:  Object to form.

18  A.        Yes, it could have played a part.

19  Q.        What do you think that risk was?

20  A.        It could have been anything.  You know,

21  when you don't have the personnel to monitor the

22  inmates, anything can go on.

23  Q.        Do you recall in 2018 and early 2019 any

24  wardens or other supervisors taking any action to

25  try to reduce the risk of violence at St. Clair

Lakeisha Ezell v. Jefferson Dunn, et al.

Anthony Brooks
8/7/2024

1 despite the shortage of staff?
2              MR. CHISM:  Object to the form.
3              MS. COBB:  Same objection.
4 A.         I can't recall.  I can't recall.
5 Q.         Did you take any steps to reduce the
6 risk of violence at St. Clair in light of the staff
7 shortages in 2018 and early 2019?
8              MS. COBB:  Object to form.
9              MR. CHISM:  Object to the form.
10 A.        I can't recall.
11 Q.        I'm going to share with you what I'll
12 mark as Exhibit 14.
13
14            (Exhibit 14 was marked
15              for identification.)
16
17            MS. PIERCE:  This is ADOC-DS027399 to
18 ADOC-DS027400.
19 Q.        And this is an email from Grantt
20 Culliver to Leon Bolling, Dewayne Estes, Gwendolyn
21 Givens, Christopher Gordy, and cc'g Edward
22 Ellington, Stephen Rogers, and Latonya Burton on
23 April 7, 2019; is that correct?
24 A.        Yes.
25 Q.        And the email from Grantt Culliver says,
Page 93

1 Birmingham.  But I don't -- I can't recall, you
2 know, what happened in 2018.  That's been six years.
3 I just don't remember.
4 Q.         What was your purpose in going to this
5 meeting?
6 A.         Well, according to the email, it was
7 going to meet with the savages for staffing
8 recommendations or a staffing plan.  I just don't
9 remember the -- I remember going -- I remember being
10 in Birmingham at this building.  But I don't
11 remember anything from it.
12 Q.        Did you take any notes or document
13 anything that was discussed at the meeting?
14 A.        Probably not.  They might have gave us
15 the information.  I don't remember taking notes.
16 Q.        Do you remember any of the information
17 that was discussed at that meeting?
18 A.        No.
19 Q.        Do you recall any topics of conversation
20 at that meeting?
21 A.        The topic of conversation had to be
22 about staffing.  I just don't remember.  It's so
23 long ago, I just don't recall the information that
24 was disseminated.  I just don't recall that.
25 Q.        Following this meeting, did you have any
Page 95

1 "Wardens, the savages will meet with you on April
2 12, 2018, 8:30 a.m. at Maynard Cooper's office, 1901
3 6th Ave. North, Regions Harbert Plaza, Suite 2400,
4 Birmingham, Alabama, 36503, conference room 24D.
5 They will discuss their staffing recommendations and
6 how they got there, along with your facility
7 staffing plan.
8              Please bring your assistant warden and
9 at least one of your captains to the meeting."
10            Did I read that correctly?
11 A.        Yes.
12 Q.        And then the next email is from
13 Mr. Estes to Grantt Culliver.  It says,
14 "Commissioner Culliver, do you want my to bring
15 Warden Brooks?"
16            And then Mr. Culliver responds, "Yes,
17 sir, and Captains White and Graham."
18            Mr. Culliver responds, "10-4."
19            Did I read that correctly?
20 A.        Yes.
21 Q.        Do you know who the savages are?
22 A.        I can't recall.
23 Q.        Do you recall this meeting in 2018
24 relating to staffing recommendations?
25 A.        I remember going to the -- going to
Page 94

1 conversations with anyone else about the
2 recommendations from the savages?
3 A.         I can't recall.
4 Q.         Did you take any steps after this
5 meeting to implement any of the recommendations or
6 corrective action that was discussed at the meeting?
7              MS. COBB:  Object to form.
8 A.         We don't hire staff.  We can't hire
9 direct staff members at the prison.  So no, I didn't
10 take any steps to hire or to better the staffing.
11 Q.        You don't recall all of the
12 recommendations or corrective action that was
13 discussed at this meeting, correct?
14 A.        I don't recall it.
15 Q.        And you don't recall taking any
16 corrective action in response to any recommendations
17 that were made at that meeting, correct?
18 A.        Yeah.  Again, at the facility level, we
19 don't do direct hiring.  So there was no action to
20 take.  Everything has got to go through personnel.
21 Q.        And there are actions that can be taken
22 to address risks posed by short staffing other than
23 just hiring additional staff, correct?
24            MS. COBB:  Object to form.
25 A.        Repeat that, please.
Page 96

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
**8/7/2024**

1 Q.        So we discussed that there are risks to
2 safety posed by staff shortages, correct?
3 **A.        Yes.**
4 Q.        And there are steps that could be taken
5 to reduce that risk other than just hiring
6 additional staff, correct?
7 **A.        I'm not sure.**
8 Q.        For example, would it be possible to
9 make sure that wardens and captains were doing
10 frequent walk-throughs of the facilities and the
11 dorms?  Is that a step that could have been taken to
12 alleviate risks posed by staff shortages?
13        MS. COBB:  Object to form.
14        MR. CHISM:  Object to the form.
15 **A.        Of course.  I'm almost positive that**
16 **wardens did walk through the facility.  But you**
17 **going to walk all night?  I'm saying the wardens and**
18 **the captains, they have a time at work.  And**
19 **throughout that time period of them being at the**
20 **facility, we did walk through the facility.  But we**
21 **had to go home, too.  And the staff -- the staffing**
22 **was still short.**
23 Q.        I'm going to stop sharing Exhibit 14.
24 I'm going to share what I'll mark as Exhibit 15.
25                                          Page 97

1 Q.        And the email from Charlotte Morrison
2 says, "Judge Ott, Dr. Austin, Mr. McGinnis, and
3 Mr. Stalder.  Yesterday the parties (Art, Charlotte,
4 Bryan and Allison, Mr. McGinnis, and Mr. Stalder)
5 completed the security renovation project, SRP, tour
6 at St. Clair.
7        The tour lasted approximately four
8 hours, and we visited D block, E block, L block, M
9 block, P block, and Q block.  We wanted to summarize
10 our observations from the tour and also highlight
11 some patterns of concern."
12        Did I read that correctly?
13 **A.        Yes.**
14 Q.        Do you recall a security renovation
15 project?
16 **A.        Yes.**
17 Q.        What was that?
18 **A.        They was renovating -- when I got there,**
19 **they was already in the process of renovating.  They**
20 **was changing out the cell doors and locks.  They was**
21 **adding fencing to the facility. They might have**
22 **added a camera system.**
23 Q.        Do you know why these renovations were
24 being done?
25 **A.        I guess they felt necessary to do it.**
                                          Page 99

1                (Exhibit 15 was marked
2                for identification.)
3
4        MS. PIERCE:  This is ADOC-DS028130 to
5 ADOC-DS028132.
6 Q.        I'm going to -- can you see this
7 document okay, Mr. Brooks?
8 **A.        Yes.**
9 Q.        And this is an email on 10-16-2018 that
10 you forwarded to your personal email; is that
11 correct?
12 **A.        Yes.**
13 Q.        And then the email that you forwarded is
14 one that Bart Harmon sent to Edward Ellington, Karla
15 Jones, you, Amanda Graham, Carla Graham, Anne Hill,
16 and Gary Willford; is that correct?
17 **A.        Yes.**
18 Q.        And the email from Bart Harmon is
19 redacted.  But he also below forwarded an email from
20 Charlotte Morrison, an attorney at EJI; is that
21 correct?
22 **A.        Yes.**
23 Q.        Do you recall receiving this email?
24 **A.        I don't recall.  But if I sent it to**
25 **myself, I must have been on leave or at home.**
                                          Page 98

1 **It was during -- it was being done prior to me**
2 **getting there.  So I guess they felt the need for**
3 **it.**
4 Q.        And while you were a warden I, and
5 particularly in early 2018 and -- excuse me.
6 Particularly in 2018 and early 2019, do you recall
7 there being issues with cell door locks at
8 St. Clair?
9 **A.        Yes.**
10 Q.        What were those issues?
11 **A.        They had gotten new cell doors and**
12 **locks.  But the inmates had figured out how to**
13 **manipulate them and get them open without the**
14 **cubicle -- having access to a key or the cubicle**
15 **unlocking them.**
16 Q.        While you were a warden I, and
17 particularly in 2018 and early 2019, was it common
18 for cell blocks -- excuse me.  Was it common for
19 cell door locks to be inoperable?
20        MS. COBB:  Object to form.
21        MR. CHISM:  Object to form.
22 **A.        No, it wasn't common.  But it happened.**
23 Q.        I'm going to read a little bit more
24 here.  "Inoperational cell door locks.  There were
25 six cell door locks that were completely
                                          Page 100

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
**8/7/2024**

1 inoperational between the blocks that we toured."
2 And it lists several cells.
3          "There was a seventh cell, Q40, with a
4 defective or damaged door jamb that prevents the
5 door from being secured without using a physical key
6 (rather than from the control panel button) which
7 Mr. McGinnis characterized as being an inoperable
8 cell door lock."
9          Did I read that correctly?
10 A.        Yes.
11 Q.        And then the next section,
12 "Inoperational control panel light centers."  Light
13 sensors.  Excuse me.
14          "For each side of the housing units,
15 there is a control panel with light sensors that are
16 intended to alert the cube operator to when a door
17 is not secure with a red light.  In every housing
18 block that we entered, there were several cells that
19 had broken or defective sensors that stayed red.
20 Including the following:"
21          Did I read that correctly?
22 A.        Yes.
23 Q.        And then it lists a number of cells that
24 appear to have had broken light sensors; is that
25 correct?

