FILED

2025 Mar-03 PM 08:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

**In The Matter Of:**

**Lakeisha Ezell v. Jefferson Dunn, et al.**

---

Grantt Culliver

*June 25, 2024*

---

Bain & Associates Court Reporting Services, Inc.
505 20th Street North
Suite 1250
Birmingham, AL 35203
Toll Free 1.888.326.0594

**Lakeisha Ezell v. Jefferson Dunn, et al.**                    **Grantt Culliver**
                                                                **6/25/2024**

| | |
|---|---|
| 1   IN THE UNITED STATES DISTRICT COURT | 1     S T I P U L A T I O N |
| 2   FOR THE NORTHERN DISTRICT OF ALABAMA | 2         IT IS STIPULATED AND AGREED |
| 3         MIDDLE DIVISION | 3   by and between the parties through their |
| 4 | 4   respective counsel that the deposition of |
| 5   CASE NUMBER: 4:20-CV-02058-ACA | 5   GRANTT CULLIVER may be taken before |
| 6 | 6   Madison Borden, Certified Shorthand |
| 7   LAKEISHA EZELL, as | 7   Reporter and Notary Public, State at |
| 8   Representative of the ESTATE OF | 8   Large, at the offices of Butler Snow, 250 |
| 9   TERRENCE ANDREWS, | 9   Commerce Street, Suite 100, Montgomery, |
| 10        Plaintiff(s), | 10  Alabama, on June 25, 2024, commencing at |
| 11  vs. | 11  approximately 9:28 a.m. |
| 12  JEFFERSON DUNN, et al., | 12        IT IS FURTHER STIPULATED AND |
| 13        Defendant(s). | 13  AGREED that the signature to and the |
| 14 | 14  reading of the deposition by the witness |
| 15        -AND- | 15  is not waived, the deposition to have the |
| 16 | 16  same force and effect as if full |
| 17  CASE NUMBER: 4:21-CV-00264-SGC | 17  compliance had been had with all laws and |
| 18  LORI GUY, as representative of the | 18  rules of Court relating to the taking of |
| 19  ESTATE OF STEVEN MULLINS, | 19  depositions. |
| 20        Plaintiff(s), | 20        IT IS FURTHER STIPULATED AND |
| 21  vs. | 21  AGREED that it shall not be necessary for |
| 22  JEFFERSON DUNN, et al., | 22  any objections to be made by counsel to |
| 23        Defendant(s). | 23  any questions, except as to form or |
| 24 | 24  leading questions, and that counsel for |
| 25                        Page 1 | 25  the parties may make objections and assign |
| | Page 3 |
| 1   VIDEO DEPOSITION TESTIMONY OF: | 1   grounds at the time of trial or at the |
| 2         GRANTT CULLIVER | 2   time said deposition is offered in |
| 3 | 3   evidence, or prior thereto. |
| 4 | 4         In accordance with Rule 5(d) |
| 5 | 5   of the Alabama Rules of Civil Procedure, |
| 6 | 6   as amended, effective May 15, 1988, I, |
| 7 | 7   Madison Borden, am hereby delivering Quinn |
| 8 | 8   Rallins the original transcript of the |
| 9 | 9   oral testimony taken June 25, 2024, along |
| 10 | 10  with the Exhibits. |
| 11 | 11        Please be advised that this |
| 12 | 12  is the same and not retained by the Court |
| 13 | 13  Reporter, nor filed with the Court. |
| 14 | 14 |
| 15 | 15 |
| 16 | 16 |
| 17 | 17 |
| 18 | 18 |
| 19  June 25, 2024 | 19 |
| 20  9:28 A.M. | 20 |
| 21 | 21 |
| 22  COURT REPORTER: | 22 |
| 23  MADISON BORDEN, CCR | 23 |
| 24  The reading and signing of this deposition | 24 |
| 25  has not been waived. | 25 |
| Page 2 | Page 4 |

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 1 (1 - 4)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

---

**Page 5**

```
1           A P P E A R A N C E S
2
3    FOR THE PLAINTIFF(S):
4         Quinn Rallins- via Zoom
5         Loevy & Loevy
6         311 North Aberdeen Street
7         3rd Floor
8         Chicago, IL  60607
9
10   FOR THE DEFENDANT(S):
11        Bill Lunsford
12        Will Cranford- via Zoom
13        Butler Snow
14        250 Commerce Street
15        Suite 100
16        Montgomery, AL  36104
17
18        Caitlin Cobb
19        Capell & Howard
20        150 South Perry Street
21        Montgomery, AL 36104
22
23
24
25
```

---

**Page 6**

```
1               I N D E X
2    WITNESS:
3    Grantt Culliver
4
5    EXAMINATION BY                    PAGE
6    Mr. Rallins.........................8
7
8
9         PLAINTIFFS' EXHIBITS
10   NO.    DESCRIPTION          PAGE
11   1      ADOC 19172           228
12   2      ADOC 25613           234
13   3      ADOC DS18842-845     270
14   4      ADOC 25953-54        271
15   5      ADOC 25724           275
16   6      ADOC 26445-47        277
17   7      ADOC 29883-86        281
18
19
20         DEFENDANTS' EXHIBITS
21   There were no Defendants' Exhibits marked
22         to this deposition.
23
24
25
```

---

**Page 7**

```
1               THE VIDEOGRAPHER:  We now
2    commence the videotape deposition in the
3    United States District Court for the
4    Northern District of Alabama Middle
5    Division in the matter of Lakeisha Ezell
6    versus Jefferson Dunn, et al., Case Number
7    4:20-CV-02058-ACA; and Lori Guy versus
8    Jefferson Dunn, et al., Case Number
9    4:21-CV-00264-SGC.  Our witness today is
10   Grantt Culliver.  Today's date is
11   June 25th, 2024.  The time is 9:28 a.m.
12   Central Time.
13            Will all attorneys present
14   please state their names and whom they
15   represent?
16            MS. COBB:  Caitlin Cobb for the
17   facility defendants.
18            MR. LUNSFORD:  Bill Lunsford for
19   the central office, ADOC officials.
20            MR. RALLINS:  Quinn Rallins via
21   Zoom from Chicago on behalf of plaintiffs.
22            MR. CRANFORD:  Will Cranford by
23   Zoom for the ADOC officials and supervisory
24   officials.
25
```

---

**Page 8**

```
1               GRANTT CULLIVER,
2     having been duly sworn, was examined and
3            testified as follows:
4          THE COURT REPORTER:  Usual
5    stipulations?
6          MR. LUNSFORD:  We'd like to read
7    and sign, please.
8          THE COURT REPORTER:  Okay.
9          MR. RALLINS:  Bill, is this
10   similar stipulation reserving all
11   objections except for --
12         MR. LUNSFORD:  That's right.
13         MR. RALLINS:  -- the form?
14         MR. LUNSFORD:  Yes.
15         MR. RALLINS:  All right.
16         MR. LUNSFORD:  Yeah.
17         MR. RALLINS:  Ready to go?
18         MR. LUNSFORD:  Whenever you are,
19   yep.
20         MR. RALLINS:  All right.
21              EXAMINATION
22   BY MR. RALLINS:
23   Q.    Good morning, Mr. Culliver.
24   A.    Good morning.
25   Q.    Can you state and spell your name
```

---

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 2 (5 - 8)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 for the record?

2     **A.**     **Grantt Culliver, G-R-A-N-T-T,**

3 **C-U-L-L-I-V-E-R.**

4     Q.     And you've been deposed before,

5 correct?

6     **A.**     **Yes, sir.**

7     Q.     Approximately how many times have

8 you been deposed in a civil case based upon

9 your employment at the Alabama Department

10 of Corrections?

11     **A.**     **More than five.**

12     Q.     Okay. When's the last time

13 you've been deposed?

14     **A.**     **In the last 90 days.**

15     Q.     Okay. All right. I'll go

16 through some of the ground rules just

17 briefly, although it sounds like you may be

18 familiar. The court reporter's going to be

19 taking down everything that we say. It's

20 important for us to keep our voices loud

21 and answer verbally rather than using

22 gestures like uh-huh so the court reporter

23 can take down what we say. I'll try to ask

24 questions that make sense, but please let

25 me know if you do not understand and ask me

*Page 9*

1 to rephrase; is that fair?

2     **A.**     **Yes, sir.**

3     Q.     If you don't ask me to rephrase,

4 my assumption's going to be that you

5 understood my question; is that fair?

6     **A.**     **Yes, sir.**

7     Q.     Okay. And we can take breaks,

8 but I ask that you answer any question

9 that's pending or a line of questions that

10 are pending before we take a break; is that

11 fair?

12     **A.**     **Yes, sir.**

13     Q.     All right. And are there any

14 health conditions or medications that may

15 affect your memory or ability to testify

16 today?

17     **A.**     **Not that I'm aware of.**

18     Q.     Okay. And how old are you today?

19     **A.**     **64.**

20     Q.     Okay. And when were you born?

21     **A.**     **September 30th, 1959.**

22     Q.     All right. I want to talk a

23 little bit about some of your background

24 starting with your educational background.

25 Did you go to college?

*Page 10*

1     **A.**     **Yes, sir.**

2     Q.     Where'd you go to college?

3     **A.**     **University of Southern**

4 **Mississippi, Hattiesburg, Mississippi.**

5     Q.     Okay. What did you study?

6     **A.**     **American studies.**

7     Q.     Okay. You study anything else?

8     **A.**     **A minored in public relations --**

9 **journalism, public relations.**

10     Q.     Okay. So you received a

11 bachelors in American studies and a minor

12 in journalism?

13     **A.**     **Yes, sir.**

14     Q.     And in what years were you at the

15 University of Southern Mississippi?

16     **A.**     **The fall of '77 until May of '81.**

17     Q.     Okay. And you were hired as a

18 correctional officer at the Alabama

19 Department of Corrections in 1981?

20     **A.**     **Yes, sir, I think.**

21     Q.     Did you have any employment

22 before you became a correctional officer at

23 the Alabama Department of Corrections?

24     **A.**     **I worked at a shirt factory.**

25     Q.     Okay. And when I say Alabama

*Page 11*

1 Department of Corrections, I can use the

2 term ADOC. You understand that means

3 Alabama Department of Corrections, correct?

4     **A.**     **Yes, sir.**

5     Q.     What encouraged you to become a

6 correctional officer in 1981?

7     **A.**     **They were hiring, and the money**

8 **was decent.**

9     Q.     How'd you learn that they were

10 hiring?

11     **A.**     **By looking for a job.**

12     Q.     Do you recall who interviewed

13 you?

14     **A.**     **No, sir.**

15     Q.     How long were you a correctional

16 officer at ADOC?

17     **A.**     **Just a correctional officer?**

18     Q.     Yes.

19     **A.**     **I think four years.**

20     Q.     Okay. And where were you a

21 correctional officer? Which facility?

22     **A.**     **Fountain Correctional Center.**

23     Q.     And when you became a

24 correctional officer, did you receive

25 formal training?

*Page 12*

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 3 (9 - 12)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1    A.    Yes, sir.
2    Q.    And was that formal training
3 conducted by the ADOC?
4    A.    That's correct.
5    Q.    What sort of training did you
6 receive if you recall?
7    A.    It was a six-week -- the basic
8 six-week training course that all -- at
9 that time, that all correctional officer
10 trainees went through.
11    Q.    Okay.  And what was the content
12 of the training?
13          MR. LUNSFORD:  Object to the
14 form.
15    A.    Security, first aid.  Most of it
16 was correctional classes.  There was
17 physical fitness.  That's the best I can
18 remember.
19    Q.    And what do you recall being
20 trained on with respect to security when
21 you became a correctional office?
22    A.    I don't.
23    Q.    Okay.  After -- and you -- and
24 around 1990, did you become a lieutenant at
25 Donaldson Correctional?
Page 13

1    A.    I became a lieutenant at Hamilton
2 Correctional, but I don't know what year it
3 was.
4    Q.    Okay.  And how did your job
5 responsibilities change when you became
6 lieutenant?
7    A.    I was the shift commander for
8 shift -- the best of recollection was third
9 shift.
10    Q.    And as shift commander, what are
11 your job responsibilities?
12    A.    Basically to manage -- I actually
13 on third shift -- the shift commander's
14 responsible for -- well, let me back that
15 up.  So at the facility that I was assigned
16 to at the time, which was Donaldson, there
17 were three phases basically at the
18 facility.  There was east, a west, and a
19 south unit.  At some point, I was
20 responsible for the south unit of the
21 facility which had overall command of the
22 facility at that time.  So basically
23 responsible for running the facility
24 between the hours of 10:00 p.m. to
25 6:00 a.m.
Page 14

1    Q.    Did the chief officers report to
2 you?
3          MR. LUNSFORD:  Object to form.
4    A.    Not directly.
5    Q.    Who reported to you as a shift
6 commander?
7    A.    Sergeants, the staff, the other
8 two lieutenants that were on duty if they
9 were on duty.
10    Q.    Okay.  Sergeants, lieutenants,
11 and you said other staff?
12    A.    Correctional officers.
13    Q.    Okay.  Now, ultimately you became
14 a correctional warden at Atmore?
15    A.    That was my first position, yes.
16 That was a community-based facility.
17 Community-based facility.
18    Q.    I'm sorry.  Go ahead.
19    A.    She's good.
20    Q.    It was your first position as a
21 warden; is that correct?
22    A.    That is correct.
23    Q.    And do you recall what year?
24    A.    No, sir.
25    Q.    Okay.  Did you have any reason to
Page 15

1 dispute it was around March of 1997?
2    A.    I have no reference, no, sir.
3    Q.    Okay.  And did you receive formal
4 training when you became a warden at
5 Atmore?
6    A.    No, sir.
7    Q.    After you were a warden at Atmore
8 -- job as a warden.
9    A.    Say that again.
10    Q.    After you were a warden at
11 Atmore, where was your next job as a
12 warden?
13    A.    I was assistant warden at Holman
14 Correctional Center -- Facility.
15    Q.    Okay.
16    A.    I think.
17    Q.    And is a warden two an assistant
18 warden?
19    A.    Yes, sir.
20    Q.    Were you a warden two at Atmore?
21    A.    Atmore community-based facility?
22    Q.    Yes.
23    A.    I was a -- so at the time, there
24 was not a warden three, warden two, warden
25 one.  It was not designated -- the
Page 16

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

Page 17

1  classification was not designated as much.
2  If I remember correctly, it was just
3  correctional warden.  But at Atmore, I was
4  a correctional warden in charge of the
5  facility and all the day-to-day operations
6  of the facility.  When I went to transfer
7  to Holman and was promoted to assistant
8  warden, then that's what I was, an
9  assistant warden.
10     Q.     Okay.  So help me understand the
11 difference between warden one, warden two,
12 and warden three.
13     A.     It all -- it varies on where you
14 are actually assigned.  So our major
15 facilities, a warden -- a correctional
16 warden three is head of the facility.  A
17 two would be the assistant warden, and a
18 one would also be an assistant warden.  If
19 -- you can have a correctional warden two
20 as a facility head at a work release
21 facility or a minimum custody facility.
22 And you can also have a correctional warden
23 one as the head at a work release facility
24 or a community-based facility.
25     Q.     Okay.  But the warden two reports

Page 18

1  to warden one?
2      A.     Well, if the warden one is the
3  head, then warden one reports to the
4  institutional coordinator.
5      Q.     Okay.  And --
6      A.     And -- excuse me.
7      Q.     Go ahead.
8      A.     The warden one does not
9  necessarily report to the warden two at any
10 of them.  The warden one would report -- if
11 there's a warden three at the facility, the
12 warden one reports to the warden three.
13     Q.     Okay.  Now, you were -- it is
14 fair to say you were a correctional warden
15 two at Holman Correctional Facility between
16 June 1998 to approximately October of 2001?
17     A.     I don't recall.
18     Q.     You wouldn't have any reason to
19 dispute that was the time period?
20     A.     No, sir.
21     Q.     Okay.  And after you were a
22 warden two at Holman Correctional, you
23 became a correctional warden three at
24 Fountain Correctional Facility; is that
25 correct?

Page 19

1      A.     That is correct.
2      Q.     Okay.  And you wouldn't have any
3  reason to dispute that time frame was
4  between October 2001 until August 2002?
5      A.     That's fair.
6      Q.     Okay.  Do you recall your next
7  job position after you were a correctional
8  warden three at Fountain?
9      A.     I was transferred to Holman
10 Correctional Facility as a warden three.
11     Q.     Why were you transferred to
12 Holman Correctional Facility?
13     A.     Because they didn't have a warden
14 three at the facility.
15     Q.     When you became a correctional
16 warden two at Holman Correctional Facility
17 around June of 1998, did you receive any
18 formal training?
19     A.     Repeat the question, please.
20     Q.     When you became a correctional
21 warden two at Holman Correctional Facility
22 around June of 1998, did you receive formal
23 training?
24     A.     No, sir.
25     Q.     When you became a correctional

Page 20

1  warden three at Fountain Correctional
2  Facility around October of 2001, did you
3  receive formal training?
4      A.     No, sir.
5      Q.     When you became a correctional
6  warden three at Holman Correctional
7  Facility in August of 2002, did you receive
8  formal training?
9      A.     No, sir.
10     Q.     Was Holman your first warden
11 position at a maximum security facility?
12     A.     Yes, sir.
13     Q.     Now, during your tenure at
14 Alabama Department of Corrections, you also
15 worked with the correctional emergency
16 response team; is that fair?
17     A.     Yes, sir.
18     Q.     What's the correctional emergency
19 response team -- let me rephrase it.
20 What's the function of the correctional
21 emergency response team?
22     A.     The functions vary based on the
23 need.  If there is a -- they do searches at
24 various facilities.  An ultimate assignment
25 would be if there was a disturbance at a

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 5 (17 - 20)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 facility would be for those -- for them to
2 come in and calm that disturbance.
3      Q.      What sort of disturbance?
4      A.      Something that would be greater
5 than what the normal staff at the facility
6 was able to contain.
7      Q.      What are some of the disturbances
8 that you responded to while you were state
9 coordinator and correctional emergency
10 response team?
11      A.      The first one that comes to mind
12 is a -- the first one that comes to mind is
13 at Holman Correctional Facility.  There was
14 a -- basically a sit-in -- if you would
15 call it such -- where inmates were refusing
16 to go to work.
17      Q.      While you were the
18 state coordinate -- let me back up.  Do you
19 recall what years you were state
20 coordinator of the correctional emergency
21 response team?
22      A.      No, sir.
23      Q.      Would you have any reason to
24 dispute you became a state coordinator
25 around 1999?
Page 21

1      A.      I wouldn't.
2      Q.      And would you have any reason to
3 dispute that you were state coordinator at
4 least until approximately 2014?
5      A.      No, sir.
6      Q.      Why were you state coordinator of
7 the correctional emergency response team so
8 long?
9      A.      I assume because I was doing a
10 good job.
11      Q.      Okay.  Did you apply to become
12 state coordinator?
13      A.      No, sir.
14      Q.      How did you become state
15 coordinator?
16      A.      I was designated by the associate
17 commissioner of operations if I -- if
18 memory serves me correctly.  I don't really
19 remember.
20      Q.      Okay.  And did you serve as state
21 coordinator after you became associate
22 commissioner for operations in
23 institutional security?
24      A.      No, sir.
25      Q.      When you became associate
Page 22

1 commissioner, that's when you gave up the
2 state coordinator role?
3      A.      That was no longer a assignment
4 that I had, that is correct.
5      Q.      As state coordinator in the
6 correctional emergency response team, did
7 you ever respond to homicides in
8 facilities?
9      A.      No, sir.
10      Q.      Never responded to stabbings --
11 inmate on inmate stabbings?
12      A.      Just an inmate on inmate
13 stabbing?
14      Q.      Yes.
15      A.      No, sir.
16      Q.      Why not?
17      A.      Why so?  I mean, a stabbing -- if
18 it's maintained and under control by the
19 people who are at that facility, then there
20 would not be a need.
21      Q.      So you wouldn't consider inmate
22 on inmate stabbings to be disturbances that
23 are greater than the usual?
24      MS. COBB:  Object to form.
25      A.      A stabbing -- I would not
Page 23

1 consider a stabbing to be the norm.  But
2 if -- again, the job of the correctional
3 response team was for unusual incidents or
4 incidents that were out of control at a
5 facility.  And so a stabbing, to the best
6 of my recollection, could be maintained by
7 the facility people who were are in charge,
8 the warden (inaudible) and the warden and
9 the staff that were there.
10      Q.      Right.  The CERT team responded
11 to unusual incidents, correct?
12      A.      Some.
13      Q.      Okay.  And stabbings -- you
14 didn't respond to stabbings because they
15 weren't unusual incidents; is that fair?
16      A.      I think that's a -- that's not
17 fair.
18      Q.      Okay.  So why didn't the CERT
19 team respond to it if it was unusual?
20      A.      Wasn't a need.
21      Q.      Why wasn't it a need?
22      A.      Because the staff at the facility
23 was able to maintain control of the
24 facility.
25      Q.      When it's a stabbing at a
Page 24

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 6 (21 - 24)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

Page 25

1  facility, who is responsible for
2  maintaining control of the facility?
3      A.      The shift commander on duty is
4  from the beginning.
5      Q.      Who else?
6      A.      It varies if there's a need.  If
7  there's a need for someone greater than
8  that to be there, then --
9      Q.      You're saying that whether or not
10 some staff other than a shift commander
11 needs to be responsible for control of the
12 facility after a stabbing, it depends on
13 the need?
14     A.      Repeat, please.
15     Q.      I asked you who's responsible for
16 control of the facility following a
17 stabbing.  Do you remember that?
18     A.      Yes.
19     Q.      And you said shift commander.  I
20 asked you if there are any other staff
21 members who are responsible for the control
22 of a facility after a stabbing, and you
23 said it depends on the need; is that
24 correct?
25     A.      Yes.

Page 27

1  everything is under control after a
2  stabbing?
3      A.      Totally depends upon the
4  situation.  The question -- to me, the
5  question is vague in nature.
6      Q.      What does it depend on?
7      A.      If there are other instances
8  happening.
9      Q.      Like what?  What other instances?
10     A.      Could be any -- it could be if --
11 if a stabbing of a person takes place, and
12 it calls for unrest -- or it causes unrest
13 throughout the facility, that could be a
14 need.  If the staff is still under control
15 of the facility, then there is not a need.
16     Q.      During your time as associate
17 commissioner, are you aware of any inmate
18 or inmate stabbings that didn't cause
19 unrest?
20         MR. LUNSFORD:  Object to the
21 form.
22     A.      Not that I can recall.
23     Q.      Do you recall who -- whether or
24 not you applied to become associate
25 commissioner?

Page 26

1      Q.      Okay.  What need?  What needs
2  determine whether or not someone other than
3  the shift commander is responsible for a
4  facility after a stabbing?
5      A.      So back up -- so let's back up a
6  little bit.  Understanding the warden is
7  always responsible for whatever happens at
8  the facility.  That's first and foremost.
9  The shift commander in charge would
10 basically report up the chain.  If there
11 was something else happening within that
12 facility besides a single stabbing, then in
13 most instances, then the shift commander is
14 able to be able to -- shift commander and
15 staff are able to maintain that situation.
16     Q.      Who aside from -- you managed the
17 warden and the shift commander.  Who aside
18 from the warden and the shift commander is
19 responsible for the control of the facility
20 after an inmate on inmate stabbing?
21     A.      So if you have a inmate on inmate
22 stabbing and everything's under control,
23 there's no need for anyone else to be in
24 control.  The shift commander's in control.
25     Q.      What determines whether or not

Page 28

1      A.      Yes, I did apply.
2      Q.      And were you interviewed?
3      A.      I was.
4      Q.      Who interviewed you?
5      A.      I don't recall honestly.
6      Q.      I'm sorry.  What'd you say?
7      A.      I said, I don't recall.
8      Q.      I think you became associate
9  commissioner around August of 2014.  Does
10 that sound right?
11     A.      I accept that.  I don't know what
12 day it was.  I was associate commissioner
13 twice so...
14     Q.      Before you became associate
15 commissioner you were an institutional
16 coordinator?
17     A.      I was.
18     Q.      And you were an institutional
19 coordinator between 2009 and 2014; is that
20 fair?
21     A.      I accept that.
22     Q.      What were your job
23 responsibilities as the institutional
24 coordinator?
25     A.      I was responsible for the

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 7 (25 - 28)

Lakeisha Ezell v. Jefferson Dunn, et al.

Grantt Culliver
6/25/2024

1 facilities in the northern region of the
2 state.
3    Q.    And did that include St. Clair?
4    A.    Yes, sir.
5    Q.    Approximately how many facilities
6 were you responsible for within the
7 northern district?
8    A.    Somewhere between 12 and probably
9 15.
10    Q.    Okay.  Did you receive formal
11 training when you became a institutional
12 coordinator?
13    A.    Can you explain formal training?
14    Q.    How would you define formal
15 training?
16    A.    I'm ask --
17          MR. LUNSFORD:  Object to the
18 form.
19    A.    I'm asking you.
20    Q.    I know.  But the way this goes is
21 that I'm going to -- you know, I'm going to
22 ask you questions.  If you don't understand
23 the question, then I'll rephrase it.  Do
24 you understand what formal training means?
25    A.    I --
                                    Page 29

1          MR. LUNSFORD:  Object to the
2 form.
3    A.    I would like for you --
4          MR. LUNSFORD:  Give me a minute.
5 Y'all just be careful.  Y'all are making
6 the court reporter's job difficult, just
7 talking over each other.
8          MR. RALLINS:  Sure.  And I
9 apologize, sir.  I'm going to try to wait
10 until you finish your response.  Let me
11 rephrase.
12    Q.    During your -- you were employed
13 with the Alabama Department of Corrections
14 over multiple decades, correct?
15    A.    Yes, sir.
16    Q.    And during that time, you
17 supervised multiple staff; is that correct?
18    A.    Yes, sir.
19    Q.    And during your time at the
20 Alabama Department of Corrections, did any
21 of the staff that you supervised receive
22 formal training in preparation for their
23 job responsibilities?
24    A.    And, again, can you explain
25 formal training to me?
                                    Page 30

1    Q.    You don't understand what formal
2 training means; is that correct?
3          MR. LUNSFORD:  Object to the
4 form.
5    A.    I understand -- my understanding
6 of formal training is a classroom setting
7 with certain objectives to be met, et
8 cetera.
9    Q.    Okay.  Well, let's use that.
10 Let's use that definition.  Did you receive
11 any formal training to become -- when you
12 became institutional coordinator at the
13 Alabama Department of Corrections?
14    A.    No, sir.
15    Q.    Did you receive any training?
16    A.    I had instructions, and my
17 training basically came within my years in
18 the system and getting to be a warden from
19 the warden one, to warden two, to warden
20 three.  But as far as formal training, sit
21 down in a classroom setting, let's go
22 through A, B, C, no, sir.
23    Q.    Okay.  Now, as institutional
24 coordinator, were you responsible for
25 supervising the wardens within the northern
                                    Page 31

1 district?
2    A.    Yes, sir.
3    Q.    Is it -- northern district,
4 correct?
5    A.    Northern region.
6    Q.    Northern region.  Sorry.  And
7 that included responsibly for the
8 supervision of the warden of St. Clair,
9 correct?
10    A.    Yes, sir.
11    Q.    As institutional coordinator, did
12 your duties include inspecting St. Clair?
13    A.    I did walkthroughs at St. Clair.
14    Q.    Okay.
15    A.    I did walkthroughs at all the
16 facilities in my region.
17    Q.    Why were you conducting
18 walkthroughs while you were institutional
19 coordinator at St. Clair?
20    A.    That was a responsibly that I
21 had.
22    Q.    I understand it was one of your
23 job responsibilities, but why were you
24 conducting walkthroughs?
25    A.    I talked to staff.  I talked to
                                    Page 32

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 8 (29 - 32)

Lakeisha Ezell v. Jefferson Dunn, et al.

Grantt Culliver
6/25/2024

1 inmate population.  I observed feeding.  I
2 observed security measures, items, things
3 being done, made recommendations to the
4 warden for changes if changes was needed.
5 I did it basically to be familiar with the
6 facility and the day-to-day operations of
7 those facilities.
8     Q.    Why were you observing the
9 security at St. Clair during your
10 walkthroughs?
11     A.    Repeat the question, please.
12     Q.    Why were you observing security
13 at St. Clair while you were doing
14 walkthroughs?
15     A.    To see if policy and procedures
16 were being followed.
17     Q.    While you were institutional
18 coordinator conducting walkthroughs at St.
19 Clair, did you notice that any policies and
20 procedures weren't being followed at St.
21 Clair?
22     A.    At times.
23     Q.    What policies and procedures did
24 you notice weren't being followed at St.
25 Clair while you were institutional

Page 33

1 coordinator conducting walkthroughs?
2     A.    One of the most common one was
3 inmate dress.
4     Q.    What other policies and
5 procedures did you notice weren't being
6 followed while you were serving as
7 institutional coordinator?
8     A.    Repeat, please.
9     Q.    What other policies and
10 procedures did you notice weren't being
11 followed at St. Clair while you conducted
12 walkthroughs as the institutional
13 coordinator?
14     A.    Some security procedures, the
15 amount of people who were released out of a
16 cellblock at any one time or at a certain
17 time, staff paying attention to detail.
18     Q.    What security procedures did you
19 notice weren't being followed?
20     A.    I thought I just answered that.
21 I'm sorry.  Can we backtrack a little bit?
22     Q.    Yeah.  You said that you noticed
23 some security procedures weren't being
24 followed.  I'm asking what specific
25 security procedures did you notice weren't

Page 34

1 being followed while you were conducting
2 walkthroughs at St. Clair as institutional
3 coordinator?
4     A.    So if I'm not mistaken, my
5 pervious answer was the number of inmates
6 and how inmates were being released from
7 the cellblock to different areas.
8     Q.    And when you say different areas,
9 you mean different areas of the prison?
10     A.    Yes, sir.
11     Q.    What did you notice about how
12 they were being released to other areas of
13 the prison?  What was improper?
14     A.    There would be times when inmates
15 would come out of the cellblock to go to
16 the dining hall.  Instead of going to the
17 dining hall, they may try and go to another
18 cellblock.  They may try and go to pill
19 call when it wasn't their time to go to
20 pill call.  They may not go anywhere but
21 just try and gather on the yard.
22     Q.    And you were concerned about
23 their free movement?
24     A.    I wasn't concerned about their
25 free movement.  I was concerned about

Page 35

1 inmates doing what they were told to do, go
2 to the places they go to, return back to
3 where they're supposed to be.
4     Q.    And why were they allowed to be
5 in a location of the prison where they
6 weren't supposed to be that you noticed
7 when you were conducting walkthroughs?
8     A.    Some of it was just disrespect to
9 staff, some of it was staff not doing their
10 job as appropriately as they should.
11     Q.    Well, did you talk to the warden
12 at St. Clair while you were institutional
13 coordinator about the movement of inmates
14 at St. Clair?
15     A.    Most of the times the warden
16 would be with me.
17     Q.    Okay.  And if the warden was with
18 you most of the time when you were
19 conducting walkthroughs, would you discuss
20 this movement of inmates that you thought
21 was improper?
22     A.    Yes, sir.
23     Q.    And what would you tell the
24 warden while you were institutional
25 coordinator over St. Clair?

Page 36

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 9 (33 - 36)

Lakeisha Ezell v. Jefferson Dunn, et al.

