Page 1

1      IN THE UNITED STATES DISTRICT COURT

2     FOR THE NORTHERN DISTRICT OF ALABAMA

3

4

5

6

7   CIVIL ACTION NO.:  4:20-cv-01293-CLM

8

9   CARRIE JEAN HUFFMAN, AS PERSONAL

10   REPRESENTATIVE OF THE ESTATE OF TERRY

11   TERRELL PETTIWAY, DECEASED,

12         Plaintiff,

13   v.

14

15   JEFFERSON DUNN; GRANTT CULLIVER; EDWARD

16   ELLINGTON; KARLA JONES, et al.,

17         Defendants.

18

19

20      VIDEO DEPOSITION TESTIMONY OF:

21            GRANTT CULLIVER

22          November 11, 2022

23

Page 2

1    S T I P U L A T I O N S
2         IT IS STIPULATED AND AGREED
3    by and between the parties through their
4    respective counsel that the deposition of
5    GRANTT CULLIVER may be taken before Lane
6    C. Butler, a Court Reporter and Notary
7    Public for the State at Large, at the law
8    offices of White, Arnold & Dowd, 2001
9    Park Place North, Suite 1400, Birmingham,
10   Alabama, on the 11th day of November,
11   2022, commencing at approximately 9:00
12   a.m. Central.
13        IT IS FURTHER STIPULATED
14   AND AGREED that the signature to and the
15   reading of the deposition by the witness
16   is waived, the deposition to have the
17   same force and effect as if full
18   compliance had been had with all laws and
19   rules of Court relating to the taking of
20   the depositions.
21        IT IS FURTHER STIPULATED
22   AND AGREED that it shall not be necessary
23   for any objections to be made by counsel

Page 3

1    to any questions except as to form or
2    leading questions and that counsel for
3    the parties may make objections and
4    assign grounds at the time of trial or at
5    the time said deposition is offered in
6    evidence, or prior thereto.
7         In accordance with the Federal
8    Rules of Civil Procedure, I, Lane C.
9    Butler, am hereby delivering to Brian
10   Earl, Esq., the original transcript of
11   the oral testimony taken the 11th day of
12   November, 2022.
13        Please be advised that this is
14   the same and not retained by the Court
15   Reporter, nor filed with the Court.
16
17
18
19
20
21
22
23

Page 4

1    A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4
5    Brian Earl, Esq.
6    Leslie Kuhn-Thayer, Esq. (via telephone)
7    SIDLEY AUSTIN
8    787 Seventh Avenue
9    New York, New York  10019
10   bearl@sidley.com
11   lkuhntha@sidley.com
12
13   Laura S. Gibson, Esq.
14   White, Arnold & Dowd
15   2001 Park Place North
16   Suite 1400
17   Birmingham, Alabama  35203
18   lgibson@whitearnolddowd.com
19
20
21
22
23

Page 5

1    A P P E A R A N C E S (continued)
2
3    FOR THE DEFENDANTS:
4
5    Ellie Putman, Esq.
6    MAYNARD, COOPER & GALE
7    655 Gallatin Street SW
8    Huntsville, Alabama  35801
9    eputman@maynardcooper.com
10
11   R. Brooke Lawson, III, Esq.
12   CAPELL & HOWARD
13   150 South Perry Street
14   Montgomery, Alabama  36105
15   brooke.lawson@chlaw.com
16
17
18   ALSO PRESENT:
19
20   Karen Kelley, videographer
21
22
23

2 (Pages 2 - 5)

Page 6

1          I N D E X

2

3 EXAMINATION BY:          PAGE NO.

4 Mr. Earl                    11

5

6

7

8

9

10       E X H I B I T S

11

12 FOR THE PLAINTIFF:

13 Exhibit 1  Employee Performance       38

14     Preappraisal, 10/01/2016 -

15     09/01/2017, Bates

16     ADOC-TP-002925

17 Exhibit 2  First Amended Complaint    128

18 Exhibit 3  Email, Bates          193

19     ADOC(DOJ)-TP-0000581

20 Exhibit 4  Institutional Vulnerability  194

21     Analysis, February 24,

22     2015, Bates

23     ADOC(DOJ)-TP-0000243

Page 7

1 Exhibit 5  Institutional Vulnerability  225

2     Analysis, May 9, 2016,

3     Bates ADOC-TP-018828

4 Exhibit 6  Institutional Vulnerability  252

5     Analysis, May 2, 2018,

6     Bates ADOC-TP-019471

7 Exhibit 7  Investigative Report,       274

8     12/04/17, Bates

9     ADOC-TP-012153

10 Exhibit 8  Email chain and ASCA       279

11     Report, Bates

12     ADOC-TP-018289

13 Exhibit 9  Email and First Monitoring  298

14     Report, Bates

15     ADOC-TP-021113

16 Exhibit 10  (Exhibithibit withdrawn)     ---

17 Exhibit 11  Email chain, Bates       307

18     ADOC-TP-019196

19 Exhibit 12  Email chain, Bates       311

20     ADOC-TP-020598

21 Exhibit 13  Duty Officer Report,      323

22     9/2/2018, Bates

23     ADOC-TP-001705

Page 8

1 Exhibit 14  Alabama Attorney General's   339

2     Office Investigative

3     Division Summary of

4     Findings, Bates

5     ADOC-TP-008994

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Page 9

1          I, Lane C. Butler, a Court

2 Reporter and Notary Public, State of

3 Alabama at Large, acting as Notary,

4 certify that on this date, pursuant to

5 the Federal Rules of Civil Procedure and

6 the foregoing stipulation of counsel,

7 there came before me at the law offices

8 of White, Arnold & Dowd, 2001 Park Place

9 North, Suite 1400, Birmingham, Alabama,

10 commencing at approximately 9:00 a.m., on

11 the 11th day of November, 2022, GRANTT

12 CULLIVER, witness in the above cause, for

13 oral examination, whereupon the following

14 proceedings were had:

15

16          THE VIDEOGRAPHER:  Good morning.

17 We're going on the record at 9:03 a.m. on

18 November 11, 2022.  This is Media Unit 1

19 in the videorecorded deposition of Grantt

20 Culliver in the matter of Carrie Jean

21 Huffman, as personal representative of

22 the estate of Terry Terrell Pettiway,

23 deceased, v. Jefferson Dunn, et al.,

3 (Pages 6 - 9)

Page 10

1 filed in the United States District Court
2 for the Northern District of Alabama,
3 Case No. 4:20-cv-1293.
4       This deposition is being held at
5 2001 Park Place North, Birmingham,
6 Alabama.  My name is Karen Kelley.  I'm
7 the videographer.  The court reporter is
8 Lane Butler, both with Veritext.
9       If counsel would please
10 introduce yourself, after which the court
11 reporter will swear in the witness.
12       MS. PUTMAN:  Ellie Putman with
13 Maynard Cooper for defendants Jeff Dunn,
14 Grantt Culliver, and Edward Ellington.
15       MR. LAWSON:  Brooke Lawson with
16 Capell & Howard for defendants.
17       MS. GIBSON:  I'm Laura Gibson.
18 I'm with White, Arnold & Dowd, and I'm
19 here for the plaintiff.
20       MR. EARL:  And Brian Earl of
21 Sidley Austin for the plaintiff.
22
23

Page 11

1       GRANTT CULLIVER,
2   having first been duly sworn,
3  was examined and testified as follows:
4
5       THE COURT REPORTER:  Thank you.
6       And, attorneys, usual
7 stipulations?
8       MS. PUTMAN:  Yes.
9       MR. LAWSON:  Yes.
10       MR. EARL:  Agreed.
11
12 EXAMINATION BY MR. EARL:
13   Q.  Mr. Culliver, my name is Brian
14 Earl.  I represent Carrie Huffman in her
15 capacity as administrator for her
16 deceased son, Terry Terrell Pettiway, in
17 this proceeding.
18       Can you please state your full
19 name for the record?
20   A.  Grantt DeWayne Culliver.
21   Q.  So I would like to start with
22 some ground rules for today's deposition.
23 You'll be testifying under oath today.

Page 12

1 Your answers will be subject to the
2 penalty of perjury.  Do you understand
3 that?
4   A.  Yes, sir.
5   Q.  Your statements here today have
6 the same effect as though they were given
7 in a court of law.  Do you understand
8 that?
9   A.  Yes, sir.
10   Q.  As you can see, we have a court
11 reporter sitting -- a court reporter
12 sitting next to you.  It's important that
13 she hear a clear record and have a clear
14 record of what is discussed today.  So
15 I'd ask that you please give audible
16 responses so that she can take down
17 everything that you say.  Try to avoid
18 nods of your head, shrugs, or "uh-huhs."
19 Do you understand that?
20   A.  Yes.
21   Q.  We should both try not to,
22 during the deposition, not to speak over
23 each other.  I'll try my best to let you

Page 13

1 finish your response to my questions.  If
2 you can also let me finish my questions
3 throughout as well, I'd appreciate that.
4       We'll take breaks as you need
5 them.  Please just let me know if you
6 need one.  The only thing I'd ask is that
7 before we take a break, you finish
8 answering the question that's been asked.
9       If there's a question you don't
10 understand, please let me know.  I'll do
11 my best to rephrase it.  If you answer a
12 question, then I assume that you
13 understood it.
14       If your counsel objects, and she
15 may object throughout the proceeding
16 today, you still will be required to
17 answer the question unless she directs
18 you otherwise.
19       Do you understand all that?
20   A.  Yes.
21   Q.  Sir, is there any reason you'll
22 be unable to testify truthfully and
23 completely here today?

4 (Pages 10 - 13)

1   A.  Not to my knowledge.
2   Q.  Are you represented by counsel
3 here today?
4   A.  Yes.
5   Q.  What have you done to prepare
6 for this deposition?
7   A.  I've had a briefing with
8 counsel.
9   Q.  Okay.  How many times have you
10 met with your counsel?
11   A.  Once.
12   Q.  Did you review any documents?
13   A.  Say it again?
14   Q.  Did you review any documents?
15   A.  I have.
16   Q.  What documents?
17   A.  Some e-mails, just various
18 documents that the counsel sent.
19   Q.  Okay.  Do you recall any of the
20 -- what any of those were?
21   A.  Not specifically.
22   Q.  Did you speak with anybody else
23 about this deposition other than your

1 counsel?
2   A.  No.
3   Q.  Have you ever been -- have you
4 ever been deposed before, Mr. Culliver?
5   A.  Yes, sir.
6   Q.  And how many times?
7   A.  I do not recall.
8   Q.  More than five?
9   A.  I do not recall.
10   Q.  Less than five?
11   A.  I don't recall.
12   Q.  Okay.  Have you ever testified
13 at trial before?
14   A.  Yes, sir.
15   Q.  How many times?
16   A.  I don't recall.
17   Q.  Was it -- so, would you say it's
18 been a lot?
19   A.  It's been enough for me.
20   Q.  Can you explain that a little
21 bit?
22   A.  It's been enough.  I mean, I
23 don't --

1   Q.  Are there any specific instances
2 you recall?
3   A.  Of going to?
4   Q.  Of testifying at trial.
5   A.  I think the last time I
6 testified was in a mental health case.
7   Q.  Okay.  Do you recall the name of
8 that case?
9   A.  I don't.
10   Q.  Do you recall when that was?
11   A.  More than four years ago.
12   Q.  And was that the last case you
13 were deposed in as well?
14   A.  I don't know.
15   Q.  Okay.  Can you describe your
16 educational background, Mr. Culliver?
17   A.  I have a bachelor of -- a
18 bachelor of science from the University
19 of Southern Mississippi in American
20 studies.
21   Q.  And where were you employed
22 after you graduated college?
23   A.  I don't remember.

1   Q.  So you don't recall your first
2 employment after you graduated college?
3   A.  No, sir.
4   Q.  Okay.
5   A.  I think it was -- I think that
6 it was at a blouse factory.
7   Q.  A blouse factory.  Okay.  And
8 what was your role there?
9   A.  Packer.
10   Q.  Okay.  Are you currently
11 employed, sir?
12   A.  Yes, sir.
13   Q.  Where are you employed?
14   A.  Division12 Consulting.
15   Q.  And what is Division12
16 Consulting?
17   A.  It's a furniture company.
18   Q.  And what do you do there?
19   A.  I am director of installations.
20   Q.  Okay.  You were previously
21 employed by the Alabama Department of
22 Corrections.  Is that right?
23   A.  Yes, sir.

5 (Pages 14 - 17)

Page 18

1    Q.   And just to level set, I'm going
2 to be referring to them throughout this
3 deposition as ADOC.  Is that okay?
4    A.   Yes, sir.
5    Q.   When did you begin your
6 employment with ADOC?
7    A.   I think it was in October of
8 '81.
9    Q.   And what was your role?
10    A.   Correctional officer.
11    Q.   And was that at a specific
12 facility?
13    A.   My first assignment was Fountain
14 Correctional Facility.
15    Q.   Were you promoted after that?
16    A.   Yes, sir.
17    Q.   To what position?
18    A.   Correctional sergeant.
19    Q.   And when was that?
20    A.   I have no idea.
21    Q.   Was it shortly after you began
22 as a -- you began as a corrections
23 officer?

Page 19

1    A.   It was somewhere in the
2 neighborhood of three to four years.
3    Q.   And do you remember where you
4 were assigned as a correctional sergeant?
5    A.   William A. Donaldson
6 Correctional Facility.
7    Q.   And what was your position?  Did
8 you hold that position the rest of your
9 career?
10    A.   No, sir.
11    Q.   What was your next position?
12    A.   Correctional lieutenant.
13    Q.   And the position after that?
14    A.   Correctional captain.
15    Q.   And when were you promoted to
16 correctional captain?
17    A.   Sir, I have no --
18    Q.   Okay.
19    A.   -- no idea.
20    Q.   You were promoted to warden in
21 1997.  Is that right?  To a warden,
22 excuse me.
23    A.   I don't know.

Page 20

1    Q.   Were you promoted to the
2 position of warden at some point?
3    A.   I was.
4    Q.   Do you know at what facility
5 that was at?
6    A.   Atmore Community-Based Facility.
7    Q.   And can you describe to me what
8 your responsibilities were as a warden?
9    A.   The management -- manage the
10 day-to-day operations at the facility.
11    Q.   Okay.  You were later promoted
12 to a position of Warden II.  Is that
13 correct?
14    A.   Yes, sir.
15    Q.   Do you recall about when that
16 was?
17    A.   No, sir.
18    Q.   Would it have been before or
19 after 2000?
20    A.   I really don't remember.
21    Q.   Okay.  And do you recall what
22 facility that was at?
23    A.   Holman Correctional Facility.

Page 21

1    Q.   Okay.  How did your
2 responsibilities change from being
3 promoted to Warden I to Warden II?
4    A.   For Warden II, I was an
5 assistant warden under the Warden III at
6 the facility.  I had certain
7 responsibilities that I don't
8 particularly remember right now.
9    Q.   Okay.  Were you promoted to
10 Warden III?
11    A.   Yes, sir.
12    Q.   When was that?
13    A.   I have no idea.
14    Q.   Do you recall what facility you
15 were Warden III at?
16    A.   Fountain Correctional Facility.
17    Q.   Were you promoted to deputy
18 commissioner?
19    A.   Associate commissioner.
20    Q.   Was there a position at ADOC
21 entitled deputy commissioner at one
22 point?
23    A.   Yes, sir.

6 (Pages 18 - 21)

Page 22

1   Q.  Did you hold that position?
2   A.  No, sir.
3   Q.  After you were -- when you were
4  Warden III, were you promoted after that?
5   A.  Yes, sir.
6   Q.  To what position?
7   A.  Institutional coordinator.
8   Q.  And do you recall when that was?
9   A.  No, sir.
10   Q.  Would it have been before or
11  after 2010?
12   A.  I have no idea.
13   Q.  As institutional coordinator,
14  you were assigned to a facility?
15   A.  I was assigned to a region.
16   Q.  And what was that region?
17   A.  The northern region.
18   Q.  And what facilities are in that
19  region?
20   A.  Limestone, William A. Donaldson,
21  St. Clair Correctional Facility, Decatur
22  Community-Based Facility, Hamilton A&I,
23  Hamilton Community-Based Facility, and

Page 23

1  then St. Clair Correctional Facility,
2  Elmore Correctional Facility, Draper
3  Correctional Facility, Staton
4  Correctional Facility, Alexander
5  Community-Based Facility, Childersburg
6  Community-Based Facility.
7   Q.  And --
8   A.  I think that's all.
9   Q.  Excuse me, I didn't mean to cut
10  you off.
11   A.  Bibb Correctional Facility.
12   Q.  That's a lot of facilities.
13   A.  Somewhere in the neighborhood of
14  13 to -- 13 to 15, somewhere.
15   Q.  And as institutional
16  coordinator, what was your
17  responsibilities with regard to those
18  facilities?
19   A.  I basically supervised the
20  wardens.
21   Q.  And what did that entail?
22   A.  Can you define?
23   Q.  So, would you meet with them

Page 24

1  often?
2   A.  I would meet with them when
3  necessary.  I would visit the facilities.
4  I would tour the facilities.
5   Q.  How often would you say you met
6  with them?
7   A.  We had regular meetings of
8  probably quarterly, we'll say, where --
9  in which they're all -- all wardens were
10  brought in for like quarterly meetings.
11      When I visited the facilities,
12  it could be random.  I can't give a
13  specific how often.  It was as needed,
14  basically, or as I felt like it was
15  needed.
16   Q.  So at your quarterly meetings,
17  what would be discussed?
18   A.  The various things going on in
19  the department.
20   Q.  And would that be so -- strike
21  that.  That's a bad question.
22      Would you go to these meetings
23  to report to the wardens things from ADOC

Page 25

1  commissioner, the commissioner's office?
2      MS. PUTMAN:  Object to the form.
3   A.  The meetings would normally have
4  an agenda.
5   Q.  Okay.
6   A.  And we generally followed the
7  agenda.  It could be from discussing
8  policy, procedures, changes within a
9  department, things put out by the
10  commissioner.  A lot of times, the
11  commissioner was down himself or would
12  make an appearance.
13   Q.  You mentioned an agenda.  Who
14  would draft that agenda?
15   A.  What position am I at now when
16  you're asking this question?
17   Q.  Institutional coordinator.
18   A.  Then normally, the associate
19  commissioner of operations in
20  coordination with the commissioner would
21  draft the agenda.
22   Q.  And do you recall who the
23  associate commissioner of operations was

7 (Pages 22 - 25)

1 while you were institutional coordinator?
2    A.   James DeLoach.
3       THE COURT REPORTER:  Say that
4 again?
5       THE WITNESS:  James DeLoach.
6       THE COURT REPORTER:  Thank you.
7    Q.   Would you discuss the conditions
8 at the prison at these facilities during
9 these meetings?
10    A.   Sometimes.
11    Q.   Would wardens -- was this an
12 opportunity for wardens to bring concerns
13 or issues to you as institutional
14 coordinator?
15       MS. PUTMAN:  Object to the form.
16    A.   Yes.
17    Q.   And what was it that you were
18 expected to do with the information you
19 received from the wardens?
20    A.   Look into it.
21    Q.   And were you responsible for
22 addressing the concerns or the issues
23 raised?

1    A.   Yes.
2    Q.   What kind of issues were raised?
3 Do you recall?
4    A.   All kinds.
5    Q.   Would the staffing levels at the
6 various facilities be brought up?
7    A.   Yes.
8    Q.   Would violence at the facilities
9 be raised?
10    A.   Yes.
11    Q.   Would the -- would contraband at
12 the facilities be discussed?
13    A.   Yes.
14    Q.   Would -- would issues with the
15 facilities such as fences or locks be
16 raised?
17    A.   Yes.
18    Q.   Were minutes taken at these
19 meetings?
20    A.   I don't know.  Not -- I don't
21 know.  Not -- not to my knowledge, not
22 that -- not minutes as you would take and
23 then everybody would get a copy of these

1 minutes, no.
2    Q.   Okay.  So you said you visited
3 the facilities as well.  Do you recall
4 about how often you would visit the
5 facilities as institutional coordinator?
6    A.   The goal was to get to all the
7 facilities within my region at least once
8 per quarter.
9    Q.   Was that a goal or was that a
10 regular -- a part of the ADOC
11 regulations?
12       MS. PUTMAN:  Object to the form.
13    A.   That was my goal.
14    Q.   Okay.  Was there a minimum
15 number of visits required under ADOC
16 regulations?
17    A.   No, sir.
18    Q.   About how many times as
19 institutional coordinator did you visit
20 St. Clair?
21    A.   For what period of time?
22    Q.   As institutional coordinator.
23    A.   Numerous.

1    Q.   So you said earlier that your
2 goal was to get to each facility once a
3 quarter.  Am I recalling that correctly?
4    A.   Yes.
5    Q.   Did you -- did you achieve that
6 goal?  Were you able to visit each
7 facility once a quarter?
8    A.   No.
9    Q.   So it's safe to say you visited
10 St. Clair less than -- less than four
11 times a year, typically?
12       MS. PUTMAN:  Object to the form.
13    A.   I probably visited St. Clair
14 more than four times a year.
15    Q.   Sorry, can you explain that?
16 Because you said -- oh, I see.  Okay.
17 So, why did you -- so, am I understanding
18 you correctly, you visited St. Clair more
19 than other facilities?
20    A.   I didn't say that.
21    Q.   Well, you said that you did not
22 visit each facility in your region every
23 quarter; right?

Page 30

1    A.   Say that again?
2    Q.   You testified that you did not
3  -- your goal of getting to each facility
4  every quarter, you did not achieve that;
5  correct?
6    A.   Correct.
7    Q.   But you visited St. Clair more
8  than four times a year; correct?
9    A.   Probably.
10   Q.   So that would mean that you
11 visited St. Clair more than other
12 facilities.  Is that right?
13   A.   Not necessarily.
14   Q.   Can you explain that to me?
15   A.   Because there were other
16 facilities I might have visited more than
17 St. Clair.  Just because I didn't -- just
18 because I say I went to St. Clair
19 probably more than four times in a year
20 does not mean that I -- there could have
21 been another facility I went to five or
22 six times within a year.
23   Q.   Understood.  Yeah.  And that

Page 31

1  wasn't -- my question was there was at
2  least one other facility you did not --
3  you visited less than St. Clair?
4    A.   At least one.
5    Q.   Understood.  And how would you
6  decide which facilities to visit?
7    A.   Well, the max facilities within
8  my region I probably visited more than I
9  would a work release facility.  Their
10 staffing situations were different.
11 Day-to-day operations within the
12 facilities are different.  There are any
13 number of things that could take place
14 that would cause me to have to go to a
15 facility.  And so the goal being to go at
16 least quarterly, but if there was an
17 incident that occurred at a facility and
18 I felt like I needed to be on site, then
19 I would go to the facility.
20   Q.   So, did you feel like you needed
21 to be on site at St. Clair often?
22        MS. PUTMAN:  Object to the form.
23   A.   I felt like I needed to be there

Page 32

1  any times that I went.
2    Q.   Okay.  Do you recall any
3  particular instance where you felt like
4  you had to go to St. Clair when you were
5  institutional coordinator?
6    A.   Yes.
7    Q.   Which instance -- can you --
8  which instance was that?
9    A.   If they had a major incident
10 that was happening.  I can recall one.  I
11 was in a -- we were actually having a
12 wardens meeting in the southern part of
13 the state and an incident occurred, and I
14 don't know what the incident was right
15 now, but I left that meeting to go to St.
16 Clair.
17   Q.   So it was significant enough for
18 you to leave a meeting?
19   A.   Yes.
20   Q.   Do you recall when that was?
21   A.   I do not.
22   Q.   Would that have been -- if there
23 were minutes for a wardens meeting, would

Page 33

1  that have been reflected in the minutes?
2    A.   I have no idea.
3    Q.   Okay.  As institutional
4  coordinator, were you -- what information
5  were you provided as institutional
6  coordinator about the facilities?
7    A.   Can you be more specif- --
8    Q.   Sure.
9    A.   -- specific?
10   Q.   Sure.  Were you provided the
11 staffing levels for each facility as
12 institutional coordinator?
13   A.   Yes.
14   Q.   How often?
15   A.   I don't recall.
16   Q.   Was it daily?
17   A.   I don't recall.
18   Q.   So, I mean -- okay.  Were you
19 provided -- did you -- strike that.
20       Were you provided incident
21 reports from the facilities?
22   A.   Yes, sir.
23   Q.   Were you responsible for reading

9 (Pages 30 - 33)

Page 34

1  all those incident reports?
2    A.  I wouldn't say I was responsible
3  for reading them.  I tried to read those
4  that were most critical.
5    Q.  Were you provided -- strike
6  that.
7        Were you provided with duty
8  officer reports?
9    A.  Yes.
10    Q.  Were you provided with I&I
11  investigation reports?
12    A.  Maybe some.  Not on a regular
13  basis.
14    Q.  Were you informed when staff at
15  the facilities were arrested or otherwise
16  caught breaking regulations?
17        MS. PUTMAN:  Object to the form.
18    A.  Yes.
19    Q.  Do you recall how often you
20  learned that an employee was arrested?
21    A.  Too often, but I can't recall a
22  number.
23    Q.  You just said "too often."  So,

Page 35

1  would one be too often?
2    A.  One would be too often.
3    Q.  Understood.  And do you recall
4  the circumstances of any of those
5  arrests?
6    A.  Contraband, being caught
7  bringing contraband into the facility.
8  That was probably the most prevalent.
9    Q.  And do you recall any of those
10  arrests being at St. Clair?
11    A.  Not specifically, no.
12    Q.  But did they occur at St. Clair?
13    A.  Yes.
14    Q.  As institutional coordinator,
15  did you review requests for improvements
16  on the facility?
17        MS. PUTMAN:  Object to the form.
18        But you can answer.
19    A.  I would say yes.  Yes.
20    Q.  So for example, if a -- if there
21  was a request to fix broken locks at a
22  facility, were you aware of that request?
23    A.  Yes.

Page 36

1    Q.  So you would be aware that locks
2  were broken?
3    A.  Yes.
4    Q.  Were you -- as institutional
5  coordinator, were you provided
6  information as to the capacity of each
7  facility?  The inmate capacity, I'm
8  sorry.
9    A.  Yes.
10    Q.  So you were aware if any
11  facility was operating above its designed
12  capacity?
13    A.  Yes.
14    Q.  You were promoted to the
15  position of associate commissioner in
16  2014.  Is that right?
17    A.  I don't remember the year, but
18  yes.
19    Q.  Is that -- is that a ballpark?
20    A.  I don't remember the year.
21    Q.  Okay.  You served as the
22  associate commissioner until 2018.  Is
23  that correct?

Page 37

1    A.  Yes.
2    Q.  So from 1981 when you started
3  until 2018 when you ended your career
4  with Alabama Department of Corrections,
5  that's about 40 years of experience.  Is
6  my math right there?
7    A.  It's 35, somewhere in that
8  neighborhood.
9    Q.  So, would you say that you had a
10  lot of experience and knowledge about the
11  ADOC prison system?
12    A.  Yes.
13    Q.  Can you walk me through your job
14  responsibilities as associate
15  commissioner of ADOC?
16    A.  Primarily, I supervised the
17  regional coordinators, oversaw -- through
18  the coordinators, oversaw the day-to-day
19  operations of the facilities, the male
20  facilities.  At one point, I think I had
21  responsibilities for transportation.
22  Maybe that was it.
23    Q.  So I'd like to -- I'm going to

10 (Pages 34 - 37)

Page 38

1 hand you what I'm going to mark as
2 Plaintiff's Exhibit 1 here. If I can put
3 the sticker on.
4      Mr. Culliver, do you recognize
5 this document?
6 (Plaintiff's Exhibit 1 was marked for
7 identification and is attached.)
8   A.  Yes.
9   Q.  Can you tell me what this
10 document is?
11   A.  Employee performance
12 preappraisal.
13   Q.  When have you seen this
14 document?
15   A.  During a review.
16   Q.  And so if you look at the top of
17 this first page here, it says period
18 covered from 10/1/2016 to 9/1/2017. You
19 see that?
20   A.  Yes, sir.
21   Q.  So you testified earlier that
22 you couldn't recall when you were
23 promoted to associate commissioner.

Page 39

1 According to this, you were associate
2 commissioner at least at the beginning of
3 2016; right?
4   A.  Yes, sir.
5   Q.  Okay.
6   A.  Or at least in October of 2016.
7   Q.  Yes, sir. If you go turn to
8 page 2, next to employee signature,
9 that's your signature; right?
10   A.  Yes, sir.
11   Q.  And underneath that, there's a
12 line item that says rater's signature?
13   A.  Yes, sir.
14   Q.  Is that Jefferson Dunn's
15 signature?
16   A.  It appears to be, yes.
17   Q.  And who was Jefferson Dunn?
18   A.  At this time, he was the
19 commissioner of the Alabama Department of
20 Corrections.
21   Q.  And was he your direct
22 supervisor as associate commissioner?
23   A.  Yes, sir.

Page 40

1   Q.  So if we go back to the first
2 page here, you see the box that says
3 "Responsibilities/Results," are these the
4 responsibilities that you had as
5 associate commissioner?
6      (Witness reviews document.)
7   Q.  We can walk through each if
8 that's easier, as well.
9   A.  I'm almost finished.
10   Q.  Understood. Take your time.
11      (Witness reviews document.)
12   A.  Yes.
13   Q.  So number 2 here says that you
14 were responsible for developing and
15 implementing policies and procedures for
16 maintaining the security and safety of
17 the inmates, facilities, and surrounding
18 communities. You see that?
19   A.  It says, "Provides assistance to
20 the institutional coordinators in
21 developing."
22   Q.  Yes. So as to the
23 responsibility for maintaining security

Page 41

1 and safety of inmates, facilities, and
2 surrounding communities, so was it true
3 that as associate commissioner, you were
4 responsible for ensuring the safety of
5 all of the inmates in ADOC custody?
6   A.  In form.
7   Q.  Can you explain that?
8   A.  One, I wasn't assigned to a
9 facility specifically, which means I was
10 not the day-to-day, on the ground. I
11 didn't work a shift -- or I did
12 sometimes, but I didn't -- I was not on
13 that responsibility. So within the grand
14 scope of things, yes, but the information
15 I'm receiving is generally after an
16 incident has occurred or if we're having
17 staffing issues, then I get a report that
18 we're having staffing issues, so things
19 like that.
20   Q.  So you mentioned if you were
21 having staffing issues. Was it your job
22 if you were told about staffing issues to
23 address them?

11 (Pages 38 - 41)

1    A.  To the best of my ability.
2    Q.  So you said that, in form, you
3  were responsible for the security, not --
4  strike that.  That's a bad question.
5        So you mentioned -- you just
6  said that you were -- you were required
7  to address staffing issues to the best of
8  your ability.  Can you explain that a
9  little bit?  What was the best of your
10 ability?
11   A.  Made aware, officer suggestions
12 based on the amount of staff that were at
13 the facility, if we could shift staff,
14 the number of people that may be assigned
15 to a shift.  Do we need to try and shift
16 more staff here or there.  We would have
17 discussions with the wardens about
18 recruiting.  Certain places were harder
19 to recruit than others.
20       So there were no immediate --
21 well, I take that back to a certain
22 degree.  We could borrow from Peter to
23 pay Paul.  We could borrow from one

1  facility and try to direct people to
2  another facility if -- those types of
3  things.  Authorized our correctional
4  emergency response team to work at a
5  facility for periods of time to assist
6  with staffing.
7    Q.  And so you said you would offer
8  suggestions.  Once you offered a
9  suggestion, were you responsible for
10 ensuring whether or not that suggestion
11 was put into action?
12   A.  Well, if I offered the
13 suggestion, it was for the warden to
14 review and see if that was going to --
15 would work.  Then there would be
16 discussions between the warden,
17 institutional coordinator, and myself as
18 to what would be best.
19       The warden, being at the
20 facility, should have been more
21 knowledgeable about what the needs of the
22 facility were at a specific time.  So I
23 may suggest that you move admin staff,

1  correctional officers who were working
2  admin duties, that you move those
3  officers from admin duties and reassign
4  them to a shift.  But then, I may have
5  been overlooking something that was going
6  on at the facility that, if we move that
7  admin officer, then this is what happens
8  here.
9        So there were suggestions.  If
10 I -- if I mandated, then they were
11 responsible for doing it.  If I made
12 suggestions, then they were suggestions
13 for them to look at, see if it was
14 feasible, to give me feedback as to
15 whether it was or it wasn't.
16   Q.  So, am I understanding you
17 correctly that a lot of your -- a lot of
18 your decisions were informed by
19 information you were receiving from the
20 wardens?
21       MS. PUTMAN:  Object to the form.
22       But you can answer.
23   A.  Yes.

1    Q.  And was it your responsibility
2  to ensure that the information that you
3  were receiving was full and accurate?
4    A.  Yes.
5    Q.  Okay.  Did you do that?
6    A.  I did my best to do it.
7    Q.  Okay.  And how would you do
8  that?
9    A.  I would discuss it with the
10 institutional coordinators who were
11 direct reports, go on site to actually
12 see.  From the standpoint of staffing, I
13 received the reports, so I basically
14 would know how bad or how good a facility
15 was doing as far as staffing levels were
16 concerned.
17   Q.  Okay.  So -- so you mentioned
18 that you could give mandates about
19 staffing.  Am I recalling that correctly?
20   A.  I could give mandates about
21 anything, but staffing was one of those,
22 yes.
23   Q.  Did you give staffing mandates?

Page 46

1    A.   Probably not.
2    Q.   Why not?
3    A.   Because probably -- I offered
4  suggestions.  They probably was normally
5  went through with, so there wasn't
6  necessarily a need.
7    Q.   I'm sorry, I didn't catch the
8  last part of that.
9    A.   Because when I made a suggestion
10  -- if we sit down and talk about
11  suggestions to try to make things better
12  for a certain shift or et cetera, then
13  there wasn't a need for any mandate
14  because normally those things were
15  followed or there was a better suggestion
16  that the warden may have or a regional
17  coordinator may have, and we might have
18  went that direction.
19    Q.   So in that case, if after those
20  discussions, it was clear that improve --
21  that nothing had improved even if the
22  suggestion wasn't put into place or it
23  wasn't successful, what was your

Page 47

1  responsibility?
2      MS. PUTMAN:  Object to the form.
3    A.   To continue to look for more
4  ways to try to make the situation better.
5    Q.   And what would you do -- strike
6  that.
7      Can you give me an example of,
8  with regard to staffing, when you looked
9  for a new way to make things better?
10    A.   As a department, we did any
11  number of things.  We worked with
12  marketing teams to find better ways to
13  reach out to try to get staff.  Through
14  the legislature, we tried to get salaries
15  raised, hoping that that would increase
16  people who wanted to come and work for
17  the Department, using an emergency
18  response team out of character to a
19  certain extent to fill voids that we had
20  in staffing.
21    Q.   Was -- are those the only --
22  strike that.
23      So I want to step back for a

Page 48

1  minute.  Going back like you testified
2  earlier that you were responsible for all
3  -- for the safety of all inmates in ADOC
4  custody in form, so -- and by that, am I
5  correct that you were saying that you
6  were responsible, but you weren't the one
7  on the ground implementing that at all
8  times.  Is that -- am I understanding
9  that correctly?
10    A.   For the most part, yes.  And
11  that -- that was male facilities, not all
12  facilities.
13    Q.   Understood.  So, was that
14  responsibility to ADOC, that was all --
15  for security and safety, that was as to
16  all inmates in these facilities; right?
17      MS. PUTMAN:  Object to the form.
18    A.   All male inmates in male
19  facilities?
20    Q.   Correct.
21    A.   Yes.
22    Q.   So that didn't depend on the
23  offense that the inmate may have;

Page 49

1  correct?
2    A.   It did not.
3    Q.   And did it -- was an inmate who
4  had more behavioral issues entitled to
5  less safety?
6    A.   No.
7    Q.   Okay.  Is there anything outside
8  of the items listed on the first page of
9  Plaintiff's Exhibit 1 that you were
10  responsible for as associate
11  commissioner?
12    A.   Not -- nothing that I can
13  specifically say.
14    Q.   We just talked about -- staffing
15  is not directly listed on here, but we
16  just talked about that you were
17  responsible for ensuring staffing; right?
18    A.   I don't think I said I was
19  responsible for ensuring staffing, but
20  staffing -- staffing issues were brought
21  to my attention, yes.
22    Q.   And you were responsible for
23  addressing those issues; right?

13 (Pages 46 - 49)

Page 50

1    A.  Yes.
2    Q.  Were you responsible for any
3  budgets?
4    A.  No, sir.
5    Q.  Were you responsible for
6  security audits?
7    A.  Yes.
8    Q.  Can you describe to me what a
9  security audit is?
10    A.  It's a -- it's a mechanism used
11  to, I would say, grade -- I would use
12  that word -- where a facility was in
13  their day-to-day security operations.
14    Q.  And do you recall how often
15  security audits were required to be
16  conducted?
17    A.  No, sir, I do not.
18    Q.  Do you recall how often they
19  were conducted?
20    A.  No, sir, I do not.
21    Q.  When a security audit was
22  conducted, you were responsible for
23  reviewing the report from that audit?

Page 51

1    A.  Yes, sir.
2    Q.  And what was your responsibility
3  with regard to follow-up from that
4  report?
5    A.  Basically -- basically, I would
6  get a -- well, first of all, I don't -- I
7  don't really recall at what point the
8  Department actually began doing security
9  audits.  I just -- I don't recall that.
10  And it was -- it was phased in over a
11  period of time.  But there -- the
12  documents itself and putting a team
13  together to actually go out and do
14  security audits, I just don't remember
15  exactly how many or which facilities
16  overall.  I cannot recall that.
17    Q.  So you said that you couldn't
18  recall when security audits began at
19  ADOC.  Did they begin while you were
20  associate commissioner?
21    A.  They actually began when I was
22  institutional coordinator, I believe.  I
23  don't recall security audits being done

Page 52

1  when I was a warden.
2    Q.  Okay.  And I'm sorry, did you --
3  do you recall how often they were done?
4    A.  No, sir.  There's a -- there's a
5  policy that says that, but I don't -- I
6  don't recall.
7    Q.  Do you know if that policy was
8  followed?
9        MS. PUTMAN:  Make sure and let
10  him finish.
11        MR. EARL:  Excuse me, I'm sorry.
12        MS. PUTMAN:  That's okay.
13    A.  I don't know.
14    Q.  Is it possible that it wasn't?
15    A.  It is possible.
16    Q.  Is it likely that it wasn't?
17        MS. PUTMAN:  Object to the form.
18    A.  It's possible.
19    Q.  And safe to say all these
20  responsibilities that we've been talking
21  about, those all applied equally to St.
22  Clair; correct?
23    A.  Yes, sir.

Page 53

1    Q.  You were an associate
2  commissioner at ADOC.  Were there other
3  commissioners as well?
4    A.  I don't understand the question.
5    Q.  So you were an associate
6  commissioner.  Were there -- and
7  obviously, you mentioned Jefferson Dunn
8  was the commissioner.  Were there other
9  commissioners at ADOC?
10    A.  There were deputy commissioners.
11    Q.  And who were they?
12    A.  I don't recall.  But the
13  difference -- the difference was an
14  associate commissioner is a merit system
15  in the State of Alabama's merit personnel
16  system.  A deputy commissioner is
17  appointed by the warden -- I mean,
18  appointed by the commissioner.
19    Q.  So --
20    A.  It is not a merit -- it is not a
21  merit position.  They work at the
22  pleasure of the commissioner.
23    Q.  Understood.  So, are you saying

14 (Pages 50 - 53)

Page 54

1 that as associate commissioner, you held
2 a higher rank than they did?
3    A.  No, sir.
4    Q.  So if they -- I guess my
5 question is, what is the difference
6 between a merit position and a position
7 serving at the pleasure of the
8 commissioner?
9    A.  Merit -- a merit position in the
10 State of Alabama's personnel policies, I
11 mean, there is -- the commissioner cannot
12 just fire me.  You know, I don't work at
13 the pleasure of the commissioner.  I have
14 a merit job, and as long as I meet these
15 standards (indicating), et cetera, my job
16 should be secure.
17       A deputy position, the
18 commissioner has the opportunity to
19 appoint whomever he chooses or she
20 chooses to that position, and whenever he
21 gets ready or she gets ready to release
22 them, they can do that without --
23 particularly without cause.  I mean, it

Page 55

1 doesn't have to be a cause.
2    Q.  Understood.  So, do you
3 recall -- you don't recall any of the
4 deputy commissioners that you -- that
5 were serving while you were associate
6 commissioner?
7    A.  I can try to give you positions
8 or responsibilities.
9    Q.  I'm sorry, I'm asking for names.
10   A.  Bran, that's the only person
11 that comes to mind at the moment, but
12 there were more.  I can't -- I can't even
13 remember the positions at this moment,
14 sir.
15   Q.  And now the question I think you
16 thought I was asking, which is, do you
17 recall what their responsibilities were?
18   A.  One of the areas was information
19 systems.  One was administration, I
20 think.  One dealt with information
21 systems.  And they -- the deputy
22 commissioner slots would normally have
23 about two to three divisions under them.

Page 56

1 I can't remember it all.
2    Q.  I'm sorry.  So, can you -- let's
3 do it this way.  Can you describe the
4 deputy commissioner position?
5    A.  I just did.
6    Q.  Well, you said that they had two
7 or three divisions under them.  I'm not
8 -- that doesn't tell me what they do.
9    A.  They do the same thing the
10 associate commissioners do (indicating),
11 but it's not within their -- how they got
12 the position is primarily the difference.
13 Their day-to-day jobs are the same.  They
14 have responsibilities for whatever
15 divisions that they are responsible for.
16   Q.  So, were their responsibilities
17 overlapping with yours?
18   A.  In one -- I don't -- I could --
19 yes.  I mean, somewhat in all of them
20 they overlap, because if the system's --
21 if the IT system is not working in the
22 facilities, that's a problem for me, so
23 we -- yes, we had to go back and forth.

Page 57

1       One of the -- one of the
2 positions had to do with maintenance, and
3 so the same.  If it wasn't -- if it was a
4 problem in a facility, because a deputy
5 commissioner was actually over our
6 engineering, then that's a problem for me
7 as well.
8    Q.  So, are you saying that the
9 deputy commissioner position was
10 organized by category?  So you said
11 there's a deputy commissioner of
12 engineering, or maintenance.  Is that --
13 so deputy commissioners were assigned to
14 specific subject areas?
15   A.  Yes.
16   Q.  Okay.  So, was it -- but, and
17 then -- so there were multiple deputy
18 commissioners per group of facilities.
19 Am I --
20   A.  I don't think the deputy
21 commissioners -- they weren't -- there
22 wasn't a facility they were presiding.
23 They were deputy commissioners within the

15 (Pages 54 - 57)

Page 58

1 Department of Corrections, not like an
2 institutional coordinator who was
3 assigned certain facilities to be
4 responsible for.
5     Q.  Understood.  So, and this is --
6 and you answered a little bit of this.
7 But could you just give me an overview of
8 the hierarchy at ADOC from commissioner
9 to associate commissioner and on down?
10     A.  You have commissioner, chief of
11 staff.  Associate commissioners were
12 equal across, and the deputy
13 commissioners were -- if you look at an
14 org chart, it goes across, straight
15 across.  You got a commissioner.  To the
16 left or to the right, you have his
17 executive secretary.  Directly up under
18 that, you would generally have a chief of
19 staff.  And from there, (indicating).
20     Q.  And so, I think we talked
21 earlier about what information you were
22 provided as institutional coordinator.
23 Were you provided -- was the information

Page 59

1 you were provided as associate
2 commissioner any different?
3     A.  Not specifically.  But
4 conversations with chief of staff and
5 commissioner -- the commissioner were
6 separate from -- you know, I may share --
7 depending on what that information was,
8 that information may be shared with the
9 institutional coordinators, and it may
10 filter down to the wardens or it may not.
11 It just -- just depended.
12     Q.  So as associate commissioner,
13 you received incident reports?
14     A.  I had access.
15     Q.  Were you responsible for
16 reviewing them?
17     A.  There's no way I could review
18 all of them.
19     Q.  That's not what I asked.
20     A.  I don't know if that was part of
21 -- it's not listed in here as a
22 responsibility, so I would say no.
23     Q.  Is it possible to fulfill these

Page 60

1 responsibilities without reviewing the
2 incident reports?
3     A.  Probably, yes.
4     Q.  How would you do that?
5     A.  I don't know.
6     Q.  Okay.  Would you review duty
7 officer reports?
8     A.  Yes.
9     Q.  Were you responsible for
10 reviewing the duty officer reports?
11     A.  It's not listed here.
12     Q.  Could you do -- could you
13 achieve these goals without reviewing
14 duty officer reports?
15     A.  Yes.
16     Q.  Is there a way to fully
17 understand the -- the events occurring in
18 a facility without reviewing the incident
19 reports?
20     A.  I don't know if it is.
21     Q.  So when your job responsibility
22 is to provide assistance to the
23 institutional coordinators in developing

Page 61

1 and implementing policies and procedures
2 for maintaining the security and safety
3 of the inmates, facilities, and
4 surrounding circumstances and you just
5 testified that there's no way -- you
6 don't know if there's a way to do that,
7 to ensure -- to understand the security
8 at a prison without reviewing the
9 incident reports.  Is that right?
10     MS. PUTMAN:  Object to the form.
11     A.  Yes.  The caveat to that is I
12 grew up in corrections, from a
13 correctional officer trainee to the
14 position I retired from, and so it was a
15 natural thing for me to delve into that,
16 or to try to see what happened.
17     If you were -- if you are
18 outside of corrections or if you don't
19 have a hands-on approach, yes, because
20 that information can be provided to you
21 without you reading the incident report.
22     Q.  But that information requires
23 that you're getting full and accurate

16 (Pages 58 - 61)

1 reporting from wardens and institutional
2 coordinators. Is that right?
3    A.  Yes.
4    Q.  So if you're relying solely on
5 the information from institutional
6 coordinators and wardens, is there any
7 way to be ensuring that you're getting
8 the full view of the circumstances at a
9 prison?
10    A.  I think -- I think yes.
11    Q.  Solely by relying on the
12 information --
13    A.  If you trust the people that
14 you're relying on, yes.
15    Q.  And did you ever not trust
16 anyone you were relying on?
17    A.  I can't answer that question.
18    Q.  Because you don't know or?
19    A.  Because I tried to read through
20 reports -- can I -- can I just provide a
21 caveat about incident reports?
22    Q.  Please.
23    A.  Okay.  So duty officer reports

1 -- and this could have changed in the
2 last four years.  I have no idea.  And
3 really, I'm struggling with this because
4 I divorced myself from corrections.  I
5 really have little or nothing to do with
6 that.  Okay?  So.
7        But the incident reports, a duty
8 officer report is considered -- you get a
9 duty -- a duty officer report goes out if
10 it's a Class A or a Class B incident.
11 Okay?  And the associate commissioner of
12 operations at the time that I was there
13 would automatically get those reports.
14 They were e-mailed to you.  Twenty-three
15 facilities, that could be a hundred
16 reports in a 24-hour period, but -- not
17 likely, but it could be.  So those --
18 those come, and I did my best to try and
19 at least scan those reports.
20        Class A incidents, I won't say
21 that I've read each and every one of
22 those duty officer reports, but I would
23 say 95 percent of them, I did.  So I took

1 it upon myself, it was my -- my thought
2 was to -- in order to keep a pulse
3 because that -- once you get to this
4 level within the department, some people
5 tend to kind of let that go, separate.
6 Or I wouldn't say let it go, but they
7 separate themselves from that to a degree
8 because there -- there are people under
9 you that are supposed to be doing their
10 job and doing that.  And the person that
11 is at this level generally has things
12 reported to them.  And I think if you --
13 if you check across the country and
14 people at this level, that's generally
15 how that works.
16        But I grew up in this, so it was
17 an interest to me; it was a concern to me
18 because I was concerned for the staffing
19 and inmate welfare within the facilities.
20        And so we can go back to your
21 questions now.  I just -- I don't -- I
22 don't know how much you know about the
23 system and how reports come and the

1 differences in a Class A, a Class B, a
2 Class C report.
3    Q.  Well, and that's a good -- well,
4 I guess I'll start here.  I do just want
5 to clarify.  So everything I'm asking you
6 is about your experience while you were
7 there.  So you mentioned you don't know
8 how it is now.  I'm solely limiting it to
9 your --
10    A.  I understand that.
11    Q.  Yeah.
12    A.  But in my caveat to try to
13 explain that to you, I'm saying that all
14 this could have changed, whatever, but
15 this is the way it was when I was there.
16    Q.  Understood.
17    A.  Yeah.
18    Q.  I just wanted to make that
19 clear.
20        So to your point, can you please
21 define a Class A incident to me?
22    A.  I can't give you what they were
23 specifically.  A homicide was, a suicide

17 (Pages 62 - 65)

Page 66

1　was, a natural death was. Depending on
2　the level, an act of violence, it could
3　be. And there are others, but those are
4　things that come to the top of my head.
5　　Q. Who was responsible for
6　classifying an incident as Class A or
7　Class B?
8　　A. There is a policy --
9　　Q. Okay.
10　　A. -- in place in the -- and the
11　type of incident that occurred, if the
12　policy -- if the policy is followed, then
13　you just follow the policy. So the list
14　of incidents, the list of type, there's a
15　whole range of list of types of
16　incidents, and they are broken down into
17　Class A, Class B, and Class C.
18　　Q. And what was the difference
19　between Class B and Class C incidents?
20　　A. Class B, I can't give you a good
21　example, but I -- because this may not be
22　right. But say a Class B may be a fight,
23　a fistfight.

Page 67

1　　　A Class C would be -- it could
2　be -- there's a whole variety of those.
3　But it could be basically failure to
4　obey, when an inmate failed to do what an
5　officer told them to do. It didn't lead
6　to any use of force. It didn't -- and
7　none of those things happened. He simply
8　just failed to do what he was told.
9　　Q. So you mentioned that there
10　might be -- and there might be a hundred
11　reports e-mailed to you in a day. Is
12　your testimony that you didn't review all
13　of the reports that came to you because
14　there were too many to review?
15　　　MS. PUTMAN: Object to the form.
16　　A. I reviewed -- ask the question
17　again.
18　　Q. I'll ask it this way. Were
19　there too many reports coming in to you
20　of Class A, Class B incidents for you to
21　review?
22　　　MS. PUTMAN: Object to the form.
23　　　But you can answer.

Page 68

1　　A. No, not necessarily. Class A
2　and Class B reports, I didn't read a lot
3　of Class A and Class B reports per se,
4　but I read duty officer reports.
5　　　A duty officer report and an
6　incident report are two different things.
7　They start out the same, but they are --
8　they are different.
9　　Q. Can you explain that difference
10　to me?
11　　A. A duty officer report basically
12　gives a synopsis, and it's the first --
13　the first viewing so that the powers that
14　be know that we had this major incident
15　at a facility, and then it's followed up
16　with an incident report that goes into
17　greater detail about what actually
18　happened.
19　　Q. So for every incident, there was
20　an incident and a duty officer report?
21　　A. I don't remember. I know duty
22　officer reports were done for the A and
23　B. I don't think a duty officer report

Page 69

1　is done for a C incident.
2　　Q. Understood. And you reviewed
3　duty officer reports or incident reports?
4　　A. Duty officer reports.
5　　Q. So, were there too many duty
6　officer reports coming in to you to
7　review?
8　　A. I read all duty officer reports.
9　I can't say that I never missed reading
10　an A or B. I would pretty much -- and I
11　-- I'll say any and every A report that
12　ever came in, I -- unless I was sick or
13　wasn't there or on vacation or whatever,
14　even coming back off of vacation, I'm
15　trying to catch that up. Actually, my
16　phone stayed with me all the time so
17　there was no vacation for real if you
18　asked my wife, so. She just says I
19　worked all the time, and I am a
20　workaholic, so that was the -- there were
21　numerous A and B reports coming in daily.
22　I would not say that there was too many,
23　no.

18 (Pages 66 - 69)

Page 70

1    Q.   You mentioned earlier that there
2  are certain people who get to your level
3  that separate themselves.  Can you
4  describe -- can you explain what you
5  meant by that?
6    A.   I think it's like any executive
7  in any other profession.  So you're an
8  attorney.  If you aspire to be the
9  attorney general of a state, you're not
10 going to be able to keep up with
11 everything that goes on across that state
12 every day.  You have people in place.
13 There are certain cases that will be of
14 greater interest to you than others for
15 whatever reason.
16       So it's -- it's no different.
17 The Department of Corrections is no
18 different.  The warden -- I felt my job
19 as associate commissioner was -- I didn't
20 have -- I didn't need a commissioner.  I
21 didn't need for everything to have to run
22 to him or somebody to have to go to him
23 to get an answer.  He had enough trust in

Page 71

1  me.  He fired me one time, then he hired
2  me back.  He had enough trust in me to --
3  "This is your responsibility."
4       And when there was something
5  that I felt he needed to know, then I
6  would make sure he knew.
7    Q.   So -- and you mentioned this
8  earlier as well, that a lot of this
9  involves having trust in the people
10 reporting to you.  Is that right?
11   A.   Yes, sir.
12   Q.   Were there people that were
13 reporting to you that you didn't trust?
14   A.   I would say there were people
15 that reported to me that I trusted more
16 than others.
17   Q.   Who were the people you trusted
18 less?
19   A.   Just people.
20   Q.   You don't recall any names?
21   A.   Yeah.  Yes, I do.
22   Q.   Who were those people?
23   A.   Well, people I -- the one person

Page 72

1  -- the one person I would say was Edward
2  Ellington, and his experience -- that's
3  probably not right, either.
4       My confidence level in Edward
5  Ellington and Cheryl Price was different.
6  Cheryl Price I had worked with in
7  facilities for years in and out.  We
8  basically started corrections
9  approximately the same time.  We were at
10 one facility together for a number of
11 years.
12       Edward Ellington, I didn't have
13 any -- I didn't have any real outside
14 work with him.  He came -- as a
15 coordinator, I had not necessarily worked
16 with him in the field.  And he had been
17 in women's services or at a women's
18 facility, and so our contact was not
19 nearly as great, and so my confidence
20 level was not as secure with him as it
21 was with Cheryl Price.
22   Q.   So, what was Edward Ellington's
23 position?

Page 73

1    A.   Institutional coordinator,
2  regional coordinator.
3    Q.   And Cheryl Price's position?
4    A.   Same.
5    Q.   And had -- do you recall how
6  long you worked with Edward Ellington?
7    A.   No, sir.
8    Q.   Was it more than one year?
9    A.   Yes, sir.
10   Q.   Was it more than two?
11   A.   I don't know.  I don't -- I
12 really don't recall.
13       I will also say that, to just
14 put that into context, Gwen Mosley and I
15 were institutional coordinators together.
16 When I was promoted to associate
17 commissioner, I had more confidence in
18 Gwen Mosley than I did in Cheryl Price
19 because we were -- we were there
20 together.  We -- I made warden, and she
21 was a warden, so.
22   Q.   Did Mr. Ellington ever do
23 anything that caused you to not to trust

19 (Pages 70 - 73)

Page 74

1 him?
2    A.  Not that I can recall.
3    Q.  So, do you recall ever reviewing
4 -- strike that.
5        So stepping back to your
6 position as associate commissioner of
7 operations, you received -- we just
8 talked about incident reports and duty
9 officer reports.  You received I&I
10 investigation reports?
11    A.  I don't recall.  If I did, it
12 was not on a regular basis.
13    Q.  What about homicide reports?
14    A.  Homicide reports from?
15    Q.  Were there specific -- were
16 there reports that were distributed
17 specifically geared towards homicides
18 when homicides occurred in the
19 facilities?
20    A.  The same, duty officer report,
21 duty officer report, incident report.
22    Q.  Understood.  What about requests
23 for repairs at facilities?

Page 75

1    A.  They -- to the best of my
2 recollection, they went to engineers.  So
3 each facility has a maintenance staff,
4 and it depended -- sometimes it would
5 depend on the level of -- at some point,
6 irregardless, because there were -- there
7 were meetings.  There was a committee or
8 a team that met, I want to say once a
9 month, maybe biweekly.  I can't recall.
10 But the deputy commissioner over
11 engineers, the -- I don't know the title,
12 but the person that was over -- actually
13 over engineers itself.  I know it sounds
14 redundant, but there was another person
15 that was under the deputy commissioner
16 that basically ran engineers, the
17 day-to-day.  The deputy commissioner over
18 women's services, myself, and the
19 accounting director, and there would
20 sometimes be other people at the table.
21 But when requests were made, that was the
22 process that we kind of went through, so.
23    Q.  But that process ended with a

Page 76

1 meeting that you attended.  Is that
2 right?
3    A.  Yes.
4    Q.  And is that where -- is that
5 when requests would be approved or not
6 approved?
7    A.  I won't -- I don't know.  And I
8 say I don't know.  In some cases, yes.
9 And then in some cases, funding may have
10 had some implications on that.  So for
11 the most part, the answer would be yes.
12 But, I mean, an item -- an item could be
13 pushed back or taken off, but it didn't
14 need my authorization to do that, but --
15 you know.
16        So sometimes -- sometimes there
17 was -- one thing may have been a priority
18 at this point, but before that project
19 was began, there may -- something else
20 may come up, and that project had to be
21 pushed back and something else took
22 precedence.
23    Q.  But safe to say -- strike that.

Page 77

1        So any requests for facility
2 repairs would be coming through this
3 meeting, though.  Is that correct?
4    A.  Major.
5    Q.  What would be considered a major
6 request?
7    A.  Anything that needed capital
8 funding, emergency-type situations, and
9 then just different projects.  If
10 Tutwiler needed more activity space, that
11 might be on that list.  I mean, it's.
12    Q.  What projects would require
13 capital funding?
14    A.  I think it had to do with how
15 much funding was needed.  I can't recall
16 that specifically, but yes.
17    Q.  And who was responsible for
18 classifying a situation as an emergency
19 or not?
20    A.  At the end of the day, I think
21 it would be a collaboration between the
22 deputy commissioner of engineers and
23 myself if it was a male facility.

20 (Pages 74 - 77)

Page 78

1   Q.  So --
2   A.  And then --
3   Q.  Oh, I'm sorry.
4   A.  And then the accounting
5   director.
6   Q.  Understood.  So, does that mean
7   that you received and reviewed every
8   request for repairs at a facility?
9   A.  No.
10   Q.  So if you were responsible for
11   deeming whether a request was an
12   emergency or not, how would you be able
13   to do that without reviewing each
14   request?
15   A.  I can't give you an answer for
16   that.
17   Q.  Okay.  As associate commissioner
18   of operations, would you review meeting
19   minutes?
20   A.  What kind of minutes?
21   Q.  Meeting minutes.
22   A.  Meeting minutes of what?
23   Q.  Security staff meeting minutes.

Page 79

1   A.  For a facility?
2   Q.  Yes.
3   A.  No.
4   Q.  What about staff meeting minutes
5   at a facility?
6   A.  No.
7   Q.  What about quality improvement
8   team meeting minutes?
9   A.  What is quality improvement team
10   minutes?
11   Q.  Well, that's a question for you,
12   I think.  Do you know?  You know what the
13   quality improvement team is?  What about
14   QIT?
15   A.  I don't.
16   Q.  I'm sorry, you still don't?
17   A.  I don't.  It doesn't ring a
18   bell.
19   Q.  Okay.  Would you attend any of
20   these?  Would you attend security staff
21   meetings?
22   A.  Rarely.
23   Q.  What about staff meetings?

Page 80

1   A.  Rarely.
2   Q.  And safe to say you didn't
3   attend QIT meetings?
4   A.  I don't even know that that
5   existed when I was at -- I don't know
6   what a QIT meeting is.
7   Q.  What about memoranda, do you
8   recall receiving memoranda?
9   A.  Yes.
10   Q.  From whom?
11   A.  The wardens.  I mean, I got them
12   from up and I got them from down, I mean.
13   Q.  And what would -- do you recall
14   any specific examples that you received?
15   A.  It could be about almost
16   anything.
17   Q.  What would be the reason for you
18   receiving a memoranda?
19   A.  I can't give you anything
20   specific.  I could just be copied.  I
21   can't -- I can't tell you.  I can't tell
22   you.
23   Q.  I guess what I'm asking is, what

Page 81

1   would be the reason for putting something
2   in a memoranda versus a phone call or
3   discussing it at a meeting?
4   A.  It doesn't say in writing if
5   they didn't write it then.
6   Q.  Understood.
7      So I want to go back quickly to
8   our discussion about Mr. Ellington.  So
9   you mentioned you didn't trust him
10   as much as you trusted others.  Is that
11   right?
12      MS. PUTMAN:  Object to the form.
13   A.  Confidence, I didn't have as
14   much confidence.
15   Q.  So if you didn't have as much
16   confidence in him, yet he reported to
17   you, how did you bridge that gap?
18   A.  I don't know.  I don't think
19   that was hard.  I mean, just like working
20   with you, I probably wouldn't have a
21   whole lot of confidence in you, but if
22   you had a job to do or if I had a job to
23   do for you, I'm going to do my job.

21 (Pages 78 - 81)

Page 82

1    Q.  So --
2    A.  So until I -- and I tried to --
3  I tried to go back and explain that.
4  Your term was "trust," and I agreed to
5  trust, but it was about confidence, the
6  amount of confidence I had in that
7  particular person.
8        And so I think the more you work
9  with a person, you learn more things
10  about them, then, you know, your level of
11  confidence or your level of trust goes up
12  with them.
13    Q.  So as part of your role, would
14  you -- was part of your role to review
15  information to ensure that you could --
16  you could trust the people reporting to
17  you?
18    A.  It was natural.  I don't know.
19  It's not part of a role, at least I don't
20  think.  I think people do that without
21  doing it.  But for me, I think it's a
22  natural thing.  So if you tell me
23  something and then I find out you lied to

Page 83

1  me, then that's an issue.  So, you know,
2  if you tell me something and you
3  consistently tell me things and I find
4  out what you were telling me is correct,
5  then I double-check less and move forward
6  more.
7    Q.  Do you recall a situation where
8  someone lied to you?
9    A.  I do not.
10    Q.  What about performance, would
11  you review information you received to
12  ensure that the people reporting to you
13  were performing to your standards?
14    A.  Repeat the question, please?
15    Q.  Would you review the information
16  received, whether it be the duty officer
17  reports or other information, to ensure
18  that the people reporting to you were
19  meeting your standards?
20    A.  Direct report or indirect?
21  Because I only had three people,
22  literally, that directly reported to me.
23  So, are you -- are you specifying direct

Page 84

1  reports or indirect?
2    Q.  Both.
3    A.  Direct reports, I wouldn't say I
4  was -- I wouldn't say it was -- I
5  wouldn't say it was a responsibility.  It
6  is in one way, but it is not.  I was
7  going to make sure that the information
8  that I got, I was -- I was looking to
9  make sure that was correct.
10        But as I said, though, as the
11  confidence level -- if every time you
12  bring me something, that's it, then I'm
13  going to pay less and less attention to
14  what's in the small print than I -- than
15  I would.
16    Q.  I'm sorry, can you explain that
17  a little bit?  What did you mean by
18  you'll "pay less and less attention to
19  what's in the small print than I would"?
20    A.  It's the same analogy that I
21  just gave you about being the attorney
22  general.  It's the same.
23        If you work with someone on a

Page 85

1  day-to-day basis and the information that
2  they bring you is accurate -- I mean,
3  when you first start, you may
4  double-check that; right?  Or you may
5  talk to somebody else about that to see.
6  If it doesn't sound right to you, if it
7  doesn't sound like the norm, then you may
8  say, well, I don't think that's happened
9  before or that doesn't sound right, so
10  you may look it up.  But as your
11  confidence -- my confidence builds up in
12  you, then less and less do I go back
13  trying to double-check that.
14    Q.  So, was accuracy the main factor
15  you considered in whether you trusted a
16  subordinate or not?
17        MS. PUTMAN:  Object to the form.
18    A.  I guess that's kind of hard for
19  me to say.  I don't know.  I never
20  thought about it before.  I never thought
21  about how my thought process got me to
22  where I was where I trust somebody or
23  have confidence in them.

22 (Pages 82 - 85)

Page 86

1  Q.  Well, so, for example, if you --
2  if you received a memoranda that was
3  accurate and accurately detailed an
4  incident but the facts of that incident
5  suggested that the person didn't do their
6  job correctly or was not meeting quality
7  standards under that position, would that
8  be something you would be looking for?
9      MS. PUTMAN:  Object to the form.
10     A.  Repeat, please.
11     Q.  Yeah, that was not a good
12  question, I apologize.
13     MS. PUTMAN:  Hey, can we take
14  about a five-minute break?
15     MR. EARL:  Yeah.
16     MS. PUTMAN:  Okay.
17     THE VIDEOGRAPHER:  We're going
18  off the record at 10:25.
19     (Break taken.)
20     THE VIDEOGRAPHER:  We're going
21  back on the record at 10:37.
22     Q.  (By Mr. Earl) Mr. Culliver,
23  before we took a break, you mentioned

Page 87

1  that you were confident in people
2  reporting to you if they gave you
3  accurate information.  Do you recall
4  that?
5      A.  Yes, sir.
6      Q.  What did you do to confirm that
7  the information being given to you was
8  accurate?
9      A.  I'm going to use a scenario.
10  Let's say I write the -- I read over a
11  duty officer report.  If there was a
12  Class A, a Class B incident, particularly
13  Class A -- we'll stick with Class A.
14      If there was a Class A incident,
15  if the regional coordinator -- and let's
16  say it took place after hours.  If I
17  didn't hear from the regional coordinator
18  after hours, then that's my first stop
19  that morning to find out who they talked
20  to, da, da, da, and then I may have some
21  questions about the report.  If there was
22  a Class A report -- it just depended on
23  what it was -- then I may pick up the

Page 88

1  phone and call the warden at the
2  facility.  And what the warden or the
3  duty officer at the facility reported to
4  the regional should have been the same
5  thing the regional reported to me.  So we
6  should stay -- we should be in the same
7  thing.  So that -- that's not like every
8  time, but it just depends.
9      I don't know if I answered your
10  question or not.  I just -- that's how --
11  I guess indirectly and maybe without even
12  knowing it, that's how I was validating
13  this.  But as I think about how the
14  validation would come about, those are
15  the types of things that I would do.
16     Q.  So, do you recall a situation
17  where you felt like you needed to call
18  the warden about a report you received?
19     A.  Not specifically, no.
20     Q.  So for example, if you reviewed
21  a duty officer report that stated that an
22  inmate was stabbed but the duty officer
23  report didn't classify the category of

Page 89

1  incident as involving a weapon, would
2  that raise issues with you?
3      MS. PUTMAN:  Object to the form.
4      But you can answer.
5      A.  Please repeat.
6      Q.  So if, for example, you reviewed
7  a duty officer report where the narrative
8  explains that an inmate was stabbed but
9  the incident -- the classification of the
10  incident does not indicate that it
11  involved a weapon, so for example, the
12  incident is classified as an assault but
13  it doesn't say assault with a weapon,
14  would that raise issues of concern for
15  you?
16     MS. PUTMAN:  Object to the form.
17     A.  That's -- there's a concern
18  there, but I'm not going to turn
19  cartwheels about it.  I'm not.  That's a
20  -- I think you would have to actually
21  understand the inner mechanics of the --
22  of the system of how the module is set up
23  and how that module works to be able to

23 (Pages 86 - 89)

1  do that.
2      If you say there was an assault
3  and I read in the narrative that it was a
4  stabbing or believed to be a stabbing, if
5  it said they didn't find a weapon or the
6  questions didn't mention a weapon, then
7  at that particular time when that
8  happened, when that person that was doing
9  that, that's what they had was an assault
10  that they didn't really know.  It's -- I
11  wouldn't say that it's easy to say, you
12  know, if I had a puncture wound in my
13  side that something happened, but I could
14  have fallen on a bed, so I might not know.
15  So that could raise -- it would have to
16  -- there would have to be more details
17  involved for me to say, "Why you didn't
18  do this assault with a weapon as opposed
19  to assault?"  And that's not a -- that's
20  really back to the regional coordinator
21  because the regional coordinators
22  actually supervise the wardens.  And I do
23  too, but it's.

1      Q.  So if, for example, the
2  narrative was specific enough to say that
3  the inmate was stabbed, but in the
4  scenario I'm talking about, occurred
5  where the duty officer report doesn't
6  classify it as involving a weapon, then
7  that would be concerning to you?
8      A.  I would want to know why.
9      Q.  That would be inaccurate
10  information; right?
11      MS. PUTMAN:  Object to the form.
12      A.  I would need to know why.  I
13  would need to know the why first before I
14  could say that was actually inaccurate.
15      Q.  Mr. Culliver, you mentioned the
16  term "module."  Can you explain to me
17  what that is?
18      A.  I tried already.  It's -- so the
19  reports are done on a computer, and
20  there's a module, there's an incident
21  report module that you click an app and
22  it takes you to the app.  And it's like
23  filling a form (indicating), you know, so

1  you get to type of incident, there's a
2  list of types of incidents that you do.
3      If it was a homicide, it was --
4  there's got to be an A.  It won't -- the
5  module won't move forward because that's
6  a Class A.  You cannot put that's a Class
7  C incident in.  It won't take it, or it
8  shouldn't take it.  I won't say it won't,
9  but it should not take it.
10      So, does that --
11      Q.  Yeah.  I guess, are the -- is
12  what is input into that module stored
13  somewhere?
14      A.  Yes.
15      Q.  Is there a database?
16      A.  Yes.
17      Q.  Do you know how long that
18  database was in place?
19      A.  Not specifically, but quite a --
20      Q.  Was --
21      A.  -- quite a while.
22      Q.  -- that in place while you were
23  an institutional coordinator?

1      A.  Yes.
2      Q.  Was that in place while you were
3  a warden?
4      A.  Yes.  Before I -- before I was
5  promoted, I'm pretty sure that was in
6  place.  I'm not totally sure, but yes.
7      Q.  And was there a specific name
8  for that database?
9      A.  I'm not sure I understand the
10  question.
11      Q.  How was it referred to?  Was it
12  called the incident database?  Was it
13  called -- is there some way it was
14  referred to within ADOC?
15      A.  Incident module.
16      Q.  Incident module.  Okay.
17      A.  Or incident report module
18  sometimes.
19      Q.  And who had access to that
20  incident report module?  The database, I
21  mean, not the --
22      A.  Not (indicating)?
23      Q.  I don't mean the individual

24 (Pages 90 - 93)

Page 94

1 reports but the database itself.
2    A.  So I'm probably a little slow
3 with the technical terminology, so you
4 probably need to break that down in order
5 to --
6    Q.  So I guess what I'm asking is,
7 right, all -- so an incident occurs.  The
8 officer who dealt with it puts in a duty
9 officer report; correct?
10    A.  Correct.
11    Q.  That duty officer report is
12 generated in this module.
13    A.  Correct.
14    Q.  Correct?  That duty officer
15 report is then -- the report itself is
16 then disseminated presumably to the
17 warden, to the institutional coordinator,
18 then to you.  Is that right?
19    A.  That's correct.  Well,
20 simultaneously, but yes.
21    Q.  Understood.
22    A.  Yeah.
23    Q.  And then that duty officer

Page 95

1 report is also saved somewhere with the
2 duty officer reports from the day before
3 and the day before and the day before.
4 Is that right?
5    A.  Correct.
6    Q.  Who has access to the repository
7 of incident reports?  Can anybody at ADOC
8 access that, that database?
9    A.  At the facility -- I'm not
10 positive, but at the facility, unless
11 it's marked confidential, then if you
12 have access to the incident module, you
13 use that.  But if I'm at Hillbrook and it
14 happened at Ocean View, the people at
15 Ocean View can view Ocean View reports,
16 people at Hillbrook can review Hillbrook
17 reports.
18        As it comes up, then the
19 institutional coordinators and myself,
20 the associate commissioner, I'm fairly
21 sure that the commissioner had access.  I
22 don't know about chief of staff because
23 that really wasn't -- the security was

Page 96

1 not the thing.  And I don't know what
2 other commissioners actually had access
3 to the reports.  I don't know.
4    Q.  Okay.  And that would be -- that
5 would contain every duty officer report,
6 so that's A, B, and C?
7    A.  Yes, sir.
8    Q.  Going back to how you measured
9 your confidence in your subordinates,
10 aside from accuracy, was there any other
11 instance or -- strike that.
12        Aside from accuracy, was there
13 anything else that could occur that would
14 cause you to lose confidence in your --
15 in the people reporting to you?
16    A.  I can't think of anything.
17    Q.  So for example, if you had --
18 even if you had received accurate
19 information but that information
20 suggested that the employee was
21 underperforming or -- would that cause
22 you to lose confidence in them?
23        MS. PUTMAN:  Object to the form.

Page 97

1    A.  I don't -- I don't know
2 specifically.  I can't answer that
3 specifically.  It would probably have to
4 -- it would probably depend on what it
5 was.
6    Q.  So, were you reviewing -- strike
7 that.
8        As your -- in your role as
9 associate commissioner of operations, did
10 you review and analyze things to decide
11 and ensure that the people underneath you
12 were doing their jobs?
13    A.  They had results and
14 responsibilities just like I did
15 (indicating).  That's part of my job is
16 to do that, yes.
17    Q.  So you were evaluating their
18 performance?
19    A.  Yes.
20    Q.  And do you recall any instance
21 where you had concerns or issues with
22 someone's performance?
23    A.  Not specifically, no, sir.

25 (Pages 94 - 97)

Page 98

1    Q.  Did it ever happen?
2    A.  I don't know.
3    Q.  Okay.  So --
4    A.  I can't -- I can't remember a
5  time where -- I mean, so the coordinators
6  were -- one was two offices down and the
7  other one was three offices down from me.
8  We talked back and forth throughout the
9  day.  If they had situations, they would
10  bring them to me.  If we needed to
11  collectively sit down and talk about some
12  things, then we did that.
13      I'm not really a hard ass as a
14  supervisor.  I just want you to do your
15  job, and as long as -- I think everybody
16  works differently.  And so the accuracy
17  part, right, if you're lying to me,
18  that's a serious issue to me; right?  If
19  you make a mistake in what you tell me,
20  then that takes some points off, too, but
21  it doesn't as if you just lied; right?
22  If you repeatedly make the same mistake,
23  then we have an issue, if that helps you.

Page 99

1    Q.  It does.
2    A.  Okay.
3    Q.  And how would you ensure whether
4  -- subordinates were not repeatedly
5  making the same mistakes?
6    A.  Discussions.  If I -- if I said
7  we need to do X, Y, Z, you have a time
8  frame for X, Y, Z, whether you met that
9  time frame, whether you did what I told
10  you to do.
11    Q.  You mentioned discussions.  Were
12  those -- those discussions were with the
13  institutional coordinators?
14    A.  Yes.
15    Q.  So for example, you mentioned
16  earlier that you were less confident with
17  Mr. Ellington, who was an institutional
18  coordinator; right?
19    A.  Yes.
20    Q.  So presumably, you had to -- you
21  had to also ensure that he was doing his
22  job; correct?
23    A.  Yes.

Page 100

1    Q.  So, how can you do that when
2  you're only relying on him to bring
3  issues with his direct reports to you?
4      MS. PUTMAN:  Object to the form.
5    A.  Repeat, please.
6    Q.  If the way in which you were
7  evaluating whether employees were meeting
8  their performance standards was reliant
9  on the institutional coordinators coming
10  to you with and identifying potential
11  issues, how were you then also able to
12  evaluate the institutional coordinators?
13      MS. PUTMAN:  Object to the form.
14    A.  Based on what they brought to
15  me.  Based on whether or not the
16  decisions that was made, whether those
17  were carried out or not carried out.  If
18  I got something from a warden before I
19  got it from the institutional
20  coordinator.  If the warden and I
21  discussed some issue and the
22  institutional coordinator was included in
23  that and we said we were going to do X,

Page 101

1  Y, Z, a week later or two weeks later,
2  the warden calls and says, "Grantt, what
3  happened?"  Those are the ways, I guess.
4    Q.  You mentioned you would do that
5  evaluation based on what the
6  institutional coordinators brought to
7  you.  You wouldn't know the things they
8  didn't bring to you though; right?
9    A.  If it -- if it was to a serious
10  enough level, I would because somebody
11  else would tell me.  That's what I just
12  -- that's what I call myself trying to
13  just explain to you.  That's the check
14  and the balance.  Or when I go to the
15  facility, if I walk through and we said
16  we were going to do X, Y, Z, that's not
17  done, that's a check and a balance.
18    Q.  So we've been talking a lot
19  about reporting to you.  Can you walk me
20  through who you reported to?
21    A.  Commissioner Dunn.
22    Q.  And --
23    A.  The chief of staff.

26 (Pages 98 - 101)

1    Q.  And I'm sorry, who was the chief
2  of staff while you were associate
3  commissioner?
4    A.  Last name was Brown, Steve
5  Brown.
6    Q.  And how would you give reports
7  to Mr. Dunn?
8    A.  Mostly verbally.
9    Q.  Did you use e-mail?
10    A.  Sometimes.
11    Q.  Would you have regular meetings
12  with Mr. Dunn?
13    A.  We had a regular -- well, not
14  specifically.  The team had a meeting
15  every Monday, I think, once a week.
16    Q.  Who else was in that meeting?
17    A.  All the commissioners.  All the
18  associate and deputy commissioners.  My
19  bad.
20    Q.  And were there minutes taken of
21  those meetings?
22    A.  I never saw any.  The executive
23  secretary was in the meetings.

1    Q.  Was counsel included in those
2  meetings?
3    A.  Yes.
4    Q.  Every single one?
5    A.  I can't recall one -- if the
6  chief counsel for ADOC wasn't there,
7  there would normally be a substitute
8  there.
9    Q.  And what is it that you would
10  report to Mr. Dunn?
11    A.  Whatever transferred -- whatever
12  rose to that level that I thought and it
13  was -- well, let's stop.
14      If there --
15    MS. PUTMAN:  Sorry, I want to
16  stop.  I just want to make sure we're not
17  asking any questions about anything he
18  would have discussed with counsel in
19  these meetings.
20    MR. EARL:  No.  Understood.
21    MS. PUTMAN:  Okay.
22    A.  So if there was -- if there was
23  an incident that happened, let's say we

1  had a Class A incident happen, like let's
2  say it was a homicide.  When I got that
3  call, he was the next person I was going
4  to talk to.  I don't care if it was 1:00
5  in the morning, 2:00.  It doesn't make
6  any difference.  I was going to talk to
7  that person.  If there was a
8  disturbance-type situation, he's going to
9  call.
10      So if you -- if you -- if you
11  had a list of the A category incidents,
12  he would -- he was getting a call.
13    Q.  Was he ever made aware of B
14  category incidents?
15    A.  It would have -- it would have
16  been unusual.  For me to make a phone
17  call to say that, you know.
18    Q.  Would you communicate those some
19  other way?
20    A.  Not necessarily.
21    Q.  Would you speak with Mr. Dunn
22  about staffing issues?
23    A.  Yes.

1    Q.  And what would those discussions
2  consist of?
3    A.  He had the same data that I had
4  for that part.  He had access to the same
5  data that I had.  If -- well, so we had
6  discussions of like staff coming out of
7  the academy, new staff coming out of the
8  academy, so.  And we used -- I'll use
9  Limestone Correctional Facility as an
10  example.
11      When our staffing numbers began
12  to fall like consistently, Limestone was
13  actually in pretty good -- they were
14  probably the -- probably the entire time
15  that I was associate commissioner of ops,
16  Limestone staffing was better than any
17  other facility that I had.  We had
18  discussions about instead of that person
19  going to Limestone, that person would go
20  where they were needed more so and not
21  to -- not to put a hardship on that
22  person and not to put a hardship on the
23  facility either.  But if that facility

27 (Pages 102 - 105)

Page 106

1  was, let's say, 80 percent staffed and
2  another facility was at 60 percent, then
3  we would -- we would have discussions
4  about that, or I would approach --
5  approach the idea that, or the suggestion
6  that we take five of these people and
7  send to this facility.  And then we --
8  and then we would try to do that ahead of
9  time.  If there was a -- if we lost a
10  sizable number of people within a 30-day
11  period or if there was a steady decline
12  of staff, we would -- we would talk about
13  those things.
14      But the thing is that in most
15  cases, you're not able to replace those
16  people just like right away, and so there
17  were -- there were all types of
18  discussions that was had about those
19  types of things.  But yeah, staffing
20  would be one.
21      Incidents, specific incidents,
22  what happened, do we know what happened.
23  Hurricanes or tornados ripping through,

Page 107

1  you know, what type of procedures and
2  things we need to do, those -- all of
3  those things would come into play.
4  Executions.  We -- but the major things
5  that were happening within the Department
6  are the types of things that he and I
7  would have conversations about.
8      Q.  You mentioned that at one point,
9  your staffing numbers began to -- I'll
10  read back.  I don't want to misquote you.
11      A.  Significantly decline.
12      Q.  Yes.  Do you recall when that
13  was?
14      A.  No, sir.
15      Q.  Was that before you became
16  associate commissioner of operations?
17      A.  Yes.
18      Q.  And did that include at St.
19  Clair?
20      A.  I can't be specific about that,
21  but St. Clair was a problem placements.
22      THE COURT REPORTER:  St. Clair
23  was what?

Page 108

1      THE WITNESS:  A problem
2  placements.
3      Q.  So, is it safe to say -- strike
4  that.
5      Is it accurate to say that St.
6  Clair was never 100 percent staffed to
7  ADOC standards during your tenure as
8  associate commissioner of operations?
9      A.  Yes.
10      Q.  What about, is the same true for
11  your tenure as institutional coordinator?
12      A.  Probably.
13      Q.  And you said Jefferson Dunn, as
14  you were associate commissioner, would
15  have been aware of that; correct?
16      A.  Yes.
17      Q.  You mentioned that you would
18  discuss potentially -- I'm using -- I'm
19  summarizing here -- diverting academy
20  graduates from one facility to another.
21  Am I recalling that correctly?
22      A.  Yes, sir.
23      Q.  Is that a -- is that a more

Page 109

1  temporary solution, or was that meant to
2  be a more permanent solution?
3      A.  It was a temporary solution.  I
4  think we did -- I think the academy was
5  12 weeks long.  I'm not sure.  So as the
6  -- as -- we would -- we would rotate.
7  So, you know, if a facility had a large
8  number of candidates in the academy and
9  we rotated five of those from going to
10  that facility to going to another
11  facility, unless they wanted to stay
12  there, then the goal was to move them to
13  their original facility when the next
14  class graduated and replace them.
15      Does that make --
16      Q.  It does.  So essentially, you
17  would have a temporary solution by
18  diverting from one recruiting class, and
19  then you would essentially do the same
20  thing with the next recruiting class?
21      A.  Unless the staffing at that
22  facility, their numbers came up, and then
23  we wouldn't necessarily do that.

28 (Pages 106 - 109)

Page 110

1    Q.  Understood.  And did you and
2  Commissioner Dunn discuss more permanent
3  solutions?
4    A.  Yes.  I mean, the permanent
5  solution is to be able to hire more staff
6  and get more staff on board.  I mean,
7  that's discussion or not discussion.  But
8  yes, we did have those discussions.
9        The problem was recruiting the
10  people and getting them there, and so we
11  discussed that as well.  And at some
12  point, a team was actually formulated and
13  brought in, and we had meetings about
14  marketing and different things like that
15  to try and increase our numbers.
16    Q.  So, who was on that team?
17    A.  Attorneys, whoever was hired as
18  the marketing.  I don't remember.  I
19  don't recall who that was.  But marketing
20  experts, myself, Mr. Dunn, chief of
21  staff.  I feel pretty sure that the
22  accounting director was, and probably
23  some others too that I don't recall.

Page 111

1    Q.  So, would you say that staffing
2  -- well, let me back up.
3        When was -- do you recall when
4  that team was put together?
5    A.  No, sir.  I was -- I was
6  associate commissioner, so it was in that
7  range.
8    Q.  Was it towards the beginning or
9  end of your tenure?
10    A.  I don't know.  I don't know.
11    Q.  So, would you say that during
12  the -- your tenure as associate
13  commissioner, that staffing at ADOC
14  facilities was a crisis?
15        MS. PUTMAN:  Object to the form.
16    A.  At some facilities, yes.
17    Q.  Was St. Clair one of those
18  facilities?
19    A.  Yes.
20    Q.  What about during your tenure as
21  institutional coordinator?
22    A.  Staffing was better at St. Clair
23  than it was when I was an associate.

Page 112

1    Q.  And you mentioned that it was
2  difficult to hire staff.  Do you know why
3  that was?
4    A.  I really don't.  I mean,
5  corrections is -- you wouldn't want to be
6  a correctional officer, do you?  I'll
7  refer you.
8    Q.  I can't say I've --
9    A.  I'm just -- so it's a difficult
10  job, and it's not a job that everybody
11  can do.  And sometimes even when you
12  bring people in, because we had -- we had
13  a process in place where we hire people
14  and they go straight to the academy.
15        We tried to change that because
16  they go to the academy, they get trained,
17  they come back to the facility, and they
18  quit in three months.  We just put money
19  -- we invested money in stuff that just
20  went down the drain.  Or they go to some
21  local county jail and go to work, but
22  they had all this training that the
23  Department had already did, and so we

Page 113

1  changed that.  To start, we would bring
2  them in, keep them at the facility for
3  two, three weeks, four weeks until the
4  next class would start based on when we
5  hired them.  So, you know, sometimes the
6  warden or the staff could kind of feel
7  the person out and say, "We don't think
8  this person is right."  That's not
9  necessarily saying that that person
10  didn't get to go to the academy, but you
11  -- at least you had that, and it gave the
12  person an opportunity to see what they
13  would actually be dealing with on a
14  day-to-day basis and whether they thought
15  they were going to be able to do that or
16  not, so.
17    Q.  So when you sent these people to
18  the -- to the facilities, were they
19  working as corrections officers?
20    A.  They were shadowing a
21  correctional officer.
22    Q.  And did you and Commissioner
23  Dunn ever consider whether the conditions

29 (Pages 110 - 113)

Page 114

1 at the prison were a reason why staff
2 were quitting?
3      MS. PUTMAN: Object to the form.
4   A. I don't know if we ever had a
5 conversation about that. I don't -- I
6 don't know. I don't know. I can't
7 remember that. I can't say that.
8      But if I hired you and you went
9 to a facility that was already short of
10 staff, you witnessed a fight or you
11 witnessed the officer tell an inmate to
12 do X, Y, Z, stop, turn around, go back,
13 and the inmate said, "F you," and kept
14 going and you saw this day after day,
15 would you stay?
16   Q. Well, I think that I would
17 probably -- you know what, I'm going to
18 ask a question. It was rhetorical.
19      So I guess my question to you
20 would be, is the answer, then, to --
21 strike that.
22      In that scenario, isn't the
23 answer to attempt to avoid those

Page 115

1 situations from happening?
2      MS. PUTMAN: Object to the form.
3   A. Yes.
4   Q. And can you do that with a lower
5 number of staff?
6   A. That's the cause of the
7 problems. That's -- not -- not all of
8 the problems. But if -- so inmates are
9 not dumb; right? There's not a prison in
10 this country, and maybe some of the
11 federal facilities, that anytime the
12 inmate population want to take the
13 prison, they literally can do that
14 because every day, every shift, the
15 inmates outnumber the staff. Every day,
16 every prison, I don't care where anybody
17 tells you; right?
18      So you can do the manning. You
19 can do the manning. You can do the
20 reports. You can do all of that; right?
21 And if you're lucky, you can hire enough
22 people to get to be -- if we -- if we use
23 the National Institute of Corrections

Page 116

1 manning theory charts -- they call it
2 something else I can't -- so if we use
3 that and we bring consultants in and we
4 go by their plan as to what they say any
5 facility in the country needs to be able
6 to operate on a safe basis, and if you
7 get to those numbers, you are still
8 outnumbered at least five to one.
9      So if -- it might just start
10 with one officer. But if I have an
11 officer that's in direct contact, meaning
12 that officer is on the floor in a
13 cellblock, it's 100 inmates in the
14 cellblock or if it's 20 inmates in the
15 cellblock and there's one officer in
16 there, if they want -- if they want that
17 cellblock, I don't care how good he is, I
18 don't care how buffed up he is, I don't
19 care, at some point he's going to go
20 down. He might fight to the end, but at
21 some point, that one officer cannot hold
22 off 20 people.
23   Q. But you would agree that there's

Page 117

1 other ways to manage a prison population
2 to accommodate short staffing; right?
3      MS. PUTMAN: Object to the form.
4   A. Such as?
5   Q. So for example, could you have
6 put St. Clair on -- hypothetically, could
7 you put a facility on lockdown?
8   A. Could we have put it on
9 lockdown? Sure. I need more staff to
10 run a locked down facility than I do an
11 open facility.
12   Q. Can you explain that?
13   A. If the facility is locked down,
14 if it's truly locked down, then I'm
15 delivering meals to the cell three times
16 a day. By standard and probably by law,
17 I have to give you some period of
18 exercise during the day, during a 24-hour
19 period. And I think they might have
20 adjusted that some; right? But
21 everything that -- with an open facility.
22      So open facility, even if it's a
23 dormitory-type situation and I feed from

30 (Pages 114 - 117)

Page 118

1 a lockdown, that means the inmates are
2 coming out, they're going to the dining
3 hall, they're eating, they're coming
4 back, I'm putting them back in place
5 before I take the next. The likelihood
6 is my feeding them -- you know, before
7 the day's out, something that is a
8 requirement is not going to get done.
9 When those things doesn't get done, then
10 you have unrest.
11        And so if you -- if you were
12 already short staffed, that helps to a
13 certain standpoint. But the amount of
14 time that you can continue to do that,
15 you -- it turns back into the same thing.
16 You end up with the same situation.
17    Q.  Well, you -- so you would put --
18 you mentioned earlier you put in
19 temporary solutions for staffing and, you
20 know, you just mentioned that a lockdown
21 would need to be a temporary solution;
22 correct?
23    A.  Yes.

Page 119

1        MS. PUTMAN: Object to the form.
2    Q.  But presumably with that
3 temporary solution, it would allow new
4 recruits to come in who would then come
5 in to a prison system that was not as
6 violent and not seeing the things you
7 mentioned earlier that caused them to
8 quit. Is that right?
9        MS. PUTMAN: Object to form.
10    A.  If I could hire them.
11        MS. PUTMAN: Object to the form.
12 Sorry.
13    A.  The first thing I have to be
14 able to do is hire people to come. I
15 don't know how much money the Department
16 spent on recruiting, doing a new
17 recruiting department, media. I don't
18 know. I don't know what that figure is,
19 but that figure is out there. But a
20 great deal of money was spent to try and
21 recruit and hire staff. And I don't
22 know -- I want to say it was -- it was
23 since I've been gone. But the

Page 120

1 legislature raised -- provided the
2 Department enough funding to be able to
3 raise salaries. To what I'm hearing,
4 what I see on the news, that raise in the
5 salaries still has not put ADOC to the
6 point where every facility, every major
7 facility -- I'm not even talking about --
8 can be fully staffed based on -- based on
9 the manning charts.
10    Q.  So you mentioned earlier that
11 the staffing at St. Clair was a -- was
12 likely a crisis while you were
13 institutional coordinator. Do you
14 remember that?
15        MS. PUTMAN: Object to the form.
16    A.  Possibly. I think I said
17 possibly.
18    Q.  Possibly. So, were these
19 efforts with media and new salaries, was
20 any of this done while you were
21 institutional coordinator?
22    A.  I know the salaries wasn't. The
23 requests, we always -- the Department

Page 121

1 always requests more funding. The
2 marketing campaign, et cetera, et cetera,
3 I know that took place when I was
4 associate commissioner.
5    Q.  And so as the -- as ADOC was
6 attempting to hire more officers, what
7 was being done to try and improve the
8 conditions and safety of the facilities?
9    A.  Different things at different
10 facilities. I think -- I know the lock
11 system at Donaldson was replaced. I
12 recall that. I don't recall times, but I
13 know that was replaced.
14        St. Clair, there was a
15 refurbishing at St. Clair. There were
16 some locks replaced at St. Clair. I'm
17 not -- I'm not sure about the fencing. I
18 know we had an idea that we broached with
19 engineers about the quad at St. Clair.
20 Are you familiar with St. Clair?
21    Q.  A little bit.
22    A.  Okay. So what I call the quad
23 is there are four population cellblock

31 (Pages 118 - 121)

Page 122

1  units that are separate, or separated to
2  a degree from the administrative.  One's
3  on one side of the facility and the
4  segregation unit is on the other side of
5  the facility.  And then, of course,
6  there's a dormitory or an open bay-type
7  dormitory that's also on the same side of
8  the facility with the segregation unit.
9      But the quad is a population
10  area, two-man cells.  I don't remember
11  exactly how many cells.  I should, but I
12  don't.  So there's a -- there's a gate.
13  As you walk across the yard, you go into
14  that area, there's a gate, and there's a
15  small gatehouse there.  So the proposal
16  was to fence the front side of those --
17  each one of those housing units off such
18  that inmates from other housing units
19  could not go back and forth without a
20  gate being open.  You could still come
21  out and you could still get sunshine.
22  You could still -- you couldn't rec
23  because it wasn't big enough for you to

Page 123

1  rec.  But fresh air, sunshine you could
2  get.  I'm not clear as to whether that
3  was finished or not.  I don't recall.
4      Q.  When you said -- just to clarify
5  when you said -- did you say "rec"?
6      A.  Yes.
7      Q.  Can you define what that means?
8      A.  Basketball, softball.
9      Q.  So recreation?
10     A.  Running.  Yes.
11     Q.  Okay.  So sticking with the
12  fence project you mentioned, so is it
13  accurate that the fencing project created
14  a smaller space for inmates at that
15  particular wing to convene in?
16     A.  Yes.  But more -- from my
17  standpoint, more importantly what it did
18  was in that quad -- so for feeding, those
19  inmates would come out and go to the
20  dining hall and they would come back.
21  When that line was to a certain point,
22  the next cellblock would be called for.
23  That whole quad area, secured, could have

Page 124

1  as many as for or five hundred inmates
2  just in that area.  What the fencing
3  would do was limit the amount of staff --
4  I mean, limit the amount of inmate
5  population.  It was a smaller area to try
6  and contain.  If you had a -- if I had a
7  problem to occur inside of this fencing
8  area, I don't have to try to run through
9  three or four hundred people.  I have a
10  100 people or 50 people trying to run.
11     Q.  But is it the case that,
12  generally, closer contact among inmates
13  creates more altercations?
14         MS. PUTMAN:  Object to the form.
15     A.  I don't -- I don't -- I don't
16  think so.  I think it depends on the
17  caliber of inmate.  It's the same thing
18  with locking them down.  So if I lock two
19  inmates down in a cell together for 23
20  hours a day, you're going to get on my
21  nerves at some point.  And so we -- so
22  I've got an altercation -- I have an
23  altercation that occurs inside of the

Page 125

1  cell itself, right, that I may or may not
2  know about.  And short staffing, with
3  short -- if I had adequate staffing and
4  I'm making my rounds like I'm supposed
5  to, then yeah, at some point I'm going to
6  see swelling of the eye if it was that
7  bad.  I'm not saying -- I'm not talking
8  about just pushing, but I'm talking about
9  -- or somebody trying to take advantage
10  of somebody in a sexual manner, any of
11  those types of things, or you're just
12  trying to take -- I got coffee, you don't
13  have any.  My folks send me money.  You
14  can't take my coffee.  But I still got a
15  situation there; right?  So it's a --
16  it's six of one, half a dozen of the
17  other.
18     Q.  Would it surprise you to learn
19  that the inmates in the new fenced
20  section at St. Clair refer to it as the
21  killing zone?
22     A.  No, I didn't.  It's after my
23  time.

32 (Pages 122 - 125)

1   Q.  I asked if you would be
2  surprised to learn that.  Does that
3  surprise you?
4     A.  I don't -- 35 years, 37 years,
5  no, nothing -- nothing really about that
6  surprises me.  It may -- it may cause me
7  to step back for a minute.  But for
8  inmates to label an area, that doesn't
9  surprise me, no.
10        Holman was called the bottom
11  when I was there.  It was -- the whole
12  prison, it was called the bottom.  Why
13  was it called the bottom?  They said,
14  well, it was -- and at that time, it was
15  the max security prison literally for the
16  state.  It was the bottom of the barrel.
17  Plus it was in south Alabama.  It was the
18  bottom.
19        MS. GIBSON:  Still the bottom.
20     Q.  Going back to our example of a
21  lockdown, is a lockdown effective if the
22  locks on the cells don't work?
23     A.  No.

1     Q.  Okay.  Did you have -- as
2  associate commissioner of operations, did
3  you have any role in compiling the
4  statistics that are posted on the ADOC's
5  website?
6     A.  Not that I can recall.  If you
7  could be more specific, I might could --
8  I might could be -- I don't know.
9  Statistical reports are done --
10  statistical reports are basically created
11  at the facility, so their -- their
12  manning, the inmate population, number of
13  incidents, et cetera, et cetera, et
14  cetera, categories of incidents.  It's
15  created and then it's sent and it's
16  compiled by research and statistical,
17  RME, whatever.
18     Q.  And who would those -- would
19  those statistical reports that were
20  created at the facilities be distributed
21  to anybody else other than those -- that
22  research and consensus RME?
23     A.  The coordinators would get it.

1  I would get it.  I mean, it's available
2  online.  Well, not necessarily online out
3  there, but in-house online.
4     Q.  Would Jefferson Dunn receive
5  them?
6     A.  I can't answer.
7     Q.  Did he ever discuss those with
8  you?
9     A.  Specific statistical reports?
10     Q.  Correct.
11     A.  Not that I can recall.
12     Q.  So, Mr. Culliver, you're aware
13  that you're a defendant in this lawsuit;
14  right?
15     A.  Yes, sir.
16     Q.  Hold on one second, apologies.
17  That explains it.
18        I'm going to mark this exhibit
19  as Plaintiff's Exhibit 2.  Do you
20  recognize this document, sir?
21  (Plaintiff's Exhibit 2 was marked for
22  identification and is attached.)
23     A.  It's the lawsuit.

1     Q.  Have you ever reviewed this
2  document?
3        (Witness reviews document.)
4     A.  I haven't read it through and
5  through, no.
6     Q.  But you have seen it?
7     A.  Yes, sir.
8     Q.  And you see that your name is
9  the second name listed there under the
10  "v"?
11     A.  Yes, sir.
12     Q.  So we already discussed
13  Jefferson Dunn, you see also under that
14  "v," he's the -- he was the commissioner
15  of ADOC.  Is that correct?
16     A.  Correct.
17     Q.  And we also discussed Edward
18  Ellington.  He was the -- an
19  institutional coordinator at ADOC; right?
20     A.  Yes, sir.
21     Q.  Were there any other
22  institutional coordinators while you were
23  associate commissioner of operations?

33 (Pages 126 - 129)

Page 130

1    A.   Cheryl Price.  During this time
2  frame (indicating)?
3    Q.   Correct.
4    A.   So in '18, Cheryl Price was the
5  other institutional.
6    Q.   What about -- and by "time
7  frame," I was confirming your time as
8  associate commissioner of operations,
9  that time frame, so 2014-2018.
10    A.   Gwendolyn Mosley.
11    Q.   Are you familiar with Karla
12  Jones?
13    A.   Yes.
14    Q.   Who was she?
15    A.   She retired as a warden.
16    Q.   A warden?
17    A.   III.
18    Q.   At where?
19    A.   I think she was at St. Clair.
20    Q.   What about Dewayne Estes?
21    A.   He's a retired warden, III.
22    Q.   Also at St. Clair?
23    A.   He had been during that -- are

Page 131

1  we still talking -- what years did you
2  say?
3    Q.   During --
4    A.   '14 to '18?
5    Q.   During your tenure at --
6    A.   '14 to '18?
7    Q.   Correct.
8    A.   Yes, he was.
9    Q.   Is there anybody else underneath
10  this "v" you do not recognize?
11      (Witness reviews document.)
12    A.   Phillip Dixon, I don't know.  I
13  think Rafael Santa Maria, I've heard the
14  name, and I've probably talked with him,
15  but I can't put a face with him.  The
16  other people, I can pretty much --
17  Russell Jones, I'm not sure about him
18  either.  I think he was a lieutenant, but
19  I'm not sure about that.  There was a
20  Jones that was a lieutenant, so I don't
21  know.
22    Q.   And do you understand the
23  allegations that are against you in this

Page 132

1  lawsuit?
2    A.   Yes, sir.
3    Q.   And can you explain to me what
4  your understanding is?
5    A.   That I was negligent in doing my
6  job.
7    Q.   Okay.  So you mentioned earlier
8  that as an institutional coordinator, St.
9  Clair was one of your facilities.  Is
10  that right?
11    A.   Yes, sir.
12    Q.   What do you recall about your
13  understanding of the conditions at St.
14  Clair during your tenure as institutional
15  coordinator?
16    A.   There were -- there were --
17  there were a number of major incidents to
18  occur, inmate-on-inmate type incidents.
19  Some of this runs together, so I don't
20  really -- like there was a problem with
21  the locks, but I don't know -- I can't
22  specifically say that that problem was
23  there during -- as a coordinator.  Quite

Page 133

1  possibly, it was.  There was just
2  renovations that needed to be done to the
3  facility as a whole, the physical plant.
4      THE COURT REPORTER:  The
5  facility as a whole?
6      THE WITNESS:  The facility as a
7  whole.
8      THE COURT REPORTER:  Thank you.
9    Q.   You mentioned there was major
10  incidents.  Do you recall what those
11  were?
12    A.   No, sir, not specifically.  I
13  know we had an escape, but I can't -- I
14  might have been commissioner then,
15  associate commissioner.  I know there was
16  an escape.  And the stabbings, homicides.
17  Contraband was ridiculous to a degree, I
18  mean, but contraband across all the
19  facilities.
20      But at St. Clair, there's a --
21  there's a county highway that goes --
22  coming into St. Clair from the interstate
23  would be on your right.  You turn to the

34 (Pages 130 - 133)

1 left to go to St. Clair. You keep
2 straight down. That's a public road. A
3 good many of the facilities will be kind
4 of isolated, and so you don't have a
5 public road going right down the side.
6 There's not a lot that you can do about
7 somebody stopping on a public road,
8 taking a football or a tennis ball and
9 throwing stuff over the fence.
10      At night, the cover, because of
11 where St. Clair sits, how it sits, you
12 can go down the road half a mile and
13 there's a dirt road that comes in behind
14 to bring you back to the facility, and
15 it's not the most ideal -- I would say
16 not in the most ideal location, but, you
17 know, no one really wants a prison around
18 their house or in their neighborhood or
19 even before stuff is actually -- even
20 before houses and things are there, there
21 were times when -- in trying to find
22 places to build prisons that people would
23 not want that, protest against having

1 prisons.
2    Q.  So during your time as
3 institutional coordinator, how did the
4 number of serious incidents at St. Clair
5 compare to the rest of the facilities
6 that you supervised?
7    A.  It ebbed and flowed. But St.
8 Clair was major incidents. Well, I would
9 say -- when I say stabbings, assaults on
10 staff was -- there were times when it was
11 higher at St. Clair than it was anywhere
12 else.
13    Q.  And you mentioned that
14 contraband was ridiculous. Is it safe to
15 say that that means that contraband at
16 St. Clair was higher than other
17 facilities?
18    A.  Depends on the time frame. It's
19 just Bibb -- the Bibb facility is a
20 medium-custody facility. It's ridiculous
21 there too, or it was ridiculous there.
22 And it's kind of the same thing, but you
23 don't have a public road, but you have so

1 much wooded area around it, there are so
2 many other ways to come up on the
3 facility that you get that. And then we
4 had a problem with staff. We had a
5 problem with staff bringing contraband or
6 facilitating the fact that contraband
7 could get in the facility.
8    Q.  How did you know that there was
9 a problem with staff bringing contraband?
10    A.  Well, some people would call;
11 right? Inmate intel, investigations
12 intel, and some of the things just didn't
13 make sense, you know, from the standpoint
14 that if I'm on the tower and that's my
15 assigned post, whether the inmates
16 actually get it or don't get it, if the
17 officer walks the yard and find three or
18 four packages on a yard that a tower is
19 sitting here and the tower -- the best
20 thing would have been for him to be
21 asleep, okay, because that means that he
22 was not necessarily -- he or she was not
23 necessarily cooperating with it. But if

1 you are awake and you're up and it's
2 coming over the fence and you don't call
3 anybody, as far as I'm concerned, you are
4 part of it.
5    Q.  So I think you actually just may
6 have answered the question I was going to
7 ask next, which was -- and this may just
8 be my ignorance, but presumably, if
9 there's particular areas of the fence
10 that -- where contraband is coming over,
11 that can be manned, correct, or observed
12 via staff?
13    A.  Depends. It just -- it just
14 depends. So you have to -- each facility
15 has its own layout design, and St. Clair
16 and Donaldson had electric fences put in.
17 And so the towers weren't necessarily
18 manned, or all of the towers weren't
19 necessarily manned. The ingress and
20 egress towers were normally manned. That
21 would be like two, a tower at your back
22 gate, a tower at your front gate. And
23 then so you've got your rest of your

35 (Pages 134 - 137)

Page 138

1  perimeter from that standpoint.
2      Q.  So if there was no one manning
3  the tower where contraband was known to
4  be coming in from, where were those
5  officers put instead?
6      A.  On the floor.  Inside the
7  facility.
8      Q.  And this is all during your
9  tenure as institutional coordinator?
10     A.  I don't think St. Clair -- I
11  don't know when St. Clair stopped manning
12  the tower that's along the roadside.  I
13  really -- I really don't.  That might
14  have been even before I was a
15  coordinator.  I don't -- I can't -- I
16  can't say that definitively.
17     Q.  Do you recall any specific
18  instances of an employee being caught
19  bringing contraband into St. Clair?
20     A.  No, sir, not by name, not by
21  date, I can't.
22     Q.  Do you recall any generally?  So
23  an instance where someone brought in a

Page 139

1  lot of contraband or something or large
2  amounts or anything along those lines?
3      A.  At St. Clair?
4      Q.  Yes, sir.
5      A.  I'm sure that happened, but I
6  can't just say.  I don't remember a name
7  or how much it was or -- but yeah,
8  because you had arrests there, and so
9  yes.
10     Q.  Anything -- strike that.
11         So, was it common for employees
12  to be arrested?
13     A.  I wouldn't think that it would
14  be called common.
15     Q.  About how many a month?
16     A.  I don't -- I have no inkling.  I
17  don't think that -- I don't think there
18  would be more than one in a month, I
19  don't think there would be more than one
20  in two or three months.  It just -- so
21  sometimes -- sometimes -- so as we went
22  through this journey, the staff, it got
23  to a point that staff actually worked in

Page 140

1  concert.  So you would have sort of four
2  of us, right, would like work together to
3  make that happen.  You may not be
4  actually bringing back-and-forth; you may
5  just be the person to say what
6  supervisor's working and who's not
7  working, or you might be the person
8  that's sent out to do a search when that
9  person gets ready to come through and you
10  don't search.  And you may not search
11  because you know if you search, you'll
12  find, so you just don't search, you know.
13  You don't do a thorough search.  You may
14  do a boom, boom (indicating) but not a
15  thorough search.
16         From a drugs -- drug
17  perspective, that situation just grew.
18  When cell phones became more proficient,
19  as that got to be, then cell phones got
20  to be another piece of contraband that
21  inmates wanted to have, and they would
22  pay for it and -- but it made it even
23  more difficult on staff, right, because

Page 141

1  as an inmate, I can sit in my cellblock
2  or I can sit in my cell and look out the
3  window.  And so we had to put in
4  perimeter patrols that would make circles
5  and then they would stop so long.  And
6  sometimes there were two; sometimes there
7  were one.  Staffing again.
8         I time that loop.  I can sit
9  there -- I don't have anything else to
10  do.  I can sit there for days on end and
11  figure out -- just by talking to staff, I
12  can figure out that John Joe is working
13  on the perimeter today.  He drives a
14  little piece and he stops.  He drive all
15  the way around.  He -- we develop
16  patterns.  People develop patterns.  I'm
17  not going anywhere.
18     Q.  So just so the record is clear,
19  are you saying that staff were colluding
20  together to bring contraband in --
21         MS. PUTMAN:  Object to the form.
22     Q.  -- to St. Clair?
23         MS. PUTMAN:  Sorry.  Object to

36 (Pages 138 - 141)

Page 142

1 the form.
2    A.   We had reason to believe that
3 staff were working together to bring
4 contraband, not in just St. Clair, but
5 other facilities as well.
6    Q.   And you mentioned that part of
7 that at St. Clair was potentially or
8 likely patterns that could be ascertained
9 by people trying to bring contraband in.
10 Is that -- do I have that right?
11    A.   I don't think so.  Say it again.
12    Q.   So you were saying that part of
13 the reason that contraband was able to
14 get in was because people who wanted to
15 bring it in could essentially avoid
16 detection based off of the patterns of
17 supervising the prison -- patterns of
18 staff, I should say?
19    A.   To a degree.  So I think -- I
20 think we're saying the same thing.  But
21 just to --
22    Q.   Yeah, understood.
23    A.   So if I'm -- if I'm the

Page 143

1 lieutenant of a shift and I'm a stickler
2 for the rules and trying to run this the
3 way it's supposed to be run by policy and
4 procedure, I take less of a chance
5 bringing something in on your shift than
6 I would on somebody who's more
7 lackadaisical, et cetera, et cetera.
8        So if you -- if that's -- if
9 that's what you were alluding to by the
10 -- then yes.
11    Q.   And what was done to -- as you
12 were -- and, again, I think we're still
13 talking about when you were institutional
14 coordinator.  What was done to prevent --
15 strike that.
16        While you were institutional
17 coordinator, what was done to ensure that
18 the officers and staff at St. Clair were
19 enforcing the policies to prohibit
20 contraband from coming in?
21    A.   I wasn't at St. Clair.  It's the
22 warden's job.  So if the warden -- if the
23 warden says, "I have a problem" -- and I

Page 144

1 understand because of my chain of command
2 that it's my problem too.  I'm not -- I'm
3 not denouncing that.  But I'm not at the
4 facility; right?  There were times when I
5 might get intel in Montgomery that a
6 warden didn't necessarily have.
7        So basically, to try and answer
8 the question that you asked is we started
9 -- we weren't doing searches of staff.
10 As a warden, that was one of the hardest
11 things we had to do is to convert to
12 actually searching staff before they came
13 into the facility.  The same people that
14 I want to go back here and do a job and
15 do their job, I'm asking somebody else to
16 search them, right, go through their
17 belongings.  You can't just buy a bag of
18 chips and bring them in anymore.  You
19 have to take the chips and open them up
20 and put them in a plastic bag.  It's like
21 visitors coming in, and it's a tough
22 thing searching visitors that's coming in
23 as well.  But that's -- that's just where

Page 145

1 corrections has gotten to.
2        So we did searches, talked to --
3 talked to the wardens about other ways.
4 We put up metal detectors.  We put a
5 procedure in place where a supervisor
6 couldn't search his or her own shift, so
7 they had to be -- the shift that was
8 there would be the person that was coming
9 up and supervising people coming in and
10 out of the facility to try to stop that
11 coming in, but that's not the only way
12 contraband comes in, so.
13    Q.   Would you say that those
14 measures were successful in reducing the
15 amount of contraband at St. Clair?
16    A.   I would say it made it more
17 difficult, but I wouldn't -- successful?
18 They still got contraband at St. Clair.
19    Q.   So, would you say that during
20 the time you were institutional
21 coordinator, drugs were regularly
22 available and used in St. Clair?
23        MS. PUTMAN:  Object to the form.

37 (Pages 142 - 145)

Page 146

1    A.   I can say that drugs were there.
2  Regularly available?  I don't -- I can't
3  say exactly how we'd quantitate that, you
4  know.  I can't say that if I wanted to go
5  get some marijuana, I could just go get
6  some marijuana.  If I want -- I can't say
7  that.  I can't say that it was just
8  readily available.  I can say that it was
9  there.
10    Q.   Would you say that staff
11  accepted drug use in the prison?
12    A.   I can't say that.
13    Q.   Would you say that staff
14  accepted cell phone use in the prison?
15      MS. PUTMAN:  Object to the form.
16    A.   I can't say that either.
17    Q.   During your time as
18  institutional coordinator -- we touched
19  on this a little bit earlier -- about how
20  many times do you think you toured St.
21  Clair?
22    A.   Regularly.  If -- St. Clair and
23  Donaldson were -- if I didn't go to any

Page 147

1  other facilities, I would generally go
2  into those two facilities back and forth,
3  so I can't really say.  Once or twice, I
4  actually worked a shift on the ground at
5  St. Clair.
6    Q.   And were you choosing to go to
7  St. Clair and Donaldson more often
8  because of concerns about the conditions
9  there relative to other facilities you
10  were supervising?
11      MS. PUTMAN:  Object to the form.
12    A.   They were problematic.
13    Q.   They were more problematic?
14    A.   They were more problematic.  But
15  then, the custody level at those two
16  facilities is higher.
17    Q.   Do you know how many times
18  Jefferson Dunn toured St. Clair?
19    A.   No, sir.
20    Q.   Do you know how often -- and
21  we're still talking about the time you
22  were -- oh, I'm sorry, the last question
23  -- I'll rephrase the last question.

Page 148

1      While you were associate
2  commissioner of operations, do you know
3  how many times Jefferson Dunn toured St.
4  Clair?
5    A.   No, sir, not how many.
6  Sometimes I was -- sometimes I would just
7  travel with him, or we would be there at
8  the same time.  Sometimes he would just
9  drop in.  But I don't -- I have no idea
10  how many times.
11    Q.   But he did tour St. Clair?
12    A.   Yes.  When Mr. Dunn came on
13  board, he toured all the facilities.  He
14  and I -- Mr. Dunn was a retired
15  lieutenant colonel from the Air Force.
16  He had no clue about corrections or
17  prisons or how they operate, kind of like
18  you say that you are; right?  You got a
19  little bit more because you're working
20  these lawsuits.  But at that time, he --
21  you know, so initially -- initially, we
22  toured all the major facilities, walked
23  through the whole facility, sat down and

Page 149

1  talked to the warden, the whole nine
2  yards.
3    Q.   And what -- so you mentioned
4  conversations with the wardens.  What was
5  discussed during those conversations?  Do
6  you recall?
7    A.   I don't recall.
8    Q.   Would the staffing situation at
9  St. Clair have been discussed?
10    A.   I'm trying to think which warden
11  here, which warden.  I think when Mr.
12  Dunn came on board, Warden Estes was at
13  the facility.  I'm not -- but I'm not
14  sure about that.  But yes, Warden Estes
15  was -- he was -- he constantly talked
16  about staffing and the problematic -- the
17  problem with staffing, yes.
18    Q.   And what about the level of
19  violence at St. Clair?
20    A.   I'm sure that was discussed.
21    Q.   And what about the availability
22  of weapons at St. Clair?
23    A.   Contraband, period.

38 (Pages 146 - 149)

Page 150

1    Q.   And drugs as well?
2    A.   (Witness nods head.)
3    Q.   What about the issues with the
4  facilities at St. Clair?
5    A.   Probably not so much.  I don't
6  recall those specific conversations, but
7  probably -- probably not so much.  It
8  probably would depend on the things that
9  were actually happening at St. Clair.
10   Q.   What about -- so I mentioned the
11 high level of violence.  Would that
12 include homicides?
13   A.   Yes.
14   Q.   And stabbings?
15   A.   Yes.
16   Q.   Sexual assaults?
17   A.   Yes.
18   Q.   Extortions?
19   A.   Probably not so much.  But a lot
20 of -- a lot of extortions and sexual
21 assault, they kind of join together, so a
22 lot of -- a lot of your -- well, I say a
23 lot, but some of your extortion part is

Page 151

1  that.
2    Q.   Were you familiar with -- strike
3  that.
4        What about excessive force by
5  staff?
6    A.   What about it?  I mean --
7    Q.   Were concerns about excessive
8  force by staff discussed with Mr. Dunn?
9    A.   I don't know.  I don't recall
10 that.  I don't -- I don't know.
11   Q.   What about the issues we were
12 just discussing about staff bringing
13 contraband?
14   A.   I'm not sure.  As the years went
15 by, things just escalated, I mean, just
16 like the staffing decreased,
17 (indicating).  And I'm not saying one had
18 any effect upon the other.  I'm just
19 saying that's -- there was almost like a
20 natural type of a thing, that you had
21 less staff, you had -- you had staff with
22 -- and this is -- this is a whole 'nother
23 part of correctional staff as a whole.

Page 152

1  But when you have senior staff that's
2  been at a facility probably a good part
3  of their career, 20, 25 years, and know
4  basically the ins-and-outs and those
5  people start retiring, and even if --
6  even if you are able to replace them one
7  for one with a new staff coming right out
8  of the academy, you don't have the same
9  thing.  This person that just came out of
10 the academy, there can be an incident --
11 because I've been there as a newbie --
12       I had a stabbing take place like
13 right here, right next to me
14 (indicating).  A guy was stabbing -- I
15 was at Holman.  I was on a corridor.  I
16 was fresh out of the academy.  It could
17 have been me.  You don't -- you don't
18 know.  You don't pick up on the tension
19 that's in the facility.  You don't know
20 the players in the facility.  You don't
21 know who thinks they're in charge and
22 who's not.  You don't know.  And so when
23 you lose that 25-year vet, and even if

Page 153

1  you can replace them, you still don't
2  have the same level of security.  There's
3  no way that you can.  And the more of
4  those 25-, 30-year people you lose, then.
5    Q.   So, is it your testimony that
6  the conditions at St. Clair worsened from
7  the time you were institutional
8  coordinator until the time you retired?
9        MS. PUTMAN:  Object to the form.
10   A.   I think they got worse.  I did
11 not think -- they got somewhat better.  I
12 think when we initially initiated CERT
13 coming and working for -- when we
14 initially started doing that, they would
15 come for two or three days at a time.  We
16 expanded that for a week at a time.  We
17 tried to rotate teams to come through.
18 Because a CERT member is a member pulled
19 out of some institution, so we were
20 pulling -- we were pulling people.  So we
21 had about five teams, and we would pull
22 like from Limestone to come, and so we
23 got to the point where they would come a

39 (Pages 150 - 153)

Page 154

1 week, they'd be off a week, they would
2 come a week, be off a week. And that
3 helped to kind of settle things a little
4 bit.
5      So I think it got worse, but
6 then I think -- I won't say necessarily
7 better, but I think it plateaued for a
8 while, and then it escalated again.
9    Q. And when was that -- when was
10 the CERT team used like that?
11    A. Dates, I can't give you. It was
12 when I was -- I was the associate
13 commissioner.
14    Q. Towards the end of your tenure?
15 The beginning?
16    A. Maybe in the middle. I don't
17 know.
18    Q. But you testified earlier
19 tensions, or issues at St. Clair had
20 declined drastically while you were
21 institutional coordinator; correct?
22      MS. PUTMAN: Object to the form.
23    A. Say that question again.

Page 155

1    Q. The conditions at St. Clair you
2 said had declined rapidly while you were
3 institutional coordinator; right?
4    A. Over a period of time, yes.
5    Q. That began while you were
6 institutional coordinator?
7    A. That didn't necessarily begin
8 while I was. They were like that before
9 I was institutional coordinator.
10    Q. Understood. So for the CERT
11 team program you just mentioned, who
12 developed that program?
13    A. I did.
14    Q. And --
15    A. You're talking about -- you say
16 CERT program, when you say "developed
17 that," what do you mean?
18    Q. So -- sorry. You're right.
19 That's a bad question.
20      The utilization of the CERT
21 team, whose --
22    A. Yeah, that was me in concert
23 with Mr. Dunn agreeing to it, the chief

Page 156

1 of staff, the warden, yeah.
2    Q. When you told -- when you spoke
3 with Mr. Dunn and the wardens at St.
4 Clair when Mr. Dunn first came as
5 commissioner, were any -- did you -- did
6 you communicate any concerns you had
7 about people who reported to you?
8      MS. PUTMAN: Object to the form.
9    A. Did I communicate that to Mr.
10 Dunn?
11    Q. Correct.
12    A. About people who reported to me,
13 that I had a problem with people who
14 reported to me?
15    Q. Correct.
16    A. No. No.
17    Q. Did you have concerns or
18 problems with people who reported to you?
19    A. Are we talking wardens? Are we
20 talking coordinators?
21    Q. You tell me.
22    A. No.
23    Q. You thought everyone was

Page 157

1 performing adequately?
2    A. See, you go to performance. You
3 said report to me. You said one thing,
4 but then you go to performance. So, can
5 you clarify?
6    Q. You're right. Apologies.
7      Did you discuss with Mr. Dunn
8 any concerns you had about any direct
9 report -- people who reported directly to
10 you?
11    A. As a coordinator or as a --
12    Q. Associate commissioner.
13    A. -- commissioner? I didn't have
14 any. Gwendolyn Mosley and Cheryl Price
15 was the two coordinators at the time.
16 Cheryl Price had the northern region, and
17 Gwendolyn Mosley had the southern region.
18 I didn't have any issues with either one
19 of them.
20    Q. Because, backing up,
21 Commissioner Dunn came on while you were
22 associate commissioner; right?
23    A. He did.

40 (Pages 154 - 157)

Page 158

1  Q.  Okay.  Just wanted to clarify.
2  A.  He fired me.
3  Q.  Yeah, you mentioned that
4 earlier.  So, can you explain the
5 circumstances of that?
6  A.  I was the only person that was
7 not permanent status as a merit employee,
8 so besides the deputy commissioners, I
9 would have been the only person that he
10 would have had time to look at and decide
11 whether he wanted me or did not want me.
12 So I was rolled back to the institutional
13 coordinator position.  Four or five
14 months later, he promoted me back.
15  Q.  Was that Mr. Dunn or was that
16 the interim commissioner at the time?
17  A.  Well, the interim commissioner
18 is the one that told me, yes, but Mr.
19 Dunn was already -- un-technically, he
20 was already in charge.  He wasn't in
21 charge, but it was -- so we'll say the
22 interim did it, but, you know -- I mean,
23 the interim person was there when I was

Page 159

1 rolled back, yes, but that was -- Mr.
2 Dunn had been announced as the
3 commissioner that would be replacing him.
4  Q.  And do you recall what year this
5 was?
6  A.  No, sir.
7  Q.  But it was before -- it was
8 before Mr. Dunn became -- was -- actually
9 took the position but after he was
10 announced as incoming?
11  A.  Yes, sir.  I don't -- I don't
12 know about officially announced, but I
13 knew he was going to be the commissioner.
14 How about that?
15  Q.  So you're saying that the
16 decision to roll you back was Mr. Dunn's?
17  A.  Yes.
18  Q.  And I'm sorry if you already
19 said this.  There -- was that -- strike
20 that.
21     Was the reason for that rollback
22 communicated to you?
23  A.  At the time?

Page 160

1  Q.  Correct.
2  A.  No.
3  Q.  Was it communicated to you
4 after?
5  A.  He and I had a conversation,
6 yes.
7  Q.  And what was said during that?
8  A.  I don't know specifically.  Just
9 what I just told you, though.
10  Q.  So he -- so you recall having a
11 conversation with him about it, but you
12 don't recall what he said?
13  A.  Well, it's just what I just told
14 you.  He didn't -- I was -- I was the
15 only merit person that was still on
16 probation at that time when he was coming
17 on board.  I was the only person he could
18 select for his own person to be there
19 besides -- besides the deputy slots.
20 Okay?  And so he wanted to take a look at
21 that for himself, who his operations
22 person was.  That's what he said.  That
23 was his explanation to me.  So if that's

Page 161

1 a lie, I mean, but that's what I was
2 told.
3  Q.  Are you aware of any reason why
4 he couldn't leave you in the position on
5 a probationary basis while he evaluated
6 who he wanted to put in that position?
7     MS. PUTMAN:  Object to the form.
8  A.  My probation was -- I was close
9 to coming off of probation.  I don't know
10 how -- I don't know how much more time
11 there actually was.  I don't know.
12  Q.  And just to clarify for the
13 record, when we're saying you were rolled
14 back, that means that you were demoted to
15 -- back to institutional coordinator;
16 right?
17  A.  Correct.
18  Q.  Getting back to our conversation
19 earlier, did you communicate to Mr. Dunn
20 when he came on about any concerns you
21 had about wardens at any facilities?
22  A.  We talked about each warden
23 individually.  I don't know.  Particular

41 (Pages 158 - 161)

Page 162

1 concerns?  There -- it's like any
2 profession; you've got strengths and
3 weaknesses.  Whatever they were, I would
4 have communicated -- whatever I saw them
5 as, I would have communicated that to
6 him.
7    Q.  Were there any wardens that you
8 thought were particularly weak in their
9 ability to perform their job?
10    A.  I can't recall.  I can't even
11 recall what wardens were where.  I don't
12 know.
13    Q.  When you were institutional
14 coordinator, did the locks at St. Clair
15 work?
16    A.  There were some problems.
17    Q.  What kinds of problems?
18    A.  The inmates were able to jimmy
19 the locks and jam the locks.
20    Q.  And how -- do you know how
21 prevalent that was?
22    A.  No, sir.
23    Q.  And am I right that the way to

Page 163

1 fix that is just to pull the -- whatever
2 is obstructing the lock out of it?
3       MS. PUTMAN:  Object to the form.
4    A.  That fixes it for that
5 particular moment, yes.
6    Q.  That was going to be my next
7 question.  How do you prevent it?
8    A.  Well, we tried -- we actually
9 did -- we actually moved inmates out so
10 that we could actually replace all of the
11 locks.
12    Q.  Am I right that for -- even a
13 brand-new lock is still -- still doesn't
14 work when something is obstructing it?
15    A.  True.
16    Q.  So --
17    A.  Now, the mechanism has to be
18 able to go into whatever that's called,
19 that hole (indicating).  There's a name
20 for that, but.  And yes, if you take a
21 piece of plastic or you take paper so
22 that that small lever, that locking
23 mechanism cannot engage inside of there,

Page 164

1 yes.
2    Q.  So replacing the locks didn't
3 actually address the problem of the locks
4 being obstructed; right?
5    A.  That did not.
6    Q.  And when you were -- excuse me.
7 When you were institutional coordinator,
8 St. Clair didn't have any cameras;
9 correct?
10    A.  If they did, they were very,
11 very few.
12    Q.  And when you were associate
13 commissioner of operations, do you recall
14 if there were cameras in St. Clair?
15    A.  We installed cameras.  We
16 installed some cameras, and I can't
17 remember exactly how many per cellblock.
18    Q.  Do you recall when that was?
19    A.  No, sir.
20    Q.  Was it the beginning, middle,
21 end of your tenure?
22    A.  I can't recall.
23    Q.  And were those cameras, they

Page 165

1 didn't -- did they -- strike that.
2       Did those cameras cover the
3 entire facility?
4    A.  No, sir.
5    Q.  What did they cover, what areas?
6    A.  The best -- to the best of my
7 recollection, population cellblocks.  So
8 the cellblocks are two-sided, so you had
9 at least one camera strategically
10 placed -- and it may have been more than
11 one, seems like it was.  But they were
12 strategically placed to be able to get a
13 -- the whole cellblock.
14       And I -- when I say "the whole
15 cellblock," there may have been -- so
16 this may not be totally correct, but I
17 can recall a camera -- the officer
18 station, the cubicle at St. Clair is a
19 split-level-type facility, so it was
20 mounted such that it would catch, so
21 directly under the camera, it wasn't
22 going to catch.
23       THE COURT REPORTER:  It wasn't

42 (Pages 162 - 165)

Page 166

1  what?
2      THE WITNESS:  Would not catch
3  whatever was happening there.
4      Q.  We mentioned officers bringing
5  contraband into St. Clair.  Do you recall
6  any similar circumstances with regard to
7  the wardens at St. Clair?
8      A.  I recall an incident where a
9  warden was accused.
10     Q.  What do you recall about that
11 incident?
12     A.  Just that --
13     Q.  Who?
14     A.  I don't know if he was actually
15 accused of bringing contraband in or if
16 he was -- he was connected with
17 contraband some type of way.
18     Q.  Who?  Who are you talking about?
19     A.  Cedric Specks.
20     Q.  And do you recall the
21 allegations against him?
22     A.  Other allegations?
23     Q.  Those allegations.  What was the

Page 167

1  contraband --
2      A.  I don't -- I don't recall.
3      Q.  Were those allegations
4  substantiated?
5      A.  I'm not sure they were.
6      Q.  So, was it as -- and was this
7  during when you were associate
8  commissioner of operations?
9      A.  I think so, yes.
10     Q.  So as an associate commissioner
11 of operations, you don't recall if one of
12 your wardens was bringing in contraband
13 to St. Clair?
14     A.  I don't recall whether it was
15 proven that he was bringing contraband
16 into St. Clair.  I do not.
17     Q.  As associate commissioner of
18 operations, is that something that should
19 have been decided one way or the other?
20     A.  Yes.
21     Q.  So, are you saying it wasn't?
22     A.  I'm saying that I don't recall
23 whether he was or wasn't.

Page 168

1      Q.  Was that something that happened
2  often?  As far as your wardens go, were
3  there a lot of allegations against your
4  wardens?
5      A.  No.
6      Q.  Are you familiar with -- strike
7  that.
8      Have you -- as your time as
9  associate commissioner of operations,
10 were you familiar with any allegations
11 that wardens were breaking ADOC
12 regulations?
13     A.  What kind?
14     Q.  Any.
15     A.  Not specifically.  I mean,
16 Cedric Specks was -- lost his job for
17 being involved with three staff members,
18 contract staff members.
19     Q.  Were you part of that
20 investigation into that --
21     A.  I was not.
22     Q.  -- incident?
23     A.  I was not.

Page 169

1      Q.  Did you know about that
2  misconduct?
3      A.  When it was reported to me?
4      Q.  Before.
5      A.  No.
6      Q.  Had you heard about it before
7  that?
8      A.  No.  I think Investigations
9  brought that to me, talked to me about
10 that.  I knew that they were doing an
11 investigation.  They tracked it down,
12 they walked it down.  Our Investigations
13 people basically work independently.
14     Q.  Are you aware -- strike that.
15     Were you aware as associate
16 commissioner of operations of any
17 allegations that wardens were being
18 extorted by inmates or other employees?
19     MS. PUTMAN:  Object to the form.
20     A.  I was not.
21     Q.  When you were -- going back to
22 when you were institutional coordinator,
23 was unauthorized movement among the

43 (Pages 166 - 169)

Page 170

1 inmate population a problem?
2    A.  Repeat, please?
3    Q.  When you were institutional
4 coordinator, so right -- so before you
5 were promoted, was unauthorized movement
6 among the inmate population at St. Clair
7 a problem?
8    A.  I can't -- I can't recall.  I
9 can't -- I can't -- I can't recall the
10 time frames.  I don't.  So movement at
11 St. Clair, I know as associate
12 commissioner that that was a problem.
13 But whether it was a problem as an
14 institutional coordinator, I really can't
15 recall because it was just a problem.
16    MR. EARL:  Do we want to take a
17 break?
18    MS. PUTMAN:  Take a lunch break
19 or?
20    MS. GIBSON:  Yeah, I think so.
21 It's 12:18.
22    MS. PUTMAN:  Okay.  Off the
23 record.

Page 171

1    THE VIDEOGRAPHER:  We're going
2 off the record at 12:17.
3    (Break taken.)
4    THE VIDEOGRAPHER:  We're going
5 back on the record at 1:31.
6    Q.  (By Mr. Earl) Mr. Culliver,
7 before the break, we were discussing
8 unauthorized inmate movement at St.
9 Clair.  Can you tell me how inmate
10 movement was tracked at St. Clair?
11    A.  Define "tracked."
12    Q.  So, how -- strike that.
13    How were employees at St. Clair
14 ensuring that inmates were not in areas
15 they were not supposed to be?
16    A.  I can't answer.  I don't know.
17    Q.  Do you know how they were
18 supposed to be making sure that inmates
19 were not in areas they weren't supposed
20 to be?
21    A.  The policy was that --
22 housing-unit-wise, that inmates should
23 not go -- that's a rule for the inmate

Page 172

1 population, that they should not go in
2 and out of a housing unit that's not
3 theirs without some authorization where
4 they needed to go from point A to point
5 B.
6    We did not use a pass system.
7 In Alabama, there may be one or two
8 facilities, there were very few
9 facilities that used a pass system.  And
10 it's basically contingent upon the staff,
11 that if I had someone that needed to go
12 to another area, that I would radio or I
13 would escort them.  With the lack of
14 staffing, that's not tracked very well.
15    Q.  So, is it your understanding
16 that staff were not tracking inmate
17 movement?
18    A.  I can't say that they were.
19    Q.  So you don't -- you don't know
20 if inmate movement was being tracked at
21 St. Clair?
22    A.  And again, you said "tracked."
23 So when I -- when I say it was tracked,

Page 173

1 if that means that we have a way of being
2 able to determine that you were in
3 Housing Unit A at this particular time
4 but you should have been in Housing Unit
5 B so I have a reason, no.
6    Q.  So you mentioned understaffing
7 as a reason I'll refer to it as
8 unauthorized movement in a prison occurs.
9 Are there other causes?
10    A.  Besides just -- besides the lack
11 of staffing, you said, are there other
12 causes for unauthorized movement?
13    Q.  Correct.
14    A.  People's failure to do their
15 job.
16    Q.  Would doors that don't work
17 account for that?
18    A.  It could.
19    Q.  What about inoperable locks?
20    A.  To the best of my knowledge, the
21 locks at St. Clair were inoperable
22 primarily inside the housing units and
23 not doors that allowed you to go from one

44 (Pages 170 - 173)

Page 174

1  area to the other, so it -- it could,
2  yes, if it was that lockdown, for
3  instance, in the instance -- the instance
4  that you described earlier of somebody
5  putting something in a lock and if nobody
6  came to take it out, could they come out
7  of their cell and go into another cell,
8  yes.
9    Q.  So, were you saying there were
10  -- there are doors separating the housing
11  units?
12    A.  Yes, sir.
13    Q.  So for an inmate to get from a
14  -- to different housing units, that door
15  would either need to be open already or
16  broken.  Is that right?
17    A.  Yes.  Or just -- it doesn't have
18  to be broken.  It's just like not closed,
19  not locked.
20    Q.  And am I right that that could
21  be primarily for two reasons?  One, as
22  you mentioned, someone not doing their
23  job.  Is that right?

Page 175

1    A.  Yes.
2    Q.  And two, that the door is, as
3  you mentioned, broken?
4    A.  Yes.
5    Q.  Understood.
6        We talked about tracking
7  inmates.  Can you describe to me what an
8  inmate count is?
9    A.  Counting inmates, counting
10  heads.
11    Q.  So, does an inmate count entail
12  just counting bodies, or is it actually
13  tracking each -- each individual and
14  ensuring that that person is where he is
15  supposed to be?
16    A.  So the counts come in various
17  forms.  So basically, like at certain
18  periods of time, you may do a -- you may
19  do a facility count that's without having
20  people inside of their housing units, or
21  inside of their assigned living area,
22  cell.  And so -- but official counts, at
23  an official time of the day, you have the

Page 176

1  institutional count, and basically,
2  besides your people who are working who
3  should already be accounted for, the
4  people in the housing units should go to
5  their assigned cells.  And if it's a
6  roster count, if it's a bed roster count,
7  then they should show their ID and the
8  fact that they're in the right cell, and
9  the officer should have the list.
10  Basically, they can check that off saying
11  that.
12      If it's -- if it's a -- informal
13  count is not the right terminology, but
14  if there's an informal count per se, then
15  it's just a body count.
16    Q.  And how many times a day were
17  roster counts supposed to be done?
18    A.  I can't remember the policy.
19    Q.  More than once?
20    A.  I can't remember the policy.
21    Q.  At least one?
22      MS. PUTMAN:  Object to the form.
23    A.  I don't think so.  My preference

Page 177

1  would have -- that would be my
2  preference, but I don't think I -- I
3  don't think the procedures are written
4  like that.
5      Some facilities would have a
6  roster count pretty much at least one
7  every 24-hour period.
8    Q.  How often were roster counts
9  conducted at St. Clair?
10    A.  I can't answer.
11    Q.  Do you know how often a roster
12  count -- what you referred to as an
13  informal roster count or informal
14  counts --
15    A.  Counts.
16    Q.  -- were conducted at St. Clair?
17    A.  There should -- there should be
18  six counts a day, at least six counts in
19  a 24-hour period.
20    Q.  Do you know if those counts were
21  being conducted at St. Clair?
22    A.  When I was there, they were.  If
23  I was there long enough, I would see a

45 (Pages 174 - 177)

Page 178

1 count. But they should have been. I
2 can't say specifically every day, every
3 count was done like they should have
4 been. That's not a -- that's not --
5 that's not an item that's reported up,
6 "We conducted five counts today." I
7 don't get that record.
8    Q.   How does -- if prisoners are
9 able to move freely in a prison, does
10 that have any effect on the security of
11 the prison?
12    A.   I guess it could. It depends on
13 what you classify as "freely." If you're
14 saying that guys can just go wherever
15 they want to whenever they want to, yes.
16    Q.   Do you think that -- is it your
17 understanding that at St. Clair, as you
18 said, guys were able to go wherever they
19 wanted to?
20    A.   Not all the time. I can't say
21 -- I can't say that there weren't -- I
22 can't stress enough that I would have to
23 be at St. Clair -- to give you a

Page 179

1 definitive, accurate answer, I would have
2 to be there for a longer period of time
3 to see that mechanism at work.
4    Q.   Could you have, in your position
5 as institutional coordinator, requested
6 reports or other information to ascertain
7 whether or not that was occurring?
8    A.   Well, I get a -- I could ask for
9 a -- I could ask for a count -- I could
10 ask for a count sheet. I'm probably
11 going to get the six count sheets in a
12 day, but I'm still not there to witness
13 that, so. But I didn't do it. Did I ask
14 for that? No.
15    Q.   Did you ask for that as an
16 associate -- as the associate
17 commissioner?
18    A.   No.
19    Q.   Why not?
20    A.   I didn't see the necessity.
21       I think if you pull a log -- if
22 you pull a log for St. Clair, you'll see
23 that these counts were done, like -- but

Page 180

1 that doesn't say that -- again, but
2 you're not there to actually see, so I
3 can't -- you're asking me to try to
4 validate and verify something that's --
5 without being on site for days at a time.
6 At that level, there's no way for me to
7 do that.
8       You could ask the shift
9 commander that, and they could probably
10 tell you. You could ask the warden that,
11 and they can probably tell you with
12 confidence yes or no. But I can't.
13    Q.   So as institutional coordinator,
14 did you feel it was your responsibility
15 to ensure that the -- those counts and
16 the information on them were verified and
17 accurate?
18    A.   No. That's not my -- that
19 wasn't my job. I have a responsibility
20 for that, but that's -- that's a
21 captain's job at the facility and then --
22 the captain and assistant warden and the
23 warden.

Page 181

1       Do you -- you realize that if --
2 with 23 facilities and if I -- if you're
3 talking institutional coordinator, 12, 13
4 facilities; associate commissioner, 23
5 facilities. If I kept up with every
6 count at every facility all day, do you
7 realize that that would be the only thing
8 I would do and I still wouldn't get
9 finished?
10    Q.   So, are you saying that, for
11 example, if there were more employees at
12 the coordinator or commissioner level,
13 that would have made supervising this
14 information easier?
15       MS. PUTMAN: Object to the form.
16    A.   No. No. What I'm saying is
17 it's above my pay grade -- I mean, it's
18 below my pay grade. That's what I'm
19 really saying. It's not -- it's the
20 warden's responsibility to be able to do
21 that.
22       I can -- I could assure you that
23 if we pulled ten logs over 24 -- a

46 (Pages 178 - 181)

Page 182

1  24-hour log that the counts are going to
2  be documented there and there's a count
3  sheet there to account for it.  But
4  that's -- yet and still, I can't.
5      Q.  So for example, if there was an
6  instance where you had multiple days of
7  Class A incidents, right, very seri- --
8  we'll call them very serious or violent
9  incidents at a prison, would that --
10 would that be cause for you to go back
11 and try to look to see what the counts
12 were and whether the counts were done?
13      MS. PUTMAN:  Object.
14     A.  That wouldn't be where I would
15 start, no.
16     Q.  But would looking at those
17 counts be part of the process there?
18     A.  No.
19     Q.  Why is that?
20     A.  Because whoever -- whoever was
21 -- whoever was the victim and whoever was
22 the suspect, if we have a victim and we
23 have a -- we have a victim, of course,

Page 183

1  and if we know who the suspect was and we
2  know where the incident took place at, to
3  me, that's more important, and then I
4  could find out simply by -- from that
5  whether this person was in the right
6  place or the wrong place.  It has nothing
7  to do with the count.
8      Q.  So if a warden -- so if the
9  warden at St. Clair was not enforcing
10 that counts -- we'll start this -- if the
11 counts had -- was not enforcing that
12 counts be done, who was -- who would know
13 about that above the warden level?
14     A.  I don't know.  I mean, there
15 would have to be something that would
16 bring that to like a coordinator's
17 attention.  There would have to be
18 something there.
19        So earlier, you talked about the
20 security audits.  So that's why you do
21 security audits is that's your check and
22 balance for those types of things.  And
23 so when you have security audits and you

Page 184

1  have a security audit team, the team goes
2  in and for three or four days they're
3  there.  They watch those kinds of things.
4  And believe it or not, particularly if
5  you are knowledgeable about what's
6  happening in prisons, as a -- as a person
7  going in, you can pick up on whether
8  they're -- whether they count on a
9  regular basis or not.
10     Q.  So as somebody who -- as you had
11 described earlier, someone who was very
12 in tune with what was going on in
13 prisons, when you went to St. Clair, did
14 you feel that counts were being done?
15     A.  I did.
16     Q.  Okay.  So I want to move to
17 searches.  How many searches were
18 supposed to be conducted at St. Clair a
19 day?
20     A.  I can't answer.
21     Q.  There are various kinds of
22 searches; right?
23     A.  Yes.

Page 185

1      Q.  There is pat-down searches?
2      A.  Yes.
3      Q.  Do you know -- do you know about
4  how much -- how often those are supposed
5  to occur?
6      A.  A pat-down -- a pat-down search
7  can happen anytime.  There's no --
8  there's no -- there's no time -- there's
9  no count -- there's no number for doing
10 pat-down searches.
11     Q.  So, is it -- would it be
12 acceptable to do none?
13      MS. PUTMAN:  Object to the form.
14     A.  To do no pat-down searches?
15     Q.  Correct.
16     A.  If you're doing a pat-down
17 search in conjunction with some other
18 type of search.  But pat-down searches,
19 it's just a random type thing.  You just
20 do it.  Or if you suspect somebody has
21 something on them, then you stop them and
22 search them.  Or if you see that there's
23 a violation that they may be committing,

47 (Pages 182 - 185)

1 then you might want to search them.
2     Just driving down the highway,
3 if I'm doing 85 and a trooper pulled me
4 over and he -- well, you was doing the
5 same thing, but he just got me and you
6 got away.
7    Q.  So I -- my question was, if
8 you -- if you learned that the officers
9 at St. Clair, for example, had done no
10 pat-down searches for a month, would that
11 be concerning to you?
12    A.  That probably would be
13 concerning to me, but I didn't learn
14 that.
15    Q.  Did you have any sense for how
16 many were being done?
17    A.  No.  I just -- I just explained
18 that.
19    Q.  But they're documented, aren't
20 they?
21    A.  Pat-down searches are not
22 documented.
23    Q.  Okay.  What about institutional

1 searches?
2    A.  Institutional search says that
3 you're locking down the facility and
4 you're going to do a search of the entire
5 facility.
6    Q.  And about how many times was
7 that supposed to get done a month?
8    A.  I don't know what the policy
9 says.
10    Q.  Do you know if there was a
11 policy?
12    A.  There's a policy on searches.
13 There's a departmental policy and there's
14 a facility policy.
15    Q.  Do you recall about how often
16 when you were coordinator that
17 institutional searches were conducted at
18 St. Clair?
19    A.  No.  I can't answer.
20    Q.  What about when you were
21 associate commissioner?
22    A.  I can't answer.  I can't -- I
23 don't remember that.

1     A true institutional search
2 calls for a facility to go into lockdown.
3 You have to have staff to do that.  CERT
4 would come in, were called in at certain
5 times to do facility searches, but I
6 don't remember how often that was done.
7 I don't -- I don't remember when that was
8 done.  I don't.
9     There were some done.  I know
10 there was some done with CERT because
11 there was a rotation.  But to tell you
12 how many, I don't.  I can't give you a
13 time range or anything like that.
14    Q.  So you mentioned earlier that
15 contraband at St. Clair was ridiculous.
16 Would that have been the case if
17 institutional searches were done
18 regularly?
19    MS. PUTMAN:  Object to the form.
20    MR. LAWSON:  Object to the form.
21    A.  In my professional opinion, yes,
22 because contraband -- it's ridiculous how
23 much contraband comes over the perimeter

1 fence.  Just because you do a search,
2 that doesn't stop them from -- the next
3 day, somebody from coming over the fence.
4    Q.  What about cell searches?  How
5 often were those supposed to occur at St.
6 Clair?
7    A.  I think -- I believe that the
8 departmental policy on searches calls for
9 four searches per housing unit per day,
10 but I'm not -- that's not -- probably not
11 accurate, but it's somewhere in that
12 neighborhood.
13    Q.  And do you recall how many times
14 -- strike that.
15     Do you recall understanding
16 whether those were -- that policy was
17 being followed when you were
18 institutional coordinator at St. Clair?
19    A.  No, sir.
20    Q.  What about when you were
21 associate commissioner?
22    A.  No, sir.
23    Q.  So I think you may have said

48 (Pages 186 - 189)

Page 190

1  this earlier.  Who was responsible for
2  ensuring that searches occurred?
3      A.  The shift commander on a shift
4  is responsible for it, and then it goes
5  up the ladder.
6      Q.  And how far up the ladder does
7  it go?
8      A.  The head of the institution.
9      Q.  Is that where the ladder stops?
10     A.  Well, there are other -- the
11  responsibility was Mr. Dunn, it was
12  through me and Mr. Dunn.  Neither --
13  neither of us are there.  The only person
14  that can legitimately do that is if it
15  gets to a warden's level and there's a
16  problem.  That really should be at the
17  captain's level.  If he sees people are
18  not doing searches the way they should be
19  doing, he or she, then that should go to
20  the next person in charge.  And
21  literally, it comes back to the
22  lieutenant to ask:  "Why aren't you doing
23  your searches?  Why aren't they being

Page 191

1  done?"
2      Q.  So safe to say you weren't
3  ensuring that searches were being done?
4      A.  I was not.
5      Q.  And to your knowledge, Mr. Dunn
6  was not, either?
7      A.  I have no idea what Mr. Dunn was
8  doing in reference to searches.
9      Q.  Under the departmental policy,
10  what was the result if a staff -- if
11  staff failed to conduct the required
12  searches?
13     A.  I don't know.  I would have to
14  look that up in the policy that covers
15  such things.
16     Q.  So just to be clear, was the
17  majority of your understanding of the
18  daily operations at St. Clair based upon
19  reports that were given to you from the
20  facility?
21     A.  Yes.  Or what I saw when I was
22  there or what somebody that was there
23  told me.

Page 192

1      Q.  And so, do you recall a time
2  when you were there when you observed
3  something that you thought was a problem?
4      A.  Yes.
5      Q.  Can you give me an example?
6      A.  Inmates walking across the yard
7  improperly dressed, inmates in a
8  cellblock that they should not have been
9  in, inmates with telephones.
10     Q.  And what did you do in response
11  to those situations?
12     A.  If I saw you going, you had to
13  put your clothes on right like you're
14  supposed to.  Then I would talk to --
15  talk to the supervisor -- it depends
16  on who is with me and whatever.  But I
17  would talk to that person in charge,
18  "That's something that you need to take
19  care of."
20         Same thing with dressing and
21  grooming.  Same thing with the
22  contraband, same thing.
23     Q.  Do you recall whether -- strike

Page 193

1  that.
2         Mr. Culliver, do you know what a
3  vulnerability analysis is?
4      A.  Of?
5      Q.  A facility.
6      A.  I don't recall doing one.  I
7  don't recall.  I don't recall doing one.
8      Q.  Do you know what one is?
9      A.  I have a fairly good idea.
10     Q.  Okay.  I'm going to hand you
11  what I've marked as Plaintiff's Exhibit
12  3.  Do you recognize this document, sir?
13  (Plaintiff's Exhibit 3 was marked for
14  identification and is attached.)
15     A.  It's an e-mail.
16     Q.  Correct.  This is an e-mail from
17  you to Kristi Simpson at -- I'm assuming
18  that's a Department of Corrections e-mail
19  address.  Is that right?
20     A.  That is correct.
21     Q.  It's dated January 13th, 2017?
22     A.  Uh-huh.
23     Q.  And it says here you're

49 (Pages 190 - 193)

Page 194

1 attaching the latest vulnerability
2 analysis completed by ADOC major male
3 facilities. See that?
4    A.  I do.
5    Q.  Who is Kristi Simpson?
6    A.  She is a secretary in the legal
7 division.
8    Q.  So I'm going to -- I'm going to
9 hand you now what is Plaintiff's Exhibit
10 4. Do you recognize this document, sir?
11 (Plaintiff's Exhibit 4 was marked for
12 identification and is attached.)
13     (Witness reviews document.)
14    A.  Vaguely.
15    Q.  This is the Alabama Department
16 of Corrections Institutional
17 Vulnerability Analysis dated February 24,
18 2015; right?
19    A.  Yes, according to what's on the
20 form.
21    Q.  And do you see back at
22 Plaintiff's Exhibit 3 that I handed you
23 the -- from -- the third line from the

Page 195

1 bottom, there's an attachment there that
2 says 030315 St. Clair CF Vulnerability
3 Analysis. Do you see that?
4    A.  Yes.
5    Q.  I'll represent to you, sir, that
6 the metadata on this file is the same
7 attachment, so this is the -- this was
8 attached to that, that e-mail. Does that
9 make sense?
10    A.  It does.
11    Q.  Can you tell me -- tell me why
12 you'd be e-mailing a vulnerability
13 analysis from 2015 in 2017 to Kristi
14 Simpson?
15    A.  Because legal asked for it, more
16 than likely.
17    Q.  So this is from -- the date of
18 this is not long after you were promoted
19 to associate commissioner. Is that
20 correct?
21    A.  I don't know. I don't know the
22 date I was promoted to associate
23 commissioner.

Page 196

1    Q.  Were you associate commissioner
2 at the time?
3    A.  According to this, I was.
4 That's what I signed my name as.
5    Q.  Okay. So if you look at the
6 bottom paragraph here, it says, "A copy
7 of this risk assessment shall be
8 forwarded to the associate commissioner
9 of operations." That was you; correct?
10    A.  Yes.
11    Q.  And it also says that this
12 assessment should be -- this process will
13 be completed annually. Is that right?
14    A.  Yes.
15    Q.  You see that?
16     Do you know whether these
17 analyses were completed annually?
18    A.  I do not know.
19    Q.  And is it safe to say that the
20 data in this analysis covered the
21 conditions at St. Clair in -- from -- in
22 2014?
23     (Witness reviews document.)

Page 197

1    A.  I can't answer that either, but
2 I assume so.
3    Q.  Okay. So if you could turn with
4 me to the page ending in 247 at the
5 bottom right.
6    A.  What page?
7    Q.  247 it ends. Page 5 of the
8 actual report. I'm sorry.
9     So there's a line item at the
10 top that says percent over or under
11 design capacity as of the date of this
12 report. And do you see it says 33 --
13 34.3 percent there?
14    A.  Yes, sir.
15    Q.  That means that the -- that St.
16 Clair was running at 34.3 percent over
17 its capacity; right?
18    A.  Over the design capacity.
19    Q.  Correct. So, does that mean
20 that St. Clair was overcrowded at the
21 time?
22     MS. PUTMAN: Object to the form.
23    A.  If we're using design capacity

50 (Pages 194 - 197)

Page 198

1  --
2  Q.  Correct.
3  A.  -- yes.
4  Q.  Would you consider that to be
5  dangerous?
6  A.  It could be.
7  Q.  Why do you say, "It could be"?
8  A.  It doesn't have to be.
9  Q.  Was it at St. Clair?
10  A.  St. Clair was -- there was
11  dangers at St. Clair.
12  Q.  Did you understand that
13  overcrowding was part of that -- part of
14  the reason for that danger?
15  A.  No, not necessarily.
16  Q.  If you can flip to the next page
17  for me.  So there's a -- in the middle of
18  the page here, there's a section that's
19  labeled "Illegal Unauthorized
20  Activities."  Do you see that?
21  A.  Yes, sir.
22  Q.  And there's another section
23  underneath it that says use of force.

Page 199

1  All the items in those sections are
2  blank; right?
3  A.  Yes.
4  Q.  Do you know why that would be?
5  A.  I don't.
6  Q.  As associate commissioner,
7  receiving this report, should you have --
8  strike that.
9      As associate commissioner,
10  receiving this report, did you follow up
11  with the folks at St. Clair who compiled
12  this to ask why this was blank?
13  A.  Not that I recall.  All this
14  information was available to me in
15  another place.
16  Q.  So just because it's available
17  somewhere else, it still doesn't mean it
18  shouldn't be complete here; correct?
19  A.  It should have been completed.
20  I think it should have, unless -- unless
21  they were instructed not to.  I can't --
22  in 2015, I can't -- I can't answer.
23  Q.  Can you think of any reason why

Page 200

1  they would be instructed not to fill that
2  in?
3  A.  I can't.  But I don't know that
4  they weren't.  I mean, if we were looking
5  at each -- each facilities' and on some
6  other facilities' they were filled in,
7  then I could concur that they should have
8  been, but I don't know because I don't
9  remember.
10  Q.  But you would agree that the
11  usefulness of this information is zero if
12  the information is not provided; right?
13  A.  I would agree with what?
14  Q.  You would agree that the
15  usefulness of this section is zero if the
16  information is not provided; right?
17  A.  This specific information?
18  Q.  Correct.
19  A.  Or this total form?
20  Q.  No, I'm sorry, the -- in this
21  section where these blanks are, this form
22  as to this -- these -- this subject
23  matter is not useful because there's no

Page 201

1  -- there's no data provided?
2  A.  Not from looking at it from
3  here.  If I wanted to get the information
4  from here, it's no value to me, but I
5  have a -- there are other places to get
6  this information.
7  Q.  Okay.  Under drug usage, again,
8  the random screening percent --
9  percent positive and the tenth screening
10  percent positive are also negative -- are
11  also -- the first one is blank and the
12  second one is NA; correct?
13  A.  Yes.
14  Q.  And in the next block, is it --
15  where it asks, "What do you consider the
16  level of drug usage to be in your
17  facility?"  And this says extensive.  Do
18  you see that?
19  A.  I see extensive, moderate, and
20  limited.  I don't see either one of them
21  that's circled.  Oh, okay.  Yes, I do.
22  Yes.
23  Q.  And then it says, "Drugs are

51 (Pages 198 - 201)

Page 202

1 readily available due to a high number of
2 items thrown over the fences and based
3 upon the number of positive drug tests
4 and the amount and variety of illegal
5 substances confiscated." Right?
6    A.  It does.
7    Q.  So we had discussed earlier, you
8 would -- at this time in 2015, you were
9 already familiar that a high number of
10 drugs were being thrown over the fence;
11 right?
12    A.  Yes, sir.
13    Q.  And you were already aware that
14 contraband was extensively available at
15 St. Clair; right?
16    A.  I was aware it was available.
17    Q.  And it says here, "based upon
18 the number of positive drug tests," yet
19 the -- like we mentioned earlier, the
20 random screening percent positive item is
21 blank; right?
22    A.  Correct.
23    Q.  So again, does this -- would

Page 203

1 this -- should this have struck something
2 with you that this form was inaccurate?
3    A.  Probably.
4    Q.  Do you recall following up about
5 this form?
6    A.  I do not.  You have to remember,
7 I couldn't even remember that this was a
8 form.
9    Q.  Understood.
10    A.  Okay.
11    Q.  So, do you recall what you did
12 in response to this form saying that
13 drugs were extensively -- were readily
14 available in St. Clair?
15    A.  No, sir.
16    Q.  Would you have done nothing?
17    A.  I don't know.
18    Q.  On the next page, if you could,
19 flip with me.  So the first section here
20 says inmate staff assaults without
21 serious injury.  You see that?
22    A.  Yes, sir.
23    Q.  What is considered a serious

Page 204

1 injury?
2    A.  It's really determined by
3 medical.
4    Q.  And do you know how they make
5 that determination?
6    A.  I'm not in medical.
7    Q.  But you oversaw medical as the
8 associate commissioner; right?
9    A.  No, sir, I did not.  There was
10 an associate commissioner for medical
11 services.
12    Q.  Understood.
13       Can you read the description and
14 number for item C.
15    A.  "Assaulted by pushing, shoving,
16 ramming, butting, lunging."
17    Q.  And how many incidents are
18 reported here?
19    A.  Forty-eight.
20    Q.  What about for item D that says,
21 "Assaulted by water, tea, coffee, food,
22 urine, feces being thrown or spit upon,"
23 how many items -- how many instances are

Page 205

1 reported there?
2    A.  Twenty.
3    Q.  What about J, "Verbal threats to
4 assault"?
5    A.  Thirty.
6    Q.  So if my math is right, that's
7 roughly 99 incidents; right?
8    A.  I don't know.  The math -- your
9 math is probably right, but I don't know
10 that one of these incidents came -- two
11 different things didn't happen on one
12 incident.  I don't know.
13    Q.  So, but multiple kinds of things
14 can happen within the same incident;
15 correct?
16    A.  Correct.
17    Q.  Okay.  Under K for "Fights and
18 altercations," it says zero.  You see
19 that?
20    A.  Yes, sir.
21    Q.  Is that supposed to denote
22 alterca- -- fights or altercations
23 between staff and inmates?

52 (Pages 202 - 205)

Page 206

1    A.   Yes.
2    Q.   Is it possible that there could
3 be zero fights between staff and inmates
4 in a single year?
5    A.   It's possible that it could be
6 zero fights between staff and inmates but
7 not zero altercations.
8    Q.   Have you ever in your 35- to
9 40-year career seen -- been -- strike
10 that.
11       Have you ever in your career
12 seen a year that there was not a single
13 fight between staff and inmates at a
14 facility?
15    A.   I know of very little -- very
16 few fights between inmates and inmates --
17 inmates and staff.
18    Q.   But no, but you don't know a
19 single year where there were no
20 altercations for inmates and staff?
21    A.   I do not.
22    Q.   So safe to say this item is
23 inaccurate?

Page 207

1       MS. PUTMAN:  Object to form.
2       MR. LAWSON:  Object to the form.
3    A.   Yes.
4    Q.   Okay.  And then if you move down
5 to "Alleged assaults," that's also zero;
6 right?
7    A.   It is.
8    Q.   Is that possible in the prison
9 system?
10    A.   It's not probable, but it's
11 possible.
12    Q.   And is that -- strike that.
13       At St. Clair, did you ever know
14 a single year where there -- where no
15 staff was alleged to have assaulted an
16 inmate?
17    A.   Alleged?  I mean, if there was
18 an assault, it would be documented.  I
19 can't -- it says "Alleged assaults,"
20 which means that somebody would have had
21 to say that they got assaulted and then
22 it would have to be proven that it didn't
23 happen; correct?

Page 208

1    Q.   Or would the allegation itself
2 be what that's asking for the report of?
3    A.   I don't know.
4    Q.   Well, I mean, the question is to
5 you, sir.  It's an ADOC form.
6    A.   It is, but I don't -- you're
7 asking me.  I'm telling you I don't know.
8    Q.   So if this is -- I guess the
9 question then -- strike that.
10       So, are you telling me that a
11 form is being forwarded to you and you
12 didn't understand the data being
13 reported?
14       MS. PUTMAN:  Object to the form.
15    A.   I'm telling you -- the question
16 that you asked me, you asked me for an
17 answer, and I'm telling you I don't know
18 your answer.
19    Q.   Okay.  Then under "Inmate staff
20 assaults with serious injury," there is
21 -- next to A, there's -- it says, "One
22 officer assaulted with a baton taken by
23 inmate."  You see that?

Page 209

1    A.   Yes, sir.
2    Q.   Do you recall that incident?
3    A.   I do not.
4    Q.   How often would you say that an
5 officer is injured by an inmate at St.
6 Clair?
7    A.   I don't know.
8    Q.   Do you recall any particular
9 incidents?
10    A.   Not specific.  I do have -- I
11 do.  I can recall one.  I don't know when
12 it was, but I remember a lieutenant was
13 beaten pretty badly.
14    Q.   Do you recall where in the
15 prison that was?
16    A.   Are you familiar with St. Clair?
17 So the breezeway area, coming from the
18 breezeway area -- when you come up the
19 steps, you come through the checkpoint
20 and you go, that's what we call the
21 breezeway.  There's a building here and a
22 building here (indicating).  When you
23 come past that area, there's a sidewalk

53 (Pages 206 - 209)

Page 210

1 there. It's right there. It comes
2 directly from that yard. It happened
3 right there.
4     Q. And do you recall an
5 investigation into that incident?
6     A. Do I recall?
7     Q. An investigation into that
8 incident.
9     A. Was there one?
10    Q. Yes.
11    A. Yes.
12    Q. Do you recall any more specifics
13 about what happened or why that incident
14 occurred?
15    A. I don't.
16    Q. Okay.
17    A. I don't recall any of the
18 specifics.
19    Q. If you want to flip the page
20 with me. So under "Inmate" -- "Inmate on
21 inmate assaults without serious injury,"
22 there's 17 incidents there with a knife
23 reported; right?

Page 211

1     A. Yes, sir.
2     Q. And another 34 under "Assaulted
3 by hitting with hand, kicking, or
4 slapping." See that?
5     A. Yes, sir.
6     Q. Do those numbers seem accurate
7 to you?
8     A. I don't know. I have nothing to
9 reference that against.
10    Q. Well, you said that you were in
11 the Department of Corrections for a lot
12 of years and were very in touch with
13 prisons. Is that right?
14    A. Yes.
15    Q. So based on your experience and
16 all that, your years of experience, does
17 that seem like an accurate number in
18 terms of altercations between inmates?
19    A. My answer remains the same. I
20 can -- I can't take this data and tell
21 you whether that's accurate or not
22 accurate. I don't have anything to
23 compare it to or post it up against.

Page 212

1     Q. Okay. Flip to the next page,
2 sir. So under "Staff issues," it says,
3 "Staff morale," and "Fair" is checked
4 off. Do you see that?
5     A. Yes.
6     Q. Does that match your
7 recollection of St. Clair at the time?
8     A. I can't remember. I can't
9 remember the 15th. I don't know what
10 happened in 2015. I don't know.
11    Q. And then if you move down the
12 page under "Staff issues" and it asks for
13 how many workplace harassment claims have
14 been filed in this year and it says four.
15 Does that seem like a lot to you?
16    A. I think "a lot" is relative.
17 But again, that's a comparison, and so
18 I'd have to put that up against -- I'd
19 have to have something to compare that
20 against for me to say yeah, I believe
21 that's a lot. If I'm comparing it to
22 other facilities, am I comparing it to
23 the year before? I -- four would be more

Page 213

1 than anybody would want to see.
2     Q. Do you recall what you or
3 anybody else did to try to lower the
4 number of harassment claims at St. Clair?
5     A. They were all -- if they were --
6 if they were documented, then they were
7 investigated.
8     Q. Do you recall if any
9 disciplinary action was --
10    A. 2015. 2015. I'm 63; right? I
11 don't know. No, I don't.
12    Q. If you keep going down, it says
13 here staff turnover was down by ten --
14 there was 10 percent in staff turnover.
15 Do you see that?
16    A. I see the 10 percent, yes.
17    Q. So, am I right that that means
18 that the -- St. Clair had a reduction in
19 staff of 10 percent?
20    A. That's what it would mean to me,
21 yes.
22    Q. And is this consistent with what
23 you were -- you testified to earlier,

54 (Pages 210 - 213)

Page 214

1 that there was a lot of people at St.
2 Clair quitting?
3    A.  I don't think I said that.
4    Q.  There was --
5    A.  I said people were retiring and
6 people were leaving, and I compared that,
7 and I said people would come and they
8 wouldn't stay.  But I didn't say --
9    Q.  But you did say people were
10 leaving; correct?
11    A.  Yes.
12    Q.  Okay.  And that's what I was
13 referencing, is that this is consistent
14 with your testimony that employees were
15 leaving St. Clair?
16    A.  Yes, sir.
17    Q.  So you were aware that there was
18 a retention issue at St. Clair even prior
19 to this; correct?
20    A.  And the rest of the Department
21 of Corrections as well.
22    Q.  And how did St. Clair compare to
23 the rest of the Department of

Page 215

1 Corrections?
2    A.  I'd have to look at it.  I can't
3 tell you.  I'm not real good at numbers.
4 I don't keep that in my head.
5    Q.  Go to the next page, sir.  Under
6 "Emergency procedures," the sixth item
7 down, it says, "The institution has
8 adequate resource and staff to handle an
9 emergency," and the answer there says no.
10 Do you see that?
11    A.  Yes.
12    Q.  Do you recall why that would be?
13    A.  Staffing problem.  That would be
14 the first thing to come to mind.
15    Q.  St. Clair was a place where an
16 emergency was -- was always possible.  Is
17 that right?
18       MS. PUTMAN:  Object to the form.
19    A.  Emergencies are always possible
20 anywhere.
21    Q.  Where --
22    A.  In particular facilities,
23 emergencies can happen any time.  I mean,

Page 216

1 it's not just germane to St. Clair.
2    Q.  But it pertains to -- so at any
3 prison, that's a -- that's a real risk?
4    A.  Emergencies?
5    Q.  Correct.
6    A.  Yeah.  But then you have to
7 quantify emergencies.  Is it a medical
8 emergency or is it a stabbing?  There's a
9 difference.  But emergencies?  Yes.
10    Q.  So I guess, who, in the
11 context of -- who is -- strike that.
12       Do you know who was in charge of
13 defining what an emergency meant in this
14 form?
15    A.  I do not.
16    Q.  Regardless -- strike that.
17       Would you agree that having an
18 institution that does not have adequate
19 resources and staff to handle an
20 emergency is dangerous?
21    A.  I would.
22    Q.  Do you recall anything you did
23 to remedy that?

Page 217

1    A.  We recruited.  We brought CERT
2 in.  We came up with a plan to try and
3 limit the amount of people who could
4 mingle together.  Locks were replaced on
5 doors.  Cameras were added.
6    Q.  And that was in response to this
7 form?
8    A.  I'm not saying it was in
9 response to the form.
10    Q.  Okay.
11    A.  You asked me what --
12    Q.  I asked in -- I asked in
13 response to this form.
14    A.  I don't know.
15    Q.  Okay.  On the next page under
16 "Inmate discord," there are two line
17 items there.  It says, "Inmates sitdowns
18 and work stoppages/slowdowns have
19 occurred in the past year," and "Inmates
20 have increased their use of passive
21 resistance and outright refusals to
22 follow direction," and both are answered
23 yes.  You see that?

55 (Pages 214 - 217)

Page 218

1   A.  Yes, sir.
2   Q.  Does that suggest a lack of
3  control over the inmate population?
4   A.  It could.
5   Q.  Does a lack of control over the
6  prison population present safety issues
7  for a prison?
8   A.  Yes.
9   Q.  Do you recall what you did to
10 address the inmate discord at St. Clair
11 in response to this form?
12  A.  I do not.
13  Q.  Do you recall what anyone else
14 did?
15  A.  I do not.
16  Q.  Towards the bottom of the page,
17 there's a section that's labeled "Group
18 disturbances."  You see that?
19  A.  Yes, sir.
20  Q.  And three lines down is a
21 comments section that says, "Multiple
22 inmates were involved in the death of a
23 population inmate."  Do you see that?

Page 219

1   A.  Yes, sir.
2   Q.  Do you recall that incident?
3   A.  I do not.
4   Q.  Was that -- was that kind of
5  incident common in St. Clair?
6   A.  Not to my knowledge, no.
7   Q.  If you could skip over to page
8  13 of this report, please, look at
9  Section IV, "Critical threats."  The
10 first critical threat here is staffing
11 shortage.  You see that?
12  A.  Yes, sir.
13  Q.  And we had already talked about
14 this.  You were already aware that
15 staffing shortages at St. Clair were a
16 crisis as of 2015; correct?
17      MS. PUTMAN:  Object to the form.
18  A.  Yes, sir.
19  Q.  And Commissioner Dunn, who at
20 this time had been -- as commissioner,
21 was also aware; correct?
22      MS. PUTMAN:  Object to the form.
23  A.  I can't answer for Commissioner

Page 220

1  Dunn.
2   Q.  Well, you said you had
3  conversations with him when he came on at
4  St. Clair.
5   A.  I did.
6   Q.  And staffing was discussed
7  there; correct?
8   A.  It was.
9   Q.  And he knew that St. Clair was
10 understaffed; correct?
11  A.  You would have to ask Mr. Dunn
12 what he knew.
13  Q.  Did you discuss that with him
14 during the meeting?
15  A.  We discussed staffing.  We did.
16  Q.  So he had to know that staffing
17 -- you told him staffing -- it was
18 understaffed; correct?
19  A.  Yes.
20  Q.  Okay.  Towards the end here, it
21 says:  "Many times there are 1300 inmates
22 with only 30 correctional officers inside
23 the facility, 44 to 1 ratio on a daily

Page 221

1  basis.  The ratio is higher on the night
2  shift."
3      Do you see that?
4   A.  Yes, sir.
5   Q.  That's referencing a ratio of
6  inmates to correctional officers.  Am I
7  right?
8   A.  I believe it is.
9   Q.  Would you agree that ratio is
10 too high?
11  A.  I would.
12  Q.  Is that ratio dangerous for a
13 prison?
14      MS. PUTMAN:  Object to the form.
15  A.  It is.
16  Q.  And do you read this to say that
17 this is the ratio during the day shift?
18  A.  That's what I get out of this
19 segment, yes.
20  Q.  Is the day shift more dangerous
21 than a night shift?
22      MS. PUTMAN:  Object to the form.
23  A.  I don't -- I don't understand.

56 (Pages 218 - 221)

Page 222

1    Q.  So during the day, officers --
2  excuse me.
3        During the day, inmates are
4  moving more often than the night shift.
5  Is that right?
6    A.  Technically, yes.
7    Q.  So, does that create for a more
8  dangerous situation because of the
9  increase in movement?
10    A.  Not necessarily.
11    Q.  Why is that?
12    A.  Because you can have orderly
13  movement just like you can have ruckus.
14  And you can have -- you can have five
15  days of orderly movement, people going
16  back and forth to classes, people -- or
17  education, people going to work, people
18  going to eat, pill call, and not have a
19  problem at all, and the ratio could still
20  be 44-to-1.  So it doesn't -- it doesn't
21  necessarily mean that.  But then there
22  are those other days that you can have
23  chaos -- chaos all day.

Page 223

1    Q.  So, was that ratio acceptable
2  under ADOC standards?
3    A.  No, sir.
4    Q.  Do you recall -- and you may
5  have answered this already.  Do you
6  recall what you did to decrease that
7  ratio?
8    A.  From 2015, no, sir.
9    Q.  And if you could, flip to the
10  next page for me.  So it says list of
11  individuals participated in this
12  assessment process.  The first individual
13  there is Carter F. Davenport.  Do you see
14  that?
15    A.  Yes, sir.
16    Q.  Do you know who that is?
17    A.  I do.
18    Q.  Who is he?
19    A.  He was a Warden III at St. Clair
20  at the time.
21    Q.  And what about Eric Evans?
22    A.  He was a Warden II at the
23  facility at the time.

Page 224

1    Q.  And do you recall Mr. Evans?
2    A.  Yes, sir.
3    Q.  And what about --
4    A.  I know everyone on this list.
5    Q.  Everyone on this list?  Do you
6  recall having any concerns about the
7  performance of anyone on this list?
8      (Witness reviews document.)
9    A.  No, sir.
10    Q.  You spoke earlier that if you're
11  not getting accurate information, that
12  gives you reason to have less confidence
13  in people who report to you.  Do you
14  recall that?
15    A.  I do.
16    Q.  We looked earlier that the
17  information in this report was
18  inaccurate; right?
19    A.  It is.  We did, sir.  Yes, sir.
20    Q.  So, did that give you reason to
21  have less confidence in any of these
22  individuals?
23    A.  Not necessarily.

Page 225

1    Q.  So I'd like to keep this out for
2  a second.  I'm going to hand to you what
3  I'm going to mark as Plaintiff's Exhibit
4  5.  Do you recognize this document, sir?
5  (Plaintiff's Exhibit 5 was marked for
6  identification and is attached.)
7    A.  Yes, sir.
8    Q.  Do you know what -- can you tell
9  me what this document is?
10    A.  Alabama Department of
11  Corrections Institutional Vulnerability
12  Analysis.  Institutional name: St. Clair
13  Correctional Facility.  Date: May 9,
14  2016.
15    Q.  So this is the vulnerability
16  analysis from the following year of the
17  analysis we just looked at; right?
18    A.  Yes, sir.
19    Q.  And this covers the conditions
20  over 2015?
21    A.  Yes, sir.
22    Q.  Just I'm going to refer to this
23  as the 2015 assessment, and I'm going to

57 (Pages 222 - 225)

1 refer to the previous exhibit as the 2014
2 assessment.  Is that okay?
3    A.   That's fine.
4    Q.   So in this document, if you
5 could turn to page 3, ending -- kind of
6 that number at the bottom -- 8830,
7 there's two items that are listed under
8 "Potential damaging litigation."  One is
9 Dunn v. Dunn.  See that?
10    A.   Yes, sir.
11    Q.   Do you recall that lawsuit?
12    A.   Not particularly.  I know what
13 it -- I have a vague idea of what it was
14 in reference to.  I can't --
15    Q.   And what is that idea?
16    A.   Being able to provide inmate
17 assistance in reference to the
18 Disabilities Act.
19       THE COURT REPORTER:  In
20 reference to?
21       THE WITNESS:  The Disabilities
22 Act.
23    Q.   And it also says Duke v. Dunn.

1 Do you see that?
2    A.   Yes, sir.
3    Q.   Do you recall what that lawsuit
4 is?
5    A.   I recall going through it, but I
6 can't put it together at this particular
7 time.
8    Q.   It says, "dealing with security
9 issues and safety inside the prison."
10 You see that?
11    A.   Yes, sir.
12    Q.   Did that refer to St. Clair?
13    A.   Yes.  Yes, sir.
14    Q.   So as of May 2016, you were
15 aware that ADOC and the prison was facing
16 potential liability for the conditions at
17 St. Clair?
18       MS. PUTMAN:  Object to the form.
19    A.   I was aware that a lawsuit had
20 been filed, yes.
21    Q.   So what I'd like to do is I'd
22 like to run through some comparisons
23 between this document and the one we

1 previously looked at.  So if you could
2 turn to page 5 of this assessment, ending
3 in 8832, and also page ending in 247 of
4 the previous exhibit, page 5 of both.
5       So this says in the 2015
6 assessment that the percent over or under
7 design capacity as of the date was 24.7
8 percent; right?
9    A.   Yes, sir.
10    Q.   So compared to the other report,
11 that's a reduction; correct?
12    A.   Yes, sir.
13    Q.   But if you turn with me to page
14 9 of that same report, ending in 8836, if
15 you could look down at staff issues, it
16 says the staff turnover was 23 percent;
17 correct?
18    (Witness reviews document.)
19    A.   Yes, sir.
20    Q.   And that's actually a 13 percent
21 increase from the year prior.  See that?
22    A.   Yes, sir.
23    Q.   So that would leave the

1 officer-to-inmate ratio at about the same
2 as the previous year; correct?
3       MS. PUTMAN:  Object to the form.
4    (Witness reviews document.)
5    A.   Am I supposed to be able to look
6 at something and tell?  I don't know --
7    Q.   Well, so let's do this.  So if
8 you could turn to page 14, ending in
9 8841, under staffing shortage, the second
10 line at the bottom of that paragraph says
11 there's still 44-to-1 ratio; right?
12    A.   Yes, sir.
13    Q.   And actually, if you look at
14 that compared to the critical threat
15 paragraph in the previous -- for the
16 previous year, they're exactly the same;
17 correct?  Page 13 of the previous report,
18 sorry.
19    (Witness reviews document.)
20    A.   Yes, sir.
21    Q.   So no improvements were made in
22 addressing the critical threat of
23 staffing shortages between 2014, 2015?

58 (Pages 226 - 229)

Page 230

1     MS. PUTMAN:  Object to the form.
2     A.   According to this, there wasn't.
3     Q.   Okay.  So if you could turn back
4  with me in the 2015 assessment to page 6,
5  ending in 8833.  So you see here under
6  illegal and unauthorized activities,
7  these figures are filled in now; right?
8     A.   Yes, sir.
9     Q.   And that's -- the previous
10  year's were not?
11     A.   Yes, sir.
12     Q.   So it says total number of major
13  disciplinary reports was 1,511.  Do you
14  see that?
15     A.   I do.
16     Q.   Do you know what was considered
17  a major disciplinary report?
18     A.   It would be in the Class A,
19  Class B range.
20     Q.   So those are the ones that you
21  received?
22     A.   Yes, sir.  Well, yes, I think
23  that's correct.  Yeah.

Page 231

1     Q.   Is 1,500 a lot of major
2  disciplinary reports?
3     A.   Yes.
4     Q.   Is that an acceptable number
5  under ADOC standards?
6     A.   I can't answer that.
7     Q.   Was that an acceptable number to
8  your standards?
9     A.   I can't answer that either.
10     Q.   Can you explain why?
11     A.   Because I don't have anything to
12  reference that against.
13          And so when we start talking
14  about major reports, A's and B's, a B
15  could be something as simple as failure
16  to obey a direct order, which means that
17  I just turned around and walked away.
18  You told me to do whatever, and I turned
19  around and walked away.  There was no
20  violence, there was no nothing in there,
21  but it still made -- made the report.
22  You could have 700 of those and 300 file
23  reports, so -- based on -- based on major

Page 232

1  report.  So -- and disciplinaries.
2          So our disciplinaries are broken
3  down into major disciplinaries and minor
4  disciplinaries, and the difference is
5  what the punishment is.  So it's not
6  necessarily just the A's and B's.  They
7  could be -- there could be a low amount
8  of A's and a high amount of B's.
9  Refusing to go to work is considered a
10  major report.  It's major -- it's a major
11  disciplinary, but it's not -- there's no
12  violence or anything that takes place in
13  there.
14     Q.   So, does that make discerning
15  the actual level of violence at a prison
16  difficult?
17     A.   There are other reports that you
18  can look at.  So -- so if I want to -- if
19  I want to -- if I want to look at -- if I
20  took St. Clair, Donaldson, and Holman and
21  put those three institutions and I did a
22  comparison of that and I had IT to run me
23  reports to show me how many fights with

Page 233

1  injury there were at each one of those
2  facilities, how many assaults with
3  weapons there were, how many assaults to
4  staff there were, those major incidents
5  of violence, that gives me a better idea
6  comparing, and then I take an added
7  staffing component into that.  So there
8  -- there's -- there's more than just
9  looking at a number, whether that number
10  increases or decreases.
11          Because it could be the same way
12  with the decrease.  This number could go
13  from 1,511 to, say, a thousand, but in
14  that report, that could have been -- in
15  this 1,511, there could have been a
16  hundred with assault, assault on staff,
17  et cetera.  Even though the number went
18  down, this number went down the following
19  year, that overall number for assaults
20  could have gone up.  So it's hard to look
21  at this (indicating), just this, as a
22  comparison of how your violence is going.
23     Q.   So following up on that, the

59 (Pages 230 - 233)

Page 234

1  analysis you just described where you
2  kind of -- did you ever actually conduct
3  that analysis to understand the violence
4  that was going on at St. Clair?
5      A.  I have looked at those numbers,
6  yes.
7      Q.  And do you recall what you found
8  from that analysis?
9      A.  In what respect?
10     Q.  Did you --
11     A.  Specifics or --
12     Q.  Did you --
13     A.  -- generalities?
14     Q.  Generalities -- I mean specifics
15  if you recall.  Do you recall what you
16  found specifically?
17     A.  Generally, St. Clair was
18  violent.  There was violence at St.
19  Clair.
20     Q.  Was it unacceptably violent?
21        MS. PUTMAN:  Object to the form.
22     A.  All violence is unacceptable.
23     Q.  And what did you do in response

Page 235

1  to seeing that?
2      A.  You continue to try to work with
3  staff.  You continue to try to get it
4  more staffed.  All of the violence is not
5  based on a lack of staff, but a good
6  portion of it.  And if you have
7  additional staff, then it makes the
8  situations better.
9        There is a component to inmate
10  activities that -- there are some people
11  who it doesn't make any difference if
12  you're standing right there or not; if
13  they're going to do whatever they do,
14  they're going to do it.  So you could
15  have ten staff standing around, and if
16  I'm mad, et cetera, and I'm mad with you
17  and I slap you, I'm going to go down, I'm
18  going to be cuffed, and I'm going to be
19  taken off.  But I -- the assault has
20  still occurred, and it's assault on a
21  staff member and it's considered serious.
22     Q.  So, are you saying that a level
23  of violence is impossible -- it will

Page 236

1  always be present?
2        MS. PUTMAN:  Object to the form.
3      A.  In the current system as I know
4  it, yes, there will always be some
5  violence.  Even if -- if you went to a
6  locked-down facility and you had two
7  inmates in the same cell all the way
8  throughout and we gave them rec, we did
9  -- fed meals, we did everything that the
10  Department should do humanly possible,
11  that's not going to stop two people from
12  getting agitated at each other.  That's
13  not going to stop -- that's not going to
14  stop me if you -- if you have a
15  vulnerable inmate in the cell with a
16  predator.  It should not happen based on
17  -- that should not happen, but you don't
18  always know that until it happens.  So
19  that still won't stop -- that won't stop
20  a sexual assault.  And so there are some
21  things that they will always happen
22  regardless.
23     Q.  But there's a difference between

Page 237

1  that and 1,511 instances a year; right?
2      A.  I just gave you the numbers.  I
3  broke that down to you.
4      Q.  Okay.  And you were -- you were
5  mentioning that -- talking about the
6  reliability and the usefulness of these
7  numbers and how they -- and what they
8  actually say about the level of violence
9  at St. Clair; right?
10     A.  Yes, sir.
11     Q.  And if I'm understanding your
12  testimony correctly, that these are --
13  these numbers are limited in their
14  usefulness because just of how the
15  reporting works?
16     A.  I would say depending on what
17  you're actually looking for.  And I would
18  say, before I would just take these
19  numbers to base that on, I've got other
20  documentation that I can go to to get
21  some better clarification on that.
22     Q.  So as the person who was
23  designated to receive these -- these

60 (Pages 234 - 237)

Page 238

1 assessments, do you think it was your job
2 to revise this to make it more useful?
3    A.  I think this -- I think, if I'm
4 not mistaken, that this is a form that is
5 produced by the National Institute of
6 Corrections, and we were using it in
7 accordance with them.  But I'm not
8 totally positive about that, but that is
9 what I believe.
10    Q.  Okay.  So moving forward in
11 this, the 2015 assessment, the amount of
12 drug usage, it says the random screening
13 positive was 32 percent.  You see that?
14    A.  Yes, sir.
15    Q.  And if you look at the
16 commentary in that third box there, the
17 narrative is the exact same as the year
18 prior; correct?
19    A.  Yes.
20    Q.  So there was no improvement in
21 drug availability at St. Clair between
22 2014 and 2015?
23        MS. PUTMAN:  Object to the form.

Page 239

1    A.  I can't find the other page, so
2 I can't --
3    Q.  So we're looking for -- 248 is
4 the end?
5    A.  Based on this, you're correct.
6    Q.  If you could turn to page 8 of
7 the 2015 report with me, that also
8 corresponds to page 8 of the previous
9 report as well.
10        So looking at the inmate
11 assaults, inmate-on-inmate assaults
12 without serious injury -- excuse me.
13        The assaults with major weapons
14 for 2015 went up from the previous year;
15 correct?
16    A.  Give me a second to re-sort.
17    Q.  Sorry.  So we're looking at 835
18 and 250.
19    A.  Yeah, I got to -- I just got to
20 take a second.
21    Q.  I hear you.  Take your time.
22    A.  Thank you.
23        MS. PUTMAN:  You're looking for

Page 240

1 two page 8's, if that helps you.
2        THE WITNESS:  Okay.
3    Q.  Sorry, this kind of thing used
4 to be easier on Zoom.
5    A.  Okay.  And your question again?
6    Q.  Yeah.  So in the 2015 analysis,
7 it says that there were 22 assaults with
8 a weapon, inmate-on-inmate assaults with
9 a weapon with serious -- without serious
10 injury, excuse me, that were involving
11 knives, broomsticks, lock, sock.  Do you
12 see that?
13    A.  Yes.
14    Q.  And so that's -- that is an
15 increase from the year prior; correct?
16    A.  Yes.
17    Q.  And assaults by hitting, hand,
18 kicking, slapping stayed the same;
19 correct?
20    A.  Yes.
21    Q.  And if you -- if you look down
22 each of the categories under inmate,
23 inmate assault with serious injury also

Page 241

1 increased; correct?
2        (Witness reviews document.)
3    A.  Yes.
4    Q.  All told, between the A and B
5 categories in the 2015 report,
6 inmate-on-inmate assaults with serious
7 injury actually went up by 31 incidents;
8 right?
9    A.  Yes.
10    Q.  If my math is correct, that's
11 roughly over -- that's about over 1000
12 percent increase?
13    A.  If your math is correct.
14    Q.  So there was no improvement on
15 inmate-on-inmate assault at St. Clair
16 from 2014 to 2015; correct?
17        MS. PUTMAN:  Object to the form.
18    A.  Based on this analysis, yes.
19    Q.  In fact, it got worse; correct?
20    A.  Yes.
21    Q.  If you could scroll -- scroll,
22 excuse me.  If you could turn to page 10
23 of the 2015 report, ending in 8837.

61 (Pages 238 - 241)

Page 242

1 Under emergency procedures, that same
2 line item that we talked about earlier,
3 "The institution has adequate resources
4 and staff to handle an emergency," it
5 says no there; correct?
6       You don't have to worry about
7 the earlier exhibit for now.
8    A.  Yes.
9    Q.  So, and we talked about earlier
10 that that was no in the previous year;
11 correct?
12    A.  Yes.
13    Q.  So there was no -- there was no
14 improvement in St. Clair's ability to
15 staff and handle an emergency; correct?
16    A.  Based on this analysis, that's
17 correct.
18    Q.  If you could turn with me to
19 page 12 of this.  Under group
20 disturbances, there's a comment that
21 says, "An officer was attacked in
22 segregation the same night multiple
23 inmates stabbed a lieutenant, causing

Page 243

1 serious injury to both employees."  Do
2 you see that?
3    A.  Yes.
4    Q.  Was this the incident you were
5 referencing earlier at St. Clair?
6    A.  I can't -- I don't know.
7    Q.  Do you recall this incident?
8    A.  No.  Not specifically, no.
9    Q.  If you could scroll -- I keep
10 doing that.  If you could turn with me to
11 page 14, please, ending in 8841.
12 Staffing shortage is still the number one
13 critical threat; right?
14    A.  Yes, sir.
15    Q.  And we talked about earlier, the
16 ratio here is still the same; correct?
17    A.  Yes.
18    Q.  So there was no improvement on
19 the critical threats of staffing --
20 staffing shortages at St. Clair for
21 2014-2015; correct?
22       MS. PUTMAN:  Object to the form.
23    A.  That's correct.

Page 244

1    Q.  If you look in item 2 down here,
2 it says public access, and I think this
3 is what you were referencing earlier
4 about the risk of the proximity to public
5 roads and individuals throwing contraband
6 over the fence.  Is that correct?
7    A.  Yes, sir.
8    Q.  It says in here in the second to
9 last sentence that a package containing
10 two handguns was recovered.  Do you see
11 that?
12    A.  Yes.
13    Q.  After locking the facility down
14 and some investigation, it was discovered
15 there was already ammunition inside the
16 facility.  Do you recall that incident?
17    A.  Yes, sir.
18    Q.  What do you recall about the
19 investigation that followed?
20    A.  I don't -- I don't recall the
21 investigation.  CERT was brought in, the
22 facility was locked down, and the whole
23 facility was searched.

Page 245

1    Q.  And --
2    A.  There was --
3    Q.  Excuse me, I didn't mean to --
4    A.  No ammunition was ever found, to
5 my knowledge.  Or to the best of my
6 recollection, it was not.
7    Q.  So this is inaccurate that there
8 was already ammunition inside the
9 facility?
10    A.  Yes, to the best of my
11 knowledge.  To the best of my
12 recollection, there was a search that
13 took place.  The facility went into
14 lockdown, and there was a search that
15 took place, but I don't recall us finding
16 any ammunition.
17       THE COURT REPORTER:  You don't
18 recall what?
19       THE WITNESS:  We finding --
20 actually finding ammunition.
21    A.  And I could be wrong, but I
22 don't remember finding ammunition.
23    Q.  How many times have guns been

62 (Pages 242 - 245)

Page 246

1  found in St. Clair?
2      A.  I don't know.
3      Q.  At least once; right?
4      A.  Yes.
5      Q.  Okay.  If you compare -- well,
6  strike that.
7          Was Commissioner Dunn informed
8  of the results of this analysis, the 2015
9  analysis?
10     A.  I can't say.  I don't know.  I
11  don't remember.
12     Q.  What about the 2014 analysis?
13     A.  I don't remember.
14     Q.  Is this something that you would
15  have reported to him?
16     A.  I don't remember.
17     Q.  So you mentioned a few things
18  that were done -- strike that.
19         Was there anything that you did
20  following receiving this report to remedy
21  the issues identified in here?
22     A.  The same thing, just continued
23  to try the same thing.

Page 247

1          You realize that -- so in this
2  report, if the accuracy of -- if this
3  report is accurate, so we've already
4  talked about staffing being down, so
5  staffing was further down.  This year,
6  staffing is less than it was because even
7  though the percentage is less, it doesn't
8  account for the people that we had
9  already lost in the previous year, which
10  means that we were further down in
11  staffing.
12         Staffing continues to be a
13  problem at St. Clair today, to my
14  knowledge, to the best of my knowledge,
15  so staffing is an issue.  Nobody -- I
16  would never try to dispute that staffing
17  is an issue.  And if you don't have the
18  staff, you can't do searches like you're
19  supposed to.  You can't control inmate
20  traffic like you're supposed to.  That's
21  -- that's a fact.  I think any expert
22  would come in and tell you that same
23  thing.

Page 248

1      Q.  So that being what it was, was
2  it clear to you after this report that
3  whatever you had done -- strike that.
4          You mentioned that you had done
5  things regarding staffing; right?
6      A.  Yes.
7      Q.  Would you agree that based on
8  the results of this report, that they
9  were unsuccessful?
10     A.  Still are.  And I don't -- so
11  the time frame that we were talking about
12  earlier when I was telling you and the
13  time frame now, I don't even know if
14  we're talking about the same two time
15  frames.
16         But I do know that if you
17  recruit, if you go out, you try to bring
18  people in.  You can't make people come to
19  work at the Department of Corrections, or
20  any other job, for that matter.  You can
21  walk down the street now and see Wendy's,
22  McDonald's, and everybody else has got a
23  sign up saying they want help.  You can't

Page 249

1  make people come to work.  You can't.
2  You can't.  It's not like a robot that I
3  can just go manufacture and put in and
4  put it in place.  It doesn't work like
5  that.  I wish it did, but it doesn't.
6      Q.  So --
7      A.  That doesn't mean that we stop
8  trying.  You don't stop recruiting.  You
9  don't stop going out trying to get people
10  to come to work.  You don't do that.  But
11  you can't make them come.
12         If you raise the salaries, then
13  everybody -- when the things were going
14  and we were looking at marketing and all
15  these other things, we thought raising
16  the salaries would get more people to
17  come to work.  If you check the numbers
18  today, see where they are, and the
19  salaries did go up.
20     Q.  So you've raised salaries and
21  recruiting multiple times, but I guess
22  what I'm curious about are other --
23  because those aspects, as you just said,

63 (Pages 246 - 249)

Page 250

1 didn't work, right, both when you were
2 there and after, what were the other
3 alternatives? And were there -- and I
4 should say, were there other alternatives
5 explored to try to improve the conditions
6 at St. Clair?
7     A.  Fencing, locks were changed,
8 dormitories were reconstructed.
9     Q.  So we talked earlier that
10 changing the locks doesn't actually
11 address the ability to obstruct them --
12 obstruct them; correct?
13     A.  It doesn't.
14     Q.  So, does that address the
15 problem?
16     A.  To a degree, it does if you put
17 a better lock in.  If you put a better
18 lock in, then you do another mechanism,
19 use other mechanisms, to a degree, it
20 does.  But if a person still -- if a
21 person can jam the lock, if a person can
22 -- no, it doesn't.  And so in one
23 opinion, it could be -- it's a twofold

Page 251

1 situation there, right, because the
2 inmate knows he shouldn't jam the lock.
3 That's not in the rules that you jam your
4 lock, but you do it anyway.  It's
5 twofold.
6         If you go through and you try to
7 make conditions better, if you try to
8 paint and do things to make it better, if
9 you put in security cameras to try and
10 make them better, you put the cameras in
11 and they try to tear them down.  You're
12 trying.  You're making an effort.  It's
13 not like nothing was being done.
14     Q.  But I guess my question is, was
15 what you were doing -- strike that.
16         So for example, if cameras were
17 put in areas where it was -- where
18 inmates could easily access them to rip
19 them down, is that a usable solution?
20         MS. PUTMAN:  Object to the form.
21     A.  If that was the case, no.
22     Q.  What about if they were put in
23 areas where inmates were easily able to

Page 252

1 scratch them or break the glass on them?
2     A.  If that's the case, no.
3     Q.  So we talked earlier that -- and
4 we looked at -- the initial vulnerability
5 analysis said that those analyses were
6 supposed to be done annually.  You
7 remember that?
8     A.  Yes, sir.
9     Q.  Do you know if they were done
10 annually?
11     A.  I do not.
12     Q.  So, is it possible that one
13 covering 2016 was not done?
14     A.  I just told you, I do not know.
15     Q.  I asked if it was possible.
16     A.  Anything's possible.
17     Q.  Okay.  Because we have not
18 received one, so that's why I wanted to
19 ask.
20         I'd introduce to you what I'm
21 going to mark as Plaintiff's Exhibit 6.
22 Do you recognize this document, sir?
23 (Plaintiff's Exhibit 6 was marked for

Page 253

1 identification and is attached.)
2     A.  I'm sorry?
3     Q.  Do you recognize this document,
4 sir?
5     A.  Alabama Department of
6 Corrections Institutional Vulnerability
7 Analysis.  Institutional name: St. Clair
8 Correctional Facility.  Date: May 2nd,
9 20- -- 2018.
10    Q.  So this would be the analysis
11 covering 2017 for St. Clair; right?
12    A.  Yes, sir.
13    Q.  So if you could turn to page 3
14 with me, ending in 947, it says under --
15 about three-quarters down the page, it
16 says, "Update of security equipment,
17 security systems included in recent
18 changes."  Here it says, "Cell" -- "Cell
19 door locking mechanisms were replaced on
20 all inmate living areas."  You see that?
21    A.  Yes, sir.
22    Q.  This is the lock project you
23 were referencing earlier?

64 (Pages 250 - 253)

Page 254

1    A.   Yes, sir.
2    Q.   So that didn't occur until 2017.
3  Is that right?
4    A.   It might have been -- might have
5  been '17 or '18, yeah.  '16 or '17, I
6  don't know.
7    Q.   So my question is, given the
8  2015 -- 2014 analysis and the 2015
9  analysis and your recollection of the
10  conditions at St. Clair while you were
11  institutional coordinator prior to that,
12  why wait until 2014 to change the locks?
13    A.   Why wait until 20- --
14    Q.   Twenty -- excuse me.  I'll reask
15  the question.
16       Given the 2014 analysis and the
17  2015 analysis and your recollection of
18  the conditions at St. Clair while you
19  were institutional coordinator at St.
20  Clair -- for St. Clair, why wait until
21  2017 to change the locks?
22    A.   I think the -- I think the
23  project itself, the making of the project

Page 255

1  actually probably began before then, but
2  you have to consider State money.  The
3  legislature appropriated proper funds to
4  be able to do that.  You have to consider
5  hiring a contractor to come in and do
6  their assessment.  If I'm not mistaken,
7  we also hired a consultant to do some
8  things and make recommendations as to the
9  changes and the type of lock that we
10  used.  Bureaucracy, lack of funds.
11    Q.   So, do you think there was
12  anything that you could have done to have
13  the locks changed earlier?
14    A.   Bureaucracy, I have no control
15  over.  Legislature, I have no control
16  over.  Funding, I don't control funding.
17    Q.   So, do you think there's
18  anything Mr. Dunn could have done to have
19  the locks changed earlier?
20    A.   I think he did.  I think -- I
21  think -- I think we all did what was
22  feasibly possible for us to do in the
23  time frame that we did it.

Page 256

1       I think Mr. Dunn probably talked
2  to legislators on a very regular basis
3  about the needs of the Department of
4  Corrections.  I wasn't with him.  I can't
5  say that specifically.  But in
6  conversations we've had, I do believe
7  that that took place.  And so State bid
8  laws, they're time-consuming.  It's --
9  everything.
10       So you say six months; before
11  you know it, it's like nine months, and
12  then a year is gone.  You've still -- you
13  got it on the boards.  You're working.
14  It's a process.
15    Q.   Then under the next section, it
16  says, "Proposed policy changes," and it
17  reads, "Develop intake procedures for
18  inmates being processed at SCCF to
19  include housing unit placement programs
20  and to create a more safe environment
21  particularly for inmates at greater
22  risk."  Do you see that?
23    A.   Yes, sir.

Page 257

1    Q.   So, can you describe to me what
2  these procedures that were being
3  developed were?
4    A.   I can vaguely.  I vaguely
5  remember.  So there were -- we were
6  trying to make adjustments to the
7  population at St. Clair.  So we had --
8  there were a high number of inmates who
9  were doing certain things, so they would
10  be placed in solitary or administrative
11  segregation, which was potentially taking
12  cell space up from people who needed to
13  be.
14       Cells, single cells,
15  administrative segregation cells
16  throughout the state were not necessarily
17  adequate for those people who had been
18  there.  Of course, at the same time, you
19  were dealing with national standards.
20  They're saying -- because remember, we
21  had the Duke case going on at the same
22  time, the Disabilities Act, and mental
23  health was a part of that, and I think

65 (Pages 254 - 257)

Page 258

1  it's still -- I think that suit is still
2  going on.
3       But the same thing, you -- you
4  don't lock -- you don't take guys and
5  just lock them away in segregation for
6  long periods of time.  So we tried to
7  come up with -- there were consultants
8  hired for this too that came in, took a
9  look at the processes, and pretty much
10 put a plan of action together so that we
11 would have a -- get a better assessment
12 of inmates who were brought to St. Clair
13 and the type of image that we had at St.
14 Clair.
15   Q.  Do you think this was the kind
16 of program that should have been in place
17 prior to 2017?
18   A.  Anything that would have been an
19 improvement, anything that would have
20 been an improvement that we could have
21 gotten sooner would have been good.
22   Q.  Is there anything else that you
23 think -- strike that.

Page 259

1       Is there anything that you think
2  could have been provided sooner that
3  would have made an improvement at St.
4  Clair?
5    A.  Not that comes to mind, no.
6    Q.  So if you could turn to page 6
7  of this document, please.  And if you
8  could also -- I apologize for another
9  comparison for the 26 -- the 2015
10 analysis ending at 8833.
11       So under use of force, it says
12 that incidents doubled between 2015 and
13 2017.  You see that?
14       (Witness reviews document.)
15   Q.  Nearly doubled, I apologize.
16   A.  I see the numbers, yes.
17   Q.  Did that concern you?
18   A.  Yes.
19   Q.  Do you know what caused that
20 spike?
21   A.  No.  But if we go back to the
22 2015 analysis, I believe it was, if this
23 is the '16, then we had the documentation

Page 260

1  that was showing that inmates were more
2  apt to be combative or not follow orders,
3  a lack of control.
4    Q.  So a lack of control over the
5  institution also increases use of force
6  by employees?
7    A.  That's not what I'm saying.  But
8  when you have -- when you're the inmate,
9  or you're the civilian on the street, for
10 that matter, and you do -- don't do what
11 law enforcement tell you to do or in the
12 prison, you don't do what the
13 correctional officer tells you to do, it
14 generally leads to some form of
15 confrontation.  And if I do a takedown
16 move, that's use of force.  If I put
17 cuffs on you, I have to take you down to
18 put cuffs on you.  I'm not going to a
19 cell to get you out to put restraints on
20 you, but I have to put restraints on you
21 because you're combative, that's use of
22 force.
23   Q.  Do you recall incidents where

Page 261

1  staff were using -- were using force
2  while inmates were restrained?
3    A.  I know it has happened.  I don't
4  recall -- recall any specific incidents
5  at St. Clair, but I do know that
6  happened.
7    Q.  Was it common at St. Clair?
8    A.  I can't say that it was common
9  at St. Clair.
10   Q.  If you keep looking down, the
11 narrative under drug usage is the same as
12 the previous two reports we looked at;
13 correct?
14   A.  Yes, sir.
15   Q.  So there was no improvement in
16 the availability of drugs at St. Clair
17 between 2014 and 2017?
18       MS. PUTMAN:  Object to the form.
19   A.  That's what that statement
20 suggests.
21   Q.  And if you compare -- if you
22 turn to page 9477 and look at the
23 corresponding page in the 2015 report of

66 (Pages 258 - 261)

Page 262

1  8834, the inmate staff assaults --
2  assaults also went up from 2015 to 2017;
3  correct?
4     (Witness reviews document.)
5     A.  Yes, sir.
6     Q.  So the inmate staff violence at
7  St. Clair got worse between 2015 and
8  2017; correct?
9     A.  According to this report.
10    Q.  And the same is true if you look
11 at the inmate-on-inmate assaults for 2017
12 versus the inmate-on-inmate assaults for
13 2015; correct?
14    (Witness reviews document.)
15    A.  And what -- which -- which just
16 happened -- which year are we looking at?
17 Which --
18    Q.  So for example, if you look at
19 inmate-on-inmate assaults with serious
20 injury in the 2017 analysis, there was 53
21 incidents of handmade -- of incidents
22 involving handmade knives.  See that?
23    A.  Yes, sir.

Page 263

1     Q.  That went up from 11 in 2015;
2  correct?
3     A.  Yes, sir.
4     Q.  So that got worse between 2015
5  and 2017; correct?
6     A.  According to this report.
7     Q.  So if you go to page 9 of the
8  2017 report -- or analysis, excuse me,
9  ending in 9479 and if you compare that to
10 the same -- the corresponding page in the
11 2015 analysis ending in 8836, the section
12 labeled "Staff issues," on both, staff
13 morale is labeled as "Low"; correct?
14    A.  Yes, sir.
15    Q.  And that's actually a decrease
16 in designation from the 2014 analysis we
17 looked at, right, that said "Fair"?
18    A.  Yes, sir.
19    Q.  And both still list staff
20 shortages as a -- as a reason for that;
21 correct?
22    A.  Yes, sir.
23    Q.  And mandatory overtime?

Page 264

1     A.  Yes, sir.
2     Q.  And no cost-of-living increases
3  or pay?
4     A.  Yes, sir.
5     Q.  And stress from the number of
6  serious and dangerous incidents?
7     A.  Yes, sir.
8     Q.  So you mentioned earlier that in
9  response to the conditions at St. Clair
10 as you were associate commissioner, pay
11 was increased.  Do you recall that?
12    A.  Yes, sir.
13    Q.  So that didn't occur until the
14 earliest 2018.  Is that right?
15    A.  I don't know exactly when it
16 occurred.
17    Q.  But up to -- based on this, up
18 to this point, it had not occurred;
19 correct?
20    A.  I just know it happened.
21    Q.  This report and the 2015
22 analysis reference mandatory overtime.
23 Do you know how long employees were

Page 265

1  mandated to work overtime, how many
2  hours?
3     A.  There was a limit of -- there
4  was a limit of eight.  You could work
5  your regular eight-hour shift.  You were
6  not to work over 16 hours.  There were --
7  there were -- there were times when that
8  was not necessarily feasible, for various
9  reasons.
10       THE COURT REPORTER:  For what?
11       THE WITNESS:  Various reasons.
12    Q.  Sorry, what was not necessarily
13 feasible?
14    A.  For you just to work 16 hours.
15 Because if I have -- if I have -- if I
16 have an officer or two officers at a
17 hospital with an inmate, I need staff to
18 come to work before I can send staff to
19 relieve them unless I know that I can
20 call them and get them to go straight to
21 the hospital.  So the likelihood is that
22 staff is not going to get relieved on
23 time, so they're going to do more than

67 (Pages 262 - 265)

Page 266

1 their 16 hours.
2    Q.    Was that common at St. Clair?
3    A.    It got worse.  I mean, the lower
4 your staffing numbers go, then it
5 continues.  So we started out like -- if
6 I'm not mistaken, we started out putting
7 mandates on -- initially, you could not
8 do but X, Y, Z amount of overtime and you
9 could not do but eight hours over.  You
10 had to have at least one off day.
11 Because all overtime wasn't mandated
12 overtime.  Some officers would volunteer
13 to work overtime.  So your mandated
14 overtime came when you couldn't get a
15 volunteer and you didn't have anyone to
16 cover the post.  So rather than let staff
17 leave the facility and leave that post
18 uncovered, they were mandated to stay.
19        You had people walk out,
20 wouldn't stay.  They would take a
21 disciplinary action, but they wouldn't
22 stay.  So then you just go to the next
23 person or the next person until you can

Page 267

1 get somebody to cover that post.  And
2 then you start calling people to come in.
3 You may be calling somebody that's
4 scheduled to come in at 6:00 in the
5 morning, but I need you to come in now.
6 So whatever it was to try to cover the
7 post, that's what was being done.
8        So there were -- there were --
9 initially with the policy -- I have no
10 idea how the policy reads now, but
11 initially with the policy, there was a
12 certain amount of overtime that you could
13 work in a workweek.  In a 40-hour
14 workweek, there was a certain amount of
15 time.  You had to have like one off day.
16 You like couldn't work both of your off
17 days.  There were things that were put in
18 place to try to.
19    Q.    So you said it got worse.  Do
20 you recall when it started to get worse?
21    A.    When I -- when I say it got
22 worse, I mean, the staffing continued to
23 get worse.  I can't -- I mean, as we've

Page 268

1 seen from these three reports, that
2 staffing continues to get worse, and you
3 run out of options on what to do to try
4 to replace them.  You don't have as many
5 classes now.  You don't have as many
6 people being hired, not even from the
7 Limestone.
8        Limestone now is in the same --
9 not the same situation, but the people
10 that were going to work at Limestone
11 where we didn't have any staffing
12 problems, so they can't -- they can't
13 divert staff now from going back to
14 Limestone.  They can't -- there's
15 nobody -- there's no Peter to borrow from
16 Paul.  There's no -- it doesn't work.
17    Q.    So, do you recall when -- so you
18 said earlier that staffing shortages were
19 a problem and got worse even before you
20 became institutional coordinator.  Is
21 that right?
22    A.    I think so.
23    Q.    So, is it safe to say that the

Page 269

1 mandatory overtime also was a problem and
2 continued to get worse during that time
3 period?
4    A.    I don't know.  I don't know if
5 we were doing mandatory overtime at that
6 time.  I don't know.  But based on this,
7 we hadn't started doing mandatory
8 overtime at that time.
9    Q.    Understood.  So you may have
10 answered this question, but do you
11 remember when mandatory overtime was put
12 into place?
13    A.    No, sir.
14    Q.    So if you could turn to page 10,
15 ending in 94- -- 9480, under emergency
16 procedures, the same line item we've
17 looked at previously on the earlier
18 reports, "The institution had adequate
19 resources and staff to handle an
20 emergency."  It still says no; correct?
21    A.    Yes.
22    Q.    So safe to say no improvement on
23 St. Clair's ability to have adequate

68 (Pages 266 - 269)

Page 270

1  staff and resources to handle an
2  emergency?
3      A.  Correct.
4      Q.  If you turn to page 9481, page
5  11 with the number 9481 in the bottom
6  right, under escapes, under the comments
7  section at the bottom, it says, "On
8  12-4-17 two inmates managed to escape
9  during a time of increased inmate
10  movement coupled with ongoing staff
11  shortages."  Do you see that?
12     A.  Yes, sir.
13     Q.  Do you recall that escape?
14     A.  No, sir.
15     Q.  Were escapes common at St.
16  Clair?
17     A.  No, sir.
18     Q.  How many escapes would you say
19  occurred while you were institutional
20  coordinator?
21     A.  I have no idea.
22     Q.  What about as associate
23  commissioner?

Page 271

1      A.  I have no idea.
2      Q.  At least one; right?
3          MS. PUTMAN:  Object to the form.
4      A.  At least one.  I think there was
5  -- well, at least one.  I don't recall
6  this one.  I do recall another one, so.
7      Q.  What's the other one you recall?
8      A.  One guy escaped.
9      Q.  When was that?
10     A.  I don't know.
11     Q.  Can you -- what were the details
12  of that escape?
13     A.  He went out the fence.  He
14  escaped.
15     Q.  Okay.
16     A.  He went under a fence and under
17  another fence and --
18     Q.  So he dug out of the prison?
19     A.  He what?
20     Q.  He dug underneath?
21     A.  I don't -- no, it wasn't a dig
22  situation.  I don't think it was.  To the
23  best of my recollection, it wasn't.  I

Page 272

1  know it was right -- it was right around
2  the sally port area.
3          THE COURT REPORTER:  Around the
4  what area?
5          THE WITNESS:  Sally port.
6          THE COURT REPORTER:  Thank you.
7      Q.  And was that while you were
8  associate commissioner or institutional
9  coordinator?
10     A.  I think associate commissioner.
11     Q.  So if you turn to page 14 of
12  this analysis -- excuse me.  You can look
13  at 13 and 14.  It's the critical threats
14  section.  The critical threats identified
15  in 2015 are the same identified in 2017;
16  correct?
17     A.  Staffing, public access,
18  infectious -- staffing, public access,
19  tuberculosis, weather events, infectious
20  disease and tuberculosis.
21     Q.  So --
22         MS. GIBSON:  Can we take a quick
23  break before you ask that question?

Page 273

1          MR. EARL:  Sure.
2          MS. GIBSON:  Just for a second.
3  I apologize.
4          THE VIDEOGRAPHER:  We're going
5  off the record at 3:19.
6          (Break taken.)
7          THE VIDEOGRAPHER:  We're going
8  back on the record at 3:34.
9      Q.  (By Mr. Earl) So, Mr. Culliver,
10  before we left, we were looking at the
11  goals listed in the 2017 analysis
12  compared to the goals listed in the 2015
13  analysis.  You remember that?
14     A.  Yes, sir.
15     Q.  And they are the exact same;
16  right?
17     A.  If you -- if you -- infectious
18  disease and tuberculosis, I mean, that is
19  an infectious disease.  But other than
20  that, yes, they are --
21     Q.  So --
22     A.  -- as far as I can tell.
23     Q.  So aside from the difference of

69 (Pages 270 - 273)

Page 274

1 infectious disease and tuberculosis, fair
2 to say there were no improvements as to
3 those items at St. Clair between 2015 and
4 2017; right?
5    A.  Yes.
6       MS. PUTMAN:  Object to the form.
7    A.  Yes, sir.
8    Q.  Why do you think that was?
9    A.  All the things I've told you for
10 the last four and a half hours, five.
11 Staffing, lack of.
12    Q.  So I'm going to introduce
13 Plaintiff's Exhibit 6 -- I'm sorry, 7.
14 Mr. Culliver, do you recognize this
15 document?
16 (Plaintiff's Exhibit 7 was marked for
17 identification and is attached.)
18    A.  It's an Investigative Report
19 from the Alabama Department of
20 Corrections.
21    Q.  It says the date of the offense
22 is 12/4/2017.  Do you see that?
23    A.  Yes, sir.

Page 275

1    Q.  And this is an investigation
2 into Officer Justin Watts; right?
3    A.  Yes, sir.
4    Q.  So, Mr. Culliver, we mentioned
5 earlier there was an escape in December
6 of 2017.  Do you recall that
7 conversation?
8    A.  I don't know about the date, but
9 we talked about an escape, yes, sir.
10    Q.  So in this report, it says that
11 two inmates were able to escape with bolt
12 cutters and hacksaw blades.  And it also
13 mentions that the inmates told I&I
14 investigators that they had a Taurus
15 9-millimeter G2 pistol during their
16 escape.  That's -- do you recall that?
17    A.  Do I recall it?
18    Q.  That -- those facts.
19    A.  No.
20    Q.  So if you could please turn to
21 page -- the page ending -- on the right
22 ending in 2155.  And then the last
23 sentence of the first paragraph reads,

Page 276

1 "As Inmate King the left the interview
2 room in which Agt Casey sat, Inmate King
3 yelled at Agt Casey across a very busy
4 and occupied lobby hallway, it was
5 Specks, Warden Cedric Specks gave us the
6 gun."
7       Do you see that?
8    A.  Yes, sir.
9    Q.  That's Warden Specks at St.
10 Clair?
11    A.  Yes, sir.
12    Q.  Do you recall this allegation?
13    A.  I do now, yes, sir.
14    Q.  And if you turn to the next
15 page, at the bottom of the last full
16 paragraph, it reads that "Inmate Wilson
17 elaborated and stated that as part of his
18 deal with Officer Watts $1,000 of the
19 $11,000 payment was for Warden Cedric
20 Specks as a cut for allowing the inmate's
21 dealings with Officer Watts."
22       Did I read that right?
23    A.  Yes, sir.

Page 277

1    Q.  Do you recall this allegation?
2    A.  No, sir.
3    Q.  So you don't recall an
4 allegation that your -- that a warden at
5 St. Clair was taking money to -- as part
6 of getting inmates a gun and escape?
7    A.  I don't recall that as it's
8 written here.
9    Q.  What do you recall?
10    A.  Just that Specks was being
11 investigated for -- and the inmate
12 claimed that he allowed a weapon to come
13 into the facility.
14    Q.  And were you at all involved in
15 that investigation?
16    A.  No, sir.
17    Q.  Do you recall the results of
18 that investigation?
19    A.  No, sir.
20    Q.  Did you recall any other similar
21 allegations against Mr. Specks?
22    A.  About contraband or --
23    Q.  Correct.

70 (Pages 274 - 277)

Page 278

1    A.  -- guns or whatever?
2    Q.  Contraband, guns.
3    A.  No, sir.
4    Q.  Mr. Specks was fired in 2018.
5 Is that right?
6    A.  He was fired.  I don't know
7 when.
8    Q.  Do you know -- do you know why?
9    A.  I thought I said earlier,
10 inappropriate -- I don't know.  I don't
11 know exactly what the charges was as far
12 as officially, but it was inappropriate
13 behavior with females, contract females
14 at the facility.
15    Q.  I'm going to hand to you what
16 I'm going to designate as Plaintiff's
17 Exhibit 8.  Oh, actually, I'm sorry, can
18 I have that one back?  My apologies, I
19 gave you the wrong one.  I'm sorry.
20        Excuse me, I'm sorry.  I was
21 right.  You can have that back.
22        Are you familiar -- excuse me.
23 Do you recognize this document, sir?

Page 279

1 (Plaintiff's Exhibit 8 was marked for
2 identification and is attached.)
3    A.  It looks like an e-mail.
4    Q.  And the second page here, do you
5 recognize this document?
6    (Witness reviews document.)
7    A.  It's an Alabama Department of
8 Corrections St. Clair Correctional
9 Facility Operational Assessment Report.
10    Q.  So, do you know what the
11 Association of State Correctional
12 Administrators is?
13    A.  It's a correctional organization
14 that I think primarily is for
15 commissioners.
16        THE COURT REPORTER:  Is what?
17        THE WITNESS:  It's a
18 correctional -- it's a national
19 correctional organization that I believe
20 is for the commissioners.
21    Q.  And they were brought in to do
22 an assessment following the December 2017
23 escape.  Do you recall that?

Page 280

1        MS. PUTMAN:  Object.
2    A.  Yes, sir.
3        MS. PUTMAN:  Object to the form.
4    Q.  And do you recall what your role
5 in that assessment was?
6    A.  I don't recall that at all.
7    Q.  Do you recall reading this
8 report?
9    A.  I don't.
10    Q.  You were interviewed as part of
11 this assessment; right?
12    A.  I may have been, but I don't
13 recall.
14    Q.  Okay.  So if you turn to page 5
15 of this report, the second paragraph
16 reads:  "Staff shortages combined with
17 low morale has created a facility culture
18 of unmotivated staff doing only the
19 minimum to make it through their shift.
20 Officers do not enforce basic facility
21 polices such as challenging inmates
22 moving without authorization on the yard
23 or enforcing the requirement for inmates

Page 281

1 to wear their issued identification
2 wristband and prohibiting smoking within
3 units.  This has resulted in the inmate
4 population being very undisciplined and
5 empowered by the lack of any real
6 structure."
7        Do you recall that being the
8 case at St. Clair in 2018?
9    (Witness reviews document.)
10    A.  Yes, sir.
11    Q.  Do you recall that being the
12 case at St. Clair prior to 2018?
13    A.  No, not in the -- not in the --
14 not in this degree as this is written
15 here, no.
16    Q.  What is it that you think
17 changed?
18    A.  What do I think changed to
19 create this?
20    Q.  Correct.
21    A.  Lack of staffing, low morale,
22 excessive overtime.
23    Q.  So, do you think that the

71 (Pages 278 - 281)

Page 282

1  description here is different from the
2  descriptions that were provided in the
3  analyses that we saw from 2015 -- 2014,
4  2015, and 2017?
5     A.  It seems -- it seems to be the
6  same, just escalated.
7     Q.  And then if you go down to the
8  third paragraph from the bottom, it says,
9  "All these issues are certainly
10 indicative of a lack of leadership."
11       And then it goes on, "Everyone
12 from top management including regional
13 staff to line staff appears to have
14 accepted mediocrity as the new normal."
15       Do you recall reading this, sir?
16    A.  I've never seen this document
17 before, to my knowledge.
18    Q.  So --
19    A.  I'm not included on the e-mail.
20    Q.  You were there though during
21 this -- during this time period?  This is
22 dated January 22, 2020 -- 2018; correct?
23    A.  Yes, sir.

Page 283

1     Q.  So, do you recall this being the
2  case at St. Clair?
3     A.  What being the case?
4     Q.  Correctional staff receiving
5  little supervision or support.
6     A.  I don't know about the support.
7  I can't say that.  I'm not -- I wasn't at
8  St. Clair every day.  The top part, not
9  doing their jobs, yes.  I witnessed that.
10    Q.  And what about "Everyone from
11 top management including regional staff
12 to line staff appears to have accepted
13 mediocrity as the new normal"?
14    A.  I can't testify to that.
15    Q.  Why is that?
16    A.  Because I wasn't -- I'm not
17 there every day.  I don't -- I can't say.
18       So Edward Ellington was the
19 person that was in charge of St. Clair.
20 I mean, it was in his region.  I can't
21 say that he accepted that.  I mean, I
22 would have to see that in action.  I
23 would have to see a guy walking down with

Page 284

1  his pants down or not having a wristband
2  on and him not challenging somebody or
3  him not telling a staff member to
4  challenge somebody before I could just
5  say that that (indicating).
6     Q.  So, did the information that we
7  reviewed in the 20- -- 2014, 2015, and
8  2017 analyses, those didn't indicate to
9  you that mediocrity was the new normal at
10 St. Clair?
11    A.  No.
12    Q.  Why not?
13    A.  Because of the -- because of the
14 staffing.  I can't -- I don't know of any
15 other way to try to get you to understand
16 that if there is nobody there, that if
17 there are not enough staff people there,
18 there is only so much you can do.
19       Earlier in this deposition, I
20 tried to explain that every facility in
21 this country, every correctional facility
22 in this country, on any given day could
23 be taken because the staff is always

Page 285

1  outnumbered.  There's a difference in
2  staff just being outnumbered and you
3  having severe staffing shortages and you
4  having people working who can barely keep
5  their eyes open, when you have low morale
6  because they can't get relieved on time.
7  They don't feel like they're paid enough.
8  I can't -- that's all I can tell you.  I
9  can redundantly tell you that over and
10 over and over again.
11       And I can't make -- I can't make
12 people be hired or even want the job.
13 That wasn't a reason for stop working --
14 for people who were there to stop doing
15 their jobs.  But you asking me if I --
16 why couldn't I see that, I wasn't there
17 every day.  When I was there, you know, I
18 don't have -- I don't have a problem
19 telling a person to pull your clothes up,
20 where are you going, go back the other
21 way.  I never had a problem with that,
22 and I always had respect with that.
23       Guys, they turn around and go

72 (Pages 282 - 285)

Page 286

1  back the other way.  I never had an
2  inmate at that level even -- I won't say
3  I didn't have anybody think about
4  assaulting me, but I never had anybody to
5  assault me, and I went to St. Clair and
6  actually worked on the ground with staff
7  when there was only three of us on the
8  ground.  And I did -- there was a slight
9  altercation.  That inmate, when he got
10  searched, he actually had a knife, but he
11  was trying to go to a housing unit he
12  didn't belong in.  He was turned around
13  and went back.
14    Q.  So, can you turn to page 10 of
15  this report for me.  Excuse me.  If you
16  could turn back to page 9 for one second.
17  I apologize.
18    A.  No problem.
19    Q.  So this section is entitled
20  "Security staffing supervision and span
21  of control"; right?
22    A.  Yes, sir.
23    Q.  And then if you flip the page

Page 287

1  again to page 10, there's a section here
2  about three-quarters of the way down that
3  says "Recommendations."  And so these are
4  the recommendations that the ASCA are
5  providing for St. Clair to remedy the
6  staffing problems at St. Clair.  Is that
7  correct?
8    A.  Can I read it?
9    Q.  Sure.
10    (Witness reviews document.)
11    A.  Okay.  Could you repeat the
12  question now?
13    Q.  So these are recommendations
14  from the ASCA to resolve the staffing
15  issues at St. Clair; right?
16    A.  Yes, sir.
17    Q.  And backing up, there are
18  certain findings in here.  There's no
19  reason -- you have no reason to dispute
20  the findings that the ASCA made here;
21  correct?
22    A.  I haven't ever read them, so I
23  can't answer that.

Page 288

1    Q.  But do you have any reason to
2  think that the ASCA's analysis was --
3    A.  My answer is the same.  I can't
4  answer that.
5    Q.  So, were any of the
6  recommendations that ASCA wrote down here
7  put into place at St. Clair while you
8  were associate commissioner?
9    A.  This is the first time I saw
10  this.
11    Q.  I understand that.
12    A.  So they wouldn't have been -- it
13  wouldn't have been in to me to put these
14  in place if I -- if I'm just now seeing
15  it and it's 2022.  It took place in 2018.
16  I'm just saying.
17    Q.  I'm asking, these were -- these
18  were alternatives, though, to fixing the
19  shortage -- the staffing issue; correct?
20    A.  Are you asking that if I think
21  that if these things had been put in
22  place, that maybe it would have helped?
23    Q.  I'm asking that -- I'm asking

Page 289

1  you to confirm that you never, prior
2  to -- you never, prior to -- strike that.
3    I'm asking you to confirm that
4  you never and ADOC never implemented any
5  of these recommendations prior to the
6  review by the ASCA?
7    A.  You can't -- how can you put
8  into place or take recommendations that
9  you didn't see?
10    Q.  I'm not asking if you got them
11  from the ASCA.  I'm just confirming that
12  none of these were put into place.  So
13  whether or not they came from the ASCA is
14  not -- ASCA is not my question.
15    So for example, at no time prior
16  to you leaving ADOC was a short-term
17  solution prioritizing filling the 96
18  security guard position vacancies done?
19    A.  I don't know.
20    Q.  How is that?
21    A.  Because we were working on that
22  security guard -- one position was being
23  worked on prior to my leaving.  At what

73 (Pages 286 - 289)

Page 290

1  point it actually was implemented, I
2  don't know.  And we -- the official title
3  is Security Guard I.  On the register, it
4  is -- I can't even -- there is a -- it's
5  called BCO now, Basic Correctional
6  Officer.  That was the position that DOC
7  was calling on the -- on the current or,
8  at that time, on the actual State
9  register for State personnel, State of
10 Alabama.  It was called a Security Guard
11 I position.  And so that -- the process
12 of putting this into place was put in
13 place before I left.
14       And I'd like to add one more
15 caveat to that.  It is as hard to hire
16 these people as it is to hire personnel
17 as a correctional officer.
18    Q.   Why do you think that is?
19    A.   I'm not in human resources.  I
20 don't -- I don't know.  I can't tell you.
21    Q.   So if I could direct you to page
22 15 of this, this is about facility
23 searches, and this is discussing SOPs and

Page 291

1  the searching of St. Clair.
2       And if I could move on to page
3  17, in the fourth paragraph down, that
4  paragraph reads, "What is missing is a
5  single person who is responsible for
6  security."  And it goes on, "Reports are
7  written and filed with no follow up."
8  And then it asks, "How does a microwave
9  system malfunction for years without
10 someone following up?"
11       Do you know what that's
12 referring to?
13    A.   No, sir.
14    Q.   What is the microwave system?
15    A.   Oh, it's the -- it's the
16 perimeter.  It's on the perimeter.  So I
17 do.
18    Q.   Okay.
19    A.   It's a -- it's a system, a
20 fencing system at St. Clair.  Before you
21 get to the fencing system, there was a
22 microwave system that was put in place
23 that should sound an alarm in central

Page 292

1  control or where you have designated if
2  that beam was broken.
3    Q.   And was that inoperable at St.
4  Clair?
5    A.   I don't recall, but I think it
6  was.  I don't think it worked properly.
7    Q.   For -- is it right that it was
8  malfunctioning for years?
9    A.   I don't know for how long.
10    Q.   Would that have been your job to
11 fix it or to have it get fixed?
12    A.   Not necessarily.  This may --
13 this may have been decided prior to me
14 assuming either one of these roles simply
15 because they put the electric fence in.
16    Q.   And --
17    A.   I don't -- but I'm not saying it
18 was because I don't know, and I don't
19 know the time frames involved here.  But
20 I do know that it's the microwave system,
21 and even if it -- if it worked at all, it
22 may have just have been across the sally
23 port, but I don't think it worked at all.

Page 293

1    Q.   For your entire tenure as
2  associate commissioner?
3    A.   I don't know when -- I don't
4  know when the last time -- I don't know
5  when it stopped working.
6    Q.   But you also don't know when it
7  was working?
8    A.   I don't.
9    Q.   Okay.  And then it goes on, "How
10 does the x-ray machine break down and the
11 hand metal detector go missing without
12 someone revising the entrance procedure
13 until such time as equipment can be
14 replaced?"
15       Do you have an answer to that
16 question, sir?
17    (Witness reviews document.)
18    A.   No.
19    Q.   Does that create safety concerns
20 at a prison?
21    A.   It does.  If I -- well.  The
22 last time I can remember, the x-ray
23 machine, coming through the front, it

74 (Pages 290 - 293)

Page 294

1 worked. But they say it don't work, so I
2 don't -- you know, I don't -- I don't
3 know. It may be -- maybe the last time I
4 saw it, it got fixed after they wrote it.
5 I don't know. But I can't -- I can't --
6 I can't answer as to why, but there are
7 some -- there are possibilities as to
8 why. The x-ray machine might have been
9 so outdated it couldn't be repaired. I
10 don't know that, though.
11    Q. And was the fixing of the x-ray
12 machine one of those projects that we
13 spoke about earlier today that you would
14 have a meeting to approve?
15    A. I would have to look at a
16 project list.
17    Q. Then it goes on, "Who made the
18 decision that it is acceptable to repair
19 perimeter lighting later rather than as
20 needed?"
21       Do you have an answer to that
22 question?
23    A. I'm assuming that would have

Page 295

1 came from the engineers.
2    Q. Do you know who the National
3 Institute for Corrections is?
4    A. Do I know what organization it
5 is?
6    Q. Correct.
7    A. Yes.
8    Q. What is that organization?
9    A. National Institution of
10 Corrections.
11    Q. Yeah. I guess I'm asking, what
12 do they do?
13    A. Similar to what this
14 organization does, they monitor national
15 corrections on a national basis. They
16 provide training, less now than they once
17 did. You can -- you can get
18 documentation from them. You can get
19 security audit training, for instance.
20 They offer that class. You can send
21 people to that class to be trained.
22 There's a book that comes with that. You
23 can order the book from them. So more --

Page 296

1 it's a training -- it's a training
2 facility.
3    Q. And do you recall ever -- you or
4 anyone else at ADOC ever reaching out to
5 NIC for assistance with regard to St.
6 Clair?
7    A. I worked for the NIC. I called,
8 yes. Not just St. Clair, but for the
9 Department as a whole.
10    Q. I'm sorry, can you explain that
11 you worked for NIC?
12    A. I was a consultant for NIC.
13    Q. So, did NIC come and assess St.
14 Clair at any point?
15    A. I don't remember exact --
16 specifically St. Clair. I don't. I
17 don't remember that -- that they did.
18       We -- I know from the staffing
19 perspective, so some of the documentation
20 like the -- the Savages were people that
21 I worked with on security audits. And
22 they were brought in, and they had
23 written a plan, not just for St. Clair, a

Page 297

1 staffing plan, but they wrote staffing
2 plans for all the major facilities.
3    Q. Do you recall when that was?
4    A. No, sir. Actually, I know some
5 of that training is still going on now.
6 I don't know exactly -- I mean, it was
7 before I left that they started working
8 on it.
9    Q. Was it while you were
10 institutional coordinator?
11    A. It was when I was associate
12 commissioner.
13    Q. So you had mentioned that a lot
14 of the staffing concerns and a lot of
15 these conditions we've been talking about
16 today have been problematic at St. Clair
17 before and during your time as
18 institutional coordinator. My question
19 is, why was it not until you were
20 associate commissioner that requests from
21 the National Institute of Corrections was
22 made?
23    A. Maybe that suggestion was made

75 (Pages 294 - 297)

Page 298

1  before and it just wasn't followed. I
2  would --
3      Q.  Why would that have been? I'm
4  sorry, I didn't mean to talk over you.
5      A.  I would be answering for
6  somebody else if I answered that. I
7  can't answer that.
8      Q.  So that wasn't your job?
9      A.  As the institutional
10 coordinator, I had an associate
11 commissioner that I answered to, so.
12     Q.  I'm going to hand you what I'm
13 going to designate as Plaintiff's Exhibit
14 9. So this first page here is an e-mail
15 to various people at the Department of
16 Corrections, including Jefferson Dunn;
17 correct?
18 (Plaintiff's Exhibit 9 was marked for
19 identification and is attached.)
20     A.  Yes, it is.
21     Q.  And it's from Brian -- it's from
22 Charlotte Morrison. You see that?
23     A.  Yes, sir, I do.

Page 299

1      Q.  And it's dated March 29, 2018?
2      A.  Yes.
3      Q.  And it says, "Please find the
4  attached first monitoring report for St.
5  Clair." Right?
6      A.  Yes, sir.
7      Q.  Do you know what that is?
8      A.  Can I glance at it real quick?
9      Q.  Yeah, of course. The report
10 itself begins on -- bottom right
11 number is 21118.
12     (Witness reviews document.)
13     A.  Yes, sir.
14     Q.  Do you recall this document?
15     A.  I don't recall the document, but
16 I am familiar with it.
17     Q.  Do you recall what -- strike
18 that.
19         What do you recall about this
20 report?
21     A.  Well, as this first page on the
22 report starts out, it was a part of a
23 settlement agreement with the Equal

Page 300

1  Justice Initiative. The Equal Justice
2  Initiative was -- in that settlement,
3  they became the monitor to come in and
4  assess things that the Department of
5  Corrections had agreed to attempt to do
6  within the settlement.
7      Q.  And do you recall -- strike
8  that.
9         So if you could turn to page 8,
10 the --
11     A.  In the settlement? I mean --
12     Q.  Yes, sir.
13     A.  -- in the report itself?
14     Q.  Correct. So it's -- 1125 is the
15 final number.
16     A.  Yes, sir.
17     Q.  First, under section 9, it says
18 that ADOC -- excuse me. "The settlement
19 requires ADOC use the best efforts to
20 maintain staffing at its current or
21 higher levels and to formally request
22 that the National Institute of
23 Corrections conduct staffing analysis to

Page 301

1  help SCCF focus on problems and possible
2  solutions to staff hiring and retention."
3  Correct?
4      A.  Yes, sir.
5      Q.  And then at the -- in the last
6  sentence there, it says, "At the time of
7  this writing, the request for staffing
8  analysis has not been submitted." Right?
9      A.  It does.
10     Q.  So we were just talking about
11 the NIC. So that -- that request had not
12 been made as of the date of this report,
13 which was sent on March -- in March of
14 2018; right?
15     A.  According to this report, yes,
16 sir.
17     Q.  Do you recall anything else
18 about the findings of this report?
19     A.  Sir, this is the first time I've
20 seen this before, to my knowledge. I do
21 not recall anything about it except what
22 I've read so far.
23     Q.  So as institutional -- excuse

76 (Pages 298 - 301)

Page 302

1  me. As associate commissioner, you would
2  have received -- you would have received
3  this report; right?
4      A.  My name is not on this e-mail.
5      Q.  So, are you saying you did not
6  receive this report?
7      A.  I don't recall receiving this
8  report. I'm just saying my name is not
9  on the e-mail. Out of the list of people
10 that's on here, I don't -- I don't find
11 my name anywhere on here.
12     Q.  Is it possible that as associate
13 commissioner, you would not have been
14 provided this report?
15     A.  If Commissioner Dunn decided not
16 to give it to me, I wouldn't. And I'm
17 not saying that I didn't. I'm just
18 saying this is the first time that I can
19 recollect -- recollect receiving --
20 seeing this. I know stuff about this,
21 but --
22     Q.  Can you tell me --
23     A.  -- I've never actually seen the

Page 303

1  report. I just told you. I told you
2  already. I said this is a settlement.
3  In the settlement, this is what happened.
4  These are some of the things that came
5  out of the settlement. And it -- and it
6  -- and as I read that, NIC had been to
7  the Department of Corrections doing
8  security audits prior, so. But this was
9  the focus at St. Clair on the hiring
10 policies. That's the way I read it.
11     What page was that again, 8?
12     Q.  Correct.
13     A.  So as I read it, it says the
14 staffing -- "The settlement agreement
15 requires ADOC to use its best efforts to
16 maintain staffing at St. Clair at its
17 current or higher levels and to formally
18 request that the National Institute of
19 Corrections conduct staffing analysis at
20 St. Clair Correctional Facility focused
21 on problems and possible solutions to
22 staff hiring and retention."
23     Q.  Correct.

Page 304

1      A.  That -- that's -- that's
2  separate from a staffing analysis. They
3  come in and -- so when the staffing
4  analysis -- when NIC does staffing
5  analysis, they basically come in and go
6  through the number of posts you have,
7  your times and dates -- or your time of
8  day when your activity is most heavy, and
9  things like that. And they will tell
10 you, or they'll make their
11 recommendations about how many staff you
12 should have.
13     In 2018, all corrections, all --
14 all, particularly in the southern states,
15 were having some of these same problems.
16     Q.  I'm going to introduce to you
17 what I'm going to mark as Plaintiff's
18 Exhibit 10. Do you recognize this
19 document, sir?
20 (Plaintiff's Exhibit 10 was marked for
21 identification and is attached.)
22     A.  It's an e-mail.
23     Q.  You're on this e-mail; correct?

Page 305

1      A.  I am.
2      Q.  And it's from Bart Harmon?
3      A.  Yes.
4      Q.  It's dated May 21st, 2018;
5  right?
6      A.  Yes, sir.
7      Q.  And it says, "Mr. Culliver and
8  Mr. Ellington: This draft" -- "This draft
9  has had several read throughs but if you
10 operations folks could read it through
11 one more time and make sure we're not
12 promising anything we can't deliver on, I
13 would appreciate it."
14     You see that?
15     A.  Yes, sir.
16     Q.  And --
17     MS. PUTMAN: Can we go off the
18 record real quick?
19     MR. EARL: Sure.
20     THE VIDEOGRAPHER: We're going
21 off the record at 4:11.
22     (Break taken.)
23     THE VIDEOGRAPHER: We're going

77 (Pages 302 - 305)

Page 306

1 back on the record at 4:16.
2        MS. PUTMAN:  And if I could just
3 make an objection for the record.  I'm
4 going to object to any questions being
5 asked on this document on the basis of
6 privilege.  I'm going to ask that he not
7 answer any questions, and I'm also going
8 to ask that we be able to claw this
9 document back.
10        MR. EARL:  Okay.  And what's
11 the --
12        MS. PUTMAN:  Attorney-client
13 privilege.
14        MR. EARL:  That's Bart Harmon?
15        MS. PUTMAN:  Yeah.
16        MR. EARL:  Was this on the
17 privilege log?
18        MS. PUTMAN:  I doubt it because
19 it was produced, but we can certainly
20 adjust the privilege log.
21        MR. EARL:  Okay.  Understood.
22    Q.  (By Mr. Earl) Okay.  I'm going
23 to introduce -- I'm going to hand you,

Page 307

1 sir, what I'm going to mark as
2 Plaintiff's Exhibit 11.  Do you recognize
3 this e-mail, sir?
4 (Plaintiff's Exhibit 11 was marked for
5 identification and is attached.)
6    A.  I see it's an e-mail that I
7 sent.
8    Q.  And it's dated March 18th, 2018;
9 right?
10    A.  Yes, sir.
11    Q.  And who is Steve Brown?
12    A.  The chief of staff.
13    Q.  That's Mr. Dunn's chief of
14 staff?
15    A.  Yes, sir.
16    Q.  And the e-mail below that is
17 from Steve Watson to you, Mr. Brown, and
18 Arnaldo Mercado; right?
19    A.  Yes, sir.
20    Q.  Who's Steve Watson?
21    A.  He's associate commissioner of
22 programs.
23    Q.  And who was Arnaldo Mercado?

Page 308

1    A.  Chief of investigations for
2 ADOC.
3    Q.  So the e-mail from March 18th
4 from Mr. Watson reads, "Pursuant your
5 directive to recommend a course of
6 corrective action based on the recent St.
7 Clair Operational Assessment Report," it
8 says, "there is no doubt that rectifying
9 the CO staffing problem at St. Clair is
10 essential, as it impacts most every
11 aspect of inferior performance noted in
12 the report."
13        See that?
14    A.  Yes.
15    Q.  So, do you understand that this
16 is a -- strike that.
17        This is an e-mail drafting like
18 a corrective action in response to the
19 ADOC report we just looked at; correct?
20    A.  I don't know.  Can I read this
21 whole e-mail right quick?
22    Q.  Let's do it this way.  So if you
23 turn back to what I designated as

Page 309

1 Plaintiff's Exhibit -- what was the A --
2 the report?  I'm sorry.
3    A.  The ASA report?
4    Q.  Yes, sir.
5    A.  It was 8.
6    Q.  Eight.  If you can just look
7 back at that quickly.  The second page of
8 that exhibit, at the top right, it says,
9 "Alabama Department of Corrections St.
10 Clair Correctional Facility Operational
11 Assessment Report."
12        You see that?
13    A.  Yes, sir.
14    Q.  And if you look back at what I
15 designated as Plaintiff's Exhibit 11, the
16 first -- the first line of that e-mail
17 from March 18 from Mr. Watson reads,
18 "Pursuant to your directive to recommend
19 a course of corrective action based on
20 the recent St. Clair Operational
21 Assessment Report."  Correct?
22    A.  Okay.
23    Q.  So, does this refresh your

78 (Pages 306 - 309)

Page 310

1 recollection, sir, that you received and
2 reviewed the ASCA report?
3    A.  No, sir.
4    Q.  How's that?
5    A.  It doesn't.  You asked me.  It
6 doesn't reflect my -- I'm not saying it
7 didn't happen.  I'm saying I don't have
8 any -- we haven't produced anything here
9 that shows my name receiving the report
10 and I don't remember the report.
11    Q.  Would you have gotten the
12 corrective action plan for a report you
13 didn't read?
14    A.  I don't know.  It could have
15 been a discussion.  I could have received
16 one.  I don't remember it.  I'm not
17 saying I didn't get it.  I never said I
18 didn't.  I said I didn't remember it, and
19 my name wasn't on that e-mail.
20    Q.  I understand that.  I'm asking,
21 would you, as operational -- as associate
22 commissioner of operations, be receiving
23 a corrective action plan for a report you

Page 311

1 didn't review?
2    A.  I don't know.  I can't -- you
3 want me to answer something I don't know.
4 I don't remember.
5    Q.  Who is Chief, sir?
6    A.  Steve Brown.
7    Q.  Okay.  I'm going to introduce
8 Plaintiff's Exhibit 12.  Do you recognize
9 this e-mail, sir?
10 (Plaintiff's Exhibit 12 was marked for
11 identification and is attached.)
12    A.  It's an e-mail to Karla Jones,
13 copying Edward Ellington and Cheryl Price
14 and myself.
15    Q.  And it's dated August 1, 2018;
16 right?
17    A.  Yes, sir.
18    Q.  And the e-mail below that is an
19 e-mail from August 1, 2018, from
20 Charlotte Morrison to Jefferson Dunn and
21 others at ADOC, including you; correct?
22    A.  Yes.
23    Q.  And if you turn the page, it

Page 312

1 reads "The St. Clair Correctional
2 Facility Second Monitoring Report."
3 Right?
4    A.  Yes, sir.
5    Q.  Do you recall this report, sir?
6    A.  I don't.
7    Q.  But you received it; right?
8    A.  I'm assuming I did.
9    Q.  And do you recall -- do you
10 recall anything about this report?
11    A.  I may if I can scan it, but I
12 don't -- I know -- I know what it is, so,
13 I mean, you can ask your question.
14    Q.  If you could turn to page 8 for
15 me.  The first line there says, "There
16 have been a total of more than 400 knives
17 documented in St. Clair incident reports
18 in an eight month period between November
19 1, 2017, and June 30, 2018."  Do you see
20 that?
21    A.  Yes, sir.
22    Q.  Would you agree that's a very --
23 that's a large amount of weapons to be

Page 313

1 found at St. Clair?
2    A.  It's a large amount of weapons
3 to be found anywhere.
4    Q.  Does that that refresh your
5 recollection at all about the contents of
6 this report, sir?
7    A.  I know what this report is.  I
8 just don't remember the report.
9    Q.  I'm asking you, so do you recall
10 the findings of this report at all in any
11 way?  Were there discussions about it?
12    A.  Well, this e-mail says that --
13 the e-mail is to Karla Jones, and we
14 would sit down and talk about this
15 report.
16    Q.  Do you remember that
17 conversation with her?
18    A.  I do not.
19    Q.  So you don't recall any actions
20 that you or anyone else took to address
21 any of the issues raised in this report?
22    A.  Not without going through this,
23 being able to read it and look at it, I

79 (Pages 310 - 313)

Page 314

1  do not.
2     Q.  Okay.  Can you turn to page 7 of
3  this report, sir.  Section III here says,
4  "Implementation of QIT."  You see that?
5     A.  Yes, sir.
6     Q.  Does this -- we talked earlier
7  about the Quality Improvement Team.  Is
8  this at all -- or does this page here
9  refresh your recollection of the QIT
10 team?
11     (Witness reviews document.)
12    A.  Yes.
13    Q.  And what do you recall about the
14 QIT team?
15    A.  That we had a person -- well, I
16 don't -- I don't recall a whole lot about
17 the QIT team.  Just from what I just
18 briefly read, we -- part of it was in
19 reference to the way the incident reports
20 were coming in.  And so we had designated
21 a person to specifically deal with the
22 incident reports, typing them up, doing
23 the checks and balances on it to see if

Page 315

1  certain things were -- were being met as
2  far as actually completing the reports
3  and that the same thing that was
4  completed was the same thing that was
5  logged into the computer and if there
6  were -- and just basically tracking and
7  monitoring incident reports.  That's what
8  I remember.
9     Q.  Were you a part -- strike that.
10       Did you have meetings with the
11 QIT team?
12    A.  I don't know if I had meetings
13 with the QIT team itself.  I had meetings
14 with the warden in reference to.  And I
15 would imagine -- I don't know if
16 everybody that was on the QIT team was
17 there, but there were probably -- the
18 captains were all there available, too.
19       THE COURT REPORTER:  I'm sorry,
20 who was available?
21       THE WITNESS:  The captains, the
22 captains of the facility.
23    A.  So I would imagine it was the

Page 316

1  captains, the assistant warden, and the
2  warden.  And maybe Mr. Ellington would
3  have been there as well, but I don't
4  remember.
5     Q.  If you could turn to page 11
6  quickly for me.  We talked earlier about
7  how -- about unauthorized movement at St.
8  Clair.
9       The first line here says,
10 "Inmates at St. Clair are able to freely
11 move about the facility without
12 authorization in violation of existing
13 departmental policies."
14       Did I read that right?
15    A.  Yes, sir.
16    Q.  So we -- you mentioned earlier
17 today that some measures had been taken,
18 including fixing the locks at St. Clair,
19 to remedy unauthorized movement.  Do you
20 recall that?
21    A.  Yes, sir.
22    Q.  So as of the date of this
23 report, those efforts were unsuccessful;

Page 317

1  correct?
2     A.  According to this report and
3  according to what I've read.  I just only
4  read a blurb, but yes, sir.
5     Q.  And why do you think that was?
6     A.  I would say staffing more than
7  anything else and not -- not all of it is
8  on the lack of staffing but staff just
9  not doing their job.  And maybe fear.
10    Q.  Fear of what?
11    A.  Fear of being attacked, fear of
12 being assaulted.
13    Q.  Staff fear of being assaulted?
14    A.  Yes.
15    Q.  If you could turn to page 14,
16 please.  In the second paragraph, it
17 reads: "One central features concerning
18 the use of force is the extent to which
19 problematic instances are taking place in
20 or on the way to segregation.  Three
21 major patterns emerge" -- "emerged.  One,
22 officers frequently resort to force when
23 men are restrained with handcuffs and leg

80 (Pages 314 - 317)

Page 318

1 irons."
2      Do you see that?
3      (Witness reviews document.)
4   A.   Yes, sir.
5   Q.   Is that concerning to you, sir
6 -- excuse me.  Was that concerning to you
7 as associate commissioner of operations?
8   A.   Yes, sir.
9   Q.   Do you recall ever going back
10 and looking at the reports of those
11 instances after reading this report?
12   A.   No, sir.
13   Q.   Do you recall ever following up
14 with anybody about these instances?
15   A.   Specific incidences or just the
16 excessive use of force?
17   Q.   Either.
18   A.   We talk about excessive use of
19 force all the time.  The specific
20 incidents, no.
21   Q.   Did you talk about excessive use
22 of force at St. Clair because you knew it
23 was a problem at St. Clair?

Page 319

1      MS. PUTMAN:  Object to the form.
2   A.   I talked about excessive use of
3 force because excessive use of force is
4 wrong.
5   Q.   And did you understand that it
6 was common at St. Clair during your time
7 as associate commissioner of operations?
8      MS. PUTMAN:  Object to the form.
9   A.   That's your terminology that it
10 was common.
11   Q.   Was it -- was the level of
12 excessive force by staff during that time
13 period acceptable under ADOC standards?
14   A.   Under what standards?
15   Q.   ADOC standards.
16   A.   No.
17   Q.   Was it acceptable under your
18 personal standards?
19   A.   No.
20   Q.   And do you recall what you did
21 to try to bring that amount of excessive
22 force down?
23   A.   No.

Page 320

1   Q.   Did you do anything to try to
2 bring it --
3   A.   I don't know.
4   Q.   Okay.  If you could turn with me
5 to page 22 of this report quickly.  So in
6 this first paragraph, there's -- it's
7 discussing the inoperative locks.  It
8 says, "This issue is known to ADOC and
9 can be addressed with officer
10 observation, removal of obstruction, and
11 inmate discipline."  You see that?
12   A.   No, sir.
13   Q.   I'm sorry, it's the first
14 paragraph under 5, the second to last
15 sentence, beginning "This issue was known
16 to ADOC."
17   A.   Okay.
18   Q.   Do you agree that those were
19 ways to remedy the lock problem at St.
20 Clair?
21   A.   Do I agree?
22   Q.   That those were -- that these
23 were ways to remedy the lock problem at

Page 321

1 St. Clair?
2      (Witness reviews document.)
3   A.   So ask your question once more.
4   Q.   Do you agree that these are --
5 these were ways to remedy the lock
6 problem at St. Clair?
7   A.   By having officers to get the
8 stuff out of the door?
9   Q.   Correct.
10   A.   I think I've already testified
11 to that.  Yes.
12   Q.   And what about disciplining the
13 inmates for obstructing the door?
14   A.   Yes.
15   Q.   And that wasn't done; right?
16   A.   I don't know.
17   Q.   Okay.
18   A.   I'm sure some was.  But did
19 every inmate that put a piece of trash in
20 the door get a disciplinary?  I doubt it
21 seriously.
22   Q.   You can move -- we can move on
23 to the second paragraph here.  The second

81 (Pages 318 - 321)

Page 322

1  sentence says, "For example" -- excuse
2  me.  The first sentence says:  "The lack
3  of cameras continue to contribute to risk
4  of violence and allows for unauthorized
5  movement across the prison.  For example,
6  the camera outside the entrance to
7  housing unit PQ is not functional."
8       You see that?
9  A.  Yes, sir.
10  Q.  Why do you think that's
11  problematic?
12  A.  What do you mean?
13  Q.  Excuse me, I should say do you
14  think that's problematic?
15  A.  That the camera is not working
16  properly?
17  Q.  Correct.
18  A.  It's not any good if it doesn't
19  work.
20  Q.  And whose job was it to ensure
21  that they continue to work?
22  A.  The warden's.
23  Q.  And whose job was it to ensure

Page 323

1  that the wardens were making sure they
2  were continuing to work?
3  A.  The institutional coordinator.
4  It's going to get to me.  I've already
5  agreed to that.  It gets to me
6  regardless.  But I -- so you want me to
7  say it was my fault?
8  Q.  Only if you think it was.
9  A.  No, I don't think it was.
10  Q.  Do you think it was?
11  A.  I don't.
12  Q.  Okay.  Mr. Culliver, are you
13  familiar with the death of Terry Terrell
14  Pettiway?
15  A.  I'm aware that it happened.  I'm
16  semi-familiar with the incident but not
17  fully, no.
18  Q.  I'm going to introduce to you
19  Plaintiff's Exhibit 13.  Do you recognize
20  this document, sir?
21  (Plaintiff's Exhibit 13 was marked for
22  identification and is attached.)
23  A.  It's a duty officer report from

Page 324

1  the Alabama Department of Corrections for
2  St. Clair Correctional Facility, date
3  9/2/2018, 5:16 p.m., Class A report.
4  Q.  So these are one of the reports
5  that you would have received and
6  reviewed; correct?
7  A.  Yes.
8  Q.  And the victim under number 10
9  there is Terry Pettiway.
10  A.  Correct.
11  Q.  Correct?
12  A.  Correct.
13  Q.  So on this first line here, it
14  says, "Inmate Terry Pettiway was stabbed
15  in front of PQ dorm."  You see that?
16  A.  Yes, sir.
17  Q.  So PQ is the area -- PQ --
18  strike that.
19      The entrance to PQ dorm --
20  strike that, I'm sorry.
21      The area in front of PQ dorm,
22  that was the area we just discussed where
23  the camera was not functional; correct?

Page 325

1      MS. PUTMAN:  Object to the form.
2  A.  Yes, I think so.
3  Q.  And the stabbing -- Mr.
4  Pettiway's stabbing involves contraband
5  that was -- a weapon was used; correct?
6      MS. PUTMAN:  Object to the form.
7  A.  Can I read this?
8  Q.  Well, does a stabbing involve a
9  weapon, sir?
10  A.  Can I just read this?
11  Q.  I would prefer you'd not at the
12  moment.
13  A.  I want to read it before I
14  answer your question.
15    (Witness reviews document.)
16  A.  Okay.
17  Q.  So this incident would have
18  involved weapons; right?
19  A.  It did.
20  Q.  And it would have involved
21  inmate-on-inmate violence; right?
22  A.  Yes, sir.
23  Q.  And this report doesn't indicate

82 (Pages 322 - 325)

Page 326

1 that anybody witnessed the stabbing;
2 correct? By -- excuse me.
3        This report does not indicate
4 that any staff were present for the
5 stabbing; correct?
6    A. It doesn't.
7    Q. Domin- -- Dominique Vales, who
8 it says that was the employee that
9 responded, was the G gate rover; right?
10    A. Yes.
11    Q. So this instance involves a lot
12 of the same issues we've been discussing,
13 correct, in terms of contraband and
14 understaffing and violence?
15        MS. PUTMAN: Object to the form.
16    A. Yes.
17    Q. This duty officer report also
18 says that no weapon was recovered. It's
19 the third line from the bottom. You see
20 that?
21    A. Yes, sir.
22    Q. Is that common, for instance, in
23 your experience?

Page 327

1        MS. PUTMAN: Object to the form.
2    A. I don't know what that -- that's
3 not -- I don't know whether it's common
4 or not.
5    Q. But you reviewed all these;
6 right? These duty officer report for
7 Class A incidents.
8    A. I read it, yes.
9    Q. Okay. Mr. Culliver, are you
10 familiar with the Department of Justice
11 CRIPA investigation into the Alabama
12 Department of Corrections?
13    A. Somewhat.
14    Q. What is your familiarity with
15 it?
16    A. I can't say directly. I know
17 they are investing -- they are
18 investigating excessive use of force. I
19 don't know how far or how deep that goes
20 or anything.
21    Q. Were you present while they were
22 doing their -- their investigation into
23 ADOC? You were still employed at ADOC;

Page 328

1 correct?
2    A. I don't recall.
3    Q. So DOJ was doing an
4 investigation of ADOC, and you don't
5 recall whether -- strike that.
6        As associate commissioner for
7 operations, would you have been involved
8 in coordinating or assisting with a
9 Department of Justice investigation into
10 the Department of Correct- -- into the
11 Alabama Department of Corrections?
12    A. Possibly.
13    Q. How would that have been done
14 without your assistance?
15    A. It could have went straight to
16 the commissioner. The commissioner could
17 have assigned the -- I can't -- I can't
18 -- hold on a second.
19        (Witness reviews document.)
20    A. I can't -- I can't think of the
21 division it is. So it could have been
22 involved with Investigations and there
23 was a -- I can't think of it. I --

Page 329

1    Q. But they -- they were -- I
2 didn't mean to cut you off.
3    A. No, you're good.
4    Q. They were investigating the
5 conditions and the security in ADOC
6 prisons which you were responsible for;
7 correct?
8    A. Correct.
9    Q. And are you familiar with the
10 findings of that investigation, sir?
11    A. Not right off the top of my
12 head.
13    Q. So, Mr. Culliver, we've talked a
14 lot today about the conditions at St.
15 Clair over a few -- over a pretty long
16 length of time. And would you agree that
17 the conditions at St. Clair did not
18 improve and, in fact, in many ways
19 worsened during your tenure as associate
20 commissioner of operations?
21        MS. PUTMAN: Object to the form.
22    A. I agree.
23    Q. And I know you attribute -- and

83 (Pages 326 - 329)

1 correct me if I'm wrong. You attribute a
2 large majority of the reasoning for that
3 just to inability to get staffing?
4    A. Staffing was a prime reason,
5 yes.
6    Q. So my question, sir, is, with
7 all these years that went by where
8 conditions continued to worsen, was there
9 ever any discussion of doing things
10 differently or trying to divert strategy
11 in the short term while the staffing
12 situation was being addressed?
13    MS. PUTMAN: Object to the form.
14    A. Doing things differently?
15    Q. I can ask my question a
16 different way.
17    So you -- you've mentioned a few
18 things that were done. You -- involving
19 media in attempts to recruit, in regards
20 to changing locks, in regards to fixing
21 the fence at St. Clair. Is it safe to
22 say, sir, that those actions either --
23 those actions were not successful in

1 improving the conditions at St. Clair?
2    A. They weren't, no.
3    Q. And it was apparent, like we saw
4 from 2014 and 2015 and 2017, that they
5 were not working; correct?
6    A. Yes.
7    MS. PUTMAN: Object to the form.
8    Q. So given that, were there other
9 options or alternatives that were
10 explored or executed to try to reverse
11 the course of the decline in the
12 conditions at St. Clair other than what
13 you've already told me?
14    A. Not that I can recall.
15    Q. So when it became clear that the
16 efforts that you were making to fix the
17 conditions at St. Clair, there was never
18 a discussion to try to -- a change in
19 strategy to find out maybe a method that
20 did work?
21    MS. PUTMAN: Object to the form.
22    A. I think -- I think optional
23 strategies were taking place all the

1 time. There are things you look for.
2 But we come back -- in the reports that
3 you've showed so far and the documents
4 that you have, staffing still remains at
5 the top of the list of not having it.
6 Every -- every year that we looked at for
7 the vulnerability analysis, staffing was
8 at the top. When ASCA came in, according
9 to the little bit I was able to read,
10 staffing was a problem. EJI filed their
11 report. The first thing we started
12 looking at and the first thing they
13 started looking at was staffing.
14    So without -- without the staff
15 to do the job, anything else that we
16 did -- cameras, if a camera just broke,
17 unfixable, should the camera have been
18 replaced? Yes. Did we have a contract
19 of things in place for somebody to come
20 and actually do that every time a camera
21 was torn up, whatever, to fix? No. So I
22 don't think -- I don't think I was ever
23 closed to any ideas that might would have

1 worked or that was presented. So the
2 same thing comes about even when EJI says
3 -- so they realized that the staffing
4 situation was as it was, but we still
5 have it today. We still have a problem
6 hiring staff.
7    Something has apparently changed
8 at St. Clair to a degree, but how much of
9 a degree, I don't know. They still stay
10 in the news. So does other facilities
11 stay in the news for the same thing. And
12 it still comes down to staffing.
13    Q. Well, part of this is enforcing
14 regulations, right, at the warden and at
15 the facility level?
16    MS. PUTMAN: Object to the form.
17    A. Some of it probably does. You
18 still have to have staff to be able to
19 enforce it. And so if you -- if you --
20 and staff, we don't -- we don't have any
21 reports showing where staff was
22 disciplined for not doing their job. We
23 don't -- we don't show that. That's not

84 (Pages 330 - 333)

Page 334

1  -- that hasn't been brought into this
2  deposition.  But in some cases, staff was
3  disciplined for not doing their job.  And
4  then if staff gets suspended for not
5  coming to work or they get fired for not
6  coming to work, I mean, because of the
7  discipline, that's one less person that
8  we have at the facility.
9      So I don't have the answer.  I
10  wish I did, but I don't have the answer
11  for that.
12      Q.  Sir, are you saying that there
13  was an incentive not to discipline
14  employees because you --
15      A.  I didn't say that.  That's not
16  what I said.  Don't change my words.
17      MS. PUTMAN:  Object to the form.
18      Q.  That's why I'm asking.
19      A.  No, I didn't say that.
20      MS. PUTMAN:  Ask your question
21  again if you don't mind.
22      Q.  Was there an incentive to not
23  discipline employees to avoid losing

Page 335

1  staff?
2      A.  There was not.
3      Q.  So, is it your position --
4  strike that.
5      If St. Clair couldn't hire --
6  could not hire a sufficient number of
7  employees to effectively supervise the
8  prison, does that mean that it is
9  acceptable to have an extremely dangerous
10  environment for the prison population?
11      MS. PUTMAN:  Object to the form.
12      A.  No.
13      Q.  So for example, was there ever a
14  point where there were discussions
15  between you or Mr. Dunn, between you and
16  Mr. Dunn or anybody else, where there
17  were -- for example, could the National
18  Guard have come in and helped ADOC?
19      A.  Those discussions were had.
20      Q.  And why weren't -- why wasn't
21  that done?
22      A.  First of all, there would need
23  to be some training.  There were a number

Page 336

1  of reasons that that -- that -- that
2  idea, not just by myself or Mr. Dunn, but
3  that was a discussion amongst several
4  other people, but it didn't seem viable.
5  That did not seem like a viable option.
6      Q.  And why was that?
7      A.  Lack of training.  Just for any
8  number of reasons.  National Guard aren't
9  trained to operate corrections.
10      Q.  Well, you said that you had --
11  that your academy class was -- I believe
12  you said 12 weeks.  I might have that
13  wrong.
14      A.  That's what I said.
15      Q.  So the National Guard presumably
16  could have been trained in 12 weeks;
17  correct?
18      A.  Yes.
19      Q.  And these conditions we already
20  talked about lasted from at least
21  beginning in 2014; correct?
22      A.  Yes.
23      Q.  So this was a viable -- strike

Page 337

1  that.
2      So this was -- so training
3  presumably could have been done within
4  less than a year.  If that had been done
5  in 2014, you would have had the National
6  Guard and much more staffing at St. Clair
7  by 2015; right?
8      MS. PUTMAN:  Object to the form.
9      A.  It's possible, I guess.
10      Q.  Mr. Culliver, are you familiar
11  that we -- excuse me.  Are you aware that
12  we've asked for some documents from you
13  in this lawsuit?
14      A.  That you asked for some
15  documents from me?
16      Q.  Correct.
17      A.  No, sir.
18      Q.  Have you looked for any
19  documents in this lawsuit?
20      A.  No, sir.
21      Q.  You never looked for any e-mails
22  that you may have?
23      A.  I don't have access to DOC

85 (Pages 334 - 337)

Page 338

1 e-mails.
2    Q.  Did you do anything on your
3 personal devices?
4    A.  No.
5    Q.  Did you keep any hard copy
6 records?
7    A.  No.  I think I asked -- I think
8 I -- I think I answered a deposition to
9 that or something to that effect.  But
10 no, I don't have anything from DOC.  I
11 don't have any hard copies.  I don't have
12 any discs with anything about DOC on it.
13 I don't have any of that.
14    Q.  Okay.  You said you retired from
15 ADOC in October 2018.  Strike that.
16      You retired in October 2018;
17 correct?
18    A.  Yes.
19    Q.  Why did you leave your position
20 in 2018?
21    A.  I was investigated for an
22 inappropriate relationship.
23    Q.  Was it one inappropriate

Page 339

1 relationship?
2    A.  I don't know how many it was.  I
3 wasn't told how many it was.
4    Q.  Were you placed on mandatory
5 leave before you retired?
6    A.  I was.
7    Q.  I'll introduce Plaintiff's
8 Exhibit 14.  Do you recognize this
9 document, sir?
10 (Plaintiff's Exhibit 14 was marked for
11 identification and is attached.)
12    A.  I do not.
13    Q.  You've never seen this?
14    A.  I have not.
15    Q.  So the top reads "Alabama
16 Attorney General's Office
17 Investigation" -- "Investigative Division
18 Summary of Findings"; right?
19    A.  Yes, sir.
20    Q.  And then it reads:  "On August
21 22nd, 2018, I, Special Agent" -- it's
22 redacted -- "and Special Agent" --
23 redacted -- "were contacted by

Page 340

1 Commissioner Jefferson Dunn of the
2 Alabama Department of Corrections.  We
3 were asked to investigate two allegations
4 against Mr. Grantt Culliver, an associate
5 commissioner" -- "commission of the
6 Alabama Department of Corrections.  Those
7 two allegations were," and then it reads,
8 "From March 10 to May 2018 Commissioner
9 Culliver was alleged to have been
10 involved in an inappropriate relationship
11 with," and then it's redacted, and then
12 it says "facility."
13      Do you recall the investigation,
14 sir?
15    A.  Yes.
16    Q.  If you turn to page 2 of this,
17 so if you look at -- under Allegation 1,
18 the beginning of the sentence, "In
19 conducting."
20      It says:  "In conducting a
21 forensic analysis of each of these
22 devices, there were e-mails identified by
23 me that led me to believe that

Page 341

1 Commissioner Culliver was not only
2 engaged in an inappropriate sexual
3 relationship with" -- redacted -- "but
4 with five additional women inside the
5 Alabama Department of Corrections as
6 well.  These e-mails led myself and
7 Agent" -- redacted -- "to identify the
8 following six women as potential sexual
9 partners of Commissioner Culliver."
10      You see that?
11    A.  I do.
12    Q.  Do you recall those
13 relationships, Mr. Culliver?
14      MS. PUTMAN:  I'm going to object
15 here.  He has already admitted that he
16 was on leave and that he left because of
17 this.  Is there anything further you need
18 out of this, or are you just --
19      MR. EARL:  I'll move on to --
20      MS. PUTMAN:  Okay.
21      MR. EARL:  -- the question.
22    Q.  Can you turn to 9012 for me.  So
23 if you look at the -- about midway down

86 (Pages 338 - 341)

Page 342

1  the first paragraph, it says,
2  "Additionally, while all parties involved
3  claim that no one benefitted from the
4  sexual relationship, there is some
5  question as to whether the expenditures
6  to repair the housing at" -- redacted --
7  "would have been approved if requested by
8  a warden not currently or formerly
9  engaged in a sexual relationship with
10 Culliver."
11      Do you see that?
12  A.  Yes.
13  Q.  So, were one of these
14 relationships a warden, sir?
15  A.  I don't know.
16  Q.  It was not a warden?
17  A.  I don't know.  Let me read it.
18 Let me read it again.
19      (Witness reviews document.)
20  A.  Yes.
21  Q.  And that was a -- strike that.
22      So, was that relationship -- did
23 that relationship ever influence your

Page 343

1  decisions as associate commissioner?
2  A.  No.
3  Q.  Do you know if others were aware
4  of the relationship with this warden?
5  A.  Do I know?
6  Q.  Correct.
7  A.  No.
8  Q.  Do you know of others at ADOC
9  who were engaged in similar relationships
10 other than Cedric Specks, who you already
11 testified about?
12  A.  No.
13  Q.  Do you understand how conduct
14 like this could be problematic in running
15 a prison system?
16  A.  Conduct like --
17  Q.  So I guess --
18  A.  -- the inappropriate
19 relationship?
20  Q.  I guess what I'm asking is, are
21 you familiar -- did you ever run into a
22 situation where you felt that you were
23 unwilling to discipline or report another

Page 344

1  employee because of fear of your own
2  misconduct coming to light?
3  A.  No.
4  Q.  We also -- going back, we talked
5  about a lot of the conditions at St.
6  Clair not -- either, you know, staying
7  the same or getting worse during your
8  tenure.  Were any wardens at St. Clair
9  ever terminated because -- for -- because
10 of the -- that -- strike that.
11      During your tenure as associate
12 commissioner, we already established that
13 conditions at St. Clair got worse.  Were
14 any wardens ever terminated because of
15 that?
16  A.  No.
17  Q.  Did you ever consider
18 terminating wardens because of that?
19  A.  No.
20  Q.  Why not?
21  A.  I've already gave it, staffing.
22  Q.  So even if there were other
23 considerations that, you know, they may

Page 345

1  not have been doing their jobs properly,
2  they still -- they were not going to get
3  fired?
4      MS. PUTMAN:  Object to the form.
5  A.  I don't think you're -- I don't
6  -- I don't know specifically.  I can't
7  remember specifically.  But I think if
8  you go and check those wardens' files,
9  that could tell you whether they were
10 disciplined for any of those things or
11 not.  But as -- firing them because we
12 couldn't get enough staff?  No.  If there
13 had been other things, then they would
14 have been disciplined for them.
15  Q.  As to Karla Jones, sir, you said
16 -- you testified that she was a warden at
17 St. Clair during your tenure as associate
18 commissioner; right?
19  A.  Yes.
20  Q.  Do you recall when you first met
21 Ms. Jones?
22  A.  No.  I had known her for years,
23 but.

87 (Pages 342 - 345)

Page 346

1   Q.   And what was your under- --
2   strike that.
3        Were you in the academy with
4   Cheryl Price and Karla Jones?
5   A.   No.
6   Q.   Ever have doubts about Ms.
7   Jones's ability to lead St. Clair as its
8   warden?
9   A.   No.  If I did, I wouldn't have
10  put her there.
11  Q.   We can just go back to --
12  A.   Fourteen?
13  Q.   Yes, sir.  If you go -- the --
14  going back to the first page, it says,
15  "The relationship has reportedly
16  undermined the position and authority of
17  the warden at the" -- "at the" --
18  redacted -- "facility and caused negative
19  effect on the operational climate, good
20  order and discipline of the facility."
21       You see that?
22  A.   Yes.
23  Q.   So you testified that your

Page 347

1   relationship with this warden has -- not
2   has -- never affected your
3   decision-making as associate
4   commissioner; right?
5   A.   The relationship I had with this
6   warden had nothing to do with this warden
7   (indicating).  It was a male warden.
8   Q.   Excuse me.  What warden?
9   A.   This says, "The relationship has
10  reportedly undermined the position and
11  authority of the warden at the" --
12  blank -- "facility and caused a negative
13  effect on the operational climate, good
14  order and discipline of the facility."
15  Q.   Okay.
16  A.   The warden I had a relationship
17  with worked in female services.  I had no
18  authority over that warden.
19  Q.   So, why was this saying --
20  A.   You'd have to ask the people
21  that wrote the report.
22  Q.   Okay.
23       Mr. Culliver, I want to thank

Page 348

1   you for your time today.  I know it's
2   been a long day, so I appreciate it.
3   A.   You're welcome.
4        THE VIDEOGRAPHER:  Okay.  This
5   concludes the deposition of Grantt
6   Culliver.  We're going off the record at
7   5:05.
8
9        END OF DEPOSITION
10       (5:05 p.m. Central)
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 349

1        C E R T I F I C A T E
2   STATE OF ALABAMA   )
3   COUNTY OF JEFFERSON )
4        I hereby certify that the above
5   and foregoing proceeding was taken down
6   by me by stenographic means, and that the
7   content herein was produced in transcript
8   form by computer aid under my
9   supervision, and that the foregoing
10  represents, to the best of my ability, a
11  true and correct transcript of the
12  proceedings occurring on said date at
13  said time.
14       I further certify that I am
15  neither of counsel nor of kin to the
16  parties to the action; nor am I in
17  anywise interested in the result of said
18  case.
19
20  LANE C. BUTLER, RPR, CRR, CCR
21  CCR# 418 -- Expires 9/30/23
22  Commissioner, State of Alabama
23  My Commission Expires:  2/11/25

88 (Pages 346 - 349)

**[& - 2017]**                                                                 Page 1

**&**

**&**   2:8 4:14 5:6
5:12 9:8 10:16
10:18

**0**

**0000243**   6:23
**0000581**   6:19
**001705**   7:23
**002925**   6:16
**008994**   8:5
**012153**   7:9
**01293**   1:7
**018289**   7:12
**018828**   7:3
**019196**   7:18
**019471**   7:6
**020598**   7:20
**021113**   7:15
**030315**   195:2
**09/01/2017**   6:15

**1**

**1**   6:13 9:18 38:2
38:6 49:9
220:23 222:20
229:11 311:15
311:19 312:19
340:17
**1,000**   276:18
**1,500**   231:1
**1,511**   230:13
233:13,15 237:1
**10**   7:16 213:14
213:16,19
241:22 269:14
286:14 287:1
304:18,20 324:8
340:8

**10/01/2016**   6:14
**10/1/2016**   38:18
**100**   108:6 116:13
124:10
**1000**   241:11
**10019**   4:9
**10:25**   86:18
**10:37**   86:21
**11**   1:22 6:4 7:17
9:18 263:1
270:5 307:2,4
309:15 316:5
**11,000**   276:19
**1125**   300:14
**11th**   2:10 3:11
9:11
**12**   7:19 109:5
181:3 242:19
311:8,10 336:12
336:16
**12-4-17**   270:8
**12/04/17**   7:8
**12/4/2017**
274:22
**128**   6:17
**1293**   10:3
**12:17**   171:2
**12:18**   170:21
**13**   7:21 23:14,14
181:3 219:8
228:20 229:17
272:13 323:19
323:21
**1300**   220:21
**13th**   193:21
**14**   8:1 131:4,6
229:8 243:11
272:11,13

317:15 339:8,10
**1400**   2:9 4:16
9:9
**15**   23:14 290:22
**150**   5:13
**15th**   212:9
**16**   254:5 259:23
265:6,14 266:1
**17**   210:22 254:5
254:5 291:3
**18**   130:4 131:4,6
254:5 309:17
**18362**   349:19
**18th**   307:8 308:3
**193**   6:18
**194**   6:20
**1981**   37:2
**1997**   19:21
**1:31**   171:5

**2**

**2**   6:17 7:5 39:8
40:13 128:19,21
244:1 340:16
**2/11/25**   349:23
**20**   116:14,22
152:3 253:9
254:13 284:7
**2000**   20:19
**2001**   2:8 4:15
9:8 10:5
**2010**   22:11
**2014**   36:16
196:22 226:1
229:23 238:22
241:16 246:12
254:8,12,16
261:17 263:16

282:3 284:7
331:4 336:21
337:5
**2014-2015**
243:21
**2014-2018**   130:9
**2015**   6:22 194:18
195:13 199:22
202:8 212:10
213:10,10
219:16 223:8
225:20,23 228:5
229:23 230:4
238:11,22 239:7
239:14 240:6
241:5,16,23
246:8 254:8,8,17
259:9,12,22
261:23 262:2,7
262:13 263:1,4
263:11 264:21
272:15 273:12
274:3 282:3,4
284:7 331:4
337:7
**2016**   7:2 39:3,6
225:14 227:14
252:13
**2017**   193:21
195:13 253:11
254:2,21 258:17
259:13 261:17
262:2,8,11,20
263:5,8 272:15
273:11 274:4
275:6 279:22
282:4 284:8
312:19 331:4

**[2018 - a.m.]**

**2018**  7:5 36:22 37:3 253:9 264:14 278:4 281:8,12 282:22 288:15 299:1 301:14 304:13 305:4 307:8 311:15,19 312:19 338:15 338:16,20 339:21 340:8
**2020**  282:22
**2022**  1:22 2:11 3:12 9:11,18 288:15
**21118**  299:11
**2155**  275:22
**21st**  305:4
**22**  240:7 282:22 320:5
**225**  7:1
**22nd**  339:21
**23**  124:19 181:2 181:4 228:16
**24**  6:21 63:16 117:18 177:7,19 181:23 182:1 194:17
**24.7**  228:7
**247**  197:4,7 228:3
**248**  239:3
**25**  152:3,23 153:4
**250**  239:18
**252**  7:4
**26**  259:9

**274**  7:7
**279**  7:10
**29**  299:1
**298**  7:13
**2:00**  104:5
**2nd**  253:8

**3**

**3**  6:18 193:12,13 194:22 226:5 253:13
**30**  106:10 153:4 220:22 312:19
**300**  231:22
**307**  7:17
**31**  241:7
**311**  7:19
**32**  238:13
**323**  7:21
**33**  197:12
**339**  8:1
**34**  211:2
**34.3**  197:13,16
**35**  37:7 126:4 206:8
**35203**  4:17
**35801**  5:8
**36105**  5:14
**37**  126:4
**38**  6:13
**3:19**  273:5
**3:34**  273:8

**4**

**4**  6:20 194:10,11
**40**  37:5 206:9 267:13
**400**  312:16

**418**  349:21
**44**  220:23 222:20 229:11
**4:11**  305:21
**4:16**  306:1
**4:20**  1:7 10:3

**5**

**5**  7:1 197:7 225:4,5 228:2,4 280:14 320:14
**50**  124:10
**53**  262:20
**5:05**  348:7,10
**5:16**  324:3

**6**

**6**  7:4 230:4 252:21,23 259:6 274:13
**60**  106:2
**63**  213:10
**655**  5:7
**6:00**  267:4

**7**

**7**  7:7 274:13,16 314:2
**700**  231:22
**787**  4:8

**8**

**8**  7:10 239:6,8 278:17 279:1 300:9 303:11 309:5 312:14
**8's**  240:1
**80**  106:1
**81**  18:8

**835**  239:17
**85**  186:3
**8830**  226:6
**8832**  228:3
**8833**  230:5 259:10
**8834**  262:1
**8836**  228:14 263:11
**8837**  241:23
**8841**  229:9 243:11

**9**

**9**  7:2,13 225:13 228:14 263:7 275:15 286:16 298:14,18 300:17
**9/1/2017**  38:18
**9/2/2018**  7:22 324:3
**9/30/23**  349:21
**9012**  341:22
**94**  269:15
**947**  253:14
**9477**  261:22
**9479**  263:9
**9480**  269:15
**9481**  270:4,5
**95**  63:23
**96**  289:17
**99**  205:7
**9:03**  9:17

**a**

**a&i**  22:22
**a.m.**  2:12 9:10 9:17

**ability** 42:1,8,10
  162:9 242:14
  250:11 269:23
  346:7 349:10
**able** 29:6 70:10
  78:12 89:23
  100:11 106:15
  110:5 113:15
  116:5 119:14
  120:2 142:13
  152:6 162:18
  163:18 165:12
  173:2 178:9,18
  181:20 226:16
  229:5 251:23
  255:4 275:11
  306:8 313:23
  316:10 332:9
  333:18
**academy** 105:7,8
  108:19 109:4,8
  112:14,16
  113:10 152:8,10
  152:16 336:11
  346:3
**acceptable**
  185:12 223:1
  231:4,7 294:18
  319:13,17 335:9
**accepted** 146:11
  146:14 282:14
  283:12,21
**access** 59:14
  93:19 95:6,8,12
  95:21 96:2
  105:4 244:2
  251:18 272:17
  272:18 337:23

**accommodate**
  117:2
**account** 173:17
  182:3 247:8
**accounted** 176:3
**accounting**
  75:19 78:4
  110:22
**accuracy** 85:14
  96:10,12 98:16
  247:2
**accurate** 45:3
  61:23 85:2 86:3
  87:3,8 96:18
  108:5 123:13
  179:1 180:17
  189:11 211:6,17
  211:21,22
  224:11 247:3
**accurately** 86:3
**accused** 166:9
  166:15
**achieve** 29:5
  30:4 60:13
**act** 66:2 226:18
  226:22 257:22
**acting** 9:3
**action** 1:7 43:11
  213:9 258:10
  266:21 283:22
  308:6,18 309:19
  310:12,23
  349:16
**actions** 313:19
  330:22,23
**activities** 198:20
  230:6 235:10

**activity** 77:10
  304:8
**actual** 197:8
  232:15 290:8
**add** 290:14
**added** 217:5
  233:6
**additional** 235:7
  341:4
**additionally**
  342:2
**address** 41:23
  42:7 164:3
  193:19 218:10
  250:11,14
  313:20
**addressed** 320:9
  330:12
**addressing**
  26:22 49:23
  229:22
**adequate** 125:3
  215:8 216:18
  242:3 257:17
  269:18,23
**adequately**
  157:1
**adjust** 306:20
**adjusted** 117:20
**adjustments**
  257:6
**admin** 43:23
  44:2,3,7
**administration**
  55:19
**administrative**
  122:2 257:10,15

**administrator**
  11:15
**administrators**
  279:12
**admitted** 341:15
**adoc** 6:16,19,23
  7:3,6,9,12,15,18
  7:20,23 8:5 18:3
  18:6 21:20
  24:23 28:10,15
  37:11,15 41:5
  48:3,14 51:19
  53:2,9 58:8
  93:14 95:7
  103:6 108:7
  111:13 120:5
  121:5 129:15,19
  168:11 194:2
  208:5 223:2
  227:15 231:5
  289:4,16 296:4
  300:18,19
  303:15 308:2,19
  311:21 319:13
  319:15 320:8,16
  327:23,23 328:4
  329:5 335:18
  338:15 343:8
**adoc's** 127:4
**advantage** 125:9
**advised** 3:13
**agenda** 25:4,7,13
  25:14,21
**agent** 339:21,22
  341:7
**agitated** 236:12
**ago** 16:11

**agree** 116:23
200:10,13,14
216:17 221:9
248:7 312:22
320:18,21 321:4
329:16,22
**agreed** 2:2,14,22
11:10 82:4
300:5 323:5
**agreeing** 155:23
**agreement**
299:23 303:14
**agt** 276:2,3
**ahead** 106:8
**aid** 349:8
**air** 123:1 148:15
**al** 1:16 9:23
**alabama** 1:2
2:10 4:17 5:8,14
8:1 9:3,9 10:2,6
17:21 37:4
39:19 126:17
172:7 194:15
225:10 253:5
274:19 279:7
290:10 309:9
324:1 327:11
328:11 339:15
340:2,6 341:5
349:2,22
**alabama's** 53:15
54:10
**alarm** 291:23
**alexander** 23:4
**allegation** 208:1
276:12 277:1,4
340:17

**allegations**
131:23 166:21
166:22,23 167:3
168:3,10 169:17
277:21 340:3,7
**alleged** 207:5,15
207:17,19 340:9
**allow** 119:3
**allowed** 173:23
277:12
**allowing** 276:20
**allows** 322:4
**alluding** 143:9
**alterca** 205:22
**altercation**
124:22,23 286:9
**altercations**
124:13 205:18
205:22 206:7,20
211:18
**alternatives**
250:3,4 288:18
331:9
**amended** 6:17
**american** 16:19
**ammunition**
244:15 245:4,8
245:16,20,22
**amount** 42:12
82:6 118:13
124:3,4 145:15
202:4 217:3
232:7,8 238:11
266:8 267:12,14
312:23 313:2
319:21
**amounts** 139:2

**analogy** 84:20
**analyses** 196:17
252:5 282:3
284:8
**analysis** 6:21 7:2
7:5 193:3 194:2
194:17 195:3,13
196:20 225:12
225:16,17 234:1
234:3,8 240:6
241:18 242:16
246:8,9,12 252:5
253:7,10 254:8,9
254:16,17
259:10,22
262:20 263:8,11
263:16 264:22
272:12 273:11
273:13 288:2
300:23 301:8
303:19 304:2,4,5
332:7 340:21
**analyze** 97:10
**announced**
159:2,10,12
**annually** 196:13
196:17 252:6,10
**answer** 13:11,17
35:18 44:22
62:17 67:23
70:23 76:11
78:15 89:4 97:2
114:20,23 128:6
144:7 171:16
177:10 179:1
184:20 187:19
187:22 197:1
199:22 208:17

208:18 211:19
215:9 219:23
231:6,9 287:23
288:3,4 293:15
294:6,21 298:7
306:7 311:3
325:14 334:9,10
**answered** 58:6
88:9 137:6
217:22 223:5
269:10 298:6,11
338:8
**answering** 13:8
298:5
**answers** 12:1
**anybody** 14:22
95:7 115:16
127:21 131:9
137:3 213:1,3
286:3,4 318:14
326:1 335:16
**anymore** 144:18
**anything's**
252:16
**anytime** 115:11
185:7
**anyway** 251:4
**anywise** 349:17
**apologies** 128:16
157:6 278:18
**apologize** 86:12
259:8,15 273:3
286:17
**app** 91:21,22
**apparent** 331:3
**apparently**
333:7

appearance
  25:12
appears  39:16
  282:13 283:12
applied  52:21
appoint  54:19
appointed  53:17
  53:18
appreciate  13:3
  305:13 348:2
approach  61:19
  106:4,5
appropriated
  255:3
approve  294:14
approved  76:5,6
  342:7
approximately
  2:11 9:10 72:9
apt  260:2
area  122:10,14
  123:23 124:2,5,8
  126:8 136:1
  172:12 174:1
  175:21 209:17
  209:18,23 272:2
  272:4 324:17,21
  324:22
areas  55:18
  57:14 137:9
  165:5 171:14,19
  251:17,23
  253:20
arnaldo  307:18
  307:23
arnold  2:8 4:14
  9:8 10:18

arrested  34:15
  34:20 139:12
arrests  35:5,10
  139:8
asa  309:3
asca  7:10 287:4
  287:14,20 288:6
  289:6,11,13,14
  310:2 332:8
asca's  288:2
ascertain  179:6
ascertained
  142:8
aside  96:10,12
  273:23
asked  13:8 59:19
  69:18 126:1
  144:8 195:15
  208:16,16
  217:11,12,12
  252:15 306:5
  310:5 337:12,14
  338:7 340:3
asking  25:16
  55:9,16 65:5
  80:23 94:6
  103:17 144:15
  180:3 208:2,7
  285:15 288:17
  288:20,23,23
  289:3,10 295:11
  310:20 313:9
  334:18 343:20
asks  201:15
  212:12 291:8
asleep  136:21
aspect  308:11

aspects  249:23
aspire  70:8
ass  98:13
assault  89:12,13
  90:2,9,18,19
  150:21 205:4
  207:18 233:16
  233:16 235:19
  235:20 236:20
  240:23 241:15
  286:5
assaulted  204:15
  204:21 207:15
  207:21 208:22
  211:2 317:12,13
assaulting  286:4
assaults  135:9
  150:16 203:20
  207:5,19 208:20
  210:21 233:2,3
  233:19 239:11
  239:11,13 240:7
  240:8,17 241:6
  262:1,2,11,12,19
assess  296:13
  300:4
assessment
  196:7,12 223:12
  225:23 226:2
  228:2,6 230:4
  238:11 255:6
  258:11 279:9,22
  280:5,11 308:7
  309:11,21
assessments
  238:1
assign  3:4

assigned  19:4
  22:14,15 41:8
  42:14 57:13
  58:3 136:15
  175:21 176:5
  328:17
assignment
  18:13
assist  43:5
assistance  40:19
  60:22 226:17
  296:5 328:14
assistant  21:5
  180:22 316:1
assisting  328:8
associate  21:19
  25:18,23 36:15
  36:22 37:14
  38:23 39:1,22
  40:5 41:3 49:10
  51:20 53:1,5,14
  54:1 55:5 56:10
  58:9,11 59:1,12
  63:11 70:19
  73:16 74:6
  78:17 95:20
  97:9 102:2,18
  105:15 107:16
  108:8,14 111:6
  111:12,23 121:4
  127:2 129:23
  130:8 133:15
  148:1 154:12
  157:12,22
  164:12 167:7,10
  167:17 168:9
  169:15 170:11
  179:16,16 181:4

187:21 189:21
195:19,22 196:1
196:8 199:6,9
204:8,10 264:10
270:22 272:8,10
288:8 293:2
297:11,20
298:10 302:1,12
307:21 310:21
318:7 319:7
328:6 329:19
340:4 343:1
344:11 345:17
347:3
**association**
279:11
**assume**  13:12
197:2
**assuming**  193:17
292:14 294:23
312:8
**assure**  181:22
**atmore**  20:6
**attached**  38:7
128:22 193:14
194:12 195:8
225:6 253:1
274:17 279:2
298:19 299:4
304:21 307:5
311:11 323:22
339:11
**attaching**  194:1
**attachment**
195:1,7
**attacked**  242:21
317:11

**attempt**  114:23
300:5
**attempting**
121:6
**attempts**  330:19
**attend**  79:19,20
80:3
**attended**  76:1
**attention**  49:21
84:13,18 183:17
**attorney**  8:1
70:8,9 84:21
306:12 339:16
**attorneys**  11:6
110:17
**attribute**  329:23
330:1
**audible**  12:15
**audit**  50:9,21,23
184:1 295:19
**audits**  50:6,15
51:9,14,18,23
183:20,21,23
296:21 303:8
**august**  311:15
311:19 339:20
**austin**  4:7 10:21
**authority**  346:16
347:11,18
**authorization**
76:14 172:3
280:22 316:12
**authorized**  43:3
**automatically**
63:13
**availability**
149:21 238:21
261:16

**available**  128:1
145:22 146:2,8
199:14,16 202:1
202:14,16
203:14 315:18
315:20
**avenue**  4:8
**avoid**  12:17
114:23 142:15
334:23
**awake**  137:1
**aware**  35:22
36:1,10 42:11
104:13 108:15
128:12 161:3
169:14,15
202:13,16
214:17 219:14
219:21 227:15
227:19 323:15
337:11 343:3

**b**

**b**  6:10 63:10
65:1 66:7,17,19
66:20,22 67:20
68:2,3,23 69:10
69:21 87:12
96:6 104:13
172:5 173:5
230:19 231:14
241:4
**b's**  231:14 232:6
232:8
**bachelor**  16:17
16:18
**back**  40:1 42:21
47:23 48:1

56:23 64:20
69:14 71:2 74:5
76:13,21 81:7
82:3 85:12
86:21 90:20
96:8 98:8
107:10 111:2
112:17 114:12
118:4,4,15
122:19 123:20
126:7,20 134:14
137:21 140:4
144:14 147:2
158:12,14 159:1
159:16 161:14
161:15,18
169:21 171:5
182:10 190:21
194:21 222:16
230:3 259:21
268:13 273:8
278:18,21
285:20 286:1,13
286:16 306:1,9
308:23 309:7,14
318:9 332:2
344:4 346:11,14
**background**
16:16
**backing**  157:20
287:17
**bad**  24:21 42:4
45:14 102:19
125:7 155:19
**badly**  209:13
**bag**  144:17,20
**balance**  101:14
101:17 183:22

**balances** 314:23
**ball** 134:8
**ballpark** 36:19
**barely** 285:4
**barrel** 126:16
**bart** 305:2
   306:14
**base** 237:19
**based** 20:6 22:22
   22:23 23:5,6
   42:12 100:14,15
   101:5 113:4
   120:8,8 142:16
   191:18 202:2,17
   211:15 231:23
   231:23 235:5
   236:16 239:5
   241:18 242:16
   248:7 264:17
   269:6 308:6
   309:19
**basic** 280:20
   290:5
**basically** 23:19
   24:14 45:13
   51:5,5 67:3
   68:11 72:8
   75:16 127:10
   144:7 152:4
   169:13 172:10
   175:17 176:1,10
   304:5 315:6
**basis** 34:13
   74:12 85:1
   113:14 116:6
   161:5 184:9
   221:1 256:2
   295:15 306:5

**basketball** 123:8
**bates** 6:15,18,22
   7:3,6,8,11,14,17
   7:19,22 8:4
**baton** 208:22
**bay** 122:6
**bco** 290:5
**beam** 292:2
**bearl** 4:10
**beaten** 209:13
**bed** 90:14 176:6
**began** 18:21,22
   51:8,18,21 76:19
   105:11 107:9
   155:5 255:1
**beginning** 39:2
   111:8 154:15
   164:20 320:15
   336:21 340:18
**begins** 299:10
**behavior** 278:13
**behavioral** 49:4
**believe** 51:22
   142:2 184:4
   189:7 212:20
   221:8 238:9
   256:6 259:22
   279:19 336:11
   340:23
**believed** 90:4
**bell** 79:18
**belong** 286:12
**belongings**
   144:17
**benefitted** 342:3
**best** 12:23 13:11
   42:1,7,9 43:18
   45:6 63:18 75:1

136:19 165:6,6
   173:20 245:5,10
   245:11 247:14
   271:23 300:19
   303:15 349:10
**better** 46:11,15
   47:4,9,12 105:16
   111:22 153:11
   154:7 233:5
   235:8 237:21
   250:17,17 251:7
   251:8,10 258:11
**bibb** 23:11
   135:19,19
**bid** 256:7
**big** 122:23
**birmingham** 2:9
   4:17 9:9 10:5
**bit** 15:21 42:9
   58:6 84:17
   121:21 146:19
   148:19 154:4
   332:9
**biweekly** 75:9
**blades** 275:12
**blank** 199:2,12
   201:11 202:21
   347:12
**blanks** 200:21
**block** 201:14
**blouse** 17:6,7
**blurb** 317:4
**board** 110:6
   148:13 149:12
   160:17
**boards** 256:13
**bodies** 175:12

**body** 176:15
**bolt** 275:11
**book** 295:22,23
**boom** 140:14,14
**borrow** 42:22,23
   268:15
**bottom** 126:10
   126:12,13,16,18
   126:19 195:1
   196:6 197:5
   218:16 226:6
   229:10 270:5,7
   276:15 282:8
   299:10 326:19
**box** 40:2 238:16
**bran** 55:10
**brand** 163:13
**break** 13:7 86:14
   86:19,23 94:4
   170:17,18 171:3
   171:7 252:1
   272:23 273:6
   293:10 305:22
**breaking** 34:16
   168:11
**breaks** 13:4
**breezeway**
   209:17,18,21
**brian** 3:9 4:5
   10:20 11:13
   298:21
**bridge** 81:17
**briefing** 14:7
**briefly** 314:18
**bring** 26:12
   84:12 85:2
   98:10 100:2
   101:8 112:12

113:1 116:3
134:14 141:20
142:3,9,15
144:18 183:16
248:17 319:21
320:2
**bringing** 35:7
136:5,9 138:19
140:4 143:5
151:12 166:4,15
167:12,15
**broached** 121:18
**broke** 237:3
332:16
**broken** 35:21
36:2 66:16
174:16,18 175:3
232:2 292:2
**brooke** 5:11
10:15
**brooke.lawson**
5:15
**broomsticks**
240:11
**brought** 24:10
27:6 49:20
100:14 101:6
110:13 138:23
169:9 217:1
244:21 258:12
279:21 296:22
334:1
**brown** 102:4,5
307:11,17 311:6
**budgets** 50:3
**buffed** 116:18
**build** 134:22

**building** 209:21
209:22
**builds** 85:11
**bureaucracy**
255:10,14
**busy** 276:3
**butler** 2:6 3:9
9:1 10:8 349:20
**butting** 204:16
**buy** 144:17

**c**

**c** 2:6 3:8 4:1 5:1
9:1 65:2 66:17
66:19 67:1 69:1
92:7 96:6
204:14 349:1,1
349:20
**caliber** 124:17
**call** 81:2 88:1,17
101:12 104:3,9
104:12,17 116:1
121:22 136:10
137:2 182:8
209:20 222:18
265:20
**called** 93:12,13
123:22 126:10
126:12,13
139:14 163:18
188:4 290:5,10
296:7
**calling** 267:2,3
290:7
**calls** 101:2 188:2
189:8
**camera** 165:9,17
165:21 322:6,15

324:23 332:16
332:17,20
**cameras** 164:8
164:14,15,16,23
165:2 217:5
251:9,10,16
322:3 332:16
**campaign** 121:2
**candidates** 109:8
**capacity** 11:15
36:6,7,12 197:11
197:17,18,23
228:7
**capell** 5:12 10:16
**capital** 77:7,13
**captain** 19:14,16
180:22
**captain's** 180:21
190:17
**captains** 315:18
315:21,22 316:1
**care** 104:4
115:16 116:17
116:18,19
192:19
**career** 19:9 37:3
152:3 206:9,11
**carrie** 1:9 9:20
11:14
**carried** 100:17
100:17
**carter** 223:13
**cartwheels**
89:19
**case** 10:3 16:6,8
16:12 46:19
124:11 188:16
251:21 252:2

257:21 281:8,12
283:2,3 349:18
**cases** 70:13 76:8
76:9 106:15
334:2
**casey** 276:2,3
**catch** 46:7 69:15
165:20,22 166:2
**categories**
127:14 240:22
241:5
**category** 57:10
88:23 104:11,14
**caught** 34:16
35:6 138:18
**cause** 9:12 31:14
54:23 55:1
96:14,21 115:6
126:6 182:10
**caused** 73:23
119:7 259:19
346:18 347:12
**causes** 173:9,12
**causing** 242:23
**caveat** 61:11
62:21 65:12
290:15
**ccr** 349:20,21
**cedric** 166:19
168:16 276:5,19
343:10
**cell** 117:15
124:19 125:1
140:18,19 141:2
146:14 174:7,7
175:22 176:8
189:4 236:7,15
253:18,18

257:12 260:19
**cellblock**  116:13
  116:14,15,17
  121:23 123:22
  141:1 164:17
  165:13,15 192:8
**cellblocks**  165:7
  165:8
**cells**  122:10,11
  126:22 176:5
  257:14,14,15
**central**  2:12
  291:23 317:17
  348:10
**cert**  153:12,18
  154:10 155:10
  155:16,20 188:3
  188:10 217:1
  244:21
**certain**  21:6
  42:18,21 46:12
  47:19 58:3 70:2
  70:13 118:13
  123:21 175:17
  188:4 257:9
  267:12,14
  287:18 315:1
**certainly**  282:9
  306:19
**certify**  9:4 349:4
  349:14
**cetera**  46:12
  54:15 121:2,2
  127:13,13,14
  143:7,7 233:17
  235:16
**cf**  195:2

**chain**  7:10,17,19
  144:1
**challenge**  284:4
**challenging**
  280:21 284:2
**chance**  143:4
**change**  21:2
  112:15 254:12
  254:21 331:18
  334:16
**changed**  63:1
  65:14 113:1
  250:7 255:13,19
  281:17,18 333:7
**changes**  25:8
  253:18 255:9
  256:16
**changing**  250:10
  330:20
**chaos**  222:23,23
**character**  47:18
**charge**  152:21
  158:20,21
  190:20 192:17
  216:12 283:19
**charges**  278:11
**charlotte**  298:22
  311:20
**chart**  58:14
**charts**  116:1
  120:9
**check**  64:13 83:5
  85:4,13 101:13
  101:17 176:10
  183:21 249:17
  345:8
**checked**  212:3

**checkpoint**
  209:19
**checks**  314:23
**cheryl**  72:5,6,21
  73:3,18 130:1,4
  157:14,16
  311:13 346:4
**chief**  58:10,18
  59:4 95:22
  101:23 102:1
  103:6 110:20
  155:23 307:12
  307:13 308:1
  311:5
**childersburg**
  23:5
**chips**  144:18,19
**chlaw.com**  5:15
**chooses**  54:19,20
**choosing**  147:6
**circled**  201:21
**circles**  141:4
**circumstances**
  35:4 61:4 62:8
  158:5 166:6
**civil**  1:7 3:8 9:5
**civilian**  260:9
**claim**  342:3
**claimed**  277:12
**claims**  212:13
  213:4
**clair**  22:21 23:1
  28:20 29:10,13
  29:18 30:7,11,17
  30:18 31:3,21
  32:4,16 35:10,12
  52:22 107:19,21
  107:22 108:6

111:17,22 117:6
120:11 121:14
121:15,16,19,20
125:20 130:19
130:22 132:9,14
133:20,22 134:1
134:11 135:4,8
135:11,16
137:15 138:10
138:11,19 139:3
141:22 142:4,7
143:18,21
145:15,18,22
146:21,22 147:5
147:7,18 148:4
148:11 149:9,19
149:22 150:4,9
153:6 154:19
155:1 156:4
162:14 164:8,14
165:18 166:5,7
167:13,16 170:6
170:11 171:9,10
171:13 172:21
173:21 177:9,16
177:21 178:17
178:23 179:22
183:9 184:13,18
186:9 187:18
188:15 189:6,18
191:18 195:2
196:21 197:16
197:20 198:9,10
198:11 199:11
202:15 203:14
207:13 209:6,16
212:7 213:4,18
214:2,15,18,22

215:15 216:1
218:10 219:5,15
220:4,9 223:19
225:12 227:12
227:17 232:20
234:4,17,19
237:9 238:21
241:15 243:5,20
246:1 247:13
250:6 253:7,11
254:10,18,20,20
257:7 258:12,14
259:4 261:5,7,9
261:16 262:7
264:9 266:2
270:16 274:3
276:10 277:5
279:8 281:8,12
283:2,8,19
284:10 286:5
287:5,6,15 288:7
291:1,20 292:4
296:6,8,14,16,23
297:16 299:5
303:9,16,20
308:7,9 309:10
309:20 312:1,17
313:1 316:8,10
316:18 318:22
318:23 319:6
320:20 321:1,6
324:2 329:15,17
330:21 331:1,12
331:17 333:8
335:5 337:6
344:6,8,13
345:17 346:7

**clair's**  242:14
  269:23
**clarification**
  237:21
**clarify**  65:5
  123:4 157:5
  158:1 161:12
**class**  63:10,10,20
  65:1,1,2,21 66:6
  66:7,17,17,17,19
  66:19,20,22 67:1
  67:20,20 68:1,2
  68:3,3 87:12,12
  87:13,13,14,22
  92:6,6 104:1
  109:14,18,20
  113:4 182:7
  230:18,19
  295:20,21 324:3
  327:7 336:11
**classes**  222:16
  268:5
**classification**
  89:9
**classified**  89:12
**classify**  88:23
  91:6 178:13
**classifying**  66:6
  77:18
**claw**  306:8
**clear**  12:13,13
  46:20 65:19
  123:2 141:18
  191:16 248:2
  331:15
**click**  91:21
**client**  306:12

**climate**  346:19
  347:13
**clm**  1:7
**close**  161:8
**closed**  174:18
  332:23
**closer**  124:12
**clothes**  192:13
  285:19
**clue**  148:16
**coffee**  125:12,14
  204:21
**collaboration**
  77:21
**collectively**
  98:11
**college**  16:22
  17:2
**colluding**  141:19
**colonel**  148:15
**combative**  260:2
  260:21
**combined**
  280:16
**come**  47:16
  63:18 64:23
  66:4 76:20
  88:14 107:3
  112:17 119:4,4
  119:14 122:20
  123:19,20 136:2
  140:9 153:15,17
  153:22,23 154:2
  174:6 175:16
  188:4 209:18,19
  209:23 214:7
  215:14 247:22
  248:18 249:1,10

249:11,17 255:5
  258:7 265:18
  267:2,4,5 277:12
  296:13 300:3
  304:3,5 332:2,19
  335:18
**comes**  55:11
  95:18 134:13
  145:12 188:23
  190:21 210:1
  259:5 295:22
  333:2,12
**coming**  67:19
  69:6,14,21 77:2
  100:9 105:6,7
  118:2,3 133:22
  137:2,10 138:4
  143:20 144:21
  144:22 145:8,9
  145:11 152:7
  153:13 160:16
  161:9 189:3
  209:17 293:23
  314:20 334:5,6
  344:2
**command**  144:1
**commander**
  180:9 190:3
**commencing**
  2:11 9:10
**comment**  242:20
**commentary**
  238:16
**comments**
  218:21 270:6
**commission**
  340:5 349:23

**commissioner**
21:18,19,21 25:1
25:10,11,19,20
25:23 36:15,22
37:15 38:23
39:2,19,22 40:5
41:3 49:11
51:20 53:2,6,8
53:14,16,18,22
54:1,8,11,13,18
55:6,22 56:4
57:5,9,11 58:8,9
58:10,15 59:2,5
59:5,12 63:11
70:19,20 73:17
74:6 75:10,15,17
77:22 78:17
95:20,21 97:9
101:21 102:3
105:15 107:16
108:8,14 110:2
111:6,13 113:22
121:4 127:2
129:14,23 130:8
133:14,15 148:2
154:13 156:5
157:12,13,21,22
158:16,17 159:3
159:13 164:13
167:8,10,17
168:9 169:16
170:12 179:17
181:4,12 187:21
189:21 195:19
195:23 196:1,8
199:6,9 204:8,10
219:19,20,23
246:7 264:10

270:23 272:8,10
288:8 293:2
297:12,20
298:11 302:1,13
302:15 307:21
310:22 318:7
319:7 328:6,16
328:16 329:20
340:1,5,8 341:1
341:9 343:1
344:12 345:18
347:4 349:22
**commissioner's**
25:1
**commissioners**
53:3,9,10 55:4
56:10 57:13,18
57:21,23 58:11
58:13 96:2
102:17,18 158:8
279:15,20
**committee**  75:7
**committing**
185:23
**common**  139:11
139:14 219:5
261:7,8 266:2
270:15 319:6,10
326:22 327:3
**communicate**
104:18 156:6,9
161:19
**communicated**
159:22 160:3
162:4,5
**communities**
40:18 41:2

**community**  20:6
22:22,23 23:5,6
**company**  17:17
**compare**  135:5
211:23 212:19
214:22 246:5
261:21 263:9
**compared**  214:6
228:10 229:14
273:12
**comparing**
212:21,22 233:6
**comparison**
212:17 232:22
233:22 259:9
**comparisons**
227:22
**compiled**  127:16
199:11
**compiling**  127:3
**complaint**  6:17
**complete**  199:18
**completed**  194:2
196:13,17
199:19 315:4
**completely**
13:23
**completing**
315:2
**compliance**  2:18
**component**
233:7 235:9
**computer**  91:19
315:5 349:8
**concern**  64:17
89:14,17 259:17
**concerned**  45:16
64:18 137:3

**concerning**  91:7
186:11,13
317:17 318:5,6
**concerns**  26:12
26:22 97:21
147:8 151:7
156:6,17 157:8
161:20 162:1
224:6 293:19
297:14
**concert**  140:1
155:22
**concludes**  348:5
**concur**  200:7
**conditions**  26:7
113:23 121:8
132:13 147:8
153:6 155:1
196:21 225:19
227:16 250:5
251:7 254:10,18
264:9 297:15
329:5,14,17
330:8 331:1,12
331:17 336:19
344:5,13
**conduct**  191:11
234:2 300:23
303:19 343:13
343:16
**conducted**  50:16
50:19,22 177:9
177:16,21 178:6
184:18 187:17
**conducting**
340:19,20
**confidence**  72:4
72:19 73:17

**[confidence - coordinators]**    Page 12

81:13,14,16,21
82:5,6,11 84:11
85:11,11,23 96:9
96:14,22 180:12
224:12,21
**confident** 87:1
99:16
**confidential**
95:11
**confirm** 87:6
289:1,3
**confirming**
130:7 289:11
**confiscated**
202:5
**confrontation**
260:15
**conjunction**
185:17
**connected**
166:16
**consensus**
127:22
**consider** 113:23
198:4 201:15
255:2,4 344:17
**considerations**
344:23
**considered** 63:8
77:5 85:15
203:23 230:16
232:9 235:21
**consist** 105:2
**consistent**
213:22 214:13
**consistently** 83:3
105:12

**constantly**
149:15
**consultant** 255:7
296:12
**consultants**
116:3 258:7
**consulting** 17:14
17:16
**consuming**
256:8
**contact** 72:18
116:11 124:12
**contacted**
339:23
**contain** 96:5
124:6
**containing** 244:9
**content** 349:7
**contents** 313:5
**context** 73:14
216:11
**contingent**
172:10
**continue** 47:3
118:14 235:2,3
322:3,21
**continued** 5:1
246:22 267:22
269:2 330:8
**continues** 247:12
266:5 268:2
**continuing** 323:2
**contraband**
27:11 35:6,7
133:17,18
135:14,15 136:5
136:6,9 137:10
138:3,19 139:1

140:20 141:20
142:4,9,13
143:20 145:12
145:15,18
149:23 151:13
166:5,15,17
167:1,12,15
188:15,22,23
192:22 202:14
244:5 277:22
278:2 325:4
326:13
**contract** 168:18
278:13 332:18
**contractor** 255:5
**contribute** 322:3
**control** 218:3,5
247:19 255:14
255:15,16 260:3
260:4 286:21
292:1
**convene** 123:15
**conversation**
114:5 160:5,11
161:18 275:7
313:17
**conversations**
59:4 107:7
149:4,5 150:6
220:3 256:6
**convert** 144:11
**cooper** 5:6 10:13
**cooperating**
136:23
**coordinating**
328:8
**coordination**
25:20

**coordinator** 22:7
22:13 23:16
25:17 26:1,14
28:5,19,22 32:5
33:4,6,12 35:14
36:5 43:17
46:17 51:22
58:2,22 72:15
73:1,2 87:15,17
90:20 92:23
94:17 99:18
100:20,22
108:11 111:21
120:13,21
129:19 132:8,15
132:23 135:3
138:9,15 143:14
143:17 145:21
146:18 153:8
154:21 155:3,6,9
157:11 158:13
161:15 162:14
164:7 169:22
170:4,14 179:5
180:13 181:3,12
187:16 189:18
254:11,19
268:20 270:20
272:9 297:10,18
298:10 323:3
**coordinator's**
183:16
**coordinators**
37:17,18 40:20
45:10 59:9
60:23 62:2,6
73:15 90:21
95:19 98:5

99:13 100:9,12
101:6 127:23
129:22 156:20
157:15
**copied** 80:20
**copies** 338:11
**copy** 27:23 196:6
338:5
**copying** 311:13
**correct** 20:13
30:5,6,8 36:23
48:5,20 49:1
52:22 77:3 83:4
84:9 94:9,10,13
94:14,19 95:5
99:22 108:15
118:22 128:10
129:15,16 130:3
131:7 137:11
154:21 156:11
156:15 160:1
161:17 164:9
165:16 173:13
185:15 193:16
193:20 195:20
196:9 197:19
198:2 199:18
200:18 201:12
202:22 205:15
205:16 207:23
214:10,19 216:5
219:16,21 220:7
220:10,18
228:11,17 229:2
229:17 230:23
238:18 239:5,15
240:15,19 241:1
241:10,13,16,19

242:5,11,15,17
243:16,21,23
244:6 250:12
261:13 262:3,8
262:13 263:2,5
263:13,21
264:19 269:20
270:3 272:16
277:23 281:20
282:22 287:7,21
288:19 295:6
298:17 300:14
301:3 303:12,23
304:23 308:19
309:21 311:21
317:1 321:9
322:17 324:6,10
324:11,12,23
325:5 326:2,5,13
328:1,10 329:7,8
330:1 331:5
336:17,21
337:16 338:17
343:6 349:11
**correctional**
18:10,14,18 19:4
19:6,12,14,16
20:23 21:16
22:21 23:1,2,3,4
23:11 43:3 44:1
61:13 105:9
112:6 113:21
151:23 220:22
221:6 225:13
253:8 260:13
279:8,11,13,18
279:19 283:4
284:21 290:5,17

303:20 309:10
312:1 324:2
**corrections**
17:22 18:22
37:4 39:20 58:1
61:12,18 63:4
70:17 72:8
112:5 113:19
115:23 145:1
148:16 193:18
194:16 211:11
214:21 215:1
225:11 238:6
248:19 253:6
256:4 274:20
279:8 295:3,10
295:15 297:21
298:16 300:5,23
303:7,19 304:13
309:9 324:1
327:12 328:11
336:9 340:2,6
341:5
**corrective** 308:6
308:18 309:19
310:12,23
**correctly** 29:3
29:18 44:17
45:19 48:9 86:6
108:21 237:12
**corresponding**
261:23 263:10
**corresponds**
239:8
**corridor** 152:15
**cost** 264:2
**counsel** 2:4,23
3:2 9:6 10:9

13:14 14:2,8,10
14:18 15:1
103:1,6,18
349:15
**count** 175:8,11
175:19 176:1,6,6
176:13,14,15
177:6,12,13
178:1,3 179:9,10
179:11 181:6
182:2 183:7
184:8 185:9
**counting** 175:9,9
175:12
**country** 64:13
115:10 116:5
284:21,22
**counts** 175:16,22
176:17 177:8,14
177:15,18,18,20
178:6 179:23
180:15 182:1,11
182:12,17
183:10,11,12
184:14
**county** 112:21
133:21 349:3
**coupled** 270:10
**course** 122:5
182:23 257:18
299:9 308:5
309:19 331:11
**court** 1:1 2:6,19
3:14,15 9:1 10:1
10:7,10 11:5
12:7,10,11 26:3
26:6 107:22
133:4,8 165:23

[court - decreased]                                                    Page 14

226:19 245:17
265:10 272:3,6
279:16 315:19
**cover**  134:10
165:2,5 266:16
267:1,6
**covered**  38:18
196:20
**covering**  252:13
253:11
**covers**  191:14
225:19
**create**  222:7
256:20 281:19
293:19
**created**  123:13
127:10,15,20
280:17
**creates**  124:13
**cripa**  327:11
**crisis**  111:14
120:12 219:16
**critical**  34:4
219:9,10 229:14
229:22 243:13
243:19 272:13
272:14
**crr**  349:20
**cubicle**  165:18
**cuffed**  235:18
**cuffs**  260:17,18
**culliver**  1:15,21
2:5 9:12,20
10:14 11:1,13,20
15:4 16:16 38:4
86:22 91:15
128:12 171:6
193:2 273:9

274:14 275:4
305:7 323:12
327:9 329:13
337:10 340:4,9
341:1,9,13
342:10 347:23
348:6
**culture**  280:17
**curious**  249:22
**current**  236:3
290:7 300:20
303:17
**currently**  17:10
342:8
**custody**  41:5
48:4 135:20
147:15
**cut**  23:9 276:20
329:2
**cutters**  275:12
**cv**  1:7 10:3

**d**

**d**  6:1 204:20
**da**  87:20,20,20
**daily**  33:16
69:21 191:18
220:23
**damaging**  226:8
**danger**  198:14
**dangerous**  198:5
216:20 221:12
221:20 222:8
264:6 335:9
**dangers**  198:11
**data**  105:3,5
196:20 201:1
208:12 211:20

**database**  92:15
92:18 93:8,12,20
94:1 95:8
**date**  9:4 138:21
195:17,22
197:11 225:13
228:7 253:8
274:21 275:8
301:12 316:22
324:2 349:12
**dated**  193:21
194:17 282:22
299:1 305:4
307:8 311:15
**dates**  154:11
304:7
**davenport**
223:13
**day**  2:10 3:11
9:11 20:10,10
31:11,11 37:18
37:18 41:10,10
50:13,13 56:13
56:13 67:11
70:12 75:17,17
77:20 85:1,1
95:2,3,3 98:9
106:10 113:14
113:14 114:14
114:14 115:14
115:15 117:16
117:18 124:20
175:23 176:16
177:18 178:2
179:12 181:6
184:19 189:3,9
221:17,20 222:1
222:3,23 266:10

267:15 283:8,17
284:22 285:17
304:8 348:2
**day's**  118:7
**days**  141:10
153:15 180:5
182:6 184:2
222:15,22
267:17
**deal**  119:20
276:18 314:21
**dealing**  113:13
227:8 257:19
**dealings**  276:21
**dealt**  55:20 94:8
**death**  66:1
218:22 323:13
**decatur**  22:21
**deceased**  1:11
9:23 11:16
**december**  275:5
279:22
**decide**  31:6
97:10 158:10
**decided**  167:19
292:13 302:15
**decision**  159:16
294:18 347:3
**decisions**  44:18
100:16 343:1
**decline**  106:11
107:11 331:11
**declined**  154:20
155:2
**decrease**  223:6
233:12 263:15
**decreased**
151:16

decreases  233:10
deeming  78:11
deep  327:19
defendant
  128:13
defendants  1:17
  5:3 10:13,16
define  23:22
  65:21 123:7
  171:11
defining  216:13
definitive  179:1
definitively
  138:16
degree  42:22
  64:7 122:2
  133:17 142:19
  250:16,19
  281:14 333:8,9
deliver  305:12
delivering  3:9
  117:15
deloach  26:2,5
delve  61:15
demoted  161:14
denote  205:21
denouncing
  144:3
department
  17:21 24:19
  25:9 37:4 39:19
  47:10,17 51:8
  58:1 64:4 70:17
  107:5 112:23
  119:15,17 120:2
  120:23 193:18
  194:15 211:11
  214:20,23

225:10 236:10
248:19 253:5
256:3 274:19
279:7 296:9
298:15 300:4
303:7 309:9
324:1 327:10,12
328:9,10,11
340:2,6 341:5
departmental
  187:13 189:8
  191:9 316:13
depend  48:22
  75:5 97:4 150:8
depended  59:11
  75:4 87:22
depending  59:7
  66:1 237:16
depends  88:8
  124:16 135:18
  137:13,14
  178:12 192:15
deposed  15:4
  16:13
deposition  1:20
  2:4,15,16 3:5
  9:19 10:4 11:22
  12:22 14:6,23
  18:3 284:19
  334:2 338:8
  348:5,9
depositions  2:20
deputy  21:17,21
  53:10,16 54:17
  55:4,21 56:4
  57:4,9,11,13,17
  57:20,23 58:12
  75:10,15,17

77:22 102:18
158:8 160:19
describe  16:15
  20:7 50:8 56:3
  70:4 175:7
  257:1
described  174:4
  184:11 234:1
description
  204:13 282:1
descriptions
  282:2
design  137:15
  197:11,18,23
  228:7
designate  278:16
  298:13
designated
  237:23 292:1
  308:23 309:15
  314:20
designation
  263:16
designed  36:11
detail  68:17
detailed  86:3
details  90:16
  271:11
detection  142:16
detector  293:11
detectors  145:4
determination
  204:5
determine  173:2
determined
  204:2
develop  141:15
  141:16 256:17

developed
  155:12,16 257:3
developing
  40:14,21 60:23
devices  338:3
  340:22
dewayne  11:20
  130:20
difference  53:13
  53:13 54:5
  56:12 66:18
  68:9 104:6
  216:9 232:4
  235:11 236:23
  273:23 285:1
differences  65:1
different  31:10
  31:12 59:2 68:6
  68:8 70:16,18
  72:5 77:9
  110:14 121:9,9
  174:14 205:11
  282:1 330:16
differently  98:16
  330:10,14
difficult  112:2,9
  140:23 145:17
  232:16
dig  271:21
dining  118:2
  123:20
direct  39:21 43:1
  45:11 83:20,23
  84:3 100:3
  116:11 157:8
  231:16 290:21
direction  46:18
  217:22

**directive** 308:5
309:18
**directly** 49:15
58:17 83:22
157:9 165:21
210:2 327:16
**director** 17:19
75:19 78:5
110:22
**directs** 13:17
**dirt** 134:13
**disabilities**
226:18,21
257:22
**discerning**
232:14
**disciplinaries**
232:1,2,3,4
**disciplinary**
213:9 230:13,17
231:2 232:11
266:21 321:20
**discipline**
320:11 334:7,13
334:23 343:23
346:20 347:14
**disciplined**
333:22 334:3
345:10,14
**disciplining**
321:12
**discord** 217:16
218:10
**discovered**
244:14
**discs** 338:12
**discuss** 26:7 45:9
108:18 110:2

128:7 157:7
220:13
**discussed** 12:14
24:17 27:12
100:21 103:18
110:11 129:12
129:17 149:5,9
149:20 151:8
202:7 220:6,15
324:22
**discussing** 25:7
81:3 151:12
171:7 290:23
320:7 326:12
**discussion** 81:8
110:7,7 310:15
330:9 331:18
336:3
**discussions**
42:17 43:16
46:20 99:6,11,12
105:1,6,18 106:3
106:18 110:8
313:11 335:14
335:19
**disease** 272:20
273:18,19 274:1
**dispute** 247:16
287:19
**disseminated**
94:16
**distributed**
74:16 127:20
**district** 1:1,2
10:1,2
**disturbance**
104:8

**disturbances**
218:18 242:20
**divert** 268:13
330:10
**diverting** 108:19
109:18
**division** 8:3
194:7 328:21
339:17
**division12** 17:14
17:15
**divisions** 55:23
56:7,15
**divorced** 63:4
**dixon** 131:12
**doc** 290:6 337:23
338:10,12
**document** 38:5
38:10,14 40:6,11
128:20 129:2,3
131:11 193:12
194:10,13
196:23 224:8
225:4,9 226:4
227:23 228:18
229:4,19 241:2
252:22 253:3
259:7,14 262:4
262:14 274:15
278:23 279:5,6
281:9 282:16
287:10 293:17
299:12,14,15
304:19 306:5,9
314:11 318:3
321:2 323:20
325:15 328:19
339:9 342:19

**documentation**
237:20 259:23
295:18 296:19
**documented**
182:2 186:19,22
207:18 213:6
312:17
**documents**
14:12,14,16,18
51:12 332:3
337:12,15,19
**doing** 44:11
45:15 51:8 64:9
64:10 82:21
90:8 97:12
99:21 119:16
132:5 144:9
153:14 169:10
174:22 185:9,16
186:3,4 190:18
190:19,22 191:8
193:6,7 243:10
251:15 257:9
269:5,7 280:18
283:9 285:14
303:7 314:22
317:9 327:22
328:3 330:9,14
333:22 334:3
345:1
**doj** 6:19,23
328:3
**domin** 326:7
**dominique** 326:7
**donaldson** 19:5
22:20 121:11
137:16 146:23
147:7 232:20

door  174:14
  175:2 253:19
  321:8,13,20
doors  173:16,23
  174:10 217:5
dorm  324:15,19
  324:21
dormitories
  250:8
dormitory
  117:23 122:6,7
double  83:5 85:4
  85:13
doubled  259:12
  259:15
doubt  306:18
  308:8 321:20
doubts  346:6
dowd  2:8 4:14
  9:8 10:18
dozen  125:16
draft  25:14,21
  305:8,8
drafting  308:17
drain  112:20
draper  23:2
drastically
  154:20
dressed  192:7
dressing  192:20
drive  141:14
drives  141:13
driving  186:2
drop  148:9
drug  140:16
  146:11 201:7,16
  202:3,18 238:12
  238:21 261:11

drugs  140:16
  145:21 146:1
  150:1 201:23
  202:10 203:13
  261:16
due  202:1
dug  271:18,20
duke  226:23
  257:21
duly  11:2
dumb  115:9
dunn  1:15 9:23
  10:13 39:17
  53:7 101:21
  102:7,12 103:10
  104:21 108:13
  110:2,20 113:23
  128:4 129:13
  147:18 148:3,12
  148:14 149:12
  151:8 155:23
  156:3,4,10 157:7
  157:21 158:15
  158:19 159:2,8
  161:19 190:11
  190:12 191:5,7
  219:19 220:1,11
  226:9,9,23 246:7
  255:18 256:1
  298:16 302:15
  311:20 335:15
  335:16 336:2
  340:1
dunn's  39:14
  159:16 307:13
duties  44:2,3
duty  7:21 34:7
  60:6,10,14 62:23

63:7,9,9,22 68:4
  68:5,11,20,21,23
  69:3,4,5,8 74:8
  74:20,21 83:16
  87:11 88:3,21,22
  89:7 91:5 94:8
  94:11,14,23 95:2
  96:5 323:23
  326:17 327:6

**e**

e  4:1,1 5:1,1 6:1
  6:10 14:17
  63:14 67:11
  102:9 193:15,16
  193:18 195:8,12
  279:3 282:19
  298:14 302:4,9
  304:22,23 307:3
  307:6,16 308:3
  308:17,21
  309:16 310:19
  311:9,12,18,19
  313:12,13
  337:21 338:1
  340:22 341:6
  349:1,1
earl  3:10 4:5 6:4
  10:20,20 11:10
  11:12,14 52:11
  86:15,22 103:20
  170:16 171:6
  273:1,9 305:19
  306:10,14,16,21
  306:22 341:19
  341:21
earlier  29:1
  38:21 48:2

58:21 70:1 71:8
  99:16 118:18
  119:7 120:10
  132:7 146:19
  154:18 158:4
  161:19 174:4
  183:19 184:11
  188:14 190:1
  202:7,19 213:23
  224:10,16 242:2
  242:7,9 243:5,15
  244:3 248:12
  250:9 252:3
  253:23 255:13
  255:19 264:8
  268:18 269:17
  275:5 278:9
  284:19 294:13
  314:6 316:6,16
earliest  264:14
easier  40:8
  181:14 240:4
easily  251:18,23
easy  90:11
eat  222:18
eating  118:3
ebbed  135:7
education
  222:17
educational
  16:16
edward  1:15
  10:14 72:1,4,12
  72:22 73:6
  129:17 283:18
  311:13
effect  2:17 12:6
  151:18 178:10

338:9 346:19
347:13
**effective** 126:21
**effectively** 335:7
**effort** 251:12
**efforts** 120:19
300:19 303:15
316:23 331:16
**egress** 137:20
**eight** 204:19
265:4,5 266:9
309:6 312:18
**either** 72:3
105:23 131:18
146:16 157:18
174:15 191:6
197:1 201:20
231:9 292:14
318:17 330:22
344:6
**eji** 332:10 333:2
**elaborated**
276:17
**electric** 137:16
292:15
**ellie** 5:5 10:12
**ellington** 1:16
10:14 72:2,5,12
73:6,22 81:8
99:17 129:18
283:18 305:8
311:13 316:2
**ellington's** 72:22
**elmore** 23:2
**email** 6:18 7:10
7:13,17,19
**emerge** 317:21

**emerged** 317:21
**emergencies**
215:19,23 216:4
216:7,9
**emergency** 43:4
47:17 77:8,18
78:12 215:6,9,16
216:8,13,20
242:1,4,15
269:15,20 270:2
**employed** 16:21
17:11,13,21
327:23
**employee** 6:13
34:20 38:11
39:8 96:20
138:18 158:7
326:8 344:1
**employees** 100:7
139:11 169:18
171:13 181:11
214:14 243:1
260:6 264:23
334:14,23 335:7
**employment**
17:2 18:6
**empowered**
281:5
**ended** 37:3
75:23
**ends** 197:7
**enforce** 280:20
333:19
**enforcement**
260:11
**enforcing** 143:19
183:9,11 280:23
333:13

**engage** 163:23
**engaged** 341:2
342:9 343:9
**engineering** 57:6
57:12
**engineers** 75:2
75:11,13,16
77:22 121:19
295:1
**ensure** 45:2 61:7
82:15 83:12,17
97:11 99:3,21
143:17 180:15
322:20,23
**ensuring** 41:4
43:10 49:17,19
62:7 171:14
175:14 190:2
191:3
**entail** 23:21
175:11
**entire** 105:14
165:3 187:4
293:1
**entitled** 21:21
49:4 286:19
**entrance** 293:12
322:6 324:19
**environment**
256:20 335:10
**eputman** 5:9
**equal** 58:12
299:23 300:1
**equally** 52:21
**equipment**
253:16 293:13
**eric** 223:21

**escalated** 151:15
154:8 282:6
**escape** 133:13,16
270:8,13 271:12
275:5,9,11,16
277:6 279:23
**escaped** 271:8
271:14
**escapes** 270:6,15
270:18
**escort** 172:13
**esq** 3:10 4:5,6,13
5:5,11
**essential** 308:10
**essentially**
109:16,19
142:15
**established**
344:12
**estate** 1:10 9:22
**estes** 130:20
149:12,14
**et** 1:16 9:23
46:12 54:15
121:2,2 127:13
127:13,13 143:7
143:7 233:17
235:16
**evaluate** 100:12
**evaluated** 161:5
**evaluating** 97:17
100:7
**evaluation** 101:5
**evans** 223:21
224:1
**events** 60:17
272:19

[everybody - facility]                                    Page 19

**everybody** 27:23
  98:15 112:10
  248:22 249:13
  315:16
**evidence** 3:6
**exact** 238:17
  273:15 296:15
**exactly** 51:15
  122:11 146:3
  164:17 229:16
  264:15 278:11
  297:6
**examination** 6:3
  9:13 11:12
**examined** 11:3
**example** 35:20
  47:7 66:21 86:1
  88:20 89:6,11
  91:1 96:17
  99:15 105:10
  117:5 126:20
  181:11 182:5
  186:9 192:5
  251:16 262:18
  289:15 322:1,5
  335:13,17
**examples** 80:14
**excessive** 151:4
  151:7 281:22
  318:16,18,21
  319:2,3,12,21
  327:18
**excuse** 19:22
  23:9 52:11
  164:6 222:2
  239:12 240:10
  241:22 245:3
  254:14 263:8

272:12 278:20
  278:22 286:15
  300:18 301:23
  318:6 322:1,13
  326:2 337:11
  347:8
**executed** 331:10
**executions** 107:4
**executive** 58:17
  70:6 102:22
**exercise** 117:18
**exhibit** 6:13,17
  6:18,20 7:1,4,7
  7:10,13,16,17,19
  7:21 8:1 38:2,6
  49:9 128:18,19
  128:21 193:11
  193:13 194:9,11
  194:22 225:3,5
  226:1 228:4
  242:7 252:21,23
  274:13,16
  278:17 279:1
  298:13,18
  304:18,20 307:2
  307:4 309:1,8,15
  311:8,10 323:19
  323:21 339:8,10
**exhibithibit** 7:16
**existed** 80:5
**existing** 316:12
**expanded**
  153:16
**expected** 26:18
**expenditures**
  342:5
**experience** 37:5
  37:10 65:6 72:2

211:15,16
  326:23
**expert** 247:21
**experts** 110:20
**expires** 349:21
  349:23
**explain** 15:20
  29:15 30:14
  41:7 42:8 65:13
  68:9 70:4 82:3
  84:16 91:16
  101:13 117:12
  132:3 158:4
  231:10 284:20
  296:10
**explained**
  186:17
**explains** 89:8
  128:17
**explanation**
  160:23
**explored** 250:5
  331:10
**extensive** 201:17
  201:19
**extensively**
  202:14 203:13
**extent** 47:19
  317:18
**extorted** 169:18
**extortion** 150:23
**extortions**
  150:18,20
**extremely** 335:9
**eye** 125:6
**eyes** 285:5

**f**

**f** 114:13 223:13
  349:1
**face** 131:15
**facilitating**
  136:6
**facilities** 22:18
  23:12,18 24:3,4
  24:11 26:8 27:6
  27:8,12,15 28:3
  28:5,7 29:19
  30:12,16 31:6,7
  31:12 33:6,21
  34:15 37:19,20
  40:17 41:1
  48:11,12,16,19
  51:15 56:22
  57:18 58:3 61:3
  63:15 64:19
  72:7 74:19,23
  111:14,16,18
  113:18 115:11
  121:8,10 127:20
  132:9 133:19
  134:3 135:5,17
  142:5 147:1,2,9
  147:16 148:13
  148:22 150:4
  161:21 172:8,9
  177:5 181:2,4,5
  194:3 200:5,6
  212:22 215:22
  233:2 297:2
  333:10
**facility** 18:12,14
  19:6 20:4,6,10
  20:22,23 21:6,14
  21:16 22:14,21

22:22,23 23:1,2
23:3,4,5,6,11
29:2,7,22 30:3
30:21 31:2,9,15
31:17,19 33:11
35:7,16,22 36:7
36:11 41:9
42:13 43:1,2,5
43:20,22 44:6
45:14 50:12
57:4,22 60:18
68:15 72:10,18
75:3 77:1,23
78:8 79:1,5 88:2
88:3 95:9,10
101:15 105:9,17
105:23,23 106:2
106:7 108:20
109:7,10,11,13
109:22 112:17
113:2 114:9
116:5 117:7,10
117:11,13,21,22
120:6,7 122:3,5
122:8 127:11
133:3,5,6 134:14
135:19,20 136:3
136:7 137:14
138:7 144:4,13
145:10 148:23
149:13 152:2,19
152:20 165:3,19
175:19 180:21
181:6 187:3,5,14
188:2,5 191:20
193:5 201:17
206:14 220:23
223:23 225:13

236:6 244:13,16
244:22,23 245:9
245:13 253:8
266:17 277:13
278:14 279:9
280:17,20
284:20,21
290:22 296:2
303:20 309:10
312:2 315:22
316:11 324:2
333:15 334:8
340:12 346:18
346:20 347:12
347:14
**facing** 227:15
**fact** 136:6 176:8
241:19 247:21
329:18
**factor** 85:14
**factory** 17:6,7
**facts** 86:4 275:18
**failed** 67:4,8
191:11
**failure** 67:3
173:14 231:15
**fair** 212:3
263:17 274:1
**fairly** 95:20
193:9
**fall** 105:12
**familiar** 121:20
130:11 151:2
168:6,10 202:9
209:16 278:22
299:16 323:13
323:16 327:10
329:9 337:10

343:21
**familiarity**
327:14
**far** 45:15 137:3
168:2 190:6
273:22 278:11
301:22 315:2
327:19 332:3
**fault** 323:7
**fear** 317:9,10,11
317:11,13 344:1
**feasible** 44:14
265:8,13
**feasibly** 255:22
**features** 317:17
**february** 6:21
194:17
**feces** 204:22
**fed** 236:9
**federal** 3:7 9:5
115:11
**feed** 117:23
**feedback** 44:14
**feeding** 118:6
123:18
**feel** 31:20 110:21
113:6 180:14
184:14 285:7
**fell** 90:14
**felt** 24:14 31:18
31:23 32:3
70:18 71:5
88:17 343:22
**female** 347:17
**females** 278:13
278:13
**fence** 122:16
123:12 134:9

137:2,9 189:1,3
202:10 244:6
271:13,16,17
292:15 330:21
**fenced** 125:19
**fences** 27:15
137:16 202:2
**fencing** 121:17
123:13 124:2,7
250:7 291:20,21
**field** 72:16
**fight** 66:22
114:10 116:20
206:13
**fights** 205:17,22
206:3,6,16
232:23
**figure** 119:18,19
141:11,12
**figures** 230:7
**file** 195:6 231:22
**filed** 3:15 10:1
212:14 227:20
291:7 332:10
**files** 345:8
**fill** 47:19 200:1
**filled** 200:6
230:7
**filling** 91:23
289:17
**filter** 59:10
**final** 300:15
**find** 47:12 82:23
83:3 87:19 90:5
134:21 136:17
140:12 183:4
239:1 299:3
302:10 331:19

finding   245:15
  245:19,20,22
findings   8:4
  287:18,20
  301:18 313:10
  329:10 339:18
fine   226:3
finish   13:1,2,7
  52:10
finished   40:9
  123:3 181:9
fire   54:12
fired   71:1 158:2
  278:4,6 334:5
  345:3
firing   345:11
first   6:17 7:13
  11:2 17:1 18:13
  38:17 40:1 49:8
  51:6 68:12,13
  85:3 87:18
  91:13 119:13
  156:4 201:11
  203:19 215:14
  219:10 223:12
  275:23 288:9
  298:14 299:4,21
  300:17 301:19
  302:18 309:16
  309:16 312:15
  316:9 320:6,13
  322:2 324:13
  332:11,12
  335:22 342:1
  345:20 346:14
fistfight   66:23
five   15:8,10
  30:21 86:14

106:6 109:9
116:8 124:1
153:21 158:13
178:6 222:14
274:10 341:4
fix   35:21 163:1
  292:11 331:16
  332:21
fixed   292:11
  294:4
fixes   163:4
fixing   288:18
  294:11 316:18
  330:20
flip   198:16
  203:19 210:19
  212:1 223:9
  286:23
floor   116:12
  138:6
flowed   135:7
focus   301:1
  303:9
focused   303:20
folks   125:13
  199:11 305:10
follow   51:3
  66:13 199:10
  217:22 260:2
  291:7
followed   25:6
  46:15 52:8
  66:12 68:15
  189:17 244:19
  298:1
following   9:13
  203:4 225:16
  233:18,23

246:20 279:22
291:10 318:13
341:8
follows   11:3
food   204:21
football   134:8
force   2:17 67:6
  148:15 151:4,8
  198:23 259:11
  260:5,16,22
  261:1 317:18,22
  318:16,19,22
  319:3,3,12,22
  327:18
foregoing   9:6
  349:5,9
forensic   340:21
form   3:1 25:2
  26:15 28:12
  29:12 31:22
  34:17 35:17
  41:6 42:2 44:21
  47:2 48:4,17
  52:17 61:10
  67:15,22 81:12
  85:17 86:9 89:3
  89:16 91:11,23
  96:23 100:4,13
  111:15 114:3
  115:2 117:3
  119:1,9,11
  120:15 124:14
  141:21 142:1
  145:23 146:15
  147:11 153:9
  154:22 156:8
  161:7 163:3
  169:19 176:22

181:15 185:13
188:19,20
194:20 197:22
200:19,21 203:2
203:5,8,12 207:1
207:2 208:5,11
208:14 215:18
216:14 217:7,9
217:13 218:11
219:17,22
221:14,22
227:18 229:3
230:1 234:21
236:2 238:4,23
241:17 243:22
251:20 260:14
261:18 271:3
274:6 280:3
319:1,8 325:1,6
326:15 327:1
329:21 330:13
331:7,21 333:16
334:17 335:11
337:8 345:4
349:8
formally   300:21
  303:17
formerly   342:8
forms   175:17
formulated
  110:12
forth   56:23 98:8
  122:19 140:4
  147:2 222:16
forty   204:19
forward   83:5
  92:5 238:10

| | | | |
|---|---|---|---|
| **forwarded** 196:8 | **functional** 322:7 | 104:12 110:10 | 146:23 147:1,6 |
| 208:11 | 324:23 | 161:18 224:11 | 157:2,4 163:18 |
| **found** 234:7,16 | **funding** 76:9 | 236:12 277:6 | 168:2 171:23 |
| 245:4 246:1 | 77:8,13,15 120:2 | 344:7 | 172:1,4,11 |
| 313:1,3 | 121:1 255:16,16 | **gibson** 4:13 | 173:23 174:7 |
| **fountain** 18:13 | **funds** 255:3,10 | 10:17,17 126:19 | 176:4 178:14,18 |
| 21:16 | **furniture** 17:17 | 170:20 272:22 | 182:10 188:2 |
| **four** 16:11 19:2 | **further** 2:13,21 | 273:2 | 190:7,19 209:20 |
| 29:10,14 30:8,19 | 247:5,10 341:17 | **give** 12:15 24:12 | 215:5 232:9 |
| 63:2 113:3 | 349:14 | 44:14 45:18,20 | 233:12 235:17 |
| 121:23 124:9 | | 45:23 47:7 55:7 | 237:20 248:17 |
| 136:18 140:1 | **g** | 58:7 65:22 | 249:3,19 251:6 |
| 158:13 184:2 | **g** 326:9 | 66:20 78:15 | 259:21 263:7 |
| 189:9 212:14,23 | **g2** 275:15 | 80:19 102:6 | 265:20 266:4,22 |
| 274:10 | **gale** 5:6 | 117:17 154:11 | 282:7 285:20,23 |
| **fourteen** 346:12 | **gallatin** 5:7 | 178:23 188:12 | 286:11 293:11 |
| **fourth** 291:3 | **gap** 81:17 | 192:5 224:20 | 304:5 305:17 |
| **frame** 99:8,9 | **gate** 122:12,14 | 239:16 302:16 | 345:8 346:11,13 |
| 130:2,7,9 135:18 | 122:20 137:22 | **given** 12:6 87:7 | **goal** 28:6,9,13 |
| 248:11,13 | 137:22 326:9 | 191:19 254:7,16 | 29:2,6 30:3 |
| 255:23 | **gatehouse** | 284:22 331:8 | 31:15 109:12 |
| **frames** 170:10 | 122:15 | **gives** 68:12 | **goals** 60:13 |
| 248:15 292:19 | **geared** 74:17 | 224:12 233:5 | 273:11,12 |
| **freely** 178:9,13 | **general** 70:9 | **glance** 299:8 | **goes** 58:14 63:9 |
| 316:10 | 84:22 | **glass** 252:1 | 68:16 70:11 |
| **frequently** | **general's** 8:1 | **go** 24:22 31:14 | 82:11 133:21 |
| 317:22 | 339:16 | 31:15,19 32:4,15 | 184:1 190:4 |
| **fresh** 123:1 | **generalities** | 39:7 40:1 45:11 | 282:11 291:6 |
| 152:16 | 234:13,14 | 51:13 56:23 | 293:9 294:17 |
| **front** 122:16 | **generally** 25:6 | 64:5,6,20 70:22 | 327:19 |
| 137:22 293:23 | 41:15 58:18 | 81:7 82:3 85:12 | **going** 9:17 16:3 |
| 324:15,21 | 64:11,14 124:12 | 101:14 105:19 | 18:1 24:18 |
| **fulfill** 59:23 | 138:22 147:1 | 112:14,16,20,21 | 37:23 38:1 |
| **full** 2:17 11:18 | 234:17 260:14 | 113:10 114:12 | 43:14 44:5 48:1 |
| 45:3 61:23 62:8 | **generated** 94:12 | 116:4,19 122:13 | 70:10 81:23 |
| 276:15 | **germane** 216:1 | 122:19 123:19 | 84:7,13 86:17,20 |
| **fully** 60:16 120:8 | **getting** 30:3 | 134:1,12 144:14 | 87:9 89:18 96:8 |
| 323:17 | 61:23 62:7 | 144:16 146:4,5 | 100:23 101:16 |

104:3,6,8 105:19
109:9,10 113:15
114:14,17
116:19 118:2,8
124:20 125:5
126:20 128:18
134:5 137:6
141:17 159:13
163:6 165:22
169:21 171:1,4
179:11 182:1
184:7,12 187:4
192:12 193:10
194:8,8 213:12
222:15,17,18
225:2,3,22,23
227:5 233:22
234:4 235:13,14
235:17,18,18
236:11,13,13
249:9,13 252:21
257:21 258:2
260:18 265:22
265:23 268:10
268:13 273:4,7
274:12 278:15
278:16 285:20
297:5 298:12,13
304:16,17
305:20,23 306:4
306:6,7,22,23
307:1 311:7
313:22 318:9
323:4,18 341:14
344:4 345:2
346:14 348:6
**good** 9:16 45:14
65:3 66:20

86:11 105:13
116:17 134:3
152:2 193:9
215:3 235:5
258:21 322:18
329:3 346:19
347:13
**gotten** 145:1
258:21 310:11
**grade** 50:11
181:17,18
**graduated** 16:22
17:2 109:14
**graduates**
108:20
**grand** 41:13
**grantt** 1:15,21
2:5 9:11,19
10:14 11:1,20
101:2 340:4
348:5
**great** 72:19
119:20
**greater** 68:17
70:14 256:21
**grew** 61:12
64:16 140:17
**grooming**
192:21
**ground** 11:22
41:10 48:7
147:4 286:6,8
**grounds** 3:4
**group** 57:18
218:17 242:19
**guard** 289:18,22
290:3,10 335:18
336:8,15 337:6

**guess** 54:4 65:4
80:23 85:18
88:11 92:11
94:6 101:3
114:19 178:12
208:8 216:10
249:21 251:14
295:11 337:9
343:17,20
**gun** 276:6 277:6
**guns** 245:23
278:1,2
**guy** 152:14
271:8 283:23
**guys** 178:14,18
258:4 285:23
**gwen** 73:14,18
**gwendolyn**
130:10 157:14
157:17

**h**

**h** 6:10
**hacksaw** 275:12
**half** 125:16
134:12 274:10
**hall** 118:3
123:20
**hallway** 276:4
**hamilton** 22:22
22:23
**hand** 38:1
193:10 194:9
211:3 225:2
240:17 278:15
293:11 298:12
306:23

**handcuffs**
317:23
**handed** 194:22
**handguns**
244:10
**handle** 215:8
216:19 242:4,15
269:19 270:1
**handmade**
262:21,22
**hands** 61:19
**happen** 98:1
104:1 140:3
185:7 205:11,14
207:23 215:23
236:16,17,21
310:7
**happened** 61:16
67:7 68:18 85:8
90:8,13 95:14
101:3 103:23
106:22,22 139:5
168:1 210:2,13
212:10 261:3,6
262:16 264:20
303:3 323:15
**happening** 32:10
107:5 115:1
150:9 166:3
184:6
**happens** 44:7
236:18
**harassment**
212:13 213:4
**hard** 81:19
85:18 98:13
233:20 290:15
338:5,11

**harder** 42:18
**hardest** 144:10
**hardship** 105:21
  105:22
**harmon** 305:2
  306:14
**head** 12:18 66:4
  150:2 190:8
  215:4 329:12
**heads** 175:10
**health** 16:6
  257:23
**hear** 12:13 87:17
  239:21
**heard** 131:13
  169:6
**hearing** 120:3
**heavy** 304:8
**held** 10:4 54:1
**help** 248:23
  301:1
**helped** 154:3
  288:22 335:18
**helps** 98:23
  118:12 240:1
**hey** 86:13
**hierarchy** 58:8
**high** 150:11
  202:1,9 221:10
  232:8 257:8
**higher** 54:2
  135:11,16
  147:16 221:1
  300:21 303:17
**highway** 133:21
  186:2
**hillbrook** 95:13
  95:16,16

**hire** 110:5 112:2
  112:13 115:21
  119:10,14,21
  121:6 290:15,16
  335:5,6
**hired** 71:1
  110:17 113:5
  114:8 255:7
  258:8 268:6
  285:12
**hiring** 255:5
  301:2 303:9,22
  333:6
**hitting** 211:3
  240:17
**hold** 19:8 22:1
  116:21 128:16
  328:18
**hole** 163:19
**holman** 20:23
  126:10 152:15
  232:20
**homicide** 65:23
  74:13,14 92:3
  104:2
**homicides** 74:17
  74:18 133:16
  150:12
**hoping** 47:15
**hospital** 265:17
  265:21
**hour** 63:16
  117:18 177:7,19
  182:1 265:5
  267:13
**hours** 87:16,18
  124:20 265:2,6
  265:14 266:1,9

274:10
**house** 128:3
  134:18
**houses** 134:20
**housing** 122:17
  122:18 171:22
  172:2 173:3,4,22
  174:10,14
  175:20 176:4
  189:9 256:19
  286:11 322:7
  342:6
**how's** 310:4
**howard** 5:12
  10:16
**huffman** 1:9
  9:21 11:14
**huh** 193:22
**huhs** 12:18
**human** 290:19
**humanly** 236:10
**hundred** 63:15
  67:10 124:1,9
  233:16
**huntsville** 5:8
**hurricanes**
  106:23
**hypothetically**
  117:6

**i**

**i&i** 34:10 74:9
  275:13
**idea** 18:20 19:19
  21:13 22:12
  33:2 63:2 106:5
  121:18 148:9
  191:7 193:9

226:13,15 233:5
  267:10 270:21
  271:1 336:2
**ideal** 134:15,16
**ideas** 332:23
**identification**
  38:7 128:22
  193:14 194:12
  225:6 253:1
  274:17 279:2
  281:1 298:19
  304:21 307:5
  311:11 323:22
  339:11
**identified** 246:21
  272:14,15
  340:22
**identify** 341:7
**identifying**
  100:10
**ignorance** 137:8
**ii** 20:12 21:3,4
  223:22
**iii** 5:11 21:5,10
  21:15 22:4
  130:17,21
  223:19 314:3
**illegal** 198:19
  202:4 230:6
**image** 258:13
**imagine** 315:15
  315:23
**immediate** 42:20
**impacts** 308:10
**implementation**
  314:4
**implemented**
  289:4 290:1

implementing
  40:15 48:7 61:1
implications
  76:10
important 12:12
  183:3
importantly
  123:17
impossible
  235:23
improperly
  192:7
improve 46:20
  121:7 250:5
  329:18
improved 46:21
improvement
  79:7,9,13 238:20
  241:14 242:14
  243:18 258:19
  258:20 259:3
  261:15 269:22
  314:7
improvements
  35:15 229:21
  274:2
improving 331:1
inability 330:3
inaccurate 91:9
  91:14 203:2
  206:23 224:18
  245:7
inappropriate
  278:10,12
  338:22,23
  340:10 341:2
  343:18

incentive 334:13
  334:22
incidences
  318:15
incident 31:17
  32:9,13,14 33:20
  34:1 41:16
  59:13 60:2,18
  61:9,21 62:21
  63:7,10 65:21
  66:6,11 68:6,14
  68:16,19,20 69:1
  69:3 74:8,21
  86:4,4 87:12,14
  89:1,9,10,12
  91:20 92:1,7
  93:12,15,16,17
  93:20 94:7 95:7
  95:12 103:23
  104:1 152:10
  166:8,11 168:22
  183:2 205:12,14
  209:2 210:5,8,13
  219:2,5 243:4,7
  244:16 312:17
  314:19,22 315:7
  323:16 325:17
incidents 63:20
  66:14,16,19
  67:20 92:2
  104:11,14
  106:21,21
  127:13,14
  132:17,18
  133:10 135:4,8
  182:7,9 204:17
  205:7,10 209:9
  210:22 233:4

241:7 259:12
  260:23 261:4
  262:21,21 264:6
  318:20 327:7
include 107:18
  150:12 256:19
included 100:22
  103:1 253:17
  282:19
including 282:12
  283:11 298:16
  311:21 316:18
incoming 159:10
increase 47:15
  110:15 222:9
  228:21 240:15
  241:12
increased 217:20
  241:1 264:11
  270:9
increases 233:10
  260:5 264:2
independently
  169:13
indicate 89:10
  284:8 325:23
  326:3
indicating 54:15
  56:10 58:19
  91:23 93:22
  97:15 130:2
  140:14 151:17
  152:14 163:19
  209:22 233:21
  284:5 347:7
indicative
  282:10

indirect 83:20
  84:1
indirectly 88:11
individual 93:23
  175:13 223:12
individually
  161:23
individuals
  223:11 224:22
  244:5
infectious
  272:18,19
  273:17,19 274:1
inferior 308:11
influence 342:23
informal 176:12
  176:14 177:13
  177:13
information
  26:18 33:4 36:6
  41:14 44:19
  45:2 55:18,20
  58:21,23 59:7,8
  61:20,22 62:5,12
  82:15 83:11,15
  83:17 84:7 85:1
  87:3,7 91:10
  96:19,19 179:6
  180:16 181:14
  199:14 200:11
  200:12,16,17
  201:3,6 224:11
  224:17 284:6
informed 34:14
  44:18 246:7
ingress 137:19
initial 252:4

**[initially - instructed]**                                    Page 26

initially   148:21
148:21 153:12
153:14 266:7
267:9,11
initiated   153:12
initiative   300:1,2
injured   209:5
injury   203:21
204:1 208:20
210:21 233:1
239:12 240:10
240:23 241:7
243:1 262:20
inkling   139:16
inmate   36:7
48:23 49:3
64:19 67:4
88:22 89:8 91:3
114:11,13
115:12 124:4,17
127:12 132:18
132:18 136:11
141:1 170:1,6
171:8,9,23
172:16,20
174:13 175:8,11
203:20 207:16
208:19,23 209:5
210:20,20,21
217:16 218:3,10
218:23 226:16
229:1 235:9
236:15 239:10
239:11,11 240:8
240:8,22,23
241:6,6,15,15
247:19 251:2
253:20 260:8

262:1,6,11,11,12
262:12,19,19
265:17 270:9
276:1,2,16
277:11 281:3
286:2,9 320:11
321:19 324:14
325:21,21
inmate's   276:20
inmates   40:17
41:1,5 48:3,16
48:18 61:3
115:8,15 116:13
116:14 118:1
122:18 123:14
123:19 124:1,12
124:19 125:19
126:8 136:15
140:21 162:18
163:9 169:18
171:14,18,22
175:7,9 192:6,7
192:9 205:23
206:3,6,13,16,16
206:17,20
211:18 217:17
217:19 218:22
220:21 221:6
222:3 236:7
242:23 251:18
251:23 256:18
256:21 257:8
258:12 260:1
261:2 270:8
275:11,13 277:6
280:21,23
316:10 321:13

inner   89:21
inoperable
173:19,21 292:3
inoperative
320:7
input   92:12
ins   152:4
inside   124:7,23
138:6 163:23
173:22 175:20
175:21 220:22
227:9 244:15
245:8 341:4
installations
17:19
installed   164:15
164:16
instance   32:3,7,8
96:11 97:20
138:23 174:3,3,3
182:6 295:19
326:11,22
instances   16:1
138:18 204:23
237:1 317:19
318:11,14
institute   115:23
238:5 295:3
297:21 300:22
303:18
institution
153:19 190:8
215:7 216:18
242:3 260:5
269:18 295:9
institutional
6:20 7:1,4 22:7
22:13 23:15

25:17 26:1,13
28:5,19,22 32:5
33:3,5,12 35:14
36:4 40:20
43:17 45:10
51:22 58:2,22
59:9 60:23 62:1
62:5 73:1,15
92:23 94:17
95:19 99:13,17
100:9,12,19,22
101:6 108:11
111:21 120:13
120:21 129:19
129:22 130:5
132:8,14 135:3
138:9 143:13,16
145:20 146:18
153:7 154:21
155:3,6,9 158:12
161:15 162:13
164:7 169:22
170:3,14 176:1
179:5 180:13
181:3 186:23
187:2,17 188:1
188:17 189:18
194:16 225:11
225:12 253:6,7
254:11,19
268:20 270:19
272:8 297:10,18
298:9 301:23
323:3
institutions
232:21
instructed
199:21 200:1

**intake** 256:17
**intel** 136:11,12
  144:5
**interest** 64:17
  70:14
**interested**
  349:17
**interim** 158:16
  158:17,22,23
**interstate** 133:22
**interview** 276:1
**interviewed**
  280:10
**introduce** 10:10
  252:20 274:12
  304:16 306:23
  311:7 323:18
  339:7
**invested** 112:19
**investigate**
  340:3
**investigated**
  213:7 277:11
  338:21
**investigating**
  327:18 329:4
**investigation**
  34:11 74:10
  168:20 169:11
  210:5,7 244:14
  244:19,21 275:1
  277:15,18
  327:11,22 328:4
  328:9 329:10
  339:17 340:13
**investigations**
  136:11 169:8,12
  308:1 328:22

**investigative** 7:7
  8:2 274:18
  339:17
**investigators**
  275:14
**investing** 327:17
**involve** 325:8
**involved** 89:11
  90:17 168:17
  218:22 277:14
  292:19 325:18
  325:20 328:7,22
  340:10 342:2
**involves** 71:9
  325:4 326:11
**involving** 89:1
  91:6 240:10
  262:22 330:18
**irons** 318:1
**irregardless**
  75:6
**isolated** 134:4
**issue** 83:1 98:18
  98:23 100:21
  214:18 247:15
  247:17 288:19
  320:8,15
**issued** 281:1
**issues** 26:13,22
  27:2,14 41:17,18
  41:21,22 42:7
  49:4,20,23 89:2
  89:14 97:21
  100:3,11 104:22
  150:3 151:11
  154:19 157:18
  212:2,12 218:6
  227:9 228:15

246:21 263:12
  282:9 287:15
  313:21 326:12
**item** 39:12 76:12
  76:12 178:5
  197:9 202:20
  204:14,20
  206:22 215:6
  242:2 244:1
  269:16
**items** 49:8 199:1
  202:2 204:23
  217:17 226:7
  274:3
**iv** 219:9

| j |
| --- |

**j** 205:3
**jail** 112:21
**jam** 162:19
  250:21 251:2,3
**james** 26:2,5
**january** 193:21
  282:22
**jean** 1:9 9:20
**jeff** 10:13
**jefferson** 1:15
  9:23 39:14,17
  53:7 108:13
  128:4 129:13
  147:18 148:3
  298:16 311:20
  340:1 349:3
**jimmy** 162:18
**job** 37:13 41:21
  54:14,15 60:21
  64:10 70:18
  81:22,22,23 86:6

97:15 98:15
  99:22 112:10,10
  132:6 143:22
  144:14,15 162:9
  168:16 173:15
  174:23 180:19
  180:21 238:1
  248:20 285:12
  292:10 298:8
  317:9 322:20,23
  332:15 333:22
  334:3
**jobs** 56:13 97:12
  283:9 285:15
  345:1
**joe** 141:12
**john** 141:12
**join** 150:21
**jones** 1:16
  130:12 131:17
  131:20 311:12
  313:13 345:15
  345:21 346:4
**jones's** 346:7
**journey** 139:22
**june** 312:19
**justice** 300:1,1
  327:10 328:9
**justin** 275:2

| k |
| --- |

**k** 205:17
**karen** 5:20 10:6
**karla** 1:16
  130:11 311:12
  313:13 345:15
  346:4

**keep** 64:2 70:10
    113:2 134:1
    213:12 215:4
    225:1 243:9
    261:10 285:4
    338:5
**kelley** 5:20 10:6
**kept** 114:13
    181:5
**kicking** 211:3
    240:18
**killing** 125:21
**kin** 349:15
**kind** 27:2 64:5
    75:22 78:20
    85:18 113:6
    134:3 135:22
    148:17 150:21
    154:3 168:13
    219:4 226:5
    234:2 240:3
    258:15
**kinds** 27:4
    162:17 184:3,21
    205:13
**king** 276:1,2
**knew** 71:6
    159:13 169:10
    220:9,12 318:22
**knife** 210:22
    286:10
**knives** 240:11
    262:22 312:16
**know** 13:5,10
    16:14 19:23
    20:4 27:20,21
    32:14 45:14
    52:7,13 54:12

59:6,20 60:5,20
61:6 62:18
64:22,22 65:7
68:14,21 71:5
73:11 75:11,13
76:7,8,15 79:12
79:12 80:4,5
81:18 82:10,18
83:1 85:19 88:9
90:10,12,14 91:8
91:12,13,23
92:17 95:22
96:1,3 97:1 98:2
101:7 104:17
106:22 107:1
109:7 111:10,10
112:2 113:5
114:4,6,6,17
118:6,20 119:15
119:18,18,22
120:22 121:3,10
121:13,18 125:2
127:8 131:12,21
132:21 133:13
133:15 134:17
136:8,13 138:11
140:11,12 146:4
147:17,20 148:2
148:21 151:9,10
152:3,18,19,21
152:22 154:17
158:22 159:12
160:8 161:9,10
161:11,23
162:12,20
166:14 169:1
170:11 171:16
171:17 172:19

177:11,20 183:1
183:2,12,14
185:3,3 187:8,10
188:9 191:13
193:2,8 195:21
195:21 196:16
196:18 199:4
200:3,8 203:17
204:4 205:8,9,12
206:15,18
207:13 208:3,7
208:17 209:7,11
211:8 212:9,10
213:11 216:12
217:14 220:16
223:16 224:4
225:8 226:12
229:6 230:16
236:3,18 243:6
246:2,10 248:13
248:16 252:9,14
254:6 256:11
259:19 261:3,5
264:15,20,23
265:19 269:4,4,6
271:10 272:1
275:8 278:6,8,8
278:10,11
279:10 283:6
284:14 285:17
289:19 290:2,20
291:11 292:9,18
292:19,20 293:3
293:4,4,6 294:2
294:3,5,10 295:2
295:4 296:18
297:4,6 299:7
302:20 308:20

310:14 311:2,3
312:12,12 313:7
315:12,15 320:3
321:16 327:2,3
327:16,19
329:23 333:9
339:2 342:15,17
343:3,5,8 344:6
344:23 345:6
348:1
**knowing** 88:12
**knowledge** 14:1
    27:21 37:10
    173:20 191:5
    219:6 245:5,11
    247:14,14
    282:17 301:20
**knowledgeable**
    43:21 184:5
**known** 138:3
    320:8,15 345:22
**knows** 251:2
**kristi** 193:17
    194:5 195:13
**kuhn** 4:6

**l**

**l** 2:1
**label** 126:8
**labeled** 198:19
    218:17 263:12
    263:13
**lack** 172:13
    173:10 218:2,5
    235:5 255:10
    260:3,4 274:11
    281:5,21 282:10
    317:8 322:2

336:7
**lackadaisical**
  143:7
**ladder** 190:5,6,9
**lane** 2:5 3:8 9:1
  10:8 349:20
**large** 2:7 9:3
  109:7 139:1
  312:23 313:2
  330:2
**lasted** 336:20
**latest** 194:1
**laura** 4:13 10:17
**law** 2:7 9:7 12:7
  117:16 260:11
**laws** 2:18 256:8
**lawson** 5:11
  10:15,15 11:9
  188:20 207:2
**lawsuit** 128:13
  128:23 132:1
  226:11 227:3,19
  337:13,19
**lawsuits** 148:20
**layout** 137:15
**lead** 67:5 346:7
**leadership**
  282:10
**leading** 3:2
**leads** 260:14
**learn** 82:9
  125:18 126:2
  186:13
**learned** 34:20
  186:8
**leave** 32:18
  161:4 228:23
  266:17,17

338:19 339:5
  341:16
**leaving** 214:6,10
  214:15 289:16
  289:23
**led** 340:23 341:6
**left** 32:15 58:16
  134:1 273:10
  276:1 290:13
  297:7 341:16
**leg** 317:23
**legal** 194:6
  195:15
**legislators** 256:2
**legislature** 47:14
  120:1 255:3,15
**legitimately**
  190:14
**length** 329:16
**leslie** 4:6
**level** 18:1 64:4
  64:11,14 66:2
  70:2 72:4,20
  75:5 82:10,11
  84:11 101:10
  103:12 147:15
  149:18 150:11
  153:2 165:19
  180:6 181:12
  183:13 190:15
  190:17 201:16
  232:15 235:22
  237:8 286:2
  319:11 333:15
**levels** 27:5 33:11
  45:15 300:21
  303:17

**lever** 163:22
**lgibson** 4:18
**liability** 227:16
**lie** 161:1
**lied** 82:23 83:8
  98:21
**lieutenant** 19:12
  131:18,20 143:1
  148:15 190:22
  209:12 242:23
**light** 344:2
**lighting** 294:19
**likelihood** 118:5
  265:21
**limestone** 22:20
  105:9,12,16,19
  153:22 268:7,8
  268:10,14
**limit** 124:3,4
  217:3 265:3,4
**limited** 201:20
  237:13
**limiting** 65:8
**line** 39:12
  123:21 194:23
  197:9 217:16
  229:10 242:2
  269:16 282:13
  283:12 309:16
  312:15 316:9
  324:13 326:19
**lines** 139:2
  218:20
**list** 66:13,14,15
  77:11 92:2
  104:11 176:9
  223:10 224:4,5,7
  263:19 294:16

302:9 332:5
**listed** 49:8,15
  59:21 60:11
  129:9 226:7
  273:11,12
**literally** 83:22
  115:13 126:15
  190:21
**litigation** 226:8
**little** 15:20 42:9
  58:6 63:5 84:17
  94:2 121:21
  141:14 146:19
  148:19 154:3
  206:15 283:5
  332:9
**living** 175:21
  253:20 264:2
**lkuhntha** 4:11
**lobby** 276:4
**local** 112:21
**location** 134:16
**lock** 121:10
  124:18 163:2,13
  174:5 240:11
  250:17,18,21
  251:2,4 253:22
  255:9 258:4,5
  320:19,23 321:5
**lockdown** 117:7
  117:9 118:1,20
  126:21,21 174:2
  188:2 245:14
**locked** 117:10,13
  117:14 174:19
  236:6 244:22
**locking** 124:18
  163:22 187:3

**[locking - mandated]**                                    Page 30

244:13 253:19
**locks**   27:15
    35:21 36:1
    121:16 126:22
    132:21 162:14
    162:19,19
    163:11 164:2,3
    173:19,21 217:4
    250:7,10 254:12
    254:21 255:13
    255:19 316:18
    320:7 330:20
**log**   179:21,22
    182:1 306:17,20
**logged**   315:5
**logs**   181:23
**long**   54:14 73:6
    92:17 98:15
    109:5 141:5
    177:23 195:18
    258:6 264:23
    292:9 329:15
    348:2
**longer**   179:2
**look**   26:20 38:16
    44:13 47:3
    58:13 85:10
    141:2 158:10
    160:20 182:11
    191:14 196:5
    215:2 219:8
    228:15 229:5,13
    232:18,19
    233:20 238:15
    240:21 244:1
    258:9 261:22
    262:10,18
    272:12 294:15

309:6,14 313:23
    332:1 340:17
    341:23
**looked**   47:8
    224:16 225:17
    228:1 234:5
    252:4 261:12
    263:17 269:17
    308:19 332:6
    337:18,21
**looking**   84:8
    86:8 182:16
    200:4 201:2
    233:9 237:17
    239:3,10,17,23
    249:14 261:10
    262:16 273:10
    318:10 332:12
    332:13
**looks**   279:3
**loop**   141:8
**lose**   96:14,22
    152:23 153:4
**losing**   334:23
**lost**   106:9 168:16
    247:9
**lot**   15:18 23:12
    25:10 37:10
    44:17,17 68:2
    71:8 81:21
    101:18 134:6
    139:1 150:19,20
    150:22,22,23
    168:3 211:11
    212:15,16,21
    214:1 231:1
    297:13,14
    314:16 326:11

329:14 344:5
**low**   232:7 263:13
    280:17 281:21
    285:5
**lower**   115:4
    213:3 266:3
**lucky**   115:21
**lunch**   170:18
**lunging**   204:16
**lying**   98:17

**m**

**machine**   293:10
    293:23 294:8,12
**mad**   235:16,16
**mail**   102:9
    193:15,16,18
    195:8 279:3
    282:19 298:14
    302:4,9 304:22
    304:23 307:3,6
    307:16 308:3,17
    308:21 309:16
    310:19 311:9,12
    311:18,19
    313:12,13
**mailed**   63:14
    67:11
**mailing**   195:12
**mails**   14:17
    337:21 338:1
    340:22 341:6
**main**   85:14
**maintain**   300:20
    303:16
**maintaining**
    40:16,23 61:2

**maintenance**
    57:2,12 75:3
**major**   32:9
    68:14 77:4,5
    107:4 120:6
    132:17 133:9
    135:8 148:22
    194:2 230:12,17
    231:1,14,23
    232:3,10,10,10
    233:4 239:13
    297:2 317:21
**majority**   191:17
    330:2
**making**   99:5
    125:4 171:18
    251:12 254:23
    323:1 331:16
    347:3
**male**   37:19
    48:11,18,18
    77:23 194:2
    347:7
**malfunction**
    291:9
**malfunctioning**
    292:8
**man**   122:10
**manage**   20:9
    117:1
**managed**   270:8
**management**
    20:9 282:12
    283:11
**mandate**   46:13
**mandated**   44:10
    265:1 266:11,13
    266:18

**mandates** 45:18 45:20,23 266:7
**mandatory** 263:23 264:22 269:1,5,7,11 339:4
**manned** 137:11 137:18,19,20
**manner** 125:10
**manning** 115:18 115:19 116:1 120:9 127:12 138:2,11
**manufacture** 249:3
**march** 299:1 301:13,13 307:8 308:3 309:17 340:8
**maria** 131:13
**marijuana** 146:5 146:6
**mark** 38:1 128:18 225:3 252:21 304:17 307:1
**marked** 38:6 95:11 128:21 193:11,13 194:11 225:5 252:23 274:16 279:1 298:18 304:20 307:4 311:10 323:21 339:10
**marketing** 47:12 110:14,18,19 121:2 249:14

**match** 212:6
**math** 37:6 205:6 205:8,9 241:10 241:13
**matter** 9:20 200:23 248:20 260:10
**max** 31:7 126:15
**maynard** 5:6 10:13
**maynardcoope...** 5:9
**mcdonald's** 248:22
**meals** 117:15 236:9
**mean** 15:22 23:9 30:10,20 33:18 53:17 54:11,23 56:19 76:12 77:11 78:6 80:11,12 81:19 84:17 85:2 93:21,23 98:5 110:4,6 112:4 124:4 128:1 133:18 151:6,15 155:17 158:22 161:1 168:15 181:17 183:14 197:19 199:17 200:4 207:17 208:4 213:20 215:23 222:21 234:14 245:3 249:7 266:3 267:22,23 273:18 283:20

283:21 297:6 298:4 300:11 312:13 322:12 329:2 334:6 335:8
**meaning** 116:11
**means** 41:9 118:1 123:7 135:15 136:21 161:14 173:1 197:15 207:20 213:17 231:16 247:10 349:6
**meant** 70:5 109:1 216:13
**measured** 96:8
**measures** 145:14 316:17
**mechanics** 89:21
**mechanism** 50:10 163:17,23 179:3 250:18
**mechanisms** 250:19 253:19
**media** 9:18 119:17 120:19 330:19
**medical** 204:3,6 204:7,10 216:7
**mediocrity** 282:14 283:13 284:9
**medium** 135:20
**meet** 23:23 24:2 54:14
**meeting** 32:12 32:15,18,23 76:1 77:3 78:18,21,22

78:23 79:4,8 80:6 81:3 83:19 86:6 100:7 102:14,16 220:14 294:14
**meetings** 24:7,10 24:16,22 25:3 26:9 27:19 75:7 79:21,23 80:3 102:11,21,23 103:2,19 110:13 315:10,12,13
**member** 153:18 153:18 235:21 284:3
**members** 168:17 168:18
**memoranda** 80:7,8,18 81:2 86:2
**men** 317:23
**mental** 16:6 257:22
**mention** 90:6
**mentioned** 25:13 41:20 42:5 45:17 53:7 65:7 67:9 70:1 71:7 81:9 86:23 91:15 99:11,15 101:4 107:8 108:17 112:1 118:18,20 119:7 120:10 123:12 132:7 133:9 135:13 142:6 149:3 150:10 155:11 158:3

166:4 173:6
174:22 175:3
188:14 202:19
246:17 248:4
264:8 275:4
297:13 316:16
330:17
**mentioning**
237:5
**mentions** 275:13
**mercado** 307:18
307:23
**merit** 53:14,15
53:20,21 54:6,9
54:9,14 158:7
160:15
**met** 14:10 24:5
75:8 99:8 315:1
345:20
**metadata** 195:6
**metal** 145:4
293:11
**method** 331:19
**microwave**
291:8,14,22
292:20
**middle** 154:16
164:20 198:17
**midway** 341:23
**mile** 134:12
**millimeter**
275:15
**mind** 55:11
215:14 259:5
334:21
**mingle** 217:4
**minimum** 28:14
280:19

**minor** 232:3
**minute** 48:1
86:14 126:7
**minutes** 27:18
27:22 28:1
32:23 33:1
78:19,20,21,22
78:23 79:4,8,10
102:20
**misconduct**
169:2 344:2
**misquote** 107:10
**missed** 69:9
**missing** 291:4
293:11
**mississippi**
16:19
**mistake** 98:19,22
**mistaken** 238:4
255:6 266:6
**mistakes** 99:5
**moderate** 201:19
**module** 89:22,23
91:16,20,21 92:5
92:12 93:15,16
93:17,20 94:12
95:12
**moment** 55:11
55:13 163:5
325:12
**monday** 102:15
**money** 112:18
112:19 119:15
119:20 125:13
255:2 277:5
**monitor** 295:14
300:3

**monitoring** 7:13
299:4 312:2
315:7
**montgomery**
5:14 144:5
**month** 75:9
139:15,18
186:10 187:7
312:18
**months** 112:18
139:20 158:14
256:10,11
**morale** 212:3
263:13 280:17
281:21 285:5
**morning** 9:16
87:19 104:5
267:5
**morrison** 298:22
311:20
**mosley** 73:14,18
130:10 157:14
157:17
**mounted** 165:20
**move** 43:23 44:2
44:6 83:5 92:5
109:12 178:9
184:16 207:4
212:11 260:16
291:2 316:11
321:22,22
341:19
**moved** 163:9
**movement**
169:23 170:5,10
171:8,10 172:17
172:20 173:8,12
222:9,13,15

270:10 316:7,19
322:5
**moving** 222:4
238:10 280:22
**multiple** 57:17
182:6 205:13
218:21 242:22
249:21

**n**

**n** 2:1 4:1 5:1 6:1
**name** 10:6 11:13
11:19 16:7 93:7
102:4 129:8,9
131:14 138:20
139:6 163:19
196:4 225:12
253:7 302:4,8,11
310:9,19
**names** 55:9
71:20
**narrative** 89:7
90:3 91:2
238:17 261:11
**national** 115:23
238:5 257:19
279:18 295:2,9
295:14,15
297:21 300:22
303:18 335:17
336:8,15 337:5
**natural** 61:15
66:1 82:18,22
151:20
**nearly** 72:19
259:15
**necessarily**
30:13 46:6 68:1

72:15 104:20
109:23 113:9
128:2 136:22,23
137:17,19 144:6
154:6 155:7
198:15 222:10
222:21 224:23
232:6 257:16
265:8,12 292:12
**necessary** 2:22
24:3
**necessity** 179:20
**need** 13:4,6
42:15 46:6,13
70:20,21 76:14
91:12,13 94:4
99:7 107:2
117:9 118:21
174:15 192:18
265:17 267:5
335:22 341:17
**needed** 24:13,15
31:18,20,23 71:5
77:7,10,15 88:17
98:10 105:20
133:2 172:4,11
257:12 294:20
**needs** 43:21
116:5 256:3
**negative** 201:10
346:18 347:12
**negligent** 132:5
**neighborhood**
19:2 23:13 37:8
134:18 189:12
**neither** 190:12
190:13 349:15

**nerves** 124:21
**never** 69:9 85:19
85:20 102:22
108:6 247:16
282:16 285:21
286:1,4 289:1,2
289:4,4 302:23
310:17 331:17
337:21 339:13
347:2
**new** 4:9,9 47:9
105:7 119:3,16
120:19 125:19
152:7 163:13
282:14 283:13
284:9
**newbie** 152:11
**news** 120:4
333:10,11
**nic** 296:5,7,11,12
296:13 301:11
303:6 304:4
**night** 134:10
221:1,21 222:4
242:22
**nine** 149:1
256:11
**nods** 12:18 150:2
**norm** 85:7
**normal** 282:14
283:13 284:9
**normally** 25:3
25:18 46:4,14
55:22 103:7
137:20
**north** 2:9 4:15
9:9 10:5

**northern** 1:2
10:2 22:17
157:16
**notary** 2:6 9:2,3
**noted** 308:11
**nother** 151:22
**november** 1:22
2:10 3:12 9:11
9:18 312:18
**number** 28:15
31:13 34:22
40:13 42:14
47:11 72:10
106:10 109:8
115:5 127:12
132:17 135:4
185:9 202:1,3,9
202:18 204:14
211:17 213:4
226:6 230:12
231:4,7 233:9,9
233:12,17,18,19
243:12 257:8
264:5 270:5
299:11 300:15
304:6 324:8
335:6,23 336:8
**numbers** 105:11
107:9 109:22
110:15 116:7
211:6 215:3
234:5 237:2,7,13
237:19 249:17
259:16 266:4
**numerous** 28:23
69:21

**o**

**o** 2:1
**oath** 11:23
**obey** 67:4 231:16
**object** 13:15
25:2 26:15
28:12 29:12
31:22 34:17
35:17 44:21
47:2 48:17
52:17 61:10
67:15,22 81:12
85:17 86:9 89:3
89:16 91:11
96:23 100:4,13
111:15 114:3
115:2 117:3
119:1,9,11
120:15 124:14
141:21,23
145:23 146:15
147:11 153:9
154:22 156:8
161:7 163:3
169:19 176:22
181:15 182:13
185:13 188:19
188:20 197:22
207:1,2 208:14
215:18 219:17
219:22 221:14
221:22 227:18
229:3 230:1
234:21 236:2
238:23 241:17
243:22 251:20
261:18 271:3
274:6 280:1,3

306:4 319:1,8
325:1,6 326:15
327:1 329:21
330:13 331:7,21
333:16 334:17
335:11 337:8
341:14 345:4
**objection** 306:3
**objections** 2:23
3:3
**objects** 13:14
**observation**
320:10
**observed** 137:11
192:2
**obstruct** 250:11
250:12
**obstructed** 164:4
**obstructing**
163:2,14 321:13
**obstruction**
320:10
**obviously** 53:7
**occupied** 276:4
**occur** 35:12
96:13 124:7
132:18 185:5
189:5 254:2
264:13
**occurred** 31:17
32:13 41:16
66:11 74:18
91:4 190:2
210:14 217:19
235:20 264:16
264:18 270:19
**occurring** 60:17
179:7 349:12

**occurs** 94:7
124:23 173:8
**ocean** 95:14,15
95:15
**october** 18:7
39:6 338:15,16
**offense** 48:23
274:21
**offer** 43:7
295:20
**offered** 3:5 43:8
43:12 46:3
**office** 8:2 25:1
339:16
**officer** 7:21
18:10,23 34:8
42:11 44:7 60:7
60:10,14 61:13
62:23 63:8,9,22
67:5 68:4,5,11
68:20,22,23 69:3
69:4,6,8 74:9,20
74:21 83:16
87:11 88:3,21,22
89:7 91:5 94:8,9
94:11,14,23 95:2
96:5 112:6
113:21 114:11
116:10,11,12,15
116:21 136:17
165:17 176:9
208:22 209:5
229:1 242:21
260:13 265:16
275:2 276:18,21
290:6,17 320:9
323:23 326:17
327:6

**officers** 44:1,3
113:19 121:6
138:5 143:18
166:4 186:8
220:22 221:6
222:1 265:16
266:12 280:20
317:22 321:7
**offices** 2:8 9:7
98:6,7
**official** 175:22
175:23 290:2
**officially** 159:12
278:12
**oh** 29:16 78:3
147:22 201:21
278:17 291:15
**okay** 14:9,19
15:12 16:7,15
17:4,7,10,20
18:3 19:18
20:11,21 21:1,9
25:5 28:2,14
29:16 32:2 33:3
33:18 36:21
39:5 45:5,7,17
49:7 52:2,12
57:16 60:6
62:23 63:6,11
66:9 78:17
79:19 86:16
93:16 96:4 98:3
99:2 103:21
121:22 123:11
127:1 132:7
136:21 158:1
160:20 170:22
184:16 186:23

193:10 196:5
197:3 201:7,21
203:10 205:17
207:4 208:19
210:16 212:1
214:12 217:10
217:15 220:20
226:2 230:3
237:4 238:10
240:2,5 246:5
252:17 271:15
280:14 287:11
291:18 293:9
306:10,21,22
309:22 311:7
314:2 320:4,17
321:17 323:12
325:16 327:9
338:14 341:20
347:15,22 348:4
**once** 14:11 28:7
29:2,7 43:8 64:3
75:8 102:15
147:3 176:19
246:3 295:16
321:3
**one's** 122:2
**ones** 230:20
**ongoing** 270:10
**online** 128:2,2,3
**open** 117:11,21
117:22 122:6,20
144:19 174:15
285:5
**operate** 116:6
148:17 336:9
**operating** 36:11

**operational**
279:9 308:7
309:10,20
310:21 346:19
347:13
**operations**  20:10
25:19,23 31:11
37:19 50:13
63:12 74:7
78:18 97:9
107:16 108:8
127:2 129:23
130:8 148:2
160:21 164:13
167:8,11,18
168:9 169:16
191:18 196:9
305:10 310:22
318:7 319:7
328:7 329:20
**opinion**  188:21
250:23
**opportunity**
26:12 54:18
113:12
**opposed**  90:18
**ops**  105:15
**option**  336:5
**optional**  331:22
**options**  268:3
331:9
**oral**  3:11 9:13
**order**  64:2 94:4
231:16 295:23
346:20 347:14
**orderly**  222:12
222:15

**orders**  260:2
**org**  58:14
**organization**
279:13,19 295:4
295:8,14
**organized**  57:10
**original**  3:10
109:13
**outdated**  294:9
**outnumber**
115:15
**outnumbered**
116:8 285:1,2
**outright**  217:21
**outs**  152:4
**outside**  49:7
61:18 72:13
322:6
**overall**  51:16
233:19
**overcrowded**
197:20
**overcrowding**
198:13
**overlap**  56:20
**overlapping**
56:17
**overlooking**  44:5
**oversaw**  37:17
37:18 204:7
**overtime**  263:23
264:22 265:1
266:8,11,12,13
266:14 267:12
269:1,5,8,11
281:22
**overview**  58:7

**p**

**p**  2:1 4:1,1 5:1,1
**p.m.**  324:3
348:10
**package**  244:9
**packages**  136:18
**packer**  17:9
**page**  6:3 38:17
39:8 40:2 49:8
197:4,6,7 198:16
198:18 203:18
210:19 212:1,12
215:5 217:15
218:16 219:7
223:10 226:5
228:2,3,4,13
229:8,17 230:4
239:1,6,8 240:1
241:22 242:19
243:11 253:13
253:15 259:6
261:22,23 263:7
263:10 269:14
270:4,4 272:11
275:21,21
276:15 279:4
280:14 286:14
286:16,23 287:1
290:21 291:2
298:14 299:21
300:9 303:11
309:7 311:23
312:14 314:2,8
316:5 317:15
320:5 340:16
346:14
**paid**  285:7

**paint**  251:8
**pants**  284:1
**paper**  163:21
**paragraph**  196:6
229:10,15
275:23 276:16
280:15 282:8
291:3,4 317:16
320:6,14 321:23
342:1
**park**  2:9 4:15
9:8 10:5
**part**  28:10 32:12
46:8 48:10
59:20 76:11
82:13,14,19
97:15 98:17
105:4 137:4
142:6,12 150:23
151:23 152:2
168:19 182:17
198:13,13
257:23 276:17
277:5 280:10
283:8 299:22
314:18 315:9
333:13
**participated**
223:11
**particular**  32:3
82:7 90:7
123:15 137:9
161:23 163:5
173:3 209:8
215:22 227:6
**particularly**
21:8 54:23
87:12 162:8

184:4 226:12
256:21 304:14
**parties** 2:3 3:3
342:2 349:16
**partners** 341:9
**pass** 172:6,9
**passive** 217:20
**pat** 185:1,6,6,10
185:14,16,18
186:10,21
**patrols** 141:4
**patterns** 141:16
141:16 142:8,16
142:17 317:21
**paul** 42:23
268:16
**pay** 42:23 84:13
84:18 140:22
181:17,18 264:3
264:10
**payment** 276:19
**penalty** 12:2
**people** 42:14
43:1 47:16
62:13 64:4,8,14
70:2,12 71:9,12
71:14,17,19,22
71:23 75:20
82:16,20 83:12
83:18,21 87:1
95:14,16 96:15
97:11 106:6,10
106:16 110:10
112:12,13
113:17 115:22
116:22 119:14
124:9,10,10
131:16 134:22

136:10 141:16
142:9,14 144:13
145:9 152:5
153:4,20 156:7
156:12,13,18
157:9 169:13
175:20 176:2,4
190:17 214:1,5,6
214:7,9 217:3
222:15,16,17,17
224:13 235:10
236:11 247:8
248:18,18 249:1
249:9,16 257:12
257:17 266:19
267:2 268:6,9
284:17 285:4,12
285:14 290:16
295:21 296:20
298:15 302:9
336:4 347:20
**people's** 173:14
**percent** 63:23
106:1,2 108:6
197:10,13,16
201:8,9,10
202:20 213:14
213:16,19 228:6
228:8,16,20
238:13 241:12
**percentage**
247:7
**perform** 162:9
**performance**
6:13 38:11
83:10 97:18,22
100:8 157:2,4
224:7 308:11

**performing**
83:13 157:1
**perimeter** 138:1
141:4,13 188:23
291:16,16
294:19
**period** 28:21
38:17 51:11
63:16 106:11
117:17,19
149:23 155:4
177:7,19 179:2
269:3 282:21
312:18 319:13
**periods** 43:5
175:18 258:6
**perjury** 12:2
**permanent**
109:2 110:2,4
158:7
**perry** 5:13
**person** 55:10
64:10 71:23
72:1 75:12,14
82:7,9 86:5 90:8
104:3,7 105:18
105:19,22 113:7
113:8,9,12 140:5
140:7,9 145:8
152:9 158:6,9,23
160:15,17,18,22
175:14 183:5
184:6 190:13,20
192:17 237:22
250:20,21,21
266:23,23
283:19 285:19
291:5 314:15,21

334:7
**personal** 1:9
9:21 319:18
338:3
**personnel** 53:15
54:10 290:9,16
**perspective**
140:17 296:19
**pertains** 216:2
**peter** 42:22
268:15
**pettiway** 1:11
9:22 11:16
323:14 324:9,14
**pettiway's** 325:4
**phased** 51:10
**phillip** 131:12
**phone** 69:16
81:2 88:1
104:16 146:14
**phones** 140:18
140:19
**physical** 133:3
**pick** 87:23
152:18 184:7
**piece** 140:20
141:14 163:21
321:19
**pill** 222:18
**pistol** 275:15
**place** 2:9 4:15
9:8 10:5 31:13
46:22 66:10
70:12 87:16
92:18,22 93:2,6
112:13 118:4
121:3 145:5
152:12 183:2,6,6

199:15 215:15
232:12 245:13
245:15 249:4
256:7 258:16
267:18 269:12
288:7,14,15,22
289:8,12 290:12
290:13 291:22
317:19 331:23
332:19
**placed**  165:10,12
257:10 339:4
**placement**
256:19
**placements**
107:21 108:2
**places**  42:18
134:22 201:5
**plaintiff**  1:12 4:3
6:12 10:19,21
**plaintiff's**  38:2,6
49:9 128:19,21
193:11,13 194:9
194:11,22 225:3
225:5 252:21,23
274:13,16
278:16 279:1
298:13,18
304:17,20 307:2
307:4 309:1,15
311:8,10 323:19
323:21 339:7,10
**plan**  116:4 217:2
258:10 296:23
297:1 310:12,23
**plans**  297:2
**plant**  133:3

**plastic**  144:20
163:21
**plateaued**  154:7
**play**  107:3
**players**  152:20
**please**  3:13 10:9
11:18 12:15
13:5,10 62:22
65:20 83:14
86:10 89:5
100:5 170:2
219:8 243:11
259:7 275:20
299:3 317:16
**pleasure**  53:22
54:7,13
**plus**  126:17
**point**  20:2 21:22
37:20 51:7
65:20 75:5
76:18 107:8
110:12 116:19
116:21 120:6
123:21 124:21
125:5 139:23
153:23 172:4,4
264:18 290:1
296:14 335:14
**points**  98:20
**polices**  280:21
**policies**  40:15
54:10 61:1
143:19 303:10
316:13
**policy**  25:8 52:5
52:7 66:8,12,12
66:13 143:3
171:21 176:18

176:20 187:8,11
187:12,13,14
189:8,16 191:9
191:14 256:16
267:9,10,11
**population**
115:12 117:1
121:23 122:9
124:5 127:12
165:7 170:1,6
172:1 218:3,6,23
257:7 281:4
335:10
**port**  272:2,5
292:23
**portion**  235:6
**position**  18:17
19:7,8,11,13
20:2,12 21:20
22:1,6 25:15
36:15 53:21
54:6,6,9,17,20
56:4,12 57:9
61:14 72:23
73:3 74:6 86:7
158:13 159:9
161:4,6 179:4
289:18,22 290:6
290:11 335:3
338:19 346:16
347:10
**positions**  55:7,13
57:2
**positive**  95:10
201:9,10 202:3
202:18,20 238:8
238:13

**possibilities**
294:7
**possible**  52:14
52:15,18 59:23
206:2,5 207:8,11
215:16,19
236:10 252:12
252:15,16
255:22 301:1
302:12 303:21
337:9
**possibly**  120:16
120:17,18 133:1
328:12
**post**  136:15
211:23 266:16
266:17 267:1,7
**posted**  127:4
**posts**  304:6
**potential**  100:10
226:8 227:16
341:8
**potentially**
108:18 142:7
257:11
**powers**  68:13
**pq**  322:7 324:15
324:17,17,19,21
**preappraisal**
6:14 38:12
**precedence**
76:22
**predator**  236:16
**prefer**  325:11
**preference**
176:23 177:2
**prepare**  14:5

**present** 5:18 218:6 236:1 326:4 327:21
**presented** 333:1
**presiding** 57:22
**presumably** 94:16 99:20 119:2 137:8 336:15 337:3
**pretty** 69:10 93:5 105:13 110:21 131:16 177:6 209:13 258:9 329:15
**prevalent** 35:8 162:21
**prevent** 143:14 163:7
**previous** 226:1 228:4 229:2,15 229:16,17 230:9 239:8,14 242:10 247:9 261:12
**previously** 17:20 228:1 269:17
**price** 72:5,6,21 73:18 130:1,4 157:14,16 311:13 346:4
**price's** 73:3
**primarily** 37:16 56:12 173:22 174:21 279:14
**prime** 330:4
**print** 84:14,19
**prior** 3:6 214:18 228:21 238:18 240:15 254:11

258:17 281:12 289:1,2,5,15,23 292:13 303:8
**prioritizing** 289:17
**priority** 76:17
**prison** 26:8 37:11 61:8 62:9 114:1 115:9,13 115:16 117:1 119:5 126:12,15 134:17 142:17 146:11,14 173:8 178:9,11 182:9 207:8 209:15 216:3 218:6,7 221:13 227:9,15 232:15 260:12 271:18 293:20 322:5 335:8,10 343:15
**prisoners** 178:8
**prisons** 134:22 135:1 148:17 184:6,13 211:13 329:6
**privilege** 306:6 306:13,17,20
**probable** 207:10
**probably** 24:8 29:13 30:9,19 31:8 35:8 46:1,3 46:4 60:3 72:3 81:20 94:2,4 97:3,4 105:14,14 108:12 110:22 114:17 117:16 131:14 150:5,7,7

150:8,19 152:2 179:10 180:9,11 186:12 189:10 203:3 205:9 255:1 256:1 315:17 333:17
**probation** 160:16 161:8,9
**probationary** 161:5
**problem** 56:22 57:4,6 107:21 108:1 110:9 124:7 132:20,22 136:4,5,9 143:23 144:2 149:17 156:13 164:3 170:1,7,12,13,15 190:16 192:3 215:13 222:19 247:13 250:15 268:19 269:1 285:18,21 286:18 308:9 318:23 320:19 320:23 321:6 332:10 333:5
**problematic** 147:12,13,14 149:16 297:16 317:19 322:11 322:14 343:14
**problems** 115:7 115:8 156:18 162:16,17 268:12 287:6 301:1 303:21 304:15

**procedure** 3:8 9:5 143:4 145:5 293:12
**procedures** 25:8 40:15 61:1 107:1 177:3 215:6 242:1 256:17 257:2 269:16
**proceeding** 11:17 13:15 349:5
**proceedings** 9:14 349:12
**process** 75:22,23 85:21 112:13 182:17 196:12 223:12 256:14 290:11
**processed** 256:18
**processes** 258:9
**produced** 238:5 306:19 310:8 349:7
**profession** 70:7 162:2
**professional** 188:21
**proficient** 140:18
**program** 155:11 155:12,16 258:16
**programs** 256:19 307:22
**prohibit** 143:19

**prohibiting**
281:2
**project** 76:18,20
123:12,13
253:22 254:23
254:23 294:16
**projects** 77:9,12
294:12
**promising**
305:12
**promoted** 18:15
19:15,20 20:1,11
21:3,9,17 22:4
36:14 38:23
73:16 93:5
158:14 170:5
195:18,22
**proper** 255:3
**properly** 292:6
322:16 345:1
**proposal** 122:15
**proposed** 256:16
**protest** 134:23
**proven** 167:15
207:22
**provide** 60:22
62:20 226:16
295:16
**provided** 33:5
33:10,19,20 34:5
34:7,10 36:5
58:22,23 59:1
61:20 120:1
200:12,16 201:1
259:2 282:2
302:14
**provides** 40:19

**providing** 287:5
**proximity** 244:4
**public** 2:7 9:2
134:2,5,7 135:23
244:2,4 272:17
272:18
**pull** 153:21
163:1 179:21,22
285:19
**pulled** 153:18
181:23 186:3
**pulling** 153:20
153:20
**pulse** 64:2
**puncture** 90:12
**punishment**
232:5
**pursuant** 9:4
308:4 309:18
**pushed** 76:13,21
**pushing** 125:8
204:15
**put** 25:9 38:2
43:11 46:22
73:14 92:6
105:21,22 111:4
112:18 117:6,7,8
118:17,18 120:5
131:15 137:16
138:5 141:3
144:20 145:4,4
161:6 192:13
212:18 227:6
232:21 249:3,4
250:16,17 251:9
251:10,17,22
258:10 260:16
260:18,19,20

267:17 269:11
288:7,13,21
289:7,12 290:12
291:22 292:15
321:19 346:10
**putman** 5:5
10:12,12 11:8
25:2 26:15
28:12 29:12
31:22 34:17
35:17 44:21
47:2 48:17 52:9
52:12,17 61:10
67:15,22 81:12
85:17 86:9,13,16
89:3,16 91:11
96:23 100:4,13
103:15,21
111:15 114:3
115:2 117:3
119:1,9,11
120:15 124:14
141:21,23
145:23 146:15
147:11 153:9
154:22 156:8
161:7 163:3
169:19 170:18
170:22 176:22
181:15 182:13
185:13 188:19
197:22 207:1
208:14 215:18
219:17,22
221:14,22
227:18 229:3
230:1 234:21
236:2 238:23

239:23 241:17
243:22 251:20
261:18 271:3
274:6 280:1,3
305:17 306:2,12
306:15,18 319:1
319:8 325:1,6
326:15 327:1
329:21 330:13
331:7,21 333:16
334:17,20
335:11 337:8
341:14,20 345:4
**puts** 94:8
**putting** 51:12
81:1 118:4
174:5 266:6
290:12

**q**

**qit** 79:14 80:3,6
314:4,9,14,17
315:11,13,16
**quad** 121:19,22
122:9 123:18,23
**quality** 79:7,9,13
86:6 314:7
**quantify** 216:7
**quantitate** 146:3
**quarter** 28:8
29:3,7,23 30:4
**quarterly** 24:8
24:10,16 31:16
**quarters** 253:15
287:2
**question** 13:8,9
13:12,17 24:21
25:16 31:1 42:4

53:4 54:5 55:15
62:17 67:16
79:11 83:14
86:12 88:10
93:10 114:18,19
137:6 144:8
147:22,23
154:23 155:19
163:7 186:7
208:4,9,15 240:5
251:14 254:7,15
269:10 272:23
287:12 289:14
293:16 294:22
297:18 312:13
321:3 325:14
330:6,15 334:20
341:21 342:5
**questions**  3:1,2
13:1,2 64:21
87:21 90:6
103:17 306:4,7
**quick**  272:22
299:8 305:18
308:21
**quickly**  81:7
309:7 316:6
320:5
**quit**  112:18
119:8
**quite**  92:19,21
132:23
**quitting**  114:2
214:2

**r**

**r**  4:1 5:1,11
349:1

**radio**  172:12
**rafael**  131:13
**raise**  89:2,14
90:15 120:3,4
249:12
**raised**  26:23
27:2,9,16 47:15
120:1 249:20
313:21
**raising**  249:15
**ramming**  204:16
**ran**  75:16
**random**  24:12
185:19 201:8
202:20 238:12
**range**  66:15
111:7 188:13
230:19
**rank**  54:2
**rapidly**  155:2
**rarely**  79:22
80:1
**rater's**  39:12
**ratio**  220:23
221:1,5,9,12,17
222:19 223:1,7
229:1,11 243:16
**ray**  293:10,22
294:8,11
**reach**  47:13
**reaching**  296:4
**read**  34:3 62:19
63:21 68:2,4
69:8 87:10 90:3
107:10 129:4
204:13 221:16
276:22 287:8,22
301:22 303:6,10

303:13 305:9,10
308:20 310:13
313:23 314:18
316:14 317:3,4
325:7,10,13
327:8 332:9
342:17,18
**readily**  146:8
202:1 203:13
**reading**  2:15
33:23 34:3
61:21 69:9
280:7 282:15
318:11
**reads**  256:17
267:10 275:23
276:16 280:16
291:4 308:4
309:17 312:1
317:17 339:15
339:20 340:7
**ready**  54:21,21
140:9
**real**  69:17 72:13
215:3 216:3
281:5 299:8
305:18
**realize**  181:1,7
247:1
**realized**  333:3
**really**  20:20 51:7
63:3,5 73:12
90:10,20 95:23
98:13 112:4
126:5 132:20
134:17 138:13
138:13 147:3
170:14 181:19

190:16 204:2
**reask**  254:14
**reason**  13:21
70:15 80:17
81:1 114:1
142:2,13 159:21
161:3 173:5,7
198:14 199:23
224:12,20
263:20 285:13
287:19,19 288:1
330:4
**reasoning**  330:2
**reasons**  174:21
265:9,11 336:1,8
**reassign**  44:3
**rec**  122:22 123:1
123:5 236:8
**recall**  14:19 15:7
15:9,11,16 16:2
16:7,10 17:1
20:15,21 21:14
22:8 25:22 27:3
28:3 32:2,10,20
33:15,17 34:19
34:21 35:3,9
38:22 50:14,18
51:7,9,16,18,23
52:3,6 53:12
55:3,3,17 71:20
73:5,12 74:2,3
74:11 75:9
77:15 80:8,13
83:7 87:3 88:16
97:20 103:5
107:12 110:19
110:23 111:3
121:12,12 123:3

127:6 128:11
132:12 133:10
138:17,22 149:6
149:7 150:6
151:9 159:4
160:10,12
162:10,11
164:13,18,22
165:17 166:5,8
166:10,20 167:2
167:11,14,22
170:8,9,15
187:15 189:13
189:15 192:1,23
193:6,7,7 199:13
203:4,11 209:2,8
209:11,14 210:4
210:6,12,17
213:2,8 215:12
216:22 218:9,13
219:2 223:4,6
224:1,6,14
226:11 227:3,5
234:7,15,15
243:7 244:16,18
244:20 245:15
245:18 260:23
261:4,4 264:11
267:20 268:17
270:13 271:5,6,7
275:6,16,17
276:12 277:1,3,7
277:9,17,20
279:23 280:4,6,7
280:13 281:7,11
282:15 283:1
292:5 296:3
297:3 299:14,15

299:17,19 300:7
301:17,21 302:7
312:5,9,10 313:9
313:19 314:13
314:16 316:20
318:9,13 319:20
328:2,5 331:14
340:13 341:12
345:20
**recalling**   29:3
45:19 108:21
**receive**   128:4
237:23 302:6
**received**   26:19
45:13 59:13
74:7,9 78:7
80:14 83:11,16
86:2 88:18
96:18 230:21
252:18 302:2,2
310:1,15 312:7
324:5
**receiving**   41:15
44:19 45:3 80:8
80:18 199:7,10
246:20 283:4
302:7,19 310:9
310:22
**recognize**   38:4
128:20 131:10
193:12 194:10
225:4 252:22
253:3 274:14
278:23 279:5
304:18 307:2
311:8 323:19
339:8

**recollect**   302:19
302:19
**recollection**   75:2
165:7 212:7
245:6,12 254:9
254:17 271:23
310:1 313:5
314:9
**recommend**
308:5 309:18
**recommendati...**
255:8 287:3,4,13
288:6 289:5,8
304:11
**reconstructed**
250:8
**record**   9:17
11:19 12:13,14
86:18,21 141:18
161:13 170:23
171:2,5 178:7
273:5,8 305:18
305:21 306:1,3
348:6
**records**   338:6
**recovered**
244:10 326:18
**recreation**   123:9
**recruit**   42:19
119:21 248:17
330:19
**recruited**   217:1
**recruiting**   42:18
109:18,20 110:9
119:16,17 249:8
249:21
**recruits**   119:4

**rectifying**   308:8
**redacted**   339:22
339:23 340:11
341:3,7 342:6
346:18
**reducing**   145:14
**reduction**
213:18 228:11
**redundant**   75:14
**redundantly**
285:9
**refer**   112:7
125:20 173:7
225:22 226:1
227:12
**reference**   191:8
211:9 226:14,17
226:20 231:12
264:22 314:19
315:14
**referencing**
214:13 221:5
243:5 244:3
253:23
**referred**   93:11
93:14 177:12
**referring**   18:2
291:12
**reflect**   310:6
**reflected**   33:1
**refresh**   309:23
313:4 314:9
**refurbishing**
121:15
**refusals**   217:21
**refusing**   232:9
**regard**   23:17
47:8 51:3 166:6

296:5
regarding   248:5
regardless
  216:16 236:22
  323:6
regards   330:19
  330:20
region   22:15,16
  22:17,19 28:7
  29:22 31:8
  157:16,17
  283:20
regional   37:17
  46:16 73:2
  87:15,17 88:4,5
  90:20,21 282:12
  283:11
register   290:3,9
regular   24:7
  28:10 34:12
  74:12 102:11,13
  184:9 256:2
  265:5
regularly   145:21
  146:2,22 188:18
regulations
  28:11,16 34:16
  168:12 333:14
relating   2:19
relationship
  338:22 339:1
  340:10 341:3
  342:4,9,22,23
  343:4,19 346:15
  347:1,5,9,16
relationships
  341:13 342:14
  343:9

relative   147:9
  212:16
release   31:9
  54:21
reliability   237:6
reliant   100:8
relieve   265:19
relieved   265:22
  285:6
relying   62:4,11
  62:14,16 100:2
remains   211:19
  332:4
remedy   216:23
  246:20 287:5
  316:19 320:19
  320:23 321:5
remember   16:23
  19:3 20:20 21:8
  36:17,20 51:14
  55:13 56:1
  68:21 98:4
  110:18 114:7
  120:14 122:10
  139:6 164:17
  176:18,20
  187:23 188:6,7
  200:9 203:6,7
  209:12 212:8,9
  245:22 246:11
  246:13,16 252:7
  257:5,20 269:11
  273:13 293:22
  296:15,17
  310:10,16,18
  311:4 313:8,16
  315:8 316:4
  345:7

removal   320:10
renovations
  133:2
repair   294:18
  342:6
repaired   294:9
repairs   74:23
  77:2 78:8
repeat   83:14
  86:10 89:5
  100:5 170:2
  287:11
repeatedly   98:22
  99:4
rephrase   13:11
  147:23
replace   106:15
  109:14 152:6
  153:1 163:10
  268:4
replaced   121:11
  121:13,16 217:4
  253:19 293:14
  332:18
replacing   159:3
  164:2
report   7:7,11,14
  7:21 24:23
  41:17 50:23
  51:4 61:21 63:8
  63:9 65:2 68:5,6
  68:11,16,20,23
  69:11 74:20,21
  74:21 83:20
  87:11,21,22
  88:18,21,23 89:7
  91:5,21 93:17,20
  94:9,11,15,15

95:1 96:5
103:10 157:3,9
197:8,12 199:7
199:10 208:2
219:8 224:13,17
228:10,14
229:17 230:17
231:21 232:1,10
233:14 239:7,9
241:5,23 246:20
247:2,3 248:2,8
261:23 262:9
263:6,8 264:21
274:18 275:10
279:9 280:8,15
286:15 299:4,9
299:20,22
300:13 301:12
301:15,18 302:3
302:6,8,14 303:1
308:7,12,19
309:2,3,11,21
310:2,9,10,12,23
312:2,5,10 313:6
313:7,8,10,15,21
314:3 316:23
317:2 318:11
320:5 323:23
324:3 325:23
326:3,17 327:6
332:11 343:23
347:21
reported   64:12
71:15 81:16
83:22 88:3,5
101:20 156:7,12
156:14,18 157:9
169:3 178:5

204:18 205:1
208:13 210:23
246:15
**reportedly**
346:15 347:10
**reporter**   2:6
3:15 9:2 10:7,11
11:5 12:11,11
26:3,6 107:22
133:4,8 165:23
226:19 245:17
265:10 272:3,6
279:16 315:19
**reporting**   62:1
71:10,13 82:16
83:12,18 87:2
96:15 101:19
237:15
**reports**   33:21
34:1,8,11 45:11
45:13 59:13
60:2,7,10,14,19
61:9 62:20,21,23
63:7,13,16,19,22
64:23 67:11,13
67:19 68:2,3,4
68:22 69:3,3,4,6
69:8,21 74:8,9
74:10,13,14,16
83:17 84:1,3
91:19 94:1 95:2
95:7,15,17 96:3
100:3 102:6
115:20 127:9,10
127:19 128:9
179:6 191:19
230:13 231:2,14
231:23 232:17

232:23 261:12
268:1 269:18
291:6 312:17
314:19,22 315:2
315:7 318:10
324:4 332:2
333:21
**repository**   95:6
**represent**   11:14
195:5
**representative**
1:10 9:21
**represented**   14:2
**represents**
349:10
**request**   35:21,22
77:6 78:8,11,14
300:21 301:7,11
303:18
**requested**   179:5
342:7
**requests**   35:15
74:22 75:21
76:5 77:1
120:23 121:1
297:20
**require**   77:12
**required**   13:16
28:15 42:6
50:15 191:11
**requirement**
118:8 280:23
**requires**   61:22
300:19 303:15
**research**   127:16
127:22
**resistance**
217:21

**resolve**   287:14
**resort**   317:22
**resource**   215:8
**resources**   216:19
242:3 269:19
270:1 290:19
**respect**   234:9
285:22
**respective**   2:4
**responded**   326:9
**response**   13:1
43:4 47:18
192:10 203:12
217:6,9,13
218:11 234:23
264:9 308:18
**responses**   12:16
**responsibilities**
20:8 21:2,7
23:17 37:14,21
40:3,4 52:20
55:8,17 56:14,16
60:1 97:14
**responsibility**
40:23 41:13
45:1 47:1 48:14
51:2 59:22
60:21 71:3 84:5
180:14,19
181:20 190:11
**responsible**
26:21 33:23
34:2 40:14 41:4
42:3 43:9 44:11
48:2,6 49:10,17
49:19,22 50:2,5
50:22 56:15
58:4 59:15 60:9

66:5 77:17
78:10 190:1,4
291:5 329:6
**rest**   19:8 135:5
137:23 214:20
214:23
**restrained**   261:2
317:23
**restraints**
260:19,20
**result**   191:10
349:17
**resulted**   281:3
**results**   40:3
97:13 246:8
248:8 277:17
**retained**   3:14
**retention**   214:18
301:2 303:22
**retired**   61:14
130:15,21
148:14 153:8
338:14,16 339:5
**retiring**   152:5
214:5
**reverse**   331:10
**review**   14:12,14
35:15 38:15
43:14 59:17
60:6 67:12,14,21
69:7 78:18
82:14 83:11,15
95:16 97:10
289:6 311:1
**reviewed**   67:16
69:2 78:7 88:20
89:6 129:1
284:7 310:2

324:6 327:5
**reviewing** 50:23
59:16 60:1,10,13
60:18 61:8 74:3
78:13 97:6
**reviews** 40:6,11
129:3 131:11
194:13 196:23
224:8 228:18
229:4,19 241:2
259:14 262:4,14
279:6 281:9
287:10 293:17
299:12 314:11
318:3 321:2
325:15 328:19
342:19
**revise** 238:2
**revising** 293:12
**rhetorical**
114:18
**ridiculous**
133:17 135:14
135:20,21
188:15,22
**right** 17:22
19:21 21:8
29:23 30:12
32:14 36:16
37:6 39:3,9
48:16 49:17,23
58:16 61:9 62:2
66:22 71:10
72:3 76:2 81:11
85:4,6,9 91:10
94:7,18 95:4
98:17,18,21
99:18 101:8

106:16 113:8
115:9,17,20
117:2,20 119:8
125:1,15 128:14
129:19 132:10
133:23 134:5
136:11 140:2,23
142:10 144:4,16
148:18 152:7,13
152:13 155:3,18
157:6,22 161:16
162:23 163:12
164:4 170:4
174:16,20,23
176:8,13 182:7
183:5 184:22
192:13 193:19
194:18 196:13
197:5,17 199:2
200:12,16 202:5
202:11,15,21
204:8 205:6,7,9
207:6 210:1,3,23
211:13 213:10
213:17 215:17
221:7 222:5
224:18 225:17
228:8 229:11
230:7 235:12
237:1,9 241:8
243:13 246:3
248:5 250:1
251:1 253:11
254:3 263:17
264:14 268:21
270:6 271:2
272:1,1 273:16
274:4 275:2,21

276:22 278:5,21
280:11 286:21
287:15 292:7
299:5,10 301:8
301:14 302:3
305:5 307:9,18
308:21 309:8
311:16 312:3,7
316:14 321:15
325:18,21 326:9
327:6 329:11
333:14 337:7
339:18 345:18
347:4
**ring** 79:17
**rip** 251:18
**ripping** 106:23
**risk** 196:7 216:3
244:4 256:22
322:3
**rme** 127:17,22
**road** 134:2,5,7
134:12,13
135:23
**roads** 244:5
**roadside** 138:12
**robot** 249:2
**role** 17:8 18:9
82:13,14,19 97:8
127:3 280:4
**roles** 292:14
**roll** 159:16
**rollback** 159:21
**rolled** 158:12
159:1 161:13
**room** 276:2
**rose** 103:12

**roster** 176:6,6,17
177:6,8,11,13
**rotate** 109:6
153:17
**rotated** 109:9
**rotation** 188:11
**roughly** 205:7
241:11
**rounds** 125:4
**rover** 326:9
**rpr** 349:20
**ruckus** 222:13
**rule** 171:23
**rules** 2:19 3:8
9:5 11:22 143:2
251:3
**run** 70:21
117:10 124:8,10
143:2,3 227:22
232:22 268:3
343:21
**running** 123:10
197:16 343:14
**runs** 132:19
**russell** 131:17

**s**

**s** 2:1,1 4:1,13 5:1
6:10
**safe** 29:9 52:19
76:23 80:2
108:3 116:6
135:14 191:2
196:19 206:22
256:20 268:23
269:22 330:21
**safety** 40:16 41:1
41:4 48:3,15

49:5 61:2 121:8
218:6 227:9
293:19
**salaries** 47:14
120:3,5,19,22
249:12,16,19,20
**sally** 272:2,5
292:22
**santa** 131:13
**sat** 148:23 276:2
**savages** 296:20
**saved** 95:1
**saw** 102:22
114:14 162:4
191:21 192:12
282:3 288:9
294:4 331:3
**saying** 48:5
53:23 57:8
65:13 113:9
125:7 141:19
142:12,20
151:17,19
159:15 161:13
167:21,22 174:9
176:10 178:14
181:10,16,19
203:12 217:8
235:22 248:23
257:20 260:7
288:16 292:17
302:5,8,17,18
310:6,7,17
334:12 347:19
**says** 38:17 39:12
40:2,13,19 52:5
69:18 101:2
143:23 187:2,9

193:23 195:2
196:6,11 197:10
197:12 198:23
201:17,23
202:17 203:20
204:20 205:18
207:19 208:21
212:2,14 213:12
215:7,9 217:17
218:21 220:21
223:10 226:23
227:8 228:5,16
229:10 230:12
238:12 240:7
242:5,21 244:2,8
253:14,16,18
256:16 259:11
269:20 270:7
274:21 275:10
282:8 287:3
299:3 300:17
301:6 303:13
305:7 308:8
309:8 312:15
313:12 314:3
316:9 320:8
322:1,2 324:14
326:8,18 333:2
340:12,20 342:1
346:14 347:9
**scan** 63:19
312:11
**sccf** 256:18
301:1
**scenario** 87:9
91:4 114:22
**scheduled** 267:4

**science** 16:18
**scope** 41:14
**scratch** 252:1
**screening** 201:8
201:9 202:20
238:12
**scroll** 241:21,21
243:9
**se** 68:3 176:14
**search** 140:8,10
140:10,11,12,13
140:15 144:16
145:6 185:6,17
185:18,22 186:1
187:2,4 188:1
189:1 245:12,14
**searched** 244:23
286:10
**searches** 144:9
145:2 184:17,17
184:22 185:1,10
185:14,18
186:10,21 187:1
187:12,17 188:5
188:17 189:4,8,9
190:2,18,23
191:3,8,12
247:18 290:23
**searching**
144:12,22 291:1
**second** 128:16
129:9 201:12
225:2 229:9
239:16,20 244:8
273:2 279:4
280:15 286:16
309:7 312:2
317:16 320:14

321:23,23
328:18
**secretary** 58:17
102:23 194:6
**section** 125:20
198:18,22
200:15,21
203:19 218:17
218:21 219:9
256:15 263:11
270:7 272:14
286:19 287:1
300:17 314:3
**sections** 199:1
**secure** 54:16
72:20
**secured** 123:23
**security** 40:16
40:23 42:3
48:15 50:6,9,13
50:15,21 51:8,14
51:18,23 61:2,7
78:23 79:20
95:23 126:15
153:2 178:10
183:20,21,23
184:1 227:8
251:9 253:16,17
286:20 289:18
289:22 290:3,10
291:6 295:19
296:21 303:8
329:5
**see** 12:10 29:16
38:19 40:2,18
43:14 44:13
45:12 61:16
85:5 113:12

**[see - significantly]**                                         Page 46

120:4 125:6
129:8,13 157:2
177:23 179:3,20
179:22 180:2
182:11 185:22
194:3,21 195:3
196:15 197:12
198:20 201:18
201:19,20
203:21 205:18
208:23 211:4
212:4 213:1,15
213:16 215:10
217:23 218:18
218:23 219:11
221:3 223:13
226:9 227:1,10
228:21 230:5,14
238:13 240:12
243:2 244:10
248:21 249:18
253:20 256:22
259:13,16
262:22 270:11
274:22 276:7
283:22,23
285:16 289:9
298:22 305:14
307:6 308:13
309:12 312:19
314:4,23 318:2
320:11 322:8
324:15 326:19
341:10 342:11
346:21
**seeing** 119:6
235:1 288:14
302:20

**seen** 38:13 129:6
206:9,12 268:1
282:16 301:20
302:23 339:13
**sees** 190:17
**segment** 221:19
**segregation**
122:4,8 242:22
257:11,15 258:5
317:20
**select** 160:18
**semi** 323:16
**send** 106:7
125:13 265:18
295:20
**senior** 152:1
**sense** 136:13
186:15 195:9
**sent** 14:18
113:17 127:15
140:8 301:13
307:7
**sentence** 244:9
275:23 301:6
320:15 322:1,2
340:18
**separate** 59:6
64:5,7 70:3
122:1 304:2
**separated** 122:1
**separating**
174:10
**sergeant** 18:18
19:4
**seri** 182:7
**serious** 98:18
101:9 135:4
182:8 203:21,23

208:20 210:21
235:21 239:12
240:9,9,23 241:6
243:1 262:19
264:6
**seriously** 321:21
**served** 36:21
**services** 72:17
75:18 204:11
347:17
**serving** 54:7
55:5
**set** 18:1 89:22
**settle** 154:3
**settlement**
299:23 300:2,6
300:11,18 303:2
303:3,5,14
**seventh** 4:8
**severe** 285:3
**sexual** 125:10
150:16,20
236:20 341:2,8
342:4,9
**shadowing**
113:20
**share** 59:6
**shared** 59:8
**sheet** 179:10
182:3
**sheets** 179:11
**shift** 41:11 42:13
42:15,15 44:4
46:12 115:14
143:1,5 145:6,7
147:4 180:8
190:3,3 221:2,17
221:20,21 222:4

265:5 280:19
**short** 114:9
117:2 118:12
125:2,3 289:16
330:11
**shortage** 219:11
229:9 243:12
288:19
**shortages**
219:15 229:23
243:20 263:20
268:18 270:11
280:16 285:3
**shortly** 18:21
**shoving** 204:15
**show** 176:7
232:23 333:23
**showed** 332:3
**showing** 260:1
333:21
**shows** 310:9
**shrugs** 12:18
**sick** 69:12
**side** 90:13 122:3
122:4,7,16 134:5
**sided** 165:8
**sidewalk** 209:23
**sidley** 4:7 10:21
**sidley.com** 4:10
4:11
**sign** 248:23
**signature** 2:14
39:8,9,12,15
349:19
**signed** 196:4
**significant** 32:17
**significantly**
107:11

**similar** 166:6
277:20 295:13
343:9
**simple** 231:15
**simply** 67:7
183:4 292:14
**simpson** 193:17
194:5 195:14
**simultaneously**
94:20
**single** 103:4
206:4,12,19
207:14 257:14
291:5
**sir** 12:4,9 13:21
15:5,14 17:3,11
17:12,23 18:4,16
19:10,17 20:14
20:17 21:11,23
22:2,5,9 28:17
33:22 38:20
39:4,7,10,13,23
50:4,17,20 51:1
52:4,23 54:3
55:14 71:11
73:7,9 87:5 96:7
97:23 107:14
108:22 111:5
128:15,20 129:7
129:11,20 132:2
132:11 133:12
138:20 139:4
147:19 148:5
159:6,11 162:22
164:19 165:4
174:12 189:19
189:22 193:12
194:10 195:5

197:14 198:21
202:12 203:15
203:22 204:9
205:20 208:5
209:1 211:1,5
212:2 214:16
215:5 218:1,19
219:1,12,18
221:4 223:3,8,15
224:2,9,19,19
225:4,7,18,21
226:10 227:2,11
227:13 228:9,12
228:19,22
229:12,20 230:8
230:11,22
237:10 238:14
243:14 244:7,17
252:8,22 253:4
253:12,21 254:1
256:23 261:14
262:5,23 263:3
263:14,18,22
264:1,4,7,12
269:13 270:12
270:14,17
273:14 274:7,23
275:3,9 276:8,11
276:13,23 277:2
277:16,19 278:3
278:23 280:2
281:10 282:15
282:23 286:22
287:16 291:13
293:16 297:4
298:23 299:6,13
300:12,16 301:4
301:16,19

304:19 305:6,15
307:1,3,10,15,19
309:4,13 310:1,3
311:5,9,17 312:4
312:5,21 313:6
314:3,5 316:15
316:21 317:4
318:4,5,8,12
320:12 322:9
323:20 324:16
325:9,22 326:21
329:10 330:6,22
334:12 337:17
337:20 339:9,19
340:14 342:14
345:15 346:13
**sit** 46:10 98:11
141:1,2,8,10
313:14
**sitdowns** 217:17
**site** 31:18,21
45:11 180:5
**sits** 134:11,11
**sitting** 12:11,12
136:19
**situation** 47:4
77:18 83:7
88:16 104:8
117:23 118:16
125:15 140:17
149:8 222:8
251:1 268:9
271:22 330:12
333:4 343:22
**situations** 31:10
77:8 98:9 115:1
192:11 235:8

**six** 30:22 125:16
177:18,18
179:11 256:10
341:8
**sixth** 215:6
**sizable** 106:10
**skip** 219:7
**slap** 235:17
**slapping** 211:4
240:18
**slight** 286:8
**slots** 55:22
160:19
**slow** 94:2
**slowdowns**
217:18
**small** 84:14,19
122:15 163:22
**smaller** 123:14
124:5
**smoking** 281:2
**sock** 240:11
**softball** 123:8
**solely** 62:4,11
65:8
**solitary** 257:10
**solution** 109:1,2
109:3,17 110:5
118:21 119:3
251:19 289:17
**solutions** 110:3
118:19 301:2
303:21
**somebody** 70:22
85:5,22 101:10
125:9,10 134:7
143:6 144:15
174:4 184:10

185:20 189:3
191:22 207:20
267:1,3 284:2,4
298:6 332:19
**someone's** 97:22
**somewhat** 56:19
153:11 327:13
**son** 11:16
**sooner** 258:21
259:2
**sops** 290:23
**sorry** 29:15 36:8
46:7 52:2,11
55:9 56:2 78:3
79:16 84:16
102:1 103:15
119:12 141:23
147:22 155:18
159:18 197:8
200:20 229:18
239:17 240:3
253:2 265:12
274:13 278:17
278:19,20
296:10 298:4
309:2 315:19
320:13 324:20
**sort** 140:1
239:16
**sound** 85:6,7,9
291:23
**sounds** 75:13
**south** 5:13
126:17
**southern** 16:19
32:12 157:17
304:14

**space** 77:10
123:14 257:12
**span** 286:20
**speak** 12:22
14:22 104:21
**special** 339:21
339:22
**specif** 33:7
**specific** 16:1
18:11 24:13
33:9 43:22
57:14 74:15
80:14,20 91:2
93:7 106:21
107:20 127:7
128:9 138:17
150:6 200:17
209:10 261:4
318:15,19
**specifically**
14:21 35:11
41:9 49:13 59:3
65:23 74:17
77:16 88:19
92:19 97:2,3,23
102:14 132:22
133:12 160:8
168:15 178:2
234:16 243:8
256:5 296:16
314:21 345:6,7
**specifics** 210:12
210:18 234:11
234:14
**specifying** 83:23
**specks** 166:19
168:16 276:5,5,9
276:20 277:10

277:21 278:4
343:10
**spent** 119:16,20
**spike** 259:20
**spit** 204:22
**split** 165:19
**spoke** 156:2
224:10 294:13
**st** 22:21 23:1
28:20 29:10,13
29:18 30:7,11,17
30:18 31:3,21
32:4,15 35:10,12
52:21 107:18,21
107:22 108:5
111:17,22 117:6
120:11 121:14
121:15,16,19,20
125:20 130:19
130:22 132:8,13
133:20,22 134:1
134:11 135:4,7
135:11,16
137:15 138:10
138:11,19 139:3
141:22 142:4,7
143:18,21
145:15,18,22
146:20,22 147:5
147:7,18 148:3
148:11 149:9,19
149:22 150:4,9
153:6 154:19
155:1 156:3
162:14 164:8,14
165:18 166:5,7
167:13,16 170:6
170:11 171:8,10

171:13 172:21
173:21 177:9,16
177:21 178:17
178:23 179:22
183:9 184:13,18
186:9 187:18
188:15 189:5,18
191:18 195:2
196:21 197:15
197:20 198:9,10
198:11 199:11
202:15 203:14
207:13 209:5,16
212:7 213:4,18
214:1,15,18,22
215:15 216:1
218:10 219:5,15
220:4,9 223:19
225:12 227:12
227:17 232:20
234:4,17,18
237:9 238:21
241:15 242:14
243:5,20 246:1
247:13 250:6
253:7,11 254:10
254:18,19,20
257:7 258:12,13
259:3 261:5,7,9
261:16 262:7
264:9 266:2
269:23 270:15
274:3 276:9
277:5 279:8
281:8,12 283:2,8
283:19 284:10
286:5 287:5,6,15
288:7 291:1,20

**[st - stated]** Page 49

292:3 296:5,8,13
296:16,23
297:16 299:4
303:9,16,20
308:6,9 309:9,20
312:1,17 313:1
316:7,10,18
318:22,23 319:6
320:19 321:1,6
324:2 329:14,17
330:21 331:1,12
331:17 333:8
335:5 337:6
344:5,8,13
345:17 346:7
**stabbed**  88:22
89:8 91:3
242:23 324:14
**stabbing**  90:4,4
152:12,14 216:8
325:3,4,8 326:1
326:5
**stabbings**
133:16 135:9
150:14
**staff**  34:14 42:12
42:13,16 43:23
47:13 58:11,19
59:4 75:3 78:23
79:4,20,23 95:22
101:23 102:2
105:6,7 106:12
110:5,6,21 112:2
113:6 114:1,10
115:5,15 117:9
119:21 124:3
135:10 136:4,5,9
137:12 139:22

139:23 140:23
141:11,19 142:3
142:18 143:18
144:9,12 146:10
146:13 151:5,8
151:12,21,21,23
152:1,7 156:1
168:17,18
172:10,16 188:3
191:10,11
203:20 205:23
206:3,6,13,17,20
207:15 208:19
212:2,3,12
213:13,14,19
215:8 216:19
228:15,16 233:4
233:16 235:3,5,7
235:15,21 242:4
242:15 247:18
261:1 262:1,6
263:12,12,19
265:17,18,22
266:16 268:13
269:19 270:1,10
280:16,18
282:13,13 283:4
283:11,12 284:3
284:17,23 285:2
286:6 301:2
303:22 304:11
307:12,14 317:8
317:13 319:12
326:4 332:14
333:6,18,20,21
334:2,4 335:1
345:12

**staffed**  106:1
108:6 118:12
120:8 235:4
**staffing**  27:5
31:10 33:11
41:17,18,21,22
42:7 43:6 45:12
45:15,19,21,23
47:8,20 49:14,17
49:19,20,20
64:18 104:22
105:11,16
106:19 107:9
109:21 111:1,13
111:22 117:2
118:19 120:11
125:2,3 141:7
149:8,16,17
151:16 172:14
173:11 215:13
219:10,15 220:6
220:15,16,17
229:9,23 233:7
243:12,19,20
247:4,5,6,11,12
247:15,16 248:5
266:4 267:22
268:2,11,18
272:17,18
274:11 281:21
284:14 285:3
286:20 287:6,14
288:19 296:18
297:1,1,14
300:20,23 301:7
303:14,16,19
304:2,3,4 308:9
317:6,8 330:3,4

330:11 332:4,7
332:10,13 333:3
333:12 337:6
344:21
**standard**  117:16
**standards**  54:15
83:13,19 86:7
100:8 108:7
223:2 231:5,8
257:19 319:13
319:14,15,18
**standing**  235:12
235:15
**standpoint**  45:12
118:13 123:17
136:13 138:1
**start**  11:21 65:4
68:7 85:3 113:1
113:4 116:9
152:5 182:15
183:10 231:13
267:2
**started**  37:2 72:8
144:8 153:14
266:5,6 267:20
269:7 297:7
332:11,13
**starts**  299:22
**state**  2:7 9:2
11:18 32:13
53:15 54:10
70:9,11 126:16
255:2 256:7
257:16 279:11
290:8,9,9 349:2
349:22
**stated**  88:21
276:17

statement
    261:19
statements   12:5
states   1:1 10:1
    304:14
station   165:18
statistical   127:9
    127:10,16,19
    128:9
statistics   127:4
staton   23:3
status   158:7
stay   88:6 109:11
    114:15 214:8
    266:18,20,22
    333:9,11
stayed   69:16
    240:18
staying   344:6
steady   106:11
stenographic
    349:6
step   47:23 126:7
stepping   74:5
steps   209:19
steve   102:4
    307:11,17,20
    311:6
stick   87:13
sticker   38:3
sticking   123:11
stickler   143:1
stipulated   2:2,13
    2:21
stipulation   9:6
stipulations   11:7
stop   87:18
    103:13,16

114:12 141:5
145:10 185:21
189:2 236:11,13
236:14,19,19
249:7,8,9 285:13
285:14
stoppages
    217:18
stopped   138:11
    293:5
stopping   134:7
stops   141:14
    190:9
stored   92:12
straight   58:14
    112:14 134:2
    265:20 328:15
strategically
    165:9,12
strategies
    331:23
strategy   330:10
    331:19
street   5:7,13
    248:21 260:9
strengths   162:2
stress   178:22
    264:5
strike   24:20
    33:19 34:5 42:4
    47:5,22 74:4
    76:23 96:11
    97:6 108:3
    114:21 139:10
    143:15 151:2
    159:19 165:1
    168:6 169:14
    171:12 189:14

192:23 199:8
206:9 207:12
208:9 216:11,16
246:6,18 248:3
251:15 258:23
289:2 299:17
300:7 308:16
315:9 324:18,20
328:5 335:4
336:23 338:15
342:21 344:10
346:2
struck   203:1
structure   281:6
struggling   63:3
studies   16:20
stuff   112:19
    134:9,19 302:20
    321:8
subject   12:1
    57:14 200:22
submitted   301:8
subordinate
    85:16
subordinates
    96:9 99:4
substances   202:5
substantiated
    167:4
substitute   103:7
successful   46:23
    145:14,17
    330:23
sufficient   335:6
suggest   43:23
    218:2
suggested   86:5
    96:20

suggestion   43:9
    43:10,13 46:9,15
    46:22 106:5
    297:23
suggestions
    42:11 43:8 44:9
    44:12,12 46:4,11
suggests   261:20
suicide   65:23
suit   258:1
suite   2:9 4:16
    9:9
summarizing
    108:19
summary   8:3
    339:18
sunshine   122:21
    123:1
supervise   90:22
    335:7
supervised   23:19
    37:16 135:6
supervising
    142:17 145:9
    147:10 181:13
supervision
    283:5 286:20
    349:9
supervisor   39:22
    98:14 145:5
    192:15
supervisor's
    140:6
support   283:5,6
supposed   64:9
    125:4 143:3
    171:15,18,19
    175:15 176:17

**[supposed - tensions]**                                    Page 51

184:18 185:4
187:7 189:5
192:14 205:21
229:5 247:19,20
252:6
**sure**  33:8,10
52:9 71:6 84:7,9
93:5,6,9 95:21
103:16 109:5
110:21 117:9
121:17 131:17
131:19 139:5
149:14,20
151:14 167:5
171:18 273:1
287:9 305:11,19
321:18 323:1
**surprise**  125:18
126:3,9
**surprised**  126:2
**surprises**  126:6
**surrounding**
40:17 41:2 61:4
**suspect**  182:22
183:1 185:20
**suspended**  334:4
**sw**  5:7
**swear**  10:11
**swelling**  125:6
**sworn**  11:2
**synopsis**  68:12
**system**  37:11
53:14,16 56:21
64:23 89:22
119:5 121:11
172:6,9 207:9
236:3 291:9,14
291:19,20,21,22

292:20 343:15
**system's**  56:20
**systems**  55:19,21
253:17

**t**

**t**  2:1,1 6:10
349:1,1
**table**  75:20
**take**  12:16 13:4
13:7 27:22
31:13 40:10
42:21 86:13
92:7,8,9 106:6
115:12 118:5
125:9,12,14
143:4 144:19
152:12 160:20
163:20,21
170:16,18 174:6
192:18 211:20
233:6 237:18
239:20,21 258:4
260:17 266:20
272:22 289:8
**takedown**
260:15
**taken**  2:5 3:11
27:18 76:13
86:19 102:20
171:3 208:22
235:19 273:6
284:23 305:22
316:17 349:5
**takes**  91:22
98:20 232:12
**talk**  46:10 85:5
98:11 104:4,6

106:12 192:14
192:15,17 298:4
313:14 318:18
318:21
**talked**  49:14,16
58:20 74:8
87:19 98:8
131:14 145:2,3
149:1,15 161:22
169:9 175:6
183:19 219:13
242:2,9 243:15
247:4 250:9
252:3 256:1
275:9 314:6
316:6 319:2
329:13 336:20
344:4
**talking**  52:20
91:4 101:18
120:7 125:7,8
131:1 141:11
143:13 147:21
155:15 156:19
156:20 166:18
181:3 231:13
237:5 248:11,14
297:15 301:10
**taurus**  275:14
**tea**  204:21
**team**  43:4 47:18
51:12 75:8 79:8
79:9,13 102:14
110:12,16 111:4
154:10 155:11
155:21 184:1,1
314:7,10,14,17
315:11,13,16

**teams**  47:12
153:17,21
**tear**  251:11
**technical**  94:3
**technically**
158:19 222:6
**telephone**  4:6
**telephones**  192:9
**tell**  38:9 56:8
80:21,21 82:22
83:2,3 98:19
101:11 114:11
156:21 171:9
180:10,11
188:11 195:11
195:11 211:20
215:3 225:8
229:6 247:22
260:11 273:22
285:8,9 290:20
302:22 304:9
345:9
**telling**  83:4
208:7,10,15,17
248:12 284:3
285:19
**tells**  115:17
260:13
**temporary**  109:1
109:3,17 118:19
118:21 119:3
**ten**  181:23
213:13 235:15
**tend**  64:5
**tennis**  134:8
**tension**  152:18
**tensions**  154:19

**tenth**  201:9
**tenure**  108:7,11
  111:9,12,20
  131:5 132:14
  138:9 154:14
  164:21 293:1
  329:19 344:8,11
  345:17
**term**  82:4 91:16
  289:16 330:11
**terminated**
  344:9,14
**terminating**
  344:18
**terminology**
  94:3 176:13
  319:9
**terms**  211:18
  326:13
**terrell**  1:11 9:22
  11:16 323:13
**terry**  1:10 9:22
  11:16 323:13
  324:9,14
**testified**  11:3
  15:12 16:6 30:2
  38:21 48:1 61:5
  154:18 213:23
  321:10 343:11
  345:16 346:23
**testify**  13:22
  283:14
**testifying**  11:23
  16:4
**testimony**  1:20
  3:11 67:12
  153:5 214:14
  237:12

**tests**  202:3,18
**thank**  11:5 26:6
  133:8 239:22
  272:6 347:23
**thayer**  4:6
**theirs**  172:3
**theory**  116:1
**thereto**  3:6
**thing**  13:6 56:9
  61:15 76:17
  82:22 88:5,7
  96:1 106:14
  109:20 118:15
  119:13 124:17
  135:22 136:20
  142:20 144:22
  151:20 152:9
  157:3 181:7
  185:19 186:5
  192:20,21,22
  215:14 240:3
  246:22,23
  247:23 258:3
  315:3,4 332:11
  332:12 333:2,11
**things**  24:18,23
  25:9 31:13
  41:14,18 43:3
  46:11,14 47:9,11
  64:11 66:4 67:7
  68:6 82:9 83:3
  88:15 97:10
  98:12 101:7
  106:13,19 107:2
  107:3,4,6 110:14
  118:9 119:6
  121:9 125:11
  134:20 136:12

144:11 150:8
  151:15 154:3
  183:22 184:3
  191:15 205:11
  205:13 236:21
  246:17 248:5
  249:13,15 251:8
  255:8 257:9
  267:17 274:9
  288:21 300:4
  303:4 304:9
  315:1 330:9,14
  330:18 332:1,19
  345:10,13
**think**  16:5 17:5,5
  18:7 23:8 37:20
  49:18 55:15,20
  57:20 58:20
  62:10,10 64:12
  68:23 70:6
  77:14,20 79:12
  81:18 82:8,20,20
  82:21 85:8
  88:13 89:20
  96:16 98:15
  102:15 109:4,4
  113:7 114:16
  117:19 120:16
  121:10 124:16
  124:16 130:19
  131:13,18 137:5
  138:10 139:13
  139:17,17,19
  142:11,19,20
  143:12 146:20
  149:10,11
  153:10,11,12
  154:5,6,7 167:9

169:8 170:20
  176:23 177:2,3
  178:16 179:21
  189:7,23 199:20
  199:23 212:16
  214:3 230:22
  238:1,3,3 244:2
  247:21 254:22
  254:22 255:11
  255:17,20,20,21
  255:21 256:1
  257:23 258:1,15
  258:23 259:1
  268:22 271:4,22
  272:10 274:8
  279:14 281:16
  281:18,23 286:3
  288:2,20 290:18
  292:5,6,23 317:5
  321:10 322:10
  322:14 323:8,9
  323:10 325:2
  328:20,23
  331:22,22
  332:22,22 338:7
  338:7,8 345:5,7
**thinks**  152:21
**third**  194:23
  238:16 282:8
  326:19
**thirty**  205:5
**thorough**  140:13
  140:15
**thought**  55:16
  64:1 85:20,20,21
  103:12 113:14
  156:23 162:8
  192:3 249:15

[thought - tried]                                                              Page 53

278:9
thousand   233:13
threat   219:10
229:14,22
243:13
threats   205:3
219:9 243:19
272:13,14
three   19:2 55:23
56:7 63:14
83:21 98:7
112:18 113:3
117:15 124:9
136:17 139:20
153:15 168:17
184:2 218:20
232:21 253:15
268:1 286:7
287:2 317:20
throughs   305:9
throwing   134:9
244:5
thrown   202:2,10
204:22
time   3:4,5 16:5
28:21 39:18
40:10 43:5,22
51:11 63:12
69:16,19 71:1
72:9 84:11 88:8
90:7 98:5 99:7,9
105:14 106:9
118:14 125:23
126:14 130:1,6,7
130:9 135:2,18
141:8 145:20
146:17 147:21
148:8,20 153:7,8

153:15,16 155:4
157:15 158:10
158:16 159:23
160:16 161:10
168:8 170:10
173:3 175:18,23
178:20 179:2
180:5 185:8
188:13 192:1
196:2 197:21
202:8 212:7
215:23 219:20
223:20,23 227:7
239:21 248:11
248:13,14
255:23 256:8
257:18,22 258:6
265:23 267:15
269:2,6,8 270:9
282:21 285:6
288:9 289:15
290:8 292:19
293:4,13,22
294:3 297:17
301:6,19 302:18
304:7 305:11
318:19 319:6,12
329:16 332:1,20
348:1 349:13
times   14:9 15:6
15:15 25:10
28:18 29:11,14
30:8,19,22 32:1
48:8 117:15
121:12 134:21
135:10 144:4
146:20 147:17
148:3,10 176:16

187:6 188:5
189:13 220:21
245:23 249:21
265:7 304:7
title   75:11 290:2
today   11:23 12:5
12:14 13:16,23
14:3 141:13
178:6 247:13
249:18 294:13
297:16 316:17
329:14 333:5
348:1
today's   11:22
told   41:22 67:5,8
99:9 156:2
158:18 160:9,13
161:2 191:23
220:17 231:18
241:4 252:14
274:9 275:13
303:1,1 331:13
339:3
top   38:16 66:4
197:10 282:12
283:8,11 309:8
329:11 332:5,8
339:15
torn   332:21
tornados   106:23
total   200:19
230:12 312:16
totally   93:6
165:16 238:8
touch   211:12
touched   146:18
tough   144:21

tour   24:4 148:11
toured   146:20
147:18 148:3,13
148:22
tower   136:14,18
136:19 137:21
137:22 138:3,12
towers   137:17
137:18,20
tp   6:16,19,23 7:3
7:6,9,12,15,18
7:20,23 8:5
tracked   169:11
171:10,11
172:14,20,22,23
tracking   172:16
175:6,13 315:6
traffic   247:20
trained   112:16
295:21 336:9,16
trainee   61:13
training   112:22
295:16,19 296:1
296:1 297:5
335:23 336:7
337:2
transcript   3:10
349:7,11
transferred
103:11
transportation
37:21
trash   321:19
travel   148:7
trial   3:4 15:13
16:4
tried   34:3 47:14
62:19 82:2,3

**[tried - understood]**

91:18 112:15
153:17 163:8
258:6 284:20
**trooper**  186:3
**true**  41:2 108:10
163:15 188:1
262:10 349:11
**truly**  117:14
**trust**  62:13,15
70:23 71:2,9,13
73:23 81:9 82:4
82:5,11,16 85:22
**trusted**  71:15,17
81:10 85:15
**truthfully**  13:22
**try**  12:17,21,23
42:15 43:1
46:11 47:4,13
55:7 61:16
63:18 65:12
106:8 110:15
119:20 121:7
124:5,8 144:7
145:10 180:3
182:11 213:3
217:2 235:2,3
246:23 247:16
248:17 250:5
251:6,7,9,11
267:6,18 268:3
284:15 319:21
320:1 331:10,18
**trying**  69:15
85:13 101:12
124:10 125:9,12
134:21 142:9
143:2 149:10
249:8,9 251:12

257:6 286:11
330:10
**tuberculosis**
272:19,20
273:18 274:1
**tune**  184:12
**turn**  39:7 89:18
114:12 133:23
197:3 226:5
228:2,13 229:8
230:3 239:6
241:22 242:18
243:10 253:13
259:6 261:22
269:14 270:4
272:11 275:20
276:14 280:14
285:23 286:14
286:16 300:9
308:23 311:23
312:14 314:2
316:5 317:15
320:4 340:16
341:22
**turned**  231:17
231:18 286:12
**turnover**  213:13
213:14 228:16
**turns**  118:15
**tutwiler**  77:10
**twenty**  63:14
205:2 254:14
**twice**  147:3
**two**  55:23 56:6
68:6 73:10 98:6
101:1 113:3
122:10 124:18
137:21 139:20

141:6 147:2,15
153:15 157:15
165:8 172:7
174:21 175:2
205:10 217:16
226:7 236:6,11
240:1 244:10
248:14 261:12
265:16 270:8
275:11 340:3,7
**twofold**  250:23
251:5
**type**  66:11,14
77:8 92:1 104:8
107:1 117:23
122:6 132:18
151:20 165:19
166:17 185:18
185:19 255:9
258:13
**types**  43:2 66:15
88:15 92:2
106:17,19 107:6
125:11 183:22
**typically**  29:11
**typing**  314:22

| u |
|---|

**u**  2:1
**uh**  12:18 193:22
**un**  158:19
**unable**  13:22
**unacceptable**
234:22
**unacceptably**
234:20
**unauthorized**
169:23 170:5

171:8 173:8,12
198:19 230:6
316:7,19 322:4
**uncovered**
266:18
**undermined**
346:16 347:10
**underneath**
39:11 97:11
131:9 198:23
271:20
**underperformi...**
96:21
**understaffed**
220:10,18
**understaffing**
173:6 326:14
**understand**  12:2
12:7,19 13:10,19
53:4 60:17 61:7
65:10 89:21
93:9 131:22
144:1 198:12
208:12 221:23
234:3 284:15
288:11 308:15
310:20 319:5
343:13
**understanding**
29:17 44:16
48:8 132:4,13
172:11 178:17
189:15 191:17
237:11
**understood**
13:13 30:23
31:5 35:3 40:10
48:13 53:23

55:2 58:5 65:16
69:2 74:22 78:6
81:6 94:21
103:20 110:1
142:22 155:10
175:5 203:9
204:12 269:9
306:21
**undisciplined**
281:4
**unfixable** 332:17
**unit** 9:18 122:4,8
171:22 172:2
173:3,4 189:9
256:19 286:11
322:7
**united** 1:1 10:1
**units** 122:1,17
122:18 173:22
174:11,14
175:20 176:4
281:3
**university** 16:18
**unmotivated**
280:18
**unrest** 118:10
**unsuccessful**
248:9 316:23
**unusual** 104:16
**unwilling** 343:23
**update** 253:16
**urine** 204:22
**usable** 251:19
**usage** 201:7,16
238:12 261:11
**use** 50:11 67:6
87:9 95:13
102:9 105:8

115:22 116:2
146:11,14 172:6
198:23 217:20
250:19 259:11
260:5,16,21
300:19 303:15
317:18 318:16
318:18,21 319:2
319:3 327:18
**useful** 200:23
238:2
**usefulness**
200:11,15 237:6
237:14
**usual** 11:6
**utilization**
155:20

---

**v**

**v** 1:13 9:23
129:10,14
131:10 226:9,23
**vacancies**
289:18
**vacation** 69:13
69:14,17
**vague** 226:13
**vaguely** 194:14
257:4,4
**vales** 326:7
**validate** 180:4
**validating** 88:12
**validation** 88:14
**value** 201:4
**variety** 67:2
202:4
**various** 14:17
24:18 27:6

175:16 184:21
265:8,11 298:15
**verbal** 205:3
**verbally** 102:8
**verified** 180:16
**verify** 180:4
**veritext** 10:8
**versus** 81:2
262:12
**vet** 152:23
**viable** 336:4,5
336:23
**victim** 182:21,22
182:23 324:8
**video** 1:20
**videographer**
5:20 9:16 10:7
86:17,20 171:1,4
273:4,7 305:20
305:23 348:4
**videorecorded**
9:19
**view** 62:8 95:14
95:15,15,15
**viewing** 68:13
**violation** 185:23
316:12
**violence** 27:8
66:2 149:19
150:11 231:20
232:12,15 233:5
233:22 234:3,18
234:22 235:4,23
236:5 237:8
262:6 322:4
325:21 326:14
**violent** 119:6
182:8 234:18,20

**visit** 24:3 28:4
28:19 29:6,22
31:6
**visited** 24:11
28:2 29:9,13,18
30:7,11,16 31:3
31:8
**visitors** 144:21
144:22
**visits** 28:15
**voids** 47:19
**volunteer** 266:12
266:15
**vulnerability**
6:20 7:1,4 193:3
194:1,17 195:2
195:12 225:11
225:15 252:4
253:6 332:7
**vulnerable**
236:15

---

**w**

**wait** 254:12,13
254:20
**waived** 2:16
**walk** 37:13 40:7
101:15,19
122:13 248:21
266:19
**walked** 148:22
169:12 231:17
231:19
**walking** 192:6
283:23
**walks** 136:17
**want** 47:23 65:4
75:8 81:7 91:8

98:14 103:15,16
107:10 112:5
115:12 116:16
116:16 119:22
134:23 144:14
146:6 158:11
170:16 178:15
178:15 184:16
186:1 210:19
213:1 232:18,19
232:19 248:23
285:12 311:3
323:6 325:13
347:23
**wanted**  47:16
65:18 109:11
140:21 142:14
146:4 158:1,11
160:20 161:6
178:19 201:3
252:18
**wants**  134:17
**warden**  19:20,21
20:2,8,12 21:3,3
21:4,5,5,10,15
22:4 43:13,16,19
46:16 52:1
53:17 70:18
73:20,21 88:1,2
88:18 93:3
94:17 100:18,20
101:2 113:6
130:15,16,21
143:22,23 144:6
144:10 149:1,10
149:11,12,14
156:1 161:22
166:9 180:10,22

180:23 183:8,9
183:13 223:19
223:22 276:5,9
276:19 277:4
315:14 316:1,2
333:14 342:8,14
342:16 343:4
345:16 346:8,17
347:1,6,6,7,8,11
347:16,18
**warden's**  143:22
181:20 190:15
322:22
**wardens**  23:20
24:9,23 26:11,12
26:19 32:12,23
42:17 44:20
59:10 62:1,6
80:11 90:22
145:3 149:4
156:3,19 161:21
162:7,11 166:7
167:12 168:2,4
168:11 169:17
323:1 344:8,14
344:18 345:8
**watch**  184:3
**water**  204:21
**watson**  307:17
307:20 308:4
309:17
**watts**  275:2
276:18,21
**way**  47:9 56:3
59:17 60:16
61:5,6 62:7
65:15 67:18
84:6 93:13

100:6 104:19
141:15 143:3
145:11 153:3
162:23 166:17
167:19 173:1
180:6 190:18
233:11 236:7
284:15 285:21
286:1 287:2
303:10 308:22
313:11 314:19
317:20 330:16
**ways**  47:4,12
101:3 117:1
136:2 145:3
320:19,23 321:5
329:18
**we've**  52:20
101:18 247:3
256:6 267:23
269:16 297:15
326:12 329:13
337:12
**weak**  162:8
**weaknesses**
162:3
**weapon**  89:1,11
89:13 90:5,6,18
91:6 240:8,9
277:12 325:5,9
326:18
**weapons**  149:22
233:3 239:13
312:23 313:2
325:18
**wear**  281:1
**weather**  272:19

**website**  127:5
**week**  101:1
102:15 153:16
154:1,1,2,2
**weeks**  101:1
109:5 113:3,3
336:12,16
**welcome**  348:3
**welfare**  64:19
**wendy's**  248:21
**went**  30:18,21
32:1 46:5,18
75:2,22 112:20
114:8 139:21
151:14 184:13
233:17,18 236:5
239:14 241:7
245:13 262:2
263:1 271:13,16
286:5,13 328:15
330:7
**white**  2:8 4:14
9:8 10:18
**whitearnolddo...**
4:18
**wife**  69:18
**william**  19:5
22:20
**wilson**  276:16
**window**  141:3
**wing**  123:15
**wise**  171:22
**wish**  249:5
334:10
**withdrawn**  7:16
**witness**  2:15
9:12 10:11 26:5
40:6,11 108:1

| | | | |
|---|---|---|---|
| 129:3 131:11 | 265:14,18 | 268:19 269:2 | 94:22 106:19 |
| 133:6 150:2 | 266:13 267:13 | 344:7,13 | 125:5 139:7 |
| 166:2 179:12 | 267:16 268:10 | **worsen** 330:8 | 142:22 155:22 |
| 194:13 196:23 | 268:16 294:1 | **worsened** 153:6 | 156:1 158:3 |
| 224:8 226:21 | 322:19,21 323:2 | 329:19 | 170:20 212:20 |
| 228:18 229:4,19 | 331:20 334:5,6 | **wound** 90:12 | 216:6 230:23 |
| 240:2 241:2 | **workaholic** | **wristband** 281:2 | 239:19 240:6 |
| 245:19 259:14 | 69:20 | 284:1 | 254:5 295:11 |
| 262:4,14 265:11 | **worked** 47:11 | **write** 81:5 87:10 | 299:9 306:15 |
| 272:5 279:6,17 | 69:19 72:6,15 | **writing** 81:4 | **year** 29:11,14 |
| 281:9 287:10 | 73:6 139:23 | 301:7 | 30:8,19,22 36:17 |
| 293:17 299:12 | 147:4 286:6 | **written** 177:3 | 36:20 73:8 |
| 314:11 315:21 | 289:23 292:6,21 | 277:8 281:14 | 152:23 153:4 |
| 318:3 321:2 | 292:23 294:1 | 291:7 296:23 | 159:4 206:4,9,12 |
| 325:15 328:19 | 296:7,11,21 | **wrong** 183:6 | 206:19 207:14 |
| 342:19 | 333:1 347:17 | 245:21 278:19 | 212:14,23 |
| **witnessed** | **working** 44:1 | 319:4 330:1 | 217:19 225:16 |
| 114:10,11 283:9 | 56:21 81:19 | 336:13 | 228:21 229:2,16 |
| 326:1 | 113:19 140:6,7 | **wrote** 288:6 | 233:19 237:1 |
| **women** 341:4,8 | 141:12 142:3 | 294:4 297:1 | 238:17 239:14 |
| **women's** 72:17 | 148:19 153:13 | 347:21 | 240:15 242:10 |
| 72:17 75:18 | 176:2 256:13 | **x** | 247:5,9 256:12 |
| **wooded** 136:1 | 285:4,13 289:21 | **x** 6:1,10 99:7,8 | 262:16 332:6 |
| **word** 50:12 | 293:5,7 297:7 | 100:23 101:16 | 337:4 |
| **words** 334:16 | 322:15 331:5 | 114:12 266:8 | **year's** 230:10 |
| **work** 31:9 41:11 | **workplace** | 293:10,22 294:8 | **years** 16:11 19:2 |
| 43:4,15 47:16 | 212:13 | 294:11 | 37:5 63:2 72:7 |
| 53:21 54:12 | **works** 64:13 | **y** | 72:11 126:4,4 |
| 72:14 82:8 | 89:23 98:16 | **y** 99:7,8 101:1,16 | 131:1 151:14 |
| 84:23 112:21 | 237:15 | 114:12 266:8 | 152:3 211:12,16 |
| 126:22 140:2 | **workweek** | **yard** 122:13 | 291:9 292:8 |
| 162:15 163:14 | 267:13,14 | 136:17,18 192:6 | 330:7 345:22 |
| 169:13 173:16 | **worry** 242:6 | 210:2 280:22 | **yelled** 276:3 |
| 179:3 217:18 | **worse** 153:10 | **yards** 149:2 | **york** 4:9,9 |
| 222:17 232:9 | 154:5 241:19 | **yeah** 30:23 65:11 | **z** |
| 235:2 248:19 | 262:7 263:4 | 65:17 71:21 | **z** 99:7,8 101:1,16 |
| 249:1,4,10,17 | 266:3 267:19,20 | 86:11,15 92:11 | 114:12 266:8 |
| 250:1 265:1,4,6 | 267:22,23 268:2 | | |

**zero**   200:11,15
  205:18 206:3,6,7
  207:5
**zone**   125:21
**zoom**   240:4

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.