**To:** Ellington, Edward (DOC)[Edward.Ellington@doc.alabama.gov]
**Cc:** McCoy, Monica (DOC)[Monica.McCoy@doc.alabama.gov]
**From:** Fassl, Mark (DOC)
**Sent:** Wed 11/21/2018 9:20:24 AM
**Subject:** FW: ASCA Inspection of St. Clair
ASCA St Clair Assessment Report DRAFT.docx

Hello Ed,

Attached is St. Clair report. We will work together to help out Warden Jones. v/r Mark

**From:** Fassl, Mark (DOC)
**Sent:** Tuesday, November 20, 2018 11:49 AM
**To:** Williams, Jeffery (DOC) <Jeff.Williams@doc.alabama.gov>
**Subject:** FW: ASCA Inspection of St. Clair

# FYI  St Clair—ASCA Report

**From:** Fassl, Mark (DOC)
**Sent:** Monday, November 19, 2018 9:27 AM
**To:** Seals, William (DOC) <William.Seals@doc.alabama.gov>
**Subject:** ASCA Inspection of St. Clair

Hello Will,

This is the report. Thanks for the help. v/r Mark

Mark F. Fassl
Alabama Department of Corrections
Inspector General "First Be Right-Then Move Forward"
Email-mark.fassl@doc.alabama.gov
C-334-353-3305
O-334-353-2575

INSPECTOR GENERAL SENSITIVE INFORMATION - FOR OFFICIAL USE ONLY:  The information contained in this email and any accompanying attachments may contain Inspector General sensitive information, which is protected from mandatory disclosure under the Freedom of Information Act (FOIA), 5 USC 552. It should not be released to unauthorized persons.  If you are not the intended recipient of this information, any disclosure, copying, distribution, or taking of any action in reliance on this information is prohibited.  If you received this email in error, please notify us immediately by returning email or by calling 334-353-2575.



EXHIBIT
8
Culliver

HIGHLY CONFIDENTIAL

# Alabama Department of Corrections
# St. Clair Correctional Facility
# Operational Assessment Report

*Submitted to the:*

# Alabama Department of Corrections

*By the:*

# *Association of State Correctional Administrators*

January 22, 2018



**Table of Contents**

HIGHLY CONFIDENTIAL

ADOC-TP-018290

Assessment Overview..................................................................................................3
Methodology.............................................................................................................3
Observations, Findings and Recommendations........................................................5
    Facility Climate and Culture.................................................................................5
    Leadership and Command Structure.....................................................................7
    Security Staffing, Supervision and Span of Control...............................................9
    Operational Policies and Procedures....................................................................11
    Post Orders (SOPs) and Logs..............................................................................12
    Tours and Inspections........................................................................................13
    Facility Access Control.......................................................................................14
    Facility Searches...............................................................................................16
    Perimeter Security............................................................................................19
    Inmate Movement and Control...........................................................................25
    Key and Tool Control.........................................................................................27
    Maintenance and Repairs..................................................................................29
    Inmate Classification.........................................................................................30
Appendix A: Assessment Team Biographical Profiles..............................................32
Appendix B: Documents Reviewed.........................................................................35
Appendix C: Staff Interviewed...............................................................................36

## Assessment Overview

Jefferson Dunn, Commissioner of the Alabama Department of Corrections (ALDOC), requested the Association of Correctional Administrators (ASCA) to conduct a facility operational assessment of the St. Clair Correctional

HIGHLY CONFIDENTIAL                                              ADOC-TP-018291

Facility (SCCF) located in Springville, Alabama. This assessment was part of ALDOC's response to the escape of two security level 5 inmates on December 4, 2017.

The SCCF is a 1,275-bed level 5 close custody male facility that opened in 1983 with a design capacity of 984. The facility is a campus style institution comprised of fifteen inmate housing units, a vocational industry building, a kitchen with a dining hall, a medical unit with an inpatient infirmary, and a number of administrative buildings all within one continuous perimeter.

The fifteen inmate housing units consist of two dormitories and thirteen cellblocks. Cellblocks consist of an A side and a B side that are physically separated from each other and have a secure officer's station (cubicle control) overlooking each side. Housing units include: One 200-bed dormitory that serves as a therapeutic community program; One 58-bed chronic care dormitory located in close proximity to the infirmary; Four 48-bed and one 24-bed cellblocks used for regional restrictive housing; Two 96-bed cellblocks that provide faith based programming; One 96-bed cellblock that houses elderly inmates; Three 96-bed general population units; One 96-bed unit that provides workers for the Holman construction project, which currently has one side shuttered; and, One 96-bed cellblock currently shuttered due to the transfer of a large number of problematic inmates to other facilities.

The average daily count during the ASCA team site visit was approximately 990 inmates. Of that number, approximately half are serving a sentence of life without parole.

## Methodology

The ASCA assessment team consisted of: Wayne Choinski, Team Lead; Michael Maloney; Wayne Scott; and, Pamela Sonnen. Biographical profiles of team members can be found in Appendix A to this report.

Based on discussions with Commissioner Dunn and Inspector General Mark Fassi, a scope of work was developed, reviewed by the ALDOC, and mutually agreed upon. The scope of work included the assessment of the following operational areas:

- **Facility Climate and Culture:** Facility culture and climate, sanitation, condition of infrastructure, staff and inmate perception of safety and security, and communication between managers, supervisors, staff and inmates;
- **Leadership and Command Structure:** Mission, vision, values, communication, organizational structure, and decision making;
- **Staffing, Supervision, and Span of Control:** Uniformed staffing levels, location of posts, staff shortages, supervisory staff, and supervisory span of control;
- **Operational Policy and Procedure:** Consistency of facility policies, procedures, and practices with agency policies, adherence to facility policies and procedures, staff knowledge of policies and procedures, staff training and enforcement of policies and procedures;
- **Post Orders (SOPs) and Logs:** Availability of SOPs for posts, consistency with staff duties, staff awareness of SOPs, log book documentation, consistency and comprehensiveness;
- **Tours and Inspections:** Frequency and documentation of housing unit tours by officers, supervisors, management, and support staff, frequency and documentation of unit, post, and equipment inspections, and, enforcement of housing unit rules and regulations
- **Facility Access Control:** Facility entrance policies and procedures for staff, visitors and vendors, accountability of vendor tools, searches of staff and visitors, facility escort procedures;
- **Facility Searches:** Searches of inmates, institutional searches, and contraband control;

1/25/18                                             3

HIGHLY CONFIDENTIAL                                    ADOC-TP-018292

- **Perimeter Security:** Adequacy of perimeter security, condition of perimeter security systems, inspection and maintenance of perimeter security systems, documentation of inspections, testing of intrusion systems, and response to alarms;
- **Inmate Movement and Control:** Facility movement policies and plans, video surveillance, accounting of inmates outside of housing units, and formal and informal count policies and procedures;
- **Key and Tool Control:** Adequacy of facility policy and procedures, issuance and return of keys and tools, accountability, inventories, audits, and access to keys and tools;
- **Maintenance and Repairs:** Process for reporting maintenance issues, timeframes for completing repairs, quality of repairs;
- **Inmate Classification:** External and internal, program assignment, and housing assignment;

In preparation for the site visit, the ASCA team requested and received a number of documents related to the agreed upon scope of work. Team members reviewed these documents in advance of the site visit. While on site, the ASCA team requested and reviewed a large number of additional documents. A list of documents reviewed can be found in Appendix B to this report.

The ASCA assessment team was on-site over a 4-day period from January 9 – 12, 2018. On the morning of January 9, 2018, the assessment team met with Inspector General Mark Fassl to discuss the site visit schedule, on site activities, and to be briefed on the escapes. At the conclusion of that briefing, the team traveled to the SCCF and conducted an initial in-briefing with Institutional Coordinator Edward Ellington and Warden I Anthony Brooks. It should be noted that Warden III DeWayne Estes and Warden II Cedric Specks were not present at the facility on January 9. The remainder of the first on site day consisted of a facility tour, individual staff interviews and observation of facility operations. As part of the initial facility tour, the assessment team observed P Cellblock, the two cells where the escapees were housed and walked the suspected escape route both inside and outside the facility perimeter.

On January 10, 2018, the assessment team arrived at the facility at 3:30 am to observe facility operations at the approximate time when the escapes occurred. The team conducted a tour of the perimeter, inmate dining hall, kitchen, P and Q cellblocks, spoke with staff and inmates in these areas, and observed a count being conducted from various vantage points. Warden II Cedric Specks was on site later that morning and was interviewed individually by assessment team members. Additionally, ALDOC Investigation and Intelligence Division Investigator Brian Casey provided the assessment team with an overview of the escape. The remainder of that day consisted of staff interviews, observation of all uniformed posts, tours of all inmate housing units and observation of facility operations. At the conclusion of the day, the assessment team met with Associate Commissioner Grantt Culliver.

On January 11, 2018, Warden III DeWayne Estes was present at the facility and was interviewed by the assessment team. Additionally, individual team members interviewed Warden Estes at other times during the day as well. The remainder of that day consisted of staff interviews and observation of facility operations. On January 12, 2018, the ASCA assessment team drove to ALDOC Headquarters and conducted an out-briefing with Commissioner Jefferson Dunn and Chief of Staff Steve Brown.

A list of all SCCF staff interviewed can be found as Appendix C to this report.

**Observations, Findings and Recommendations**

**Facility Climate and Culture**

<u>Observations and Findings</u>

1/25/18                                            4

ADOC-TP-018293

During the assessment team's three full days on site, we had the opportunity to observe facility operations on both the day and evening shifts. With very few exceptions, all of the staff we came in contact with, interviewed, and spoke to during our observations were personable, accommodating and candid. With that said, security staff overwhelmingly described morale as being low. The general consensus was that they felt under-appreciated and overworked. Low pay, mandated overtime, changes to the retirement system, the lack of meaningful pay raises, and fear for their personal safety were cited   reasons for the low morale. Due to significant correction officer shortages, mandated overtime is rampant, with 16-hour shifts the norm.

Staff shortages combined with low morale has created a facility culture of unmotivated staff doing only the minimum to make it through their shift. Officers do not enforce basic facility policies such as challenging inmates moving without authorization on the yard, enforcing the requirement for inmates to wear their issued identification wristband, and prohibiting smoking within housing units. This has resulted in the inmate population being very undisciplined and empowered by the lack of any real structure.

