FILED
2025 Mar-17  AM 09:39
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA MIDDLE DIVISION

| | | |
|---|---|---|
| LAKEISHA EZELL, as representative of the ESTATE OF TERRENCE ANDREWS, | ) ) ) | Case No.: 4:20-CV-02058-ACA |
| | ) | Hon. Judge Annemarie Carney Axon |
| *Plaintiff,* | ) ) | |
| *v.* | ) ) | |
| JEFFERSON DUNN, *et al.,* | ) ) | |
| *Defendants.* | ) | |

## PLAINTIFF LAKEISHA EZELL'S CONSOLIDATED RESPONSE IN OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT

*Ruth Z. Brown (pro hac vice)
Megan Pierce (pro hac vice)
Quinn Rallins (pro hac vice)
Attorneys for Plaintiff
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
Telephone: 312-243-5900
Fax: 312-243-5902
Email: ruth@loevy.com,
          megan@loevy.com
          rallins@loevy.com
*Counsel of Record

Anil A. Mujumdar (ASB-2004-L5M)
Dagney Johnson Law Group
2170 Highland Avenue, Suite 250
Birmingham, AL 35205
T: 205.590.6986
F: 205.809.7899
E: anil@dagneylaw.com

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

RESPONSE TO DEFENDANTS BAKER'S FACTS .................................................. 2

RESPONSE TO ADOC DEFENDANTS' FACTS........................................................ 6

ADDITIONAL UNDISPUTED FACTS........................................................................11

ADDITIONAL DISPUTED FACTS............................................................................12

    A. Mr. Andrews was stabbed to death in the P/Q blocks at St. Clair. ...............12

    B. Mr. Andrews's assailant had a known history of extensive
institutional violence, and yet was housed in the dangerous general population
P/Q blocks. ....................................................................................................16

    C. In 2018, violence at St. Clair was the norm, particularly in P/Q. ..................20

    D. In 2018, weapons contraband was pervasive and St. Clair had a widespread
practice of failing to conduct reasonable contraband searches. ..........................25

    E. In 2018, St. Clair had a widespread practice of largely uncontrolled prisoner
movement in its general population units..............................................................30

    F. In 2018, St. Clair had a widespread practice of failing to safely house and
monitor violent prisoners with histories of institutional violence. ......................33

    G. In 2018, St. Clair had a widespread practice of noncompliance with its
written security policies..........................................................................................35

    H. In 2018, physical plant issues at St. Clair exacerbated the substantial risk of
serious harm from violence to prisoners. ..............................................................37

    I. Defendants Jones, Ellington, Dunn, and Baker were well aware of the risk to
prisoners such as Mr. Andrews, but failed to act....................................................40

    J. Defendants failed to act even after multiple 2018 murders at St. Clair..........54

LEGAL STANDARDS .................................................................................55

    I.    Summary Judgment ....................................................................55

    II.    Eighth Amendment Failure to Protect..........................................56

    III.    Affirmative Defense of Qualified Immunity...................................59

    IV.    Wrongful Death Claim Liability .....................................................61

ARGUMENTS AND AUTHORITIES .........................................................62

    I.    Defendant Jones is not entitled to summary judgment on Count I............ 62

    II.    Defendant Jones is not entitled to qualified immunity as to Count I..........69

    III.    Defendant Jones is not entitled to summary judgment on Count IX  ........75

    IV.    Defendant Ellington is not entitled to summary judgment on Count I......77

    V.    Defendant Ellington is not entitled to qualified immunity as to Count I ...81

    VI.    Defendant Ellington is not entitled to summary judgment
        on Count IX ...........................................................................83

    VII.    Defendant Dunn is not entitled to summary judgment on Count I............85

    VIII.    Defendant Dunn is not entitled to qualified immunity as to Count I .........90

    IX.    Defendant Dunn is not entitled to summary judgment on Count IX.........92

    X.    Defendant Baker is not entitled to summary judgment on Count I.............94

    XI.    Defendant Baker is not entitled to qualified immunity as to Count 1.........97

    XII.    Defendant Baker is not entitled to summary judgment on Count
        IX and X. .............................................................................99

TABLE OF AUTHORITIES

CASES

*Adickes v. Kress & Co.*, 398 U.S. 144 (1970) ..........................................................56

*Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700 (11th Cir.1985).......................90

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................56

*Armstrong v. Daily*, 786 F.3d 529 (7th Cir. 2015) ..................................................91

*Auriemma v. Rice*, 910 F.2d 1449 (7th Cir. 1990) ...................................................91

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....................................................58

*Boykins v. Dunn*, 696 F. Supp. 3d 1061
    (N.D. Ala. 2023)............................................. 60, 63, 69, 70, 75, 77, 81, 82, 90

*Bridges v. Poe*, 487 F. Supp. 3d 1250 (N.D. Ala. 2020) ..........................................65

*Brooks v. Warden*, 800 F.3d 1295 (11th Cir. 2015) .................................................75

*Brown v. Dunn,* 2024 WL 5168637 (M.D. Ala. Dec. 19, 2024) ...........................92

*Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090
    (11th Cir. 2014) ..................................................................................... 56, 74

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)..............................................56, 63, 95

*Crawford-El v. Britton*, 523 U.S. 574 (1998) ..........................................................60

*Dickinson v. Cochran*, 833 F. App'x 268
    (11th Cir. 2020) ......................................60, 63, 64, 65, 71, 82, 89, 90, 98,99

*Epps v. Watson*, 492 F.3d 1240 (11th Cir. 2007) ....................................................60

*Est. of Cummings v. Davenport*, 906 F.3d 934 (11th Cir. 2018)............................. 60, 69, 81

*Ex parte Cranman*, 792 So. 2d 392 (Ala. 2006) ............................................... 62, 76, 84, 94

*Ex parte Est. of Reynolds*, 946 So. 2d 450 (Ala. 2006) ...................................... 62, 76, 84, 94

*Ex parte Hayles*, 852 So. 2d 117 (Ala. 2002) ...................................................... 62

*Farmer v. Brennan*, 511 U.S. 825 (1994) ............................................... 56, 57, 61, 74

*Fikes v. Abernathy,* 7:16-CV-00843-LSC, 2018 WL 2207134
    (N.D. Ala. May 14, 2018), aff'd, 793 Fed. Appx. 913
    (11th Cir. 2019) ...............................................................................61

*George v. Wexford Health Sources*, 2024 WL 1120110
    (M.D. Ala. Mar. 10, 2024) ........................................................ 89

*Gomez v. Toledo*, 446 U.S. 635 (1980) .......................................................60

*Gonzalez v. Reno*, 325 F.3d 1228 (11th Cir. 2003) ...................................59

*Guy v. Dunn*, 2023 WL 6378967 (N. D. Ala. Sept. 29, 2023) ..................... 62, 93

*Hale v. Tallapoosa Cty.*, 50 F.3d 1579
    (11th Cir. 1995) ....................................................57, 58, 59, 65, 68, 71, 72, 88

*Handley v. United States*, 5:17-CV-01278-HNJ, 2021 WL 2023057
    (N.D. Ala. Mar. 18, 2021) .............................................................61

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ...............................................60

*Harris v. Thigpen*, 941 F.2d (11th Cir. 1991) ..............................................90

*Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252
    (11th Cir. 2004) .............................................................................60

*Hope v. Pelzer*, 536 U.S. 730 (2002) ..................................................... 60

*Huffman v. Dunn*, 4:20-CV-01293-CLM, 2021 WL 2533024
    (N.D. Ala. June 21, 2021) ..............................................61, 62, 76, 83, 93

*Int'l Woodworkers v. Champion Int'l*, 790 F.2d 1174 (5th Cir. 1986) ...................73

*Jackson v. City of Cleveland,* 925 F.3d 793, 826 (6th Cir. 2019) .........................91

*Jones v. Diamond*, 636 F.2d 1364 (5th Cir. Jan. 29, 1981) (en banc)................................72

*Kingsley v. Hendrickson*, 801 F.3d 828, 832-33 (7th Cir. 2015)..............................................91

*LaMarca v. Turner*, 995 F.2d 1526 (11th Cir. 1993), *cert. denied,*
    510 U.S. 1164 S.Ct. 1189 L.Ed.2d 539 (1994)................................59, 65, 72, 80, 82, 89

*Lane v. Philbin*, 835 F.3d 1302 (11th Cir. 2016) ...................................................................72

*Ledbetter v. Goodyear Tire & Rubber Co.*, 421 F.3d 1169
    (11th Cir. 2005), aff'd, 550 U.S. 618 (2007) ........................................................... 73, 83

*Marbury v. Warden*, 936 F.3d 1227 (11th Cir. 2019) .................................57, 58, 63, 64, 99,

*Marsh v. Butler County*, 268 F.3d 1014
    (11th Cir. 2001) (en banc)...............................................................58, 64, 65, 71, 72, 89

*Patel v. Lanier Cnty.*, 969 F.3d 1173 (11th Cir. 2020)............................................................74

*Pearson v. Callahan*, 555 U.S. 223 (2009) ....................................................................... 91, 99

*Perez v. Suszczynski*, 809 F.3d 1213 (11th Cir. 2016) ......................................................61, 70

*Perryman v. Butler Cnty. Comm'n*, 2024 WL 2221476
    (M.D. Ala. May 16, 2024) ..............................................................................................93

*Powell v. Dunn*, 2022 WL 610172 (N.D. Ala. March 1, 2022).................................................93

*Purcell ex rel. Est. of Morgan*  400 F.3d 1313 (11th Cir. 2005)..............................................72

*Reeves v. Sanderson Plumbing Prods., Inc.,*
    530 U.S. 133 (2000) ........................................................... 56, 73, 77, 80, 83, 84, 94

*Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611
    (11th Cir. 2007) .................................................................................. 56, 57, 59, 68, 80

*Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678
    (11th Cir. 2014) ...........................................................................................63, 70, 77

*Smith v. Sullivan*, 611 F.2d 1039 (5th Cir. 1980)...................................................................90

*Taylor v. Hughes*, 920 F.3d 729 (11th Cir. 2019) ....................................................62

*Thompson v. Alabama*, 65 F.4th 1288 (11th Cir. 2023)..................................... 56, 76, 84, 94

*Valdes v. Crosby*, 450 F.3d 1231 (11th Cir. 2006) ........................................... 65, 89

*Vinson v. Clarke Cnty., Ala.*, 10 F. Supp. 2d 1282 (S.D. Ala. 1998)................................61

*Wade v. McDade*, 106 F.4th 1251 (11th Cir. 2024) (en banc) ...............................57, 59, 85

*Waldron v. Spicher*, 954 F.3d 1297 (11th Cir. 2020)................................................61

*Williams v. Edwards,* 547 F.2d 1206 (5th Cir. 1977)............................................72

*Wilson v. Stewart*, 2021 WL 3439398 (S.D. Ala. Aug. 5, 2021).........................................93

## RULES

Federal Rule of Civil Procedure 56(c) ................................................................. 56

## STATUTES

Alabama Code § 6-5-410 ............................................................................61

# INTRODUCTION

Despite their knowledge that they were operating the most violent prison in the country, the Defendant Supervisors—the head warden of St. Clair Correctional Facility, the highest-ranking Alabama Department of Corrections ("ADOC") administrators responsible for St. Clair's safety, and the shift commander on duty— turned a blind eye to the horrific violence devastating prisoners in their custody. Plaintiff's evidence shows that, rather than acting urgently to respond to the crisis, these Defendants ignored the dangerous conditions and continued the practices that fueled the violence. They permitted contraband weapons to proliferate at St. Clair, and failed to take steps to control the use of contraband weapons by prisoners. They enabled a culture of rampant unauthorized movement and widespread non-compliance with written policies, failing to discipline misconduct. And they housed dangerous inmates with histories of institutional violence in the "hot bay" P/Q blocks, with minimal supervision, despite the lack of functional security cameras and other physical plant challenges of those blocks. Defendants' deliberate indifference foreseeably resulted in the death of Terrence Andrews, who was just twenty-four years old when he was stabbed to death at St. Clair by a cell partner with a known history of institutional violence, and contraband knives, in the dangerous P/Q blocks.

Warden Jones, Institutional Coordinator Ellington, ADOC Commissioner Dunn, and Shift Commander Baker are not entitled to summary judgment. They fail to satisfy their burden to establish an absence of genuine issue of material fact on

1

Plaintiff's Eighth Amendment and wrongful death claims or any immunity.

**RESPONSE TO DEFENDANTS BAKER'S FACTS**[1] (Dkt. 269 at 10)

3. Disputed. No officer was working as P/Q rover that day. PSOF 20. Staffing that day did not meet minimum requirements. PSOF 17; ECF 343-7 at 1-4 (identifying staffing shortage on shift).

4. Disputed. The exhibit does not contain the page and line numbers cited and does not support this fact. *See* ECF 190-26 at 6.

6. Disputed. At 10:30am and 11:37am, Caver reported doing a visual check of P2 only. ECF 190-76 at 2. Also disputed to the extent that Baker suggests that Caver left the cube or viewed all parts of the cell house. ECF 344 at 12:17-13:9, 35:22-36:24.

9. Disputed. Prisoners were the first to respond to help Mr. Andrews and held his hand before staff arrived; Andrews had to be carried to the infirmary using a cart. ECF 344 at 76:6-77:1,77:21-78:2; ECF 185-55 at 2.

10. Partially disputed because exhibit 190-26 does not contain the page and line numbers cited and does not support that "Defendant Baker received the 10-17 while providing security in the chow hall to inmates eating and calling the next dormitories to the chow." *See* 190-26 at 6.

13. Disputed in part. Davis walked out of cell P-28 on his own and was then

---

[1] References to the record are to the ECF docket number and the page number in the upper right hand corner provided by the CM/ECF system (Dkt. 107 at 14), with the exception of deposition testimony, which is cited based on the reporter's page and line number.

detained by Sergeant Weaver. *See* Dkt. 185-55 at 2.

14. Disputed in part. Exhibit 190-26 does not contain the page and line numbers cited. Also, Exhibit 190-24 states that only Weaver (not Baker) searched the cell. ECF 190-24 at 18:3-6. . *See* Dkt. 190-26 at 6. Further disputed because Weaver found three knives, not a single knife. ECF 190-24 at 46:17-20.

15. Undisputed that this is what Davis told SCCF staff.

16. Disputed. The evidence shows Davis's murder of Andrews was premeditated. ECF 185-55 at 3-4 ("Davis stated that the murder weapon would not be found and that it would be a souvenir for somebody somewhere."); ECF 290 at 2 (Davis asked Andrews to bring him the knife used to stab him).

17. Disputed because it is unclear what is meant by "[t]hey had no reported disciplinaries or issues with each other." Otherwise, undisputed.

18. Disputed. Exhibit 190-80 is unrelated to Andrews's murder and does not support this fact.

19. Disputed. Exhibit 190-26 at 6 does not contain the pages and lines cited. Garrett simply states that, to his knowledge, no one *knew* Davis was going to stab Andrews. ECF 190-11 at 141:16-19. There was ample warning that Davis would stab a prisoner like Andrews, and that he therefore needed to be segregated and/or monitored. PSOF 32-48. This attack was foreseeable, intentional and premeditated. ECF 185-55 at 3 ("In my mind I ain't done nothing."); ECF 290 at 2.

The altercation started sometime before Caver realized it was happening. ECF

190-27 at 1, 3, 5. If Baker had made sure that someone was in P block monitoring prisoners like Davis (including by assigning other staff or supervisors to the unit), someone might have been able to intervene sooner. ECF 350 at 34:15-22; ECF 229-1 at 49:16-51:5; ECF 342 at 93:6-12; ECF 344 at 12:17-14:11, 35:22-36:24. Baker was responsible for ensuring that contraband searches were done in every cell house on every shift. ECF 342 at 26:4-8; ECF 363-3 at 3; ECF 361-14 at 3. No contraband searches were done in P block on the day shift. ECF 294 at 1-3; ECF 369 (filed conventionally and under seal. And at that time contraband searches were random and sporadic. PSOF 80-82; ECF 339 at 56. Had Baker enforced contraband search policies both on December 29 and prior to that date, staff would have found the three knives in Davis's possession and prevented Andrew's murder. ECF 190-78 at 2.

20. Disputed. The cited evidence does not support that he never expressed such fear. Garrett testifies that he "very vaguely" remembered Andrews, and that Andrews had never expressed to him *personally* any fear of his life at St. Clair or a fear of Davis. ECF 190:11 at 58:10-13, 140:18-20. Andrews's mother testified that she did not recall Andrews ever telling her about any fear of a particular prisoner at St. Clair, but that Andrews had told her he was afraid for his life at St. Clair. ECF 185-20 at 52:11-19, 54:4-8. Andrews was identified by SCCF staff as vulnerable. ECF 315 at 5-6.

22. Disputed. Searches were required to be documented in an incident report, and a review of the incident reports from January 2018 through March 15, 2019 shows that Garrett conducted only a single search in that 14.5-month period. ECF

369 (filed under seal) (see 12/14/18 incident, SCCF-18-01604); ECF 363-3 at 4; ECF 229-1 at 59:14-22, 60:4-61:3; ECF 185-12 at 183:9-184:4. Contraband searches were not happening as required by policy. PSOF 80-82.

23. Disputed because the exhibit does not contain the page and line numbers cited. *See* Dkt. 190-26 at 3. Further disputed because the meaning of this fact, as written, is confusing and unclear. Further disputed to the extent this fact incorrectly implies that counts were regularly done in compliance with policy. ECF 339 at 58, 77 (only 17 bed roster checks over a year period)

25. Disputed. The exhibits do not contain the page and line numbers cited and therefore do not support this fact. *See* ECF 190-75; ECF 190-26 at 5

26. Disputed. The exhibit does not contain the page and line numbers cited and therefore does not support this fact. *See* ECF 190-26 at 3. Further disputed because in 2018, CERT teams were mostly used for post coverage, not searches. PSOF 90

27-28. Disputed. The exhibit does not contain the page and line numbers cited and therefore does not support these facts. *See* ECF 190-26 at 3, 6.

30. Disputed. There is no exhibit cited to support this fact as required, and the letter simply says that the Department "does not serve as a *tribunal authorized* to make factual findings and legal conclusions binding on, or admissible in, any court." (emphasis added). It does not (and cannot) make any conclusion that communications, observations, records, reports or other documents from the DOJ are inadmissible in this Court for any purpose.

35-38. Disputed. The exhibit does not contain the page and line numbers cited and therefore does not support these facts. *See* ECF 190-26 at 3.

39. Disputed. The exhibit does not contain the page and line numbers cited and therefore does not support this fact. *See* ECF 190-26 at 3. Further, ADOC's own records show that only a small fraction of the required searches were actually occurring. Staff also frequently failed to confiscate observed contraband. PSOF 80-82.

40-41. Disputed because the exhibit does not contain the page and line numbers cited and therefore does not support this fact. ECF 190-26 at 3.

42. Disputed. This email does not show that Baker actually took any steps to facilitate the transfer of dangerous prisoners from St. Clair; he simply emailed a request from Malone to transfer these inmates. *See* 190-80.

**RESPONSE TO ADOC DEFENDANTS' FACTS** (Dkt. 192 at 7)

4. Disputed. The cited material does not support this fact. ECF 89 is ADOC Defendants' Reply to Plaintiff's Response to the Order to Show Cause.

7. Partially disputed. The cited materials do not discuss Warden Jones's responsibilities as Warden III of St. Clair or support this statement of her responsibilities. ECF 89; ECF 185-12 at 6.

8. Disputed. The cited material does not state that Level V housing has the "most violent" prisoners. The document notes that life without parole prisoners and Medium custody inmates that require more security will be housed in Level V facilities, and that some Minimum custody inmates can also be in Level V facilities.

13-23. Disputed. Defendants do not support these facts with competent evidence. Defendants cite solely to one of their expert's reports, not Andrews's institutional records. ECF 185-32 (Myers report). Myers's explanation of Andrews's institutional records contains misrepresentations and errors. For example, Myers states that on January 14, 2014, Andrews assaulted an inmate with a broomstick. But records of the incident show that it was another prisoner (not Andrews) who hit someone with a broomstick. Andrews was hit in the face with a lock attached to a belt and required treatment at a free-world hospital. ECF 371 at 1. Further dispute fact 21 because the exhibit identifies only four alleged assaults during that period and does not discuss any recommended change to his custody level in 2018. ECF 185-32 at 9 (discussing 12/2/17, 2/18/18, 4/2/18, 4/12/18). Further dispute fact 22 because the exhibit does not provide any support for a May 16, 2018 re-classification hearing and custody level change, nor the reason for any such change. ECF 185-32 at 9.[2]

25. Disputed to the extent that "several" means not very many. Davis had an extensive disciplinary history. PSOF 32-35, 39-44, 49.

29. Disputed. The cited exhibit does not state that Garrett was doing a security round at the time of the altercation or that Q was located in the "same housing unit." ECF 185-8. Further disputed because it is unclear what Defendants mean by the "same housing unit." P and Q are separate housing blocks separated by a hallway, and

---

[2] Plaintiff will file a motion to strike Defendants' expert opinions relied on by Defendants in their summary judgment motions by March 24, consistent with the Parties notification to the Court.

they each require their own rover and cubicle officers. ECF 344 at 33:7-34:9; ECF

185-60 at 5-6; *see also* ECF 185-61 at 4.

