

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION


4:21-cv-264-ACA

CAROL GUY, ET AL.,
          Plaintiffs,
v.

JEFFERSON DUNN, ET AL.,
          Defendants.
_____

4:20-cv-2058-ACA

LAKEISHA EZELL,
          Plaintiff,
v.

JEFFERSON DUNN, ET AL.,
          Defendants.

   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

TRANSCRIPT OF MOTION HEARING

JUNE 18, 2025


HUGO L. BLACK UNITED STATES COURTHOUSE
1729 5TH AVENUE NORTH
BIRMINGHAM, ALABAMA 35203


BEFORE THE HONORABLE ANNEMARIE CARNEY AXON
UNITED STATES DISTRICT JUDGE


COURT REPORTER:
B. Stone Arledge, RPR, CRR
Federal Official Court Reporter
1729 Fifth Avenue North
Birmingham, Alabama 35203
(205)278-2067

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:
      MEGAN C. PIERCE, ESQ.
 4    LOCKE E. BOWMAN, ESQ.
      QUINN RALLINS, ESQ.
 5    Loevy & Loevy
      311 North Aberdeen St., Third Floor
 6    Chicago, Illinois 60607
      megan@loevy.com
 7    locke@loevy.com
      rallins@loevy.com
 8

 9
      FOR THE DEFENDANTS:
10    WILLIAM R. LUNSFORD, ESQ.
      WILLIAM J. CRANFORD, III, ESQ.
11    MATTHEW B. REEVES, ESQ.
      KENNETH S. STEELY, ESQ.
12    DANIEL J. CHISM, ESQ.
      Butler Snow, LLP
13    200 West Side Square, Suite 100
      Huntsville, Alabama 35801
14    bill.lunsford@butlersnow.com
      will.cranford@butlersnow.com
15    matt.reeves@butlersnow.com
      kenneth.steely@butlersnow.com
16    daniel.chism@butlersnow.com

17
      CAITLIN E. COBB, ESQ.
18    W. ALLEN SHEEHAN, ESQ.
      C. RICHARD HILL, JR., ESQ.
19    JAMES N. WALTER, JR., ESQ.
      W. JACKSON BRITTON, ESQ.
20    Capell & Howard, P.C.
      150 South Perry Street
21    Montgomery, Alabama 36104
      caitlin.cobb@chlaw.com
22    allen.sheehan@chlaw.com
      rick.hill@chlaw.com
23    jimmy.walter@chlaw.com
      jackson.britton@chlaw.com
24

25
```

```
 1                A P P E A R A N C E S  (CONT.)

 2

 3    FOR THE RESPONDENTS:
      GREGORY H. HAWLEY, ESQ.
 4    JEROME C. CHAPMAN, IV, ESQ.
      Hand Arendall Harrison Sale, LLC
 5    1801 5th Ave North, Suite 400
      Birmingham, Alabama 35203
 6    ghawley@handfirm.com
      jchapman@handfirm.com
 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1               <u>EXAMINATION INDEX</u>

                                                    PAGE
2   KEVIN MYERS
          DIRECT BY THE COURT................................24
3         CROSS BY MR. LUNSFORD..............................52

1          (Proceedings commenced at 10:44 a.m. in open court.)

2          THE COURT:  We are here in the matters of Ezell versus

3   Dunn and Wills versus Dunn.  The case number for Ezell is

4   20-2058; for Wills it is 21-264.  I want to say before we go a

5   minute further I think it would be appropriate for me to point

6   out that through the duration or through a substantial part of

7   this case the estate of Mr. Mullins, which is the issue

8   presented in Wills versus Dunn, was represented by

9   Mr. Mullins's mother who has now passed away.  As hard as I

10  try, I consistently refer to her as Ms. Guy, which I do

11  understand is her maiden name.  I hope that there will be no

12  offense taken by that misidentification.  I will be happy to

13  represent to you that if I focus on that then I am sure to

14  miss something far more important.

15          So would counsel please identify themselves for the

16  record.

17          MS. PIERCE:  Megan Pierce on behalf of the plaintiffs,

18  Your Honor.

19          MR. BOWMAN:  Good morning, Your Honor.  My name is

20  Locke Bowman also on behalf of plaintiffs.  I've just added my

21  appearance.

22          MR. RALLINS:  Good morning, Your Honor.  Quinn Rallins

23  also on behalf of plaintiff.

24          MR. LUNSFORD:  Bill Lunsford on behalf of former

25  Commissioner Dunn, Mr. Ellington, Ms. Vincent, former

1    Commissioner -- Warden Jones, and Mr. Culliver in the Guy

2    matter and for Mr. Dunn, Mr. Ellington, and Ms. Jones in the

3    Ezell matter.

4        MR. REEVES:  Your Honor, Matt Reeves on behalf of

5    Mr. Dunn, Mr. Ellington, and Ms. Jones in the Ezell matter.

6        MR. CRANFORD:  Your Honor, William Cranford, and I am

7    here on behalf of Mr. Dunn, Mr. Ellington, Ms. Jones,

8    Mr. Culliver, and Ms. Vincent in the Guy matter; in the Ezell

9    matter on behalf of Mr. Dunn, Mr. Ellington, and Ms. Jones.

10        MR. STEELY:  Kenneth Steely, Your Honor.  I'm here on

11    behalf of the ADOC officials that were identified by

12    Mr. Cranford.

13        MR. CHISM:  Daniel Chism, Your Honor.  I'm here on

14    behalf of the ADOC officials previously identified.

15        MR. HAWLEY:  Your Honor, I'm Greg Hawley from the Hand

16    Arendall firm and I'm here representing the respondents,

17    Mr. Lunsford, Chism, Steely, Cranford, and Reeves.

18        MR. CHAPMAN:  Good morning, Your Honor.  Jerome

19    Chapman with Mr. Hawley in representation of the respondents.

20        MR. SHEEHAN:  Your Honor, I'm Allen Sheehan.  I'm

21    representing in the Wills matter Carla Graham, Anthony Brooks,

22    Greg Malone, Gwendolyn Givens, William Ragsdale, Antoine

23    Price, and Angelia Gordy; in the Ezell matter, Larry Baker.

24        MS. COBB:  Good morning, Your Honor.  Caitlin Cobb on

25    behalf of Carla Graham, Anthony Brooks, Gary Malone, Gwendolyn

1    Givens, William Ragsdale, Antoine Price, and Angelia Gordy in

2    the Wills matter and Defendant Larry Baker in the Ezell

3    matter.

4         MR. WALTER:  Your Honor, I'm Jimmy Walter.  I am

5    representing the same defendants as just identified by

6    Mr. Sheehan and Ms. Cobb.

7         MR. HILL:  Yes, Your Honor.  My name is Rick Hill and

8    I represent the same defendants as identified by Mr. Sheehan.

9         MR. BRITTON:  Jackson Britton with Capell & Howard,

10   and I represent the same defendants in the Ezell matter and

11   the Wills matter.

12        THE COURT:  Thank you.  There are several matters that

13   we need to address this morning, and one of them is my order

14   to show cause.  There is a motion for summary judgment and the

15   pretrial deadlines.  As the parties are aware, these cases

16   will be tried beginning on August 5th.

17        The first order of business that I wish to take up is

18   the order to show cause.  I should state for the record that I

19   have just received the response and objection that Mr. Hawley

20   filed along with the exhibits attached, and we will go over

21   those shortly.

22        I think it would be fair to just state that I have

23   said on more than one occasion that the reason that only

24   district judges can sentence a person is because no one would

25   want to be a district judge if they knew what that felt like.

1    And I have had very difficult sentencings for one reason or

2    another on both spectrums, and I will say to you that I would

3    rather have a week of those types of sentencings than a minute

4    addressing the allegations and the facts that I appear to have

5    found and identified in the order to show cause.

6         Mr. Hawley, I'm going to give you a minute, and I

7    don't want to -- I don't want to foreclose anything that you

8    want to say, okay?  There are a couple of things that I'm not

9    sure if you have had -- if your clients have brought to your

10   attention, and so I thought it might be helpful for me, if you

11   don't mind, if I provided you with a little background

12   information --

13        MR. HAWLEY:  Certainly, Your Honor.

14        THE COURT:  -- with respect to both of these cases in

15   general.  With your permission, I will use the Guy case in

16   particular for citation purposes.

17        You say in your response -- and we'll talk about

18   notice in a minute.  You say in your response that there is a

19   significant divergence in the briefs and the submissions and

20   that there are problems with the citations as a result, and by

21   way of explanation of how that came to occur, you explained to

22   me that Mr. Cranford filed a motion to seal the Tuesday before

23   summary judgment motions -- their evidence was due, I should

24   say, on the following Monday, and you note that I didn't

25   respond at two o'clock.  Have you had an opportunity, if I may

1    ask, to review my response -- my order on the motion?

2          MR. HAWLEY:  Your order denying the motion to file

3    under seal?

4          THE COURT:  Yes.

5          MR. HAWLEY:  We haven't looked at that, Your Honor.  I

6    have not looked at it.  I'm not sure I could cite it chapter

7    and verse.  I'm aware of it.  It has been quoted to me.  I'm

8    not even certain that I have put my eyeballs on it.  I'm aware

9    of it.

10          THE COURT:  Okay.  That's fair.  That's completely

11    fair.  And you're right that I did file that at two o'clock

12    that morning.  I wonder, also, if you are aware that before --

13    well, let me give you a little bit of background.  I've had

14    several of these cases where your clients have appeared as

15    counsel, and we have repeatedly addressed the issue of what is

16    appropriately sealed in a case.  I will say to you that my

17    experience informs me that your clients would contend that

18    matters should be sealed simply because they have been

19    designated as highly confidential and then in the next breath

20    admit that the highly confidential designation was overused.

21    Having explained to them that how a party designates

22    confidentiality does not inform the court's decision on

23    whether a document should be sealed, we went over the Romero

24    factors.  I remember specifically addressing those with

25    Mr. Lunsford.  I remember on that occasion being told that

1    really anything that has to do with the prison's working

2    environment the disclosure of that information would create a

3    huge security risk.  In that particular case, I remember that

4    that extended to the duty roster for specific shifts on or

5    around the time that the prisoner was killed.  Perhaps you can

6    understand why I did not agree that the list of people who

7    were sitting somewhere years before did not create a security

8    risk.

9           When we came to these two cases, having been through

10   this process several times, including having been provided

11   Bankers Boxes full of reams of paper for me to review to

12   determine whether they should be sealed, only to open those

13   Bankers Boxes to find that they had been completely redacted.

14   If I cannot read what is supposed to be sealed, certainly I

15   cannot determine if it is supposed to be sealed.  So after

16   that point, and again with the benefit of experience, I set

17   out a very specific procedure by which we would address

18   motions to seal.

19          The document that the defendants filed the Tuesday

20   before their submission was due in no way complies with the

21   order that I entered regarding motions to seal, and as I

22   stated -- and I'm not holding you to this, but I want you to

23   understand where we -- our baseline here today.  I reiterated

24   in my order that in November of '23 I explained the

25   designation of a document that is confidential or highly

confidential does not entitle a party to seal that document.

I entered the stipulated protective order that they asked for.

I adopted the language in paragraphs 12 and 13 of the proposed

order in their entirety.

        Paragraph 12 required the parties to meet -- by their

agreement, meet and confer within 30 days of the close of

expert discovery to exchange a list of so-called confidential

documents that they intended to use in any pretrial motion.

It required them to no longer -- no later than 21 days before

the deadline file a motion to seal, and it sets out the

procedure for filing that motion, including compliance with

CM/ECF procedure.  Before I had entered that protective order,

I entered a scheduling order.  The scheduling order in these

two cases isn't unique to any other case that I have.  It is

also the product of experience in these cases.  It requires

dispositive motions -- I'm sorry.  Let me read from it so I'm

not messing up.  It required separate dispositive motions for

each defendant; I don't have separate dispositive motions for

each defendant.  I set the deadline and then on the 21st

Mr. Cranford moved to file over 200 exhibits under seal.  They

listed the documents that they wished to seal, but in

contravention of this court's order and the CM/ECF rules, they

did not describe the documents; they did not submit them for

in-camera review, and so I denied the motion to seal.

        Part of -- and I'm going by memory, which is pretty

```
 1    bad.  I believe that -- well, to be sure, I got this
 2    document -- it would have been after noon because of the way
 3    we get notice of filings -- on Tuesday.  I responded to it on
 4    Monday.  It is a six-page response -- order, I should say, and
 5    part of the delay was waiting for the documents.  I cannot
 6    review a motion to seal if I don't have the documents that you
 7    wish to seal.  I say all of this because I want to be very
 8    clear, and I appreciate that you say that the respondents
 9    mistakenly and regrettably assumed that I would grant leave to
10    file those motions under seal, but I do want you to know that
11    that belief was not reasonable; it was fantastical.  So to the
12    extent that these errors in citation are just a terrible
13    mistake, well, it's hard for me to understand how this is a
14    mistake.
15          Let me hear from you, please, on your objection to the
16    notice and your due process arguments.
17          MR. HAWLEY:  Thank you, Your Honor.  Your Honor, I'm
18    here with my colleague and smart lawyer, Jerry Chapman, so I
19    may call on him from time to time.
20          THE COURT:  Sure.
21          MR. HAWLEY:  Okay.  If you ask hard questions, he is
22    here for that.  But, Your Honor, we were called into this.
23    And everything you said, Your Honor, we appreciate because
24    Jerry and I have talked about this, and we have been working
25    pretty much nonstop since we were engaged on behalf of these
```

```
 1   respondents.  We apologize for the late filing, but we took as

 2   much time as needed to get everything we wanted to file

 3   correct.

 4          THE COURT:  When were you engaged?

 5          MR. HAWLEY:  Last week.

 6          THE COURT:  Okay.

 7          MR. HAWLEY:  Friday to be specific.

 8          THE COURT:  Thank you.

 9          MR. HAWLEY:  So, Your Honor, I'm smiling because

10   everything you said is consistent with what Mr. Chapman and I

11   have said to each other privately in preparation for this,

12   which is we think there is great value in having an

13   independent assessment and separate outside counsel as we

14   present ourselves.

15          THE COURT:  I would agree.

16          MR. HAWLEY:  But we recognize there's a big blind spot

17   because we don't have the years of experience that all of

18   these lawyers have in prison litigation.  We have no

19   experience in that.  So everything Your Honor said about the

20   background to motions for leave to file under seal, rules set

21   forth about that or discussions about that or colloquies about

22   that we were not aware of that, and so when we described --

23   and, Your Honor, you obviously understand what we're saying

24   that mistaken assumption is a very poor exercise of judgment

25   you have described as fantastical, and I get that, but just so
```

1    further you understand on the day of the filing on January

2    27th; no excuse here, but they were operating under that

3    assumption and the Court had already granted a motion for the

4    parties to file a joint submission -- evidentiary submission,

5    so the Capell Howard lawyers and the Butler Snow

6    lawyers/respondents had created a voluminous proposed

7    submission.

8              THE COURT:  Uh-huh.

9              MR. HAWLEY:  And the brief that was then drafted at

10   that time ready to be filed on January 27th.  Let's say it's

11   noon on that day.  Submission is ready.  It's jointly

12   constructed by the Capell Howard lawyers and respondents.