Page 101

1 operator that the window that he looked through to
2 observe the block was so dusty and dirty that he was
3 unable to see out of it, and that he tried to get it
4 cleaned for months with no luck."
5          Did I read that correctly?
6 A.        Yes.
7 Q.        And then it says, "Additionally, we
8 observed cell doors with the window panes broken so
9 badly that the cells cannot be seen into."
10          And then it lists three cells; is that
11 correct?
12 A.        Yes.
13 Q.        And then the next section is Inoperable
14 Cameras.  "The experts agree that the camera system
15 at St. Clair is 'by and large inoperable.'  The
16 entry camera to D block was operational.  There were
17 no cameras installed inside the segregation housing
18 blocks.
19          There was an operational camera
20 monitoring the entrance to L-M blocks, but no
21 cameras are working inside of L and M.  There are no
22 working cameras monitoring the entrance to P-Q
23 blocks and no cameras working inside of P and Q."
24          Did I read that correctly?
25 A.        Yes.

Page 103

1 A.        Yes.
2 Q.        Then the next section is titled Lock
3 Obstructions.  "In every housing unit that we
4 toured, including the segregation blocks, we
5 observed at least 33 locks and door jambs with
6 obstructions in them.
7          While St. Clair staff and the experts
8 concluded that the obstructed locks were still
9 largely operational, EJI has received reports from
10 men that they can come out of their cells when the
11 locks are obstructed, but that someone wouldn't
12 necessarily be able to come inside the cell."
13          And then they've identified a number of
14 cells with obstructed locks; is that correct?
15 A.        Yes.
16 Q.        And then the next section, "We were
17 informed by cube operators/officers that they are
18 never able to observe cells 11 and 12 (on the one
19 side of blocks) and cells 35 to 36 (on the two side
20 of blocks) because those cells are located in the
21 corners near the showers, and the mirrors and the
22 blocks do not make the areas visible."
23          Did I read that correctly?
24 A.        Yes.
25 Q.        "We were also informed by a cube

Page 102

1 Q.        And then the next section, Patterns and
2 Other Observations.  "On the tour, we observed an
3 area of noncompliance with paragraph 75C of the
4 settlement agreement which provides for the
5 immediate transfer of inmates out of cells with
6 inoperable locks.  Of the seven cells with
7 inoperable locks, five of those cells had men
8 assigned there as of that morning and/or occupying
9 them."
10          And then it lists several cells; is that
11 correct?
12 A.        Yes.
13 Q.        And the third paragraph from the bottom,
14 "It appears that there was a last minute effort on
15 the part of St. Clair staff (Warden Brooks and Carla
16 Graham) to accomplish compliance for the purpose of
17 the tour.  But given that many of these locks were
18 noted as inoperable in the 10-3 preaudit, men should
19 have been moved out of those cells long before our
20 10-15 tour.
21          Additionally, this bed movement was done
22 by Warden Brooks and Captain Graham rather than the
23 ICB.  So we would ask that Dr. Austin and
24 Mr. Stalder review and confirm that the warden
25 override procedures were followed."

Page 104

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 26 (101 - 104)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
**8/7/2024**

1 Did I read that correctly?

2 A.        Yes.

3 Q.        And then the next paragraph, "We also

4 observed an overall culture of indifference to the

5 security of cell doors, locks, and a tolerance of

6 obstructions in locks.

7 For example, Captain Graham and Malone

8 conceded that officers do not remove obstructions

9 from the locks. Captain Graham said that it would

10 be pointless to do so because the men would just

11 obstruct the locks again.

12 Bart asked the experts if this is just

13 the way things are in the maximum security prison.

14 But they responded that this was not typical, but it

15 has been normalized at St. Clair, and that's a

16 problem.

17 In P-Q blocks, around half of the lights

18 indicating whether or not a lock is secured were

19 inoperable. The cube operators/officers informed us

20 that many of those light sensors had been that way

21 for months, and shrugged when asked how they would

22 know whether a cell is, in fact, secure.

23 Mr. McGinnis and Mr. Stalder agreed this

24 culture of indifference needs to be addressed.

25 Mr. Stalder noted that one or two lights can be

Page 105

1 inoperable, things break in prisons regularly, but

2 that a cube operator/officer should know about that

3 and then take a special care to do something else to

4 confirm the locks are secure. It's when there are

5 multiple sensor lights that don't work for extended

6 periods of time and no other measures taken that it

7 becomes a dangerous culture.

8 Finally, in evaluating the bed roster

9 that we received yesterday, we have concerns that

10 the prison is currently over the population cap by

11 12 men, given the inoperable locks on cells." And

12 then it lists several cells.

13 Did I read that correctly?

14 A.        Yes.

15 Q.        Do you recall getting this email?

16 A.        I don't recall getting it. But it

17 happened. So I got it. Is this the one that I

18 forwarded to -- I might have been at home at the

19 time. Is this the one I forwarded to myself?

20 Q.        Yes.

21 A.        Okay. Yeah.

22 Q.        Let me scroll up so you can see.

23 Do you dispute any of the findings that

24 are identified in this email that we discussed?

25 A.        No.

Page 106

1 MR. CHISM: Object to the form.

2 MS. COBB: Same objection.

3 Q.        Go ahead.

4 A.        I said, "No."

5 Q.        Were problems with inoperable locks --

6 strike that.

7 Were inoperable locks a problem at

8 St. Clair in the 2018 time period?

9 MS. COBB: Object to form.

10 MR. CHISM: Object to the form.

11 A.        Well, I mentioned to you earlier that

12 when you're short of staff, inmates do what they

13 want. I told you that they would manipulate the

14 locks. They destroyed the camera system. So when

15 you don't have staffing to monitor the inmates, this

16 is what happens.

17 Q.        And were you aware in 2018 about the

18 inoperable camera system?

19 MR. CHISM: Object to the form.

20 A.        Yes.

21 Q.        Did you ever discuss any concerns about

22 the inoperable camera system with anybody else?

23 MR. CHISM: Object to the form.

24 A.        Discuss it with anybody in particular?

25 Everybody was aware of it from St. Clair down to

Page 107

1 Montgomery.

2 Q.        Did you and the other wardens and

3 captains discuss anything that could be done to

4 address the inoperable camera system?

5 A.        I'm pretty sure we discussed it. But it

6 was a new system. I told you they was in the

7 process when I got there adding a camera system,

8 new doors, new locks, that kind of stuff when I got

9 there. So the camera system was fairly new.

10 But when you have nobody to manage those

11 blocks, that's exactly what happens. The inmates is

12 aware. They're aware that these cameras are

13 watching them. And just as soon as they got an

14 opportunity, they was going to destroy them with

15 nobody around to manage them, keep them from

16 destroying them. So yes, I was aware. And we

17 probably discussed that.

18 Q.        When you say you probably discussed

19 that, do you recall any --

20 A.        I don't recall any particular time we

21 discussed it. But I'm pretty sure it was a topic

22 that we discussed.

23 Q.        Do you recall having any discussions

24 with Warden Jones, any of the other wardens or

25 captains, or Mr. Ellington about obstructed or

Page 108

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 27 (105 - 108)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
**8/7/2024**

1  broken locks at St. Clair?
2              MR. CHISM:  Object to the form.
3  A.        I don't remember having any direct
4  discussions with them.  It might have been a topic
5  that was brought up.  But I don't remember.
6  Q.        In 2018, did policy require any
7  inspections of the cell doors to make sure that they
8  were operable?
9              MR. CHISM:  Object to the form.
10  A.        Yes, there was a policy that was -- that
11  had the -- the shift that was on at the time to
12  inspect the doors.
13  Q.        Fair to say that every shift was
14  responsible for inspecting the doors in the cell
15  house that they were assigned to?
16              MS. COBB:  Object to form.
17  A.        Yes, it's fair to say that they should
18  have done it.
19  Q.        Did policy require them to do that?
20  A.        I'm not sure if it was in a policy or a
21  memo, but it was -- it was initiated to do that.
22  Q.        And this was in 2018 and early 2019,
23  correct?
24  A.        Yeah.
25  Q.        And those inspections, should they have

Page 109

1  been documented?
2  A.        Yes.
3  Q.        And where would they have been
4  documented?
5  A.        They had a door lock inspection form,
6  door lock inspection sheet that someone had created
7  to do that.  I'm not sure who created it.  But I
8  remember that they did have some formal -- some
9  document that showed what block that they went into
10  and inspected the locks.
11  Q.        And were any supervisors responsible for
12  reviewing those sheets and making sure that cell
13  lock inspections were done?
14  A.        It could have been the security warden
15  and the captain that was over population in the
16  unit, that monitored those units.  They didn't come
17  directly to me.  I might have got cc'd on them.  But
18  for the most part, the security warden, which was at
19  the time I think Givens, and Ms. Jones, she might
20  have got them.
21  Q.        What steps should a staff member take
22  when they realized during an inspection that a cell
23  lock was inoperable or obstructed?
24  A.        They just document it on the form that
25  they was using.  If there was an inoperable lock, I