Grantt Culliver
6/25/2024

1         MR. LUNSFORD:  Object to the
2 form.
3     A.     Most of the time it would be a
4 question to the warden as to why.  Why is
5 this happening, why, et cetera.  And then
6 the conversation would not necessarily take
7 place there.  It may take place later on or
8 I may give the warden some suggestions as
9 to how we could do that better.
10    Q.     Okay.  While you were
11 institutional coordinator between
12 approximately 2009 and 2014, what changes
13 were made at St. Clair with regard to
14 inmate movement?
15        MS. COBB:  Object to form.
16    A.     I really can't tell you.  I can't
17 remember.
18    Q.     You don't recall any policies or
19 procedures that changed during that period;
20 is that fair?
21        MS. COBB:  Object to form.
22    A.     That's fair.
23    Q.     Did you talk to the associate --
24 strike that.
25        While you were institutional
                                    Page 37

1 coordinator, did you report directly to the
2 associate commissioner -- yeah, did you
3 report directly to the associate
4 commissioner for operations and
5 institutional security?
6     A.     I did.
7     Q.     Did you tell the associate
8 commissioner for operations and
9 institutional security that you had
10 concerns with the security protocols at St.
11 Clair?
12    A.     I don't think I said I had
13 concerns.
14    Q.     Well, you stated that you noticed
15 that policies and procedures weren't being
16 followed with respect to where inmates were
17 supposed to be in the facility, correct?
18    A.     Yes.
19    Q.     You didn't have concern about
20 that policies and procedures weren't being
21 followed?
22    A.     But I don't think I used that
23 terminology, and I don't -- in my thought
24 process, that's not what I would consider
25 to be necessarily a concern.  If -- if I
                                    Page 38

1 can finish, please.
2     Q.     Sure.
3     A.     If it was totally chaotic, then I
4 would have a concern.  That's how I would
5 categorize a concern.  Did I speak with the
6 associate commissioner -- after every visit
7 I made to a facility, I did not necessarily
8 come back and talk to the associate
9 commissioner for operations and say, this
10 is what I observed, this is what I saw.
11    Q.     Why not?
12    A.     I didn't feel like it was
13 necessary, and that wasn't what I was
14 required to do.
15    Q.     Why didn't you feel like it was
16 necessary to report security issues to the
17 associate commissioner for operations and
18 institutional security?
19        MR. LUNSFORD:  Object to form.
20    A.     In my mind, that's a
21 miscategorization of what I'm saying.  And
22 so maybe the understanding -- my
23 understanding of what my duties were and
24 what my responsibilities were and what your
25 ideal about what they should've been are
                                    Page 39

1 just different.  So the associate
2 commissioner basically -- the job of a
3 coordinator is to supervise the wardens at
4 those facilities and ensure or try and
5 ensure that policy and procedure are being
6 followed.
7         So if I walk through the facility,
8 and I'm with the warden when I walk through
9 the facility, and there aren't any
10 egregious things happening, when I address
11 that with the warden -- unless I make a
12 return trip and the same things are
13 happening or something more serious takes
14 place -- I think that's what my job was.
15 That's what I considered it to be, and
16 that's what the associate commissioner of
17 operations at the time held me responsible
18 for.
19    Q.     Well, unrestricted movement was
20 still an issue at St. Clair even when you
21 became associate commissioner of operations
22 in institutional security; is that correct?
23        MS. COBB:  Object to form.
24    A.     There were some problems, yes.
25    Q.     What type of problems were there
                                    Page 40

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 10 (37 - 40)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

---

1 when you became associate commissioner of
2 operations in institutional security?
3     A.     There was still movement that
4 should not have been taking place.  There
5 was -- there were different -- there were
6 different things at St. Clair that made it
7 somewhat unique.  The style of the
8 facility, the layout and design of the
9 facility all were -- in my opinion, were
10 problems from the beginning.  I didn't like
11 the campus style.  But there was nothing I
12 could do about that so...
13     Q.     And you stated that there was
14 some movement issues still taking place.
15 What type of the movement issues of inmates
16 did you notice when you became associate
17 commissioner of operations and
18 institutional security in August of 2014?
19     A.     There was still some lack of
20 control.  The design of the facility -- the
21 campus style of the facility is quite
22 different from the traditional all under
23 one roof type of a facility.  And so from
24 point A to point B, if a person is allowed
25 -- given approval to go from point A to

*Page 41*

1 point B but is able to go to point C and
2 point D while he's out to go to point B,
3 then -- and then if you have that happening
4 -- if that happens from cellblock -- I'm
5 just going to use A, B, and C.  That has no
6 reference to any facility.  But if that
7 happens from cellblock A, B, C and D, then
8 you have inmates out who should probably
9 not be out in certain areas or they are
10 doing other things that they should not be
11 doing.
12     Q.     While you were institutional
13 coordinator, you would interview applicants
14 for the position of warden; is that
15 correct?
16     A.     Yes.
17     Q.     Who did you interview to become
18 the warden over at St. Clair?
19     A.     I don't recall.
20     Q.     Did you ever interview Gwendolyn
21 Givens?
22     A.     I don't recall.
23     Q.     Did you interview Karla Jones?
24     A.     Yes.
25     Q.     As institutional coordinator, you

*Page 42*

1 were also given duties assigned by the
2 associate commissioner of operations; is
3 that correct?
4     A.     Please repeat.
5     Q.     As institutional coordinator, you
6 were assigned duties by the associate
7 commissioner of operations --
8     A.     Yes, sir.
9     Q.     -- is that fair?  What type of
10 duties were you assigned by the associate
11 commissioner of operations?
12     A.     Touring facilities, supervising
13 the wardens, some committees, and if I'm
14 not mistaken, at some point I was on the
15 regulation committee.  That's the best of
16 my recollection to be specific.
17     Q.     As institutional coordinator
18 after you interview a potential warden of
19 St. Clair, were you able to make a final
20 decision or did you make a recommendation?
21     A.     I made a recommendation.
22     Q.     And who would you make the
23 recommendation to?
24     A.     The associate commissioner of
25 operations.

*Page 43*

1     Q.     Do you recall interviewing any?
2     A.     Repeat, please.
3     Q.     Do you recall interviewing any
4 person who ultimately became warden over
5 St. Clair other than Karla Jones?
6     A.     Probably Dewayne Estes.  I really
7 -- my recollection of that is quite vague
8 actually.
9     Q.     Okay.  But you do recall
10 interviewing Karla Jones?
11     A.     Yes.
12     Q.     What do you recall about that
13 interview?
14     A.     Warden Jones was confident.  She
15 was -- I consider her to be strong.  She
16 had -- her track record was good for
17 actually running facilities, and I -- as I
18 try to remember, I don't -- as a
19 coordinator, if I'm not mistaken, Karla
20 Jones was moved to St. Clair when I was
21 associate commissioner of operations if
22 memory serves me correctly.  I'm not really
23 sure.
24     Q.     And Warden Jones was hired at St.
25 Clair while you were institutional

*Page 44*

Lakeisha Ezell v. Jefferson Dunn, et al.

Grantt Culliver
6/25/2024

1 coordinator?
2        MS. COBB:  Object to form.
3      A.      I don't think so.  I don't
4 recall.
5      Q.      You don't recall.  Can you tell
6 me everything you did to prepare for
7 today's deposition aside from mentioning
8 specific conversations you had with your
9 counsel?
10     A.      That was it.
11     Q.      Did you review any materials?
12     A.      I reviewed some materials that
13 counsel sent me.
14     Q.      What materials did you review?
15     A.      Previous depositions.
16     Q.      How many depositions did you
17 review?
18     A.      I don't -- I don't know.
19     Q.      These were your deposition
20 transcripts?
21     A.      Yes, sir.  And they were not the
22 entire -- they were not the entire
23 deposition.
24     Q.      It was excerpts from your
25 deposition transcripts?

Page 45

1      A.      Yes, sir.
2      Q.      And were they transcripts from
3 more than one deposition?
4      A.      That's -- I don't know honestly.
5      Q.      Do you recall approximately when
6 the date of the deposition was that you
7 reviewed the transcripts?
8      A.      No, sir.
9      Q.      Aside from deposition
10 transcripts, did you review any other
11 documents?
12     A.      No, sir.
13     Q.      Did you review any reports?
14     A.      The only thing that I reviewed
15 prior to this was the depositions I've
16 already mentioned -- or the deposition.
17 Whether it was more than one or not, I
18 don't really know.
19     Q.      Okay.  Did you keep any personal
20 file relating to your employment as
21 associate commissioner?
22     A.      No, sir.
23     Q.      Did you keep copies of any
24 incident reports from St. --
25     A.      Replete, please.

Page 46

1      Q.      Did you keep copies of any
2 incident reports from St. Clair?
3      A.      No, sir.  I don't have access to
4 any of that.
5      Q.      Right.  But do you have -- did
6 you keep any copies yourself of any
7 incident reports from your times at Alabama
8 Department of Corrections?
9      A.      I don't have anything in my
10 possession that I am aware of from any ADOC
11 stuff that I ever did beside certificates
12 that go on my wall, the badge that I get
13 when I retire, the pins you get every five
14 years.
15     Q.      How many times did you meet with
16 your attorney in preparation for today's
17 deposition?
18     A.      Once.
19     Q.      And when was that?
20     A.      Well, twice if we count this
21 morning.  Yesterday afternoon.  The first
22 appointment that I had I wasn't able to
23 keep, and then so yesterday afternoon I met
24 with an attorney, and this morning I met
25 with an attorney.

Page 47

1      Q.      So there was a meeting afternoon
2 -- yesterday afternoon?
3      A.      Yes, sir.
4      Q.      And for how long was that
5 meeting?
6      A.      30 minutes.  I don't know.
7      Q.      Was anyone there present aside
8 from your counsel?
9      A.      No, sir.
10     Q.      And you met for approximately how
11 long that day?
12     A.      15 minutes.
13     Q.      Did you have any meetings via
14 phone in preparation for today's
15 deposition?
16     A.      No, sir.
17     Q.      How many times did you review the
18 transcripts of your deposition?
19     A.      Twice.
20     Q.      When's the last time you reviewed
21 them?
22     A.      Last night before I went to bed
23 -- or about 1:00 o'clock this morning
24 actually.
25     Q.      Do you recall where you were when

Page 48

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 12 (45 - 48)

**Lakeisha Ezell v. Jefferson Dunn, et al.**                    **Grantt Culliver**
                                                                  **6/25/2024**

1 you learned that you were a defendant in
2 this lawsuit?
3    A.    No, sir.
4    Q.    What's your understanding of the
5 allegations against you in the complaint of
6 this lawsuit?
7    A.    I should know that because of
8 attorney -- I was just told that.
9    Q.    I don't want to hear about the
10 communicating with the attorney, but --
11   A.    That's all I can tell you.
12   Q.    Okay.  You have no understanding
13 about the allegations against you in this
14 complaint?
15        MR. LUNSFORD:  Object to the
16 form.
17   A.    No, sir.
18   Q.    Do you know who the plaintiff is
19 in the lawsuits that are the subject of
20 today's deposition?
21   A.    I don't recall the name.
22   Q.    Do you know the inmates who died
23 who are the subject of today's deposition?
24        MR. LUNSFORD:  Object to the
25 form.
                                    Page 49

1    A.    I don't know the name.
2    Q.    Have you talked with any of the
3 defendants since you were served with the
4 plaintiff's lawsuit?
5    A.    No, sir, not to my knowledge.
6    Q.    Is there anything you wanted to
7 look at in preparation for today's
8 deposition that you weren't able to look
9 at?
10   A.    No, sir.
11   Q.    Did you have adequate time to
12 prepare?
13        MR. LUNSFORD:  Object to form.
14   A.    As far as I'm concerned, I did.
15   Q.    Do you feel prepared to testify
16 today?
17        MR. LUNSFORD:  Object to the
18 form.
19   A.    Yes, sir.
20        MR. LUNSFORD:  Can I just get a
21 clarification?  'Cause I just got confused
22 about something.  You said this case is
23 about inmates who died.  Are we talking
24 about more than one inmate or did I
25 mishear?  Was that inmates plural or
                                    Page 50

1 inmates singular?
2        MR. RALLINS:  I'm talking about
3 the inmates in -- who are up for our
4 discussion.  I'm talking about the inmates,
5 Guy and Ezell.
6        MR. LUNSFORD:  So wait.  But I
7 think we only got a notice for the Guy.  So
8 are you taking -- I just want to make sure
9 this is clear for the record.  Are you
10 taking this for both cases?
11        MR. RALLINS:  I believe that --
12 well, no, wait.  Let me just double check.
13        MR. LUNSFORD:  Well, this is
14 where I'm confused because I don't -- I
15 don't even think --
16        MR. RALLINS:  I think that's --
17 Bill, I think that's right.  I think that's
18 right.  Yeah, I misspoke.  And I don't
19 think it's going to be an issue right now,
20 but I'll just -- if there's anything that
21 we can discuss on the break -- but my
22 questions at this point aren't that
23 particular.
24        MR. LUNSFORD:  Well, I just want
25 to be clear 'cause Mr. Culliver isn't even
                                    Page 51

1 a party in the Ezell matter.
2        MR. RALLINS:  Right, right.  So I
3 think that's right.
4        MR. LUNSFORD:  No, I mean, I know
5 it's right so I want to make sure we're not
6 -- you're not under the perception you're
7 taking this for multiple cases because that
8 was not the agreement, and that was not the
9 notice.
10        MR. RALLINS:  Right.  And to be
11 frank, my question also could pertain to
12 multiple inmates who were described in the
13 lawsuit where he is a defendant.  And but I
14 --
15        MR. LUNSFORD:  I mean, again, if
16 you're referring to those, I think that
17 wasn't even clear from the question, and so
18 might want to go back and clarify that.  I
19 didn't know what inmates you were referring
20 to when you asked the question earlier.
21        MR. RALLINS:  Okay.  If I need to
22 rephrase, I will.
23   Q.    Mr. Culliver, let's talk about
24 your job responsibilities as associate
25 commissioner for operations and
                                    Page 52

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 13 (49 - 52)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 institutional security. What were those
2 job responsibilities?
3      A.      The oversight of the male
4 facilities in the Alabama Department of
5 Corrections, the supervision of the
6 regional or institutional coordinators --
7 however the terminology's used.
8      Q.      Okay. Did you receive formal
9 training when you became associate
10 commissioner of operations in institutional
11 security?
12      A.      By my definition, no.
13      Q.      Did you receive any training when
14 you became associate commissioner of
15 operations?
16              MS. COBB: Object to form.
17      A.      Training --
18      Q.      I'm sorry. What'd you say?
19      A.      Training, no. On the job, yes.
20 Preparation for the job as institutional
21 coordinator as a warden, yes. Sit down
22 discussion with the commissioner as what
23 was expected, yes. Sit down with a
24 textbook to say X, Y and Z, no.
25      Q.      What commissioner did you sit

Page 53

1 down and meet with when you became
2 associate commissioner?
3      A.      The first time it was -- I can't
4 recall his name. That's age. That's just
5 old age. But I can see him, but I can't
6 recall his name. But it was a previous --
7 I might not even have that right. I don't
8 know. The last one was Commissioner
9 Dunn -- the second one was Commissioner
10 Dunn.
11      Q.      Okay. I know you don't recall
12 who you met with when you first became
13 associate commissioner for operations.
14 What did they tell you were your job
15 responsibilities?
16              MR. LUNSFORD: Object to the
17 form.
18      A.      There was -- the oversight of the
19 male facilities in the department,
20 supervision of the institutional
21 coordinators, team player, meeting with the
22 other commissioners on a regular basis and
23 as needed when there were -- and as needed.
24 That's the best I can recall.
25      Q.      Who did you report to when you

Page 54

1 became associate commissioner for
2 operations and institutional security?
3      A.      Repeat, please.
4      Q.      Who did you become -- who did you
5 report to when you became associate
6 commissioner?
7      A.      The commissioner or his chief of
8 staff.
9      Q.      Okay. And who reported directly
10 to you when you became associate
11 commissioner?
12      A.      Institutional coordinators.
13 That's all I recall.
14      Q.      So your job responsibly as
15 associate commissioner included directing
16 and managing institutional security; is
17 that correct?
18      A.      Part of it, yes, sir.
19      Q.      Okay. That included directing
20 and managing institutional security at St.
21 Clair, right?
22      A.      It included all the male
23 facilities including St. Clair.
24      Q.      Okay. And your job
25 responsibilities included directing and

Page 55

1 managing staffing at all male facilities
2 including St. Clair?
3      A.      Yes, sir.
4      Q.      And your job responsibilities
5 included directing and managing training of
6 staff, including at St. Clair?
7      A.      No, sir.
8      Q.      It didn't include training?
9      A.      No, sir.
10      Q.      Who was responsible for directing
11 and managing training --
12      A.      I don't --
13      Q.      -- at St. Clair?
14      A.      I don't know who was over
15 training. I don't recall who was over
16 training. I have a very vague
17 recollection. I put the department of
18 corrections behind me. I've been gone
19 five, six years now. And so I'm not being
20 a -- by saying that I don't recall. I
21 literally -- I do not recall.
22      Q.      That's fair. You don't recall
23 anyone being responsible for training while
24 you served as associate commissioner for
25 operations and institutional security?

Page 56

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 14 (53 - 56)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

1  A.    I don't recall who that was, no.
2  Q.    Do you recall anyone being
3 responsible for training?
4  A.    The training director, but who
5 that was, I don't know.
6  Q.    And was there a training director
7 for the Alabama Department of Corrections
8 while you were associate commissioner?
9  A.    Yes, sir.
10  Q.    Who did they report to?
11  A.    I don't know, sir.
12  Q.    Were you responsible for over the
13 daily operations of male operational
14 facilities including St. Clair?
15  A.    Yes, sir.
16  Q.    But while you were associate
17 commissioner, you had supervisory oversight
18 over Edward Ellington; is that correct?
19  A.    Yes, sir.
20  Q.    Did you have supervisory
21 oversight over any other institutional
22 coordinators while you were associate
23 commissioner?
24  A.    Yes, sir.
25  Q.    And that was the commissioners of

Page 57

1 coordinators were not responsible -- I
2 mean, just doing written reports.  We met
3 on a regular basis, generally two or three
4 times a week and discussed various things
5 to do -- to having to do with the
6 facilities or whether it had to do with
7 personnel or whether it had to do with
8 staffing.  But I had a general meeting with
9 them at least once a week to the best of my
10 recollection.  My door was always open if
11 there was something that needed to be
12 reported so...
13  Q.    Would Edward Ellington ever
14 submit written reports to you?
15  A.    I don't recall any.
16  Q.    You don't recall Edward Ellington
17 ever sending you a memo?
18  A.    I don't recall.  But I'm not
19 saying he didn't.  I don't recall one.
20  Q.    You don't recall him ever
21 submitting a formal report to you?
22  A.    A formal report of what type?
23  Q.    Of any type.
24  A.    I don't recall one, no.
25  Q.    Was it your expectation that

Page 59

1 the various regions within ADOC, correct?
2  A.    Repeat your question, please.
3  Q.    And that was the other
4 institutional coordinators in the various
5 regions of ADOC, correct?
6  A.    Yes, sir.
7  Q.    How would Edward Ellington report
8 to you while he was institutional
9 coordinator?
10  A.    How?
11  Q.    Yes.  How?
12  A.    Verbally mostly, face to face.
13  Q.    Would you go and meet with him in
14 person regularly?
15  A.    Would he come meet with me
16 personally?  Yes.
17  Q.    Okay.  And where would you
18 usually meet?
19  A.    In my office.
20  Q.    And where was your office?
21  A.    Downtown Montgomery.  I tried to
22 remember the address for you, but I can't.
23  Q.    That's fair.  Would he provide
24 you with written reports?
25  A.    Coordinators were not -- so the

Page 58

1 Edward Ellington would conduct walkthroughs
2 at St. Clair?
3  A.    Yes, sir.
4  Q.    And when he conducted
5 walkthroughs, it was your expectation he
6 would evaluate any security concerns at St.
7 Clair, correct?
8  A.    Yes, sir.
9  Q.    Was it your expectation that if
10 there was security concerns, he would
11 report those concerns to you?
12  A.    Was it my expectations that he
13 would?  Is that the question?
14  Q.    Yes.
15  A.    Yes, sir.
16  Q.    And was it your expectation that
17 if he noticed policies and procedures --
18 strike that.
19       Was it your expectation that if
20 he noticed policies and procedures weren't
21 being followed at St. Clair with respect to
22 security, he would report that to you?
23  A.    To a degree.  I probably
24 supervised Mr. Ellington and the other
25 coordinators the way that I was supervised.

Page 60

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 15 (57 - 60)

Lakeisha Ezell v. Jefferson Dunn, et al.

Grantt Culliver
6/25/2024

1 And so if there was something that he
2 felt -- that he couldn't correct or didn't
3 correct or he felt was happening too often,
4 then, yes, he would report those things to
5 me.
6         THE WITNESS:  Can I take a break,
7 please?  Can I get a break?
8         MR. RALLINS:  Sure.  We'll take
9 five?
10        THE WITNESS:  Can I get 10, 15?
11        MR. LUNSFORD:  Yeah.  Can we take
12 ten?  I got 10:38, so we'll come back at
13 10:48?  That works?
14        THE VIDEOGRAPHER:  The time is
15 10:39 a.m.  We are off the record.
16    (Whereupon, a recess was taken.)
17        THE VIDEOGRAPHER:  The time is
18 10:51 a.m.  We are back on the record.
19    Q.    I was asking you some questions,
20 Mr. Culliver, about your responsibilities
21 as the associate commissioner.  Part of
22 your responsibility was helping to
23 formulate operations, policy and standard
24 operating procedures, correct?
25    A.    Yes, sir.
                                    Page 61

1    Q.    And what other staff within the
2 Alabama Department of Corrections would you
3 work with to formulate operations --
4 standard operating procedures?
5    A.    There was -- for a period of
6 time, there was actually a committee that
7 worked on policy for the lack of -- I guess
8 the proper name of what that committee
9 really was, we just call it a policy
10 committee.  But I was a part of that policy
11 committee over a good long period of time.
12 And then from a facility to facility
13 position, the way the department was set up
14 when I was there, then policy came from
15 what we call the administrative
16 regulations, and then the institutions
17 would develop standard operating procedures
18 that were relative to those administrative
19 regulations.
20    Q.    When you say institutions, you
21 mean the prisons?
22    A.    Yes, sir.
23    Q.    So you would coordinate with the
24 warden in the formulation of standard
25 operating procedures?
                                    Page 62

1    A.    I need you to -- I need for that
2 to be more clear.  I don't --
3    Q.    Well, the warden -- you said the
4 prison would help develop standard
5 operating procedures, correct?
6    A.    I said -- I'm just repeating
7 so -- the policy committee wrote policies
8 for the department, including security
9 policies.
10    Q.    Okay.
11    A.    But each institution followed
12 that policy up with a standard operating
13 procedure that would mirror the
14 administrative regulation with enhancements
15 based on each facility because all the
16 facilities are not laid out the same.  They
17 don't have the same security fencing
18 systems.  They don't have the same layout
19 from a control center perspective as the
20 oversight from the officer that's on the
21 floor to the person who controls and
22 unlocks the doors.  And so each institution
23 then would take the policy in place and
24 draft their standard operating procedure
25 for those institutions.
                                    Page 63

1    Q.    Okay.  And would the standard
2 operating procedures need to be approved?
3    A.    I don't recall.  I don't recall
4 the policies actually being submitted to my
5 office or the coordinator's office for
6 their approval before they went into
7 effect.
8    Q.    Okay.  Now, you served on the
9 policy committee while you were associate
10 commissioner, correct?
11    A.    Warden, institutional
12 coordinator, and associate commissioner.
13    Q.    Okay.  And --
14    A.    I take -- excuse me.  I'm not
15 totally sure about associate commissioner.
16 There was a break there where the policy
17 committee did not meet as regularly as it
18 did.  So I would say for a period of that
19 time as associate commissioner, yes.  But I
20 don't know when we got away from that.  But
21 at some point, we kind of drifted away from
22 meeting on a regular basis.
23    Q.    Okay.  So you served on the
24 policy committee while you were
25 institutional coordinator and then later
                                    Page 64

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 16 (61 - 64)

Lakeisha Ezell v. Jefferson Dunn, et al.

Grantt Culliver
6/25/2024

1 when you became the associate commissioner;
2 is that fair?
3     A.     Sure.  Yes, sir.
4     Q.     Okay.  I want to ask you
5 questions about who was -- I want to talk
6 about this policy committee and make sure I
7 understand.  Were all the institutional
8 coordinators assigned to this policy
9 committee?
10     A.     At the time that I was a
11 institutional coordinator, there were only
12 two of us, and we both were on the
13 committee, yes.
14     Q.     Okay.  And associate commissioner
15 of operations and institutional security
16 was on that policy committee even while you
17 were institutional coordinator?
18     A.     I don't think the associate
19 commissioner of operations was on that
20 committee at that time.
21     Q.     Okay.  While you were an
22 associate commissioner, who else was on the
23 policy committee as -- who else was on the
24 policy committee?
25     A.     Associate commissioner -- I think

Page 65

1 the title is right.  The associate
2 commissioner over women services was on the
3 committee.  There was a regional
4 coordinator on the facility -- regional
5 coordinator or institutional coordinator
6 was on the committee; a person from policy
7 and procedure.  There were several wardens
8 that were on the committee and some of the
9 department heads that I don't -- I can't
10 necessarily say which ones.
11     Q.     Okay.  Was the warden -- was any
12 warden at St. Clair on the committee?
13     A.     To the best -- if my memory
14 serves me correct, I believe Warden Estes
15 was on the committee for a period of time.
16     Q.     Okay.  And was it helpful to have
17 wardens on the committee to make sure that
18 you all were formulating appropriate
19 policies for the administrative
20 regulations?
21     A.     Repeat, please.  I missed the
22 first part.
23     Q.     You had wardens on this policy
24 committee to give their input for the
25 policy recommendations that would become

Page 66

1 administrative regulations?
2     A.     Yes, sir.
3     Q.     Are you the highest ranking
4 member of the policy committee while you
5 were associate commissioner?
6     A.     No, sir.  I mean -- no, sir.
7     Q.     Who else was on the committee
8 that had a higher ranking than you?
9     A.     Chief of staff.
10     Q.     Was somebody else aside from the
11 chief of staff who was on the policy
12 committee that had a higher ranking than
13 you?
14     A.     Well, there were one or two other
15 associate commissioners on the committee
16 so...
17     Q.     Okay.
18     A.     It's not higher, but it's equal.
19     Q.     Okay.  And I'm trying to flush
20 out who was all on the committee.  So the
21 other associate commissioners were also on
22 the committee?
23     A.     Mr. McDonald was until -- I think
24 until his retirement.  Ms. Naglich was.
25 She was -- I think she was.  She would

Page 67

1 appear from time to time.  She was over
2 medical services -- medical -- medical and
3 mental health.  That's my best
4 recollection.
5     Q.     Okay.  And this committee would
6 recommend -- strike that.
7          This committee would formulate
8 policies that would become a part of the
9 Alabama Department of Corrections
10 Administrative Regulations --
11     A.     Yes, sir.
12     Q.     -- correct?
13     A.     Yes, sir.
14     Q.     Would the policy recommendations
15 need to be approved by Commissioner Dunn?
16     A.     Yes, sir.
17     Q.     And the expectation of the
18 leadership within the correctional
19 facilities is that they would use these
20 administrative regulations to make their --
21 to formulate their respective standard
22 operating procedure.  That's my
23 understanding of what you communicated; is
24 that fair?
25     A.     Yes, sir.

Page 68

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 17 (65 - 68)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1    Q.    And the facility's standard
2  operating procedures were approved by the
3  warden, correct?
4    **A.    Yes, sir.**
5    Q.    While you were associate
6  commissioner, do you recall ever
7  disagreeing with the standard operating
8  procedures being promulgated at St. Clair?
9    **A.    Can you rephrase the question?**
10   Q.    Yes.  While you were the
11  associate commissioner at -- while you were
12  associate commissioner, do you recall ever
13  disagreeing with the standard operating
14  procedures that were being proposed at St.
15  Clair?
16   **A.    No, sir.  Understanding that**
17  **those policies did not come to me for**
18  **approval.**
19   Q.    Right.  But if St. Clair was
20  promulgating standard operating procedures
21  with regard to operations or institutional
22  security that you didn't agree with, you
23  had the authority to change those standard
24  operating procedures, correct?
25   **A.    Yes, sir.**

Page 69

1    Q.    But as you sit here today, you
2  don't recall ever seeking to change any
3  standard operating procedures that St.
4  Clair was -- had promulgated?
5    **A.    No, sir.**
6    Q.    Do you recall -- strike that.
7          As you were -- while you were
8  associate commissioner, do you recall any
9  warden at St. Clair discussing standard
10  operating procedures with you before they
11  were approved?
12   **A.    No, sir.**
13   Q.    While you were the warden at any
14  of the facilities that you've described,
15  did you approve any standard operating
16  procedures?
17   **A.    Yes, sir.**
18   Q.    Do you recall ever seeking
19  approval for the standard operating
20  procedures from an institutional
21  coordinator?
22   **A.    No, sir.**
23   Q.    Do you recall ever receiving --
24  seeking approval for the standard operating
25  procedures from the associate commissioner

Page 70

1  of operations and institutional security?
2    **A.    No, sir.**
3    Q.    Do you recall ever seeking
4  approval from any superior over at Alabama
5  Department of Corrections?
6    **A.    No, sir.**
7    Q.    While you were a warden at the
8  respective facilities as you've described,
9  who would advise you on the formulation of
10  standard operating procedures?
11   **A.    The policy on -- the policy on**
12  **standard operating procedures is an**
13  **administrative -- there's an administrative**
14  **regulation policy governing standard**
15  **operating procedures, and basically those**
16  **procedures are written in accordance with**
17  **the administrative regulations so -- and**
18  **there was not -- to my recollection, there**
19  **was not a requirement for approval.**
20  **Because they were -- you were expected to**
21  **write the policy based on the regulation**
22  **that was in place.**
23   Q.    Okay.  Let me ask it a different
24  way.  Are you aware of who -- strike that.
25          While you were associate

Page 71

1  commissioner, you were responsible -- you
2  were a member of Commissioner Dunn's
3  executive staff, correct?
4    **A.    Yes, sir.**
5    Q.    And as a member of the executive
6  staff, you were particularly responsible
7  for internal security of the prisoners at
8  the prisons, correct?
9    **A.    Internal security of?**
10   Q.    The prisoners at the facilities.
11          MR. LUNSFORD:  Object to the
12  form.
13   **A.    Yes, sir.**
14   Q.    And you were responsible for
15  ensuring that searching for weapons,
16  contrabands were occurring as required by
17  policy at St. Clair and the other
18  facilities, correct?
19   **A.    Yes, sir.**
20   Q.    And you were responsible for
21  ensuring that security hardware issues like
22  broken cells or locks were identified and
23  brought to the attention of the executive
24  team of ADOC, correct?
25   **A.    Yes, sir.**

Page 72

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 18 (69 - 72)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

Page 73

1    Q.    And to identify security issues,
2 you would also rely on information that was
3 communicated to you from your institutional
4 coordinator of the northern region,
5 correct?
6    **A.    Yes, sir.**
7    Q.    And you would rely on the
8 information that was communicated to you
9 from the warden at St. Clair, correct?
10    **A.    Yes, sir.**
11    Q.    And there were many times where
12 the institutional coordinator would conduct
13 walkthroughs or visits at St. Clair without
14 you, correct?
15    **A.    Without me?**
16    Q.    Yes.
17    **A.    Yes, sir.**
18    Q.    And in order for you to be aware
19 of security issues, there was an
20 expectation that any security issues that
21 the institutional coordinator learned about
22 would be communicated to you, correct?
23    **A.    For the most part, yes.**
24    Q.    And that was important so you
25 could communicate that to the executive

Page 74

1 team -- strike that.
2        That was important so that you
3 could bring those security issues and
4 communicate that to the executive team,
5 correct?
6    **A.    Yes, sir.**
7    Q.    As associate commissioner, you
8 were also responsible for ensuring that St.
9 Clair and other facilities were complying
10 with policies or procedures affecting
11 internal security at a prison like
12 contraband search, correct?
13    **A.    Yes, sir.**
14    Q.    As associate commissioner, you
15 had discretion to manage, place, and assign
16 wardens based upon -- based on whether
17 there were effective or ineffective,
18 correct?
19    **A.    I could make that recommendation**
20 **to the commissioner, yes, sir.**
21    Q.    During your time as associate
22 commissioner, did you ever make a
23 recommendation to the commissioner that a
24 warden at St. Clair was ineffective?
25    **A.    I don't recall.**

Page 75

1    Q.    Did you ever communicate to the
2 commissioner that Warden Jones was
3 ineffective as a warden?
4        MS. COBB:  Object to form.
5    **A.    No, sir.**
6    Q.    You advised Commissioner Dunn as
7 associate commissioner, correct?
8    **A.    Yes, sir.**
9    Q.    And you would meet with him three
10 to four times a week on average?
11    **A.    Just depends.  Sometimes -- no, I**
12 **would not.  Not three or four times a week**
13 **on a regular basis, no.**
14    Q.    Okay.  On average, how many times
15 would you meet with Commissioner Dunn in a
16 given week?
17    **A.    Once or twice.  There was one**
18 **formal meeting which was the executive**
19 **meeting that we had on whatever day we had**
20 **that on, and if things arose from that time**
21 **to the next time that he needed to be made**
22 **aware of, then I would meet with him about**
23 **those things or if he had questions, things**
24 **that were brought to his attention, and he**
25 **had questions about certain things then he**

Page 76

1 would call me in or he would come by the
2 **office, and we would talk about that.  And**
3 **there were other times when I might just go**
4 **to the chief of staff and --**
5    Q.    So there was the weekly meeting
6 with the executive team where you would
7 meet with Commissioner Dunn, correct?
8    **A.    I would meet with the team, yes,**
9 **sir.**
10    Q.    And would Commissioner Dunn be
11 present at the executive team meetings?
12    **A.    Yes, sir.**
13    Q.    And you did not have a -- strike
14 that.
15        Did you have a regular meeting
16 scheduled weekly with Commissioner Dunn
17 outside of that team meeting?
18    **A.    No, sir.**
19    Q.    Okay.  So you would say that on
20 average, you wouldn't meet with him at
21 least once a week aside from the executive
22 team meeting?
23    **A.    Correct.**
24    Q.    And he was the only person you
25 reported to while he was commissioner,

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 19 (73 - 76)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 correct -- directly reported to?
2     A.    He and the chief of staff.
3     Q.    You would provide formal reports
4 to Commissioner Dunn?
5     A.    No, sir.
6     Q.    And when you provided formal
7 reports to Commissioner Dunn, you would
8 include information that you received with
9 regard to security issues and operations
10 from your institutional coordinator,
11 correct?
12     A.    So if we could go back. I
13 thought your question before was did I
14 provide formal reports to Commissioner
15 Dunn.
16     Q.    That was my question.
17     A.    And I said, no, sir.
18     Q.    Okay. You didn't provide formal
19 reports. You did not provide formal
20 reports, okay. Were your -- how did you
21 provide reports to Commissioner Dunn?
22     A.    Verbally.
23     Q.    Would you send text messages to
24 Commissioner Dunn while you were associate
25 commissioner?