Sanitation in the facility is very poor. Copious amounts of trash were noted in most areas of the facility.  The trash in some areas of the institution has accumulated over a period of time indicating sanitation is a very low priority.  An active mouse infestation was observed around the outside of the food service building. It appears that staff has accepted the unsanitary conditions.  Poor sanitation is one sign of poor control over a facility.

Excess clutter and nuisance contraband is visible in inmate cells. This has potentially contributed to the significant level of contraband that exists within the facility. Cell phones, drugs, and weapons are prevalent among the inmate population. While touring the facility, several assessment team members observed an inmate using a broken piece of a glass mirror; accompanying the tour was a warden, a central office representative and several supervisors. No action was taken to confiscate the contraband from the inmate.

Inmate vandalism was observed throughout the facility.  Newly installed windows in some cellblocks have already been broken. Metal strips that secure cell door windows to the frame have been removed. Many of the camera shields located in cellblock day rooms have been scratched, reportedly by sandpaper, rendering them useless. Inmate vandalism is exacerbated by the fact that inmates are rarely locked in their cells, which also leaves no designated time for cleaning.

All of these issues are certainly indicative of a lack of leadership. Correctional staff receive little supervision or support.  Everyone from top management, including regional staff, to line staff appears to have accepted mediocrity as the new normal.  Staff realizes that they are not running a safe and secure facility; however, they believe that due to the shortage of resources, the bureaucracy, and the large number of security staff vacancies, they are doing the best job possible. This has resulted in a situation where vital security functions such as cell searches and security inspections are not being performed. The failure to perform vital security functions has had a negative impact on facility safety and security and certainly contributed to the December 4, 2017 escapes.

There is no system in place to provide direction to line staff regarding what "shortcuts" are approved due to the shortage of staff.  Leadership staff is not visible to line staff, so line staff are doing what they have to do to get through the day, with no clear direction.

An example of the lack of direction is the recent escape, which was accomplished by cutting out a cell window, and very possibly the inmates being reported as present during a major count.  It was reported by security staff and supervisors that there have been at least three known incidents where windows have been cut out. When asked what direction the staff has been given to address the window security issue, it was reported that the Population Captain issued a directive to shift commanders that on each Sunday an inspection of all windows, to include tapping with a mallet, would be conducted and documented in the Duty Post Log.  A copy of the directive

1/25/18                                                                 5

could not be produced, and a review of three weeks of Duty Post Logs revealed that there had not been any documentation that the checks had been completed.

Recommendations:

1. Modify facility operations to accommodate current staffing levels. Consider reducing inmate movement, out of cell time, and rotating recreation periods so that less inmates are out of their housing units at any given time;
2. Review and revise Standard Operating Procedures (SOPs) to reflect the current conditions i.e. staffing and resources;
   - Identify the individual in the chain of command that is responsible to monitor that each individual SOP is being enforced as directed
   - Establish a method to track corrective actions taken when deficiencies are identified
3. Implement a facility sanitation plan;
4. Ensure wardens and supervisors tour the facility as required and communicate expectations to staff;
5. **The wardens and captains should make it a priority to find ways to motivate, inspire, and encourage staff on a continuing basis. Properly motivating, inspiring, and encouraging staff also has the added benefit of lifting morale; and**
6. The facility should be locked down, with minimal inmate movement, and a contraband search and security inspection of all areas conducted.

**Leadership and Command Structure**

Observations and Findings

The facility has a leadership team that consists of a Warden III, Warden II, and a Warden I. As seen in the SCCF Table of Organization below, the Warden III has nine direct reports. The Warden II is responsible for security and operations and has four direct reports. The Warden I responsible for inmate classification and a number of inmate services and inmate programming.

SCCF Table of Organization

HIGHLY CONFIDENTIAL                                                              ADOC-TP-018295



As the overall facility administrator, the Warden III has considerably more direct reports than the assessment team would expect to find in a maximum-security facility. Possibly because of this, the Warden II and Warden I are not being mentored by the Warden III and therefore are reluctant to make decisions.

During the several days that the ASCA team was on site, it was frequently reported that the leadership team did not initiate action unless they were specifically directed to do so by the Warden III. Staff were not knowledgeable about issues that directly affected their area of responsibility, often stating that they were waiting for direction or answers from the Warden III. This included the status of security equipment purchases or repairs e.g. microwave detection system repairs in the sally port, or replacement of the fluoroscope at the main entrance of the facility.

SCCF relies heavily upon verbal communication. The Warden III holds a meeting with the two assistant wardens and three captains each weekday morning in his office at 8:00 AM. The events from the previous day and anticipated events for the current day are discussed. Additionally, the Warden III convenes a monthly meeting of all supervisors and department heads, including all support services supervisors, on the third Monday of each month. These meeting cover a range of topics that the Warden III feels needs to be disseminated to all staff. Twice each year the Warden III holds a meeting with all staff to include correctional officers for a wide-ranging discussion of topics where he discusses and dispenses relevant information that he feels is important for the staff to know. Minutes of the monthly and the bi-annual meeting are taken and were reviewed by the assessment team.

Without exception, all three wardens conveyed to the assessment team that they felt important information is not being communicated well to lower-level staff. In particular, they felt that mid and first level supervisors were not communicating relevant information to the correctional officers.

While verbal communication and personal interaction is important, in a correctional organization standardization is necessary. Standardization requires communicating in writing as well as verbally. Policies and Standard Operating Procedures must be up to date, available to all, and there has to be a process in place to monitor staff compliance with mandated practices.

Interviews with line level supervisors and security staff gave the assessment team the strong impression that the three wardens did not tour the facility frequently. The Warden III stated that he tries to get to all areas of the

1/25/18                                                7

HIGHLY CONFIDENTIAL                                                      ADOC-TP-018296

institution weekly, but admitted sometimes he is unable to meet that schedule. Both the Warden II and Warden I stated that they try to get to the back of the institution daily and admitted that they rarely tour on the evening shift.

All three wardens attributed the current issues within facility security to a lack of staff. There is a critical need for the leadership team to analyze the resources available and modify operations based on current staffing levels. Additionally, they must revise policies to give clear direction to staff on how to accomplish the functions for which they are responsible, including what is minimally acceptable. Equally important is to establish methods to monitor that vital security functions are being completed satisfactorily. The SCCF leadership team must regularly observe facility operations, ensure policies are being followed and correct staff when deviations from established policies are observed.

<u>Recommendations:</u>

1. Review and revise the current table of organization;
   - The Warden III should have no more than 4-5 direct reports
   - The Warden I and Warden II should be given clearly defined areas of responsibility with decision making authority for those areas
2. Modify facility operations based on current staffing levels. Consider reducing inmate movement, out of cell time, and rotating recreation periods so that less inmates are out of their housing units at any given time;
3. All three wardens should be visible throughout the facility on a daily basis to show staff that they are engaged and supportive of their efforts. Warden tours on the night shift should be discussed and scheduled among the three wardens so that each warden has the opportunity to spend meaningful time with staff on that shift. This is especially important in times where morale and staffing levels are critically low;
4. All three wardens should make it a priority to ensure that relevant information is conveyed properly and in a timely manner to all correctional staff. Clear communication up and down the chain of command in a Level 5 institution is extremely important to the success of the operation and the safety of staff and inmates;
5. The Warden III should review his staff meeting schedules and ascertain if he needs to meet more frequently than the currently scheduled monthly and bi-annual meetings. More frequent meetings give the warden the opportunity to share important information in a timelier manner with staff and also to receive more input from his supervisors;
6. The wardens should develop a "crisis management" plan with the input of all stakeholders at the facility. Input should also be obtained from regional and departmental levels. The plan should outline specifically how to manage the crisis brought on by the severe lack of staffing at the facility. The plan must be viable so that the staff can unquestionably execute it. The goal of the plan must be clearly stated and obtainable. Once the plan is formulated it should be shared and communicated clearly and concisely to all security staff and support service employees. Crisis management planning also has the advantage of being a great team building exercise;
7. Since communication from mid-level supervisors to line correctional staff is an acknowledged problem, the shift commanders/assistant shift commanders should document any oral communications to shift personnel in the Shift's Daily Action Log. The Shift's Daily Action Log should be reviewed by a warden on a daily basis to ensure that all pertinent communication is being properly and timely delivered to all correctional personnel. Whenever possible, all pertinent information should be communicated to correctional staff in writing with a copy being secured in a binder at each post. Correctional officers should review every new written communication daily and sign to acknowledge their notification and understanding.

1/25/18                                                    8

**Security Staffing, Supervision and Span of Control**

<u>Observations and Findings</u>

*Security Staffing*

There is a concerning number of correctional officer vacancies at SCCF. Of the 249 approved correctional officer positions, currently only 91 are filled. That leaves 158 correctional officer positions vacant, equating to a vacancy rate of 64%. The industry standard for correctional officer vacancy rates is not to exceed 10% for any 18-month period[1]

Staffing of security posts is achieved through the utilization of a combination of full time correctional officers, part time retired correctional officers, Security Guard I positions (locally known as correctional cubicle officers), and Radio Operators. Additionally, the facility regularly depends on voluntary overtime, mandated overtime, staff on loan from other facilities and CERT staff to man its shift rosters.

The Security Guard I positions were established to assist with manning cubicle control posts. While 110 of these positions have been established, only 14 are currently filled. Radio Operators are only assigned to the Facility Control Center. Both positions require significantly less training than correctional officers and probably are not good long term solutions to the security staffing issues at SCCF.

<u>Even with the utilization of a number of creative staffing practices, the facility regularly fails to meet minimum staffing requirements specified in SOP #032,</u> Staff Manning Requirements. Table 1 below shows the staffing requirements specified in SOP #32.

**Table 1**

| | AM Shift Fully Staffed | AM Shift Minimal Staffing | PM Shift Fully Staffed | PM Shift Minimal Staffing |
|---|---|---|---|---|
| Supervisors | 4 | 2 | 4 | 2 |
| Security Posts Weekday | 57 | 40 | 36 | 27 |
| Security Posts Weekend | 65* | 46* | 36 | 27 |

*Includes Inmate Visiting Staff

While on site, the assessment team observed very few security staff within cellblocks and in areas where inmate movement occurs. Some cubicle control posts were manned on only one side and a number of rover posts were not manned. <u>Even on shifts that begin with minimal or slightly greater than minimal staffing, security staff are routinely pulled from posts to relieve mandated staff that have reached the maximum 16-hours on duty, and for emergency medical trips.</u> Scheduled medical trips and emergency medical trips occur frequently due to the facility having an inpatient infirmary and a 58-bed chronic care unit.