34. Disputed. Weaver found three knives together with the pants in the

clothing box, not just a single knife. ECF 190-24 at 46:17-47:4.

35. Disputed because the crime scene was not secured or preserved. Deny that

the crime scene was secured. PSOF 29-30.

42-43. Disputed because the crime scene was not preserved, otherwise

undisputed. PSOF 29-30.

48. Disputed. Caver *thought* the stabbing occurred in P-22 cell but did not know.

ECF 185-55 at 4.

49. Disputed. The exhibit does not support this fact. The Investigative Report

states that Goubeaux overheard Davis saying he was trying to get into his cell but

could not because there was another prisoner inside. It does not say that she

overheard that Andrews was engaging in sexual relations. ECF 185-55 at 4.

54-55. Disputed to the extent that Defendants imply that these policies were

followed. *See* PSOF 118-127.

59. Disputed to the extent Defendants incorrectly imply this policy was

enforced. ECF 324 at 4 ("it was obvious practice was not in place")

61. Undisputed that the ICB was required to meet weekly to review housing

assignments, but disputed that the ICB was meeting as required in 2018 and carrying

out its obligations to house prisoners at St. Clair based on their safety needs. ECF 339

at 6-8. Further disputed because the quoted language is not found in the exhibit cited.

67. Disputed. The cited exhibits do not indicate who introduced the CCO position. Disputed to the extent "direct contact" means something less than physical contact. CCOs spoke to/interacted with prisoners. ECF 344 at 49:9-12, 71:3-10.

68. Disputed. Warren Averett recommended an increase to $*36,500*-38,500. The exhibit states that ADOC retained Warren Averett after ADOC was ordered by a court to improve staffing. ECF 185-73, at 2, 72.

72. Disputed in part. The cited exhibit appears to be from 2017 and does not show that ADOC and Savage completed any analysis in May 2018. ECF 185-69 at 2.

75. Disputed. The exhibit appears to reflect only 6 individual shifts within thirty days of the Incident, and one additional shift more than 30 days before the incident (one shift each on December 9, 11, 12, 13, 14 and November 28, 29). ECF 185-52.

76. Disputed. In 2018 and early 2019, ADOC staff regularly failed to conduct required contraband searches, and to seize contraband and discipline prisoners when they saw contraband or contraband was reported to them. PSOF 80-82

77. Disputed to the extent that Defendants imply the contraband levels at St. Clair were typical of those across the country; they were not. ECF 185-36 at 46-47.

78. Disputed in part. The cited testimony does not discuss any searches of vehicles, searches of individuals entering the front gate, or of monitoring the perimeter fences, nor any searches conducted by I&I or LESD, therefore the majority of this fact is unsupported. ECF 185-12 at 49. Undisputed that at times the K-9 team

conducted searches at or outside the facility.

79. Disputed to the extent Defendants imply that any similar large-scale search occurred in 2018, which is not supported by the cited material. ECF 185-5 at 35-36.

80. Disputed. During this period, CERT members were used primarily for post coverage, not contraband searches. PSOF 90.

81. Disputed. Contraband searches were not carried out as required by policy, and ADOC's own records show that individual searches, shakedowns, and facility-wide searches were sporadic and infrequent. PSOF 80-82; ECF 339 at 28, 55-56.

83-84. Disputed to the extent that APTI implementation is implied, which the cited evidence does not show. ECF 185-11 at 10; ECF 185-42 at 15.

86. Disputed. The cited exhibits do not discuss replacing cell doors or maintaining the camera system at St. Clair. ECF 185-11 at 19; ECF 185-42 at 6.

89. Disputed. This policy on paper was rarely enforced. PSOF 99-100.

90. Disputed. 21 prisoners were not wearing their wristbands, and all were assigned to the P/Q blocks. Disputed to the extent Defendants are suggesting this shows sustained compliance with the wristband policy, which it does not. *See* PSOF 108; ECF 295 at 2-3.

91. Disputed that officers received corrective action for failing to secure doors. Exhibit 185-15 does not support this, and the deposition testimony relied on by Defendants' expert to say corrective action was taken does not support that opinion. *See* ECF 344 at 99:8-100:24. Policies relating to controlling prisoner movement were

10

largely unenforced. PSOF 99-100, 104, 118-120, 122-125, 127 128-139.

92. Disputed. Neither ECF 185-62 nor Exhibit P-23/ECF 185-64 support this.

93. Disputed. Housing assignments at St. Clair were made largely based on where there was available bed space. PSOF 111-112.

95. Disputed. The classification system Defendants allege was in place was not actually being used. *See* PSOF 111-112. Defendants cite only to their own expert Myers's report to allege that ADOC and St. Clair's classification system complies with nationally accepted standards.  But Myers did not review St. Clair's complete classification manual or any classification records other than Andrews and Davis's records; he also did not conduct any analysis to see if St. Clair staff were following the classification manual. ECF 348 at 87:13-14, 89:7-12, 89:22-90:5, 201:21-202:12.

97-100.  Disputed. The declaration from Mr. Sanders was not produced in discovery, and Sanders is not listed on Defendants' disclosures. As such, Defendants do not support this fact with competent or admissible evidence. ECF 372-73.

### ADDITIONAL UNDISPUTED FACTS

1.    Jones served as St. Clair's warden from May 2018 through July 2019. ECF 363 at 34:15-20, 337:16-22, 339:14-17; ECF 229-1 at 17:19-25, 19:15-20.

2.    As Warden III, Jones's responsibilities included enforcing St. Clair's Standard Operating Procedures ("SOPs"), including by instituting corrective action when they were not being followed. ECF 361 at 134:21-135:9 .

3.    Defendant Edward Ellington began working as an ADOC Institutional

11

Coordinator in June 2017. ECF 185-5 at 21:14-20. As Institutional Coordinator, Ellington oversaw St. Clair from 2017 through 2022. ECF 185-5 at 33:16-24, 34:4-7.

4.    Ellington was Jones's direct supervisor for her entire tenure as Warden III at St. Clair. ECF 185-5 at 17:25-18:3, 34:8-21.

5.    Ellington's responsibilities included ensuring that the wardens and captains at St. Clair followed all policies. ECF 185-1 at 18:21-19:4; ECF 353 at 40:1-18. If St. Clair's Warden was not enforcing policies, Ellington was responsible for bringing corrective action against her. ECF 361 at 135:10-19, 136:4-15.

6.    Jones's responsibilities as warden included ensuring that necessary corrective action was taken in response to incidents of violence at St. Clair, including any necessary staff discipline. ECF 185-5 at 169:14-170:5.

7.    Defendant Jefferson Dunn served as ADOC's Commissioner from 2015 through December 2021. ECF 185-11 at 14:8-10, 273:22-23.

8.    Dunn had a broad statutory duty to oversee and lead the ADOC, including independently directing, supervising and controlling ADOC. Ala. Code. 1975 § 14-1-1.3. Dunn was ADOC's highest ranking official. ECF 357 at 18:23-19:3.

9.    Defendant Larry Baker was a lieutenant shift commander at St. Clair from fall 2016 through January 2021, and was on duty during the shift during which Mr. Andrews was killed in December 2018. ECF 342 at 89:6-8,16:21-23, 22:4-9.

## ADDITIONAL DISPUTED FACTS

**A.    Mr. Andrews was stabbed to death in the P/Q blocks at St. Clair.**

12

10.    Mr. Andrews entered prison in 2013 at the age of 19, with a sentence of 25 years. ECF 315 at 4.

11.    At 5'3" and weighing 160 pounds, he had a small physical build. ECF 315 at 1; ECF 185-36 at 40.

12.    Mr. Andrews was transferred to St. Clair in June 2018 (ECF 190-73 at 2), and was assessed as a PREA victim vulnerable to assault (ECF 315 at 5-6).

13.    Mr. Andrews was housed in the P block in St. Clair's general population from June 27, 2018 through his death on December 29, 2018, apart from two brief periods (July 2-11 and Nov. 1-13). ECF 190-73 at 2.

14.    On November 26, 2018, Andrews was assigned to cell P22 alongside cell partner Cedric Davis. ECF 190-73 at 2; ECF 190-74 at 3.

15.    On December 29, 2018 at approximately 3:35 pm, an altercation began in the P-1 side of the P block between Mr. Andrews and Mr. Davis, and Mr. Andrews collapsed. ECF 185-8 at 2-3; ECF 190-29 at 1; ECF 185-55 at 2; ECF 190-27 at 1-2, 5, 7-9; ECF 290 at 1-2; ECF 190-13 at 2-4; ECF 294 at 2.

16.    Officer Caver was the sole officer in the P block, and she was positioned in the cubicle. ECF 294 at 2, ECF 185-8 at 2-3; ECF 315 at 1-3.

17.    SOP #031 required two rovers to be assigned to the P block, with two additional rovers assigned to Q block, on the day shift; even in times of extreme staff shortage, one rover was required in P during the day shift, with another separate rover assigned to Q. ECF 185-60 at 5-6; ECF 185-61 at 4; ECF 342 at 89:13-90:9.

13

18.    As a cubicle officer, Caver was prohibited by policy from leaving the cube or intervening in the incident involving Mr. Andrews. ECF 344 at 12:17-14:11.

19.    Caver radioed for help when she noticed the altercation, and officers had to respond from the Q dormitory and G-Yard because there were no other officers in the P blocks. Officers found Mr. Andrews with multiple stab wounds. ECF 185-8 at 2-3; ECF 190-12 at 1.

20.    No officers were actually working as a rover in the P and/or Q blocks on the December 29, 2018 day shift.

a.    While the Day Shift Duty Post Log states that "R. Taylor" was assigned as P/Q rover that day, Taylor is not identified in the incident reports, duty officer reports or investigative reports relating to Mr. Andrews's murder as one of the officers who responded. ECF 190-75 at 2; ECF 185-8 at 2-3; ECF 190-29 at 1; ECF 185-55 at 2-6; ECF 342 at 90:16-19 ("[A]ll rovers respond to every incident").

b.    Officers Rickey Johnson and Eric Garrett were the first to respond to Caver's radio call for assistance. ECF 315 at 1-3. Johnson was listed as on "holiday" on December 29, but told investigators he was assigned to G gate doing chow. ECF 190-75 at 2; ECF 368 at 1. Garrett was assigned to the population gate. ECF 190-75 at 2; ECF 342 at 92:12-22.

c.    Neither Taylor nor any other officers were disciplined for failing to be at their post on December 29, 2018; for failing to respond to the stabbing of Mr. Andrews; or for any other misconduct relating to Mr. Andrew's death. ECF 370 (filed

conventionally and under seal) (showing no employee discipline for any conduct on Dec. 29, 2018); ECF 185-12 at 246:2-5.

21.    No officers actually saw Davis stab Andrews. ECF 190-27 at 12.

22.    After Mr. Andrews was stabbed, other prisoners responded to help Mr. Andrews and carried him out to the infirmary. ECF 344 at 76:6-77:1; ECF 190-27 at 9; ECF 342 at 131:11-18.

23.    Mr. Andrews was brought to the infirmary in a cart and at 4:12 pm, was pronounced dead. ECF 185-8 at 2.

24.    Immediately following the altercation with Andrews, Davis ran from the P-1 side to the P-2 side without staff interference. ECF 185-55 at 4; ECF 185-8 at 2-3. Davis was hiding in cell P-28. ECF 185-55 at 2; ECF 185-8 at 2-3; ECF 190-25 at 1.

25.    Davis should not have been able to run from P-1 to P-2; there was a door between the two sides of the cell block, and it should have been closed unless Caver received instruction to open it to release prisoners. ECF 344 at 31:21-32:23.

26.    Davis was found hiding in cell P-28. Three prison-made knives were found with his bloody pants. ECF 190-28 at 3; ECF 185-8 at 2-3; ECF 190-29 at 1.

27.    The inmate assigned to cell P-28, F.F., had not slept in that cell in the three months since he had been at St. Clair; he was sleeping in a different cell (P-26), which was common at St. Clair. ECF 289 at 1-5, 9; ECF 190-28 at 3.

28.    Inmate F.F. was not disciplined for the unauthorized movement. ECF 369 (filed conventionally and under seal) [March 15, 2019 Incident Spreadsheet]

15

(showing no discipline of F.F. for sleeping in an unauthorized cell).

29.     At 5:05 pm that evening, an hour and a half after Mr. Andrews was stabbed, the P block was instructed to lock down. Despite the lockdown, the P cube officer reported that men in P-1 were leaving their supposedly locked cells without authorization and were cleaning up the crime scene. Though the shift officer was informed, no incident or duty officer report appears to have been created regarding this unauthorized movement during lockdown. ECF 339 at 26; ECF 294 at 3.

30.     Sometime after the murder, staff who were witnesses to the murder and the aftermath left the prison for the day before I&I could interview them and the crime scene was not preserved. Mr. Davis reported to staff that he killed Mr. Andrews. ECF 185-55 at 3; ECF 364 at 1.

**B.     Mr. Andrews's assailant had a known history of institutional violence, and yet was housed in the dangerous general population P/Q blocks.**

31.     Davis was in ADOC custody due to a life sentence for murder. ECF 366-1 at 75:4-75:16; ECF 198-6 at 11.

32.     Prior to killing Mr. Andrews, Davis had a documented history of institutional violence, including multiple in-custody stabbings, use and possession of contraband weapons, and unauthorized movement. The sustained disciplinaries documented in his October 4, 2018 Classification Summary include multiple assaults, including major assaults with weapons, among other serious offenses. ECF 198-6 at 4-6; ECF 366 and 366-1 at 75:17-87:6. An 8/23/2011 entry noted that he had once

16

stabbed another inmate "11 times with an inmate made knife." ECF 198-6 at 4.

33.     In an August 2017 notice, an officer summarized (at ECF 325 at 1):

On 8/1/2017, you Inmate Cedric Davis B/2283 79 received a disciplinary for rule violation #910 (fighting with a weapon).  On 7/25/2017, an ADOC official conducted an investigation and discovered that you stabbed another inmate during an altercation. . . . On 7/12/2017, you were fighting in the kitchen with another inmate over the debt he owed you. This behavior does not warrant placement in Med/SL IV custody and **poses a threat to the general population**.

34.     Davis was transferred to St. Clair on August 14, 2017, after being deemed to require close custody in July 2017. ECF 190-74 at 4; ECF 198-6 at 11. ECF 185-17 at 25, 37 ("He has . . . an institutional pattern for violence, not willing to wait for serious injury to Close his custody"); ECF 366 and 366-1 at 89:12-91:16.

35.     A "close custody" designation at St. Clair meant that an inmate needed to be housed in the single cells in the restrictive housing unit (a.k.a. segregation), and not in any general population units. ECF 366 and 366-1 at 37:24-38:23, 107:9-11.

36.     It is well known to correctional officials that an inmate who has committed multiple in-custody stabbings poses a serious risk of violence to other inmates, and needs to be either closely supervised and monitored with his movement controlled, or held in a safe single-cell segregation placement in which the inmate is kept away from other inmates. ECF 185-36 at 41; ECF 366 at 91:7-12, 90:18-21.

37.     As Jones knew, when an inmate has a very extensive pattern for institutional violence, including multiple stabbings, closed custody was appropriate. ECF 185-12 at 232:23-233:3.

38.     On November 28, 2017, Davis was placed in disciplinary segregation through February 1, 2018. ECF 190-74 at 3.

39.     Despite Davis's institutional history of violence, on Jan. 30, 2018, Davis was reduced from close to medium custody "per SCCF ISRB" (St. Clair Institutional Segregation Review Board). ECF 185-17 at 37; ECF 325 at 2.

40.     On April 8, 2018, Davis received a disciplinary, noted in his October 2018 classification summary, for being in an unauthorized area. ECF 198-6 at 4.

41.     On April 20, 2018, Davis received a major sustained disciplinary for failing to obey an order. ECF 198-6 at 4.

42.     ADOC's classification manual required use of a Risk Assessment tool that indicated closed custody for prisoners with **either**: (a) a total of 12 points or more for the entire set of 8 questions, **or** (b) 10 points or more in total on the first 4 questions. ECF 185-18 at 75-76; ECF 366-1 at 51:2-12 [Estelle Tr in Ezell/Guy].

43.     Davis's risk assessments on August 12, 2017 and January 30, 2018 both assessed Davis at 22 points in all, with 13 points on the first four questions, and thus he required close custody according to both metrics in the Risk Assessment tool. ECF 185-17 at 10, 24, 36; ECF 185-18 at 75-76; ECF 366-1 at 51:2-12.

44.     By October 4, 2018, Davis's documented classification risk level had risen to 24 risk level points, with 13 points in total on the first four questions. ECF 198-6 at 10. Thus, Davis again required close custody according to both metrics in the Risk Assessment. ECF 185-18 at 75-76; ECF 366-1 at 51:2-12, 88:9-16.

18

45.    The Institutional Segregation Review Board (ISRB) at St. Clair was responsible for making custody reduction recommendations for prisoners. ECF 185-17 at 37; ECF 325 at 2. Defendant Jones made the final decisions for the ISRB. ECF 366 at 14:23-15:4, 54:3-7, 55:10-13; ECF 198-1 at 151:23-152:10, 48:9-22.

46.    Jones sat in on classification reviews and was responsible for signing off on the classification decision for each prisoner. ECF 198-1 at 48:9-22, 151:23-152:10.

47.    Jones signed off on a recommendation that Davis be held in medium custody during an October 2018 review. ECF 198-6 at 10-11; ECF 366 at 96:17-21.

48.    When recommending that Davis be placed in general population rather than in close custody, Jones had electronic access to, and would have reviewed, Davis's classification records, disciplinary records, and incident reports. ECF 185-12 at 46:2-47:8, 48:2-8, 43:2-44:6.

49.    On October 22, 2018, prisoner C.N. reported that several prisoners, including Davis, had assaulted C.N. and that Davis had pulled a knife on him. ECF 319 at 2-3. C.N.'s report was documented in an incident report and notice was provided to supervisors. ECF 319 at 3. C.N.'s handwritten statement indicated that Davis had "slapped me and called me a rat and drawed a knife on me." ECF 319 at 2.

50.    The investigating lieutenant wrote that C.N. was "in debt for drugs" with no explanation of the basis for this conclusion, and also indicated that C.N. "is in-need of a bath." ECF 319 at 3. C.N. was put in segregation pending disciplinary action for intentionally creating a security safety or health hazard. ECF 319 at 1, 3.

51.    There is no indication that any investigatory or disciplinary action was taken toward Davis with respect to C.N.'s report. ECF 319 at 3. Had such investigation occurred, it would have been documented. ECF 352 at 73:7-74:6, 76:6-17. Davis should have been taken to administrative segregation following C.N.'s report so that he could be investigated for the reported assault and contraband weapon. ECF 366 and 366-1 at 100:11-101:4.

52.    Had discipline been sustained against Davis for fighting C.N. with a weapon, Davis would have required reclassification. ECF 366 at 110:2-111:1.

53.    There is no indication that Davis or his cell were searched for the knife C.N. had reported in Davis's possession, even though supervisors were notified of the incident. ECF 319 at 3. Policy required for a cell house to be locked down and a search conducted for the reported knife when incidents like this occurred. ECF 350 at 102:2-18; ECF 229-1 at 30:22-31:8.

54.    Defendant Jones testified that she would have received and reviewed the incident report regarding C.N.'s allegations about Davis and the knife in his possession, as well as the staff response to the incident. ECF 185-12 at 217:10-218:12, 43:2-23, 65:1-21, 284:5-21; ECF 363 at 49:22-53:10.

55.    Nonetheless, Jones did not remove Davis from general population following review and notice of the C.N. incident. ECF 190-74 at 3. Nor did she ensure that any contraband search was carried out with regard to Davis. ECF 319 at 3.

56.    Beginning on November 13, 2018, Davis was placed in general

population, first in Q block and then in cell P22 in the P block. ECF 190-74 at 2-3.

## C.    In 2018, violence at St. Clair was the norm, particularly in P/Q.

57.    The mortality rate for prisoners in ADOC–especially for deaths caused by homicide–were some of the highest in the nation, in the years leading up to December 2018. The rate was significantly higher than the national average based on ADOC's data, which undercounted the actual number of homicides by classifying some homicides as natural deaths. ECF 334 at 8, 19, Mortality in State and Federal Prisons; ECF 321 at 11-12; ECF 198-20 at 1.

58.    In 2018, St. Clair's homicide rate at St. Clair was higher than that of any other Alabama prison. ECF 291 at p.1, 12 (chart comparing inmate on inmate homicides at the various ADOC facilities for *fiscal* year 2018); ECF 292 at 1, 5 (chart comparing inmate on inmate homicides at the various ADOC facilities through December of *fiscal* year 2019, which is part of calendar year 2018); ECF 357 at 110:4-7 (explaining the ADOC's legislative fiscal year).