13   Briefs had been drafted with citations to the pages in the

14   evidentiary submission, and so the lawyers, the respondents,

15   thought everything was ready to go in pristine form and then

16   they received Your Honor's order denying the motion to file

17   under seal about two o'clock.  This is in no way, of course,

18   trying to blame the Court for all of the things that then

19   happened, right?  You understand that.

20             THE COURT:  No, I did.  I just wanted you to

21   understand.

22             MR. HAWLEY:  And now I do.  And I'm not sure fully how

23   to incorporate that into what we are saying, but I'll try to.

24   But we do think that the efforts made beginning at two o'clock

25   after the order was received, Your Honor, bears some real

1   attention, and again, I say attention.  I don't have the

2   history of all the attention the Court has given these lawyers

3   and respondents in cases prior to, but they worked very hard

4   because the proposed submission jointly created by Capell

5   Howard and Butler Snow all of a sudden could not be filed as

6   it was created, so they had to take it apart in effect and

7   those areas that they thought were sensitive -- the Court

8   might agree about that or might not agree about that, but they

9   made a decision there were things that they justified for the

10  filing under seal they felt had to be removed; prisoner inmate

11  files, for example, and because it had been jointly put

12  together by the Capell lawyers and the Butler Snow lawyers

13  they divided up the previously joint submission and said

14  you -- you refile or create your individual submission; we'll

15  create our individual submission, so all of a sudden this

16  giant submission that had been in final form had to be taken

17  apart and recreated in separate forms.  And so that may have

18  been easier; it may have been harder, but making decisions

19  about what to include and what to remove under that analysis

20  of what's sensitive -- again, the parties and the judge may

21  disagree about that.  But they made decisions about things

22  that should be removed as sensitive then they were left with a

23  brief already prepared with citations to the giant joint

24  submission and all of those citations had to be reworked to

25  the new hastily-put-together submission.

1       And one decision which I think Your Honor is

2   addressing in the show-cause orders is because inmate files

3   had been removed from the actual submission.  I'm sorry;

4   removed from the previous joint submission into the final

5   product.  Inmate files had been removed, but all of the

6   citations in the brief that had cites to the inmate file they

7   had to find a place to find factual support for those cites.

8   Inmate filings gone, and so they made the decision the next

9   best thing is we have an expert who has reviewed the inmate

10  files and his factual background is consistent with the inmate

11  files, and so let's provide citations to the expert report in

12  some of the inmate files.  That's broad brush.  It's more

13  complicated than -- there were more citations than I'm

14  providing the Court with.

15      But we can't appreciate being a judge because we've

16  never been one.  Your Honor has been a lawyer in firms and

17  been under stressful situations, so I'm sure you can imagine

18  that even if it was a fantastical assumption, once they

19  received Your Honor's order then everything had to be broken

20  apart and put back together in another semblance, and the

21  filing deadline was that day, and so the briefs -- had to find

22  new citations, and the lawyers I think under the circumstance

23  were working reasonably to find citations and cite them to the

24  new evidentiary submission.  And in addition to that, the ECF

25  (sic) system went down and further delayed the filing of the

1    evidentiary submission and caused frustration.  Whether it

2    caused other circumstances that bear repeating here, Your

3    Honor, I don't know.

4            THE COURT:  Mr. Hawley, can I stop you just

5    anecdotally?

6            MR. HAWLEY:  Of course.

7            THE COURT:  Never mind.

8            MR. HAWLEY:  So in our review of what happened, we

9    came away with the conclusion, and we think it's supported by

10   the Eleventh Circuit case law as set forth in our response,

11   that there was no intention to mislead; there was no bad

12   faith; there was no vexatious conduct; there was no wanton

13   conduct; there were no disregard for facts.  It was a genuine

14   but frantic effort to find citations to support facts, and it

15   was -- it was messy and sloppy in its final result.

16           THE COURT:  Okay.

17           MR. HAWLEY:  And we believe that Mr. Cranford's

18   declaration explains -- well, let me back up on that.

19           So, Your Honor, in our effort we came in hopefully

20   with fresh eyes and independence to see how this all

21   happened -- what happened and how it happened, so we reviewed

22   Your Honor's orders; we reviewed the briefs, and I say we.  It

23   was not just Mr. Chapman and me.  There was a team of Butler

24   Snow lawyers who helped us with an independent review, not

25   Butler Snow lawyers' part of the prison litigation team but in

the home office in Ridgeland, Mississippi primarily.  So that

team reviewed the briefs and found many, many, many citation

errors.  So on one hand we're saying to Your Honor -- we're

disclosing there are many errors in a way consistent and maybe

even more so than Your Honor previously realized.  That caused

us then to say how did this happen, and so we had to then go

to the respondents, the prison team.  So we went outside of

our independent review team, in other words, to say help us

with this, and that's where Mr. Cranford was extremely helpful

in looking at all of the citations that we identified as

either -- either inaccurate or at least we couldn't understand

the factual basis for them either just like if the Court

reviewed them probably couldn't find the basis.  And he went

through pretty painstakingly.  And I think the declaration

shows that they are correctable citations, and we find his

declaration persuasive and persuasive to the point of saying

even the summary judgment briefs as filed and poorly cited do

have factual basis in the record.  They might not be cited

correctly in the record, but he can cite them correctly and

has explained many of them in his declaration.

        And, moreover, sort of separate or parallel to our

independent review because of this court's show-cause orders

the respondents' team of lawyers began looking at their own

briefs and trying to correct them, and I think the Cranford

declarations will further support that they are correctable,

1    and, Your Honor, we believe that if the court would permit an

2    amended summary judgment filing with better corrections --

3    because the initial filing obviously did not have much time,

4    we think that an amended filing with those corrected citations

5    would satisfy the Court, one, with a good brief going forward

6    for ultimate decision on summary judgment, but more

7    importantly for your show-cause order it would really show

8    that there's no bad faith; there's nothing contemptible here;

9    there's nothing sanctionable here.  Everything is -- instead

10   of being contemptible, it's correctable, and if the court

11   would allow that amended brief to be filed, we think the court

12   and all the parties would be satisfied that the show-cause

13   orders, while understandable, were also based on incomplete

14   information because Your Honor didn't have the portions that

15   they withdrew from the joint evidentiary submission, if that

16   makes sense.

17            THE COURT:  It does.

18            MR. HAWLEY:  Your Honor, we also would say with all

19   due respect the show-cause orders themselves generally stated

20   the court's concerns that -- we have concerns that the orders

21   themselves don't afford the respondents due process to respond

22   to them.  The court discussed or used the word

23   misrepresentations in the orders.

24            THE COURT:  Uh-huh.

25            MR. HAWLEY:  I don't think the court intended this,

1    but let me say this anyway.  To the extent the court has

2    already decided that there were misrepresentations --

3          THE COURT:  Oh, no.

4          MR. HAWLEY:  Okay.  Enough said.  But to the extent

5    it's an allegation of potential misrepresentations, then the

6    orders themselves lack specificity for us and them to really

7    understand exactly what in the briefs caused heartburn on the

8    court's behalf.

9          THE COURT:  Okay.

10         MR. HAWLEY:  I know it's hard to read the words and

11   say oh, I know where to go to look for that and figure out if

12   the court is right or wrong.

13         THE COURT:  Okay.

14         MR. HAWLEY:  And so it was that concern, Your Honor,

15   that led us -- I've already said this, so I'll just allude to

16   it -- to go to a very comprehensive, independent review by a

17   team of lawyers, especially Jerry Chapman and Butler Snow

18   lawyers in Mississippi, that found again perhaps more errors

19   than the court was even aware of.  All right.  So full

20   disclosure; there are a lot of errors, but we do think that

21   those errors had been corrected by Mr. Cranford's declaration

22   and could be further corrected by an amended summary judgment

23   filing.

24         THE COURT:  Okay.

25         MR. HAWLEY:  So, Your Honor, if it would help the

1    court, I can just briefly summarize parts of our argument.  I

2    think I've said enough about our concern about the orders, but

3    we think they don't comport with due process.

4          When it comes to our conclusion or our belief that

5    the -- that the briefs are faulty because of citation errors,

6    that can be corrected because we believe they are factually

7    correct.  They just don't cite good authority for the factual

8    assertion.

9          THE COURT:  Uh-huh.

10         MR. HAWLEY:  We could not find a lot of Eleventh

11   Circuit case law on that, so we thought the right place for

12   the court to start was the Eleventh Circuit's frivolity

13   analysis where the Gulisano court, 34 F.4th 935 at 942, says a

14   factual claim is frivolous when it has no reasonable factual

15   basis.  So we would say under that type of analysis from the

16   Eleventh Circuit there is a factual basis.  It was really

17   poorly cited, but the declaration from Mr. Cranford would show

18   that, one, he -- I think he persuasively corrects some of

19   those citations.  He certainly explains the reason for them

20   being incorrect and points the direction for correction, and I

21   think that gets you halfway there if not all the way there and

22   an amended filing and summary judgment would get you all the

23   way there.  But again, that same court in Gulisano says when

24   attorney's evidence is merely weak but supports a claim under

25   existing law after reasonable inquiry, sanctions are

1    unwarranted.  So again, we say it was weak, but the sanctions
2    are not warranted because there is a valid claim that can be
3    cited properly to existing law and existing facts in the case.
4           THE COURT:  Let me do this.  I think it might be more
5    helpful.  I could be wrong, but let's try it out, shall we?
6           MR. HAWLEY:  Okay.  Sure.
7           THE COURT:  With respect to the notice, I do want to
8    say much of what I referenced comes from plaintiffs'
9    responses.  In other words -- and I should also say this, sort
10   of -- forgive me if I'm going back and forth, but what seems
11   very clear to me is likely not clear to you.  Given my
12   experience, the parties were instructed that they had to
13   provide pin cites to every piece of evidence that they wished
14   for the court to consider, period.  In addition to the fact
15   that the rule does not require me to sift through their
16   record, I gave them notice that I wasn't going to; that they
17   were on their own.
18          MR. HAWLEY:  Yes.
19          THE COURT:  What you cite is what I'm looking at, so I
20   think that that's sort of an important piece of information
21   for you to consider.  I also want to say this.  So, for
22   example, when Mr. Cranford cited to the expert report, that
23   was all he wanted me to look at, okay; and interestingly, the
24   expert report cites to the information upon which that
25   statement is based.  So just as soon as he would have had to

1  have gone back to page 5 of the factual background to see

2  where the statement he needed support for was, he would have

3  seen the cite that was used to support that fact, but he chose

4  instead to cite to the expert report.  I noticed -- is

5  Mr. Myers here?

6        MR. HAWLEY:  He is.

7        THE COURT:  Mr. Myers, why don't we do this.  Do you

8  mind taking the stand because I have a couple of questions for

9  you.  I think this might be informative to you.  Thank you.

10        MR. HAWLEY:  Your Honor, to the extent that we might

11  have questions to follow up on, Your Honor, could I defer to

12  Mr. Cranford on that?  I've met Mr. Myers, but let's -- I'll

13  raise that when I need to.  Sorry.

14        THE COURT:  Would you mind taking a seat in the

15  witness stand, please.  Yes, please, sir.

16                        KEVIN MYERS,

17  being first duly sworn, was examined and testified as follows:

18        THE COURT:  Mr. Myers, good morning.  Thank you so

19  much for coming.  I want to first express my sincere

20  appreciation for the work that you have done over your

21  lifetime.

22        I mentioned sentencing.  It is not lost on me the

23  importance of your job and the risk that you put yourselves

24  in, and I really appreciate what you all do.  And I noted as

25  part of -- in your deposition and in part of your report, you

1  know, I found myself nodding like, yeah, I hear you, right,

2  because, you know, we seem to focus on the bad things that

3  happen, but that's not what happens every day, and I

4  appreciated your passion about that.

5       I have -- do we have a copy of his reports?  Would you

6  mind sharing them.  And, Mr. Hawley, if you'll approach the

7  clerk, she'll give you some as well.

8       MR. HAWLEY:  Thank you.

9                    DIRECT EXAMINATION

10  BY THE COURT:

11  Q.  Mr. Myers, I have some preliminary questions for you.

12  Did you prepare at all for this morning's --

13  A.  I did, Your Honor.

14  Q.  You did not?

15  A.  I did.

16  Q.  Okay.  What did you do to prepare for that?

17  A.  I reread the deposition that was taken in the case.

18  And I did not go through every detail of the reports, but I

19  did peruse all of the reports.

20  Q.  Okay.  Fair.  Perfect.  Okay.  I want to also give you

21  sort of -- I want to acknowledge something.  So when an expert

22  provides their opinion, it is unusual that an expert's report

23  that is submitted to the court will not have some sort of

24  input from an attorney and they may help prepare, like put it

25  all together and put in the boilerplate.  And so I don't want

1    you to be concerned about that here, but I do have specific

2    questions, please, about sort of the report itself.  We'll

3    hold off on opinions for a second, but let's just look at the

4    report itself.

5             It seems that it is 60 pages; is that correct?  That

6    includes the exhibits and your CV.

7        A.   The Guy one is, yes.

8        Q.   Okay.  And based on the declaration that I received

9    this morning, it appears that the documents that are

10   identified that you reviewed that that listing, that Exhibit

11   B, was not prepared by you.  Was that prepared -- is that a

12   fair statement?

13       A.   It was a rough draft by me and then I was assisting

14   with putting the rest of it together.

15       Q.   Okay.  And when you did the rough draft part, did you

16   list what you considered?

17       A.   I listed what I re -- yes, I listed what was

18   considered.

19       Q.   Okay.  Goodness, that's a lot.  Okay.  So 50 different

20   sets of information that you considered.  And then the date of

21   this report is December 20th, right, of 2024; is that correct,

22   if you look on page 55?

23       A.   That is correct.

24       Q.   And can you tell me -- your opinions in here, when did

25   you provide those to counsel?

1    A.   I actually drafted the complete report.

2    Q.   Oh, wow.

3    A.   Both of these reports I drafted.  I looked at the

4    documentation that I had and the material that was Bates

5    stamped in both cases, and, Your Honor, that is part of what I

6    really struggled with --

7    Q.   Okay.

8    A.   -- is because the Bates stamps for Guy and for Ezell

9    were very similar.  They had a lot of duplicating information,

10   and with hindsight and looking at it now, I realize that there

11   were things I looked at in performing and coming to my opinion

12   that was not listed in Exhibit B in both cases.  In fact, if

13   you look at the Guy case, there is an exhibit that was

14   referenced in Ezell, but it wasn't on the list and vice versa.

15   Q.   Okay.

16   A.   That's on me.  That is my error --

17   Q.   That's fair.

18   A.   -- of not going into detail and really checking and

19   double-checking the documentation.

20   Q.   Sure.

21   A.   So I went through all the material.  I looked at what

22   the plaintiff had said; what the defendants had said.  I

23   looked at the information of what the defendants have done

24   over the last five, ten, fifteen years to address a lot of the

25   concerns that the plaintiff had made.  I looked at the inmate

1    files to look at their classifications, their disciplinaries,

2    their movements all four of the individuals and then I came up

3    with my own opinion.  The document that you see for the most

4    part is the draft document that I personally prepared.