Page 110

1  know it was documented that the lock was inoperable.
2  We would turn it over to the maintenance -- I'm
3  pretty sure it was turned over to maintenance to try
4  to fix it.
5  Q.        And if a cell lock was inoperable, did
6  inmates assigned to the cell need to be moved?
7  A.        According to Stalder, yeah.  But where
8  do you move them to?
9  Q.        What do you mean by that?
10  A.        I'm saying where do you move them to?
11  You've got -- the dorm is filled up.  You've got
12  inmates in every cell.
13  Q.        So do you ever recall there being an
14  issue where you had cell locks that weren't working,
15  but you didn't have anywhere to place the inmates
16  who were assigned to those cells?
17              MR. CHISM:  Object to the form.
18              MS. COBB:  Object to the form.
19  A.        I can't recall.
20  Q.        Do you know if that was an occurrence
21  that would happen?
22              MR. CHISM:  Object to the form.
23              MS. COBB:  Object to form.
24  A.        I can't recall.
25  Q.        So why did you testify, then, where

Page 111

1  would you put the inmates if the cell lock was
2  inoperable?
3  A.        You read it in the memo from Stalder
4  saying that inmates were still housed in the dorms
5  that the locks was inoperable.  I'm just saying
6  where would they go?
7  Q.        So is it your testimony that you did not
8  have enough cells with locking doors to place all
9  the inmates at St. Clair?
10              MS. COBB:  Object to the form.
11              MR. CHISM:  Object to the form.
12  A.        I'm just saying if we had -- he
13  mentioned that we had 12 inmates over the capacity
14  of the required inmates to be housed at St. Clair.
15  Do you remember reading that?
16  Q.        And you're referring to this bottom
17  paragraph here?
18  A.        Yeah.
19  Q.        Okay.  So do you dispute his statement,
20  then, that there was not enough --
21  A.        I --
22  Q.        Let me finish my question just for the
23  record.
24          Do you dispute his finding that there
25  was not enough beds to place all the inmates, given

Page 112

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 28 (109 - 112)

Lakeisha Ezell v. Jefferson Dunn, et al.

Anthony Brooks
8/7/2024

1 the inoperable locks, at St. Clair?
2          MS. COBB:  Object to form.
3          MR. CHISM:  Object to the form.
4 A.          I don't dispute it.  I'm saying there
5 was nowhere to place them unless you're going to
6 place them on the floor inside the dormitory.
7 Q.          I want to go back up to the first -- the
8 second page of the attachment.  Excuse me.  The
9 second page of the email.  In the third paragraph
10 from the bottom, he wrote, "It appears that there
11 was a list" -- excuse me.  Strike that.
12          The third paragraph from the bottom,
13 Ms. Morrison wrote, "It appears that there was a
14 last minute effort on the part of St. Clair staff
15 (Warden Brooks and Captain Graham) to accomplish
16 compliance for the purpose of the tour."
17          Did I read that correctly?
18 A.          Yeah, you read it correctly.  But what
19 it mean by "accomplish compliance"?  I'm saying we
20 did what we had to do.  We didn't adjust nothing
21 because of the purpose of the tour.  What was he
22 trying to say?  I'm confused about what he was
23 trying to say.
24 Q.          Do you recall taking any action in
25 preparation for this tour?
                                              Page 113

1 A.          I can't recall.
2 Q.          Do you specifically -- strike that.
3          Were you present when this tour
4 occurred?
5 A.          I might have been.  We had so many tours
6 from different entities.  So I might have been
7 there.  I can't recall.  You know, I'm sure I was if
8 he wrote my name in there saying I tried to
9 accomplish compliance.
10 Q.          Did you -- strike that.
11          Do you recall taking any action to
12 address any of the problems, the specific problems
13 identified in this email?
14 A.          I don't recall.
15 Q.          Do you recall Dr. Austin, Mr. Stalder,
16 or Mr. McGinnis?
17 A.          Do I recall them?
18 Q.          Yes.
19 A.          Yeah, I remember them.  Yeah.
20 Q.          Did you ever have any conversations with
21 them about the conditions at St. Clair?
22          MR. CHISM:  Object to the form.
23 A.          I probably had several conversations
24 with them.  But I don't recall any specifics.
25 Q.          Did you ever raise any concerns to them
                                              Page 114

1 about the conditions at St. Clair?
2          MS. COBB:  Object to form.
3 A.          I can't recall.
4 Q.          Did you have any discussions with Warden
5 Jones, Warden Givens, Mr. Ellington, or anyone else
6 about the problems and patterns identified in this
7 email?
8          MR. CHISM:  Object to the form.
9 A.          I can't recall.
10 Q.          Did any of the wardens or Mr. Ellington
11 or the captains initiate any corrective action in
12 response to the problems identified in this email?
13          MR. CHISM:  Object to the form.
14 A.          I can't recall.
15 Q.          What we just looked at was Exhibit 15.
16 So I'm going to mark what I'll -- I'm going to show
17 you what I'll mark as Exhibit 16.
18          MS. COBB:  Megan, do you know how much
19 more you have to go?  I was wondering for restroom
20 break purposes.  But if you don't have too much
21 more, then I'll wait
22          MS. PIERCE:  I'll go at least until
23 1:00.  Hopefully -- I'll do my best to wrap up by
24 1:00 so we can keep on schedule.  So if you would
25 like to get a restroom break, that's fine.
                                              Page 115

1          (Recess was taken.)
2          MS. PIERCE:  Back on the record.
3 Q.          Mr. Brooks, I'm going to share with you
4 what I will mark as Exhibit 16.
5
6          (Exhibit 16 was marked
7              for identification.)
8
9          MS. PIERCE:  This is ADOC-DS010610 to
10 ADOC-DS010624.
11 Q.          Let's go back up to the top.  The title
12 of this document is Alabama Department of
13 Corrections Institutional Vulnerability Analysis for
14 St. Clair Correctional Facility dated March 2, 2018;
15 is that correct?
16 A.          Yes.
17 Q.          Are you familiar with this document?
18 A.          I don't recall.  But I might have got
19 it.
20 Q.          Do you know what the institutional
21 vulnerability analysis is?
22 A.          I can't remember.
23 Q.          Were you involved in conducting the
24 institutional vulnerability analysis?
25 A.          I can't remember.
                                              Page 116

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 29 (113 - 116)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
**8/7/2024**

1 Q.        And let's scroll down to Page 14 of this
2 document.  It says, "List of individuals who
3 participated in the assessment process."  And the
4 first one listed is Anthony Brooks, warden I,
5 St. Clair Correctional Facility.
6           Did I read that correctly?
7 **A.        Yes.**
8 Q.        And it says the date risk assessment was
9 conducted was May 2, 2018.  Did I read that
10 correctly?
11 **A.        Yes.**
12 Q.        Does this refresh your recollection at
13 all about your participation in conducting the risk
14 assessment?
15 **A.        It doesn't.**
16 Q.        Do you dispute that you were involved in
17 conducting this risk assessment?
18 **A.        No, I don't dispute it.**
19 Q.        How often were institutional
20 vulnerability analyses conducted?
21 **A.        I'm not sure.**
22 Q.        As you sit here today, do you have any
23 recollection of what the institutional vulnerability
24 analysis was?
25 **A.        I can't remember.**
Page 117

1 **A.        I don't dispute it.  I just don't**
2 **recall.**
3 Q.        Were you involved in making this
4 finding?
5           MR. CHISM:  Object to the form.
6 **A.        I don't recall.**
7 Q.        Was there an issue with extensive drug
8 use at St. Clair in 2018?
9           MR. CHISM:  Object to the form.
10 **A.        I don't recall.**
11 Q.        In 2018 and early 2019, did you take any
12 steps to limit or control drug usage at St. Clair?
13 **A.        I don't recall.**
14 Q.        And who would have been responsible for
15 taking steps to decrease and control drug usage at
16 St. Clair?
17           MR. CHISM:  Object to the form.
18 **A.        All staff.**
19 Q.        Would that have fallen under the
20 responsibility of any particular warden or captain?
21 **A.        All staff members.  I'm saying from the**
22 **warden down.**
23 Q.        I'm going to continue to Page 8.  Sorry.
24 I'm going to continue on to Page 9, Staff Issues.
25 Here it says, "Staff morale is:"  And then out of
Page 119

1 Q.        I'm going to go to Page 1, the sections
2 entitled Document Purpose and Document Use.  Page 2
3 has an institutional overview.  Page 4, Factors
4 Which May Affect Vulnerability.  Page 5 is titled
5 Inmate Population.  That looks like it continues on
6 to Page 6.  Is that correct?
7 **A.        Yes.**
8 Q.        And I want to look at Page 6 of the
9 vulnerability analysis here, the section entitled
10 Drug Usage.
11           It says, "What do you consider the level
12 of drug usage to be in your facility?  Please
13 explain why."
14           And it looks like extensive has been
15 underlined out of the options of extensive,
16 moderate, and limited; is that correct?
17 **A.        Yes.**
18 Q.        And then the explanation says,
19 "Extensive.  Drugs are readily available due to a
20 high number of items thrown over the fences, the
21 number of positive drug tests, and the amount and
22 variety of illegal substances confiscated."
23           Did I read that correctly?
24 **A.        Yes.**
25 Q.        Do you dispute this finding?
Page 118