Page 77

1     A.    I don't recall. It would only --
2 only if I could not get him on the phone.
3     Q.    Okay. Why would you send text
4 messages only if you could not get him on
5 the phone?
6     A.    Because he was basically
7 accessible by phone. I could talk to him.
8     Q.    Would you send e-mails to
9 Commissioner Dunn regularly?
10     A.    As needed.
11     Q.    Who else was on the executive --
12     A.    Who else was on the executive
13 team? I'm sorry. I couldn't hear you.
14     Q.    Yes. I want you to name the
15 positions -- strike that.
16     I want you to tell me who else
17 was on the executive team that -- for the
18 weekly meetings that were convened by
19 Commissioner Dunn.
20     A.    Associate commissioner for
21 medical services, chief of staff, associate
22 commissioner for programs and research I
23 think it was.
24     Q.    Anyone else?
25     A.    Associate commissioner for

Page 78

1 political -- I don't know the titles. I
2 don't recall the titles. There would be
3 approximately 10 people -- 10 to 12; the
4 legal advisor, a general counsel for the
5 department of corrections, plans and
6 programs were covered by -- (inaudible)
7 services were covered by plans and
8 programs. The person that were over --
9 that was over engineers, maintenance of the
10 facilities. I don't think I've named them
11 all, but that's all I can recall.
12     Q.    What about the inspector general?
13     A.    Yes.
14     Q.    What about the director of
15 investigations?
16     A.    Yes.
17     Q.    Who else was on the executive
18 team and a part of the weekly meetings with
19 Commissioner Dunn?
20     A.    I just named the ones that I
21 could recall.
22     Q.    Was there an executive secretary?
23     A.    Yes.
24     Q.    There an accounting director?
25     A.    I would say yes. I really don't

Page 79

1 recall because I can't recall who that was.
2 Yes, I do. He was.
3     Q.    Was -- is it the general practice
4 for members of the executive team to
5 provide Commissioner Dunn with written
6 reports for these meetings?
7     MR. LUNSFORD: Object to the
8 form.
9     A.    Not to my knowledge.
10     Q.    Did you receive written reports
11 in preparation for these meetings?
12     A.    No, sir.
13     Q.    Did you receive written reports
14 at these meetings?
15     A.    Maybe occasionally if
16 something -- if there was something new,
17 different coming out, but generally, no.
18     Q.    Occasionally when there were
19 reports, what types of reports would you
20 receive?
21     A.    It would be germane to whatever
22 was being put out. I don't recall a lot of
23 things. I can remember chief of staff
24 maybe putting out -- I don't know what
25 would be on them. He would put out some

Page 80

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 20 (77 - 80)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 things from time to time if there were
2 changes that were coming forth.  Basically
3 the meeting consisted of each person --
4 Commissioner Dunn would go through whatever
5 was on his agenda to discuss.  If there
6 were new things coming abreast or if there
7 were changes that were coming abreast, he
8 may discuss those things.
9         Each person in the meeting had an
10 opportunity to present from their
11 department if there were changes.  If there
12 were positives that had happened within the
13 department, if there were negative type of
14 situations that had happened within their
15 department, that's -- that was the general
16 consensus of the meeting.  And then it was
17 up to each commissioner if you took -- I
18 took notes.  But if you took notes, it was
19 up to you to do that.  If you didn't take
20 notes, then that was up to you.
21    Q.    After you took notes in the
22 meeting, what would you do with those
23 notes?
24    A.    Brief the institutional
25 coordinators.

Page 81

1    Q.    You said you would do what?
2    A.    Brief the institutional
3 coordinators.
4    Q.    Okay.  On what you learned?
5    A.    Sir?
6    Q.    You would brief them on what you
7 learned during the --
8    A.    What was presented at the
9 meeting, yes.
10    Q.    Okay.  And what would you do with
11 the physical notes that you took?
12    A.    I probably kept them for a while,
13 but they became trash at some point.
14    Q.    You had an office, correct?
15    A.    Yes, sir.
16    Q.    Did you have a file cabinet where
17 you kept your important documents?
18    A.    I kept them in a drawer.  I had a
19 drawer in my desk -- a couple of them, and
20 things that I felt like I needed to hold on
21 to, I would keep them there until I didn't
22 need them anymore.
23    Q.    And when you didn't need the
24 files that you kept, what would you do with
25 them?

Page 82

1    A.    Shred them.
2    Q.    Would you -- when you took notes,
3 would you -- you didn't take it on, like, a
4 notepad?
5    A.    Sometimes -- yeah, notepad or --
6 yeah.  I normally took a notepad with me I
7 normally kept in my portfolio or whatever
8 you call it.  I normally kept notes there.
9    Q.    Why would you communicate what
10 you learned during the executive team
11 meeting to the institutional coordinators?
12    A.    Why would I?
13    Q.    Yes.
14    A.    So that they would be informed of
15 whatever was discussed in the meeting so
16 they could pass that along to the wardens,
17 if it was appropriate to pass on to --
18 there were certain things that was
19 discussed in the meeting that it stayed --
20 it should stay within the meeting.  So some
21 of the things the we discussed in the
22 meeting never got to the institutional
23 coordinators from me.  But there were other
24 things that needed to go -- be filtered out
25 or go down stream.

Page 83

1    Q.    What are some of the things that
2 you thought needed to be filtered down to
3 the institutional coordinators after the
4 executive team meeting?
5         MR. LUNSFORD:  Object to the
6 form.
7    A.    Any changes in policy that was
8 coming up, any items that was discussed in
9 relationship to security, anything that we
10 may have been changing from a day-to-day
11 operational standpoint in managing our
12 inmate population.  For instance, if you
13 were going to change clothing -- if we were
14 looking at changing clothing somewhere down
15 the road, then that would be discussed.  If
16 you were looking at changing uniforms with
17 staff, that would be discussed.  Just
18 pertinent things that came up in the
19 meeting that they needed to be informed
20 about.
21         And it was from everybody.  So if
22 medical was having -- if the person from
23 medical came and said we were having
24 problems being able to see patients at
25 night, then the coordinators need to know

Page 84

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 21 (81 - 84)

Lakeisha Ezell v. Jefferson Dunn, et al.

Grantt Culliver
6/25/2024

1 that and know that they would be scheduled
2 so they could talk with the warden and find
3 out what the problem was and get it
4 rectified.
5      Q.    Okay.  Now these weekly staff
6 meetings -- strike that.
7           These weekly executive team
8 meetings with Dunn started in 2015 when he
9 became commissioner, correct?
10     A.    Yes, sir.
11     Q.    And these meetings would be on a
12 particular day of the week?
13     A.    They were a Monday or a Tuesday.
14 I don't remember.  There was a specific
15 date for them.  I don't remember exactly
16 what date that was.
17     Q.    Now, as associate commissioner,
18 you were the person responsible on the
19 executive team for reclassifying or
20 figuring out where to house an inmate that
21 was in need of protection, correct?
22     A.    Please repeat.
23     Q.    You were the person -- as
24 associate commissioner, you were
25 responsible on the executive team in

Page 85

1 prison, then it was the classifications
2 position to determine whether that
3 individual was able to live in general
4 population or needed to go to protective
5 custody.  Same thing -- all of this starts
6 at the institutional level.  So if an
7 inmate reports to someone at the
8 institution that they were vulnerable or if
9 when they come through classification
10 central -- when they come into Kilby, like,
11 for -- if they come into receiving, which
12 was at Kilby, and it appears that this is a
13 vulnerable inmate or that inmate seems to
14 be as such, then it's classifications
15 responsibly to classify the inmate and the
16 facility that that inmate goes to.
17     Q.    All right.  But the
18 classification officer wasn't a part of the
19 executive team, correct?
20     A.    But the person over
21 classification was.  There was a
22 commissioner that was over classification.
23     Q.    Okay.  Who was the commissioner
24 over classification -- the classification
25 officer?

Page 87

1 conjunction with the classification officer
2 for reclassifying or figuring out where to
3 house an inmate that was in need of
4 protection, correct?
5      A.    I ponder that because there are
6 different situations with them.  So we had
7 a facility that was designated for our
8 inmates who needed protective custody.
9      Q.    Right.  And I guess my question
10 is:  Were you the person who was
11 responsible on the executive team for
12 reclassifying or figuring out where to
13 house an inmate who was in need for
14 protection?  For example, if they had been
15 threatened by other inmates because -- or
16 because they were vulnerable?
17           MS. COBB:  Object to form.
18     A.    Then classification -- if an
19 inmate at a facility reported, or staff
20 felt like an inmate was vulnerable, or a
21 person was -- because of the crime that he
22 committed, or the position he held in the
23 world -- and if he was a police officer --
24 I'll use that for example.  If he was a
25 police officer, committed a crime, came to

Page 86

1      A.    He wasn't a classification
2 officer.  It was a commissioner.  It was an
3 associate commissioner.  The one that I
4 remember most recently was McDonald, but
5 then he retired while I was there, and I
6 don't recall at the moment who took his
7 place.
8      Q.    What's McDonald's first name?
9      A.    Terry.
10     Q.    Would the institutional
11 coordinator -- strike that.
12           If inmates weren't being properly
13 housed who are in need of protection, would
14 the warden communicate that issue to the
15 institutional coordinator?
16           MR. CRANFORD:  Object to the
17 form.
18     A.    I would think that would only
19 happen if he had a problem at his own
20 classification -- with his own
21 classification team at the facility.
22     Q.    Right.  Assuming the
23 classification team wasn't doing what they
24 were supposed to do, is it your expectation
25 that the warden would communicate that to

Page 88

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 22 (85 - 88)

Lakeisha Ezell v. Jefferson Dunn, et al.

Grantt Culliver
6/25/2024

1 the institutional coordinator?
2     A.    My first expectation if the
3 warden felt that way was to communicate
4 that to the institutional coordinator, and
5 then the institutional coordinator would
6 bring that forward, and then -- but the
7 very first thing that the warden did -- if
8 he thought that that was the possibility,
9 was get that individual placed somewhere
10 that he had protection.
11    Q.    While you were associate
12 commissioner, did the warden at St. Clair
13 or the institutional coordinator ever
14 communicate to you that St. Clair wasn't
15 properly reclassifying inmates who are in
16 need of protection?
17         MS. COBB:  Object to form.
18    A.    Not that I recall.
19    Q.    At the executive team meetings,
20 you would provide verbal reports, correct?
21    A.    Yes, sir.
22    Q.    And you would provide verbal
23 reports about assaults and issues related
24 -- strike that.
25         You would provide verbal reports
Page 89

1    A.    Yes, sir.
2    Q.    And you would provide verbal
3 reports about inmate on inmate stabbings
4 that were the subject of those incident
5 reports, correct?
6         MR. CRANFORD:  Object to the
7 form.
8    A.    Inmate on inmate stabbings, no.
9 I would not necessarily bring that to --
10 unless there were other -- if there were --
11 if a stabbing caused the facility to go to
12 lockdown, then, yes.  If the stabbing -- if
13 it was a stabbing -- if the inmate that was
14 stabbed was okay, the likelihood is no.
15    Q.    What do you mean by okay?
16    A.    Didn't have to be transported out
17 to the hospital, was able to be seen at the
18 health care facility within the facility.
19    Q.    Right.  But it was an inmate on
20 inmate stabbing where an inmate died, you
21 would typically provide a verbal report at
22 the executive team meeting, correct?
23    A.    I would.  And if the head of
24 investigations would be also -- would also
25 provide what investigations had came up
Page 91

1 about issues related to violence in the
2 prisons, correct?
3         MR. CRANFORD:  Object to the
4 form.
5    A.    Yes, sir.
6    Q.    And you would provide reports
7 about issues related to violence at St.
8 Clair, correct?
9         MR. CRANFORD:  Object to the
10 form.
11         MS. COBB:  Same objection.
12    A.    Yes.  Yes, sir.
13    Q.    And you would provide verbal
14 reports about homicides at St. Clair,
15 correct?
16    A.    I would -- yes, I would elaborate
17 on those.  The commissioner got -- he would
18 receive -- or the chief of staff would
19 receive -- the incident -- the original
20 incident -- at the beginning, the incident
21 report from any homicide.
22    Q.    Okay.  And at the executive team
23 meetings, you would have an opportunity to
24 elaborate on what you had learned about
25 those specific incidents, correct?
Page 90

1 with at that point.
2    Q.    Okay.  At these executive team
3 meetings, you would also provide verbal
4 reports about issues related to contraband
5 at facilities, correct?
6    A.    It depend on to what degree.
7    Q.    For example, if you had conducted
8 a search and -- strike that.
9         For example, if a search had been
10 conducted at St. Clair and multiple knives
11 were found and collected, you would provide
12 a report at these staff meetings, correct?
13    A.    Yes, sir.
14    Q.    Why would you provide -- strike
15 that.
16         Why was it important to provide
17 reports about violence at the facilities in
18 these executive team meetings?
19    A.    To make the executive team aware
20 of what security was dealing with, the
21 types of problems that were at the
22 facilities.
23    Q.    Why would they need to be aware
24 about problems at St. Clair related to
25 violence?
Page 92

**Lakeisha Ezell v. Jefferson Dunn, et al.**                                    **Grantt Culliver**
**6/25/2024**

1         MS. COBB:  Object to form.
2     A.      They would need to be aware so
3  they could pass these things on to their
4  staff as well.  So medical, their staff
5  there -- their staff is there.  They should
6  be concerned about classifications the same
7  way; how we reclassify these people, how we
8  can get them moved in any situations.
9  People just -- I thought it important
10 enough for them to be aware.  And then a
11 lot of times there were questions.  Even if
12 a facility was going to lockdown, then
13 everybody needed to know that to be aware
14 to pass that information along to try and
15 keep people informed.
16    Q.      Did you ever communicate to
17 Warden Jones that the commissioner -- that
18 Commissioner Dunn didn't believe she was
19 doing a good job?
20         MS. COBB:  Object to form.
21    A.      Commissioner Dunn never reported
22 to me that he didn't think she was doing a
23 good job.  I don't even recall -- I don't
24 recall how long Warden Jones was -- if --
25 first of all, I don't recall if Warden

Page 93

1  not necessarily been enforced in the past
2  or were lackadaisical about.  And then we
3  probably had one or two, maybe even three,
4  conversations in reference to some things
5  that were happening at St. Clair and
6  whether he was the right person for that
7  job.
8     Q.      Was Warden Estes fired?
9     A.      No, sir.
10         MR. CRANFORD:  Object to the
11 form.
12    Q.      How was -- what do you recall
13 about how Warden Estes left his position as
14 warden in St. Clair?
15    A.      I really don't.
16         MR. CRANFORD:  Object to the
17 form.
18    A.      I don't.  I don't remember -- I
19 don't remember when he transferred.  I
20 think he was transferred, but I don't
21 recall that situation specifically.
22    Q.      Okay.  You left the Alabama
23 Department of Corrections in 2019, correct?
24    A.      I think my last day with the
25 department of corrections was December 31st

Page 95

1  Jones was the warden at St. Clair while I
2  was associate commissioner of operations.
3     Q.      Do you recall having any
4  discussion with Commissioner Dunn about any
5  warden at St. Clair?
6         MR. CRANFORD:  Object to the
7  form.
8     A.      I do.
9     Q.      Who do you recall having a
10 discussion with Commissioner Dunn about?
11    A.      Warden Estes.
12    Q.      What do you recall about --
13 strike that.
14         And that -- you recall that
15 conversation happening while you were
16 associate commissioner, correct?
17    A.      Yes, sir.
18    Q.      Okay.  Do you recall -- what do
19 you recall about that conversation?
20    A.      We just had a conversation about
21 him.  Warden Estes' staff -- probably our
22 first conversation was about him was in
23 reference to staff members complaining
24 about various things, particularly policy
25 that he was trying to enforce and that had

Page 94

1  of 2018.
2     Q.      And throughout 2018, you were
3  still a member of the executive team,
4  correct?
5     A.      I was relieved of my physical
6  duties at -- as associate commissioner
7  sometime in August or September I think.
8     Q.      Prior to that, you were still a
9  member of the executive team, correct?
10    A.      Yes, sir.
11    Q.      Prior to that, you would still
12 attend the weekly executive team staff
13 meetings, correct?
14    A.      Yes, sir.
15    Q.      What was discussed regarding
16 violence at St. Clair at these executive
17 team meetings in 2018 before your
18 departure?
19         MS. COBB:  Object to form.
20         MR. CRANFORD:  Object to the
21 form.
22    A.      There were more discussions about
23 the solutions, trying to find solutions for
24 some of the things that was causing -- or
25 that was leading to the violence at St.

Page 96

Lakeisha Ezell v. Jefferson Dunn, et al.

Grantt Culliver
6/25/2024

1 Clair.
2      Q.      There was -- what was that last
3 part?  That was needed?
4      A.      Was leading -- for what was
5 causing the violence.
6      Q.      And in 2018 during these
7 discussions, what was your sense of what
8 was -- strike that.
9           In 2018, what was causing the
10 violence?
11           MR. CRANFORD:  Object to the
12 form.
13           MS. COBB:  Same objection.
14      A.      There were a number of things in
15 my -- and this is my opinion.  This is --
16 but there were a number of things -- a
17 number of factors.  As I pointed out
18 earlier in this deposition, the
19 institutional layout for the level of
20 inmate we had at St. Clair was not the best
21 in my opinion.  Staffing was not very good.
22 Morale was not very good, and our
23 contraband issues were not very good at our
24 control.  Contraband, because of where St.
25 Clair sits, people would come through the

Page 97

1 across from each other to try and separate
2 and assist the staff with being able to
3 control people being able to move about as
4 freely as they were.  And that topic
5 basically goes on and on from there.
6      Q.      Now, you discussed how -- strike
7 that.
8           At the executive team meetings,
9 would you -- in 2018, would you raise the
10 issue of contraband leading to violence?
11           MR. CRANFORD:  Object to the
12 form.
13           MS. COBB:  Same objection.
14      A.      When -- certain contraband leads
15 to violence, not necessarily all
16 contraband.  But if you have -- we would
17 discuss ways to try and secure the facility
18 such that it wasn't as easy for people to
19 be able to introduce contraband into the
20 facility without coming into the facility.
21      Q.      And what sort of contraband leads
22 to violence?
23      A.      Drugs primarily.  I would say --
24 and that's an opinion on my part.  But I
25 would say probably drugs and particularly

Page 99

1 woods.  They would ride along the highway.
2 There's a public highway that goes right by
3 the facility within short order.
4           Those types of things were
5 discussed.  We had -- there were physical
6 plant issues that we were dealing with.  We
7 came up with a plan to -- well, we asked
8 for our locks to be fixed.  There was --
9 there was a feeling -- not being
10 necessarily a mechanical person myself.
11 And so -- but there was a feeling or there
12 was a knowledge on my part that -- or my
13 opinion was that the lock that we were
14 using -- whether it was because of the
15 amount of time that they had been in or
16 because of the level of the inmates that we
17 had at the facility -- but they were not
18 significant.  And requests were put in to
19 have those locks replaced I think that --
20 well, I know that that project began before
21 I departed the department.
22           There was a recommendation for
23 additional fencing to be in on what I call
24 the quad, which is the eight facilities
25 that -- the eight housing units that sit

Page 98

1 the fact that if the wrong person -- if an
2 item was -- if marijuana was thrown over
3 the fence or came into the facility, and it
4 was designated for one person or a group of
5 people, and another person or another group
6 of people got -- received that, and would
7 not give that back, yes, that's violence.
8 It's no difference than it is on the
9 street.
10      Q.      Okay.  That could cause violence
11 at St. Clair?
12      A.      Yes.  And any other facility we
13 had.
14      Q.      At these executive team meetings
15 in 2018, did you raise the issue of knives
16 causing violence at St. Clair?
17           MR. CRANFORD:  Object to the
18 form.
19      A.      I don't think knives -- knives
20 don't cause violence.  Knives is an object
21 used for violence.  I mean, that's how I
22 would look at it.
23      Q.      Did you raise the issue of --
24 that knives were overly present at St.
25 Clair at these staff meeting?

Page 100

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 25 (97 - 100)

Lakeisha Ezell v. Jefferson Dunn, et al.

Grantt Culliver
6/25/2024

```
 1            MS. COBB:  Object to form.
 2            MR. CRANFORD:  Object to the
 3 form.
 4       A.    From time to time that would come
 5 up if we did -- we got to the point that we
 6 were actually moving -- not moving.  We
 7 were actually taking CERT teams out of what
 8 their norm were and basically bringing them
 9 to the facility on a more regular basis to
10 do searches and to assist in just
11 day-to-day operations of the facility.  The
12 staffing was at that level, but the
13 teams -- the warden could always request a
14 team, and then -- but we set up for teams
15 to actually rotate in and out to try and
16 help curve the contraband, provide
17 additional staff at St. Clair, and help to
18 build an overall morale of the staff that
19 was assigned there.
20       Q.    And I guess -- my question is
21 very particular, Mr. Culliver.  At these
22 executive team meetings in 2018, who would
23 raise the issue of knives and contraband at
24 St. Clair?
25       A.    I just --
                                      Page 101
```

```
 1            MR. CRANFORD:  Object to the
 2 form.
 3            MS. COBB:  Same objection.
 4       A.    I just answered that question.  I
 5 did.
 6       Q.    Okay.  Would you talk with the
 7 institutional coordinator about the problem
 8 of knives and drugs and other contraband at
 9 St. Clair?
10       A.    Yes, sir.
11       Q.    And you would talk to the
12 institutional coordinator about knives and
13 drugs and contraband at St. Clair even in
14 2018 before your departure, correct?
15       A.    Yes, sir.
16       Q.    And would you talk to the warden
17 about it in 2018 before your departure at
18 St. Clair?
19       A.    Yes, sir.
20       Q.    What did Edward Ellington do
21 about contraband, including knives, at St.
22 Clair in 2018?
23            MR. CRANFORD:  Object to the
24 form.
25       A.    You would have to ask Edward
                                      Page 102
```

```
 1 Ellington.
 2       Q.    Do you recall him take -- do you
 3 recall asking him to take any affirmative
 4 steps to address the knives and contraband
 5 at St. Clair in 2018?
 6       A.    Sir, I've already -- I answered.
 7 I'm not -- I answered that earlier.  I know
 8 I gave a longer dissertation than was
 9 probably requested, and I probably did not
10 necessarily answer your point-blank
11 question, but I've already -- I've already
12 stated that.
13       Q.    Well, what steps did you ask him
14 to take in 2018?
15            MS. COBB:  Object to form.
16       A.    The same things that I just told
17 you.  I told you, we instituted having
18 CERT, the correctional emergency response
19 team, from various regions to come to the
20 facility and actually work.  We
21 specifically did searches at St. Clair with
22 the CERT teams where we would bring all
23 five teams or at least four of those teams
24 to the facility to do searches.  We
25 requested funding basically for
                                      Page 103
```

```
 1 implementing, modifying the courtyard so
 2 that movement was -- could be more
 3 controlled.
 4       Q.    Who made the decision to have --
 5 and you had the CERT team come to the
 6 facility to do searches in 2018?
 7       A.    Yes, sir.
 8       Q.    Who made that decision?
 9       A.    I did.
10       Q.    Okay.  Did you tell Edward
11 Ellington to have the CERT team come to the
12 facility to conduct searches?
13            MR. CRANFORD:  Object to the
14 form.
15       A.    Mr. Ellington was in the
16 conversation, yes.
17       Q.    Right.  I'm asking who -- was it
18 you telling Edward Ellington to have the
19 CERT team come to the facility to conduct
20 searches or did you make that decision
21 yourself?
22            MS. COBB:  Object to form.
23       A.    I made the decision.
24            MR. CRANFORD:  Same objection.
25       A.    The decision was going to be mine
                                      Page 104
```

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 26 (101 - 104)

Lakeisha Ezell v. Jefferson Dunn, et al.

Grantt Culliver
6/25/2024

1 regardless -- or unless the commissioner
2 said no. It was mine. Mr. Ellington could
3 recommend or either come to me and say,
4 Mr. Culliver, I think we need some extra
5 help at St. Clair, right. But that
6 decision was mine.
7     Q.    What was the result of the CERT
8 team coming to the facility to conduct
9 searches in 2018 under your direction?
10    A.    I -- we found contraband. We
11 found drugs, marijuana, pills, knives. I
12 mean, I can't remember -- I don't remember
13 how many times that that actually took
14 place, but that started before 2018.
15    Q.    And did the CERT team coming into
16 the facility to conduct searches for
17 contraband, did that stop contraband from
18 coming into the facility --
19    A.    No, sir.
20    Q.    -- in 2018?
21    A.    No, sir.
22    Q.    Why not?
23         MS. COBB:  Object to form.
24         MR. CRANFORD:  Object to the
25 form.

1     A.    I wish I -- I really wish I knew
2 the answer, but I don't have an answer for
3 you. Getting contraband out of the
4 facility has nothing to do with contraband
5 coming into the facility. Contraband was
6 coming into the facility by people -- I
7 said this earlier. But people actually
8 going through the woods, waiting for the
9 perimeter patrol vehicle to go by, timing
10 it up, throwing cell phones, drugs, putting
11 them in tennis balls, covering them with
12 grass, throwing it over the perimeter
13 fence. So if I come today, and I send the
14 CERT team today and they make a sweep, they
15 do the searches, and if they stay three
16 days doing searches, whenever they leave,
17 all that did was drive the price of the
18 drugs up that they were throwing in because
19 people were going to come back. They were
20 going to do the same process again and
21 throw contraband back into the facility.
22    Q.    What did you do as associate
23 commissioner in 2018 to stop contraband
24 from coming into St. Clair?
25    A.    Everything I just named to you.

1     Q.    Well, you talked about what you
2 did to get contraband out of the facility.
3 I'm asking what did you do to get --
4 prevent contraband from coming into the
5 facility?
6     A.    I wish I knew what I could've
7 did. I don't know. I don't know if I did
8 anything. It's apparent that I didn't do
9 enough or it's apparent that the department
10 didn't do enough or wasn't capable of doing
11 enough. And maybe it's not capable
12 anywhere in this country. Anywhere in the
13 country -- every place in this country that
14 has a facility, has the same problem with
15 contraband, staffing. It has the same
16 problems. So we search staff. Do you know
17 -- and I'm passionate about this because I
18 stayed in this business a very long time.
19         But do you know how hard it is to
20 make a decision to have to search staff
21 before they walk inside a facility? The
22 same person that you are paying to be able
23 to watch over and have care of the inmates
24 that are in the prison, that you have to
25 search those people? Do you know how that

1 feels as a warden or as a commissioner or
2 as associate commissioner or institutional
3 coordinator to actual staff -- to search
4 other staff coming into the facility? And
5 if I take people and put them on the
6 perimeter of a facility to try and stop
7 contraband from coming into the facility,
8 then I don't have anybody inside the
9 facility to manage the stuff that needs to
10 be done. Then I get sued for not providing
11 medical. I get sued for not feeding
12 people.
13    Q.    Were you -- was St. Clair
14 searching staff who came into work in 2018?
15    A.    Yes, sir.
16    Q.    Why were they searching staff?
17    A.    The conversation we just had.
18    Q.    Were they searching staff because
19 some staff members had been found bringing
20 contraband into the facility?
21    A.    Yes, sir.
22    Q.    I just want to make sure I
23 understand. And I'm going to ask this of
24 multiple defendants. As you sit here
25 today, you aren't aware of any steps you

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 took to stop contraband from coming into
2 the facility?
3           MS. COBB:  Object to form.
4           MR. CRANFORD:  Object to the
5 form.
6     **A.**     **Repeat your question.**
7     Q.     As you sit here today, you're
8 unaware of any steps you took to prevent
9 contraband from coming into St. Clair in
10 2018?
11           MR. CRANFORD:  Object to the
12 form.
13           MS. COBB:  Object to form.
14     **A.**     **Sir, did I just not -- that's**
15 **what I just told you that I did.  I just --**
16 **I'm not going to repeat all of that.  It's**
17 **going to be on the deposition.  I just told**
18 **you, we search staff and --**
19     Q.     Okay.  Okay.
20     **A.**     **I just --**
21     Q.     So you searched staff.  What did
22 you do aside from searching staff to
23 prevent contraband from coming into the
24 facility --
25     **A.**     **We already had -- I'm talking**
                                        Page 109

1 over you, and I realize that.  I apologize
2 for that on one side.  We already had
3 **perimeter trucks that were on the perimeter**
4 **that were going around the perimeter, okay.**
5 **You can't add to that.**
6     Q.     Aside from searching staff who
7 were coming into the facility and perimeter
8 trucks, what else did you do in 2018 to
9 prevent contraband from coming into the
10 facility?
11     **A.**     **Those are the only --**
12           MR. CRANFORD:  Object to the
13 form.  Object to the form.
14     **A.**     **Those are the only things that I**
15 **can recall.**
16     Q.     Okay.  Did you make the decision
17 to have staff searched coming into the
18 facility at St. Clair in 2018?
19     **A.**     **We were searching staff at all**
20 **our facilities.**
21     Q.     Okay.  And who made that
22 decision?
23           MR. CRANFORD:  Object to the
24 form.
25     **A.**     **It was a -- I actually think we**
                                        Page 110

1 **began searching staff prior to -- I**
2 **probably was an institutional coordinator,**
3 **and so it would've been the person that was**
4 **before me.**
5     Q.     Okay.  And you said -- and you
6 believe the associate commissioner before
7 you instituted that practice?
8     **A.**     **I do believe that, yes.**
9     Q.     But you didn't make that
10 decision?
11           MR. CRANFORD:  Object to the
12 form.
13     **A.**     **It was in already in place when I**
14 **got -- when I went into the position.**
15     Q.     Okay.
16     **A.**     **I didn't stop it.  I could've**
17 **stopped it.**
18     Q.     In 2018 -- could you describe how
19 contraband was coming into the facility in
20 different ways?  In 2018, were knives
21 coming into the facility from outside?
22           MR. CRANFORD:  Object to the
23 form.
24           MS. COBB:  Same objection.
25     **A.**     **I don't know exactly at St. Clair**
                                        Page 111

1 if we found civilian knives -- free world
2 knives.  So I can't say yes, and I can't
3 say no.
4     Q.     As associate commissioner, what
5 was your understanding of how knives were
6 -- strike that.
7           As associate commissioner, what
8 was your understanding of how knives were
9 coming to be present in St. Clair?
10     **A.**     **Most of --**
11           MS. COBB:  Object to form.
12           MR. CRANFORD:  Object to the
13 form.  Mr. Culliver, I just ask that -- you
14 know, just slow down a little bit so that I
15 can --
16           THE WITNESS:  I'm trying.
17           MR. CRANFORD:  And not talking
18 over each other.
19           THE WITNESS:  I'm trying.
20           MR. CRANFORD:  Sorry to
21 interrupt.
22           THE WITNESS:  No problem.
23     Q.     You can go ahead, sir.
24     **A.**     **Most of the knives from St. Clair**
25 **and all of the facilities were knives that**
                                        Page 112

Lakeisha Ezell v. Jefferson Dunn, et al.