There is one correctional canine handler supervisor, two correctional canine handlers, and two correctional canine assistant handlers assigned to the facility. These positions are regularly pulled from their canine handler duties and utilized to fill posts inside the facility.

---

[1] ACA Standards for Adult Correctional Institutions, 4th Edition, Section C: Personnel, Standard 4-4052

1/25/18                                        9

HIGHLY CONFIDENTIAL                                        ADOC-TP-018298

The assessment team believes that, if fully staffed, SCCF has an adequate number of posts that are appropriately located to supervise and manage the current inmate population.

*Supervision and Span of Control*

Seven correctional lieutenants and thirteen correctional sergeants provide supervision for line security staff. Four of the lieutenants are assigned as shift commanders for the two 12-hour shifts and the remaining three are assigned to an administrative shift. One serving as the segregation lieutenant, one as an administrative lieutenant, and one as the facility PREA coordinator. The thirteen correctional sergeants assist the shift commanders and segregation lieutenant in providing 24/7 supervisory coverage.

As a result of the security staff shortages, lieutenants and sergeants routinely perform correctional officer duties such as manning posts, assisting with counts and controlling inmate movement. While on site, the assessment team frequently observed supervisors performing duties that would normally be expected to be performed by correctional officers.

Staff do not receive appropriate supervision and mentoring. There was little evidence that supervisors make required tours. Supervisors seem resigned to the fact that they are understaffed and therefore unable to perform basic correctional practices such as proper inmate supervision, maintaining order, and conducting tours and inspections.

The supervisory span of control for the general population currently falls on the responsibility of one captain, three shift commanders and two sergeants. A second captain oversees segregation, H Dorm, B Shift staff and some administrative functions. A third captain and three lieutenants are assigned to administrative functions. Shift commanders appear to be mired down with administrative functions and have little time to tour and supervise staff. Supervision is often left to the two population sergeants.

Recommendations:

1. As a short-term solution, prioritize the filling of the 96 Security Guard I position vacancies. Requiring only a 7-day training period, the filling of these positions can have the most immediate impact on staffing;
2. In the long term, consider moving away from POST certification for correction officers and moving towards a correction officer training program that is of a shorter duration. Many states employ a 6-8 week training program facilitated at a regional location;
3. Reevaluate duties and responsibilities of administrative supervisory staff in order to possibly reassign some administrative supervisors to line supervisory roles to assist with the supervision and mentoring of staff; and,
4. Consider creating a Chief of Security position responsible for all facility security and to oversee all security staff. Most high security facilities have a chief of security that reports to an operational deputy warden. In this case, the SCCF Warden II.

**Operational Policies and Procedures**

Observations and Findings

The majority of SCCF operational policies, Standard Operating Procedures (SOPs), were reviewed by the assessment team either in advance of the site visit or while on site. SOPs were found to be consistent with corresponding ALDOC Administrative Regulations. In general, SOPs were found to be well written; however,

1/25/18                                    10

many had not been updated in several years. The accepted practice for reviewing and updating facility policies calls for a review of each policy to be conducted annually with updates made as needed during the review process. Additional updates are made in between annual reviews on as needed basis. The Administrative Captain updates SOPs when advised to do so by a warden, based on a change in policy or institutional practice. There is no schedule in place to ensure each SOP is reviewed annually.

The Administrative Captain is responsible for policy training and to ensure that staff read and understand the SOPs. There is a procedure in place for the communication and dissemination of new and revised SOPs to staff. That procedure requires staff to read new or revised SOPs and to acknowledge by signature that they have read and understand the new or revised SOP. The Administrative Captain could not produce an acknowledgement form that had been signed in the past 24-months.

The general consensus among the assessment team is that staff do not follow the SOPs, or, follow them in part, but not completely. Security staff consistently stated that they cannot follow SOPs because of staffing shortages. However, the assessment team observed instances where staff should have followed SOPs, but did not do so. As an example, the officer assigned to Front Lobby Checkpoint post does not search staff bags. Another example is the facility has a tool control and a key control policy; however, neither are currently being followed by staff.

The Warden II stated that he was aware of staff not being able to complete duties as outlined in the SOPs, but he has not given staff any direction on what the security priorities are for their posts. The staff and management have used the excuse of short staffing for so long that they seem to have given up on finding ways to meet the most basic security functions.

<u>Recommendations:</u>

1. As a short-term solution, assemble a team to review and revise as needed all SOPs to reflect operational changes;
2. Ensure the procedure currently in place for the communication and dissemination of new or revised SOPs is followed; and
3. Develop and implement an ongoing review process to ensure SOPs are reviewed annually and updated as needed.


**Post Orders (SOPs) and Logs**

<u>Observations and Findings</u>

SOPs for security posts (post orders) are not reviewed and updated annually. The assessment team found similar issues while reviewing general facility SOPs not related to a specific post. The Administrative Captain assigned to this task only updates SOPs when advised to do so by a warden based on a change in policy or institutional practice. The accepted practice for reviewing and updating facility policies calls for a review of each policy to be conducted annually with updates made as needed during the review process. Additional updates are made in between annual reviews on an as needed basis.

A review of current SOPs for security posts revealed that the majority have effective dates within the past 24-months; however, there are some with effective dates over 10-years old. These include SOPs for critical posts such as Front Lobby Security Checkpoint and Sally Port Security Tower Officer. It is imperative that the duties and responsibilities delineated for each security post are regularly reviewed to ensure they reflect the current needs of each post and that it can be reasonably expected that staff can carry out those delineated duties during the course of the shift.

1/25/18                                                                 11

During a tour of facility security posts, the assessment team requested to review copies of SOPs for security posts. The majority of posts did not have SOPs on post. The assessment team was informed that SOPs in some inmate housing units were removed during renovations due to roof damage and were not replaced. SOPs that were found on post were inspected. Staff acknowledgment forms included with the SOPs were found not to be current, indicating that staff have not reviewed post orders upon assuming newly assigned posts. It is an accepted practice that copies of security post SOPs are maintained at each fixed post and that when assuming a new post, staff acknowledge that they have read and understand the orders for that post by signing and dating the posts SOP. A master copy of all SOPs is maintained in the shift commander's office and is available for staff to review.

While conducting the tour of security posts, the assessment team also reviewed Duty Post Logs throughout the facility. The Duty Post Log maintained in the Shift Commanders Office is typed and fairly detailed with documentation of counts, major inmate movement, inmate transfers in and out of the facility and incidents. It does not reflect facility tours and inspections made by supervisors. Duty Post Logs for security posts and cellblocks are handwritten and lack detail. They do not consistently reflect individual inmate activities, programming, incidents and security tours that take place. As an example, on the date of the escapes, the P Cellblock Duty Post Log does not note that two inmates from P-2 were unaccounted for and the 6:00am count total is inaccurate. Supervisory tours and inspections, when found to be noted in Duty Post Logs, were difficult to identify as supervisory tours.

Recommendations:

1. In light of the current staffing limitations, review and revise all security post SOPs to reflect current duties and responsibilities and any operational changes;
2. Implement an ongoing review process of SOPs for security posts that provides for an annual review of each SOP with additional reviews on an as needed basis;
3. Require all supervisors conducting tours and inspections to sign security post logs in red (or green) acknowledging that they have toured the post and reviewed the log entries for that shift; and,
4. Reinforce with all staff the need for detailed log entries emphasizing the fact that Duty Post Logs are a permanent record of what transpired during their shift. If it's not in writing, it didn't happen.

**Tours and Inspections**

Observations and Findings

*Facility Tours and Inspections*

Facility tours and inspections are not conducted as frequently as prescribed by policy. SOP #182, Institutional Security Inspections, dictates the frequency and requirements of tours and inspections by managers, supervisors and security staff. The SOP is fairly comprehensive and well written and designed to maintain facility security, sanitation and safety standards.  Shift Commanders and Sergeants are required to tour and inspect the facility daily. Wardens, Captains and Department Heads are required to tour and inspect the facility weekly.

The assessment team found that managers, supervisors and security staff are not conducting tours and inspections of the facility as often as they should. Tours and inspections by security staff and supervisors are rarely noted in Duty Post Logs. Supervisors and managers up to and including the warden level admitted that they do not tour as often as required.

1/25/18                                    12

HIGHLY CONFIDENTIAL

The failure of security staff, supervisors and managers to regularly and consistently tour the facility is evident in the overall poor condition of the facility that was observed by the assessment team while on site.

*Inmate Housing Unit Tours and Inspections*

Tours and inspections of cellblocks and inmate dormitories are not conducted as prescribed by SOPs. SOPs for cellblock and inmate dormitory rover posts specify that a "check" will be made every 30 minutes with the exception of chow and count times. The accepted standard for tours of inmate housing areas by security staff is every hour in general population units and every 30 minutes in restrictive housing units. A review of Duty Post Logs for cellblocks and inmate dormitories revealed that "checks" are not always recorded in the logs. While on site, the ASCA assessment team observed very few tours and inspections of inmate housing areas being conducted either by rovers or by supervisors. Security staff attributed their failure to conduct required tours and inspections of inmate housing areas to the lack of staff.

Tours and inspections of inmate housing areas by security staff is critical in preventing escapes, suicides, and assaults as well as enforcing rules and regulations among the inmate population. Security staff should be touring inmate housing areas as required by the accepted standard. Supervisors should be touring inmate housing areas at least once per shift.

Recommendations:

1. Ensure managers and supervisors conduct tours and inspections in accordance with SOP #182;
2. Ensure all staff consistently document tours and inspections of the facility and of inmate housing areas in Duty Post Logs;
3. Revise SOPs for applicable rover posts to define what their responsibilities are during a "check"; and,
4. Revise SOPs for applicable rover posts to reflect the accepted standard for tours of inmate housing areas by security staff; Every hour in general population units and every 30 minutes in restrictive housing units.

**Facility Access Control**

Observations and Findings

There are two ways to access the SCCF; the front entrance and the vehicle sally port.  Information regarding the vehicle sally port will be included in the discussion on the perimeter. Standard Operating Procedure #061, Front Lobby Security Checkpoint, establishes the responsibilities of the Checkpoint Operator.  The assessment team was able to observe entrance procedures for three consecutive days.  Several shift changes were observed, as well as general traffic into the facility.  There were no visits scheduled during the time that the assessment team was onsite, therefore, visitor processing was not observed.  Also, no contractors were observed entering the institution during the time of the site visit.  Assessment team members were required to sign in daily, and issued Visitor ID. The team was provided with escorts during the entire time of the site visit.