59.    Between February 2018 and February 2019, five prisoners were stabbed to death at St. Clair. ECF 356-4 at 1 (Feb. 2018 fatal stabbing of Travis Wilson); ECF 363-12 at 2-3 (Sept. 2018 fatal stabbing of Terry Pettiway); ECF 301 at 1-2 (Sept. 2018 fatal stabbing of Rogarius Bray); ECF 185-8 (Dec. 2018 fatal stabbing of Mr. Andrews); ECF 185-30 (Feb. 2019 fatal stabbing of Steven Mullins). There were numerous other serious prisoner-on-prisoner assaults in 2018. ECF 198-17 at 7-8; ECF 369 (filed conventionally and under seal).

60.    ADOC supervisors received notice of these incidents. For example:

a.    Jones testified that she received and reviewed St. Clair's incident reports for Class A, B and C incidents, and had notice of trends through incident reports sent to her, the electronic "incident module" that she checked regularly, phone calls from staff, and a spreadsheet of incidents emailed to her regularly. ECF 363 at 49:22-53:10; ECF 185-12 at 43:2-23, 65:1-21, 284:5-21; ECF 185-5 at 227:1-229:20.

b.    Ellington also had access to the incident module and was notified of incidents at St. Clair orally or in writing; he also regularly received a spreadsheet of incidents at the facility, and reviewed all Class A and B incident reports ECF 185-5 at 56:2-13, 56:24-57:22, 60:9-20, 302:11-16, 227:1-229:20; ECF 361 at 47:10-21; 62:13-19; ECF 363 at 99:1-100:1; 70:12-71:10; ECF 229-1 at 38:22-39:16.

61.    For years, and in late 2018, levels of violence at St. Clair were well above what would be expected in a controlled and reasonably safe facility, with near-daily violence. ECF 198-1 at 35:14-18, 71:25-72:18; ECF 185-36 at 43; ECF 339 at 11-12.

62.    Violent incidents, including serious assaults and murders, were unsurprising to staff and occurred with regularity. ECF 305 at 10 (152 incidents of violence at St. Clair between 11/2017 and 6/2018, including 22 resulting in serious injury); ECF 198-1 at 72:14-23; ECF 185-36 at 33, 45, 53; ECF 359 at 90:11-20, 146:12-22; ECF 354 at 135:7-12; 234:17-19; ECF 369 (filed under seal); ECF 354-4 at 7-8; ECF 303 at 7-9; ECF 198-17 at 7-8; ECF 185-3 at 2-93.

63.    Warden Jones understood while warden that St. Clair had high levels of

violence. ECF 185-12 at 32:13-32:18.

64.    In May 2018, St. Clair's own internal Vulnerability Analysis found extremely high levels of contraband and violence, as well as other disciplinary issues, that increased the dangerousness of St. Clair. ECF 198-17 at 6-9. There were 550 major disciplinary incidents that were reported, including 80 for possession of weapons. ECF 198-17 at 6. There were also 170 documented prisoner-on-staff assaults and 269 documented prisoner-on-prisoner assaults. ECF 198-17 at 7-8.

65.    Given that many incidents of violence or contraband, among other rule violations, were not addressed or reported (or were improperly classified), the reported statistics significantly underestimated the true levels of violence, contraband, and rule violations in 2017 and 2018. ECF 339 at 11, 41-43 (failure to properly document incidents and investigate suspicious injuries); ECF 302 at 5, 16 ("Officers do not enforce basic facility policies[.]"); ECF 185-36 at 54; ECF 197-4 at 05; ECF 185-2 at 6 (openly violating rules); *see* ECF 229-1 and 355 at 79:16-83:9 (failing to properly classify an assault).

66.    The levels of violence and lack of facility control reached such high levels that, in March 2019, the New York Times received from an anonymous source over 2,000 photos depicting mostly seriously injured and dead prisoners within St. Clair. ECF 288; ECF 330 at 1-2.

67.    Violence was so common at St. Clair that many Defendants and St. Clair staff have no memory of Terrence Andrew or Steven Mullins, or their murders. ECF

23

352 at 71:25-72:23, 85:25-86:18; ECF 229-1 at 64:1-65:5, 84:10-85:7; ECF 365 at 32:3-20; ECF 350 at 9:14-10:19; ECF 185-12 at 144:12-145:3, 256:23-257:3.

68.    Throughout 2018, the levels of violence, contraband, and unauthorized movement in the general population P/Q blocks were especially high in comparison to other housing units and staff were on notice that serious action needed to be taken to address the resulting risks. ECF 320 at 6, 11; ECF 190-19 at 3; ECF 326 at 3, 15-17; ECF 339 at 08, 18-20, 53 94-95, 113-14; ECF 320 at 11-15.

69.    Jones knew the majority of incidents at St. Clair in late 2018 and early 2019 involved the P/Q blocks. ECF 185-12 at 147:25-148:24, 135:22-136:3; ECF 363 at 300:7-301:10; ECF 353 at 265:18-266:3.

70.    Dunn was put on notice of elevated levels of violence in P/Q. ECF 300.

71.    From August to November 2018, 78% of serious incidents of violence at St. Clair occurred in the P/Q blocks. ECF 339 at 53. In August 2018, five stabbings resulting in hospitalizations occurred in the P/Q blocks or involved prisoners assigned to those blocks. ECF 339 at 94-95. From November 2017 and June 2018, at least 22 incidents of serious violence occurred in P/Q blocks or involved prisoners assigned to the P/Q blocks. ECF 305 at 29-30; ECF 296 at 2 & n.3.

72.    The September 2018 Terry Pettiway and Rogarius Bray murders occurred in and/or in front of P/Q. ECF 357-10; ECF 339 at 53; ECF 301.

73.    Jones was responsible for identifying St. Clair housing units at high risk for violence and taking action to reduce the violence. ECF 185-12 at 133:19-134:7.

24

74.    St. Clair had sufficient staff to ensure constitutional conditions for the prisoners and to conduct fundamental security functions like properly supervising prisoners, conducting contraband searches and facility inspections, and controlling prisoner movement. ECF 185-11 at 248:12-16; ECF 229-1 at 150:10-151:14.

**D.    In 2018, weapons contraband was pervasive and St. Clair had a widespread practice of failing to conduct reasonable searches.**

75.    It was well-understood that contraband was pervasive and commonplace at St. Clair in the years leading up to December 2018. ECF 185-36 at 35, 45-47; ECF 354 at 133:9-19; ECF 357 at 44:17-22; ECF 359 at 270:18-22; ECF 185-12 at 25:16-27:14; ECF 302 at 5; ECF 363 at 82:21-84:1. Indeed, the ASCA audit of St. Clair in January 2018 concluded that the Facility "ha[d] a major contraband problem." ECF 302 at 19, 24 (interviewed staff said inmates had contraband "in abundance"); *see also* ECF 339 at 27 ("St. Clair has long been plagued by widespread presence of weapons contraband.")); ECF 185-12 at 180:2-6.

76.    Contraband was frequently brought into St. Clair by staff and visitors. ECF 302 at 13; ECF 359-4 at 1. Two prisoners escaped from St. Clair in 2017 in possession of a gun provided to them by staff. ECF 360 at 33:3-34:10.

77.    SOP 110 had been in effect for years by the time of Mr. Andrews's death and set out requirements for conducting searches within St. Clair. ECF 363-3 at 3.

78.    SOP 110 required shift commanders to make sure that all cell block rovers conducted a minimum of two cell searches each shift, as well as random pat

25

searches. ECF 363-3 at 3; ECF 229-1 at 59:7-13. Additionally, captains were required to ensure that each area of St. Clair (including every housing unit) was searched on a monthly basis. ECF 363-3 at 3; ECF 198-1 at 15:19-16:3. SOP #56 also required all rovers to "conduct sufficient random personal and area searches to eliminate the flow of contraband," but no less than four cell searches and personal searches each shift by each officer. ECF 302 at 16; ECF 320 at 13.

79.    All searches were required to be documented in an incident report (form 302), whether or not contraband was found. ECF 363-3at 3; ECF 229-1 at 59:14-22, 60:4-61:3 ; ECF 185-12 at 183:9-184:4.

80.    St. Clair's own records show that contraband searches were not happening as required by policy. ECF 302 at 16-17; ECF 339 at 120. Based on SOP 110, there should have been thousands of searches and shakedowns completed and documented at St. Clair every year. ECF 339 at 120 (at bare minimum, there should have been 16 cell searches documented per day). Yet ADOC's own dashboard shows only 116 institutional searches[3] in 2018. ECF 369 (filed conventionally and under seal)[4]; ECF 361-13 at 1 (only 61 searches were reported over 12 months); ECF 367-10 at  6. St. Clair staff knew that searches were not happening as required in 2018 and

---

[3] The designation "institutional search" does not mean that a search was done of the entire facility. Instead, it encompasses any search done in the facility, including individual cell or individual prisoner searches or shakedowns. *See, e.g.*, (line 279 2/19/28 "Institutional search" of cell L-33, incident number SCCF-18-00215) (line 1334 7/28/18 "Institutional search" discussing "routine inmate shakedowns"); *see also* ECF 185-5 at 123:21-124:16.

[4] The actual number of searches done appears to be lower, as searches were often counted multiple times. *See* lines 1060-1062 (counting 6/12/2018 search three separate times).

early 2019. ECF 302 at 01; ECF 361-13; ECF 339 at 56.

81.     Indeed, staff members regularly failed to seize contraband when they saw it, or to discipline prisoners for contraband including weapons. ECF 302 at 5 ; ECF 339 at 118; ECF 238-1. It was common for weapons used in assaults to not be recovered. ECF 374 at 190:10-13; ECF 305 at 26-27.

82.     As a result, when searches were done, unreasonably large amounts of contraband were discovered. ECF 185-36 at 46-47. For example:

a.      A December 27, 2017 institutional search yielded, among other things, 98 inmate-made knives and a hacksaw blade. ECF 329 at 1-3.

b.      In August 2018, a search of one side of the P block (P-2) turned up 16 weapons. Up to 48 prisoners could live in P-2, meaning roughly one in three prisoners had a weapon. ECF 314. Sixteen weapons was a common number of weapons found in a search of one half of a cell block. ECF 374 at 207:11-14; ECF 238-2.

c.      One random search of a prisoner on November 29, 2018 revealed that he was carrying five knives in a bag. ECF 369 (filed conventionally and under seal).

83.     Controlling contraband is a critical and fundamental correctional duty. ECF 185-36 at 45, 47; ECF 185-12 at 29:24-30:18. Contraband–particularly weapons, cellphones and drugs–seriously undermines safety and contributes to violence. ECF 185-36 at 45, 15-16; ECF 302 at 19, 24; ECF 197-4 at 63; ECF 185-2 at 63; ECF 185-12 at 34:18-35:4; ECF 363 at 122:23-123:22, 124:15-124:22, 86:11-87:18.

84.     Defendants were aware of the importance of conducting contraband

searches to reduce violence. ECF 185-12 at 63:19-64:8; ECF 185-11 at 242:21-243:8; ECF 361 at 271:7-19. SOP 110 explicitly acknowledged: "[s]earches and shakedowns are simply a necessary portion of correctional work," should be commonplace, and that, for many positions at St. Clair, should make up a majority of staff responsibilities and are indeed "the most important single function of the job." ECF 363-3 at 3.

85.    Dunn knew well before Mr. Andrews was killed that more contraband searches were needed to reduce weapons at St. Clair. ECF 185-11 at 242:21-243:8.

86.    Dunn had notice that staff were not conducting required routine contraband searches at St. Clair, and did not take any meaningful steps to investigate this information, nor did he take any steps to specifically enforce, or direct the enforcement of, policy requiring daily and monthly searches. ECF 185-11 at 164:8-175:19, 201:9 -204:24. Dunn could have done so. ECF 185-11 at 204:25-205:24.

87.    Ellington and Jones were responsible for making sure that contraband searches were done at St. Clair in compliance with the SOPs. ECF 185-5 at 142:25-143:15; ECF 185-12 at 64:9-64:17; ECF 185-11 at 176:5-21.

88.    Although Ellington was advised that contraband searches were not happening as required, he never took any meaningful steps to ensure that Jones was actually enforcing search policies at St. Clair, despite having responsibility to do so. ECF 185-5 at 143:16-21, 183:8-19, 185:17-186:4, 185:22-4; ECF 185-11 at 176:5-21.

89.    After a monitoring report brought to Jones's attention a decrease in the frequency of institutional contraband searches at St. Clair, Jones did not implement

any action plan directed at locating and removing contraband from the facility. ECF 363 at 317:17-318:14. Nor did Jones discipline any staff (or ensure that staff were disciplined) for failing to conduct contraband searches. ECF 185-5 at 162:17-163:21.

90.     Jones had the authority to have CERT teams at St. Clair conduct additional searches and to request additional CERT teams for searches, or to hold a shift over or call in supervisors to do a search. ECF 185-5 at 126:24-128:15, 129:21-130:9. Despite this, CERT teams at St. Clair were primarily used for post coverage, not contraband searches. ECF 185-12 at 196:2-197:11; ECF 320 at 14.

91.     Staffing was sufficient to conduct the searches required by policy. ECF 229-1 at 151:2-5; ECF 185-5 at 131:10-13; ECF 185-12 at 185:5-185:25, 186:23-187:7.

92.     Baker, as a shift commander, was responsible for ensuring that officers were completing shakedowns, cell inspections, and contraband searches daily on his shift. ECF 350 at 25:12-27:25, 28:24-29:6.

93.     Charles Daniels joined the ADOC as Deputy Commissioner in January 2019, and immediately recognized the need for, and planned, a thorough, institution-wide search of St. Clair called "Operation Restore Order" intended to ascertain the level of contraband at St. Clair and remove it, so that a clean facility could then be maintained through consistent searches. ECF 345 at 43:18-44:6, 144:18-146:3, 174:6-22, 176:20-177:7, 178:6-20. The operation took Daniels only a few weeks to plan and implement at St. Clair.  ECF 345 at 175:3-7.

94.     The St. Clair Operation Restore Order search could have been proposed

29

and carried out before 2019, but was not. ECF 185-11 at 236:5-237:10, 238:18-21.

95. The Operation Restore Order search occurred on February 28, 2019, too late to help Mr. Andrews; it turned up 130 inmate made knives, 20 razor blades, and 17 manufactured knives, in addition to drugs and cell phones. ECF 356-14 at 1-08.

**E. In 2018, St. Clair had a widespread practice of largely uncontrolled prisoner movement in its general population units.**

96. In 2018, uncontrolled prisoner movement was the norm at St. Clair in general population, as it had been for years. ECF 185-36 at 50; ECF 302 at 5 ("Officers do not enforce basic facility policies such as challenging inmates moving without authorization on the yard, enforcing the requirement for inmates to wear their . . . wristband"); ECF 328 at 1-2; ECF 363 at 299:16-300:6, 320:10-321:3; ECF 185-12 at 159:12-160:15, 161:4-162:1, 164:14-165:1; ECF 353 at 40:19-41:4, 41:13-20.

97. Prisoners regularly lived or slept in areas other than their assigned cells. ECF 237-4; ECF 185-12 at 24:3-25:15, 169:14-170:15; ECF 289 at 1, 5, 7 ("This whole facility in unauthorized area sir. . . . Don't nobody sleep in the . . . same assigned cell."); ECF 363 at 192:4-194:14; ECF 190-1 at 39:9-19.

98. St. Clair's SOPs required that all prisoner movement be coordinated through the shift commander's office. ECF 185-29 at 3. The Shift Supervisors were responsible for making sure that staff were controlling prisoner movement during their shifts. ECF 185-29 at 2. St. Clair policy also required that all cellblock entrances remain closed except to permit authorized movement, and that prisoners not be

allowed to enter cellblocks to which they are assigned without authorization. ECF 344 at 28:12-29:3; ECF 185-29 at 2-6; ECF 328 at 1. It also required that all inmate movement be documented in the duty post log. ECF 185-29 at 3.

99.    In 2018, staff did not enforce policies controlling prisoner movement, resulting in prisoners moving about without interference. ECF 185-36 at 47-51; ECF 302 at 23; ECF 185-2 at 6, 13; ECF 185-15 at 2; ECF 198-16 at 2; ECF 190-19 at 2-3; ECF 305 at 13-15; ECF 339 at 30-31; ECF 185-12 at 161:4-161:19, 164:14-165:1.

100.    In 2018, St. Clair had a wristband policy to control movement; however, the wristband policy was rarely enforced, and prisoners were allowed to move freely throughout the general population despite the policy. ECF 185-36 at 27-29; ECF 302 at 5; ECF 185-2 at 6,13; ECF 185-15 at 2; ECF 185-76 at 5;  ECF 185-12 at 159:12-161:19, 164:14-165:1; ECF 363 at 140:17-141:15; ECF 185-5 at 166:3-17, 168:1-19.

101.    Controlling prisoner movement is a critical and fundamental correctional duty. ECF 185-36 at 48. Failure to control prisoner movement puts staff and prisoners at risk of violence. ECF 185-36 at 50-52; ECF 185-12 at 35:11-16; ECF 185-2 at 6, 13; ECF 328 at 1; ECF 185-15 at 2; ECF 363 at 320:10-321:3. It is also important to control movement to hold prisoners accountable and manage unlawful activity. ECF 185-36 at 52; ECF 347-1 at 31:20-32:2; ECF 318, 327, 333 at ¶2 (RFAs for Givens, Brooks and Malone); ECF 339 at 113-114; ECF 305 at 14-15, 28-29.

102.    The failure to control prisoner movement falls well below accepted

correctional standards. ECF 185-36 at 49-50.

103.    Given staffing challenges at St. Clair, controlling prisoner movement was especially important. ECF 185-36 at 57.

104.    Jones received reports that officers were leaving the doors to the P/Q housing block open when the camera was not functioning, and herself observed the door left open, but did not recall any discipline of staff who had left the doors open and did not create any written plan for P/Q movement. ECF 363 at 327:11-328:21; ECF 185-12 at 162:2-162:15, 164:21-165:1, 174:12-17.

105.    Jones knew that St. Clair had an issue with prisoners living outside of their assigned housing units. ECF 185-12 at 24:3-25:15.

106.    Bed roster checks were an important mechanism to ensure that prisoners were sleeping in their assigned cells. Jones did not know if these were happening as required, and did not take steps to keep track of when bed roster checks were happening. ECF 229-1 at 116:9-14 ; ECF 363 at 141:16-142:16.

107.    Jones's response to unauthorized movement at St. Clair was merely to reemphasize existing procedures. ECF 363 at 321:4-324:15. Indeed, she provided a performative memo telling staff to enforce the wristband policy, which was wholly ineffective and which she did not enforce. ECF 185-15 at 2 ; ECF 324 at 7-8 (explaining that after Jones's directive, Cotten returned and staff were still not complying with the policy); ECF 185-36 at 28-29, 59-60, 50-51 (a minimally competent correctional supervisor would have recognized the need for meaningful

action and urgency, not empty performative gestures shown to be ineffective).

108.    Any improvement was short-lived at best, and uncontrolled movement remained the norm. ECF 339 at 30 ("The Department's assurance that corrective action was taken in the form of new policies issued by the Warden and a single wristband audit, while knowing that the facility is unable to comply with these policies and has documented an inability to control movement out of P/Q, is deeply troubling."); ECF 339 at 82-87, 101; ECF 295 at 1-2 (13 prisoners in P block were not wearing wristbands, and another 8 prisoners in Q block); ECF 369 and 370 (filed conventionally and under seal) (providing additional information about the incidents identified in the EJI report, SCCF-18-01548, SCCF-18-01572, SCCF-18-01530 and showing that more than 27 men were found in unauthorized housing areas during a single count on November 29, 2018 - SCCF-18-01572 incident number). ECF 197-9 at 4; ECF 185-19 at 3-4 (noting the "fluid nature of the prison population's residences and the frequency by which inmates locate to various cells without authorization").

109.    Neither Jones, nor any other St. Clair staff, made any changes before Andrews was stabbed to ensure that prisoner movement was controlled. ECF 190-1 at 41:16-42:12; ECF 229-1 and 355 at 112:23-113:7, 135:9-14, 156:14-22, 171:7-15, 179:24-180:3; ECF 352 at 143:8-144:8, 144:19-145:12; ECF 190-1 at 41:21-42:12 (Officer Smith was not aware of any steps taken to address inmates being found without authorization in unassigned housing units prior to February 26, 2019).

**F.    In 2018, St. Clair had a widespread practice of failing to safely house and**

**monitor violent prisoners with histories of institutional violence.**

110.    It is well known that prisoners with an established history of institutional violence need to be housed in a single cell or otherwise separated from other prisoners, and that they need to be closely monitored and have their movements controlled, to avoid a significant risk of violence to other prisoners. ECF 185-36 at 43; ECF 366 at 91:7-12, 90:18-21; ECF 185-12 at 232:23-233:3; ECF 296 at 2.

111.    In 2018, St. Clair prisoners were assigned to cells based on empty bed space, and often, the only open beds were in P/Q. ECF 339 at 5-8 ; ECF 185-2 at 42.