5        Q.  You are underpaid.

6        A.  Ma'am?

7        Q.  Nothing.  So okay.  Then are you the person that came

8    up with the -- let me give you an example.  Well, on page 49

9    there are -- by the letter D.  Are you there?

10       A.  I'm getting there.

11       Q.  Okay.  Let me know when you're there.

12       A.  Yes, I'm there.

13       Q.  Okay.  There is a summary in bold of what your opinion

14   is.  Is that a correct characterization?

15       A.  If my memory is correct, I actually took that bold

16   part out of the plaintiffs' complaint.

17       Q.  Okay.

18       A.  And so, if you will, Your Honor, let me look at it and

19   make sure.

20       Q.  Absolutely.  No, I'm not going to cut you off.  You

21   tell me.

22       A.  Yes, that is -- I stand corrected.  That is what my

23   overall opinion is.

24       Q.  Okay.  But did you write that opinion -- that summary

25   that's in D?

1    A.  I did.

2    Q.  And you did that all by yourself?  Nobody helped you

3  with that?

4    A.  I did write that.

5    Q.  Okay.  And what about E?

6    A.  Your Honor, I'm sorry.  E?

7    Q.  Yes.  That's on the same page.

8    A.  Okay.  Yes.

9    Q.  The summary that's next to the letter E.  Did you

10  write that all by yourself?

11    A.  I did.

12    Q.  Okay.  And how did you -- well, one minute.  Can the

13  same be said on page 40, the summary by the letter C?

14    A.  Yes, those are my words.

15    Q.  Okay.  And B as well on page 36?

16    A.  Yes, that is mine.

17    Q.  And also A on page 31?

18    A.  Yes, that is my opinion.

19    Q.  Okay.  And you -- and nobody edited that for you.  You

20  wrote that.  You were like this is my opinion in a nutshell?

21    A.  To the best of my memory, that is my exact words.

22    Q.  Okay.

23    A.  There could have been some minor edits.

24    Q.  Sure.

25    A.  But the material part of that was my opinion.

1    Q.  Okay.  Great.  Thank you.  And then let's go -- so

2    then we have -- I'm going backwards, which is never helpful.

3    Forgive me, please.  Let's start at the top.  Forgive me.

4         The sections that are identified on page 2 as

5    Introduction and Qualifications all of that was written by

6    you?

7    A.  Yes.

8    Q.  It was not edited?

9    A.  That's correct.

10   Q.  Okay.  And is that fair to say throughout page 5?  I

11   mean, everything in that section is written by you?

12   A.  Yes, Your Honor.

13   Q.  Including the Retention section on page -- in section

14   3 on page 5?

15   A.  Yes.

16   Q.  Okay.  And then the methodology that you employed was

17   written by you completely?

18   A.  To the best of my memory, yes.

19   Q.  Okay.  And what about the Factual Background?  That's

20   a pretty big one.  It goes for several pages.

21   A.  The Factual Background I wrote as a result of going

22   through the plaintiffs' records --

23   Q.  Sure.

24   A.  -- the defendants' records, the inmate files,

25   everything that was in the exhibits where you had witness

1    statements, and all of that combined allowed me to try to

2    piece together the best I could the factual background of what

3    had happened in that event.

4        Q.   Okay.  And then you cite to -- do you understand what

5    I mean by citing?

6        A.   Yes, ma'am.

7        Q.   Okay.  And you cite the documents that you reviewed.

8        A.   Yes.

9        Q.   Okay.  And to the best of your memory, this is

10   completely your work product?

11       A.   Yes.

12       Q.   All 24 pages?  Don't check me on the math.  It's

13   likely wrong.

14       A.   Yes.  And I will add I did send it to Mr. Cranford for

15   his review and he may have made small edits, but the meat of

16   the report is my report.

17       Q.   Okay.  Let me ask you this.  Did he provide you -- did

18   he send you the edits like in a redline document so you could

19   see what he was changing?

20       A.   Any suggestions he had would've been very observable,

21   so I can tell what I had written versus what he was

22   suggesting, yes.

23       Q.   How could you tell that?

24       A.   I don't remember whether it was marked through or -- I

25   don't actually remember how it was, but I do know that because

1    I've done three cases now with Mr. Cranford, I believe three.

2        Q.   Okay.

3        A.   And each time he is very careful to say what about

4    this, and he never changes my language.  It's up to me to

5    change my language in my report.

6        Q.   Okay.  I appreciate that.

7        A.   Is that responsive to your --

8        Q.   It is, yes.  Thank you so much.  Okay.  So you

9    explained -- you said that you reviewed your deposition.  At

10   your deposition, you said that your role was to provide your

11   opinion related to each one of the complaints that were made

12   as to whether you found them to be valid or whether they had

13   merit, whether there were mitigating or aggravating

14   circumstances and then give your opinion about those

15   complaints.

16       A.   Yes, Your Honor.

17       Q.   Okay.  And you did that by using the documents that

18   ADOC provided you.

19       A.   Yes, Your Honor.

20       Q.   So is it fair for me to say that you sort of took the

21   amended complaint and put that next to the -- and then put

22   that to one side after reviewing that and then you reviewed

23   what the ADOC defendants gave you and compared the two?

24       A.   That was partially it.  That's part of what I studied

25   was the amended complaint and the documents that were provided

1    by counsel, but I also did some online research of different

2    things related to the history of some of the individuals.

3        Q.   Sure.

4        A.   I did some online research to see what the

5    commissioner and his team had done to try to address the

6    longstanding challenges of the department.

7        Q.   Okay.

8        A.   So there -- there were a lot of different pieces

9    coming in from different areas that I was trying to

10    assimilate.

11        Q.   Okay.  And I note -- I'm not fussing -- you at your

12    deposition were very clear until the very end that the

13    documents that you considered were listed on Exhibit B and

14    then there was a little bit of an equivocation that that was

15    to the best of your recollection.

16        A.   Correct.

17        Q.   Okay.  Did you ever go back and look at your report

18    and compare it to Exhibit B?

19        A.   I have not done that.

20        Q.   Okay.  Would it surprise you if I said there are a lot

21    of citations to the record in your report that are not listed

22    in Exhibit B?

23        A.   That would surprise me.

24        Q.   Okay.  Let me ask you this.  Have you compared what

25    has been submitted as your expert report to the final draft

1    that you okayed?

2        A.   I'm not certain that I have a copy of what was

3    actually submitted.

4        Q.   Okay.

5        A.   I do know what I turned in.

6        Q.   Okay.

7        A.   I've learned from experiences.

8        Q.   Me too.

9        A.   This is something that experience has told me be

10   very -- if I do this any more in the future, be very careful

11   to make sure that your exhibits and your citations are

12   completely in alignment.  I can truthfully tell the court that

13   the opinions and the documentation that I provided are a

14   result of specific information that I did review that were

15   Bates stamped.

16        Did I get the Bates stamps wrong?  I could have

17   because, in all honesty, there were different documents that

18   had different Bates stamps that I was provided because -- I

19   don't know why.  I'm not a legal expert.  But it got very

20   confusing as I was trying to go from one case to another case

21   and that Bates stamp versus that Bates.  That's on me, and

22   I've learned that lesson.  If I do it again, I will make sure

23   that all the references line up as they should.

24        Q.   Okay.  So did you review your report before you took

25   your deposition?

1      A.   Yes.

2      Q.   Okay.

3      A.   Both reports.

4      Q.   And I'm sorry to go back over this.  When you -- as

5    you see this report today, although I appreciate that you have

6    not read it carefully, it does seem to be in the same

7    format -- I mean, it seems to be -- it appears to be the same

8    document that you provided to counsel.

9      A.   The two reports I have in front of me do appear to be

10   what I submitted to counsel.

11     Q.   As the final report?

12     A.   As the final report.

13     Q.   Okay.  I want to bring your attention to page 8 of

14   your report.

15     A.   I'm there.

16     Q.   Okay.  On page 8 of your report, you begin citing ADOC

17   pages 8963; you cite 8964, 8965.  Do you see those cites?

18     A.   I do.

19     Q.   Okay.  Those cites are not included on Exhibit B, and

20   I will give you that mistakes happen.  We are human.  And

21   maybe it was a document that you considered but didn't include

22   on Exhibit B.  I'm concerned that you actually did not review

23   that document, though.

24     A.   I can actually, Your Honor, tell you that the 8963

25   document was actually statements taken from -- written by

1    Senior Agent Casey in that report, and my recollection is 8965

2    was an actual statement documented by Lieutenant Gordy related

3    to the PREA complaint, the PREA phone call that came in that

4    morning.

5    Q.  Okay.  And you remember reviewing that?

6    A.  I do.

7    Q.  Okay.  So just a second.  Do you see, beginning at the

8    second paragraph, that you cite to page 864 (sic) as Mullins

9    reported that another inmate had assaulted him?

10    A.  In the third paragraph?

11    Q.  Yes.

12    A.  Okay.  I'm sorry.  Yes.

13    Q.  And then you say that he failed to identify the inmate

14    and requested a cell for himself.

15    A.  Yes, Judge.

16    Q.  On page --

17    THE COURT:  Do we have a copy of it?  Thank you.

18    Would you mind showing him.

19    LAW CLERK:  On page 8964?

20    THE COURT:  Yes.  Will you give him a copy of that.

21    And do you have copies for counsel?

22    LAW CLERK:  I do.

23    Q.  (THE COURT:)  Okay.  Let's look at 8964.  On the

24    paragraph that begins, then on Monday, February 25th --

25    A.  Yes.

1    Q.  -- that mimics what you -- that is consistent with

2    what you report in your statement on February 25th at

3    approximately --

4    A.  Correct.

5    Q.  -- 6 a.m.  The last sentence in that paragraph says,

6    Officer Tucker escorted Mullins to the infirmary for a medical

7    assessment.

8    A.  Yes.

9    Q.  You don't include that in your factual background; is

10   that correct?

11   A.  Correct.  Correct.

12   Q.  Okay.  And then if you look at 8964, it says that

13   during that medical assessment staff noted bruising and

14   Mullins told the nurse that the person that did -- well, let

15   me quote; Inmate Mullins told the attending nurse that his

16   assailant was his cellmate but did not give the name.

17   A.  Correct.

18   Q.  You didn't include that in your report, did you?

19   A.  I did not.  That's correct.

20   Q.  And in your deposition, you said that he never used

21   the word cellmate; he only used the word inmate.  I think --

22   and, I mean, let me say this.  I have no desire to ever read

23   an opinion that I write, not because I didn't do my very,

24   very, very best, but even a stray comma or a fact that is

25   accurate but poorly stated makes me want to call the attorneys

1    and fall on my sword.  And I know that that's probably very

2    much how you feel, and I'm so sorry for that, but I just want

3    to make sure that I'm on the same page with you.  Does that

4    seem fair?

5        A.   It does.  And, if I might, when I talked earlier about

6    factual background and how I came up with that --

7        Q.   Yeah.

8        A.   -- this is exactly how I did that.  I went to

9    different pieces of different reports, and this 8963 through

10   8968 was part of that factual background because this is

11   the -- as I understand it, the charges against the individual

12   for capital murder, so I did not include what you were talking

13   about just now where -- let's see if I can get back to it --

14   he went to the infirmary and said that it was his cellmate.  I

15   did not include that.  I'm not sure why not.  I can say that

16   at that point in time it was not known that Clarence Jackson

17   was his cellmate because someone else was supposed to be his

18   cellmate.

19       Q.   I understand that part.

20       A.   Okay.

21       Q.   I understand that he was in the wrong cell.

22       A.   Yeah.

23       Q.   But I want to pull up -- okay.  At your deposition,

24   which is at Document 351, and on page 30 of that deposition

25   you were asked, Why is it significant to you that Steven

1    Mullins did not -- did not confirm that the cellmate that he

2    was in fear of was Clarence Jackson until after he was fatally

3    assaulted, and your answer was, Okay.  You said cellmate.  To

4    my knowledge, Mullins never said cellmate, okay?

5        A.   Correct.

6        Q.   But if you reviewed this document, you would have

7    known that he did identify him as his cellmate and then he

8    mentioned that it was his cellmate, CJ.

9        A.   CJ.  And, if I might, that deposition was seven

10   hours-plus long and there were parts that I could not recall

11   every detail as questions were asked and I also felt like,

12   whether it's fair or not, the attorney would go from the Guy

13   case to the Ezell case, back to the Guy case and there were

14   several times when I was confused.

15       Q.   Okay.  And I get that.  As you might've heard when we

16   first came in, I said hey, listen, I might call Ms. Wills

17   Ms. Guy, and I hope that she does not get offended by that.

18       A.   Right.

19       Q.   And routinely in my chambers I will say something and

20   my colleagues will go, huh-uh, that's Ezell, you know, when

21   I'm talking about Guy.  I do appreciate this.  In here,

22   though, we are talking specifically in that part of your

23   deposition which occurred very early on.

24       A.   Okay.

25       Q.   They're only talking about the Guy case and you're

1    adamant that they did not use the word cellmate.  They used --

2    he only knew it was an inmate named CJ.  And you're also

3    adamant that he never identified the prisoner beyond CJ, okay;

4    do you disagree, in your deposition?

5        A.   Initially, I had stated, if my memory is right, that I

6    said he never identified CJ until after the event occurred and

7    he was en route to the infirmary after having been stabbed.

8    It is the case that my memory was refreshed during

9    cross-examination that it was the afternoon/evening before the

10   event where he did tell Lieutenant -- I think Morty may be her

11   name.

12       Q.   Gordy.  Correct.  Yes.

13       A.   I think that's right.  He did tell her that it was

14   Clarence Jackson the evening before.

15       Q.   Okay.

16       A.   So that part of my deposition was incorrect.

17       Q.   Your report was consistent with your initial

18   testimony; is that fair?

19       A.   I believe that's fair, yes.

20       Q.   Okay.  So your report, sitting here today, is

21   inaccurate to the extent that they knew the night before

22   Mr. -- see, watch it -- Mr. Mullins was stabbed that Clarence

23   Jackson was the aggressor who caused him to be afraid and had

24   caused him to --

25            THE COURT:  I'm sorry.  That's distracting to me.

1      MR. LUNSFORD:  My apologies.

2      THE COURT:  Thank you.

3      Q.  (THE COURT:)  So would you agree, sitting here

4  today -- let me ask you this differently.  Would you agree,

5  sitting here with me today, that Mr. Mullins identified to the

6  nurse the morning of February 25th that the person who

7  attacked him and punched him in the head and stabbed -- he

8  wasn't stabbed at that point, was he?

9      A.  No.

10     Q.  Okay.  That he said to the nurse it was his cellmate?

11     A.  I'm not sure that was on the 25th, but I will agree

12  that he did tell a nurse in the infirmary that it was his

13  cellmate.

14     Q.  Okay.  I promise you it was the 25th.

15     A.  Okay.

16     Q.  And then he went back.  He was told to go back for his

17  bed count, okay?

18     A.  Correct.

19     Q.  And then he called the PREA hotline, and when he calls

20  them, he includes that he was supposed to -- that Warden

21  Givens told him he was supposed to go back to the block so

22  they could do a recount and he felt that his life was in

23  danger, so he was at the gym and had nowhere to sleep; his

24  property was in the breezeway by the shift office and he had

25  asked to be placed in segregation.