1 good, fair, and low, low has been marked; is that
2 correct?
3 **A.        Yes.**
4 Q.        Then it says, "Please explain your
5 reasoning."
6           And it says, "Staff shortages, no cost
7 of living increases/pay, mandatory overtime, and
8 stress from the number of serious and dangerous
9 incidents."
10           Did I read that correctly?
11 **A.        Yes.**
12 Q.        Do you dispute this finding?
13 **A.        I don't dispute it.  But I don't recall**
14 **the document.**
15 Q.        Did you have any involvement in making
16 this finding?
17 **A.        I don't recall.**
18 Q.        In your opinion and your experience as
19 warden I at St. Clair, was staff morale low at least
20 in part due to stress from the number of serious and
21 dangerous incidents at St. Clair?
22           MR. CHISM:  Object to the form.
23           MS. COBB:  Same objection.
24 **A.        It's documented on this vulnerability**
25 **sheet.  So the information had to come from the**
Page 120

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 30 (117 - 120)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
**8/7/2024**

---

1  staff.  So yeah.
2  Q.         Do you have an opinion, based on your
3  experience as a warden I, about staff morale in
4  2018?
5  A.         I don't recall.
6  Q.            In 2018 and early 2019, did you take any
7  steps to try to address staff morale?
8  A.         I can't recall.
9  Q.            Did any of the other wardens or
10 Mr. Ellington take any steps to address staff morale
11 in 2018 and early 2019?
12 A.         I can't recall.
13 Q.            Did you have any discussions with the
14 other wardens or Mr. Ellington about low staff
15 morale in 2018 and early 2019?
16 A.         I can't recall.
17 Q.            I'm going to scroll down to Page 11,
18 Assault From Outside.  This is the first section on
19 Page 11.  "Curiosity seekers, ex-inmates, visitors
20 have been found in unauthorized areas on institution
21 property."  And "Yes" is marked.
22            Did I read that correctly?
23 A.         Yes.
24 Q.            Do you recall during your time as warden
25 I having outsiders found in unauthorized areas of
Page 121

1  the prison?
2  A.         Yes.
3  Q.            What incidents do you recall?
4  A.         **I can't recall the incident.  But yeah,**
5  **we have found individuals outside the institution**
6  **that was unauthorized.**
7  Q.            And how often did that occur?
8  A.         I can't recall.
9  Q.            Did you take any steps to make sure that
10 outsiders weren't able to access areas where they
11 weren't authorized to be?
12 A.         I can't recall.
13 Q.            I want to go down to the section titled
14 Escapes, which is the fourth section down.  "On
15 12-4-17, two inmates managed to escape during a time
16 of increased inmate movement coupled with ongoing
17 staff shortages."
18            Did I read that correctly?
19 A.         Yes.
20 Q.            Do you recall those two escapes in
21 December 2017?
22 A.         **I know we had them.  I just don't recall**
23 **who the inmates were and all that.**
24 Q.            So fair to say that you recall that
25 inmates escaped, but you don't remember any of the
Page 122

1  details about the escapes?
2  A.         Yes.
3  Q.            Were you involved in the response to the
4  escapes?
5  A.         **Everybody was involved.**
6  Q.            What was your involvement?
7  A.         I can't recall.
8  Q.            Why do you say, "Everybody was
9  involved"?
10 A.         **I'm saying whenever you have an escape**
11 **at a prison, everybody have to be involved.**
12 **Everybody have to be there.**
13 Q.            Were you involved in any discussions
14 about the escape occurring during a time of
15 increased movement?
16 A.         I can't recall.
17 Q.            I'm going to go down to section -- or
18 Page 13, Section IV titled Critical Threats.  Do you
19 see this section that I'm talking about?
20 A.         Yes.
21 Q.            Were you involved in drafting this
22 portion of the assessment?
23 A.         **I could have been.  I just don't recall.**
24 Q.            Critical threat one is, "Staffing
25 shortage.  Assessment:  The lack of adequate number
Page 123

1  of correctional officers on post to patrol areas
2  leaves inmates unattended for long periods of time.
3  It also hinders the ability of staff to respond to
4  incidents and be able to control the situations.
5  The inmate-to-officer ratio is too high during each
6  shift, especially on the night shift."
7            Did I read that correctly?
8  A.         Yes.
9            MR. CHISM:  Object to the form.
10 Q.            Were you involved at all in this
11 assessment?
12 A.         **I could have been.  I don't recall.**
13 Q.            Do you dispute the findings in this
14 section?
15            MR. CHISM:  Object to the form.
16 A.         **No, I don't.**
17 Q.            Do you agree that in 2018 and early
18 2019, staffing levels left inmates unattended for
19 long periods of time?
20            MR. CHISM:  Object to the form.
21 A.         I can't recall.
22 Q.            Were you involved in any discussions or
23 efforts to take corrective action to address the
24 problems discussed in this paragraph?
25 A.         I can't recall.
Page 124

---

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 31 (121 - 124)

Lakeisha Ezell v. Jefferson Dunn, et al.

Anthony Brooks
8/7/2024

1 Q.        I'm going to go down to Page 15.  The
2 section is titled Goals.  Do you see this?
3 A.        Yes.
4 Q.        Were you involved in the creation of
5 this list of goals for 2018?
6 A.        I could have been.  I just don't recall.
7 Q.        Did you have any discussions with the
8 wardens, the captains, or other security staff
9 relating to goals for 2018?
10 A.       I can't recall.
11 Q.       Goal Number 2 is, "Create inmate
12 specialized dorms, (i.e., inmate safety, restricted
13 privilege, intake.)"
14          Did I read that correctly?
15 A.       Yes.
16 Q.       What steps did you take to implement
17 this goal?
18 A.       I can't recall.
19 Q.       Did Karla Jones or any of the other
20 administrators provide any direction on implementing
21 this goal?
22          MR. CHISM:  Object to the form.
23 A.       I can't recall.
24 Q.       Why don't you take a moment to review
25 the goals listed on this page.  And let me know when
Page 125

1 you are done.
2 A.        Okay.  I'm done.
3 Q.        Did you take any steps in 2018 or early
4 2019 to further any of these goals?
5 A.        I can't recall.
6 Q.        Did Warden Jones, Warden Givens, or
7 Mr. Ellington provide any directives about achieving
8 or implementing these goals in 2018 and early 2019?
9          MS. COBB:  Object to form.
10          MR. CHISM:  Object to the form.
11 A.       I can't recall.
12 Q.       Did you participate in any discussions
13 relating to these goals in 2018 and early 2019?
14 A.       I can't recall.
15 Q.       Was there any follow-up to the
16 institutional vulnerability analysis that we just
17 discussed here?
18          MR. CHISM:  Object to the form.
19 A.       I can't recall.
20 Q.       Was there typically some sort of
21 follow-up to monitor the issues identified in the
22 vulnerability analysis and efforts to achieve the
23 goals identified in the vulnerability analysis?
24          MR. CHISM:  Object to the form.
25 A.       There could have been.  I just don't
Page 126

1 recall.
2 Q.        We've looked through this 2018
3 vulnerability analysis.  Did this refresh your
4 recollection at all about what this process was and
5 your involvement in it?
6 A.        No.
7 Q.        Do you recall ever being involved in the
8 institutional vulnerability analysis at any time as
9 warden I?
10 A.       I could have been.  You said my name was
11 on it.  I just don't recall.  It's been such a long
12 time.
13 Q.       I'm done sharing Exhibit 16.
14          Do you recall PREA audits -- strike
15 that.
16          Do you know what a PREA audit is?
17 A.       Yes.
18 Q.       What is a PREA audit?
19 A.       It's been a long time since I've seen it
20 or heard it.  I just don't recall the details of it.
21 Q.       As warden I, did you have any
22 involvement in the PREA audits at St. Clair?
23 A.       I can't recall if I did or not.
24 Q.       Did you have any discussion relating to
25 the findings from PREA audits at St. Clair?
Page 127

1 A.        I don't remember.
2 Q.        I believe we are on Exhibit 17.
3
4          (Exhibit 17 was marked
5          for identification.)
6
7          MS. PIERCE:  This is ADOC025638.
8 Q.        This is an Incident Report from March
9 23, 2018; is that correct?
10 A.       Yes.
11 Q.       Go ahead and take a moment to review the
12 incident report.  And let me know when you're done.
13 A.       Okay.  I'm done.
14 Q.       After reviewing this incident report, do
15 you recall this incident?
16 A.       I don't recall it.
17 Q.       Do you recall an inmate named Michael
18 Kinchen?
19 A.       I don't recall.
20 Q.       This incident report states that Michael
21 Kinchen was found with noticeable swelling to his
22 cheek and that a correctional officer, Mark Walker,
23 observed that and questioned Kinchen about his
24 injuries; is that correct?
25 A.       Yes.
Page 128

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 32 (125 - 128)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
**8/7/2024**