Grantt Culliver
6/25/2024

1 are made within the facility.
2    Q.    And what did you do in 2018 to
3 prevent knives from being made in St.
4 Clair?
5        MR. CRANFORD:  Object to the
6 form.
7    A.    I don't know of anything specific
8 that I did to stop knives from being made
9 at St. Clair.
10    Q.    Did you ever discuss the problem
11 with knives being made at St. Clair with
12 Warden Jones?
13    A.    As I stated before, I don't think
14 Warden Jones was at St. Clair during that
15 period of time that I was there.  I don't
16 know.  I discussed it with the warden.  I
17 discussed that with the coordinators.  I
18 discussed that with staff at St. Clair and
19 at other facilities to where it was coming
20 from.  You tend to have more weapons if
21 you've got a trade school, and you tend to
22 have more weapons if there is construction
23 going on at a facility.
24    Q.    In 2018, which staff at St. Clair
25 did you discuss knives with aside from the
Page 113

1 warden.
2    Q.    And I'm going to ask him.  I'm
3 asking whether or not you know of any
4 specific steps the warden took?
5    A.    And my answer's going to be the
6 same thing, and the things that I've
7 discussed with you already were discussed
8 with the warden.  The warden took those
9 things.  He offered suggestions, took those
10 things, and then tried to put those things
11 into place.
12    Q.    What specifically did the warden
13 at St. Clair in 2018 put into place --
14        MS. COBB:  Object to form.
15    Q.    -- to alleviate knives at St.
16 Clair?
17        MR. LUNSFORD:  Let me just say,
18 that's the same question.  You asked the
19 question, then you asked two similar
20 questions, and then you just went back to
21 the question that he's already asked.
22 That's not the first time that's happened
23 today.
24        MR. RALLINS:  Well, he still
25 hasn't answered it.
Page 115

1 warden?
2    A.    The shift commanders and
3 captains, assistant warden.
4    Q.    Why did you discuss the issue of
5 knives at St. Clair in 2018 with the shift
6 commanders, captains and assistant wardens?
7    A.    Seeking solutions to try and keep
8 the contraband down, keep knives down,
9 inside input, gathering intel, to try and
10 figure out why or where they were coming
11 from.
12    Q.    What steps did the warden at St.
13 Clair in 2018 take to alleviate knives that
14 were being found at St. Clair?
15        MR. LUNSFORD:  Object to the
16 form.
17    A.    The things that I've already
18 stated that were tried.
19    Q.    I'm asking specifically what the
20 warden did.  You described, you know, the
21 steps you took.  I'm asking specifically
22 about the warden.
23        MS. COBB:  Object to form.
24        MR. LUNSFORD:  Object to form.
25    A.    Then you would have to ask the
Page 114

1        MR. LUNSFORD:  He did answer the
2 question.  He asked --
3        MR. RALLINS:  He hasn't answered
4 -- no, he has not answered the question.
5 He understood at the beginning of his
6 deposition, if he doesn't understand the
7 question, tell me he doesn't understand the
8 question.  What he's telling me, he's
9 already answered it.
10        MR. LUNSFORD:  I mean, he can
11 say, refer back to my earlier answer.  He
12 can -- that's actually a thing a witness
13 can do.
14    Q.    Do you understand my question,
15 sir?
16    A.    I did my best to answer your
17 question.
18    Q.    Let me ask it a different way.
19 What specifically did the shift commander
20 do in 2018 at St. Clair -- any shift
21 commander do in 2018 at St. Clair after you
22 discussed the problem of knives in the
23 facility?
24    A.    I don't know.
25    Q.    What about any captain at St.
Page 116

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 29 (113 - 116)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 Clair?
2    A.    I don't know.
3    Q.    At the executive team meetings
4 with the commissioner in 2018 before your
5 departure, did you raise the issue of the
6 unrestricted movement of inmates at St.
7 Clair?
8    A.    **We had that discussion, yes.**
9    Q.    Okay.  And in 2018, did
10 Commissioner Dunn give you any directive to
11 address the problem?
12         MR. LUNSFORD:  Object to the
13 form.
14    A.    **I don't recall him giving any**
15 **directive.  We did get approved to put the**
16 **additional fencing on the quad yard.**
17    Q.    And you -- in 2018, you discussed
18 the issue of unrestricted movement at St.
19 Clair with the institutional coordinator,
20 Edward Ellington, correct?
21         MS. COBB:  Object to form.
22    A.    Yes, sir.
23    Q.    And in 2018, you discussed the
24 issue of unrestricted movement with the
25 warden at St. Clair, correct?

Page 117

1         MS. COBB:  Same objection.
2    A.    **Well, to clarify, when I think of**
3 **unrestricted movement, I think that as**
4 **being just anybody go anywhere they want to**
5 **any time they get ready.  And so**
6 **unrestricted movement, I disagree with the**
7 **terminology from my perspective.  That**
8 **being stated then, I need you to repeat the**
9 **question.**
10    Q.    Did you discuss the issue of
11 unrestricted movement with the warden at
12 St. Clair in 2018?
13    A.    Yes, sir.
14    Q.    And did you discuss it with the
15 shift commander at St. Clair in 2018?
16    A.    **I don't recall doing that, no,**
17 **sir.**
18    Q.    Did you discuss it with the
19 assistant wardens at St. Clair in 2018?
20    A.    Yes, sir.
21    Q.    Did you discuss it with the
22 captains at St. Clair in 2018?
23    A.    **Yes, sir.  2017 or 2018, yes,**
24 **sir.**
25    Q.    Which assistant warden do you

Page 118

1 recall discussing it with in 2018?
2    A.    **I don't recall his name.**
3    Q.    Do you recall discussing it with
4 Gwendolyn Givens?
5    A.    **Gwendolyn Givens retired when --**
6 **was not at St. Clair in 2018 when I was**
7 **with the department of corrections.**
8    Q.    Which captains do you recall
9 discussing the issue with?
10    A.    **Malone.  I can't think of the**
11 **other captains' names.**
12    Q.    And what specific steps did you
13 take in 2018 as associate commissioner to
14 address the issue of unrestricted movement
15 at St. Clair?
16    A.    **I recommended that -- I don't**
17 **know if this was in 2018 or 2017, but a**
18 **recommendation was done to put up the**
19 **additional fencing -- as I've stated before**
20 **-- and on the quad between those**
21 **dormitories that's there to assist the**
22 **staff in being able to control better.**
23    Q.    And you -- in 2018, they set up
24 additional fencing at St. Clair?
25    A.    **It had -- I think the project**

Page 119

1 began before I left, but I'm not -- I don't
2 know.
3    Q.    And did the additional fencing
4 prevent inmates from moving from in between
5 cellblocks?
6    A.    **I have no idea.**
7    Q.    Did you do anything -- strike
8 that.
9         Did you as associate commissioner
10 do anything specifically aside from
11 recommending additional fencing to address
12 the unrestricted movement?
13    A.    **We also recommended the locks be**
14 **replaced, and we requested camera**
15 **surveillance -- additional camera -- I**
16 **don't know if we had the ones that were**
17 **camera surveillance.  I know the lock**
18 **project went into -- began prior to my**
19 **leaving.  I'm pretty sure it wasn't**
20 **finished, but I do know that it began.  And**
21 **I do know that additional surveillance**
22 **equipment was placed at St. Clair.**
23    Q.    Aside from the additional
24 fencing, recommending the lock be replaced,
25 and additional security cameras, did you

Page 120

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 30 (117 - 120)

1  make any other recommendations to address
2  unrestricted movements at St. Clair in
3  2018?
4      **A.    One of the primary things would**
5  **have been additional staffing, and that was**
6  **an ongoing project to try and provide**
7  **additional staffing at St. Clair.  The**
8  **results of that, I have no idea.**
9      Q.     Anything else you did?
10     **A.    No, sir, not to my recollection.**
11     Q.     Why did you recommend the lock be
12 replaced?
13     **A.    Because they weren't working.**
14     Q.     What do you mean by they weren't
15 working?
16     **A.    The inmates were able to**
17 **manipulate the lock.  And the lock, in my**
18 **opinion, was just a -- basically was an**
19 **insufficient lock for the type of inmate**
20 **that we had.**
21     Q.     And when you say inmates were
22 able to manipulate the locks, you mean the
23 locks of their cells?
24     **A.    Yes, sir.**
25     Q.     Meaning they were able to open

1  the locks of their cells without -- by
2  themselves?
3      **A.    They were able to place -- they**
4  **were able to do that, and they also placed**
5  **plastic and other things within the locking**
6  **mechanisms so it wouldn't work properly.**
7      Q.     Why did you recommend additional
8  security cameras at St. Clair in 2018?
9      **A.    To assist the person that was**
10 **working in the control center in being able**
11 **to see things that were actually happening**
12 **throughout the cellblock.**
13     Q.     And in 2018 before your
14 departure, did St. Clair increase the
15 number of security cameras?
16     **A.    They were in the process before I**
17 **left.**
18     Q.     Were there security cameras in
19 the hallways before your departure in 2018?
20     **A.    I don't recall.**
21     Q.     Were there security cameras in
22 the TV room?
23     **A.    Yes.  At least one before I left.**
24 **I don't know how many, but, yes.**
25     Q.     Were there security cameras near

1  the cubicle office?
2      **A.    I can't recall if -- I can't**
3  **recall.  Another recommendation was to put**
4  **a camera above the cubicle which would've**
5  **then given a good view of what was in front**
6  **of the cubicle officer, and then -- but the**
7  **range -- the far right and the far left, I**
8  **don't think that that was going to be**
9  **covered by that.  But that's what I**
10 **remember.**
11     Q.     And security cameras would've
12 been helpful during your time as associate
13 commissioner to know what was happening at
14 St. Clair when you were there, correct?
15            MS. COBB:  Object to form.
16     **A.    Yes, sir.**
17     Q.     And if inmates were -- inmates or
18 staff were bringing contraband into the
19 facility, the security cameras might've
20 helped you understand how that was
21 happening, correct?
22     **A.    Possibly.**
23     Q.     And if there was violence at St.
24 Clair that wasn't fully explained in
25 reports, the security cameras might've been

1  helpful for you to know what had occurred,
2  correct?
3            MS. COBB:  Object to form.
4      **A.    Yes, sir.**
5      Q.     And that would include inmate on
6  inmate stabbings, correct?
7      **A.    That would include all violence.**
8  **Everything.**
9      Q.     Was the problem of inadequate
10 security cameras at St. Clair raised as an
11 issue by anyone before you made the
12 recommendation in 2018?
13            MR. LUNSFORD:  Object to the
14 form.
15            MS. COBB:  Same objection.
16     **A.    It was probably made by me as the**
17 **institutional coordinator.  I mean, pretty**
18 **much everyone that was in security, from**
19 **the wardens and the staff, felt that**
20 **surveillance cameras would be of an**
21 **assistance to managing a facility.**
22     Q.     What did the institutional
23 commissioner do in 2018 in response to you
24 discussing the issue of unrestricted
25 movement with him?

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1    A.    You would really have to ask him.
2    Q.    It's fair to say you don't know,
3 correct?
4        MR. LUNSFORD:  Object to the
5 form.
6    A.    You would have to ask him.
7    Q.    I am going to ask him.  I just
8 want to just clarify.  It's fair to say you
9 do not know, correct?
10        MR. LUNSFORD:  Object to the
11 form.
12    A.    I do not know.
13    Q.    What did the warden at St. Clair
14 do in response to you discussing the issue
15 of unrestricted movement with him in 2018?
16    A.    Besides talking to staff and
17 trying -- and passing that along to the
18 shift commanders, et cetera, I don't know.
19    Q.    As you sit here today, are you
20 aware of whether or not the issue of
21 insufficient security cameras that you
22 raised in 2018 has been fixed?
23        MS. COBB:  Object to form.
24    A.    I do not know.
25    Q.    Are you aware of whether or not

Page 125

1 that -- yeah.
2    Q.    Okay.  And who are you thinking
3 of?
4    A.    Jeff Williams.
5    Q.    Okay.  And in 2018, what did you
6 understand is Jeffery Williams'
7 responsibilities at ADOC to be?
8    A.    Primarily to be -- to voice the
9 Department's concerns to legislatures,
10 bills, find people -- or find legislatures
11 who would be willing to sponsor bills that
12 would benefit the Department.
13    Q.    Are you aware of any bills that
14 Jeffery Williams lobbied specifically to
15 address security issues at St. Clair while
16 you were associate commissioner?
17    A.    I am not.
18    Q.    Do you recall Jeffery Williams
19 ever asking you for policy ideas that he
20 could bring to the legislature to address
21 violence at St. Clair?
22    A.    No, sir.
23    Q.    Was Edward Ellington a member of
24 the executive team?
25    A.    No, sir.

Page 127

1 your recommendations that the locks be
2 replaced that you made in 2018, are you
3 aware of whether or not that has been
4 fixed?
5    A.    That was being done in 2018
6 before I left.
7    Q.    Okay.  Was it completed in 2018
8 before you left?
9    A.    I don't know.
10    Q.    Well, when you say it was being
11 done, what do you mean?  What was being
12 done around security locks?
13    A.    Cellblock had been cleared out of
14 all the inmates, construction company had
15 been -- bids had been done, construction
16 company was on site working to replace the
17 locks.
18    Q.    In 2018, was the deputy
19 commissioner of governmental relations at
20 ADOC a member of the executive team?
21    A.    Who?
22    Q.    Deputy commissioner of
23 governmental elections.
24    A.    Yes.  I'm not familiar with that
25 title, but we had a deputy commissioner

Page 126

1    Q.    -- while you were -- I'm sorry.
2    A.    No, sir.
3    Q.    When's the first time you recall
4 -- strike that.
5        You -- when you joined the -- you
6 joined the Alabama Department of
7 Corrections in 1981; is that right?  We
8 talked about that.
9        MR. LUNSFORD:  Object to form.
10    A.    Yes, sir.
11    Q.    And --
12    A.    I think, yeah.
13    Q.    -- it was a riot in the mid 80s
14 at St. Clair, correct?
15        MR. LUNSFORD:  Object to the
16 form.
17    A.    Yes, sir.
18    Q.    Other facilities were asked to go
19 to St. Clair in response to the rioting in
20 the mid 80s, correct?
21    A.    Yes, sir.
22    Q.    Did you go to St. Clair in the
23 mid 80s in response to a riot?
24    A.    Yes, sir.
25    Q.    Did you go up on the day of the

Page 128

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 32 (125 - 128)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 riot?
2    A.    Yes, sir.
3    Q.    Was that your first time at St.
4 Clair?
5    A.    No, sir.
6    Q.    Do you remember -- what's your
7 understanding of what caused the riot in
8 the mid 80s?
9    A.    I'm not sure. I don't recall.
10    Q.    Okay. When you would visit St.
11 Clair in the mid 80s, not withstanding
12 responding to that riot, why would you go
13 to St. Clair?
14    A.    I was on CERT team.
15    Q.    Okay. You would go as part of
16 your duties with CERT?
17    A.    Yes, sir. To the best of my
18 recollection, that was probably only maybe
19 once. It was just a -- there was a visit
20 through -- to familiarize the members of
21 our regional CERT team with the facility,
22 as we did all the facilities.
23    Q.    Okay. And did you visit St.
24 Clair in the 1990s?
25    A.    Yes, sir.
Page 129

1    Q.    What brought you to St. Clair in
2 the 1990s?
3    A.    CERT.
4    Q.    How often would CERT bring you to
5 St. Clair on average in the 90s? Was it
6 once a year, twice a decade? What are we
7 talking about?
8    A.    No idea.
9    Q.    Okay. But multiple times in the
10 90s, correct?
11    A.    Yes, sir.
12    Q.    In the 1990s, was your
13 perspective at that time that St. Clair was
14 one of the more violent facilities in the
15 Alabama Department of Corrections?
16    MS. COBB:  Object to form.
17    A.    I can't recall.
18    Q.    Now, in 1990, you were a
19 lieutenant at Donaldson, correct?
20    A.    I was a lieutenant at Donaldson.
21 I couldn't give you the dates.
22    Q.    Okay. You don't have any reason
23 to dispute it was in 1990?
24    A.    No, sir.
25    Q.    In 1990, did you consider St.
Page 130

1 Clair to be a more violent facility than
2 Donaldson?
3    A.    I really can't recall.
4    Q.    Was Donaldson a maximum security
5 prison?
6    A.    Yes, sir.
7    Q.    It was?
8    A.    Yes, sir.
9    Q.    Okay. When you were a
10 correctional warden at Atmore in the late
11 1990s, did you consider Atmore to be a more
12 violent facility than St. Clair?
13    A.    Atmore was -- the facility that I
14 was at was a work release, and I did not.
15    Q.    Between approximately 1990 and
16 2001 when you were a warden at Holman
17 Correctional Facility, did you consider
18 Holman to be a more violent facility than
19 St. Clair?
20    A.    I can't recall.
21    Q.    When you were a warden at
22 Fountain Correctional Facility in early
23 2000, did you consider Fountain to be a
24 more dangerous facility than St. Clair?
25    A.    I can't recall -- I don't -- I
Page 131

1 don't -- my recollection of St. Clair and
2 what was happening at St. Clair when I was
3 a warden at Fountain, it just -- it doesn't
4 register.
5    Q.    Okay. While you were associate
6 commissioner of St. Clair in 2018, you were
7 aware that St. Clair had one of the highest
8 levels of violence in the United States,
9 correct?
10    A.    What was the --
11    MS. COBB:  Object to form.
12    A.    I'm sorry. That was the title
13 you gave me?
14    Q.    I said associate commissioner.
15 I'll rephrase. While you were associate
16 commissioner in 2018, you were aware that
17 St. Clair had one of the highest levels of
18 violence in the nation?
19    MS. COBB:  Object to form.
20    A.    I don't know about the nation,
21 but I know as far as our -- as far as
22 Alabama was concerned, yes.
23    Q.    Okay. You weren't aware in 2018
24 how St. Clair compared to other prisons in
25 the nation in terms of violence levels?
Page 132

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 33 (129 - 132)

Lakeisha Ezell v. Jefferson Dunn, et al.

Grantt Culliver
6/25/2024

1    MR. LUNSFORD:  Object to the
2 form.
3    A.    I don't recall.
4    Q.    As associate commissioner in
5 2018, was it your responsibility to know
6 how St. Clair (inaudible) or compared to
7 other prisons in the nation in terms of
8 violence levels?
9    MR. LUNSFORD:  Object to the
10 form.
11    A.    Repeat the question, please.
12    Q.    In 2018, was it your
13 responsibility as associate commissioner to
14 know how St. Clair compared to other
15 prisons in the nation in terms of --
16    MR. LUNSFORD:  Object to the --
17 object to the form.
18    A.    It was not a part of my
19 responsibilities and results.
20    Q.    Would you be surprised to hear
21 that St. Clair had one of the highest
22 violence levels in the nation in 2018?
23    MR. LUNSFORD:  I object to the
24 form.
25    MS. COBB:  Same objection.

Page 133

1    MS. COBB:  Same objection.
2    A.    Probably.  I would probably be
3 surprised of that.
4    Q.    Why would you be surprised?
5    A.    Because I was a consultant for
6 NIC.  I talked to other wardens across the
7 country.  I traveled across the country to
8 see other places.  I taught classes.  And
9 I've -- particularly I can remember one of
10 the wardens from Ohio talking about how bad
11 the situation was at Ohio, and we were not
12 having the problems that they were having
13 at that particular time.  Whether -- I
14 don't know -- I couldn't give you the date,
15 and I couldn't tell you any of those
16 things.  But the situation that that
17 particular warden was dealing with, we were
18 not having those same kind of problems.
19    Q.    Can you recall the warden in Ohio
20 suggesting that the levels of violence at a
21 prison in Ohio was higher than St. Clair in
22 2018?
23    A.    The warden in Ohio didn't know
24 anything about the prison in St. Clair.
25    Q.    Okay.  Did you know Jefferson

Page 135

1    MR. LUNSFORD:  I mean, again, let
2 me say, that's a question that I don't
3 think you have an adequate factual basis
4 for.  And I just want it on the record that
5 that is manufactured evidence.  If you have
6 evidence of it, we'd like to see it because
7 that evidence does not exist.
8    MR. RALLINS:  Bill, I understand
9 your point.  I think we have in agreement a
10 speaking objection to --
11    MR. LUNSFORD:  Yeah.  But I'm
12 just saying, if you're going to ask a
13 witness about something that's a fact --
14    MR. RALLINS:  And I may do that.
15 I may refresh his recollection.  I may do
16 that.  I understand.  I got it on the first
17 sentence.
18    Q.    You want me to repeat the
19 question?
20    A.    Yeah.  I forgot what the question
21 was.
22    Q.    Okay.  Would you be surprised to
23 hear that St. Clair had one of the highest
24 levels of violence in the nation in 2018?
25    MR. LUNSFORD:  Same objection.

Page 134

1 Dunn before he became commissioner?
2    A.    No, sir.
3    Q.    Did you know of him before he
4 became commissioner?
5    A.    What do you mean by know of him?
6    Q.    Were you familiar with who he was
7 before he became commissioner?
8    A.    No, sir.
9    Q.    Do you recall your first meeting
10 with Jefferson Dunn after he became
11 commissioner?
12    A.    I was getting -- I got out a car
13 coming from some facility going back into
14 the facility.  He and chief of staff was
15 standing on the steps, and the chief of
16 staff introduced me to him.
17    Q.    And do you recall the name of the
18 chief of staff at that time?
19    A.    Brown.  Steve Brown.
20    Q.    And what did you all discuss
21 during that first meeting you had with
22 Jefferson Dunn after he became
23 commissioner?
24    A.    Why he rolled me back from
25 associate commissioner back to

Page 136

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 34 (133 - 136)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 institutional coordinator was probably the
2 primary discussion.
3      Q.      In that first meeting, did he ask
4 you about the security issues or violence
5 within the prisons?
6      A.      I don't recall.
7      Q.      I'm sorry.  What'd you say?
8      A.      I don't recall.
9      Q.      Now, after Commissioner Dunn came
10 in 2015 to the Alabama Department of
11 Corrections in 2015, he spent some time
12 learning about the problems and issues in
13 the Alabama prison system as any
14 commissioner would, correct?
15      A.      Yes, sir.
16      Q.      And there was an opportunity for
17 leadership and staff to help him understand
18 the state of the prisons, correct?
19      A.      Yes, sir.
20      Q.      And you had an opportunity to
21 meet with him to provide him with your
22 understanding, knowledge, and wisdom about
23 the state of the prisons in Alabama,
24 correct?
25      A.      Yes, sir.
Page 137

1 Go ahead.
2      A.      Those that were in my area.
3      Q.      Okay.
4      A.      I think I probably went with him
5 on most of all of them, but there's
6 probably some that I didn't go.
7      Q.      So you went with him on the visit
8 to St. Clair after his arrival?
9      A.      At some point, yes, sir.
10      Q.      Okay.  And do you recall going
11 with him on a visit to St. Clair and
12 discussing security issues with the warden?
13      A.      Not specifically.
14      Q.      You said not specifically.  What
15 does that mean?
16      A.      'Cause I don't remember exactly
17 what it was he talked about.  We walked the
18 facility.  We talked about different things
19 with the facility.  The warden was with us.
20 I know we went back to the warden's office,
21 and he talked to the warden.  And I can't
22 remember if he ended up talking to each
23 warden without me being present and then
24 maybe with me being present.  I just don't
25 recall.
Page 139

1      Q.      And do you recall Commissioner
2 Dunn conducting a six-month factfinding --
3 strike that.
4           Do you recall Commissioner Dunn
5 embarking on six months of factfinding
6 after he came on board to meet with staff
7 and understand the problems and issues in
8 Alabama prisons?
9      A.      I need you to repeat that.
10      Q.      Do you recall Commissioner Dunn
11 embarking on six months of factfinding to
12 better understand the problems and issues
13 in Alabama prisons?
14      A.      I recall him visiting.  He made
15 an effort to visit each facility, discuss
16 with the warden, take tours through those
17 facilities, spent some time with staff.  If
18 that was his factfinding mission, he didn't
19 -- that wasn't the way it was labeled to
20 me, but I guess if that suffices as a
21 factfinding mission, then, yes.
22      Q.      Did you go with him on visits to
23 prisons?
24      A.      Yes, sir.
25      Q.      Did you go with him -- I'm sorry
Page 138

1      Q.      Okay.  Did you go and visit St.
2 Clair with the warden within a year -- I'm
3 sorry.  Did you go to visit St. Clair with
4 Commissioner Dunn within a year after his
5 arrival?
6      A.      I would think it would've been
7 earlier than a year, but, yeah.
8      Q.      Okay.  Did you go to visit St.
9 Clair with the warden within a month after
10 his arrival?
11      A.      I don't -- I don't know the time
12 frame.  I just --
13      Q.      If you assume -- based on your
14 recollection, it was within a year after
15 his arrival at least?  Okay.
16      A.      That'd be fair.
17      Q.      Is that a yes?
18      A.      Yes.
19      Q.      But you had an opportunity to
20 meet with the commissioner before you
21 travelled with him on a visit to St. Clair,
22 correct?
23      A.      Yes, sir.
24      Q.      And you had an opportunity to
25 meet with him -- are we talking within days
Page 140

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 35 (137 - 140)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 or weeks after his arrival to discuss the
2 issues at St. Clair?
3    A.    I really can't recall.
4    Q.    It's possible you did meet with
5 Commissioner Dunn to discuss the issues at
6 St. Clair for months after his arrival?
7    A.    I met with Mr. Dunn.  I don't
8 know.  I don't -- I really don't -- I
9 really don't recall.  We talked a lot, and
10 we traveled together.  We traveled in
11 separate cars.  But we went to facilities
12 together.  But the time frame -- because
13 the time frame was based pretty much on his
14 schedule and his availability to be able to
15 do those things.
16    Q.    You don't recall how soon after
17 Commissioner Dunn's arrival that you spoke
18 with him about the issues at St. Clair --
19    A.    I --
20    Q.    -- but you know it was before you
21 went with him on a visit to St. Clair?
22    A.    Yes.  Well -- yes.
23    Q.    When you would meet with -- when
24 you met with Commissioner Dunn to describe
25 the issues at St. Clair for the first time,
Page 141

1 who else was there?
2        MR. LUNSFORD:  Object to the
3 form.
4    A.    I don't know.
5    Q.    Okay.  You don't recall?
6    A.    I don't know.
7    Q.    Was it just you and him?  Was it
8 just you and him meeting when you told him
9 about the issues at St. Clair?
10        MS. COBB:  Object to form.
11    A.    I don't know.  I do not recall.
12    Q.    Okay.  Do you ever recall meeting
13 with him at any point, whether it was just
14 you and him where you described the issues
15 -- security issues and violence at St.
16 Clair?
17    A.    I can't say that I do.  If we
18 were in the office, then generally the
19 chief of staff was with him, regardless of
20 what we were discussing.  And so unless I
21 just -- unless he just simply called for me
22 to come to the office or -- but I don't
23 recall any -- I don't recall that.
24    Q.    When you first met with
25 Commissioner Dunn, what did you tell him
Page 142

1 about St. Clair?
2    A.    I can't recall.  I basically --
3 on all of the facilities, what I recall is
4 on all the facilities is giving him a
5 breakdown of the type of facility that it
6 was, whether it was a level five, four,
7 three -- level five, four, two, one; the
8 population, the staffing situation -- well,
9 the warden and the staffing situation; if
10 there was, like -- if there was
11 programming, if there was restrictive
12 housing.  Those are the types of things
13 that I would try to lay out for him.
14    Q.    When you met with Commissioner
15 Dunn in 2015, did you communicate to him
16 that St. Clair was overcrowded?
17        MR. LUNSFORD:  Object to the
18 form.
19        MS. COBB:  Same objection.
20    A.    I probably didn't feel like St.
21 Clair was overcrowded, so I probably did
22 not.
23    Q.    Did you feel like St. Clair was
24 overcrowded in 2018 before your departure?
25    A.    No, sir.
Page 143

1    Q.    Do you feel like St. Clair was
2 overcrowded in 2016 or 2017?
3        MR. LUNSFORD:  Object to the
4 form.
5    A.    No, sir.  And when we look at
6 overcrowding, I think it -- my personal
7 thing is that it's -- it has to be relative
8 to the situation.  There was -- everybody
9 that was at St. Clair had a bed to sleep
10 on.  Nobody wasn't sleeping on the floor.
11 We weren't housing people in places they
12 shouldn't be housed.  So, you know -- and
13 I've been through these surveys.  I've
14 looked at the so called experts and how
15 some of the figures, they change based on
16 what the original design of the facility
17 was and where additional beds were at.  And
18 so my question -- my answer to your
19 question then from my perspective, St.
20 Clair was not overcrowded.
21        MS. COBB:  Quinn, do you mind if
22 we take a quick bathroom break?
23        MR. RALLINS:  Sure.
24        MR. LUNSFORD:  Yeah.  What's the
25 plan?
Page 144

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 36 (141 - 144)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

---

Page 145

1      MR. RALLINS:  Well, I think -- I
2  would like to grab some quick lunch and
3  then get back to it.  Not a long lunch.  25
4  minutes.
5      MS. COBB:  That's fine with me.
6      MR. LUNSFORD:  Yeah.
7      MR. RALLINS:  Is that fine for
8  you, sir?  Do you need more time?
9      THE WITNESS:  30 minutes.
10      MR. LUNSFORD:  Okay.
11      MR. RALLINS:  30 minutes.
12      MR. LUNSFORD:  Yeah, let's do
13  that.  We'll be back about 1:17 our time.
14      MR. RALLINS:  Sure.  Yeah.
15      MR. LUNSFORD:  Okay.
16      THE VIDEOGRAPHER:  12:48.
17      (A lunch recess was taken.)
18      THE VIDEOGRAPHER:  The time is
19  1:23 p.m.  We are back on the record.
20      Q.    Mr. Culliver, you realize you're
21  still under oath, correct?
22      A.    Yes, sir.
23      Q.    Are you familiar with monthly
24  statistical reports at the Alabama
25  Department of Corrections?

---

Page 146

1      A.    Yes, sir.
2      Q.    What are monthly statistical
3  reports?
4      A.    **A compiling of various records of**
5  **population incidents, various things that**
6  **are -- that change from month to month --**
7  **or may stay the same for that matter -- but**
8  **that are put out on a monthly basis.**
9      Q.    And it provides -- monthly
10  statistical reports provide statistics on
11  violence at facilities, correct?
12      A.    **Yes.**
13      Q.    It provides data on homicides,
14  correct?
15      A.    **Yes.**
16      Q.    And you would receive monthly
17  statistical reports from each facility,
18  correct?
19      A.    **I received a compilate of the**
20  **information that was sent in to research**
21  **after it's all been complied.  I would get**
22  **that report.**
23      Q.    That data was provided to
24  research, and you would get a comprehensive
25  monthly statistical report?

---

Page 147

1      A.    **Yes, sir.**
2      Q.    Okay.  And what was the purpose
3  of you receiving the monthly statistical
4  report?
5      A.    **Looking at populations for each**
6  **facility, incidents, types of incidents,**
7  **violence, contraband.  I think that's on**
8  **there.  Those --**
9      Q.    Why was it -- okay.  But why was
10  it important that you receive information
11  related to violence, contraband, and other
12  aspects of the facilities?
13      MR. LUNSFORD:  Object to the
14  form.
15      A.    **These are the areas that I was**
16  **responsible for.  Information.**
17      Q.    And what did the statistical --
18  or excuse me.  (Inaudible)?
19      MR. LUNSFORD:  What?
20      THE COURT REPORTER:  Can you
21  repeat that, please?
22      MR. RALLINS:  I'm hearing --
23      THE WITNESS:  He's getting
24  feedback.
25      (Whereupon, a discussion was held

---

Page 148

1      off the record.)
2      THE VIDEOGRAPHER:  The time is
3  1:28.  We are back on the record.
4      Q.    We were talking about the monthly
5  statistical reports, Mr. Culliver.  What
6  did the statistical reports tell you about
7  violence at St. Clair in 2018?
8      A.    **I would have to see a copy of the**
9  **report.**
10      Q.    You don't recall?
11      A.    **No, sir.**
12      Q.    Okay.  As associate commissioner,
13  would you receive duty officer reports?
14      A.    **Yes, sir.**
15      Q.    Okay.  What are duty officer
16  reports?
17      A.    **The best way I can describe it is**
18  **a preliminary copy of an incident report**
19  **that -- when I was there -- it would -- I**
20  **think it was class A and class B incidents**
21  **would automatically be forwarded with the**
22  **preliminary -- the beginning of -- it ended**
23  **up being an actual incident report, but it**
24  **was the beginning of the incident report**
25  **and got information out to you as quickly**

---

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 37 (145 - 148)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 as they possibly could.
2    Q.    What was classified as a class A
3 incident while you were associate
4 commissioner?
5    A.    Assault on staff, homicide would
6 be, like, class A.  A class B would be
7 fighting without a weapon, fighting with a
8 weapon.  The incident -- I think it's
9 changed.  But the incident module at that
10 time was -- divided the types of incidents
11 into -- the best I can remember is A, B,
12 and C.  C being the lower type things.  A
13 being the most serious, and then B.
14    Q.    Stabbing that resulted in the
15 death of an inmate, how would it be
16 classified?
17    A.    Class A.
18    Q.    Any homicide would be classified
19 as A, correct?
20    A.    Yes, sir.
21    Q.    Would you receive duty officer
22 reports via e-mail?
23    A.    Yes, sir.
24    Q.    And who would author the duty
25 officer reports?

Page 149

1    A.    I'm sorry.  Repeat.
2    Q.    Who would author these reports?
3    A.    The staff member -- the security
4 staff member that was making the report.
5    Q.    And if there was a stabbing that
6 resulted in the death of an inmate, was the
7 duty officer report required?
8    A.    Yes, sir.
9    Q.    And how long after -- strike
10 that.
11        Was there a time frame upon which
12 you were supposed to receive duty officer
13 reports?
14    A.    There is.  I don't remember what
15 that was.
16    Q.    Okay.  And was there a time frame
17 that you were supposed to receive the
18 report after it was written or after the
19 incident?
20    A.    I don't think policy actually
21 specified that.  I don't recall it actually
22 specifying between the time of the incident
23 or the time.  I don't recall.
24    Q.    What was the purpose of you
25 receiving duty officer reports?