It was reported that there is a major issue with contraband at this facility.  The two commonly reported methods of introducing contraband are: 1) Thrown over the perimeter fence; and 2) Visitors and/or staff bringing it in through the main entrance.

According to SOP #061, Front Lobby Checkpoint, the front entrance will be equipped with a walk-through metal detector, an X-ray machine (fluoroscope), and a hand-held metal detector.  At the time of the site visit, only a walk-through metal detector was present.  It was explained that the X-ray machine had been broken for some

1/25/18                                     13

time (no one could give an exact date). It was also explained that someone had "stolen" the hand-held metal detector (again no exact date was given). The Warden III stated that he submitted a request for a new X-ray machine over six months ago; he also produced a copy of a follow-up purchase order for a new X-ray scanner (10/17/2017). He sent a follow-up correspondence (12/20/2017), asking the status of the purchase order. At of the time of the site visit there has been no progress in procuring the needed piece of equipment.

All packages entering the institution must be inspected by the Checkpoint Operator. Due to the lack of the X-ray machine, these inspections are completed manually. **Assessment team members were present when packages were being inspected, at the same time that staff was being processed into the facility. The inspection process was cursory, at best.**

The front lobby was a very hectic location during shift change. A sergeant was checking individuals into the facility and notifying them of their assignments. Each employee being processed through the metal detector was placing a clear plastic bag with their lunches and personal items on a table for inspection by the Checkpoint Operator, then proceeding through the walk-through metal detector. A single officer was assigned to complete the processing of the oncoming shift. **He performed a perfunctory search of the bags; and, although the metal detector alarmed on several individuals, no one was required to submit to a pat search or pass through the metal detector a second time.**

SOP #061 states:
> *The employee(s) assigned to operate/monitor equipment will ensure that every person entering the facility is screened by the walk-through metal detector/x-ray machine checkpoint.*
>
> *No one is allowed to enter the facility via central control who fails to clear through the checkpoint (walk through metal detector, x-ray machine, pat search, etc.)*

Understandably, during shift change there is a surge of staff entering the facility to begin their tour of duty. The process that was observed appeared to be more about getting the staff into the facility, rather than preventing the introduction of contraband.

SOP #061 states:
> *The warden or his/designee will daily establish the parameters for the random search for the following day and relay that information to the checkpoint operator. For instance, the order may be given to search every sixth employee entering the facility. The search will be a pat search with shoes removed. The pat search will be in addition to being subject to the walk-through metal detector and the x-ray machine.*

It was reported by the Checkpoint Operator that the use of random searches is seldom implemented.

If it is truly believed that the front entrance of the facility is one of the major introduction points for contraband, very little effort is being expended to establish an effective interdiction process. **Entrance processing is predictable and ineffective.**

Recommendations:

1. Appoint an individual to be responsible for the overall security program at SCCF. Consider creating a Chief of Security position:
   - To be responsible to oversee the development, implementation, and annual review of SOPs
   - To be responsible to monitor the condition of security equipment within the facility; and to track the status of repairs and replacement of equipment, as needed

HIGHLY CONFIDENTIAL                                                     ADOC-TP-018303

- To be responsible to make decisions regarding the deployment of security staff
- To oversee an institution security inspection process
  - Identification of areas to be inspected
  - Provide direction regarding the procedure for inspection
  - Determine the method to document inspections
  - Determine the method to ensure that security deficiencies are corrected.

2. Properly equip the Checkpoint;
- Replace the missing hand held metal detector
- Expedite the replacement of the X-ray machine
3. Re-implement the practice of daily random searches at the Checkpoint;
4. Add at least one additional employee to the checkpoint during shift change to assist in the processing of employees; and,
5. Ensure that a ranking officer is present to specifically monitor the search process during the change of shifts.


**Facility Searches**

Observations and Findings

ALDOC Administrative Regulation #322, Security Audits, establishes a process to conduct comprehensive security inspections (audits) of three major institutions per year. The Associate Commissioner of Operations reported that, due to staff shortages in the ALDOC, no audits have been conducted for approximately three years. He also reported that the responsibility for implementing Administrative Regulation #322 was now the responsibility of the Inspector General. Institution staff were unable to recall when the last audit was conducted. Staff was also unable to produce a copy of the report for the last audit.

SOP #182, Institution Security Inspections, states:
> *The Warden or his designee is responsible for ensuring that periodic institutional inspections are conducted, reported and discrepancies addressed so that security, sanitation and safety of the institution is maintained.*

A request to produce the last report of an institution security inspection had negative results.

Given the recent escape it is important to note that SOP #182 also includes the following language:
> *Weekly—The Warden, Assistant Warden, Captain or Department Heads will inspect the institution on a weekly basis.*
>
> *Maintenance tunnels will be inspected at least once each week.*
>
> *A Correction Officer will physically challenge all inmate housing unit windows, checking for tampering, cuts, etc., by pounding the windows with a rubber mallet at least twice each week. A 302-A Incident Report will be completed to document the inspection and any discrepancies.*

It was reported by the Population Captain that, after the recent escape, he issued a memo to all shift commanders requiring that all windows in the facility would be inspected (tapping with a rubber mallet) on Sunday evenings, and that the results would be documented in the Duty Log. A copy of the memo was requested and could not be produced. A review of the last three Sunday Duty Logs did not reveal any indication that the checks had been completed.

SOP #110, Search and Shakedowns, states:

1/25/18                                    15

> *Shift Commanders will ensure that Cell Block rovers conduct a minimum of (2) two cell searches each shift in their assigned Cell Blocks. Pat searches will be conducted randomly by the Cell Block Rovers or as the situation dictates. Latex gloves are available in the Shift Offices for searches, etc., and the security staff is encouraged to use gloves.*

SOP #110, Search and Shakedowns, does not include a total facility search plan. The SOP lists several areas to search and also provides time frames for those searches; what is lacking is a facility search plan identifying all areas of the facility to be searched, frequency of searches, direction regarding the methods of search, and documentation requirements.

SOP #056, Population Cellblock Rovers, states:

> *Consistent with the institutional policies and requirements, assigned rovers will conduct sufficient random personal and area searches to eliminate the flow of contraband. A minimum of (4) four cell searches and personal searches will be conducted each shift. Inmates must be present when at all possible during cell searches. These searches will be reported to the shift clerk. An incident report and disciplinary will be completed on any contraband found, when applicable. Tasks such as conducting cell searches, escorting hostile and/or combative inmates, etc. will be conducted when there are at least two (2) or more officers present.*
>
> *The cell block rover will ensure that clothes, linen, books, papers, etc. are not hanging from the beds, stored under the mattresses or stacked under the beds, and pictures, etc. are not affixed to the walls. Each inmate's bed may have one (1) towel, one (1) washcloth, one (1) pair of tennis shoes, one (1) pair of boots, and one (1) pair of shower shoes. All of each inmate's property should be stored in the inmate's assigned locker box in each cell except for the inmate's shoes which should be neatly placed under the bed or has otherwise been approved by the Warden.*

SOP #110, Search and Shakedowns, states:

> *All inmate housing units will be searched every 30 days.*
> *All other areas will be searched randomly every 60 days.*

Staff report that cell searches are not being completed because there seldom are two officers available to conduct the searches.

A tour of the facility was sufficient to reveal that security inspections and shakedowns are not being conducted. The majority of cells have makeshift clotheslines and curtains. Many windows within the facility have been vandalized, including some of the windows that have been recently installed by a contractor. Interior fencing around H dorm (suspected of being a major source of contraband in the institution) has been missing for some time allowing inmates to gain access to the segregation units. Excessive amounts of building material and debris is located outside the Trade School; this potential source of weapons and escape implements is readily accessible to inmates assigned to that area, as well as to inmates housed in H dorm. Approximately 50-75 feet of rubber hose was observed mounted to the exterior wall of the inmate gym.

Given the current level of staffing, it is obvious that the inmate population feels empowered and is taking every opportunity to attempt to intimidate employees. This is all the more reason why the existing policies regarding security inspections and searches should be implemented. While observing the morning count, one assessment team member saw and inmate clothesline with a curtain blocking the door to the cell. The curtain had writing on it; upon closer inspection, the words "You made it this far. Now get out" were observed. No attempt was made to remove that curtain or the dozens of others that were present in the unit.

HIGHLY CONFIDENTIAL                                                                 ADOC-TP-018305

Inmates are released to go to breakfast at approximately 3:30 AM; the assessment team observed movement during this time. Lighting was so poor that it was difficult to recognize inmates. In these low light conditions, inmates could easily be retrieving or moving contraband undetected; or, involving themselves in other illicit activities.

During the three days that the assessment team was on site, no member of the team observed any inmate in the facility being pat searched by an officer. It was reported by staff that cell phones are so abundant in the facility that pat searches frequently result in phones being confiscated, yet pat searches are not being conducted.

A list is generated monthly of 5% of the inmate population, identifying those inmates to be tested for drug use. Those found guilty of drug use are charged for the confirmation test, and normally receive a sanction of loss of privileges. The person responsible for the drug testing works part time. Of the 62 drug tests that were performed, 43 were sent out for confirmatory testing, 7 were returned with positive results. This appears to be too great of a disparity between institution drug testing and confirmation testing.

There are regulations and SOPs in place that if implemented would significantly improve security at SCCF. What is missing is a single person who is responsible for security. Procedures are written, directives are issued, but there is not a single person responsible to ensure that all security functions are performed. Reports are written and filed with no follow up. How does a microwave system malfunction for years without someone following up? How does the X-ray machine breakdown and the hand metal detector go missing without someone revising the entrance procedure until such time as equipment can be replaced? Who made the decision that it is acceptable to repair perimeter lighting annually rather than as needed?

While a major concern of the assessment team is the lack of staffing, there has been no significant change in the management of the inmate population to counter the reduction in staffing. As an example, with the lack of staff, there are fewer rovers in the inmate housing units; however, all of the inmate housing units continue to release all inmates in the unit to the dayrooms. In many correctional systems, a decision would be made to release only one tier at a time. This would allow for the reduced number of staff to deal with a reduced number of inmates, while still completing the post duties.