112.    Prisoners were often moved out of restricted housing (segregation) simply because bed space was needed there, not because it was determined that they could be properly and safely housed in general population. ECF 302 at 28; ECF 185-5 at 244:6-16; ECF 185-12 at 201:15-202:14, 203:12-18.

113.    Throughout 2018, prisoners were frequently released from segregation directly into the inadequately supervised P/Q blocks. ECF 339 at 6, 8; ECF 296 at 2 ; ECF 190-74 at 3 (released from segregation to P/Q on 2/1/18 and 11/13/18); ECF 190-73 at 1 (instances on 6/20/18, 7/11/18 and 11/13/18); ECF 210-1 at 1 (3/30/18 and 1/12/19); ECF 204-4 at 1 (10/23/18); ECF 314 at 1.

114.    In 2018, prisoners in general population (including P/Q) were left largely unmonitored, and cell houses were regularly staffed with just a single cube officer. ECF 350 at 35:16-24; ECF 302 at 9; ECF 185-11, 26:14-24, 28:4-22, 29:2-6; ECF 198-16 at 2; ECF 350 at 54:3-55:2; ECF 354-4; ECF 303; ECF 198-17 at 13; ECF 185-12

at 104:16-105:1.

115.    The *Duke* settlement required the creation of a Behavior Modification Unit to safely house prisoners identified as in-need of behavior modification programming and who should not be housed in general population because they posed a risk to others' safety. ECF 185-70 at 7-9; ECF 185-12 at 107:5-10.

116.    The Behavior Modification Unit was not implemented as required by the *Duke* agreement, nor was any behavioral modification programming implemented at St. Clair in 2018. ECF 185-11 at 214:5-21, 215:22-216:3; ECF 185-12 at 203:19-25.

## G.    In 2018, St. Clair had a widespread practice of noncompliance with its written security policies.

117.    A failure to enforce security policies and procedures at an institution like St. Clair risks increased violence. ECF 185-12 at 35:23-36:3.

118.    In 2018, officers did not enforce basic security policies at St. Clair. ECF 302 at 11, 5 ("Officers do not enforce basic facility policies such as challenging inmates moving without authorization on the yard, enforcing the requirement for inmates to wear their . . . wristband, and prohibiting smoking . . . . This has resulted in the inmate population being very undisciplined and empowered by the lack of any real structure."); ECF 185-36 at 55-56; ECF 361 at 270:11-14; ECF 185-2 at 6.

119.    Supervisors also failed to hold subordinate staff accountable for failing to carry out their basic security functions, including for failing to conduct required searches; seize contraband weapons; control prisoner movement; and maintain

35

security by locking down doors. ECF 185-36 at 55-56; ECF 302 at 5, 10, 13; ECF 370 (filed under seal) (of the 25 incidents of employee discipline in October through December 2018, 13 were related to work attendance/overtime policies, and there was no staff discipline for failure to conduct contraband searches, failure to conduct inspections or work-throughs, failure to control prisoner movement, or failure to secure cell block dorms)[5]; ECF 229-1 and 355 at 61:12-16, 175:15-21 ; ECF 318, 327, 333 at ¶¶9, 10, 13-16, 18-19 (RFAs of Givens, Brooks and Malone); ECF 229-1 at 61:12-16; ECF 198-1 at 143:8-144:8; ECF 369 (filed conventionally and under seal).

120.    The number of major disciplinary reports for prisoner misconduct fell from 1,511 in 2016 to just 550 in 2018. *Compare* ECF 303 at 6 , *with* ECF 198-17 at 6 .

121.    The failure to enforce ADOC and St. Clair policies led to dangerous and chaotic conditions, where prisoners were emboldened to violate rules and intimidate staff, increasing violence. ECF 185-36 at 51-52; ECF 302 at 16; ECF 185-76 at 04.

122.    In 2018 and 2019, Ellington was provided with reports for all prisoner and staff discipline at St. Clair. ECF 185-5 at 85:19-86:7, 162:17-163:10.

123.    Ellington is not aware of any instances in 2018 in which officers were disciplined at St. Clair for failing to conduct required contraband searches, failing to properly respond to a prisoner's expression of fear for their safety, failing to supervise

---

[5] To view only employee discipline on this spreadsheet, in column F, select the arrow in the right corner and check the box for "staff discipline." Then use column G to look at incidents only in October -December 2018. Explanations of each incident are in column Y.

their subordinates, failing to enforce the wristband policy, or failing to control prisoner movement. ECF 185-5 at 163:11-21, 164:9-165:23-166:17.[6]

124.    Jones knew that staff were not enforcing policies, but she merely made "vague recommendations and admonitions" at staff meetings "without any enforcement." ECF 185-36 at 29-30.

125.    Jones does not recall taking any corrective action against any wardens, captains or shift supervisors for failing to supervise subordinates. ECF 185-12 at 199:24-200:3 Jones, along with Ellington, supervised Warden Givens. ECF 229-1 at 31:23-32:3. Givens never disciplined any staff for failing to carry out daily searches or failing to enforce SOPs related to searches, or for failing to properly complete incident reports. ECF 229-1 at 61:12-16, 161:12-163:11, 175:15-21. Prior to 2020, Givens was never disciplined for failing to ensure contraband searches and inspections were carried out, or for failing to make sure that incidents were properly documented, ECF 229-1 and 355 at 231:17-.233:1.

126.    Warden Brooks does not recall ever being disciplined at St. Clair for failing to ensure contraband searches were carried out, conduct necessary rounds and inspections, control prisoner movement, or document violent incidents or weapons. ECF 198-1 at 11:6-7, 18:5-9, 144:19-145:17.

## H.    In 2018, physical plant issues at St. Clair exacerbated the substantial risk

---

[6] Ellington remembers one time that a staff member was disciplined for having too many prisoners on the yard, but he does not know if that occurred in the 2018-19 timeframe or not. He otherwise does not recall any staff discipline for failing to control movement. ECF 185-5 at 164:14-165:22.

**of serious harm from violence to prisoners.**

127.    The physical condition of the facility presented a number of obvious security risks. ECF 302 at 5,13, 20; ECF 185-2 at 6. Dunn was aware of many of these risks as early as his 2015 St. Clair tour. ECF 185-11 at 26:14-24, 28:4-22, 29:2-6.

128.    Cell locks were frequently jammed or inoperable. ECF 374 at 209:9-23. In October 2018, about half the lock-indicator lights in the P/Q blocks were inoperable and had been that way for months, and men continued to be housed in cells with locks known to be broken. ECF 198-16 at 2-3; ECF 352 at 106:15-25, 107:11-16; ECF 197-4 at 5; ECF 185-2 at 6; ECF 185-36 at 35, 52; ECF 302 at 23; ECF 357 at 241:6-21; ECF 363 at 147:1-157:5 (institutional logs from May and Sept. 2018 show many cell locks, many call buttons, and all cameras not working in P/Q, and some staff fabricating required checks); ECF 320 at 6-8.

129.    In 2018, there was "an overall culture of indifference to the security of cell doors/locks and a tolerance of obstructions in locks." ECF 198-16 at 2; ECF 352 at 106:15-25, 107:11-108:1.

130.    Camera systems were largely inoperable in the years leading up to December 2018. ECF 352 at 106:15-25, 107:11-108:1 ECF 198-16. For instance, in October 2018, there were no working cameras in P/Q or monitoring the entrance to those blocks; ECF 197-4 at 5-6; ECF 198-16 at 2; ECF 305 at 13, 24; ECF 185-76 at 25. Dunn knew from his first tour of St. Clair in 2015 that there were serious problems with the cameras and their placement, but he did not submit a request to

38

the legislature for a new camera system until at least three years later. ECF 185-11 at 29:7-12, 254:5-11; ECF 357 at 243:21-244:12, 246:16-21.

131.    In 2018, cell and cube windows were commonly so dirty or damaged that one could not see through them, and sometimes went months without cleaning or repair. ECF 185-36 at 6; ECF 198-16 at 2-3; ECF 197-4 at 5; ECF 185-2 at 6.

132.    Because of the layout in the cell houses, cube officers were not able to see many cells in the housing units they were charged with monitoring. In general, the layout and conditions in the cell houses made it difficult to properly monitor all areas of the cell house, and there were numerous blind spots. ECF 185-11 at 26:14-24, 28:4-22, 29:2-6; ECF 198-16 at 2; ECF 350 at 54:3-55:2.

133.    Given the physical plant problems, ADOC and St. Clair staff were well aware for years that steps needed to be taken to ensure that prisoners were properly monitored and movement controlled. ECF 185-11 at 26:14-24, 28:4-22, 29:2-6.

134.    Jones was responsible for ensuring that housing units were supervised properly despite staff shortages and camera issues. ECF 185-11 at 33:3-15, 34:7-19.

135.    Moreover, Jones discovered that institutional inspection reports to identify issues with security cameras and cell locks were being fabricated by staff and not being done according to policy. ECF 367 at 204:20-23, 205:12-22 , but there is no evidence that any staff members were disciplined for lack of compliance. ECF 370 (filed conventionally and under seal)[Spreadsheet of Incidents at ADOC045014] (of the 25 incidents of employee discipline in October through December 2018, none

were for failure to conduct inspections or work-throughs).[7]

## I.    Defendants Jones, Ellington, Dunn, and Baker were well aware of the risk to prisoners such as Mr. Andrews, but failed to act.

136.    The risks discussed above were so serious, long-established, readily apparent, and well-known that every Defendant would have been aware of them. ECF 185-36 at 57-58; ECF 363 at 310:22-311:13.

137.    Dunn visited St. Clair within the first six months of being appointed ADOC Commissioner in 2015. ECF 357 at 26:12-16, 27:1-17, 28:13-30:15.

138.    Dunn was advised about significant challenges or problems within ADOC facilities like St. Clair by the deputy commissioners and institutional coordinators. ECF 185-11 at 52:21-53:4. Dunn would also receive daily summaries of all major incidents at St. Clair, including assaults. ECF 185-11 at 103:25-104:25, 106:10-17. Dunn received monthly and annual statistical reports about violence at St. Clair, as well quarterly analyses of this data. ECF 185-11 at 114:19-115:19.

139.    Dunn knew that steps needed to be taken to address deficiencies at St. Clair and to adjust correctional practices. ECF 185-11 at 32:8-12. Dunn was also aware of a lack of leadership at St. Clair, and a lack of support and supervision of staff. ECF 357 at 134:18-135:7; ECF 302 at 5.

140.    Despite this, Dunn did not address problems at St. Clair as to the day-to-

---

[7] To view only employee discipline on this spreadsheet, in column F, select the arrow in the right corner and check the box for "staff discipline." Then use column G to look at incidents only in October-December 2018. Explanations of each incident are in column Y.

day operation, he left that to the Deputy Commissioner and Warden III. He did not

take meaningful steps to make sure that recommendations or corrective action were

actually implemented by the Warden and other St. Clair staff. Dunn focused on

obtaining resources for ADOC facilities. ECF 357 at 157:18-158:21, 159:19-160:14,

161:20-162:12, 164:19-165:8, 165:15-167:14, 206:20-207:21, 228:21-229:18, 230:22-

232:3, 320:15-321:12 ; ECF 185-36 at 56 ("Commissioner Dunn were responsible for

taking urgent and meaningful action to stem the dangerous conditions and violence at

St. Clair, . . . and did not do so prior to [Andrews'] death."); ECF 185-36 at 49-51

("Any minimally competent warden and administrator would understand the extreme

levels of risk posed by these conditions and take urgent action . . . Jones (as well as

Ellington and Dunn) failed to do so here.").

141.    Dunn also failed to carry out, or instruct anyone else to carry out, any

evaluation of corrective action taken against St. Clair staff. ECF 357 at 309:18-310:5.

142.    In 2018 and early 2019, Ellington visited St. Clair at least once a month,

and during these visits he would speak with staff and the wardens. ECF 185-5 at

44:11-19; ECF 229-1 at 38:13-17.

143.    Ellington was responsible for corrective action regarding the wardens'

conduct. Ellington never gave the St. Clair wardens any written reprimands or

corrective action in 2018, nor did he create in 2018 any written improvement plans for

Jones for St. Clair. ECF 185-5 at 210:5-19, 211:1-15.

144.    Annual internal "vulnerability analyses" at St. Clair alerted Defendants

41

and other St. Clair staff to serious risks of violence and other unsafe conditions for years. ECF 354-4; ECF 303; ECF 198-17 at 7-8. Among other things, they alerted ADOC and St. Clair staff that prisoners were being left unmonitored for long periods of time (ECF 354-4 at 13; ECF 303 at 14; ECF 198-17 at 13); drugs and other contraband are readily available (ECF 303 at 6 , ECF 198-17 at 13); and a significant number of serious and dangerous incidents were causing stress and low morale (ECF 303 at 9; ECF 198-17 at 9). Jones received the 2018 Institutional Vulnerability Analysis. ECF 363 at 249:18-250:17, 251:8-251:23.

145.    In 2014, the Equal Justice Initiative ("EJI") brought a class action on behalf of prisoners at St. Clair alleging that they faced a substantial risk of serious violence due to inadequate supervision and monitoring at the facility, widespread contraband, and a failure by staff to respond appropriately to instances of violence at the facility, among other things. ECF 1-1. Dunn was aware of this lawsuit early in his tenure as Commissioner. ECF 357 at 78:16-79:11. In March 2016, a motion for class certification detailed dangerous conditions at St. Clair: prolific violence, including sexual violence, pervasive weapons, failures to monitor the housing units and control movement, widespread broken cell locks and control panels, and severe understaffing, providing evidence from St. Clair's own documents. *See generally* ECF 323.

146.    The parties in the *Duke* class action entered into a settlement in November 2017. As part of the settlement, the parties jointly retained mutually agreed experts to monitor implementation of the agreement. ECF 185-13 at 2-21; ECF 185-

36 at 16; ECF 185-11 at 84:13-85:13. The settlement agreement was entered into on behalf of ADOC employees including Dunn and Ellington. ECF 185-13 at 2-3.

147.    When Jones took over as warden (ECF 363 at 34:15-20), she understood that she had been transferred to St. Clair to implement many provisions in the *Duke* settlement agreement. ECF 185-12 at 23:15-19, 32:19-33:8; ECF 229-1 and 355 at 166:1-168:25; ECF 363 at 58:19-60:6.

148.    Jones was kept informed about significant communications in *Duke*. ECF 185-12 at 73:21-73:25, 74:1-78:24.

149.    At the start of Jones's tenure as warden, she was advised about problems at St. Clair, including inmates not being housed in correct housing units, unauthorized inmate movement, the overall security of the facility, the amount of contraband in the facility, gang activity, and the need to ensure adequate contraband searches. ECF 185-12 at 23:20-31:3. Jones was aware that St. Clair had a lot of contraband and received incident reports on contraband. ECF 363 at 82:21-84:1.

150.    Among other things, the *Duke* settlement required ADOC to: implement a 48-bed special safety unit; establish a Behavior Modification Unit; establish "an incident management, corrective action, and quality improvement process" and "Quality Improvement Team"; audit and improve St. Clair's video system, including "submit[ting] the cost estimate to the legislature in the 2018 legislative session and to apply for known, available federal funding to support additional camera upgrades"; complete a Security Renovation Project; address policies on contraband; and

43

accelerate the timeframe to conduct a PREA Audit. ECF 185-13 at 2-21.

151.    In January 2018, the Association of State Correctional Administrators ("ASCA") conducted an audit at St. Clair after two prisoners escaped with a handgun; the audit found alarming conditions, including: staff were not enforcing basic policies, sanitation was very poor, there was excess contraband, inmate vandalism was visible throughout, leadership was lacking; staff morale was low; security inspections were not being completed; wardens and supervisors did not tour the facility as frequently as required; staff were not adequately supervised; operations needed to be changed in light of staffing shortages; staff largely did not follow facility policies; inspections were not conducted as required, and there were major issues with contraband and searches were not being conducted as required. ECF 302 at 3, 5, 12-13, 16.

152.    Defendant Dunn also received a copy of the ASCA report, and he was generally aware of the problems described in it well before he received it. Despite this, he left implementation of recommendations and corrective action from the ASCA assessment to his Deputy Commissioner of Operation and the Warden III, and he did not take any steps to make sure they were implemented. ECF 357 at 121:2-122:7, 125:17-21, 126:6-21, 150:16-152:12, 159:19-160:14, 165:15-168:17. 171:12-172:15, 194:7-196:5, 205:6-12, 260:14-20, 261:8-12, 263:18-264:9, 117:6-12.

153.    Ellington reviewed the ASCA report. ECF 185-5 at 182:15-183:7.

154.    The ASCA report was also made available to Jones, but she could not remember any steps she took to implement its recommendations or any

communications she had to implement its recommendations. ECF 363 at 277:12-278:21, 279:22-281:19.

155.    In March 2018, two months after the ASCA audit was completed, EJI submitted its First Monitoring Report regarding implementation of the settlement agreement, which was meant to reflect the period of November 1, 2017 through March 1, 2018. ECF 190-19 at 1.

156.    Jones, Ellington, security staff, and executive team members at St. Clair received and discussed the *Duke* monitoring reports, including this First Monitoring Report. ECF 363 at 307:10-309:5, 292:7-292:21; ECF 185-5 at 264:4-265:4.

157.    The First Monitoring Report identified numerous significant deficiencies in the implementation of the settlement agreement and serious concerns about the conditions at St. Clair, citing to specific incident reports and other evidence. ECF 190-19 at 1-4. Among other things, the report concluded that "[i]nmate movement within general population appears to be occurring nearly unchecked", "inmates are frequently documented sleeping in unauthorized housing areas" and "violent incidents are frequently associated with unauthorized movement"; 183 knives were *documented* in incident reports in a three-month period; "ADOC did not meet the deadline for drafting new SOPS for the internal classification board, intake unit, special safety unit, and behavioral modification unit", as well as the "incident report manager, the quality improvement team, incident reporting, and the I&I position"; and "single officers are being tasked with ensuring the safety of large areas of the prison". ECF 190-19 at 1-4.

45

158.    In April 2018, Melinda Allen conducted a PREA audit and expressed "grave concerns" about conditions that posed serious risks of sexual violence, such as: inadequate staffing to ensure safety of prisoners; unsecured gates, cell doors, and storage doors; broken cameras and electronic monitoring devices and windows; jammed cell door locks; and inmates "openly violating facility rules." ECF 185-2 at 6.

159.    In May 2018, Dave Cotten conducted a second PREA audit of St. Clair. He found, among other things, that "[n]umerous inmates were seen violating rules, sometimes challenged by staff and sometimes not"; policies separating victim prone inmates from abusive prone inmates were not in place; "[t]he majority of inmates observed were not wearing wrist bands and staff granting access to the different sides of the unit did not check wrist bands"; dormitory doors were left unsecured; numerous blankets and sheets created blind spots; "camera placement was . . . not in adequate numbers to provide sufficient support for the minimal staffing"; and numerous cameras were damaged. ECF 185-76 at 4-5.

160.    Jones received Cotten's PREA report. ECF 185-1 at 111:16-112:7.

161.    Jones, along with the Institutional PREA Compliance Manager "(IPCM"), was responsible for carrying out corrective action related to the PREA audit's findings. ECF 185-1 at 17:4-18, 29:6-30:8, 128:22-129:1, 137:1-12.

162.    Jones, along with the IPCM, was responsible for monitoring compliance with PREA at St. Clair on a day-to-day basis and ensuring that PREA is being properly implemented at the facility, including requirements to separate victims and

abusers. ECF 365 at 12:7-10; 13:4-14; 17:4-6; ECF 185-1 at 34:20-36:4, 37:19-25, 38:16-40:10 43:19-44:5; ECF 229-1 at 54:11-55:18.

163.    In July 2018, EJI issued a Second Monitoring Report again ringing alarm bells about serious deficiencies in implementation of the settlement agreement and dangerous risks to prisoners. Again, relying on cited evidence, the Report concluded, among other things, that: ADOC had taken no steps to comply with requirements to establish a behavioral modification unit; "the presence of weapons contraband continues to contribute to serious incidents of violence at St. Clair"; "St. Clair has maintained a steadily high rate of violence throughout the monitoring period"; "[i]nmates at St. Clair are able to freely move about the facility without authorization"; and "there is a routine failure to identify, investigate, review or record . . . [t]he presence of weapons in incident reports. ECF 305 at 8-19.

164.    Jones received the first and second monitoring reports and discussed them with executive team members and Ellington. ECF 363 at 307:10-309:5. Dunn received the second monitoring report and reviewed it within a month of receiving it, including the appendices. ECF 357 at 276:19-278:8.

165.    In April 2019, EJI issued a Monitor's Report on Non-Compliance, covering the period of November 2018 through February 2019. ECF 339 at 1. The Report cited attached evidence and incident numbers and concluded, among other things, that: the Internal Classification Board was not reviewing segregation placements as required and "St. Clair continues to rely on a space available bed

assignments system" and that "open bed space most commonly is found in P/Q housing units"; the behavioral modification unit had not been put in place; the Quality Improvement Team was not actually monitoring as an oversight body; ADOC failed to take corrective action to address serious risks in the P/Q blocks; and that "the presence of weapons contraband . . . directly contributes to the ongoing risk of lethal harm."  ECF 399 at 6, 7, 9, 15-18.