1      A.   I agree with that.

2      Q.   Okay.  And then when Ms. Gordy received this

3  information at 3:30 that afternoon, he said to her it's my

4  cellmate and she pulled up who was supposed to be in that

5  cell, and believe it or not, it was Clarence Jackson, and I

6  say believe it or not because according to this document that

7  you cited in your report it says, as a result of

8  determining -- nope, that's one of the -- because of the

9  nature of the prison population's residents and the frequency

10  by which inmates relocate to various cells without

11  authorization they were unable to identify Mullins' assailant

12  that morning, but by that afternoon Ms. Gordy looks it up and

13  she says, oh my goodness, the person that's in that -- that's

14  assigned to that cell is CJ, Clarence Jackson.

15      A.   That's not my recollection.

16      Q.   Okay.  Tell me what's wrong.

17      A.   And I thought I had it in my report where when

18  Lieutenant Gordy investigated the phone call made to the PREA

19  line that Mullins at that point told her Clarence Jackson did

20  it.  I don't recall -- and I may be incorrect, but I don't

21  recall Gordy saying that Mullins told her it was his cellmate

22  and she pulled it up.  My recollection was that Mullins told

23  her it was Clarence Jackson that did it.

24      Q.   Okay.  And that might be consistent with the

25  information you had, and I appreciate that distinction.  But

1    you would agree -- and I'm sorry.  I included that as part of

2    like just making it -- I was attempting to make it clear in my

3    mind what you understood.  But you understood that at least by

4    four o'clock they knew who the aggressor was.

5        A.   Lieutenant Gordy knew who the aggressor was.  Whether

6    the lieutenant shared that with anyone else, and I would have

7    to look back at it, at some point Mullins was moved from one

8    dorm to another to get him completely away.  And I apologize.

9    I don't recall whether that was before the Gordy call or after

10   the Gordy call.  I think it was before.  I think he had

11   already been moved.

12       Q.   There is evidence that suggests that he was moved that

13   morning to a different cell.  Is it fair for me to assume that

14   you're talking about when he was moved after he identified

15   Clarence Jackson to the L-Dorm?  Another dorm?  Does that help

16   you with the distinction that you're trying to make?

17       A.   Yeah, but I'm not sure whether it was after he was

18   identified as Jackson or before that, but at any -- any rate,

19   he was moved from Q-Dorm to another dorm.  So if the

20   perpetrator was Jackson and the lieutenant knew it, then he

21   had already been separated from that perpetrator, or alleged

22   perpetrator.

23       Q.   Okay.  So to the extent that your report and your

24   deposition says we didn't know who he was and therefore what

25   they did -- how they responded to this incident was

1    appropriate, that would be wrong?

2        A.   Will you say that again?  I'm sorry.  I didn't hear

3    you.

4        Q.   Sure.  I think that was very poorly said.  Well, let

5    me -- one quick question.  Hold on a second.  Let me just read

6    one more thing to make sure I'm -- well, actually, on page 19

7    you go into a little bit more detail and you say, Mullins

8    reports to Tucker that he was assaulted.  He requests to

9    receive a placement in a cell by himself, so Ragsdale moves

10   him within that dorm.

11       A.   Correct.

12       Q.   Tucker then takes him to the infirmary.

13       A.   What paragraph is that in, please?

14       Q.   It's the first full paragraph beginning with

15   "According to."

16       A.   What page?

17       Q.   Nineteen.  The CM/ECF number is 19, your Myers --

18       A.   Okay.  I'm sorry.

19       Q.   I'm sorry.

20       A.   Thank you.  Okay.  I'm following now.

21       Q.   Okay.  And then you say, Gordy receives notice of the

22   PREA hotline call several hours before and she identifies

23   assailant as Jackson.

24       A.   Correct.

25       Q.   And then she sent him back to the infirmary and then

1   he was transferred to the L-Dorm.  Do you see that?

2   A.  Yes.  I'm trying to track through.

3   Q.  Please.  No.  Yeah.

4   A.  So he got moved to P-36 at 8:53 that A.M.

5   Q.  Uh-huh.

6   A.  Then we have the incident with the count when he

7   wanted to be moved again.  He made the PREA call.  Lieutenant

8   Gordy responded to -- it's Gordy or Price.  Gordy.

9   Q.  That's --

10  A.  Gordy responded to appropriately the phone call and

11  interviewed him again, and after that interview Lieutenant

12  Gordy had him moved from P-36 to L-28.  It is true that part

13  of that Gordy also had him taken to the infirmary.  That is

14  normal protocol when you have a PREA allegation.

15  Q.  Sure.

16  A.  You'll have them checked by medical then he went back

17  to L-Pod.  So in my -- part of my opinion was that Lieutenant

18  Gordy investigated that and decided the best action at that

19  point was to move him out of that dorm where Clarence Jackson

20  lived into another dorm where Clarence Jackson did not live.

21  Q.  Okay, okay.  Staying on the issue of what is -- that

22  what you cite of the document or what you elect to include in

23  your background facts --

24  A.  Correct.

25  Q.  -- that are contained from the I&I report which are

1    contained in the documents with the Bates label ADOC 8964

2    through 66 --

3        A.   Which is the capital murder charge.

4        Q.   Is that what it is?

5        A.   Yes, ma'am.

6        Q.   I didn't get complete --

7        A.   If it will help, it's Exhibit D hyphen P.

8        Q.   Thank you.  And the ADOC Bates labels are 8963 to

9    8968.

10       A.   Yes.  Correct.

11       Q.   So you did not report in your background that Mullins

12   identified his cellmate as the aggressor to the nurse.

13       A.   That was not a part of the factual background,

14   correct.

15       Q.   Okay.  And then that he identified the aggressor in

16   his PREA call as being his cellmate, CJ, and you don't

17   identify that the warden said go back to your cell.

18       A.   Correct.  That is not in the factual background.  It

19   is in the body of the report.

20       Q.   Okay.  And then you don't report that he did not feel

21   safe in his dorm and requested segregation.

22       A.   Not in the factual background, I did not report that.

23       Q.   Okay.

24       A.   I think it's in the body of the report.

25       Q.   Okay.  In your opinion on page 32, you say in the

1    third paragraph that at the time of Mr. Mullins's death

2    following his allegation ADOC moved Mullins to L-Dorm, an

3    entirely separate housing unit across the population yard from

4    the Q-Dorm.  St. Clair staff appropriately separated Mullins

5    from the environment where he alleged CJ assaulted him.  In my

6    opinion, without the ability to properly identify the alleged

7    abuser at the time, St. Clair properly moved Mullins to the

8    L-Dorm.  You say, As previously --

9        A.   Excuse me.  Is that on page 32?

10       Q.   It's on Myers 32.

11       A.   Okay.

12       Q.   It's on Document page 33.

13       A.   I'm with you.  Okay.

14       Q.   Okay.  So again --

15       A.   I'm still not following -- following everything that

16   you've cited.  And that's the third full paragraph?

17       Q.   Yes.  It begins with -- hold on just one second.

18       A.   At the time of his death?

19       Q.   Yes.  If you go --

20       A.   In my opinion.  Okay.  I'm tracking with you now.

21       Q.   And if you read that sentence, it says that because

22   they could not identify the assailant beyond CJ --

23       A.   Correct.

24       Q.   -- it was proper that they -- excuse me; it was proper

25   for them to move Mullins to another dorm.

1      A.   Correct.

2      Q.   And then you said he never requested placement in RHU,

3   which I think in your deposition you say -- you use

4   segregation and RHU interchangeably.

5      A.   Correct.  And in my deposition, I said to the best of

6   my memory.  And, if I might, it was my opinion then when I

7   wrote the report and it's my opinion now that even if they had

8   known CJ was Clarence Jackson the steps that they took to move

9   him to a separate dorm would have been a plausible, realistic

10   movement to make, and one of the reasons I say that, if I can

11   go ahead and expound on it --

12      Q.   Sure.

13      A.   -- is in corrections, especially in the last ten to

14   fifteen years, we are trying to minimize long-term impact of

15   segregation on individuals.  Mr. Mullins -- let me make sure I

16   get the right one.  Mr. Mullins had repeatedly been in and out

17   of that environment.  That is not safe for the mental

18   condition of any person, myself included.  Don't want to be

19   there.  So --

20      Q.   Right.  I mean, he didn't -- I mean, to be fair to

21   you, he didn't want to be there.

22      A.   No.

23      Q.   That's right.  He asked --

24      A.   He, in fact, asked to be out several times; signed

25   waivers for whatever that's worth.

1    Q.   Indeed.

2    A.   But given at that point in time with the information

3    that the staff had, I believe the choice to move him to that

4    dorm was a reasonable choice.

5    Q.   Okay.  So even though he said, knowing full well the

6    implications it would have on his mental health, please put me

7    back there; I'm afraid for my life, it was reasonable for them

8    to ignore that?

9    A.   I don't -- I'm not going to say they ignored it.  I

10   can't speak for them.  I can say they took that into

11   consideration.  They also had to take into consideration who

12   was currently assigned in those segregation RHU cells, and my

13   experience is if I'm going to kick Kevin Myers out of an RHU

14   cell, I've got to put -- or if I'm going to put Myers in,

15   someone has got to come out.  So what is the worst-case

16   scenario?  What's the best-case scenario?  And oftentimes

17   those people on the scene at that time have to try to judge

18   what's the best option we have here.

19   Q.   Right.  But we don't know for sure whether it was

20   full.

21   A.   No, we don't.

22   Q.   I mean, I'm just -- okay.  So do you -- would you

23   consider your statement -- I'm not asking you whether you

24   would -- I'm asking you in isolation.  Is your statement that,

25   quote, in my opinion, without the ability to properly identify

1    the alleged abuser at the time, St. Clair staff properly moved

2    Mullins to L-Dorm; is it your position today -- knowing

3    everything we've gone over, would you consider that statement

4    factually sound?

5        A.   I would not.  I would rewrite that statement if I had

6    it to rewrite today.

7        Q.   Sure.  Got it.  Understand it.  I won't -- can I ask

8    you.  You mentioned you don't remember -- well, I don't want

9    to mischaracterize your statement.  I asked you why you didn't

10   include some of these facts in your background report.

11       A.   Correct.

12       Q.   To be sure, I was mistaken.  In fact, you do include

13   them in another portion.  For example, you talked about Givens

14   sending him back to the cell after he complained and you

15   discussed later on in your report that he identified the

16   assailant as CJ, but is there a -- what was your reason for

17   not including that initially in the fact background?

18       A.   I would believe that my thinking was make the factual

19   background a condensed version of what happened and then the

20   rest of the report I would add other facts in it, but I don't

21   believe that I ever intended the factual background to be the

22   facts in -- all of the facts included in that section.

23   Otherwise, that report may have been 120 pages instead of 60

24   pages.

25       Q.   That's fair.  That's very fair.  What about the fact

1    that the author of the report says that prisoners move cells

2    without authorization all the time or --

3        A.   And I wrote that.

4        Q.   -- frequently?

5        A.   I wrote that.

6        Q.   That's in your report?

7        A.   I believe so.

8        Q.   Okay.  Have you reviewed this report -- well, I think

9    you've already testified that you have not reviewed this

10   report to determine whether you still believe that the

11   information contained in it is factually sound.

12       A.   I have not reviewed the report since the order came

13   down.  I do believe that it's factually sound.  I do know that

14   I was not as diligent as I should have been in including all

15   of the exhibits in Exhibit B that I should have, and I

16   apologize for that.

17       Q.   Oh, no.

18       A.   But as to the meat of the report itself, I believe,

19   with the exception of what we agreed to or what I agreed to,

20   there are parts of the report that should be reworded related

21   to the identification of Clarence Jackson.

22       Q.   And you've said specifically that you do not believe

23   that your opinion -- hold on a second; that St. Clair staff

24   properly moved Mullins is factually sound.  In other words,

25   you acknowledge that the facts upon which you based your

1    opinion are not factually sound today.

2        A.   May I ask you to ask that again?

3        Q.   Well, sure.  When I asked you a couple minutes ago, I

4    said would you -- let me pull it up exactly.

5        A.   Okay.  Thank you.

6        Q.   Yeah, of course.  I asked you in your opinion --

7    whether in your opinion without the ability to properly

8    identify -- I read that statement and I said is that factually

9    sound, and you said you would not say that it was factually

10   sound.

11       A.   Correct.

12       Q.   Okay.  All right.  Thank you.  And you are certain

13   that before you wrote your report you reviewed that document?

14       A.   Yes.

15       Q.   Okay.

16            THE COURT:  Do you have any questions?

17            MR. HAWLEY:  Your Honor, I don't.  I don't know if any

18   of my respondent clients who have worked with Mr. Myers

19   extensively might have a question.

20            THE COURT:  About anything that would be appropriate

21   based on what I asked as long as it's within the scope of what

22   I asked.

23            MR. LUNSFORD:  Your Honor, I just want to make sure

24   we're clear on the timeline, if I could.

25            THE COURT:  Sure.

```
 1                        CROSS-EXAMINATION
 2    BY MR. LUNSFORD:
 3       Q.   Mr. Myers, you were handed the investigative report,
 4    and I want to go back to this.  The Court asked you about the
 5    statement to the nurse, and I want to go through the timeline
 6    here.  So how many times was Mr. Mullins moved on
 7    February 25th?
 8       A.   On the 25th?
 9       Q.   Yes, sir.
10       A.   My memory is that he was moved from one side of the
11    dorm to another side of the dorm and then later in that day he
12    was moved to a completely different dorm, so twice is what my
13    memory recalls.
14       Q.   And when was the first occasion?  If I might --
15       A.   The first occasion is on page 18 or page 19, page 18
16    in my report, and it says 6:01 a.m.
17       Q.   Okay.
18       A.   I say 601 hours.
19       Q.   Do you also have a copy of the Exhibit D-P with you?
20       A.   I do.
21       Q.   If you would look at that document.
22            THE COURT:  What is that document, please?
23            MR. LUNSFORD:  It is Document number 160-18.
24            THE COURT:  Just a minute, please, so I can pull that
25    up.  Okay.
```

1    Q.   (MR. LUNSFORD:)   Okay.  So if we look at the bottom of

2    the second page of that text document -- I guess it would

3    technically be the third page of the document -- the Court

4    asked you earlier about Mr. Mullins informing the attending

5    nurse that his assailant was his cellmate.  My question is,

6    Mr. Myers, in your investigation, did you identify any

7    information as to whether the nurse reported that information

8    prior to this investigation?

9    A.   I'm going to ask you to ask that again, please.  I'm

10   sorry.

11   Q.   Sure.  So this report that's marked Exhibit D-P,

12   Document number 160-18 --

13   A.   Correct.

14   Q.   -- was it created before or after the incident where

15   Mr. Mullins was stabbed by Mr. Jackson?

16   A.   It's my understanding this was created after the

17   incident because this document is actually the capital murder

18   charges.

19   Q.   Okay.  My question, though, Mr. Myers, is in your

20   investigation did you obtain any information as to whether the

21   attending nurse told anyone prior to this investigation that

22   Mr. Mullins had reported that his assailant, quote, was his

23   cellmate?