1 Q.          And then you and Mr. Baker also
2 questioned Mr. Kinchen about his injuries; is that
3 correct?
4 **A.        Yes.**
5 Q.          Do you recall questioning Mr. Kinchen?
6 **A.        I can't recall the incident period.**
7 Q.          And it says here, "Inmate Kinchen stated
8 Inmate Kinchen owed debts Inmate Kinchen could not
9 pay.  And Inmate Gregory Bester, Inmate Jacques
10 Pyant, and Inmate Lorenzo Jackson were involved in
11 the incident."
12          Did I read that correctly?
13 **A.        Yes.**
14 Q.          It says that he was taken to medical.
15 And then at 3:35, he was placed in restrictive
16 housing pending disciplinary action for
17 intentionally creating a security, safety, and
18 health hazard.
19          Did I read that correctly?
20 **A.        Yes.**
21 Q.          Was it appropriate to discipline
22 Mr. Kinchen following the attack that he suffered?
23          MR. CHISM:  Object to the form.
24 **A.        If the lieutenant deemed that he put**
25 **himself in a position where he intentionally created**

Page 129

1 **himself a safety and health hazard, yes.**
2 Q.          Would you have been -- given that you
3 questioned Mr. Kinchen, would you have been involved
4 in the decision here to place him in segregation?
5 **A.        Of course, I placed him -- I placed him**
6 **in safekeeping, you know.  Not just segregation, but**
7 **to keep him out of future harm.**
8 Q.          Did you, as warden I, think it would be
9 appropriate to place someone like Mr. Kinchen, based
10 on what's in this incident report, to place him in
11 segregation --
12          MS. COBB:  Object to form.
13 Q.          -- for disciplinary reasons?
14          MS. COBB:  Object to form.
15 **A.        Obviously, Mr. Kinchen was in -- his**
16 **safety was the number one priority.  So, of course,**
17 **yes, put him in restrictive housing, put him**
18 **somewhere where he's by himself.**
19 **          Yes, I would do that every time if I**
20 **knew that his situation -- notice where we put in**
21 **there remaining in population pending investigation.**
22 **So once we finished the investigation, then the**
23 **remaining inmates might go to segregation and be**
24 **disciplined.**
25 Q.          Based on your experience in corrections

Page 130

1 and as warden I, do you believe it's appropriate to
2 discipline someone based on what's in this incident
3 report?  Strike that.
4          Based on your experience in corrections
5 and as warden I, based on what's in this incident
6 report, do you believe it was appropriate to
7 discipline Mr. Kinchen?
8          MS. COBB:  Object to form.
9          MR. CHISM:  Object to the form.
10 **A.        Again, Mr. Kinchen stated that he owed**
11 **debts, could not pay inmates.  So he put himself in**
12 **a position to create a security hazard for himself**
13 **and others.  So, of course, if the lieutenant that**
14 **was investigating it deemed that it was necessary to**
15 **write him a disciplinary for that, then yes, I'm**
16 **okay with it.  I agree with it.**
17 Q.          It says here, "Per Warden Brooks, Inmate
18 Jackson, Inmate Bester, and Inmate Pyant remain in
19 population pending investigation."
20          Did I read that correctly?
21 **A.        Yes.**
22 Q.          Is it proper to leave inmates in
23 population after they were accused of engaging in
24 violence against another inmate?
25          MS. COBB:  Object to form.

Page 131

1 **A.        It's hearsay until we find -- until we**
2 **can investigate it and find that there was facts**
3 **that happened.**
4 Q.          Mr. Kinchen had visible injuries at the
5 time that you spoke with him, correct?
6 **A.        Exactly.  But you just don't know the**
7 **number of inmates that would harm themselves to get**
8 **themselves out of population because they owed**
9 **debts.**
10 Q.          So is it your position that it's
11 appropriate to leave --
12 **A.        I left them out there.**
13 Q.          Let me ask my question.  Let me make
14 sure I get my question on the record.
15          Is it your position that it's
16 appropriate to leave inmates who have been accused
17 of engaging in violence against another inmate in
18 population until that -- until the investigation
19 into the incident can be completed?
20 **A.        Yes.**
21          MS. COBB:  Object to form.
22 Q.          As warden I, based on your experience in
23 corrections, do you have any concerns that leaving
24 inmates that have been accused of recently engaging
25 in acts of violence against other inmates in

Page 132

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 33 (129 - 132)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
**8/7/2024**

1 population poses a threat to the safety of other
2 inmates in population?
3          MS. COBB:  Object to form.
4 **A.        All inmates poses threats.**
5 Q.        I will stop sharing Exhibit 17.  I'm
6 going to share what I'll mark as Exhibit 18.
7
8          (Exhibit 18 was marked
9            for identification.)
10
11          MS. PIERCE:  This is ADOC030958.
12 Q.        This is an email from Karla Jones to
13 you, Carla Graham, Gary Malone, and Gwendolyn Givens
14 on September 20, 2018; is that correct?
15 **A.        Yes.**
16 Q.        The email says, "Warden Brooks, did we
17 identify a suspect in this incident?  Did inmate
18 return from hospital?  Was incident report created
19 within module?  We need to act quickly and document
20 on all assaults and show we made an effort to
21 identify suspects and locate weapon.  KWJ."
22          Did I read that correctly?
23 **A.        Yes.**
24 Q.        And below that, there's a description,
25 it looks like, from Randall McGilberry describing an

Page 133

1 assault on an inmate at St. Clair on September 17,
2 2018; is that correct?
3 **A.        Yes.**
4 Q.        And it says, "On September 17, 2018, at
5 approximately 4:30 p.m., Dr. Walter Wilson
6 authorized an emergency medical run by ambulance for
7 Inmate Jareco Howard to UAB Hospital due to a broken
8 jaw and potential head trauma.
9          At approximately 4:24 p.m., Officer
10 Robert Taylor notified Sergeant Randall McGilberry
11 of the incident.  At approximately 4:26 p.m.,
12 Captain Carla Graham and Warden I Anthony Brooks
13 were notified."
14          Did I read that correctly?
15 **A.        Yes.**
16          MR. CHISM:  Object to form.
17 Q.        Do you recall this incident?
18 **A.        I don't recall it.**
19 Q.        Do you recall receiving this email?
20 **A.        I don't recall it.  I'm saying it was**
21 **sent to me, but I just don't recall the incident and**
22 **the email.**
23 Q.        If you were the on-call warden at the
24 time of this incident, would you have been
25 responsible for making sure that an incident report

Page 134

1 was created and that all investigatory steps were
2 taken in response?
3          MS. COBB:  Object to form.
4 **A.        Of course, yes.**
5 Q.        Do you know why Karla Jones said to you,
6 "We need to act quickly and document on all assaults
7 and show we made an effort to identify suspects and
8 locate weapons"?
9 **A.        I don't recall why she wrote it.**
10 Q.        Did you have any discussion with Karla
11 Jones about this incident?
12 **A.        I don't recall.**
13 Q.        In 2018 and early 2019, was there a
14 problem of weapons not being located after they were
15 used in violent incidents?
16          MR. CHISM:  Object to the form.
17          MS. COBB:  Same objection.
18 **A.        I can't recall.**
19 Q.        If an incident was reported in which a
20 weapon was used against another inmate, should a
21 search have been done for that weapon?
22 **A.        Yes.**
23 Q.        And who would have been responsible for
24 making sure that search was done?
25 **A.        The security staff that was on the**

Page 135

1 scene.
2 Q.        And who would that be?
3 **A.        I'm not sure.  I don't -- I can't**
4 **recall.  McGilberry wrote it.  I'm not sure if it**
5 **was him or who he had with him.**
6 Q.        I've stopped sharing Exhibit 18.  I'll
7 share what I'll mark now as Exhibit 19.
8
9          (Exhibit 19 was marked
10            for identification.)
11
12          MS. PIERCE:  This is ADOC031253 to
13 ADOC031254.
14 Q.        This is an email that looks like you
15 forwarded to your personal email.  It's an email
16 from Karla Jones to Edward Ellington, Gwendolyn
17 Givens, you, and Becky Steele on September 25, 2018;
18 is that correct?
19 **A.        Yes.**
20 Q.        And it says, "St. Clair had a total of
21 nine deaths since January 2016."
22          Did I read that correctly?
23 **A.        Yes.**
24 Q.        And then it lists several deaths during
25 that period; is that correct?