Page 150

1    A.    To be informed.
2    Q.    Did they go to all staff?
3    A.    No, sir.  Institutional
4 coordinators -- and I don't know if a
5 commissioner actually got those or not.
6 I'm pretty sure chief of staff got those.
7 It was selective people who actually got
8 those.  The institutional coordinators
9 received them.
10    Q.    But why as associate commissioner
11 did you need to receive duty officer
12 reports of stabbings of inmates at a
13 facility?
14        MS. COBB:  Object to form.
15    A.    The Department considered it
16 relative that the person that was in my
17 position would need to know that to be able
18 to follow up.  I generally -- if it was a
19 homicide, at some point I was going to get
20 a phone call as well, but it's a way of
21 record basically being able to provide that
22 information.  So if -- it generally would
23 offer things that I may need to -- if a
24 commissioner gave a call or if it was
25 something that he needed to know, for

Page 151

1 instance, an escape from a major facility
2 would also be classified as an A.  Those
3 are things that if somebody needs to be
4 informed, I needed that information, and
5 the others needed that information to be
6 able to pass good information on.
7    Q.    And you mentioned that you would
8 -- you might need the information to follow
9 up.  What do you mean by that?
10    A.    So if -- let's just say the
11 incident took place at 12:00 o'clock at
12 night, and I didn't hear the phone.
13 Whenever I woke up, then I had -- before I
14 walked in the office, I already at least
15 had that.  It gave me an opportunity to
16 call the warden and see what the conditions
17 were, then -- and if they had anymore
18 pertinent information to go along with it,
19 et cetera.
20    Q.    Okay.  If there was a homicide --
21 strike that.
22        If you received a duty officer
23 report that there was a homicide at a
24 facility was it your duty to call the
25 warden while you were associate

Page 152

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 38 (149 - 152)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 commissioner?
2      A.      I would -- generally I'm going to
3 talk to the warden or talk to somebody.  I
4 mean, so that -- generally it would be the
5 warden, but in certain instances,
6 vacations, et cetera, then I'd talk to the
7 next person in command.  Or I may pick up
8 the phone and call and talk to the shift
9 commander until they can get me somebody
10 else to talk to.
11      Q.      And that's because you are
12 expected to have a baseline of information
13 about what occurred with that homicide,
14 correct?
15      A.      That's correct.
16      Q.      And the commissioner expects you
17 to have a baseline understanding of what
18 occurred?
19      A.      Yes, sir.
20      Q.      Aside from the duty officer
21 report, if you received a phone call about
22 the death of an inmate, who would usually
23 call you while you were associate
24 commissioner?
25      A.      Who would call?

Page 153

1 first.  If it was a -- if it a -- if it was
2 a volatile situation or if -- there were
3 situations that happened that I thought I
4 may need to go or -- it just varied.
5      Q.      And when you say -- you mean
6 there was some situations where after you
7 received a call, you would go and visit the
8 prison?
9      A.      Yes.  There was some situations
10 that I would get out of bed and go then,
11 not the next day, but then.  And then there
12 are others that if it was under control but
13 it was a lot of tension, then normally the
14 institutional coordinator would already be
15 there, but I may follow up and go, like,
16 first thing in the morning.
17      Q.      Okay.  And you recall going to
18 St. Clair as associate commissioner after
19 you received a call from a duty officer?
20      A.      This is any call from any duty
21 officer for a situation at St. Clair?  Is
22 that the question?
23      Q.      Yes.
24      A.      Yes.
25      Q.      What incident do you recall

Page 155

1      Q.      Yeah.  Would it be the warden or?
2      A.      It was going to be whoever --
3 normally it would be the duty officer for
4 the facility that would make that call.
5      Q.      Okay.  And the duty officers had
6 your contact information, correct?
7      A.      Correct.
8      Q.      And they had your phone number?
9      A.      Correct.
10      Q.      And when a duty officer calls you
11 following an incident, what type of
12 information did you expect them to provide
13 to you?
14      A.      Just to recant the incident to
15 me, whatever took place in the incident, if
16 you had a suspect.  If it was a stabbing,
17 for instance, if you had a suspect, if it
18 was a natural caused death, you know, where
19 was the person at.  Just pertinent
20 information that I would need to know.
21 Because if I got a call, then -- the only
22 call that I generally was going to get is
23 going to be from the commissioner, but he
24 would've had to got the information some
25 kind of way if I hadn't already called him

Page 154

1 visiting St. Clair for after a call from
2 the duty officer?
3      A.      I don't.  I don't recall what the
4 incident was.  I recall being at another
5 facility.  It was middle of the day.  I was
6 at another facility seemed like for some
7 type of training or something like that.  I
8 just --
9      Q.      You don't recall -- do you recall
10 whether or not it was a homicide?
11      A.      I don't.
12      Q.      Okay.  As associate commissioner,
13 you would receive incident reports,
14 correct?
15      A.      Yes, sir.
16      Q.      What are incident reports?
17      A.      It's -- I use the terminology.
18 It's the full story -- or it's the full
19 story that staff have at that time.  You
20 can always come back and add an addendum as
21 other information is captured.  But it
22 gives you more details than what you get
23 with the duty officer report.
24      Q.      And what types of information did
25 you expect to be in incidents reports that

Page 156

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 39 (153 - 156)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 wouldn't have been in the duty officer
2 reports?
3     A.    The duty officer report is
4 basically cut and dried to the incident as
5 it just happened, whereas the incident
6 report may contain additional information
7 as suspects have been pointed out, and you
8 should get a clearer picture.  In a
9 narrative, you should have a clearer
10 picture of what the staff -- what took
11 place as far as with the staff, the
12 information they have at the time.
13     Q.    Okay.  So with an incident report
14 of the stabbing of an inmate, you would
15 expect to find information about who
16 stabbed the inmate?
17     A.    If they had that information at
18 that time.
19     Q.    And if there was information
20 regarding which correctional officers
21 observed the stabbing, you would expect to
22 see that in the incident report?
23     A.    Correct.
24     Q.    If there were relevant times
25 related to the stabbing, you would expect

Page 157

1 to see that in the incident report?
2     A.    Relative times meaning?
3     Q.    Relevant times.
4     A.    Relevant.  I still need a
5 clarification on what --
6     Q.    Well, you would expect to see
7 what time the stabbing happened in an
8 incident report, right?
9     A.    Yes.  I expect all the basic
10 information; the who, what, when, where,
11 why, if you had the why.  But why is much
12 different than the who, what, when, where.
13 And then I expect to see the how.  And so
14 all the pertinent information -- I really
15 should have -- most of that should be in
16 the duty officer report.  The incident
17 report gives you greater detail to what's
18 in the duty officer report.
19     Q.    Right.  You expect to see the
20 who, what, when, where in the incident
21 report?
22     A.    I expect to see the who, what,
23 when, where in the duty officer report and
24 the incident report.
25     Q.    Okay.  Now, you mentioned the

Page 158

1 why.  What is the why that you'd expect to
2 see in a duty officer report but certainly
3 in an incident report?
4     A.    I don't really expect that in the
5 why.  I expect it if you know it.  But I
6 expect that -- I expect whatever
7 investigation has taken place up until that
8 point.  So if we're talking homicide, then
9 basically investigative division -- they
10 changed the name of it now.  But the
11 investigative division would come in, and
12 they would take that over.  And so I would
13 get that later.  I would normally get a
14 follow up from the director of
15 investigations as to where his people were
16 with the investigation, as to how and why
17 that took place.  But I expect in duty
18 officer report who it is, where it took
19 place, if it was stabbing with a knife, hit
20 in the head with a baseball bat, a hanging,
21 whatever, I expect that to be there.
22     I expect the times to be, as you
23 say, relevant as to what time was this
24 person found or what time did they get
25 located, how long it took to get that

Page 159

1 person through point A or heath care or if
2 health care was notified, those types of
3 things.  If the person -- if it was a
4 stabbing, for instance, and -- or it could
5 be just an assault.  It didn't have to be a
6 stabbing.  Somebody was beaten badly.  If
7 they have to go out to an outside hospital,
8 I would expect that to be in there.
9     Q.    If any inmate -- strike that.
10     If any inmates witnessed the
11 incident, would you expect to see that in
12 the duty officer report?
13     A.    I would not necessarily expect to
14 see that in the duty officer report.
15     Q.    Okay.  If it was known, would you
16 expect to see it in the incident report?
17     A.    Yes.
18     Q.    Okay.  Why would you expect to
19 see it in the incident report?
20     A.    Because the duty officer report,
21 if it's done immediately after and
22 depending on the type of the incident -- so
23 that -- it may be there, but I'm not
24 necessarily looking for that every time.
25 But if it's -- but it takes -- normally it

Page 160

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1  will take a certain period of time to try
2  to make sure that the information that you
3  are putting in the report is actually
4  accurate information.  So you may get intel
5  that John Doe committed the assault, but as
6  you follow up on it, you may find out that
7  that's not true.  So I would rather that
8  information -- we're still looking -- I
9  would rather know that we're still looking
10  for the person that did it unless there was
11  somebody that had an eyewitness that
12  actually saw it.
13     Q.    Okay.  In your time as associate
14  commissioner, did you ever have an issue
15  where a correctional officer wanted to give
16  a report unanimously?
17     A.    Not to my recollection.
18     Q.    Have you ever had -- let me
19  phrase it a different way.
20          While you were associate
21  commissioner, do you recall a staff member
22  not wanting to provide a report for fear of
23  backlash from inmates?
24     A.    No, sir, not in my career.
25     Q.    Okay.  Who would author the

Page 161

1  incident reports?
2     A.    The same person.  Generally it
3  would be the same person.
4     Q.    You say the same person, the same
5  person who wrote the duty officer report?
6     A.    Right.  Some -- some
7  facilities -- so when we say -- some
8  facilities may have a clerk, so the
9  information was being passed, and that
10  person would actually author and trying to
11  make sure it was grammatically correct.
12  But at the same time, generally -- and even
13  just shift supervisor may be the person to
14  actually submit that into the computer, but
15  then they were getting the information
16  directly from whoever that officer was from
17  that cellblock or that housing unit
18  dormitory.
19     Q.    Now, you mentioned that the
20  monthly statistical reports (inaudible).
21  If the duty officer report is that -- would
22  that be e-mailed to you directly from the
23  duty officer?
24     A.    Repeat your question, please.
25     Q.    How do you receive the duty

Page 162

1  officer report via e-mail?  Who does it
2  come from?
3     A.    The shift office -- generally
4  from the shift commander's office.
5     Q.    Okay.  The shift commander
6  officer sends you the duty officer report?
7     A.    Yes.
8     Q.    So the shift commander office at
9  St. Clair would send you the duty officer
10  report after it's completed?
11     A.    Yes.  It's --
12     Q.    Who sends you the incident
13  reports?
14     A.    They come the same way.
15     Q.    Okay.
16     A.    I mean, the follow up to the --
17  once the incident report is done -- so your
18  shift may not have a clerical personnel --
19  a person -- like, if it's night shift, they
20  may not have a clerical person, so the duty
21  officer report comes out -- it may be the
22  next day or in certain facilities, it may
23  be one person to type up 90 percent of all
24  the incident reports.  That would mean that
25  they were getting that information from

Page 163

1  that shift supervisor and whatever they
2  added into there.  But the system was -- it
3  was a system in place that would send duty
4  officer reports to the people that was
5  supposed to get them and the full incident
6  report would go -- there would be initial
7  people who got the full incident report or
8  additional departments would get the full
9  incident report that did not necessarily
10  get the duty officer report.
11     Q.    Now, you mentioned there was a
12  select few who received the monthly
13  statistical reports.  Were -- did the duty
14  officer reports just go to you or did they
15  go to other staff?
16     A.    Duty officer reports went to the
17  commissioner, chief of staff, to the
18  institutional coordinators, myself.  I
19  don't really know who all got it.  I just
20  know those people got it.  So probably
21  investigations --
22     Q.    Okay.
23     A.    -- would've got it.
24     Q.    Okay.  And aside from you
25  receiving the incident reports, who else

Page 164

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 41 (161 - 164)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1  received those?
2      A.      Classification would get one,
3  records would get one.  I'm trying to think
4  if it automatically went to the inmate's
5  file or it had to be loaded to the file.  I
6  can't remember.  But a copy of that report
7  goes into the institutional file for the
8  inmate and of course investigations gets a
9  full copy.
10      Q.      Does the incident report go to
11  the institutional coordinator?
12      A.      Yes.
13      Q.      Does it go to chief of staff?
14      A.      I don't know.
15      Q.      Would it go to the commissioner?
16      A.      I don't know.
17      Q.      So if there were an incident that
18  needed to be discussed at any executive
19  staff meetings -- you needed to discuss
20  with the commissioner, it was important for
21  you to review the incident report because
22  it may have a full story than the duty
23  officer report, correct?
24      A.      Not necessarily because by that
25  time, I would've talked to somebody at the
Page 165

1  facility, and I would have probably -- I
2  could have more information that's even in
3  the incident report.  The incident
4  report -- it may take two, three days
5  before the incident report actually is
6  completed.
7      Q.      Right.  How long -- so you said
8  it could take three days to get it --
9  receive the incident reports.  But how long
10  after the incident would you normally
11  receive the incident reports?
12      A.      I don't recall.
13      Q.      Okay.  But three days would be on
14  the longer end?  Three days could -- it's
15  fair to say three days could be the average
16  time it would take for you to receive the
17  incident report?
18      A.      Could be.  I think it varies on
19  the facility and the clerical staff that
20  they had is how quickly that would get out.
21      Q.      What about St. Clair while you
22  were associate commissioner?
23      A.      The duty officer report was out
24  as it was supposed to be.  If memory serves
25  me correct, I had gotten to a point where
Page 166

1  St. Clair's reports may have been lagging a
2  little bit.  I know we -- in working on
3  some other cases, we tried to devise a
4  better system at St. Clair, and I think
5  that might've just been like a pile of them
6  and then it -- but I don't recall exactly
7  what those circumstances were.
8      Q.      Had that time frame for you to
9  receive the incident reports at St. Clair
10  improved by the time you left in 2018?
11      A.      Honestly I read very few incident
12  reports in totality because there was so
13  many, and so I can't honestly say how much
14  better it got.
15      Q.      So what would -- so what
16  circumstances would encourage you to read
17  an incident report?
18      A.      Probably following up or some
19  information -- I may end up getting some
20  information from investigations, and so I'm
21  able to backtrack to see what was actually
22  in the incident report to be able to
23  discuss that back and forth with them.  And
24  so if investigations came and talked to me
25  about a situation on our intel that they
Page 167

1  had picked up on and it was different from
2  what was actually in the incident report,
3  then I would need to have a conversation
4  with the warden as to that as well.
5      Q.      Did investigations come and talk
6  with you about what was in an incident
7  report often?
8      A.      No.
9      Q.      Do you recall, did they come and
10  talk to you in 2018 about any specific
11  incident?
12      A.      I don't recall.
13      Q.      While you were associate
14  commissioner, did you receive any reports
15  about St. Clair regarding the overall level
16  of violence at St. Clair over a certain
17  time period?
18      A.      Please repeat.
19      Q.      Yeah.  Did you receive -- while
20  you were associate commissioner, did you
21  receive any reports that provided you with
22  information about the overall level of
23  violence at St. Clair over a certain time
24  period?
25      A.      And so when you say any reports,
Page 168

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 42 (165 - 168)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 that's like statistical reports?  What type
2 of report are you talking about?
3      Q.      Right.  Any -- well, let's start
4 with statistical reports.  For the
5 statistical reports, did it provide
6 information specific to St. Clair over a
7 certain time period?  It'd be a month,
8 right?
9      A.      That's in a month, yeah.  It's a
10 month, but seemed like there was another --
11 I don't think they gave a quarterly report.
12 I don't recall.
13      Q.      Okay.  Did you receive any
14 reports that provided you with information
15 about the overall level of violence at St.
16 Clair over the course of approximately a
17 year?
18      A.      A year?
19      Q.      Yeah.
20      A.      So that information -- if memory
21 serves me correct -- was actually in the
22 yearly report.
23      Q.      Okay.  Okay.  There would be a
24 yearly report that would provide you with
25 the information about the level of violence
                                          Page 169

1 at each facility?
2      A.      Right.
3      Q.      Okay.  And that would include St.
4 Clair obviously --
5      A.      Right.
6      Q.      -- correct?  Okay.  And that
7 would provide a yearly report for 2015 or
8 2016, correct?
9      A.      Correct.
10      Q.      The yearly report would provide
11 you with overall level of violence at St.
12 Clair over 2017 or 2018, correct?
13      A.      Correct.
14      Q.      How would the overall level of
15 violence change between the time when you
16 became associate commissioner in 2014 and
17 your departure -- and your departure?
18      A.      From the department?  From a
19 departmental standpoint?
20      Q.      Yeah, the overall level of
21 violence at St. Clair.
22      A.      At St. Clair?
23      Q.      Yes.
24      A.      I don't -- 2018, I think the
25 level of violence -- overall violence --
                                          Page 170

1 was probably on the down slope in 2018.  I
2 don't think 2018 -- from a period of 2014
3 to 2018, I don't think 2018 was the peak.
4 I think the peak would've came from
5 probably 2016, 2017 or something like that.
6      Q.      What leads you to believe -- you
7 said that you believe the peak was when?
8      A.      Probably somewhere between '16
9 and '17.
10      Q.      What leads you to believe the
11 peak was in 2016 or 2017?
12      A.      Because I was a coordinator -- I
13 was a regional during that period of time,
14 and the violence level at St. Clair had
15 actually decreased by 2018 in my -- I think
16 if you look at the statistics, I think it
17 still may be pretty close, but I don't
18 think 2018 was -- there was more violence
19 going on at St. Clair in 2018 -- from the
20 time period I was there in 2018 -- than it
21 was in '16 and '17.
22      Q.      And it's your recollection that
23 the violence at St. Clair went down from
24 2017 to 2018?  That's your independent
25 recollection?
                                          Page 171

1      A.      Yes.
2      Q.      And is that your independent
3 recollection from reviewing specific
4 reports?
5      A.      I haven't looked at a statistical
6 report in so long.  I really -- you put one
7 before me, I might not know what it is.
8 That's just from memory.  It's just from
9 memory.
10      Q.      Okay.  Well, what do you recall
11 the level of violence in 2018 being at St.
12 Clair?
13      A.      There was still violence, but St.
14 Clair had began to settle some.  And so
15 like in 2018, we had started working on one
16 of the justice department's mandates.  And
17 so there had been some changes in some
18 housing.  There were a number of things
19 that were being put in place, and so we
20 were -- there was some change coming.  And
21 the staff attitude also seemed to have
22 changed some.  Things -- my best
23 recollection was things had started to kind
24 of level out more than continue to
25 increase.
                                          Page 172

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 43 (169 - 172)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1    Q.    Okay.  Is there anything aside
2 from the justice department coming in,
3 changes in housing and staff attitude that
4 leads you to believe St. Clair level of
5 violence was improving --
6              MR. LUNSFORD:  Object to the
7 form.
8    A.    Not without looking at a
9 statistical report I can't.
10   Q.    Okay.  You would need to look at
11 the monthly statistical reports?
12   A.    I can't think of the word.  I
13 cannot recall what the name of the report
14 is that's done at the end of the year for
15 the department as a whole.  But in that
16 report, then it gives -- it gives those
17 tables normally, if my memory serves me
18 correct, with some graphs and some
19 different things like that.
20   Q.    Do you recall whether or not the
21 levels of violence at St. Clair was higher
22 in 2016 or 2017?
23   A.    I really can't -- I cannot
24 differentiate years from -- it's just --
25 it's time.  So I can't differentiate and
                                    Page 173

1 say in 2015, St. Clair had X, Y, Z or any
2 other facility had X, Y, Z.  It's basically
3 a field from what I can remember at this
4 time without looking at some reports to
5 validate what I'm saying.
6    Q.    Okay.  And that feeling is based
7 upon the things -- the things you've
8 described, the justice department coming in
9 that had to do some changes in housing?
10   A.    I think that had some effects,
11 yes.  Along with trying to do some other
12 things that I've talked about earlier.
13   Q.    Well, did staff -- did the
14 attitude of staff at St. Clair change in
15 2018?
16   A.    I think it got better.  I felt
17 like it was getting better.  But, I mean,
18 that's a feeling, you know.  And that's
19 from talking to staff and walking through
20 the facility and, you know, just an overall
21 feeling that you get.
22   Q.    Do you recall any specific staff
23 stating that they feel like St. Clair was
24 improving in 2018?
25   A.    I don't.
                                    Page 174

1    Q.    So what makes you think that
2 staff believed the levels of violence at
3 St. Clair was improving in 2018?
4    A.    The attitude of the staff when I
5 walked through, when I talked to people
6 basically.  You know, the -- just --
7    Q.    They didn't say anything --
8    A.    It's a feel, right.  So it's
9 almost like you got to be in the business
10 to be able to have certain feelings.  It's
11 not -- it's a feel, and it's the inmate
12 population and how the inmate population
13 interact with staff, whether they follow
14 directions, whether they give the staff lip
15 back, whether they try to keep the place
16 cleaned up or not, whether the inmate
17 population feels like things are being
18 better for them -- made better for them.
19 And so my relationship with -- overall with
20 inmate population was fairly decent.  And
21 so, you know, if you walk -- I did this for
22 37 years, right.
23           And so over that period of time,
24 you get a certain feel for how things are.
25 And, you know, sometimes you feel like
                                    Page 175

1 you're getting better, and then you have a
2 terrible incident to occur, right, and you
3 would think that that we was on the right
4 track, but then you may not have another
5 incident to occur for several months.  And
6 so, you know, things happen.  It's prison
7 and things actually -- they happen in
8 prison just like things happen on the
9 street.  And so to a certain degree, it
10 ebbs and flows.  Sometimes it's a person
11 that -- it could be one or two inmates that
12 you take out of a population that could
13 cause that whole population to settle for a
14 while.  It's just -- it's a feel.  That's
15 the only thing I can tell you.
16   Q.    Do you recall any inmates telling
17 you that they believe St. Clair was
18 improving in the levels of violence in
19 2018?
20   A.    I probably had some inmates to
21 tell me that.  I can't tell you where I was
22 when they told me that because I basically
23 walked and talked, so I can't.  But, yeah,
24 I've had people come up and tell me that.
25   Q.    What did the justice department
                                    Page 176

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 44 (173 - 176)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 do in 2018 to improve the levels of
2 violence at St. Clair?
3          MS. COBB:  Object to form.
4     A.    I would really have to have
5 something in front of me to remind me of
6 the steps that were actually taken.
7     Q.    Okay.  You don't have any
8 independent recollection as you sit here
9 today?
10     A.    Not for me to put on this
11 deposition to make sure I'm telling the
12 truth.
13     Q.    Right.  And I'm not trying to
14 trick you.  As you sit here today without
15 any documentation, you have no independent
16 recollection of any changes made by the
17 justice department in 2018 at St. Clair?
18     A.    They're too vague to try to --
19 for me to try to do that.  I can't do that.
20 I just know that there were things put in
21 place.  I know I visited facilities in
22 Louisiana, looked at the way they were
23 doing some things.  One of the consultants
24 that was sent to help lead that was from
25 Louisiana.  I know that the incident report

1 type stuff, we changed some stuff with
2 that.  I know that we had gotten approval
3 to change the locks out.  I know we were
4 looking at how many people that we had in
5 restrictive housing during that period of
6 time and how -- and I'm not so sure the
7 justice department did this or not, but we
8 tried to explain to the justice department
9 -- the people -- and it wasn't the justice
10 department.
11          But we tried to explain to the
12 experts that were trying to assist us
13 how -- you know, there was a wave across
14 the country to get away from restrictive
15 housing, and we tried to take a serious
16 look at that and how to be able to do that.
17 But at the same time, you have to try and
18 explain to people that there are some
19 people who are in restrictive housing,
20 that's really where they do their time the
21 best at, and when you try to put it in a
22 population setting, it creates problems for
23 you.  And then when you ask the question
24 then -- so if you're saying I can't keep
25 this person in restrictive housing for six

1 months or for a year, when I put him back
2 in general population and that person stabs
3 somebody or beats somebody to death, then
4 who's going to take responsibility for
5 that?  Is the justice department going to
6 step up and say, well, we recommended that
7 you put this person back in population
8 because he had been in restrictive housing
9 for over six months?  They're not.  It's
10 going to come back to -- still coming back
11 to me or it's coming back to that warden.
12          And so it makes the people look
13 bad for trying to do the things they're
14 trying to do because you don't necessarily
15 have a feel.  You can be in the field or
16 you could've been in the field, but for
17 that facility and every facility -- just my
18 professional opinion.  Every facility takes
19 on the mannerisms of the person who leads
20 the facility.  Every facility has a
21 different -- there are no facility that's
22 run -- it just runs perfectly.  There's no
23 copycat for that.  Every facility has its
24 own personality.  And so it was -- but
25 that's my feeling.

1     Q.    Were there -- did anyone from the
2 justice department ever communicate to you
3 that levels of violence at St. Clair were
4 improving in 2018?
5          MR. LUNSFORD:  Object to the
6 form.
7     A.    Not to my recollection.
8     Q.    Do you recall any person -- any
9 representative of the justice department
10 communicating to anyone at the Alabama
11 Department of Corrections that the levels
12 of violence at St. Clair were improving in
13 2018?
14     A.    No, sir.
15     Q.    So you don't know what the levels
16 of violence at St. Clair were in 2017?
17     A.    How?  I mean, you show me the
18 documentation of that.  Do I remember what
19 the levels of violence were compared to the
20 levels of violence at another facility?  Is
21 that -- I mean, I don't really understand
22 the question.
23     Q.    Do you -- what were the levels of
24 -- do you recall the levels of violence at
25 St. Clair in 2017?

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 45 (177 - 180)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1  A.    There was violence at St. Clair
2  and other facilities too.  I don't -- I
3  just feel like you're trying to quantitate
4  something that is very difficult for you to
5  try to do without the statistics to
6  actually look at that.  And then statistics
7  -- statistically, you could have stabbings
8  every day that was listed as stabbings but
9  none of them were serious.
10        And so, you know, when we start
11  looking at those numbers and we start
12  trying to break those numbers out -- so if
13  I had a facility, and there was 365
14  stabbings in a year, that meant
15  theoretically I had a stabbing every day.
16  But then when you look back at the reports
17  to see how many people were actually
18  seriously injured from a stabbing, it may
19  have only been two, when another
20  institution may have only had 15 a month,
21  right, but we had 5 homicides.  And so I
22  would think then that 5 homicides would
23  create you a situation where you would
24  think that that was more violent than it
25  was where you had the more assaults with
Page 181

1  results in a homicide or results in serious
2  injury where I lose a limb or I lose the
3  ability -- I only have one lung now where I
4  had two as opposed to me getting cut across
5  the neck, and I have to have ten stitches,
6  but I'm back in my bunk the next night.
7      Q.    That would be less serious?
8      A.    That would be less serious.  But
9  statistically, it still shows up in the
10  statistical report as a stabbing.
11      Q.    Right.  As associate
12  commissioner, you would receive
13  classification reports from each facility,
14  correct?
15      A.    Not necessarily.  So explain
16  classification reports, as you said.
17      Q.    Well, are you familiar with the
18  concept -- the term classification reports?
19      A.    Classification -- I didn't hear
20  that part.
21      Q.    Reports.
22      A.    Yes and no.  I mean, I know
23  classification -- classification puts out
24  certain reports, but they put out all kinds
25  of reports.  ADOC classification, they used
Page 183

1  weapons.
2      Q.    And what makes a stabbing
3  serious?  Is it when it leads to death?
4          MR. LUNSFORD:  Object to the
5  form.
6      A.    Say that again.
7      Q.    What makes a stabbing serious in
8  your opinion?
9          MR. LUNSFORD:  Object to the
10  form.
11          MS. COBB:  Same objection.
12      A.    In my opinion, a stabbing is a
13  stabbing because I don't want to be
14  stabbed.  It gets to be different as to how
15  serious the stabbing is once it's done.
16      Q.    Can you explain?
17      A.    So if the stabbing -- if you stab
18  me in my chest, and I'm near death, right,
19  as opposed to you stabbing me in my side
20  and you puncture a lung, it's -- both of
21  them are serious, right, because I have
22  to -- most of our -- most of our health
23  care facilities within the facilities can
24  stabilize you, but then you still have to
25  go out for treatment.  So if the stabbing
Page 182

1  to so...
2      Q.    Okay.  So what types of
3  classification reports did you receive from
4  St. Clair as associate commissioner?
5      A.    I generally didn't receive
6  classification reports from any facility.
7      Q.    Did you receive reports from
8  classification officers of any sort?
9      A.    Not that I can recall.  The
10  institutional file is available to me with
11  a touch of a button, so the computer -- we
12  had a classification module for the system.
13  So I could look at a particular inmate's
14  institutional file from my desk.  That
15  doesn't -- so I don't know -- when you say
16  classification reports, I mean, could that
17  be how many people's custody was reduced
18  from close to medium?  I mean, there are so
19  many things that you could report.
20      Q.    You can look at an inmate's
21  institutional file within a click of a
22  button, right?
23      A.    Yes, sir.
24      Q.    What would be -- and what was --
25  for what reasons would you look at an
Page 184

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 46 (181 - 184)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 inmate's institutional file?
2    A.    Somebody would've had to bring me
3 something to -- their attention that I
4 needed to look at.  It could've been a
5 phone call from a mom, right, saying X, Y,
6 Z, you know.  They could've said, I want to
7 know when my son's going to get out or they
8 could've said, Mr. Culliver, I need you to
9 move Joe from here because of -- when I
10 look through his file, I might see that Joe
11 is a drug user, right, and for every
12 facility he leaves and go to -- every time
13 we transfer him to try to make that
14 situation better, he goes and does the same
15 thing.  He creates debt to get drugs, and
16 so boom, we start all over again.
17    Q.    And when you looked at the
18 inmate's file, it would give you
19 information about their disciplinary
20 history, correct?
21    A.    Yes, sir.
22    Q.    It would've given you information
23 about their history of violence, correct?
24    A.    It gives me -- well, if I look at
25 each incident -- if I look at each incident
Page 185

1 report or disciplinary that he has, and
2 it's fighting, fighting, fighting,
3 fighting, that tells me about his violence.
4 But the whole -- his whole history is there
5 so...
6    Q.    Okay.  Now, as associate
7 commissioner, you would also receive the
8 minutes from monthly staff meetings at each
9 facility, correct?
10    A.    Yes, sir.
11    Q.    And these meetings were held by
12 the wardens at the facilities with their
13 executive staff?  Let me rephrase it
14 (inaudible).
15         These meetings were held by the
16 wardens at the facilities, correct?
17    A.    Yes.
18    Q.    And that included the warden of
19 St. Clair holding weekly staff meetings,
20 correct?
21    A.    Weekly or monthly.  Whatever --
22 it depends on -- I'm assuming -- it depends
23 on how the warden is running it, how he
24 runs his facility.  Some wardens, they meet
25 with the assistant warden and captain every
Page 186

1 morning.  Some do it midday, and then some
2 have, like you say, weekly meetings, and
3 then some may have a monthly meeting with
4 additional staff where they bring, like,
5 the nonsecurity staff as well.
6    Q.    Did you receive minutes of
7 monthly meetings from St. Clair?
8    A.    I don't recall them.  I probably
9 did.  I probably didn't read them.
10    Q.    Did you read the minutes from
11 staff meetings at any facilities --
12    A.    No, sir.
13    Q.    -- regularly?
14    A.    Not regularly, no, sir.
15    Q.    Were the minutes -- the minutes
16 would be e-mailed to you, correct?
17    A.    Yes, sir.
18    Q.    Were they e-mailed to -- do you
19 recall whether or not they were e-mailed to
20 any staff besides yourself?
21    A.    Institutional coordinator.
22 That's their job.
23    Q.    But it'd be e-mailed to the
24 institutional coordinator as well as
25 yourself, correct?
Page 187

1    A.    Yes, sir.
2    Q.    Was it e-mailed to the
3 commissioner?
4    A.    I doubt it seriously.  If they
5 did, I didn't know anything about it.
6    Q.    Do you recall -- was it e-mailed
7 to anyone else?
8    A.    I wouldn't think so.
9    Q.    As associate commissioner, you
10 would receive reports of sexual assault at
11 each facility, correct?
12    A.    Yes, sir.
13    Q.    And would the reports of these
14 sexual assaults be included in the incident
15 and duty officer reports?
16    A.    Yes, sir.  Sexual assault would
17 be a class A or a class B incident, so a
18 duty officer report would be in there.
19    Q.    Okay.  And you would also get a
20 follow-up report of any investigation of a
21 sexual assault in a facility, correct?
22    A.    Yes, sir.
23    Q.    What was the purpose of you
24 getting the -- a follow-up report from the
25 investigation of a sexual assault?
Page 188

Lakeisha Ezell v. Jefferson Dunn, et al.