Recommendations:

1. Identify a single person to be responsible for all security functions. Consider creating a Chief of Security position;
   - Review, revision, and implementation of SOPs
   - Deployment of staff
   - Shakedowns and inspections
     - Document results
     - Follow up on any discrepancies identified
2. Update SOP #182, Security Inspections;
   - Identify all areas to be inspected
   - Determine the frequency of inspections in all areas
   - Provide specific direction for the methods of inspection e.g. visual, tapping, probing etc.
   - Identify items to be inspected e.g. locks, windows, doors, drains, pipe chases, etc.
   - Establish a method of documentation
     - Identification of the individual(s) performing the inspection
     - Results of the inspection
     - Identification of the individual responsible for the inspection process
       - Scheduling
       - Documentation of results

HIGHLY CONFIDENTIAL                                    ADOC-TP-018306

       ➢ Documentation of corrective action taken

3. Update SOP #110, Search and Shakedowns;
   - Divide the facility into manageable sections to be searched
   - Establish the frequency of required searches in each area
   - Provide direction regarding the acceptable methods of searches
   - Establish a method to document the results of searches
   - Identify an individual to be responsible to manage searches
     - Scheduling
     - Documentation of results
     - Documentation of corrective action taken

4. Install additional lighting within the facility;
   - Additional lighting on walkways from units to dining hall
   - Additional lighting around H Dorm
   - Additional lighting in the recreation field
   - Additional lighting behind Industries and the Trade school

5. Require rovers to randomly pat search inmates;
   - All SOPs for posts that monitor movement within the facility should include the provision that staff, at least, randomly, pat search inmates
   - It should be mandatory that all inmates entering and leaving through the gate, between H dorm and the tunnel, are pat searched

6. At regular intervals lock down units and use the available staff to conduct security inspections and shakedowns;
   - Several members of the CERT team are assigned to the facility twice per month. Rather than using them to man posts, lock down units on a rotating basis and have the team members shake them down

7. Contact the laboratory that does the confirmation tests for positive drug tests;
   - Determine if the lab is testing at "drug cutoff levels" that are higher than the institution drug test. (e.g. if the institution is testing marijuana at 50 ng/ml and the lab is testing at 100 ng/ml, many of the institution positive drug tests will be returned as negative)

## Perimeter Security

### Observations and Findings

The SCCF perimeter is reported to be a little over one mile in length. The perimeter has two parallel 12' chain link fences. The exterior fence has nine coils of razor wire, with a coil of concertina wire on the ground level of the outside of the fence. The interior fence is equipped with a shaker alarm system, three coils of razor wire, and additional coils of concertina wire on the ground level inside the perimeter. With the exception of the vehicle sally port, the entire perimeter also includes a lethal electric fence that also has two additional coils of razor wire. The vehicle sally port is equipped with a microwave detection system, which has reportedly not been operational for several years. No documentation could be produced that provided an exact length of time that the microwave system was inoperable.

There are many areas on the perimeter where repairs have been made by institutional staff. Rebar and expanded metal have been installed in areas that have either been breached or determined to be vulnerable. After an escape in 2001, a concrete footing was installed around the exterior fence. Much of the concrete footing is now above ground and in several areas has been washed out and undermined due to erosion.

1/25/18                                    18

The area between the fences which would normally be sanitized has a substantial amount of vegetation, which could interfere with visibility both from the Vehicle Sally Port Tower and the Mobile Patrol.
There are no cameras on the perimeter or on the buildings within the facility facing out toward the perimeter.

Four towers are located in Zones 1, 6, 8, and 12. Zone 1 is the Sally Port Tower which is manned 24-hours per day. Zones 8 and 12 Towers are not manned due to staffing shortages at the facility. Zone 6 Tower is manned when inmates are in the recreation yard.

**Visibility from the Sally Port Tower is good during the day, but at night visibility is seriously compromised. There is an excessive amount of building material and debris located outside the Trade School and the Industries Building, which in addition to being a source of weapons and escape implements, also provides inmates with places to conceal contraband or to avoid detection from the Sally Port Tower.** The Sally Port Tower is equipped with a 12-gauge shotgun and a .40 Cal. handgun; neither weapon would be effective to respond to an emergency unless it occurred directly below the tower. Additional weapons are also stored in the tower and issued to correctional officers that are assigned to details outside the facility e.g. emergency hospital trips.

The perimeter is equipped with high pressure sodium lighting. There are 68 lighting polls each with two high pressure sodium lamps, as well as two impact lights that are capable of providing lighting toward the perimeter road and to the tree line beyond the facility. The assessment team drove around the perimeter at 3:30 AM on the second day of the site visit; a number of the sodium lamps were not operable. It was later reported by the maintenance department that 23 of the perimeter lights were scheduled to be replaced. On the morning that the assessment team observed the perimeter, the impact lights were not on, which is the practice at the facility. Impact lighting is only turned on during emergency situations e.g. escapes. Maintenance reported that there are 130 impact lamps on the perimeter and that at this time between 50-60 need replacement. With the exception of the impact lighting, there is no significant light source between the perimeter fence and the tree line. According to staff reports, individuals frequently approach the fence undetected and throw contraband into the prison yard.

It was reported that perimeter lighting replacement only occurs annually when the Maintenance Department can obtain a lift sufficient to provide access to the light fixtures. It was also reported that at this time it is unknown exactly how many light fixtures may be damaged and have to be replaced; a number that will not be determined until the lift is available and the repair/replacement process can begin.
**Lighting on the buildings within the facility facing the perimeter is poor. Many lights are inoperable and those that are working are inadequate. Except for areas directly below the existing lighting, an inmate could easily hide in the shadows; in fact, it is believed that the inmates who escaped on December 4, 2017 were able to follow the building lines until they were able to gain access to the vehicle sally port and eventually escape.**

A road circles the entire perimeter. A Mobile Patrol Vehicle is assigned at all times. **The perimeter road is in serious disrepair, which could cause a delay in the vehicle response to reported emergencies.** When interviewed, a Mobile Patrol Officer reported that visibility at night was poor. It was also reported that because of the large number of cell phones in the possession of inmates it is very possible that inmates communicate directly to individuals on the outside of the perimeter, who may be delivering contraband. It is believed that inmates on cell phones are reporting on the location of the Mobile Patrol Vehicle, thereby enhancing the potential to throw contraband over the perimeter without being detected.

SCCF has a major contraband problem. According to staff who were questioned, the primary introduction points for contraband are: 1) Over the fence, and 2) Delivered by visitors and a minority of staff through the front entrance of the facility. There is a very active K-9 Unit at the institution. Although they are not part of the mobile patrol, they could certainly supplement the perimeter security workforce. The K-9 Unit has identified many of the major pathways by which outsiders deliver contraband to the facility; they frequently patrol these

1/25/18                                                        19

areas and have also developed a number of techniques to identify when intruders have entered the area undetected.

*Fence and Detection System Checks*

Each shift is required to conduct a perimeter fence check. A review of Duty Post Logs indicates that the checks are being conducted. However, with the exception of SOP # 066, Perimeter Security, no information was provided as to exactly what was expected from the individual conducting a fence checks.

SOP #066, Perimeter Security, states:
> *The perimeter fence razor wire, etc. will be inspected during the scheduled fence checks to detect rusted or broken areas of the perimeter fence.*

Duty Post Logs indicate the times when a perimeter fence check began and ended. There was no indication in the logs that any problem areas were identified with the fencing. No additional reports were produced which would indicate that the fence check was anything but a cursory review of the fence fabric, looking for large gaps.

SOP #066 Perimeter Security also states:
> *An electrified lethal fence system located between the double chain link fences and encompasses the entire perimeter with the exception of the Sally port. The system will be tested/checked by maintenance staff at least once every day-Monday through Friday. The results will be documented in the Central Control Log and the Electric Control Building Log.*

The practice in place is that whenever a member of the maintenance staff exits the facility through the vehicle sally port, he/she is required to enter the Electrified Control Building and check the system. The check consists of determining that the circuit loop is intact i.e. the entire perimeter is covered with live voltage, and that the voltage is being maintained at the required level. The check is documented in a log located in that building, no notification is made to Central Control that the check has been made. **A review of the documentation in the Electrified Control Building revealed that checks are consistently made several times per day. The Plant Maintenance Supervisor reported that if an issue was identified with the electric fence he would notify the Warden.**

*Fence Alarm System Checks*

SOP #066, Perimeter Security, states:
> *Formally trained electronic technicians, who are trained in the maintenance and repair of all perimeter electronic detection systems, electrified fence systems, etc., will be on staff and/or on call.*

**According to the Plant Maintenance Supervisor there is no person on the maintenance staff trained to maintain the shaker or the microwave systems. Any repairs to either system must be performed by technicians assigned to the Central Office Engineering Division.**

The maintenance department does, however, perform weekly tests of the shaker system. The "Thumper" test consists of a maintenance employee walking the entire inner perimeter fence and attempting to cause an alarm in each zone. There is also an individual in Central Control monitoring if the alarms are activating.

Shaker systems are very susceptible to extreme weather conditions. High winds often cause alarms. A review of the last two weeks of testing results for the shaker system revealed that during **the week of 12/25/17, the test resulted in over 400 alarms; during the week of 1/1/18 the test resulted in 233 alarms.** Central Office

1/25/18                                                      20

Engineering was reportedly at the institution to service the shaker system, between tests; it is believed that they adjusted the sensitivity of the system (turned it down); however, this has not been confirmed.

The Microwave system has been inoperable reportedly for years. The Sally Port area is the only area of the perimeter not covered by the electrified fence. During the time of the site visit, it was reported that repairs to the system are in process; there is no estimate when the repairs will be completed. Other than the previously mentioned language there is no reference in SOPs regarding who is responsible to test the microwave system, the method to conduct that check, or to document the results.

Because the microwave system is not operational, a vehicle is assigned on the night shift, positioned at the Vehicle Sally Port.

*Vehicle Sally Port*

One officer was assigned to the Vehicle Sally Port. The duties of this officer are listed in SOP #077, Sally Port Officers.

SOP #077, Sally Port Officers, states:
> *The Sally Port Officer will search all vehicles entering or leaving the institution via the Sally Port to include, but not limited to, the cargo, cargo compartment, passenger compartment, glove compartment, sun visors, seats under the hood, under the dash and any other areas in which an inmate or contraband could be concealed. An iron rod will be used to probe trash or other such materials to detect hidden inmates and a rolling extension mirror will be used to visually check underneath the vehicle.*

Two vehicles were observed being processed into and out of the facility. One vehicle was an institution van and the other was a semi-tractor trailer truck making a delivery to the industries program. It was explained that both vehicles were DOC vehicles, operated by DOC employees.

The Sally Port Officer searched the cab of the van, and checked under the hood. The cargo space was not searched, and there was no visual inspection underneath the vehicle with a rolling extension mirror. When the vehicle departed, the same type of search was completed.