166.    Following the *Duke* Monitoring Reports, the Settlement Agreement eventually fell apart, and the litigation resumed. ECF 185-36 at 15-16.

167.    On September 6, 2018, Dunn received a letter from EJI informing ADOC administrators of a "concerning increase in serious incidents of violence" at St. Clair; warning—specifically—about the "dangers of St. Clair's 'hot bay' dorm management policy that houses individuals with behavior problems together in a single housing unit in general population where they lack . . . any regular security staff presence" and that "the last two homicides [in the P/Q block] are a manifestation of the safety problems this kind of management technique creates." EJI also warned that "weapons contraband continues to saturate the prison and . . . contribute to serious incidents of violence at St. Clair" and that "contraband searches continue to be sporadic and ineffectual," recommending feasible steps to regain control. The letter provided a number of expert recommendations to address the issues. ECF 367-5.

168.    In October 2016, the U.S. Department of Justice opened a Civil Rights of Institutionalized Persons investigation into the conditions within ADOC's male

prison facilities, including St. Clair, such as whether there were systematic Eighth Amendment violations, whether ADOC adequately protects prisoners from physical harm and sexual abuse, and whether ADOC provides secure and safe living spaces. ECF 339 at 5. Jones knew of the investigation. ECF 363 at 292:1-292:6.

169.    Dunn understood that when serious problems at St. Clair were identified to him by any source, including advocacy groups, he needed to investigate and, if substantiated, implement a plan to address them. ECF 185-11 at 80:6-81:12. Nonetheless, Dunn did not do any investigation into EJI's conclusions or review the data they relied on to see if their conclusions were correct. ECF 357 at 275:21-276:2.

170.    Numerous recommendations to improve St. Clair safety and security were made as part of, or following, facility assessments. *See, e.g.*, ECF 302 at 1-35; ECF 304; ECF 190-5 at 1-26; ECF 367-5; ECF 185-76 at 1-92 (setting forth various "corrective action")); ECF 261-12. Despite this, Defendants failed to take meaningful steps to timely implement any of the detailed and specific recommendations, or to take other actions to increase safety and security that were available to them before Mr. Andrews's death**.** *See, e.g.* ECF 185-36 at 49-51 ("Any minimally competent warden and administrator would understand the extreme levels of risk posed by these conditions and take urgent action to address them. In my opinion, Defendant Jones (as well as Ellington and Dunn) failed to do so here."); ECF 339 at 03-32 (discussing numerous failures). For example:

a.    In January and March 2018, it was recommended that tier rotation be

49

implemented in the housing units to better facilitate inmate movement and supervision. ECF 304 at 2; ECF 302 at 17. However, Defendants still had not initiated a plan for staggered or tier rotation movement in the P/Q blocks as of February 26, 2019. ECF 190-6 at 7.

     b.     After Daniels took over as ADOC Deputy Commissioner of Operations in January 2019, he ordered staff to implement a new tier rotation for the P/Q blocks starting in April 2019. Daniels started discussions about the new policy in late February 2019. ECF 345 at 50:19-22, 201:8-205:21, 268:21-269:10, 273:3-274:4; ECF 190-6 at 7; ECF 185-5 at 90:18-92:13, 94:18-23. This policy could have been instituted much earlier. ECF 185-11 at 236:5-237:10, 238:18-21, 278:21-280:5, 281:16-23. Still, Jones, who was the primary person responsible for implementing the policy, did not implement it. ECF 185-5 at 102:2-8, 104:1-20.

     c.     Daniels later discovered that Jones (and Warden II Gwendolyn Givens) were not implementing his 2019 controlled movement directive for the P/Q blocks when a staff member informed Daniels in August 2019 before someone "gets hurt." ECF 345 at 279:11-281:13; ECF 331 at 2.

     d.     Jones retired from her position under threat of discipline initiated by Daniels due to allegations that she had not ensured compliance by her staff with the March 2019 controlled movement directive issued by Charles Daniels for the P/Q blocks. ECF 363 at 339:18-341:4; ECF 185-12 at 176:1-177:4; ECF 357 at 294:3-21; ECF 190-5 at 7; ECF 345 at 201:5-202:8; ECF 331 at 2, 4.

e.      In October 2018, the *Duke* experts provided a short-term 90-day plan to address acute risks and suggested, among other things, that St. Clair initiate the use of immediate individual cell lockdowns for moderate but still serious offenses; shift staffing to P/Q blocks; and more frequently assess the housing of individuals assigned to P/Q. ECF 339 at 36-37, 61-63. Dunn did not take any action to implement this plan or provide any counter proposals. ECF 185-11 at 229:25-235:9. Jones also received this plan. ECF 185-12 at 286:287:8; ECF 339.

f.      In January 2018, the ASCA auditors recommended using the CERT team to conduct regular shakedowns of locked down units. ECF 302 at 18; But quarterly CERT team searches were not done until February 2019. ECF 190-6 at 5-6.

g.      On February 28, 2019, a comprehensive, institution-wide search was carried out at St. Clair. ECF 190-6 at 5; ECF 190-3; ECF 185-5 at 93:9-12, 131:14-25. This search–called Operation "Restore Order"–could have been proposed and carried out at ADOC before Mr. Daniels started, but was not. ECF 185-11 at 236:5-237:10, 238:18-21. Daniels expected that, if staff conducted regular searches after Operation Restore Order as directed, contraband levels, uncontrolled movement and violence at St. Clair would decrease. ECF 345 at 182:22-183:6.

h.      It was not until April 2019 that Daniels implemented a policy to have senior staff stationed in the P/Q blocks in order to reduce the violence there. ECF 185-12 at 138:16-139:22; ECF 185-11 at 243:21-5, 245:8-24; ECF 352 at 93:9-94:17, 94:24-95:2; ECF 185-5 at 113:1-20, 114:17-23. This initiative was effective in reducing

51

violence. ECF 185-5 at 116:18-117:4.

i.    It was not until April 2019 that schedules for the captains and wardens were staggered so that a warden or captain would be present outside the 8-5 shift previously assigned to all captains and wardens, to improve supervision and policy enforcement. ECF 185-5 at 186:9-187:12.

171.   Assessments of the conditions at St. Clair were done regularly, but Dunn generally refused to accept the conclusions from those assessments or dismissed them as only temporary problems. ECF 357 at 103:1-104:10, 142:4-23, 177:9-179:15, 185:5-186:11, 194:7-22, 212:7-213:2, 213:21-214:12, 227:20-228:13, 232:18-23, 246:22-247:22, 249:23-251:22. Indeed, rather than acknowledge problems at St. Clair, Dunn had a practice of quibbling with how the problems were defined. ECF 357 at 80:2-81:15, 82:6-83:3,163:13-164:18, 186:12-187:6, 238:20-239:10, 260:9-261:2.

172.   In 2018, Ellington had access to quarterly and monthly reports identifying trends at major ADOC institutions, but he did not review them because he felt they fell outside of his job responsibilities. ECF 185-5 at 67:8 68:23.

173.   To reach a settlement in *Duke* and at the suggestion of experts, Dunn and the other *Duke* defendants agreed in 2017 to create a St. Clair Quality Improvement Team that would assist with the implementation of corrective action. ECF 185-13 at 12; ECF 185-11 at 82:9-23, 83:16-84:12.

174.   Dunn received very general updates on the QIT, but he did not ask for any details or meaningfully supervise implementation.  ECF 185-11 at 92:18-93:5,

98:15-99:3, 100:6-101:23.

175.    Ellington participated in QIT meetings in 2018 and early 2019. ECF
185-5 at 86:8-14, 206:18-21. Jones did as well. ECF 320 at 3.

176.    The QIT's first meeting did not occur until July 17, 2018, and the QIT
decided to meet monthly for six months and then quarterly after that. ECF 320 at 1.

177.    The QIT did not initiate or implement any corrective action or create
any corrective action plan prior to March 2019, other than changing the definition of
"serious injury" as it related to incidents at St. Clair. ECF 339 at 17-21 (discussing
failure to implement the QIT, including that it "has not taken any corrective action to
address issues that are directly contributing to the lack of safety and security at the
prison"); ECF 185-12 at 141:18-143:7; ECF 320; ECF 367-10 at 6-8 (acknowledging
issues with P/Q involving contraband, unauthorized movement, and lock/door repair
issues, but failing to make any plan to address those risks); ECF 185-36 at 56-57.

178.    Ellington could not recall any changes the QIT team implemented at St.
Clair prior to February 2019. ECF 185-5 at 207:15-21; ECF 185-11at 102:12-19.

179.    Baker's role as a shift commander required him to review and submit all
incident and duty officer reports prepared on his shifts. ECF 342 at 22:4-23.

180.    Baker was aware of the high levels of violence and problem with
contraband weapons at St. Clair.  ECF 342 at 32:3-8, 33:3-18, 36:11-17.

181.    Baker knew that increasing contraband searches and controlling
movement were required to decrease the violence at St. Clair. ECF 342 at 47:2-11.

182.   As shift commander, Baker was responsible for ensuring that contraband searches were carried out on the shifts he supervised. ECF 342 at 26:4-8.

183.   Nonetheless, Baker did not write up any staff for failing to carry out required contraband searches or failing to discipline inmates for having contraband. ECF 342 at 81:19-82:21, 87:19-88:1.

184.   There were no contraband cell searches done in the P block on November 29, 2018, prior to Mr. Andrew's death. ECF 369 (filed under seal), Incident Reporting Spreadsheet, March 5, 2019 (search first tab for 12/29/2018).

185.   Shift commanders were also responsible for assigning officers to posts and requesting more staff up the chain of command if needed. ECF 350 at 34:15-23; ECF 229-1 at 49:16-51:5.

186.   As shift commander, Baker could have stationed a supervisor in the P Block to monitor inmates and deter assault. ECF 342 at 93:6-12.

## J.   Defendants failed to act even after multiple 2018 murders at St. Clair.

187.   Dunn testified that, when there was an incident of serious violence at St. Clair, Ellington was responsible for learning what had occurred so that he could identify and direct the implementation of appropriate corrective action. ECF 185-11 at 127:23-128:18, 130:11-20, 131:14-22.

188.   Ellington testified that it was Jones's responsibility to assess major incidents. ECF 185-5 at 273:4-14, 305:22-306:6; ECF 374 at 127:3-18.

189.   Jones did not recall the names of, or the circumstances of the deaths of,

men killed at St. Clair while she was warden. ECF 363 at 330:23-331:18; ECF 185-12 at 256:24-257:16. Jones did not recall Mr. Andrew's name, even while appearing for her deposition in his case. ECF 185-12 at 144:12-145:9, 149:8-149:12.

190.    After the deaths of Pettiway and Bray in September 2018, and the near-fatal stabbing of Weaver in January 2019, Jones did not conduct investigate whether staff could have done anything differently. ECF 185-12 at 151:15-153:20.

191.    Ellington had no conversations with Jones about what could have been done differently with regard to Mr. Andrews's murder, and he has no opinions about what staff could or should have done differently. ECF 185-5 at 274:24-276:21.

192.    After the deaths of Mr. Andrews and Mr. Mullins, Jones did not examine whether issues such as unauthorized movement, inoperable security cameras, inadequate supervision, or P/Q blocks violence played any role in those deaths, nor did she impose any staff discipline, nor identify where staff had missed a prevention opportunity. ECF 185-12 at 244:12-21, 245:12-21, 246:2-9, 293:17-294:20, 295:16-21.

193.    Jones did not address Mr. Andrews's murder at any staff meetings (ECF 185-12 at 243:9-243:12) or institute any policy or training change in response. ECF 344 at 82:11-18; ECF 185-12 at 244:2-244:8.

## LEGAL STANDARDS

### I.    Summary Judgment

Summary judgment must be denied unless the moving party demonstrates both that there "is no genuine issue as to any material fact" and that "the moving party is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c) ("Rule 56(c)"). The moving party carries the burden of demonstrating that the evidence "is so one-sided that [the moving] party [should] prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Adickes v. Kress & Co.*, 398 U.S. 144, 157 (1970). A defendant cannot meet this burden unless it identifies "the basis for its motion, and identif[ies] those portions of [the record], which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c). In adjudicating the motion, the Court "view[s] all evidence in the light most favorable to the nonmoving party and draw[s] all justifiable inferences in that party's favor." *Thompson v. Alabama*, 65 F.4th 1288, 1297 (11th Cir. 2023); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (a court "disregard[s] all evidence favorable to the moving party that the jury is not required to believe.").

## II.    Eighth Amendment Failure to Protect

The Constitution requires correctional institutions to "provide humane conditions of confinement" and "take reasonable measures to guarantee the safety of . . . inmates." *Farmer v. Brennan*, 511 U.S. 825, 836 (1994). "[U]nder the Eighth Amendment, prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014); *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 617 (11th Cir. 2007). "'It is well settled that prison officials must take reasonable measures to guarantee the safety of the inmates, and a prison official violates the Eighth Amendment's prohibition

against cruel and unusual punishment . . . if the official is deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury.'" *Dickinson v. Cochran*, 833 F. App'x 268, 271-72 (11th Cir. 2020) (unpublished) (quoting *Marbury v. Warden*, 936 F.3d 1227, 1233 (11th Cir. 2019)); *see also Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 (11th Cir. 1995). "Having stripped prisoners of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Rodriguez*, 508 F.3d at 616-17. To survive summary judgment, Plaintiff must "produce sufficient evidence of (1) a substantial risk of serious harm that was objectively, sufficiently serious"; and conduct by the defendant that amounts to "subjective recklessness as used in the criminal law." *Wade v. McDade*, 106 F.4th 1251, 1252 (11th Cir. 2024) (en banc) (quoting *Farmer*, 511 U.S. at 834, 844-45)); *see also Hale*, 50 F.3d at 1582.

To show "a deprivation that was, objectively, sufficiently serious" (*Wade*, 106 F.4th at 1252), a prisoner need not show that he "was especially likely to be assaulted by the specific prisoner who eventually committed the assault" (*Rodriguez*, 508 F.3d at 617). Rather, the prisoner can "face[] an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, 511 U.S. at 843. A showing of a generalized risk of violence, without any more, suffices if the plaintiff provides evidence "that serious inmate-on-inmate violence was the norm or something close to it." *Marbury*, 936 F.3d at 1234-1235; *Dickinson*, 833 F. App'x at 275. When "inmate-on-inmate violence occur[s] regularly" and "the violence [is] severe

57

enough to require medical attention and even hospitalization on occasion," there is a question of fact as to this element. *Hale*, 50 F.3d at 1583.

Alternatively, a plaintiff may demonstrate a claim by showing dangerous *conditions* of a correctional institution that "render it particularly violent," such as a failure to identify and segregate violent inmates, failure to properly search inmates, failure to limit contraband, and failure to adequately supervise inmates. *Dickinson*, 833 F. App'x at 275, 271-72; *see also Marsh v. Butler County*, 268 F.3d 1014, 1029 (11th Cir. 2001) (en banc), abrogated on other grounds by *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (conditions including a failure to segregate nonviolent prisoners from violent ones, to control prisoner movement, and to discipline prisoners who assaulted others; the availability of contraband weapons; and the inadequacy of supervision and monitoring posed an objectively substantial risk of serious harm). "[S]pecific features of a facility or its population rendering it particularly violent" may also include unique risks posed by individual prisoners or logistical issues that render prison staff unable to stem near-constant violence. *Marbury*, 936 F.3d at 1235.

To show that a defendant acted with "subjective recklessness as used in the criminal law," the plaintiff must show that "the defendant was subjectively aware that his own conduct put the plaintiff at substantial risk of serious harm," and yet

disregarded the risk.[8] *Wade*, 106 F.4th at 1255, 1262. In addition, liability does not attach if the Defendant responded reasonably to the risk. *Id.* at 1255, 1262. "A prison official responds to a known risk in an objectively unreasonable manner if he knew of ways to reduce the harm but knowingly ... or recklessly declined to act." *Rodriguez*, 508 F.3d at 620 (quoting *Hale*, 50 F.3d at 1583). This showing may be made by evidence that a supervisor "(1) 'had the means substantially to improve' the inmate's safety, (2) 'knew that the actions he undertook would be insufficient to provide [the inmate] with reasonable protection from violence,' and (3) had 'other means [ ] available to him which he nevertheless disregarded.'" *Rodriguez*, 508 F.3d at 622 (quoting *LaMarca v. Turner*, 995 F.2d 1526, 1539 (11th Cir. 1993)). "[W]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration" by inference from circumstantial evidence. *Hale*, 50 F.3d at 1583.

## III.    Affirmative Defense of Qualified Immunity[9]

Qualified immunity does not protect correctional officials from suit if their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003). Qualified immunity is an affirmative defense that defendants themselves

---

[8] Plaintiff agrees with Defendants (Dkt. 269 at 29) that the former causation element of the claim is "subsumed" by the *Wade* standard of subjective recklessness. Should the Court analyze this element separately, the subjective recklessness evidence likewise establishes causation.

[9] This brief accepts the current state of the law on qualified immunity. Qualified immunity, however, is a judge-made doctrine not tied to the statutory language or to the common law as it existed at the time § 1983 was enacted. Plaintiff reserves the right to seek relief in case of a change in the law.

must invoke. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Crawford-El v. Britton*, 523 U.S. 574, 587 (1998); *Harlow v. Fitzgerald*, 457 U.S. 800, 815 & n.24 (1982). A defendant asserting the defense must first show that he was "engaged in a discretionary function when he performed the acts of which the plaintiff complains." *Epps v. Watson*, 492 F.3d 1240, 1243 (11th Cir. 2007); *accord. Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1263–64 (11th Cir. 2004). The discretionary function inquiry turns on whether the Defendant is "engaged in a legitimate job-related function," and if so, whether he was "executing that job-related function . . . in an authorized manner." *Id.* at 1266.

"It is the burden of the governmental official to make" the discretionary function showing. *Id.* at 1266. "A defendant unable to meet this burden may not receive summary judgment on qualified immunity grounds." *Id.* at 1263-64; *Est. of Cummings v. Davenport*, 906 F.3d 934, 939 (11th Cir. 2018). A defendant's single sentence argument, that does not demonstrate with authority and based on the evidentiary record "what his job-related function was or how his actions were within the scope of his authority," is insufficient to satisfy the defendant's burden. *Boykins v. Dunn*, 696 F. Supp. 3d 1061, 1079-1080 (N.D. Ala. 2023).

"For a right to be clearly established, "[t]he 'salient question' is 'whether the state of the law' at the time of the official's conduct gave the official 'fair warning that their alleged treatment of [the plaintiff] was unconstitutional.'" *Dickinson*, 833 F. App'x at 273 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Plaintiff may show such fair warning in at least three ways: a "materially similar case" with "binding precedent tied

to particularized facts"; that "a broader, clearly established principle should control the novel facts of a particular case"; and that the case "fits within the exception of conduct which so obviously violates the Constitution that prior case law is unnecessary." *Waldron v. Spicher*, 954 F.3d 1297, 1304-05 (11th Cir. 2020). The Court draws all reasonable inferences in favor of the plaintiff when deciding if qualified immunity is appropriate. *Perez v. Suszczynski*, 809 F.3d 1213, 1221 (11th Cir. 2016).

## IV.  Wrongful Death Claim Liability

The elements of a wrongful death claim pursuant to Alabama Code § 6-5-410 are duty, breach, causation, and damages. *Vinson v. Clarke Cnty., Ala.*, 10 F. Supp. 2d 1282, 1303 (S.D. Ala. 1998); *Huffman v. Dunn*, 4:20-CV-01293-CLM, 2021 WL 2533024, at *6 (N.D. Ala. June 21, 2021); *Handley v. United States*, 5:17-CV-01278-HNJ, 2021 WL 2023057, at *25 (N.D. Ala. Mar. 18, 2021). With regard to the duty element, correctional officials that manage a prison have a duty of care towards its prisoners to ensure reasonable safety. *Farmer*, 511 U.S. at 828 (holding that prison officials have a duty to ensure reasonable safety). This element is satisfied by a showing that prison supervisors had a duty to protect Mr. Andrews from known and unreasonable risks of serious harm from prisoner-on-prisoner violence. *Huffman*, 2021 WL 2533024, at *6-*7. To establish breach of duty, negligence suffices. *Fikes v. Abernathy,* 2018 WL 2207134, at *6 (N.D. Ala. May 14, 2018). The plaintiff need only show that Defendants disregarded and failed to reduce the known risk of harm to a prisoner from violence. *Id.*; *Huffman*, 2021 WL 2533024, at *6-*7. Finally, the

61

causation and injury elements require a showing that the defendant caused the decedent prisoner's death by failing to take corrective action to address the known risks to prisoners from violence, when that failure led to the death. *Ezell v. Dunn*, 2023 WL 11987541, at *26 (N.D. Ala. Mar. 31, 2023); *Huffman*, 2021 WL 2533024, at *6-*7.