24   A.   I do not recall seeing that anywhere else.

25   Q.   Okay.  Do you know if prior to the PREA complaint

1    Lieutenant Gordy ever spoke to this nurse?

2        A.   To my knowledge, she did not.

3        Q.   But then in the next sentence in the investigation

4    report which the Court pointed out because of the fluid nature

5    of, and it's difficult to read, circumstances, it goes on to

6    say, SA Casey was unable to identify Inmate Mullins' assailant

7    during this incident.  Do you know when SA Casey attempted to

8    identify Inmate Mullins?

9            THE COURT:  I think that that is a typographical error

10   and he meant was unable to identify Inmate Jackson.

11           MR. LUNSFORD:  Oh, Inmate Mullins' assailant.  Excuse

12   me.  I cut it short.

13           THE COURT:  Oh, okay.  Yeah.  And I've already -- I've

14   consistently misread that to mean --

15           MR. LUNSFORD:  Sorry.

16           THE COURT:  No.  It's my fault.  I'm saying I did the

17   same thing.

18       Q.  (MR. LUNSFORD:)  Okay.  And my question is, do you

19   know when SA Casey attempted to identify Inmate Mullins'

20   assailant?

21       A.   I do not know that.

22       Q.   Okay.  So just so we're clear on the timeline, was

23   Inmate Mullins moved to P-Dorm, Cell P-36, before or after

24   this medical assessment?

25       A.   From reading the report, it appears that he was moved

1    before the assessment.

2        Q.   Okay.

3        A.   I can speculate that normally if you're moving from

4    one spot to another you go by the infirmary on the way and get

5    checked out and then you're moved to it, but that's only

6    speculation on my part.

7            THE COURT:  Mr. Lunsford, can I please do you a favor?

8            MR. LUNSFORD:  Yes, ma'am.

9            THE COURT:  Thank you.

10           MR. LUNSFORD:  Sorry.

11           THE COURT:  No.  I'm really going to do you a favor.

12   As you can imagine, we have carefully reviewed the record in

13   this case.  There is an open question about when, if ever,

14   Mr. Mullins knew that he was reassigned.

15           MR. LUNSFORD:  Right.  I'm trying to get to --

16           THE COURT:  Okay.  Hold on a second.  It does not

17   appear that you all provided him the document -- the nurse

18   infirmary sheet to review from 6:00 that morning.  It says

19   that he was in the infirmary at 6:30.  It says that he

20   identified his cellmate as the assailant.  We do not have from

21   you all a complete copy of the incident reports and duty

22   officer reports in this case relating to these events.  Some

23   of them are attached to other pieces of evidence without

24   any -- I mean, they're just like give me the classification

25   documents and one of Mr. Ragsdale's incident reports.  Indeed,

1    it is that one -- hold on a second.  I believe so.  Just a

2    second.  It is that one which you can find at 160-55 where

3    Mr. Ragsdale -- this is me helping you out -- editorializes

4    the nurse's evaluation and says that the wound was not fresh.

5          MR. LUNSFORD:  I believe I've seen that fact appear.

6          THE COURT:  Yeah.  So there is no -- I think that

7    there is a bed assignment or a cell transfer listed on some

8    bed report, but the time at which it occurred -- well, I think

9    it's around 9:53 in the morning that Ragsdale entered in the

10   different cell number, but the PREA report suggests that that

11   was never told to Mr. Mullins because as you'll recall from

12   that recording, he asked to be placed in segregation.  He says

13   he's scared for his life; he's hiding in the gym and all of

14   his belongings are still at the shift office.  I'll just leave

15   that right there.

16         MR. LUNSFORD:  I'm actually --

17         THE COURT:  If you want to continue asking him, you

18   can --

19         MR. LUNSFORD:  I'm focusing on one other moment and

20   I'll ask a few questions.

21         THE COURT:  Okay.

22   Q.   (MR. LUNSFORD:)  Let's -- let's go to the next

23   movement by Lieutenant Gordy.  My question -- I'm going to try

24   to cut to the chase here with hopefully with just one or two

25   questions.

1      Did you see any evidence in your review that

2  Lieutenant Gordy knew the name of Mr. Mullins' assailant at

3  the time he transferred Mr. Mullins into L-Dorm?

4      A.   I may be recalling wrong, but I thought Lieutenant

5  Gordy was responding to the PREA call and it was at that time

6  when Lieutenant Gordy interviewed Mullins and Mullins said it

7  was Clarence Jackson, and at that time Gordy moved him to

8  L-Dorm.

9      Q.   Okay.

10     A.   My time may be off, but that's --

11     Q.   Well, double-check your report on that, if you would,

12  just to make sure.

13          THE COURT:   I think that's page 19.

14     A.   Yes.   Page 18 or page 19 of the document, page 18 of

15  my report, it says, Lieutenant received notification of PREA

16  hotline call.   In her report, she identified Mullins'

17  assailant, CJ, as Jackson and then it's got the Bates number

18  out there, which is 8965.   After reviewing the incident,

19  Lieutenant Gordy escorted Mullins to St. Clair's infirmary for

20  a brief medical assessment and noted that Captain White would

21  investigate Mullins's claim of sexual harassment against CJ.

22  Mullins then received another transfer from P-36 to L-28 at

23  approximately 17:25, and that's got another Bates reference,

24  000615.   Which if my memory is right, that's actually a bed

25  assignment document.

1      MR. LUNSFORD:  That's all we have, Your Honor.  Thank

2  you.

3      THE COURT:  Let me make sure that I don't have

4  anything from the Ezell report.

5      Okay.  I think that all I have for you.  I want to

6  tell you I really -- it pains me to do this because I know

7  it's so hard when you write something, but I appreciate you.

8  Do you have to leave here?

9      THE WITNESS:  I'm fine.  I can hang around if the

10  Court would appreciate that.

11      THE COURT:  Okay.  Thank you.  You can step down now.

12      THE WITNESS:  Thank you.

13          (The witness was excused from the stand.)

14      THE COURT:  Mr. Hawley, did you have anything you

15  wanted to say at this point?

16      MR. HAWLEY:  Your Honor, I have a few more things I

17  would like to say consistent with our pleading filed this

18  morning.  One thing I would like to say in addition after

19  thinking about your background of facts that were very helpful

20  to us and the background of facts that we did not know and

21  your description of the assumption that the motion for leave

22  to file would be granted as fantastical.

23      I'm not sure I can address under Rule 11 sanctioned

24  behavior -- potential sanctioned behavior that assumption, but

25  I still maintain that the actions taken by Cranford and others

1    after they received the decision not to allow a filing under

2    seal were reasonable, though frantic at the last minute.  The

3    end result was chock-full of mistakes which we have uncovered,

4    but after those had been uncovered we think they have been

5    adequately explained by Mr. Cranford sufficiently to get

6    outside the realm of sanctions and sufficiently to invite the

7    court to allow an amended summary judgment pleading which

8    would further cite factually to the underlying record.

9         THE COURT:  Okay.  Hold on because I'm not done.

10   There are other issues besides cites.  Given the

11   fact-extensive inquiry, the court instructed the clerks to

12   create a spreadsheet.  It contains the fact -- the formula is

13   the fact, the evidence that was cited in support of that fact,

14   whether the fact is supported by that evidence, whether it is

15   disputed and the evidence cited for that dispute.  The next

16   column asks whether that dispute is supported and then

17   summarizes the dispute for me.

18        In the case of Mr. Mullins in the Guy case and notably

19   in response to having it pointed out by the plaintiffs that,

20   number one, you cannot cite to an expert's report; but, number

21   two, the statement contained in the undisputed fact was not

22   correct, defendants replied either -- well, specific to a

23   certain number of disputes which are identified as facts,

24   defendants' facts 18, 19, 20; in 19 and 20 they cite only to

25   the expert's report.  Again, when going to the expert's report

1  to find that information, they could have seen the appropriate

2  cite or they would -- the appropriate cite would have been

3  available to them and they knew I'm only considering what you

4  cite, and a summary admittedly incomplete of the facts, which

5  is where they cited.  They didn't cite to the bulk.  They go

6  to the factual background.  They cite that and then when it's

7  called out to them that, A, hey, just so you know, you can't

8  cite to an expert's report and also the statement of fact

9  mischaracterizes the evidence with respect to 19 and 20, the

10 reply from the defendants was well, this fact is immaterial.

11 Well, you're the one that identified it as a material fact and

12 then says for the sake of space -- this is their reply; for

13 the sake of space, we're only going to address a sample of

14 disputes.

15         Statement of fact 19 reads, on January 6th, 2003,

16 Mullins assaulted another inmate at Donaldson for stealing

17 sandwiches from the kitchen.  There is no part in Mr. Myers'

18 expert report that states that.  In fact, what happened -- and

19 I don't know whether they used AI, and I was intentional about

20 not raising that in my order.  So to the extent that there's a

21 notice problem, I'll say to you now you're welcome.  What they

22 did is they took -- it appears as though -- it appears that

23 this was a computer-generated summary of three different

24 incidents because the date's wrong.  There is a date in which

25 there's a problem and there are sandwiches which are a

1    problem, but they do not go together.

2          There is -- in fact 20, it says, on January 20th,

3    Mullins stabbed an inmate multiple times because the inmate

4    owed Mullins a debt.  The actual evidence of that incident

5    says that the hearing officer found that both prisoners

6    suffered stab wounds and the principal aggressor could not be

7    determined.  This is relevant to the purpose of whether he was

8    appropriately classified as being aggressive or violent.  Then

9    there is -- hold on a minute.  I'll just hit the high notes.

10   Oh, this is one of my favorites.

11         Statement of fact 100.  St. Clair implemented a

12   color-coded wristband system to assist security staff in

13   identifying inmate housing assignments and improve inmate

14   movement control.  However, St. Clair faced difficulties as

15   inmates frequently removed and damaged their wristbands.  I

16   think we've heard evidence today of the problem with people

17   moving around like they're not supposed to, and I would be

18   incredibly offended if Mr. Lunsford stood up and said that

19   there was not a problem with wristbands based on the testimony

20   that he has provided in other cases.  But the next fact reads,

21   During a September of 2018 audit of wristband compliance at

22   St. Clair, there were only 19 of 888 inmates housed at

23   St. Clair that lacked wristbands.  Moreover, the auditors

24   noted that the correctional staff secured and controlled all

25   doors, and, in total, only 2.3 percent of the inmate

1    population failed to comply with the wristband policy and

2    those inmates received disciplinary action.  I will not ask

3    Mr. Lunsford if he believes that that statement can be

4    generally applied throughout the relevant period of time.

5          106.  And these are kind of -- this one would seem

6    like, well, we're -- there is a fine line between advocacy and

7    misleading or misrepresenting the court.  This says ADOC and

8    St. Clair's classification system complies with nationally

9    accepted standards.  It cites to another expert report.  That

10    expert did not consider the classification standards for the

11    prison as a whole, and I think the only way that you could say

12    that that statement was accurate is if you replace the word

13    system with procedures.  In other words, there is evidence

14    that ADOC and St. Clair's classification procedures comply

15    with nationally accepted standards, but it is very disputed

16    whether they actually -- the system complies with those

17    standards, and so for that purpose, using Rule 11(b)(3), they

18    cannot say that this fact is not disputed.  Let me tie it to

19    the exact language for you.  They cannot say to the best of

20    their knowledge, information, and belief that is formed after

21    reasonable inquiry under the circumstances that their factual

22    contention has evidentiary support.  That is the -- those are

23    the highlights for Guy.  Let's talk about Ezell for a minute.

24          In Ezell, in facts 13 through 15, they set out

25    information relating to the classification of Mr. Andrews.

1    They cite only to an expert report.  In fact, this is
2    Mr. Myers's report, but their statement of those facts -- this
3    is -- there are some where -- and I want to be very clear
4    about this.  There are some statements they attribute to
5    Mr. Myers and they cite his report, but his report does not
6    say that at all.  There are reports where they mischaracterize
7    and misrepresent facts about his history.  One of them -- hold
8    on a second.

9         What number is the broomstick?

10        LAW CLERK:  Seventeen.

11        THE COURT:  They say that in 2016 Andrews assaulted an
12   inmate with a broom handle, resulting in his placement in
13   restrictive housing until August 30th, 2016.  The records from
14   this incident show that another prisoner hit somebody with a
15   broomstick.  Andrews was hit with a lock.  That was I think --
16   I'm editorializing.  I think that the lock was in a pillowcase
17   and another prisoner hit him in the face with the lock, but it
18   was because, I mean, he didn't -- it was attached to a belt.
19   It was not a pillowcase.  It was attached to a belt.

20        Facts 18 through 21.  These are facts to which again
21   they cite to an expert report, and that report does not
22   identify as Exhibit B the documents received and the document
23   that they cite -- that Mr. Myers cites is not included in the
24   documents that he reviewed, okay?  And I will note the
25   discrepancy between Mr. -- let me give you the exact cite.

1    Mr. Cranford's declaration today creates a discrepancy between

2    the preparation on that exhibit -- of that exhibit.

3              MR. HAWLEY:  I'm sorry.  The discrepancy of what?

4              THE COURT:  Of the exhibit.

5              MR. HAWLEY:  Okay.

6              THE COURT:  Let me think.  Let me go through it.  Hold

7    on a second.  We got that one.

8              Statement of fact 22.  On May 16th, 2018, after a

9    reclassification hearing, ADOC increased Andrews to medium

10   custody at a security level of five due to his repeated

11   violent behavior and on June 12th, 2018, transferred Andrews

12   to St. Clair.  The statement -- this again cites to Mr. Myers'

13   report.  Mr. Myers' report does not identify the reason for

14   the change in his custody.  The statement of fact says that it

15   was due to his repeated violent behavior.  I'm going through

16   them and ignoring the ones that could be cite-related.

17             There are little things like, for example, Mr. Myers

18   accurately reports that Mr. Andrews assaulted inmates on four

19   occasions between December of 2017 and April of 2018.  The

20   fact as presented to the court as being undisputed is that he

21   did it five times.

22             Statement of fact 29.  Caver called for assistance

23   over her radio and Correctional Officer Eric Garrett responded

24   from Q-Dorm.  The cite is Document 185-8 at 2.  That's what

25   they cite in support for that statement.  The cited exhibit

1    does not state that he was -- oh, I'm sorry.  I forgot to read

2    the part that's not true.  So they say Caver called for

3    assistance over her radio and Correctional Officer Eric

4    Garrett responded from Q-Dorm.  That is correct.  But they

5    also say, Q-Dorm is located in the same housing unit where he

6    was performing a security round at the time of the

7    altercation.  Just so you know, P and Q are separate housing

8    blocks that are separated by a hallway and they incidentally

9    require their own rover and cubicle officer, but there is no

10   evidence that he was doing a security round at the time of the

11   altercation.

12         Statement of fact 61.  The St. Clair Internal

13   Classification Board which consists of a captain or above, a

14   classification specialist, and a psychological associate or

15   mental health professional meets weekly and on an as-needed

16   basis to review housing assignments and determine the needs

17   and requirements of an inmate, including the custody level,

18   the programming, and the housing unit placement for St. Clair.