Page 136

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 34 (133 - 136)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
**8/7/2024**

```
1  A.          Yes.
2  Q.          Do you recall getting this email?
3  A.          I don't recall the email.  But,
4  obviously, it was sent to me and I forwarded it to
5  myself.  I must have been at home at the time.
6  Q.          Was this -- in your opinion and your
7  experience, was this a high number of deaths during
8  that time period?
9             MS. COBB:  Object to form.
10            MR. CHISM:  Object to the form.
11 A.          I'm not sure.
12 Q.          Were you involved in any discussions
13 about the number of deaths that occurred during this
14 time period and any corrective action you could take
15 to improve inmate safety at the facility?
16 A.          I can't recall.
17 Q.          Did anyone, including Warden Jones,
18 Warden Givens, or Mr. Ellington, take any steps to
19 try to limit the risk that inmates would die at
20 St. Clair?
21            MR. CHISM:  Object to form.
22 A.          I can't recall.
23 Q.          I'm sorry?
24 A.          I can't recall.
25 Q.          I've stopped sharing Exhibit 19.  I'm
                                              Page 137
```

```
1  going to share what I will mark as Exhibit 20.
2
3             (Exhibit 20 was marked
4               for identification.)
5
6             MS. PIERCE:  This is ADOC034636.
7  Q.          It's an email -- excuse me.  Strike
8  that.
9             Kenneth Robertson forward this email to
10 Gwendolyn Givens on January 4, 2019; is that
11 correct?
12 A.          Yes.
13 Q.          But the original email from January 4,
14 2019, is from Kenneth Robertson to you; is that
15 correct?
16 A.          Yes.
17 Q.          And he writes, "Good morning, Warden
18 Brooks.  I locked up Inmate Fletcher for
19 intentionally creating a security, safe, or health
20 hazard this morning after he had refused to tell me
21 the name of the inmate who stated that he was going
22 to kill him.
23            Earlier in the shift, I had taken him to
24 the infirmary because he was high on something, and
25 I allowed him slept it off.
                                              Page 138
```

```
1             During security checks this morning, he
2  stated that he was into it with a guy who stated
3  that he was going to kill him and could no longer
4  live in population.  Due to the events that we've
5  had in the past week, I decided to go ahead and lock
6  him up."
7             Did I read that correctly?
8  A.          Yes.
9  Q.          Do you recall this incident?
10 A.          I do not recall it.
11 Q.          Is it appropriate to discipline someone
12 simply because they refuse to identify the name of
13 an inmate who has threatened them?
14            MS. COBB:  Object to form.
15            MR. CHISM:  Object to the form.
16 A.          Again, it's appropriate if the inmate
17 comes to you and he don't want to -- he's saying
18 he's being threatened and there's no merit or
19 there's nothing showing that, you know -- and he's
20 high and he wants to be out of general population
21 because he feels like somebody is after him that he
22 owes.  Yeah, we do -- that was -- that was
23 appropriate actions.
24 Q.          I want to be clear.  This doesn't say he
25 was disciplined because he was high, correct?
                                              Page 139
```

```
1  A.          But he said that he was high.  And
2  during the time, he stated that somebody was out to
3  kill him.
4  Q.          And my question is other factors aside,
5  is it appropriate to discipline someone simply
6  because they are refusing to identify the name of an
7  inmate who has threatened them?
8             MS. COBB:  Object to form.
9             MR. CHISM:  Object to the form.
10 A.          I'm not sure.
11 Q.          Did you have any discussion here with
12 Kenneth Robertson about whether or not it was
13 appropriate to discipline Mr. Fletcher based on the
14 information you were provided?
15            MS. COBB:  Object to form.
16 A.          I don't recall.
17 Q.          Go ahead.
18 A.          I can't recall.
19 Q.          Here the third line from the bottom
20 says, "Due to the events that we've had in the past
21 week."
22            Do you know what events Mr. Robertson
23 was referring to?
24 A.          I can't recall.
25 Q.          While you were a warden I at St. Clair,
                                              Page 140
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 35 (137 - 140)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

1 were there incidents in which inmates who had
2 reported a threat or an incident of violence
3 committed by another inmate were then retaliated
4 against by the inmate they reported on?
5          MS. COBB:  Object to form.
6 A.        I don't recall.
7 Q.        Was that type of retaliation something
8 that you were concerned with?
9 A.        Retaliation from anybody was a concern
10 from the top down.
11 Q.        Based on your experience as warden I,
12 were inmates ever afraid to identify their attackers
13 or someone who had threatened them because they
14 thought they would be retaliated against?
15          MS. COBB:  Object to form.
16          MR. CHISM:  Object to the form.
17 A.        I can't recall.
18 Q.        Did you take any steps as warden I to
19 make sure that inmates who reported violence or
20 threats were not retaliated against by the inmates
21 they reported on?
22 A.        I don't remember.
23 Q.        Based on your experience in corrections
24 and as warden I, was it important to make sure that
25 inmates who reported violence or threats were

1 protected from retaliation?
2 A.        All inmates should be protected from
3 retaliation.  And it should be -- it should be held
4 from the top down.
5 Q.        What do you mean by that?
6 A.        I'm saying everybody should be -- that's
7 responsible for the safety of inmates should expect
8 no retaliation from nobody, inmates or staff.  So
9 from the top down, there should be no retaliation
10 from anybody.  And we should enforce that.
11 Q.        And what steps should be taken after an
12 inmate reports a threat or an incident of violence
13 to make sure they aren't retaliated against?
14          MR. CHISM:  Object to the form.
15 A.        I've been away so long, I don't
16 remember.
17 Q.        In your interrogatories, you mention
18 that you were involved in the creation and
19 implementation of the inmate control board.  Is that
20 correct?
21 A.        Repeat that.
22 Q.        In your responses to the interrogatories
23 in this case, you mentioned that you were involved
24 in the creation and implementation of something
25 called an inmate control board.  Is that correct?

1 A.        I don't remember telling you that I was
2 involved in it.  I told you that the captain, a
3 psychiatrist, and somebody from classification was
4 directly involved with the ICB.
5 Q.        So the inmate control board is the ICB;
6 is that correct?
7 A.        Yes.
8 Q.        While you were warden I at St. Clair,
9 did you ever discipline or reprimand staff for
10 failing to control inmate movement?
11 A.        I can't remember.
12 Q.        While you were a warden I at St. Clair,
13 did you ever discipline or reprimand staff for
14 failing to secure cell block doors?
15 A.        I can't remember.
16 Q.        While you were a warden I at St. Clair,
17 did you ever discipline or reprimand staff for
18 failing to conduct contraband searches pursuant to
19 policy?
20 A.        I can't remember.
21 Q.        While you were a warden I at St. Clair,
22 did you ever discipline or reprimand staff for
23 failing to document an incident of violence or an
24 incident involving a contraband weapon in a duty
25 officer log report or an incident report?

1          MR. CHISM:  Object to the form.
2 A.        I can't remember.
3 Q.        If you had disciplined staff or
4 reprimanded staff for any of the reasons I just
5 discussed, would you have documented that somewhere?
6          MS. COBB:  Object to form.
7 A.        If I had, it would have been documented.
8 But I can't remember.
9 Q.        And where would it have been documented?
10 A.        It would be documented into their
11 personnel records.
12 Q.        Anywhere else?
13 A.        I'm not sure.
14 Q.        Would you have put it in an incident
15 report?
16 A.        I'm not sure if it deemed for an
17 incident report or not.  I just can't remember the
18 process.
19 Q.        Did your supervisors ever discipline
20 you, reprimand you, or counsel you for failing to
21 enforce staff compliance with SOPs?
22          MS. COBB:  Object to form.
23 A.        I can't remember.
24 Q.        Did your supervisors ever discipline
25 you, reprimand you, or counsel you for failing to

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 36 (141 - 144)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
**8/7/2024**

1 ensure contraband searches were carried out at
2 St. Clair?
3            MS. COBB:  Object to form.
4 **A.       No.**
5 Q.       Did your supervisors ever discipline
6 you, reprimand you, or counsel you for failing to
7 conduct necessary rounds and inspections?
8 **A.       I can't remember.**
9 Q.       Did your supervisors ever discipline
10 you, reprimand you, or counsel you for failing to
11 control inmate movement at St. Clair?
12 **A.       I can't remember.**
13 Q.       Did your supervisors ever discipline
14 you, reprimand you, or counsel you for failing to
15 properly document incidents of violence or incidents
16 involving a contraband weapon?
17 **A.       I can't remember.**
18 Q.       I'm going to share what will be Exhibit
19 22.
20
21            (Exhibit 21 was marked
22             for identification.)
23
24 Q.       This is a document that says St. Clair
25 Correctional Facility Security Staff Meeting, May
Page 145

1 15, 2017.
2            Did I read that correctly?
3 **A.       Yes.**
4 Q.       Do you know what this is?
5 **A.       It look like it might have been a**
6 **security staff meeting notes.**
7 Q.       I'm going to go down -- strike that.
8            You generally participated in the
9 security staff meetings, correct?
10 **A.       Yes.**
11 Q.       I am going to scroll down to -- I'm
12 sorry.
13            MS. PIERCE:  For the record, this is
14 ADOC -- I'm sorry.  This is DS-FD-007225 to
15 DS-FD-007227.