Grantt Culliver
6/25/2024

1    A.    The results.  Just validated, not
2 validated.
3    Q.    And what would you do with the
4 information that you received from the
5 investigation of a sexual assault?
6    A.    Look over it and move on.
7    Q.    Do you recall ever recommending
8 any policy changes at St. Clair with
9 respect to problems with assaults?
10    A.    I do not.
11    Q.    While you were associate
12 commissioner?
13    A.    I do not.
14    Q.    Did you raise the issue of sexual
15 assaults at St. Clair at the executive team
16 meetings in 2018 before your departure?
17    A.    I don't recall ever raising that.
18 In order for me to talk to the executive
19 committee about sexual assault, it's kind
20 of like the same thing with stabbing
21 incidents.  If it was a homicide and -- we
22 probably were going to mention that.  If it
23 was a series of people who got stabbed up
24 but they were serious, nonserious, we'd
25 probably mention that.  If it was one

Page 189

1 stabbing that took place, nobody got hurt,
2 I wasn't bringing that up.
3         With sexual assaults, we had -- we
4 made robust efforts with PREA in all our
5 facilities, and, you know, literature is
6 posted.  I mean, there's everything posted
7 which was -- it was really a good thing
8 until basically you found that the inmates
9 knew PREA and what could and could not
10 happen better than the staff did.  And so
11 when a person wanted to manipulate the
12 system, that was a prime way for them to be
13 able to manipulate the system.  Because if
14 I come up and say that something happened
15 to me, but then from a security point of
16 view, I have to take some action to put you
17 in a safe environment.  And some of those
18 were true and some of those weren't.
19    Q.    You have a recollection of
20 learning that any complaints -- PREA
21 complaints at St. Clair while you were
22 associate commissioner were -- strike that.
23 Let me give you a better question.
24         While you were associate
25 commissioner, do you recall learning that

Page 190

1 any PREA complaints made at St. Clair were
2 untrue?
3    A.    I can't recall.
4    Q.    Aside from literature being
5 posted, what other robust efforts do you
6 recall being made with respect to PREA
7 changes while you were associate
8 commissioner?
9    A.    Literally I cannot remember the
10 -- all of the things that were done.  There
11 was classes -- inmate classes.  There were
12 staff classes.  There were -- there was
13 classes on top of classes.  There were
14 classes for the executive staff.  I had a
15 good working relationship with our PREA
16 coordinator.  She pretty much kept me in
17 the loop of where we had, like, more
18 problems than other problems from a
19 perspective of showering and those types of
20 things.  We worked well together, along
21 with the engineering department to try to
22 safely allow certain privacy parts.  Those
23 are the things that I remember right off
24 the top.
25    Q.    Who was the PREA coordinator you

Page 191

1 were referring to?
2    A.    Christy -- I don't know what her
3 last name is.
4    Q.    Christy Vincent?
5    A.    Vincent, right.
6    Q.    Did the levels of sexual assault
7 violence improve in 2018 at St. Clair?
8    A.    Specifically about St. Clair, I
9 can't -- I can't answer one way or the
10 other.
11    Q.    You don't know as you sit here
12 today, correct?
13    A.    Right.
14    Q.    Who else got reports of sexual
15 assault -- well, strike that.
16         Would you receive any reports of
17 sexual violence from any reports aside from
18 the incident and duty officer reports?
19    A.    Not that I recall.
20    Q.    While you were associate
21 commissioner, did the executive team make
22 an effort to reduce the population with
23 inmates at St. Clair?
24    A.    I don't recall making effort -- I
25 don't recall efforts to reduce the

Page 192

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 48 (189 - 192)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 population at St. Clair. I don't recall
2 that. We changed some housing units. I
3 don't recall.
4 Q. While you were associate
5 commissioner, did you, in your role, do
6 anything specifically to reduce the
7 population of inmates at St. Clair?
8 A. No, sir, not that I can recall.
9 We may have reduced a -- there was one
10 dormitory housing unit at St. Clair. As I
11 recall, we may have reduced some beds in
12 that housing unit, but other than that, I
13 don't recall. We moved inmates out as we
14 did construction. We had -- while we were
15 doing the lock series, we moved however
16 many people were housed in -- we moved
17 those people out to another facility. And
18 we had a storm that ripped a portion of a
19 roof off of a building, and we moved those
20 people out during that time. But those --
21 to my recollection, those buildings, once
22 they were repaired, then -- you have to
23 understand with the lock series that it was
24 one dormitory, one housing unit at a time.
25 So if the housing unit held 100 people,
Page 193

1 that 100 people were moved out to another
2 facility. When that housing unit was
3 completed, then the next housing unit we
4 was going to work on, that 100 people
5 stayed over there. So if you lost 100
6 people or 80 people, that project probably
7 took a year if not longer. So for that
8 period of time, just to say that we were
9 reducing the population at St. Clair, other
10 than maybe that dormitory unit, I don't
11 recall any measures taken to reduce the
12 population.
13 Q. Did any of those efforts reduce
14 the population of inmates at St. Clair?
15 A. Say that again. I'm sorry.
16 Q. Did any of those efforts reduce
17 the population of inmates at St. Clair?
18 A. It reduced the population for the
19 time being, but it was because of
20 construction. I don't know -- I can't -- I
21 don't know when that project was actually
22 finished. So not to my knowledge.
23 Q. Okay. Did you ever raise the
24 issue of overcrowding of inmates at St.
25 Clair in the executive team meetings in
Page 194

1 2018 before your departure?
2 A. I didn't think that St. Clair was
3 overcrowded so I would not have.
4 Q. Okay. Did you ever -- strike
5 that.
6 Did the institutional coordinator
7 of the northern region ever communicate to
8 you that the inmate population was
9 overcrowded at St. Clair?
10 A. Not that I recall.
11 Q. Did you ever have a discussion
12 with the warden of St. Clair about
13 overcrowding of inmates at St. Clair?
14 A. Not that I recall.
15 Q. Did you ever have any
16 conversations with any other staff at St.
17 Clair about the overcrowding of inmates at
18 St. Clair?
19 A. Not that I recall.
20 Q. If St. Clair was overcrowded in
21 2018, would that have been a concern of
22 yours as associate commissioner?
23 MR. LUNSFORD: Object to the
24 form.
25 A. Truthfully it would probably have
Page 195

1 been what the definition of overcrowded
2 was. If I had people sleeping on
3 mattresses on the floor, if I had -- St.
4 Clair is predominately cellblocks. If I
5 had three people sleeping to a cell at St.
6 Clair, then, yes. If everybody had a bed,
7 then, no.
8 Q. Do you recall the -- strike that.
9 Do you recall any prisons at the
10 Alabama Department of Corrections being
11 overcrowded during your time as associate
12 commissioner?
13 MS. COBB: Object to form.
14 A. Not to the extent that anyone was
15 sleeping on the floor. So if you look at
16 the statistical report and you look at the
17 upper correctional facility which was
18 originally -- had an original man for X
19 number of people, and that was based on
20 single bunks and we turned that from a
21 single bunk unit into two bunks -- double
22 bunking -- I think it's semantics is when
23 you start to do that to look at that
24 whether it's overcrowded or not
25 overcrowded. If -- and then you have to
Page 196

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 49 (193 - 196)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 look at more than just the facility itself.
2 You also have to look at the systems, the
3 water system, the cesspools, that whole
4 thing.  If your kitchen -- all of those
5 things go into play when you start using
6 the numbers to say whether a place is
7 overcrowded.  Just my opinion.
8     Q.     As associate commissioner, would
9 you make an effort to ensure that once an
10 inmate was moved out of St. Clair, they
11 were not moved back?
12     A.     No.
13     Q.     Why not?
14     A.     I was fixing to ask you the same
15 thing.  Why?  It depends on why the
16 individual was moved out.  So the question
17 was generic, and whether they were moved
18 out, where they're not going back.  And so
19 why they were moved out and where did they
20 go to -- so if a person left St. Clair, and
21 he was a level-five inmate, and he went to
22 a medium custody facility which was a
23 level-four inmate, he committed violence at
24 a level-four facility, classification
25 reclassified him as a level-five inmate,

Page 197

1 and we had a bed open at St. Clair, should
2 we not move him back to St. Clair?
3     Q.     You could make the decision to
4 transfer inmates back to St. Clair,
5 correct, as associate commissioner?
6     A.     I really didn't make decisions on
7 transferring inmates back and forth from
8 one facility to the other.  That's a
9 classification -- that goes through
10 classification.  Classification classified.
11 Could I override and say I want this inmate
12 to go to point A to point B?  Yeah, sooner
13 or later that would've caught up with me.
14 Let classification do the job that
15 classification do.
16     Q.     During your time as associate
17 commissioner, did you ever make a decision
18 to transfer an inmate to a specific prison?
19     A.     Not that I can recall.
20     Q.     As associate commissioner, you
21 were updated on the status of the
22 segregation units at prison facilities,
23 correct?
24     A.     Updated in what type way?
25     Q.     Did you receive any updates

Page 198

1 whatsoever about the status of segregation
2 units?
3     A.     If there was a problem.
4     Q.     What types of problems were you
5 updated on with regard to segregation units
6 while you were associate commissioner?
7     A.     I really can't remember any.  I
8 don't -- I really don't understand the
9 question.  I don't follow.
10     Q.     Well, I think you spoke earlier
11 about -- well, let me ask it a different
12 way.
13         You spoke earlier about the way
14 inmates would use restrictive housing,
15 correct?
16     A.     Yes, sir.
17     Q.     And would you receive updates
18 about -- like, how do you know how inmates
19 were using restrictive housing at St. Clair
20 and other facilities?
21     A.     Conversations with the wardens,
22 conversation with the institutional
23 coordinators.  Sometimes it would be
24 brought to the attention by classification
25 that we'd move this inmate from here to

Page 199

1 here to here to here, and every incident
2 report that it revolves around if the
3 inmate says that he's in debt and his life
4 is in danger, things of that nature.
5     Q.     And did you ever speak to Warden
6 Jones about the way inmates were using
7 restrictive housing at St. Clair?
8     A.     I really don't think Warden Jones
9 was at St. Clair while I was institutional
10 coordinator.  I do not recall talking to
11 Warden Jones in reference to inmates
12 manipulating segregation at St. Clair.  I
13 talked to Warden Estes about it.  I mean,
14 Warden Estes talked to me in reference to
15 the same thing happening.
16     Q.     And what steps did you
17 specifically take while you were associate
18 commissioner to improve the way inmates
19 were using restrictive housing at St.
20 Clair?
21     A.     Please repeat.
22     Q.     As associate commissioner, what
23 steps did you take to improve the way
24 inmates were using restrictive housing at
25 St. Clair?

Page 200

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 50 (197 - 200)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1    A.      None.
2    Q.      What steps did you know of that
3 the warden at St. Clair take to improve
4 restrictive housing while you were
5 associate commissioner?
6    A.      I don't know of any.  It's
7 between a rock and a hard place.  So if I
8 can't take the guy -- the guy's complaining
9 or the guy says his life is in danger, I
10 can't take him out of a restrictive housing
11 unit and just put him back in population.
12 I'm going to be liable for that.  If I move
13 him to a different population, take him
14 out, and put him in a different population
15 in another place, and then he creates the
16 same situation and goes to that segregation
17 unit, the likelihood is he would end up
18 back at St. Clair, Donaldson, or Holman.
19         So, you know, there's not a whole
20 lot that you can do to that when you
21 consider -- when you consider PREA, when
22 you consider DOJ does not want people to
23 stay in restrictive housing for certain
24 periods of time, and then you have
25 manipulation that's going on by the inmate

Page 201

1 population.  I mean, you still are
2 responsible for the welfare of the inmate.
3    Q.      As associate commissioner, did
4 you know how many available beds there were
5 in the segregation unit at St. Clair?
6         MR. LUNSFORD:  Object to the
7 form.
8    A.      On any given day or total beds?
9    Q.      Total beds.
10    A.      At the time, I would've known how
11 many total beds.  There's a time I knew how
12 many total beds was all over.  Wherever the
13 institution was, I knew how many beds was
14 in segregation.  I knew how many beds was
15 in general population.
16    Q.      And were you updated on how many
17 available beds there were in the
18 segregation unit at St. Clair while you
19 were the associate commissioner?
20    A.      I just pull it up on the
21 computer.
22    Q.      Okay.  And would you pull it up
23 on your computer to check?
24    A.      Only if there was a need.
25    Q.      What would cause you to look up

Page 202

1 on your computer how many available beds
2 there were in a segregation unit at St.
3 Clair?
4    A.      If the commissioner came to me
5 and said, we need to put somebody at X, Y,
6 Z, then I would check.  If we had a
7 disturbance at one facility, and we needed
8 to move some people out of that facility,
9 then I would check.  Other than that, I
10 really didn't have a reason to know that.
11    Q.      You are familiar with the Equal
12 Justice Initiative, correct?
13    A.      Yes, sir.
14    Q.      And you're familiar with Bryan
15 Stevenson?
16    A.      Yes, sir.
17    Q.      Commissioner Dunn met with EJI
18 director Bryan Stevenson after his arrival
19 as commissioner, correct?
20    A.      I don't know.
21    Q.      Did Commissioner Dunn ever
22 communicate to you that he met with
23 Bryan Stevenson and Stevenson expressed
24 concern about the growing violence at St.
25 Clair?

Page 203

1         MR. LUNSFORD:  Object to the
2 form.
3    A.      I don't recall.
4    Q.      Have you ever investigated
5 concerns raised by the Equal Justice
6 Initiative and Bryan Stevenson about
7 growing violence at St. Clair?
8    A.      I mean, I get the reports.  I see
9 the duty officer reports.  I guess I was
10 investigating it all the time.  I mean,
11 it's a continuous thing.
12    Q.      But did you ever investigate
13 concerns specifically raised by Bryan
14 Stevenson --
15    A.      I -- I'm sorry.  I didn't mean to
16 interrupt.  I do not know of any -- I do
17 not recall any request for me to look at
18 anything that Bryan Stevenson asked me
19 about -- asked commissioner about.
20    Q.      Are you aware that Bryan
21 Stevenson and Equal Justice Initiative
22 raising concerns about the growing violence
23 at St. Clair in 2015?
24    A.      I probably was at the time.  I
25 don't recall that now.  They weren't the

Page 204

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 51 (201 - 204)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 only people who raised concerns.
2    Q.    Who else raised concerns?
3    A.    I don't know.  ACLU.  There's
4 always people making concerns.  Everybody
5 has their opinion.
6    Q.    Aside from the Equal Justice
7 Initiative and ACLU, who else do you
8 recall --
9    A.    I can't --
10    Q.    Did you investigate concerns
11 raised by the ACLU?
12    A.    I investigate -- if a particular
13 concern was directed to me, then I looked
14 at it.  I do not remember any particular
15 concerns coming to me from ACLU or any
16 particular concerns coming to me from EJI.
17    Q.    As associate commissioner, did
18 you ever document an investigation you took
19 regarding concerns raised by Bryan
20 Stevenson or the Equal Justice Initiative?
21        MR. LUNSFORD:  Object to the
22 form.
23    A.    I don't recall.
24    Q.    Do you ever take any corrective
25 action as a result of an investigation

1 based upon -- raised by Bryan Stevenson and
2 the Equal Justice Initiative?
3        MR. LUNSFORD:  Object to the
4 form.
5        MS. COBB:  Same objection.
6    A.    I don't recall.  And I just said
7 that I don't recall ever receiving any
8 complaint from Bryan Stevenson at EJI or
9 ACLU.  I don't recall.
10    Q.    Do you recall conducting any
11 investigation related to concerns raised by
12 the ACLU?
13    A.    No, sir.
14    Q.    I want to go back briefly to our
15 discussion about contraband, weapon
16 searches.  You recall talking about that,
17 right?
18    A.    Yes, sir.
19    Q.    What happens when insufficient
20 searches of contraband weapons are done?
21        MS. COBB:  Object to form.
22    A.    Can you be more specific?
23    Q.    Yeah.  What happens when
24 insufficient searches of contraband are
25 done?

1    A.    When insufficient searches of
2 contraband, is that what you said?
3    Q.    Yes.
4        MS. COBB:  Object to form.
5    A.    So how do we know if the search
6 was insufficient?
7    Q.    Well, as -- you were a warden,
8 correct?
9    A.    Yes, sir.
10    Q.    You were an institutional
11 coordinator, correct?
12    A.    Yes, sir.
13    Q.    And you were associate
14 commissioner of operations and
15 institutional security, correct?
16    A.    Yes, sir.
17    Q.    What did you communicate to the
18 wardens who you supervised about proper
19 contraband weapon searches at their
20 facilities?
21    A.    Searching is taught at their
22 academy when a person comes through their
23 academy.  So the only thing that I could
24 actually advise them to was following the
25 training that you have to search for --

1 depending on what type of search we were
2 doing.
3    Q.    Well, how were wardens trained
4 during your time as associate commissioner
5 on how to conduct proper contraband weapon
6 searches?
7    A.    The wardens went through the same
8 training that any other CO -- we didn't
9 have -- we didn't bring wardens from any
10 other area.  Everybody in ADOC while I was
11 there went through ADOC academy.  Searching
12 is a training issue that -- or, you know, I
13 say issue.  But it's not -- searching is
14 taught at the academy when they go through
15 -- when they go through their yearly
16 training as COs, it is touched on again.
17 So searching is taught.  And so the only
18 thing that I can actually tell them is to
19 be as thorough as possible.
20    Q.    Do you recall any policies while
21 you were associate commissioner that
22 instructed facilities on how to conduct
23 contraband weapon searches?
24    A.    No, sir.
25    Q.    Do you know how contraband weapon

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 52 (205 - 208)

Lakeisha Ezell v. Jefferson Dunn, et al.

Grantt Culliver
6/25/2024

1 searches were conducted at St. Clair in the
2 2015 and 2018 time frame?
3     A.     The ones I saw when I was there
4 when they were doing searches -- the ones
5 that I saw.  When I'm not there, I don't
6 know.
7     Q.     What did you see at St. Clair
8 when they conducted contraband weapon
9 searches?
10     A.     You want me to go -- walk you all
11 the way through a search of a cellblock?
12 I'm really -- I'm trying to answer the
13 question but it --
14     Q.     I want to know -- I want you to
15 tell me what you saw at St. Clair.
16     A.     So when -- it depends on the
17 search.  So if it's a search by a CO that's
18 at St. Clair that's on a routine shift,
19 then basically the shift commander -- or
20 they even have a random list that they use
21 or the shift commander give them somebody
22 specific use.  So if I entered a unit, if
23 there are two inmates in the unit, then I
24 ask the inmates to step outside or stand in
25 the doorway, shed their clothes.  They're

Page 209

1 strip searched first.  Their clothes are
2 checked.  They give those clothes back to
3 them.  They ask them to stand outside the
4 doorway.
5          The officer goes in, generally
6 will start with the bedding.  Basically you
7 roll it back, you take the sheets off, you
8 take the pillowcase off, you roll the
9 pillowcase, you roll the mattress to the
10 best of your ability, you check for the
11 seams and the stitches and see if the
12 mattress is good.  Roll the mattress over.
13 You check under the mattress, back over,
14 check the other side of the mattress.  At
15 St. Clair, depending population or -- well,
16 even in population on the bottom bunk is a
17 block.  It's a concrete block.  The top
18 bunk would be a bunk made out of iron.
19 Generally it's the same thing here.  And
20 then you open their drawer that they keep
21 their belongings in.  You sit it on the
22 bed.  You go through it individually.  You
23 do that for both bunks all the way through.
24          When you're finished with that,
25 then you turn -- you want to check your

Page 210

1 light fixture to see if there's anything
2 loose with your light fixture, et cetera.
3 Then you want to check your toilet.  There
4 may be bags or et cetera in, you would
5 empty those out onto the bed.  You always
6 try to be as mindful of an inmate's
7 property as if it was your property that
8 you were dealing with.  You don't just
9 trash the cell.  You be professional with
10 that.  You check the window seals.  You
11 check the roller that opens the window if
12 they have windows that open.  You look up,
13 you look down.  You try to check the vent
14 coming into the cell, and if you don't find
15 anything, the inmate is allowed to go back
16 in the cell.
17     Q.     Is that the way all staff were
18 conducting contraband weapon searches at
19 St. Clair in the 2015 to 2018 time frame?
20     A.     I can't say.  'Cause I didn't see
21 every -- you said every, and I didn't see
22 every officer make a search.  I just
23 described to you how a search would be done
24 or should be done.
25     Q.     Is that the way staff at St.

Page 211

1 Clair were trained to conduct contraband
2 weapon searches in 2015 to 2018 --
3     A.     That's the way they were trained
4 when they came through the academy.
5     Q.     Did you ever see a staff member
6 at St. Clair conduct a contraband weapon
7 search in the way you described it between
8 2015 and 2018?
9          MR. LUNSFORD:  Object to form.
10          MS. COBB:  Same objection.
11     A.     Yes.
12     Q.     Who?
13          MR. LUNSFORD:  Same objection.
14          MS. COBB:  Same objection.
15     A.     I don't know names.  I don't know
16 names of all the staff members at St.
17 Clair.
18     Q.     Can you describe the staff member
19 that you recall conducting --
20     A.     It was numerous staff.  They was
21 black people.  There were white people.  It
22 was young ladies.
23     Q.     But you don't recall their names?
24     A.     I probably didn't even know their
25 names.

Page 212

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 53 (209 - 212)

Lakeisha Ezell v. Jefferson Dunn, et al.                                          Grantt Culliver
                                                                                   6/25/2024

1    Q.    What year did you watch staff
2  members at St. Clair conduct contraband
3  weapon searches?
4    A.    Probably the last time I was
5  there, 2018.  I don't know.  I worked a
6  shift there once or twice.  So the people
7  that worked there, they did good.
8    Q.    Did they find any contraband
9  weapons when you were there?
10   A.    I don't recall.  I don't recall.
11 There have been some found when I was
12 there, but whether I was watching their
13 search or not, I don't recall.
14   Q.    Okay.  How did you evaluate
15 whether the level of contraband searches at
16 St. Clair was adequate or inadequate?
17   A.    I don't know if you can really do
18 that.  I really don't.  I don't know -- if
19 I bring -- if I go into eight population
20 cellblocks at St. Clair, and I bring out --
21 I bring out marijuana, small quantity, if I
22 bring out 25 knives, if I bring out just a
23 piece of metal that wasn't made into
24 anything, but it wasn't authorized, if I
25 find a piece of clothing that was
                                                    Page 213

1  unauthorized, and I bring that out, and
2  then throughout that day I collect 100
3  knives, marijuana, cocaine, flakka, and I
4  go back a month from now and I bring out
5  the same amount, I don't know whether
6  that is -- I don't know.  I don't know how
7  to quantitate that.
8    Q.    How -- was the rate of contraband
9  searches at St. Clair fairly consistent
10 between 2015 and 2018?
11        MS. COBB:  Object to form.
12   A.    What was the rate?
13   Q.    I'm asking you whether or not the
14 rate was consistent.
15        MS. COBB:  Same objection.
16        MR. LUNSFORD:  Same objection.
17   A.    Okay.  But for you to ask me if
18 it was consistent, I would need to know
19 what the rate was.  I don't -- were
20 searches done consistently?  Were they done
21 consistently?
22        MR. LUNSFORD:  Hold on.
23   Q.    Do you know how many contraband
24 searches there were in 2015?
25   A.    I do not.
                                                    Page 214

1    Q.    Do you know how many contraband
2  searches there were at St. Clair in 2016?
3    A.    I do not.
4    Q.    Do you know how many contraband
5  searches there were in 2018?
6    A.    I do not.
7    Q.    Whose role was it to ensure that
8  sufficient contraband searches were done at
9  St. Clair?
10   A.    There's a -- it's the warden's
11 role.  Everything that happens at a
12 facility is the warden's -- it's going to
13 get credited to the warden.  If it's good,
14 the warden gets credit for it.  If it's not
15 good, the warden gets the blame for it.
16 It's the warden.
17   Q.    Okay.  And that starts with the
18 head warden, warden three, correct?
19   A.    When I say the warden, that's --
20 I'm talking about the warden three.
21   Q.    What actions did you take to make
22 sure the warden was carrying out sufficient
23 contraband searches between 2015 and 2018?
24   A.    I didn't do any.
25   Q.    Okay.  This isn't the first time
                                                    Page 215

1  you've been sued about incidents related to
2  violence at St. Clair, correct?
3    A.    Repeat the question, please.
4    Q.    This isn't the first time you've
5  been sued about incidents related to the
6  violence at St. Clair, correct?
7    A.    Probably not.  I don't know.  I
8  don't keep up.
9    Q.    Were you named as a defendant in
10 McGregor V. Thomas?
11   A.    I don't recall it.
12   Q.    Do you recall, were you named as
13 a defendant in Miller V. Dunn?
14   A.    I don't recall.  I don't recall
15 any -- you can ask me all of them.  I
16 recall very few lawsuits by name.
17   Q.    What lawsuits do you recall being
18 named?
19   A.    None.
20   Q.    None, okay.
21   A.    Dunn.  What the federal suit that
22 we end up doing?  I recall that.  Huh?  Say
23 again.
24   Q.    Are you referring -- you said you
25 remembered one lawsuit.
                                                    Page 216

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 54 (213 - 216)

Lakeisha Ezell v. Jefferson Dunn, et al.

Grantt Culliver
6/25/2024

1    A.    No.  I was trying to remember.
2 It's Duke versus Dunn I believe.  I
3 remember that.
4    Q.    You recall being named as a
5 defendant in that lawsuit?
6    A.    I do.
7    Q.    Now, you helped the Alabama
8 Department of Corrections reach a
9 settlement agreement in Duke V. Dunn; is
10 that fair?
11    A.    Hopefully.
12    Q.    Were you involved in coming up
13 with solutions for the settlement agreement
14 in Duke V. Dunn in 2017?
15    MR. LUNSFORD:  Object to the
16 form.
17    A.    I don't recall.  I recall vaguely
18 what the suit was about.  I don't -- at
19 this particular time and moment, I don't
20 recall.
21    Q.    While you were associate
22 commissioner, were you involved in
23 developing policy ideas for an internal
24 classification system?
25    A.    Yes.

Page 217

1    Q.    While you were associate
2 commissioner at ADOC, were you involved in
3 creating a policy idea for a special safety
4 unit?
5    A.    Yes.  I don't recall it being
6 called a special safety unit.
7    Q.    What's your understanding of a
8 special safety unit or whatever name you
9 used?
10    A.    I can't really -- I can't -- my
11 recollection is that some of the same
12 things that I described to you earlier were
13 happening at St. Clair and other
14 facilities.  And to try and eliminate
15 those, we tried -- at St. Clair, we tried
16 some different housing units, and that's as
17 much as my memory goes.  I don't recall the
18 specifics.
19    Q.    What do you recall about -- did
20 anything about working and developing an
21 internal classification system at St.
22 Clair?
23    A.    Right off the top of my head --
24 it's vague.  I remember -- I can remember
25 meeting with classification and going over

Page 218

1 some things, but I can't give you any
2 specifics.
3    Q.    Okay.  Do you know if an internal
4 classification system at St. Clair had been
5 implemented by the time you departed in
6 2018?
7    A.    I don't recall.
8    Q.    Do you recall whether or not a
9 special safety unit for inmates had been
10 implemented by the time you departed in
11 2018?
12    A.    I think it had or we were in the
13 middle of doing it.  I don't truly recall.
14    Q.    And when I say a special safety
15 unit, are you referring to 48 bed spaced
16 housing unit?
17    A.    I don't recall.
18    Q.    While you were -- I want to go
19 back to the security cameras.  While you
20 were associate commissioner, did St. Clair
21 ever put security cameras in hot spots in
22 the prison?
23    A.    In high spots?
24    Q.    Hot spots --
25    A.    Hot spots?

Page 219

1    Q.    -- particularly areas where
2 violence might've been occurring?
3    MS. COBB:  Object to form.
4    MR. LUNSFORD:  Object to the
5 form.
6    A.    The areas that I described
7 earlier where the cameras went as far as my
8 knowledge, that's all I recall.  I recall a
9 camera being in a -- putting a camera in
10 the television rooms particularly on the
11 first floor, and I can't really recall
12 where the other cameras went.
13    Q.    But there were cameras at St.
14 Clair in 2018 at the facility's front
15 entrance?
16    A.    I don't recall.
17    Q.    At any rate, you recall that in
18 2018, St. Clair was working to install
19 additional cameras at St. Clair?
20    A.    Yes, sir.
21    Q.    You talked about the issue of the
22 locks.  Do you recall that?
23    A.    Yes, sir.
24    Q.    I want to talk about what happens
25 without functional locks.  If the locks are

Page 220

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 55 (217 - 220)

Lakeisha Ezell v. Jefferson Dunn, et al.

Grantt Culliver
6/25/2024

1 consistently nonfunctional, would fixing
2 them be a priority that you would address
3 while you were associate commissioner?
4     A.    Yes, if it was feasible.
5     Q.    You said yes, if what?
6     A.    It was feasible.  So, yes, if you
7 could get a contractor to come back and fix
8 them.  Yes, if there was somebody at the
9 facility that had been trained on those
10 locks when it was done.  I don't know if we
11 maintained a maintenance agreement with the
12 company that installed the locks.  I don't
13 -- I don't know that.
14     Q.    If the facility is unable to fix
15 the locks, what can a prison do to ensure
16 safety without functioning locks?
17     A.    Ideally, if the facility is
18 unfunctional because of the lock, the
19 person would be moved -- we should really
20 close that cell, move both people out of
21 the cell, but if -- ideally.  Whether that
22 happened or not, I don't know.
23     Q.    What if the majority of
24 cellblocks have nonfunctional locks?
25     A.    Then we start over.

Page 221

1     Q.    What do you mean by start over?
2     A.    The same way we had to move
3 everybody out of the cellblock to be able
4 to put the new locks in to begin with.  You
5 would basically have to empty the cellblock
6 back out and start over.  And apparently,
7 if the first -- it's just like the first
8 version of the locks that came with the
9 building.  If those locks -- and at least
10 there was a period of time when they
11 started to be unfunctional.  But if the new
12 locks were put in, and they were
13 unfunctional, then I would think that we
14 should be able to hold them legally binding
15 to come back and replace the locks.  But it
16 still requires that everybody be moved out
17 of the cellblocks.
18     Q.    Between 2015 and 2018, was there
19 a policy at St. Clair that inmates would be
20 moved if there were nonfunctioning locks in
21 their cell?
22     MS. COBB:  Object to form.
23     A.    Wasn't a policy that I put out.
24 I don't know.
25     Q.    In 2015 and 2018, would inmates

Page 222

1 be moved whenever there were nonfunctioning
2 locks on their cells?
3     MS. COBB:  Object to form.
4     A.    I don't know.
5     Q.    Did you ever communicate to the
6 warden at St. Clair that you expected
7 inmates to be moved from their cells if the
8 locks were nonfunctioning?
9     A.    I don't recall.
10     Q.    Did the warden of St. Clair ever
11 communicate to you that they had a practice
12 of removing inmates from their cells if the
13 locks were nonfunctioning between 2015 and
14 2018?
15     A.    I don't recall.
16     Q.    Now, would you ever request a
17 list of specific incidents related to
18 violence at St. Clair between 2015 and
19 2018?
20     A.    Did I ever request a list of
21 violent incidents at St. Clair in 2015 and
22 2018?
23     Q.    Yes.
24     A.    No, sir.  Computer wise, I can
25 really pull that up without requesting it.