When the semi-trailer truck entered the facility, it was too long to fit into the Vehicle Sally Port. Both gates in the Sally Port were opened to allow the truck to enter. The vehicle cab was searched. The cargo area was not searched, and there was no inspection of the underneath of the vehicle using mirrors. The hood was not opened to check that area. It was explained that this vehicle was under escort at all times. The truck was inside the facility for approximately 30 minutes.

It should be noted that there is a warehouse located directly across from the Vehicle Sally Port. Some dry goods are stored in that area, but the space is primarily filled with salvage materials and debris. If the area was cleaned out, it would be an excellent storage area.

*Introduction of Contraband*

Staff readily express their frustration over the amount of contraband within the facility, specifically cell phones, and drugs. Many also reported that weapons have also been introduced into the institution. While they admit that some staff may be guilty of introducing contraband, most employees report that the majority of the contraband is being thrown over the perimeter fence, then retrieved by inmates. It is the consensus among those staff reporting that the two most common areas to introduce contraband are over the fence and into the recreation yard; and over the fence behind H Dorm. Both of these areas allow inmates to approach very close to the institution perimeter to retrieve contraband items.

1/25/18                                    21

HIGHLY CONFIDENTIAL                                    ADOC-TP-018310

**Recommendations:**

1. Clear all vegetation from between the perimeter fences;
2. Remove all building materials and debris currently located behind the trade school and Industries. Dispose of the debris and relocate the building materials outside the perimeter;
3. Have the Engineering Division obtain an evaluation of the existing perimeter to determine if repairs or replacement is the best option;
   - Include drainage issues
   - Repairs or replacement to concrete footings on the exterior fence
   - Repairs to the perimeter road
   - Expansion of the vehicle sally port
   - Improved lighting
   - Installation of cameras
4. Upgrade perimeter lighting;
   - Current lighting is insufficient. Tower officers and mobile patrol officers do not have acceptable visibility of the area between the buildings and the perimeter
   - Lighting for the area between the perimeter and tree line should be installed
5. Change the current practice of repairing perimeter lighting on an annual basis;
   - Perimeter lighting should be repaired as soon as possible when an issue is identified
6. Install PTZ cameras on the perimeter;
   - The towers in the two areas identified as the most likely introduction points for contraband (Zone 6 and Zone 8) are not manned
   - Only one mobile patrol vehicle is typically assigned to the perimeter
   - Cameras could be monitored in Central Control
7. Stop the practice of opening both sally port gates to allow semi-trailer trucks to enter the facility;
   - Consider using the warehouse opposite the vehicle sally port to offload loads from trailer trucks.
   - Have industries store materials in the warehouse and bring materials in as needed
8. Develop an SOP regarding fence checks;
   - Develop a report form to be completed by the person completing the check
     - Condition of fence fabric and fence ties
     - Condition of razor wire
     - Condition of concreted footings
     - Lights needing replacement
   - Define the method to be used to test detection systems (Shaker and Microwave);
     - Who is responsible
     - Exactly how the system is to be tested
     - How is it documented
9. Identify a ranking security officer to be responsible to monitor all issues regarding the perimeter;
   - To receive all documentation regarding fence checks
   - To receive all documentation regarding detections system checks, and lethal fence checks.
   - To receive all reports about lighting issues on the perimeter.
   - To be responsible to follow up on any repair orders so that major deficiencies do not go unattended.
10. Install cross fencing in the recreation yard creating an additional buffer zone between recreation yards and the perimeter fence. The additional space should make it more difficult to deliver contraband over the fence into the yard. The fence should have a gate large enough to allow maintenance vehicles to enter the area, if needed. Razor wire should be installed on the top of the fence;
11. Install fencing to prevent inmates in H Dorm to access any areas near the perimeter;

1/25/18                                          22

12. Repair the fencing between H Dorm and Segregation Units;
13. Have inmates in H Dorm use the former staff dining room for meals. This will reduce the ability of inmates in this area to transport contraband into general population;
14. Pat search all inmates going through the gate leading to and from H Dorm. This practice should reduce the amount of contraband moving from that area into general population;
15. Replace the lighting on exterior facing buildings to increase illumination of the areas between the buildings and the perimeter;
    - Continue the current practice of replacing high pressure sodium lights with LED lighting to improve illumination between interior buildings and the perimeter
16. Due to the limitations of the existing Sally Port Tower armaments, equip the tower with and AR 15 or similar weapon which will be effective for long range coverage

**Inmate Movement and Control**

Observations and Findings

Over the last two years, Cornerstone, a private contractor, has been on-site installing new locking mechanisms on security doors in the facility. The locks in the high security cellblocks were in dire need of replacement and upgrading to a sturdier and more reliable security lock. Cornerstone also replaced security glass in and around the cell block areas. Among other items that Cornerstone installed were surveillance cameras in the dayrooms and in the hallway leading to the dayroom entry door. An inspection of these cameras revealed that the cameras were placed in areas in the dayroom that were easily accessible to the inmates. As a result, the cameras have been rendered totally inoperable in P and Q Cellblocks that house a large number of Level 5 inmates. The inmates have scuffed the lens of each camera making it appear on the monitor in the cellblock security cubicle as an amorphous white blob. The cameras also only save the video for 72 hours, making it very difficult to go back and review activity and incidents that the camera previously captured.

**The facility is not in compliance with SOP #137, Inmate Movement Control.** The assessment team observed on numerous occasions that the inmate population was able to travel from their housing units to other locations around the facility without being officially authorized by staff. It was also noted that many inmates did not wear the required identification wristbands. It was clear that correctional staff were reluctant to challenge inmates about their intended destination and not wearing the required wristband. The facility does not utilize a written pass system that officially authorizes inmates to travel from Point A to Point B.

The facility conducts six counts over a 24-hour period in accordance with the mandate specified in SOP #112, Inmate Counts. Counts are conducted at 6:15 p.m., 9:00-10:30 p.m., 12:00 a.m., 2:00 a.m., 6:30 a.m. and 1:00 p.m. A bed roster count is conducted per policy every night during the 9:00-10:30 p.m. count and every Thursday and Saturday at the 6:30 a.m. count. However, **the facility does not always comply with the requirement in the governing SOP to have two officers performing independent, redundant counts. The** assessment team observed correctional officers taking count in three inmate housing areas on January 10, 2018 at a count that commenced at 5:28 a.m. The assessment team members noted that the counts were not performed in the independent, redundant manner required by policy. **The team members also noted that inmates were not in their cells during count making it difficult to perform an accurate count. Conducting proper inmate counts is one the most important, essential, and basic functions of a correctional officer.**

There is no video surveillance equipment to monitor the inside compound area at the facility or its perimeter fence. It is important for a Level 5 institution to be able to monitor movement within the compound and around the perimeter. Video surveillance with recording capability is an essential tool at high security institutions to augment and enhance the enforcement of control and security by the correctional staff. Protecting the integrity

1/25/18                                            23

                                   ADOC-TP-018312

of the perimeter fence with electronic detection systems is further enhanced by also surveilling the entire perimeter with security cameras. This institution has consistently had issues with subjects throwing contraband items over the fence into a yard area that is readily accessible by inmates to retrieve the contraband items. The facility administrators concede that items such as cell phones and drugs are among the most frequent items introduced in this manner. Contraband cell phones and drugs within a prison environment create a perilous situation for both staff and inmates.

During times when staffing levels are critically low the warden or designee should have the discretion to curtail inmate activities in order to maintain correctional staff on higher priority posts. As an example, the assessment team observed that a correctional officer was assigned to open and supervise recreation in the gymnasium for six inmates. Any activities that occur outside the inmate housing units should be subject to being curtailed or cancelled when staffing is deemed to be critically low by the shift commander.

**The degree of inmate movement and control at a Level 5 Institution is very difficult to appropriately manage when staffing levels are critically low as they are at the SCCF.** On an average work day, the SCCF has anywhere from 18-25 correctional staff including supervisors to fill all security posts. The day shift requires a minimum of 42 correctional staff including supervisors during weekdays and the night shift requires a minimum of 29 correctional staff including supervisors. The extreme staffing shortage at this facility severely hinders the staff's ability to maintain proper movement and control of the inmate population. So many critical posts must be left unmanned that the inmates have the ability to move around the facility with very little staff supervision. Without the ability to properly maintain inmate movement and control, the inmate population goes unchallenged into areas of the facility that would ordinarily be off limits to them. The severe staffing shortage also exacerbates the staff's inability to control the movement of contraband throughout the facility. The inmates' ability to move contraband unabated throughout the facility creates a very dangerous environment for both staff and inmates.

It is an accepted correctional practice to place inmates into a lockdown with all inmates being locked securely in their cells immediately after a serious incident occurs at an institution. The lockdown should remain in effect until the warden or designee decides that it is safe to once again resume a normal schedule. SCCF utilized a lockdown immediately after the December 4, 2017 escape, but allowed inmates out of their cells to go to the dining hall within six hours of the discovery of the escape. At that time, the escape was still being actively investigated and staff were involved in apprehension efforts. The warden should have the discretion to feed inmates in their cells and cease all other activities with the exception of medical emergencies during a lockdown to better ensure the safety of the institution, to free staff to concentrate solely on dealing with issues surrounding the serious incident and its aftermath, and to keep potential evidence related to the serious incident from being destroyed, removed, or contaminated.

It was clear to the assessment team that the SCCF facility design and critically low correctional officer staffing levels did not allow for the proper control and movement of Level 5 offenders. The ASCA team observed that the Level 5 offenders were very aggressive toward staff and staff did not challenge them for fear of their personal safety due to being alone with no immediate backup. All correctional staff that were interviewed readily acknowledged that SCCF Level 5 offenders possessed weapons, drugs, and cell phones in abundance. Serious contraband such as weapons, cell phones, and drugs creates potentially harmful situations in a prison for staff and offenders, particularly in a high security facility.