Under Alabama law, "[s]tate-agent immunity protects state employees . . in the exercise of their judgment in executing their work responsibilities." *Ex parte Hayles*, 852 So. 2d 117, 122 (Ala. 2002). A burden shifting framework applies. *Ex parte Est. of Reynolds*, 946 So. 2d 450, 452 (Ala. 2006). First, the state agent must demonstrate that the "plaintiff's claims arise from a function that would entitle the State agent to immunity." *Id.* If that burden is satisfied, the burden shifts to the Plaintiff to show either: (1) that "the Constitution or laws of the United States . . . require[s] otherwise," or (2) that the defendants acted "willfully, maliciously, fraudulently, in bad faith, beyond [their] authority, or under a mistaken interpretation of the law." *Ex parte Cranman*, 792 So. 2d 392, 405 (Ala. 2006). "[S]tate-agent immunity do[es] not immunize" defendants "from liability under state law if they violated [a plaintiff's] constitutional rights." *Taylor v. Hughes*, 920 F.3d 729, 734 (11th Cir. 2019).

## ARGUMENTS AND AUTHORITIES

### I.    Defendant Jones is not entitled to summary judgment on Count I

Defendant Jones does not carry her initial burden to demonstrate an absence of genuine issue of material fact as to any elements of Plaintiff's Eighth Amendment failure-to-protect claim in Count I, and thus this Court need go no further. *See supra* at

62

55-56 (citing *Celotex*, 477 U.S. at 323). Jones's discussion consists of a single paragraph. Dkt. 192 at 48-49. That paragraph is unclear as to the specific claim elements challenged, cites only two "example" facts, and is cursory at best. *Id.* It does not comply with the requirement of this Court and the Eleventh Circuit that arguments be "'plainly and prominently' raised," and thus amounts to forfeiture. Dkt. 125 at 2 (citing *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014)). On top of that, Jones's statement of undisputed facts is rife with misstatements and citations to evidence that do not track the fact proposed. *See* Resp. to ADOC Defs' Facts, above. These errors violate the Court's orders. Dkt. 107 at 15; Dkt. 125 at 2. Thus, even if Jones had cited sufficient facts to carry her initial burden in her claim discussion (which she has not), even her statement of facts does not make out a sufficient basis for the motion. *See Celotex*, 477 U.S. at 323. To the extent that Jones attempts to resuscitate this deficiency with new arguments in reply, it will come too late, as doing so would unfairly deprive Plaintiff of any opportunity to respond. *See Boykins*, 696 F. Supp. 3d at 1079 (citing *Sapuppo*, 739 F.3d at 683).

    <u>Substantial risk of serious harm.</u>  To the extent challenged by Jones (unclear), Plaintiff provides sufficient evidence of an objectively serious deprivation in several ways. *Supra* at 57-58. First, Plaintiff presents evidence that, Mr. Andrews faced a serious risk of substantial harm from violence at St. Clair (PSOF 57-72 & 137), where violence "was the norm or something close to it." *Marbury*, 936 F.3d at 1234; *Dickinson*, 833 F. App'x at 275. The risk was particularly acute in the P/Q blocks

63

(PSOF 68-72), where Mr. Andrews was stabbed to death by his cell partner (PSOF 13-14). Plaintiff also shows dangerous *conditions* of a correctional institution, that, both in isolation and collectively, "render it particularly violent," such as dangerous levels of contraband (PSOF 75-89); widespread unauthorized movement (PSOF 96-105); a failure to safely house and monitor violent prisoners with histories of institutional violence, including their placement in the poorly staffed P/Q blocks (PSOF 110-116, 31-37, 39-49, 51-56); and a widespread practice at St. Clair of lack of enforcement of written security policies (PSOF 117-127); all exacerbated by physical plant deficiencies, including in the P/Q blocks, such as broken locks, nonfunctional security cameras, and blind spots (PSOF 128-136). *See Dickinson*, 833 F. App'x at 275, 271-72; *Marsh*, 268 F.3d at 1029. In summary, prisoners such as Mr. Andrews in the P/Q blocks lived at constant threat of assault because of extreme violence and weapons, the grouping of dangerous prisoners with histories of institutional violence without sufficient monitoring and supervision, exacerbated by physical plant issues, amidst a culture of violence, widespread noncompliance with policy, and inadequate discipline.

Further supporting this element, although unnecessary to the result, are the "unique risks posed by" Mr. Andrews's non-segregated cell partner (*Marbury*, 936 F.3d at 1235), who had a long history of stabbings and an obvious propensity for further violence (PSOF 31-37) and yet was housed with Defendant Jones's knowing approval in the poorly monitored general population P blocks (PSOF 31-37, 39-49, 51-56). Davis's housing assignment was but one manifestation of the dangerous practice of

failing to segregate, monitor, and provide behavioral modification to St. Clair prisoners who engaged in in-custody violence (PSOF 110-116). Also adding to the risk to Andrews was his vulnerable status as a small, PREA victim (PSOF 11-12).

Such evidence easily suffices. *See Dickinson*, 833 F. App'x at 271-72; *LaMarca*, 995 F.2d at 1535; *Marsh*, 268 F.3d at 1029 (conditions including a failure to segregate nonviolent from violent prisoners, control prisoner movement, and discipline prisoners who assaulted others; the availability of weapons; and the inadequacy of supervision and monitoring); *Hale*, 50 F.3d at 1583; *Valdes v. Crosby*, 450 F.3d 1231, 1244 (11th Cir. 2006); *Bridges v. Poe*, 487 F. Supp. 3d 1250, 1258 (N.D. Ala. 2020).

<u>Subjective recklessness</u>: Likewise, a genuine fact dispute exists regarding whether Jones was subjectively aware that her conduct put prisoners such as Mr. Andrews at substantial risk of serious harm, and responded unreasonably to that risk, pursuant to the standards described *supra* at 58-59. Plaintiff provides evidence that Jones was St. Clair's head warden, with responsibilities to enforce St. Clair's written policy SOPs, including by instituting corrective action for noncompliance, and to ensure corrective action in response to incidents of violence at St. Clair, including any necessary staff discipline. PSOF 1-2, 6. Jones was responsible for identifying St. Clair housing units such as the P/Q blocks that were at high risk for violence and taking action to reduce that violence. PSOF 73, 68-72. Jones was responsible for ensuring that contraband searches were done in compliance with the SOPs and had authority to bring in CERT team staff for searches. PSOF 2, 87, 91, 74. Jones was also

65

responsible for ensuring that the housing units were properly supervised according to policy. PSOF 2, 135. She had sufficient staff to carry out the required contraband searches and staff the housing units. PSOF 87, 91, 74. Jones had the authority and responsibility as warden to address widespread uncontrolled movement and ensure policy compliance. PSOF 2, 107, 171(c), (d). Jones was the final decisionmaker on classification decisions and recommendations (PSOF 45-48), pursuant to the requirements of the classification manual (PSOF 42-44, 2), including the recommendation to place and keep Mr. Davis in general population despite his extensive violence (PSOF 31-56). Jones was responsible for ensuring compliance with requirements to separate victims and abusers. PSOF 162-63, 2. Finally, Jones was charged with implementing the settlement agreement in the *Duke* class action (PSOF 147-151, 165) and served on the Quality Improvement Team (PSOF 176).

Jones was aware of, and repeatedly warned about, the dangerous conditions identified above (e.g., PSOF 137, 63, 69, 75, 104-105, 138-179), and knew they would lead to continued violence (e.g., PSOF 84, 101, 110, 117, 57-72, 36, 137). Yet Plaintiff's evidence is that she failed to respond meaningfully to that risk and acted unreasonably, failing to enforce policies she knew were required for safety, declining to take the urgent and meaningful action such as employee discipline that was needed to stem the time of violence as dangerous conditions persisted, and declining to take feasible actions that were presented to her. E.g., PSOF 171, 137, 148-179. Jones failed to take even the bare minimum of competent action to protect prisoners in the P/Q

blocks, such as by enforcing regular and consistent contraband searches as required by policy through St. Clair's staff or by using available augmenting resources, remedying the culture of widespread noncompliance with security policies, and either segregating the inmates most likely to inflict violence in restrictive housing, controlling their movement, or ensuring sufficient monitoring and staffing in the particularly dangerous P/Q blocks. The violence and dangerous conditions continued through December 2018, further reflecting Jones's inaction. PSOF 57-179. Moreover, her inaction is further apparent in her callous response of inaction and lack of discipline following each one of the murders at St. Clair in 2018 (PSOF 188-194), including Mr. Andrews's, which was peppered with rule violations that went undisciplined (e.g., PSOF 16-20, 22-28, 49-53, 42-47,183-185, 31-56, 60a).

Plaintiff thus presents evidence that Jones's role put her in a position of authority and responsibility for addressing the extreme prisoner-on-prisoner violence and dangerous conditions at St. Clair, but that she turned a blind eye. It was foreseeable and known to Jones that prisoners such as Mr. Andrews would continue to be stabbed to death without action on her part in the P blocks, where, as reflected on the date of his death: contraband searches were inadequate and noncompliant (PSOF 183-185, 15, 22, 26); unauthorized movement went unchecked (PSOF 24-29); the P/Q blocks held known violent perpetrators of institutional violence due to Jones's recommendations to house prisoners like Davis in general population notwithstanding the classification manual risk assessment tool (PSOF 31-56);

contraband knives were prevalent (PSOF 183-185, 15, 22, 26); and no rovers were present to monitor prisoners despite contrary policy (PSOF 16-20), in a general environment of lawlessness and noncompliance. Given the dangerous conditions and lack of urgent action by Jones to ameliorate them, it was entirely foreseeable that the conditions persisted on the date of Mr. Andrews's death, contributing to his death. A jury could thus find that Jones knew the manner in which she ran St. Clair was endangering prisoners such as Mr. Andrews, but turned a blind eye.

A jury could likewise find that Jones acted unreasonably in responding with inaction to the culture of violence in the P/Q blocks (PSOF 57-73, 68-72, 168, 166, 171e, 178), contraband weapons (PSOF 75-97), uncontrolled movement (PSOF 96-105), failures to safely house and monitor prisoners with histories of institutional violence (PSOF 110-116), and widespread lack of compliance with security policies (PSOF 117-127), of which she was repeatedly put on notice (e.g., PSOF 137, 145, 149-150, 152, 156-161, 164-166, 168-169), by ignoring readily available fixes and persisting without any meaningful, urgent action. PSOF 137-187; ECF 185-36 at 28-29, 59-60 & 50-51 (a minimally competent correctional supervisor would have recognized the need for meaningful action and urgency, not inaction and, at best, empty performative gestures the administrator knew to be ineffective). "A prison official responds to a known risk in an objectively unreasonable manner if he knew of ways to reduce the harm but knowingly … or recklessly declined to act." *Rodriguez*, 508 F.3d at 620 (quoting *Hale*, 50 F.3d at 1583).

68

Jones argues otherwise based on evidence that she issued a single memo to enforce the wristband policy and ensure door closing, and a citation to her own unpersuasive testimony claiming that she implemented additional bed roster checks. Dkt. 192 at 48-49. However, Plaintiff's evidence reflects that the memo gesture was empty and performative (PSOF 107; ECF 339 at 30); Jones did not meaningfully increase bed roster checks (PSOF 107-109, 96, 97, 104, 106); Jones did not enforce her wristband memo, bed roster checks, or other aspects of controlled movement (PSOF 106, 96-97, 99, 98-105); Jones knew of the widespread noncompliance with her movement policies (*id.*), as part of a broader culture of widespread noncompliance with security policies (PSOF 117-127), but failed to respond with feasible actions (e.g., PSOF 117-121, 125-127, 171; ECF 185-36 at 28-29, 59-60 & 50-51).

## II.    Defendant Jones is not entitled to qualified immunity as to Count I.

Qualified immunity is an affirmative defense that Jones bears the burden to invoke through an initial showing that she acted in a discretionary capacity. *Supra* at 59-60. Jones does not make this showing, even though this Court instructed her in advance that the Court will "consider only those arguments 'plainly and prominently' raised," supported by specific evidence. Dkt. 125 at 2. Jones forfeits the defense by offering a mere fragment (that "Jones took reasonable actions within her authority," Dkt. 192 at 49), which fails to demonstrate with authority and record evidence "what [her] job-related function was or how [her] actions were within the scope of [her] authority." *Boykins*, 696 F. Supp. 3d at 1079-80; *see also Est. of Cummings*, 906 F.3d at

939. Jones does not show that the body of conduct alleged by Plaintiff fell within her discretion. Indeed, evidence reflects that Jones's conduct fell outside her authority because her job required her to ensure compliance with SOPs (PSOF 2 & *supra* at 65-66); she did the opposite, and administrator Daniels recommended her for termination in late 2019 for failing to enforce controlled movement. PSOF 171(a)-(d).

Should Defendants attempt to resuscitate this argument for the first time in reply, it will come too late, as doing so would deprive Plaintiff of any opportunity to respond. *See Boykins*, 696 F. Supp. 3d at 1079 (citing *Sapuppo*, 739 F.3d at 683). Should Defendants attempt to argue in reply that Plaintiff waived this argument at the motion to dismiss stage, such an argument would fail because Plaintiff defeated the qualified immunity defense then and was not obliged to raise (and waste the Court's time with) alternative arguments in support of denial. Invocation of a qualified immunity defense at summary judgment presents a different inquiry: whether the evidentiary record, rather than allegations, establishes the defense as a matter of law.

On the merits, Plaintiff establishes the elements of an Eighth Amendment violation above to satisfy the first prong of qualified immunity. Pursuant to the second prong, Jones had fair warning of the unconstitutionality of her conduct in all three permissible ways (*supra* at 60-61), when as required, all reasonable inferences are taken in Plaintiff's favor. *Perez*, 809 F.3d at 1221.

As the Court previously held at the motion to dismiss stage (Dkt. 105 at 39-43), broader, clearly established principles provided Jones with fair notice of the

unconstitutionality of her conduct. As the Eleventh Circuit recognized recently in

*Dickinson*, it was clearly established as of January 2018 (before Mr. Andrews's

December 2018 murder) that high-ranking officials violate the Eighth Amendment

where, as here, they fail to respond reasonably to deficiencies in management of

contraband weapons, supervision and monitoring of prisoners, and

classification/housing of prisoners, and those deficiencies resulted in a known,

"ongoing problem with inmate-on-inmate abuse." 833 F. App'x at 272-73 (discussing

*Hale*, 50 F.3d at 1584-85; *Marsh*, 268 F.3d at 1034). *Dickinson* post-dates the

misconduct here, but its holding regarding the clarity of the law in January 2018 and

discussion of *Hale* and *Marsh* compels denial of qualified immunity here.

      *Dickinson* relies on *Marsh*, in which the Eleventh Circuit held, sitting *en banc*,

that, "it was clearly established in this Circuit [in 1996] that it is an unreasonable

response for an official to do nothing when confronted with prison conditions that

pose a risk of serious physical harm to inmates." 268 F.3d at 1034. The particular

conditions in *Marsh* included—as alleged here—a proliferation of weapons, improper

classification and segregation of dangerous prisoners, a failure to discipline and

segregate prisoners who assaulted others, inadequate supervision and monitoring of

prisoners, and other similar policies and customs promoting and facilitating violence.

*Id.* at 1029. Indeed, even though the plaintiffs in *Marsh* did not allege "a history of

inmate assaults with serious injuries" (as Plaintiff here has alleged in detail) the Court

explained that "that factual variance cannot make a difference." *Id.* at 1034.

Subsequently, the Eleventh Circuit's decision in *Hale* provided notice that—as alleged here—prison supervisors violate the Eighth Amendment when they act unreasonably in the face of a substantial risk of serious harm arising from the failure to segregate dangerous prisoners, inadequate supervision and monitoring of prisoners, and regularly occurring fights between prisoners that occasionally necessitated medical attention. *See Hale*, 50 F.3d at 1581-84; *Marsh*, 268 F.3d at 1033 n.12. By December 2018, other cases, too, had held—consistent with *Hale* and *Marsh*—that deliberate indifference to an "excessive risk of inmate-on-inmate violence" violates the Eighth Amendment. *E.g.*, *Lane v. Philbin*, 835 F.3d 1302, 1307-1308 (11th Cir. 2016) (inadequate supervision of prisoners, failures to segregate particularly dangerous prisoners, ready access to contraband weapons, and widespread prisoner-on-prisoner violence gives rise to a substantial risk of serious harm to which prison officials cannot constitutionally respond with deliberate indifference); *LaMarca,* 995 F.2d at 1536-38 (prison officials' deliberate indifference in the face of inadequate supervision and monitoring of prisoners with known histories of prisoner-on-prisoner violence violates the Eighth Amendment); *Purcell ex rel. Est. of Morgan* 400 F.3d 1313, 1320 (recognizing that "excessive risk of inmate-on-inmate violence . . . creates a substantial risk of serious harm" based on *Hale* and *Marsh* and dismissing claims at summary judgment based only on a lack of evidence of such risk); *Williams v. Edwards,* 547 F.2d 1206, 1211 (5th Cir. 1977); *Jones v. Diamond*, 636 F.2d 1364, 1374 (5th Cir. Jan. 29, 1981) (en banc) ("When prison officials have failed to control or separate prisoners

72

who endanger the physical safety of other prisoners and the level of violence has become so high . . . it constitutes cruel and unusual punishment . . . . "), overruled on other grounds, *Int'l Woodworkers v. Champion Int'l*, 790 F.2d 1174 (5th Cir. 1986).

Pursuant to this line of cases, Jones had fair notice of the unconstitutionality of her inaction, in light of the materially similar dangerous conditions here – endemic violence in the P/Q blocks, widespread weapons, uncontrolled movement, failures to safely house and monitor prisoners with histories of institutional violence, and widespread lack of compliance with security policies, all exacerbated by physical plant deficiencies, such as broken cameras, broken locks, and blind spots.

Jones cannot secure an immunity defense merely by citing without explanation to nearly 30 statements of fact (Dkt. 192 at 52); many of which are disputed above or incorrect, and most of which do not concern Jones's conduct. In addition, the "jury is not required to believe" much of this evidence, such as Jones's own statements about her conduct that are flatly disproved by Plaintiff's evidence, and thus it must be disregarded. *See Reeves*, 530 U.S. at 150; *Ledbetter*, 421 F.3d at 1177. Given Plaintiff's robust evidence of Jones's lack of action and unreasonable response (e.g., PSOF 171, 164-167, 177-179, 188-194, 93-95, 115-116, 123-127, 168, 159-163, 174, 176, 84-91, 99-100, 107-109, 135-136; ECF 185-36 at 28-29, 59-60 & 50-51), Jones cannot avoid a jury trial by citing to disputed facts regarding a handful of empty performative gestures. This includes her own testimony that she instituted bed roster checks or issued a single wristband memo, which Jones knew accomplished nothing and did not

73

enforce (PSOF 106, 107, 96-97, 99, 90-91, 74, 104, 108, 109, 123-127, 160, 164, 171(a)-(d), 100, 117-127). Likewise, she cannot prevail merely by pointing to written policies that Plaintiff's evidence establishes existed on paper only, as Jones knew of widespread lack of compliance (PSOF 117-127), as reflected on the date of Mr. Andrews's death (PSOF 183-185, 15-20, 24-29, 42-47, 49-55, 31-56), but took no action to discipline the rule violations (PSOF 188-194).

In addition, the law is clear that prison administrators "are under an obligation to take reasonable measures to guarantee the safety of the inmates," and "have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 832-33 (quotation omitted). Based on this tenet, "[a] prison official violates the Eighth Amendment when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not respond reasonably to the risk." *Caldwell*, 748 F.3d at 1099. "This broad principle has put all law-enforcement officials on notice that if they actually know about a condition that poses a substantial risk of serious harm and yet do *nothing* to address it, they violate the Constitution." *Patel v. Lanier Cnty.*, 969 F.3d 1173, 1190 (11th Cir. 2020). Likewise, as discussed in *Caldwell*, the Court has found that a "total failure to investigate–or to take any other action to mitigate" a condition that poses a substantial risk of harm constitutes a clearly established constitutional violation. 748 F.3d at 1103. Pursuant to this law, as well, Plaintiff's evidence that Jones did not take any meaningful, urgent action in response to repeated notice of a host of dangerous conditions and resulting stabbings and

74

deaths defeats a qualified immunity defense at the summary judgment stage. No reasonable correctional official would have thought that it was constitutionally permissible to do so little in the face of the dangerous conditions leading up to Mr. Andrews's murder. E.g., ECF 185-36 at 28-29, 59-60 & 50-51.

Plaintiff also contends that *Hale* and *Marsh* constitute materially similar cases, for the reasons discussed immediately above, that likewise provided fair notice of the unconstitutionality of Jones's conduct. Finally, any reasonable correctional official would have known that inaction in the face of the dangerous conditions at St. Clair was obviously "at war with the command of the Eighth Amendment." *Brooks v. Warden*, 800 F.3d 1295, 1307 (11th Cir. 2015). No case on point was required for Defendants to know that prisoners should not have been subjected to the horrific and obviously cruel violence at St. Clair.