19   Plaintiffs do not dispute that they're required, and we add is

20   required to.  They don't say that there's a requirement, but

21   there is a requirement; and they say, yeah, they're required

22   to, but there's no evidence that they did that.  I mean,

23   effectively they cite to these policies and procedures and use

24   words like utilizes -- hold on -- which means, if you look it

25   up in Webster's Dictionary, uses is a derivative of uses, they

1    say ADOC utilizes the Ohio Risk Assessment System in its

2    facilities, including St. Clair.  This is cited to something

3    other than Mr. Myers's expert report, and I should note that

4    because of Mr. Myers's experience and education in using this

5    system he makes findings based on the assumption that

6    St. Clair uses that risk assessment system.  The problem is

7    that it's undisputed that housing assignments at St. Clair

8    were made largely on where there was available bed space.

9    They don't dispute that fact.  Moreover, the fact as -- the

10   undisputed fact as they write it says, also, that the ORAS

11   considers an inmate's security risk, disciplinary history,

12   mental health, and medical needs, programming, educational,

13   and vocational needs to place inmates into the

14   least-restrictive setting available while taking into account

15   the safety and security of the facility, staff, other inmates,

16   and the general public.  That is not on that document.

17          Here is another one where I'll let you decide whether

18   this is advocacy or misleading.  It is undisputed, according

19   to the defendants, that ADOC and St. Clair's classification

20   system complies with nationally accepted standards.  The

21   classification system that the defendants allege was in place

22   was not -- there is a dispute over whether it was actually

23   used, and they know that.

24          Those are the highlights from Myers' report, and when

25   you say -- and I hear you, and so there you go; there is your

 1    notice, but I will say this.  Once we realized this issue,
 2    which was not the day that these things were filed.  It was
 3    last week because as you might imagine, you know, you have
 4    cases and you're like okay, I got to figure that out before
 5    discovery ends.  Well, I was up against a deadline.
 6    Plaintiffs had asked for a scheduling conference for the
 7    trial.  I had two very aggressive law clerks reminding me that
 8    we had to address the motions for summary judgment, so I put
 9    everything aside and we start digging in, and I think before
10    we realized what I would characterize to be gracious
11    statements on the part of the plaintiffs in identifying some
12    of the shortcomings and now we're ready and there was not a
13    big jump, so the fact that they -- that Mr. Cranford
14    represents that he's not really sure what I'm talking about
15    seems unbelievable to me.  I don't know how you cannot know
16    that.
17            You had the opportunity to review the plaintiffs'
18    response to your motion for summary judgment.  That contained
19    many objections.  Some of them you didn't want to discuss, so
20    you decided that you were going to take the hey, I'm going to
21    save space here.  I'm only going to cherry-pick what I
22    address.  Then you have a motion to strike and you double down
23    on these expert reports; you double down on them, and you're
24    saying to me, and I don't -- I'm not saying like you're -- I'm
25    saying you're suggesting to me oh, well, we looked at them

1    after we got your order to show cause.  That may have been the
2    first time that Ridgeland looked at them, but it's not the
3    first time.

4         There is not a lot of real estate in the area of what
5    other things could have happened and none of that land looks
6    pretty, but it's hard to believe that when they got my order
7    to show cause they had no idea what I was talking about.  They
8    are filing a declaration in the court this morning saying I
9    still -- I mean, what are you talking about?  Oh, wait, there
10   are problems with the citations, and that's -- you might
11   recall, Judge, we had a motion that we filed on a Tuesday and
12   you didn't get back to us until Monday, and also I know that
13   we didn't address the fact that we completely disregarded your
14   order and that any other reasonable attorney would have
15   presumed that they had to go forward without sealing those
16   documents given what they knew about their prior experience.
17   So there is your notice.

18        Here is what I would like to do.  I would like the
19   metadata to review in-camera of all of the expert reports, the
20   metadata for the motions for summary -- the briefs on the
21   motions for summary judgment and the replies and the motion to
22   strike.  I reserve the right to ask for email correspondence
23   between the attorneys on those matters.

24        I know that you said that you do not do prison
25   litigation.  Have you ever handled a 1983 action?

1        MR. HAWLEY:  Years ago.

2        THE COURT:  Okay.

3        MR. HAWLEY:  And the only ones perhaps when I was a

4   federal court law clerk.

5        THE COURT:  Right.  Yeah.  But you remember it because

6   it was such a joyful occasion.  Here is the issue with the

7   proposal that they get the opportunity to refile their motion.

8   First of all -- and you had no way of knowing this, and I do

9   appreciate this, but Mr. Cranford sure did, and I assume that

10  they talk amongst themselves before they act.  Plaintiffs had

11  the same exact problems with CM/ECF as Mr. Cranford identifies

12  in his declaration.

13       Mr. Cranford, would you please tell your attorney what

14  you did when the plaintiffs filed part of their submission

15  and/or their brief at 12:04 the following morning.

16       MR. CRANFORD:  Your Honor, we filed a motion to

17  exclude, but at the time I don't believe -- this is my best

18  recollection.  I don't believe I knew what the circumstances

19  were.

20       THE COURT:  Okay.

21       MR. CRANFORD:  It was filed late and we filed a motion

22  to --

23       THE COURT:  It was like barely late, right?  Will you

24  agree with me on that?  And you wanted me -- you wanted me to

25  strike their opposition and enter summary judgment in your

1    favor, right?

2            MR. CRANFORD:  I can't recall exactly what the motion

3    said, but, yes, we moved to strike the opposition.

4            THE COURT:  Okay.  Thank you.  You can sit down.  The

5    motion for summary judgment.  The plaintiffs' complaint I

6    think in both of these cases were around 300 pages each.  They

7    amended the complaint.  I don't even -- was it 150 pages and

8    300-and-something allegations?  They were not complaints; they

9    were novels.  It made it extremely difficult to go through the

10   evidence.  We held a hearing on the motion to dismiss in hopes

11   that that would clarify it.  At the conclusion of that

12   hearing, I ordered rebriefing.  One of the things that I

13   mentioned then was that the defendants were asking me to

14   dismiss the case on the basis of qualified immunity, but they

15   did not establish that they were acting in their discretionary

16   function.  They pointed out to me that that was an allegation

17   in the complaint.

18           Your clients -- well, I'm getting ahead of myself as

19   far as the motion for summary judgment, but I will say that

20   the facility defendants support their claim -- they make a

21   bald assertion that they are entitled to qualified immunity

22   because they were acting in their discretionary function.

23   They cite to the complaint.  A complaint does not establish a

24   fact and it certainly does not satisfy their burden, however

25   extraordinarily low that it is.  Defendants cite my order, my

1    memo op, on the motion to dismiss.  In that -- let me pull it

2    up, please, so I'm -- I'm sorry.  The supervisory defendants.

3    Let me back up, please.

4        The complaints in both cases allege, not that they

5    were performing their discretionary function; they say they

6    were acting under color of law and within the scope of their

7    employment.  The burden that the plaintiff has to show is that

8    they were acting within their discretionary authority, which

9    means that they were doing what they were supposed to be

10   doing; that that was part of their job and that they were

11   doing it in a lawful manner, okay, and that's the defendants'

12   burden.

13       To satisfy that burden, your clients said -- they cite

14   to my memo op in their respective cases.  For an example, in

15   Guy in my memo op, which is at Document 84 in this case, I

16   cite the Eleventh Circuit's decision in Alocer and say that a

17   defendant asserting qualified immunity must show that he was

18   acting within the scope of his discretionary authority.  As

19   was sufficient at that stage of the proceedings, I noted that

20   the defendants asserted that they were acting in their

21   discretionary authority and that Ms. Guy did not challenge

22   that assertion, and I cite to her briefs.  So, in other words,

23   she wasn't saying you haven't satisfied your burden, and so I

24   left it as this is -- this is sufficient.  They now say --

25   without saying that they're judicially estopped, they now say

1    that that itself is sufficient basis to establish that they

2    are entitled to the defense of qualified immunity.  I

3    disagree.

4            Importantly, that fundamentally changes the roadmap

5    because if they were entitled, if they had satisfied their

6    very small burden of presenting evidence to support their

7    claim, something beyond the bald assertion that they were

8    acting within their discretionary authority, the burden would

9    have been on the plaintiff, and that burden is interesting

10   when it comes to summary judgment.  So they have to show first

11   that what they allege they violated, the defendants violated,

12   was a clearly established violation, right?  They got to -- we

13   typically view it as first, you have to show the

14   constitutional violation, but second, you do clearly

15   establish.  In a motion for summary judgment, they have to be

16   able to show first that what they're claiming they did was

17   clearly established because it's only then that they would go

18   forward and say as a practical matter, at least, and here is

19   the evidence that we have that entitles us to have a jury

20   determine whether that violation occurred.  Of course, they do

21   that using undisputed facts.  In this case, however, it was

22   the defendants' burden to show that they did not violate the

23   constitution.  To do that in their analysis, they take -- so

24   their brief is organized so that they say here is the law,

25   which is fine.  It was not for each defendant.  We'll talk --

1    I mean, at this point I'm used to being ignored.  They say,

2    okay, here is the law and now we're going to talk to you about

3    each separate defendant and we're going to say to you, oh,

4    they did not violate that law.

5           Let's take, for example, the commissioner or the

6    former commissioner.  The only evidence that they cite is his

7    deposition testimony.  That's not part of their undisputed

8    facts nor do they allege that his testimony undisputedly is

9    accurate, and importantly, the testimony is well, look at all

10   the things that I did, but there is no context to the things

11   that he did or the timing in which they did it.  So I'll give

12   you an example.

13          They have this CERT -- I'll call them CERT squad,

14   okay, and they are about 80 to 85 people that come in and help

15   the prisons out.  Most of the time during the relevant periods

16   in this case those CERT squads were used at St. Clair to fill

17   shift assignments, but in 2017 at some point that I do not

18   know, the CERT squad performed a contraband search at

19   St. Clair.  So I want you to keep in mind that their evidence

20   to support their claim that Commissioner Dunn was not

21   deliberately indifferent is well, in 2017, which even if they

22   did it on December 31st would have been at least ten months

23   before the Ezell death, Mr. Andrews's death, we looked for

24   contraband and then they say, and don't forget about Operation

25   Restore Order, which, by the way, was clearly named without

1    the use of an attorney because Operation Restore Order was a

2    multi -- statewide multiagency sweep of St. Clair to get rid

3    of the contraband at St. Clair, and they -- and Mr. Dunn

4    points to that.  Do you want to know when Operation Restore

5    Order happened?

6          MR. HAWLEY:  When?

7          THE COURT:  Two days after Mr. Mullins died.

8    Mr. Andrews died before Mr. Mullins.  That is their defense of

9    Mr. Dunn.  I know that you are only here for the purpose of

10   the order to show cause, and so we'll break and then we'll

11   come back for the motion for summary judgment, where I'll give

12   them more information on why they're not entitled to summary

13   judgment, but your proposal is not something that the Court is

14   willing to entertain given the fact that without the

15   undisputed facts they're still not entitled to summary

16   judgment.  Does that make sense to you?

17         MR. HAWLEY:  Your Honor --

18         THE COURT:  I mean, I think it would affect it -- no,

19   it wouldn't affect the motion for summary judgment.  It might

20   affect the motion to strike, although again, I would please

21   note for you that that was filed after -- that was filed on

22   the same day as plaintiffs filed their motion -- their

23   response to motion for summary judgment.  No?

24         MS. PIERCE:  No, Your Honor.  I believe it was one

25   week after, maybe, or a few days after.  It was the Friday

1    after we filed.  I believe we filed on a Monday.

2         THE COURT:  And that's where they doubled down on

3    their expert opinions being factually sound.

4         MR. HAWLEY:  Your Honor, the only thing that I would

5    say, if I may, in light of this information, which is almost

6    overwhelming, but interesting and helpful to me to understand

7    the underlying case and the current underlying issues would be

8    two things.  It sounds like your review that went through

9    paragraph by paragraph or allegation by allegation or

10   assertion by assertion that resulted in a spreadsheet of

11   inaccuracies is along the lines of what our independent team

12   did, and we found a lot of inaccuracies as I said earlier.

13   Earlier, I said it may be more than the Court knows.  In light

14   of what you just said, I'm not sure ours are any more numerous

15   than the ones you've cited, but I do think having you recite

16   all of that to us, and you said here is your notice, at least

17   gives us, the independent team, the non-litigation team, a

18   better sense of the extent of the errors.  And it sounds like

19   you want to proceed with summary judgment.  I understand.  I

20   heard you loud and clear, but I think it is that sort of

21   notice that you provided through that long recitation that

22   should allow someone to go back and say can these be

23   corrected.  I don't know if that results in a different motion

24   for summary judgment or something else, but time to analyze

25   that would be helpful to us.

1          THE COURT:  Okay.  I will be happy to give you that.

2     It will not change the summary judgment motions for the

3     substantive reasons that I pointed out.  I don't know if I

4     made this clear, and forgive me if I didn't, they don't cite

5     to their statement of undisputed facts in their analysis for

6     each defendant, so it's sort of -- it's unusual.  They have

7     these statements, but they don't refer back to them in their

8     analysis.  So the reason in fact-intensive cases that we do

9     something as onerous as this is because I need to completely

10    appreciate whether it is, in fact, undisputed and also be able

11    to say okay, yes, that is technically disputed, but that sort

12    of advocacy -- just for me to make my own assessment, so when

13    I'm reading the analysis I know which facts fly and which ones

14    don't.

15          MR. HAWLEY:  Yes.

16          THE COURT:  As you I'm sure are familiar with motions

17    for summary judgment and as an advocate, you don't usually get

18    ones that are inaccurate.  So it's more of an advocacy issue,

19    so that's the approach.  But because they don't rely on them

20    it does not affect the analysis for the motion for summary

21    judgment.

22          I will allow you more time to respond.  I will note

23    that I object to the characterization that your clients were

24    not on notice.  I appreciate that they waited a couple of days

25    before they called you, but they knew, or at least one of them

1    did.  I should say that.  One member of this team knew exactly

2    what I was talking about; and remind you that I wish to

3    inspect the facts -- the briefs in their entirety and the

4    reports and the metadata as part of my determination on any

5    sanctions that should be entered in this case.

6          I would also note, and I hesitate to raise this, I am

7    unsure given the suggestion that there was going to be a joint

8    submission by both parties whether -- and I note that all

9    parties signed on to the opposition -- I'm sorry.  All of the

10   parties in this case signed on to the motion to strike.  I

11   would like information on who drafted it, what input the

12   facility supervisors had in it.

13         MR. HAWLEY:  On the motion to strike?

14         THE COURT:  Correct.

15         MR. HAWLEY:  Okay.

16         THE COURT:  And whether they reviewed it in its final

17   form prior to its filing.

18         MR. HAWLEY:  Your Honor, with respect to those

19   metadata and other related submissions, do you care whether

20   outside counsel submit those to the court or whether they are

21   submitted by the litigation counsel with carbon copies to

22   outside counsel?

23         THE COURT:  Mr. Hawley, if we are at a place where I

24   cannot even rely on their counsel, I'll have to hang up my

25   robe.

1    MR. HAWLEY:  Okay.  That's my preference too.  I just

2    don't want to have to learn --

3    THE COURT:  But I do believe that you should to the

4    extent that that -- well, let me say this.  I would like them

5    to email that information to you all and then you should

6    forward it promptly to me.

7    MR. HAWLEY:  I'm just trying to make sure I understand

8    my role going forward.  So thank you.