16 Q.       I want to direct you to the third page
17 of this document.  Warden Specks says, "Use of force
18 should not be your first course of action."
19            Then the next paragraph says, "During
20 chow, inmates should eat and return to their cells
21 before the next group is called to chow.  We
22 recently had a problem which could have been big
23 because this was not handled correctly."
24            Did I read that correctly?
25            MR. CHISM:  Object to the form.
Page 146

1 **A.       Yes.**
2 Q.       Do you recall this conversation with
3 Warden Specks?
4 **A.       I do not recall it.**
5 Q.       Was there an issue with significant
6 inmate movement during chow times?
7            MS. COBB:  Object to form.
8            MR. CHISM:  Object to the form.
9 **A.       I do not recall.**
10 Q.       Were there any concerns about inmate
11 movement during chow time?
12 **A.       It must have been a concern for Warden**
13 **Specks.  But I can't recall.**
14 Q.       And he says, "We recently had a
15 problem."  Do you know what problem he's referring
16 to?
17 **A.       I don't even remember -- I don't**
18 **remember the meeting.**
19            MS. COBB:  Megan, for the record, I
20 think that was Exhibit 21, not 22.
21            MS. PIERCE:  Thank you.
22 Q.       I'm going to show you what I'll mark as
23 Exhibit 22.
24            MS. PIERCE:  And just to give y'all an
25 idea, I'm almost done.
Page 147

1
2            (Exhibit 22 was marked
3             for identification.)
4
5            MS. PIERCE:  This is Exhibit 22.  It is
6 ADOC035562.
7 Q.       It's an email from Nekitris Estelle to
8 DOC classification.  And you have been cc'd on
9 January 21, 2019.
10            And it says, "FYI, if a LWOP inmate
11 receives a behavior citation for possession of a
12 weapon, he still needs to be reclassed to close
13 custody for six months.  I have no idea why security
14 is giving LWOP inmates behavior citations for
15 possession of a weapon."
16            Did I read that correctly?
17 **A.       Yes.**
18 Q.       Do you recall getting this email?
19 **A.       I don't recall it.**
20 Q.       Do you know if there was an issue where
21 inmates who were found to be in possession of a
22 weapon were not getting disciplinary action for that
23 behavior?
24            MR. CHISM:  Object to the form.
25 **A.       I'm not sure.**
Page 148

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 37 (145 - 148)

**Lakeisha Ezell v. Jefferson Dunn, et al.**                    **Anthony Brooks**
                                                                    **8/7/2024**

---

1 Q.          Could you repeat your answer?
2 A.          **I can't recall.**
3 Q.          Do you know what she means when she
4 says, "I have no idea why security is giving LWOP
5 inmates behavior citations for possession of a
6 weapon"?
7 A.          **I have no idea about this situation.**
8 Q.          Did you take any action in response to
9 this email from Ms. Estelle?
10 A.          **I can't recall.**
11 Q.          I will stop sharing Exhibit 22.  I'm
12 going to share Exhibit 23.
13
14              (Exhibit 23 was marked
15                for identification.)
16
17 Q.          Can you see this document?
18 A.          **Yes.**
19              MS. PIERCE:  This is ADOC025764 to
20 ADOC025847.
21 Q.          This document is titled Prison Rape
22 Elimination (PREA) Audit Report; is that correct?
23 A.          **Yes.**
24 Q.          Have you ever seen one of these PREA
25 audit reports before?
                                                    Page 149

1 A.          **I haven't -- I can't recall.**
2 Q.          And the date on this is -- it says the
3 date of the facility visit was April 3rd through 6th
4 of 2018; is that correct?
5 A.          **Yes.**
6 Q.          Do you recall that PREA audit and PREA
7 tour?
8 A.          **I can't recall it.**
9 Q.          I'm going to scroll down to Page 4, the
10 second paragraph.  "An in-brief meeting held April
11 3, 2018, with Deputy Warden Anthony Brooks, the
12 institutional PREA compliance manager, Lieutenant
13 Angelia Gordy, institutional assistant PREA
14 compliance manager Lieutenant Ragsdale, and Captain
15 Carla Graham."
16              Did I read that correctly?
17 A.          **Yes.**
18 Q.          Does this refresh your recollection at
19 all about being involved in this PREA audit?
20 A.          **It does not.**
21 Q.          I'm going to scroll down to the next
22 page.  The third paragraph from the bottom says, "At
23 the closure of the on-site audit, a debrief meeting
24 was held with Warden Estes, Deputy Warden Brooks,
25 Lieutenant Gordy, and Lieutenant Ragsdale."
                                                    Page 150

1              Did I read that correctly?
2 A.          **Yes.**
3 Q.          Do you recall being part of this debrief
4 meeting?
5 A.          **I don't remember it.**
6 Q.          Were you involved in any discussions
7 after this debrief meeting about implementing
8 corrective action to address deficiencies noted
9 during the PREA audit tour?
10 A.          **I can't recall.**
11              MS. PIERCE:  I have no additional
12 questions currently.
13 EXAMINATION BY MS. CHISM:
14 Q.          Hey, Warden Brooks.  This is Daniel
15 Chism.  I represent a group of former ADOC
16 officials, including the former commissioner, Jeff
17 Dunn.  I've just got a couple of follow-up questions
18 for you.  And I promise I'll try and be quick.
19              We talked earlier about Warden Jones
20 being responsible for classification, having
21 sign-off authority.  Do you remember that?
22 A.          **Yes.**
23 Q.          Were you with Warden Jones when she made
24 any decisions regarding classification?
25 A.          **I wasn't directly with her.  She took**
                                                    Page 151

1 **over the classification department from me when she**
2 **got there.  She had -- she had experience.  I don't**
3 **know if you know her experience.**
4              **But at one time in her career, she was a**
5 **classification supervisor.  So she felt like that**
6 **she should be -- she had more knowledge about**
7 **classification and she should be responsible for it.**
8 **So she took those duties away from me.  And we never**
9 **discussed any of her actions, you know, when it came**
10 **to classification.**
11 Q.          But you don't know what her process was
12 as far as classification goes, do you?
13 A.          **No.**
14 Q.          Do you know what information she looked
15 at before making a decision?
16 A.          **No.**
17 Q.          And her decision was at least partially
18 based on a recommendation from the classification
19 specialist, correct?
20              MS. PIERCE:  Object to form and
21 foundation.
22 A.          **It should have been.**
23 Q.          A classification specialist makes
24 recommendations; is that fair?
25 A.          **Yes.**
                                                    Page 152

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 38 (149 - 152)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
**8/7/2024**

1 Q.        And those go to the warden?

2 **A.        Yes.**

3 Q.        Karla Jones in this case?

4 **A.        Yes.**

5 Q.        And earlier you said incidents of

6 violence occurred almost daily.  When you say

7 "violence," are you talking about fist fights,

8 verbal altercations, stabbings, all of the above?

9 **A.        All of the above.**

10        MS. PIERCE:  Object to form.

11 Q.        So a verbal altercation would be counted

12 as violence, in your mind?

13        MS. PIERCE:  Object to form.

14        MR. CHISM:  What's the objection?

15 **A.        Most of the time it could lead to**

16 **violence.**

17 Q.        Would a verbal altercation be reported

18 on an incident report?

19 **A.        It depends if the staff witnessed it and**

20 **reported it.**

21 Q.        Would you say that stabbings occurred

22 almost daily in St. Clair in 2018?

23 **A.        I don't recall.**

24 Q.        Would you say that fist fights occurred

25 almost daily in St. Clair in 2018?

Page 153

1 **A.        Not that I know of for retaliation, no.**

2        MR. CHISM:  Megan, could you put Exhibit

3 7 back up, please?

4        MS. COBB:  I can give you the Bates

5 label, if you need it.

6        MS. PIERCE:  I think I can.  Give me one

7 moment.

8        Thank you, Caitlin.  I've got it.

9        It's three pages, Dan, if you need me to

10 scroll down.

11        MR. CHISM:  I want to look at Page 3,

12 please.  I can see it now.

13 Q.        Warden Brooks, can you see it?

14 **A.        Yes.**

15 Q.        So we read this native summary earlier.

16 Is there any information here that demonstrates why

17 a urine sample collection was performed on Steven

18 Mullins?

19 **A.        The only thing I can think of, there's**

20 **nothing in the -- there's nothing in the narrative**

21 **that shows why they gave him a urine test.**

22 **But I think from the previous page where**

23 **it talks about -- and this is the -- in this report,**

24 **could you scroll up to the top of Page 3?  So this**

25 **is a different report from the original one.**

Page 155

1 **A.        I can't recall that either.**

2 Q.        And we looked at an incident report

3 earlier with Mr. Steven Mullins, and he had been

4 placed in RHU pending a disciplinary.  And there

5 were a line of questions about a drug test for an

6 inmate in restrictive housing.  Do you remember

7 that?

8 **A.        Yes.**

9 Q.        Do you know if -- in the restrictive

10 housing units at St. Clair, were there routine drug

11 tests?

12        MS. PIERCE:  Object to the form.

13        MR. CHISM:  What's the objection?

14        MS. PIERCE:  Leading.

15 Q.        You can answer, if you know.

16 **A.        Only if they suspected usage.**

17 Q.        As a matter of policy at St. Clair, were

18 any routine drug tests performed?

19 **A.        Yes, they did do routine drug testing.**

20 Q.        Was that a random sampling?

21 **A.        I'm not sure.**

22 Q.        Do you know if there was a practice for

23 requesting drug tests in retaliation for reporting

24 an incident?

25        MS. PIERCE:  Object to foundation.

Page 154

1 **I think they talked about him owing for**

2 **drug debts or whatever.  They probably just went off**

3 **that to give him a suspicion -- if they suspect drug**