Page 223

1     Q.    Okay.  And because you could pull
2 it up, you wouldn't necessarily request a
3 comprehensive list of incident reports at
4 St. Clair?
5     A.    Correct.
6     THE WITNESS:  Can we take a
7 break?
8     Q.    Would a list of specific
9 incidents related to inmate on inmate
10 assaults at St. Clair have been helpful to
11 you as associate commissioner over
12 operations and institutional security?
13     A.    I think the availability was
14 there.  If I needed to see -- be able to
15 look and see if we had -- let's say we had
16 assault with a weapon on another inmate.  I
17 think I had the ability to be able to pull
18 that up, and when it pulled that up and
19 gave me the name of the inmate, it would
20 give me where that person was housed at.
21 It would not particularly give me where
22 that -- because that person could've been
23 moved from one place to the other.  So it
24 might've been -- but if -- I think that
25 information was available to me.  I think

Page 224

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 56 (221 - 224)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 that was more important basically for the
2 warden than it would be for me per se, but
3 I can see where that would be helpful, yes.
4     Q.    Why would it have been helpful?
5     A.    Well, then at least I can keep
6 the people -- the most violent people, I
7 can either take them and put the most
8 violent people together or take them and
9 try to separate them or I might can take
10 some and try to move them from one facility
11 to the other.  There's any number of things
12 that you could do with that list if you had
13 that.  And then, but there are so many
14 other things that you have to take into
15 account.  You have to take into account if
16 either one of these people are gang
17 related, right.  You got to take that into
18 account because I could create a bigger
19 problem than I was solving if I did that.
20 We have to take into account -- there are
21 any number of other things that you have to
22 take into account.
23     Q.    And would it be helpful for the
24 list of the specific incidents to include
25 the specific cellblocks that inmates were
                                    Page 225

1 on?
2     A.    That was -- that's there.
3     Q.    Okay.
4     A.    That would be there, where they
5 -- I could request that -- that I get that
6 information as to where they were when that
7 incident happened, and where they were
8 living now so...
9     Q.    In 2018, were you aware that the
10 P block at St. Clair had a high level of
11 violence as compared to other blocks?
12     MS. COBB:  Object to form.
13     A.    I can't recall.
14     Q.    What about the Q blocks?
15     MS. COBB:  Object to form.
16     A.    I can't recall specifically the
17 particular violent areas.
18     THE WITNESS:  Can I take a break,
19 please?
20     MR. RALLINS:  Sure.
21     THE VIDEOGRAPHER:  The time is
22 3:15 p.m.  We are off the record.
23     (Whereupon, a recess was taken.)
24     THE VIDEOGRAPHER:  The time is
25 3:31 p.m.  We are back on the record.
                                    Page 226

1     Q.    All right, sir, I'm going to pull
2 up a document.
3     MR. RALLINS:  Should I share the
4 exhibit in the chat?  Is that easiest?
5     MR. LUNSFORD:  Can you share
6 what?
7     MR. RALLINS:  If I share it on
8 the screen, is that sufficient?
9     MR. LUNSFORD:  I mean, if we can
10 see it, yep.  I mean --
11     MR. RALLINS:  Okay.  Let's give
12 it a go.  Hold on one second actually.  All
13 right.
14     Q.    Can you see this --
15     A.    I'm trying.
16     Q.    -- document?
17     A.    Can you make it a little larger?
18 Okay.
19     Q.    That better?
20     A.    Yes, sir.
21     Q.    All right.  There's a thread of
22 e-mails here.  Do you recall Anthony
23 Brooks?
24     A.    Yes, sir.
25     Q.    Who is Anthony Brooks?
                                    Page 227

1     A.    He's the warden -- he was the
2 warden one at St. Clair Correctional
3 Facility.
4     Q.    And do you recall who Tammy
5 Montgomery is?
6     A.    She was administrative assistant
7 at St. Clair.
8     Q.    All right.  Now on January 2nd,
9 2018 --
10     MR. RALLINS:  And just for the
11 record, we're at what's Bates stamped ADOC
12 19172.  We'll make this Exhibit 1.
13     (Plaintiffs' Exhibit Number 1 was
14     marked for identification.)
15     Q.    There's an e-mail from January
16 2nd, 2018 at approximately 2:38 p.m. from
17 you to Dewayne Estes, who's the warden at
18 St. Clair, correct?
19     A.    Yes, sir.
20     Q.    And you copy your institutional
21 coordinator, Edward Ellington; is that
22 fair?
23     A.    Yes, sir.
24     Q.    And according to this e-mail, you
25 -- it says, I have had information systems
                                    Page 228

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 57 (225 - 228)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 to give me a listing of specific incidents
2 from 2015 to 2017.  Do you see that?
3     **A.**    **Yes, sir.**
4     Q.    And you don't have any reason to
5 doubt that you sent this e-mail to the
6 warden at St. Clair, do you?
7     **A.**    **No, sir.**
8     Q.    And below this e-mail, it has
9 some categories including sexual assault
10 inmate, one employee, inmate -- it has
11 assault inmate on inmate with serious
12 injury.  Do you see that?
13     **A.**    **Yes, sir.**
14     Q.    And at the bottom -- towards the
15 bottom, you see death inmate on inmate?
16     **A.**    **Yes, sir.**
17     Q.    And then there's a spreadsheet
18 that lists the incidents at St. Clair
19 starting with the beginning, January 2015,
20 which coincides with the time period that
21 you asked for, correct?
22     **A.**    **Yes, sir.**
23     Q.    Okay.  And this spreadsheet is
24 detailed; is that fair?
25     **A.**    **Yes, sir.**
                Page 229

1     Q.    And it includes -- for each of
2 the incidents at St. Clair, it includes the
3 date, correct?
4     **A.**    **Correct.**
5     Q.    It includes the time, correct?
6     **A.**    **Correct.**
7     Q.    It includes the incident number,
8 correct?
9     **A.**    **Correct.**
10     Q.    It includes the location of the
11 incident, correct?
12     **A.**    **Correct.**
13     Q.    It tells you whether or not it's
14 in the L/M blocks or whether or not it's in
15 the hallway, correct?
16     **A.**    **Yes, sir.**
17     Q.    It tell you if it's in the Q
18 blocks, correct?
19     **A.**    **Yes, sir.**
20     Q.    It tells you if it's in the P
21 blocks, correct?
22     **A.**    **Yes, sir.**
23     Q.    And it also tells you, as we
24 discussed earlier, the type of assault,
25 correct?
                Page 230

1     **A.**    **Yes, sir.**
2     Q.    Including whether or not inmate
3 on inmate assault, correct?
4     **A.**    **Yes, sir.**
5     Q.    Whether or not it's a serious
6 injury has occurred, correct?
7     **A.**    **Yes, sir.**
8     Q.    Then it also provides the
9 suspects of the incident, correct?
10     **A.**    **Yes, sir.**
11     Q.    And you were provided -- I'm just
12 going to scroll down.  You were provided a
13 spreadsheet for all of the incidents at St.
14 Clair for the period that you asked for,
15 correct?
16     **A.**    **Yes, sir.**
17     Q.    I'll stop sharing.  And this --
18 was it common for you to request -- well,
19 strike that.
20         So from your position as
21 associate commissioner, you had the ability
22 to request detailed information about the
23 incidents that were taking place at St.
24 Clair, correct?
25     **A.**    **Yes, sir.**
                Page 231

1     Q.    And you had the capacity to
2 request fairly detailed information that
3 gave you a sense of the type of violence
4 that was occurring at St. Clair, correct?
5     **A.**    **Yes, sir.**
6     Q.    That included knowing the time,
7 locations and perpetrators of the
8 incidents, correct?
9     **A.**    **Correct.**
10     Q.    And the victims, correct?
11     **A.**    **Correct.**
12     Q.    And the specific cellblocks,
13 correct?
14     **A.**    **Correct.**
15     Q.    So had you the ability at the
16 time in January of 2018, according to this
17 e-mail, to know which areas of St. Clair,
18 specifically which blocks, the incidents of
19 violence were occurring on, correct?
20     **A.**    **Yes, sir.**
21     Q.    And the commissioner also had
22 access to this information, correct?
23         MS. COBB:  Object to form.
24     **A.**    **I assume so.  He could've did**
25 **what I did to get it, yes.**
                Page 232

Lakeisha Ezell v. Jefferson Dunn, et al.

Grantt Culliver
6/25/2024

1    Q.    Or he could've asked his
2 associate commissioner of operations and
3 institutional security to procure this
4 information for him, correct?
5    A.    Sure.
6    Q.    The same way you asked staff to
7 procure that information for you, correct?
8    A.    Sure.
9    Q.    And the warden had access to
10 this -- the warden of St. Clair had access
11 to this level of detailed information,
12 correct?
13    A.    I'm not sure.  I mean, if he had
14 -- I think from reading the e-mail, it
15 looks like I asked RME to put that together
16 for me if I glanced through that correctly.
17 So if he had asked them for that and they
18 had denied him -- but if he would've asked
19 me to get that for him, then I would've got
20 it for him.
21    Q.    Right.  Well, in the e-mail you
22 asked Dewayne Estes to have these incidents
23 copied to a jump drive and available for
24 the team, correct?
25    A.    Yes.
Page 233

1 don't know specifically how to describe
2 what they do, but they have the ability to
3 do maintenance type situations.
4    Q.    Okay.  And you've worked with
5 them before as associate commissioner,
6 correct?
7    A.    Yes, sir.
8    Q.    Okay.  And you know who Kevin
9 Jones is?
10    A.    Doesn't ring a bell, no, sir.
11    Q.    Okay.  You don't remember him
12 specifically then.  But you don't have any
13 reason to dispute that you received a
14 letter from Johnson Controls on March --
15 that it was sent on March 22nd, 2018?
16    A.    I don't recall a letter.
17    Q.    You don't have any reason to
18 dispute this was sent to him, do you?
19    A.    I don't recall a -- I don't
20 recall receiving a letter.  So I mean, I
21 see what you have, but I don't recall the
22 letter or receiving the letter.
23    Q.    Okay.  Well, let's get into it.
24 Now, do you recall working with Johnson
25 Controls on ensuring that the security
Page 235

1    Q.    And even if Warden Estes couldn't
2 have accessed that information himself, you
3 certainly had the authority, as you did
4 here, to get that information for the
5 warden of St. Clair at any time, correct?
6    A.    Yes, sir.  That's what I just
7 said.
8    Q.    I want to go back to security
9 cameras and pull up another exhibit.  All
10 right.  Let me zoom in.  Can you see this,
11 sir?
12    A.    Yes, sir.
13    Q.    Okay.  Now, are you familiar with
14 Johnson Controls?
15    A.    Yes, sir.
16    Q.    Okay.  And we'll --
17         MR. RALLINS:  Just for the
18 lawyers, this'll be Exhibit 2 and we'll
19 mark it as -- and it's Bates stamped ADOC
20 25613, and this'll be Plaintiffs'
21 Exhibit 2.
22         (Plaintiffs' Exhibit Number 2 was
23         marked for identification.)
24    Q.    What is Johnson Controls?
25    A.    It's a maintenance company.  I
Page 234

1 camera systems was improved at St. Clair?
2    A.    I don't recall that.  I don't
3 recall who the contractor was.  I remember
4 ShawnTech more than I do Johnson Controls.
5    Q.    Okay.  Now, in the second
6 paragraph, it states -- if you take a
7 second to read the second paragraph.
8    A.    Okay.
9    Q.    Now, it mentions a few things in
10 this paragraph.  It mentions that no
11 recording devices have been installed.  Do
12 you see that?
13    A.    Yes, sir.
14    Q.    And it mentions the destruction
15 of current cameras in certain housing
16 units.  Do you see that?
17    A.    Yes, sir.
18    Q.    And it mentions that this problem
19 is creating an unsafe condition for the
20 incarcerated and staff.  Do you see that?
21    A.    Yes, sir.
22    Q.    And it communicates that the
23 current system's configuration is not
24 industry standard for a state-run prison.
25 Do you see that?
Page 236

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 59 (233 - 236)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1  A.    I do.

2  Q.    And then they provide a proposal
3  -- or they anticipate that approximately
4  300 to 400 new cameras will need to be
5  installed to fulfill 100 percent coverage
6  of this facility.  Do you see that?

7  A.    Yes, sir.

8  Q.    And then they give a budget of 4
9  to $7 million for these 300 to 400 new
10  cameras.  Do you see that?

11  A.    Yes, sir.

12  Q.    And it also references being in
13  discussion with the warden at St. Clair at
14  the time.  Do you see that?

15  A.    Yes, sir.

16  Q.    I'm going to stop sharing.  When
17  you received written concerns that the
18  status of the security cameras at St. Clair
19  was creating an unsafe condition for the
20  incarcerated and the staff, did you
21  communicate it to the warden of St. Clair?

22  A.    Did I communicate it to the
23  warden of St. Clair?

24  Q.    Yes.

25  A.    I don't recall.  I don't recall

Page 237

1  getting a letter.

2  Q.    Well, do you recall whether or
3  not you brought the issue of the 300 new
4  cameras needed to be installed to
5  Commissioner Dunn?

6  A.    I don't.  I don't recall.

7  Q.    Did you advocate for funds for
8  300 to 400 new cameras at St. Clair?

9  A.    I don't recall.  I don't recall
10  the letter.

11  Q.    Well, you -- and this has been
12  produced by the Alabama Department of
13  Corrections.

14  A.    It doesn't make any difference
15  who produced the letter.  I'm telling you
16  that I do not recall receiving a letter.
17  I'm not saying that I didn't.  But I don't
18  recall receiving the letter.  Thus, I don't
19  recall talking to Commissioner Dunn about
20  the letter or Mr. --

21  Q.    At any rate -- but you don't
22  dispute that you received the letter?  You
23  just don't recall; is that fair?

24  A.    Well, I can't say whether -- I
25  can't say that I received the letter.  I

Page 238

1  can't say that I did receive the letter
2  either if I can't remember receiving the
3  letter.  And it seems like to me that I
4  would -- that letter of that magnitude, I
5  would remember, but I do not remember it.

6  Q.    Why do you say a letter of this
7  magnitude you would remember it?

8  A.    Well, it's obvious that by that
9  letter, some of the questions that I did
10  not -- the things that you asked me earlier
11  that I did not know.  So obviously by that
12  letter, cameras had already been placed in
13  the facility if cameras were being torn up
14  because the facility did not come with
15  cameras.  So obviously that part was
16  already -- that part had already been done,
17  and now the cameras were being torn up.

18  I don't know how many cameras were
19  actually installed, but according to that
20  letter, 3 to 400 cameras were needed
21  throughout the facility at a dollar cost of
22  4 to $7 million.  So knowing, sort of,
23  where the budget was at the Department of
24  Corrections, that -- a lot of hoops
25  would've had to have been jumped through

Page 239

1  for somebody to get approval to redo
2  cameras that we had already had cameras
3  done and to go to that level.

4  Q.    Do you have any reason to -- do
5  you have any reason to dispute that St.
6  Clair needed 300 to 400 new cameras in
7  2018?

8  A.    That's not my field.  I mean,
9  Johnson Controls wrote the letter.  The
10  Department of Corrections used Johnson
11  Controls throughout with several
12  maintenance type issues.  I'm not disputing
13  what they're saying in the letter.  I'm
14  just saying that it seems like to me that I
15  would have recalled that if I had got the
16  letter, and I don't recall -- I don't
17  recall the letter.

18  Q.    Because you would consider this
19  to be important information?

20  A.    I would.

21  Q.    And -- okay.  And this would be
22  important enough information to communicate
23  to Commissioner Dunn, correct?

24  A.    Yes, sir.

25  Q.    And it'd be important enough

Page 240

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 60 (237 - 240)

Lakeisha Ezell v. Jefferson Dunn, et al.

Grantt Culliver
6/25/2024

1 information to discus directly with the
2 warden of St. Clair about the status of
3 either destroy cameras or new cameras that
4 needed to be installed?
5     **A.     Yes, sir.**
6     Q.     All right.  I am going to pull up
7 another exhibit.  All right.  Can you see
8 this?
9     **A.     If you could make it a little**
10 **bigger, that would help.**
11    Q.     Sure.
12    **A.     Okay.**
13    Q.     All right.  Let me go to the
14 bottom first.  You see it's a letter that
15 is from Bryan Stevenson.  You see that?
16    **A.     Yes, sir.**
17    Q.     Okay.  And it is addressed to
18 your supervisor in March of 2018,
19 Commissioner Jefferson Dunn.  You see that?
20    **A.     Yes, sir.**
21    Q.     And as copied, Steve Brown, chief
22 of staff, Mercado, Fassl, Hill, Harmon.
23 Are you familiar with these names?
24    **A.     Yes, sir.**
25    Q.     And the subject of the letter is
Page 241

1 the first monitoring report.  Do you see
2 that?
3     **A.     Yes, sir.**
4     Q.     And do you recall that EJI
5 provided the first monitoring report
6 following the settlement agreement in Duke
7 V. Dunn?
8     **A.     I do not.**
9          MR. LUNSFORD:  Just for the
10 record, I want to be careful here 'cause I
11 know you have a relationship with EJI.  EJI
12 has said because they don't want to be
13 disqualified from the Duke case that they
14 were not actually a monitor, that they
15 continued to service plaintiff's counsel.
16 So I just wanted you to know that.  I know
17 you were representing they were a monitor,
18 but they actually have taken the position
19 that they're not a monitor.
20          MR. RALLINS:  Okay.  Thank you.
21    Q.     And in this letter -- I'll let
22 you read the first two paragraphs, Mr.
23 Culliver before I continue.  All right.
24 This letter from Bryan Stevenson is
25 updating Commissioner Dunn on the work of
Page 242

1 the monitoring team and highlighting some
2 of the team's findings.  Do you see that?
3     **A.     Yes, sir.**
4     Q.     Okay.  And it says that it's
5 identified practices and problems that, if
6 not addressed, will jeopardize
7 implementation of these reforms and the
8 safety of staff and inmate.  Do you see
9 that, sir?
10    **A.     No, sir.**
11    Q.     You see that at the bottom of the
12 first paragraph?
13    **A.     Okay.**
14    Q.     You see that?
15    **A.     I do.**
16    Q.     Okay.  And it says that the
17 report is based on monitoring documents
18 provided by the Alabama Department of
19 Corrections from November 27th through
20 March 1st -- strike that.
21          From November 1st, 2017, through
22 March 1st, 2018, and a tour conducted on
23 March 2nd, 2018.  Do you see that?
24    **A.     Yes, sir.**
25    Q.     And then it provides a brief
Page 243

1 summary of what -- I want to just go
2 through some of the highlights.  It begins
3 with discussing overcrowding.  Do you see
4 that?
5     **A.     Yes, sir.**
6     Q.     It said, overcrowding of inmates
7 remains a significant concern, as each of
8 the cellblocks housing inmates is filled
9 either to or near capacity.  Do you see
10 that?
11    **A.     Yes, sir.**
12    Q.     And does this refresh your
13 recollection that in March of 2018, the
14 overcrowding of inmates was still a serious
15 concern at St. Clair?
16          MS. COBB:  Object to form.
17          MR. LUNSFORD:  Object to form.
18    **A.     To have -- I think that -- so the**
19 **next paragraph says that 90 percent -- I**
20 **guess that's what we agreed to, the**
21 **90 percent of the beds being filled.  And**
22 **as I related to you earlier, that as I look**
23 **at it -- the situation -- knowing that we**
24 **were working towards a settlement**
25 **agreement, there was still nobody -- even**
Page 244

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 61 (241 - 244)

Lakeisha Ezell v. Jefferson Dunn, et al.

**Grantt Culliver**
**6/25/2024**

1 according to EJI, there was nobody sleeping
2 on the floor.  All the beds were full
3 except one they say.  Yes, sir.  I mean,
4 and if you can see at the bottom, I wasn't
5 included on that letter.  I don't remember
6 that letter, and I don't remember the
7 commissioner talking to me about that
8 letter.
9     Q.    Okay.  So you would disagree that
10 in 2018 -- March of 2018, the overcrowding
11 of inmates remained a significant concern
12 at St. Clair?
13     A.    I would not -- I would -- if we
14 agreed to 90 percent of the beds being
15 open, then I can't disagree that we were
16 overcrowded.  But my information of how I
17 saw overcrowding -- that there were --
18 people were sleeping on the floor.  We had
19 no place to put them.  Everybody was in a
20 bed.  There was a bed for everybody that we
21 had at the facility.  So I stick to what my
22 assumption is of being overcrowded.  I
23 don't have people sleeping in dayrooms.
24 There wasn't people sleeping on the floor.
25 None of those things were taking place.

Page 245

1 But as it applies to the bullet point there
2 that 90 percent -- if that's what we're
3 agreed to, then, yes.
4     Q.    You see in the letter
5 uncontrolled movement.  Do you see that?
6     A.    I see contraband, uncontrolled --
7 let me read it.  Okay.
8     Q.    Okay.  Now, it says that inmate
9 movement within the general population
10 appears to be occurring nearly unchecked.
11 You see that?
12     A.    I read it.
13     Q.    And it states that the policy of
14 St. Clair is that inmates are only allowed
15 into their assigned housing block.  You see
16 that?
17     A.    Yes, sir.
18     Q.    Is that your understanding of the
19 policy at St. Clair in 2018?
20     A.    That was the policy at all
21 facilities, but St. Clair's included in
22 that, yes, sir.
23     Q.    Okay.  And it says this is
24 monitored by way of a colored wristband
25 corresponding to the permitted block.  You

Page 246

1 see that?
2     A.    Yes, sir.
3     Q.    Is that your understanding of the
4 practice at St. Clair in 2018?
5     A.    Yes, sir.
6     Q.    Okay.  And it says the monitoring
7 team observed that the vast majority of
8 inmates were wearing no bands at all.  Do
9 you see that?
10     A.    I read the paragraph.
11     Q.    Is that your understanding of
12 what was occurring at St. Clair in 2018?
13         MS. COBB:  Object to form.
14     A.    That's my understanding of what
15 they have written in this report, and
16 that's what they say they saw.
17     Q.    Is that what you observed when
18 you visited St. Clair, that the vast
19 majority --
20     A.    I don't -- I never --
21     Q.    Let me just -- let me just get it
22 on the record, sir.
23         When you visited St. Clair in
24 2018, did you observe that the vast
25 majority of inmates were wearing no bands

Page 247

1 at all?
2     A.    I don't recall that, no, sir.
3     Q.    Did you observe that the vast
4 majority of inmates were wearing bands at
5 St. Clair?
6     A.    I don't recall that at all.  I
7 don't recall arm bands at all.
8     Q.    In 2018, did you look to see
9 whether or not inmates were wearing bands
10 at St. Clair?
11     A.    I do not recall.  I'm not saying
12 -- I implemented that for all facilities.
13 I'm just telling you that when I walked
14 through St. Clair, I do not recall arm
15 bands or no arm bands.
16     Q.    Okay.  If you don't recall, do
17 you have -- you have no reason to dispute
18 the observations according to this letter?
19     A.    I'm not disputing it.
20     Q.    Okay.  It says the incident
21 reports and bed count sheet document a high
22 level of unauthorized movement,
23 particularly out of the P/Q blocks.  You
24 see that?
25     A.    Yes, sir.

Page 248

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 62 (245 - 248)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

Q.    And you had access to these incident reports and bed count sheets, correct?

A.    I don't look at bed count sheets. Incident reports --

Q.    You didn't --

A.    Incident reports, if they were done, they would've been pulled up. The last I -- the other document that you showed me did not say anything about it dealing with violence all together. So I don't know. I don't know the point. I mean, I'm trying to understand the point.

Q.    In 2018, you had access to incident reports in the same way we discussed earlier, correct?

A.    Yes, sir.

Q.    And in 2018, did you -- were you aware that incident reports documented a high level of unauthorized movement particularly out of P/Q blocks at St. Clair?

MS. COBB:  Object to form.

A.    No, sir.

Q.    If --

Page 249

A.    So if EJI's report -- not disputing their report.  But if that is correct, and it says that the staff -- it appeared that the staff was noncompliant. Apparently it was a pattern. And it says, also documented a pattern of staff noncompliance. If there was staff noncompliance, they weren't writing -- even if it was happening, and they were allowing it to happen, they weren't writing incident reports, and so it wouldn't show up on any report.

Q.    Do you have any reason to believe that the incident reports that were available at the time documented a high level of unauthorized movement particularly at the P/Q blocks?

MR. LUNSFORD:  Object to the form.

MS. COBB:  Same objection.

A.    I have no way of knowing that. You didn't show me that, so I don't know.

Q.    If you have no way of knowing, you have no reason to dispute it either?

MS. COBB:  Object to form.

Page 250

A.    Okay.  So I didn't say I was disputing it.  What I explained to you was if -- if that is correct -- and I'm not saying that's not correct -- then there would not be incident reports to document that people were not wearing their arm bands.  If staff was not checking people, stopping them, making them go back and getting their name, number, AIS number, and writing that incident report, there's no documentation of an incident report. So if I had pulled that up, it still would not have told me that because there was no incident report either.

Q.    The incident reports wouldn't tell you whether or not inmates were moving unauthorized?

A.    It would not because it wouldn't be an incident report.

Q.    Okay.  Are you familiar with the standard operating procedures at St. Clair regarding unauthorized movement in 2018?

A.    Show me a copy.  I need a copy to see.

Q.    Without looking at a copy, are

Page 251

you familiar?

A.    Sir?  I didn't understand you.

Q.    I said, without looking at a copy, do you have any independent recollection of the standard operating procedure at St. Clair regarding unauthorized movement?

A.    No, sir.

Q.    Did you ever look at the standard operating procedures regarding unauthorized movement at St. Clair from 2018?

A.    Not that I remember.

Q.    Have you ever seen the standard operating procedures regarding unauthorized movement at St. Clair?

A.    Not that I remember.

Q.    Do you recall ever discussing the standard operating procedures regarding unauthorized movement with the warden at St. Clair?

A.    Sir, if I had discussed that with the warden, then the likelihood is I would have had seen the report or remembered seeing the report to be able to do that.  I don't recall.

Page 252

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 63 (249 - 252)

Lakeisha Ezell v. Jefferson Dunn, et al.

Grantt Culliver
6/25/2024

1    Q.    Would you need to view -- it's
2 fair to say you would've needed to view the
3 standard operating procedure regarding
4 unauthorized movement to know whether or
5 not staff were not compliant, correct?
6    A.    No, not necessarily.  Not if I
7 was at the facility and saw it for myself,
8 I wouldn't.
9    Q.    How would you know whether or not
10 staff were complying if you didn't read the
11 standard operating procedure --
12    A.    Same way EJI knew when they
13 walked by and they knew that the fact that
14 their inmates were supposed to have on
15 wristbands, and they say that -- I don't
16 know what that percentage is -- but that a
17 large percentage was not wearing
18 wristbands.  That's noncompliance within
19 itself.
20    Q.    So it's your view that you could
21 know without reading the standard operating
22 procedures, correct?
23    A.    That's 'cause I -- I wrote the
24 policy.  It's not a policy for St. Clair.
25 It was a policy by ADOC, the Department of

1 Corrections.  I know the policy.  I
2 introduced the wristbands to all of the
3 facilities, so I know that.  But you would
4 --
5    Q.    You've --
6    A.    No.  Let me finish, please.  You
7 asked me about the policy -- reviewing the
8 policy at St. Clair Correctional Facility.
9 I don't have a copy of that.  I'm not
10 looking at that.
11    Q.    You've never reviewed the
12 standard operating procedures at St. Clair
13 regarding unauthorized movement?
14    A.    Not that I recall.
15    Q.    All right.  The letter refers to
16 contraband.  You see that, sir?
17    A.    Yes, sir.
18    Q.    It says in the three-month period
19 from November 1st, 2017, to January 31st,
20 2018, a total of 183 knives were documented
21 in St. Clair incident reports.  You see
22 that?
23    A.    Yes, sir.
24    Q.    This is information you had
25 access to as associate commissioner,

1 correct?
2    A.    So November to January -- in two
3 months, it looked like staff did a decent
4 job if they got 90 plus knives out of the
5 facility in a two-month period.  It's all
6 in how you look at it, right.  So it says
7 -- they said three-month period, but then
8 they say from November to January so to me
9 -- okay.  January 31st.  I misread that.
10 So in a three-month period then, that's 60
11 something -- that's an average of 60
12 something knives coming out of the facility
13 per month.  It doesn't lend to the fact
14 that the staff is not doing searches.
15    Q.    Right, I'm not asking that, sir.
16 I'm asking --
17    A.    I know, but that's my answer.  I
18 know that you didn't ask that --
19    Q.    I'm --
20    A.    I thought we weren't going to
21 talk over each other.
22    Q.    Sir, I think -- if you're
23 finished, that's not my question.  I just
24 want to make sure I'm clear.  My question
25 is not -- is whether or not you had access

1 to the incident reports between
2 November 1st, 2017, and January 31st, 2018,
3 that documented the number of knives that
4 were from St. Clair?
5    MS. COBB:  Object to form.
6    A.    I had the opportunity to have --
7 that information looks like any other
8 information, sir.
9    Q.    Okay.  And do you have any reason
10 to dispute that this contraband was
11 documented in St. Clair's incident reports
12 between November 1st, 2017, to January --
13    A.    I thought -- I do not.  I think
14 they did a good job.
15    Q.    Okay.
16    A.    I would like to see what the
17 numbers were three months before that, how
18 many weapons we got out of the facility
19 three months prior to that and compare it.
20 Did we do better or did we do worse?
21    Q.    Okay.  Did you compare that in
22 2018 while you were associate commissioner?
23    A.    I didn't.
24    Q.    Why not?
25    A.    So if I did that for St. Clair, I

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 64 (253 - 256)

Lakeisha Ezell v. Jefferson Dunn, et al.