Recommendations:

1. Reevaluate the placement of the existing security cameras to locate them in places that are not accessible to tampering by the inmates and expand the recording capability for each camera beyond the current 72 hours. The industry standard for surveillance camera recording capability is generally six

HIGHLY CONFIDENTIAL                                                    ADOC-TP-018313

months.  The facility should build protective cages around the cameras to prevent inmate tampering if the cameras cannot be moved;

2. Retrain security staff to properly supervise all inmate movement in accordance with SOP 137 and discipline inmates that have destroyed or are caught not wearing the required wristband;
3. Retrain security staff to conduct proper counts in accordance with SOP 112;
4. Revise SOP 112 to include a provision that all inmates in the housing area during count must be secured in their assigned cell for the duration of the count;
5. Revise SOP 112 to require a bed roster count each day at 6:30 a.m. instead of just Thursday and Saturday;
6. Consider the addition of surveillance equipment with adequate recording capability for both the inside compound area and along the entire length of the perimeter fence;
7. Revise SOP 137 to allow the warden or designee the discretion to curtail or cancel inmate activities during times when correctional officer staffing is deemed critically low;
8. Consider reducing the inmate population at the facility to better fit the staffing that is available to the warden;
9. Review all SOP's with an eye toward reducing or scaling back some requirements that staff cannot meet because of the shortage of staff;
10. Create a facility lockdown policy that allows the warden or his designee the discretion to place inmates into a lockdown mode with no movement allowed until the warden determines it is safe to resume a normal schedule.  In-cell feeding of inmates should be incorporated into the policy; and,
11. The Alabama Department of Corrections executive management team should give serious consideration to downgrading the SCCF to a Level 4 institution and moving out all Level 5 offenders due to poor facility design and critically low staffing.

**Key and Tool Control**

Observations and Findings

*Key Control*

SCCF SOP #095, Key Control, is the facilities governing policy for the accountability and maintenance of keys and locking devices. The SOP is consistent with Administrative Regulation #337, Key Control. While the facility has a comprehensive key control policy, the policy is not adhered to by staff.

SCCF does not have a designated Key Control Officer. The SOP states that the warden will designate a Key Control Officer and an Assistant Key Control Officer. Control Center staff stated they didn't know who was assigned these duties. The Maintenance Supervisor stated no one has been assigned this duty in at least three years. The Warden II stated he told the Population Captain to assign a Key Control Officer on January 8, 2018. The Population Captain was interviewed and stated that he assigned a Tool Control Officer, however, did not realize that the officer would have responsibility for both key and tool control. The Population Captain could not produce any documentation that he assigned any officer to these duties.

It does not appear that security staff are properly accounting for keys and key sets during shift change. In accordance with the SOP, cellblock keys are passed on from one staff to another at shift change and when relieving each other. The assessment team observed security staff throwing keys to each other during shift change. Keys should be passed hand to hand and not thrown. The SOP requires that staff log that all keys are accounted for during the shift change. No log entries in any post logs could be found that indicated an inspection of any keys or key boxes was made.

1/25/18                                                 25

The SOP further notes that staff are not allowed to take security keys home at the end of their shift. While interviewing staff in the vocational area, they stated they took their keys home every day. The keys for the vocational area open all doors and tool areas. The vocational area also has extra keys that go to every lock kept in the supervisor's office and not in the control center. A member of the assessment team tried to conduct an inventory of the keys in the Control Center, but several keys were missing and there was not an updated key inventory. The Control Center staff stated the keys in question were missing for a long time and they did not know what happened to them.

The assessment team could not find any procedures required by the key control SOP being followed. The Warden II was questioned about the failure of staff to follow the SOP. He stated that he has not had the time to work on key control due to the many other issues at the facility.

*Tool Control*

SCCF SOP #169, Control of Tools, Equipment and Hazardous Materials, is the facilities governing policy for the accountability and maintenance of keys and locking devices. This SOP was written in 2002 and has not been revised since that date. The policy outlines for requirements for the control and accountability of tools, equipment and hazardous materials. The policy requires the Warden to assign a Tool Control Supervisor and Assistant Tool Control Supervisor from the security ranks. According to the Population Captain, the assignment of a Tool Control Supervisor was made on January 8, 2018. Interviews were conducted with staff responsible for maintaining tools. None of these staff knew who the Tool Control Officer was or when the last time anyone had been assigned those duties.

Eight areas of the facility that contain tool rooms or toll cages were inspected. In all of these areas, restricted tools were observed to be not stored in accordance with the SOP. Maintenance staff conducts daily, monthly and quarterly inventories; however, no one security staff reviews the inventories or inspects the tool cabinets. Several maintenance staff stated that no security staff or management staff have ever inspected their areas. One maintenance staff stated that the only management staff who had been to his area was a warden from another facility.

Tools were inspected and found to not be engraved or color coded in accordance with accepted practices. Many of the shadow boards were found to be old and out of date. There were areas on shadow boards that appeared to be show a tool was missing; however, the assessment team member was told the tool had been broken and never replaced. The assessment team member attempted to conduct an inventory, but was unable to do so. Inventory sheets are created by inmates, and no security staff verifies the accuracy of the inventories. Inmates regularly check out class A tools in the vocational areas without supervision. There are large acetylene tanks that are not stored in compliance with the SOP.

It is the opinion of the assessment team that the facility does not have an accountability of all tools and could accurately state if tools have been missing or stolen. It was reported by a maintenance staff member that two weeks prior to the assessment team's site visit, a CERT team member had borrowed a screw driver and it has yet to be returned or located. Additionally, vocational staff stated that CERT had cut all the locks off of the tool cabinets and it took two weeks to get replacement locks. During this time, all tool cabinets in the areas were left unlocked.

Recommendations:

1. Designate one staff as the facility Key Control Officer and provide them with training on the requirements of SOP #95. Utilize a Key Control Officer on loan from another facility if needed;
2. Utilize staff knowledgeable in key control to conduct an immediate inventory of all keys and key sets within the facility;

1/25/18                                                26

3. Utilize staff knowledgeable in tool control to conduct an immediate inventory of all tools within the facility. Utilize staff from other facilities on a temporary basis if needed;
4. Utilize these same staff to train the recently appointed Tool Control Officer on the requirement of SOP #169;
5. Review SOP #169 and update as needed to comply with the requirements of Administrative Regulation #334, Tool Control;
6. Retrain all staff having responsibility for tools on the requirements of SOP #169;
7. Consolidate some of the existing secure tool locations inside the facility so that fewer locations exist. Consider one secure area inside the institution and one secure area outside the institution for the issuance of tools.

**Maintenance and Repairs**

Observations and Findings

The Maintenance staff at the SCCF consists of a supervisor and four subordinates. In addition, three inmate workers are assigned to the Maintenance Department. Three maintenance worker positions are currently unfilled. This is a very large, sprawling Level 5 institution that has numerous maintenance issues due to aging infrastructure.

The maintenance supervisor does not have a budget that he manages. However, he has never had a problem ordering and receiving replacement stock items for his inventory.

The facility has a very simple work order request system that works very well. Maintenance work orders are submitted by staff to the Assistant Warden for Security on a half-page form describing the maintenance issue and location of the problem. It is dated and signed by the submitting staff member. The Assistant Warden for Security reviews the requests daily and either approves or disapproves the request. The approved requests are placed on a list that is given to the Maintenance Supervisor each morning. The Maintenance Supervisor prioritizes the work requests and assigns them out to his staff for completion. A list of all completed Maintenance work requests is filed with the Senior Warden each month.

Recommendations:

1. Allow the facility to hire and fill the three vacant Maintenance positions; and,
2. Ensure that the maintenance department continues to receive replacement stock items for inventory to keep up with the growing needs of maintaining and repairing the aging infrastructure at the SCCF.

**Inmate Classification**

Observations and Findings

An assessment team member conducted a review of Administrative Regulation #400, Classification, and the Classification Manual. Interviews were conducted with the Classification Specialist Supervisor and the Warden II regarding the classification process. The process at SCCF meets all requirements of the Administrative Regulation and the ALDOC Classification Manual.

Based on the assessment team member's review, both inmates who escaped were properly classified to a level 5 facility. Inmate Wilson is serving a sentence of life without parole, and had received nine disciplinary reports in 2017; seven for contraband cell phones and two for intoxicants. Inmate King is serving a 50-year sentence for

HIGHLY CONFIDENTIAL

ADOC-TP-018316

burglary, and had received four disciplinary reports in 2017; one for failure to obey a direct order, one for a weapon, one for an assault, and one for fighting.

The ALDOC classification policy requires that any inmate with a sentence of life without parole must be held at a level 5 facility. At the time of the assessment, there were 446 inmates serving sentences of life without parole at SCCF.

It was noted that one of the escapees, Inmate Wilson, had been housed in close custody segregation until 11/07/17 when he was reclassified to medium administrative segregation and moved to population. He had been placed in close custody segregation for an assault on another inmate in August 2016 and had received his nine disciplinary reports while in close custody segregation. When classification staff was asked why inmate Wilson was released from close custody segregation, the assessment team member was told it was because he had gone 4 months without a disciplinary report and the facility needed the segregation space.

SCCF's segregation unit serves as a regional segregation unit. According to the Warden II there are have approximately 90 inmates "hiding" in segregation that have protective custody issues. The Warden II stated that he submitted a plan to move those inmates with protective custody issues into another housing unit, but had not heard back from headquarters on the recommendation. Inmate Wilson was an appropriate candidate for close custody segregation based on his disciplinary history. The recommendation for release from close custody segregation was subjective, driven by available bed space, and not a good security practice.

The Warden II spends about 5-hours every week reviewing segregation placements. In addition to the Warden II, classification staff and at least two security staff are needed to escort approximately 96 inmates to segregation placement reviews each week. The classification policy does not indicate the inmate must appear in person at this weekly review. The generally accepted practice for continued placement reviews for inmates in restrictive housing is weekly for the first one to two months, then every thirty days thereafter.

**Inmate institutional jobs are assigned by a Job Board. Jobs are not rotated unless there is a problem and there is no job rotation schedule. This practice can lead to inmates becoming overfamiliar with staff and empowered by their job seniority making the subversion of facility security more likely. As an example, an inmate assigned to a tool crib had been at that job for several years. Neither of the escapees were assigned to an institutional job.**

Recommendations:

1. Consider implementing the Warden II's proposal to move inmates with protective custody issues out of segregation and into a separate housing unit that can be run as a general population protective custody unit;
2. Consider conducting segregation placement reviews in accordance with generally accepted practices. Discontinue weekly reviews of every inmate. When reviews are conducted, consider allowing the Segregation Captain to chair the review team, only requiring the Warden II to be present in cases where a custody reduction is recommended; and,
3. Consider rotating inmate institutional jobs according to a schedule.

HIGHLY CONFIDENTIAL                                              ADOC-TP-018317

**Appendix A: Assessment Team Biographical Profiles**

**Wayne Choinski, Team Lead**

Wayne Choinski has served as a project manager with ASCA since 2010. His correctional experience includes having served the Connecticut Department of Correction for over 27 years as a senior administrator at several large correctional institutions, the senior administrator for community corrections, and a regional administrator responsible for the oversight of nine correctional facilities including jails.