Jones cites *Boykins v. Dunn*, 696 F. Supp. 3d 1061, 1085 (N.D. Ala. 2023), in support of immunity, but omits the critical difference that the *Boykins* plaintiff proceeded based only on materially similar cases and obviousness, and did not pursue the theory here of broader, clearly established principles, waiving the argument. *Compare id.*; with Dkt. 105 at 39-43.

## III.    Defendant Jones is not entitled to summary judgment on Count IX

With regard to Count IX (wrongful death), Plaintiff sets forth the requirements for liability *supra* at 61-62. Jones offers a one-sentence argument, devoid of argument or citation to facts or authority, that Plaintiff's "failure to provide evidence that Jones

caused Andrew's death." Dkt. 192 at 50. This argument is so conclusory as to have been forfeited. As to the unchallenged duty element, Plaintiff shows that Jones had a duty of care as a prison warden to prisoners in her custody, by virtue of her position of authority and responsibilities for addressing violence. E.g., PSOF 1-2, 6, 135, 73. Likewise, Jones does not challenge breach; regardless, Plaintiff's evidence establishes that Jones was negligent by disregarding and turning a blind eye to the known risk of harm to prisoners such as Mr. Andrews at St. Clair (supra at 66-68) and in her knowing, negligent response to the risk posed by Davis, specifically, to prisoners in P/Q (PSOF 31-56). *Huffman*, 2021 WL 2533024, at *6-*7. This same evidence could lead a jury to find causation: a foreseeable result of Jones's failure to address known risks to prisoners such as Mr. Andrews, and her negligent decisions regarding Davis, was the stabbing of prisoners such as Mr. Andrews in the P/Q blocks. Jones had the means to improve safety and prevent the risk posed by Davis; knew her actions were insufficient; and had means available to her which she disregarded.

As for state agent immunity, Jones's one-sentence argument (Dkt. 192 at 45) fails to satisfy her initial burden to provide factual evidence that the "plaintiff's claims arise from a function that would entitle [her] to immunity." *See supra* at 62; *Ex parte Est. of Reynolds*, 946 So. 2d at 452; Dkt. 125 at 2. Moreover, Plaintiff's evidence that Jones violated the Eighth Amendment (*supra* at 65-68) defeats the immunity. *Ex parte Cranman*, 792 So. 2d at 405. Finally, Plaintiff presents evidence that raises an inference (*Thompson*, 65 F.4th at 1297) of willful, bad faith conduct (e.g., PSOF 31-55, 188-194,

76

171), further defeating the defense. *See also Reeves*, 530 U.S. at 150. The factual record in *Ex parte Ala. Dept. of Corr.*, 201 So.3d at 1181 (Ala. 2016) is materially different.

## IV.    Defendant Ellington is not entitled to summary judgment on Count I

Defendant Ellington, too, does not carry his initial burden to demonstrate an absence of genuine issue of material fact on the Eighth Amendment claim in Count I. *Supra* at 55-56. Ellington's discussion consists of a single paragraph. Dkt. 192 at 41-42. That paragraph is unclear as to the specific claim elements challenged and does not comply with the requirement that arguments be "'plainly and prominently' raised," resulting in forfeiture. Dkt. 125 at 2 (citing *Sapuppo*, 739 F.3d at 681). On top of that, Ellington's statement of undisputed facts is rife with errors and disputed facts, as shown above. These errors violate the Court's orders regarding record evidence. Dkt. 107 at 15; Dkt. 125 at 2. Thus, even if Ellington had cited sufficient facts to carry his initial burden (which he does not), once the few facts cited in his substantive discussion are assessed for their disputed nature, inaccuracies, and lack of factual support, what remains is further deficient. Ellington is not permitted to resuscitate this deficiency by raising new arguments in reply. *Boykins*, 696 F. Supp. 3d at 1079.

Regardless, Plaintiff provides sufficient evidence of each element of Count I. First, Plaintiff shows a substantial risk of serious harm (*supra* at 57-58), for the same reasons and upon the same evidence discussed *supra* at 63-65. Ellington does not appear to challenge this element. Dkt. 192 at 46-47. As for subjective recklessness, a jury must decide whether Ellington was subjectively aware that his conduct and

inaction put prisoners such as Mr. Andrews at substantial risk of serious harm, and responded unreasonably to that risk, pursuant to the standards *supra* at 58-59.

Ellington was Warden Jones's direct supervisor and had the authority and responsibility to address the violence and dangerous conditions at St. Clair as Institutional Coordinator, overseeing St. Clair from 2017 through 2022. PSOF 3-4. Ellington's responsibilities included supervising St. Clair's wardens, ensuring that its wardens and captains followed all policies and procedures, and bringing corrective action if they were not. PSOF 5, 144, 137. Ellington bore responsibility for ensuring compliant contraband searches. PSOF 87. He served on St. Clair's Quality Improvement Team, created pursuant to the *Duke* settlement. PSOF 176-179. When serious incidents of violence occurred, Ellington was responsible for learning what had occurred so that he could identify and implement corrective action. PSOF 188. Ellington received audits and other documents identifying systemic deficiencies at St. Clair. PSOF 152-155, 157, 165, 122, 60b, 173.

Ellington was repeatedly warned about the dangerous conditions in P/Q (e.g., PSOF 137, 139, 143, 145, 152, 154, 156-169), which he knew had, and would, result in violence (e.g., PSOF 84, 101, 110, 117, 57-72, 36, 137). Yet Ellington failed to take action, such as by enforcing contraband search policy (including through additional staffing resources); remedying the culture of widespread policy noncompliance; implementing change in the P/Q blocks through St. Clair's Quality Improvement Team; and/or ensuring that Jones segregated the inmates most likely to inflict

78

violence in restrictive housing, controlled their movement, and/or provided sufficient monitoring and staffing in the particularly dangerous P/Q blocks, such as through the placement of a supervisor in those blocks. E.g., PSOF 171, 137, 148-179; ECF 185-36 at 28-29, 59-60 & 50-51. A jury could find that Ellington acted negligently in his response to the stream of deaths and culture of violence in the P/Q blocks (PSOF 57-73, 68-72, 168, 166, 171e, 178), contraband weapons (PSOF 75-97), uncontrolled movement (PSOF 96-105), failures to safely house and monitor prisoners with histories of institutional violence (PSOF 110-116), and widespread lack of compliance with security policies (PSOF 117-127), of which he was repeatedly put on notice (e.g., PSOF 137, 139, 143, 145, 152, 154, 156-160, 164-165, 166, 169), by taking no meaningful, urgent action and by ignoring feasible measures to stem the violence that were repeatedly made known to him, until it was too late (PSOF 171(a)-(i), 84, 87-89, 93-95, 99-100, 115-116, 144, 164-168, 173, 174, 176, 177-179, 188-194). Ellington's inaction is apparent in his non-response to the spate of deaths and violence in P/Q (PSOF 188-194), including his failure to implement any corrective action or discipline following Mr. Andrews's death (PSOF 188-194), despite the many rule violations apparent (e.g., PSOF 16-20, 22-28, 49-53, 42-47,183-185, 31-56, 60a).

Plaintiff presents evidence that Ellington's role put him in a position of authority and responsibility for addressing the extreme prisoner-on-prisoner violence and dangerous conditions at St. Clair, but that he turned a blind eye. Given the dangerous conditions and lack of urgent action by Ellington to ameliorate them, it

was entirely foreseeable that these same conditions persisted on the date of Mr.

Andrews's death, contributing to it: inadequate searches and proliferation of weapons

(PSOF 183-185, 49-53, 26); noncompliant staffing in P/Q (PSOF 16-20); dangerous

housing of known violent perpetrators of institutional violence in P/Q (PSOF 31-56);

unauthorized movement (PSOF 24-29); in a general environment of lawlessness and

widespread policy noncompliance. It was thus foreseeable and known to Ellington

that prisoners such as Mr. Andrews would continue to be stabbed to death without

action on his part in the P block; Ellington had the means to improve safety, knew his

actions were insufficient, and had means available which he disregarded. *Rodriguez*, 508

F.3d at 622; *LaMarca*, 995 F.2d at 1539.

Ellington argues otherwise, citing his own testimony that he held meetings that

"presented 'an opportunity'" for "discussions." Dkt. 192 at 47. This fact appears

nowhere in Ellington's list of "undisputed" facts (Dkt. 192 at 2-20) and thus is

improper. Regardless, the meetings concerned all Level IV and V facilities and took as

little as an hour. ECF 185-5 at 64:5-23. Ellington presents no evidence that action

resulted, let alone undisputed evidence the jury is required to believe. Dkt. 192 at 47;

*Reeves*, 530 U.S. at 150. Plaintiff's evidence reflects that *no* meaningful action came out

of the Duke-mandated QIT meetings (PSOF 174-179). Ellington next discusses

cameras and cell door locks, but his sole fact on this matter (No. 86), cites evidence

on a different topic and thus should be stricken. *Supra* at 10. Plaintiff's evidence is to

the contrary. PSOF 129-131, 136. A jury need not believe Ellington's vague

testimony, particularly given his lack of certainty about the timeframe of these efforts, and Plaintiff's evidence that the cameras and locks were largely broken throughout 2018 and staff routinely fabricated the inspections to identify broken hardware with impunity. PSOF 129-131, 136. Ellington points to the use of CERT team staff for contraband searches, but Plaintiff's evidence shows CERT teams were not used for contraband searches at St. Clair until 2019, even though recommended by the ASCA audit team back in January 2018. PSOF 171(f) & 90. Without an accompanying "undisputed" fact, Ellington cites testimony about a gang member transfer, but he omits that this transfer was both initiated (by a different administrator) and implemented long *after* Mr. Andrews' death (ECF 185-5 at 94:18-95:9 & 97:17-98:13), even though gangs were a known problem as early as May 2018 (PSOF 150, 1).

## V.    Defendant Ellington is not entitled to qualified immunity as to Count I.

Ellington does not meet his initial burden to raise the affirmative defense of qualified immunity (*supra* at 59-60), despite the Court's order. Dkt. 125 at 2. Ellington offers a mere fragment of an argument that he took unspecified "reasonable actions within his authority" (Dkt. 192 at 42), which fails to demonstrate with sufficient specificity, authority, and pin cites to the evidentiary record, "what his job-related function was or how his actions were within the scope of his authority." *Boykins*, 696 F. Supp. 3d at 1079-80; *Est. of Cummings*, 906 F.3d at 939. This sentence is insufficient. Plaintiff's evidence further reflects that Ellington's conduct fell outside his authority because, for example, his role required him to identify corrective action following

81

incidents of violence, ensure compliance with SOPs, discipline subordinates, and he did the opposite. *Supra* at 78-80; PSOF 188-194. To the extent Defendants attempt to resuscitate this argument in reply, it has been forfeited. *Boykins*, 696 F. Supp. 3d at 1079. If Ellington attempts to argue that Plaintiff waived this argument at the motion to dismiss stage, such an argument fails for the reasons discussed *supra* at 70.

As to clearly established law, Plaintiff's analysis above regarding Jones applies with equal force to Ellington, and thus, given space limitations, she incorporates that discussion by reference here. *Supra* at 70-75. As with Jones, Ellington was a correctional administrator with direct responsibility for overseeing and remedying St. Clair's violent conditions, and for ensuring adherence to policy there, and yet, a jury could find that, in the many months leading to Mr. Andrews's 2018 death, Ellington took no meaningful action to address the dangerous conditions (*supra* at 78-80). Pursuant to the *Hale*, *Marsh*, *Dickinson*, *Lane*, *LaMarca*, *Purcell*, and *Jones* line of cases (*supra* at 70-73), Ellington had fair notice of the unconstitutionality of inaction and continued failure to take reasonable steps to provide a safer environment, in light of the broadly established principles reflected in those decisions, in response to materially similar dangerous conditions. Likewise, *Hale* and *Marsh* present materially similar decisions, and, in any case, the violation was obvious. *Supra* at 60-61, 75.

Ellington cannot secure an immunity defense merely by citing without explanation to nearly 30 statements of fact (Dkt. 192 at 47); many of which are disputed, inaccurate, misleading, or unsupported, as shown above, and only five of

which mention Ellington by name: Nos 5, 6, 79, 85, 88. The "jury is not required to believe" Ellington's characterizations, such as his own statements about his violence indicator meetings and conduct that are flatly disproved by Plaintiff's evidence (*supra* at 80-81). *Reeves*, 530 U.S. at 150; *Ledbetter*, 421 F.3d at 1177. Given Plaintiff's robust evidence of Ellington's inaction and unreasonable response, Ellington cannot avoid a jury trial by citing to disputed facts regarding conduct that took place either long before or after 2018; written policies that Plaintiff's evidence establishes existed on paper only given known, widespread noncompliance (PSOF 117-127); or conduct that, as a whole, failed to address the conditions and violence despite repeated warnings and knowledge of feasible steps that could have been taken (PSOF 171(a)-(i), 84, 87-89, 93-95, 99-100, 115-116, 144, 164-168, 173, 174, 176, 177-179, 188-194).

## VI.    Defendant Ellington is not entitled to summary judgment on Count IX.

Plaintiff set forth the requirements for wrongful death liability *supra* at 61-62. Ellington does not challenge the duty element; even if he had, Plaintiff's evidence demonstrates that Ellington had a duty of care to prisoners at St. Clair by virtue of his position of authority and responsibility with direct oversight responsibility over St. Clair and its wardens. *See* PSOF 3-5. Likewise, Ellington does not challenge negligence/breach; regardless, Plaintiff's evidence establishes that Ellington breached a duty by disregarding and turning a blind eye to the known risk of harm to prisoners such as Mr. Andrews at St. Clair from violence and dangerous conditions. *See supra* at 78-80; *Huffman*, 2021 WL 2533024, at *6-*7.

As to causation, Ellington offers a one-sentence argument, so devoid of argument or citation to facts or authority as to have been forfeited, challenging the causation element alone. Dkt. 192 at 53. Yet Plaintiff's evidence shows that Ellington was a cause of Mr. Andrews's death by failing to take corrective action to address the known risks to prisoners such as Mr. Andrews from prisoner-on-prisoner violence, when that failure led to Mr. Andrews being stabbed. *Supra* at 78-80. A jury could find that Ellington acted negligently, and that, given the dangerous conditions and lack of urgent response by Ellington, it was entirely foreseeable that prisoners such as Mr. Andrews would continue to be stabbed to death in the P block at St. Clair.

As for state agent immunity, Ellington's one-sentence argument (Dkt. 192 at 43) fails to satisfy his initial burden to demonstrate that the "plaintiff's claims arise from a function that would entitle him to immunity." *See supra* at 62; *Ex parte Est. of Reynolds*, 946 So. 2d at 452. Ellington's reference to unspecified "reasonable actions within his authority" does not satisfy his burden, and thus forfeits this argument. Dkt. 125 at 2. Plaintiff also incorporates his discussion *supra* at 81-82. Plaintiff's evidence that Ellington violated the Eighth Amendment (*supra* at 78-80) likewise suffices to defeat state agent immunity. *Ex parte Cranman*, 792 So. 2d at 405. Finally, Plaintiff presents evidence that gives rise to an inference of callous, willful, bad faith conduct despite prisoners dying at incredibly high rates (e.g., PSOF 188-194, 171), further defeating the defense at the summary judgment stage. *Thompson*, 65 F.4th at 1297; *Reeves*, 530 U.S. at 150 (court "disregard[s] all evidence favorable to the moving party

that the jury is not required to believe").

## VII.   Defendant Dunn is not entitled to summary judgment on Count I

Defendant Dunn, too, does not carry his initial burden to demonstrate an absence of genuine issue of material fact as to any elements of Plaintiff's Eighth Amendment claim. *See supra* at 55-56. Dunn's challenge appears limited to the criminal recklessness element, as discussed in *Wade*, 106 F.4th 1251. Dkt. 192 at 30-36. Dunn does not appear to challenge whether Mr. Andrews faced an objectively serious deprivation, which, in any case, is satisfied by Plaintiff's showing *supra* at 63-65.

Fatal to his argument, Dunn does not satisfy his initial burden to demonstrate an absence of a genuine fact issue as to criminal recklessness. He cites no evidence that he acted reasonably in 2018 to stem the violence in P/Q or St. Clair, or the dangerous conditions that fueled it, such as extraordinary contraband levels (PSOF 75-89), widespread unauthorized movement (PSOF 96-105), a failure to safely house and monitor violent prisoners with histories of institutional violence, including their placement in the poorly staffed P/Q blocks (PSOF 110-116, 31-37, 39-49, 51-56), and a widespread practice of noncompliance with security policies (PSOF 117-127). Dunn's statement of facts, which he does not cite in his substantive discussion of the claim, is rife with errors that violate the Court's orders. Dkt. 107 at 15; Dkt. 125 at 2.

Dunn primarily rests on a citation to six lines of text from his own deposition in which he lists a few items, without any explanation, timeframe, or context. Dkt. 192 at 34-35 (citing Dkt. 185-11 at 161:17-23). This sentence fragment falls far short of

establishing an absence of genuine dispute of fact, and thus he has not met his burden. Dunn does not even claim that it is undisputed as required (*supra* at 55-56), nor could he. Plaintiff's evidence shows that Dunn failed to take meaningful action in 2018, prior to Mr. Andrew's death, despite repeated notice of dangerous conditions that fueled violence (PSOF 164-167, 170-75, 80-86, 91-95, 177-179, 188-194, 115-116, 123-127, 168, 151, 139-42, 147-53). Dunn cites actions that he purportedly took, but many did not occur in 2018 and all are hotly disputed. Dunn's testimony snippet references Operation Restore Order, but that was a search that post-dated Mr. Andrews's death by months, initiated by a different administrator who joined ADOC in 2019, even though it could have been done far earlier by Dunn and Ellington. PSOF 93-95 & 171(g)). Dunn references the CERT team and staffing issues, but Plaintiff's evidence shows that CERT teams were not used for contraband searches at St. Clair until long after Mr. Andrew's death, even though recommended by the ASCA audit team back in January 2018. PSOF 171(f) & 90. Tellingly, Dunn does not produce any underlying records to show frequent CERT team searches at St. Clair in 2018. Likewise, Plaintiff's evidence establishes that the QIT referenced did absolutely nothing and that Dunn did not even meaningfully oversee it. PSOF 174-178.

Dunn cites his own testimony (which the jury need not credit), attempting to excuse his lack of urgent, immediate action in 2018 by falling back on a "long-term" years-out approach of building new prisons. Yet Plaintiff offers expert testimony to the contrary. E.g., ECF 185-36 at 59 ("A crisis requires an immediate response. There

is nothing wrong with having a strategic plan or a staffing analysis, but inaction when the safety and security of your staff and the people in your custody is at immediate risk, as it clearly was at St. Clair, while you wait for another report that you may or may not chose to do anything with is a dereliction of duty."). Even Dunn (Dkt. 185-11 at 186:23-187:1) acknowledges that he had a duty to act in the short term to address the violence. A jury could find that allowing prisoners to continue to suffer violence and death in P/Q, week after week, constituted deliberate indifference, regardless of whether or not Dunn intended to build a new prison many years later.

If the Court finds that Dunn satisfied his initial burden, Plaintiff's evidence easily creates a fact issue for trial as to whether Dunn was subjectively aware that his conduct and inaction put prisoners such as Mr. Andrews at substantial risk of serious harm, and responded unreasonably to that risk, pursuant to the standards described *supra* at 58-59. Plaintiff's proof tracks that for Defendant Ellington, which she further incorporates by reference here. *Supra* at 78-80.

Plaintiff provides evidence that Dunn was ADOC Commissioner from 2015 through 2021, with the broad statutory authority to oversee facilities including St. Clair and with the authority to direct, supervise, and control the ADOC. PSOF 7-8. Dunn had notice of the same violence and conditions identified *supra* at 78-80 for Ellington, pursuant to the same evidence. *See also* PSOF 70, 85-86, 137-139. Despite this, Dunn failed to take action. E.g., PSOF 139-142, 145-168, 170-179, 80-86, 91-95, 188-194, 115-116, 123-127, 168. The notice to Dunn included a September 2018 letter

87

warning him of a "concerning increase in serious incidents of violence" at St. Clair;

warning—specifically—about the "dangers of St. Clair's "'hot bay' dorm management

policy that houses individuals with behavior problems together in a single housing

unit in general population where they lack . . . any regular security staff presence" and

that "the last two homicides [in the P/Q block] are a manifestation of the safety

problems this kind of management technique creates." EJI also warned that "weapons

contraband continues to saturate the prison and . . . contribute to serious incidents of

violence at St. Clair" and that "contraband searches continue to be sporadic and

ineffectual," recommending feasible steps to regain control. The letter also provided a

number of expert recommendations to address these problems. PSOF 168. Yet again

Dunn did not respond with any corrective action (PSOF 139-142, 145-147, 152-168,

170-179), even though any minimally competent administrator would have done so

(ECF 185-36 at 51, 52, 56-57. Taking inferences in Plaintiff's favor, including from

circumstantial evidence of the persistence of the conditions despite notice (*Hale*, 50

F.3d. at 1583), and Dunn's continued inaction even after Mr. Andrew's death (PSOF

188-194), a reasonable jury could find that Dunn knew the manner in which he

oversaw St. Clair was endangering prisoners such as Mr. Andrews, but turned a blind

eye and acted unreasonably.