9    THE COURT:  Thank you.  All right.  Let's meet back at

10   two for the motion for summary judgment.

11                   (A recess was taken.)

12   THE COURT:  All right.  We're continuing in the

13   hearings in Ezell and Guy.  At this stage, we are going to be

14   addressing the motions for summary judgment.  Let me just make

15   sure that this is connected to my system.

16   Mr. Bowman, I noted when Mr. Hawley asked if they

17   could first receive the metadata you sort of --

18   MR. BOWMAN:  Oh, I --

19   THE COURT:  And I don't take anything by that, but I

20   do think that it is appropriate for the purposes of the

21   record -- and to make clear to you, I appreciate that you're

22   coming into this late in the game.  I have had the privilege

23   of practicing alongside and presiding over cases involving

24   other attorneys at Butler Snow, and I have no reason to

25   expect -- to suspect, I should say, that they would not --

1    that they would violate their rules of professional

2    responsibility or misrepresented something to the court.

3            MR. BOWMAN:  I have no reason to doubt that, Judge.

4    I'm not a very good poker player, and I apologize if I was in

5    any way disruptive.

6            THE COURT:  You were not.  You were not.  And I hope

7    that Ms. Pierce has, also speaking of poker, told you --

8    warned you about my face.  Has she done that?

9            MR. BOWMAN:  She has not.

10           THE COURT:  Well, you need to talk to her about that.

11   It is terrible.  I'm aware of the problem.  I have my best

12   people on it.  It's been like that since I was born.  I am the

13   only person whose husband, instead of complaining about people

14   buying Botox, actually suggests that it's time for a refill

15   for me.  So do not infer anything by my face.  I'm told I

16   either look mean, mad or that I think you're stupid, and none

17   of those things apply.  That's just how God made me.

18           MR. BOWMAN:  Understood.  And -- and it's obviously an

19   in-camera review.  We get that.

20           THE COURT:  All right.  We have two motions for

21   summary judgment, one is Guy; one is Ezell.  I think before we

22   proceed with those motions I do want to reiterate that in

23   support of the motions for summary judgment in both cases both

24   the facility defendants and the supervisor defendants asserted

25   that they were acting in their discretionary authority.  The

1    only evidence that the facility supervisors cite is the

2    complaint.  That is not evidence that the Court can consider

3    at this juncture, according to Rule 56, and that therefore

4    does not sustain the burden of proving or establishing that

5    you were acting in your discretionary authority.

6           The supervisory defendants went a step further.  They

7    said -- they cite to my memo op, which as I explained

8    previously recognized that the defendants made the bald

9    assertion that they were engaged in a discretionary function

10   and that the plaintiffs did not claim otherwise.  In fact, you

11   alleged as part of your complaint that they were acting in

12   their discretionary function.  Again, because we don't rely on

13   allegations in a complaint at this stage of the proceedings

14   and in the absence of anything other than -- and, of course, I

15   want to note that the allegations in the complaint were

16   different from, or I should say did not contain facts that

17   would have satisfied the defendants' burden.  The parties have

18   not established that they are -- they acted in their

19   discretionary function and therefore are not entitled to

20   assert a defense of qualified immunity as part of their motion

21   for summary judgment.

22          I am pretty sure I have reviewed a substantial portion

23   of the record in this case and the evidence before me.  I

24   believe that I have previously indicated that the failure to

25   present proof of qualified immunity at a certain stage -- I'm

1    sorry.  The failure to satisfy your burden of proving you were

2    acting in a discretionary authority at a certain stage in

3    litigation does not waive your ability to raise that at a

4    later stage, but again for our purposes now, the burden of

5    proof for the allegations in the complaint are analyzed under

6    the traditional burden-shifting analysis so that the

7    defendants have to establish that they have -- that they are

8    entitled as a matter of law to a judgment in their favor on

9    these counts.  That applies, of course, only to the claims

10    that are made under 1983.

11         With respect to the state law claims, the defendants

12    claimed state agent immunity.  They have a similar burden to

13    establish that they're entitled to state agent immunity for

14    those counts and they similarly failed to sustain that burden,

15    and so those claims as well will be considered as though they

16    are Joe Q. Public and have the burden of establishing they're

17    entitled to judgment as a matter of law on those counts.

18         With that in mind, it's defendants' motion.  Who wants

19    to proceed?

20         MR. LUNSFORD:  Your Honor, I can speak to any

21    questions you might have or any particular issues you would

22    like us to address with regard to our motions or if you want

23    me to discuss the qualified immunity issues.

24         THE COURT:  No.  Let's go through your argument that

25    Mr. Dunn did not violate Mr. Mullins's constitutional right to

1    be free of cruel and unusual punishment.  I think I've already

2    kind of highlighted that one previously, but for purposes of

3    this record I do want to reiterate that the only evidence that

4    you include as part of your analysis; in other words, you cite

5    out what the law is and then you state "and we did not do

6    that" --

7            MR. LUNSFORD:  Right.

8            THE COURT:  -- and the only -- the only information

9    that you included in that analysis was the deposition

10   testimony of Mr. Dunn which cited to some things that he has

11   either successfully implemented or attempted to implement but

12   without any reference to the time these changes were made, and

13   so that doesn't close the loop.

14           I mentioned it earlier, and I'm trying to be brief,

15   because I'm not going to enter -- I'm not going to give you a

16   memo op on this because there's just not time to do it at this

17   point.  I will be relying on our statements here today for any

18   appellate purposes.  You point to the fact that at some point

19   in 2017, some point unknown, there was a contraband search at

20   the prison and then two days after the last of these two

21   deceased prisoners' deaths ADOC along with a statewide law

22   enforcement agency -- multiagency group executed Operation

23   Restore Order which was for the purposes of searching and

24   retrieving contraband.  Do you have anything else you want to

25   add?

1          MR. LUNSFORD:  Your Honor, nothing other than I would

2    say with regard to -- we started with Commissioner Dunn, and I

3    think that's where the court started with this discussion.

4    But with regard to Commissioner Dunn, we believe his analysis

5    and Mr. Ellington's analysis is different because they were

6    not assigned to/at the facility there on a day-to-day basis,

7    and therefore with regard to those particular individuals,

8    this would fall into the inaction category that the Wade

9    decision discusses; that the allegation is not that these

10   individuals did something to cause the unfortunate death of

11   Mr. Mullins or Mr. Andrews, but that -- that they did

12   something to cause it, but they -- it was the failure to act.

13   And so obviously our goal when we submit a summary judgment is

14   to point to what our clients did that the plaintiffs can't

15   stand on the bald assertion that our clients did zero to

16   improve conditions at St. Clair.  Most of the allegations from

17   plaintiffs come down to the things that Commissioner Dunn and

18   Mr. Ellington did were not as effective or, in the plaintiffs'

19   opinion, they weren't effective in achieving some improvement

20   or result.

21          THE COURT:  Well, hold on.  Let's remarry ourselves to

22   a couple of things.  First of all, it's your burden.

23          MR. LUNSFORD:  Understood.

24          THE COURT:  We're not talking about what they gave.

25          MR. LUNSFORD:  Understood.

1        THE COURT:  And I'll note, and thank you for bringing

2    this up or I would have forgotten, nobody challenges.  None of

3    the defendants challenge the first step of the

4    deliberate-indifference analysis, which is was there a

5    substantial risk of serious harm.  So we -- so our sole

6    analysis is did you actually know about the substantial risk

7    of serious harm and, for purposes of your motion, did you

8    respond in a reasonable way, which is to say we agree, or I

9    hope we would, that it is criminally reckless to do nothing,

10   right?

11       MR. LUNSFORD:  I mean, that's pretty broad.  I

12   think if you know of a risk, a substantial risk of harm and

13   doing nothing, yes, I think in most instances depending on

14   their role.  If the person didn't have the authority to do

15   anything, then you could argue it's not criminally reckless,

16   but as a general matter I understand what you're saying.

17       THE COURT:  You're not asserting that Mr. Dunn didn't

18   have the authority to do what he needed to do, are you?

19       MR. LUNSFORD:  I'm saying Mr. Dunn --

20       THE COURT:  I don't see that in your motion.

21       MR. LUNSFORD:  Mr. Dunn didn't know anything about

22   this incident.  He didn't know anything about the facts or

23   circumstances leading to the death of Mr. Mullins.

24       THE COURT:  Okay.  That is something that we probably

25   should also make clear.  I'm sorry I didn't.  I saw some -- I

1    got a taste of this in your motion, but I did not appreciate

2    that your argument is that Mr. Dunn needed to know about the

3    substantial risk of harm to Mr. Mullins.

4         MR. LUNSFORD:  So, Your Honor, if I could, this is

5    from -- directly from Wade, which is 106 F.4th 1251, and this

6    is at page -- it's the last paragraph right before the

7    beginning of page 1262, and it's the conclusion.  For all

8    these reasons, we hold that in order to show that a defendant

9    acted with, quote, subjective recklessness as used in the

10   criminal law, and it cites the Farmer versus Brennan, a

11   deliberate-indifference plaintiff must demonstrate that the

12   defendant was actually aware that his own conduct caused a

13   substantial risk of serious harm to the plaintiff.

14        THE COURT:  Right.

15        MR. LUNSFORD:  And so our general position on that law

16   as we understand the way Judge Newsom wrote it was that a

17   generalized risk to a generalized group of people is not

18   sufficient.  A generalized understanding that if I don't do X

19   then Y might occur is not sufficient.

20        THE COURT:  Well, let me stop you there.  I don't

21   think that the plaintiffs argue that something might occur,

22   and I'll remind you, also -- let's start with Wade.  Wade does

23   not represent a seismic shift in the deliberate-indifference

24   standard, okay, with respect to failure to protect claims.  It

25   doesn't.  That case is about constitutional violations related

1    to medical care and treatment.  There is a divergence -- there

2    was a intracircuit split over whether -- what level of

3    negligence was required for those types of claims.  With a

4    failure to protect claim, I will not be so bold as to say that

5    there does not exist a case that uses mere negligence or

6    something anywhere short of more than gross negligence before

7    a violation is found.

8         I appreciate and understand the language of Wade.  I

9    considered it very carefully.  I'll ask you, please, to define

10   for me the difference between something that goes beyond

11   gross -- more than gross negligence and criminal recklessness.

12        MR. LUNSFORD:  I don't -- I don't know that I've

13   necessarily researched that to a point where I could provide

14   you with what I would deem an adequate definition.  I would

15   say that Wade certainly defines the term criminal recklessness

16   as used by the court in that decision.

17        THE COURT:  Uh-huh, that they knew that there was a

18   substantial risk of serious harm and they did not respond

19   reasonably to it.  You have actual knowledge -- let me --

20        MR. LUNSFORD:  Your Honor is doing a fine job of

21   paraphrasing the language I'm looking at right now.  So, yes,

22   I would agree with you.

23        THE COURT:  So they actually knew what was going on.

24   Now, so they actually knew that there was a substantial risk

25   of serious harm.  You want me to go one step further and say

1    to Larry Mullins -- that's actually the Guy from U2 -- to --

2          MR. LUNSFORD:  Mr. Mullins --

3          THE COURT:  Mr. Mullins.

4          MR. LUNSFORD:  -- or Mr. Andrews.

5          THE COURT:  In order for Wade to apply to supervisory

6    liability claims, they would have had to have expressly

7    addressed that, right?  This goes more into your clearly

8    establish -- it doesn't matter whether you all violated.  They

9    can't establish that a violation -- that this was a violation

10   of clearly established law because it was criminally reckless

11   and that wasn't the standard at the time, and we can go on and

12   on for hours, indeed, about whether or not the standard is

13   different.  I mean, it clearly establishes that you knew that

14   you were violating the law when you did what you did.

15         MR. LUNSFORD:  Correct.

16         THE COURT:  Right?

17         MR. LUNSFORD:  Correct.

18         THE COURT:  To the extent that there has been a change

19   in that law, there is great question that I look forward to

20   hearing you all on, on whether or not we view it from the

21   perspective of the law as it is now or the law at the time of

22   the conduct, right?

23         MR. LUNSFORD:  I can see that question.

24         THE COURT:  Okay.  And I'm sorry.  I try -- I'm trying

25   to be very intentional so that I'm not giving the plaintiffs

1    arguments that they may not have thought of, so I thought we

2    could start at a space that we may not be able to start at.

3        MR. LUNSFORD:  No.  I think that's fine, Your Honor.

4        THE COURT:  But Wade deals with direct individual

5    liability.  Your clients are being held -- are being -- the

6    plaintiffs claim that I should hold your clients individually

7    liable for their supervisory actions, and there is nothing

8    that suggests that they have to know exactly about the

9    particular prisoner.  I think, and I don't want to get ahead

10   of myself; and maybe I'm wrong, and if the plaintiffs will

11   share with me a scale of one to ten how wrong I am, I

12   understand that they're alleging you knew that nobody was

13   following the policies and procedures that were in place.  You

14   knew that.  You actually knew that and you didn't do anything.

15   Your response I read as hold on a second; yeah, we did.  I

16   read your response as saying we knew there was a substantial

17   risk of serious harm; we're not disputing that, and we would

18   be deliberately indifferent except that we responded in

19   reasonable ways and that reasonable -- the response is judged

20   from a reasonableness standard, right?

21       MR. LUNSFORD:  It's a totality of the circumstances,

22   yes, argument.

23       THE COURT:  Correct.  And you've come to me in your

24   briefs and you've said, Judge, we were responsible.  I mean,

25   that's your argument in your brief is hold on a second; we

1    were responsible.  Look at all the stuff we did.

2            MR. LUNSFORD:  Agreed.  We certainly made that.

3            THE COURT:  And you cite to me his deposition

4    testimony.  Do you agree with me that his testimony does not

5    establish that he was doing these things when Mr. Mullins or

6    Mr. Andrews was in the prison?  Let's say six months; let's

7    say nine months.  There is nothing in that testimony that says

8    that, is there?

9            MR. LUNSFORD:  Well, there are some dates.  There are

10    some time frames, and I --

11            THE COURT:  You need to be confined to your brief.

12            MR. LUNSFORD:  Right.  Understood.  But, for example,

13    we talk about the prison construction projects, which was a

14    major undertaking.

15            THE COURT:  You don't cite that.  Oh, I think you do,

16    but -- okay.  So you're saying well, what we did is we tried

17    to build a new prison?

18            MR. LUNSFORD:  That's certainly part of it, yes,

19    ma'am.

20            THE COURT:  Okay.  And you think that given the

21    situation at hand that was reasonable to protect the inmates

22    from a substantial risk of serious harm.  When did you start

23    building the prison?

24            MR. LUNSFORD:  Well, Commissioner Dunn started the

25    effort to obtain the money from the legislature long before it

1    was approved.  In fact, he testified -- his testimony is that

2    one of the first things he did was realize that the

3    infrastructure needed improvement.

4         THE COURT:  I know.  Right.  But, I mean, the

5    infrastructure here needs improvement.  I realized that the

6    first day that I came here.  There are also major problems

7    with this building, right, and we are all working very hard to

8    get it fixed, right, but we have to fix the problems that we

9    have with it.  We have to put Band-Aids on those issues until

10   we get money, and we just can't just say well, hold on; one

11   day we're going to get money for this.