4 **usage, then they'll authorize or give him a drug**

5 **test.**

6 Q.        There's nothing in this incident report

7 that says that, correct?

8 **A.        Nothing.**

9 Q.        So that's just a guess on your part?

10 **A.        Yes.**

11 Q.        Is it just as possible this was a random

12 drug test that he received?

13 **A.        It could have been a random.**

14        MS. PIERCE:  Object to form.  Add an

15 objection to that question.

16        MR. CHISM:  I'm done with that exhibit.

17 Thank you, Megan.

18 Q.        Do you know any steps ADOC was taking in

19 2018 to recruit officers?

20 **A.        I'm not sure.**

21 Q.        What are the minimum standards to be an

22 officer at ADOC?

23 **A.        I'm not sure of that anymore.**

24 Q.        So if I wanted to go be an officer

25 today, would I have to do any kind of special

Page 156

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 39 (153 - 156)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
**8/7/2024**

1 training before I could show up?
2 A.        I think there's a 12-week training
3 process that you have to take.  But I'm not -- I'm
4 not familiar with the requirement now.
5 Q.        So it's fair to say that hiring an ADOC
6 officer takes some time?
7 A.        Yes.
8          MS. PIERCE:  Object to form and
9 foundation.
10 Q.        Do you know any steps ADOC was taking to
11 recruit officers in 2019?
12 A.        I know they had up billboards and ads
13 throughout the state.  You could ride down 65 and
14 see billboards and stuff.  They haven't done that,
15 you know, from the time I've been in the system
16 where they advertise through ads and billboards and
17 social media.
18 Q.        And we talked about having sufficient
19 staff earlier.  Do you know of any times where
20 St. Clair in 2018 did not have sufficient staff to
21 man critical posts?
22          MS. PIERCE:  Object to form.
23 A.        Probably throughout the whole 2018.
24 Q.        Are you aware of a specific time they
25 have didn't sufficient staff?

Page 157

1 A.        Not specifically.
2 Q.        Are you aware of any specific time in
3 2019 that ADOC did not have sufficient staff to man
4 a critical post?
5          MS. PIERCE:  Object to form.
6 A.        Not specifically.
7          MR. CHISM:  Megan, could you pull up
8 Exhibit 15 for me, please?
9 Q.        Warden Brooks, do you remember reading
10 this email before today?
11 A.        I can't remember or recall.  And I might
12 have got it.  I just don't remember it.
13 Q.        I think you said earlier that you don't
14 dispute the findings.  Is that fair?
15 A.        Yes.
16 Q.        Do you know the people who conducted
17 this tour?
18 A.        Yeah, I knew of them.  I've met them.
19 Q.        Do you know why they were giving a tour?
20 Or taking a tour?
21 A.        It might have been some type of audit or
22 -- you know, I'm not sure what the reasoning behind
23 it was.  I can't remember the reasoning.
24 Q.        Are you aware that the people who were
25 touring that day were plaintiffs and plaintiffs'

Page 158

1 experts in an active piece of litigation?
2          MS. PIERCE:  Object to form.
3 A.        I'm not sure.  I wasn't sure who they
4 worked for or the reasoning behind them being there.
5 I can't remember that.
6 Q.        We talked about some of the findings
7 contained in this letter.  Do you remember that?
8 A.        Yes.
9 Q.        Did you conduct your own investigation
10 to any of the findings contained in this email?
11 A.        I can't recall.
12 Q.        Do you know if any other ADOC staff
13 investigated the findings in this email?
14 A.        I'm not sure.
15 Q.        Do you know if any of the findings in
16 this email are correct or factually accurate?
17          MS. PIERCE:  Object to form.
18 A.        I'm not sure.  But I don't dispute the
19 findings.  I'm just not sure.
20 Q.        And you say you don't dispute them.  But
21 you don't know they're true.  Is that fair?
22 A.        Yeah.  Exactly.  I don't know exactly if
23 the numbers are right, you know.
24          MS. PIERCE:  I just want to object to
25 the form of that question.

Page 159

1 Q.        So any percentage of these findings
2 could be correct or incorrect, from your memory?
3          MS. PIERCE:  Object to form.
4 A.        Yes.
5 Q.        When you say you don't dispute this
6 letter, you're not saying it's accurate.  You're
7 saying that you don't know; is that fair?
8 A.        Yes.
9          MS. PIERCE:  Object to form.  Go ahead,
10 Mr. Brooks.
11 A.        Yes.
12 Q.        And earlier we talked about drug use at
13 St. Clair.  Do you remember that?
14 A.        Yes.
15 Q.        And there was a report or an analysis
16 that had extensive drug use underlined.  Do you
17 remember that?
18 A.        Yes.
19 Q.        Do you know where that information came
20 from?
21 A.        I'm not sure.
22 Q.        And I think you said you don't dispute
23 that.  Is that fair?
24 A.        Yes.
25 Q.        So kind of like this exhibit we're

Page 160

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 40 (157 - 160)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
8/7/2024

1 looking at, it could be true or it could not be.
2 But you don't have a reason to doubt it, is that
3 what you're saying?
4 **A.       Yes.**
5          MS. PIERCE:  Object to form.
6 **A.       Yes.**
7 Q.          And I believe you said you don't dispute
8 that staff morale was low.  Were you talking to
9 staff in 2018 on a routine basis?
10 **A.       Yes, I spoke with the staff.**
11 Q.         Do you remember staff talking about
12 having low morale in 2018?
13          MS. PIERCE:  Object to form.
14 **A.       I can't recall.**
15 Q.         So, again, you say you don't dispute
16 this.  But it could be true or it could not be true.
17 You just don't know?
18 **A.       Yes.**
19          MS. PIERCE:  Object to form.
20 Q.         And I think you said the information had
21 to come from the staff.  Do you remember saying
22 that?
23 **A.       Yeah.  Yeah, I remember saying -- I**
24 **remember making that statement, yes.**
25 Q.         Do you know who was interviewed before
                                              Page 161

1 that statement was made, before that finding was
2 made?
3 **A.       I'm not sure.**
4 Q.          So you don't know who believed staff
5 morale was low, is that fair to say?
6 **A.       Yes.**
7 Q.          Again, saying you don't dispute that, it
8 would be a guess or speculation for you to say that
9 was accurate; is that fair?
10          MS. PIERCE:  Object to form.
11 **A.       Yes.**
12 Q.         We talked about inmates going into debt
13 briefly and whether or not it was appropriate to
14 discipline inmates for going into debt.  Do you
15 remember that?
16 **A.       Yes.**
17 Q.         Is it against St. Clair or ADOC policy
18 for inmates to go into debt?
19 **A.       Yes.  I think there's a rule violation**
20 **for bartering and trading.  I don't know the**
21 **specific wordage or language of it.  But yeah, there**
22 **is.**
23 Q.         Why is that against the rules?
24          MS. PIERCE:  Object to foundation.
25 **A.       One reason, it puts the inmate in harm's**
                                              Page 162

1 **way if he can't -- if you go into debt or borrow**
2 **from others and you can't repay them, it puts them**
3 **in harm.**
4 Q.          Would it be a rule violation for an
5 officer not the cite an inmate for going into debt
6 or bartering and borrowing?
7          MS. PIERCE:  Object to form.
8 **A.       Repeat that again.**
9 Q.          If an officer did not cite or discipline
10 an inmate for borrowing or going into debt, would
11 that be against the rules?
12          MS. PIERCE:  Object to form.
13 **A.       It could be, if he don't cite it.**
14 Q.         Let me ask that differently.
15          Could the officer be cited for not
16 disciplining an inmate for going into debt?
17 **A.       Yes, he could be.**
18 Q.         You were shown a PREA audit report for
19 2018 just right at the end here.
20          MR. CHISM:  Megan, will you pull that
21 up, please?
22          Warden Brooks, can you see this exhibit?
23 **A.       Yes.**
24 Q.          And you see at the top it says Interim
25 Audit Report?
                                              Page 163

1 **A.       Yes.**
2 Q.          Have you ever seen the final audit
3 report, PREA audit report, that came from this same
4 time period?
5 **A.       I can't recall seeing it.**
6 Q.          So you don't know if any of the
7 perceived deficiencies identified in this interim
8 report were corrected in a final report, do you?
9          MS. PIERCE:  Object to form.  Go ahead.
10 **A.       I can't recall.**
11 Q.         And if the final report noted that
12 deficiencies or perceived deficiencies were
13 corrected, would you have any reason to dispute the
14 final report?
15          MS. PIERCE:  Object to form and
16 foundation.
17 **A.       If I seen it, I wouldn't have any**
18 **disputes.**
19          MR. CHISM:  Mr. Brooks, I think that's
20 all I have for you.
21          MS. PIERCE:  I don't have any additional
22 questions.
23          MS. COBB:  You're done, Mr. Brooks.
24
25          (DEPOSITION ENDED AT 1:33 P.M.)
                                              Page 164

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 41 (161 - 164)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Anthony Brooks**
**8/7/2024**

```
 1 STATE OF ALABAMA )
 2 JEFFERSON COUNTY )
 3
 4            I hereby certify that the above
 5 proceedings were taken down by me and transcribed by
 6 me using computer-aided transcription and that the
 7 above is a true and correct transcript of said
 8 proceedings taken down by me and transcribed by me.
 9            I further certify that I am neither of
10 kin nor of counsel to any of the parties nor in
11 anywise financially interested in the result of this
12 case.
13            I further certify that I am duly
14 licensed by the Alabama Board of Court Reporting as
15 a Certified Court Reporter as evidenced by the ACCR
16 number following my name found below.
17            So certified on August 7, 2024.
18
19
20
21
                 LeAnn Maroney, Commissioner
22               ACCR# 134, Expires 10/31/25
                 505 North 20th Street, Suite 1250
23               Birmingham, AL  35203
24
25
                                      Page 165
```