Grantt Culliver
6/25/2024

| | |
|---|---|
| 1 had to do that for 20 other facilities.<br>2 Come on.  I mean, I didn't.  That wasn't my<br>3 job.  A statistical person is not my job.<br>4 That's not my job -- or wasn't my job.<br>5     Q.     It said -- it mentions<br>6 classification and housing.  You see that?<br>7     A.     Yes, sir.<br>8     Q.     It says the Alabama Department of<br>9 Corrections did not meet the deadline for<br>10 drafting new standard operating procedures<br>11 for the internal classification board,<br>12 intake unit, special safety unit, and<br>13 behavioral modification unit.  You see<br>14 that?<br>15     A.     Yes, sir.<br>16     Q.     Do you have any reason to dispute<br>17 the Department did not meet the deadline?<br>18         MS. COBB:  Object to form.<br>19     A.     I have no idea, no, sir.  I have<br>20 no reason to dispute it.<br>21     Q.     In March of 2018, were you<br>22 tracking the Alabama Department of<br>23 Correction's progress toward meeting these<br>24 deadlines for St. Clair?<br>25     A.     I should've been, and I probably<br><div align="right">Page 257</div> | 1 they're doing it, they continue to do what<br>2 they're doing until they get the policy to<br>3 do what's different.<br>4     Q.     Okay.  And until the policy<br>5 changes, things would occur, new arrivals<br>6 would primarily be assigned based upon bed<br>7 availability, correct?<br>8     A.     That's correct.<br>9     Q.     And inmates in need of protection<br>10 would be assigned to segregation, correct?<br>11     A.     That's correct.<br>12     Q.     Do you believe as this letter<br>13 states this practice continues to present a<br>14 risk to the safety of staff and inmates?<br>15     A.     Well, if -- I believe that if the<br>16 Department -- if we had been able to get<br>17 that SOP written and that practice in<br>18 place, right, that those things would then<br>19 be happening.  But I believe pertaining to<br>20 the person who's unsafe, if I don't have a<br>21 special unit to be able to put that person<br>22 in, be able to keep them safe, the best<br>23 place to put them is in segregation.<br>24     Q.     Okay.  And do you think that the<br>25 practice presents a risk to the safety of<br><div align="right">Page 259</div> |
| 1 was, and there are probably justifiable<br>2 reasons why that didn't happen, but I don't<br>3 recall that.<br>4     Q.     Can you name any justifiable<br>5 reasons why --<br>6     A.     I -- I just stated that I didn't<br>7 recall it.<br>8     Q.     Okay.  It also states that the<br>9 facility continues to assign housing for<br>10 new arrivals primarily based on bed<br>11 availability and inmates in need of<br>12 protection continue to be assigned to<br>13 segregation.  You see that?<br>14     A.     Yes, sir.<br>15     Q.     Was that your understanding of<br>16 the practice at St. Clair in 2018?<br>17         MS. COBB:  Object to form.<br>18     A.     If the previous thing -- if that<br>19 new SOP was not out which would've changed<br>20 that intake unit -- special safety unit --<br>21 then I understand why that reads as it<br>22 reads.<br>23     Q.     What do you understand?<br>24     A.     They go hand in hand.  If you<br>25 don't have a policy to change the way that<br><div align="right">Page 258</div> | 1 staff and inmates?<br>2     A.     I don't necessarily agree with<br>3 that, no.<br>4     Q.     Why not?<br>5     A.     Well, so the person that we're<br>6 talking about is vulnerable in a cell by<br>7 themselves.  So there's no -- what harm<br>8 comes to them?  The reason -- the reason<br>9 that that part was wanting to be changed<br>10 was because those people who were being<br>11 protected felt like they were not receiving<br>12 all the amenities of being in general<br>13 population, but they still were protected.<br>14 The staff -- I don't know where the<br>15 staffing part about the injury -- I don't<br>16 know where that comes from, not based on<br>17 what we're talking about right now.<br>18     Q.     Okay.  The next -- there's a<br>19 section that is titled incident reporting,<br>20 investigation, corrective action review.<br>21 You see that?<br>22     A.     Yes, sir.<br>23     Q.     And it states that the Alabama<br>24 Department of Corrections did not meet the<br>25 deadline for drafting standard operating<br><div align="right">Page 260</div> |

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 procedures for the incident report manager,
2 quality improvement team, incident
3 reporting, and the I&I position.  You see
4 that?
5     A.    Yes, sir.
6     Q.    Were you aware in March of 2018
7 that the Alabama Department of Corrections
8 hadn't met these deadlines for drafting
9 standard operating procedures?
10    A.    I don't recall.  I probably was
11 aware of that.  I don't recall that now.
12    Q.    And you would agree with me, as
13 you stated earlier, that it's difficult to
14 make changes until the policies are in
15 place?
16    A.    I do.
17    Q.    Correct?
18    A.    I do.  If you are policy driven
19 to start with.  If you're a policy-driven
20 organization -- company, right, and you are
21 accustomed to following policies, until you
22 get a policy in place for people to be able
23 to read and follow, you can't expect them
24 to follow it.
25    Q.    It also said the monitoring team

1 that the monitoring team conducted an
2 incident review and found that:  A,
3 unauthorized movement between the housing
4 blocks occurs regularly.  So that means --
5 the other one said something a little
6 different from that.  But that means
7 documentation was being done for that in
8 order for there to be an incident report
9 for them to look at and say that.  And
10 inmates are frequently documented sleeping
11 in unauthorized housing areas between the
12 hours of 11:00 and 4:00.  So --
13    Q.    The --
14    A.    So let me finish, please, sir.
15    Q.    Go ahead.
16    A.    So that means that for whatever
17 reason -- we don't know what reason -- and
18 I surely don't know what reason.  But if
19 the staff was writing an incident report
20 and reporting to their supervisor that an
21 inmate was -- some sleeping in an
22 unauthorized area at the facility, right,
23 there had to be some type of cause because
24 that's like telling on yourself.  If I walk
25 in a housing unit, and a man is in here

1 conducted an incident review and found that
2 unauthorized movement between the housing
3 blocks occurs regularly and inmates are
4 frequently documented sleeping in
5 unauthorized housing areas between the
6 hours of 11:00 p.m. and 4:00 a.m.  You see
7 that?
8     A.    I do.
9     Q.    It says that violent incidents
10 are frequently associated with unauthorized
11 movement.  You see that?
12    A.    I do.
13    Q.    That the highest level of
14 unauthorized movement is associated with P
15 and Q blocks.  You see that?
16    A.    Yes, sir.
17    Q.    It's contrary to St. Clair's SOP.
18 Staff are not documenting unauthorized
19 movement and violent incident reports or
20 taking disciplinary action.  You see that?
21    A.    Yes, sir.
22    Q.    Stopping there.  Would you
23 disagree with these findings?
24    A.    I hadn't said I disagree with
25 their findings.  I have -- it's interesting

1 sleeping in an area that don't -- he isn't
2 supposed to be, and I don't have him to
3 move to where he's supposed to go, then my
4 thought process is that I'm documenting the
5 fact that he's not, but I'm not trying to
6 hide the fact that he's not, but I'm not
7 necessarily putting in why he's not.
8     Q.    All right.  Would you have any
9 reason to dispute this finding that the
10 unauthorized movement between the housing
11 blocks was occurring regularly and inmates
12 were frequently documented sleeping in
13 unauthorized areas between the hours --
14    A.    I wasn't there.  I didn't see it.
15 They saw it.  They wrote what they saw.  I
16 think EJI is a credible business.
17    Q.    Okay.  So you wouldn't have any
18 reason to dispute that?
19    A.    No.
20    Q.    And --
21    A.    With the exception of what I have
22 disputed on my lack of understanding what
23 I'm reading.
24    Q.    Would you have any reason to
25 dispute that violent incidents are

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 66 (261 - 264)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 frequently associated with unauthorized
2 movement?
3     A.     I don't know how to -- I don't
4 know how to determine that.
5     Q.     Would you have any reason to
6 dispute it?
7     A.     I mean, how did they determine
8 that?
9     Q.     Well, were you aware that
10 violence resulted from unauthorized
11 movement while you were associate
12 commissioner in 2018?
13           MS. COBB:  Object to form.
14     A.     Not all violence.  Not some
15 violence.  I don't know how big of a
16 percentage of violence.  I don't know.  No,
17 I didn't.
18     Q.     Were you aware that the highest
19 level of unauthorized movement was
20 associated in the P and Q blocks at St.
21 Clair?
22           MS. COBB:  Object to form.
23     A.     I was.
24     Q.     Okay.  And did you ever have a
25 discussion about the unauthorized movement

1 those are things that were driven by a
2 committee that came in and made
3 recommendations for us to make changes.
4     Q.     What steps did you specifically
5 take to address the high level of
6 unauthorized movement associated with P and
7 Q blocks?
8     A.     Just my conversation with the
9 warden.
10     Q.     Would you have any reason to
11 dispute the staff are not -- were not
12 documenting unauthorized movement in
13 violent incident reports or taking
14 disciplinary action --
15           MS. COBB:  Object to form.
16     Q.     -- in 2018?
17     A.     I'm confused really.  Because at
18 one point we're saying we have these
19 incident reports that -- that we have this
20 unauthorized movement, but then we come
21 back and then it's related to the violence,
22 and then but now we're saying that there is
23 no documentation.  Which is it?
24     Q.     At any rate, you aren't sure what
25 staff were documenting or not with regard

1 in the P and Q blocks with the warden at
2 St. Clair?
3     A.     We did.
4     Q.     And did you discuss it with the
5 assistant wardens?
6     A.     I talked to the warden, sir.  I
7 talked to assistant wardens too.  That's
8 the warden's job.  But basically when I sit
9 down and talk to a warden -- unless I have
10 a group conversation with people, it's the
11 warden that I have a conversation with.
12 And then it's the warden's job to pass that
13 along to his staff.
14     Q.     And in 2018 when you
15 communicated -- when you had a discussion
16 with the warden about the unauthorized
17 movement in the P and Q blocks, what steps
18 did the warden take to address it?
19           MS. COBB:  Object to form.
20     A.     I don't recall.  I'm not sure he
21 took a whole lot of any.  And there -- all
22 of these other things -- if we go back and
23 these SOPs -- once these policies and stuff
24 are written and get into place, some of
25 this stuff should go away.  That was --

1 to unauthorized movement?
2     A.     And that same thing could apply
3 for EJI.
4     Q.     Well, I guess I'm asking you,
5 sir.
6     A.     But you --
7     Q.     In 2018, were you aware of
8 whether or not staff were documenting
9 unauthorized movement in violent incident
10 reports?
11     A.     No, sir.  I wasn't at St. Clair.
12 I wasn't there day in and day out.  If I
13 didn't see it, I don't know whether they
14 were or whether they weren't.  I can only
15 -- this is a documentation you presented to
16 me to question me about.  And so my only
17 thing is saying that we're saying on two
18 sentences above where it's saying that
19 we've got documentation of people that are
20 moving in unauthorized areas, and then we
21 come down and say that we're not
22 documenting the amount of violence to take
23 place with it.  I'm just confused.  That's
24 all.
25     Q.     Well, when you discussed the

Lakeisha Ezell v. Jefferson Dunn, et al.

**Grantt Culliver**
**6/25/2024**

1 unauthorized movement with the warden, did
2 you ask the warden whether or not staff
3 were documenting the unauthorized movement
4 in their violent incident reports?
5     **A.     I probably told the warden that**
6 **they -- I probably didn't address it.  I**
7 **was part -- I probably told the warden --**
8 **and I don't know this.  I can't remember**
9 **this exactly, but just knowing me, and then**
10 **I would've told him that he needed to get a**
11 **check on that.  He'd need to handle that**
12 **because if that was happening, and that's**
13 **what we -- there's where our problems were**
14 **coming from, then you simply stop people**
15 **from moving around, and then our problems**
16 **go away.  That's a simple thing to do if**
17 **you have the ability to be able to do it.**
18     Q.     Did you find out whether or not
19 there was any disciplinary action of any
20 staff on unauthorized movement in 2018?
21     **A.     I don't recall any.**
22     Q.     Did you ask the warden whether or
23 not -- did you ask the warden at St. Clair
24 whether or not any staff had been
25 disciplined for not documenting
Page 269

1 unauthorized movement?
2     **A.     No, not that I recall.**
3          MR. RALLINS:  And just for the
4 record, this is Bates stamped -- this
5 Exhibit 3 -- Plaintiffs' Exhibit 3 is Bates
6 stamped ADOC DS18842 through 845.  Stop
7 sharing.
8          (Plaintiffs' Exhibit Number 3 was
9          marked for identification.)
10     Q.     Did you ever read the first
11 monitoring report, Mr. Culliver?
12     **A.     I don't recall.**
13     Q.     Did you discuss the first --
14 strike that.
15          Did the executive team discuss
16 the first monitoring report with Mr. Dunn
17 at any point?
18     **A.     I don't recall.  As you can see,**
19 **I -- there were a lot of people listed for**
20 **CC.  I wasn't CC'ed on that, and I don't**
21 **recall the commissioner discussing that**
22 **with me.  So, no, I don't recall.**
23     Q.     Should you have been CC'ed?
24     **A.     I think so if I was going to be**
25 **held responsible for it.**
Page 270

1     Q.     And that's because you are the
2 associate commissioner over operations and
3 security, correct?
4     **A.     Yes, sir.**
5     Q.     Is there any reason Commissioner
6 Dunn wouldn't have wanted you to receive
7 that information?
8          MS. COBB:  Object to form.
9     **A.     You would have to ask**
10 **Commissioner Dunn.**
11     Q.     All right.  I'm going pull up --
12 pulling up what we'll mark as Plaintiffs'
13 Exhibit 4.
14          (Plaintiffs' Exhibit Number 4 was
15          marked for identification.)
16     Q.     And it starts at ADOC 25953
17 through 54.  I'm going to zoom in a little
18 bit so you can see it better, sir.  All
19 right.  This is an e-mail that's from
20 July 26th, 2018.  You see that, sir?
21     **A.     Yes, sir.**
22     Q.     And the subject is inmate
23 assault/St. Clair.  You see that?
24     **A.     Yes, sir.**
25     Q.     And this is an e-mail sent from
Page 271

1 the institutional coordinator, Edward
2 Ellington, to you, Grantt Culliver, and
3 Cheryl Price, correct?
4     **A.     Yes, sir.**
5     Q.     What was Cheryl Price's title in
6 July of 2018?
7     **A.     Institutional coordinator.**
8     Q.     And she was the other
9 institutional coordinator, correct?
10     **A.     Yes, sir.**
11     Q.     And here, Edward Ellington is
12 reporting to you that an inmate stabbed two
13 other inmates in the P cellblock.  You see
14 that?
15     **A.     If you could blow it up a little**
16 **bit more, I could see it.  It's fuzzy.  I'm**
17 **getting old.  Yes, sir, I've read it.**
18     Q.     Okay.  And you see that Edward
19 Ellington is reporting that this inmate
20 Traion Jones was stabbed by inmates -- who
21 stabbed inmates OBryan Green and Roderick
22 Abrams while in this P cellblock.  You see
23 that?
24     **A.     Yes, sir.**
25     Q.     And you don't have any reason to
Page 272

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 68 (269 - 272)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 dispute this is referring to the P
2 cellblock in St. Clair, do you?
3     **A.      No, sir.**
4     Q.      And the -- they said that one of
5 the inmates was transported via ambulance
6 to UAB Hospital.  You see that?
7     **A.      Yes, sir.**
8     Q.      And it also states that the
9 weapon was recovered and investigations
10 were notified.  You see that?
11     **A.      Yes, sir.**
12     Q.      And it suggests that the incident
13 involved words about one of the inmates
14 being homosexual.  You see that?
15     **A.      Yes, sir.**
16     Q.      Was it common for you to receive
17 e-mails from Edward Ellington about inmate
18 assaults at St. Clair?
19     **A.      Not that I recall, no, sir.**
20     Q.      Was there any practice -- strike
21 that.
22         When you were institutional
23 coordinator, what determined whether or not
24 you informed the associate commissioner
25 about an inmate assault at St. Clair?
Page 273

1 form.
2     **A.      I don't recall any.**
3     Q.      All right.
4         MR. LUNSFORD:  Just so you know,
5 we're getting close on time.
6         MR. RALLINS:  Yeah.  How much
7 time do we have?
8         THE VIDEOGRAPHER:  30 minutes
9 give or take.
10         MR. LUNSFORD:  How much?
11         THE VIDEOGRAPHER:  30 give or
12 take.
13         MR. LUNSFORD:  Yeah.  I have 23.
14         THE VIDEOGRAPHER:  I said give or
15 take.
16         MR. LUNSFORD:  Yeah.
17         MR. RALLINS:  All right.  Mark
18 this Exhibit 5.
19         (Plaintiffs' Exhibit Number 5 was
20         marked for identification.)
21     Q.      You see this e-mail, sir?
22     **A.      Would you make it a little**
23 **larger, please?**
24         MR. RALLINS:  And we'll mark as
25 Exhibit 5 -- for the lawyers, this is ADOC
Page 275

1     **A.      I probably would not -- I**
2 **probably would not have talked to him until**
3 **the following day unless it was a life or**
4 **death type of a situation or an escape.**
5     Q.      Okay.  And there wasn't any set
6 standard between you and Edward Ellington
7 about -- regarding when he should report
8 inmate assaults at St. Clair to you?
9     **A.      Not that I recall.**
10     Q.      Based upon this e-mail, you don't
11 know why he is sending you an e-mail about
12 this specific inmate assault; is that fair?
13     **A.      No, sir.**
14     Q.      Okay.  At any rate, in July of
15 2018, you are receiving information that at
16 least two other inmates were stabbed on the
17 P blocks at St. Clair, correct?
18     **A.      Yes, sir.**
19     Q.      Pull up another exhibit.  Can you
20 see my screen?  Okay.  Do you -- do you
21 recall receiving -- do you have any
22 independent recollection of receiving any
23 monitoring reports in 2018?
24         MS. COBB:  Object to form.
25         MR. LUNSFORD:  Object to the
Page 274

1 25724 Bates stamp.
2     Q.      You see it?
3     **A.      Yes, sir.**
4     Q.      Okay.  And this is an e-mail from
5 Charlotte Morrison at EJI to -- and the
6 subject is St. Clair second monitoring
7 report, and the recipients include multiple
8 staff, including Jefferson Dunn and you,
9 Grantt Culliver.  You see that?
10     **A.      Yes, sir.**
11     Q.      Does this refresh your
12 recollection that you received the second
13 monitoring report for St. Clair in August
14 of 2018?
15     **A.      No, sir.**
16     Q.      And --
17     **A.      I actually don't know if I was**
18 **even there August the 1st of 2018.  Go**
19 **ahead.  I'm sorry.**
20     Q.      Well, were you still at the
21 Alabama --
22     **A.      I don't --**
23     Q.      -- Department of Corrections on
24 August 1st, 2018?
25     **A.      I don't recall.  I don't recall.**
Page 276

1-888-326-0594 depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 69 (273 - 276)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 **I left before I retired, so I don't recall**
2 **if I was still there August the 1st or not.**
3          MS. COBB:  Let's take a break.
4          MR. RALLINS:  Sure.
5          THE VIDEOGRAPHER:  The time is
6 4:41 p.m.  We are off the record.
7          (Whereupon, a recess was taken.)
8          THE VIDEOGRAPHER:  The time is
9 4:48.  We are back on the record.
10     Q.     I'm going to pull up another
11 exhibit.  I think we're at Exhibit 6.
12          (Plaintiffs' Exhibit Number 6 was
13          marked for identification.)
14     Q.     Can you see this?
15     **A.     Yes, sir.**
16     Q.     Now, this is an e-mail from -- on
17 July 30th, 2018, from Tammy Montgomery to
18 Edward Ellington, and you're copied.  Do
19 you see that?
20     **A.     Yes, sir.**
21     Q.     And at the top, it says -- the
22 subject is incident reporting, and at the
23 top it says, what do you think about this?
24 You see that?
25     **A.     Yes, sir.**
                                        Page 277

1 this is one of the primary areas the
2 lawsuit focuses on.  They are expecting to
3 see more from this category rather than
4 less.  We should report what we have and
5 not worry about how many.  The job is to
6 place inmates in their unauthorized --
7 strike that.
8          The job is to place inmates in
9 their authorized area and keep them there,
10 not to cover up that they have free roam of
11 the facility.  You see that?
12     **A.     Yes, sir.**
13     Q.     Why did you feel the need to
14 respond to Tammy, staff at St. Clair, about
15 -- in that way about her and how to deal
16 with unauthorized location numbers?
17     **A.     Because she needed to tell the**
18 **truth.**
19     Q.     Huh?
20     **A.     Because she needs to tell the**
21 **truth.  The whole facility needed to tell**
22 **the truth.  Whatever it was, it was.**
23     Q.     And was this the only occasion
24 that you can recall where staff at St.
25 Clair wanted to change the numbers?
                                        Page 279

1     Q.     And towards the bottom, it
2 discusses unauthorized location.  You see
3 that?
4     **A.     Yes, sir.**
5     Q.     It says -- this e-mail from Tammy
6 Montgomery says, our numbers is too high.
7 I understand we need to write inmates up.
8 Our numbers is up too high due to this
9 charge.  How can we go a different route?
10 If a cellphone/contraband is found in a
11 common area, why create an incident report?
12 No one is being charged.  If we get
13 incident report numbers down, St. Clair
14 will look better/good in many eyes.  And
15 that's at 2:54 p.m.  You see that?
16     **A.     Yes, sir.**
17     Q.     And on July 30th, the same day,
18 3:39 -- at 3:39 p.m., there's an e-mail
19 from you to Tammy Montgomery, and you copy
20 Edward Ellington.  You see that?
21     **A.     Yes, sir.**
22     Q.     And it says, see my answers
23 below.  And it indicates that you gave a
24 response, and I just want to focus on the
25 unauthorized location response.  It says,
                                        Page 278

1          MS. COBB:  Object to form.
2     **A.     I don't recall that one until you**
3 **pulled it up on the screen, so, no, sir.  I**
4 **don't recall any others.**
5     Q.     Okay.  And you would agree that
6 the proposal from a staff member at St.
7 Clair was inappropriate, correct?
8          MS. COBB:  Object to form.
9     **A.     Yes, sir.**
10     Q.     And even according to this
11 e-mail, you suggested inmates have had free
12 roam of the facility at St. Clair, correct?
13     **A.     Did I say that?**
14     Q.     The job is to place inmates in
15 their authorized area and keep them there,
16 not to cover up that they have free roam of
17 -- you see that?  Do you recall being
18 concerned that inmates had free roam of the
19 facility at St. Clair?
20     **A.     Not necessarily free roam, but**
21 **they weren't -- we all agreed that the**
22 **problem was that they were not being kept**
23 **in the right areas.**
24     Q.     And you had this concern in July
25 -- at least on July 30th, 2018, correct?
                                        Page 280

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1    A.    Yes, sir.  You -- yes, sir.
2    Q.    All right.
3          MR. RALLINS:  Just for the
4  record, this is Bates stamped ADOC 26445
5  through 26447.  And mark this Exhibit 7,
6  Bates stamped ADOC 29883, ends at ADOC
7  29886.
8          (Plaintiffs' Exhibit Number 7 was
9          marked for identification.)
10   Q.    You see this, sir, this e-mail?
11   A.    Yes, sir.
12   Q.    Okay.  It's dated September 2nd,
13  2018.  You see that?
14   A.    Yes, sir.
15   Q.    It's from Russell Jones to Warden
16  Karla Jones at St. Clair.  You see that?
17   A.    Yes, sir.
18   Q.    And the subject is stabbing on
19  the yard in front of the P and Q blocks.
20  You see that?
21   A.    Yes, sir.
22   Q.    And according to this e-mail at
23  approximately 5:16 p.m., inmate Terry
24  Pettiway and it was -- was stabbed in front
25  of the P and Q blocks.  Do you see that?
Page 281

1    A.    Yes, sir.
2    Q.    And this happened, according to
3  the e-mail, as the inmates from P and Q
4  were returning from dinner meal.  You see
5  that?
6    A.    Yes, sir.
7    Q.    Can you recall what time chow was
8  approximately at -- in St. Clair in 2018?
9    A.    No, sir.
10   Q.    Okay.  And it states that no
11  weapon was recovered at this time.  You see
12  that?
13   A.    Yes, sir.
14   Q.    And that same day -- that e-mail
15  was from September -- was at 4:09 p.m. on
16  September 2nd, 2018.  Approximately
17  30 minutes later, you get an e-mail from
18  Edward Ellington providing you with the
19  report -- an e-mail reporting that inmate
20  Terry Pettiway was stabbed.  Do you see
21  that?
22   A.    Yes, sir.
23   Q.    And he communicates to you that
24  he was stabbed in his throat while in the P
25  and Q breezeway by an unidentified inmate.
Page 282

1  You see that?
2    A.    Yes, sir.
3    Q.    And similar to the e-mail that we
4  saw earlier, he also sends this e-mail to
5  Cheryl Price, correct?
6    A.    Yes, sir.
7    Q.    You see that?
8    A.    Yes, sir.
9    Q.    Okay.  And similarly, this is
10  with regard to an inmate assault at St.
11  Clair, correct?
12   A.    Yes, sir.
13   Q.    So it wasn't uncommon for Edward
14  Ellington in 2018 to send you e-mails
15  updating you on inmate assaults that
16  occurred at St. Clair?
17   A.    Is that a question?
18   Q.    Yes.
19   A.    I don't recall.  I don't recall
20  this -- I don't recall.  You said was it
21  uncommon, but I don't recall getting a
22  whole bunch of e-mails from Mr. Ellington.
23   Q.    Yeah.  Well, you don't dispute
24  that Edward Ellington in 2018 would send
25  you e-mails to update you on inmate
Page 283

1  assaults that were occurring at St. Clair?
2          MS. COBB:  Object to form.
3    A.    You showed me two.
4    Q.    So you don't have any reason to
5  dispute that, do you?
6          MS. COBB:  Same objection.
7    A.    I don't have any reason to
8  dispute what?
9    Q.    That Edward Ellington in 2018
10  would send you e-mails to report inmate
11  assaults that were occurring at St. Clair.
12   A.    You showed me two that he sent
13  me.  I don't know if he sent me 50, 60.  I
14  don't know.  I don't recall.
15   Q.    Right.  You don't recall.  You
16  don't have any reason to dispute that he
17  would send you e-mails?
18          MR. LUNSFORD:  Object to the
19  form.
20   Q.    Is that right?
21   A.    He sent me two.  You showed me
22  two e-mails that he sent me.  I agree that
23  you showed me.  I have no reason to doubt
24  that he sent these two e-mails, but I still
25  don't remember them.
Page 284

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 71 (281 - 284)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1    Q.    But you doubt that he sent you
2 more than two e-mails?
3    **A.    I didn't say that.  Don't put**
4 **words in my mouth.**
5    Q.    Okay.  Mr. Ellington [sic], has a
6 complaint ever been filed against you for
7 using your office to pressure women for
8 sex?
9         MR. LUNSFORD:  Object to the
10 form.
11    **A.    Repeat the question.**
12    Q.    Has a complaint ever been filed
13 against you for using your office at the
14 Alabama Department of Corrections to
15 pressure women for sex?
16    **A.    Not that I'm aware of.**
17    Q.    Have you ever spoken to
18 Commissioner Dunn about complaints that
19 were filed against you?
20         MR. LUNSFORD:  Object to the
21 form.
22    **A.    Yes.**
23    Q.    What complaints do you recall
24 speaking with Commissioner Dunn about?
25    **A.    About having an inappropriate**

Page 285

1 **relationship with a coworker.**
2    Q.    And was that one coworker that
3 you spoke with him about?
4    **A.    No.**
5    Q.    How many coworkers did you speak
6 with him about?
7    **A.    I don't know if he said how many**
8 **people.  I don't know.  I don't recall**
9 **that.**
10    Q.    What were the names of those
11 coworkers?
12    **A.    Why?  Why do you need to know**
13 **that?**
14    Q.    I'm asking you under oath, Mr.
15 Ellington.  What were the names of those
16 coworkers?
17    **A.    My name is not Mr. Ellington.**
18 **It's Mr. Culliver.  And I still would like**
19 **to --**
20    Q.    I mean Mr. Culliver.
21    **A.    -- why you need to know that.**
22 **What relevance -- I would like to know what**
23 **the relevance is to this case that I'm on**
24 **now.**
25    Q.    Are you refusing to answer the

Page 286

1 question?
2    **A.    I refuse to answer.**
3         MR. RALLINS:  I'll certify that
4 question.
5         MR. LUNSFORD:  I mean, there's no
6 process for certifying it.  I just -- I'd
7 like to resolve the issue.  I do think it's
8 an irrelevant question, and if I can help
9 through this -- I don't know what --
10         MR. RALLINS:  Can we go off the
11 record?
12         MR. LUNSFORD:  No.  I don't want
13 to go off the record because I want to have
14 the discussion on the record.
15         MR. RALLINS:  Okay.
16         MR. LUNSFORD:  Why do you need to
17 know the names -- I mean, I think if you
18 ask those -- the question of were any of
19 those individuals at St. Clair, I mean,
20 that might be -- I could see you asking if
21 any of those individuals were at St. Clair,
22 and if they were, then we can discuss it.
23 I don't actually know their names, but --
24         MR. RALLINS:  I'm happy to do
25 that.

Page 287

1         MR. LUNSFORD:  Okay.
2         MR. RALLINS:  Okay.
3    Q.    Mr. Culliver, were any of those
4 individuals at St. Clair?
5    **A.    No.**
6    Q.    Were any of those individuals --
7 did any of those individuals report
8 directly to you?
9    **A.    No.**
10    Q.    Were any of those individuals on
11 the executive team at the Alabama
12 Department of Corrections?
13    **A.    No.**
14    Q.    Was the complaint that you had
15 sexual relationships with six women under
16 your authority?
17    **A.    I don't know if it was six.  It**
18 **was about me having sexual relationships**
19 **with women who, by policy, was a violation**
20 **of the policy -- the ethics policy.  Yeah.**
21    Q.    And just a few quick questions.
22 The -- was -- were you investigated by the
23 attorney general's office?
24    **A.    Yes.**
25    Q.    And what was the finding from the

Page 288

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 72 (285 - 288)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

1 investigation of the attorney general's
2 office?
3    A.    I never saw it.
4    Q.    Were you ever -- did you become
5 aware of the findings?
6    A.    I never saw them.
7    Q.    I understand you never saw them,
8 Mr. Culliver.  Did you ever become aware of
9 the findings from the investigation by the
10 attorney general's office?
11    A.    The only way that I know I
12 would've been able to do that is if I had
13 saw them.  I didn't know.  I never -- no.
14    Q.    It's your testimony today that as
15 you sit here today, you are unaware of what
16 the findings were from the attorney
17 general's investigation?
18    A.    The only thing I'm aware of is
19 what the investigator asked -- questioned
20 me about.  It's the same things that you
21 just asked me.  That was it.  As far as
22 what the actual findings were, no.
23    Q.    Were you aware that the attorney
24 general turned the findings -- strike that.
25         Were you aware that the attorney

Page 289

1 general provided the information from the
2 investigation to the Alabama Ethics
3 Commission?
4    A.    No.
5    Q.    Why were you placed on
6 administrative leave in September of 2018?
7    A.    Because I was under investigation
8 for this case that you're talking about.
9    Q.    And before you were placed
10 on administrative leave -- strike that.
11         After the investigation occurred
12 and before you were placed on
13 administrative leave, did you discuss the
14 results of the investigation with
15 Commissioner Dunn?
16    A.    I only discussed the
17 investigation with Mr. Dunn when he told me
18 he was relieving me of my duty.  We had no
19 real discussion about this.  He asked for
20 my credentials.  He told me I was under
21 investigation, and I was escorted out of
22 the facility.
23    Q.    And was the meeting with
24 Commissioner Dunn in person?
25    A.    Yes.

Page 290

1    Q.    Was it at his office?
2    A.    Yes.
3    Q.    And who escorted you out of the
4 facility?
5    A.    Investigations.  A person -- the
6 assistant director of investigations.
7    Q.    And did you believe the decision
8 to place you on administrative leave and to
9 force you out of the facility was
10 appropriate?
11    A.    Yes and no.
12    Q.    Why do you say yes, and why do
13 you say no?
14    A.    Because there was a policy in
15 place about fraternization, and so it was
16 clearly fraternization.  I never forced
17 anybody or led anybody on or coerced
18 anybody to do anything.  And therefore --
19 and then it wasn't worth the fight.  I had
20 37 years in.  I didn't need to take my wife
21 through that.  I didn't need -- some of
22 these people were married.  I didn't need
23 them to go through that.  The easiest
24 thing, and the most appropriate thing for
25 me to do was just walk out.

Page 291

1    Q.    Okay.  And I just have a few sort
2 follow-up questions.  Did the women who
3 filed the complaint against you for --
4 strike that.  Did the women who filed a
5         Did the women who filed a
6 complaint against you work with you at any
7 facility during your career at the Alabama
8 Department of Corrections?
9    A.    I don't know who the women were
10 that filed the complaint.
11    Q.    Okay.  You don't have any idea
12 who the women were?
13    A.    I know the women who I slept
14 with.  I don't know who the women were who
15 filed the complaint.
16    Q.    Okay.  So you don't know whether
17 or not the women who filed the complaint
18 worked at the Alabama Department of
19 Corrections?
20    A.    I don't know how to make that
21 anymore --
22    Q.    Okay.  Strike that.
23    A.    No.  No.
24    Q.    You don't know --
25    A.    No.

Page 292

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 73 (289 - 292)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

| | |
|---|---|
| 1    Q.    -- the other women who filed the | 1        C E R T I F I C A T E |
| 2 complaint worked at St. Clair? | 2    State of Alabama |
| 3    A.    No. | 3    Elmore County |
| 4    Q.    Did you have a sexual | 4        I, Madison Borden, do hereby |
| 5 relationship with Warden Karla Jones? | 5 certify that I recorded, by means of |
| 6    A.    No.  No. | 6 stenotype, the foregoing proceedings at the |
| 7    Q.    Did you have a sexual | 7 time and place stated in the caption |
| 8 relationship with Carla Graham? | 8 hereof, that the foregoing represents a |
| 9    A.    Who? | 9 full, true, and correct transcript of the |
| 10        MS. COBB:  Object to form. | 10 proceedings on said occasion. |
| 11    A.    Who? | 11        I further certify that I am |
| 12    Q.    Carla Graham. | 12 neither of counsel nor of kin to any |
| 13    A.    I don't know if I even know Carla | 13 parties, nor interested in the outcome of |
| 14 Graham.  But the answer is no. | 14 this case. |
| 15    Q.    Did you have a sexual | 15        I further certify that I am a |
| 16 relationship with Gwendolyn Givens? | 16 duly licensed Court Reporter, as displayed |
| 17    A.    No. | 17 by my license number below, by the Alabama |
| 18    Q.    Okay. | 18 Board of Court Reporting. |
| 19        MR. RALLINS:  I don't have any | 19        So certified on July 13th, 2024. |
| 20 further questions. | 20 |
| 21        MR. LUNSFORD:  Thank you. | 21 |
| 22        THE VIDEOGRAPHER:  The time is | 22 |
| 23 5:07 p.m.  We are off the record. | 23        /s/Madison Borden |
| 24        (The deposition of GRANTT CULLIVER | 24        MADISON BORDEN, CCR |
| 25        was concluded at 5:07 p.m.) | 25        CCR#687, Expires 9/30/24 |
| Page 293 | Page 295 |

| | |
|---|---|
| 1        --oOo-- | 1        SIGNATURE OF WITNESS |
| 2 | 2 |
| 3 | 3 I,              , do hereby certify that |
| 4 | 4 on this      day of        2024, I |
| 5 | 5 have read the foregoing transcript and to |
| 6 | 6 the best of my knowledge it constitutes a |
| 7 | 7 true and accurate transcript of my |
| 8 | 8 testimony taken by oral deposition on June |
| 9 | 9 25, 2024. |
| 10 | 10 |
| 11 | 11 |
| 12 | 12 |
| 13 | 13        WITNESS |
| 14 | 14 |
| 15 | 15        Subscribed and sworn to before me |
| 16 | 16 this    day of          ,2024. |
| 17 | 17 |
| 18 | 18 |
| 19 | 19 |
| 20 | 20 |
| 21 | 21 |
| 22 | 22 |
| 23 | 23        NOTARY PUBLIC |
| 24 | 24 |
| 25 | 25 |
| Page 294 | Page 296 |

1-888-326-0594  depos@bainandassociates.com
Bain & Associates Court Reporting Services, Inc.

Page: 74 (293 - 296)

**Lakeisha Ezell v. Jefferson Dunn, et al.**

**Grantt Culliver**
**6/25/2024**

```
 1 PAGE   LINE   CORRECTION AND REASON THEREFORE
 2 _____  _____  _____
 3 _____  _____  _____
 4 _____  _____  _____
 5 _____  _____  _____
 6 _____  _____  _____
 7 _____  _____  _____
 8 _____  _____  _____
 9 _____  _____  _____
10 _____  _____  _____
11 _____  _____  _____
12 _____  _____  _____
13 _____  _____  _____
14 _____  _____  _____
15 _____  _____  _____
16 _____  _____  _____
17 _____  _____  _____
18 _____  _____  _____
19 _____  _____  _____
20 _____  _____  _____
21 _____  _____  _____
22 _____  _____  _____
23 _____  _____  _____
24 _____  _____  _____
25 _____  _____  _____
                                       Page 297
```