Wayne has served as a project manager for a number of ASCA projects including; operational staffing assessments, critical incident reviews, master plan development, compliance audits, and review of restrictive housing policies and programs. Additionally, he has consulted on collaborative projects with RAND Corporation, The Council of State Governments, and The Pew Research Center in addition to assisting with the facilitation of ASCA training programs and committee meetings.

**Michael Maloney, Team Member**

Mr. Maloney has more than 40 years of experience in the corrections field.  During his 29 years with the Massachusetts Department of Correction, he served in a variety of positions including Deputy Superintendent, Superintendent, Deputy Commissioner and Commissioner.  Through these positions, Mr. Maloney has been

1/25/18                                                  29

HIGHLY CONFIDENTIAL

ADOC-TP-018318

responsible for the development and allocation of programs and resources, as well as determination of agency objectives, goals and internal organizational structure. After leaving the Massachusetts Department of Correction, Mr. Maloney served as the Norfolk County Jail and House of Correction Superintendent of Administration and Operations for the Norfolk County Sheriff's Department until his retirement in 2007. He has been a guest instructor for the National Institute of Corrections, American Correctional Association, Association of State Correctional Administrators and the National Major Gang Task Force on topics that included disorder management, gang identification and management, prison security, labor relations transition planning and re-entry initiatives. He has been an auditor for the American Correctional Association and served as a lead compliance inspector with MGT of America inspecting facilities holding ICE detainees to determine compliance with ICE National Detention Standards.

In 2008, Mr. Maloney was a member of a team that developed and delivered a pilot program, sponsored by the Office of Anti-Terrorism Assistance (ATA). The program, Mitigating Prison Inmate Radicalization, was presented to command staff of the Bureau of Corrections, at New Bilibid Prison in the Philippines.

Mr. Maloney was an Adjunct Professor at Westfield State University in Massachusetts; and currently is an Adjunct Professor at the University of Maryland University College, teaching criminal justice courses on line. In 2017, he was appointed to be Course Chair for CCJS 497 Correctional Administration, at the University of Maryland University College.
Since his retirement in 2007, Mr. Maloney has worked as a correctional consultant. He has worked individually and as a team member during that time on projects including critical incident reviews, operational reviews, staffing analyses, program evaluations, and suicide protocol reviews. He is an active ASCA associate and has worked on a number of ASCA projects including several staffing studies and the post incident assessment of escapes from an ODRC facility.

**Wayne Scott, Team Member**

Wayne Scott's career in criminal justice began in January 1972 when he was hired as a correctional officer by the Texas Department of Corrections (TDC). While working for TDC he earned a BBA in Finance and Management from Sam Houston State University. From 1972 until 1983, he was promoted through the security ranks of TDC achieving the rank of Major, which is the highest-ranking uniformed security officer in the Texas Department of Corrections rank structure. Mr. Scott was Major of Correctional Officers at the Ellis Unit in Huntsville, Texas and at the Retrieve Unit (now the Wayne Scott Unit) in Angleton, Texas. He went on to serve as an Assistant Warden, Senior Warden, Regional Director, and Deputy Director of Operations. In 1995, Wayne Scott became Executive Director of the Texas Department of Criminal Justice. The agency had grown significantly, and he was now responsible for 150,000 inmates, 40,000 employees, and a $5.2 billion biennial budget. He remained as Executive Director until his retirement in July 2001.

Post retirement, Mr. Scott accepted an appointment from Governor Perry to the Texas Board of Pardons and Paroles as a board member and a member of the executive committee of the board. After leaving the Board of Pardons and Paroles, he worked for Management and Training Corporation (MTC) as a vice president, where he was responsible for the company's private prisons in Texas and overseas. In 2003, he accepted a Senior Associate position with MGT of America. With MGT of America, he performed operational reviews of the Harris County Jail in Houston, Texas and the Cook County Jail in Chicago, Illinois. He also worked extensively in operational reviews of the Puerto Rico Department of Corrections and Rehabilitation, and actively participated in Immigration and Customs Enforcement reviews of 37 county jails throughout the United States.

In October 2010, Mr. Scott accepted a position as Director of Operations, Secure Division, with Community Education Centers, Inc. His responsibilities included overseeing the operations of all CEC facilities located in

HIGHLY CONFIDENTIAL                                                      ADOC-TP-018319

Texas, to include drafting, revising, and monitoring jail policies to ensure compliance with the Texas Commission on Jail Standards. In October 2011, he resigned from that position and reestablished his consulting practice. Most recently, he has completed projects in Oregon, Ohio, Florida, and California. Mr. Scott is an active ASCA associate and has worked on a number of ASCA projects including several staffing studies and the post incident assessment of escapes from a ODRC facility.

**Pam Sonnen, Team Member**

Pam Sonnen served as a manager in the Idaho Department of Correction for 29 years. Her correctional experience included being a Warden, Deputy Administrator, and Chief of Prisons responsible for seven facilities. She also supervised Probation and Parole to include four community work centers. During her management career, she developed security audits and trained staff to conduct audits and make recommendations for improvements.

Ms. Sonnen has conducted numerous investigations into security breaches to include escapes, disturbances, inmate murders, and staff misconduct. Pam has been trained by the National Institute of Corrections in changing culture, prison security, how to deal with difficult inmates, working with female offenders, staffing analysis, and numerous other management courses. Pam dedicated her career to creating an atmosphere for change in inmate behavior, and creating an environment for staff to feel included in the success for positive change. Pam was the first manager in Idaho to include line staff in the behavioral treatment of inmates. While Pam was working at the maximum-security prison she reduced offender violence by half and was able to move inmates to facilities that enabled them to prepare for release.

Ms. Sonnen has worked with both male and female offenders in all custody levels from community to maximum security. Her management experience includes staffing, training, budgeting, policy development, auditing, facility operations, emergency preparedness, insuring the civil rights of inmates, strategic planning, presenting to groups, programing for offenders, mediating conflicts, compliance with laws, staff hiring, staff corrective and disciplinary actions and conducting investigations.

Since her retirement, Ms. Sonnen has consulted with attorneys on correctional litigation, now conducts PREA audits across the United States.

HIGHLY CONFIDENTIAL                                                              ADOC-TP-018320

**Appendix B: Documents Reviewed**

1.  Alabama Department of Corrections Annual Report Fiscal Year 2016
2.  Alabama Department of Corrections Administrative Regulations
3.  Alabama Department of Corrections Classification Manual
4.  Alabama Department of Corrections Male Inmate Handbook
5.  Classification Summaries for Inmates Wilson and King
6.  St. Clair Correctional Facility Employee Roster December 2017
7.  St. Clair Correctional Facility list of significant incidents from 1/3/15 – 12/27/17
8.  St. Clair Correctional Facility incident reports for December 4, 2017 escape
9.  St. Clair Correctional Facility 2016 PREA Audit Report
10. St. Clair Correctional Facility Newsletter for 1/9/18
11. St. Clair Correctional Facility Post Plan
12. St. Clair Correctional Facility Table of Organization
13. St. Clair Correctional Facility Standard Operating Procedures
14. St. Clair Correctional Facility Housing Designation Logs
15. St. Clair Correctional Facility Inmate Alpha Rosters
16. St. Clair Correctional Facility Daily Log Packages for 12/1/17 – 12/4/17 and 1/9/18 – 1/10/18
17. St. Clair Correctional Facility Duty Post Logs
18. St. Clair Correctional Facility Security Staff Count for 1/2/18
19. St. Clair Correctional Facility Shift Rosters

1/25/18                                    32

HIGHLY CONFIDENTIAL

ADOC-TP-018321

**Appendix C: Staff Interviewed\***

| | |
|---|---|
| Larry Baker | Correctional Lieutenant |
| Steven Battles | Correctional K-9 Handler |
| David Bivens | Correctional Officer |
| Anthony Brooks | Warden I |
| Calvin Bush | Correctional Officer |
| Brian Casey | Investigator |
| Regina Cook | Radio Operator |
| Angelia Cooper | Radio Operator |
| William Cornelison | Correctional Officer |
| Joel Christian | Correctional Officer |
| Grantt Culliver | Associate Commissioner |
| Phillip Dixon | Correctional Sergeant |
| Edward Ellington | Institutional Coordinator |
| Nekitris Estelle | Classification Specialist Supervisor |
| DeWayne Estes | Warden III |
| Mark Fassl | Inspector General |
| Michael Gaines | Correctional Trainee |
| Angelia Gordy | Correctional Lieutenant |
| Carla Graham | Correctional Captain |
| Wendell Guthery | Correctional Officer |
| William Hadley | Plant Maintenance Supervisor I |
| Jason Harris | Correctional Officer |
| Kenneth Hawkins | Correctional Officer |
| James Holt | Correctional K-9 Supervisor |
| Wilbert Howard | Correctional Officer |
| Russell Jones | Correctional Lieutenant |
| Kathleen Kizzard | Correctional Cubicle Operator |
| Jasper Luitze | Correctional Sergeant |
| Gary Malone | Correctional Captain |
| John Mason | Correctional Sergeant |
| Erica Moore | Administrative Support Assistant I |
| Mathew Moore | Correctional Officer |
| Danny Nichols | Plant Maintenance Supervisor II |
| Richard Parton | Part Time Correctional Officer (Retired State Employee) |

1/25/18                                          33

HIGHLY CONFIDENTIAL

ADOC-TP-018322

| | |
|---|---|
| Kenneth Patton | Correctional Officer |
| Jerry Puckett | Part Time Correctional Officer (Retired State Employee) |
| William Ragsdale | Correctional Lieutenant |
| Kenneth Robertson | Correctional Sergeant |
| Morris Rogers | Correctional Lieutenant |
| Mitchell Sanders | Part Time Correctional Officer (Retired State Employee) |
| Rafael Santa-Maria | Correctional Sergeant |
| Latonya Scott | Correctional Lieutenant |
| Cedric Specks | Warden II |
| Marina Starks | Radio Operator |
| Rebecca Steele | Administrative Support Assistant III |
| Dennis Stefaniak | Correctional K-9 Handler |
| Stephen Tish | Part Time Correctional Officer (Retired State Employee) |
| Kevin White | Correctional Captain |

*There were additional staff that the assessment team spoke with during the on-site visit that were not formally interviewed and therefore, not noted in this appendix.

1/25/18                                   34

HIGHLY CONFIDENTIAL                                   ADOC-TP-018323

1/25/18

35

HIGHLY CONFIDENTIAL

ADOC-TP-018324