 This Court need not even reach Dunn's challenge to Plaintiff's evidence from

the *Duke* litigation because Plaintiff presents abundant independent evidence. E.g.,

PSOF 152-155 (ASCA audit). Indeed, while Dunn takes issue with EJI's monitoring

reports, Jones herself agreed with many of their characterizations, providing more evidence of the same. ECF 363 at 292:11-18, 299:16-301:10, 307:10-307:15, 311:2-311:13, 313:16-314:5. Regardless, Dunn's arguments about the *Duke* settlement are a red herring: Plaintiff does not argue that non-compliance is equivalent to a constitutional violation. She argues that the *Duke* litigation, including monitoring reports with supporting evidence, put Dunn (and Jones and Ellington) on notice of the dangerous conditions at St. Clair and of the urgent need to fix them (PSOF 146-167, 115-116). Dunn provides no authority permitting the Court to disregard Plaintiff's evidence of notice from lawsuits merely because the complaints did not take the form of facts adjudicated in court. This Court has already rejected Dunn's argument. *See* Dkt. 105 at 31-32 (citing *Marsh*, 268 F.3d at 1029); *see also Dickinson*, 833 F. App'x at 273 (letter from advocates); *Valdes*, 450 F.3d at 1244 (prisoner complaints); *LaMarca*, 995 F.2d at 1536) (internal and external reports).

Moreover, certain substantive terms in the agreement, adopted by Dunn, reflect commitments that Defendants then chose not to implement. PSOF 151, 115-116, 158, 164, 174. Defendants' conduct in *Duke* bears on that inquiry: it reflects admissions about the availability of feasible actions and subjective knowledge of the consequences of non-implementation of previously agreed changes. *George v. Wexford Health Sources*, 2024 WL 1120110 (M.D. Ala. Mar. 10, 2024), is inapposite, as Plaintiff does not rely on the settlement to overcome qualified immunity. As a final matter, to the extent that Dunn implies that budgetary or logistical concerns provide some kind

of a defense, they are not. *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th

Cir.1985); *Harris v. Thigpen*, 941 F.2d 1495 (11th Cir. 1991); *Smith v. Sullivan*, 611 F.2d

1039, 1043-44 (5th Cir. 1980).

## VIII. Defendant Dunn is not entitled to qualified immunity as to Count I.

Defendant forfeits his affirmative defense of qualified immunity by failing to

make an initial showing that he acted within his discretionary authority to meet his

initial burden to establish an entitlement to qualified immunity. Dkt. 192 at 36-40;

*supra* at 59-60; Dkt. 125 at 2. Dunn's analysis fails to specify "what his job-related

function was or how his actions were within the scope of his authority." *Boykins*, 696

F. Supp. 3d at 1079-80. Any attempt to improperly construct this argument in reply

fails. *Boykins*, 696 F. Supp. 3d at 1079. Any argument that Plaintiff waived this

argument at the motion to dismiss stage fails for the reasons discussed *infra* at 94.

On the merits, Plaintiff's analysis of qualified immunity above regarding Jones

and Ellington applies with equal force to Dunn, and thus, given space limitations, she

incorporates that discussion by reference here. *Supra* at 70-75. Dunn, too, was a

correctional administrator with core responsibility for overseeing and remedying St.

Clair's violent conditions, and for ensuring adherence to policy there (*supra* at 87-88),

and yet, a jury could find that, in the many months leading to Mr. Andrews's death,

Dunn took no meaningful action to address the dangerous conditions and responded

with unconstitutional inaction (*supra* at 85-89). Pursuant to the *Hale*, *Marsh*, *Dickinson*,

*Lane*, *LaMarca*, *Purcell*, and *Jones* line of cases (*supra* at 70-73), Dunn had fair notice of

the unconstitutionality of inaction and continued failure to take reasonable steps to provide a safer environment, in light of the broadly established principles reflected in those decisions in response to materially similar conditions. Likewise, those same cases present materially similar decisions, and, in any case, the constitutional violation was obvious. *Supra* at 75.

Contrary to Dunn's argument, he does not establish material differences between the facts here and *Hale* or *Marsh*. The nature of Dunn's conduct is disputed and requires a jury; his factual statements regarding actions taken (for example, regarding cameras, classification, bed roster checks, training and classification procedures) are hotly disputed, as reflected in Plaintiff's facts and response to facts. Dunn is also incorrect that any change to the subjective element of the claim due to *Wade* impacts the qualified immunity analysis (nor could it abrogate *Marsh*, which, too, was *en banc*). Whether a right is clearly established hinges on the "'objective legal reasonableness of the <u>action</u> . . . at the time it was taken." *Pearson v. Callahan*, 555 U.S. 223, 244 (2009)). A defendant's state of mind is irrelevant to the objective qualified immunity inquiry, *Armstrong v. Daily*, 786 F.3d 529, 538 (7th Cir. 2015), including when a particular state of mind is an element of the constitutional violation itself. *Kingsley v. Hendrickson*, 801 F.3d 828, 832-33 (7th Cir. 2015); *Auriemma v. Rice*, 910 F.2d 1449, 1452 (7th Cir. 1990); *Jackson v. City of Cleveland*, 925 F.3d 793, 826 (6th Cir. 2019).

Nor can Dunn secure an immunity defense merely by citing without explanation to 35 statements of fact (Dkt. 192 at 44); many of which are disputed,

inaccurate or misleading, lack appropriate timeframes, and lack supporting record cites. Fatal to Dunn's argument, not a single purportedly undisputed fact that mentions Dunn by name (Nos. 3-4, 66-67, 71, 82-85, 97) reference any actions taken by Dunn in the year leading up to Mr. Andrew's December 2018 death, to address any of the dangerous conditions identified by Plaintiff.[10] Also, the "jury is not required to believe" Dunn's own pronouncements, such as those about CERT team and Operation Restore Order searches that long post-dated Mr. Andrews's death, as Plaintiff's evidence establishes. *See supra* at 86. Given Plaintiff's robust evidence of Dunn's inaction and unreasonable response (*supra* at 85-89), Dunn cannot avoid a jury trial by citing to disputed facts regarding conduct that took place either long before or long 2018; written policies that existed on paper only given widespread noncompliance (PSOF 117-127); or conduct that, as a whole, failed to respond to the dangerous conditions and violence at St. Clair despite repeated notice.

## IX.    Defendant Dunn is not entitled to summary judgment on Count IX.

Defendant Dunn, alone (Dkt. 192 at 40), offers a one-sentence argument that the wrongful death claim in Count IX against him is redundant of Plaintiff's Eighth Amendment claim against Dunn, citing *Brown v. Dunn*, 2024 WL 5168637, at *10 (M.D. Ala. Dec. 19, 2024). Yet in that case, the plaintiff pleaded a wrongful death

---

[10] Fact No. 66 references a "reversed [] decline in hiring" in 2019, after Mr. Andrew's death; No. 67 discusses the introduction of a cubicle officer position by an unknown person in 2016, two years prior to Mr. Andrew's death; No. 71 discusses budget increases as of 2021, three years after Mr. Andrew's death; and Nos. 83-84 reference a long-term facility replacement plan that did not address conditions in 2018;

claim that was directly tied to and dependent on the section 1983 claim, alleging that the wrongful action causing the decedent's' deaths *was* the Eighth Amendment violation. *Id.* at *10. Where, as here, a plaintiff makes specific claims about how a state law duty was owed to the decedent and the defendants' conduct violates that statute, then courts have permitted both claims to proceed. *Perryman v. Butler Cnty. Comm'n*, 2024 WL 2221476, at *6 (M.D. Ala. May 16, 2024); *Wilson v. Stewart*, 2021 WL 3439398, at *20-21 (S.D. Ala. Aug. 5, 2021); *Huffman v. Dunn*, 2021 WL 2533024, at *7 (N.D. Ala. June 21, 2021); *Powell v. Dunn*, 2022 WL 610172 (N.D. Ala. March 1, 2022). Moreover, should the Court find any of the Defendants are entitled to qualified immunity on Count I, the wrongful death claim should survive for that reason as well, as state law provides a separate and distinct immunity standard. *Guy v. Dunn*, 2023 WL 6378967, at *23 (N. D. Ala. Sept. 29, 2023).

Likewise, in an argument devoid of explanation, facts, or authority, Dunn appears to challenge the breach element of the claim. Yet Plaintiff's evidence establishes that Dunn had a duty of care as the ADOC commissioner with oversight responsibility and authority over St. Clair to its prisoners, by virtue of his position of authority and responsibility for addressing violence and safety at St. Clair, but breached that duty by disregarding and turning a blind eye to the known risk of harm to prisoners such as Mr. Andrews at St. Clair from prisoner-on-prisoner violence and dangerous conditions. *See supra* at 85-89; *Huffman*, 2021 WL 2533024, at *6-*7. A jury could find this to constitute negligence. Given the dangerous conditions and lack of

urgent action by Dunn to ameliorate them, it was entirely foreseeable that prisoners such as Mr. Andrews would continue to be stabbed to death in the P block as a result.

As for the affirmative defense of state agent immunity, Dunn fails to satisfy his initial burden to demonstrate that the "plaintiff's claims arise from a function that would entitle him to immunity." *See supra* at 62; *Ex parte Est. of Reynolds*, 946 So. 2d at 452. Dunn contends that Plaintiff waived this argument at the motion to dismiss stage, citing only to the Court's order observing that the issue was not challenged at that stage. Dkt. 105 at 67. Yet Dunn is incorrect; Plaintiff defeated Dunn's state agent immunity defense at the pleading stage, and was not obliged to raise (and waste the Court's time with) alternative arguments in support of denial. The defense's invocation of an immunity defense at summary judgment presents a different inquiry: whether the evidentiary record establishes the defense as a matter of law. This Court's prior order in no way held that Plaintiff conceded the issue at the summary judgment stage, and its ruling does not excuse Dunn's forfeiture here.

Moreover, Plaintiff's evidence that Dunn violated the Eighth Amendment (*supra* at 85-89) likewise suffices to defeat state agent immunity, which does not protect unconstitutional conduct. *Ex parte Cranman*, 792 So. 2d at 405. Plaintiff also presents evidence that gives rise to an inference of callous, willful, bad faith inaction as prisoners died at incredibly high rates (e.g., PSOF 188-194, 171), further defeating the defense. *Thompson*, 65 F.4th at 1297; *Reeves*, 530 U.S. at 150.

## X. Defendant Baker is not entitled to summary judgment on Count I.

Baker's challenge to Count I appears limited to the deliberate indifference element of Plaintiff's claim, as discussed in *Wade*. Dkt. 192 at 30-36. Baker does not challenge Plaintiff's evidence of an objectively serious substantial risk of serious harm, which, in any case, is satisfied by the showing *supra* at 63-65.

Baker's argument on criminal recklessness lacks merit. First, Baker does not carry his initial burden to demonstrate an absence of genuine issue of fact as to this element. *Supra* at 55-56 (citing *Celotex*, 477 U.S. at 323). This is because nearly all of Baker's purportedly undisputed fact statements are highly problematic. Most of the citations are erroneous and violate the Court's orders and are unsupported, as shown above. Dkt. 107 at 15; Dkt. 125 at 2. Baker relies primarily on his own deposition, which is not a source the jury must credit. *See supra* at 56. Baker thus fails to present any evidence, let alone undisputed evidence, to make the requisite initial showing.

In addition, Plaintiff's evidence easily creates a fact issue for trial as to whether Baker was subjectively aware that his inaction put prisoners such as Mr. Andrews at substantial risk of serious harm, and responded unreasonably, pursuant to the standards described *supra* at 58-59. Baker was a lieutenant from 2016 to 2021, and he was on duty as the shift commander during the shift that culminated in Mr. Andrews's death. PSOF 9; Baker SOF 31-32. Baker's duties included ensuring that staff completed contraband searches (PSOF 92, 183), overseeing and conducting searches (Baker SOF 32, 34), assigning staff to posts (PSOF 195), requesting more staff from the chain of command if needed (PSOF 195), ensuring all positions were filled

according to the staffing plan (Baker SOF 32), ensuring critical posts were manned (*id.*), and disciplining staff for SOP violations (Baker SOF 33). As a longtime shift commander, Baker was aware of the extreme violence, particularly in P/Q (PSOF 57-73) and the dangerous conditions–excessive contraband (PSOF 75-89), widespread unauthorized movement (PSOF 96-105), a failure to safely house and monitor violent prisoners, including their placement in the poorly staffed P/Q blocks (PSOF 110-116, 31-37, 39-49, 51-56), and a widespread practice of noncompliance with security policies (PSOF 117-127), exacerbated by physical plant deficiencies (PSOF 128-136).

Although Baker was aware of the high levels violence and excessive contraband weapons (PSOF 195; ECF 342 at 32:3-8, 33:3-18, 36:11-17); knew that increased searches and movement control were required to decrease the violence (PSOF 196; ECF 342 at 47:2-11); and was responsible for ensuring sufficient contraband searches and for disciplining staff violations regarding contraband searches (PSOF 197, Baker SOF 33 & 34), Baker also knew that, in fact, contraband searches were *not* being carried out as required (PSOF 75-97). Nonetheless, Baker did not write up any staff for failing to carry out required contraband searches or failing to discipline inmates for having contraband. PSOF 198; ECF 342 at 81:19-82:21 & 87:19-88:1. Baker did not ensure that the required contraband searches occurred in the P block on the date of Mr. Andrew's death, nor were any staff disciplined after Mr. Andrews's death to correct the rule violation (PSOF 180-185, 193, 9). In addition, as shift commander, Baker was responsible for assigning officers to posts and requesting more staff up the

96

chain of command if needed. PSOF 195, Baker SOF 33). Yet although Baker knew of the particular dangerousness of the P/Q blocks (PSOF 68-72); knew the rover staffing requirements for the P Block (PSOF 16-23); had the ability to adhere to them (PSOF 74, 91, 186) and also to station a supervisor in the P Block to monitor and deter assault (PSOF 187, 74); and was responsible for staffing (PSOF 195; Baker SOF 32), a jury could find that Baker took no action to do so (PSOF 110-114, 16-23). Finally, as a shift commander responsible for ensuring rule compliance, Baker was aware of the widespread noncompliance with security policies (PSOF 117-127), and unauthorized movement (PSOF 96-105), and yet Plaintiff's evidence shows he took no action to address compliance (PSOF 180-187, 117-127).

Taking inferences in Plaintiff's favor, including from circumstantial evidence of the persistence of the conditions without change despite notice, a reasonable jury could find that Baker subjectively knew that the manner in which he oversaw contraband searches, staff assignment to posts in the P/Q Blocks, and discipline, particularly in the highly dangerous P/Q blocks, was endangering prisoners such as Mr. Andrews, but Baker turned a blind eye and acted unreasonably. He failed to enforce policies he knew were required for safety, declined to take action to stem the time of violence as dangerous conditions persisted, and declined to take feasible actions, while prisoners continued to suffer assaults and die (PSOF 57-74).

## XI.    Defendant Baker is not entitled to qualified immunity as to Count 1.

Baker attempts an initial showing that he acted in a discretionary capacity (Dkt.

269 at 12-13), as required to establish an entitlement to qualified immunity (*supra* at 59-60), relying on Plaintiff's generic pleading allegations. His vague argument is insufficient to show with competent evidence that Baker's actions here satisfy the standard. In fact, Baker's challenged conduct directly *contravened* his job requirements; he was required to comply with non-discretionary staffing plans and search policies (Baker SOF 31-34; PSOF 9, 92, 183), but failed to comply (*supra* at 95-97).

On the merits, Plaintiff's analysis of qualified immunity above regarding Jones applies with equal force to Baker, and thus, given space limitations, she incorporates that discussion by reference here. *Supra* at 70-75. Baker, too, was a correctional supervisor with direct responsibility to impact St. Clair's violent conditions and for ensuring sufficient contraband searches, appropriate staffing in the P/Q blocks, compliance with security policies, and appropriate discipline. *Supra* at 95-97. Yet, a jury could find that, in the timeframe leading up through Mr. Andrews's death, Baker took no meaningful action to address contraband proliferation, widespread unauthorized movement, widespread policy noncompliance, failures to safely house violent inmates, and unsafe conditions in P/Q blocks. *Id.* Pursuant to the line of cases in *Hale*, *Marsh*, *Dickinson*, *Lane*, *LaMarca*, *Purcell*, and *Jones* line of cases (*supra* at 70-75), Baker had fair notice that his continued inaction contravened the law, in light of the broadly established principles reflected in those decisions in response to materially similar conditions. Likewise, those same cases present materially similar decisions, and, in any case, the constitutional violation was obvious. *See supra* at 70-75.

Baker's citation to *Marbury v. Warden*, 936 F.3d 1227 (11th Cir. 2019), fails, as the decision post-dates the conduct here and could not have informed Defendants' understanding of the established law at the time. *Pearson*, 555 U.S. at 244. Regardless, Defendants' expansive reading of *Marbury* was expressly rejected in *Dickinson. Marbury* makes clear that inaction by correction officials in the face of a generalized risk of violence contravenes the Eighth Amendment if the risk is sufficiently great, and merely held that evidence of only "occasional, isolated attacks," such as "2.5 stabbings per year" did not suffice. 936 F.3d at 1235 & nn. 20-22.

## XII.    Defendant Baker is not entitled to summary judgment on Count IX & X.

Plaintiff brings two wrongful death claims against Baker: one turns on Baker's policies and customs as a supervisor (Count IX), and the other on Baker's direct participation as a supervisor on the date of Andrews's death (Count X).[11]

As to Count IX, Baker challenges only breach and causation, conceding the other elements. Dkt. 269 at 37-38. Yet Plaintiff's evidence establishes a jury question as to whether Baker breached his duty of care to prisoners such as Mr. Andrews in a way that caused Mr. Andrews's death. As shift commander, Baker disregarded and turned a blind eye to the known risk of harm to prisoners such as Mr. Andrews at St. Clair in P/Q from violence and dangerous conditions. *Supra* at 95-97. This

---

[11] The conduct in which Baker engaged in both instances is of the same nature. Under either claim, the full weight of Plaintiff's evidence regarding Baker's conduct, as both a supervisor and a supervisor on the date of Mr. Andrew's death, supports liability.

misconduct continued on the date of Mr. Andrews's death, as Baker again did not ensure that required contraband searches in the P block. PSOF 180-185, 193, 9. Although Baker was responsible for staffing assignments (PSOF 195; Baker SOF 32); knew of the dangerousness of P/Q (PSOF 68-72); knew the rover staffing requirements (PSOF 16-23); had the ability to adhere to them and station a supervisor in P Block to deter assault (PSOF 74, 91, 186-187), a jury could find that Baker took no action to do so (PSOF 110-114, 16-23). Finally, Baker was aware of the widespread noncompliance with security policies (PSOF 117-127), and unauthorized movement (PSOF 96-105), and yet took no action in response (PSOF 117-127). A jury could find that Baker acted negligently and that Mr. Andrews's death was a foreseeable result.

As to Baker's causation challenge to Count X, Plaintiff need not show that the specific altercation with Davis was foreseeable; it is sufficient to show that Baker knew his negligent conduct put prisoners at P/Q at risk of harm. *Supra* at 95-97.

Baker invokes state agent immunity. Dkt. 269 at 25-28. Yet again, he fails to make the initial showing through competent evidence. Baker points only to a single allegation from Plaintiff's complaint (Dkt. 34 ¶34), but it does not speak to whether Baker exercised discretion, or rather, as Plaintiff shows, carried out functions that were subject to "hard and fast rule." Dkt. 269 at 33. Regardless, Plaintiff's evidence that Baker violated the Eighth Amendment (*supra* at 95-97), as well as an inference of bad faith conduct given Baker's refusal to act while prisoners died at high rates, likewise defeats the immunity.

100

Respectfully submitted,

BY**:** /s/ Ruth Z. Brown
*One of Plaintiff's Attorneys*

BY**:** /s/ Anil Mujumdar
*Local Counsel*

*Ruth Z. Brown (pro hac vice)
Megan Pierce (pro hac vice)
Quinn Rallins (pro hac vice)
Attorneys for Plaintiff
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, IL 60607
Telephone: 312-243-5900
Fax: 312-243-5902
Email: ruth@loevy.com,
        megan@loevy.com
        rallins@loevy.com
*Counsel of Record

Anil A. Mujumdar (ASB-2004-L65M)
Dagney Johnson Law Group
2170 Highland Avenue, Suite 250
Birmingham, AL 35205
T: 205.590.6986
F: 205.809.7899
E: anil@dagneylaw.com

## <u>CERTIFICATE OF SERVICE</u>

I, Ruth Brown, an attorney, hereby certify that on March 17, 2025, I caused the foregoing to be filed using the Court's CM/ECF system, thereby effecting service on all counsel of record.

/s/Ruth Z. Brown
*One of Plaintiff's Attorneys*

102