12        MR. LUNSFORD:  I understand, Your Honor.  And he also

13   testified about things that were done, and this is where -- I

14   mean, I think some of this goes with --

15        THE COURT:  Look at your brief and tell me what is

16   cited there.

17        MR. LUNSFORD:  And there's a reference to locks, the

18   lock project that was undertaken.

19        THE COURT:  Mr. Lunsford, do you remember your

20   argument in Pilcher?

21        MR. LUNSFORD:  Yes.

22        THE COURT:  Do you want to move on?

23        MR. LUNSFORD:  I mean, I'll be happy to move on, but

24   I'm just saying there were -- there were actions that were

25   taken, and I think in light of the court's analysis as to what

1    a reasonable response is it's appropriate and necessary in my
2    view to consider the person's role.  For example, is the
3    expectation for a commissioner?
4           THE COURT:  Is that for me to decide as a matter of
5    law?
6           MR. LUNSFORD:  I think it's -- I think the question
7    is, is what's a reasonable response for a commissioner?  Is
8    the reasonable response of a commissioner the same as it is
9    for a frontline correctional officer?
10          THE COURT:  Am I the person that has to decide that?
11          MR. LUNSFORD:  I think -- I think you can't --
12          THE COURT:  As a matter of law, I can't.
13          MR. LUNSFORD:  Okay.  I understand.
14          THE COURT:  You know that.
15          MR. LUNSFORD:  I understand.
16          THE COURT:  I mean, come on.  Can we just actually be
17   real and be honest.  You know that I cannot as a matter of law
18   say that what they did was reasonable under the circumstances.
19   There is -- there are factual disputes about that.  That is
20   the stuff that trials are made of.  Why are we talking about
21   that?
22          MR. LUNSFORD:  Okay.  I understand.
23          THE COURT:  All right.  Next up.
24          MR. LUNSFORD:  That really incapsulates the arguments
25   for Mr. Dunn and Mr. Ellington, and obviously Warden Jones is

1    in a different situation because she's on-site.  And then I

2    believe I'm a little bit confused on the status of Christy

3    Vincent.  She was somebody I'm not sure if you guys are still

4    pursuing a claim against or not.  And then there's

5    Mr. Culliver as well, but generally --

6              THE COURT:  Mister who?  Sorry.

7              MR. LUNSFORD:  Mr. Culliver.

8              THE COURT:  Yeah.  Well, he's still in here.

9              MR. LUNSFORD:  Right.

10             THE COURT:  I'm not sure if Ms. Vincent is out and I

11   don't remember -- was that part of the settlement?

12             MS. PIERCE:  No, no settlement, Your Honor, but we

13   agreed to dismiss -- yes.  Sorry.  We agreed to dismiss Ms. --

14             THE COURT:  Oh, okay. All right.  Sorry.  I didn't

15   mean to mischaracterize how she left.

16             MR. LUNSFORD:  But, Your Honor, that's -- beyond the

17   briefs that's essentially the argument, Your Honor,

18   incapsulated.  A lot of our argument as you indicated is

19   focused on the reasonableness of the response.

20             THE COURT:  And you can see that that's a factual

21   issue.

22             MR. LUNSFORD:  I understand.

23             THE COURT:  Okay.  Well, that was quick and painless.

24   It's not the way that you wanted it to work out, and I get

25   that.

1    MR. LUNSFORD:  Your Honor, let's just be clear, and I

2  want to say this to Your Honor, nothing about what has

3  happened here is about the way I want it; nothing, and I'm

4  very sorry.  I'm sorry to the plaintiffs' counsel; I'm sorry

5  to the court.  You know, these are the types of things we work

6  for decades to avoid, and I am very sorry.

7    THE COURT:  I appreciate that.  All right.  Who's up?

8  Mr. Hill.

9    MR. HILL:  Yes, Your Honor.

10    THE COURT:  How are you?

11    MR. HILL:  Doing well.  I don't think I have very much

12  to say.  I'm here on the summary judgment briefs that were

13  filed by the Capell & Howard defendants in the Ezell and in

14  the Wills case.  I've been listening to Your Honor today, and

15  I don't intend to argue with the court and I think I

16  understand what you've said.  Obviously, you've put a lot of

17  work into this and your staff has as well.  So, with all of

18  that said, we would be happy to rest on all the briefs that

19  have been provided thus far to the court and be done with our

20  portion unless there's something that the court wants -- wants

21  me to cover and to hear right now.

22    THE COURT:  Do you agree that the determination of

23  whether your clients responded reasonably is a question for

24  the jury?

25    MR. HILL:  If the question of whether my clients

1    responded --

2          THE COURT:  Reasonably.

3          MR. HILL:  -- reasonably is a question for the jury?

4          THE COURT:  Yes.

5          MR. HILL:  No.

6          THE COURT:  Okay.  Then I do need you to argue it.

7          MR. HILL:  Okay.  Well, we would have to go back to

8    square one, I believe, but in the interest again of -- I mean,

9    are you asking me do we still agree with the basis for our

10   motions for summary judgment?

11         THE COURT:  No.  I think it's a little bit different.

12   Let me --

13         MR. HILL:  Because I don't -- again, if you're asking

14   me in retrospect with the benefit of hindsight or if -- I'm

15   not sure what you're asking.

16         THE COURT:  So as I've mentioned, it's your burden now

17   to prove that you did not violate these defendants'

18   constitutional rights or, I'm sorry, these prisoners'

19   constitutional rights.

20         MR. HILL:  Yes.

21         THE COURT:  And in your briefs, for example, with

22   Ragsdale, you said that he moved Mullins to P-36 at 8:53 to

23   separate him from the assailant that Mullins did not identify

24   and there is no evidence thereafter that Ragsdale and Mullins

25   had any further contact.  Oh, this is on the retaliation

1    claim; excuse me, and they -- please forgive me.  They do not

2    survive because I do not believe that even in a light most

3    favorable to the plaintiff the evidence creates a triable

4    issue as to whether Ragsdale moved Mullins for the purpose of

5    retaliating for reporting the assault, and because the

6    evidence is limited -- is so limited I'm not sure that you've

7    established -- well, hold on a second because that goes back

8    to whether you established the violation.  So then we have to

9    ask you if you have -- what evidence did you present to the

10   court to establish that Mr. Ragsdale did not retaliate against

11   Mr. Mullins by moving him to P-36.  Is that an appropriate

12   summary of the claim that you have against Mr. Ragsdale,

13   Ms. Pierce?

14        MS. PIERCE:  Yes.  Yes, Your Honor, we allege that Mr.

15   -- well, we believe that there is evidence for a jury to

16   decide that Mr. Ragsdale -- it's undisputed that Mr. Mullins

17   engaged in protected speech and then Mr. Ragsdale took adverse

18   action against him by leaving him in general population with

19   his accuser or with his attacker when he knew that individuals

20   who reported assaults were likely to be retaliated against.

21        MR. HILL:  So the question is in the Wills case in the

22   retaliation part we're asking about the specific fact inquiry

23   about the reasonableness, and our argument is in the brief.

24        THE COURT:  I'm sorry, Mr. Hill, and that is

25   completely 100 percent my fault.  I have completely messed you

1    up.  It's not about deliberate indifference.  It's whether or

2    not Mr. Ragsdale retaliated against Mr. Mullins when -- for

3    Mr. Mullins' complaint, and in each of these cases you argued

4    causation, that the plaintiffs had not established that the

5    complaint caused the next action your defendants took.

6         MR. HILL:  Yes, Your Honor.  All that I would say is

7    that -- as we have said is that at 6:01 Ragsdale learned from

8    another correctional officer that Mullins was assaulted by an

9    unknown inmate and requested placement in a one-man cell; that

10   he questioned Mullins, but Mullins couldn't identify who had

11   assaulted him because it was too dark in his cell.  Still

12   Ragsdale moved Mullins to cell P-36-1A at 8:53 a.m.; that

13   Ragsdale had no further interaction with Mullins, and

14   according to his shift roster, he did not work the following

15   day, so at 8:53 that was the last contact he had with him

16   before the assault at 5:45 p.m. later that day, almost that

17   evening.

18        THE COURT:  That's fair.  Okay.  Ms. Pierce, what do

19   you have to say about causation?

20        MS. PIERCE:  I think there is ample evidence that --

21   both at St. Clair and generally in correction facilities that

22   individuals who report sexual assaults or attacks are

23   retaliated against.  This is well known and it was known at

24   St. Clair, and he was -- Mr. Ragsdale knew he had an

25   obligation to put someone making that type of complaint into

1    protective housing.  He decided not to do so in direct

2    response to the complaint made by Mr. Mullins.

3           THE COURT:  What is your evidence that he did it in

4    direct response to the complaint?  I mean, I get -- first of

5    all, for these claims we're not talking about the world; we're

6    talking about what's happening at St. Clair, okay?  And what

7    evidence do you have that creates the inference that because

8    of Mr. Mullins' complaint or reporting the sexual assault

9    Mr. Ragsdale moved Mr. Mullins?

10           MS. PIERCE:  And, Your Honor, I believe the

11    plaintiffs' burden is slightly different.  We have to show

12    that there is protected speech and then that there is an

13    adverse action taken --

14           THE COURT:  Because of that speech.

15           MS. PIERCE:  -- in response then the burden shifts to

16    the other side to show that there is a legitimate penological

17    interest supporting the decision that they made to leave him

18    in general population.  There is no such interest here.

19    They -- they actually contravened their own policies and rules

20    about where to put someone who had reported an assault.

21           THE COURT:  And can you give me a case for that one?

22           MR. HILL:  Are you talking to me or to the plaintiffs'

23    counsel?

24           THE COURT:  Plaintiffs.  Sorry.

25           MS. PIERCE:  Off the top of my head, I cannot.  I

1    apologize.  I know it is either in our briefing or in

2    defendants'.

3            THE COURT:  Okay.  All right.  Let's hold off on that.

4    I'll do a paper order on the retaliation claims because I --

5    so I will not rule today on the retaliation claims.  What

6    about the wrongful death claims?

7            MR. HILL:  Well, I heard Your Honor say that for the

8    reasons -- and we're talking about both Wills -- Wills and

9    Ezell right now, correct, for both cases?

10           THE COURT:  We can.  It might be cleaner to limit it

11   to Mullins right now, please.

12           MR. HILL:  So we're on Wills versus Dunn; is that

13   right?

14           THE COURT:  Yes.  Sorry.

15           MR. HILL:  Okay.  Well, we -- we made those arguments

16   in our brief.  Is the question then about whether, I mean, we

17   agree or are there things that we can talk about in our

18   argument about the state agent immunity that would be helpful

19   to the court or is that -- is that an issue that's already

20   been resolved to the court?

21           THE COURT:  That issue has been resolved.

22           MR. HILL:  Okay.

23           THE COURT:  Did you argue anything other than that

24   they were entitled to state agent immunity?

25           MR. HILL:  No, we did not.

1    THE COURT:  Okay.  All right.  That's fair.  Then

2    those claims will proceed to trial and I'll get back to you on

3    the retaliation, and that's sort of the -- that's on me.  I

4    need to look further into the retaliation claim and the

5    burden-shifting analysis.

6    MR. HILL:  Sure.  I just want to make sure that I -- I

7    mean, that is our argument and that is your ruling, so unless

8    there is something else I can provide, that's -- that's good

9    with me.

10    THE COURT:  Okay.  Great.  Thank you.

11    MR. HILL:  And the same is true in both Guy and -- I'm

12    sorry; in Wills and in Ezell is -- what I'm saying just for

13    the record is that we would fall back on the arguments we made

14    in our briefs and we stand by those arguments.  However, we

15    have learned a lot today and -- but we -- we stand behind the

16    briefs.  If the Court does allow these defendants to amend

17    their briefs, we would just request that we be allowed the

18    same opportunity.  But if that is not the case, we will just

19    rest on what we filed with the court.

20    THE COURT:  Okay.  Thank you so much.

21    MR. HILL:  Thank you, Judge.

22    THE COURT:  Mr. Lunsford, Mr. Ezell.  No.  Yes.  No.

23    Mr. Andrews.  Sorry.

24    MR. HILL:  Does that cover everything that we have?

25    THE COURT:  It does.  It does.

1          MR. LUNSFORD:  Your Honor, I don't think I have

2     anything to add.  I think the analysis is -- I mean, obviously

3     there's a separation of facts because in this -- let's see.

4     We're switching to Ezell, and Ezell it's a slightly different

5     case because there wasn't -- there was not a series of

6     incidents that led up to or the day of.  It does seem to be an

7     incredibly random act that occurred in a cell, and so for

8     the -- really, based on some of the same things we think in

9     terms of the risk of that happening and gauging that risk it's

10    a very -- it is very different as it pertains to risk.  I

11    don't want you to take anything I said earlier that they're

12    the same case because they're certainly not.

13         THE COURT:  Okay.  Thank you.

14         MR. LUNSFORD:  But I don't have anything further to

15    add.

16         THE COURT:  Thank you.  Can I ask you a question?  I

17    do want to hold you to it, so I'll give you a minute to think

18    it through.  Is it fair -- when the rubber meets the road,

19    your argument -- maybe I should have taken a minute to think

20    about it first.  When the rubber meets the road, you win if

21    it's not clearly -- if you can establish it was not clearly

22    established at the time that these defendants --

23         MR. LUNSFORD:  That certainly is a path, yes, and one

24    of the better paths.  I would agree with that.  I think the

25    question that Ezell raises is how does a court evaluate what

1    is a substantial risk of serious harm when there is a single

2    incident that appears to be unprovoked out of the blue.

3         THE COURT:  Again, though, remind yourself -- that was

4    not well said.  Sorry.  I apologize for that.  Don't forget

5    that you're here for supervisor liability.

6         MR. LUNSFORD:  Correct.

7         THE COURT:  Okay.  All right.

8         MR. LUNSFORD:  Thank you, Your Honor.

9         THE COURT:  So I'm going to reserve -- oh, you can sit

10   down.  I'm going to reserve ruling on the retaliation claims,

11   but we'll get back to you shortly on those.  I'm going to deny

12   summary judgment on all other claims against the defendants,

13   and we will proceed to trial beginning on August 5th.  I think

14   that that concludes the hearing.

15        Oh, I'm so sorry.

16        MR. CHAPMAN:  I'm so sorry, Judge, just as things were

17   about to be wrapped up.  May I approach?

18        THE COURT:  Please.  Of course.

19        MR. CHAPMAN:  I was sent with a mission to get some

20   clarity as to when the court would like the -- any

21   supplemental response, if there is going to be one, and when

22   the court is expecting to receive the metadata.  Ideally,

23   they've asked for 14 days to respond, if that's acceptable.

24        THE COURT:  That is acceptable.

25        MR. CHAPMAN:  Thank you, Your Honor.  May I be

1    excused?

2         THE COURT:  You may.

3              (The proceedings were adjourned at 2:54 p.m.)

1                        C E R T I F I C A T E

2

3          I certify that the foregoing is a correct transcript to
    the best of my ability from the record of proceedings in the
4    above-entitled matter.

5          So certified on this date, June 24, 2025.

6

7

8

9    _____

10   B. Stone Arledge, RPR, CRR, CCR
    Federal Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25